No. 25-10453-G

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

**MARITZA REYES,**

Plaintiff-Appellant

v.

**FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")**

Defendant-Appellee

Appeal from the United States District Court
for the Middle District of Florida

No. 6:22-cv-1525-WWB-DCI

_____

**APPENDIX TO APPELLANT'S OPENING BRIEF**

_____

Maritza Reyes, *Pro Se*
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

***Reyes v. FAMU***, **Case No. 25-10453-G**

Pursuant to Rule 30(a) of the Federal Rules of Appellate Procedure and Rule 30-1 of the Eleventh Circuit Rules, the undersigned Plaintiff-Appellant, Maritza Reyes, respectfully submits this Appendix. As required, the tab numbers in the index below correspond to the original document numbers assigned by the U.S. District Court for the Middle District of Florida, Orlando Division, as noted on the district court docket sheet.

*Reyes v. FAMU*, Case No. 25-10453-G

# INDEX of APPENDIX

# DOCKET SHEET

| Date | Document | Tab |
|------|----------|-----|
| 5/9/25 | Docket in U.S. District Court for the Middle District of Florida, Orlando Division | A |

# PLEADINGS AND RELATED ORDERS

| Date | Document | Tab |
|------|----------|-----|
| 8/25/22 | Complaint and Demand for a Jury Trial and Permanent Injunctive Relief Requested | 1 |
| 9/1/22 | Order (*sua sponte* dismissing Complaint without prejudice) | 8 |
| 9/12/22 | Amended Complaint and Demand for a Jury Trial and Permanent Injunctive Relief Requested | 10 |
| 9/15/23 | Order (granting in part and denying in part Defendant's Opposed Motion to Dismiss Plaintiff's Amended Complaint as a Shotgun Pleading and to Strike Immaterial Allegations and Alternative Motion for More Definite Statement (Doc. 22)) | 30 |
| 10/09/23 | Second Amended Complaint, Demand for a Jury Trial, and Request for Permanent Injunctive Relief | 34 |
| 9/9/24 | Order (denying Defendant's Opposed Motion to Dismiss with Prejudice, or in the Alternative, Motion to Strike (Doc. 35)) | 94 |
| 9/23/24 | Defendant's Answer and Affirmative Defenses | 97 |

## ORDER APPEALED FROM AND JUDGMENT

| Date | Document | Tab |
|------|----------|-----|
| 1/10/25 | Order (granting Defendant's Motion for Summary Final Judgment (Doc. 76)) | 153 |
| 1/13/25 | Judgment in a Civil Case | 154 |

## OTHER ORDERS SOUGHT TO BE REVIEWED

| Date | Document | Tab |
|------|----------|-----|
| 6/20/24 | Order (denying Plaintiff's Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and *Daubert* Motions Deadline if Necessary (Doc. 51)) | 72 |
| 11/1/24 | Order (denying Plaintiff's Time-Sensitive [Opposed] Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102)) | 124 |
| 11/1/24 | Order (denying Plaintiff's Time-Sensitive [Opposed] Motion to Re-Open Discovery and Summary Judgment (Doc. 105)) | 125 |
| 11/4/24 | Order (denying Plaintiff's [Opposed] Motion to Strike Defendant's Affirmative Defenses (Doc. 112)) | 127 |
| 12/10/24 | Order (denying Plaintiff's Time-Sensitive [Opposed] Motion for Reconsideration of Court's Order Denying Plaintiff's Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 130)) | 144 |

## OTHER PRETRIAL ORDERS RELEVANT TO THE ISSUES ON APPEAL

| Date | Document | Tab |
|------|----------|-----|
| 11/1/24 | Order (denying Plaintiff's [Opposed] Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106)) | 126 |

## MOTIONS NOT SPECIFICALLY RULED UPON RELEVANT TO THE ISSUES ON APPEAL

**(pending motions were "terminate[d]" by Order granting Defendant's Motion for Summary Final Judgment (Doc. 153) or denied as moot**

| Date | Document | Tab |
|------|----------|-----|
| 11/19/24 | Plaintiff's Emergency [Opposed] Motion for Extension of Pretrial Deadlines | 131 |
| 11/26/24 | Plaintiff's Emergency [Opposed] Motion for Extension of Deadline to File Joint Pretrial Statement (denied as moot by magistrate judge on 1/9/25 (Doc. 152) after the passage of the time for the relief requested) | 133 |
| 11/27/24 | Plaintiff's Emergency [Opposed] Motion to File a Reply to Defendant's Response in Opposition to Plaintiff's Emergency Motion for Extension of Pretrial Deadlines (Doc. 134) ("Emergency Motion for Extension of Pretrial Deadlines") | 135 |
| 12/1/24 | Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement | 138 |
| 12/11/24 | Plaintiff's Time-Sensitive [Opposed] Motion for Court Case Management ("Motion for Case Management") | 145 |
| 12/18/24 | Plaintiff's [Opposed] Motion for Reconsideration of Court's Order Denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses ("Motion for Reconsideration") | 147 |

# ADDITIONAL FILINGS THAT WILL HELP THE COURT TO DECIDE THE APPEAL

| Date | Document | Tab |
|------|----------|-----|
| 7/29/24 | Plaintiff's Expert Workplace Mobbing Report – Dr. Kenneth Westhues | 81-1 (also at 74-1) |
| 8/12/24 | Plaintiff's Notice of Filing Recordings and Transcripts in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law**<br><br>** Plaintiff's record evidence was delivered to the District Court Clerk's Office for filing in the form of a USB drive. Because the size of the deposition transcripts, with all exhibits embedded, the surveillance videos, and the audio recordings exceeded the 50 megabyte limit that can be filed electronically through the Case Management/Electronic Filing System (EC/MF), the Clerk's Office instructed Plaintiff to deliver the materials to the Clerk's Office in an USB.<br><br>For this appeal, Plaintiff-Appellant contacted the Clerk's Office in the U.S. District Court for the Middle District of Florida to ascertain the procedure to forward the USB drive to the Eleventh Circuit Court of Appeals. The Clerk's Office responded that the Clerk in the Eleventh Circuit will request it. Plaintiff-Appellant contacted the Clerk's Office in the Eleventh Circuit, and they confirmed that they will request it once briefing is complete. | 86 |
| 9/3/24 | Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment | 92 |
| 10/2/24 | Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in | 102 |

| | | |
|---|---|---|
| | Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration | |
| 10/2/24 | Plaintiff's Time-Sensitive Motion to Re-Open Discovery and Summary Judgment | 105 |
| 11/15/24 | Plaintiff's Time-Sensitive Motion for Reconsideration of Court's Order Denying Plaintiff's Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("Motion for Reconsideration re Corrected Response and Declaration") | 130 |
| 11/15/24 | Exhibit 1 to Motion for Reconsideration re Corrected Response and Declaration ("PLAINTIFF'S DILIGENCE TIMELINE") | 130-1 |

## AFFIDAVITS

| Date | Document | Tab |
|---|---|---|
| 5/23/24 | Declaration of Plaintiff Maritza Reyes (in support of Plaintiff's Time-Sensitive Motion for Excusal from Mediation or Referral to Settlement Conference Before a United States Magistrate Judge) | 47-1 |
| 10/2/24 | Declaration of Plaintiff Maritza Reyes (in support of Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination) | 106-1 |

## HEARING TRANSCRIPTS

| Date | Document | Tab |
|---|---|---|
| 12/6/24 | Transcript of Motion Hearing (Doc. 51) Before the Honorable Daniel C. Irick, United States Magistrate Judge | 140 |
| 12/16/24 | Amended Transcript of Motion Hearing Re: [37] Defendant's Time-Sensitive Motion for Protective Order | 146 |

| | Precluding the Deposition of Dr. Larry Robinson Before the Honorable Daniel C. Irick, United States Magistrate Judge | |
|---|---|---|

## EXCERPTS AND FULL DEPOSITION TRANSCRIPTS

| Date | Document | Tab |
|---|---|---|
| 8/12/24 | FAMU College of Law Professor LeRoy Pernell (former Dean) | 86(3)(a) |
| 8/12/24 | FAMU College of Law Professor Patricial Broussard (Member of College of Law Retention, Promotion and Tenure Committee and representative of the College of Law in University Tenure and Promotion Committee) | 86(3)(b) |
| 8/12/24 | FAMU (former) President Larry Robinson | 86(3)(d) |
| 7/2/24 | Plaintiff Maritza Reyes | 75-3 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 15, 2025, I electronically filed the foregoing Appendix with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant-Appellee's attorneys.

/s/ *Maritza Reyes*

Tab A

APPEAL,CLOSED,MEDIATION

# U.S. District Court
# Middle District of Florida (Orlando)
# CIVIL DOCKET FOR CASE #: 6:22-cv-01525-WWB-DCI

| | |
|---|---|
| Reyes v. Florida A&M University Board of Trustees | Date Filed: 08/25/2022 |
| Assigned to: Judge Wendy W. Berger | Date Terminated: 01/13/2025 |
| Referred to: Magistrate Judge Daniel C. Irick | Jury Demand: Plaintiff |
| Case in other court: 11th Circuit, 25-10453 | Nature of Suit: 442 Civil Rights: Jobs |
| Cause: 28:1331 Fed. Question: Employment Discrimination | Jurisdiction: Federal Question |

## Plaintiff

**Maritza Reyes**                    represented by    **Maritza I. Reyes**
Maritza Reyes, ESQ.
P.O. Box 5102
Winter Park, FL 32793
305-308-8200
Email: mreyesclaim@gmail.com
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Florida A&M University Board of**          represented by    **Sarah P. L. Reiner**
**Trustees (FAMU)**                                   GrayRobinson, PA
301 E Pine St Ste 1400
Orlando, FL 32801
407/843-8880
Fax: 407/244-5690
Email: sarah.reiner@gray-robinson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Zolty**
GrayRobinson, P.A.
301 E. Pine Street
Suite 1400
Orlando, FL 32801
407-204-3195
Email: julie.zolty@gray-robinson.com
*ATTORNEY TO BE NOTICED*

**Richard E. Mitchell**
GrayRobinson, P.A.
Legal
301 East Pine Street
Suite 1400

Orlando, FL 32801
407-843-8880
Email: rmitchell@gray-robinson.com
*ATTORNEY TO BE NOTICED*

**Susan T. Spradley**
GrayRobinson, PA
301 E Pine St Ste 1400
Orlando, FL 32801
407/843-8880
Fax: 407/244-5690
Email: susan.spradley@gray-robinson.com
*TERMINATED: 08/12/2024*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/25/2022 | 1 | COMPLAINT against Florida A&M University Board of Trustees with Jury Demand (Filing fee $402 receipt number AFLMDC-19927837) filed by Maritza Reyes. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons)(Reyes, Maritza) (Entered: 08/25/2022) |
| 08/25/2022 | 2 | NEW CASE ASSIGNED to Judge Wendy W. Berger and Magistrate Judge Embry J. Kidd. New case number: 6:22-cv-1525-WWB-EJK. (SJB) (Entered: 08/25/2022) |
| 08/26/2022 | 3 | SUMMONS issued as to Florida A&M University Board of Trustees (FAMU). (SRD) (Entered: 08/26/2022) |
| 08/26/2022 | 4 | **ORDER of Recusal. Signed by Magistrate Judge Embry J. Kidd on 8/26/2022. (Kidd, Embry)** (Entered: 08/26/2022) |
| 08/26/2022 | 5 | **NOTICE TO COUNSEL AND PARTIES: The Middle District of Florida's revised Local Rules become effective February 1, 2021 and can be found on the Court's public website https://www.flmd.uscourts.gov/local-rules. For a just and efficient resolution of this case, the parties are DIRECTED to read and comply with the Middle District of Florida's Local Rules. See Local Rule 1.01(a). Failure to comply with ANY Local Rules or Court Orders may result in the imposition of sanctions including, but not limited to, the dismissal of this action or entry of default without further notice. Signed by Judge Wendy W. Berger on 8/26/2022. (RMF)** (Entered: 08/26/2022) |
| 08/26/2022 | 6 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (RMF) (Entered: 08/26/2022) |

| 08/26/2022 | 7 | Case Reassigned to Magistrate Judge Daniel C. Irick. New case number: 6:22-cv-1525-WWB-DCI. Magistrate Judge Embry J. Kidd no longer assigned to the case. (RPB) (Entered: 08/26/2022) |
|---|---|---|
| 09/01/2022 | 8 | **ORDER: The Complaint 1 is DISMISSED without prejudice. Plaintiff may file an amended complaint on or before September 8, 2022, to correct the deficiencies noted herein. Failure to timely file an amended pleading in compliance with this Order may result in the dismissal of this case without further notice. Signed by Judge Wendy W. Berger on 9/1/2022. (RMF)** (Entered: 09/01/2022) |
| 09/02/2022 |  | Set deadlines: Amended Complaint due by 9/8/2022 (KNC) (Entered: 09/02/2022) |
| 09/08/2022 | 9 | Time-Sensitive MOTION for Extension of Time to Amend re 8 Order to file amended complaint, by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. Modified on 9/8/2022 to edit docket text (KNC). (Entered: 09/08/2022) |
| 09/12/2022 | 10 | AMENDED COMPLAINT against Florida A&M University Board of Trustees (FAMU) with Jury Demand. filed by Maritza Reyes.(Reyes, Maritza) (Entered: 09/12/2022) |
| 09/15/2022 | 11 | **ENDORSED ORDER granting 9 Time-Sensitive Motion to Extend Time to File Amended Complaint, the Court will accept the 10 Amended Complaint as filed. Signed by Magistrate Judge Daniel C. Irick on 9/15/2022. (Irick, Daniel)** (Entered: 09/15/2022) |
| 12/06/2022 | 12 | NOTICE of Appearance by Richard E. Mitchell on behalf of Florida A&M University Board of Trustees (FAMU) (Mitchell, Richard) (Entered: 12/06/2022) |
| 12/06/2022 | 13 | Unopposed MOTION for Extension of Time to File Answer re 10 Amended Complaint by Florida A&M University Board of Trustees (FAMU). (Mitchell, Richard) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 12/06/2022) |
| 12/07/2022 | 14 | NOTICE of Appearance by Susan T. Spradley on behalf of Florida A&M University Board of Trustees (FAMU) (Spradley, Susan) (Entered: 12/07/2022) |
| 12/07/2022 | 15 | NOTICE of Appearance by Julie Zolty on behalf of Florida A&M University Board of Trustees (FAMU) (Zolty, Julie) (Entered: 12/07/2022) |
| 12/11/2022 | 16 | **ENDORSED ORDER granting 13 Unopposed Motion for Extension of Time. Florida A&M University Board of Trustees (FAMU) must respond to the Amended Complaint by 1/23/2023. Signed by Magistrate Judge Daniel C. Irick on 12/11/2022. (Irick, Daniel)** (Entered: 12/11/2022) |
| 01/04/2023 | 17 | RETURN of service on 11/18/2022 as to Florida A&M University Board of Trustees by Maritza Reyes (Attachments: # 1 Affidavit Additional Proof of Service of Process) (Reyes, Maritza) Modified on 1/4/2023 to edit docket text (KNC). (Entered: 01/04/2023) |
| 01/20/2023 | 18 | CERTIFICATE of interested persons and corporate disclosure statement by Maritza Reyes. (Reyes, Maritza) (Entered: 01/20/2023) |
| 01/20/2023 | 19 | NOTICE of a related action per Local Rule 1.07(c) by Florida A&M University Board of Trustees (FAMU). Related case(s): Yes (Spradley, Susan) (Entered: 01/20/2023) |

| 01/20/2023 | 20 | CORPORATE Disclosure Statement by Florida A&M University Board of Trustees (FAMU). (Spradley, Susan) (Entered: 01/20/2023) |
|---|---|---|
| 01/20/2023 | 21 | **WRONG PDF ATTACHED** CASE MANAGEMENT REPORT. (Spradley, Susan) Modified on 1/23/2023 to edit docket text (KNC). (Entered: 01/20/2023) |
| 01/20/2023 | 22 | First MOTION to Dismiss *Amended Complaint* by Florida A&M University Board of Trustees (FAMU). (Spradley, Susan) (Entered: 01/20/2023) |
| 01/20/2023 | 23 | CASE MANAGEMENT REPORT. (Spradley, Susan) (Entered: 01/20/2023) |
| 01/30/2023 | 24 | Unopposed MOTION for Extension of Time to File Response/Reply as to 22 First MOTION to Dismiss *Amended Complaint* , MOTION to File Excess Pages by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 01/30/2023) |
| 01/30/2023 | 25 | **ENDORSED ORDER granting in part and denying in part 24 Plaintiff's Unopposed (In Part) Motion to Serve Omnibus Response to Defendant's Motions. On or before 2/13/2023, Plaintiff must respond to Defendant's 22 Motion. Cause has not been stated to file a 30-page response to the 10-page 22 Motion, and Plaintiff's interpretation of Local Rule 3.01 is incorrect--Plaintiff is permitted a single 20-page response to the 22 Motion. Signed by Magistrate Judge Daniel C. Irick on 1/30/2023. (Irick, Daniel)** (Entered: 01/30/2023) |
| 02/13/2023 | 26 | **CASE MANAGEMENT AND SCHEDULING ORDER: Amended Pleadings due by 4/28/2023 Joinder of Parties due by 4/28/2023 Discovery due by 5/31/2024 Dispositive motions due by 7/2/2024 Pretrial statement due by 11/4/2024 All other motions due by 10/2/2024 Plaintiff disclosure of expert report due by 4/2/2024 Defendant disclosure of expert report due by 5/2/2024 Trial Status Conference set for 11/12/2024 at 10:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger. Jury Trial set for the December 2024 trial term commencing on 12/2/2024 at 09:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger. Conduct mediation hearing by 6/14/2024. Lead counsel to coordinate dates. Signed by Judge Wendy W. Berger on 2/13/2023. (RMF)** (Entered: 02/13/2023) |
| 02/13/2023 | 27 | CASE REFERRED to Mediation. Mediator: Travis R. Hollifield (KNC) (Entered: 02/13/2023) |
| 02/13/2023 | 28 | RESPONSE in Opposition re 22 First MOTION to Dismiss *Amended Complaint* filed by Maritza Reyes. (Reyes, Maritza) (Entered: 02/13/2023) |
| 08/15/2023 | 29 | NOTICE of Appearance by Sarah P. L. Reiner on behalf of Florida A&M University Board of Trustees (FAMU) (Reiner, Sarah) (Entered: 08/15/2023) |
| 09/15/2023 | 30 | **ORDER granting in part and denying in part 22 Motion to Dismiss. The Amended Complaint is dismissed without prejudice. On or before September 29, 2023, Plaintiff may file an amended pleading to correct the deficiencies noted in the Order. Signed by Judge Wendy W. Berger on 9/15/2023. (MDJ)** (Entered: 09/15/2023) |
| 09/18/2023 | 31 | NOTICE TO COUNSEL Maritza I. Reyes of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (AJS) (Entered: 09/18/2023) |

| | | |
|---|---|---|
| 09/25/2023 | 32 | Time Sensitive MOTION for Extension of Time to File Second Amended Complaint by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 09/25/2023) |
| 09/26/2023 | 33 | **ENDORSED ORDER granting 32 Time-Sensitive Unopposed Motion to Extend Time to File Second Amended Complaint. Plaintiff must file an amended pleading on or before 10/9/2023. However, the Court will not grant further extensions because Plaintiff failed to monitor her email account or had other work commitments, nor would the stated cause qualify as good cause to extend a CMSO deadline. See Fed.R.Civ.P. 16(b)(4). As with all pro se parties, the Court strongly encourages Plaintiff to obtain the assistance of counsel in this matter and cautions Plaintiff that she must comply with the rules and orders of this Court. Finally, Plaintiff is cautioned that a motion to extend a deadline does not toll the deadline at issue while the motion pends. Signed by Magistrate Judge Daniel C. Irick on 9/26/2023. (Irick, Daniel)** (Entered: 09/26/2023) |
| 10/09/2023 | 34 | SECOND AMENDED COMPLAINT against Florida A&M University Board of Trustees (FAMU) with Jury Demand. filed by Maritza Reyes.(Reyes, Maritza) Modified text on 10/10/2023 (LSS). (Entered: 10/09/2023) |
| 10/23/2023 | 35 | MOTION to Dismiss Plaintiff's Second Amended Complaint *with Prejudice or in the Alternative MOTION to Strike and Incorporated Memorandum of Law* by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah). Modified text and added event on 10/24/2023 (GL). (Entered: 10/23/2023) |
| 11/13/2023 | 36 | RESPONSE in Opposition re 35 MOTION to Dismiss Plaintiff's Second Amended Complaint *with Prejudice or in the Alternative Motion to Strike and Incorporated Memorandum of Law* MOTION to Strike filed by Maritza Reyes. (Reyes, Maritza) (Entered: 11/13/2023) |
| 05/07/2024 | 37 | Time Sensitive MOTION for Protective Order *Precluding the Deposition of FAMU President Dr. Larry Robinson* by Florida A&M University Board of Trustees (FAMU). (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Reiner, Sarah) Motions referred to Magistrate Judge Daniel C. Irick. (Chambers notified)- Modified on 5/7/2024 to edit docket text (AJS). (Entered: 05/07/2024) |
| 05/08/2024 | 38 | NOTICE of hearing on motion re 37 Time Sensitive MOTION for Protective Order *Precluding the Deposition of FAMU President Dr. Larry Robinson*. Motion Hearing set for 5/13/2024 at 11:00 AM via Zoom Video Conference before Magistrate Judge Daniel C. Irick. The parties shall file a joint notice three days before the hearing certifying ongoing conferral and stating which issues, if any, have been resolved. A Zoom link will be sent to counsel via email. (TNP) (Entered: 05/08/2024) |
| 05/10/2024 | 39 | NOTICE of compliance re 38 Notice of Hearing on Motion, 37 Time Sensitive MOTION for Protective Order *Precluding the Deposition of FAMU President Dr. Larry Robinson* by Florida A&M University Board of Trustees (FAMU) (Reiner, Sarah) (Entered: 05/10/2024) |
| 05/13/2024 | 40 | Minute Entry. Virtual Proceedings held before Magistrate Judge Daniel C. Irick: MOTION HEARING held on 5/13/2024 re 37 Time Sensitive MOTION for Protective Order *Precluding the Deposition of FAMU President Dr. Larry Robinson* filed by Florida A&M University Board of Trustees (FAMU). (Digital / Zoom) (TNP) (Entered: 05/13/2024) |

| | | |
|---|---|---|
| 05/13/2024 | 41 | **ORDER ON DISCOVERY MOTIONS. Signed by Magistrate Judge Daniel C. Irick on 1/2/2020. (TNP)** (Entered: 05/13/2024) |
| 05/15/2024 | 43 | NOTICE of compliance re 38 Notice of Hearing on Motion *Time Sensitive Motion for Protective Order Precluding the Deposition of FAMU President Dr. Larry Robinson* by Maritza Reyes (Reyes, Maritza) (Entered: 05/15/2024) |
| 05/20/2024 | 44 | Expedited Opposed MOTION for Protective Order by Maritza Reyes. (Attachments: # 1 Exhibit, # 2 Exhibit)(Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. (Modified on 5/21/2024, chambers notified) (BGR). (Entered: 05/20/2024) |
| 05/21/2024 | 45 | RESPONSE in Opposition re 37 Time Sensitive MOTION for Protective Order *Precluding the Deposition of FAMU President Dr. Larry Robinson Plaintiff's Response* filed by Maritza Reyes. (Reyes, Maritza) (Entered: 05/21/2024) |
| 05/22/2024 | 46 | Expedited RESPONSE in Opposition re 44 MOTION for Protective Order *Expedited Opposed* filed by Florida A&M University Board of Trustees (FAMU). (Attachments: # 1 Exhibit A, # 2 Composite Exhibit B)(Reiner, Sarah) Modified on 5/23/2024 to edit docket text (AJS). (Entered: 05/22/2024) |
| 05/23/2024 | 47 | MOTION for Miscellaneous Relief, specifically Plaintiff's Time-Sensitive Motion for Excusal from Mediation or Referral to Settlement Conference Before a United States Magistrate Judge by Maritza Reyes. (Attachments: # 1 Exhibit, # 2 Exhibit)(Reyes, Maritza) (Entered: 05/23/2024) |
| 05/23/2024 | 48 | **ENDORSED ORDER denying 44 Expedited Motion for Protective Order, as neither the record nor the law cited supports a protective order as requested. Though it is unfortunate that this must be said in this case, the Court expects all parties and counsel to act in accordance with their ethical obligations and the rules governing this Court. Signed by Magistrate Judge Daniel C. Irick on 5/23/2024. (Irick, Daniel)** (Entered: 05/23/2024) |
| 05/24/2024 | 49 | **ORDER denying 37 Time Sensitive Motion for Protective Order Precluding the Deposition of FAMU President Dr. Larry Robinson. The Court will not award Plaintiff attorney fees, as the Defendant was substantially justified in making the Motion. See Fed.R.Civ.P. 26(c)(3) and 37(a)(5)(B). Signed by Magistrate Judge Daniel C. Irick on 5/24/2024. (LDJ)** (Entered: 05/24/2024) |
| 05/29/2024 | 50 | EXPEDITED MOTION to Compel FAMU President Larry Robinson's Deposition by Maritza Reyes. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. Modified on 5/30/2024 to edit text (ELM). (Entered: 05/29/2024) |
| 05/31/2024 | 51 | EXPEDITED MOTION for Extension of Time to Complete Discovery Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary by Maritza Reyes. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. Modified on 6/5/2024 to edit docket text (EAM). (Entered: 05/31/2024) |
| 06/04/2024 | 52 | RESPONSE in Opposition re 50 MOTION to Compel FAMU President Larry Robinson's Deposition *Plaintiff's Expedited Motion to Compel FAMU President Larry Robinson's Deposition* filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 06/04/2024) |

| | | |
|---|---|---|
| 06/04/2024 | 53 | RESPONSE in Opposition re 47 MOTION for Miscellaneous Relief, specifically Plaintiff's Time-Sensitive Motion for Excusal from Mediation or Referral to Settlement Conference Before a United States Magistrate Judge filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 06/04/2024) |
| 06/05/2024 | 54 | EXPEDITED NOTICE of Additional Conferral by Maritza Reyes re 50 MOTION to Compel FAMU President Larry Robinson's Deposition (Attachments: # 1 A)(Reyes, Maritza) Modified on 6/5/2024 to edit text (ELM). (Entered: 06/05/2024) |
| 06/05/2024 | 55 | RESPONSE in Opposition re 51 EXPEDITED MOTION for Extension of Time to Complete Discovery Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 06/05/2024) |
| 06/07/2024 | 56 | Expedited MOTION for for Leave to File a Reply to Defendant's Response to Plaintiff's Expedited Motion to Compel FAMU President Larry Robinson's Deposition by Maritza Reyes. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2")(Reyes, Maritza) (Chambers notified)- Modified motion relief/text on 6/7/2024 (AJS). (Entered: 06/07/2024) |
| 06/07/2024 | 57 | **ENDORSED ORDER granting 56 Plaintiff's Expedited Motion for Leave to File a Reply to the extent that Plaintiff may file a Reply to Defendant's Response on or before June 10, 2024. The Reply shall not exceed 5 pages. Signed by Magistrate Judge Daniel C. Irick on 6/7/2024. (JEB)** (Entered: 06/07/2024) |
| 06/07/2024 | 58 | Time Sensitive MOTION for Leave to File a Reply to 53 Response to Plaintiff's Time-Sensitive Motion for Excusal from Mediation or Referral to Settlement Conference Before a United States Magistrate Judge by Maritza Reyes. (Attachments: # 1 Exhibit Composite Exhibit "1", # 2 Exhibit Composite Exhibit "2")(Reyes, Maritza) Modified on 6/10/2024 to edit text (ELM). (Entered: 06/07/2024) |
| 06/10/2024 | 59 | **ENDORSED ORDER granting 58 Plaintiff's Expedited Motion for Leave to File a Reply to the extent that Plaintiff may file a Reply to Defendant's Response on or before June 13, 2024. The Reply shall not exceed 5 pages. Signed by Magistrate Judge Daniel C. Irick on 6/10/2024. (Irick, Daniel)** (Entered: 06/10/2024) |
| 06/10/2024 | 60 | REPLY to Response to Motion re 50 MOTION to Compel FAMU President Larry Robinson's Deposition *Plaintiff's Expedited Motion to Compel FAMU President Larry Robinson's Deposition Plaintiff's Reply to Defendant's Response to Plaintiff's Expedited Motion to Compel FAMU President Larry Robinson's Deposition* filed by Maritza Reyes. (Attachments: # 1 Exhibit Composite Exhibit "1", # 2 Exhibit Composite Exhibit "2")(Reyes, Maritza) (Entered: 06/10/2024) |
| 06/11/2024 | 61 | Unopposed MOTION for Miscellaneous Relief, specifically Plaintiff's Unopposed Expedited Motion for Leave to File a Reply to Defendant's Response (Doc. 55) in Opposition to Plaintiff's Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary by Maritza Reyes. (Reyes, Maritza) (Entered: 06/11/2024) |
| 06/11/2024 | 62 | **ENDORSED ORDER granting 61 Plaintiff's Expedited Motion for Leave to File a Reply to the extent that Plaintiff may file a Reply to Defendant's Response on or before June 17, 2024. The Reply shall not exceed 5 pages. Signed by Magistrate Judge Daniel C. Irick on 6/11/2024. (Irick, Daniel)** (Entered: 06/11/2024) |

| 06/11/2024 | 63 | NOTICE of hearing on motion re 51 EXPEDITED MOTION for Extension of Time to Complete Discovery Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary. Motion Hearing set for 6/18/2024 at 10:30 AM via Zoom Video Conference before Magistrate Judge Daniel C. Irick. The parties should be prepared to present argument and legal authority to support their positions. The parties also shall file a joint notice three days before the hearing certifying ongoing conferral and stating which issues, if any, have been resolved. A Zoom link will be sent to counsel via email. (TNP) (Entered: 06/11/2024) |
|---|---|---|
| 06/13/2024 | 64 | **ORDER granting in part and denying in part 50 Plaintiff's Expedited Motion to Compel FAMU President Larry Robinson's Deposition. Plaintiff's Motion (Doc. 50) is GRANTED in part to the extent that Dr. Robinson shall appear in person in Orlando, Florida for the deposition at a mutually agreeable date and time to be completed on or before June 26, 2024. The remainder of the Motion is DENIED. The Court finds that payment of reasonable expenses, including attorney fees, incurred in making the Motion is not necessary pursuant to Rule 37(a)(5)(C). Signed by Magistrate Judge Daniel C. Irick on 6/12/2024. (TNP)** (Entered: 06/13/2024) |
| 06/13/2024 | 65 | REPLY to Response to Motion re 47 MOTION for Miscellaneous Relief, specifically Plaintiff's Time-Sensitive Motion for Excusal from Mediation or Referral to Settlement Conference Before a United States Magistrate Judge filed by Maritza Reyes. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2")(Reyes, Maritza) (Entered: 06/13/2024) |
| 06/14/2024 | 66 | NOTICE by Maritza Reyes re 65 Reply to Response to Motion *Plaintiff's Notice of Scrivener's Errors in Reply to Defendant's Response to Plaintiff's Time-Sensitive Motion for Excusal from Mediation or Referral to Settlement Conference Before a United States Magistrate Judge* (Reyes, Maritza) (Entered: 06/14/2024) |
| 06/15/2024 | 67 | NOTICE by Maritza Reyes re 63 Notice of Hearing on Motion *JOINT NOTICE Certifying Ongoing Conferral re Plaintiff's EXPEDITED Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary (Doc. 51)* (Reyes, Maritza) (Entered: 06/15/2024) |
| 06/17/2024 | 68 | REPLY to Response to Motion re 51 EXPEDITED MOTION for Extension of Time to Complete Discovery Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary filed by Maritza Reyes. (Reyes, Maritza) (Entered: 06/17/2024) |
| 06/18/2024 | 69 | Minute Entry. Virtual Proceedings held before Magistrate Judge Daniel C. Irick: MOTION HEARING held on 6/18/2024 re 51 EXPEDITED MOTION for Extension of Time to Complete Discovery Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary filed by Maritza Reyes. (Digital / Zoom) (TNP) (Entered: 06/18/2024) |
| 06/19/2024 | 71 | NOTICE of supplemental authority re 69 Motion Hearing, 51 EXPEDITED MOTION for Extension of Time to Complete Discovery Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary by Maritza Reyes. (Attachments: # 1 Exhibit "Exhibit 1") (Reyes, Maritza) (Entered: 06/19/2024) |

| 06/20/2024 | 72 | **ORDER denying 51 Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and Daubert Motions Deadline if Necessary. Signed by Magistrate Judge Daniel C. Irick on 6/20/2024. (TNP)** Modified on 6/21/2024 (TNP). (TNP). (Entered: 06/20/2024) |
|---|---|---|
| 06/28/2024 | 73 | **ORDER Directing Compliance: it is ORDERED that the parties shall advise the Court on the status of mediation on or before July 3, 2024. Failure to comply with this Order may result in dismissal without prejudice or other appropriate sanctions pursuant to Local Rule 3.10(a). Signed by Judge Wendy W. Berger on 6/28/2024. (RMF)** (Entered: 06/28/2024) |
| 07/01/2024 | 74 | MOTION for Miscellaneous Relief, specifically Exclude Plaintiff's Expert *Kenneth Westhues, Ph.D.* by Florida A&M University Board of Trustees (FAMU). (Attachments: # 1 Exhibit A - Report)(Zolty, Julie) (Entered: 07/01/2024) |
| 07/02/2024 | 75 | NOTICE of Filing Documents in Support of 76 Defendant's Motion for Summary Final Judgment by Florida A&M University Board of Trustees (FAMU) (Attachments: # 1 Declaration of FAMU Provost Allyson Watson, PH.D., # 2 Declaration of Maurice Edington, PH.D., # 3 Deposition Transcript of Maritza Reyes and Referenced Exhibits)(Reiner, Sarah) Modified text on 7/3/2024 (BD). (Entered: 07/02/2024) |
| 07/02/2024 | 76 | MOTION for Summary Judgment *and Incorporated Memorandum of Law* by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 07/02/2024) |
| 07/03/2024 | 77 | Joint RESPONSE to 73 Order Requesting the Status of Mediation filed by Maritza Reyes. (Reyes, Maritza) Modified text on 7/3/2024 (BD). (Entered: 07/03/2024) |
| 07/09/2024 | 78 | **ORDER re 77 Joint Response to the Court's Order Requesting Status of Mediation: This case is REFERRED to United States District Judge Paul G. Byron, who is not assigned to this case, to conduct a settlement conference. Signed by Judge Wendy W. Berger on 7/9/2024. (RMF)** (Entered: 07/09/2024) |
| 07/17/2024 | 79 | Time Sensitive Unopposed MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Miscellaneous Relief, specifically Exclude Plaintiff's Expert Kenneth Westhues, Ph.D., 76 MOTION for Summary Judgment and Incorporated Memorandum of Law by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. (chambers notified) Modified on 7/18/2024 as to docket text (ARL). (Entered: 07/17/2024) |
| 07/19/2024 | 80 | **ENDORSED ORDER granting 79 Unopposed Motion for Extension of Time. Plaintiff must respond to the 74 Daubert Motion by 7/29/2024. Plaintiff must respond to the 76 Motion for Summary Judgment by 8/8/2024. Signed by Magistrate Judge Daniel C. Irick on 7/19/2024. (Irick, Daniel)** (Entered: 07/19/2024) |
| 07/29/2024 | 81 | RESPONSE in Opposition re 74 MOTION for Miscellaneous Relief, specifically Exclude Plaintiff's Expert *Kenneth Westhues, Ph.D.* filed by Maritza Reyes. (Attachments: # 1 Exhibit 1)(Reyes, Maritza) (Entered: 07/29/2024) |
| 08/02/2024 | 82 | Time Sensitive Unopposed MOTION for Extension of Time to File Response/Reply as to 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law* by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. Modified on 8/5/2024 to edit text (ELM). (Entered: 08/02/2024) |

| | | |
|---|---|---|
| 08/05/2024 | 83 | **ENDORSED ORDER granting 82 Unopposed Motion for Extension of Time Plaintiff must respond to the 76 Motion for Summary Judgment by 8/12/2024. Signed by Magistrate Judge Daniel C. Irick on 8/5/2024. (Irick, Daniel)** (Entered: 08/05/2024) |
| 08/12/2024 | 84 | Unopposed MOTION for Susan T. Spradley to Withdraw as Attorney by Florida A&M University Board of Trustees (FAMU). (Spradley, Susan) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 08/12/2024) |
| 08/12/2024 | 85 | **ENDORSED ORDER granting 84 Motion to Withdraw as Attorney. Susan T. Spradley is terminated as counsel in this case. Signed by Magistrate Judge Daniel C. Irick on 8/12/2024. (Irick, Daniel)** (Entered: 08/12/2024) |
| 08/12/2024 | 86 | NOTICE of Filing Recordings and Transcripts by Maritza Reyes(ARL) Modified on 8/23/2024 as to docket text (ARL). (Entered: 08/12/2024) |
| 08/12/2024 | 87 | Emergency MOTION for Extension of Time to File Response/Reply as to 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law* , MOTION for Extension of Time to File Response to Defendant's Motion for Summary Judgment by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 08/12/2024) |
| 08/13/2024 | 88 | SUPPLEMENT re 87 Emergency MOTION for Extension of Time to File Response/Reply as to 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law* MOTION for Extension of Time to File Response to Defendant's Motion for Summary Judgment *Local Rule 3.01(g) Certification Supplement and Amendment* by Maritza Reyes. (Reyes, Maritza) (Entered: 08/13/2024) |
| 08/13/2024 | 89 | **ENDORSED ORDER granting 87 Unopposed Motion for Extension of Time to File Response to 76 Motion for Summary judgment. Response due by 8/19/2024. Signed by Magistrate Judge Daniel C. Irick on 8/13/2024. (Irick, Daniel)** Modified text to correct RESPONSE DUE DATE on 8/13/2024 (MJT). (Entered: 08/13/2024) |
| 08/13/2024 | | Set deadline as to 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law*. Response due by 8/19/2024 per 89 ENDORSED ORDER. (MJT) (Entered: 08/13/2024) |
| 08/16/2024 | 90 | NOTICE of hearing: Settlement Conference set for 10/21/2024 at 09:30 AM in Orlando Courtroom 4 B before Judge Paul G. Byron (KM) (Entered: 08/16/2024) |
| 08/19/2024 | 91 | RESPONSE re 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law* filed by Maritza Reyes. (Reyes, Maritza) (Entered: 08/19/2024) |
| 09/03/2024 | 92 | NOTICE by Maritza Reyes re 91 Response, 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law - Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment* (Reyes, Maritza) (Entered: 09/03/2024) |
| 09/03/2024 | 93 | REPLY to Response to Motion re 76 MOTION for Summary Judgment *and Incorporated Memorandum of Law* filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 09/03/2024) |
| 09/09/2024 | 94 | **ORDER denying 35 Defendant's Opposed Motion to Dismiss With Prejudice, or in the Alternative, Motion to Strike. Defendant shall file an answer to the 34 Second Amended Complaint on or before September 23, 2024. Signed by Judge Wendy W. Berger on 9/9/2024. (MDJ)** (Entered: 09/09/2024) |

| 09/09/2024 | 95 | **ORDER re 77 Joint Response to the Court's Order Requesting Status of Mediation: This case is REFERRED to United States Magistrate Judge Leslie Hoffman Price, who is not assigned to this case, to conduct a settlement conference. The parties shall attend the conference at Magistrate Judge Leslie Hoffman Price's direction, the details of which will be contained in a separate order issued by Magistrate Judge Leslie Hoffman Price. United States District Judge Paul G. Byron is no longer assigned to this case. Signed by Judge Wendy W. Berger on 9/9/2024. (RMF)** (Entered: 09/09/2024) |
|---|---|---|
| 09/09/2024 | 96 | **ORDER AND NOTICE OF SETTLEMENT CONFERENCE. Settlement Conference set for 10/24/2024 at 10:00 AM in Orlando Courtroom 5 D before Magistrate Judge Leslie Hoffman Price. See PDF Order for further requirements, deadlines, and details. Signed by Magistrate Judge Leslie Hoffman Price on 9/9/2024. (MKH)** (Entered: 09/09/2024) |
| 09/23/2024 | 97 | ANSWER and affirmative defenses to 34 Amended Complaint by Florida A&M University Board of Trustees (FAMU).(Reiner, Sarah) (Entered: 09/23/2024) |
| 09/25/2024 | 98 | **ORDER re 96: To promote timely and efficient resolution of any issues remaining unresolved after the settlement conference, it is ORDERED that the Case Management and Scheduling Order 26 is AMENDED. See PDF for details. Signed by Judge Wendy W. Berger on 9/25/2024. (RMF)** (Entered: 09/25/2024) |
| 09/25/2024 |  | Set/reset scheduling order deadlines: Pretrial statement due by 12/2/2024 Trial Status Conference set for 12/10/2024 at 09:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger Jury Trial set for the February 2025 trial term commencing on 2/3/2025 at 09:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger. (RMF) (Entered: 09/25/2024) |
| 09/26/2024 | 99 | TIME SENSITIVE UNOPPOSED MOTION for Miscellaneous Relief, specifically for Deadline to File Motion to Strike Pursuant to Time Allowed Under Federal Rule of Civil Procedure 12(f)(2) by Maritza Reyes. (Reyes, Maritza) Modified on 9/27/2024 to edit text (ELA). (Entered: 09/26/2024) |
| 09/27/2024 | 100 | **ENDORSED ORDER granting 99 Unopposed Motion for Deadline to File Motion to Strike. On or before 10/15/2024, Plaintiff may file a motion to strike pursuant to Federal Rule of Civil Procedure 12(f)(2). Signed by Magistrate Judge Daniel C. Irick on 9/27/2024. (Irick, Daniel)** (Entered: 09/27/2024) |
| 10/02/2024 | 101 | MOTION In Limine by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/02/2024) |
| 10/02/2024 | 102 | Time Sensitive MOTION to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration by Maritza Reyes. (Reyes, Maritza) Modified text on 10/3/2024 (BD). (Entered: 10/02/2024) |
| 10/02/2024 | 103 | NOTICE of Filing Declarations in Support of 102 Time Sensitive MOTION by Maritza Reyes. (Reyes, Maritza) Modified text on 10/3/2024 (BD). (Entered: 10/02/2024) |
| 10/02/2024 | 104 | MOTION In Limine by Maritza Reyes. (Reyes, Maritza) Modified text on 10/3/2024 (BD). (Entered: 10/02/2024) |

| 10/02/2024 | 105 | Time Sensitive MOTION to Re-Open Discovery and Summary Judgment by Maritza Reyes. (Reyes, Maritza) Modified text on 10/3/2024 (BD). (Entered: 10/02/2024) |
|---|---|---|
| 10/02/2024 | 106 | MOTION to Stay Case Pending Exhaustion of Administrative Remedies after Wrongful Termination by Maritza Reyes. (Attachments: # 1 Exhibit 1)(Reyes, Maritza) Modified text and event type on 10/3/2024 (BD). (Entered: 10/02/2024) |
| 10/04/2024 | 107 | Time Sensitive Amended NOTICE by Maritza Reyes re 102 Time Sensitive MOTION to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept, 103 Affidavit (Attachments: # 1 Exhibit Exhibits A, B and C, # 2 Affidavit Declarations/Exhibits 1, 2, 3, 4, 5 & 6) (Reyes, Maritza) Modified on 10/7/2024 as to docket text (ARL). (Entered: 10/04/2024) |
| 10/08/2024 | 108 | NOTICE by Florida A&M University Board of Trustees (FAMU) re 96 Order Setting Hearing , of Authority and Attendance at Settlement Conference (Reiner, Sarah) (Entered: 10/08/2024) |
| 10/10/2024 | 109 | NOTICE by Maritza Reyes re 96 Order Setting Hearing Identifying the Person Who Will Attend the Settlement Conference and Confirming Full Settlement Authority (Reyes, Maritza) Modified on 10/11/2024 to edit the docket text (RPB). (Entered: 10/10/2024) |
| 10/14/2024 | 110 | Time Sensitive MOTION for Extension of Time to File Motion To Strike and to Respond to Defendant's Omnibus Motion In Limine by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. Modified on 10/15/2024 to edit docket text(RN). (Entered: 10/14/2024) |
| 10/15/2024 | 111 | RESPONSE in Opposition re 110 Time Sensitive MOTION for Extension of Time to File Motion to Strike and to Respond to Defendant's Omnibus Motion in Limine filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) Modified on 10/16/2024 to remove capitalization (ARL). (Entered: 10/15/2024) |
| 10/15/2024 | 112 | MOTION to Strike 97 Answer to amended complaint by Maritza Reyes. (Reyes, Maritza) Modified on 10/16/2024 as to docket text (ARL). (Entered: 10/15/2024) |
| 10/16/2024 | 113 | RESPONSE in Opposition re 102 Time Sensitive MOTION to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/16/2024) |
| 10/16/2024 | 114 | MOTION to Strike Plaintiff's Declarations (Doc. 103 and 107) by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/16/2024) |
| 10/16/2024 | 115 | RESPONSE in Opposition re 106 MOTION to Stay Case Pending Exhaustion of Administrative Remedies after Wrongful Termination filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/16/2024) |
| 10/16/2024 | 116 | RESPONSE in Opposition re 104 MOTION In Limine filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/16/2024) |
| 10/16/2024 | 117 | RESPONSE in Opposition re 101 MOTION In Limine filed by Maritza Reyes. (Attachments: # 1 1)(Reyes, Maritza) (Entered: 10/16/2024) |

| 10/16/2024 | 118 | RESPONSE in Opposition re 105 Time Sensitive MOTION to Re-Open Discovery and Summary Judgment filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/16/2024) |
|---|---|---|
| 10/22/2024 | 119 | **ENDORSED ORDER denying 110 Motion for Extension of Time to File as moot. Signed by Judge Wendy W. Berger on 10/22/2024. (CHM)** (Entered: 10/22/2024) |
| 10/23/2024 | 120 | NOTICE of Lead Counsel Designation by Sarah P. L. Reiner on behalf of Florida A&M University Board of Trustees (FAMU). Lead Counsel: Sarah P. L. Reiner. (Reiner, Sarah) (Entered: 10/23/2024) |
| 10/24/2024 | 121 | Minute Entry. In Person Proceedings held before Magistrate Judge Leslie Hoffman Price: SETTLEMENT CONFERENCE held on 10/24/2024. Impasse. (DIGITAL) (ECJ) (Entered: 10/24/2024) |
| 10/24/2024 | | Magistrate Judge Leslie Hoffman Price no longer assigned to case. (ECJ) (Entered: 10/24/2024) |
| 10/29/2024 | 122 | RESPONSE in Opposition re 112 MOTION to Strike 97 Answer to amended complaint *and Affirmative Defenses* filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 10/29/2024) |
| 10/30/2024 | 123 | RESPONSE in Opposition re 114 MOTION to Strike *Plaintiff's Declarations (Doc. 103 and 107)* filed by Maritza Reyes. (Reyes, Maritza) (Entered: 10/30/2024) |
| 11/01/2024 | 124 | **ORDER: it is ORDERED and ADJUDGED that Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration 102 is DENIED. Signed by Judge Wendy W. Berger on 11/1/2024. (RMF)** (Entered: 11/01/2024) |
| 11/01/2024 | 125 | **ORDER: it is ORDERED and ADJUDGED that Plaintiff's Time-Sensitive Motion to Re-Open Discovery and Summary Judgment 105 is DENIED. Signed by Judge Wendy W. Berger on 11/1/2024. (RMF)** (Entered: 11/01/2024) |
| 11/01/2024 | 126 | **ORDER: it is ORDERED and ADJUDGED that Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination 106 is DENIED. Signed by Judge Wendy W. Berger on 11/1/2024. (RMF)** (Entered: 11/01/2024) |
| 11/04/2024 | 127 | **ORDER denying 112 Motion to Strike Defendant's Affirmative Defenses. Signed by Magistrate Judge Daniel C. Irick on 11/4/2024. (TNP)** (Entered: 11/04/2024) |
| 11/06/2024 | 128 | ***STRICKEN PER #129 ENDORSED ORDER*** NOTICE (Time-Sensitive) by Maritza Reyes re 127 Order on Motion to Strike, 125 Order on Motion for Miscellaneous Relief, 124 Order on Motion for Miscellaneous Relief *of Intent to File Motions for Reconsideration of the Court's Recent Orders.* (Reyes, Maritza) Modified on 11/8/2024 (LD). (Entered: 11/06/2024) |
| 11/07/2024 | 129 | **ENDORSED ORDER to strike 128 Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders. The rules of this court do not provide for the filing of a notice of intent to file a motion. Signed by Magistrate Judge Daniel C. Irick on 11/7/2024. (Irick, Daniel)** (Entered: 11/07/2024) |

| 11/15/2024 | 130 | Time Sensitive MOTION for Reconsideration re 124 Order on Motion for Miscellaneous Relief *Order denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102)* by Maritza Reyes. (Attachments: # 1 Exhibit 1)(Reyes, Maritza) (Entered: 11/15/2024) |
|---|---|---|
| 11/19/2024 | 131 | Emergency MOTION for Miscellaneous Relief, specifically for Extension of Pretrial Deadlines by Maritza Reyes. (Reyes, Maritza) (chambers notified) Modified on 11/20/2024 as to docket text (ARL). (Entered: 11/19/2024) |
| 11/26/2024 | 132 | NOTICE OF RESCHEDULING HEARING: The Trial Status Conference previously scheduled for 12/10/2024 is rescheduled as a Telephone Trial Status Conference set for 12/3/2024 at 09:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger. The parties shall call 1-855-244-8681 ten minutes before the hearing is scheduled to begin. Access Code: 23028923440. (RMF) (Entered: 11/26/2024) |
| 11/26/2024 | 133 | Emergency MOTION for Extension of Time to File Joint Final Pretrial Statement by Maritza Reyes. (Reyes, Maritza) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 11/26/2024) |
| 11/26/2024 | 134 | RESPONSE in Opposition re 131 Emergency MOTION for Miscellaneous Relief, specifically for Extension of Pretrial Deadlines filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 11/26/2024) |
| 11/27/2024 | 135 | Emergency MOTION for Miscellaneous Relief, specifically Plaintiff's Emergency Motion to File a Reply to Defendant's Response re Pretrial Deadlines *Leave to Reply to Doc. 134* by Maritza Reyes. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Reyes, Maritza) (Entered: 11/27/2024) |
| 11/29/2024 | 136 | Notice of updated Local Rule 3.01(g) Certification by Maritza Reyes re 133 Emergency MOTION for Extension of Time to File Joint Final Pretrial Statement *Plaintiff's Notice of Updated Local Rule 3.01(g) Certification* (Reyes, Maritza) Modified text on 12/2/2024 (AA). (Entered: 11/29/2024) |
| 11/29/2024 | | NOTICE OF RESCHEDULING HEARING: The Telephone Trial Status Conference previously scheduled for 12/3/2024 is rescheduled as a Trial Status Conference set for 1/15/2024 at 09:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger. (CHM) (Entered: 11/29/2024) |
| 12/01/2024 | 137 | RESPONSE in Opposition re 130 Time Sensitive MOTION for Reconsideration re 124 Order on Motion for Miscellaneous Relief denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 12/01/2024) |
| 12/01/2024 | 138 | Emergency MOTION for Miscellaneous Relief, specifically Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement by Maritza Reyes. (Reyes, Maritza) (Entered: 12/01/2024) |
| 12/03/2024 | 139 | Motion for Leave to File Document in Response to 137 Response in Opposition to 130 MOTION for Reconsideration by Maritza Reyes. (Reyes, Maritza) Modified on 12/4/2024 as to docket text (ARL). (Entered: 12/03/2024) |

| 12/06/2024 | [140](#) | TRANSCRIPT of Motion Hearing held on 6/18/24 before Judge Daniel C. Irick. Court Reporter/Transcriber: Suzanne L. Trimble, CRR, RPR, WA-CCR. Email address: trimblecourtreporter@outlook.com. Telephone number: 407.900.8775.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 12/27/2024. Redacted Transcript Deadline set for 1/6/2025. Release of Transcript Restriction set for 3/6/2025. (SLT) (Entered: 12/06/2024) |
| 12/09/2024 | [141](#) | RESPONSE in Opposition re [139](#) Motion for Leave to File Document in Response to [137](#) Response in Opposition to [130](#) MOTION for Reconsideration, [135](#) Emergency MOTION for Miscellaneous Relief, specifically Plaintiff's Emergency Motion to File a Reply to Defendant's Response re Pretrial Deadlines *Leave to Reply to Doc. 134 Omnibus Response* filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 12/09/2024) |
| 12/09/2024 | [142](#) | RESPONSE in Opposition re [133](#) Emergency MOTION for Extension of Time to File Joint Final Pretrial Statement filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 12/09/2024) |
| 12/10/2024 | [143](#) | TRANSCRIPT of Motion Hearing re: [37](#) Defendant's Time-Sensitive Motion for Protective Order Precluding the Deposition of Dr. Larry Robinson held on 05/13/2024 before Judge Daniel C. Irick. Court Reporter/Transcriber: Heather Suarez, RDR, FCRR, FCRR, FPR-C. Email address: heather@stenosuarez.com. Telephone number: (407) 801-8921.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 12/31/2024. Redacted Transcript Deadline set for 1/10/2025. Release of Transcript Restriction set for 3/10/2025. (HLS) (Entered: 12/10/2024) |
| 12/10/2024 | [144](#) | **ORDER: it is ORDERED and ADJUDGED that Plaintiff's Time-Sensitive Motion for Reconsideration [130](#) is DENIED.Signed by Judge Wendy W. Berger on 12/10/2024. (RMF)** (Entered: 12/10/2024) |
| 12/11/2024 | [145](#) | Time Sensitive MOTION for Miscellaneous Relief, specifically Plaintiff's Time-Sensitive Motion for Court Case Management by Maritza Reyes. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3, # [4](#) Exhibit 4)(Reyes, Maritza) (Entered: 12/11/2024) |
| 12/16/2024 | [146](#) | AMENDED TRANSCRIPT of Motion Hearing re: [37](#) Defendant's Time-Sensitive Motion for Protective Order Precluding the Deposition of Dr. Larry Robinson held on 05/13/2024 before Judge Daniel C. Irick. Court Reporter/Transcriber: Heather Suarez, |

|  |  | RDR, CRR, FCRR, FPR-C. Email address: heather@stenosuarez.com. Telephone number: (407) 801-8921.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 1/6/2025. Redacted Transcript Deadline set for 1/16/2025. Release of Transcript Restriction set for 3/17/2025. (HLS) (Entered: 12/16/2024) |
| --- | --- | --- |
| 12/18/2024 | 147 | MOTION for Reconsideration re 127 Order on Motion to Strike by Maritza Reyes. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Reyes, Maritza) Modified text on 12/19/2024 (LNR). (Entered: 12/18/2024) |
| 12/26/2024 | 148 | RESPONSE to Motion re 145 Time Sensitive MOTION for Miscellaneous Relief, specifically Plaintiff's Time-Sensitive Motion for Court Case Management filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 12/26/2024) |
| 01/02/2025 | 149 | RESPONSE in Opposition re 147 MOTION for Reconsideration *of Court's Order (Doc. 127) Denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112)* filed by Florida A&M University Board of Trustees (FAMU). (Reiner, Sarah) (Entered: 01/02/2025) |
| 01/08/2025 | 150 | NOTICE canceling Trial Status Conference scheduled for 1/14/2025. The hearing will be reset by separate Order. (RMF) (Entered: 01/08/2025) |
| 01/08/2025 | 151 | **ORDER: it is ORDERED that the Case Management and Scheduling Order 26, as amended by the Court's September 25, 2024 Order 98, is AMENDED. Signed by Judge Wendy W. Berger on 1/8/2025. (RMF)** (Entered: 01/08/2025) |
| 01/08/2025 |  | Reset Scheduling Order Deadlines/Hearings: Pretrial statement due by 4/1/2025 Trial Status Conference set for 4/8/2025 at 10:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger Jury Trial set for 5/6/2025 at 09:00 AM in Orlando Courtroom 3 B before Judge Wendy W. Berger. (RMF) (Entered: 01/08/2025) |
| 01/09/2025 | 152 | **ENDORSED ORDER denying as moot 133 Emergency Motion for Extension of Time. See Doc. 151. Signed by Magistrate Judge Daniel C. Irick on 1/9/2025. (Irick, Daniel)** (Entered: 01/09/2025) |
| 01/10/2025 | 153 | **ORDER: Defendant's Motion for Summary Final Judgement 76 is GRANTED in part as set forth herein and DENIED in all other respects. The Clerk is directed to enter judgment in favor of Defendant, and against Plaintiff, on each of her claims. Thereafter, the Clerk is directed to terminate all pending motions and close this case. Signed by Judge Wendy W. Berger on 1/10/2025. (RMF)** (Entered: 01/10/2025) |
| 01/13/2025 | 154 | JUDGMENT in favor of Florida A&M University Board of Trustees (FAMU) against Maritza Reyes. ( Signed by Deputy Clerk) (ELA) (Entered: 01/13/2025) |
| 01/13/2025 | 155 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals |

| | | |
|---|---|---|
| | | are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (ELA) (Entered: 01/13/2025) |
| 01/27/2025 | 156 | PROPOSED BILL OF COSTS by Florida A&M University Board of Trustees (FAMU). (Attachments: # 1 Exhibit Declaration in Support of Bill of Costs)(Reiner, Sarah) (Entered: 01/27/2025) |
| 02/10/2025 | 157 | NOTICE OF APPEAL as to 153 Order on Motion for Summary Judgment, 154 Judgment by Maritza Reyes. Filing fee $ 605, receipt number AFLMDC-23005524. (Reyes, Maritza) (Entered: 02/10/2025) |
| 02/11/2025 | 158 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 157 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (LSS) (Entered: 02/11/2025) |
| 02/12/2025 | 159 | BILL OF COSTS taxed against Maritza Reyes in the amount of $8,769.15. Signed by Deputy Clerk. (RMF) (Entered: 02/12/2025) |
| 02/19/2025 | 160 | MOTION for Miscellaneous Relief, specifically Plaintiff's Motion For Court's Review Of Clerk's Entry Of Costs And Incorporated Memorandum Of Law by Maritza Reyes. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Reyes, Maritza) Modified text on 2/20/2025 (KME). (Entered: 02/19/2025) |
| 02/26/2025 | 161 | TRANSCRIPT information form filed by Maritza Reyes for proceedings held on 5-13-24 & 6-18-24 before Judge Irick re 157 Notice of Appeal. USCA number: 25-10453-G. Electronic notification sent to Court Reporter Heather Suarez (Reyes, Maritza) (Entered: 02/26/2025) |
| 02/27/2025 | 162 | NOTIFICATION that transcript has been filed by Suzanne L. Trimble, CRR, RPR, WA-CCR re: 157 Notice of Appeal. USCA number: 25-10453. (SLT) (Entered: 02/27/2025) |
| 02/27/2025 | 163 | COURT REPORTER ACKNOWLEDGMENT by Heather Suarez re 157 Notice of Appeal. Estimated transcript filing date: 12/16/2024. USCA number: 25-10453-G. (HLS) (Entered: 02/27/2025) |
| 02/27/2025 | 164 | NOTIFICATION that transcript has been filed by Heather Suarez re: 157 Notice of Appeal. USCA number: 25-10453-G. (HLS) (Entered: 02/27/2025) |
| 03/05/2025 | 165 | RESPONSE in Opposition re 160 MOTION for Miscellaneous Relief, specifically Plaintiff's Motion For Court's Review Of Clerk's Entry Of Costs And Incorporated Memorandum Of Law filed by Florida A&M University Board of Trustees (FAMU). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Reiner, Sarah) (Entered: 03/05/2025) |
| 03/07/2025 | 166 | MOTION for Miscellaneous Relief, specifically Plaintiff's Motion to File a Reply to Defendant's Response in Opposition to Plaintiff's Motion for Court's Review of Clerk's Entry of Costs *(Doc. 165)* by Maritza Reyes. (Reyes, Maritza) (Entered: 03/07/2025) |
| 03/10/2025 | 167 | **ENDORSED ORDER granting in part and denying in part 166 Motion for Leave to File a Reply. Within 10 days, Plaintiff may file a 10-page reply re 160 Plaintiff's Motion For Court's Review Of Clerk's Entry Of Costs. Signed by Magistrate Judge Daniel C. Irick on 3/10/2025. (Irick, Daniel)** (Entered: 03/10/2025) |

| 03/20/2025 | 168 | REPLY to Response to Motion re 160 MOTION for Miscellaneous Relief, specifically Plaintiff's Motion For Court's Review Of Clerk's Entry Of Costs And Incorporated Memorandum Of Law Reply to Defendant's Response (Doc. 165) filed by Maritza Reyes. (Reyes, Maritza). (Entered: 03/20/2025) |
|---|---|---|
| 04/23/2025 | 169 | **ORDER granting in part and denying in part 160 Motion for Court's Review and Clerk's Entry of Costs. Plaintiff's Motion (Doc. 160) is GRANTED in part to the extent that Plaintiff's deadline to file a motion to review the Clerk's action pursuant to Rule 54(d)(1) is extended to the 14th day after the date the Circuit issues a mandate or an order dismissing the appeal. The remainder of the Motion (Doc. 160) is DENIED. Signed by Magistrate Judge Daniel C. Irick on 4/23/2025. (TNP) (Entered: 04/23/2025)** |
| 05/09/2025 | | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Florida certifies that the record is complete for the purposes of this appeal re: 157 Notice of Appeal. All documents are imaged and available for the USCA to retrieve electronically. USCA number: 25-10453 (JG) (Entered: 05/09/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 05/09/2025 14:41:27 | | | |
| PACER Login: | mreyesesq | Client Code: | |
| Description: | Docket Report | Search Criteria: | 6:22-cv-01525-WWB-DCI |
| Billable Pages: | 15 | Cost: | 1.50 |

Tab 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


MARITZA REYES,

     Plaintiff,

v.                                   CASE NO.:

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

     Defendant.

_____

**COMPLAINT AND DEMAND FOR A JURY TRIAL AND PERMANENT
INJUNCTIVE RELIEF REQUESTED**

     Plaintiff ("Plaintiff" or "Professor Reyes") hereby complains against the
Board of Trustees of Florida Agricultural & Mechanical University ("Defendant"
or "FAMU") as follows:

**I.     NATURE OF THE CLAIMS**

     1. This suit is brought by a Hispanic/Latina law professor who has been
subjected to race, color, national origin, and sex discrimination and retaliation by
Defendant in violation of: Title VII of the Civil Rights Act of 1964, as amended
and codified at 42 U.S.C. § 2000e, *et seq.* ("Title VII"); 42 U.S.C. § 1983, as

amended ("§1983") for violating her rights under the Equal Protection Clause of the United States Constitution; and Florida Civil Rights Act of 1992, as amended and  codified at Fla. Stat. § 760.01, *et seq*. ("FCRA").

2.  The   unlawful   discrimination,   harassment,   ongoing   hostile   work environment, and retaliation because of race, color, national origin, and sex have taken many forms, including a phenomenon termed by experts as "workplace mobbing."

3.  Plaintiff seeks all available remedies including damages, attorneys' fees, costs, interest, compensatory damages, and punitive damages.

## II.    PARTIES

4.  Plaintiff is a Hispanic/Latina, a woman of Hispanic, Latino origin, who resides in the State of Florida, Orange County, and is and was employed by Defendant at all times relevant to the allegations in this Complaint.

5.  Defendant is a public historically black college university ("HBCU") within the State University System of Florida ("SUS"). Defendant's main campus is located in Tallahassee Florida. Defendant's law school campus, Florida A&M University College of Law ("FAMU College of Law"), is located in Orlando, Florida, Orange County.[1]

---

[1] In 2000, through bipartisan efforts, the Florida Legislature re-established FAMU College of Law. To comply with the location requirements of the legislation, FAMU College of Law was located in Orlando, Florida.

6. At all times relevant to this Complaint Defendant was an employer pursuant to the pertinent laws and received federal and state financial assistance.

7. Defendant acted through its agents, representatives, and/or employees at all times material hereto.

### III.   JURISDICTION AND VENUE

8. This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. Plaintiff has complied with the administrative prerequisites by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Notice of Right to Sue from the EEOC and filed this Complaint within ninety (90) days of the Notice of Right to Sue.

10. Plaintiff has fulfilled the conditions precedent prior to filing this Complaint.

11. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b).

## IV.   GENERAL ALLEGATIONS

12. Professor Maritza Reyes ("Professor Reyes") earned the "traditional" credentials to become a law professor before joining the faculty of FAMU College as a full-time tenure track assistant professor.

13.  Professor Reyes earned a Juris Doctor (J.D.) *summa cum laude* from Nova Southeastern University Shepard Broad College of Law ("Nova Law") in 2000 (graduating in the top 1% of her class of over 400 students). Professor Reyes attended Nova Law on a full-tuition, merit Goodwin academic scholarship. She earned Dean's List all semesters and book awards for highest grade in several courses. Professor Reyes served as Articles Editor of the *Nova Law Review* and earned membership in the Moot Court Honor Society. She also volunteered as Editor of the Florida Bar Foundation's Children First Project Legislative Bill-Tracking Publication, contributing writer in *Broadly Speaking*, Nova Law's Student Newspaper, and law student advisor.

14. During her J.D. studies at Nova Law, Professor Reyes earned several awards, including:  Best Brief in the Moot Court Freshmen Appellate Writing Competition, Student Bar Association Academic Achievement Award, Public Interest Bronze Pro Bono Award, Gold Circle Women's Club Scholarship, Young Lawyers Division of The Florida Bar Scholarship, the National Association of

Women Lawyers Award – Outstanding Law Student (2000), and Who's Who: American Law Students (20th ed.).

15. During her J.D. studies at Nova Law, Professor Reyes gained practical legal experience as a summer associate with an international law firm and as a certified legal intern in the U.S. Attorney's Office Appellate Division.

16. After earning her J.D., Professor Reyes's legal experience included working for private law firms as an associate and serving as a federal court law clerk at the district court level.

17. In preparation to begin full-time law teaching, Professor Reyes attended the Harvard Law School ("Harvard Law") where she earned a Master of Laws (LL.M.) in 2008. Admission to the Harvard Law LL.M. program is highly competitive nationally and internationally. Only about one to two percent of students (a handful) admitted each year hold J.D. degrees from law schools in the United States and Puerto Rico.

18. While at Harvard Law, Professor Reyes served as General Editor of the *Harvard Latino Law Review* and Coordinator of External Affairs of La Alianza, a student-run organization. She also participated in the Spring Pro Bono Program in the Florida Immigrant Advocacy Center. She was awarded a Congressional Hispanic Caucus Institute Graduate Scholarship and, upon graduation, a Harvard

Law Post-Graduate Research Fellowship. She published articles in the *Harvard Latino Law Revie*w, *The Harvard Law Record*, and *The Harvard Crimson*.

19. The re-established FAMU College of Law opened its doors in August 2002. It received provisional accreditation in August 2004. The Florida Legislature gave the FAMU College of Law a period of five years from the graduation of its first class to achieve full accreditation. Fla. Stat. § 240.7105(5) (2000). The FAMU College of Law graduated its first class in April 2005.

20.  According to the FAMU College of Law 2008 Self Study, "[t]he founding dean of the law school, Percy Luney, was dismissed in June 2005 after allegations of financial improprieties. James Douglas was appointed interim dean and his tenure at the law school ended abruptly when he left the law school during the 2006 winter break. His associate dean, Ruth Witherspoon, became interim dean in January 2007 and held that position during an extensive dean search which culminated in the appointment of" "LeRoy Pernell, in late 2007."

21.  Professor Reyes was recruited as the FAMU College of Law was seeking full approval by the American Bar Association (ABA)'s Council of the Section of Legal Education and Admissions to the Bar. Professor Reyes was identified by the 2008-2009 FAMU College of Law Faculty Recruitment Committee ("Recruitment Committee") in fall 2008 as a result of a national search through the Association of American Law Schools ("AALS") Faculty Recruitment Conference. Professor

Reyes became the first FAMU College of Law entry-level faculty member identified and hired through the AALS Faculty Recruitment Conference.

22. Professor Reyes was initially interviewed by Dean Pernell and faculty members of the Recruitment Committee at the AALS Faculty Recruitment Conference in Washington, D.C.  Subsequently, she was invited for a visit to the FAMU College of Law where she was interviewed by additional members of the faculty. Although there were many women on the faculty (Black women), the dinner with the faculty consisted of two White men, one of them picked up Professor Reyes from the airport. In hindsight, maybe that meant something, but Professor Reyes did not think much about it. As part of the on-campus visit Professor Reyes made a "job talk" presentation to faculty members. Thereafter, the faculty of the FAMU College of Law and Dean Pernell recommended to Dr. Cynthia Hughes Harris, the then Provost and Vice President for Academic Affairs, that she be hired as a full-time, tenure-earning, assistant professor of law.

23. On March 30, 2009, then FAMU University Provost Cynthia Hughes Harris made Professor Reyes an offer of employment as an assistant professor of law in a tenure-earning position. As part of the hiring negotiations, Professor Reyes requested the rules and standards for promotion and tenure. She received the rules for promotion and tenure that would apply to her according to the FAMU College of Law Faculty Handbook in existence at that time and a Memo prepared

by then Associate Dean for Research and Faculty Development and Professor of Law Kenneth B. Nunn (the "Nunn Memo").

24.  On April 7, 2009, Professor Reyes accepted the offer of employment as a full-time, tenure-earning/tenure-track faculty member of the FAMU College of Law in a position of assistant professor of law.

25.  The FAMU College of Law received full ABA accreditation  in July 2009.

26.  Under the terms agreed upon hiring, Professor Reyes was required to apply for tenure no later than the beginning of the 2014-2015 academic year, which was the beginning of her sixth tenure-earning year. The College of Law Faculty Handbook ("CoL Faculty Handbook")[2] stated: "Submission of materials by the candidate in support of his/her application for promotion and/or tenure must coincide with the University's Schedule for Promotion and Tenure as generated annually from the Provost's Office."[3] The "2014/2015 Tenure and Promotion Schedule" ("University Tenure Schedule") generated by the University stated that the deadline for applications for tenure and promotion was September 12, 2014.

27. The FAMU College of Law Retention, Promotion and Tenure (RPT) Committee is a Committee constituted pursuant to the rules of the CoL Faculty Handbook. When Professor Reyes joined the faculty, the RPT Committee

---

[2] The CoL Faculty Handbook that applied to Professor Reyes in the review of her applications for tenure and promotion was the CoL Faculty Handbook in existence when she was hired.

[3] CoL Faculty Handbook, § I.E.7.

8

consisted only of the tenured, full professors. At the urging of a group of Black female law professors who were not yet full professors, after they made their complaints to the ABA accreditation site teams, the CoL Faculty Handbook was amended to include all tenured associate and full professors in the RPT Committee.

28.  During the 2014-2015 academic year the RPT Committee consisted of the following tenured associate and full professors (the tenured faculty):  Randall S. Abate (a White man), Robert H. Abrams (a White man), Deleso A. Alford (a Black woman), Nicola ("Nicky") A. Boothe-Perry (a Black woman), Patricia ("Pat") Broussard (a Black woman), Jeffrey M. Brown (a Black man), Joan R.M. Bullock (a Black woman), Ann Marie B. Cavazos (a Black woman), Markita D. Cooper (a Black woman), John Duncan (a Black man), Jonathan W. Fineman (a White man), Joseph Grant (a Black man), Ronald C. Griffin (a Black man), William ("Bill") D. Henslee (a White man), Darryll K. Jones (a Black man), Lundy R. Langston (a Black woman), Shiv Persaud (an Asian/West Indian man), Rhonda M. Reaves (a Black woman), Omar Saleem (a Black man), Jennifer M. Smith (a Black woman), and Phyllis C. Taite (a Black woman).[4]

29. Aggregated by race, the members of the RPT Committee that reviewed Professor Reyes's application for tenure were as follows: ten (10) Black women, six (6) Black men, four (4) White men, and one (1) Asian/West Indian man. All the

---

[4] Professor Jeremy Levitt was on leave.

female members of the RPT Committee were Black women. There was no Latina/o (man or woman). Professor Reyes was the first Latina/o hired in the tenure track and the first to apply for tenure.

30. Dean LeRoy Pernell appointed Professor John Duncan as Chair of the 2014-2015 RPT Committee. Professor Duncan was supposed to guide Professor Reyes through the tenure process. However, he turned the process into an adversarial process even before she applied. He did not provide information and told Professor Reyes that she should contact Professor Phyllis Taite with questions. When Professor Reyes contacted Professor Taite with questions, she responded that she would forward her questions to Professor Duncan. Professor Taite treated Professor Reyes very rudely on August 20, 2014 during what was supposed to be a presentation when Professor Taite was going to provide information about the tenure process. Rather than answer Professor Reyes's questions, Professor Taite instructed her to submit her questions in writing. Therefore, Professor Reyes followed up via email. Unbeknown to Professor Reyes, Professor Taite sent a memorandum to Dean Pernell alleging that Professor Reyes was harassing her by asking her questions about the tenure process; this was before Professor Reyes applied for tenure. Professor Taite never informed Professor Reyes about this memorandum and she did not recuse herself from participation in Professor

Reyes's tenure process. Instead, she participated in the ploys to deny Professor Reyes tenure.

31.  On September 12, 2014, Professor Reyes submitted her application and portfolio materials in full compliance with the deadline set forth in the University Tenure Schedule. She delivered her application and portfolio materials in accordance with instructions given to her by Professor John Duncan. Professor Reyes put together a very strong application by all objective standards. She fulfilled and exceeded the standards that were provided to her upon hiring. Dean Pernell had rated her performance as excellent in all categories of her annual evaluations. The annual RPT Committee reviews had all rated her performance in teaching, scholarship, and service to be very good to excellent. She had received class peer observations rating her teaching from very good to excellent. Students had consistently rated her as an effective, highly competent teacher. The overwhelming majority of comments in student evaluations were extremely positive about her teaching. A few students complained about Professor Reyes's rigorous teaching style, but no one ever raised concerns about this during her annual evaluations.

32.  Pursuant to the University Tenure Schedule, the deadline for the RPT Committee to submit its recommendation to Dean Pernell was October 10, 2014. In mid-October 2014, Professor Reyes became concerned because she had not

heard anything about the status of her application. She also noticed that members of the RPT Committee were avoiding her. She reached out to Dean Pernell via email to request the status of her application and he responded that they should meet. On October 29, 2014, Professor Reyes met with Dean Pernell, in his office, and he informed her that he was unable to begin his review of her application because the RPT Committee had not sent him her application and portfolio materials or its letter of recommendation. The deadline for Dean Pernell to submit his recommendation was November 14, 2014.

33. Dean Pernell told Professor Reyes that he could not review her application and materials if the RPT Committee did not first fulfill its duty to engage in the initial review process and provide a letter of recommendation to him. Therefore, the failure of the RPT Committee to perform its duty to (a) process Professor Reyes's application and supporting materials, including arranging for external and internal reviews of her scholarship, and (b) prepare a letter of recommendation by the stated deadline derailed Professor Reyes's entire tenure process. Moreover, if the RPT Committee did not process her application, there would be no review by the College of Law Dean, University Tenure and Promotion ("T&P") Committee, Provost, President, and Board of Trustees. The failure of the RPT Committee to fulfill its duty to process Professor Reyes's application and issue a recommendation would foreclose a review of Professor Reyes's application for

tenure altogether. The University Faculty Handbook stated: "By the end of six years of continuous full-time, or equivalent part-time service in a tenure-earning position in the University, a Faculty employee shall be nominated for tenure or given notice that further employment will not be offered, in the affected position with reason(s) why the employee was not nominated for tenure."[5]

34. The majority clique that hijacked Professor Reyes's tenure process was driven by unlawfully discriminatory animus against Professor Reyes. They recruited allies and followers. They silenced the dissenters, who were also prohibited from communicating with Professor Reyes about what was happening in the secret, closed RPT Committee meetings, including about the decisions that were being made to derail her tenure process and reach a recommendation that tenure should be denied.

35. In their efforts to deny Professor Reyes tenure, the majority clique repeatedly violated the regulations that governed the tenure review process. They also violated the regulations that set forth the standards that should be applied when reviewing an application for tenure. They also violated the ethical standards

---

[5] University Faculty Handbook, § II.J.(5)(a).

of the legal profession,[6] including by denying Professor Reyes fairness and due process. They engaged in many ploys, including the following:

a. Making a five-minute false allegation of violation of a non-deadline that turned Professor Reyes's tenure process into an adversarial, controversial, and difficult process, which served to discredit Professor Reyes at the RPT Committee level and higher levels of review.

b. Stopping Professor Reyes's tenure process in violation of the rules and ignoring Professor Reyes's repeated assertion that she delivered her materials by 5:00 PM. The actual deadline for submission was an entire day (until 11:59 PM). The RPT Committee refused to tell Professor Reyes what the allegation was (the 5:05 PM time) and what evidence they alleged, despite her repeated requests for this crucial information.

c. Denying Professor Reyes the opportunity to refute their unsubstantiated allegation. They made it extremely difficult to set up a meeting and then, once a date and place were finally agreed upon (September 29, 2014) with Chair John Duncan, Professor Lundy Langston, and Professor Joseph ("Joe") Grant, they cancelled the meeting at the last minute without any explanation to Professor Reyes as to the reason for the cancellation. Subsequently, they misrepresented to the other members of the RPT Committee, the FAMU Division of Audit and Compliance ("DAC") investigator, the Dean, the Interim Provost, the President, the General Counsel, and/or other University officials that Professor Reyes did not want to clarify, without telling them that they were the ones who canceled the meeting and continued to keep Professor Reyes in the dark about what was happening in her tenure process.

d. Keeping Professor Reyes isolated and marginalized during the entire tenure process (over two semesters when the process was only supposed to be one semester). Chair John Duncan refused to provide Professor Reyes with the information she was entitled to receive. He also instructed other Committee members not to speak with her; thereby silencing them and alienating Professor Reyes from colleagues who would vote on her tenure.

e. Arguing for "confidentiality" of the process to keep everything secret while they violated the claimed "confidentiality" by going outside the process (to

---

[6] CoL Faculty Handbook, § III.V.(c) ("*In addition to their assigned duties, faculty members have responsibilities arising from the nature of the educational process. Such responsibilities include, but are not limited to, observing and upholding the ethical standards of their discipline.*").

14

all decision-makers at the University level) with their unsubstantiated allegation that Professor Reyes was lying about the time of delivery of her materials and also falsely claiming that she refused to clarify. In their statements, they never sated the alleged time (5:05 PM); they just kept saying that she submitted late or after the deadline. They also spread the falsehood to Black law professors beyond the FAMU College of Law.

f. Disenfranchising two White men from voting on Professor Reyes's tenure application: Professors Randall ("Randy") Abate and Robert ("Rob") Abrams.

g. Causing Professor Reyes to be subjected to a DAC investigation that she only learned about when she received notice of her interview, three days before the interview, at a time when she was busy teaching an extra heavy course load. Upon information and belief, a Black female faculty member who was a member of the RPT Committee submitted her tenure application materials late in a prior year but she was not accused and investigated as Professor Reyes was.

36. Three members of the RPT Committee were interviewed during the DAC investigation: John Duncan, Joe Grant, and Phyllis Taite. Their interviews were audio recorded. In those interviews, they attempted to corroborate the alleged late submission; however, none of them were present when Professor Reyes submitted her application. Then Associate Dean, Professor, and RPT Committee member Joan Bullock, the one who made the initial false allegation, did not submit herself to an interview. Instead, she provided a self-serving written statement in which she claimed that she stopped by Professor Reyes's office, early in the afternoon on the day when she was supposed to submit her materials, and Professor Reyes was still working on her application. In her written statement, Associate Dean Bullock

15

gratuitously and falsely alleged that Professor Reyes "grunted" at her. Although Associate Dean Bullock was present in the law school building, she did not receive Professor Reyes's materials. Instead, she assigned the most junior program assistant, someone under her supervision, to receive Professor Reyes's application and supporting materials (3 large binders and 25 small binders as required).

37. Associate Dean Bullock and Professor Duncan manipulated the program assistant who received the materials into going along with their allegation of late submission. They got her to say that Professor Reyes submitted her materials five (5) minutes after 5:00 PM (not the published deadline). They also tried to get Professor Reyes's program assistant, Celia Westbrook (formerly DeAlmeida), who was also present when Professor Reyes submitted her application, to go along with their ploy. However, she refused and told the truth during the DAC investigation. Thereafter, Associate Dean Bullock, her supervisor, retaliated against her with the lowest evaluation Ms. Westbrook had ever received.

38. Ms. Westbrook complained to the DAC that she was subjected to retaliation after she was promised that she would suffer no retaliation if she told the truth. Eventually, the DAC conducted an investigation and reviewed the evaluations provided by three of the faculty members whom Ms. Westbrook assisted. All three (Professor Randy Abate, Professor Pat Broussard, and Professor Reyes) provided individual evaluations with very high scores; therefore, Associate

Dean Bullock had no basis to give Ms. Westbrook the low scores she assigned. According to records of the DAC investigation of Ms. Westbrook's complaint of retaliation, Professor Pat Broussard stated that she gave Ms. Westbrook high scores in her evaluation; however, she wanted to give her lower scores but was afraid that Ms. Westbrook may file a complaint against her. The DAC found that the Ms. Westbrook's complaint of retaliation by Associate Dean Bullock was corroborated by the evidence.

39. Ms. Westbrook resigned from the FAMU College of Law a couple of weeks before the current academic year (2022-2023) began. Ms. Westbrook worked in the FAMU College of Law for twelve (12) years and witnessed the ongoing discrimination, harassment, hostilities, and workplace mobbing that Professor Reyes has endured. Ms. Westbrook was targeted when she refused to participate in ploys to harm Professor Reyes. It was all part of the hostile work environment.

40. Three (3) professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant) rushed to review Professor Reyes's evidence and professional responsibility classes right at the beginning of fall 2014; they knew, by that point, that there was a late submission ploy underway to stop processing Professor Reyes's application for tenure. Stopping the tenure process meant that the four (4) evaluations by these three (3) professors were the only peer teaching evaluations available for Professor

Reyes's fall 2014 classes. RPT Committee Chair John Duncan refused to give Professor Reyes the four (4) peer teaching evaluations from Professors Broussard, Cavazos, and Grant. This was another violation of the process. Professor Reyes was left in the dark about the false and negative comments those three (3) professors stated in those four (4) evaluations; therefore, she did not have a chance to refute what they stated.

41. The individual professors (Broussard, Cavazos, and Grant), the teaching subcommittee, and the RPT Committee violated the mandate in the College of Law Faculty Handbook that required that class observers meet with the professor to provide feedback. None of the three (3) professors (Broussard, Cavazos, and Grant) met with Professor Reyes. The RPT Committee considered and gave credit to allegations made by Professor Pat Broussard during the RPT Committee meeting and in her peer teaching evaluation about what students allegedly told her. Professor Broussard did not disclose to the RPT Committee that she told students to complain about Professor Reyes to then Associate Dean Darryll Jones, who then instructed them to file written complaints against Professor Reyes.

42. Professor Patricia Broussard, a member of the RPT Committee and the College of Law representative in the University-wide T&P Committee, approached students in Professor Reyes's evidence course (at the beginning of fall 2014), in violation of the peer evaluation process, to elicit negative gossip about Professor

18

Reyes and her class. She was supposed to conduct a peer evaluation (class observation) of Professor Reyes's teaching, not student evaluations of her teaching. Student evaluations were due to be administered at the end of the semester and faculty members are not supposed to be involved in student evaluations. Professor Broussard approached students and asked them about Professor Reyes and her class right at the beginning of the semester (at the beginning of Professor Reyes's tenure process) as Professor Reyes was just beginning to establish a rapport with second year students who had not taken any of her courses until then because she generally does not teach first year courses.

43. In a repeated and ongoing pattern of discriminatory and hostile conduct toward Professor Reyes, Professor Pat Broussard negatively interfered with Professor Reyes's relationships with students and empowered students to question Professor Reyes's teaching methodology and disrespect her. She informed students that Professor Reyes was applying for tenure, something that Professor Reyes had not shared with students. Professor Broussard also told students to submit complaints against Professor Reyes.

44. After Professor Pat Broussard sent students to complain to then Associate Dean Darryll Jones about Professor Reyes, four (4) students, out of seventy-four (74) students in her evidence course, submitted written complaints, at the beginning of fall 2014. Neither Professor Broussard nor Associate Dean Jones ever

discussed the alleged student issues with Professor Reyes. As with the false allegation of five-minute late submission, the RPT Committee denied Professor Reyes an opportunity to respond to the ploy to use the four (4) student complaints in her tenure process. Professor Reyes learned about this ploy after a student warned her, on February 11, 2015, the date when the teaching subcommittee disclosed the four (4) complaints to the entire RPT Committee. According to the student, the ringleader of the four (4) complaints was encouraging students to complain about Professor Reyes and telling them that there was a meeting that day "to get her fired." The student said that the ringleader was openly saying this in Professor Broussard's class. Professor Reyes did not know when the RPT Committee was meeting but students knew.

45. The teaching subcommittee, under the leadership of Professor Nicola ("Nicky") Boothe-Perry, a member of the majority clique, presented information about the four (4) student complaints to the RPT Committee at the last minute. The members of the RPT Committee who were blindsided with this new material did not have a meaningful opportunity to argue the issue, including whether it was a violation of the process to consider this type of student complaints and what due process should be provided to Professor Reyes. Professor Boothe-Perry did not notify Professor Reyes that the student complaints would be added to her tenure file. When Professor Reyes learned of the ploy, she urged the RPT Committee to

consider the potential repercussions for the four (4) law students whose frivolous complaints and allegations were going to become part of the record. The RPT Committee did not attach and did not consider in its deliberations a memorandum Professor Reyes provided to the RPT Committee on February 24, 2015 (with Exhibits), in response to the four (4) student complaints. The negative comments in those four (4) complaints were highlighted in the teaching assessment of Professor Reyes's tenure report. However, the majority clique refused a suggestion by some Committee members that, if those four (4) complaints were going to be added and considered, the total student evaluations from fall 2014 should be added and considered. Those evaluations were not yet available when Professor Reyes applied in fall 2014 but were available in spring 2015 by the point the four (4) complaints were being added to her tenure file (in violation of the rules).

46. RPT Committee Chair John Duncan selected the members and chairs of three (3) subcommittees to review Professor Reyes's teaching, scholarship, and service. On repeated occasions Professor Reyes requested information about the composition of the subcommittees, but Chair Duncan refused to provide this information, just like he refused to provide Professor Reyes the information she was entitled to receive immediately before and during the tenure process. She finally received the list of RPT subcommittees after the DAC concluded its investigation and Professor Reyes sought and received the records.

47. None of the chairs of the subcommittees ever requested to meet with Professor Reyes. Chair Duncan selected chairs and members of subcommittees who went along with the ploys (by action or inaction). Upon information and belief, the following full professors were excluded from Professor Reyes's tenure subcommittees: Professor Randall Abate, Professor Robert Abrams, Professor Ron Griffin, Professor Rhonda Reaves, and Professor Omar Saleem. However, they were still members of the entire RPT Committee. The subcommittees wrote the teaching, scholarship, and service sections of the RPT Report.

48. Professor Nicky Boothe-Perry, the chair of the teaching subcommittee, was supposed to visit Professor Reyes's Professional Responsibility class in fall 2014, but she never did. She also never responded to Professor Reyes's email in which she asked her if she was going to visit her class in fall 2014. Professor Boothe-Perry did not visit Professor Reyes's class in spring 2015.

49. Professor Boothe-Perry did not give Professor Reyes copies of the class observation forms that were provided to her during the tenure process (fall 2014 and spring 2015). Professor Boothe-Perry never communicated with Professor Reyes to give her feedback about her peer teaching evaluations during the tenure process. The teaching subcommittee waited until the last minute (February 11, 2015) to slip in the information about the four (4) student complaints in its report; at a point when other committee members felt they could not do much to refute

them and Professor Reyes could not receive due process. At that point, the RPT Committee was told that a vote had to be taken on February 25, 2015 and the final report had to be assembled and provided to Dean Pernell by February 27, 2015.

50. The scholarship subcommittee was chaired by Professor William ("Bill") Henslee. Upon information and belief, Professor Henslee wrote (or guided) the scholarship report that dismissed the merit of two of Professor Reyes's law review articles and totally ignored one of her other articles in clear violation of the rules, which required that all articles Professor Reyes submitted should be considered in the scholarship assessment. Professor Henslee never went through a tenure process in a law school. Professor Henslee received tenure and promotion to associate professor upon being hired as a founding faculty member of the re-established FAMU College of Law. Professor Henslee knew Dean Percy Luney, the dean who hired the founding faculty.

51. Upon information and belief, Professor Henslee was denied promotion to full professor in the FAMU College of Law on a couple of occasions due to alleged deficiencies with his scholarship. Some years before Professor Reyes applied for tenure, Professor Henslee told Professor Reyes that he was denied promotion because he is a White man. However, during Professor Reyes's tenure process, Professor Henslee gained insider status by participating in the ploys against Professor Reyes with the Black majority clique.

52.  In yet another violation of the tenure process, Professor Lundy Langston, the same person who silenced Professor Ronald Griffin (by filing a complaint against him) when he tried to argue for fairness in Professor Reyes's tenure process in fall 2014, was the person who took charge of the outside reviewer selection process with her co-chair, Professor Deleso Alford. After Professor Reyes received excellent external reviews of her scholarship from law professors in top-ranked law schools, Professor Langston, at the last minute, slipped in a negative external review by a Black female law professor whose area of expertise is critical race theory. That external reviewer professor was not vetted through the Outside Reviewer Selection Subcommittee process. She provided the only negative external review of Professor Reyes's scholarship.

53.  The clique that took control of the tenure process, inappropriately placed great emphasis on the highly critical external review by the critical race scholar, someone who did not disclose in her external review that she and her friend, a self-described Afro-Latina law professor, both attacked Professor Reyes personally when they were all participants in the *Defining Multiracialism and its Impact on the Law* panel during the 2014 Southeastern Association of Law Schools Annual Conference. This was during the summer before Professor Reyes applied for tenure. The two professors mocked Professor Reyes for proposing that Hispanic/Latino has become a race and should be considered for inclusion in the

racial categories of the next U.S. Census (the 2020 Census). Immediately after the panel, Professor Reyes approached the critical race theory scholar to introduce herself; the professor responded in a rude and dismissive manner. She told Professor Reyes, in what Professor Reyes perceived as a threatening tone, "you should tell LeRoy Pernell, your dean, that I said hello. He and I go a long way back." During the tenure process, Professor Reyes did not know that this professor had become part of the ugly ploys.

54. There were additional ploys as part of Professor Reyes's tenure process. The ploys stated in this complaint are only a representative sample of the ongoing, severe and pervasive hostilities and indignities Professor Reyes has faced for years. On April 24, 2015, Professor Reyes submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to FAMU's Office of Equal Opportunity Programs ("EOP") against members of the 2014-2015 RPT Committee who discriminated against her, harassed her, and made the tenure process as hostile as possible.

55. The majority clique did not want a non-Black Latina from Hispanic origin to join the group of tenured professors.

56. Professor Reyes's Charge was investigated by Carrie M. Gavin, EOP Director. Ms. Gavin did a sham investigation and dismissed the Charge.

57. Professor Reyes documented the flaws in Ms. Gavin's investigation in a memorandum dated September 8, 2015, which Professor Reyes submitted to then President Elmira Mangum requesting review of the decision.

58. On September 14, 2014, the then General Counsel, Avery McKnight, responded that there was no appellate procedure to review the sham EOP investigation.

59. At the end of the RPT Committee review, the majority clique recommended denial of tenure to Professor Reyes.

60. Dean LeRoy Pernell, after conducting an independent evaluation of the application, recommended that Professor Reyes be granted tenure. He concluded that the majority in the RPT Committee did not provide a rational basis for its conclusion (recommendation). He also found that the RPT Report and Recommendation issued by the RPT Committee did not set forth a rationale that supported the conclusion (recommendation).

61. The University T&P Committee (with Professor Broussard as the representative of the College of Law) followed the lead of the RPT Committee.

62. Provost Marcella David, an experienced, accomplished law professor who had recently joined FAMU as provost, knew how to review an application for tenure by a law professor and did an independent review of Professor Reyes's application.

63. Provost David and President Elmira Mangum recommended that Professor Reyes receive tenure.

64.  Professor Reyes's tenure was approved on June 10, 2015.

### On the Basis of Race, Color, National Origin, and Sex

65. The factual findings section of the 2008 ABA Site Visit Report documented a workplace riddled with divisions and tension within the faculty. Specifically, the report described "pervasive, persistent and destructive tensions between the senior and junior faculty." The report stated: "The faculty continues to suffer from a negative dynamic that is extraordinary." The report suggested that the law school should recruit new faculty to improve the faculty relationships and environment especially because there was a "race against the clock" to satisfy the requirements for full accreditation.

66. It is against this backdrop that Professor Reyes joined the faculty of the FAMU College of Law as the first Hispanic/Latina/o in the tenure track. Professor Reyes did not have access to the site visit report until years after she joined the faculty when she was searching for answers as to why she was experiencing horrific circumstances. Eventually, Professor Reyes came to understand that she cured the senior and junior faculty divisions by her mere presence. The senior and junior Black faculty found a common interest in discriminating against, harassing, and making the work environment hostile for Professor Reyes.

67. Comments about race, color, and national origin have been prevalent in Professor Reyes's experiences at FAMU. There has also been a gender aspect to the ongoing discrimination. A former Latina executive assistant who worked in the Dean's Suite, Wanda Aviles, went through similar discrimination and hostile work environment. She no longer works in the FAMU College of Law. Ms. Aviles described how a group of Black women targeted her when she was the only non-Black woman in the Dean's Suite. She also described how another Latina staff member adopted a Black identity and was accepted by the majority clique. Ms. Aviles also described how, once Associate Dean Darryll Jones and Associate Dean Reginald Green realized that the Black women did not like Ms. Aviles, they also joined in efforts to sabotage her to gain favor with the Black women. Associate Dean Jones even raised his voice at Ms. Aviles in what she considered an abusive tone. Associate Dean Jones has also been abusive toward Professor Reyes for years. By targeting Professor Reyes he has bonded with the Black women who harass her because she is Latina and not Black.

68. After Professor Reyes accepted the offer to join the FAMU Law faculty, during a visit to look for housing she stopped by the law school and was introduced by a staff member to Professor Rhoda Cato, a more senior faculty member, a Black woman. Professor Cato's first comment to Professor Reyes was: "So you are the wise, Latina diva they hired." Professor Reyes was hired around the time of Justice

Sonia Sotomayor's confirmation hearing, when she was attacked and chastised for her comment that a wise Latina judge may reach a different result than a wise judge of a different background and experience.

69. Professor John Duncan's first comment to Professor Reyes when she joined the faculty was: "We are going to have fun with you." Professor Reyes found the comment odd at the time but did not say anything.

70. Professor Patricia Broussard, during Professor Reyes's first weeks on the job, kept referring to Professor Reyes's Latina identity as the basis for her hiring. Professor Reyes finally responded that she was qualified for the job beyond her Latina identity.

71. Professor Lundy Langston once told Professor Reyes that the reason why the African-American women professors were hostile toward her was because of her hair. She explained that her straight hair and light complexion means she is White. Professor Langston also told Professor Reyes that she identifies with her Dominican (someone from the Dominican Republic) hairdresser because they have the same hair texture and, as such, they share a racial connection. Professor Reyes does not have the same hair texture as Professor Langston and had no idea that her hair and skin color would be scrutinized.

72. The comments about race, color, and national origin distinctions continue year after year. The scrutiny of Professor Reyes's hair, skin color, and race self-

identification are also replicated within the student body and often serve to divide. It has taken Professor Reyes years working at FAMU to understand how "code language" is used by some Black faculty members. For example, some Black professors, primarily some of the ones who constantly target Professor Reyes, often responded to Professor Reyes's suggestions during faculty meetings with the phrase "this is a Black school." Eventually, Professor Reyes realized that this comment was meant to silence her and to signal to other faculty members that Professor Reyes should not comment because she is not Black.

73. There were also comments about a caste system depending on the national origin of immigrants. Black immigrants and immigrants from countries that are deemed Black are preferred. There is also a preference for dark skin color if someone is not Black. Related to this, Professor Reyes also learned that some Black faculty members divide Latinas/os between "Black Latino" and "White Latino." Some Latina/o students shared with Professor Reyes that Professor Jeremy Levitt, during class, shamed Latina/o students into picking between Black and White after they initially responded that they are Latina/o. Latina/o students also shared with Professor Reyes that this feeds racial conflict within the student body.

74. About two years ago, HALSA Board members met with Dean Keller to raise some of the issues they face because they are Latinas/os and told her that they

30

want Professor Reyes to be treated the same as other tenured professors. Dean Keller has not spoken with the HALSA Board after that and she has not spoken with Professor Reyes about the issues. Recently, Professor Reyes reminded Dean Keller that, if she presents data on Black students and Bar passage, she should also present data for Hispanic/Latino students because they are also statistically at high risk of not passing the Bar. The fact that Professor Reyes speaks on behalf of Latina/o students and HALSA, as HALSA's advisor, has made her a target of additional conflict, including when she raised the issue of HALSA being left out of a domestic violence and breast cancer event, organized by students in Professor Langston's domestic violence workshop, during the Covid pandemic.

75. Black tenured professors (men and women) have attacked Professor Reyes throughout the years with impunity, including when the entire faculty and even students have been present. They have sent a message to Professor Reyes that she, a non-Black Latina, should not be a tenured law professor in the FAMU College of Law.

76. A year after Professor Reyes was hired as a tenure-track assistant professor, the professors who have targeted Professor Reyes with racial animosity for years, pushed for a legal writing instructor, a Latina who self-identified as Black, to be hired in the tenure-track. Some professors and students reported that they did not know that the professor was Latina. She had changed her name and was primarily

using the African name she adopted. When Professor N.N. applied to become a tenure track faculty member, she distributed documents to the faculty explaining that she changed her name to denote her African ancestry and moved from College Park to Pine Hills to be in a Black neighborhood. She emphasized her Black racial identity during the hiring process. Professor Reyes tried to approach her a couple of times but, the first time, Professor Levitt interrupted and physically got between Professor Reyes and Professor N.N. The second time, they spoke briefly and, after that, Professor Reyes perceived that Professor N.N. felt she had to stay away from Professor Reyes in order to gain favor with the Black faculty members who target Professor Reyes. This is how some faculty members divide Latinas/os. Professor N.N. is no longer in the FAMU College of Law. She and Professor Reyes may have been able to make a great team if they had not been divided.

77. After Professor N.N. was hired in a tenure track position, during a faculty meeting, Professor Jeremy Levitt made it a point to correct the FAMU 2012 Self-Study, which the faculty was preparing to present to the ABA, to describe Professor N.N. as "Black Latina" and not as "Latina." Professor N.N. was present at the meeting but said nothing. At the time, Professor Reyes asked whether the ABA had a separate category for "Black Latino." Professor Darryll Jones looked at Professor Reyes with disdain and asked her what kind of Latina she is. Professor Reyes responded that she self-identifies just as Latina, but Professor Jones asked

her again what kind. Professor Reyes responded that she would need some type of DNA test to tell him more. Years later, Professor Jeremy Levitt, in an email to the entire faculty on October 23, 2019, falsely accused Professor Reyes of rejecting N.N.'s "self-designation as Black and Latina." He characterized Professor Reyes as a "White Latina" with "white privilege," and attempted to once against pit her against Professor N.N., a "Black Latina" who was no longer working in the law school. Apparently, Professor Levitt and perhaps other Black faculty members had been spreading the falsehood about Professor Reyes and she had no idea.

78. Professor Reyes has been subjected to the constant message that some of the Black professors who discriminate against her perceive her as a White Latina and want her to accept said label. During the DAC investigation, then Associate Dean and Professor Joan Bullock said that Professor Reyes is "White appearing." On April 8, 2020, Professor Jennifer Smith called Professor Reyes a "White Latina" after a presentation during which Professor Reyes once again stressed that she self-identifies as Latina without any additional qualifier.

79. Some years before that incident, Professor Smith made a comment during a forum when Professor Smith was a panelist, as she saw Professor Reyes enter with students, that "Asians and Latinos are unintended beneficiaries of the Civil Rights Movement." Professor Reyes responded to the comment by briefly explaining that Latinos participated in the Civil Rights Movement, even if they were not in the

South, and Chinese fought against the Chinese Exclusion Acts and racist treatment. Another constant message Professor Reyes gets is that Black ancestry is superior, that Blacks have a superior right to life in the United States than Latinos, and that she is supposed to accept inferior status, including by accepting the discrimination, disparate treatment, and hostilities without complaining.

80. The racial hostility became evident in the closed RPT Committee meetings when the Committee was reviewing Professor Reyes's application for tenure. On October 1, 2014, Professor Lundy Langston sent an e-mail to then Dean Pernell with copies to his executive assistant, Pamela Leonard, and then Associate Dean Jones complaining about "reprehensible conduct" allegedly exhibited by an African American male professor, Ronald Griffin, against her during an RPT Committee meeting on October 1, 2014. This was around the time when the majority clique was insisting that Professor Reyes's process should not proceed.

81.     On October 24, 2014, Professor Langston sent another e-mail that she characterized as "an official complaint" against Professor Griffin "for his [alleged] conduct referring to [her] and other [Black] female colleagues . . . as being malicious, evil, racist, and vile" during an RPT Committee meeting on October 23, 2014. She stated that Professor Griffin made his statements "while addressing the viewpoints expressed by African American women committee members." Professor Langston sent her complaint to Dean Pernell and copied the University

34

President, the Interim Provost, the Board of Trustees' attorney, the University EEO Officers, the General Counsel, Chair Duncan, Associate Dean Jones, and Pamela Leonard (Ms. Leonard was one of the Black women who was hostile to Wanda Aviles when they worked together in the Dean's Suite and she was also hostile to Professor Reyes since the hiring process when she delayed processing Professor Reyes's moving paperwork).

82.    In her complaint, Professor Langston described, with much verbosity, a scenario of "African American women committee members" breaking down and "sobbing, loudly" after Professor Griffin allegedly made his comments. "Two other African American women" allegedly "walked out of the meeting." Professor Langston claimed that the words that he allegedly used were "actionable as slanderous." She went on to define each term and seemed to conclude that Black women cannot be racist because of the racism they themselves experience.

83.    Professor Langston tainted Professor Reyes's tenure process by potentially creating additional animus against her when she submitted her complaint about what she alleged happened in the tenure process to decision-makers that were supposed to review and make recommendations on Professor Reyes's application for tenure at subsequent levels of review. Rather than limit herself to submitting her complaint to the University Equal Opportunity Programs Officer, which is the procedure specifically prescribed in the University

Regulation, she sent her complaint to Dean Pernell, an African-American man, and copied the President, an African-American woman, the Interim Provost, an African-American man, the Board's attorney, another African-American woman, the Associate Dean for Academic Affairs, an African-American man; the Chair of the RPT Committee, an African-American man, and Dean Pernell's executive assistant, an African-American woman. By including Ms. Leonard, Professor Langston riled up even the staff, the majority of whom are Black women.

84.     Professor Langston did not stop there. She and some of the other Black female faculty members complained behind the scenes about Professor Reyes and claimed that they were afraid of her. There were email exchanges with EOP Director Carrie Gavin and Human Resources liaison Adrienne Snyder raising all kinds of rumors about Professor Reyes being "dangerous." Professor Jennifer Smith told a staff member about a dream she had about Professor Reyes and the staff member allegedly had some type of anxiety attack. Professor Reyes did not know this was happening. She found out when she obtained the records of the investigations. Those records show the deep racial hatred against Professor Reyes and how turning Professor Reyes into a "dangerous White Latina" conjures up ancestral fears that cause group frenzy like workplace mobbing.

85.     FAMU's General Counsel Denise Wallace, a Black woman, has also misrepresented Professor Reyes's conduct, including by claiming that Professor

Reyes contacted the Office of the General Counsel in another university to ask about open meetings when it was not Professor Reyes. Professor Reyes has been blamed and become the scapegoat for situations that she does not even know about.

86.     In addition to dealing with hostilities from Black women, Professor Reyes has also been subjected to abusive conduct from Black men. For example, Professor Reyes only communicates with Professor Levitt in group emails and she is only around him during faculty meetings because he was highly abusive toward her since she joined the faculty in 2009. Around that time, Professor Barbara Bernier and Professor Jennifer Smith filed complaints against Professor Levitt. Professor Reyes did not know that a Hispanic/Latino student had also filed a race and national origin complaint against Professor Levitt. When Professor Reyes spoke about his abusive conduct with Associate Dean Markita Cooper, she told Professor Reyes that she was also dealing with his harassment but, if Professor Reyes told anyone, she would deny it. Basically, Associate Dean Cooper said that she would lie. Therefore, Professor Reyes realized that she could not count on her to help. Professor Reyes had to fend for herself in an abusive workplace where she was more vulnerable than most.

87.     In May 2019, Professor Levitt sent an individual email to Professor Reyes. This was soon after he ridiculed Professor Reyes at a faculty meeting on

May 8, 2019 when, upon Professor Reyes's request for credit for her professional

contributions, Professor Levitt responded that he was going to give her "a star and

smelly sticker or happy face." Professor Levitt's subsequent email was apparently

an excuse to start conflict with Professor Reyes, claim offense, accuse her of

racism, and insult her because of her race. In that email exchange, he called

Professor Reyes a "white Latin or Hispanic," and termed her response to his attack

"[her] defensive and white privileged victim-based response." On May 13, 2019,

Professor Reyes demanded that Professor Levitt stop sending her emails. She

stated in pertinent part:

> Jeremy,
>
> You have crossed the line into harassment. I am copying attorney Shira Thomas,
> FAMU's Interim Vice President and General Counsel, so she can add this record
> to all the records in the Office of the General Counsel about FAMU Law and
> what happens here. I **am not** filing a Regulation 10.103 complaint because I have
> no confidence in the FAMU Office of Equal Opportunity Programs. They and
> the FAMU Office of the General Counsel have been aware of the hostile work
> environment in the law school for years. Unfortunately, like the avoidance of
> dealing with the hazing problem until it became public, the institution has, thus
> far, ignored the workplace environment problem in the law school. I hope that
> the selection of a new dean serves to address this cancer that has been killing the
> law school and harming human beings who find ourselves in a position of
> vulnerability.

88. On May 14, 2022, Professor Reyes also put Provost Maurice Edington on

notice of Professor Levitt's latest attack. She also notified then Interim Dean Nicky

Boothe-Perry, Interim Associate Dean Phyllis Taite, and Associate Dean Reginald

Green (Professor Levitt's friend since they were 1L students in law school).

Professor Reyes reminded the three of them that they were present when Professor

Levitt ridiculed her during the faculty meeting and they, as administrators, said

nothing. In her email to Provost Edington and Interim General Counsel Thomas,

Professor Reyes stated:

> The e-mail below from Jeremy Levitt confirms the latest setup. Jeremy Levitt bullied me at the faculty meeting (on 5/8/19) when we met to discuss the finalists for the dean position. Then, he followed up by e-mailing me. He escalated the situation and, after I defended myself and copied attorney Shira Thomas, he leveled a heinous and false accusation against me by stating that I am "attacking [him] and others on the basis of race and or gender." This is a blatant lie. It is also hypocritical and self-serving, especially after Jeremy Levitt called me a "white Latin or Hispanic" with "white privilege." This is how he and others view me in this workplace.
>
> Professor Levitt is accusing me to silence me. I will not remain silent.
>
> ***
>
> The fact that this situation is happening in an HBCU law school with a publicized mission of social justice is troubling and demoralizing. How would people outside judge what is happening here? This is beyond embarrassing. It is abusive. The University should hire a reputable law firm to conduct an independent investigation of the workplace environment and propose a plan of action to address the mayhem.

89. On May 15, 2022, Carrie Gavin, FAMU's EOP Director, sent an email to

Professor Reyes asking her if she wanted to file a harassment complaint. Professor

Reyes responded in pertinent part:

> With all due respect, I am not going to spend yet another summer, without pay, dealing with another non-productive, non-objective, sham internal investigation. FAMU is on notice of the hostile work environment and the actions against me.

If additional circumstances arise, I may re-assess the need to file a complaint after consultation with legal counsel. In such case, the goal will be to get objective and independent review of my claims.

I understand that the only assistance you are offering is documenting that you told me to file a Regulation 10.103 complaint. I suggest that you go beyond that and finally advise the Provost and the President to hire a reputable law firm to conduct an independent, credible investigation of the hostile work environment in the law school.

90. After Professor Reyes demanded that Professor Levitt stop sending her emails, he joined in a group email to the faculty wherein Professor Phyllis Taite dismissed Professor Reyes's comment and said that the "majority" was in agreement. Professor Reyes has heard the same "majority" comment for years and has come to understand that it is meant to constantly remind her that she is not part of the majority. In response to Professor Taite, Professor Reyes acknowledged her minority status. Professor Levitt then took this opportunity to reply to all faculty attacking Professor Reyes and questioning her race and gender identity. In summary, Professor Levitt, in his e-mail correspondence dated October 23, 2019, 2:56 PM:

a) began by insulting Professor Reyes and self-servingly claiming that there were no "EO concerns" raised by his harassment, which Professor Reyes qualified as abusive conduct;
b) applied some type of litmus test to question Professor Reyes's racial identity;
c) used a reference to former colleague N.[N.], a self-described Black Latina who was pitted against Professor Reyes, to set up a false race-based accusation against Professor Reyes;
d) ascribed to Professor the thinking of a Spanish conquistador who was a torturer and mass murderer of indigenous people;

e) falsely alleged that Professor Reyes admitted not understanding the diversity of Black people;

f) determined that Professor Reyes does not have the knowledge and experience Professor Reyes claims about "race, ethnicity, color, gender and religion in the US" because, according to Professor Levitt, Professor Reyes's experience is not morally equivalent to his;

g) labeled Professor Reyes a descendant of the "enslavers" of "[his] people;" and

h) criticized the definition of Latino that Professor Reyes used in an article in 2008 in the Harvard Law School student newspaper.

91. Professor Reyes waited three weeks to see if any faculty member or administrator who was copied in Professor Levitt's email responded in her defense or at least ask her how she was feeling after such a vicious and public attack. No one reached out to her. Professor Reyes determined that she must respond; otherwise, her silence may be deemed an admission of Professor Levitt's false allegations.

92. Professor Reyes prepared a memorandum, dated November 13, 2019, which she submitted to the following: College of Law Faculty, President Larry Robinson, Provost Maurice Edington, General Counsel D. Denise Wallace, and EOP Director Carrie Gavin. In said memorandum, before responding to each of Professor Levitt's vicious racialized attacks, Professor Reyes stated:

> I must respond to Levitt's dangerous and abusive allegations (See Composite Exhibit "A"). He made unsupported accusations and broad misrepresentations about me and what I have stated with the clear intent of harassing me, damaging my reputation, and promoting additional racial animus against me. Therefore, I cannot afford to leave his false allegations unchallenged. This is by no means an academic exchange. This is my response/defense to Levitt's discrimination and

harassment, which institutional actors have been aware of. Again, I became his target as soon as I began working here.

\*\*\*

The e-mail exchange that led to this memorandum response is a perfect example of how I have yet again been attacked by a member of this law school's faculty, and need to defend myself because, otherwise, the false allegations may be deemed admissions. The lies are spread all over the law school and beyond. This has happened before; therefore, I must respond, preferably in e-mails to all faculty, to try to avoid misrepresentations of what I said or did.

\*\*\*

Can you imagine what would happen if I (a Latina) wrote to Levitt (a Black man) the hateful things he writes to me? To put Levitt's attacks against me in context, in his "*Fuck your Breath*" law review article, Levitt stated that hate "means to intensely dislike, harbor extreme hostility, or antipathy toward [another] 'usually deriving from fear, anger, or sense of injury.'" To me, Levitt's e-mails are full of this hate. What is even more dangerous is that Levitt is using this institution to spread hate and a hate-filled rhetoric against people whom he perceives as not being "the same [as] or even similar" to him – people he places "on different sides of the enslavement and slavery index" [Levitt's words].

93. There was infighting present in the FAMU College of Law before Professor Reyes arrived. In fact, an outside consultant identified all kinds of dysfunctional dynamics within the faculty, including malicious gossip. Professor Reyes had no idea how bad it was or how extra vulnerable to attacks she would be.

94. When Professor Reyes was recruited and hired, she also did not know that, upon information and belief, Carmenelisa Perez-Kudzma, a former College of Law non-tenure track legal research and writing instructor, complained that she was being discriminated for being Latina. Professor Perez-Kudzma was no longer

teaching at the FAMU College of Law by the time Professor Reyes joined the faculty.

95. Professor Levitt has not attacked any other faculty member with the racist attacks he has directed at Professor Reyes in plain view of many people, including deans and associate deans. President Robinson and Provost Edington have been on notice. Professor Levitt has also attacked Professor Reyes in combination of woman and "White Latina." Professor Darryll Jones has also joined in attacking Professor Reyes in emails and in meetings. And, Associate Dean Reginald Green has also participated behind the scenes in ploys to sabotage Professor Reyes.

96. Black female faculty members who themselves complained that they suffered gender discrimination from Black men on the faculty, including Professor Joan Bullock, Professor Lundy Langston, Professor Jennifer Smith, Professor Patricia Broussard, Professor Ann Marie Cavazos, Professor Nicky Boothe-Perry, and Professor Phyllis Taite joined with Black men in attacking Professor Reyes for years. In this way, attacking Professor Reyes has become a source of Black racial solidarity. Other faculty and staff members follow the lead of the majority clique. That is how workplace mobbing works.

97. A Black female tenure-track faculty member who did not follow the lead of the majority clique had her Black identity questioned by Professor Jennifer Smith during a pre-planning workshop when then Dean Felecia Epps was dean. Professor

Reyes was seated at the same table with Professor Smith. She saw and heard what happened. Dean Epps placed rushed to get in between the two of them when it looked like the situation may escalate. Rumors started that the junior faculty member was "friendly" with Professor Reyes. She joined the faculty when Professor Reyes was going through the horrific tenure process. Dean Epps knew that Professor Smith was sending abusive emails to the junior faculty member; however, upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith like she did to Professor Reyes over malicious and frivolous allegations by Professors Broussard and Cavazos. The junior faculty member eventually resigned and called the FAMU College of Law a "hellish" work environment.

98. The race issues have also permeated to the student body. Professor Reyes has heard stories of Hispanic/Latina/o students who have felt racially discriminated but do not want to complain because they are afraid. Professor Reyes has also heard similar stories from White students, primarily White female students who have felt racially targeted primarily by some Black female students who have told them that "this is a Black school" and they are taking the place of Black people. Professor Reyes has also heard about Caribbean students who are made to feel that they have to prove their "Blackness," including by distancing themselves from non-Black students.

99. For years, Professor Reyes has advanced that racial hostility causes divisions that should not happen in a law school with the noble mission of the FAMU College of Law. It is harmful for the law school, students, the clients alumni will serve, the legal profession, and society in general. Even as she has been racially, color, national origin, and gender attacked, Professor Reyes has worked to bring students of all race, ethnic, and cultural backgrounds together for a common purpose of serving as catalysts for positive change. The diverse students in the law school are the reason why Professor Reyes has remained. She has helped many students and alumni. In turn, many students and alumni of diverse gender, race, ethnic, and cultural groups have sought her mentoring and showed appreciation for her teaching and service. Some Black female students have been the most supportive, including because they share Professor Reyes's Christian faith. Many students and alumni have provided moral support and prayers along the years when Professor Reyes has been dealing with the ongoing discrimination, harassment, and hostile work environment, including workplace mobbing.

**The Discrimination, Harassment, Hostile Work Environment and Retaliation Continued After Professor Reyes Received the Tenure She Earned**

100.    EOP Director Carrie Gavin's sham investigation of Professor Reyes's EOP Charge during the tenure process, including Director Gavin just taking members of the majority clique at their word (even with one-sentence denials), emboldened them in their ploys against Professor Reyes.

101.    For example, in her EOP Charge, Professor Reyes detailed several violations by Professor Broussard. Professor Broussard's response to the Charge consisted of one sentence: "I categorically deny all allegations of Ms. Reyes's Complaint." This was sufficient for EOP Director Gavin to conclude that Professor Reyes's Charge as to Professor Broussard's conduct was unsubstantiated.

102.    The retaliation against Professor Reyes continued even when she was visiting at the University of Florida Levin College of Law ("UF Law") in fall 2015.

103.    When Professor Reyes accepted the invitation to visit UF Law for one semester (right after her tenure ordeal), she remained in the FAMU payroll system. FAMU negotiated with UF Law for a rate they charged to cover Professor Reyes's FAMU salary and benefits. The rate they charged UF Law was higher than what they paid Professor Reyes. Therefore, FAMU received a windfall which became a line item in the FAMU College of Law's budget. For all intents and purposes, Professor Reyes remained a FAMU employee.

104.    In fall 2015, Professor Darryll Jones, who was then Interim Dean, invited the new UF Law Dean to meet with the FAMU Law faculty in Orlando. However, he did not invite Professor Reyes. Professor Reyes learned about the invitation when the UF Law Dean told her. To Professor Reyes's recollection this was the only time a dean from another law school in Florida was invited to visit with the faculty of the FAMU College of Law.

46

105.      Upon information and belief, that same semester (fall 2015), FAMU College of Law's Black Law Students Association (BLSA) hosted UF Law's BLSA. A BLSA member told Professor Reyes that some FAMU College of Law BLSA members were gossiping with UF Law BLSA members about Professor Reyes. Upon information and belief, Professor Jennifer Smith was the faculty advisor of FAMU College of Law BLSA.

106.      Professor Reyes has been serving as faculty advisor of the Hispanic American Law Student Association ("HALSA") for many years. Professor Reyes planned to continue to advise HALSA during fall 2015. She reviewed the Student Handbook rules and confirmed that she could remain as faculty advisor, including because she was still a full-time employee in the FAMU system. UF Law arranged her class schedule such that she could travel to Orlando to attend HALSA functions. She paid for parking at FAMU College of Law because she planned to attend HALSA events. Professor Reyes worked with HALSA's president to re-certify the organization through FAMU's bureaucratic process. She fulfilled all her duties as faculty advisor for the semester, including attending activities for Hispanic Heritage Month. She put a lot of time and effort into driving from Gainesville to Orlando to attend orientation for HALSA and all major events. She also spent lots of time communicating by phone and email with HALSA's

president. UF Law arranged video conferencing so Professor Reyes could meet with HALSA's Board.

107.    Toward the end of the fall 2015 semester, Associate Dean Reginald Green, with the approval of Interim Dean Darryll Jones, instructed members of the HALSA Board to remove Professor Reyes as faculty advisor. Upon information and belief, then Associate Dean Joan Bullock was also involved in the ploy.

108.    The hostile removal was effected in violation of the University Student Handbook, which required consultation with the faculty advisor prior to removal.

109.    Associate Dean Reginald Green, Interim Dean Darryll Jones, and Associate Dean Joan Bullock did not contact Professor Reyes.

110.    The president of HALSA reported to Professor Reyes that she was threatened with HALSA losing funding if Professor Reyes was not replaced.

111.    Associate Dean Green instructed FAMU College of Law Student Affairs Director Fritzlaine Powell not to respond to Professor Reyes's request for information.

112.    One of Professor Reyes's ongoing harassers, Professor Patricia Broussard, replaced Professor Reyes as HALSA's faculty advisor without even contacting Professor Reyes.

113.    The hostile way in which the hostile removal was orchestrated was meant to humiliate Professor Reyes and ostracize her from students.

114.    The institutional actors who participated in the hostile removal caused chaos, confusion, and division within HALSA and nearly decimated the organization.

115.     HALSA members reached out to Professor Reyes to find out what was happening. They reported that they were being called into a meeting to elect Professor Broussard as faculty advisor. However, the meeting and vote were being scheduled and conducted in violation of the provisions in the HALSA Constitution.

116.    Professor Reyes felt she had a duty to inform HALSA members to be careful and not violate HALSA's internal documents.

117.     She sent a couple of emails to HALSA members explaining what she knew about the situation and advising them not to violate HALSA's Constitution.

118.    Everything Professor Reyes stated in her emails to HALSA was true and stated in good faith for the benefit and protection of HALSA and its members.

119.    For the sake of HALSA, to avoid having the organization be further targeted in efforts to harm Professor Reyes, Professor Reyes did not fight the removal as HALSA's faculty advisor.

120.    In further retaliation against Professor Reyes, on November 25, 2015, the day before Thanksgiving, Professor Broussard submitted a false, malicious, and frivolous EOP Charge against Professor Reyes.

121.    Professor Broussard alleged retaliation and Title IX stalking. She used the email Professor Reyes sent to HALSA as the basis for her Charge.

122.    Professor Broussard also referenced a video of a faculty meeting and falsely alleged that Professor Reyes "attempted to push her way into [her] space." She also claimed that Associate Dean Green "was so upset by [the video.]"

123.    Associate Dean Green denied that he said what Professor Broussard alleged and stated that he did not watch the video.

124.    The video actually showed Professor Broussard blocking Professor Reyes from participation in the counting of votes during a meeting when a White male candidate was being considered for a clinic position.

125.    The video also showed that two Black female law professors were much closer to Professor Broussard than Professor Reyes and even made physical contact with Professor Broussard. Professor Broussard did not accuse them of attempting to push their way into her space. The video also showed Professor Cavazos questioning why Professor Reyes was counting the votes. Professor Reyes had to remind these faculty members that she also had a right to participate in the counting like Black female professors.

126.     Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith sent emails with copy to all faculty insulting Professor Broussard.

127.     Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith called her a "snake" and a "weasel" in emails that were filed in Professor Smith's federal case against FAMU.

128.     In addition to slanderous accusations against Professor Reyes, Professor Broussard claimed that she was afraid of Professor Reyes and tried to stay away from her. This was patently false.

129.     Professor Reyes responded to Professor Broussard's EOP Charge line by line. Professor Reyes noted that Professor Broussard's own actions belied her claims of fear and staying away from Professor Reyes. Professor Broussard participated voluntarily in the hostile replacement as HALSA's faculty advisor. She was not afraid. She has constantly looked for ways to harm Professor Reyes including via student situations and student organizations.

130.     Professor Reyes's comprehensive response to Professor Broussard's Charge demonstrated the falsity of Professor Broussard's conclusory and defamatory allegations.

131.     In her response to Professor Broussard's EOP Charge, Professor Reyes requested that the EOP recommend that Professor Broussard be disciplined in accordance with FAMU Regulation 10.103(6)(d) for knowingly filing a false complaint of retaliation and Title IX stalking and for providing false testimony in the form of false facts alleged in her Charge.

132.     Professor Broussard was not disciplined and this further emboldened her to continue to harass Professor Reyes and make false allegations against her.

## The Hostilities Became Physical

133.     The hostilities against Professor Reyes have even become physical.

134.     In spring 2015, as Professor Reyes was being tortured in the tenure process, a member of the staff, Erica Polite, who had been bringing lunch to Professor Broussard in her office that semester, bumped Professor Reyes on her shoulder as Professor Reyes was walking by her. Ms. Polite had the space available to move to her right and avoid the physical contact. Professor Reyes was literally against a wall and did her best to get against the wall to avoid Ms. Polite. About a year or two before that, Ms. Polite screamed at Professor Reyes on the phone, about an IT issue. Professor Reyes reported that incident to Ms. Polite's supervisor and avoided Ms. Polite since then. Professor Reyes could not avoid the bump.

135.     Professor Reyes reported the bump incident to IT/Security Director Shashi Persaud whose office door was open, right by where the incident happened.

He claimed he did not see anything; however, he had a video of the incident because it was recorded in the surveillance camera. The matter was reported to Associate Dean Reginald Green and Dean LeRoy Pernell; neither of them ever followed up with Professor Reyes. Instead, they escalated the situation by referring it to the FAMU Police in Tallahassee without even consulting with Professor Reyes. This was leaked all over the building and turned against Professor Reyes.

136.    Professor Phyllis Taite, Professor Rhoda Cato, and Professor Pat Broussard made a point of exaggerating their efforts to stay far from Professor Reyes as they passed each other in a hallway. The rumor was that Professor Reyes was going to accuse them with the FAMU Police. However, Professor Reyes has never accused anyone with the police despite all that has been done to her.

137.    There was also an incident with something that looked like blood smeared on the doorframe of Professor Reyes's office. Professor Reyes discovered it when she was walking back to her office with a student. Professor Reyes's program assistant, Celia Westbrook, and Professor Rhonda Reaves also saw it. Professor Reaves, as she often did when Professor Reyes was targeted, dismissed it as if nothing happened. The cleaning crew later notified Professor Reyes that they had to report it to their supervisor because it appeared to be blood when they cleaned it. Professor Reyes informed Dean Pernell about it but she never heard anything more.

138.      At the beginning of fall 2018, Professor Broussard bumped Professor Reyes from behind as Professor Reyes was walking back from taking the group faculty pictures. Professor Broussard acted as if it was by accident and Professor Reyes did not say anything. Professor Reyes knew that Professor Broussard wanted a reaction from Professor Reyes.

139.      On May 6, 2019, Professor Broussard ran to one of the two elevators in the first floor of the FAMU College of Law lobby when she saw that Professor Reyes had just gotten in the elevator. Professor Broussard was accompanied by Professor Ann Marie Cavazos, as she often is. Rather than take the empty elevator right next to the one Professor Reyes had just entered, Professor Broussard ran to push the button so she could stop Professor Reyes from going up alone in the elevator.

140.      When Professor Broussard and Professor Cavazos entered the elevator, Professor Reyes rushed out. She then went to the library elevator.

141.      When Professor Reyes exited the library elevator in the third floor, by the faculty suites, Professor Broussard and Professor Cavazos were standing by the door of that elevator with a Black female staff member, Claudine Beale, who has also engaged in hostile actions against Professor Reyes. The law school surveillance cameras recorded the incident. The video showed that Professor Broussard and Professor Cavazos enjoy harassing Professor Reyes.

142.    In spring 2022, Professor Broussard once again found a way to be in the same space as Professor Reyes, when Professor Reyes had gone out of her way to check and confirm that Professor Broussard would not serve as moderator of a diversity and inclusion student panel organized by the Women's Law Caucus ("WLC") with several organizations, including HALSA.

143.    Professor Broussard is the faculty advisor of the WLC. Therefore, Professor Reyes requested the identity of the panelists and moderator. The president of the WLC, a Black female student who had been hostile to Professor Reyes, finally provided the information Professor Reyes requested. She provided it the Friday before the Monday panel. She provided the itinerary and questions for the panel. She also provided the name of the moderator and it was not Professor Broussard.

144.    Contrary to the information Professor Reyes sought and received about the identity of the moderator and the start time of the panel, she was shocked when she entered the room and saw Professor Broussard already moderating the panel. Professor Broussard started the panel earlier than the time in the itinerary that was provided to Professor Reyes. Professor Broussard made a comment about Professor Reyes being late. Professor Reyes explained, by reference to the printout of the email she received, that she was actually early.

145.     During the panel, Professor Broussard stood over Professor Reyes, said she was going to deviate from the questions that had been agreed upon, poked Professor Reyes on her shoulder with her finger and glasses, and mocked Professor Reyes about wearing a mask and not wanting to be videotaped. She also questioned why Professor Reyes was going to be in the group picture if she did not want to be on video. Professor Reyes had to explain the obvious, that video is not the same as a picture. Professor Reyes had to do her best to maneuver the situation with alumni and students present. A few of those alumni and students had been disrespectful to Professor Reyes in her evidence course. This has been a consistent circumstance for years; some students who are close to Professor Broussard are rude and disrespectful toward Professor Reyes.

## The Review for Promotion to Full Professor Became a Continuation of the Discriminatory Review for Tenure

146.     The effective date of Professor Reyes's promotion to associate professor was August 6, 2012. Her tenure was approved on June 10, 2015. Professor Reyes planned to submit her application for promotion to full professor as soon as she qualified under the University rule, which required that she serve five (5) years in rank as associate professor. That meant that she would have been qualified to apply in 2017, the year when FAMU adopted the Interfolio electronic

application system which required that the Office of the Provost provide the information to access the system.

147.     Professor Rhonda Reaves was chair of the RPT Committee during the 2017-2018 academic year.

148.     Professor Reyes asked Professor Reaves for the Interfolio access information on several occasions and Professor Reaves responded that she did not receive it.

149.     Professor Reyes once again began asking for the Interfolio information the next year, in summer 2018. That year, Professor Rob Abrams was appointed chair of the RPT Committee.

150.     Professor Reyes finally received the Interfolio case access information at the last minute in fall 2018 and applied by the published deadline. She became the first professor from the College of Law to apply for promotion via the new online Interfolio platform. She had to figure out the system on her own.

151.     All ten (10) tenured, full professors who participated in the review of Professor Reyes's application for promotion to full professor were also members of the RPT Committee when Professor Reyes submitted her application for tenure in fall 2014. They were Rob Abrams, Nicky Boothe-Perry, Pat Broussard, Ann Marie Cavazos, Ron Griffin, Bill Henslee, Darryll Jones, Rhonda Reaves, Jennifer Smith, and Phyllis Taite. They were all involved, in one way or another, in the

discriminatory, harassing, and retaliatory tenure process Professor Reyes endured during the 2014-2015 academic year. Three (3) of the ten (10) members of the RPT Committee (Professors Rob Abrams, Ron Griffin, and to a lesser extent Rhonda Reaves) became targets of hostility when they were deemed supportive of Professor Reyes's application for tenure. During the review of Professor Reyes's application for promotion to full professor they went along to get along with the discrimination and retaliation. That is how workplace mobbing works.

152.     The RPT Committee applied a quantitative standard for scholarship that did not appear anywhere in the CoL Faculty Handbook or in the interpretive memorandum provided to Professor Reyes (the "Nunn Memo") when she was hired.[7] The Committee's application of a standard that did not exist in the CoL Faculty Handbook or the University Faculty Handbook was basically the same tactic as when the RPT Committee invented and used incorrect standards to evaluate Professor Reyes's application for tenure and conclude that she did not meet the standards.

153.     The RPT Committee's discriminatory actions tainted the entire process at all levels with discriminatory animus. The RPT Committee members carried the discrimination from the tenure process into the promotion process by

---

[7] The FAMU College of Law represented to the ABA accrediting body that the Nunn Memo clarified how the scholarship standards should apply.

refusing to conduct a new review according to the standards in the CoL Faculty Handbook and the Nunn Memo. They built on the same unlawfully discriminatory animus that drove violations of the rules and misapplication of the standards during Professor Reyes's tenure process. In this way, they turned her promotion review into the same review as the tenure process. The two became a continuous process.

154.    The RPT Committee attached reports from Professor Reyes's prior application for promotion to associate professor (in Fall 2011) and for tenure (in Fall 2014). However, in violation of the express provision in the Faculty Handbook,[8] they did not attach any of the external reviews of her scholarship conducted during those evaluations. This is how they set up their recommendation that she be denied promotion.

155.     All actors at higher levels of review, namely Interim Dean LeRoy Pernell, the T&P Committee led by Dr. Michael Abazinge (same as during the tenure process), Provost Maurice Edington and President Larry Robinson went along with the misapplication of the scholarship standard and decision of the RPT Committee. They did not conduct independent reviews. They allowed and perpetuated the discrimination, retaliation, and hostile work environment.

---

[8] The Faculty Handbook requires that external reviews be attached to the RPT Committee reports.

**Provost Edington and President Robinson Participate in the Hostilities**

156.     According to the Provost's published schedule, the President was supposed to provide the decision to Professor Reyes in June 2019.

157.     When Professor Reyes had not received the decision by the beginning of July, she requested it.

158.     On July 17, 2019, Provost Edington responded to one of Professor Reyes's e-mails and stated: "You will be provided notification of the outcome of your application for promotion within the next week."

159.     A week after that email, Professor Reyes followed up because no decision was provided within a week of Provost Edington's response.

160.     On August 5, 2019, Professor Reyes once again requested the decision from President Robinson and Provost Edington; this time, she copied Trustee Belvin Perry in the e-mail.

161.     That same day, August 5, 2019, Provost Edington responded and alleged that a letter was sent to Professor Reyes via regular mail on July 25, 2019. However, he never even bothered to confirm whether Professor Reyes received the letter and did not provide the letter to Professor Reyes via e-mail despite her several e-mails asking for the decision. This is a tactic in the hostile work environment.

162.   Provost Edington falsely claimed that the letter was sent to Professor Reyes's mailing address, which FAMU has had on file since Professor Reyes began working at FAMU in 2009. However, the letter was sent to a wrong address in Tallahassee and it was returned by the U.S. Postal Service to FAMU "Return to Sender – Not Deliverable as Addressed."

163.   Professor Reyes sent Provost Edington an e-mail on July 23, 2019, once again requesting the decision; however, Provost Edington did not respond until she followed up again on August 5, 2019. The letter from Provost Edington was dated July 24, 2019, but it was not provided to Professor Reyes until August 5, 2019 via email. They waited to provide the letter until the first day of the semester; this was an additional act of hostility. They gave Professor Reyes the negative decision on the first day of classes rather than during the summer when she was not teaching. They waited until Professor Reyes was starting to teach the heaviest teaching load of any professor in the law school (two large, required, first-year and second-year courses for a total of seven (7) credits).

164.   After that, President Robinson and Provost Edington made it impossible for Professor Reyes to appeal the denial of promotion. They involved Associate Provost Genyne Boston (a Black woman) and General Counsel Denise Wallace (a Black woman), who engaged Professor Reyes in a back-and-forth of e-

mails about the information, only to finally deny her the information and sabotage her appeal.

165.    President Robinson has gone along with the hostilities against Professor Reyes since he was Provost. Professor Reyes tried to meet with him in 2013 as Professor Reyes was being subjected to blatant discrimination and escalating hostilities. She offered to drive to Tallahassee to meet with him; however, he and his administrative assistant, Ora Mukes, sabotaged the meeting in August 2013 and made it seem as if Professor Reyes did not show up for the appointment when they never informed her of the appointment.

166.    More recently, Provost Edington ostracized Professor Reyes in front of the faculty during a faculty meeting in the law school on January 22, 2020. Provost Edington disagreed with Professor Reyes's reiteration of something he said and turned to the faculty and asked them whether they sided with his version or Professor Reyes's. No one responded because no one was going to take Professor Reyes's side against the Provost. It was one more hostile way to send a message to the faculty that such types of hostility should be directed at Professor Reyes. He undermined her in front of faculty and staff. After the incident, Provost Edington told Professor Reyes that it was not "personal." She responded that it felt very personal to her, including because he has great institutional power as the provost and as a Black man in an HBCU. However, Professor Reyes offered an

olive branch and asked Provost Edington if he would finally agree to meet with her to come up with a plan to address the discrimination and hostilities, including the denial of her promotion. Provost Edington responded by asking Professor Reyes if she would agree to meet and she responded, "Of course, this is what I have been asking for, to try to resolve matters amicably and put an end to the hostilities."

167.    Professor Reyes followed up via email that same day asking Provost Edington when he was available and offering to audio- and even video-record the meeting to avoid "that's not what I said" issues. To date, Provost Edington has not responded to Professor Reyes's request to schedule a meeting. Professor Reyes realized that it was one more sham tactic.

168.    The denial of promotion meant that Professor Reyes did not get a long, overdue 15% raise. She also did not get other benefits, such as an office with a window. Professor Reyes must work harder than most full professors, including because she must deal with ongoing hostilities, including denial of information and resources she needs to do her job. In addition to the duties associated with being an excellent law professor, Professor Reyes must spend precious time defending against the constant attacks, writing memoranda about incidents, and documenting what she says and does in order to be able to defend against potential allegations. Upon information and belief, Professor Reyes has been the target of more investigations than any other employee in the law school. It is a testament to

Professor Reyes's ethics, professionalism, and competence that she has been able to respond over and over again to the malicious prosecution to which she has been subjected.

### New Deans but Same Old Systemic Discrimination, Harassment, Hostile Work Environment and Retaliation Against Professor Reyes

169.     As new deans (interim and permanent) have been appointed by President Robinson and Provost Edington, they have joined in the discrimination, harassment, hostile work environment and retaliation against Professor Reyes. President Robinson and Provost Edington have apparently endorsed the hostile work environment against Professor Reyes. They have received notice for years of what a majority clique have done to Professor Reyes. Again, the phenomenon of workplace mobbing explains why so many people have participated in the harm against Professor Reyes, individually and collectively.

170.     Angela Felecia Epps was recruited and hired when Professor Reyes was visiting at UF Law. Professor Epps started her tenure as dean at the same time Professor Reyes returned from UF Law in spring 2016. Professor Reyes reached out to Dean Epps via email to welcome her to the law school. She also invited her to meet for coffee or lunch, a professional courtesy in many law schools when a new dean joins the faculty. However, Dean Epps responded that she would only meet in the law school building. There is no cafeteria in the law school; therefore, sharing a meal was not an option.

64

171.    When Dean Epps showed up in Professor Reyes's office, Professor Reyes decided to ask for her help. She tried to tell her about what had just happened in her tenure process and the recent frivolous charge by Professor Broussard. Dean Epps responded that she did not want to hear history and that Professor Broussard had a right to file a charge. Dean Epps did not even try to empathize with Professor Reyes. She told her, "you got tenure and that's that."

172.    The way Dean Epps acted toward Professor Reyes upon meeting her, led Professor Reyes to think that she had been talking to some of the faculty members who target Professor Reyes – the majority clique. Dean Epps sided with the Black women who targeted Professor Reyes. She showed them gender/racial solidarity by going after Professor Reyes.

173.    Dean Epps refused to help Professor Reyes. Instead, based on false complaints by Professor Pat Broussard and Professor Ann Marie Cavazos, Dean Epps issued a letter of "counseling" to Professor Reyes without due process. By terming it a letter of "counseling" and not a letter of "reprimand," she avoided giving Professor Reyes the due process required in the FAMU Regulations. However, in violation of said regulations, she placed the letter in Professor Reyes's file.

174.    When Professor Reyes submitted a complaint about the letter of "counseling" to President Robinson, he refused to process it in clear violation of

the FAMU Regulations. When Professor Reyes reported the refusal to abide by FAMU's Regulation to the Division of Audit and Compliance, they also refused to investigate. Dean Epps continued to retaliate against Professor Reyes. Thankfully, she only lasted as dean for about sixteen (16) months and is no longer employed in the FAMU College of Law.

175.     Then, when Nicky Boothe-Perry became Interim Dean and named her friend Phyllis Taite as Interim Associate Dean they also retaliated and escalated the hostilities against Professor Reyes. The two of them, individually and as part of the majority clique, had participated in ploys to deny Professor Reyes tenure.

176.     Once Professor Boothe-Perry and Professor Taite became interim administrators, they targeted two students (a Latina and an Indian woman) whose independent research Professor Reyes supervised. They refused to process Professor Reyes's upper-level writing certification of the students' independent research papers, which the students needed to graduate. Interim Dean Boothe-Perry and Interim Associate Dean Taite falsely accused Professor Reyes, in a meeting when faculty and students were present, of not doing her job in reference to the certification. They also told the students not to communicate with Professor Reyes thereby marginalizing her. The students were afraid that they would not be able to graduate.

177.     Professor Reyes documented to Provost Edington that Interim Dean Boothe-Perry and Interim Associate Dean Taite were violating the Student Handbook provision that applied to the students and falsely accusing her. However, the damage was done. Since then, Professor Reyes has not volunteered to supervise additional independent writing projects to avoid students getting harmed when Professor Reyes is targeted. Professor Boothe-Perry and Professor Taite have been visiting at other law schools and Professor Reyes does not know if they will come back to the FAMU College of Law.

178.     On January 29, 2020, Interim Dean Boothe-Perry and Interim Associate Dean Taite accused Professor Reyes of not doing her job.

179.     On May 13, 2020, Interim Associate Dean Taite falsely accused Professor Reyes of withholding grades and threatened to put a memo in Professor Reyes's evaluation file.

180.     On May 15, 2020, Professor Reyes reached out to Provost Edington about the false accusations, but she is still waiting to hear from him.

181.      Professor Reyes actively participated in the dean search process of the current dean, Deidré Keller. She also encouraged Professor Markita Cooper to serve as Associate Dean of Academic Affairs once again. She suggested to Dean Keller that Associate Dean Cooper was the most qualified faculty member to become associate dean because she already knew the job and would support her.

Unfortunately, Dean Keller and Associate Dean Cooper also joined in the retaliation, hostile work environment, and workplace mobbing against Professor Reyes. Once again, Professor Reyes became the litmus test to show racial solidarity with the Black faculty members who target Professor Reyes.

182.    Even before Dean Keller officially started working in the FAMU College of Law, she joined with then Interim Dean Nicky Boothe-Perry in an op-ed in the *Orlando Sentinel* where they both proclaimed their shared identity as Black women and mothers of Black boys.

183.    Dean Keller scheduled phone calls with faculty and, after those phone calls, she distanced herself from Professor Reyes. She also closed the faculty meetings, which is something that the majority clique always wanted to do. This way, they hide their wrongdoing, including unlawful discrimination, behind group decisions when other stakeholders, like students, are not present. Dean Keller has also whitewashed the minutes. In this way, the law school has gone backward instead of forward.

184.    Dean Keller and Associate Dean Markita Cooper have also retaliated against Professor Reyes after she filed her EEOC charge. When Professor Reyes has tried to address the discrimination and retaliation, they both become upset. They do not provide information that Professor Reyes should receive like where she is in the wait list for faculty office with a window. Professor Reyes has been

asking them for over a year. It is a pattern of conduct meant to humiliate, marginalize, and distress Professor Reyes.

185.     On February 24, 2021, Dean Keller and Associate Dean Cooper held a Zoom meeting with students and permitted two Black students to make disparaging comments about Professor Reyes when the students were arguing that they wanted a Black female visiting law professor to remain in the law school beyond the agreed upon term of her visit. The students wanted to know why she was not scheduled to teach the evening evidence course that Professor Reyes was teaching. The students who complained were not students who were taking the evidence course. There were about 80 participants in said Zoom meeting. Professor Reyes could not believe that Dean Keller and Associate Dean Cooper did nothing to address the disparaging comments the two students made about Professor Reyes.

186.     Immediately after the first Zoom meeting ended, Professor Reyes posted in the chat of the next Zoom meeting (a town hall), when some of the same students were still present, that law students should not engage in such conduct. Professor Reyes also posted that she may need to deal with the disparaging comments in due time as in making them a teaching moment about professionalism. Dean Keller posted in the chat that she would discuss the situation with Professor Reyes. Thereafter, she asked to meet with Professor Reyes via

Zoom but did not tell Professor Reyes that Associate Dean Cooper would also be present in the meeting.

187.     When the three met, Dean Keller proceeded to "counsel" Professor Reyes that some students could consider what Professor Reyes wrote as a "threat." However, Dean Keller did not receive any complaints from students about Professor Reyes. In fact, two Black female students emailed Dean Keller, with copy to Professor Reyes, complaining about Dean Keller's conduct of permitting the disparaging comments against Professor Reyes.

188.     After Professor Reyes met with Dean Keller, someone submitted an anonymous complaint to the Division of Audit and Compliance (DAC) against Professor Reyes with vicious, false allegations and referenced the "threat" that Dean Keller referenced. The DAC forwarded the complaint to the EOP and Sylvia Barge sent the one-page anonymous complaint to Professor Reyes. Professor Reyes prepared a 15-page memo and 62 exhibits to respond to the malicious and false allegations.

189.     On May 13, 2021, Ms. Barge notified Professor Reyes via email, with copy to EOP Director Carrie Gavin, that the anonymous complaint was closed. However, there was now a written report of the investigation stating that Dean Keller met with Professor Reyes and "counseled" her. The report stated that Dean Keller acknowledged that no students complained to her. The DAC did not receive

any complaints from students. Dean Keller took it upon herself to view a threat where there was none thereby creating a reason to "counsel" Professor Reyes for no valid reason. During the meeting with Professor Reyes, Dean Keller made serious allegations about what Professor Reyes may do to students without any proof that Professor Reyes has ever done any such thing. In fact, because Professor Reyes is highly ethical and professional, she has been able to defend against all the malicious, false claims and complaints that have been made against her. Professor Reyes has learned to do her best to get ahead of the next ploy or at least be ready to respond with evidence.

190.     The anonymous complaint was one more instance when Professor Reyes was forced to document with evidence her innocence but the accuser(s) was not required to provide evidence in support of the accusations. The accuser did not even provide his/her/their name. The anonymous complaint, the processing of the complaint, the written report, and Dean Keller's reference to "counseling" all served to further soil Professor Reyes's professional/academic record.

191.     Dean Keller and Associate Dean Cooper never apologized for the part they played in permitting the disparaging comments against Professor Reyes and possible the anonymous complaint that followed.

192.      Dean Keller recently gave Professor Reyes the lowest annual evaluation she has ever received (average), including by not giving her credit for

71

her extensive service work, when the electronic faculty activities report that Dean Keller provided did not indicate that there were word count limits and more questions than appeared on the screen. When Professor Reyes was unable to include all the information in the spaces in the electronic form, she copied and pasted the questions into a Word document, answered them, and submitted them to Dean Keller in a PDF document (as she had submitted annual faculty activity reports to prior deans). Professor Reyes did not find out, until May 11, 2022, the day of her evaluation meeting, which Dean Keller insisted must be in person in the Dean's conference room (rather than via Zoom as Professor Reyes preferred), that there were more questions than the ones that appeared on the screen.

193.     During that hostile evaluation meeting, Dean Keller did not tell Professor Reyes until the end of the meeting that she would state in the evaluation form that she could not assess Professor Reyes's service because she did not provide the information. This was a two-year evaluation which is a violation of the one-year evaluation procedure stated in the University Faculty Handbook. It was arbitrary, petty, and capricious for Dean Keller to essentially punish Professor Reyes and not give her credit for the merit of her two-year service work. Professor Reyes requested that she provide the missing questions and allow her to submit the information. As of the date of filing of this complaint, Dean Keller and Associate Dean Cooper have not provided the additional questions to Professor Reyes.

194.     On May 13, 2022, Professor Reyes reached out to Provost Edington and requested that he intervene and instruct Dean Keller to provide the questions, allow Professor Reyes to provide the information, and re-assess her based on the merit of her work. Professor Reyes explained to Provost Edington that this was the first year that faculty received the electronic form, that there were glitches with the form (as documented in emails from the Dean's Suite), and that Professor Reyes's request was reasonable in light of the circumstances.

195.     On May 16, 2022, Provost Edington responded: "I will review this matter and follow up with you accordingly." On July 22, 2022, when Professor Reyes was still in unpaid status during the summer, she sent an email to Provost Edington following up on her request for assistance. On July 26, 2022, Provost Edington responded that he would follow up with her by the end of the week. On July 29, 2022, he responded that he discussed the matter with Dean Keller and decided that "[Dean Keller] is not obligated to conduct an additional evaluation of you. You are free to provide responses to the branch questions for inclusion in your file." On that same day, Professor Reyes replied to Provost Edington correcting several factual inaccuracies he stated about the electronic form and the process. Professor Reyes's last comment on the matter was: "Please let me know when Dean Keller will finally provide all the questions, so I can provide the responses I should have been permitted to provide." Nearly a month has passed since that

email and Professor Reyes has not received the courtesy of a response or the missing questions; therefore, she has been denied the opportunity to respond and at least include those responses in her file. These are the recurring hostilities and indignities that Professor Reyes, an attorney and law professor, must deal with.

196.    Dean Keller has made it unbearable for Professor Reyes to do her job. To start, right as she became dean, she appointed Professor Reyes Chair of the 2020-2021 Faculty Recruitment Committee, during the Covid pandemic, and then sabotaged the work Professor Reyes needed to do by not providing the information she needed. She also allowed Director Adrienne Snyder, someone who was supposed to perform the Human Resources function and has been involved behind the scenes in defamation and group hysteria about Professor Reyes (in emails). Ms. Snyder made getting information for the hiring process very difficult by not responding to emails, which is a tactic used against Professor Reyes. When Professor Reyes asked to meet with her via Zoom, Ms. Snyder refused and said they would have to wait until her supervisor, Associate Dean Green, could attend the meeting. Associate Dean Green did not make himself readily available. Professor Reyes needed to get the hiring process started and no one was providing the resources she needed to do so. To add insult to injury, Dean Keller told Professor Reyes that she should not meet with Associate Dean Green or Ms. Snyder, that all questions should be submitted to her. Dean Keller joined in

discriminating against Professor Reyes and furthering the hostile work environment. She also promoted Ms. Snyder to Chief of Staff.

197.     When Professor Reyes complained about not getting the information she needed to start the recruitment process, Dean Keller asked her if she wanted to quit as chair of the committee. Professor Reyes responded that she would not quit and did not appreciate that Dean Keller seemed to be setting her up for failure. Professor Reyes knew that this could be used against her in an evaluation, including a post-tenure review.

198.     Professor Reyes worked seven days a week to do all her assigned duties in addition to the work required to do the recruitment process without assistance she should have received from Director Snyder and Associate Dean Green. Professor Reyes structured a professional hiring and recruitment process from scratch. It was the most successful hiring process since Professor Reyes has been a member of the faculty (over a decade). Professor Reyes organized and led the recruitment efforts in 50 public Zoom meetings and nine public full-day Zoom interviews all in compliance with Florida's Sunshine Law. Three faculty members were hired: a Latina legal research and writing instructor (the first Latina alumni hired for a full-time teaching position); a doctrinal constitutional law professor (a Black man who immediately received majority status and joined in hostility against Professor Reyes); and a clinic director/professor (a White man who received tenure

upon appointment after Professor Reyes helped him to prepare materials sufficient to support approval of tenure).

### The Majority Clique Voted a Highly Qualified White Woman Unqualified – Similar to How They Voted to Deny Professor Reyes Tenure and Promotion

199.    During a faculty meeting on February 17, 2021, the majority clique managed to foreclose consideration of a White woman who was highly qualified for a doctrinal position. She was a tenured law professor with outstanding credentials and experience. Her resume showed that her interests and work, since she was in law school, aligned with the mission of the FAMU College of Law. She had the best scholarship record of the three finalists in addition to impressive work experience, including prestigious federal district court and appellate clerkships. As a tenured associate professor, she had a better scholarship record and credentials than most tenured full professors in the FAMU College of Law. She was eager to teach in an HBCU law school because of her commitment to social justice. The Faculty Recruitment Committee ranked her in the top two candidates with the Black male professor who was eventually hired.

200.    Professor Reyes, as Chair of the Faculty Recruitment Committee, presented the candidates to the faculty. For the doctrinal position, there were three finalists who were already tenured professors: a Black man, a White man, and the White woman. The Committee found them all to be highly qualified. Some faculty attended their full day interviews but some did not. Because all three were tenured,

only tenured faculty (the RPT Committee) could vote on the first question – whether they were qualified for the position.

201.     The White man did not even progress to a vote. Then, the majority clique was ready to vote on the White woman without even discussing her credentials. The following faculty members (all members of the RPT Committee) voted that the White woman was not qualified: Pat Broussard, Ann Marie Cavazos, Ron Griffin, Yolanda Jones, Lundy Langston, Jeremy Levitt, Jennifer Smith, and Phyllis Taite. The Black man received a unanimous vote as he should have because the Committee had already found him to be qualified for the position, same as the White woman. However, by finding the White woman not qualified for the position, the majority clique ensured that only the Black man was considered for hiring. Therefore, the faculty did not get to proceed to a vote on ranking the candidates because only one was found to be qualified by the majority clique. Dean Keller was present when this happened.

202.     The obvious racial aspect of the vote reminded Professor Reyes of her own tenure and promotion votes by the majority clique. After the vote, Professor Reyes, as Chair of the Faculty Recruitment Committee, had to call the White female candidate and tell her that she was no longer under consideration because she was not found to be qualified. This was humiliating for a candidate with her credentials. Professor Reyes remembered the ways in which the majority clique

diminished her qualifications in efforts to humiliate her and get rid of her like they got rid of the highly qualified White female candidate. The law professor cried when she heard the news and Professor Reyes empathized with her and also cried after she hung up the phone. It was one more racial traumatic experience at FAMU College of Law. Professor Reyes remains the only non-Black tenured woman in the FAMU College of Law.

203.     Something similar almost happened with the White male candidate for the clinic position. He was also highly qualified. However, he was not tenured and had never been in a tenure track position. The CoL Faculty Handbook permitted granting tenure upon appointment if the candidate met the standards. Chair Reyes worked with the candidate to put together a strong record for tenure upon appointment. He made it through the qualification question, but the next review happened in the closed RPT Committee meetings. There, the issue of "White man privilege" was raised by Black members of the RPT Committee. Professor Reyes responded that race should not become the issue; the issue was whether he met the standards and should be granted tenure upon appointment. A factor that helped him is that a Black female candidate withdrew from consideration and the other Black female candidate did not show much interest in the position.

204.     In 2021-2022, another White male candidate was being considered for tenure upon hire; he had tenure in another law school that was no longer in

existence. Black female faculty members in the RPT Committee argued that he should not be eligible for tenure because the law school where he got tenure was no longer in existence. However, these were the same faculty members who favored granting tenure to a Black female candidate the year before when the law school where she received tenure was no longer in existence. The White male candidate had a much stronger teaching, scholarship, and service record, including from years when he taught as a visiting professor in the FAMU College of Law. Professor Reyes once again had to defend her position that he was qualified for tenure upon appointment as a lateral hire and, for her, race was not a factor in the decision.

205.    After Professor Reyes filed her EEOC charge, the retaliation from President Robinson, Provost Edington, Dean Keller, Associate Dean Cooper and other faculty members has made Professor Reyes realize that the targeting is systemic. The emails about what seem like insignificant issues are many. It is the frequency, severity, humiliating, and recurring nature of what they do. They deny Professor Reyes an accommodation to teach from home during the pandemic when she provided a doctor's letter stating that she was the sole caretaker of her elderly mother and would put her at risk of contracting Covid if Professor Reyes were to teach in person. Dean Keller and Associate Dean Cooper had some discretion to decide which 50% of the faculty returned in person. They made Professor Reyes

teach in person. Then, Professor Reyes got sick and needed to be on bed rest with her leg up during the last week of the fall 2021 semester. She requested permission to teach those last three classes synchronously via Zoom. Dean Keller and Associate Dean Cooper said no, same as President Robinson and Provost Edington. What made their tactic more egregious is that they insisted that Professor Reyes apply for an ADA accommodation when she kept telling them that she was not disabled. Then, when she applied it was denied. It was all a waste of time and additional work and stress. Professor Reyes did not get to rest. She had more work as a result of all the back-and-forth of emails and the work she had to prepare to make up for class time instead of teach synchronously.

206.    It has become evident to Professor Reyes that the retaliation plan is to (1) keep her busy defending against ongoing hostilities and indignities, in addition to all the work, which reduces her time for scholarship; (2) make it as hostile as possible so she leaves "voluntarily" or gets sick and is unable to keep up with the job; (3) set her up for "good cause" dismissal, despite her tenure; and (4) ruin her chances of getting other jobs by soiling her professional record (including with false accusations, formal investigations and by "blacklisting" her). This means that Professor Reyes is even more vulnerable after tenure and after she filed the EEOC charge. The ongoing incidents are also meant to intimidate, ridicule, insult,

ostracize, marginalize, and drive Professor Reyes out of the FAMU College of Law, after ruining her academic career.

207.     Through the years Professor Reyes, through records requests, has obtained surveillance videos showing some of the hostilities. The FAMU email system has all the emails Professor Reyes has sent and received. Many of those emails are evidence of the hostilities, discrimination, harassment, hostile work environment and retaliation she has endured. Many of those emails also demonstrate the many times she has reached out to President Robinson and Provost Edington asking for help. She has even asked them to consider how what they have done and permitted to be done to her would look if it were being done to a Black woman in a predominantly white institution. They do not seem to care.

208.     Professor Reyes is a lawyer and law professor. However, Professor Reyes has never practiced in the areas of employment or civil rights law. As the 90-day deadline to file this lawsuit was approaching, Professor Reyes was still wrestling with the decision whether to sue FAMU. She did not make the final decision until the first week back to classes (August 15 – 19, 2022) after she was verbally attacked by Professor Jeffery Brown, a Black man, on August 18, 2022. Some years ago, Professor Brown referred to Professor Reyes as a "fucking thing," during a committee meeting when then Associate Dean Darryll Jones, Professor Cavazos, and Professor Reaves were present. No one came to Professor Reyes's

defense. In fact, Associate Dean Jones said Professor Brown's epithet was "inappropriate but understandable." Professor Brown also provided cover for Professor Jeremy Levitt when he attacked Professor Reyes during her first semester at the FAMU College of Law.

209.     On August 18, 2022, Professor Reyes provided notice of Professor Brown's verbal attack to Provost Edington, Dean Keller, Associate Dean Cooper and the faculty. As of the date of the filing of this complaint, no one has reached out to Professor Reyes about the matter. This was definitive confirmation that the discrimination, harassment, workplace mobbing, and hostile work environment will continue unabated during the 2022-2023 academic year. No one within FAMU will do anything to address the situation. After years of putting up with abuse in her workplace, Professor Reyes decided that she must file a lawsuit.

210.     Due to the time and circumstances when Professor Reyes made the final decision to file this lawsuit, Professor Reyes had to prepare and file this complaint on her own. Professor Reyes conducted a good faith investigation of the facts she alleges and the applicable laws before filing this complaint.

211.     Professor Reyes is not the first FAMU College of Law professor to represent herself in a lawsuit against FAMU. Professor Jennifer Smith, a Black woman, filed her second lawsuit against FAMU on July 30, 2018 in the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida. Professor

Smith asserted claims for gender discrimination in pay and retaliation. FAMU removed said action to the United States District Court for the Northern District of Florida, Tallahassee Division.

212.    Professor Reyes is not the first FAMU College of Law professor to litigate an action against FAMU in the United States District Court for the Middle District of Florida, Orlando Division. Ka'Juel Washington, a Black man, and Rhoda Cato, a Black woman, also litigated actions against FAMU in this Court. FAMU Law students also litigated actions against FAMU in this Court.

213.    Professor Reyes has been uplifted by students and alumni of diverse race, ethnic, and cultural backgrounds during the thirteen (13) years she has taught in the FAMU College of Law. Professor Reyes has remained in the FAMU College of Law because she cares about the law school and students. However, she can no longer tolerate the abuse. This is why she is filing this lawsuit and hopes that students and alumni will understand that it is her right, as a human being, to do what she can to protect herself from further harm.

214.    Through the years, Professor has learned of faculty who instigate students and alumni against her. Professor Reyes hopes that law students and alumni will not be easily manipulated into thinking that Professor Reyes's act of speaking out is not a positive way to deal with the situation. Sometimes litigation helps to finally bring light to a problem and move to resolution.

215.     Professor Reyes prays that the FAMU leadership will finally do something to address the foundational problems that have plagued the FAMU College of Law since it was re-established. The abusive work environment is not conducive to more productive endeavors like scholarship production for example. Professor Reyes has pulled some of her articles from publication and has not attended some conferences because she has been busy dealing with the many investigations, appeals, and workplace situations that she should not have been subjected to as a law professor. Now, she must deal with this lawsuit. It is certainly not what she envisioned when she decided to become a law professor in a SUS law school.

216.     The FAMU College of Law is the only SUS law school that is not yet a full member of the Association of American Law Schools. There is a reason for that and it is the institutional environment. Like Dr. King said, "Injustice anywhere is a threat to justice everywhere." "Our lives begin to end the day we become silent about things that matter."

## FIRST THROUGH SECOND CLAIMS FOR RELIEF
**[Discrimination in the Terms and Conditions of Employment in Violation of: 1) Title VII and 2) § 1983]**

217.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

218.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions it made vis-á-vis Professor Reyes as outlined herein.

219.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

220.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race, color, national origin, and gender discrimination.

221.     Defendant treated Professor Reyes differently because of her race, color, national origin, and gender in the terms and conditions of her employment. Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

## THIRD THROUGH FOURTH CLAIMS FOR RELIEF
## [Failure to Promote in Violation of: 3) Title VII and 4) § 1983]

222.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

223.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

224.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

225.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race, color, national origin, and gender discrimination.

226.     Defendant discriminated against Professor Reyes based on her race, color, national origin, and gender by failing to promoter her to full professor when she applied in 2018.

227.     Professor Reyes is a member of a protected class.

228.     Professor Reyes was qualified for the position of full professor when she applied in 2018.

229.     Professor Reyes applied for full professor in 2018 and was denied the promotion.

230.     Non-members of the protected class were treated more favorably and were promoted to full professor.

231.     Professor Reyes suffered and has damages such as lost compensation and benefits and emotional distress.

## FIFTH THROUGH SIXTH CLAIMS FOR RELIEF
### [Pay Discrimination in Violation of: 5) Title VII and 6) § 1983]

232.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

233.    Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outline herein.

234.    Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

235.    Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race, color, national origin, and gender discrimination.

236.    Defendant denied a salary raise when it denied Professor Reyes's 2018 application for promotion.

237.    Professor Reyes believed it was futile to apply for promotion in 2019.

238.    Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional distress.

## SEVENTH THROUGH EIGHTH CLAIMS FOR RELIEF
### [Hostile Work Environment in Violation of 7) Title VII and 8) § 1983]

239.    Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

240.    Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Professor Reyes based on her race, color, national origin, and/or gender and/or in retaliation for her protected activities.

241.    These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

242.    Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race, color, national origin, gender and/or for retaliatory reasons.

243.    Professor Reyes was subjected to insulting, humiliating and/or discriminatory conduct related to her race, color, national origin, and gender. Such conduct was unwelcome

244.    The discriminatory and hostile acts described herein were severe and/or pervasive and altered Professor Reyes's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

245.    Professor Reyes perceived the environment to be abusive or hostile.

246.    A reasonable Latina in her circumstances would consider the environment to be abusive or hostile.

247.    Defendant is vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Professor Reyes.

248.     Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional distress.

### NINTH THROUGH TENTH CLAIMS FOR RELIEF
### [Retaliation in Violation of: 9) Title VII and 10) § 1983]

249.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

250.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

251.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

252.     Defendant acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse action.

253.     On April 27, 2015, Professor Reyes formally opposed and complained about unequal treatment, discrimination and bias when she submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to Defendant's Office of Equal Opportunity Programs (EOP). However, Professor Reyes had raised concerns informally before then and has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race, color, national origin, and/or gender.

254.    In response to raising these concerns, she has been subjected to a pattern of retaliatory conduct.

255.    Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

## ELEVENTH CLAIM FOR RELIEF
### [Discrimination in Violation of FCRA]

256.   Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

257.   The foregoing allegations establish a cause of action for discrimination against Professor Reyes on the basis of race, color, national origin, and sex.

258.   The disparate treatment and discrimination described herein was based on Professor Reyes's race, color, national origin, and sex, and negatively affected the terms, conditions, and privileges of her employment.

259.   Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

## TWELFTH CLAIM FOR RELIEF
### [Retaliation in Violation of FCRA]

260.    Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

261.    The foregoing allegations establish a cause of action for retaliation against Professor Reyes in violation of the Florida Civil Rights on the basis of race, color, national origin, and sex.

262.    The disparate treatment and discrimination described herein was based on Professor Reyes's race, color, national origin, and sex, and negatively affected the terms, conditions, and privileges of her employment.

263.    Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following:

a.  Back pay, in amounts to be determined at trial;

b.  Compensatory and consequential damages;

c.  Front pay;

d.  Injunctive and/or declaratory relief;

e.  Prospective relief;

f.  Punitive damages;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

i.  Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 25th day of August, 2022.


/s/ Maritza Reyes

P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

Tab 8

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

       Plaintiff,

v.                                    Case No. 6:22-cv-1525-WWB-EJK

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES,

       Defendant.
_____/

## <u>ORDER</u>

THIS CAUSE is before the Court on *sua sponte* review of the record. The Complaint (Doc. 1) is an impermissible shotgun pleading. As a general matter, "[t]he failure to identify claims with sufficient clarity to enable the defendant to frame a responsive pleading constitutes a 'shotgun pleading.'" *Beckwith v. BellSouth Telecomms. Inc.*, 146 F. App'x 368, 371 (11th Cir. 2005) (per curiam) (citing *Byrne v. Nezhat*, 261 F.3d 1075, 1029–30 (11th Cir. 2001)). "Shotgun pleadings wreak havoc on the judicial system" and "divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) (quotation omitted). As such, "[w]hen presented with a shotgun complaint, the district court should order repleading *sua sponte*." *Ferrell v. Durbin*, 311 F. App'x 253, 259 n.8 (11th Cir. 2009) (per curiam); *see also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998) (noting that shotgun pleadings drain judicial resources, and the district should act *sua sponte* to define the issues at the earliest possible stage).

The Eleventh Circuit has defined four types of shotgun pleadings. "The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015). The second most common type "is a complaint that . . . is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1322. "The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1322–23. "Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323.

Plaintiff's Complaint falls into the first and third categories. First, each count of the Complaint reincorporates by reference every allegation of the entire pleading. (Doc. 1, ¶¶ 217, 222, 232, 239, 249, 256, 260). This circumstance alone makes it virtually impossible to discern which of the many facts alleged supports each claim. The Complaint also fails to separate into a different count each cause of action. (*Id.* ¶¶ 217–255). Therefore, the Complaint will be dismissed as a shotgun pleading.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. The Complaint (Doc. 1) is **DISMISSED without prejudice**.

2. Plaintiff may file an amended complaint on or before **September 8, 2022**, to correct the deficiencies noted herein. Failure to timely file an amended

pleading in compliance with this Order may result in the dismissal of this case without further notice.

**DONE AND ORDERED** in Orlando, Florida on September 1, 2022.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

Tab 10

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

     Plaintiff,

v.                                 CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

     Defendant.

_____

**AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL AND
PERMANENT INJUNCTIVE RELIEF REQUESTED**

     Maritza Reyes ("Plaintiff" or "Professor Reyes") hereby complains against the Board of Trustees of Florida Agricultural & Mechanical University ("Defendant" or "FAMU") as follows:

## I.    NATURE OF THE CLAIMS

    1. This suit is brought by a Hispanic/Latina law professor who has been subjected to race, color, national origin, and sex discrimination and retaliation by Defendant in violation of: Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq*. ("Title VII").

1

2. The unlawful discrimination, harassment, ongoing hostile work environment, and retaliation because of race, color, national origin, and sex have taken many forms, including a phenomenon termed by experts as "workplace mobbing."

3. Plaintiff seeks all available remedies including damages, attorneys' fees, costs, interest, and compensatory damages.

## II.   PARTIES

4. Plaintiff is a Hispanic/Latina, a woman of Hispanic, Latino origin, who resides in the State of Florida, Orange County, and is and was employed by Defendant at all times relevant to the allegations in this Amended Complaint.

5. Defendant is a public historically black college university ("HBCU") within the State University System of Florida ("SUS"). Defendant's main campus is located in Tallahassee Florida. Defendant's law school campus, Florida A&M University College of Law ("FAMU College of Law"), is located in Orlando, Florida, Orange County.

6. At all times relevant to this Amended Complaint Defendant was an employer pursuant to the pertinent laws and received federal and state financial assistance.

7. Defendant acted through its agents, representatives, and/or employees at all times material hereto.

### III.   JURISDICTION AND VENUE

8.  This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law.

9.  Plaintiff has complied with the administrative prerequisites by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Notice of Right to Sue from the EEOC and filed this action within ninety (90) days of the Notice of Right to Sue.

10.  Plaintiff has fulfilled the conditions precedent prior to filing this Amended Complaint.

11. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b).

### IV.   GENERAL ALLEGATIONS

**Professor Reyes's Credentials Prior to Joining the FAMU College of Law**

12. Professor Reyes earned the "traditional" credentials to become a law professor before joining the faculty of FAMU College as a full-time tenure track assistant professor. Professor Reyes earned a Juris Doctor (J.D.) *summa cum laude* from Nova Southeastern University Shepard Broad College of Law ("Nova Law") in 2000 (graduating in the top 1% of her class of over 400 students). Professor Reyes attended Nova Law on a full-tuition, merit Goodwin academic scholarship. She earned Dean's List all semesters and book awards for highest grade in several

3

courses. Professor Reyes served as Articles Editor of the *Nova Law Review* and earned membership in the Moot Court Honor Society. She also volunteered as Editor of the Florida Bar Foundation's Children First Project Legislative Bill-Tracking Publication, contributing writer in *Broadly Speaking*, Nova Law's Student Newspaper, and law student advisor.

13. During her J.D. studies at Nova Law, Professor Reyes earned several awards, including:  Best Brief in the Moot Court Freshmen Appellate Writing Competition, Student Bar Association Academic Achievement Award, Public Interest Bronze Pro Bono Award, Gold Circle Women's Club Scholarship, Young Lawyers Division of The Florida Bar Scholarship, the National Association of Women Lawyers Award – Outstanding Law Student (2000), and Who's Who: American Law Students (20th ed.). Professor Reyes also gained practical legal experience as a summer associate with an international law firm and as a certified legal intern in the U.S. Attorney's Office Appellate Division.

14. After earning her J.D., Professor Reyes's legal experience included working for private law firms as an associate attorney and serving as a federal court law clerk at the district court level.

15. In preparation to begin full-time law teaching, Professor Reyes attended the Harvard Law School ("Harvard Law") where she earned a Master of Laws (LL.M.) in 2008. Admission to the Harvard Law LL.M. program is highly competitive

4

nationally and internationally. Only about one to two percent of students (a handful) admitted each year hold J.D. degrees from law schools in the United States and Puerto Rico.

16.  While at Harvard Law, Professor Reyes served as General Editor of the *Harvard Latino Law Review* and Coordinator of External Affairs of La Alianza, a student-run organization. She also participated in the Spring Pro Bono Program in the Florida Immigrant Advocacy Center. She was awarded a Congressional Hispanic Caucus Institute Graduate Scholarship and, upon graduation, a Harvard Law Post-Graduate Research Fellowship. She published articles in the *Harvard Latino Law Revie*w, *The Harvard Law Record*, and *The Harvard Crimson*.

## The FAMU College of Law

17.  The re-established FAMU College of Law opened its doors in August 2002. It received provisional accreditation in August 2004. The Florida Legislature gave the FAMU College of Law a period of five years from the graduation of its first class to achieve full accreditation. Fla. Stat. § 240.7105(5) (2000). The FAMU College of Law graduated its first class in April 2005.

18.  According to the FAMU College of Law 2008 Self Study, "[t]he founding dean of the law school, Percy Luney, was dismissed in June 2005 after allegations of financial improprieties. James Douglas was appointed interim dean and his tenure at the law school ended abruptly when he left the law school during the

2006 winter break. His associate dean, Ruth Witherspoon, became interim dean in January 2007 and held that position during an extensive dean search which culminated in the appointment of" "LeRoy Pernell, in late 2007."

19.  Professor Reyes was recruited as the FAMU College of Law was seeking full approval by the American Bar Association (ABA)'s Council of the Section of Legal Education and Admissions to the Bar. Professor Reyes was identified by the 2008-2009 FAMU College of Law Faculty Recruitment Committee ("Recruitment Committee") in fall 2008 as a result of a national search through the Association of American Law Schools ("AALS") Faculty Recruitment Conference ("AALS Conference").

20. Professor Lundy Langston, a Black woman, served as Chair of the Faculty Recruitment Committee. Professor Reyes was initially interviewed by Dean Pernell and faculty members of the Recruitment Committee at the AALS Conference in Washington, D.C.  Subsequently, she was invited for a visit to the FAMU College of Law where she was interviewed by additional members of the faculty. Although there were many women on the faculty (overwhelmingly Black women) and Black women in the Recruitment Committee, the dinner with the faculty consisted of two White men, Professors Robert Abrams and Jonathan Fineman. Professor Fineman picked up Professor Reyes from the airport.

21. As part of the on-campus visit Professor Reyes made a "job talk" presentation to faculty members. All interviews with faculty members, with the exception of the interview with Professor Patricia ("Pat") Broussard, a Black woman, included more than one faculty member. Professor Broussard met with Professor Reyes alone in Professor Broussard's office. During the interview, Professor Broussard was arranging paperwork on her desk, did not make eye contact with Professor Reyes, and asked her why she wanted to teach in the FAMU College of Law. Professor Reyes responded that she was thrilled by the prospect of joining the faculty in an HBCU law school in her home state of Florida. She also explained that she sought to contribute to the mission of the law school, teach diverse students, and help with efforts to increase bar passage. Professor Broussard then asked "but why this law school?" Professor Reyes thought she had already answered the question but once again provided a similar response.

22. When Professor Reyes joined the faculty of the FAMU College of Law, she learned through a faculty member that Professor Broussard told faculty members that Professor Reyes would not accept the offer.

23. Prior to the job talk presentation, Professor Reyes was supposed to get time to eat lunch, prepare for the job talk, and meet with IT staff to go over the computer setup for her Power Point presentation. None of this happened because Professor Lundy Langston spent too much time walking her through the law school

building. During this walk, Professor Reyes asked for a bathroom break. Professor Langston was walking her to the bathroom on the first floor when a woman approached and started talking to Professor Langston. Professor Reyes stood next to Professor Langston waiting for Professor Langston to introduce her. As Professor Langston continued talking with the woman, Professor Reyes noticed the bathroom door and hesitantly interrupted the conversation to briefly introduce and excuse herself, in order to go to the restroom. The woman was Professor Joan Bullock. After Professor Reyes exited the restroom, Professor Langston said bye to Professor Bullock and walked Professor Reyes to the faculty conference room in the fourth floor.

24. By the time Professor Reyes arrived in the conference room, faculty members were seated and Professor Reyes had to set up her Power Point presentation while she also addressed the faculty and began her job talk. Professor Reyes enjoyed the job talk presentation and her time with the faculty. Then Associate Dean Kenneth Nunn, a Black man, asked probing questions, which made for a good presentation. Professor Reyes viewed some of the odd situations (not getting materials prior to the interview, not having any women join the dinner, being questioned repeatedly by Professor Broussard about why she was interested in "this law school," not being introduced to Professor Bullock by Professor Langston, and not getting time to prepare before her job talk) through a positive

lens and did not presume ill-intent. Professor Reyes liked the FAMU College of Law, the faculty, and the students she met during her visit.

25. The faculty of the FAMU College of Law and Dean Pernell recommended to Dr. Cynthia Hughes Harris, the then Provost and Vice President for Academic Affairs, that she be hired as a full-time, tenure-earning, assistant professor of law. On March 30, 2009, then FAMU University Provost Cynthia Hughes Harris made Professor Reyes an offer of employment as an assistant professor of law in a tenure-earning position. As part of the hiring negotiations, Professor Reyes requested the rules and standards for promotion and tenure. She received the rules for promotion and tenure that would apply to her according to the FAMU College of Law Faculty Handbook in existence at that time and a Memo prepared by then Associate Dean for Research and Faculty Development and Professor of Law Kenneth B. Nunn (the "Nunn Memo"). The Nunn Memo was appended to the Self Study that the FAMU College of Law presented to the ABA as part of the law school's application for full accreditation. The law school represented to the ABA that the Nunn Memo clarified the standards as requested by the ABA.

26. On April 7, 2009, Professor Reyes accepted the offer of employment as a full-time, tenure-earning/tenure-track faculty member of the FAMU College of Law in a position of assistant professor of law. Professor Reyes became the first FAMU College of Law entry-level faculty member identified and hired through the

AALS Faculty Recruitment Conference. Professor Reyes became the first Hispanic/Latina/o hired in a tenure-track position in the FAMU College of Law.

27. The FAMU College of Law received full ABA accreditation   in July 2009.

28.  Under the terms agreed upon hiring, Professor Reyes was required to apply for tenure no later than the beginning of the 2014-2015 academic year, which was the beginning of her sixth tenure-earning year. The College of Law Faculty Handbook ("CoL Faculty Handbook")[1] stated: "Submission of materials by the candidate in support of his/her application for promotion and/or tenure must coincide with the University's Schedule for Promotion and Tenure as generated annually from the Provost's Office."[2] The "2014/2015 Tenure and Promotion Schedule" ("University Tenure Schedule") generated by the University stated that the deadline for applications for tenure and promotion was September 12, 2014.

## The "Majority Clique" & "Workplace Mobbing"

29. In this Amended Complaint, the term "majority clique" is defined as Black, tenured professors who have individually and collectively participated in the tangible decisions and ploys that have harmed Professor Reyes during her employment at FAMU.

---

[1] The CoL Faculty Handbook that applied to Professor Reyes in the review of her applications for tenure and promotion was the CoL Faculty Handbook in existence when she was hired.

[2] CoL Faculty Handbook, § I.E.7.

30. The majority clique bonds together over their shared race, color, national origin, and race-sex characteristics (their "shared characteristics"). The majority clique self-identify as Black. Within the Black race they include all shades of color. Their national origins are African American or ancestry from a country associated with African ancestry. Black women also bond together over the combination of their race and sex characteristics. At FAMU, the shared characteristics of the majority clique are highly valued with Black race receiving the highest status for inclusion within the "FAMUly."

31. Defendant has delegated institutional power to the majority clique.

32.  Members of the majority clique have co-opted FAMU employees with their shared characteristics to join in their efforts to harm Professor Reyes.  A few non-Black FAMU employees have followed the lead of the majority clique and have participated in efforts to harm Professor Reyes.

33. "Swedish psychologist Heinz Leymann coined the term *workplace mobbing*, drawing on earlier research in ethology by Nobel Laureate Konrad Lorenz."[3] Workplace mobbing has been defined by experts as "a form of persecution, of humiliation, of degradation. It is the dark side of organizational life in workplaces, [including] universities, schools, religious organizations, the military, the judicial system, correctional institutions, and community

---

[3] MAUREEN DUFFY & LEN SPERRY, MOBBING: CAUSES, CONSEQUENCES, AND SOLUTIONS xi (2012).

organizations."[4] "When workers get mobbed in the workplace, their physical and psychological health suffers, marriages suffer, relationships with children suffer, and a cascade of reputational and financial losses quickly follow."[5] "For abusiveness to occur in an organization, the aggressive elements must exist within a culture that permits and rewards abusiveness, and leadership must allow or permit the abusiveness."[6]

34. Workplace mobbing includes organizational dynamics and involvement.[7]

35. Employees who have a different status in terms of race, sex/gender, ethnicity, and national origin in relation to the majority group in an organization may be subjected to workplace mobbing because of this difference.[8] The majority clique has used workplace mobbing to harm Professor Reyes.

36. Professor Reyes has been subjected to workplace abuse during her employment in FAMU because she does not have the shared characteristics of the majority clique. Professor Reyes is Hispanic/Latina, light skin, with national origin ancestry from a Hispanic/Latin American country. Professor Reyes is not a Black woman.

---

[4] *Id.*

[5] *Id.* at 38.

[6] *Id.* at 89.

[7] *Id.* at 4.

[8] MAUREEN DUFFY & LEN SPERRY, OVERCOMING MOBBING 26 (2014).

**The RPT Committee**

37. The FAMU College of Law Retention, Promotion and Tenure (RPT) Committee is a Committee constituted pursuant to the rules of the CoL Faculty Handbook. When Professor Reyes joined the faculty, the RPT Committee consisted only of the tenured, full professors. At the urging of a group of Black female law professors who were not yet full professors, after they made their complaints to the ABA accreditation site teams, the CoL Faculty Handbook was amended to include all tenured associate and full professors in the RPT Committee.

38. During the 2014-2015 academic year the RPT Committee consisted of the following tenured associate and full professors (the tenured faculty): [9]

Randall S. Abate (a White man),

Robert H. Abrams (a White man),

Deleso A. Alford (a Black woman),

Nicola ("Nicky") A. Boothe-Perry (a Black woman),

Patricia ("Pat") Broussard (a Black woman),

Jeffrey ("Jeff") M. Brown (a Black man),

Joan R.M. Bullock (a Black woman),

Ann Marie B. Cavazos (a Black woman),

Markita D. Cooper (a Black woman),

---

[9] Professor Jeremy Levitt (a Black man) was on sabbatical leave.

John Duncan (a Black man),

Jonathan W. Fineman (a White man),

Joseph Grant (a Black man),

Ronald C. Griffin (a Black man),

William ("Bill") D. Henslee (a White man),

Darryll K. Jones (a Black man),

Lundy R. Langston (a Black woman),

Shiv Persaud (an Asian/West Indian man),

Rhonda M. Reaves (a Black woman),

Omar Saleem (a Black man),

Jennifer M. Smith (a Black woman), and

Phyllis C. Taite (a Black woman).

39. Aggregated by race, the members of the RPT Committee that reviewed Professor Reyes's application for tenure were as follows: ten (10) Black women, six (6) Black men, four (4) White men, and one (1) Asian/West Indian man. All the female members of the RPT Committee were Black women. There was no Latina/o (man or woman). Professor Reyes was the first Latina/o hired in the tenure track and the first to apply for tenure.

40. Dean LeRoy Pernell appointed Professor John Duncan as Chair of the 2014-2015 RPT Committee. Professor Duncan was supposed to guide Professor

14

Reyes through the tenure process. However, he turned the process into an adversarial process even before she applied. He did not provide information and told Professor Reyes that she should contact Professor Phyllis Taite with questions. When Professor Reyes contacted Professor Taite with questions, she responded that she would forward her questions to Professor Duncan. Professor Taite treated Professor Reyes very rudely on August 20, 2014 during what was supposed to be a presentation when Professor Taite was going to provide information about the tenure process. Rather than answer Professor Reyes's questions, Professor Taite instructed her to submit her questions in writing. Therefore, Professor Reyes followed up via email. Unbeknown to Professor Reyes, Professor Taite sent a memorandum to Dean Pernell alleging that Professor Reyes was harassing her by asking her questions about the tenure process; this was before Professor Reyes applied for tenure. Professor Taite never informed Professor Reyes about this memorandum and she did not recuse herself from participation in Professor Reyes's tenure process. Instead, she participated in the ploys to deny Professor Reyes tenure.

41. On September 12, 2014, Professor Reyes submitted her application and portfolio materials in full compliance with the deadline set forth in the University Tenure Schedule. She delivered her application and portfolio materials in accordance with instructions given to her by Professor John Duncan. Professor

Reyes put together a very strong application by all objective standards. She fulfilled and exceeded the standards that were provided to her upon hiring. Dean Pernell had rated her performance as excellent in all categories of her annual evaluations. The annual RPT Committee reviews had all rated her performance in teaching, scholarship, and service to be very good to excellent. She had received class peer observations rating her teaching from very good to excellent. Students had consistently rated her as an effective, highly competent teacher. The overwhelming majority of comments in student evaluations were extremely positive about her teaching. A few students complained about Professor Reyes's rigorous teaching style, but no one ever raised concerns about this during her annual evaluations.

42. Pursuant to the University Tenure Schedule, the deadline for the RPT Committee to submit its recommendation to Dean Pernell was October 10, 2014. In mid-October 2014, Professor Reyes became concerned because she had not heard anything about the status of her application. She also noticed that members of the RPT Committee were avoiding her. She reached out to Dean Pernell via email to request the status of her application and he responded that they should meet. On October 29, 2014, Professor Reyes met with Dean Pernell, in his office, and he informed her that he was unable to begin his review of her application because the RPT Committee had not sent him her application and portfolio

materials or its letter of recommendation. The deadline for Dean Pernell to submit his recommendation was November 14, 2014.

43.   Dean Pernell told Professor Reyes that he could not review her application and materials if the RPT Committee did not first fulfill its duty to engage in the initial review process and provide a letter of recommendation to him. Therefore, the failure of the RPT Committee to perform its duty to (a) process Professor Reyes's application and supporting materials, including arranging for external and internal reviews of her scholarship, and (b) prepare a letter of recommendation by the stated deadline derailed Professor Reyes's entire tenure process. Moreover, if the RPT Committee did not process her application, there would be no review by the College of Law Dean, University Tenure and Promotion ("T&P") Committee, Provost, President, and Board of Trustees. The failure of the RPT Committee to fulfill its duty to process Professor Reyes's application and issue a recommendation would foreclose a review of Professor Reyes's application for tenure altogether. The University Faculty Handbook stated:  "By the end of six years of continuous full-time, or equivalent part-time service in a tenure-earning position in the University, a Faculty employee shall be nominated for tenure or given notice that further employment will not be offered, in the affected position with reason(s) why the employee was not nominated for tenure."[10]

---

[10] University Faculty Handbook, § II.J.(5)(a).

44. The majority clique that hijacked Professor Reyes's tenure process was driven by unlawfully discriminatory animus against Professor Reyes. They recruited allies and followers. They silenced the dissenters, who were also prohibited from communicating with Professor Reyes about what was happening in the secret, closed RPT Committee meetings, including about the decisions that were being made to derail her tenure process and reach a recommendation that tenure should be denied. In their efforts to deny Professor Reyes tenure, the majority clique repeatedly violated the regulations that governed the tenure review process. They also violated the regulations that set forth the standards that should be applied when reviewing an application for tenure, including by denying Professor Reyes fairness and due process.

45. The majority clique engaged in many ploys, including the following:

i. Making a five-minute false allegation of violation of a non-deadline that turned Professor Reyes's tenure process into an adversarial, controversial, and difficult process, which served to discredit Professor Reyes at the RPT Committee level and higher levels of review.

ii. Stopping Professor Reyes's tenure process in violation of the rules and ignoring Professor Reyes's repeated assertion that she delivered her materials by 5:00 PM. The actual deadline for submission was an entire day (until 11:59 PM). The RPT Committee refused to tell Professor Reyes what the allegation was (the 5:05 PM time) and what evidence they alleged, despite her repeated requests for this crucial information.

iii. Denying Professor Reyes the opportunity to refute their unsubstantiated allegation. They made it extremely difficult to set up a meeting and then, once a date and place were finally agreed upon (September 29, 2014) with Chair John Duncan, Professor Lundy Langston, and Professor Joseph

("Joe") Grant, they cancelled the meeting at the last minute without any explanation to Professor Reyes as to the reason for the cancellation. Subsequently, they misrepresented to the other members of the RPT Committee, the FAMU Division of Audit and Compliance ("DAC") investigator, the Dean, the Interim Provost, the President, the General Counsel, and/or other University officials that Professor Reyes did not want to clarify, without telling them that they were the ones who canceled the meeting and continued to keep Professor Reyes in the dark about what was happening in her tenure process.

iv.   Keeping Professor Reyes isolated and marginalized during the entire tenure process (over two semesters when the process was only supposed to be one semester). Chair John Duncan refused to provide Professor Reyes with the information she was entitled to receive. He also instructed other Committee members not to speak with her; thereby silencing them and alienating Professor Reyes from colleagues who would vote on her tenure.

v.    Arguing for "confidentiality" of the process to keep everything secret while they violated the claimed "confidentiality" by going outside the process (to all decision-makers at the University level) with their unsubstantiated allegation that Professor Reyes was lying about the time of delivery of her materials and also falsely claiming that she refused to clarify. In their statements, they never stated the alleged time (5:05 PM); they just kept saying that she submitted late or after the deadline. They also spread the falsehood to Black law professors beyond the FAMU College of Law.

vi.   Disenfranchising two White men from voting on Professor Reyes's tenure application: Professors Randall ("Randy") Abate and Robert ("Rob") Abrams.

vii.  Causing Professor Reyes to be subjected to a DAC investigation that she only learned about when she received notice of her interview, three days before the interview, at a time when she was busy teaching an extra heavy course load. Upon information and belief, Professor Deleso Washington, a Black female faculty member who was a member of the RPT Committee by the time Professor Reyes applied for tenure, submitted her tenure application

materials well after 5:00 PM but she was not accused and investigated as Professor Reyes was.

46. When the RPT Committee was refusing to process Professor Reyes's application for tenure, she hired an attorney who sent a letter to then Interim Provost Rodner Wright on October 22, 2014 and a follow-up letter to then General Counsel Avery McKnight on October 30, 2014. Those letters explained the irreparable injury Professor Reyes would suffer from the discrimination if the RPT Committee did not process her application. The letters also stated that it was not in good faith to recruit Professor Reyes under the guise that her application for tenure would be reviewed in her sixth year and then deny tenure without review. After Professor Reyes's attorney sent the two letters opposing the discrimination, Provost Wright retaliated against Professor Reyes by subjecting her to an official Division of Audit and Compliance ("DAC") investigation over the alleged five-minute late submission of a non-deadline.

47. Three members of the RPT Committee were interviewed during the DAC investigation: John Duncan, Joe Grant, and Phyllis Taite. Their interviews were audio recorded. In those interviews, they attempted to corroborate the alleged late submission; however, none of them were present when Professor Reyes submitted her application. Then Associate Dean, Professor, and RPT Committee member Joan Bullock, the one who made the initial false allegation, did not submit herself

to an interview. Instead, she provided a self-serving written statement in which she claimed that she stopped by Professor Reyes's office, early in the afternoon on the day when she was supposed to submit her materials, and Professor Reyes was still working on her application. In her written statement, Associate Dean Bullock gratuitously and falsely alleged that Professor Reyes "grunted" at her. Although Associate Dean Bullock was present in the law school building, she did not receive Professor Reyes's materials. Instead, she assigned the most junior program assistant, someone under her supervision, to receive Professor Reyes's application and supporting materials (3 large binders and 25 small binders as required).

48. Associate Dean Bullock and Professor Duncan manipulated the program assistant who received the materials into going along with their allegation of late submission. They got her to say that Professor Reyes submitted her materials five (5) minutes after 5:00 PM (not the published deadline). They also tried to get Professor Reyes's program assistant, Celia Westbrook , who was also present when Professor Reyes submitted her application, to go along with their ploy. However, she refused and told the truth during the DAC investigation. Thereafter, Associate Dean Bullock, her supervisor, retaliated against her with the lowest evaluation Ms. Westbrook had ever received.

49. Ms. Westbrook complained to the DAC that she was subjected to retaliation after she was promised that she would suffer no retaliation if she told

the truth. Eventually, the DAC conducted an investigation and reviewed the evaluations provided by three of the faculty members whom Ms. Westbrook assisted. All three (Professor Randy Abate, Professor Pat Broussard, and Professor Reyes) provided individual evaluations with very high scores; therefore, Associate Dean Bullock had no basis to give Ms. Westbrook the low scores she assigned. According to records of the DAC investigation of Ms. Westbrook's complaint of retaliation, Professor Patricia Broussard stated that she gave Ms. Westbrook high scores in her evaluation; however, she wanted to give her lower scores but was afraid that Ms. Westbrook may file a complaint against her. At the point when Professor Broussard was interviewed, Ms. Westbrook had never complained about her evaluation. The DAC found that the Ms. Westbrook's complaint of retaliation by Associate Dean Bullock was corroborated by the evidence. Associate Dean Bullock decreased Ms. Westbrook's evaluation points and increased the evaluation points of the program assistant who provided the five-minute allegation.

50. Ms. Westbrook resigned from the FAMU College of Law a couple of weeks before the current academic year (2022-2023) began. Ms. Westbrook worked in the FAMU College of Law for twelve (12) years and witnessed the ongoing discrimination, harassment, hostilities, and workplace mobbing that Professor Reyes has endured. Ms. Westbrook was targeted when she refused to participate in ploys to harm Professor Reyes.

51. Three (3) professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant) rushed to review Professor Reyes's evidence and professional responsibility classes right at the beginning of fall 2014; they knew, by that point, that there was a late submission ploy underway to stop processing Professor Reyes's application for tenure. Stopping the tenure process meant that the four (4) evaluations by these three (3) professors were the only peer teaching evaluations available for Professor Reyes's fall 2014 classes. RPT Committee Chair John Duncan refused to give Professor Reyes the four (4) peer teaching evaluations from Professors Broussard, Cavazos, and Grant. This was another violation of the process. Professor Reyes was left in the dark about the false and negative comments those three (3) professors stated in those four (4) evaluations; therefore, she did not have a chance to refute what they stated.

52. The individual professors (Broussard, Cavazos, and Grant), the teaching subcommittee, and the RPT Committee violated the mandate in the College of Law Faculty Handbook that required that class observers meet with the professor to provide feedback. None of the three (3) professors (Broussard, Cavazos, and Grant) met with Professor Reyes. The RPT Committee considered and gave credit to allegations made by Professor Patricia Broussard during the RPT Committee meeting and in her peer teaching evaluation about what students allegedly told her. Professor Broussard did not disclose to the RPT Committee that she told students

to complain about Professor Reyes to then Associate Dean Darryll Jones, who then instructed them to file written complaints against Professor Reyes.

53. Professor Patricia Broussard, a member of the RPT Committee and the College of Law representative in the University-wide T&P Committee, approached students in Professor Reyes's evidence course (at the beginning of fall 2014), in violation of the peer evaluation process, to elicit negative gossip about Professor Reyes and her class. She was supposed to conduct a peer evaluation (class observation) of Professor Reyes's teaching, not student evaluations of her teaching. Student evaluations were due to be administered at the end of the semester and faculty members are not supposed to be involved in student evaluations.

54. In a repeated and ongoing pattern of discriminatory and hostile conduct toward Professor Reyes, Professor Patricia Broussard negatively interfered with Professor Reyes's relationships with students and empowered students to question Professor Reyes's teaching methodology and disrespect her. Professor Broussard informed students that Professor Reyes was applying for tenure, something that Professor Reyes had not shared with students. Professor Broussard also told students to submit complaints against Professor Reyes.

55. After Professor Pat Broussard sent students to complain to then Associate Dean Darryll Jones about Professor Reyes, four (4) students, out of seventy-four (74) students in her evidence course, submitted written complaints, at the

beginning of fall 2014. Neither Professor Broussard nor Associate Dean Jones ever discussed the alleged student issues with Professor Reyes. As with the false allegation of five-minute late submission, the RPT Committee denied Professor Reyes an opportunity to respond to the ploy to use the four (4) student complaints in her tenure process. Professor Reyes learned about this ploy after a student warned her, on February 11, 2015, the date when the teaching subcommittee disclosed the four (4) complaints to the entire RPT Committee. According to the student, the ringleader of the four (4) complaints was encouraging students to complain about Professor Reyes and telling them that there was a meeting that day "to get her fired." The student said that the ringleader was openly saying this in Professor Broussard's class. The ringleader was close to Professor Broussard and Professor Jennifer Smith. Professor Reyes did not know when the RPT Committee was meeting but students knew.

56. The teaching subcommittee, under the leadership of Professor Nicola ("Nicky") Boothe-Perry, a member of the majority clique, presented information about the four (4) student complaints to the RPT Committee at the last minute. The members of the RPT Committee who were blindsided with this new material did not have a meaningful opportunity to argue the issue, including whether it was a violation of the process to consider this type of student complaints and what due process should be provided to Professor Reyes. Professor Boothe-Perry did not

25

notify Professor Reyes that the student complaints would be added to her tenure file. When Professor Reyes learned of the ploy, she urged the RPT Committee to consider the potential repercussions for the four (4) law students whose frivolous complaints and allegations were going to become part of the record. The RPT Committee did not attach and did not consider in its deliberations a memorandum Professor Reyes provided to the RPT Committee on February 24, 2015 (with Exhibits), in response to the four (4) student complaints. The negative comments in those four (4) complaints were highlighted in the teaching assessment of Professor Reyes's tenure report. However, the majority clique refused a suggestion by some Committee members that, if those four (4) complaints were going to be added and considered, the total student evaluations from fall 2014 should be added and considered. Those evaluations were not yet available when Professor Reyes applied in fall 2014 but were available in spring 2015 by the point the four (4) complaints were being added to her tenure file (in violation of the rules).

57. RPT Committee Chair John Duncan selected the members and chairs of three (3) subcommittees to review Professor Reyes's teaching, scholarship, and service. On repeated occasions Professor Reyes requested information about the composition of the subcommittees, but Chair Duncan refused to provide this information, just like he refused to provide Professor Reyes the information she was entitled to receive immediately before and during the tenure process. She

26

finally received the list of RPT subcommittees after the DAC concluded its investigation and Professor Reyes sought and received the records.

58. None of the chairs of the subcommittees ever requested to meet with Professor Reyes. Chair Duncan selected chairs and members of subcommittees who went along with the ploys (by action or inaction). Upon information and belief, the following full professors were excluded from Professor Reyes's tenure subcommittees: Professor Randall Abate, Professor Robert Abrams, Professor Ron Griffin, Professor Rhonda Reaves, and Professor Omar Saleem. However, they were still members of the entire RPT Committee. The subcommittees wrote the teaching, scholarship, and service sections of the RPT Report.

59. Professor Nicky Boothe-Perry, the chair of the teaching subcommittee, was supposed to visit Professor Reyes's Professional Responsibility class in fall 2014, but she never did. She also never responded to Professor Reyes's email in which she asked her if she was going to visit her class in fall 2014. Professor Boothe-Perry did not visit Professor Reyes's class in spring 2015.

60. Professor Boothe-Perry did not give Professor Reyes copies of the class observation forms that were provided to her during the tenure process (fall 2014 and spring 2015). Professor Boothe-Perry never communicated with Professor Reyes to give her feedback about her peer teaching evaluations during the tenure process. The teaching subcommittee waited until the last minute (February 11,

2015) to slip in the information about the four (4) student complaints in its report. At that point, the RPT Committee was told that a vote had to be taken on February 25, 2015 and the final report had to be assembled and provided to Dean Pernell by February 27, 2015.

61. The scholarship subcommittee was chaired by Professor William ("Bill") Henslee. Upon information and belief, Professor Henslee wrote (or guided) the scholarship report that dismissed the merit of two of Professor Reyes's law review articles and totally ignored one of her other articles in clear violation of the rules, which required that all articles Professor Reyes submitted should be considered in the scholarship assessment. Professor Henslee never went through a tenure process in a law school. Professor Henslee received tenure and promotion to associate professor upon being hired as a founding faculty member of the re-established FAMU College of Law. Professor Henslee knew Dean Percy Luney, the dean who hired the founding faculty.

62. Upon information and belief, Professor Henslee was denied promotion to full professor in the FAMU College of Law on a couple of occasions due to alleged deficiencies with his scholarship. Some years before Professor Reyes applied for tenure, Professor Henslee told Professor Reyes that he was denied promotion because he is a White man. However, during Professor Reyes's tenure process,

28

Professor Henslee gained insider status by participating in the ploys against Professor Reyes with the majority clique.

63. In yet another violation of the tenure process, Professor Lundy Langston, the same person who silenced Professor Ronald Griffin (by filing a complaint against him) when he tried to argue for fairness in Professor Reyes's tenure process in fall 2014, was the person who took charge of the outside reviewer selection process with her co-chair, Professor Deleso Washington. After Professor Reyes received excellent external reviews of her scholarship from law professors in top-ranked law schools, Professor Langston, at the last minute, slipped in a negative external review by a Black female law professor whose area of expertise is critical race theory. That external reviewer professor was not vetted through the Outside Reviewer Selection Subcommittee process. She provided the only negative external review of Professor Reyes's scholarship.

64. The clique that took control of the tenure process, inappropriately placed great emphasis on the highly critical external review by the critical race scholar, someone who did not disclose in her external review that she and her friend, a self-described Afro-Latina law professor, both attacked Professor Reyes personally when they were all participants in the *Defining Multiracialism and its Impact on the Law* panel during the 2014 Southeastern Association of Law Schools Annual Conference. This was during the summer before Professor Reyes applied for

tenure. The two professors mocked Professor Reyes for proposing that Hispanic/Latino has become a race and should be considered for inclusion in the racial categories of the next U.S. Census (the 2020 Census). Immediately after the panel, Professor Reyes approached the critical race theory scholar to introduce herself; the professor responded in a rude and dismissive manner. She told Professor Reyes, in what Professor Reyes perceived as a threatening tone, "you should tell LeRoy Pernell, your dean, that I said hello. He and I go a long way back." During the tenure process, Professor Reyes did not know that this professor had become part of the ugly ploys.

65. There were additional ploys as part of Professor Reyes's tenure process. The ploys stated in this complaint are only a representative sample of the ongoing, severe and pervasive hostilities and indignities Professor Reyes has faced for years. On April 24, 2015, Professor Reyes submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to FAMU's Office of Equal Opportunity Programs ("EOP") against members of the 2014-2015 RPT Committee who discriminated against her, harassed her, and made the tenure process as hostile as possible. The majority clique did not want a non-Black Latina from Hispanic origin to join the group of tenured professors.

66. Professor Reyes's Charge was investigated by Carrie M. Gavin, EOP Director. Ms. Gavin did a sham investigation and dismissed the Charge. Professor Reyes documented the flaws in Ms. Gavin's investigation in a memorandum dated September 8, 2015, which Professor Reyes submitted to then President Elmira Mangum requesting review of the decision. On September 14, 2014, the then General Counsel, Avery McKnight, responded that there was no appellate procedure to review the EOP investigation.

67. At the end of the RPT Committee review, the majority clique and their allies recommended denial of tenure to Professor Reyes. Dean LeRoy Pernell, after conducting an independent evaluation of the application and reviewing dissenting reports that advocated for tenure, recommended that Professor Reyes be granted tenure. He concluded that the majority in the RPT Committee did not provide a rational basis for its conclusion (recommendation). He also found that the RPT Report and Recommendation issued by the RPT Committee did not set forth a rationale that supported the conclusion (recommendation).

68. The University T&P Committee (with Professor Broussard as the representative of the College of Law) followed the lead of the RPT Committee. Provost Marcella David, an experienced, accomplished law professor who had recently joined FAMU as provost, knew how to review an application for tenure by a law professor and did an independent review of Professor Reyes's application.

Provost David and President Elmira Mangum recommended that Professor Reyes receive tenure. Professor Reyes's tenure was approved on June 10, 2015.

### Race, Color, National Origin, Gender, and Gender-Race

69. The factual findings section of the 2008 ABA Site Visit Report documented a workplace riddled with divisions and tension within the faculty. Specifically, the report described "pervasive, persistent and destructive tensions between the senior and junior faculty." The report stated: "The faculty continues to suffer from a negative dynamic that is extraordinary." The report suggested that the law school should recruit new faculty to improve the faculty relationships and environment especially because there was a "race against the clock" to satisfy the requirements for full accreditation.

70. It is against this backdrop that Professor Reyes joined the faculty of the FAMU College of Law as the first Hispanic/Latina/o in the tenure track. Professor Reyes did not have access to the site visit report until years after she joined the faculty when she was searching for answers as to why she was experiencing horrific circumstances. Eventually, Professor Reyes came to understand that she cured the senior and junior faculty divisions by her mere presence. The senior and junior Black faculty found a common interest in discriminating against, harassing, and making the work environment hostile for Professor Reyes.

71. Comments about race, color, and national origin have been prevalent in Professor Reyes's experiences at FAMU. There has also been a gender aspect to the ongoing discrimination. For example, a former Latina executive assistant who worked in the Dean's Suite, Wanda Aviles, went through similar discrimination and hostile work environment as Professor Reyes although for a shorter period of time because she resigned due to the hostilities. Ms. Aviles described how a group of Black women targeted her when she was the only non-Black woman in the Dean's Suite. She also described how another Latina staff member adopted a Black identity and was accepted by the majority clique. Ms. Aviles also described how, once Associate Dean Darryll Jones and Associate Dean Reginald Green realized that the Black women did not like Ms. Aviles, they also joined in efforts to sabotage her to gain favor with the Black women. Associate Dean Jones even raised his voice at Ms. Aviles in what she considered an abusive tone. Associate Dean Jones has also been abusive toward Professor Reyes for years. By targeting Professor Reyes he has bonded with the Black women who harass her because she is Latina and not Black. Associate Dean Jones has constantly rejected Professor Reyes's Hispanic/Latina/o race identity. According to him, she is White Latina.

72. After Professor Reyes accepted the offer to join the FAMU Law faculty, during a visit to look for housing she stopped by the law school and was introduced by a staff member to Professor Rhoda Cato, a more senior faculty member, a Black

woman. Professor Cato's first comment to Professor Reyes was: "So you are the wise, Latina diva they hired." Professor Reyes was hired around the time of Justice Sonia Sotomayor's confirmation hearing, when she was attacked and chastised for her comment that a wise Latina judge may reach a different result than a wise judge of a different background and experience. Professor John Duncan's first comment to Professor Reyes when she joined the faculty was: "We are going to have fun with you." Professor Reyes found the comment but did not say anything.

73. Professor Patricia Broussard, during Professor Reyes's first weeks on the job, kept referring to Professor Reyes's Latina identity as the basis for her hiring. She seemed focused on and bothered by Professor Reyes's Hispanic/Latina identity. Professor Reyes finally responded that she was qualified for the job beyond her Hispanic/Latina identity.

74. Professor Lundy Langston once told Professor Reyes that the reason why the Black female professors were hostile toward her was because of her hair. She explained that her straight hair and light complexion means she is White. Professor Langston also told Professor Reyes that she identifies with her Dominican (someone from the Dominican Republic) hairdresser because they have the same hair texture and, as such, they share a racial connection. Professor Reyes does not have the same hair texture as Professor Langston and had no idea that her hair and skin color would be scrutinized.

75. The comments about race, color, and national origin distinctions continue year after year. The scrutiny of Professor Reyes's hair, skin color, and race self-identification are also replicated within the student body and often serve to divide. It has taken Professor Reyes years working at FAMU to understand how "code language" is used by some Black faculty members. For example, some Black professors, primarily some of the ones who constantly target Professor Reyes, often responded to Professor Reyes's suggestions during faculty meetings with the phrase "this is a Black school." Eventually, Professor Reyes realized that this comment was meant to silence her and to signal to other faculty members that Professor Reyes should not comment because she is not Black.

76. There were also comments about a caste system depending on the national origin of immigrants. Black immigrants and immigrants from countries that are deemed Black are preferred. There is also a preference for dark skin color if someone is not Black. Related to this, Professor Reyes also learned that some Black faculty members divide Latinas/os between "Black Latino" and "White Latino." Some Latina/o students shared with Professor Reyes that Professor Jeremy Levitt, during class, shamed Latina/o students into picking between Black and White race after they initially responded that they are Latina/o. Latina/o students also shared with Professor Reyes that this feeds racial conflict within the student body.

35

77. On May 13, 2021, HALSA Board members met with Dean Deidré Keller to raise some of the issues they face because they are Hispanics/Latinas/os/x. They also told her that they want Professor Reyes to be treated the same as other tenured professors. As of the date of this amended complaint, Professor Reyes has not followed up with the HALSA Board or Professor Reyes about the negative experiences that were discussed during that presentation over a year ago.

78. During a meeting with faculty on April 27, 2022, Dean Keller and her administrative team presented data, charts, and analysis on bar passage for African-American students. Professor Reyes asked whether the same data was available for Hispanic/Latina/o/x graduates. Dean Keller responded that the data was available but they did not analyze it. In spring 2022, HALSA was excluded from co-hosting with BLSA a Lunch and Learn Zoom session with the Miami-Dade Public Defender's Office. When Professor Reyes complained about the exclusion, Director Gary Harrington said it was because HALSA was not eligible due to a vacancy in the HALSA Board. There was no rule about this. Dean Keller went along with it.

79. The fact that Professor Reyes speaks on behalf of Hispanic/Latina/o/x students and HALSA, as HALSA's faculty advisor, has made her a target of additional conflict, including when she raised the issue of HALSA being left out of a domestic violence event, organized by students in Professor Langston's domestic

violence workshop in conjunction with the Black Law Students Association ("BLSA") and the Women's Law Caucus ("WLC").

80. Members of the majority clique have harassed Professor Reyes throughout the years with impunity, including when the entire faculty and even students have been present. They have sent a message to Professor Reyes that she, a non-Black Latina, should not be a tenured law professor in the FAMU College of Law.

**The Majority Clique Pitted "Black Latina" vs. "White Latina"**

81. A year after Professor Reyes was hired as a tenure-track assistant professor, the professors who have targeted Professor Reyes with racial animosity for years, pushed for a legal writing instructor, a Latina who self-identified as Black, to be hired in the tenure-track. Some professors and students reported that they did not know that the professor was Latina. She had changed her name and was primarily using the African name she adopted. When Professor N.N. applied to become a tenure track faculty member, she distributed documents to the faculty explaining that she changed her name to denote her African ancestry and moved from College Park to Pine Hills to be in a Black neighborhood. She emphasized her Black racial identity during the hiring process. Professor Reyes greeted Professor N.N. when she was about to give her "job talk" to the faculty. Professor Levitt interrupted and physically got between Professor Reyes and Professor N.N. After that, Professor N.N. and Professor Reyes spoke briefly when they were alone one evening in the

faculty suite. Professor Reyes perceived that Professor N.N. felt she had to stay away from Professor Reyes in order to gain favor with the majority clique. This is how some faculty members divide Latinas/os. Professor N.N. is no longer in the FAMU College of Law. She and Professor Reyes may have been able to make a great team if they had not been divided.

82. After Professor N.N. was hired in a tenure track position, during a faculty meeting, Professor Jeremy Levitt made it a point to correct the FAMU 2012 Self-Study, which the faculty was preparing to present to the ABA, to describe Professor N.N. as "Black Latina" and not as "Latina." Professor N.N. was present at the meeting but said nothing. At the time, Professor Reyes asked whether the ABA had a separate category for "Black Latino." Professor Darryll Jones looked at Professor Reyes with disdain and asked her what kind of Latina she is. Professor Reyes responded that she self-identifies just as Latina, but Professor Jones asked her again what kind. Professor Reyes responded that she would need some type of DNA test to tell him more. Professor Jones, Professor Levitt, and other members of the majority clique want Hispanics/Latinas/os/x to choose between a Black and White racial identity thereby disappearing the group racially. And, their preference is for Black Latinas/os.

83. Professor Levitt reignited the issue of Black Latina versus White Latina again on October 23, 2019 when he viciously attacked Professor Reyes in a racial

and gender attack that was worse than his prior racial attacks against Professor Reyes. As part of his abusive emails, he falsely accused Professor Reyes of rejecting Professor N.N.'s "self-designation as Black and Latina." He characterized Professor Reyes as a "White Latina" with "white privilege," and attempted to once against pit her against Professor N.N., a "Black Latina" who was no longer working in the law school. The attack was particularly heinous because Professor Levitt falsely accused Professor Reyes of attacking Professor N.N.'s racial self-identification. This was character assassination in a political climate where those types of allegations could derail Professor Reyes's career. Professor Levitt copied the entire faculty in his abusive and defamatory email.

84. Professor Reyes has been subjected to the constant message that some of the Black professors who discriminate against her perceive her as a White Latina and want her to accept said label. During the DAC investigation, then Associate Dean and Professor Joan Bullock said that Professor Reyes is "White appearing." On April 8, 2020, Professor Jennifer Smith called Professor Reyes a "White Latina" after a presentation during which Professor Reyes once again stressed that she self-identifies as Latina without any additional qualifier. Some years before that incident, Professor Smith made a comment during a forum when Professor Smith was a panelist, as she saw Professor Reyes enter with students, that "Asians and Latinos are unintended beneficiaries of the Civil Rights Movement." Professor

Reyes responded to the comment by briefly explaining that Latinos participated in the Civil Rights Movement, even if they were not in the South, and Chinese fought against the Chinese Exclusion Acts and racist treatment.

85. Another constant message Professor Reyes gets is that Black ancestry is superior, that Blacks have a superior right to life in the United States than Latinos, and that she is supposed to accept inferior status, including by accepting the discrimination, disparate treatment, and hostilities without complaining.

86. The racial hostility toward Professor Reyes became evident in the closed RPT Committee meetings when the Committee was reviewing Professor Reyes's application for tenure. Professor Ronald Griffin and Professor Randall ("Randy") Abate noted the race discrimination against Professor Reyes. Professor Griffin noted it during a faculty meeting and Professor Abate noted it in a memorandum he sent to Dean LeRoy Pernell after the RPT Committee, led by the majority clique, recommended that Professor Reyes be denied tenure.

87. On October 1, 2014, Professor Lundy Langston sent an e-mail to then Dean Pernell with copies to his executive assistant, Pamela Leonard, and then Associate Dean Jones complaining about "reprehensible conduct" allegedly exhibited by an African American male professor, Ronald Griffin, against her during an RPT Committee meeting on October 1, 2014. This was around the time when the majority clique was insisting that Professor Reyes's process should not proceed.

88.     On October 24, 2014, Professor Langston sent another e-mail that she characterized as "an official complaint" against Professor Griffin "for his [alleged] conduct referring to [her] and other [Black] female colleagues . . . as being malicious, evil, racist, and vile" during an RPT Committee meeting on October 23, 2014. She stated that Professor Griffin made his statements "while addressing the viewpoints expressed by African American women committee members." Professor Langston sent her complaint to Dean Pernell and copied the University President, the Interim Provost, the Board of Trustees' attorney, the University EEO Officers, the General Counsel, Chair Duncan, Associate Dean Jones, and Pamela Leonard (Ms. Leonard was one of the Black women who was hostile to Wanda Aviles when they worked together in the Dean's Suite and she was also hostile to Professor Reyes since the hiring process when she delayed processing Professor Reyes's moving paperwork).

89.     In her complaint, Professor Langston described, with much verbosity, a scenario of "African American women committee members" breaking down and "sobbing, loudly" after Professor Griffin allegedly made his comments. "Two other African American women" allegedly "walked out of the meeting." Professor Langston claimed that the words that he allegedly used were "actionable as slanderous." She went on to define each term and seemed to conclude that Black women cannot be racist because of the racism they themselves experience.

41

90.    Professor Langston tainted Professor Reyes's tenure process by potentially creating additional animus against her when she submitted her complaint about what she alleged happened in the tenure process to decision-makers that were supposed to review and make recommendations on Professor Reyes's application for tenure at subsequent levels of review. Rather than limit herself to submitting her complaint to the University Equal Opportunity Programs Officer, which is the procedure specifically prescribed in the University Regulation, she sent her complaint to Dean Pernell, an African-American man, and copied the President, an African-American woman, the Interim Provost, an African-American man, the Board's attorney, another African-American woman, the Associate Dean for Academic Affairs, an African-American man; the Chair of the RPT Committee, an African-American man, and Dean Pernell's executive assistant, an African-American woman. By including Ms. Leonard, Professor Langston riled up even the staff, the majority of whom are Black women.

91.    Professor Langston did not stop there. She and some of the other Black female faculty members complained behind the scenes about Professor Reyes and claimed that they were afraid of her. There were email exchanges with EOP Director Carrie Gavin and Human Resources liaison Adrienne Snyder raising all kinds of rumors about Professor Reyes being "dangerous." Professor Jennifer Smith told a staff member about a dream she had about Professor Reyes and the

staff member allegedly had some type of anxiety attack. Professor Reyes did not know this was happening. She found out when she obtained the records of the investigations. Those records show the deep racial hatred against Professor Reyes and how turning Professor Reyes into a "dangerous White Latina" conjures up ancestral fears that cause group frenzy like workplace mobbing.

92.     FAMU's General Counsel Denise Wallace, a Black woman, has also misrepresented Professor Reyes's conduct, including by claiming that Professor Reyes contacted the Office of the General Counsel in another university to ask about open meetings when it was not Professor Reyes. Professor Reyes has been blamed and become the scapegoat for situations that she does not even know about.

93.     In addition to dealing with hostilities from Black women, Professor Reyes has also been subjected to abusive conduct from Black men. For example, Professor Reyes only communicates with Professor Levitt in group emails and she is only around him during faculty meetings because he was highly abusive toward her since she joined the faculty in 2009. Around that time, Professor Barbara Bernier and Professor Jennifer Smith filed complaints against Professor Levitt. Professor Reyes did not know that a Hispanic/Latino student had also filed a race and national origin complaint against Professor Levitt. When Professor Reyes spoke about his abusive conduct with Associate Dean Markita Cooper, she told

Professor Reyes that she was also dealing with his harassment but, if Professor Reyes told anyone, she would deny it. Basically, Associate Dean Cooper said that she would lie. Therefore, Professor Reyes realized that she could not count on her to help. Professor Reyes had to fend for herself in an abusive workplace where she was more vulnerable than most.

94.    In May 2019, Professor Levitt sent an individual email to Professor Reyes. This was soon after he ridiculed Professor Reyes at a faculty meeting on May 8, 2019 when, upon Professor Reyes's request for credit for her professional contributions, Professor Levitt responded that he was going to give her "a star and smelly sticker or happy face." Professor Levitt's subsequent email was apparently an excuse to start conflict with Professor Reyes, claim offense, accuse her of racism, and insult her because of her race. In that email exchange, he called Professor Reyes a "white Latin or Hispanic," and termed her response to his attack "[her] defensive and white privileged victim-based response." On May 13, 2019, Professor Reyes demanded that Professor Levitt stop sending her emails. She stated in pertinent part:

> Jeremy,
>
> You have crossed the line into harassment. I am copying attorney Shira Thomas, FAMU's Interim Vice President and General Counsel, so she can add this record to all the records in the Office of the General Counsel about FAMU Law and what happens here. I **am not** filing a Regulation 10.103 complaint because I have no confidence in the FAMU Office of Equal Opportunity Programs. They and the FAMU Office of the General Counsel have been aware of the hostile work

environment in the law school for years. Unfortunately, like the avoidance of dealing with the hazing problem until it became public, the institution has, thus far, ignored the workplace environment problem in the law school. I hope that the selection of a new dean serves to address this cancer that has been killing the law school and harming human beings who find ourselves in a position of vulnerability.

95. On May 14, 2022, Professor Reyes also put Provost Maurice Edington on notice of Professor Levitt's latest attack. She also notified then Interim Dean Nicky Boothe-Perry, Interim Associate Dean Phyllis Taite, and Associate Dean Reginald Green (Professor Levitt's friend since they were 1L students in law school). Professor Reyes reminded the three of them that they were present when Professor Levitt ridiculed her during the faculty meeting and they, as administrators, said nothing. In her email to Provost Edington and Interim General Counsel Thomas, Professor Reyes stated:

> The e-mail below from Jeremy Levitt confirms the latest setup. Jeremy Levitt bullied me at the faculty meeting (on 5/8/19) when we met to discuss the finalists for the dean position. Then, he followed up by e-mailing me. He escalated the situation and, after I defended myself and copied attorney Shira Thomas, he leveled a heinous and false accusation against me by stating that I am "attacking [him] and others on the basis of race and or gender." This is a blatant lie. It is also hypocritical and self-serving, especially after Jeremy Levitt called me a "white Latin or Hispanic" with "white privilege." This is how he and others view me in this workplace.
>
> Professor Levitt is accusing me to silence me. I will not remain silent.
>
> ***
>
> The fact that this situation is happening in an HBCU law school with a publicized mission of social justice is troubling and demoralizing. How would people outside judge what is happening here? This is beyond embarrassing. It is

45

abusive. The University should hire a reputable law firm to conduct an independent investigation of the workplace environment and propose a plan of action to address the mayhem.

96. On May 15, 2022, Carrie Gavin, FAMU's EOP Director, sent an email to Professor Reyes asking her if she wanted to file a harassment complaint. Professor Reyes responded in pertinent part:

> With all due respect, I am not going to spend yet another summer, without pay, dealing with another non-productive, non-objective, sham internal investigation. FAMU is on notice of the hostile work environment and the actions against me. If additional circumstances arise, I may re-assess the need to file a complaint after consultation with legal counsel. In such case, the goal will be to get objective and independent review of my claims.

> I understand that the only assistance you are offering is documenting that you told me to file a Regulation 10.103 complaint. I suggest that you go beyond that and finally advise the Provost and the President to hire a reputable law firm to conduct an independent, credible investigation of the hostile work environment in the law school.

97.     After Professor Reyes demanded that Professor Levitt stop sending her emails, he joined in a group email to the faculty wherein Professor Phyllis Taite dismissed Professor Reyes's comment and said that the "majority" was in agreement. Professor Reyes has heard the same "majority" comment for years and has come to understand that it is meant to constantly remind her that she is not part of the majority. In response to Professor Taite, Professor Reyes acknowledged her minority status. Professor Levitt then took this opportunity to reply to all faculty attacking Professor Reyes and questioning her race and gender identity.

98.     In summary, Professor Levitt, in his e-mail correspondence dated October 23, 2019, 2:56 PM:

a) began by insulting Professor Reyes and self-servingly claiming that there were no "EO concerns" raised by his harassment, which Professor Reyes qualified as abusive conduct;

b) applied some type of litmus test to question Professor Reyes's racial identity;

c) used a reference to former colleague N.[N.], a self-described Black Latina who was pitted against Professor Reyes, to set up a false race-based accusation against Professor Reyes;

d) ascribed to Professor the thinking of a Spanish conquistador who was a torturer and mass murderer of indigenous people;

e) falsely alleged that Professor Reyes admitted not understanding the diversity of Black people;

f) determined that Professor Reyes does not have the knowledge and experience Professor Reyes claims about "race, ethnicity, color, gender and religion in the US" because, according to Professor Levitt, Professor Reyes's experience is not morally equivalent to his;

g) labeled Professor Reyes a descendant of the "enslavers" of "[his] people;" and

h) criticized the definition of Latino Professor Reyes used in an article in 2008 in the Harvard Law School student newspaper.

99. Professor Reyes waited three weeks to see if any faculty member or administrator who was copied in Professor Levitt's email responded in her defense or at least ask her how she was feeling after such a vicious and public attack. No one reached out to her. Professor Reyes determined that she must respond; otherwise, her silence may be deemed an admission of Professor Levitt's false allegations. In today's political climate, the types of race-based accusations Professor Levitt made about Professor Reyes foster hatred and animosity against

the non-Black person. They are especially detrimental in professional settings and are used to destroy professional careers.

100. Professor Reyes prepared a memorandum, dated November 13, 2019, which she submitted to the following: College of Law Faculty, President Larry Robinson, Provost Maurice Edington, General Counsel D. Denise Wallace, and EOP Director Carrie Gavin. In said memorandum, before responding to each of Professor Levitt's vicious racialized attacks, Professor Reyes stated:

> I must respond to Levitt's dangerous and abusive allegations (See Composite Exhibit "A"). He made unsupported accusations and broad misrepresentations about me and what I have stated with the clear intent of harassing me, damaging my reputation, and promoting additional racial animus against me. Therefore, I cannot afford to leave his false allegations unchallenged. This is by no means an academic exchange. This is my response/defense to Levitt's discrimination and harassment, which institutional actors have been aware of. Again, I became his target as soon as I began working here.

> ***

> The e-mail exchange that led to this memorandum response is a perfect example of how I have yet again been attacked by a member of this law school's faculty, and need to defend myself because, otherwise, the false allegations may be deemed admissions. The lies are spread all over the law school and beyond. This has happened before; therefore, I must respond, preferably in e-mails to all faculty, to try to avoid misrepresentations of what I said or did.

> ***

> Can you imagine what would happen if I (a Latina) wrote to Levitt (a Black man) the hateful things he writes to me? To put Levitt's attacks against me in context, in his "*Fuck your Breath*" law review article, Levitt stated that hate "means to intensely dislike, harbor extreme hostility, or antipathy toward [another] 'usually deriving from fear, anger, or sense of injury.'" To me, Levitt's e-mails are full of this hate. What is even more dangerous is that Levitt is using this institution to spread hate and a hate-filled rhetoric against people whom he perceives as not

being "the same [as] or even similar" to him – people he places "on different sides of the enslavement and slavery index" [Levitt's words].

101.    There was infighting present in the FAMU College of Law before Professor Reyes arrived. In fact, an outside consultant identified all kinds of dysfunctional dynamics within the faculty, including malicious gossip. Professor Reyes had no idea how bad it was or how extra vulnerable to attacks she would be.

102.    When Professor Reyes was recruited and hired, she also did not know that, upon information and belief, Carmenelisa Perez-Kudzma, a former College of Law non-tenure track legal research and writing instructor, complained that she was being discriminated for being Latina. Professor Perez-Kudzma was no longer teaching at the FAMU College of Law by the time Professor Reyes joined the faculty.

103.    Professor Levitt has not attacked any other faculty member with the racist and gendered attacks he has directed at Professor Reyes in plain view of many people, including deans and associate deans. President Larry Robinson and Provost Maurice Edington have been on notice. Professor Levitt has also attacked Professor Reyes in combination of race and gender - "White Latina." Professor Darryll Jones has also joined in attacking Professor Reyes in emails and in meetings. And, Associate Dean Reginald Green, their friend and ally, has also participated in ploys to sabotage Professor Reyes.

104.     Black female faculty members who themselves complained that they suffered gender discrimination from Black men on the faculty, including Professor Joan Bullock, Professor Lundy Langston, Professor Jennifer Smith, Professor Patricia Broussard, Professor Ann Marie Cavazos, Professor Nicky Boothe-Perry, and Professor Phyllis Taite joined with Black men in attacking Professor Reyes for years. In this way, attacking Professor Reyes has become a source of Black racial solidarity. Other faculty and staff members follow the lead of the majority clique. That is how workplace mobbing works.

105.     A Black female tenure-track faculty member who did not follow the lead of the majority clique had her Black identity questioned by Professor Jennifer Smith during a pre-planning workshop when then Dean Felecia Epps was dean. Professor Reyes was seated at the same table with Professor Smith. She saw and heard what happened. Dean Epps placed rushed to get in between the two of them when it looked like the situation may escalate. Rumors started that the junior faculty member was "friendly" with Professor Reyes. She joined the faculty when Professor Reyes was going through the horrific tenure process. Dean Epps knew that Professor Smith was sending abusive emails to the junior faculty member; however, upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith like she did to Professor Reyes over malicious and frivolous allegations by Professors Broussard and Cavazos. The junior faculty

member eventually resigned and called the FAMU College of Law a "hellish" work environment.

106.     The race issues have also permeated to the student body. Professor Reyes has heard stories of Hispanic/Latina/o students who have felt racially discriminated but do not want to complain because they are afraid. Professor Reyes has also heard similar stories from White students, primarily White female students who have felt racially targeted primarily by some Black female students who have told them that "this is a Black school" and they are taking the place of Black people. Professor Reyes has also heard about Caribbean students who are made to feel that they have to prove their "Blackness," including by distancing themselves from non-Black students.

107.     For years, Professor Reyes has advanced that racial hostility causes divisions that should not happen in a law school with the noble mission of the FAMU College of Law. It is harmful for the law school, students, the clients alumni will serve, the legal profession, and society in general. Even as she has been racially, color, national origin, and gender attacked, Professor Reyes has worked to bring students of all race, ethnic, and cultural backgrounds together for a common purpose of serving as catalysts for positive change. The diverse students in the law school are the reason why Professor Reyes has remained. She has helped many students and alumni. In turn, many students and alumni of diverse gender,

race, ethnic, and cultural groups have sought her mentoring and showed appreciation for her teaching and service. Some Black female students have been the most supportive, including because they share Professor Reyes's Christian faith. Many students and alumni have provided moral support and prayers along the years when Professor Reyes has been dealing with the ongoing discrimination, harassment, and hostile work environment, including workplace mobbing.

### The Discrimination, Harassment, Hostile Work Environment and Retaliation Continued After Professor Reyes Received the Tenure She Earned

108.   EOP Director Carrie Gavin's sham investigation of Professor Reyes's EOP Charge during the tenure process, including Director Gavin just taking members of the majority clique at their word (even with one-sentence denials), emboldened them in their ploys against Professor Reyes.

109.   For example, in her EOP Charge, Professor Reyes detailed several violations by Professor Broussard. Professor Broussard's response to the Charge consisted of one sentence: "I categorically deny all allegations of Ms. Reyes's Complaint." This was sufficient for EOP Director Gavin to conclude that Professor Reyes's Charge as to Professor Broussard's conduct was unsubstantiated.

110.   The retaliation against Professor Reyes continued even when she was visiting at the University of Florida Levin College of Law ("UF Law") in fall 2015. When Professor Reyes accepted the invitation to visit UF Law for one semester (right after her tenure ordeal), she remained in the FAMU payroll system. FAMU

negotiated with UF Law for a rate they charged to cover Professor Reyes's FAMU salary and benefits. The rate they charged UF Law was higher than what they paid Professor Reyes. Therefore, FAMU received a windfall (over $60,000) which became a line item in the FAMU College of Law's budget. For all intents and purposes, Professor Reyes remained a FAMU employee.

111.    In fall 2015, Professor Darryll Jones, who was then Interim Dean, invited the new UF Law Dean to meet with the FAMU Law faculty in Orlando. However, he did not invite Professor Reyes. Professor Reyes learned about the invitation when the UF Law Dean told her. To Professor Reyes's recollection this was the only time a dean from another law school in Florida was invited to visit with the faculty of the FAMU College of Law. Upon information and belief, that same semester (fall 2015), FAMU College of Law's Black Law Students Association ("BLSA") hosted UF Law's BLSA. A BLSA member told Professor Reyes that some FAMU College of Law BLSA members were gossiping with UF Law BLSA members about Professor Reyes. Upon information and belief, Professor Jennifer Smith was the faculty advisor of  the FAMU College of Law BLSA.

112.    Professor Reyes has been serving as faculty advisor of the Hispanic American Law Student Association ("HALSA") for many years. Professor Reyes planned to continue to advise HALSA during fall 2015. She reviewed the Student

Handbook rules and confirmed that she could remain as faculty advisor, including because she was still a full-time employee in the FAMU system. UF Law arranged her class schedule such that she could travel to Orlando to attend HALSA functions. She paid for parking at FAMU College of Law because she planned to attend HALSA events. Professor Reyes worked with HALSA's president to re-certify the organization through FAMU's bureaucratic process. She fulfilled all her duties as faculty advisor for the semester, including attending activities for Hispanic Heritage Month. She put a lot of time and effort into driving from Gainesville to Orlando to attend orientation for HALSA and all major events. She also spent lots of time communicating by phone and email with HALSA's president. UF Law arranged video conferencing so Professor Reyes could meet with HALSA's Board.

113.    Toward the end of the fall 2015 semester, Associate Dean Reginald Green, with the approval of Interim Dean Darryll Jones, instructed members of the HALSA Board to remove Professor Reyes as faculty advisor. Upon information and belief, then Associate Dean Joan Bullock was also involved in the ploy. The hostile removal was effected in violation of the University Student Handbook, which required consultation with the faculty advisor prior to removal. Associate Dean Reginald Green, Interim Dean Darryll Jones, and Associate Dean Joan Bullock did not contact Professor Reyes.

114.     The president of HALSA reported to Professor Reyes that she was threatened with HALSA losing funding if Professor Reyes was not replaced. Associate Dean Green instructed FAMU College of Law Student Affairs Director Fritzlaine Powell not to respond to Professor Reyes's request for information. One of Professor Reyes's ongoing harassers, Professor Patricia Broussard, replaced Professor Reyes as HALSA's faculty advisor without even contacting Professor Reyes. The hostile way in which the hostile removal was orchestrated was meant to humiliate Professor Reyes and ostracize her from students. The institutional actors who participated in the hostile removal caused chaos, confusion, and division within HALSA and nearly decimated the organization.

115.     HALSA members reached out to Professor Reyes to find out what was happening. They reported that they were being called into a meeting to elect Professor Broussard as faculty advisor. However, the meeting and vote were being scheduled and conducted in violation of the provisions in the HALSA Constitution. Professor Reyes felt she had a duty to inform HALSA members to be careful and not violate HALSA's internal documents. She sent a couple of emails to HALSA members explaining what she knew about the situation and advising them not to violate HALSA's Constitution. Everything Professor Reyes stated in her emails to HALSA was true and stated in good faith for the benefit and protection of HALSA and its members.

116.     For the sake of HALSA, to avoid having the organization be further targeted in efforts to harm Professor Reyes, Professor Reyes did not challenge the removal as HALSA's faculty advisor. In further harassment of and retaliation against Professor Reyes, on November 25, 2015, the day before Thanksgiving, Professor Broussard submitted a false, malicious, and frivolous EOP Charge against Professor Reyes. Professor Broussard alleged retaliation and Title IX stalking. She used the email Professor Reyes sent to HALSA as the basis for her Charge. Professor Broussard also referenced a video of a faculty meeting and falsely alleged that Professor Reyes "attempted to push her way into [her] space." She also claimed that Associate Dean Green "was so upset by [the video.]"

117.     Associate Dean Green denied that he said what Professor Broussard alleged and stated that he did not watch the video.

118.     The video actually showed Professor Broussard blocking Professor Reyes from participation in the counting of votes during a meeting when a White male candidate was being considered for a clinic position. The video also showed that two Black female law professors were much closer to Professor Broussard than Professor Reyes and even made physical contact with Professor Broussard. Professor Broussard did not accuse them of attempting to push their way into her space. The video also showed Professor Cavazos questioning why Professor Reyes

was counting the votes. Professor Reyes had to remind these faculty members that she also had a right to participate in the counting like Black female professors.

119.    Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith sent emails with copy to all faculty insulting Professor Broussard. Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith called her a "snake" and a "weasel" in emails that were filed in Professor Smith's federal case against FAMU. Upon information and belief, Professor Broussard has only filed an EOP Charge against Professor Reyes. In addition to slanderous accusations against Professor Reyes, Professor Broussard claimed that she was afraid of Professor Reyes and tried to stay away from her. This was patently false.

120.    Professor Reyes responded to Professor Broussard's EOP Charge line by line. Professor Reyes noted that Professor Broussard's own actions belied her claims of fear and staying away from Professor Reyes. Professor Broussard participated voluntarily in the hostile replacement as HALSA's faculty advisor. She was not afraid. She has constantly looked for ways to harm Professor Reyes including via student situations and student organizations. Professor Reyes's comprehensive response to Professor Broussard's Charge demonstrated the falsity of Professor Broussard's conclusory and defamatory allegations.  Professor Reyes

requested that the EOP recommend that Professor Broussard be disciplined in accordance with FAMU Regulation 10.103(6)(d) for knowingly filing a false complaint of retaliation and Title IX stalking and for providing false testimony in the form of false facts alleged in her Charge. Professor Broussard was not disciplined and this further emboldened her to continue to harass Professor Reyes and make false allegations against her.

### The Hostilities against Professor Reyes Became Physical

121.     The hostilities against Professor Reyes have even become physical.

### The "Bump" Incident - Erica Polite
### February 9, 2015

122.     In spring 2015, as Professor Reyes was being tortured in the tenure process (for a second semester), a member of the IT staff, Erica Polite, who had been bringing lunch to Professor Broussard in her office that semester, bumped Professor Reyes on her shoulder as Professor Reyes was walking by her. Ms. Polite had the space available to move to her right and avoid the physical contact. Professor Reyes was literally against a wall and did her best to get against the wall to avoid Ms. Polite.

123.     Three years before that spring 2015 incident, Ms. Polite, a Black woman, screamed at Professor Reyes on the phone, about an IT issue. Professor Reyes reported that incident to Ms. Polite's supervisor, IT/Security Director Shashi

Persaud, and avoided Ms. Polite since then. Professor Reyes could not avoid the bump.

124.     Professor Reyes reported the bump incident to Director Persaud whose office door was open, right by where the incident happened. He claimed he did not see anything; however, Professor Reyes noticed that there was a surveillance camera and asked to see the surveillance video.

125.     The incident was reported to Associate Dean Reginald Green and Dean LeRoy Pernell; neither of them ever followed up with Professor Reyes. Instead, they escalated the situation by referring it to the FAMU Police in Tallahassee without even consulting with Professor Reyes. This was leaked all over the building and turned against Professor Reyes. Professor Reyes, the perceived "White Latina" was being falsely portrayed as the person who reported the incident to the FAMU police against a Black woman. This was false.

126.     During her thirteen (13) years teaching in the FAMU College of Law Professor Reyes has never reported any of the many incidents she has experienced as a result of her employment in the law school to a police department (FAMU or otherwise), although she has considered it. Thus far, Professor Reyes has erred on the side of trying to resolve matters internally, unfortunately, to her detriment.

127.     Right after Professor Reyes reported the incident with Ms. Polite to Ms. Polite's supervisor (IT/Security Director Persaud), Professors Patricia

Broussard, Rhoda Cato, and Phyllis Taite made a point of exaggerating their efforts to stay far from Professor Reyes as they passed her in the hallways.

### The Blood on the Office Door's Doorframe Incident
### February 8, 2018
### &
### The Removal of the Christian Cross from the Office's Door Handle

128.    On February 8, 2018, Professor Reyes was talking and walking with a student.  When they reached her office, Professor Reyes noticed a stain on the doorframe of her office door. It looked like blood to her, but she did not say this because the student was next to her. The student offered to clean the stain, but Professor Reyes told her that the office cleaning people would take care of it. Professor Reyes's program assistant, Celia Westbrook, and Professor Rhonda Reaves also saw it. Professor Reaves, as she often did when Professor Reyes was targeted, dismissed it as if nothing happened. The cleaning crew later notified Professor Reyes that they had to report it to their supervisor because it appeared to be blood when they cleaned it. They took pictures. Professor Reyes informed Dean Pernell but he never contacted her about it.

129.    Professor Reyes shared about the incident with her mother and her mother gave her a Christian cross and asked her to put it on her office door handle. Professor Reyes did as her mother told her. Unfortunately, the cross was taken down from the door handle and thrown on the floor several times. The program assistants found the cross on the floor. The cleaning crew also found the cross on

the floor and took pictures of the cross on the floor. Professor Reyes took down the cross and placed it on the inside of her office.

### Another Bump Incident – Professor Patricia Broussard
### Fall 2018

130.     At the beginning of fall 2018, Professor Broussard bumped Professor Reyes from behind as Professor Reyes was walking back from taking the group faculty pictures. Professor Broussard acted as if it was by accident and Professor Reyes did not say anything.

131.     Professor Reyes suspected that Professor Broussard, just like Erica Polite, wanted a reaction from Professor Reyes. For years, the majority clique and their allies have been trying to get a reaction or outburst from Professor Reyes to support the false narrative they have disseminated about her. Professor Reyes has always maintained her composure and professionalism despite the many incidents in the hostile work environment.

### The Elevator Incident
### Professors Patricia Broussard and Ann Marie Cavazos
### May 6, 2019

132.     On May 6, 2019, Professor Reyes entered the law school and headed toward the first floor elevators (two side by side) in the first floor lobby to get to the faculty suites in the third floor. As she was nearing the elevator, Professor Reyes saw Professor Joe Grant passing by with a student. Professors Broussard and Cavazos were walking together farther behind them. They were coming from the

opposite direction from which Professor Reyes was approaching the elevators. Professor Reyes rushed to get in one of the elevators and pushed the button so the door would close but the door did not close. To her shock, Professors Broussard and Cavazos entered the elevator. Professor Reyes quickly exited the elevator.

133.   Professor Reyes then headed toward the other side of the building to use the elevator in the library. When the elevator door opened, Professors Broussard and Cavazos were standing in front of the door of the elevator with a Black female staff member, Claudine Beale, who has also engaged in hostile actions against Professor Reyes. Professor Reyes exited that elevator and headed away from them. Later, when Professor Reyes reviewed the surveillance video, she saw that, as they were laughing, they were signaling toward the direction to which Professor Reyes headed when she exited the elevator.

134.   The surveillance video of the first encounter by the elevator in the lobby shows Professor Broussard running toward the elevators to push the button and not allow Professor Reyes, who was already in the elevator pushing the button to close the door, to go up. The video also shows how Professor Cavazos looks out by the elevator door as she follows Professor Broussard into the elevator which Professor Reyes quickly exits after they enter.

135.   Professors Broussard and Cavazos are two of the Black female law professors who have been claiming behind the scenes, at all levels of the

62

University and beyond, that they are afraid of Professor Reyes and seek to avoid her. The surveillance video of the elevator incident demonstrates the falsity of their alleged fear. The video shows that they even physically run after Professor Reyes to be alone with her in the elevator. The video also shows that Professor Reyes does her best to avoid being alone with them for fear that they may harm her or falsely accuse her of doing something to them.

### By the Elevator Incident – Professor Jennifer Smith
### January 13, 2022

136.    On January 13, 2022, as Professor Reyes was headed toward her evening evidence course, from the third floor faculty offices' door, Professor Jennifer Smith exited the elevator ahead of where Professor was walking. Rather than continue walking, Professor Smith pulled to the side, waited for Professor Reyes to pass, mumbled something to Professor Reyes, and walked behind her so as to intimidate her. There is also a surveillance video of this incident.

### The Student Organizations Event Incident
### Professor Patricia Broussard
### March 28, 2022

137.    In spring 2022, Professor Broussard once again found a way to make a law school experience hostile for Professor Reyes, in front of students who had no idea of the ways in which Professor Broussard has harassed Professor Reyes for years. Professor Reyes was scheduled to serve as one of several panelists in a panel organized by several student organizations, including HALSA. A student

representative of the Women's Law Caucus ("WLC") invited HALSA, at the last minute, to join in a diversity and inclusion grant application to the Florida Bar Young Lawyers Division with other student organizations that were invited before HALSA was invited.

138.     The WLC student representative noted in the invitation that WLC became aware of claims that HALSA was being excluded from joint events. This was after Professor Reyes raised the issue of HALSA's exclusion from the domestic violence event organized in conjunction with Professor Langston's domestic violence course, in which the WLC joined with the Black Law Students Association ("BLSA"). This is the situation that the WLC student representative referenced as the reason for inviting HALSA to the joint diversity and inclusion event.

139.     Professor Reyes was glad that her raising the issue opened an opportunity for inclusion, for the benefit of all students. Professor Reyes advised the HALSA president and Board to accept the invitation even if it was last minute. Because it was at the last minute, HALSA was the only student organization that was noted on the application as pending approval by its Board, which was not fair to HALSA. Nonetheless, HALSA accepted the invitation and designated the HALSA vice president as the student representative for the planning committee of the joint event.

140.     Each student organization selected a panelist to represent the organization. HALSA designated Professor Reyes. The Caribbean Law Students Association designated Professor Kim Crag-Chaderton, the organization's faculty advisor. Other student organizations designated attorneys. Because Professor Broussard is the WLC's faculty advisor, Professor Reyes did her best to ascertain whether Professor Broussard was going to serve as moderator or panelist without directly asking about it. Professor Reyes asked the HALSA student representative in the planning committee to ask for the name of the moderator. The HALSA student representative informed Professor Reyes that the WLC was not releasing the name.

141.     On Wednesday, March 23, 2022, the WLC student representative sent an email to all panelists with the questions for the panel. The list of email recipients did not include Professor Broussard. On Friday, March 25, 2022, Professor Reyes replied to the student's email and stated:

> Thank you for your email and for the questions. I look forward to contributing and participating in a diverse and inclusive event for the benefit of all students.
>
> I have not heard from the moderator of the panel. Who is it?
>
> Please send us the structure of the panel. Do we each say opening and closing remarks? How long do we each get for that? How long do we each get to respond to each question, etc.
>
> As for our bios, are those going to be read? If so, does someone from the student organization that submitted our name get to read it (for purposes of diversity & inclusion)?
>
> The panel is on Monday, so I would like to receive this information today, Friday, if possible.

142.    On Friday, March 25, 2022, the WLC student representative responded that the moderator would be Courtney Jones, a Black female attorney who works in the FAMU College of Law's Office of Career Planning and Development. The student also provided the itinerary, which stated: "6:15 - 6:30 PM - Introduction of event and panelists by Moderator."

143.    On Monday, March 28, 2022, at 6:10 PM, Professor Reyes arrived in the classroom where the diversity and inclusion event was being held. When she opened the door, she saw all the panelists already seated and, to her shock, Professor Broussard was standing at the podium reading the bios of the panelists. Rather than leave the seat farthest from the podium empty for Professor Reyes, the only empty seat in the panel table was right next to the podium, right below from where Professor Broussard was standing. Moreover, to get to the seat, Professor Reyes had to walk behind all the seats where the other panelists were already seated.

144.    Professor Broussard started the panel early with full knowledge that Professor Reyes was not yet present. Professor Broussard made a comment about Professor Reyes being late, which prompted Professor Reyes to explain, by reference to the printout of the email she received, that she was actually early. When Professor Broussard read Professor Reyes's bio, she shortened it. She

also said that she was going to deviate from the questions that were provided and asked her own questions.

145.     During the panel, Professor Broussard stood over Professor Reyes and mocked Professor Reyes about wearing a mask and not wanting to be videotaped. When Professor Reyes started to get up to participate in the panel group picture, Professor Broussard poked Professor Reyes on her left shoulder-arm with her finger and glasses and questioned why Professor Reyes was going to be in the picture if she did not want to be on video. Professor Reyes had to explain the obvious, that video is not the same as a picture and she could take off her mask briefly to take a picture.

146.     Professor Reyes had to do her best to maintain her composure and not allow Professor Broussard to intimidate her with attorneys from the community, alumni, and students present. Most of the students and alumni were current and former members of the WLC. A few of them had been disrespectful to Professor Reyes in her evidence course (in different semesters). This has been a consistent circumstance for years; a few students who are close to Professor Broussard and her allies are rude and disrespectful toward Professor Reyes. One of those disrespectful students, including via email (in fall 2021), was the WLC Black female student representative who gave Professor Reyes the itinerary information

and did not inform her of the change of moderator or start time for the panel. After the event, Professor Reyes felt sick.

**The Review for Promotion to Full Professor Became a Continuation of the Discriminatory Review for Tenure**

147.    The effective date of Professor Reyes's promotion to associate professor was August 6, 2012. Her tenure was approved on June 10, 2015. Professor Reyes planned to submit her application for promotion to full professor as soon as she qualified under the University rule which required that she serve five (5) years in rank as associate professor. That meant she was qualified to apply in 2017.

148.    In 2017, FAMU adopted the Interfolio electronic application system which required that the Office of the Provost provide the information to access the system. Professor Rhonda Reaves was chair of the RPT Committee during the 2017-2018 academic year. Professor Reyes asked Professor Reaves for the Interfolio access information on several occasions and Professor Reaves responded that she did not receive it.

149.    Professor Reyes was disappointed that Professor Reaves was not more proactive about getting the information in her role as chair of the RPT Committee. Professor Reaves knew that a promotion was the only way for Professor Reyes to get a raise, which she had not received since her last promotion in 2012. Rather than demand that Professor Reaves ascertain and provide the Interfolio access

information, Professor Reyes did not raise the issue again and gave up on applying that year, which meant foregoing a 15% raise.

150. Professor Reyes once again began asking for the Interfolio information the next year, in summer 2018. That year, Professor Rob Abrams was appointed chair of the RPT Committee. Professor Reyes finally received the Interfolio case access information at the last minute in fall 2018 and applied by the published deadline. She became the first professor from the College of Law to apply for promotion via the new online Interfolio platform. She had to figure out the system on her own.

151. All ten (10) tenured, full professors who participated in the review of Professor Reyes's application for promotion to full professor were also members of the RPT Committee that reviewed Professor Reyes's application for tenure. They were:

    i.    Rob Abrams, a White man

    ii.    Nicky Boothe-Perry, a Black woman

    iii.    Pat Broussard, a Black woman

    iv.    Ann Marie Cavazos, a Black woman

    v.    Ron Griffin, a Black man

    vi.    Bill Henslee, a White man

    vii.    Darryll Jones, a Black man

 viii. Rhonda Reaves, a Black woman

 ix. Jennifer Smith, a Black woman, and

 x. Phyllis Taite, a Black woman.

152. They were all involved, in one way or another, in the discriminatory, harassing, and retaliatory tenure process Professor Reyes endured during the 2014-2015 academic year. They were all included in the internal EOP charge Professor Reyes submitted during her tenure process for discrimination based on race, color, national origin, sex, and retaliation. None of them provided responses explaining any of their wrongful actions or omissions during the EOP investigation.

153. Professors Boothe-Perry, Broussard, Cavazos, Henslee, Jones, and Taite actively participated in the many ploys to derail Professor Reyes's tenure process. They escalated their hostilities against Professor Reyes after she received tenure, including when some of them served in administrative roles. They bonded over workplace mobbing Professor Reyes. Professor Henslee gained superficial acceptance within the majority clique by joining in workplace mobbing Professor Reyes. This is after he told Professor Reyes that he has been discriminated in the law school because he is a White man.

154. In her response to Professor Reyes's EOP complaint against the RPT Committee, Professor Jennifer Smith claimed that she did not participate in

Professor Reyes's tenure process.[11] However, on November 4, 2014, IT/Security Director Shashi Persaud sent an email to FAMU police officer Kelvin L. Hunter stating:

> On Wednesday 10/29/14 at approximately 11:45 AM, a law school professor, Jennifer Smith, arrived at the office. Professor Smith told [program assistant], that she had a vision that another professor (Maritza Reyes) was going to harm Ms. [program assistant]. Ms. [program assistant] asked Professor Smith how she was going to be harmed and Smith pointed at her face with her hand in the shape of a gun. Professor Smith pretended she was firing the gun, then walked away. Ms. [program assistant] felt significantly threatened by this and was in a state of panic. She reported the incident to law school security.

155.     Director Persaud never warned Professor Reyes that Professor Smith told a staff member that she had a "vision" about Professor Reyes harming the staff member. After Professor Reyes received tenure, Professor Smith escalated hostilities against her, including by involving students. Dean Epps appointed Professor Smith to chair the Student Disciplinary Committee and also appointed Professor Reyes to be a member of the committee. Right at the beginning of the spring 2017 semester, students told Professor Reyes that Professor Smith went to Professor Reyes's class right as the semester started and told students to visit her if they wanted to talk about student grievances (against other students). A student also told Professor Reyes that, once she went to Professor Smith's office, she realized that all Professor Smith wanted to do was to gossip about Professor Reyes.

---

[11] Professor Smith received a right to sue notice on July 9, 2014 and thereafter filed a lawsuit against FAMU for gender discrimination and retaliation. That lawsuit was ongoing during Professor Reyes's tenure process.

156.     After the first meeting of the Student Disciplinary Committee, on January 13, 2017, Professor Reyes responded to a group email that Professor Smith sent to the Committee and stated: "I understand that you have been meeting with students, including my Civil Procedure students, and informing them that it is about the Student Disciplinary Committee. What is that about?" Professor Smith responded: "I have not. I do not report to you. Do not email me with no facts." On January 13, 2017, Professor Reyes responded:

Professor Smith,

I was asking the question because it pertains to the Committee's work. Please keep it civil in these e-mails. There are staff members and also students in this Committee.

Best,

Prof. Reyes

157.     On January 13, 2017, Professor Smith responded (with copy to Professor Shiv Persaud, Professor Jonathan Fineman, Associate Dean Reginald Green, and Student Affairs Director Gary Harrington):

You have been reprimanded already for your email behavior to others. You acted inappropriately in the mtg on the 11th (only one who refused to adhere to the chair), so I am appointing a parliamentarian if I cannot have you transferred to another committee. JS

158.     Professor Reyes realized that Professor Smith was spreading false rumors that Professor Reyes was "reprimanded" because she obviously found out about Dean Epps's October 18, 2016 letter of "counseling." Professor Reyes also realized that Professor Smith's false allegation in reference to her conduct toward her, as chair, was patterned after the language Dean Epps used in her March 3, 2016 memorandum about the incident when Professor Reyes did not return the document (evidence of abuse) to Professor Henslee. Professor Reyes had noticed that Professor Smith and Dean Epps seemed very close during this time. Professor Reyes confirmed how close when Dean Epps removed Professor Reyes from the Student Disciplinary Committee after Professor Smith sent a one word email to Professor Reyes stating: "DELETE." Dean Epps and Professor Smith shared characteristics that blinded Dean Epps to favor Professor Smith and harm Professor Reyes.

159.     Professor Reyes reported Professor Smith's abusive emails, including the "DELETE" email to Dean Epps and requested that Professor Smith be disciplined. Upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith for misusing the FAMU email to harass Professor Reyes. Upon information and belief, Dean Epps did not issue Professor Smith a letter of counseling when Dean Epps was copied in emails in which Professor Smith engaged in vicious abuse of Professor Cori Harvey, a tenure-track, junior

faculty member who joined the faculty in fall 2014. Upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith after Professor Smith questioned Professor Harvey's Black identity in a meeting in the presence of Dean Epps and many faculty members.

160.     Professors Boothe-Perry, Broussard, Cavazos, and Taite gave evidence against Professor Griffin in the *Langston v. Griffin E*OP complaint which Professor Langston submitted after Professor Griffin called these Black female law professors "malicious, evil, racist, and vile" when they derailed Professor Reyes's tenure process. After Professor Reyes received tenure, these Black female professors escalated their hostilities against Professor Reyes, including by raising false allegations about her conduct.

161.     Three (3) of the ten (10) members of the RPT Committee (Professors Rob Abrams, Ron Griffin, and to a lesser extent Rhonda Reaves) became targets of hostility when they were deemed supportive of Professor Reyes's application for tenure. During the review of Professor Reyes's 2018 application for promotion to full professor they went along to get along with the discrimination and retaliation. That is how workplace mobbing works. They also knew they did not have the votes to overcome the will of the majority clique.

162.     The RPT Committee applied a quantitative standard for scholarship that did not appear anywhere in the CoL Faculty Handbook or in the interpretive

memorandum provided to Professor Reyes (the "Nunn Memo") when she was hired.[12] The Committee's application of a standard that did not exist in the CoL Faculty Handbook or the University Faculty Handbook was basically the same tactic as when the majority clique in the RPT Committee invented and used made-up standards to evaluate Professor Reyes's application for tenure and conclude that she did not meet the standards.

163.    The CoL Faculty Handbook did not state a quantitative standard for promotion; the "Nunn Memo" confirmed this. The Nunn Memo provided the only quantitative standard provided to Professor Reyes: (a) one "scholarly manuscript" that has been accepted for publication for promotion to associate professor; and (b) for promotion to full professor, "at least two additional scholarly works over that required for promotion to associate professor." Professor Reyes met and exceeded this quantitative standard. She also met and exceeded the qualitative standard.

164.    The RPT Committee members who participated in the review and vote on Professor Reyes's 2018 application for promotion to full professor carried the discriminatory animus from the tenure process and their escalation or hostilities into the promotion process. They also used the promotion process to further retaliate against Professor Reyes after she opposed their discrimination, harassment, hostility, retaliation and workplace mobbing. By refusing to review

---

[12] The FAMU College of Law represented to the ABA accrediting body that the Nunn Memo clarified how the scholarship standards should apply.

Professor Reyes's application in accordance with the standards that were provided to her upon hire, they built on the same unlawfully discriminatory animus that drove violations of the rules and misapplication of the standards during Professor Reyes's tenure process. In this way, they turned her promotion review into the same review as the tenure process. The two became a continuous process.

165.    The RPT Committee attached reports from Professor Reyes's prior application for promotion to associate professor (in Fall 2011) and for tenure (in Fall 2014). However, in violation of the express provision in the Faculty Handbook,[13] they did not attach any of the external reviews of her scholarship conducted during those evaluations. This is how they set up their recommendation that she be denied promotion because she did not meet the scholarship standard.

The RPT Committee's discriminatory actions tainted the entire process at all levels with discriminatory animus. All actors at higher levels of review, namely Interim Dean LeRoy Pernell, the T&P Committee led by Dr. Michael Abazinge with Professor Patricia Broussard as the College of Law representative (same as during the tenure process), Provost Maurice Edington, and President Larry Robinson went along with the misapplication of the scholarship standard and decision of the RPT Committee. They did not conduct independent reviews. They rubber-stamped the RPT Committee's recommendations. They allowed and perpetuated the

---

[13] The Faculty Handbook requires that external reviews be attached to the RPT Committee reports.

discrimination, harassment, hostile work environment, and retaliation.

**Provost Edington and President Robinson Participate in the Hostilities**

166. According to the Provost's published schedule, the President was supposed to provide the decision to Professor Reyes in June 2019. When Professor Reyes had not received the decision by the beginning of July, she requested it.

167. On July 17, 2019, Provost Edington responded to one of Professor Reyes's e-mails and stated: "You will be provided notification of the outcome of your application for promotion within the next week." A week after that email, Professor Reyes followed up because no decision was provided within a week of Provost Edington's response. On August 5, 2019, Professor Reyes once again requested the decision from President Robinson and Provost Edington; this time, she copied Trustee Belvin Perry in the e-mail. That same day, August 5, 2019, Provost Edington responded and alleged that a letter was sent to Professor Reyes via regular mail on July 25, 2019. However, he never even bothered to confirm whether Professor Reyes received the letter and did not provide the letter to Professor Reyes via e-mail despite her several e-mails asking for the decision. This is a tactic in the hostile work environment.

168. Provost Edington falsely claimed that the letter was sent to Professor Reyes's mailing address, which FAMU has had on file since Professor Reyes began working at FAMU in 2009. However, the letter was sent to a wrong address

in Tallahassee and it was returned by the U.S. Postal Service to FAMU "Return to Sender – Not Deliverable as Addressed." Professor Reyes sent Provost Edington an e-mail on July 23, 2019, once again requesting the decision; however, Provost Edington did not respond until she followed up again on August 5, 2019. The letter from Provost Edington was dated July 24, 2019, but it was not provided to Professor Reyes until August 5, 2019 via email. They waited to provide the letter until the first day of the semester; this was an additional act of hostility. They gave Professor Reyes the negative decision on the first day of classes rather than during the summer when she was not teaching. They waited until Professor Reyes was starting to teach the heaviest teaching load of any professor in the law school (two large, required, first-year and second-year courses for a total of seven (7) credits).

169.    After that, President Robinson and Provost Edington made it impossible for Professor Reyes to appeal the denial of promotion. They involved Associate Provost Genyne Boston (a Black woman) and General Counsel Denise Wallace (a Black woman), who engaged Professor Reyes in a back-and-forth of e-mails about the information, only to finally deny her the information and sabotage her appeal.

170.    President Robinson has gone along with the hostilities against Professor Reyes since he was Provost. Professor Reyes tried to meet with him in 2013 as Professor Reyes was being subjected to blatant discrimination and

78

escalating hostilities. She offered to drive to Tallahassee to meet with him; however, he and his administrative assistant, Ora Mukes, sabotaged the meeting in August 2013 and made it seem as if Professor Reyes did not show up for the appointment when they never informed her of the appointment.

171.     More recently, Provost Edington ostracized Professor Reyes in front of the faculty during a faculty meeting in the law school on January 22, 2020. Provost Edington disagreed with Professor Reyes's reiteration of something he said and turned to the faculty and asked them whether they sided with his version or Professor Reyes's. No one responded because no one was going to take Professor Reyes's side against the Provost. It was one more hostile way to send a message to the faculty that such types of hostility should be directed at Professor Reyes. Provost Edington undermined her in front of faculty and staff. After the incident, Provost Edington told Professor Reyes that it was not "personal." She responded that it felt very personal to her, including because he has great institutional power as the provost and as a Black man in an HBCU. However, Professor Reyes offered an olive branch and asked Provost Edington if he would finally agree to meet with her to come up with a plan to address the discrimination and hostilities, including the denial of her promotion. Provost Edington responded by asking Professor Reyes if she would agree to meet and she responded, "Of

course, this is what I have been asking for, to try to resolve matters amicably and put an end to the hostilities."

172.     Professor Reyes followed up via email that same day asking Provost Edington when he was available and offering to audio- and even video-record the meeting to avoid "that's not what I said" issues. To date, Provost Edington has not responded to Professor Reyes's request to schedule a meeting. Professor Reyes realized that it was one more sham tactic.

173.     The denial of promotion meant that Professor Reyes did not get a long, overdue 15% raise. She also did not get other benefits, such as an office with a window. Professor Reyes must work harder than most full professors, including because she must deal with ongoing hostilities, including denial of information and resources she needs to do her job. In addition to the duties associated with being an excellent law professor, Professor Reyes must spend precious time defending against the constant attacks, writing memoranda about incidents, and documenting what she says and does in order to be able to defend against potential allegations. Upon information and belief, Professor Reyes has been the target of more investigations than any other employee in the law school. It is a testament to Professor Reyes's ethics, professionalism, and competence that she has been able to respond over and over again to the malicious prosecution to which she has been subjected.

**New Deans but Same Old Systemic Discrimination, Harassment, Hostile Work Environment and Retaliation against Professor Reyes**

174.     As new deans (interim and permanent) have been appointed by President Robinson and Provost Edington, they have joined in the discrimination, harassment, hostile work environment and retaliation against Professor Reyes. President Robinson and Provost Edington have apparently endorsed the hostile work environment against Professor Reyes. They have received notice for years of what a majority clique have done to Professor Reyes. Again, the phenomenon of workplace mobbing explains why so many people have participated in the harm against Professor Reyes, individually and collectively.

175.     Angela Felecia Epps was recruited and hired when Professor Reyes was visiting at UF Law. Professor Epps started her tenure as dean at the same time Professor Reyes returned from UF Law in spring 2016. Professor Reyes reached out to Dean Epps via email to welcome her to the law school. She also invited her to meet for coffee or lunch, a professional courtesy in many law schools when a new dean joins the faculty. However, Dean Epps responded that she would only meet in the law school building. There is no cafeteria in the law school; therefore, sharing a meal was not an option.

176.     When Dean Epps showed up in Professor Reyes's office, Professor Reyes decided to ask for her help. She tried to tell her about what had just happened in her tenure process and the recent frivolous charge by Professor

Broussard. Dean Epps responded that she did not want to hear history and that Professor Broussard had a right to file a charge. Dean Epps did not even try to empathize with Professor Reyes. She told her, "you got tenure and that's that."

177.    The way Dean Epps acted toward Professor Reyes upon meeting her, led Professor Reyes to think that she had been talking to some of the faculty members who target Professor Reyes – the majority clique. Dean Epps sided with the Black women who targeted Professor Reyes. She showed them gender/racial solidarity by going after Professor Reyes.

178.    Dean Epps refused to help Professor Reyes. Instead, based on false complaints by Professor Pat Broussard and Professor Ann Marie Cavazos, Dean Epps issued a letter of "counseling" to Professor Reyes without due process. By terming it a letter of "counseling" and not a letter of "reprimand," she avoided giving Professor Reyes the due process required in the FAMU Regulations. However, in violation of said regulations, she placed the letter in Professor Reyes's file.

179.    When Professor Reyes submitted a complaint about the letter of "counseling" to President Robinson, he refused to process it in clear violation of the FAMU Regulations. When Professor Reyes reported the refusal to abide by FAMU's Regulation to the Division of Audit and Compliance, they also refused to investigate. Dean Epps continued to retaliate against Professor Reyes. Thankfully,

she only lasted as dean for about sixteen (16) months and is no longer employed in the FAMU College of Law.

180.     Then, when Nicky Boothe-Perry became Interim Dean and named her friend Phyllis Taite as Interim Associate Dean they also retaliated and escalated the hostilities against Professor Reyes. The two of them, individually and as part of the majority clique, had participated in ploys to deny Professor Reyes tenure.

181.     Once Professor Boothe-Perry and Professor Taite became interim administrators, they targeted two students (a Latina and an Indian woman) whose independent research Professor Reyes supervised. They refused to process Professor Reyes's upper-level writing certification of the students' independent research papers, which the students needed to graduate. Interim Dean Boothe-Perry and Interim Associate Dean Taite falsely accused Professor Reyes, in a meeting when faculty and students were present, of not doing her job in reference to the certification. They also told the students not to communicate with Professor Reyes thereby marginalizing her. The students were afraid that they would not be able to graduate.

182.     Professor Reyes documented to Provost Edington that Interim Dean Boothe-Perry and Interim Associate Dean Taite were violating the Student Handbook provision that applied to the students and falsely accusing her.

However, the damage was done. Since then, Professor Reyes has not volunteered to supervise additional independent writing projects to avoid students getting harmed when Professor Reyes is targeted. Professor Boothe-Perry and Professor Taite have been visiting at other law schools and Professor Reyes does not know if they will come back to the FAMU College of Law.

183.    On January 29, 2020, Interim Dean Boothe-Perry and Interim Associate Dean Taite accused Professor Reyes of not doing her job. On May 13, 2020, Interim Associate Dean Taite falsely accused Professor Reyes of withholding grades and threatened to put a memo in Professor Reyes's evaluation file. On May 15, 2020, Professor Reyes reached out to Provost Edington about the false accusations, but she is still waiting to hear from him.

184.    Professor Reyes actively participated in the dean search process of the current dean, Deidré Keller. She also encouraged Professor Markita Cooper to serve as Associate Dean of Academic Affairs once again. She suggested to Dean Keller that Associate Dean Cooper was the most qualified faculty member to become associate dean because she already knew the job and would support her. Unfortunately, Dean Keller and Associate Dean Cooper also joined in the retaliation, hostile work environment, and workplace mobbing against Professor Reyes. Once again, Professor Reyes became the litmus test to show racial solidarity with the Black faculty members who target Professor Reyes.

185.     Even before Dean Keller officially started working in the FAMU College of Law, she joined with then Interim Dean Nicky Boothe-Perry in an op-ed in the *Orlando Sentinel* where they both proclaimed their shared identity as Black women and mothers of Black boys.

186.     Dean Keller scheduled phone calls with faculty and, after those phone calls, she distanced herself from Professor Reyes. She also closed the faculty meetings, which is something that the majority clique always wanted to do. This way, they hide their wrongdoing, including unlawful discrimination, behind group decisions when other stakeholders, like students, are not present. Dean Keller has also whitewashed the minutes. In this way, the law school has gone backward instead of forward.

187.     Dean Keller and Associate Dean Markita Cooper have also retaliated against Professor Reyes after she filed her EEOC charge. When Professor Reyes has tried to address the discrimination and retaliation, they both become upset. They do not provide information that Professor Reyes should receive like where she is in the wait list for faculty office with a window. Professor Reyes has been asking them for over a year. It is a pattern of conduct meant to humiliate, marginalize, and distress Professor Reyes.

188.     On February 24, 2021, Dean Keller and Associate Dean Cooper held a Zoom meeting with students and permitted two Black students to make disparaging

comments about Professor Reyes when the students were arguing that they wanted a Black female visiting law professor to remain in the law school beyond the agreed upon term of her visit. The students wanted to know why she was not scheduled to teach the evening evidence course that Professor Reyes was teaching. The students who complained were not students who were taking the evidence course. There were about 80 participants in said Zoom meeting. Professor Reyes could not believe that Dean Keller and Associate Dean Cooper did nothing to address the disparaging comments the two students made about Professor Reyes.

189.    Immediately after the first Zoom meeting ended, Professor Reyes posted in the chat of the next Zoom meeting (a town hall), when some of the same students were still present, that law students should not engage in such conduct. Professor Reyes also posted that she may need to deal with the disparaging comments in due time as in making them a teaching moment about professionalism. Dean Keller posted in the chat that she would discuss the situation with Professor Reyes. Thereafter, she asked to meet with Professor Reyes via Zoom but did not tell Professor Reyes that Associate Dean Cooper would also be present in the meeting.

190.    When the three met, Dean Keller proceeded to "counsel" Professor Reyes that some students could consider what Professor Reyes wrote as a "threat." However, Dean Keller did not receive any complaints from students about

Professor Reyes. In fact, two Black female students emailed Dean Keller, with copy to Professor Reyes, complaining about Dean Keller's conduct of permitting the disparaging comments against Professor Reyes.

191.    After Professor Reyes met with Dean Keller, someone submitted an anonymous complaint to the Division of Audit and Compliance (DAC) against Professor Reyes with vicious, false allegations and referenced the "threat" that Dean Keller referenced. The DAC forwarded the complaint to the EOP and Sylvia Barge sent the one-page anonymous complaint to Professor Reyes. Professor Reyes prepared a 15-page memo and 62 exhibits to respond to the malicious and false allegations.

192.    On May 13, 2021, Ms. Barge notified Professor Reyes via email, with copy to EOP Director Carrie Gavin, that the anonymous complaint was closed. However, there was now a written report of the investigation stating that Dean Keller met with Professor Reyes and "counseled" her. The report stated that Dean Keller acknowledged that no students complained to her. The DAC did not receive any complaints from students. Dean Keller took it upon herself to view a threat where there was none thereby creating a reason to "counsel" Professor Reyes for no valid reason. During the meeting with Professor Reyes, Dean Keller made serious allegations about what Professor Reyes may do to students without any proof that Professor Reyes has ever done any such thing. In fact, because Professor

Reyes is highly ethical and professional, she has been able to defend against all the malicious, false claims and complaints that have been made against her. Professor Reyes has learned to do her best to get ahead of the next ploy or at least be ready to respond with evidence.

193.    The anonymous complaint was one more instance when Professor Reyes was forced to document with evidence her innocence but the accuser(s) was not required to provide evidence in support of the accusations. The accuser did not even provide his/her/their name. The anonymous complaint, the processing of the complaint, the written report, and Dean Keller's reference to "counseling" all served to further soil Professor Reyes's professional/academic record.

194.    Dean Keller and Associate Dean Cooper never apologized for the part they played in permitting the disparaging comments against Professor Reyes and possible the anonymous complaint that followed.

195.     Dean Keller recently gave Professor Reyes the lowest annual evaluation she has ever received (average), including by not giving her credit for her extensive service work, when the electronic faculty activities report that Dean Keller provided did not indicate that there were word count limits and more questions than appeared on the screen. When Professor Reyes was unable to include all the information in the spaces in the electronic form, she copied and pasted the questions into a Word document, answered them, and submitted them to

Dean Keller in a PDF document (as she had submitted annual faculty activity reports to prior deans). Professor Reyes did not find out, until May 11, 2022, the day of her evaluation meeting, which Dean Keller insisted must be in person in the Dean's conference room (rather than via Zoom as Professor Reyes preferred), that there were more questions than the ones that appeared on the screen.

196.    During that hostile evaluation meeting, Dean Keller did not tell Professor Reyes until the end of the meeting that she would state in the evaluation form that she could not assess Professor Reyes's service because she did not provide the information. This was a two-year evaluation which is a violation of the one-year evaluation procedure stated in the University Faculty Handbook. It was arbitrary, petty, and capricious for Dean Keller to essentially punish Professor Reyes and not give her credit for the merit of her two-year service work. Professor Reyes requested that she provide the missing questions and allow her to submit the information. As of the date of filing of this complaint, Dean Keller and Associate Dean Cooper have not provided the additional questions to Professor Reyes.

197.    On May 13, 2022, Professor Reyes reached out to Provost Edington and requested that he intervene and instruct Dean Keller to provide the questions, allow Professor Reyes to provide the information, and re-assess her based on the merit of her work. Professor Reyes explained to Provost Edington that this was the first year that faculty received the electronic form, that there were glitches with the

form (as documented in emails from the Dean's Suite), and that Professor Reyes's request was reasonable in light of the circumstances.

198.     On May 16, 2022, Provost Edington responded: "I will review this matter and follow up with you accordingly." On July 22, 2022, when Professor Reyes was still in unpaid status during the summer, she sent an email to Provost Edington following up on her request for assistance. On July 26, 2022, Provost Edington responded that he would follow up with her by the end of the week. On July 29, 2022, he responded that he discussed the matter with Dean Keller and decided that "[Dean Keller] is not obligated to conduct an additional evaluation of you. You are free to provide responses to the branch questions for inclusion in your file." On that same day, Professor Reyes replied to Provost Edington correcting several factual inaccuracies he stated about the electronic form and the process. Professor Reyes's last comment on the matter was: "Please let me know when Dean Keller will finally provide all the questions, so I can provide the responses I should have been permitted to provide." Nearly a month has passed since that email and Professor Reyes has not received the courtesy of a response or the missing questions; therefore, she has been denied the opportunity to respond and at least include those responses in her file. These are the recurring hostilities and indignities that Professor Reyes, an attorney and law professor, must deal with.

199.     Dean Keller has made it unbearable for Professor Reyes to do her job. To start, right as she became dean, she appointed Professor Reyes Chair of the 2020-2021 Faculty Recruitment Committee, during the Covid pandemic, and then sabotaged the work Professor Reyes needed to do by not providing the information she needed. She also allowed Director Adrienne Snyder, someone who was supposed to perform the Human Resources function and has been involved behind the scenes in defamation and group hysteria about Professor Reyes (in emails). Ms. Snyder made getting information for the hiring process very difficult by not responding to emails, which is a tactic used against Professor Reyes. When Professor Reyes asked to meet with her via Zoom, Ms. Snyder refused and said they would have to wait until her supervisor, Associate Dean Green, could attend the meeting. Associate Dean Green did not make himself readily available. Professor Reyes needed to get the hiring process started and no one was providing the resources she needed to do so. To add insult to injury, Dean Keller told Professor Reyes that she should not meet with Associate Dean Green or Ms. Snyder, that all questions should be submitted to her. Dean Keller joined in discriminating against Professor Reyes and furthering the hostile work environment. She also promoted Ms. Snyder to Chief of Staff.

200.     When Professor Reyes complained about not getting the information she needed to start the recruitment process, Dean Keller asked her if she wanted to

quit as chair of the committee. Professor Reyes responded that she would not quit and did not appreciate that Dean Keller seemed to be setting her up for failure. Professor Reyes knew that this could be used against her in an evaluation, including a post-tenure review.

201.     Professor Reyes worked seven days a week to do all her assigned duties in addition to the work required to do the recruitment process without assistance she should have received from Director Snyder and Associate Dean Green. Professor Reyes structured a professional hiring and recruitment process from scratch. It was the most successful hiring process since Professor Reyes has been a member of the faculty (over a decade). Professor Reyes organized and led the recruitment efforts in 50 public Zoom meetings and nine public full-day Zoom interviews all in compliance with Florida's Sunshine Law. Three faculty members were hired: a Latina legal research and writing instructor (the first Latina alumni hired for a full-time teaching position); a doctrinal constitutional law professor (a Black man who immediately received majority status and joined in hostility against Professor Reyes); and a clinic director/professor (a White man who received tenure upon appointment after Professor Reyes helped him to prepare materials sufficient to support approval of tenure).

**The Majority Clique Voted a Highly Qualified White Woman Unqualified – Similar to How They Voted to Deny Professor Reyes Tenure and Promotion**

202.    During a faculty meeting on February 17, 2021, the majority clique managed to foreclose consideration of a White woman who was highly qualified for a doctrinal position. She was a tenured law professor with outstanding credentials and experience. Her resume showed that her interests and work, since she was in law school, aligned with the mission of the FAMU College of Law. She had the best scholarship record of the three finalists in addition to impressive work experience, including prestigious federal district court and appellate clerkships. As a tenured associate professor, she had a better scholarship record and credentials than most tenured full professors in the FAMU College of Law. She was eager to teach in an HBCU law school because of her commitment to social justice. The Faculty Recruitment Committee ranked her in the top two candidates with the Black male professor who was eventually hired.

203.    Professor Reyes, as Chair of the Faculty Recruitment Committee, presented the candidates to the faculty. For the doctrinal position, there were three finalists who were already tenured professors: a Black man, a White man, and the White woman. The Committee found them all to be highly qualified. Some faculty attended their full day interviews but some did not. Because all three were tenured, only tenured faculty (the RPT Committee) could vote on the first question – whether they were qualified for the position.

204.     The White man did not even progress to a vote. Then, the majority clique was ready to vote on the White woman without even discussing her credentials. The following faculty members (all members of the RPT Committee) voted that the White woman was not qualified: Pat Broussard, Ann Marie Cavazos, Ron Griffin, Yolanda Jones, Lundy Langston, Jeremy Levitt, Jennifer Smith, and Phyllis Taite. The Black man received a unanimous vote as he should have because the Committee had already found him to be qualified for the position, same as the White woman. However, by finding the White woman not qualified for the position, the majority clique ensured that only the Black man was considered for hiring. Therefore, the faculty did not get to proceed to a vote on ranking the candidates because only one was found to be qualified by the majority clique. Dean Keller was present when this happened.

205.     The obvious racial aspect of the vote reminded Professor Reyes of her own tenure and promotion votes by the majority clique. After the vote, Professor Reyes, as Chair of the Faculty Recruitment Committee, had to call the White female candidate and tell her that she was no longer under consideration because she was not found to be qualified. This was humiliating for a candidate with her credentials. Professor Reyes remembered the ways in which the majority clique diminished her qualifications in efforts to humiliate her and get rid of her like they got rid of the highly qualified White female candidate. The law professor cried

when she heard the news and Professor Reyes empathized with her and also cried after she hung up the phone. It was one more racial traumatic experience at FAMU College of Law. Professor Reyes remains the only non-Black tenured woman in the FAMU College of Law.

206. Something similar almost happened with the White male candidate for the clinic position. He was also highly qualified. However, he was not tenured and had never been in a tenure track position. The CoL Faculty Handbook permitted granting tenure upon appointment if the candidate met the standards. Chair Reyes worked with the candidate to put together a strong record for tenure upon appointment. He made it through the qualification question, but the next review happened in the closed RPT Committee meetings. There, the issue of "White man privilege" was raised by Black members of the RPT Committee. Professor Reyes responded that race should not become the issue; the issue was whether he met the standards and should be granted tenure upon appointment. A factor that helped him is that a Black female candidate withdrew from consideration and the other Black female candidate did not show much interest in the position.

207. In 2021-2022, another White male candidate was being considered for tenure upon hire; he had tenure in another law school that was no longer in existence. Black female faculty members in the RPT Committee argued that he should not be eligible for tenure because the law school where he got tenure was

no longer in existence. However, these were the same faculty members who favored granting tenure to a Black female candidate the year before when the law school where she received tenure was no longer in existence. The White male candidate had a much stronger teaching, scholarship, and service record, including from years when he taught as a visiting professor in the FAMU College of Law. Professor Reyes once again had to defend her position that he was qualified for tenure upon appointment as a lateral hire and, for her, race was not a factor in the decision.

208.    After Professor Reyes filed her EEOC charge, the retaliation from President Robinson, Provost Edington, Dean Keller, Associate Dean Cooper and other faculty members has made Professor Reyes realize that the targeting is systemic. The emails about what seem like insignificant issues are many. It is the frequency, severity, humiliating, and recurring nature of what they do. They deny Professor Reyes an accommodation to teach from home during the pandemic when she provided a doctor's letter stating that she was the sole caretaker of her elderly mother and would put her at risk of contracting Covid if Professor Reyes were to teach in person. Dean Keller and Associate Dean Cooper had some discretion to decide which 50% of the faculty returned in person. They made Professor Reyes teach in person. Then, Professor Reyes got sick and needed to be on bed rest with her leg up during the last week of the fall 2021 semester. She requested permission

to teach those last three classes synchronously via Zoom. Dean Keller and Associate Dean Cooper said no, same as President Robinson and Provost Edington. What made their tactic more egregious is that they insisted that Professor Reyes apply for an ADA accommodation when she kept telling them that she was not disabled. Then, when she applied it was denied. It was all a waste of time and additional work and stress. Professor Reyes did not get to rest. She had more work as a result of all the back-and-forth of emails and the work she had to prepare to make up for class time instead of teach synchronously.

209.    It has become evident to Professor Reyes that the retaliation plan is to (1) keep her busy defending against ongoing hostilities and indignities, in addition to all the work, which reduces her time for scholarship; (2) make it as hostile as possible so she leaves "voluntarily" or gets sick and is unable to keep up with the job; (3) set her up for "good cause" dismissal, despite her tenure; and (4) ruin her chances of getting other jobs by soiling her professional record (including with false accusations, formal investigations and by "blacklisting" her). This means that Professor Reyes is even more vulnerable after tenure and after she filed the EEOC charge. The ongoing incidents are also meant to intimidate, ridicule, insult, ostracize, marginalize, and drive Professor Reyes out of the FAMU College of Law, after ruining her academic career.

210.     Through the years Professor Reyes, through records requests, has obtained surveillance videos showing some of the hostilities. The FAMU email system has all the emails Professor Reyes has sent and received. Many of those emails are evidence of the hostilities, discrimination, harassment, hostile work environment and retaliation she has endured. Many of those emails also demonstrate the many times she has reached out to President Robinson and Provost Edington asking for help. She has even asked them to consider how what they have done and permitted to be done to her would look if it were being done to a Black woman in a predominantly white institution. They do not seem to care.

211.      Professor Reyes is a lawyer and law professor. However, Professor Reyes has never practiced in the areas of employment or civil rights law. As the 90-day deadline to file this lawsuit was approaching, Professor Reyes was still wrestling with the decision whether to sue FAMU. She did not make the final decision until the first week back to classes (August 15 – 19, 2022) after she was verbally attacked by Professor Jeffery Brown, a Black man, on August 18, 2022. Some years ago, Professor Brown referred to Professor Reyes as a "fucking thing," during a committee meeting when then Associate Dean Darryll Jones, Professor Cavazos, and Professor Reaves were present. No one came to Professor Reyes's defense. In fact, Associate Dean Jones said Professor Brown's epithet was "inappropriate but understandable." Professor Brown also provided cover for

Professor Jeremy Levitt when he attacked Professor Reyes during her first semester at the FAMU College of Law.

212.    On August 18, 2022, Professor Reyes provided notice of Professor Brown's verbal attack to Provost Edington, Dean Keller, Associate Dean Cooper and the faculty. As of the date of the filing of this complaint, no one has reached out to Professor Reyes about the matter. This was definitive confirmation that the discrimination, harassment, workplace mobbing, and hostile work environment will continue unabated during the 2022-2023 academic year. No one within FAMU will do anything to address the situation. After years of putting up with abuse in her workplace, Professor Reyes decided that she must file a lawsuit.

213.    Due to the time and circumstances when Professor Reyes made the final decision to file this lawsuit, Professor Reyes had to prepare and file this complaint on her own. Professor Reyes conducted a good faith investigation of the facts she alleges and the applicable laws before filing this complaint.

214.    Professor Reyes is not the first FAMU College of Law professor to represent herself in a lawsuit against FAMU. Professor Jennifer Smith, a Black woman, represented herself in her second federal lawsuit against FAMU. Professor Reyes is also not the first FAMU College of Law professor to litigate an action against FAMU in the United States District Court for the Middle District of Florida, Orlando Division. Ka'Juel Washington, a Black man, and Rhoda Cato, a

Black woman, also litigated actions against FAMU in this Court. FAMU Law students also litigated actions against FAMU in this Court.

215.     Professor Reyes has been uplifted by students and alumni of diverse race, ethnic, and cultural backgrounds during the thirteen (13) years she has taught in the FAMU College of Law. Professor Reyes has remained in the FAMU College of Law because she cares about the law school and students. However, she can no longer tolerate the abuse. This is why she is filing this lawsuit and hopes that students and alumni will understand that it is her right, as a human being, to do what she can to protect herself from further harm.

## COUNT I
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Promote – Race

216.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

217.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

218.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

219.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race discrimination.

220.     Defendant discriminated against Plaintiff based on her race, Hispanic/Latina, by failing to promote her to full professor when she applied in 2018.

221.     Plaintiff is a member of a protected class.

222.     Plaintiff was qualified for the position of full professor when she applied in 2018.

223.     Plaintiff applied for full professor in 2018 and was denied the promotion.

224.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

225.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT II
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Promote - Color

226.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

227.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

228.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

229.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from color discrimination.

230.     Defendant discriminated against Plaintiff based on her color, light skin Hispanic/Latina, by failing to promote her to full professor when she applied in 2018.

231.     Plaintiff is a member of a protected class.

232.     Plaintiff was qualified for the position of full professor when she applied in 2018.

233.     Plaintiff applied for full professor in 2018 and was denied the promotion.

234.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

235.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT III
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Promote – National Origin

236.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

237.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

238.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

239.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from national origin discrimination.

240.     Defendant discriminated against Plaintiff based on her national origin, Hispanic/Latin American ancestry, by failing to promote her to full professor when she applied in 2018.

241.     Plaintiff is a member of a protected class.

242.     Plaintiff was qualified for the position of full professor when she applied in 2018.

243.     Plaintiff applied for full professor in 2018 and was denied the promotion.

244.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

245.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT IV**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Failure to Promote – Gender and/or Gender-Race**

246.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

247.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

248.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

249.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from gender and/or gender-race discrimination.

250.     Defendant discriminated against Plaintiff based on her gender and/or gender-race, female/Hispanic/Latina, by failing to promoter her to full professor when she applied in 2018.

251.     Plaintiff is a member of a protected class.

252.     Plaintiff was qualified for the position of full professor when she applied in 2018.

253.     Plaintiff applied for full professor in 2018 and was denied the promotion.

254.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

255.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT V
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Award Pay Raise – Race

256.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

257.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions it made vis-á-vis Plaintiff as outlined herein. Defendant denied Plaintiff a pay raise when it unlawfully denied her 2018 application for promotion to full professor.

258.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

259.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race discrimination.

260.     Defendant treated Plaintiff differently because of her race, Hispanic/Latina, in the terms and conditions of her employment.

261.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional harm.

## COUNT VI
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Award Pay Raise – Color

262.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

263.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions it made vis-á-vis Plaintiff as outlined herein. Defendant denied Plaintiff a pay raise when it unlawfully denied her 2018 application for promotion to full professor.

264.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

265.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from color discrimination.

266.     Defendant treated Plaintiff differently because of her color, light skin Hispanic/Latina, in the terms and conditions of her employment.

267.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional harm.

## COUNT VII
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Award Pay Raise – National Origin

268.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

269.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions it made vis-á-vis Plaintiff as outlined herein. Defendant denied Plaintiff a pay raise when it unlawfully denied her 2018 application for promotion to full professor.

270.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

271.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from national origin discrimination.

272.     Defendant treated Plaintiff differently because of her national origin, Hispanic/Latin American ancestry, in the terms and conditions of her employment.

273.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional harm.

## COUNT VIII
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Failure to Award Pay Raise – Gender and/or Gender-Race

274.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

275.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions it made vis-á-vis Plaintiff as outlined herein. Defendant denied Plaintiff a pay raise when it unlawfully denied her 2018 application for promotion to full professor.

276.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

277.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from gender and/or gender-race discrimination.

278.     Defendant denied a salary raise when it denied Plaintiff's 2018 application for promotion.

279.     Defendant treated Plaintiff differently because of gender and/or gender-race, female/Hispanic/Latina in the terms and conditions of her employment.

280.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional harm.

**COUNT IX**
**Hostile Work Environment in Violation Title VII – Race**

281.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

282.     Plaintiff belongs to a protected group.

283.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her race.

284.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

285.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race.

286.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her race, Hispanic/Latina. Such conduct was unwelcome.

287.    The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

288.    Plaintiff perceived the environment to be abusive or hostile.

289.    A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

290.    Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

291.    Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT X
### Hostile Work Environment in Violation Title VII – Color

292.    Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

293.    Plaintiff belongs to a protected group.

294.    Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her color.

295.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

296.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of color.

297.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her color, light skin Hispanic/Latina. Such conduct was unwelcome.

298.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

299.     Plaintiff perceived the environment to be abusive or hostile.

300.     A reasonable light skin Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

301.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

302.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT XI**
**Hostile Work Environment in Violation Title VII – National Origin**

303.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

304.     Plaintiff belongs to a protected group.

305.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her national origin.

306.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

307.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of national origin and/or for retaliatory reasons.

308.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her national origin, Hispanic/Latin American ancestry. Such conduct was unwelcome.

309.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

310.     Plaintiff perceived the environment to be abusive or hostile.

311.    A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

312.    Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

313.    Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT XII
## Hostile Work Environment in Violation Title VII – Gender and/or Gender-Race

314.    Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

315.    Plaintiff belongs to a protected group.

316.    Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her gender and/or gender-race.

317.    These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

318.    Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of gender and/or gender-race and/or for retaliatory reasons.

319.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her gender and/or gender-race, female/Hispanic/Latina. Such conduct was unwelcome.

320.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

321.     Plaintiff perceived the environment to be abusive or hostile.

322.     A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

323.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

324.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT XIII
## Retaliation in Violation of Title VII

325.     This claim is pled in the alternative.

326.     Plaintiff realleges paragraphs 1 through 215 as fully set forth therein.

327.     Plaintiff belongs to a protected group.

328.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

329.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

330.     Defendant acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse action.

331.     On October 22, 2014 and October 30, 2014, Plaintiff formally opposed and complained about unequal treatment, discrimination and bias when her attorney sent letters to then Interim Provost Rodner Wright and General Counsel Avery McKnight. On April 27, 2015, Plaintiff once again formally opposed and complained about unequal treatment, discrimination and bias when she submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, gender, and retaliation to Defendant's Office of Equal Opportunity Programs (EOP). However, Plaintiff had raised concerns informally before then and has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race, color, national origin, and/or gender. Plaintiff filed a Charge of Discrimination with the EEOC on May 29, 2020.

332.     In response to raising these concerns, Plaintiff has been subjected to a pattern of retaliatory conduct, including ongoing harassment that is severe and/or pervasive and has altered the terms and conditions of her employment.

333.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional harm.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following:

a.  Back pay, in amounts to be determined at trial;

b.  Compensatory and consequential damages;

c.  Front pay;

d.  Injunctive and/or declaratory relief;

e.  Prospective relief;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

h.  Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 12th day of September, 2022.


/s/ Maritza Reyes

P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

Tab 30

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

        Plaintiff,

v.                                     Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),

        Defendant.

_____/

**<u>ORDER</u>**

THIS CAUSE is before the Court on Defendant's Opposed Motion to Dismiss Plaintiff's Amended Complaint as a Shotgun Pleading and to Strike Immaterial Allegations and Alternative Motion for More Definite Statement ("**Motion to Dismiss**," Doc. 22) and Plaintiff's Response (Doc. 28) thereto.  For the reasons set forth below, Defendant's Motion will be granted in part.

**I.      BACKGROUND**

Plaintiff, a Hispanic/Latina woman, was offered a position as an assistant professor of law at the Florida A&M University College of Law ("**FAMU Law**") in March 2009, which she accepted.  (Doc. 10, ¶¶ 4, 25–26).  Plaintiff alleges that she was the first Hispanic person hired in a tenure-track position at FAMU Law and the first to apply for tenure.  (*Id.* ¶¶ 26, 39).  Plaintiff alleges that she applied for tenure on September 12, 2014, and was subjected to a variety of unfair and improper conduct by members of the reviewing committee based on her race.  (*See generally id.* ¶¶ 41–64).  On April 24, 2015, Plaintiff submitted a complaint alleging discrimination and retaliation on the basis of race, color,

national origin, and sex to the Office of Equal Opportunity Programs against the members of the tenure committee, which was dismissed after an investigation.  (*Id.* ¶¶ 65, 66). Although members of the committee recommended that Plaintiff be denied tenure, she was granted tenure on June 10, 2015.  (*Id.* ¶¶ 67–68).  Plaintiff subsequently applied for a promotion to full professor in 2018.  (*Id.* ¶ 150).  Plaintiff alleges that the process was again fraught with discrimination and irregularities, ultimately resulting in the denial of a promotion.  (*See generally id.* ¶¶ 151–168).  Additionally, Plaintiff alleges generally that she has been subjected to ongoing race and gender-based hostilities since she began her employment at FAMU Law.  (*See generally id.*).  As a result, Plaintiff alleges claims for discrimination, hostile work environment, and retaliation on the basis of race, color, national origin, and gender in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e *et seq*.  (*Id.* ¶¶ 216–333).

## II.   LEGAL STANDARDS

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party.  *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009).  Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Furthermore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

"A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  "'[I]n the federal system, . . . motions for a more definite statement are not favored'" and "should rarely be granted."  *Foster v. Dead River Causeway, LLC*, No. 6:14-cv-688-Orl, 2014 WL 4059899, at *2 n.2 (M.D. Fla. Aug. 15, 2014) (quoting *Eye Care Int'l, Inc. v. Underhill*, 92 F. Supp. 2d 1310, 1316 (M.D. Fla. 2000)).  "A motion for a more definite statement will only be required when the pleading is so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself."  *Campbell v. Miller*, 836 F. Supp. 827, 832 (M.D. Fla. 1993) (quotation omitted).

Pursuant to Federal Rule of Civil Procedure 12(f), the Court may, on motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  However, motions to strike are generally disfavored by the courts and "should be granted only if 'the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party.'"  *Schmidt v. Life Ins. Co. of N. Am.*, 289 F.R.D. 357, 358 (M.D. Fla. 2012) (quoting *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995)).

## III.    DISCUSSION

Plaintiff filed her initial Complaint (Doc. 1) on August 25, 2022.  On September 1, 2022, the Court dismissed the Complaint as an impermissible shotgun pleading.  (Doc. 8 at 2).  Specifically, the Court noted that Plaintiff's Complaint "reincorporate[d] by reference every allegation of the entire pleading" and "fail[ed] to separate into a different count each cause of action."  (*Id.*).  Thus, Plaintiff was ordered to replead.  Defendant argues that Plaintiff's Amended Complaint (Doc. 10) fails to correct the reincorporation issue and also falls within the category of shotgun pleadings that are "guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."  *Weiland v. Palm Beach Cnty. Sherriff's Off.*, 792 F.3d 1313, 1322 (11th Cir. 2015).

Although Plaintiff incorporates by reference each factual allegation of her Amended Complaint into every claim for relief, unlike before, she does not incorporate each cause of action into each successive cause of action, although, admittedly, some factual allegations are clearly irrelevant to certain causes of action.  Several courts, including this one, have recognized that this alone does not constitute a shotgun pleading. *See, e.g.*, *Burillo de Larrea v. Golden Yacht Charters, Inc.*, No. 21-cv-22324, 2022 WL 1135695, at *7 (S.D. Fla. Apr. 18, 2022); *Pagan v. Wal-Mart Assocs., Inc.*, No. 8:21-cv-1095, 2021 WL 3172018, at *3–4 (M.D. Fla. July 27, 2021); *Woznicki v. Raydon Corp.*, No. 6:18-cv-2090-Orl, 2019 WL 5702728, at *2 (M.D. Fla. Nov. 4, 2019).

Nevertheless, although the bulk of Plaintiff's allegations appear to be relevant to her claims, the Amended Complaint also contains several allegations that do not appear to be logically connected to any cause of action, allege harms to other persons, or are

wholly unnecessary to properly allege the causes of actions Plaintiff seeks to allege. Plaintiff also includes improper legal argument and citation to scholarly articles.  Finally, the Amended Complaint, although seemingly including every slight or disagreement that Plaintiff has had with a colleague while employed at FAMU Law, is replete with conclusory and vague statements regarding various individuals' conduct spanning nearly fifteen years—not organized in a coherent and logical manner—making it difficult to understand how the numerous alleged actions by Defendant's faculty and staff are legally connected to her various causes of action.  Accordingly, the Court finds that the Amended Complaint is a shotgun pleading and will be dismissed.  Plaintiff will be granted leave to file an amended pleading, but she is cautioned that failure to correct the deficiencies noted herein may result in the dismissal of any amended pleading with prejudice.  *See Barmapov v. Amuial*, 986 F.3d 1321, 1326 (11th Cir. 2021).

Having determined that the Amended Complaint must be dismissed as a shotgun pleading, this Court declines to address Defendant's remaining arguments at this juncture until the basis or bases upon which Plaintiff seeks to hold it liable have been more clearly pleaded.  Defendant may renew its objections to the extent relevant in response to an amended pleading.

## IV.    CONCLUSION

Therefore, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant's Motion to Dismiss (Doc. 22) is **GRANTED in part** as set forth herein and **DENIED without prejudice** in all other respects.

2.  The Amended Complaint (Doc. 10) is **DISMISSED without prejudice**.

3. On or before **September 29, 2023**, Plaintiff may file an amended pleading to correct the deficiencies noted herein.  Plaintiff is cautioned, however, that the Court will not grant further leave to amend the plead in this case.

**DONE AND ORDERED** in Orlando, Florida on September 15, 2023.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

6

Tab 34

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

      Plaintiff,

v.                            CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

      Defendant.

_____

## SECOND AMENDED COMPLAINT, DEMAND FOR A JURY TRIAL, AND REQUEST FOR PERMANENT INJUNCTIVE RELIEF

Maritza Reyes ("Plaintiff" or "Professor Reyes") hereby complains against the Board of Trustees of Florida Agricultural & Mechanical University ("Defendant" or "FAMU") as follows:

### I.    NATURE OF THE CLAIMS

1.  This suit is brought by a Hispanic/Latina law professor who has been subjected to race, color, national origin, and sex discrimination and retaliation by Defendant in violation of: Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq.* ("Title VII").

2.  The unlawful discrimination, harassment, ongoing hostile work environment, and retaliation because of race, color, national origin, and sex have taken many forms, including a phenomenon termed by experts as "workplace mobbing."

1

3.  Plaintiff seeks all available remedies including damages, attorneys' fees, costs, interest, and compensatory damages.

## II.      PARTIES

4.  Plaintiff is a Hispanic/Latina, a woman of Spanish-speaking, Latin American origin, who resides in the State of Florida, Orange County, and is and was employed by Defendant at all times relevant to the allegations in this Amended Complaint.

5.  Defendant is a public historically black college university ("HBCU") within the State University System of Florida ("SUS"). Defendant's main campus is located in Tallahassee Florida. Defendant's law school campus, Florida A&M University College of Law ("FAMU College of Law"), is located in Orlando, Florida, Orange County.

6.  At all times relevant to this Amended Complaint Defendant was an employer pursuant to the pertinent laws and received federal and state financial assistance.

7.  Defendant acted through its agents, representatives, and/or employees at all times material hereto.

## III.      JURISDICTION AND VENUE

8.  This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law.

9.  Plaintiff has complied with the administrative prerequisites by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Notice of Right to Sue from the EEOC and filed this action within ninety (90) days of the Notice of Right to Sue.

10.  Plaintiff has fulfilled the conditions precedent prior to filing this Amended Complaint.

2

11. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b).

## IV.  FACTUAL BACKGROUND

**Professor Reyes's Credentials Prior to Joining the FAMU College of Law**

12. Professor Reyes earned the "traditional," excellent credentials to become a tenure track law professor before she joined academia in the faculty of FAMU College as a full-time tenure track assistant professor. Professor Reyes earned a Juris Doctor (J.D.) *summa cum laude* from Nova Southeastern University Shepard Broad College of Law ("Nova Law") in 2000 (graduating in the top 1% of her class of over 400 students). Professor Reyes attended Nova Law on a full-tuition, merit Goodwin academic scholarship. She earned Dean's List all semesters and book awards for highest grade in several courses. Professor Reyes served as Articles Editor of the *Nova Law Review* and earned membership in the Moot Court Honor Society. During her J.D. studies at Nova Law, Professor Reyes earned several awards.

13. During law school, Professor Reyes gained practical legal experience as a summer associate with an international law firm and as a certified legal intern in the U.S. Attorney's Office Appellate Division. After earning her J.D., Professor Reyes's legal experience included working for private law firms as an associate attorney and as a federal court law clerk at the district court level.

14. During her second year of law school, Professor Reyes worked as research assistant for two professors and developed an interest in a teaching career. One of those professors provided a list of the "traditional" credentials for a tenure track career and Professor Reyes fulfilled every credential on that list before going on the

3

competitive, national teaching market through the Association of American Law Schools ("AALS") Faculty Recruitment Conference ("AALS Conference").

15.  In final preparation to begin full-time law teaching, Professor Reyes attended the Harvard Law School ("Harvard Law") where she earned a Master of Laws (LL.M.) in 2008. While at Harvard Law, Professor Reyes served as General Editor of the *Harvard Latino Law Review* and Coordinator of External Affairs of La Alianza, a student-run organization. She also participated in the Spring Pro Bono Program in the Florida Immigrant Advocacy Center. She was awarded a Congressional Hispanic Caucus Institute Graduate Scholarship and, upon graduation, a Harvard Law Post-Graduate Research Fellowship. She published articles in the *Harvard Latino Law Revie*w, *The Harvard Law Record*, and *The Harvard Crimson.*

### The FAMU College of Law When Professor Reyes was Hired

16.  The FAMU College of Law was legislatively re-established in 2000 and opened its doors in August 2002. It received provisional accreditation by the American Bar Association (ABA)'s Council of the Section of Legal Education and Admissions to the Bar in August 2004. The FAMU College of Law graduated its first class in April 2005. Professor LeRoy Pernell was hired as Dean of FAMU College of Law in late 2007. The ABA Journal reported, after an interview with Dean Pernell, in an article titled "Saving the School," that Dean Pernell joined the law school after ABA site visits in 2005, 2006, and 2007 "reported numerous problems and FAMU Law's failure to adequately address them." According to the article, FAMU College of Law was also under a deadline to get full accreditation or be subject to potential closure as stated in the Florida statute that re-established it in 2000. There were reports of issues within the faculty, including

4

conflict between the "founding faculty" and junior faculty. Dean Pernell said "'I knew we had to infuse the faculty with new faces, bringing in new as well as experienced law faculty.'" Dean Pernell also said that his efforts would include "reach[ing] out to more diverse people, not only throughout the state of Florida but regionally and nationally."

### Professor Reyes's Recruitment Process

17.  Professor Reyes was recruited as the FAMU College of Law was seeking full accreditation. Professor Reyes was identified by the 2008-2009 FAMU College of Law Faculty Recruitment Committee ("Recruitment Committee") in fall 2008 as a result of a national search through the AALS Conference. Dean Pernell was part of the Recruitment Committee. Professor Lundy Langston, a Black woman and "founding faculty," served as Chair of the 2008-2009 Recruitment Committee. Professor Reyes was initially interviewed by Dean Pernell and some members of the Recruitment Committee at the AALS Conference in Washington, D.C. However, a couple of days prior to that initial interview, Professor Reyes had to reach out to Dean Pernell to get the information about where the interview would take place. Dean Pernell was surprised that Professor Reyes had not received the information and reached out to Professor Langston about it. Professor Reyes was not aware of who was supposed to send her the information; she received the information by phone from Dean Pernell.

18. After the initial interview at the AALS Conference, Professor Reyes was invited for a visit to FAMU College of Law where she was interviewed by additional members of the faculty. Although there were many women on the faculty (overwhelmingly Black women) and Black women in the Recruitment Committee, including Professor Langston as Chair, the dinner with the faculty consisted of two White men, Professors Robert

Abrams and Jonathan Fineman. Professor Fineman picked up Professor Reyes from the airport.

19. All interviews with faculty members, with the exception of the interview with Professor Patricia ("Pat") Broussard, a Black woman, included more than one faculty member. Professor Broussard met with Professor Reyes alone in Professor Broussard's office. During the interview, Professor Broussard was arranging paperwork on her desk, did not make eye contact with Professor Reyes, and asked her why she wanted to teach in the FAMU College of Law. Professor Reyes responded that she was thrilled by the prospect of joining the faculty in an HBCU state law school in her home state of Florida. She also explained that she sought to contribute to the mission of the law school, teach diverse students, and help with efforts to increase bar passage. Professor Broussard then asked "but why this law school?" Professor Reyes thought she had already answered the question but once again provided a similar response.

20. As part of the on-campus visit Professor Reyes made a "job talk" presentation to faculty members. Prior to the job talk presentation, Professor Reyes was supposed to get time to eat lunch, prepare for the job talk, and meet with IT staff to go over the computer setup for her Power Point presentation. None of this happened because Professor Lundy Langston spent too much time walking her through the law school building. During this walk, Professor Reyes asked for a bathroom break. Professor Langston was walking her to the bathroom on the first floor when a woman approached and started talking to Professor Langston. Professor Reyes stood next to Professor Langston waiting for Professor Langston to introduce her. As Professor Langston continued talking with the woman, Professor Reyes noticed the bathroom door and

hesitantly interrupted the conversation to briefly introduce and excuse herself, in order to go to the restroom. The woman was Professor Joan Bullock. After Professor Reyes exited the restroom, Professor Langston said bye to Professor Bullock and walked Professor Reyes to the faculty conference room in the fourth floor.

21. By the time Professor Reyes arrived in the conference room, faculty members were seated and Professor Reyes had to set up her Power Point presentation while she also addressed the faculty and began her job talk. Despite not getting time to eat or prepare before her job talk, Professor Reyes enjoyed the job talk presentation and her time with the faculty. Then Associate Dean Kenneth Nunn, a Black man, asked probing questions, which made for a good presentation. Professor Reyes viewed some of the odd situations (not getting materials prior to the interview, not having any women join the dinner, being questioned repeatedly by Professor Broussard about why she was interested in "this law school," not being introduced to Professor Bullock by Professor Langston, and not getting time to prepare before her job talk) through a positive lens and did not presume ill-intent. Professor Reyes liked the FAMU College of Law, the faculty, and the students she met during her visit.

22. Some years after Professor Reyes joined the faculty of FAMU College of Law, when she mentioned to a faculty member that she sensed that Professor Broussard was sabotaging her, she learned that, at the time of her recruitment and hiring process, Professor Broussard told faculty members that Professor Reyes would not accept an offer to join the faculty. Years later, once Professor Reyes learned to identify Professor Broussard's, Professor Bullock's, and Professor Langston's tactics, she realized that they had been sabotaging her since the beginning although initially not full frontal. They

kept escalating their attacks against Professor Reyes including behind the scenes which Professor Reyes did not even know. They made a full attack, in the closed retention, promotion, and tenure meetings of the tenured faculty, during Professor Reyes's tenure process.

**Professor Reyes Accepted the Offer to Join FAMU College of Law**

23. The full faculty of FAMU College of Law and Dean Pernell recommended to Dr. Cynthia Hughes Harris, the then Provost and Vice President for Academic Affairs, that Professor Reyes be hired as a full-time, tenure-earning, assistant professor of law. On March 30, 2009, then FAMU University Provost Cynthia Hughes Harris made Professor Reyes an offer of employment as an assistant professor of law in a tenure-earning position.

24. As part of the hiring negotiations, Professor Reyes requested the rules and standards for promotion and tenure. She received the rules for promotion and tenure that would apply to her according to the FAMU College of Law Faculty Handbook ("CoL Faculty Handbook") and a Memo prepared by then Associate Dean for Research and Faculty Development and Professor of Law Kenneth B. Nunn (the "Nunn Memo"). The Nunn Memo was appended to the Self Study that the FAMU College of Law presented to the ABA as part of the law school's application for full accreditation. The law school represented to the ABA that the Nunn Memo clarified the standards as requested by the ABA.

25. On April 7, 2009, Professor Reyes accepted the offer of employment as a full-time, tenure-earning/tenure-track faculty member of the FAMU College of Law in a position of assistant professor of law. Professor Reyes became the first FAMU College

of Law entry-level faculty member identified and hired through the AALS Conference. Professor Reyes also became the first Hispanic/Latina/o hired in a tenure-track position in the FAMU College of Law.

26.  The FAMU College of Law received full ABA accreditation in July 2009.

### The "Majority Clique" & "Workplace Mobbing"

27. In this pleading, the term "majority clique" is defined as Black, tenured professors who have individually and collectively participated in the tangible decisions and ploys that have harmed Professor Reyes during her employment at FAMU.

28. At FAMU, Black persons receive the highest status for automatic inclusion within the "FAMUly."

29.  Defendant delegated institutional power to the majority clique.

30.   The majority clique has led the workplace mobbing of Professor Reyes because she is not Black and she is Hispanic/Latina. Members of the majority clique have co-opted some Black FAMU non-faculty employees in their efforts to mob Professor Reyes. As further described in this complaint, they included Associate Dean Reginald Green, Director Mildred Graham, staff member Claudine Beale, program assistant Evett Collins, IT assistant Erica Polite, Director Adrienne Snyder, and others. A few non-Black FAMU employees have also followed the lead of the majority clique and participated in efforts to harm Professor Reyes.

31.  Workplace mobbing includes organizational dynamics and involvement.

**The FAMU College of Law Retention, Promotion and Tenure Committee**

**("RPT Committee")**

32. The FAMU College of Law Retention, Promotion and Tenure (RPT) Committee is a Committee constituted pursuant to the rules of the CoL Faculty Handbook. When Professor Reyes joined the faculty, the RPT Committee consisted only of the tenured, full professors. At the urging of a group of Black female law professors who were not yet full professors, after they made their complaints to the ABA accreditation site teams, the CoL Faculty Handbook was amended to include all tenured associate and full professors in the RPT Committee.

**The RPT Committee during Professor Reyes's Tenure Process**

33. Under the terms agreed upon hiring, Professor Reyes was required to apply for tenure no later than the beginning of the 2014-2015 academic year, which was the beginning of her sixth tenure-earning year. The CoL Faculty Handbook, section I.E.7., stated: "Submission of materials by the candidate in support of his/her application for promotion and/or tenure must coincide with the University's Schedule for Promotion and Tenure as generated annually from the Provost's Office." The "2014/2015 Tenure and Promotion Schedule" ("University Tenure Schedule") generated by the University stated that the deadline for applications for tenure and promotion was September 12, 2014 (with no hour of time stated).

34. During the 2014-2015 academic year the RPT Committee consisted of the following tenured associate and full professors (the tenured faculty):

    i.    Randall S. Abate (a White man),

    ii.   Robert H. Abrams (a White man),

10

iii.      Deleso A. Alford Washington (a Black woman),

iv.      Nicola ("Nicky") A. Boothe-Perry (a Black woman),

v.      Patricia ("Pat") Broussard (a Black woman),

vi.      Jeffrey ("Jeff") M. Brown (a Black man),

vii.      Joan R.M. Bullock (a Black woman),

viii.      Ann Marie B. Cavazos (a Black woman),

ix.      Markita D. Cooper (a Black woman),

x.      John Duncan (a Black man),

xi.      Jonathan W. Fineman (a White man),

xii.      Joseph Grant (a Black man),

xiii.      Ronald C. Griffin (a Black man),

xiv.      William ("Bill") D. Henslee (a White man),

xv.      Darryll K. Jones (a Black man),

xvi.      Lundy R. Langston (a Black woman),

xvii.      Jeremy Levitt (a Black man) who was on sabbatical leave, but may have participated in RPT Committee activities and communications,

xviii.      Shiv Persaud (an Indian/West Indian man),

xix.      Rhonda M. Reaves (a Black woman),

xx.      Omar Saleem (a Black man),

xxi.      Jennifer M. Smith (a Black woman), and

xxii.      Phyllis C. Taite (a Black woman).

35. Aggregated by race, the members of the 2014-2015 RPT Committee were as follows: ten (10) Black women, seven (7) Black men, four (4) White men, and one (1)

Indian/West Indian man. All the female members of the RPT Committee were Black women. There was no Hispanic/Latina/o (man or woman) in the RPT Committee.

36. Professor Reyes was the first Hispanic/Latina/o hired in the tenure track and the first and only thus far to apply for tenure.

37. Dean LeRoy Pernell appointed Professor John Duncan as Chair of the 2014-2015 RPT Committee. Professor Duncan was supposed to guide Professor Reyes through the tenure process. However, he turned the process into an adversarial process even before she applied. He did not provide information and told Professor Reyes that she should contact Professor Phyllis Taite with questions. When Professor Reyes contacted Professor Taite with questions, Professor Taite responded that she would forward her questions to Professor Duncan. Professor Reyes was getting the run around about what she needed to do, including to where and to whom she needed to submit her tenure application, and the time to prepare her materials was running.

38. Unbeknown to Professor Reyes, Professor Phyllis Taite sent a memorandum to Dean Pernell, dated August 15, 2014, alleging that Professor Reyes was "harass[ing]" her after an email exchange between Professor Reyes and Professor Taite about a faculty meeting, on August 13, 2014, when then Associate Dean Darryll Jones set up a student situation and used it to bully Professor Reyes, including at the meeting. Professor Taite joined with then Associate Dean Jones against Professor Reyes during that meeting and in the email exchange that she used to set up her false allegations against Professor Reyes. In her August 15, 2014 memorandum to Dean Pernell, Professor Taite stated that she was concerned for her safety, afraid of what Professor Reyes may do to her, and trying to avoid being around Professor Reyes. She also

12

blamed Professor Reyes for stress that allegedly affected her health, including her blood pressure and ability to sleep. Nothing Professor Reyes stated in the email exchange warranted such accusations. However, this became the narrative behind the scenes and Professor Reyes did not even know about it.

39. Professor Taite was herself preparing her application for promotion to full professor at the same time that Professor Reyes was preparing her application for tenure. Professor Taite did not have to accept the designation as the point person to answer Professor Reyes's questions about her tenure application, but Professor Taite's designation gave her access to harm Professor Reyes shortly before the deadline to apply for tenure.

40. Neither Professor Taite nor Dean Pernell ever informed Professor Reyes about Professor Taite's August 15, 2014 memorandum. Professor Taite did not recuse herself from participation in Professor Reyes's tenure process. Instead, she participated in the ploys to deny Professor Reyes tenure, including the false and unsubstantiated allegation of five-minute late submission.

41. On September 12, 2014, Professor Reyes submitted her application and portfolio materials in full compliance with the deadline set forth in the University Tenure Schedule. She delivered her application and portfolio materials in accordance with instructions given to her by Professor John Duncan. Professor Reyes put together a very strong application by all objective standards. She fulfilled and exceeded the standards that were provided to her upon hiring. Dean Pernell had rated her performance as excellent in all categories of her annual evaluations. The annual RPT Committee reviews had all rated her performance in teaching, scholarship, and service

13

to be very good to excellent. She had received class peer observations rating her teaching from very good to excellent. Students had consistently rated her as an effective, highly competent teacher. The overwhelming majority of comments in student evaluations were extremely positive about her teaching. A few students complained about Professor Reyes's rigorous teaching style, but no one ever raised concerns about this during her annual evaluations.

42. Pursuant to the University Tenure Schedule, the deadline for the RPT Committee to submit its recommendation to Dean Pernell was October 10, 2014.

43. In mid-October 2014, Professor Reyes became concerned because she had not heard anything about the status of her application. She also noticed that members of the RPT Committee were avoiding her. She reached out to Dean Pernell via email to request the status of her application and he responded that they should meet.

44. On October 29, 2014, Professor Reyes met with Dean Pernell, in his office, and he informed her that he was unable to begin his review of her application because the RPT Committee had not sent him her application and portfolio materials or its letter of recommendation. The deadline for Dean Pernell to submit his recommendation was November 14, 2014.

45. Dean Pernell told Professor Reyes that he could not review her application and materials if the RPT Committee did not first fulfill its duty to engage in the initial review process and provide a letter of recommendation to him. Therefore, the failure of the RPT Committee to perform its duty to (a) process Professor Reyes's application and supporting materials, including arranging for external and internal reviews of her

14

scholarship, and (b) prepare a letter of recommendation by the stated deadline derailed Professor Reyes's entire tenure process.

46. If the RPT Committee did not process Professor Reyes's application for tenure, there would be no review by the College of Law Dean, University Tenure and Promotion ("T&P") Committee, Provost, President, and Board of Trustees. The failure of the RPT Committee to fulfill its duty to process Professor Reyes's application and issue a recommendation would foreclose a review of Professor Reyes's application for tenure altogether. The University Faculty Handbook, section II.J.(5)(a), stated: "By the end of six years of continuous full-time, or equivalent part-time service in a tenure-earning position in the University, a Faculty employee shall be nominated for tenure or given notice that further employment will not be offered, in the affected position with reason(s) why the employee was not nominated for tenure."

47. The majority clique that hijacked Professor Reyes's tenure process was driven by unlawfully discriminatory racial and racial/sex animus against Professor Reyes. They recruited allies and followers. They silenced the dissenters, who were also prohibited from communicating with Professor Reyes about what was happening in the secret, closed RPT Committee meetings, including about the decisions that were being made to derail her tenure process and reach a recommendation that tenure should be denied.

48. In their efforts to deny Professor Reyes tenure, the majority clique repeatedly violated the regulations that governed the tenure review process. They also violated the regulations that set forth the standards that should be applied when reviewing an application for tenure, including by denying Professor Reyes fairness and due process.

49. The majority clique engaged in many ploys, including the following:

i.  Made a five-minute false allegation of violation of a non-deadline that turned Professor Reyes's tenure process into an adversarial, controversial, and difficult process, which served to discredit Professor Reyes at the RPT Committee level and higher levels of review.

ii.  Stopped Professor Reyes's tenure process in violation of the rules and ignoring Professor Reyes's repeated assertion that she delivered her materials by 5:00 PM. The actual deadline for submission was an entire day (until 11:59 PM). The RPT Committee refused to tell Professor Reyes what the allegation was (the 5:05 PM allegation) and what evidence they alleged, despite her repeated requests for this crucial information.

iii.  Denied Professor Reyes the opportunity to refute their unsubstantiated allegation. They made it extremely difficult to set up a meeting and then, once a date and place were finally agreed upon (September 29, 2014) with Chair John Duncan, Professor Lundy Langston, and Professor Joseph ("Joe") Grant, they cancelled the meeting at the last minute without any explanation to Professor Reyes as to the reason for the cancellation.  Subsequently, they misrepresented to the other members of the RPT Committee, the FAMU Division of Audit and Compliance ("DAC") investigator, the Dean, the Interim Provost, the President, the General Counsel, and/or other University officials that Professor Reyes did not want to clarify, without telling them that they were the ones who canceled the meeting and continued to keep Professor Reyes in the dark about what was happening in her tenure process.

iv.  Kept Professor Reyes isolated and marginalized during the entire tenure process (over two semesters when the process was only supposed to be one semester). Chair John Duncan refused to provide Professor Reyes with the information she was entitled to receive. He also instructed other Committee members not to speak with her; thereby silencing them and alienating Professor Reyes from colleagues who would vote on her tenure.

v.  Argued for "confidentiality" of the process to keep everything secret while they violated the claimed "confidentiality" by going outside the process (to all decision-makers at the University level) with their unsubstantiated allegation that Professor Reyes was lying about the time of delivery of her materials and also falsely claiming that she refused to clarify. In their statements, they never stated the alleged time (5:05 PM); they just kept saying that Professor Reyes submitted late or after the deadline. They also spread the falsehood to Black law professors beyond the FAMU College of Law.

vi.  Disenfranchised two White men from voting on Professor Reyes's tenure application: Professors Randall ("Randy") Abate and Robert ("Rob") Abrams.

16

vii.    Caused Professor Reyes to be subjected to a FAMU Division of Audit and Compliance ("DAC") investigation, in fall 2014, that she only learned about when she received notice of her interview, three days before the interview, at a time when she was busy teaching an extra heavy course load. Upon information and belief, Professor Deleso Alford Washington, a Black female faculty member who was a member of the RPT Committee by the time Professor Reyes applied for tenure, submitted her tenure application materials well after 5:00 PM but she was not accused and investigated as Professor Reyes was.

50. When the RPT Committee refused to process Professor Reyes's application for tenure, she hired an attorney who sent a letter to then Interim Provost Rodner Wright on October 22, 2014 and a follow-up letter to then General Counsel Avery McKnight on October 30, 2014. Those letters explained the irreparable injury Professor Reyes would suffer from the ongoing discrimination if the RPT Committee did not process her application. Professor Reyes's attorney advocated that it was not in good faith to recruit Professor Reyes under the guise that her application for tenure would be reviewed in her sixth year and then deny tenure without review. After Professor Reyes's attorney sent letters opposing the race, gender, and national origin discrimination, Interim Provost Wright retaliated against Professor Reyes by subjecting her to an official Division of Audit and Compliance ("DAC") investigation over the unsubstantiated, alleged five-minute late submission of a 5:00 PM non-deadline, which Professor Reyes insisted that she met.

51. Three members of the RPT Committee were interviewed during the DAC investigation: John Duncan, Joe Grant, and Phyllis Taite. Their interviews were audio recorded. In those interviews, they attempted to corroborate the alleged late submission; however, none of them were present when Professor Reyes submitted her application.

52. Then Associate Dean, Professor, and RPT Committee member Joan Bullock, the one who made the initial false allegation of late submission, did not submit herself to an interview. Instead, she provided a self-serving written statement in which she claimed that she stopped by Professor Reyes's office, early in the afternoon on the day when she was supposed to submit her materials, and Professor Reyes was still working on her application. In her written statement, Associate Dean Bullock gratuitously and falsely alleged that Professor Reyes "grunted" at her. Although Associate Dean Bullock was present in the law school building, she did not make herself available to receive Professor Reyes's materials. Instead, she assigned the most junior program assistant, Evett Collins, someone under her supervision, to receive Professor Reyes's application and supporting materials (3 large binders and 25 small binders as required).

53. Associate Dean Bullock and Professor Duncan persuaded Ms. Collins, the program assistant who was designated to receive the materials, to go along with their allegation of late submission. They got her to say that Professor Reyes submitted her materials five (5) minutes after 5:00 PM (not the published deadline). They also tried to get Professor Reyes's program assistant, Celia Westbrook , who was also present when Professor Reyes submitted her application, to go along with their ploy. However, Ms. Westbrook refused and told the truth during the DAC investigation. Thereafter, Associate Dean Bullock, her supervisor, retaliated against her with the lowest evaluation Ms. Westbrook had ever received.

54. Ms. Westbrook complained to the DAC that she was subjected to retaliation after she was promised that she would not suffer retaliation if she told the truth during the DAC investigation of the timeliness of Professor Reyes's application for tenure. After

Ms. Westbrook's repeated requests for an investigation of the retaliation against her by then Associate Dean/Professor Joan Bullock, the DAC conducted an investigation and reviewed the evaluations provided by three of the faculty members whom Ms. Westbrook assisted. All three (Professor Randy Abate, Professor Pat Broussard, and Professor Reyes) provided individual evaluations with very high scores; therefore, Associate Dean Bullock had no basis to give Ms. Westbrook the low scores she assigned.

55. According to records of the DAC investigation of Ms. Westbrook's complaint of retaliation, when the DAC investigator interviewed Professor Patricia Broussard, Professor Broussard stated that she gave Ms. Westbrook high scores in her evaluation; however, she also stated that she wanted to give Ms. Westbrook lower scores but was afraid that Ms. Westbrook may file a complaint against her. At the point when Professor Broussard was interviewed, Ms. Westbrook had never complained about her evaluation.

56. The FAMU Division of Audit and Compliance ("DAC") found that Ms. Westbrook's complaint of retaliation by Associate Dean Bullock was corroborated by the evidence, including because Associate Dean Bullock decreased Ms. Westbrook's evaluation points and increased the evaluation points of Ms. Collins, the program assistant that provided the unsubstantiated five-minute allegation.

57. Ms. Westbrook, a woman of Brazilian, Latin American origin, resigned from the FAMU College of Law a couple of weeks before the 2022-2023 academic year began. Ms. Westbrook worked in the FAMU College of Law for twelve (12) years and witnessed the ongoing discrimination, harassment, hostilities, and workplace mobbing that

Professor Reyes endured during over a decade when Ms. Westbrook was assigned as Professor Reyes's program assistant. Ms. Westbrook was also targeted.

58.  Three (3) professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant) rushed to review Professor Reyes's evidence and professional responsibility classes right at the beginning of fall 2014; they knew, by that point, that there was a late submission ploy underway to stop processing Professor Reyes's application for tenure. Stopping the tenure process meant that the four (4) evaluations by these three (3) professors were the only peer teaching evaluations available for Professor Reyes's fall 2014 classes. RPT Committee Chair John Duncan refused to give Professor Reyes the four (4) peer teaching evaluations from Professors Broussard, Cavazos, and Grant. This was another violation of the process. Professor Reyes was also left in the dark about the false and negative comments those three (3) professors stated in those four (4) evaluations; therefore, she did not have a chance to refute what they stated.

59. The individual professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant), the teaching subcommittee, and the RPT Committee violated the mandate in the CoL Faculty Handbook that required that class observers meet with the professor to provide feedback. None of the three (3) professors (Broussard, Cavazos, and Grant) met with Professor Reyes.

60. The RPT Committee also considered and gave credit to unsubstantiated allegations made by Professor Patricia Broussard during the RPT Committee meeting and in her peer teaching evaluation about what students allegedly told her.

61. Professor Broussard did not disclose to the RPT Committee that she told students in Professor Reyes's fall 2014 evidence course to complain about Professor

Reyes to then Associate Dean Darryll Jones, who then instructed them to file written complaints against Professor Reyes.

62. In a repeated and ongoing pattern of discriminatory and hostile conduct toward Professor Reyes, Professor Patricia Broussard negatively interfered with Professor Reyes's relationships with students and empowered students to question Professor Reyes's teaching methodology and disrespect her. Professor Broussard informed students that Professor Reyes was applying for tenure, something that Professor Reyes had not shared with students.

63. After Professor Pat Broussard sent students to complain to then Associate Dean Darryll Jones about Professor Reyes, four (4) students, out of seventy-four (74) students in her fall 2014 evidence course, submitted written complaints, at the beginning of fall 2014. Neither Professor Broussard nor Associate Dean Jones ever discussed the students' allegations with Professor Reyes.

64. As with the false and unsubstantiated allegation of five-minute late submission, the RPT Committee denied Professor Reyes an opportunity to respond to the ploy to use the four (4) student complaints in her tenure process. Professor Reyes learned about this ploy after a student warned her, on February 11, 2015, the date when the teaching subcommittee disclosed the four (4) complaints to the entire RPT Committee. According to the student, J.S., the ringleader of the four (4) complaints was encouraging students to complain about Professor Reyes and telling them that there was a meeting that day "to get her fired." The student said that the ringleader was openly saying this in Professor Broussard's class. The ringleader was close to Professor Broussard and Professor Jennifer Smith. Professor Reyes did not know when the RPT Committee was

21

meeting but students knew when and why they were meeting; this was evidence of the violations of the "confidentiality" of the process.

65.  The teaching subcommittee, under the leadership of Professor Nicola ("Nicky") Boothe-Perry, a member of the majority clique, presented information about the four (4) student complaints to the RPT Committee at the last minute. The members of the RPT Committee who were blindsided with this new material did not have a meaningful opportunity to argue that it was a violation of the process to consider this type of student complaints. Professor Boothe-Perry did not notify Professor Reyes that the student complaints would be added to her tenure file, which was a violation of due process. When Professor Reyes learned of the ploy, she urged the RPT Committee to consider the potential repercussions for the four (4) law students whose frivolous complaints and allegations were going to become part of the record.

66. During its deliberations, the RPT Committee did not attach and did not consider a memorandum Professor Reyes provided to the RPT Committee on February 24, 2015 (with Exhibits), in response to the four (4) student complaints. The negative comments in those four (4) complaints were highlighted in the teaching assessment of Professor Reyes's tenure report. However, the majority clique refused a suggestion by some Committee members that, if those four (4) complaints were going to be added and considered, the total student evaluations from fall 2014 should be added and considered. Those evaluations were not yet available when Professor Reyes applied in fall 2014 but were available in spring 2015 by the point the four (4) complaints were added to her tenure file (in violation of the rules).

67.  RPT Committee Chair John Duncan selected the members and chairs of three (3) subcommittees to review Professor Reyes's teaching, scholarship, and service. On repeated occasions Professor Reyes requested information about the composition of the subcommittees, but Chair Duncan refused to provide this information, just like he refused to provide Professor Reyes the information she was entitled to receive immediately before and during the tenure process. She finally received the list of RPT subcommittees in investigation records provided to her by the FAMU Division of Audit and Compliance ("DAC"). The chairs of the subcommittees were: Nicola Boothe-Perry (teaching), Bill Henslee (scholarship), and Shiv Persaud (service). None of the chairs of the subcommittees ever requested to meet with Professor Reyes. Chair Duncan selected chairs and members of subcommittees who went along with the ploys (by action or inaction). Upon information and belief, the following full professors were excluded from Professor Reyes's tenure subcommittees: Professor Randall Abate, Professor Robert Abrams, Professor Ron Griffin, Professor Rhonda Reaves, and Professor Omar Saleem. However, they were still members of the entire RPT Committee. The subcommittees wrote the teaching, scholarship, and service sections of the RPT Report.

68. Professor Nicky Boothe-Perry, the chair of the teaching subcommittee, was supposed to visit Professor Reyes's Professional Responsibility class in fall 2014, but she never did. She also never responded to Professor Reyes's email in which she asked her if she was going to visit her class in fall 2014. Professor Boothe-Perry did not visit Professor Reyes's class in spring 2015. Professor Boothe-Perry did not give Professor Reyes copies of the class observation forms that were provided to her during

the tenure process (fall 2014 and spring 2015). Professor Boothe-Perry never communicated with Professor Reyes to give her feedback about her peer teaching evaluations during the tenure process. The teaching subcommittee waited until the last minute (February 11, 2015) to slip in the information about the four (4) student complaints in its report. At that point, the RPT Committee was told that a vote had to be taken on February 25, 2015 and the final report had to be assembled and provided to Dean Pernell by February 27, 2015.

69. The scholarship subcommittee was chaired by Professor William ("Bill") Henslee, someone who had never gone through a tenure process because he was granted tenure upon being hired, as a "founding faculty" associate professor, by inaugural Dean Percy Luney, who knew him personally. Upon information and belief, Professor Henslee wrote (or guided) the scholarship report that dismissed the merit of two of Professor Reyes's law review articles and ignored one of her other articles in clear violation of the rules, which required that all articles Professor Reyes submitted should be considered in the scholarship assessment.

70. Some years before Professor Reyes applied for tenure, Professor Henslee told Professor Reyes that he was denied promotion to full professor because he is a White man. He told her that he was going to sue if they denied him again. However, during Professor Reyes's tenure process, Professor Henslee gained semi-insider status by participating in the ploys against Professor Reyes with the majority clique.

71. In yet another violation of the tenure process, Professor Lundy Langston, the woman who silenced Professor Ronald Griffin (by filing a complaint against him) when he argued against the race discrimination during Professor Reyes's tenure process in

fall 2014, took charge of the outside reviewer selection process with her co-chair, Professor Deleso Alford Washington. After Professor Reyes received excellent external reviews of her scholarship from law professors in top-ranked law schools, Professor Langston, at the last minute, slipped in a negative external review by a Black female law professor, from a lower ranked law school, whose area of expertise is critical race theory. Professor Randy Abate stated, in a memorandum to Dean LeRoy Pernell, that the external reviewer was not vetted through the Outside Reviewer Selection Subcommittee process. That external reviewer provided the only negative external review of Professor Reyes's scholarship.

72.   The majority clique that took control of the tenure process, inappropriately placed great emphasis on the highly critical external review by the critical race scholar, someone who did not disclose in her external review that she and her friend, a self-described Afro-Latina law professor, both attacked Professor Reyes personally when they were all participants in the *Defining Multiracialism and its Impact on the Law* panel during the 2014 Southeastern Association of Law Schools Annual Conference. This was during the summer before Professor Reyes applied for tenure. The two professors mocked Professor Reyes for proposing that Hispanic/Latino has become a race and should be considered for inclusion in the racial categories of the next U.S. Census (the 2020 Census). Immediately after the panel, Professor Reyes approached the critical race theory scholar to introduce herself; the professor responded in a rude and dismissive manner. She told Professor Reyes, in what Professor Reyes perceived as a threatening tone, "you should tell LeRoy Pernell, your dean, that I said hello. He and I

go a long way back." During the tenure process, Professor Reyes did not know that this professor had become part of the internal ploys.

73.   There were additional ploys as part of Professor Reyes's tenure process. The ploys stated in this complaint are only a representative sample of the ongoing, severe and pervasive hostilities and indignities Professor Reyes has faced for years. On April 24, 2015, Professor Reyes submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to FAMU's Office of Equal Opportunity Programs ("EOP") against members of the 2014-2015 RPT Committee who discriminated against her, harassed her, and made the tenure process as hostile as possible. The majority clique did not want a non-Black Latina from Hispanic origin to join the group of tenured professors.

74.   FAMU's EOP Director, Carrie M. Gavin, did a sham investigation of Professor Reyes's Charge and dismissed it. Professor Reyes documented the flaws in Ms. Gavin's sham investigation in a memorandum dated September 8, 2015, which Professor Reyes submitted to then President Elmira Mangum requesting review of the decision. On September 14, 2015, the then FAMU General Counsel, Avery McKnight, responded that there was no appellate procedure to review the EOP investigation.

75.   At the end of the RPT Committee review, the majority clique and their allies recommended denial of tenure to Professor Reyes. Dean LeRoy Pernell, after conducting an independent evaluation of the application and reviewing dissenting reports that advocated for tenure, recommended that Professor Reyes be granted tenure. He concluded that the majority in the RPT Committee did not provide a rational basis for its conclusion (recommendation). He also found that the RPT Report and

Recommendation issued by the RPT Committee did not set forth a rationale that supported the conclusion (recommendation).

76. The University T&P Committee, with Professor Broussard as the representative of the College of Law and Dr. Michael Abazinge as Chair, followed the lead of the RPT Committee.

77. Provost Marcella David, an experienced, accomplished law professor who had recently joined FAMU as provost, knew how to review an application for tenure by a law professor and did an independent review of Professor Reyes's application. Provost David and President Elmira Mangum recommended that Professor Reyes receive tenure. Professor Reyes's tenure was approved on June 10, 2015.

### The Racial Animus against non-Black Latinas in the FAMU College of Law

78. Comments about race, color, and national origin have been prevalent in Professor Reyes's experiences at FAMU. There has also been a race-sex/gender aspect to the ongoing discrimination. There is a history of discrimination against Hispanics-Latinas in the College of Law. Carmenelisa Perez-Kudzma, a Hispanic-Latina legal writing instructor, complained that she was being discriminated against by a Black woman, the then director of the legal research and writing program; her contract was terminated. Professor Reyes observed how Wanda Aviles, a Hispanic-Latina executive assistant who worked in the Dean's Suite, went through similar discrimination and hostile work environment as Professor Reyes although for a shorter period of time because she resigned due to the hostilities. Ms. Aviles described to Professor Reyes how a group of Black women targeted her when she was the only non-Black woman in the Dean's Suite. She also described how another Latina staff member adopted a Black

27

identity and was accepted by the majority clique. Ms. Aviles also described how Associate Dean Darryll Jones and Associate Dean Reginald Green joined in efforts to sabotage Ms. Aviles to gain favor with the Black women. Associate Dean Jones also raised his voice at Ms. Aviles in what she considered an abusive tone. Associate Dean Markita Cooper did not step in to help Ms. Aviles. Dean Pernell did not respond to Ms. Aviles's requests for a meeting with him.

79. Associate Dean Jones has also been abusive toward Professor Reyes for years. By targeting Professor Reyes he has bonded with the Black women who harass her. Associate Dean Jones has constantly rejected Professor Reyes's Hispanic/Latina/o race self-identification. According to him, she is White Latina.

80. After Professor Reyes accepted the offer to join the FAMU Law faculty, during a visit to look for housing she stopped by the law school and was introduced by a staff member to Professor Rhoda Cato, a more senior faculty member, a Black woman. Professor Cato's first comment to Professor Reyes was: "So you are the wise, Latina diva they hired." Professor Reyes was hired around the time of Justice Sonia Sotomayor's confirmation hearing, when Justice Sotomayor was attacked and chastised for her comment that a wise Latina judge may reach a different result than a wise judge of a different background and experience. Professor John Duncan's first comment to Professor Reyes when she joined the faculty was: "We are going to have fun with you." Professor Reyes found the comments inappropriate and odd but did not say anything.

81. Professor Patricia Broussard, during Professor Reyes's first weeks on the job, kept referring to Professor Reyes's Latina identity as the basis for her hiring. She seemed focused on and bothered by Professor Reyes's Hispanic/Latina identity.

28

Professor Reyes finally responded that she was qualified for the job beyond her Hispanic/Latina identity. Professor Broussard also told Professor Reyes that her daughter dated a man from Latin America, but emphasized that he was Black.

82. Professor Lundy Langston told Professor Reyes that the reason why the Black female professors were hostile toward her was because of her hair. She explained that her straight hair and light complexion means she is White. Professor Langston also told Professor Reyes that she identifies with her Dominican (someone from the Dominican Republic) hairdresser because they have the same hair texture and, as such, they share a racial connection. Professor Reyes does not have the same hair texture as Professor Langston and had no idea that her hair and skin color were being scrutinized.

83. The comments about race, color, and national origin distinctions continued year after year. It has taken Professor Reyes years working at FAMU to understand how "code language" is used by some Black faculty members. For example, some Black professors, primarily some of the ones who constantly targeted Professor Reyes, often responded to Professor Reyes's suggestions during faculty meetings with the phrase "this is a Black school." Eventually, Professor Reyes realized that this comment was meant to silence her and to signal to other faculty members that Professor Reyes should not comment because she is not Black.

84. There were also comments about a caste system depending on the national origin of immigrants. Black immigrants and immigrants from countries that are deemed Black are preferred. There is also a preference for dark skin color if someone is not Black. Related to this, Professor Reyes also learned that some Black faculty members divide Latinas/os between "Black Latino" and "White Latino." Some Latina/o students

shared with Professor Reyes that Professor Jeremy Levitt, during class, shamed Latina/o students into picking between the Black and White races after they initially self-identified as Hispanic/Latina/o. Hispanic/Latina/o students also shared with Professor Reyes that this questioning feeds racial conflict within the student body.

### Professor Reyes Endures Retaliation When She Opposes Race Discrimination against Hispanic/Latina/o Students

85. Administrators have not addressed the race-based discrimination against Hispanic/Latina/o students even though it has been brought to their attention by students. As early as October 31, 2008, G.F., a Hispanic student, filed a complaint based on race and national origin discrimination with FAMU's EOP Office against Professor Jeremy Levitt. On December 19, 2008, EOP Director Carrie Gavin sent a letter to the student advising him that she recommended that the complaint be dismissed in its entirety. On December 19, 2008, the student responded to Ms. Gavin stating: "I am amazed that the complaint is dismissed given the amount of persons and information provided to your office. I am also surprised a visit to our school never took place. I had previously shared my concerns regarding a less than thorough investigation. I still share this sentiment."

86. On May 13, 2021, HALSA Board members met with Dean Deidré Keller to raise some of the discrimination issues they face because they are Hispanics/Latinas/os/x. They also told her that they want Professor Reyes to be treated the same as other tenured professors. As of the date of this amended pleading, Dean Keller has not followed up with the HALSA Board or Professor Reyes about the negative experiences that were discussed during that presentation over two years ago.

87. In fall 2021, HALSA was not invited to join a domestic violence and breast cancer event organized by students in Professor Lundy Langston's domestic violence workshop in conjunction with the Black Law Students Association ("BLSA") and the Women's Law Caucus ("WLC"). Professor Jennifer Smith is BLSA's faculty advisor and Professor Patricia Broussard is WLC's faculty advisor. Professor Langston sent an email to the faculty announcing the event. Professor Reyes replied that she supported the event but thought it was a missed opportunity not to have invited HALSA because statistics showed that domestic violence against women rose during the Covid pandemic shutdown and breast cancer is the most common form of cancer among Latinas. Professor Langston got defensive and mischaracterized Professor Reyes's email as an attack on the work of the Black female students who organized the event. Unbeknown to Professor Reyes, Professor Langston copied two Black female students in the email to the faculty. After that, HALSA Board members reported to Professor Reyes that they were being questioned by Black female students about Professor Reyes's email in a very confrontational manner. Professor Reyes advised the HALSA Board members to send students to talk with her but none reached out to her.

88. In spring 2022, HALSA was excluded from co-hosting with BLSA a Lunch and Learn Zoom session with the Miami-Dade Public Defender's Office, which extended the invitation to both organizations. When Professor Reyes complained about the exclusion, Director Gary Harrington said it was because HALSA was not eligible due to a vacancy in the HALSA Board. There was no rule about this. Dean Keller went along with the exclusion of HALSA.

89. During a meeting with faculty on April 27, 2022, Dean Keller and her administrative team presented data, charts, and analysis on bar passage for Black graduates/students. Professor Reyes asked whether the same data was available for Hispanic/Latina/o/x graduates. Dean Keller responded that the data was available but they did not analyze it. Professor Reyes requested that a similar analysis be conducted for Hispanic/Latina/o/x graduates. As of the date of this pleading, that analysis has not been provided to the faculty.

90. On October 20, 2022, Professor Jennifer Smith harassed W.M., a student in Professor Reyes's fall 2022 evidence course. Professor Smith was not supposed to be in the classroom at the time the student entered to get ready for Professor Reyes's class. The student filed a complaint against Professor Smith and the FAMU Office of Compliance and Ethics ("OCE") issued a report finding that Professor Smith retaliated against the student, including by filing a complaint against her for the purpose of having the student report the complaint on her bar application. Professor Smith described the student as "one of reyes' students (Hispanic blonde)," "Aggressive rude." Professor Patricia Broussard participated as a witness on behalf of Professor Smith in the investigation with allegations about what she allegedly heard students say about W.M. in bathroom stalls. The OCE did not allow Professor Reyes to participate as a witness in the investigation on behalf of the student even though Professor Reyes had relevant information, including what students told her immediately after the incident happened, right before her evidence class and the harassment by Professor Smith. Professor Smith used the investigation as an opportunity to make heinous, defamatory allegations about Professor Reyes.

91. The fact that Professor Reyes opposes discrimination on behalf of students who are or are perceived to be Hispanic/Latina/o/x students and HALSA, as HALSA's faculty advisor, has made her a target of additional retaliation.

**The Majority Clique Pitted "Black Latina" vs. "White Latina"**

92. A year after Professor Reyes was hired as a tenure-track assistant professor, the majority clique pushed for a legal writing instructor, a Latina who self-identified as Black, to be elevated to the tenure track faculty. Some professors and students reported that they did not know that the professor was Latina. Professor Reyes did not know she was Latina. Professor N.N. had changed her name and was primarily using the African name she adopted. When Professor N.N. applied to become a tenure track faculty member, she distributed documents to the faculty explaining that she changed her name to denote her African ancestry and moved from College Park to Pine Hills to be in a Black neighborhood. She emphasized her Black racial identity during the hiring process.

93. Professor Reyes greeted Professor N.N. when she was about to give her "job talk" to the faculty. Professor Levitt interrupted and physically got between Professor Reyes and Professor N.N. After that, Professor N.N. and Professor Reyes spoke briefly when they were alone one evening in the faculty suite. Professor Reyes perceived that Professor N.N. felt she had to stay away from Professor Reyes in order to gain favor with the majority clique. The more some professors, including Pat Broussard and Ann Marie Cavazos attacked Professor Reyes, the more they supported Professor N.N. They even wrote a workbook with her. This is how some Black faculty members divide Latinas/os.

94. During a faculty meeting, Professor Jeremy Levitt made it a point to correct the FAMU 2012 Self-Study, which the faculty was preparing to present to the ABA, to describe Professor N.N. as "Black Latina" and not as "Latina." Professor N.N. was present at the meeting but said nothing. During the meeting, Professor Reyes asked whether the ABA had a separate category for "Black Latino." Professor Darryll Jones looked at Professor Reyes with disdain and asked her what kind of Latina she is. Professor Reyes responded that she self-identifies just as Latina, but Professor Jones asked her again what kind. Professor Reyes responded that she would need some type of DNA test to tell him more. Professor Jones, Professor Levitt, and other members of the majority clique want Hispanics/Latinas/os/x to choose between a Black and White racial identity thereby disappearing the group racially. And, their preference is for Black Latinas/os.

95. Professor Levitt reignited the issue of Black Latina versus White Latina again on October 23, 2019 when he viciously attacked Professor Reyes in a racial and gender attack that was worse than his prior racial attacks against Professor Reyes. As part of his abusive emails, he falsely accused Professor Reyes of rejecting Professor N.N.'s "self-designation as Black and Latina." He characterized Professor Reyes as a "White Latina" with "white privilege," and attempted to once against pit her against Professor N.N., a "Black Latina" who was no longer working in the law school. The attack was particularly heinous because Professor Levitt falsely accused Professor Reyes of attacking Professor N.N.'s racial self-identification. This was character assassination in a political climate where those types of allegations can derail Professor Reyes's career. Professor Levitt copied the entire faculty in his abusive and defamatory email.

96. Professor N.N. is no longer in the FAMU College of Law. Professor Reyes was alienated from Professor N.N., another Latina professor, due to the race division that was fueled by the majority clique. This forced racial division was not good for Professor Reyes or Professor N.N.

**Racial Animosity and Discriminatory Treatment against Professor Reyes as "White Latina"**

97. Professor Reyes has been subjected to the constant message that Black professors who discriminate against her perceive her as a White Latina and place that label on her to denote that she is not Black in the Black-White binary of race that they promote. During the DAC investigation, then Associate Dean and Professor Joan Bullock said that Professor Reyes is "White appearing." On April 8, 2020, Professor Jennifer Smith called Professor Reyes a "White Latina" during a presentation when Professor Reyes once again stressed that she self-identifies as Latina without any additional qualifier.

98. Another constant message Professor Reyes gets is that Black ancestry is superior, that Blacks have a superior right to life in the United States than Latinos, and that she is supposed to accept inferior status, including by accepting the discrimination, disparate treatment, and hostilities without complaining. For example, some years ago, Professor Jennifer Smith made a comment during a forum when Professor Smith was a panelist, as she saw Professor Reyes enter with students, that "Asians and Latinos are unintended beneficiaries of the Civil Rights Movement." Professor Reyes responded to the comment by briefly explaining that Latinos participated in the Civil Rights Movement, even if they were not in the South, and Chinese fought against the Chinese Exclusion Acts and racist treatment.

**Black Women Retaliated against Colleagues who tried to Defend Professor Reyes from Race Discrimination**

99. The racial hostility toward Professor Reyes became evident in the closed RPT Committee meetings when the Committee was reviewing Professor Reyes's application for tenure. Professor Ronald Griffin and Professor Randall ("Randy") Abate called out the race discrimination against Professor Reyes. Professor Griffin protested against it during a Committee meeting and Professor Abate documented it in a memorandum he sent to Dean LeRoy Pernell after the RPT Committee, led by the majority clique, recommended that Professor Reyes be denied tenure.

100.    In retaliation against Professor Griffin for opposing the discrimination, on October 1, 2014, Professor Lundy Langston sent an e-mail to then Dean Pernell with copies to his executive assistant, Pamela Leonard, and then Associate Dean Jones complaining about "reprehensible conduct" allegedly exhibited by an "African American male professor," Ronald Griffin, against her during an RPT Committee meeting on October 1, 2014. This was around the time when the majority clique was insisting that Professor Reyes's tenure review should not proceed as a result of the unsubstantiated allegation of late submission.

101.     On October 24, 2014, Professor Langston sent another e-mail that she characterized as "an official complaint" against Professor Griffin "for his [alleged] conduct referring to [her] and other [Black] female colleagues . . . as being malicious, evil, racist, and vile" against Professor Reyes during an RPT Committee meeting on October 23, 2014. Professor Langston stated that Professor Griffin made his statements "while addressing the viewpoints expressed by African American women committee members." Professor Langston sent her complaint to Dean Pernell and copied the

36

University President, the Interim Provost, the Board of Trustees' attorney, the University EEO Officers, the General Counsel, Chair Duncan, Associate Dean Jones, and Pamela Leonard (one of the Black women who was hostile to executive assistant Wanda Aviles when they worked together in the Dean's Suite; Ms. Leonard was also hostile to Professor Reyes since the hiring process when she delayed processing Professor Reyes's moving paperwork).

102.    In her complaint, Professor Langston described, with much verbosity, a scenario of "African American women committee members" breaking down and "sobbing, loudly" after Professor Griffin allegedly made his comments. "Two other African American women" allegedly "walked out of the meeting." Professor Langston claimed that the words that Professor Griffin allegedly used were "actionable as slanderous." She went on to define each term and seemed to conclude that Black women cannot be racist because of the racism they themselves experience.

103.    Professor Langston used her complaint against Professor Griffin to silence Professor Griffin's opposition to the discrimination and taint Professor Reyes's tenure process by potentially creating additional racial animus against her. Professor Langston, in violation of the FAMU EOC process, submitted her complaint about what she alleged happened in Professor Reyes's tenure meetings to decision-makers that were supposed to review and make recommendations on Professor Reyes's application for tenure at subsequent levels of review. Rather than limit herself to submitting her complaint to the University Equal Opportunity Programs Officer, which is the procedure specifically prescribed in the University Regulation, she sent her complaint to Dean Pernell, an African-American man, and copied the President, an African-American

woman, the Interim Provost, an African-American man, the Board's attorney, another African-American woman, the Associate Dean for Academic Affairs, an African-American man; the Chair of the RPT Committee, an African-American man, and Dean Pernell's executive assistant, an African-American woman. By including Ms. Leonard, Professor Langston riled up even the Black female staff, the majority of staff members in the law school.

104.     Professor Langston did not stop there. She and some of the other Black female faculty members complained behind the scenes about Professor Reyes and claimed that they were afraid of her. There were email exchanges with EOP Director Carrie Gavin and Human Resources liaison Adrienne Snyder raising all kinds of rumors about Professor Reyes being "dangerous."

105.     Professor Langston effectively silenced Professor Griffin from defending Professor Reyes against future racist attacks. In fact, since then, Professor Griffin distanced himself from Professor Reyes. This is how the retaliation served to alienate from Professor Reyes a colleague with whom Professor Reyes had enjoyed positive interactions.

106.     A junior Black female faculty member, C.H., was also retaliated against for exercising individual, independent thinking and not going along with ploys to harm Professor Reyes. After Professor C.H. was deemed "friendly" to Professor Reyes, the Black women in the majority clique turned against her. Professor Jennifer Smith even questioned Professor C.H.'s "blackness" during a faculty meeting when then Dean Felecia Epps, a Black woman, rushed to stand between Professor Smith and Professor

C.H. in a motion that seemed an effort to stop a physical altercation. Professor Reyes was present when this happened.

**The "Dangerous" White Latina Narrative and Blaming Professor Reyes for Actions she did not even know About When they Allegedly Happened**

107.   Even alleged "visions" have been used to promote the narrative that Professor Reyes is "dangerous." On November 4, 2014, then IT/Security Director Shashi Persaud reported to FAMU Police Officer Kelvin Hunter via email:

> "On Wednesday 10/29/14 at approximately 11:45AM, a law school professor, Jennifer Smith, arrived at the office. Professor Smith told program assistant Evett Collins, that she had a vision that another professor (Maritza Reyes) was going to harm Ms. Collins. Ms. Collins asked Professor Smith how she was going to be harmed and Smith pointed at her face with her hand in the shape of a gun. Professor Smith pretended she was firing the gun, then walked away. Ms. Collins felt significantly threatened by this and was in a state of panic. She reported the incident to law school security."

108.   Director Persaud never told Professor Reyes about Professor Jennifer Smith's violent vision about her or any other complaints against her. She found out when she obtained records of investigations. Those records show the deep racial hatred against Professor Reyes and how turning Professor Reyes into a "dangerous White Latina" conjures up race-based group frenzy, including workplace mobbing.

109.   FAMU's General Counsel Denise Wallace, a Black woman, has also misrepresented Professor Reyes's conduct, including on August 20, 2020, in an email to President Larry Robinson, Provost Maurice Edington, Dean Deidre Keller, and Associate Counsel Shira Thomas, intimating that Professor Reyes contacted the Office of the General Counsel in another university to ask about faculty meetings and sunshine laws when it was not Professor Reyes. This was around the time when FAMU and Dean

Keller were sued by a law student after Dean Keller closed the faculty meetings to students immediately after she became dean.

### Black Men Also Targeted Professor Reyes

110.    In addition to dealing with hostilities from Black women, Professor Reyes has also been subjected to abusive conduct from Black men. For example, Professor Reyes only communicates with Professor Levitt in group emails and she is only around him during faculty meetings because he was highly abusive toward her since she joined the faculty in 2009. When Professor Reyes spoke about Professor Levitt's abusive conduct with Associate Dean Markita Cooper, she told Professor Reyes that she was also dealing with his harassment but, if Professor Reyes told anyone, she would deny it. Basically, Associate Dean Cooper said that she would lie. Therefore, Professor Reyes realized that she could not count on her to help. Professor Reyes had to fend for herself in an abusive workplace where she was more vulnerable than most.

111.    On May 9, 2019, Professor Levitt sent an individual email to Professor Reyes. This was soon after he ridiculed Professor Reyes at a faculty meeting on May 8, 2019, when, upon Professor Reyes's request for credit for her professional contributions, Professor Levitt responded that he was going to give her "a star and smelly sticker or happy face." Professor Levitt's subsequent email was an excuse to start conflict with Professor Reyes, claim offense, accuse her of racism, and insult her because of her race. On May 10, 2019, Professor Levitt accused Professor Reyes of "anti/Black Caucasian critiques of progressive Black men." In that email exchange, he also called Professor Reyes a "white Latin or Hispanic," and termed her response to his attack "[her] defensive and white privileged victim-based response." On May 13, 2019,

Professor Reyes demanded that Professor Levitt stop sending her emails and copied then Interim General Counsel Shira Thomas. Professor Reyes stated in pertinent part:

Jeremy,

You have crossed the line into harassment. I am copying attorney Shira Thomas, FAMU's Interim Vice President and General Counsel, so she can add this record to all the records in the Office of the General Counsel about FAMU Law and what happens here. I **am not** filing a Regulation 10.103 complaint because I have no confidence in the FAMU Office of Equal Opportunity Programs. They and the FAMU Office of the General Counsel have been aware of the hostile work environment in the law school for years. Unfortunately, like the avoidance of dealing with the hazing problem until it became public, the institution has, thus far, ignored the workplace environment problem in the law school. I hope that the selection of a new dean serves to address this cancer that has been killing the law school and harming human beings who find ourselves in a position of vulnerability.

112.     On May 14, 2019, Professor Reyes also put Provost Maurice Edington on notice of Professor Levitt's latest attack. She also notified then Interim Dean Nicky Boothe-Perry, Interim Associate Dean Phyllis Taite, and Associate Dean Reginald Green (Professor Levitt's friend since they were 1L students in law school). Professor Reyes reminded the three of them that they were present when Professor Levitt ridiculed her during the faculty meeting and they, as administrators, said nothing. In her email to Provost Edington and Interim General Counsel Thomas, Professor Reyes stated:

The e-mail below from Jeremy Levitt confirms the latest setup. Jeremy Levitt bullied me at the faculty meeting (on 5/8/19) when we met to discuss the finalists for the dean position. Then, he followed up by e-mailing me. He escalated the situation and, after I defended myself and copied attorney Shira Thomas, he leveled a heinous and false accusation against me by stating that I am "attacking [him] and others on the basis of race and or gender." This is a blatant lie. It is also hypocritical and self-serving, especially after Jeremy Levitt called me a "white Latin or Hispanic" with "white privilege." This is how he and others view me in this workplace.

41

Professor Levitt is accusing me to silence me. I will not remain silent.

\*\*\*

The fact that this situation is happening in an HBCU law school with a publicized mission of social justice is troubling and demoralizing. How would people outside judge what is happening here? This is beyond embarrassing. It is abusive. The University should hire a reputable law firm to conduct an independent investigation of the workplace environment and propose a plan of action to address the mayhem.

113.    On May 15, 2019, Carrie Gavin, FAMU's EOP Director, sent an email to

Professor Reyes asking her if she wanted to file a harassment complaint. Professor

Reyes responded in pertinent part:

Based on my knowledge of how the FAMU Office of Equal Opportunity Programs (EOP) has conducted prior investigations of complaints by law professors and other employees, including me, I currently have no intention of filing a Regulation 10.103 complaint. You should remember what happened when then law professor Barbara Bernier filed her internal complaint against then Associate Dean Jeremy Levitt. The way the EOP conducted its investigation, reached a conclusion, and wrote it up provided cover for what Jeremy Levitt was doing. He got away with it and continues to get away with it, with full knowledge by actors at all levels of the institution. The law school and the ones under attack suffered the negative consequences, which some of us as still enduring. The State of Florida paid for the costs of the entire mess and is still paying.

With all due respect, I am not going to spend yet another summer, without pay, dealing with another non-productive, non-objective, sham internal investigation. FAMU is on notice of the hostile work environment and the actions against me. If additional circumstances arise, I may re-assess the need to file a complaint after consultation with legal counsel. In such case, the goal will be to get objective and independent review of my claims.

I understand that the only assistance you are offering is documenting that you told me to file a Regulation 10.103 complaint. I suggest that you go beyond that and finally advise the Provost and the President to hire a reputable law firm to conduct an independent, credible investigation of the hostile work environment in the law school.

114.    After Professor Reyes demanded that Professor Levitt stop sending her

emails, he joined in a group email to the faculty wherein Professor Phyllis Taite

dismissed Professor Reyes's comment and said that the "majority" was in agreement. Professor Reyes has heard the same "majority" comment for years and has come to understand that it is meant to constantly remind her that she is not part of the majority. In response to Professor Taite, Professor Reyes acknowledged her minority status. Professor Levitt then took this opportunity to reply to all faculty attacking Professor Reyes and questioning her race and gender identity.

115.   In summary, Professor Levitt, in his e-mail correspondence dated October 23, 2019, 2:56 PM:

a)   began by insulting Professor Reyes and self-servingly claiming that there were no "EO concerns" raised by his harassment, which Professor Reyes qualified as abusive conduct;

b)   applied some type of litmus test to question Professor Reyes's racial identity;

c)   used a reference to former colleague N.[N.], a self-described Black Latina who was pitted against Professor Reyes, to set up a false race-based accusation against Professor Reyes;

d)   ascribed to Professor the thinking of a Spanish conquistador (Pedro de Alvarado) who was a torturer and mass murderer of indigenous people;

e)   falsely alleged that Professor Reyes admitted not understanding the diversity of Black people;

f)   determined that Professor Reyes does not have the knowledge and experience Professor Reyes claims about "race, ethnicity, color, gender and religion in the US" because, according to Professor Levitt, Professor Reyes's experience is not morally equivalent to his;

g)   labeled Professor Reyes a descendant of the "enslavers" of "[his] people;" and

h)   criticized the definition of Latino that Professor Reyes used in an article in 2008 in the Harvard Law School student newspaper.

116.      Professor Reyes waited three weeks to see if any faculty member or administrator who was copied in Professor Levitt's email responded in her defense or at least asked her how she was feeling after such a vicious and public attack. No one reached out to her. Professor Reyes determined that she must respond; otherwise, her

silence may be deemed an admission of Professor Levitt's false allegations. In today's political climate, the types of race-based accusations Professor Levitt made about Professor Reyes foster hatred and animosity against the non-Black person. They are especially detrimental in professional settings and are used to destroy professional careers.

117.      Professor Reyes prepared a memorandum, dated November 13, 2019, which she submitted to the following: College of Law Faculty, President Larry Robinson, Provost Maurice Edington, General Counsel D. Denise Wallace, and EOP Director Carrie Gavin. In said memorandum, before responding to each of Professor Levitt's vicious racialized attacks, Professor Reyes stated:

> I must respond to Levitt's dangerous and abusive allegations (See Composite Exhibit "A"). He made unsupported accusations and broad misrepresentations about me and what I have stated with the clear intent of harassing me, damaging my reputation, and promoting additional racial animus against me. Therefore, I cannot afford to leave his false allegations unchallenged. This is by no means an academic exchange. This is my response/defense to Levitt's discrimination and harassment, which institutional actors have been aware of. Again, I became his target as soon as I began working here.
>
> ***
>
> The e-mail exchange that led to this memorandum response is a perfect example of how I have yet again been attacked by a member of this law school's faculty, and need to defend myself because, otherwise, the false allegations may be deemed admissions. The lies are spread all over the law school and beyond. This has happened before; therefore, I must respond, preferably in e-mails to all faculty, to try to avoid misrepresentations of what I said or did.
>
> ***
>
> Can you imagine what would happen if I (a Latina) wrote to Levitt (a Black man) the hateful things he writes to me? To put Levitt's attacks against me in context, in his "*Fuck your Breath*" law review article, Levitt stated that hate "means to intensely dislike, harbor extreme hostility, or antipathy toward [another] 'usually deriving from fear, anger, or sense of injury.'" To me, Levitt's e-mails are full of

this hate. What is even more dangerous is that Levitt is using this institution to spread hate and a hate-filled rhetoric against people whom he perceives as not being "the same [as] or even similar" to him – people he places "on different sides of the enslavement and slavery index" [Levitt's words].

118.    Professor Levitt has not attacked any other faculty member with the racist and gendered attacks he has directed at Professor Reyes in plain view of many people, including deans and associate deans. President Larry Robinson and Provost Maurice Edington have been on notice. Professor Levitt has also attacked Professor Reyes in combination of race and gender - "White Latina." Professor Darryll Jones has also joined in attacking Professor Reyes in emails and in meetings. And, Associate Dean Reginald Green, their friend and ally, has also participated in ploys to sabotage Professor Reyes.

119.     Black female faculty members who themselves complained that they suffered gender discrimination from Black men on the faculty, including Professor Joan Bullock, Professor Lundy Langston, Professor Jennifer Smith, Professor Patricia Broussard, Professor Ann Marie Cavazos, Professor Nicky Boothe-Perry, and Professor Phyllis Taite joined with Black men in attacking Professor Reyes for years. In this way, attacking Professor Reyes became a source of Black racial solidarity. Other faculty and staff members follow the lead of the majority clique. That is how workplace mobbing works.

120.    For years, Professor Reyes has advanced that racial hostility causes divisions that should not happen in a law school with the noble mission of the FAMU College of Law. Even as she has faced ongoing discrimination and hostilities, Professor Reyes has worked to bring students of all race, ethnic, and cultural backgrounds

together for a common purpose of serving as catalysts for positive change. The diverse students in the law school are the reason why Professor Reyes has remained. She has helped many students and alumni. In turn, many students and alumni of diverse backgrounds have sought her mentoring and showed appreciation for her teaching and service. Some Black female students have been the most supportive, including because some share Professor Reyes's Christian faith. Many students and alumni have provided moral support and prayers along the years when Professor Reyes has been dealing with the ongoing discrimination, harassment, and hostile work environment, including workplace mobbing.

### The Discrimination, Harassment, Hostile Work Environment, and Retaliation Continued and Escalated After Professor Reyes Received the Tenure She Earned

121.     EOP Director Carrie Gavin's sham investigation of Professor Reyes's EOP Charge during the tenure process, including Director Gavin taking members of the majority clique at their word (even with one-sentence general denials), emboldened them in their ploys against Professor Reyes.

122.     For example, in her EOP Charge, Professor Reyes detailed several documented violations by Professor Broussard. Professor Broussard's response to the Charge consisted of one sentence: "I categorically deny all allegations of Ms. Reyes's Complaint." This was sufficient for EOP Director Gavin to conclude that Professor Reyes's Charge as to Professor Broussard's conduct was unsubstantiated. She did the same thing for all other wrongdoers.

### Professor Reyes Was Targeted Even When She was Visiting at UF Law

123.      The retaliation against Professor Reyes continued even when she was visiting at the University of Florida Levin College of Law ("UF Law") in fall 2015. When

Professor Reyes accepted the invitation to visit UF Law for one semester (right after her tenure ordeal), she remained in the FAMU payroll system. FAMU negotiated with UF Law for a rate they charged to cover Professor Reyes's FAMU salary and benefits. The rate they charged UF Law was higher than what they paid Professor Reyes. Therefore, FAMU received a windfall (over $60,000) which became a line item in the FAMU College of Law's budget. However, for all intents and purposes, Professor Reyes remained a FAMU employee.

124.     In fall 2015, Professor Darryll Jones, who was then Interim Dean, invited the new UF Law Dean to meet with the FAMU Law faculty in Orlando. However, he did not invite Professor Reyes. Professor Reyes learned about the invitation when the UF Law Dean told her, which placed Professor Reyes in an uncomfortable position. To Professor Reyes's recollection, this was the only time a dean from another law school in Florida was invited to visit with the faculty of the FAMU College of Law.

125.     That same semester (fall 2015), FAMU College of Law's Black Law Students Association ("BLSA") hosted UF Law's BLSA. A BLSA member told Professor Reyes that some FAMU College of Law BLSA members were gossiping with UF Law BLSA members about Professor Reyes. Professor Jennifer Smith was the faculty advisor of  the FAMU College of Law BLSA.

126.     Professor Reyes has been serving as faculty advisor of the Hispanic American Law Student Association ("HALSA") for many years. Professor Reyes planned to continue to advise HALSA during fall 2015. She reviewed the Student Handbook rules and confirmed that she could remain as faculty advisor, including because she was still a full-time employee in the FAMU system. UF Law arranged her

class schedule such that she could travel to Orlando to attend HALSA functions. She paid for parking at FAMU College of Law because she planned to attend HALSA events. Professor Reyes worked with HALSA's president to re-certify the organization through FAMU's bureaucratic process. She fulfilled all her duties as faculty advisor for the semester, including attending activities for Hispanic Heritage Month. She put a lot of time and effort into driving from Gainesville to Orlando to attend orientation for HALSA and all major events. She also spent lots of time communicating by phone and email with HALSA's president. UF Law arranged video conferencing so Professor Reyes could meet with HALSA's Board.

127.     Toward the end of the fall 2015 semester, Associate Dean Reginald Green, with the approval of Interim Dean Darryll Jones, instructed members of the HALSA Board to remove Professor Reyes as faculty advisor. Then Associate Dean Joan Bullock was also involved in the ploy. The hostile removal was effected in violation of the University Student Handbook, which required consultation with the faculty advisor prior to removal. Associate Dean Reginald Green, Interim Dean Darryll Jones, and Associate Dean Joan Bullock did not contact Professor Reyes.

128.     The president of HALSA reported to Professor Reyes that she was threatened with HALSA losing funding if Professor Reyes was not replaced. Associate Dean Green instructed then FAMU College of Law Student Affairs Director Fritzlaine Powell not to respond to Professor Reyes's request for information. One of Professor Reyes's ongoing harassers, Professor Patricia Broussard, replaced Professor Reyes as HALSA's faculty advisor without even contacting Professor Reyes. The hostile way in which the hostile removal was orchestrated was meant to humiliate Professor Reyes

48

and ostracize her from HALSA members, the majority of whom were Hispanic students. The institutional actors who participated in the hostile removal caused chaos, confusion, and division within HALSA and nearly decimated the organization.

129. HALSA members reached out to Professor Reyes to find out what was happening. They reported that they were being called into a meeting to elect Professor Broussard as faculty advisor. However, the meeting and vote were being scheduled and conducted in violation of the provisions in the HALSA Constitution. Professor Reyes felt she had a duty to inform HALSA members to be careful and not violate HALSA's internal documents. She sent a couple of emails to HALSA members explaining what she knew about the situation and advising them not to violate HALSA's Constitution. Everything Professor Reyes stated in her emails to HALSA was true and stated in good faith for the benefit and protection of HALSA and its members. For the sake of HALSA, to avoid having the organization be further targeted in efforts to harm Professor Reyes, Professor Reyes did not challenge the removal as HALSA's faculty advisor.

130. In further harassment of and retaliation against Professor Reyes, on November 25, 2015, the day before Thanksgiving, Professor Broussard submitted a false, malicious, and frivolous EOP Charge to the FAMU EOP against Professor Reyes. Professor Broussard alleged retaliation and Title IX stalking. She used the emails Professor Reyes sent to HALSA as the basis for her Charge. Professor Broussard also referenced a video of a faculty meeting and falsely alleged that Professor Reyes "attempted to push her way into [her] space." She also claimed that Associate Dean Green "was so upset by [the video.]"

131.     Associate Dean Green denied that he said what Professor Broussard alleged in her EOP Charge and stated that he did not watch the video.

132.     The video actually showed Professor Broussard blocking Professor Reyes from participation in the counting of votes during a meeting when a White male candidate was being considered for a clinic position. The video also showed that two Black female law professors were much closer to Professor Broussard than Professor Reyes and even made physical contact with Professor Broussard. Professor Broussard did not accuse them of attempting to push their way into her space. The video also showed Professor Cavazos questioning why Professor Reyes was counting the votes. Professor Reyes responded that she also had a right to participate in the counting like Black female professors.

133.     Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith sent emails with copy to all faculty insulting Professor Broussard. Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith called her a "snake" and a "weasel" in emails that were filed in Professor Smith's federal case against FAMU. Upon information and belief, Professor Broussard has only filed an EOP Charge against Professor Reyes. In addition to slanderous accusations against Professor Reyes, Professor Broussard claimed that she was afraid of Professor Reyes and tried to stay away from her when the opposite was true.

134.     Professor Reyes responded to Professor Broussard's EOP Charge line by line. Professor Reyes noted that Professor Broussard's own actions belied her claims of fear and staying away from Professor Reyes. Professor Broussard

participated voluntarily in the hostile replacement as HALSA's faculty advisor. She was not afraid. She constantly looked for ways to harm Professor Reyes including via student situations and student organizations. Professor Reyes's comprehensive response to Professor Broussard's Charge demonstrated the falsity of Professor Broussard's conclusory and defamatory allegations.  Professor Reyes requested that the EOP recommend that Professor Broussard be disciplined in accordance with FAMU Regulation 10.103(6)(d) for knowingly filing a false complaint of retaliation and Title IX stalking and for providing false testimony in the form of false facts alleged in her Charge. Professor Broussard was not disciplined and this further emboldened her to continue to harass Professor Reyes and make false allegations against her.

### The Hostilities against Professor Reyes Became Physical

135.    The hostilities against Professor Reyes have even become physical.

### The "Bump" Incident - Erica Polite
### February 9, 2015

136.    In spring 2015, as Professor Reyes was being tortured in the tenure process (for a second semester), a member of the IT staff, Erica Polite, who had been bringing lunch to Professor Broussard in her office that semester, bumped Professor Reyes on her shoulder as Professor Reyes was walking by her. Ms. Polite had the space available to move to her right and avoid the physical contact. Professor Reyes was literally against a wall and did her best to get against the wall to avoid Ms. Polite.

137.    Three years before that spring 2015 incident, Ms. Polite, a Black woman, screamed at Professor Reyes on the phone, about an IT issue. Professor Reyes reported that incident to Ms. Polite's supervisor, IT/Security Director Shashi Persaud, and avoided Ms. Polite since then. Professor Reyes could not avoid the bump.

51

Professor Reyes reported the bump incident to Director Persaud whose office door was open, right by where the incident happened. He claimed he did not see anything; however, Professor Reyes noticed that there was a surveillance camera and asked to see the surveillance video.

138.    The incident was reported to Associate Dean Reginald Green and Dean LeRoy Pernell; neither of them ever followed up with Professor Reyes. Instead, they escalated the situation by referring it to the FAMU Police in Tallahassee without even consulting with Professor Reyes. This was leaked all over the building and turned against Professor Reyes. Professor Reyes, the perceived "White Latina" was falsely portrayed as the person who reported the incident to the FAMU police against a Black woman.

139.    During her thirteen (13) years teaching in the FAMU College of Law Professor Reyes has never reported any of the many incidents she has experienced as a result of her employment in the law school to a police department (FAMU or otherwise), although she has considered it. Thus far, Professor Reyes has erred on the side of trying to resolve matters internally, unfortunately, to her detriment.

140.    Right after Professor Reyes reported the incident with Ms. Polite to Ms. Polite's supervisor (IT/Security Director Persaud), Professors Patricia Broussard, Rhoda Cato, and Phyllis Taite made a point of exaggerating their efforts to stay far from Professor Reyes as they passed her in the hallways.

**The Blood on the Office Door's Doorframe Incident**
**February 8, 2018**
**&**
**The Removal of the Christian Cross from the Office's Door Handle**

52

141.     On February 8, 2018, Professor Reyes was talking and walking with a student.   When they reached her office, Professor Reyes noticed a stain on the doorframe of her office door. It looked like blood to her, but she did not say this because the student was next to her. The student offered to clean the stain, but Professor Reyes told her that the office cleaning staff would take care of it. Professor Reyes's program assistant, Celia Westbrook, and Professor Rhonda Reaves also saw it. Professor Reaves, as she often did when Professor Reyes was targeted, dismissed it as if nothing happened. The cleaning crew later notified Professor Reyes that they had to report it to their supervisor because it appeared to be blood when they cleaned it. They took pictures. Professor Reyes informed Dean Pernell but he never contacted her about it.

142.     Professor Reyes shared about the incident with her mother and her mother gave her a Christian cross and asked her to put it on her office door handle. Professor Reyes did as her mother told her. Unfortunately, the cross was taken down from the door handle and thrown on the floor several times. The program assistants found the cross on the floor. The cleaning crew also found the cross on the floor and took pictures of the cross on the floor. Professor Reyes took down the cross and placed it on the inside of her office.

**Another Bump Incident – Professor Patricia Broussard**
**Fall 2018**

143.     At the beginning of fall 2018, Professor Broussard bumped Professor Reyes from behind as Professor Reyes was walking back from taking the group faculty pictures. Professor Broussard acted as if it was by accident and Professor Reyes did not say anything. Professor Reyes suspected that Professor Broussard, just like Erica Polite, wanted a reaction from Professor Reyes. For years, the majority clique and their

53

allies have been trying to get a reaction or outburst from Professor Reyes to support the false narrative they have disseminated about her. Professor Reyes has always maintained her composure and professionalism despite the many incidents in the hostile work environment.

### The Elevator Incident - Professors Patricia Broussard and Ann Marie Cavazos
### May 6, 2019

144.     On May 6, 2019, Professor Reyes entered the law school and headed toward the first floor elevators (two side by side) in the first floor lobby to get to the faculty suites in the third floor. As she was nearing the elevator, Professor Reyes saw Professor Joe Grant passing by with a student. Professors Broussard and Cavazos were walking together farther behind them. They were coming from the opposite direction from which Professor Reyes was approaching the elevators. Professor Reyes rushed to get in one of the elevators and pushed the button so the door would close but the door did not close. To her shock, Professors Broussard and Cavazos entered the elevator. Professor Reyes quickly exited the elevator.

145.     Professor Reyes then headed toward the other side of the building to use the elevator in the library. When the elevator door opened, Professors Broussard and Cavazos were standing in front of the door of the elevator with a Black female staff member, Claudine Beale, who has also engaged in hostile actions against Professor Reyes. Professor Reyes exited that elevator and headed away from them. Later, when Professor Reyes reviewed the surveillance video, she saw that, as they were laughing, they were signaling toward the direction to which Professor Reyes headed when she exited the elevator.

146.     The surveillance video of the first encounter by the elevator in the lobby showed Professor Broussard running toward the elevators to push the button and not allow Professor Reyes, who was already in the elevator pushing the button to close the door, to go up. The video also showed how Professor Cavazos looked out by the elevator door as she followed Professor Broussard into the elevator which Professor Reyes quickly exited after they entered.

147.     Professors Broussard and Cavazos are two of the Black female law professors who have been claiming, behind the scenes, at all levels of the University and beyond, that they are afraid of Professor Reyes and seek to avoid her. The surveillance video of the elevator incident demonstrated the falsity of their alleged fear. The video showed that they ran after Professor Reyes to be alone with her in the elevator. The video also showed that Professor Reyes did her best to avoid being alone with them for fear that they may harm her or falsely accuse her of doing something to them.

**By the Elevator Incident – Professor Jennifer Smith**
**January 13, 2022**

148.     On January 13, 2022, as Professor Reyes was headed toward her evening evidence course, from the third floor faculty offices' door, Professor Jennifer Smith exited the elevator ahead of where Professor was walking. Rather than continue walking, Professor Smith pulled to the side, waited for Professor Reyes to pass, mumbled something to Professor Reyes, and walked behind her so as to intimidate her. There is also a surveillance video of this incident.

**The Student Organizations Event Incident  - Professor Patricia Broussard**
**March 28, 2022**

149.     In spring 2022, Professor Broussard once again found a way to make a law school experience hostile for Professor Reyes, in front of students who had no idea of the ways in which Professor Broussard has harassed Professor Reyes for years. Professor Reyes was scheduled to serve as one of several panelists in a panel organized by several student organizations, including HALSA. A student representative of the Women's Law Caucus ("WLC") invited HALSA, at the last minute, to join in a diversity and inclusion grant application to the Florida Bar Young Lawyers Division with other student organizations that were invited before HALSA was invited.

150.     The WLC student representative noted in the invitation that WLC became aware of complaints that HALSA was being excluded from joint events. This was after Professor Reyes raised the issue of HALSA's exclusion from the domestic violence event organized in conjunction with Professor Langston's domestic violence course, in which the WLC joined with BLSA. This is the situation that the WLC student representative referenced as the reason for inviting HALSA to the joint diversity and inclusion event.

151.     Professor Reyes was glad that her raising the issue opened an opportunity for inclusion, for the benefit of all students. Professor Reyes advised the HALSA president and Board to accept the invitation even if it was last minute. Because it was at the last minute, HALSA was the only student organization that was noted on the application as pending approval by its Board, which was not fair to HALSA. Nonetheless, HALSA accepted the invitation and designated the HALSA vice president as the student representative for the planning committee of the joint event.

152.     Each student organization selected a panelist to represent the organization. HALSA designated Professor Reyes. The Caribbean Law Students Association designated Professor Kim Crag-Chaderton, the organization's faculty advisor. Other student organizations designated attorneys. Because Professor Broussard is the WLC's faculty advisor, Professor Reyes did her best to ascertain whether Professor Broussard was going to serve as moderator or panelist without directly asking students about it. Professor Reyes asked the HALSA student representative in the planning committee to ask for the name of the moderator. The HALSA student representative informed Professor Reyes that the WLC was not releasing the name.

153.     On Wednesday, March 23, 2022, the WLC student representative sent an email to all panelists with the questions for the panel. The list of email recipients did not include Professor Broussard. On Friday, March 25, 2022, Professor Reyes replied to the student's email and stated:

> Thank you for your email and for the questions. I look forward to contributing and participating in a diverse and inclusive event for the benefit of all students.
>
> I have not heard from the moderator of the panel. Who is it?
>
> Please send us the structure of the panel. Do we each say opening and closing remarks? How long do we each get for that? How long do we each get to respond to each question, etc.
>
> As for our bios, are those going to be read? If so, does someone from the student organization that submitted our name get to read it (for purposes of diversity & inclusion)?
>
> The panel is on Monday, so I would like to receive this information today, Friday, if possible.

154.     On Friday, March 25, 2022, the WLC student representative responded that the moderator would be Courtney Jones, a Black female attorney who works in the

FAMU College of Law's Office of Career Planning and Development. The student also provided the itinerary, which stated: "6:15 - 6:30 PM - Introduction of event and panelists by Moderator."

155.     On Monday, March 28, 2022, at 6:10 PM, Professor Reyes arrived in the classroom where the diversity and inclusion event was being held. When she opened the door, she saw all the panelists already seated and, to her shock, Professor Broussard was standing at the podium reading the bios of the panelists. Rather than leave the seat farthest from the podium empty for Professor Reyes, the only empty seat in the panel table was right next to the podium, right below from where Professor Broussard was standing. Moreover, to get to the seat, Professor Reyes had to walk behind all the seats where the other panelists were already seated.

156.     Professor Broussard started the panel early with full knowledge that Professor Reyes was not yet present. Professor Broussard made a comment about Professor Reyes being late, which prompted Professor Reyes to explain, by reference to the printout of the email she received, that she was actually early. When Professor Broussard read Professor Reyes's bio, she shortened it. She also said that she was going to deviate from the questions that were provided and asked her own questions.

157.     During the panel, Professor Broussard stood over Professor Reyes and mocked Professor Reyes about wearing a mask and not wanting to be videotaped. When Professor Reyes started to get up to participate in the panel group picture, Professor Broussard poked Professor Reyes on her left shoulder-arm with her finger and glasses and questioned why Professor Reyes was going to be in the picture if she

did not want to be on video. Professor Reyes had to explain the obvious, that video is not the same as a picture and she could take off her mask briefly to take a picture.

158.     Professor Reyes did her best to maintain her composure and not allow Professor Broussard to intimidate her with attorneys from the community, alumni, and students present. Most of the students and alumni were current and former members of the WLC. A few of them had been disrespectful to Professor Reyes in her evidence course (in different semesters). This has been a consistent circumstance for years; a few students who are close to Professor Broussard and her allies are rude and disrespectful toward Professor Reyes. One of those disrespectful students, including via email (in fall 2021), was the WLC Black female student representative who gave Professor Reyes the itinerary information and did not inform her of the change of moderator or start time for the panel. During the event, Professor Reyes felt uncomfortable and tense. Immediately after the event, Professor Reyes felt sick.

**The Review for Promotion to Full Professor Became a Continuation of the Discriminatory Review for Tenure and the Ongoing Hostile Work Environment**

159.     The effective date of Professor Reyes's promotion to associate professor was August 6, 2012. Her tenure was approved on June 10, 2015. Professor Reyes planned to submit her application for promotion to full professor as soon as she qualified under the University rule which required that she serve five (5) years in rank as associate professor. That meant she was qualified to apply in 2017.

160.     In 2017, FAMU adopted the Interfolio electronic application system which required that the Office of the Provost provide the information to access the system. Professor Rhonda Reaves was chair of the RPT Committee during the 2017-2018 academic year. Professor Reyes asked Professor Reaves for the Interfolio access

information on several occasions and Professor Reaves responded that she did not receive it. Professor Reyes was disappointed that Professor Reaves was not more proactive about getting the information in her role as chair of the RPT Committee. Professor Reaves knew that a promotion was the only way for Professor Reyes to get a raise, which she had not received since her last promotion in 2012. Rather than demand that Professor Reaves ascertain and provide the Interfolio access information, Professor Reyes did not raise the issue again and gave up on applying that year, which meant foregoing a 15% pay raise.

161.    Professor Reyes once again began asking the Office of the Provost for the Interfolio information the next year, in summer 2018. That year, Professor Rob Abrams was appointed chair of the RPT Committee. Professor Reyes finally received the Interfolio case access information at the last minute in fall 2018 and applied by the published deadline. She became the first professor from the College of Law to apply for promotion via the new online Interfolio platform. She had to figure out the system on her own.

162.    All ten (10) tenured, full professors who participated in the review of Professor Reyes's application for promotion to full professor were also members of the RPT Committee that reviewed Professor Reyes's application for tenure. They were:

   i.   Rob Abrams, a White man

   ii.  Nicky Boothe-Perry, a Black woman

   iii. Pat Broussard, a Black woman

   iv.  Ann Marie Cavazos, a Black woman

   v.   Ron Griffin, a Black man

vi.   Bill Henslee, a White man

vii.   Darryll Jones, a Black man

viii.   Rhonda Reaves, a Black woman

ix.   Jennifer Smith, a Black woman, and

x.   Phyllis Taite, a Black woman.

163.   They were all involved, in one way or another, in the discriminatory, harassing, and retaliatory tenure process Professor Reyes endured during the 2014-2015 academic year. They were all included in the internal EOP charge Professor Reyes submitted during her tenure process for discrimination based on race, color, national origin, sex, and retaliation. None of them provided responses explaining any of their wrongful actions or omissions during the EOP investigation.

164.   Professors Boothe-Perry, Broussard, Cavazos, Henslee, Jones, and Taite actively participated in the many ploys to derail Professor Reyes's tenure process. They escalated their hostilities and retaliation against Professor Reyes after she received tenure, including when some of them served in administrative roles. They bonded over workplace mobbing Professor Reyes. Professor Henslee, a White man, gained superficial acceptance within the majority clique by joining in workplace mobbing Professor Reyes.

165.   In her response to Professor Reyes's EOP complaint against the RPT Committee, Professor Jennifer Smith claimed that she did not participate in Professor Reyes's tenure process. However, on October 29, 2014, Professor Smith sent Ms. Evett Collins into a panic attack when she told her about her "vision" that Professor Reyes was going to harm Ms. Collins. Ms. Collins was the program assistant who went along

with the 5:05 PM false allegation of late submission of Professor Reyes's tenure application. Therefore, Professor Smith was involved in efforts to harm Professor Reyes during her tenure process.

166.    Director Shashi Persaud never warned Professor Reyes that Professor Jennifer Smith told Ms. Collins that she had a "vision" about Professor Reyes harming her. After Professor Reyes received tenure, Professor Smith escalated hostilities and retaliation against her, including by involving students.

167.    Dean Epps appointed Professor Jennifer Smith to chair the Student Disciplinary Committee and also appointed Professor Reyes to be a member of the committee. Right at the beginning of the spring 2017 semester, students told Professor Reyes that Professor Smith went to Professor Reyes's class right as the semester started and told students to visit her if they wanted to talk about student grievances (against other students). A student also told Professor Reyes that, once she went to Professor Smith's office, she realized that all Professor Smith wanted to do was to gossip about Professor Reyes.

168.    After the first meeting of the Student Disciplinary Committee, on January 13, 2017, Professor Reyes responded to a group email that Professor Jennifer Smith sent to the Committee and stated: "I understand that you have been meeting with students, including my Civil Procedure students, and informing them that it is about the Student Disciplinary Committee. What is that about?" Professor Smith responded: "I have not. I do not report to you. Do not email me with no facts." On January 13, 2017, Professor Reyes responded:

Professor Smith,

I was asking the question because it pertains to the Committee's work. Please keep it civil in these e-mails. There are staff members and also students in this Committee.

Best,

Prof. Reyes

169.     On January 13, 2017, Professor Smith responded (with copy to Professor Shiv Persaud, Professor Jonathan Fineman, Associate Dean Reginald Green, and Student Affairs Director Gary Harrington):

You have been reprimanded already for your email behavior to others. You acted inappropriately in the mtg on the 11th (only one who refused to adhere to the chair), so I am appointing a parliamentarian if I cannot have you transferred to another committee. JS

170.     Professor Reyes realized that Professor Jennifer Smith was spreading false rumors that Professor Reyes was "reprimanded" because she obviously found out about Dean Felecia Epps's October 18, 2016 letter of "counseling," which was the result of frivolous and malicious complaints by Professor Patricia Broussard, Professor Ann Marie Cavazos, and Emeritus Professor Nayaran Persaud (the father of IT/Security Director Shashi Persaud and Professor Shiv Persaud). The three complained after Professor Reyes exercised her First Amendment rights and participated in email exchanges with faculty at the University level during a time when FAMU President Elmira Mangum was being bullied by some members of the FAMU Board of Trustees and faculty, including retired Dr. Nayaran Persaud. Everything Professor Reyes stated in her emails consisted of true facts and substantiated opinions. However, Dean Epps did not give Professor Reyes an opportunity to respond to the allegations because she initially refused to tell her who submitted the complaints and also gave her a last-minute

opportunity to respond when she had already decided that she was going to issue a letter of "counseling" to Professor Reyes. A letter of "counseling" is not considered disciplinary action under the FAMU Regulation; therefore, Professor Reyes could not appeal the "counseling." Dean Epps took the side of the Black women who discriminated against and harassed Professor Reyes.

171.    Professor Reyes also realized that Professor Jennifer Smith's false allegation in reference to her conduct toward her, as chair of the Student Disciplinary Committee, was patterned after the language Dean Epps used in her March 3, 2016 memorandum about the incident when Professor Reyes did not return the document (evidence of abuse) to Professor Henslee, the then Chair of the RPT Committee, when he blindsided Professor Reyes during her first RPT Committee once she returned to the law school as a tenured faculty member. In said document, Professor Henslee assigned Professor Jeremy Levitt as Professor Reyes's mentor without consulting with Professor Reyes and with full knowledge of Professor Levitt's harassing conduct. When Professor Reyes protested the assignment during the meeting, Professor Henslee told her to take it up with the Provost. However, when she was leaving the meeting, he demanded that she return the one-page document with the mentor assignments. Professor Reyes refused and explained to Professor Henslee that she needed the document to take it up with the Provost as he instructed her to do. Professor Reyes felt accosted by Professor Henslee and reported the incident to Dean Epps who concluded that there was no wrongdoing, including about the mentor assignment, but warned Professor Reyes to give in to requests from the Chair.

172.     Professor Reyes noticed that Professor Smith and Dean Epps seemed very close. Professor Reyes confirmed how close when Dean Epps removed Professor Reyes from the Student Disciplinary Committee after Professor Smith sent a one word email to Professor Reyes, on January 13, 2017, stating: "DELETE." Dean Epps sided with Professor Smith and notified Professor Reyes, on January 17, 2017, that she was removing her from the Student Disciplinary Committee, which sent a message to professors, staff, and students in the Committee and throughout the law school that Professor Smith got away with bullying and discriminating against Professor Reyes.

173.     Professor Reyes reported Professor Jennifer Smith's abusive emails, including the "DELETE" email to Dean Epps and requested that Professor Smith be disciplined. Upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith for misusing the FAMU email to harass Professor Reyes. Upon information and belief, Dean Epps did not issue Professor Smith a letter of counseling when Dean Epps was copied in emails in which Professor Smith engaged in vicious abuse of Professor C.H., a junior faculty member who joined the tenure track faculty in fall 2014. Upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith after Professor Smith questioned Professor C.H.'s Black identity in a meeting in the presence of Dean Epps and many faculty members.

174.     Professors Boothe-Perry, Broussard, Cavazos, and Taite gave evidence against Professor Griffin in the *Langston v. Griffin E*OP complaint which Professor Langston submitted after Professor Griffin called these Black female law professors "malicious, evil, racist, and vile" when they derailed Professor Reyes's tenure process. After Professor Reyes received tenure, these Black female professors escalated their

hostilities against Professor Reyes, including by raising false allegations about her conduct.

175.     Three (3) of the ten (10) members of the RPT Committee (Professors Rob Abrams, Ron Griffin, and to a lesser extent Rhonda Reaves) became targets of hostility when they were deemed supportive of Professor Reyes's application for tenure. During the review of Professor Reyes's 2018 application for promotion to full professor they went along to get along with the discrimination and retaliation. That is how workplace mobbing works. They also knew they did not have the votes to overcome the will of the majority clique.

176.     The RPT Committee applied a quantitative standard for scholarship that did not appear anywhere in the CoL Faculty Handbook or in the interpretive memorandum provided to Professor Reyes (the "Nunn Memo") when she was hired. The Committee's application of a standard that did not exist in the CoL Faculty Handbook or the University Faculty Handbook was basically the same tactic as when the majority clique in the RPT Committee invented and used made-up standards to evaluate Professor Reyes's application for tenure and conclude that she did not meet the standards.

177.     The CoL Faculty Handbook did not state a quantitative standard for promotion; the "Nunn Memo" confirmed this. The Nunn Memo provided the only quantitative standard provided to Professor Reyes: (a) one "scholarly manuscript" that has been accepted for publication for promotion to associate professor; and (b) for promotion to full professor, "at least two additional scholarly works over that required for

promotion to associate professor." Professor Reyes met and exceeded this quantitative standard. She also met and exceeded the qualitative standard.

178.    The RPT Committee members who participated in the review and vote on Professor Reyes's 2018 application for promotion to full professor carried the discriminatory animus from the tenure process and their escalation or hostilities into the promotion process. They also used the promotion process to further retaliate against Professor Reyes after she continued to oppose the discrimination, harassment, hostile work environment, including workplace mobbing, and retaliation. By refusing to review Professor Reyes's application in accordance with the standards that were provided to her upon hire, they built on the same unlawfully, racially discriminatory animus and hostile work environment that drove violations of the rules and misapplication of the standards during Professor Reyes's tenure. In this way, they turned her promotion review into a continuation of her tenure process. The two became a continuous discriminatory, hostile, retaliatory process.

179.    The RPT Committee attached reports from Professor Reyes's prior application for promotion to associate professor (in Fall 2011) and for tenure (in Fall 2014). However, in violation of the express provision in the Faculty Handbook, they did not attach any of the external reviews of her scholarship conducted during those evaluations. They also refused to review her scholarship anew. This is how they set up their recommendation that she be denied promotion because she did not meet the scholarship standard, without reviewing her scholarship record.

180.    The RPT Committee's discriminatory actions tainted the entire process at all levels with discriminatory animus. All actors at higher levels of review, namely Interim

Dean LeRoy Pernell, the T&P Committee led by Dr. Michael Abazinge with Professor Patricia Broussard as the College of Law representative (same as during the tenure process), Provost Maurice Edington, and President Larry Robinson went along with the misapplication of the scholarship standard and decision of the RPT Committee. They did not conduct independent reviews. They rubber-stamped the RPT Committee's recommendation thereby condoning and participating in the discrimination, harassment, hostile work environment, and retaliation.

### Provost Edington and President Robinson Participated in the Discrimination and Hostilities

181.     President Larry Robinson and Provost Maurice Edington had been made aware of the race discrimination and hostile work environment against Professor Reyes even before she applied for promotion to full professor, including since on or before March 2, 2017, when Professor Reyes reached out to President Robinson via email asking for help. They, both Black men, went along with the Black majority clique. They participated in the ongoing hostile work environment against Professor Reyes, including by rubber-stamping the discriminatory RPT Committee recommendation, making it difficult for Professor Reyes to get the promotion decision, and foreclosing appeal of the decision.

182.     According to the Provost's published schedule, the President was supposed to provide the decision to Professor Reyes in June 2019. When Professor Reyes had not received the decision by the beginning of July, she requested it. On July 17, 2019, Provost Edington responded to one of Professor Reyes's e-mails and stated: "You will be provided notification of the outcome of your application for promotion within the next week." A week after that email, Professor Reyes followed up because no

decision was provided within a week of Provost Edington's response. On August 5, 2019, Professor Reyes once again requested the decision from President Robinson and Provost Edington; this time, she copied Trustee Belvin Perry in the e-mail. That same day, August 5, 2019, Provost Edington responded and alleged that a letter was sent to Professor Reyes via regular mail on July 25, 2019. However, he never even bothered to confirm whether Professor Reyes received the letter and did not provide the letter to Professor Reyes via e-mail despite her several e-mails asking for the decision. This was additional hostility.

183.    Provost Edington falsely claimed that the letter was sent to Professor Reyes's mailing address, which FAMU had on file since Professor Reyes began working at FAMU in 2009. However, the letter was sent to a wrong address in Tallahassee and it was returned by the U.S. Postal Service to FAMU "Return to Sender – Not Deliverable as Addressed." Professor Reyes never resided in Tallahassee.

184.    Professor Reyes sent Provost Edington an e-mail on July 23, 2019, once again requesting the decision; however, Provost Edington did not respond until she followed up again on August 5, 2019. The letter from Provost Edington was dated July 24, 2019, but it was not provided to Professor Reyes until August 5, 2019 via email. He waited to provide the letter until the first day of the semester; this was an additional act of hostility. He finally gave Professor Reyes the negative decision on the first day of classes rather than during the summer when she was not teaching. He waited until Professor Reyes was starting to teach the heaviest teaching load of any professor in the law school (two large, required, first-year and second-year courses for a total of seven (7) credits).

69

185.    After Professor Reyes finally receive notice of the denial of her application for promotion, President Robinson and Provost Edington made it impossible for Professor Reyes to appeal the denial. They involved Associate Provost Genyne Boston (a Black woman) and General Counsel Denise Wallace (a Black woman), who engaged Professor Reyes in a back-and-forth of e-mails about the information, only to finally deny her the information and sabotage her appeal.

186.    On January 22, 2020, Provost Edington ostracized Professor Reyes in front of the faculty during a faculty meeting in the law school. Provost Edington disagreed with Professor Reyes's reiteration of something he said and turned to the faculty and asked them whether they sided with his version or Professor Reyes's. No one responded because no one was going to take Professor Reyes's side against the Provost. It was one more hostile way to send a message to the faculty that such types of hostility should be directed at Professor Reyes. Provost Edington undermined her in front of faculty and staff. After the incident, Provost Edington told Professor Reyes that it was not "personal." She responded that it felt very personal to her, including because of his institutional power as provost and as a Black man in an HBCU. However, Professor Reyes offered an olive branch and asked Provost Edington if he would finally agree to meet with her to come up with a plan to address the discrimination and hostilities, including the denial of her promotion. Provost Edington oddly responded by asking Professor Reyes if she would agree to meet and she responded, "Of course, this is what I have been asking for, to try to resolve matters amicably and put an end to the hostilities."

187.     On January 22, 2020, Professor Reyes followed up via email asking Provost Edington when he was available and offering to audio- and even video-record the meeting to avoid "that's not what I said" issues. Provost Edington did not respond to Professor Reyes's request to schedule a meeting. Professor Reyes realized that it was one more sham tactic.

188.     The denial of promotion meant that Professor Reyes did not get a long, overdue 15% raise. She also did not get other benefits, such as an office with a window.

189.     Professor Reyes must work harder than most full professors, including because she must deal with ongoing hostilities, including denial of information and resources she needs to do her job. In addition to the duties associated with being an excellent law professor, Professor Reyes must spend precious time defending against the constant attacks, writing memoranda about incidents, and documenting what she says and does in emails in order to be able to defend against potential allegations.

190.     Upon information and belief, Professor Reyes has been the target of more investigations than any other employee in the FAMU College of Law. Professor Reyes has always responded to every investigation with the truth, with professionalism, and with integrity. She has spent precious personal time responding to the malicious prosecutions to which she has been subjected.

**New Deans Participated in the Systemic Discrimination, Harassment, Hostile Work Environment and Retaliation against Professor Reyes**

191.      As new deans (interim and permanent) have been appointed by President Robinson and Provost Edington, they have joined in the discrimination, harassment, hostile work environment and retaliation against Professor Reyes. President Robinson and Provost Edington have condoned the hostile work environment against Professor

71

Reyes. They have received notice for years of what a majority clique have done to Professor Reyes. Again, the phenomenon of workplace mobbing explains why so many people have participated in the harm against Professor Reyes, individually and collectively.

192.     Angela Felecia Epps was recruited and hired when Professor Reyes was visiting at UF Law. Professor Epps started her tenure as dean at the same time Professor Reyes returned from UF Law in spring 2016. Professor Reyes reached out to Dean Epps via email to welcome her to the law school. She also invited her to meet for coffee or lunch, a professional courtesy in many law schools when a new dean joins the faculty. However, Dean Epps responded that she would only meet in the law school building. There is no cafeteria in the law school; therefore, sharing a meal was not an option.

193.     When Dean Epps showed up in Professor Reyes's office, at the beginning of the spring 2016 semester, Professor Reyes decided to ask for her help. She tried to tell her about what had just happened in her tenure process and the recent frivolous charge by Professor Broussard. Professor Reyes tried to explain the discrimination and hostile work environment she was experiencing. Dean Epps responded that she did not want to hear history and that Professor Broussard had a right to file a charge. Dean Epps did not even try to empathize with Professor Reyes. She told her, "you got tenure and that's that." After Professor Reyes opposed the discrimination and hostile work environment, Dean Epps retaliated against her.

194.     The hostile way Dean Epps acted toward Professor Reyes upon meeting her, led Professor Reyes to think that she had been talking to some of the faculty

members who target Professor Reyes – the majority clique. When Professor Reyes tried to explain the hostile work environment she was facing, Dean Epps sided with the Black women who targeted Professor Reyes. She showed them sex/racial solidarity by going after Professor Reyes.

195.    Dean Epps never informed Professor Reyes that, on January 8, 2016, Director Persaud raised his "active concern" about Professor Reyes due to complaints made to him the prior year by Professor Lundy Langston, Professor Patricia Broussard, Professor Deleso Alford Washington, Professor Phyllis Taite, and staff members Erica Polite and Pamela Leonard, all Black women. He sent his email to newly appointed Dean Epps during her first week as dean. In his email, he stated: "I think you should be aware that I have fielded quite a few written and verbal complaints about Professor Reyes. Because of this, I have made my concerns known to the appropriate personnel on main campus in the past. This is just a heads up, thanks for your time."

196.    Dean Epps refused to help Professor Reyes. Instead, based on false complaints by Professor Pat Broussard and Professor Ann Marie Cavazos, Dean Epps issued a letter of "counseling" to Professor Reyes without due process. By terming it a letter of "counseling" and not a letter of "reprimand," she avoided giving Professor Reyes the due process required in the FAMU Regulations. However, in violation of said regulations, she placed the letter in Professor Reyes's file.

197.    When Professor Reyes submitted a Regulation 10.206 complaint about Dean Epps issuing and placing the letter of "counseling" in her personnel file to President Robinson, he refused to process it in clear violation of the FAMU Regulations. When Professor Reyes reported his refusal to abide by FAMU's Regulation to the

Division of Audit and Compliance, they also refused to investigate. Dean Epps continued to retaliate against Professor Reyes. Dean Epps only lasted as dean for about sixteen (16) months. During this time, she actively soiled Professor Reyes's record.

198.      Then, in April 2019, Nicky Boothe-Perry became Interim Dean and named her friend Phyllis Taite as Interim Associate Dean. They continued retaliating and escalating hostilities against Professor Reyes, including by targeting two students (a Latina and an Indian woman) whose independent research Professor Reyes supervised. They refused to process Professor Reyes's upper-level writing certification of the students' independent research papers, which the students needed to graduate. Interim Dean Boothe-Perry and Interim Associate Dean Taite used the setup to falsely accuse Professor Reyes of not doing her job in reference to the certification, in a public faculty meeting on January 29, 2020, when faculty and students were present. They also told the students not to communicate with Professor Reyes thereby marginalizing her. The students were afraid that they would not be able to graduate.

199.      Professor Reyes documented to Provost Edington that Interim Dean Boothe-Perry and Interim Associate Dean Taite were violating the Student Handbook provision that applied to the students and falsely accusing her. However, the damage was done. During the Boothe-Perry-Taite Interim Administration, Professor Reyes stopped supervising additional independent writing projects to avoid students getting harmed when Professor Reyes was targeted.

200.      On May 13, 2020, Interim Associate Dean Taite falsely accused Professor Reyes of withholding grades and threatened to put a memo in Professor Reyes's

evaluation file. On May 15, 2020, Professor Reyes reached out to Provost Edington about the false accusations, but he never responded.

201.      Professor Reyes actively participated in the dean search process of the current dean, Deidré Keller. She also encouraged Professor Markita Cooper to serve as Associate Dean of Academic Affairs once again. She suggested to Dean Keller that Associate Dean Cooper was the most qualified faculty member to become associate dean because she already knew the job and would support her.

202.      Dean Keller and Associate Dean Cooper also joined in the retaliation, hostile work environment, and workplace mobbing against Professor Reyes. Once again, Professor Reyes became the litmus test to show racial solidarity with the Black faculty members who target Professor Reyes, especially the Black women. Even before Dean Keller officially started working in the FAMU College of Law, she joined with then Interim Dean Nicky Boothe-Perry in an op-ed in the *Orlando Sentinel*, in summer 2020, when they both proclaimed their shared identity as Black women and mothers of Black boys in reference to the murder of George Floyd.

203.      As she was getting ready to start her tenure as dean, Dean Keller scheduled phone calls with faculty and, after those phone calls, she distanced herself from Professor Reyes.

204.      Dean Keller and Associate Dean Markita Cooper have also retaliated against Professor Reyes after she filed her EEOC charge. On October 20,2020, Professor Reyes told Dean Keller that she had filed an EEOC charge due to the ongoing discrimination and hostile work environment. Thereafter, both Dean Keller and Associate Dean Cooper retaliated against Professor Reyes, including by not providing

information that Professor Reyes should receive like where she was in the wait list of faculty waiting for a window office (reserved for full professors). They made Professor Reyes ask over and over again. Finally, during summer 2023, Associate Dean Reginald Green assigned Professor Reyes to a faculty office that is isolated from the program assistants, far from the printer, and across from and near the noisy mechanical rooms and the bathroom. Dean Keller participated in the hostile decision and has thus far refused to re-consider the decision in light of health and safety concerns that Professor Reyes raised to her. It is a pattern of conduct meant to humiliate, marginalize, and distress Professor Reyes.

205.     On February 24, 2021, Dean Keller and Associate Dean Cooper held a Zoom meeting with students and permitted two Black students to make disparaging comments about Professor Reyes when the students were arguing that they wanted a Black female visiting law professor (a friend of Professors Patricia Broussard and Jennifer Smith) to remain in the law school beyond the agreed upon term of her visit. The students wanted to know why she was not scheduled to teach the evening evidence course that Professor Reyes was teaching. The students who complained were not students who were taking the evidence course. Dean Keller and Associate Dean Cooper did nothing to address the disparaging comments the two students made about Professor Reyes.

206.     Immediately after the first Zoom meeting ended, Professor Reyes posted in the chat of the next Zoom meeting (a town hall), when some of the same students were still present, that law students should not engage in such conduct. Professor Reyes also posted that she may need to deal with the disparaging comments in due

time as in making them a teaching moment about professionalism. Dean Keller posted in the chat that she would discuss the situation with Professor Reyes. Thereafter, she asked to meet with Professor Reyes via Zoom but did not tell Professor Reyes that Associate Dean Cooper would also be present in the meeting.

207.     When the three met, Dean Keller proceeded to "counsel" Professor Reyes that some students could consider what Professor Reyes wrote as a "threat." However, Dean Keller did not receive any complaints from students about Professor Reyes. In fact, two Black female students emailed Dean Keller, with copy to Professor Reyes, complaining about Dean Keller's conduct of permitting the disparaging comments against Professor Reyes.

208.      After Professor Reyes met with Dean Keller, someone submitted an anonymous complaint to the Division of Audit and Compliance (DAC) against Professor Reyes with vicious, false allegations and referenced the "threat" that Dean Keller referenced. The DAC forwarded the complaint to the FAMU EOP and Sylvia Barge sent the one-page anonymous complaint to Professor Reyes. Professor Reyes prepared a 15-page memo and 62 exhibits to respond to the malicious and false allegations.

209.     On May 13, 2021, Ms. Barge notified Professor Reyes via email, with copy to EOP Director Carrie Gavin, that the anonymous complaint was closed. However, there was now a written report of the investigation stating that Dean Keller met with Professor Reyes and "counseled" her. The report stated that Dean Keller acknowledged that no students complained to her. The DAC did not receive any complaints from students. However, Dean Keller took it upon herself to view a threat where there was none thereby creating a reason to "counsel" Professor Reyes for no valid reason.

During the meeting with Professor Reyes, Dean Keller made serious allegations about what Professor Reyes may do to students without any proof that Professor Reyes has ever done any such thing. During that meeting, Dean Keller informed Professor Reyes that a faculty full of only Black professors meets the definition of diversity because Black people are from diverse countries and backgrounds. Professor Reyes responded that said rationale could apply to all race groups, but that is not what Dean Keller advocated in the predominantly white majority institution where she worked before.

210.    The anonymous complaint was one more instance when Professor Reyes was forced to document with evidence her innocence but the accuser(s) was not required to provide evidence in support of the accusations. The accuser did not even provide his/her/their name. The anonymous complaint, the processing of the complaint, the written report, and Dean Keller's reference to "counseling" all served to further soil Professor Reyes's professional/academic record.

211.    On May 11, 2022, Dean Keller gave Professor Reyes the lowest annual evaluation she has ever received (average), including by not giving her credit for her extensive service work, when the electronic faculty activities report that Dean Keller provided did not indicate that there were word count limits and more questions than appeared on the screen. When Professor Reyes was unable to include all the information in the spaces in the electronic form, she copied and pasted the questions into a Word document, answered them, and submitted them to Dean Keller in a PDF document (as she had submitted annual faculty activity reports to prior deans). Professor Reyes did not find out, until May 11, 2022, the day of her evaluation meeting, which Dean Keller insisted must be in person in the Dean's conference room (rather

than via Zoom as Professor Reyes requested), that there were more questions than the ones that appeared on the screen.

212.     During that hostile evaluation meeting, Dean Keller did not tell Professor Reyes, until the end of the meeting, that she would state in the evaluation form that she could not assess Professor Reyes's service because she did not provide the information. This was a two-year evaluation (2020-2021 and 2021-2022) which was a violation of the one-year evaluation procedure stated in the University Faculty Handbook. In an arbitrary and capricious manner, Dean Keller retaliated against Professor Reyes by not giving her credit for the merit of her two-year service work when Dean Keller was well aware of Professor Reyes's extensive service work, including as Chair of the 2020-2021 Faculty Recruitment Committee, all the Committees to which Dean Keller assigned her, and her service as HALSA's faculty advisor. Professor Reyes requested that Dean Keller provide the missing questions and allow her to submit the information. As of the date of filing of this amended pleading, Dean Keller and Associate Dean Cooper have not provided the additional questions to Professor Reyes.

213.     On May 13, 2022, Professor Reyes reached out to Provost Edington and requested that he intervene and instruct Dean Keller to provide the questions, allow Professor Reyes to provide the information, and re-assess her based on the merit of her work. Professor Reyes explained to Provost Edington that this was the first year that faculty received the electronic form, that there were glitches with the form (as documented in emails from the Dean's Suite including from Dean Keller), and that Professor Reyes's request was reasonable in light of the circumstances.

214.    On May 16, 2022, Provost Edington responded: "I will review this matter and follow up with you accordingly." On July 22, 2022, when Professor Reyes was still in unpaid status during the summer, she sent another email to Provost Edington following up on her request for assistance. On July 26, 2022, Provost Edington responded that he would follow up with her by the end of the week. On July 29, 2022, he responded that he discussed the matter with Dean Keller and decided that "[Dean Keller] is not obligated to conduct an additional evaluation of you. You are free to provide responses to the branch questions for inclusion in your file." On that same day, Professor Reyes replied to Provost Edington correcting several factual inaccuracies he stated about the electronic form and the process. Professor Reyes's last comment on the matter was: "Please let me know when Dean Keller will finally provide all the questions, so I can provide the responses I should have been permitted to provide." Professor Reyes did not receive the courtesy of a response or the missing questions; therefore, she was denied the opportunity to respond and at least include those responses in her file.

215.    Dean Keller has made it unbearable for Professor Reyes to do her job. To start, right as she became dean, she appointed Professor Reyes Chair of the 2020-2021 Faculty Recruitment Committee, during the Covid pandemic, and then sabotaged the work Professor Reyes needed to do by not providing the information she needed. She also allowed Director Adrienne Snyder, a Black woman, someone who was supposed to perform the Human Resources function and was involved behind the scenes in defamation and group hysteria about Professor Reyes (in emails) without ever telling Professor Reyes, to make getting information Professor Reyes needed for

the hiring process very difficult including by not responding to emails. When Professor Reyes asked to meet with her via Zoom, Ms. Snyder refused and said they would have to wait until her supervisor, Associate Dean Reginald Green, could attend the meeting. Associate Dean Green did not make himself readily available. Professor Reyes needed to get the hiring process started and no one was providing the resources she needed to do so. To add insult to injury, Dean Keller told Professor Reyes that she was not allowed to meet with Associate Dean Green or Ms. Snyder and that all questions should be submitted to Dean Keller. Dean Keller joined in discriminating against Professor Reyes and furthering the hostile work environment. Thereafter, Dean Keller promoted Ms. Snyder to Chief of Staff.

216.    When Professor Reyes complained about not getting the information she needed to start the recruitment process, Dean Keller asked her if she wanted to quit as chair of the committee. Professor Reyes responded that she would not quit and did not appreciate that Dean Keller seemed to be setting her up for failure. Professor Reyes knew that this could be used against her in an evaluation, including a post-tenure review.

217.    Professor Reyes worked seven days a week to do all her assigned duties in addition to the work required to do the recruitment process without assistance she should have received from Director Snyder and Associate Dean Green. Professor Reyes structured a professional hiring and recruitment process from scratch. It was the most successful hiring process since Professor Reyes has been a member of the faculty (over a decade). Professor Reyes organized and led the recruitment efforts in 50 public Zoom meetings and nine public full-day Zoom interviews all in compliance with

Florida's Sunshine Law. Three faculty members were hired: a Latina legal research and writing instructor (the first Latina alumni hired for a full-time teaching position); a doctrinal constitutional law professor (a Black man who immediately received majority status and joined in hostility against Professor Reyes); and a clinic director/professor (a White man who received tenure upon appointment after Professor Reyes helped him to prepare materials sufficient to support approval of tenure).

**The Majority Clique Voted a Highly Qualified White Woman Unqualified – Similar to How They Voted to Deny Professor Reyes Tenure and Promotion**

218.     Professor Reyes, as Chair of the 2020-2021 Faculty Recruitment Committee, presented the candidates to the faculty during a faculty meeting on February 17, 2021. For the doctrinal position, there were three finalists who were already tenured professors: a Black man, a White man, and a White woman. The Committee found them all to be highly qualified. Some faculty attended their full day interviews but some did not. Because all three were tenured, only tenured faculty (the RPT Committee) could vote on the first question – whether they were qualified for the position.

219.     During the meeting, the majority clique managed to foreclose consideration of the White woman who was highly qualified for a doctrinal position. She was a tenured law professor with outstanding credentials and experience. Her resume showed that her interests and work, since she was in law school, aligned with the mission of the FAMU College of Law. She had the best scholarship record of the three finalists in addition to impressive work experience, including prestigious federal district court and appellate clerkships. As a tenured associate professor, she had a better scholarship record and credentials than most tenured full professors in the FAMU

College of Law. She was eager to teach in an HBCU law school because of her commitment to social justice. The Faculty Recruitment Committee ranked her in the top two candidates with the Black male professor who was eventually hired.

220.     The White man did not progress to a vote. Then, the majority clique was ready to vote on the White woman without even discussing her credentials. The following faculty members (all members of the RPT Committee) voted that the White woman was not qualified: Pat Broussard, Ann Marie Cavazos, Ron Griffin, Yolanda Jones, Lundy Langston, Jeremy Levitt, Jennifer Smith, and Phyllis Taite. The Black man received a unanimous vote as he should have because the Committee had already found him to be qualified for the position, same as the White woman. However, by finding the White woman not qualified for the position, the majority clique ensured that only the Black man was considered for hiring. Therefore, the faculty did not get to proceed to a vote on ranking the candidates because only one was found to be qualified by the majority clique. Dean Keller was present when this happened and did not say anything.

221.     The obvious racial aspect of the vote reminded Professor Reyes of her own tenure and promotion votes by the majority clique. After the vote, Professor Reyes, as Chair of the Faculty Recruitment Committee, had to call the White female candidate and tell her that she was no longer under consideration because she was not found to be qualified. This was humiliating for a candidate with her credentials. Professor Reyes remembered the ways in which the majority clique diminished her qualifications in efforts to humiliate her and get rid of her like they got rid of the highly qualified White female candidate. The law professor cried when she heard the news and Professor

Reyes empathized with her and also cried after the phone call ended. It was one more racial traumatic experience during Professor Reyes's time at FAMU College of Law. Professor Reyes remains the only non-Black tenured woman in the FAMU College of Law.

222.     Something similar almost happened with the White male candidate for the clinic position. He was also highly qualified. However, he was not tenured and had never been in a tenure track position. The CoL Faculty Handbook permitted granting tenure upon appointment if the candidate met the standards. Professor Reyes, as Chair, worked with the candidate to put together a strong record for tenure upon appointment. He made it through the qualification question, but the next review happened in the closed RPT Committee meetings. There, the issue of "White man privilege" was raised by Black members of the RPT Committee. Professor Reyes responded that race should not become the issue; the issue was whether he met the standards and should be granted tenure upon appointment. A factor that helped him was that a Black female candidate withdrew from consideration and the other Black female candidate did not show much interest in the position. Therefore, he was the only remaining candidate.

223.     In 2021-2022, another White male candidate was being considered for tenure upon hire; he had tenure in another law school that was no longer in existence. Black female faculty members in the RPT Committee argued that he should not be eligible for tenure because the law school where he got tenure was no longer in existence. However, these were the same faculty members who favored granting tenure to a Black female candidate the year before when the law school where she received tenure was no longer in existence. The White male candidate had a much stronger

teaching, scholarship, and service record, including from years when he taught as a visiting professor in the FAMU College of Law. Professor Reyes once again had to defend her position that he was qualified for tenure upon appointment as a lateral hire and, for her, race was not a factor in the decision.

### The Discrimination, Hostile Work Environment, and Retaliation against Professor Reyes are Systemic

224.     After Professor Reyes filed her EEOC charge, the retaliation from President Robinson, Provost Edington, Dean Keller, Associate Dean Cooper and other faculty members has made Professor Reyes realize that the targeting is systemic. The emails about what seem like insignificant issues are many. It is the frequency, severity, humiliating, and recurring nature of what they do. They denied Professor Reyes an accommodation to teach from home during the pandemic when she provided a doctor's letter stating that she was the sole caretaker of her elderly mother and would put her at risk of contracting Covid if Professor Reyes were to teach in person.

225.     Dean Keller and Associate Dean Cooper had some discretion to decide which 50% of the faculty returned to teach in person. They made Professor Reyes teach in person. Then, Professor Reyes got sick and needed to be on bed rest with her leg up during the last week of the fall 2021 semester. She requested permission to teach those last three classes synchronously via Zoom. Dean Keller and Associate Dean Cooper said no, same as President Robinson and Provost Edington. What made their tactic even more hostile was that they insisted that Professor Reyes apply for an ADA accommodation when she kept telling them that she was not disabled. Then, when she applied, her request was denied. It was all a waste of time and additional work and stress. Professor Reyes did not get to rest. She had more work as a result of all the

back-and-forth of emails and the work she had to prepare to make up for class time instead of teach synchronously.

226.     Dean Keller has even refused to list Harvard University, the school from which Professor Reyes earned her highest law degree, in the Academic Regalia section of the College of Law Hooding Program. When Professor Reyes reached out to President Robinson about it, two years ago, he forwarded the matter to the Office of the General Counsel even though it was a clear academic affairs decision. FAMU's own academic regalia form asks faculty for their highest degree; this is the practice in academia. It is one more tactic to retaliate against Professor Reyes even at the expense of the best interest of the FAMU College of Law which would benefit from having Harvard University listed in the faculty academic regalia section of the program.

227.     It has become evident to Professor Reyes that the retaliation plan is to (1) keep her busy defending against ongoing hostilities and indignities, in addition to all the work, which reduces her time for scholarship; (2) make it as hostile as possible so she leaves "voluntarily" or gets sick and is unable to keep up with the job; (3) set her up for "good cause" dismissal, despite her tenure; and (4) ruin her chances of getting other jobs by soiling her professional record (including with false accusations, formal investigations, and by "blacklisting" her). This means that Professor Reyes is even more vulnerable after tenure and after she filed the EEOC charge. The ongoing incidents are meant to intimidate, ridicule, insult, ostracize, marginalize, and drive Professor Reyes out of the FAMU College of Law, after ruining her academic career.

228.     Through the years Professor Reyes, through records requests, has obtained surveillance videos showing some of the hostilities. The FAMU email system

has all the emails Professor Reyes has sent and received. Many of those emails are evidence of the hostilities, discrimination, harassment, hostile work environment and retaliation she has endured. Many of those emails also demonstrate the many times she has reached out to President Robinson and Provost Edington asking for help. She has even asked them to consider how what they have done and permitted to be done to her would look if it were being done to a Black woman in a predominantly white institution. They do not seem to care.

229.      As the 90-day deadline to file this lawsuit was approaching, Professor Reyes was still wrestling with the decision whether to sue FAMU. She did not make the final decision until the first week back to classes (August 15 – 19, 2022) in fall 2022 after she was verbally attacked by Professor Jeffery Brown, a Black man, on August 18, 2022. Some years ago, Professor Brown referred to Professor Reyes as a "fucking thing," during a committee meeting when then Associate Dean Darryll Jones, Professor Cavazos, and Professor Reaves were present. No one came to Professor Reyes's defense. In fact, Associate Dean Darryll Jones said Professor Brown's epithet was "inappropriate but understandable." Professor Brown also provided cover for Professor Jeremy Levitt when he attacked Professor Reyes during her first semester at the FAMU College of Law.

230.      On August 18, 2022, Professor Reyes provided notice of Professor Brown's verbal attack to Provost Edington, Dean Keller, Associate Dean Cooper and the faculty. They did not reach out to Professor Reyes about the matter. To Professor Reyes, this was definitive confirmation that the ongoing discrimination, harassment, workplace mobbing, and hostile work environment will continue unabated. No one within

FAMU will do anything to address the situation. After years of putting up with abuse in her workplace, Professor Reyes decided that she must file this lawsuit.

231.    Professor Reyes has been uplifted by students and alumni of diverse race, ethnic, and cultural backgrounds during the fourteen (14) years she has taught in the FAMU College of Law. Professor Reyes has remained in the FAMU College of Law because she cares about the law school and students. However, she can no longer tolerate the abuse. This is why she is filing this lawsuit and hopes that students and alumni will understand that it is her right, as a human being, to do what she can to protect herself from further harm.

**COUNT I**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Race**

232.    Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

233.    Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

234.    Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

235.    Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race discrimination.

236.    Defendant discriminated against Plaintiff based on her race, Hispanic/Latina, by failing to promote her to full professor when she applied in 2018.

237.    Plaintiff is a member of a protected class.

238.     Plaintiff was qualified for the position of full professor when she applied in 2018.

239.     Plaintiff applied for full professor in 2018 and was denied the promotion and the 15% pay raise and other benefits associated with the promotion.

240.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

241.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT II**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Color**

242.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

243.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

244.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

245.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from color discrimination.

246.     Defendant discriminated against Plaintiff based on her color, light skin Hispanic/Latina, by failing to promote her to full professor when she applied in 2018.

247.     Plaintiff is a member of a protected class.

248.    Plaintiff was qualified for the position of full professor when she applied in 2018.

249.    Plaintiff applied for full professor in 2018 and was denied the promotion and the 15% pay raise and other benefits associated with the promotion.

250.    Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

251.    Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT III**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Sex and Sex-Race**

252.    Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

253.    Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

254.    Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

255.    Defendant acted with deliberate indifference toward its obligation to provide a workplace free from gender and/or gender-race discrimination.

256.    Defendant discriminated against Plaintiff based on her sex and/or sex-race, female/Hispanic/Latina, by failing to promoter her to full professor when she applied in 2018.

257.    Plaintiff is a member of a protected class.

258.    Plaintiff was qualified for the position of full professor when she applied in 2018.

259.    Plaintiff applied for full professor in 2018 and was denied the promotion.

260.    Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

261.    Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT IV
## Hostile Work Environment in Violation Title VII – Race

262.    Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

263.    Plaintiff belongs to a protected group.

264.    Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her race.

265.    These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

266.    Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race.

267.    Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her race, Hispanic/Latina. Such conduct was unwelcome.

268.    The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

269.    Plaintiff perceived the environment to be abusive or hostile.

270.     A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

271.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

272.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT V**
**Hostile Work Environment in Violation Title VII – Color**

273.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

274.     Plaintiff belongs to a protected group.

275.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her color.

276.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

277.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of color.

278.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her color, light skin Hispanic/Latina. Such conduct was unwelcome.

279.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

280.     Plaintiff perceived the environment to be abusive or hostile.

92

281.     A reasonable light skin Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

282.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

283.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT VI
## Hostile Work Environment in Violation Title VII – Sex and Sex-Race

284.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

285.     Plaintiff belongs to a protected group.

286.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her gender and/or gender-race.

287.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

288.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of sex and/or sex-race and/or for retaliatory reasons.

289.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her gender and/or gender-race, female/Hispanic/Latina. Such conduct was unwelcome.

290.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

291.     Plaintiff perceived the environment to be abusive or hostile.

292.     A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

293.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

294.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT VII
## Retaliation in Violation of Title VII

295.     This claim is pled in the alternative.

296.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

297.     Plaintiff belongs to a protected group.

298.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

299.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

300.     Defendant acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse action.

301.     On October 22, 2014 and October 30, 2014, Plaintiff formally opposed and complained about unequal treatment, discrimination and bias when her attorney sent letters to then Interim Provost Rodner Wright and General Counsel Avery McKnight. On April 27, 2015, Plaintiff once again formally opposed and complained about unequal treatment, discrimination and bias when she submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, gender, and retaliation to Defendant's Office of Equal Opportunity Programs (EOP). However, Plaintiff had raised concerns informally before then and has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race, color, national origin, and/or sex. Plaintiff filed a Charge of Discrimination with the EEOC on May 29, 2020. Plaintiff continued to oppose the discrimination and hostile work environment in communications to Dean Felecia Epps, Interim Dean Nicky Boothe-Perry, and Dean Deidre Keller. They all retaliated against Professor Reyes.

302.     In response to raising these concerns, Plaintiff has been subjected to a pattern of retaliatory conduct, including ongoing harassment that is severe and/or pervasive and has altered the terms and conditions of her employment.

303.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional harm.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following:

a.  Back pay, in amounts to be determined at trial;

b.  Compensatory and consequential damages;

c. Front pay;

d. Injunctive and/or declaratory relief;

e. Prospective relief;

f. Pre-judgment and post-judgment interest at the highest lawful rate;

g. Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

h. Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 9th day of October, 2023.


/s/ Maritza Reyes

P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 9, 2023, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.


/s/ Maritza Reyes
Plaintiff, Pro Se

96

Tab 94

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

                Plaintiff,

v.                                        Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),

                Defendant.
_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Opposed Motion to Dismiss With Prejudice, or in the Alternative, Motion to Strike (Doc. 35) and Plaintiff's Response (Doc. 36).  For the reasons set forth below, Defendant's Motion will be denied.

## I.    BACKGROUND

Plaintiff, a Hispanic/Latina woman, joined the faculty at the Florida A&M University College of Law ("**FAMU Law**") as a professor of law in April 2009.  (Doc. 34, ¶¶ 4, 23–25).  Plaintiff was promoted to associate professor on August 6, 2012, and on June 10, 2015, Plaintiff received tenure.  (*Id.* ¶¶ 77, 159).  However, when Plaintiff applied for a promotion to full professor in 2018, she alleges that the process was fraught with procedural irregularities and largely conducted by a panel of individuals that harbored racial animosity toward Plaintiff.  (*Id.* ¶¶ 161–163, 175–180, 182–185).  Plaintiff was notified that she had been denied the promotion to full professor on August 5, 2019, the first day of classes.  (*Id.* ¶ 184).  Plaintiff also alleges that the Provost and President "made it impossible for" her to appeal the negative decision by involving an Associate

Provost and General Counsel, both Black women, that denied her information and "sabotage[d] her appeal."  (*Id.* ¶ 185).

In addition to being denied a promotion to full professor, Plaintiff alleges that throughout her recruitment and employment she was subjected to systemic harassment and discrimination by tenured Black professors, whom she refers to as the "majority clique."  (*Id.* ¶¶ 22, 27, 31).  Plaintiff also alleges that members of the majority clique recruited others to participate in the discrimination, including both Black and White professors and faculty, staff members, and students.  (*See, e.g.*, *id.* ¶¶ 30, 62–64, 70, 119, 164, 166, 205).  Plaintiff details a number of alleged slights and embarrassments from her colleagues, such as interfering with and attempting to prevent Plaintiff from obtaining tenure, (*id.* ¶¶ 32–77), retaliating against the Hispanic American Law Student Association and removing Plaintiff as its faculty advisor, (*id.* ¶¶ 87–88, 126–127), rejecting Plaintiff's racial self-identification, (*id.* ¶¶ 94, 97, 111), and making other rude comments, gestures, and physical contacts, (*see generally id.*).  Plaintiff alleges generally that these actions are the result of the majority clique's preference for individuals that identify as Black.  (*See generally id.*).

As a result of the denial of promotion and perceived hostilities, Plaintiff alleges claims for discrimination and hostile work environment on the basis of race, color, and gender and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e *et seq*.  (*Id.* ¶¶ 232–303).

## II.  LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

8(a)(2).  Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party.  *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009).  Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Furthermore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Pursuant to Federal Rule of Civil Procedure 12(f), the Court may, on motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  However, motions to strike are generally disfavored by the courts and "should be granted only if 'the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party.'"  *Schmidt v. Life Ins. Co. of N. Am.*, 289 F.R.D. 357, 358 (M.D. Fla. 2012) (quoting *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995)).

### III.    DISCUSSION

Plaintiff, a licensed attorney, filed this lawsuit on her own behalf on August 25, 2022.   Upon review of the ninety-two-page Complaint (Doc. 1), the Court *sua sponte* dismissed Plaintiff's initial pleading as an impermissible shotgun pleading and ordered Plaintiff to replead.  (Doc. 8 at 2–3).  Plaintiff filed an Amended Complaint (Doc. 10), which the Court again dismissed as a shotgun pleading.  (Doc. 30 at 4–6).  Therein, the Court noted that "although the bulk of Plaintiff's allegations appear to be relevant to her claims, the Amended Complaint also contains several allegations that do not appear to be logically connected to any cause of action, allege harms to other persons, or are wholly unnecessary to properly allege the causes of action Plaintiff seeks to allege." (*Id.* at 5– 6).  The Court also noted that many of the allegations contained in Plaintiff's amended pleading were so vague and conclusory that it was nearly impossible to determine the reason they were included in the pleading.  (*Id.* at 6).  Plaintiff was cautioned that she would not be granted further leave to amend if she failed to correct the pleading deficiencies.  (*Id.*).  Thereafter, Plaintiff filed her Second Amended Complaint (Doc. 34), which Defendant argues still fails to meet the minimum federal pleading standards.

Specifically, Defendant argues that Plaintiff's ninety-six-page, 303 paragraph Second Amended Complaint is still "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322 (11th Cir. 2015).   In support of this argument, Defendant points to Plaintiff's failure to remove allegations regarding harms to other persons unrelated to this lawsuit and to either remove factual allegations without any apparent connection to the purported discrimination or to properly allege that connection.

In her Response, Plaintiff argues that she needed to include sufficient factual information to demonstrate the cumulative effects resulting in an allegedly hostile work environment.  While the Court agrees with this general proposition, Plaintiff's pleading far exceeds that threshold.  Plaintiff is not required to prove her case in her complaint, rather she is required to make a short and plain statement that would entitle her to relief and raise her claims above a speculative level.  *See Buchanan v. Delta Air Lines, Inc.*, 727 F. App'x 639, 642 (11th Cir. 2018).  Despite this, Plaintiff argues that "[i]t would take a lot more pages than Plaintiff is allowed for this response to provide an explanation of how each section and paragraph connects to her causes of action."  (Doc. 36 at 10).  This is precisely the problem with Plaintiff's pleading.  Her statement of the case, as she admits, is neither short nor plain.  *See Plain*, Black's Law Dictionary (12th ed. 2024) (defining "plain" as "[c]lear and unobstructed," "[e]xceedingly easy to understand or recognize," and "[i]n clear and simple words, without technicalities; unambiguously straightforward"); *Olson v. Takeda Pharms. Am., Inc.*, No. 8:23-cv-590, 2023 WL 8254354, at *3 (M.D. Fla. Nov. 29, 2023); *Menashe v. Jaoude*, No. 22-22220-Civ, 2023 WL 7385602, at *1–2 (S.D. Fla. Nov. 8, 2023).

Nevertheless, while the Second Amended Complaint, like Plaintiff's prior pleadings, could certainly benefit from significant refinement, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Weiland*, 792 F.3d at 1323.  Despite its many shortcomings and excessive overinclusion, Plaintiff's Second Amended Complaint gives Defendant adequate notice of her claims and is not virtually impossible to understand.  In

its current iteration, the pleading makes it clear that Plaintiff is seeking relief for the denial of the promotion to full time professor and for the existence of a hostile work environment at FAMU Law.  Simply put, "this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count."  *Id.* at 1324; *see also Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1208 (11th Cir. 2019); *Hum. Rts. Def. Ctr. v. Inch*, No. 21-81391-CV, 2022 WL 19486385, at *3 (S.D. Fla. Mar. 24, 2022). Therefore, the Court will deny Defendant's Motion to the extent it seeks dismissal.

In the alternative, Defendant moves to strike any allegations of conduct that occurred more than 300 days before the filing of Plaintiff's EEOC charge.  However, as Plaintiff points out, Defendant fails to state how such allegations have "no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Schmidt*, 289 F.R.D. at 358 (quotation omitted); *see also Harris v. Pub. Health Tr. of Mia.-Dade Cnty.*, 82 F.4th 1296, 1303 (11th Cir. 2023); *Johnson v. Bennett Auto Supply, Inc.*, 319 F. Supp. 3d 1278, 1286 & n.2 (S.D. Fla. 2018).  Additionally, Defendant only argues that the allegations are not relevant to Plaintiff's failure to promote claims but fails to address Plaintiff's hostile work environment claims.   *See Harris*, 82 F.4th at 1303. Consequently, Defendant's alternative request to strike will also be denied.

## IV.    CONCLUSION

Therefore, it is **ORDERED** and **ADJUDGED** that Defendant's Opposed Motion to Dismiss With Prejudice, or in the Alternative, Motion to Strike (Doc. 35) is **DENIED**. Defendant shall file an answer to the Second Amended Complaint (Doc. 34) on or before **September 23, 2024**.

**DONE AND ORDERED** in Orlando, Florida on September 9, 2024.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

Tab 97

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

      Plaintiff,

v.                               CASE NO.: 6:22-cv-1525-WWB-DCI

THE FLORIDA AGRICULTURAL AND
MECHANICAL UNIVERSITY BOARD
OF TRUSTEES,

      Defendant.
_____/

**DEFENDANT, THE FLORIDA AGRICULTURAL AND MECHANICAL
UNIVERSITY BOARD OF TRUSTEES' ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT, DEMAND
FOR JURY TRIAL, AND REQUEST FOR PERMANENT INJUNCTIVE RELIEF**

      Defendant, The Florida Agricultural and Mechanical University Board of
Trustees ("FAMU" or "Defendant") hereby submits its Answer and Affirmative
Defenses to Plaintiff, Maritza Reyes's ("Plaintiff") Second Amended Complaint
Demand for a Jury Trial, and Request for Permanent Injunctive Relief, and as a
general denial, FAMU denies all of Plaintiff's allegations, arguments, contentions,
characterizations, implications, facts and conclusions not specifically and explicitly
admitted herein.

## I. NATURE OF THE CLAIMS

      1.     Admit that Plaintiff brings this action under 42 U.S.C. §2000e et seq.
("Title VII"). Denied as to any remaining allegations in this paragraph.

      2.     Denied.

3.      Denied that Plaintiff is entitled to any relief on her alleged claims, and denied that Defendant should pay for her attorneys' fees as Plaintiff has represented herself during the course of this litigation.

## II. PARTIES

4.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation regarding Plaintiff's residency, race, native language, or national origin, therefore denied.  Defendant admits that Plaintiff was employed by Defendant. Denied as to any remaining allegations in this paragraph.

5.      Admit.

6.      Admit that Defendant is an employer within the meaning of Title VII. Defendant is without knowledge as to the other "pertinent laws" and therefore denies the remaining allegations in this paragraph.

7.      Admit that Defendant acts through its agents, representatives and employees. To the extent that Plaintiff implies that all alleged actions taken by employees, agents and representatives were authorized by Defendant, this allegation is denied.

## III. JURISDICTION AND VENUE

8.      Admit.

9.      Denied that all of Plaintiff's allegations were timely filed with the EEOC. Admit that Plaintiff filed this lawsuit within 90 days of receiving a Notice of Right to Sue from the EEOC.

10.      Denied.

11.     Admit.

## IV. FACTUAL BACKGROUND

12.     Admit that prior to joining FAMU, Plaintiff tendered certain credentials to FAMU including that she earned her J.D. from Nova Southeastern University College of Law and graduated *summa cum laude* in 2000. Plaintiff also represented that she earned Dean's List all semesters, that she received a book award in multiple classes, she was an editor on *Nova Law Review*, member of Moot Court Honor Society, and earned several awards while at Nova. Defendant lacks knowledge or information sufficient to form a belief about whether Plaintiff actually received these credentials, therefore denied. Denied as to the remaining allegations and inferences in this paragraph.

13.     Admit that Plaintiff disclosed to FAMU that during law school she was a summer associate with Holland and Knight and worked as a certified legal intern in the U.S. Attorney's Office. Admit that Plaintiff disclosed to FAMU that she had experience as a federal law clerk and in private practice. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

14.     Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

15.     Admit that Plaintiff advised FAMU that she earned her LLM from Harvard Law School. Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

16.     Admit that the FAMU COL was reestablished in 2000, reopened in 2002 and graduated its first class in 2005. Admit FAMU COL has been fully accredited by the ABA since 2009. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding LeRoy Pernell, therefore all remaining allegations are denied.

17.     Defendant admits that the FAMU COL recruited Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding the details of the recruitment process and specific communications with Dean Pernell, therefore all remaining allegations are denied.

18.     Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

19.     Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

20.     Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

21.     Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

22.     Denied that certain professors were sabotaging or attacking Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's belief, therefore denied.

23.     Defendant admits that Plaintiff was given an offer of employment as an assistant professor of law in a tenure track position. Defendant lacks knowledge

4

or information sufficient to form a belief about Plaintiff's allegations regarding the specifics of Plaintiff's hiring process, recommendations and offer, therefore denied.

24.    Defendant lacks knowledge or information sufficient to form a belief about Plaintiff's allegations regarding any calls Plaintiff made or materials she reviewed, therefore denied.  All remaining allegations of this paragraph are denied.

25.    Admit that on April 7, 2009, Plaintiff accepted the offer of employment as an Assistant Professor. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

26.    Admit.

27.    Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

32.    Admit that the RPT Committee was for a period comprised of only tenured full-professors and that this was changed to include tenured associate professors as well. All remaining allegations in this paragraph are denied.

33.    Admit that Plaintiff was required to apply for tenure by the 2014-2015 academic year. Defendant states that the COL Faculty Handbook and the Tenure and Promotion Schedule speak for themselves. Denied as to the remaining

allegations in this paragraph.

34.    Admit that these individuals comprised the 2014-2015 RPT Committee for the FAMU College of Law. Defendant lacks knowledge or information sufficient to form a belief about each individual's race or national origin, therefore all remaining allegations are denied.

35.    Defendant lacks knowledge or information sufficient to form a belief about each individual's race or national origin, therefore denied.

36.    Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

37.    Admit that Duncan was the Chair of the 2014-2015 RPT COL Committee. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

38.    Admit that Taite sent a memorandum to Dean Pernell on August 15, 2014 and that the Memorandum speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

39.    Defendant lacks knowledge or information sufficient to form a belief about the truth of whether Professor Taite was preparing her application for promotion, therefore denied. Denied as to any remaining allegations in this paragraph.

40.    Defendant lacks knowledge or information sufficient to form a belief about the truth of whether Taite or Pernell ever told Plaintiff about the

memorandum, therefore denied. Denied as to any remaining allegations in this paragraph.

41.     Admit that Plaintiff submitted her application for tenure on September 12, 2014.  All remaining allegations of this paragraph are denied.

42.     Admit that the University Tenure Schedule speaks for itself and lists October 10, 2014 as the date for the RPT Committee to provide its recommendation to Dean Pernell.

43.     Admit that Plaintiff emailed Dean Pernell regarding the status of her application and that the email referred to in this paragraph speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

44.     Admit that the tenure schedule speaks for itself and lists November 14, 2014 as the date for Dean Pernell to provide his recommendation. Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegations regarding the conversation between Plaintiff and Dean Pernell, therefore denied.

45.      Defendant lacks knowledge or information sufficient to form a belief about the truth of this allegation, therefore denied.

46.     Defendant states that the University Faculty Handbook speaks for itself. Denied as to any remaining speculative allegations in this paragraph.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Defendant states that the letters to Wright and Knight speak for themselves. Denied as to the remaining allegations in this paragraph.

51.     Admit that Duncan, Taite and Grant were interviewed. Without knowledge regarding the nature and content of the interviews or the intent of the witnesses, therefore all remaining allegations of this paragraph are denied.

52.     Admit that Ms. Collins was assigned to receive all professors applications and supporting materials and that Associate Dean Bullock provided a statement to the Division of Audit and Compliance investigation. Denied as to the remaining allegations in this paragraph.

53.     Denied that Associate Dean Bullock and Professor Duncan persuaded Ms. Collins to say Plaintiff submitted her application after the deadline. Defendant admits that Ms. Collins submitted a written statement and that Ms. Westbrook declined to submit a written statement. Denied as to the remaining allegations in this paragraph.

54.     Admit that Westbrook made a complaint of retaliation to the DAC, that the DAC conducted an investigation. Denied as to the remaining allegations in this paragraph.

55.     Admit that Broussard was interviewed during the DAC investigation and that she said it was easier to give Westbrook a good evaluation instead of have an investigation into her. Denied as to the remaining allegations in this paragraph.

56.     Admit that the DAC investigation found that Westbrook's evaluation from Associate Dean Bullock decreased and Collin's increased. Denied as to the remaining allegations in this paragraph.

57.     Defendant lacks knowledge as to Westbrook's national origin or when she separated her employment from the College. Denied as to the remaining allegations in this paragraph.

58.     Denied.

59.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

60.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

61.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

62.     Denied.

63.     Admit that students in Plaintiff's fall 2014 evidence course submitted complaints about Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

64.     Defendant lacks knowledge of information sufficient to form a belief about the truth of Plaintiff's conversation with a student on February 11, 2015. Denied as to the remaining allegations in this paragraph.

65.     Denied.

66.      Defendant states that the RPT's Report and Recommendation on

Tenure of Associate Professor Maritza Reyes speaks for itself. Admit that the students' written complaints and Plaintiff's response were attached to this Report and Recommendation. Denied as to the remaining allegations in this paragraph.

67.    Admit that Boothe-Perry, Henslee, and Persaud were chairs of subcommittees. Denied as to the remaining allegations in this paragraph.

68.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

69.    Denied.

70.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's conversations with Henslee, therefore denied. Denied as to the remaining allegations in this paragraph.

71.    Denied that Plaintiff received excellent external reviews on her scholarship. Defendant states that the reviews and the memorandum from Dean Pernell speak for themselves. Denied as to the remaining allegations in this paragraph.

72.    Denied.

73.    Denied that there were "ploys" during Plaintiff's tenure process, or that Plaintiff faced severe and pervasive hostilities and indignities in the workplace. Admit that Plaintiff submitted a Charge of Discrimination to the EOP on April 24, 2015 and that the document speaks for itself. Denied as to the remaining allegations in this paragraph.

74.    Admit that Gavin dismissed Plaintiff's complaint in its entirety and

that McKnight informed Plaintiff there is no appellate procedure to EOP investigations. Defendant states that the September 8, 2015 Memorandum speaks for itself. Denied as to the remaining allegations in this paragraph.

75.    Admit that ten (10) people on the RPT Committee voted as "opposed" to Plaintiff's tenure and that Dean Pernell recommended Plaintiff for tenure. Denied as to the remaining allegations in this paragraph.

76.    Admit that the University-wide RPT Committee did not recommend Plaintiff for tenure. Without knowledge regarding the makeup of the committee or input of its members with respect to the decision therefore all remaining allegations are denied.

77.    Admit that Mangum reviewed Plaintiff's tenure application and approved Plaintiff's tenure on June 10, 2015. Denied as to the remaining allegations in this paragraph.

78.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's conversations with Perez-Kudzma or Aviles, therefore denied. Denied as to the remaining allegations in this paragraph.

79.    Denied.

80.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's conversations with Cato or Duncan, therefore denied. Denied as to the remaining allegations in this paragraph.

81.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's conversations with Broussard, therefore denied.

Denied as to the remaining allegations in this paragraph.

82.     Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's conversations with Langston, therefore denied. Denied as to the remaining allegations in this paragraph.

83.     Denied.

84.     Denied.

85.     Admit that G.F. filed a complaint with the EOP office that was dismissed and that on December 19, 2008, G.F. sent a letter to Gavin regarding the EOP complaint. Defendant states that the documents referenced in this paragraph speak for themselves. Denied as to the remaining allegations in this paragraph.

86.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

87.     Defendant states that the email correspondence referenced in this paragraph speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

88.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

89.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

90.     Admit that there was an interaction on October 20, 2022 between

Smith and M.W. that resulted in the student filing a complaint with OCE, and that OCE issued a report. Defendant states that the OCE Report speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

91.     Denied.

92.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph dating back to 2010, therefore denied.

93.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph dating back to 2010, therefore denied.

94.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

95.     Defendant states that the October 23, 2019 email correspondence from Levitt speaks for itself. Denied as to the remaining allegations in this paragraph.

96.      Admit that Professor N.N. is not currently employed by Defendant. Denied as to the remaining allegations in this paragraph.

97.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

98.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

99.     Defendant states that the memorandum to Pernell speaks for itself. Denied as to the remaining allegations in this paragraph.

100.    Defendant states that the email correspondence speaks for itself. Denied as to the remaining allegations in this paragraph.

101.    Defendant states that Langston's Complaint speaks for itself. Denied as to the remaining allegations in this paragraph.

102.    Defendant states that Langston's Complaint speaks for itself. Denied as to the remaining allegations in this paragraph.

103.    Defendant states that Langston's Complaint speaks for itself. Denied as to the remaining allegations in this paragraph.

104.    Defendant states that the email correspondence speaks for itself. Denied as to the remaining allegations in this paragraph.

105.    Denied.

106.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

107.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

108.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

109.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this

14

paragraph.

110.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

111.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

112.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

113.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

114.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

115.    Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

116.    Denied.

117.    Defendant states that Plaintiff's memorandum referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

118. Denied.

119. Denied.

120. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

121. Denied.

122. Defendant states that Plaintiff's EOP Charge, Broussard's Response, and Gavin's Report speak for themselves. Denied as to the remaining allegations in this paragraph.

123. Admit that Plaintiff visited UF Law during the fall 2015 and that Defendant continued to pay Plaintiff while she was at UF Law. Denied as to the remaining allegations in this paragraph.

124. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

125. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

126. Admit that Plaintiff served as the faculty advisor for HALSA during her employment with Defendant. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

127. Admit that Plaintiff was removed as the HALSA faculty advisor after the Fall 2015 semester. Denied as to the remaining allegations in this paragraph.

128. Denied.

129.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

130.    Admit that Broussard submitted a EOP Charge against Plaintiff on November 25, 2015 and that the Charge speaks for itself. Denied as to the remaining allegations in this paragraph.

131.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

132.    Defendant states that the video referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

133.    Admit that Broussard filed a EOP Charge against Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

134.    Defendant states that Plaintiff's response to Broussard's EOP Charge speaks for itself. Denied as to the remaining allegations in this paragraph.

135.    Denied.

136.    Defendant state that the security footage of this incident speaks for itself. Denied as to the remaining allegations in this paragraph.

137.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's conversations with Polite, therefore denied. Defendant states that the security footage speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

138.    Denied.

139.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

140.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

141.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

142.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

143.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

144.    Defendant states that the security footage of the May 6, 2019 elevator encounter speaks for itself. Denied as to the remaining allegations in this paragraph.

145.    Denied that Beale engaged in hostile actions towards Plaintiff. Defendant states that the security footage of the elevator incident speaks for itself. Denied as to the remaining allegations in this paragraph.

146.    Defendant states that the security footage of the elevator incident speaks for itself. Denied as to the remaining allegations in this paragraph.

147.    Defendant states that the security footage of the elevator incident speaks for itself.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore

18

denied.

148.   Defendant states that the security footage of the elevator incident speaks for itself. Denied as to the remaining allegations in this paragraph.

149.   Admit that Plaintiff was a panelist. Denied as to the remaining allegations in this paragraph.

150.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

151.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

152.   Admit that Plaintiff was the panelist. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

153.   Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

154.   Defendant states that the email correspondence referenced in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

155.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

156.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

157.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

158.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

159.   Admit that the effective date of Plaintiff's promotion to Associate Professor was August 6, 2012, her tenure was approved on June 10, 2015, and that she was able to apply for promotion to full professor in 2017. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

160.   Admit that in 2017 FAMU used the Interfolio electronic application system, and that Reaves was the Chair of the RPT Committee. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

161.   Admit that Abrams was the Chair of the RPT Committee in 2018 and that Plaintiff timely submitted her application for promotion to full professor. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

162.   Defendant admits that these individuals reviewed Plaintiff's application for promotion to full professor. Defendant lacks knowledge or information sufficient to form a belief about each individual's race or national origin, therefore denied.

163.   Admit that Plaintiff filed and EOP Charge during her tenure process

20

and that the document speaks for itself. Denied as to the remaining allegations in this paragraph.

164. Denied.

165. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

166. Denied.

167. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

168. Defendant states the email correspondence referred to in this paragraph speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

169. Defendant states the email correspondence referred to in this paragraph speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

170. Denied.

171. Defendant states the email correspondence referred to in this paragraph speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

172. Defendant states the email correspondence referred to in this

paragraph speaks for itself. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph, therefore denied.

173.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

174.   Defendant lacks knowledge or information sufficient to form a belief about which professors gave evidence in support of Langston's EOP Charge, therefore denied. Denied as to the remaining allegations in this paragraph.

175.   Denied.

176.   Denied.

177.   Denied.

178.   Denied.

179.   Admit that the RPT Committee for Plaintiff's promotion to full professor in 2018 attached the 2014 and 2012 Reports on Plaintiff's scholarship from the previous evaluations of her scholarship. Denied as to the remaining allegations in this paragraph.

180.   Denied.

181.   Defendant states that the March 2, 2017 email to President Robinson speaks for itself. Denied as to the remaining allegations in this paragraph.

182.   Admit that the President was scheduled to notify promotion applicants of decisions in June 2019. Defendant states that the emails referred to

in this paragraph speak for themselves. Denied as to the remaining allegations in this paragraph.

183.    Defendant lacks knowledge or information sufficient to form a belief about Plaintiff's residence in Tallahassee, therefore denied. Denied as to the remaining allegations in this paragraph.

184.    Defendant states that the emails referred to in this paragraph speak for themselves. Denied as to the remaining allegations in this paragraph.

185.    Denied.

186.    Defendant lacks knowledge or information sufficient to form a belief about Plaintiff's conversations with Provost Edington, therefore denied. Denied as to the remaining allegations in this paragraph.

187.    Denied.

188.    Admit that Plaintiff did not receive the benefits associated with a promotion to full professor but denied as to the remaining allegations in this paragraph.

189.    Denied.

190.    Denied.

191.    Denied.

192.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

193.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

23

194.   Denied.

195.   Defendant states that the email correspondence referred to in this paragraph speaks for itself. Denied as to the remaining allegations in this paragraph.

196.   Admit that Dean Epps issued a letter of counseling to Plaintiff on October 18, 2016 and that the letter was placed in her personnel file. Denied as to the remaining allegations in this paragraph.

197.   Denied.

198.   Denied.

199.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

200.   Denied.

201.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

202.   Denied.

203.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

204.   Admit that Plaintiff filed a Charge of Discrimination with the EEOC. Denied as to the remaining allegations in this paragraph.

205.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

206.   Defendant lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph, therefore denied.

207.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

208.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

209.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

210.    Denied.

211.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

212.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, therefore denied.

213.    Defendant states that the documents referred to in the paragraph speak for themselves. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

214.    Defendant denies that Dean Keller or Ms. Snyder sabotaged Plaintiff. Defendant admits that Dean Keller promoted Snyder to Chief of Staff. Defendant states that the documents referred to in the paragraph speak for themselves. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

215.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

216.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

217.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

218.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

219.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

220.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

221.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

222.     Defendant denies that race was considered in any faculty member's tenure. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

223.     Denied that the decision to hire or award tenure was based on race. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations, therefore denied.

224.     Defendant denies that it retaliated against Plaintiff after she filed her EEOC Charge or that Plaintiff is being systematically targeted. Defendant admits that it denied Plaintiff's request to work remotely during the pandemic.

225.     Denied.

226.   Admit that Harvard University was not listed in the Academic Regalia section of the College of Law Hooding Ceremony for the Spring 2022 and that Plaintiff reached out to President Robinson. Denied as to the remaining allegations in this paragraph.

227.   Denied.

228.   Defendant states that the surveillance videos speak for themselves and denied that the surveillance videos show any "hostilities". Admit that FAMU is in possession of Plaintiff's emails sent or received from her FAMU email address. Denied that those emails provide evidence of her alleged claims of discrimination, harassment, hostile work environment, or retaliation. Denied as to the remaining allegations in this paragraph.

229.   Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

230.   Denied that Plaintiff has been "putting up with abuse in her workplace", that "she must file this lawsuit", or that anyone discriminated or harassed Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied.

231.   Defendant lacks knowledge or information sufficient to form a belief about Plaintiff's experiences and beliefs, therefore denied. Denied that Plaintiff has had to "tolerate the abuse" while employed with Defendant. Denied as to the remaining allegations in this paragraph.

**COUNT I**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII - Race**

232.   Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

233.   Defendant admits that it denied Plaintiff's application for promotion but denied that the decision was based on discrimination or retaliation. All remaining allegations of this paragraph are denied.

234.   Denied.

235.   Denied.

236.   Denied.

237.   Admit.

238.   Denied.

239.   Admit.

240.   Denied.

241.   Denied.

**COUNT II**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Color**

242.   Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

243.   Defendant admits that it denied Plaintiff's application for promotion but denied that the decision was based on discrimination or retaliation.   All

remaining allegations of this paragraph are denied.

 244. Denied.

 245. Denied.

 246. Denied.

 247. Admit.

 248. Denied.

 249. Admit.

 250. Denied.

 251. Denied.

## COUNT III
### Discrimination in the Terms and Conditions of Employment in Violation of Title VII – Sex and Sex-Race

 252. Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

 253. Defendant admits that it denied Plaintiff's application for promotion but denied that the decision was based on discrimination or retaliation. All remaining allegations of this paragraph are denied.

 254. Denied.

 255. Denied.

 256. Denied.

 257. Admit.

 258. Denied.

 259. Admit.

260.   Denied.

261.   Denied.

## COUNT IV
### Hostile Work Environment in Violation of Title VII – Race

262.   Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

263.   Admit.

264.   Denied.

265.   Denied.

266.   Denied.

267.   Denied.

268.   Denied.

269.   Defendant lacks knowledge or information sufficient to form a belief about the truth of what Plaintiff subjectively perceives, therefore denied.

270.   Denied.

271.   Denied.

272.   Denied.

## COUNT V
### Hostile Work Environment in Violation of Title VII – Color

273.   Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

274.   Admit.

275.    Denied.

276.    Denied.

277.    Denied.

278.    Denied.

279.    Denied.

280.    Defendant lacks knowledge or information sufficient to form a belief about the truth of what Plaintiff subjectively perceives, therefore denied.

281.    Denied.

282.    Denied.

283.    Denied.


**COUNT VI**
**Hostile Work Environment in Violation of Title VII – Sex and Sex-Race**

284.    Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

285.    Admit.

286.    Denied.

287.    Denied.

288.    Denied.

289.    Denied.

290.    Denied.

291.    Defendant lacks knowledge or information sufficient to form a belief about the truth of what Plaintiff subjectively perceives, therefore denied.

292.   Denied.

293.   Denied.

294.   Denied.

## COUNT VII
### Retaliation in Violation of Title VII

295.   To the extent this paragraph requires a response, Defendant denies that Plaintiff is entitled to relief in the alternative.

296.   Defendant reasserts and incorporates its prior responses to paragraphs 1 through 231 above as if fully set forth and incorporated herein.

297.   Admit.

298.   Defendant admits that it denied Plaintiff's application for promotion but denies that the decision was based on discrimination or retaliation. All remaining allegations of this paragraph are denied.

299.   Denied.

300.   Denied.

301.   Admit that Plaintiff sent letters on October 22, 2014 and October 30, 2014 and that on May 29, 2020 Plaintiff filed a EEOC Charge of Discrimination and that these documents speak for themselves. Denied as to the remaining allegations in this paragraph.

302.   Denied.

303.   Denied.

**WHEREFORE** Defendant denies that Plaintiff is entitled to receive any of her requested relief.

## AFFIRMATIVE DEFENSES

Without admitting, acknowledging or assuming any burden of proof that Defendant would not otherwise bear under law, and reserving the right to assert additional or other defenses or matters in avoidance after discovery progresses in this case, Defendant hereby asserts the following affirmative defenses against Plaintiff's Second Amended Complaint:

## FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief can be granted for any of the Counts asserted in the Second Amended Complaint. Plaintiff fails to allege facts show that Defendant's failure to promote her to full professor was based on her protected status or engaging in a protected activity and fails to allege facts that support a claim for damages. Plaintiff also fails to allege facts that reflect acts and events so severe and pervasive that that they would support a claim for a hostile work environment.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent she failed to timely file her Charge of Discrimination following the denial of her promotion to full-professor.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent she failed to exhaust her administrative remedies. Plaintiff's alleged Charge of Discrimination is not

attached to Plaintiff's Second Amended Complaint. To the extent Plaintiff's claims for discrimination in her Second Amended Complaint exceed the scope of her Equal Employment Opportunity Commission (EEOC) Charge and/or are outside the scope of any investigation conducted by the EEOC or the FCHR, such claims are barred because Plaintiff failed to exhaust her administrative remedies as required by Title VII of the Civil Rights Act of 1964 (Title VII).

## FOURTH AFFIRMATIVE DEFENSE

All allegations in Plaintiff's Second Amended Complaint that occurred more than 300 days prior to Plaintiff's filing of her Charge of Discrimination with the EEOC are time barred under 42 U.S.C. § 2000e(5) from being the basis of any of Plaintiff's claims, which are being brought pursuant to Title VII.

## FIFTH AFFIRMATIVE DEFENSE

Defendant cannot be liable under Title VII as it had in place legally sufficient anti-discrimination policies and reporting procedures, and exercised reasonable care to prevent and/or correct any discrimination, retaliation or harassment alleged by Plaintiff.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff fails to plausibly assert sufficient facts showing that she incurred any alleged damages that are causally related to any alleged acts, omissions, or breaches of duty by Defendant.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff alleged that an employee of Defendant acted in a

discriminatory manner toward her, such conduct, without admitting it occurred, was outside the course and scope of the employee's employment and/or was not condoned or ratified by Defendant and/or was undertaken without the knowledge or consent of the Defendant, and accordingly, Defendant is not liable.

## EIGHTH AFFIRMATIVE DEFENSE

Defendant's alleged actions as to Plaintiff were premised upon legitimate, non-discriminatory and non-retaliatory business reasons. Defendant's actions in this matter were undertaken in good faith, were necessary for the performance of its operations, and Defendant would have taken the same actions even in the absence of any alleged impermissible motivating factor.

## NINTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff has failed to make a good faith, reasonable effort to mitigate her damages she is not entitled to relief and Defendant is entitled to a setoff for any amounts recovered by Plaintiff in her efforts to mitigate damages.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's entitlement to any alleged relief is limited by the after-acquired evidence doctrine.

## ELEVENTH AFFIRMATIVE DEFENSE

Without waiving any other affirmative defense, Plaintiff's claims for damages, if any, are subject to applicable statutory caps, including but not limited to those imposed by 42 U.S.C. §1981a, and applicable federal and state law.

## TWELFTH AFFIRMATIVE DEFENSE

Defendant is entitled to a set off for any and all collateral sources, including but not limited to, any compensation earned by Plaintiff.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff does not have standing to assert a claim for injunctive relief because she cannot allege any danger of future harm.

**WHEREFORE,** Defendant, THE FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES, respectfully requests this Honorable Court to render a Final Judgment in favor of Defendant and against Plaintiff dismissing her Second Amended Complaint with prejudice, awarding Defendant its taxable costs of this action, reserving jurisdiction to determine Defendant's entitlement to an award of attorneys' fees against Plaintiff upon proper motion, and awarding all other relief the Court deems just and proper.

Respectfully submitted on September 23, 2024.

*/s/ Sarah P. L. Reiner*
Richard E. Mitchell, Esq.
Florida Bar No.: 0168092
rick.mitchell@gray-robinson.com
maryann.hamby@gray-robinson.com
Sarah L. Reiner, Esq.
Florida Bar No.: 520195
sarah.reiner@gray-robinson.com
roseann.foster@gray-robinson.com
Julie M. Zolty, Esq.
Florida Bar No.: 1036454
julie.zolty@gray-robinson.com
chantal.mccoy@gray-robinson.com
GrayRobinson, P.A.

301 East Pine Street, Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
*Attorneys for Defendant FAMU*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on September 23, 2024, a true and correct copy of the foregoing was filed through the CM/ECF system which will serve an electronic copy on all parties of record.

/s/ *Sarah P. L. Reiner*
Sarah P. L. Reiner, Esq.
GrayRobinson, P.A.

#61631661 v2

Tab 153

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

        Plaintiff,

v.                                       Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),

        Defendant.
_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Motion for Summary Final Judgement (Doc. 76), Plaintiff's Response in Opposition (Doc. 91), and Defendant's Reply (Doc. 93). For the reasons set forth below, the Motion will be granted.

## I.    BACKGROUND

Plaintiff, a Latina woman, accepted a position as an assistant professor of law at the Florida A&M University College of Law ("**FAMU Law**") in March 2009. (Doc. 34, ¶¶ 4, 25–26). Plaintiff alleges that she was the first Hispanic person hired in a tenure-track position at FAMU Law and the first to apply for tenure. (*Id.* ¶¶ 25, 36). Plaintiff alleges that she applied for tenure on September 12, 2014, and was subjected to a variety of unfair and improper conduct by members of the reviewing committee based on her race. (*See generally id.* ¶¶ 33–77). On April 24, 2015, Plaintiff submitted a complaint alleging discrimination and retaliation on the basis of race, color, national origin, and sex to the Office of Equal Opportunity Programs against the members of the tenure committee, which was dismissed after an investigation. (*Id.* ¶¶ 73–74). Although members of the

tenure committee recommended that Plaintiff be denied tenure, she was granted tenure on June 10, 2015. (*Id.* ¶¶ 75–77). Plaintiff subsequently applied for a promotion to full professor in 2018. (*Id.* ¶ 161). Ultimately, Defendant denied Plaintiff the promotion and communicated that decision in a letter dated July 24, 2019, and directed to Plaintiff at the College of Law. (Doc. 75-3 at 347). Plaintiff alleges that the process was again fraught with discrimination and irregularities. (*See generally* Doc. 34, ¶¶ 159–180). Additionally, Plaintiff alleges generally that she has been subjected to ongoing race and gender-based hostilities since she began her employment at FAMU Law. (*See generally id.*). Plaintiff raised these allegations in a Charge of Discrimination filed with the United States Equal Employment Opportunity Commission ("**EEOC**") on May 29, 2020. (Doc. 75-3 at 350–353). Plaintiff then brought the instant suit, alleging claims for discrimination, hostile work environment, and retaliation on the basis of race, color, national origin, and gender in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e *et seq.* (Doc. 34, ¶¶ 232–303).

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306,

1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor."  *Allen*, 495 F.3d at 1314.

## III.    DISCUSSION

As a preliminary matter, Defendant argues in its Reply that Plaintiff has failed to respond to its Statement of Material Facts, and therefore the Court may consider those facts undisputed in resolving the instant Motion.  As the movant, Defendant bears the initial burden of "showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Allen*, 495 F.3d at 1313–14.  Plaintiff then must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324 (quotation omitted).  Where the nonmovant fails to do so, the Court may consider the movant's asserted facts undisputed. *See Amguard Ins. Co. v. Super Winn Nail Spa, Inc.*, No. 23-

61304-CV, 2024 WL 999453, at *2 (S.D. Fla. Mar. 5, 2024) ("When a party fails to respond to a Motion for Summary Judgment and Statement of Undisputed Facts, Fed. R. Civ. P. 56(e) provides that the court may 'grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it.'" (quoting Fed. R. Civ. P. 56(e))); *see also Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2005) ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the Court's attention.").

Defendant is correct that Plaintiff's Response does not dispute the Statement of Material Facts contained in the Motion with citation to record evidence.  Indeed, the Response contains few citations to the record at all.  Further, Plaintiff's assertion that the Second Amended Complaint (Doc. 34) "provides a sufficient factual showing for Plaintiff's claims to survive summary judgment" is unavailing.  (Doc. 91 at 3); *see Celotex Corp.*, 477 U.S. at 324 ("Rule 56(e) . . . requires the nonmoving party to *go beyond the pleadings* and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." (emphasis added); *see also Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984) ("The party adverse to the movant for summary judgment cannot rest on his pleadings to present an issue of fact.").  Accordingly, to the extent that Plaintiff has failed to dispute Defendant's statement of facts or otherwise support her arguments with record evidence, the Court will treat the facts laid out in the Motion as undisputed.

A.    **Timeliness of Plaintiff's Claims**

Turning to the merits of the Motion, Defendant first argues that summary judgment is appropriate on Counts I, II, and III because Plaintiff failed to timely exhaust administrative remedies.  Timely filing a charge of discrimination with the EEOC is a prerequisite to suit under Title VII.  *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001).  In Florida, A plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory act.  *Id.* at 1262–63.  The Eleventh Circuit has held that "an adverse employment action is deemed to have occurred when the employer made the final decision and communicated it to the employee."  *Liu v. Univ. of Mia. Sch. of Med.*, 138 F. Supp. 3d 1360, 1370 (S.D. Fla. 2015) (quoting *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009); *see also Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996) ("[T]he time for filing an EEOC charge begins to run when the employee receives unequivocal notice of the adverse employment decision.").

Defendant contends that it notified Plaintiff of the denial of promotion by the July 24, 2019 letter.  (Doc. 75-2 at 1, 5).  Defendant accordingly argues that Plaintiff's May 29, 2020 Charge of Discrimination—filed 310 days after July 24, 2019—was untimely.  While there is no dispute that the July 24, 2019 letter is "unequivocal notice" of Plaintiff's denial of promotion, Plaintiff responds that she did not receive the same until August 5, 2019.  (Doc. 75-3 at 172:1–17; Doc. 91 at 7).  The Court therefore finds that the record evidence shows a genuine dispute of material fact as to when Plaintiff received notice of her denial of promotion to full professor.  Accordingly, the Court will deny summary judgment on the basis that Plaintiff's Charge of Discrimination was untimely.  *See Stewart v. Booker T.*

*Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000) ("[T]o require a plaintiff to file a discriminatory termination charge with the EEOC prior to the *receipt* of notice of termination would be to require a filing prior to the occurrence of the discriminatory conduct." (emphasis added)).

**B.    Employment Action Discrimination**

Defendant next argues that Plaintiff has failed to produce evidence to support her claims for employment discrimination on the basis of race, color, national origin, and sex—Counts I, II, and III—related to her denial of promotion to full professor. In cases where, as here,[1] there is no direct evidence of discrimination, a burden-shifting framework applies to evaluate circumstantial evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, Plaintiff must produce "sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion." *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998) (quotation omitted). To establish her prima facie case, Plaintiff must prove that (1) she was a member of a protected class; (2) she was qualified for or adequately performed her position; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably than she was. *See Knight v. Baptist Hosp. of Mia., Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

If Plaintiff produces sufficient evidence to support an inference that her denial of promotion was motivated by unlawful animus, the burden then shifts to Defendant to articulate legitimate and nondiscriminatory reasons for the employment action. *See*

---

[1] Plaintiff contends that she has direct evidence that her denial of promotion was motivated by unlawful animus but fails to identify any such evidence in the record.

*Castillo v. Roche Labs, Inc.*, 467 F. App'x 859, 862–63 (11th Cir. 2012).  This would require Defendant to produce evidence that would allow the jury to rationally conclude that the employment action was not motivated by discriminatory animus.  *See Tex. Dep't of Cmty Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981).  The burden then shifts back to Plaintiff to prove that Defendant's proffered nondiscriminatory reason is pretextual and that the actual reason for the adverse employment action was discrimination.  *Brown v. City of Opelika*, 211 F. App'x 862, 863–64 (11th Cir. 2006).

There is no dispute that Plaintiff belongs to a protected class with respect to each of her claims for employment discrimination or that her denial of promotion was an adverse employment action.  Defendant instead argues that summary judgment is appropriate on Counts I, II, and III because Plaintiff has failed to point to any evidence of actual discriminatory intent or motive.

The Court finds that Plaintiff has failed to establish a prima facie case of employment discrimination.  Plaintiff's Response contains only argument that her denial of promotion was motivated by discriminatory animus, without citation to *any* record evidence for support.  Similarly, although Plaintiff does name several individuals she contends are "similarly situated" comparators, she fails entirely to explain, with citation to the record, how they qualify as "similarly situated" and how they were treated more favorably.  Without record support, Plaintiff necessarily cannot produce "sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion."  *Williams*, 144 F.3d at 1441 (quotation omitted).  Accordingly, Plaintiff's claims for employment discrimination fail at the outset.

Even assuming that Plaintiff could establish a prima facie case of discrimination, the Court further finds that Defendant has articulated a nondiscriminatory reason for the denial of promotion.  *See Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) ("[T]he defendant's burden of rebuttal is exceedingly light; 'the defendant need not persuade the court that it was actually motivated by the proffered reasons . . . it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" (quoting *Tex. Dep't of Cmty Affs.*, 450 U.S. at 254–55)).  Specifically, Defendant points to a committee report recommending against Plaintiff's promotion because Plaintiff had failed to meet the standard for production of scholarship.  (Doc. 75-3 at 340–343).  Provost Maurice Edington, the final decisionmaker with respect to Plaintiff's denial of promotion, articulated this same reason to Plaintiff when explaining the reasons for her denial of promotion.  (Doc. 75-2 at 1, 6).

The Court finds that this is a legitimate, nondiscriminatory reason for Plaintiff's denial of promotion, and sufficient to satisfy Defendant's "exceedingly light" burden of rebuttal.  *Perryman*, 698 F.2d at 1142; *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (quotation omitted)).  Moreover, apart from several conclusory comments, Plaintiff has failed to develop and support any argument that this reason is pretextual.  Any such argument is thus waived.  *See W. Sur. Co. v. Steuerwald*, No. 16-61815-CV, 2017 WL 5248499, at *2 (S.D. Fla. Jan. 17, 2017) ("It is axiomatic that arguments not supported and properly developed are deemed waived."); *see also U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting

that the court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived); *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Finally, Plaintiff argues that a Title VII plaintiff who cannot satisfy the *McDonnell Douglas* burden shifting framework may still prove her case with what the Eleventh Circuit has called a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) (quotation omitted). "A convincing mosaic of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Id.* at 947 (quotations omitted); *see also Equal Emp. Opportunity Comm'n v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018) ("A plaintiff can prove sex discrimination under Title VII by showing that her sex was a motivating factor for any employment practice, even though other factors also motivated the practice." (quotations omitted)).

Under any standard or procedural framework, however, Plaintiff's claims cannot survive summary judgment. As noted above, Provost Edington has disclaimed any discriminatory intent. Further, the committee that evaluated Plaintiff for promotion articulated a legitimate reason for its recommendation of denial. Although Plaintiff contends that she has a "convincing mosaic" of evidence in addition to "mixed-motive" evidence showing otherwise, she does not point to any such evidence, direct or circumstantial, in the record. Plaintiff accordingly fails to create any genuine dispute of material fact, and there is no basis upon which a reasonable jury could infer that

Defendant's failure to promote Plaintiff was motivated by unlawful discriminatory animus. Summary judgment is appropriate on Plaintiff's claims for employment discrimination in Counts I, II, and III.

### C.    Hostile Work Environment Harassment

Defendant next seeks summary judgment on Plaintiff's hostile work environment claims under Title VII, alleged in Counts IV, V, and VI.  An employer may be liable for unlawful discrimination against an employee through the "creation of a hostile work environment caused by . . . harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007).  To establish her claims for hostile work environment, Plaintiff must show that: (1) she belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her race, color, or sex; (4) the "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) "a basis for holding the employer liable." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Defendant first contends that Plaintiff's claims for hostile work environment are untimely.  As noted above, prior to bringing suit under Title VII, Plaintiff was first required to file a charge of discrimination within 300 days of the discriminatory acts alleged therein. *See Maynard*, 256 F.3d at 1262–63.  With respect to claims of harassment, a Court may consider a series of untimely harassing conduct, provided that such conduct is "part of the same actionable hostile work environment practice, and . . . any act falls within the statutory time period."  *Jimerson v. Int'l Longshoremen's Ass'n, Local 1423*, No. Civ.A. CV205-101, 2005 WL 3533044, at *16 (S.D. Ga. Dec. 22, 2005) (quotation omitted).  "A

series of harassing conduct comprises the same hostile work environment where the 'pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'" *Jones v. Allstate Ins. Co.*, 707 F. App'x 641, 647 (11th Cir. 2017) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002)).

Plaintiff filed her Charge of Discrimination on May 29, 2020. (Doc. 75-3 at 350). Accordingly, only acts of discriminatory harassment occurring on or after August 3, 2019, are timely. Although Plaintiff's charge of discrimination alleges a series of discriminatory incidents stretching back to 2010, the Court notes that these incidents seemed to occur only rarely over a span of more than ten years. (*Id.* at 350–351). Further, the charge of discrimination alleges insulting comments, a "sham" dismissal of Plaintiff's discrimination charge with Defendant, and accusations related to the performance of Plaintiff's job duties. Each of these actions is alleged to have been perpetrated by different individuals, some Plaintiff's colleagues, some her supervisors. The Court accordingly finds that these allegations involve disparate discriminatory acts, committed infrequently, and by different individuals. Therefore, the incidents alleged before August 3, 2019 are not "part of the same actionable hostile work environment practice" and are thus untimely. *Jimerson*, 2005 WL 3533044, at *6. The Court will accordingly not consider evidence of any such incidents in evaluating Plaintiff's claims for hostile work environment.

On the merits, Defendant argues that Plaintiff's claims for hostile work environment fail because the alleged harassment is not sufficiently "severe or pervasive." *Mendoza*, 195 F.3d at 1245. Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation omitted). In fact, "Title VII does not prohibit all verbal

or physical harassment in the workplace[.]"  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing[,]" do not violate the law.  *Faragher*, 524 U.S. at 788 (quotation omitted).  Instead, "Title VII prohibits only the type of severe or pervasive [ ] harassment that 'alter[s] the conditions of the victim's employment.'"  *Johnson*, 234 F.3d at 509 (quoting *Oncale*, 523 U.S. at 81).  In evaluating whether harassing conduct is severe or pervasive, courts must consider the "totality of the circumstances," looking to four factors: (1) frequency, (2) severity, (3) whether the conduct is physically threatening or humiliating, and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza*, 195 F.3d at 1246.  Plaintiff's subjective perception of harassment as severe or pervasive "must be objectively reasonable."  *Id.*  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Id.* (quoting *Oncale*, 523 U.S. at 81).

Considering the totality of the circumstances presented in the summary judgment record, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claims.  First, it is undisputed that Plaintiff was never subjected to physically threatening conduct, cutting against the severity of the alleged harassment.  Second, the record shows that any harassing conduct or behavior was too infrequent or sporadic to be considered pervasive.  Plaintiff cites no record evidence to refute these conclusions.  Further, the harassing conduct Plaintiff alleges—again, without record support—simply does not rise to the level of severity necessary to alter the conditions of Plaintiff's employment.  *See, e.g.*, *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005)

(affirming summary judgment for employer where African American plaintiff was repeatedly called racial slurs and occasionally subjected to other racially threatening conduct).  Finally, Plaintiff points to no evidence that any of the alleged harassing conduct "unreasonably interfere[d] with [her] job performance."  *Mendoza*, 195 F.3d at 1246.  Because Plaintiff has failed to set forth any evidence showing there is a genuine dispute of material fact as to the severity and pervasiveness of the alleged harassment, the Court finds that summary judgment for Defendant on Counts IV, V, and VI is appropriate.

### D.    Retaliation

Defendant finally argues that it is entitled to summary judgment on Plaintiff's retaliation claim, alleged in Count VII.  Under Title VII's anti-retaliation provision, an employer cannot retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish retaliation, Plaintiff must show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  *Howard v. Walgreen* Co., 605 F.3d 1239, 1244 (11th Cir. 2010).

Defendant argues summary judgment is appropriate because Plaintiff has failed to establish a causal connection between her protected activity and an adverse employment action.  Plaintiff alleges that she filed multiple formal complaints with Defendant regarding "unequal treatment, discrimination, and bias"—in addition to similar informal statements— and that Defendant subjected Plaintiff to a "pattern of retaliatory conduct."  (Doc. 34, ¶¶ 301–302).  However, Plaintiff fails to identify *any* instances of such retaliatory conduct

or to cite to the same in the record.  Nor does Plaintiff explain the causal connection between the alleged "retaliatory harassment" and an adverse employment action. Without any evidence of the alleged pattern of retaliatory conduct or a causal link to her complaints, Plaintiff's claim for retaliation cannot survive summary judgment.  *See DeBose v. USF Bd. of Trs.*, 811 F. App'x 547, 557 (11th Cir. 2020) (affirming judgment as a matter of law against the plaintiff for failure to present evidence establishing causation between complaints of discrimination and the plaintiff's termination). Accordingly, Defendant's Motion will be granted as to Count VII.

## IV.   CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Summary Final Judgement (Doc. 76) is **GRANTED in part** as set forth herein and **DENIED** in all other respects.

2. The Clerk is directed to enter judgment in favor of Defendant, and against Plaintiff, on each of her claims.

3. Thereafter, the Clerk is directed to terminate all pending motions and close this case.

**DONE AND ORDERED** in Orlando, Florida on January 10, 2025.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

Tab 154

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

     Plaintiff

v.                               Case No.:  6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY
BOARD OF TRUSTEES (FAMU),

     Defendant.

_____

## JUDGMENT IN A CIVIL CASE

**Decision by Court.**    This action came before the Court and a decision has been rendered.

     **IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, and

against Plaintiff, on each of her claims.

**Any motions seeking an award of attorney's fees and/or costs must be filed within the time and in the manner prescribed in Local Rule 7.01, United States District Court Middle District of Florida.**

Date: January 13, 2025

                             ELIZABETH M. WARREN,
                             CLERK

                             s/ELA, Deputy Clerk

## CIVIL APPEALS JURISDICTION CHECKLIST

1.    **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)    **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable.  A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983).  A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

    (b)    **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984).  A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)    **Appeals pursuant to 28 U.S.C. Section 1292(a)**:  Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed."  Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)    **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5:**  The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals.  The district court's denial of a motion for certification is not itself appealable.

    (e)    **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546-49 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.    **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional.  Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001).  In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

    (a)    **Fed.R.App.P. 4(a)(1)**:  A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from.  However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within  60 days after such entry.  **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.**  Special filing provisions for inmates are discussed below.

    (b)    **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)    **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)    **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal.  Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause.  Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)    **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing.  Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format.  See also Fed.R.App.P. 3(c).  A pro se notice of appeal must be signed by the appellant.

4.    **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

Tab 72

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**MARITZA REYES,**

             **Plaintiff,**

**v.**                                            **Case No: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),**

             **Defendant.**

_____

**ORDER**

          This cause comes before the Court for consideration with oral argument on the following

motion:

| | |
|---|---|
| **MOTION:** | **Plaintiff's Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and _Daubert_ Motions Deadline if Necessary (Doc. 51)** |
| **FILED:** | **May 31, 2024** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

          Maritza Reyes (Plaintiff), proceeding _pro se_, brings this case against Florida A&M

University Board of Trustees (Defendant) for discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, _et. seq_.  Doc.

34.  On February 13, 2023, the Court entered the Case Management Scheduling Order (CMSO)

and set May 31, 2024 as the discovery deadline.  Doc. 26.  At 8:43pm on the date of that deadline,

Plaintiff filed an Expedited Short-Form Discovery Motion for Extension of Discovery Deadline

and Dispositive and _Daubert_ Motion Deadline if necessary.  Doc. 51 (the Motion).  Plaintiff

requests a 60-day extension of the discovery deadline to allow an attorney to join the case or, alternatively, "the time necessary to complete the pending depositions of Defendant Florida A&M University Board of Trustees ("FAMU")'s employee administrators, including President Larry Robinson, who has not been made available for deposition despite the Court's Order denying Defendant's Motion for Protective Order." *Id*. at 1-2.[1]  Plaintiff still seeks to depose five witnesses; conferral began in March 2024 for the deposition of one, and conferral began in May 2024 for the other four depositions.   Plaintiff adds that the July 2, 2024 dispositive and *Daubert* motions deadline will also need to be extended to allow the parties time to obtain the transcripts of the depositions.  *Id*. at 2.  Defendant has filed a Response in opposition to the Motion and, with leave of Court, Plaintiff filed a Reply to the Response.  Docs. 55, 68.  On June 18, 2024, the Court conducted a hearing on the Motion.  Doc. 69.[2]  Plaintiff has since filed a Notice of Supplemental Authority.  Doc. 71.

The Motion is due to be denied as Plaintiff has not established good cause for the requested extension.  Rule 16(b)(4) provides that a case management and scheduling order "may be modified only for good cause and with the judge's consent."   "This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension."  *See Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (per curiam)

---

[1] Plaintiff mentions President Larry Robinson (Dr. Robinson) as one of FAMU's administrators she seeks to depose, but Dr. Robinson was also the subject of a separate motion to compel.  Doc. 50.  By Order dated June 13, 2024, the Court granted in part that request and ruled that Dr. Robinson shall appear for deposition on or before June 26, 2024.

[2] Plaintiff states in the Motion that she limited the analysis of the "good cause" requirement because of the Court's Order on Discovery Motions.  Doc. 51 at 2 n 3.  Plaintiff requested an opportunity to provide additional briefing if the Court was not inclined to grant the Motion.  *Id*. at 3.  The court granted Plaintiff's request to file a reply.  Further, the Court held a hearing and allowed the parties to present argument and legal authority to support their positions.  Doc. 63.

(internal quotation marks omitted).  The CMSO also warns that an extension will not be granted absent a showing of good cause.  Doc. 26 at 5.

Litigation in this case began in August 2022, yet Plaintiff waited until March 2024 to begin conferral with Defendant's counsel regarding the depositions at issue in the Motion.  By the time Plaintiff filed the Motion—on the final day of the discovery period, May 31, 2024—more than 15 months had passed since the Court set the deadline for discovery.  Plaintiff offers two reasons to explain her delay and to support her claim that good cause exists, but neither reason satisfies the standard.

First, Plaintiff alleges that Defendant wrongfully dismissed her from employment in February 2024[3] and "has kept Plaintiff busy defending against its false charges in its internal proceedings."  Doc. 51 at 2.  Plaintiff claims that she "planned to devote [her] personal time to handling this lawsuit, including discovery during the Spring 2024 semester, well before the discovery deadline on May 31, 2024," but in February FAMU's Provost sent a letter of intent to dismiss employment.  Doc. 51-1 at 1.  Some administrative proceedings with FAMU regarding dismissal followed, and on March 28, 2024, FAMU's Provost issued the Notice of Dismissal of Employment terminating Plaintiff's employment effective April 5, 2024.  *Id*. at 4.  Additional events regarding the dismissal and appeal took place, and Plaintiff contends that she has "devoted a substantial amount of time to dealing with additional repercussions of [her] dismissal[.]"  *Id*. at 5.  Plaintiff asserts that "[d]ealing with the wrongful dismissal took precedence over this lawsuit because [her] career, professional reputation, source of income, livelihood, and future employment are at stake."  *Id*. at 2.

---

[3] Plaintiff clarifies in her declaration that on February 16, 2024, FAMU's Provost sent a Notice of Intent to Dismiss from Employment and on March 28, 2024, the Provost issued the Notice of Dismissal of Employment.  Doc. 51-1 at 1-2.

While Plaintiff may not have anticipated that FAMU would ultimately dismiss her from employment, her decision to wait until March 2024 to begin discovery in this case was her own. Plaintiff is responsible for litigating her case, and she made a personal or strategic choice to hold off on attempting to conduct depositions. FAMU's purported disruption of that plan with the employment decision and the administrative activity that ensued does not provide good cause under Rule 16(b)(4) or justify modifying the Court's deadlines. This also holds true regarding the period between FAMU's notice of intent to dismiss in February 2024 and the filing of the Motion on May 31, 2024. Diligence in fighting FAMU on the administrative front is not diligence in complying with the CMSO deadlines. Plaintiff chose to wait over a year to attempt to set depositions in this case, and Plaintiff also chose to prioritize the administrative process over this case; strategic and personal choices she made at her own peril. But litigating this case and fighting FAMU administratively are not mutually exclusive activities—all Plaintiff had to do was notice the depositions or serve the subpoenas during the discovery period. She did not.

Second, Plaintiff claims that good cause exists because she "proceeded under the General Policy and Practice of this Court's Civil Discovery Handbook and trusted Defense counsel's continued representations that it was coordinating the depositions with Defendant." Doc. 51 at 2. Plaintiff started conferral with Defendant's counsel in March 2024 to schedule two of the depositions,[4] but the parties could not agree on the dates or location. Then, just weeks before discovery closed—in May 2024—Plaintiff requested four additional depositions. The parties began conferrals about those four depositions, but no depositions were agreed to prior to the discovery deadline. It is Plaintiff's position that her attempt to comply with the spirit of the good

---

[4] One of these depositions was for Dr. Robinson, and the Court has ordered that his deposition proceed.

faith conferral requirement delayed the filing of the Motion even though she diligently communicated with Defendant's counsel.  Docs. 51; 68.[5]

The main problem for Plaintiff is that she waited too long to request the depositions.  While Plaintiff may have been diligent starting in March 2024 (as to one witness) or May of 2024 (as to the other four), the diligence inquiry takes into consideration the entirety of the discovery period, not just how diligent you were once you started trying to conduct discovery.  In other words, a hard but fruitless scramble at the end of the discovery period fails to establish that the Court's deadlines could not have been met had Plaintiff exercised diligence when the scramble began 15 months after discovery opened.

Further, Plaintiff should have taken unilateral action during the discovery period, and then, if necessary, Plaintiff should have sought Court intervention during the discovery period.  Assuming it is true that Defendant engaged in dilatory tactics that made it "impossible" for Plaintiff to schedule the depositions by agreement, Plaintiff should have unilaterally noticed the depositions or served subpoenas.  *See* Middle District of Florida Handbook, § II(A)(1) (2021) ("An attorney is expected to accommodate the schedules of opposing counsel. In doing so, the attorney should normally pre-arrange a deposition with opposing counsel before serving the notice. If this is not possible, counsel may unilaterally notice the deposition while at the same time indicating a willingness to be reasonable about any necessary rescheduling.").  Here, Plaintiff took no unilateral action during the discovery period—she noticed no depositions and served no subpoenas.  Had Plaintiff taken unilateral action, and had Defendant or any person failed to comply with Plaintiff's notices or subpoenas, Plaintiff could have sought Court intervention during the discovery period;

---

[5] Plaintiff represents that she counted at least 70 emails regarding the deposition schedule.  Doc. 68 at 2.

a process made inexpensive and efficient by the Court's Order on Discovery Motions. Requirements concerning conferral are certainly enforced, but they do not require an exchange of 70 emails before seeking Court intervention.

Finally, to the extent that Plaintiff seeks an extension to allow an attorney to "join the case," no attorney has appeared on behalf of Plaintiff, and Plaintiff made no representation at the hearing that such an appearance is imminent.  The Court will not grant an extension based on the mere possibility that a lawyer may appear on Plaintiff's behalf if an extension is granted.

Based on the foregoing, and the reasons stated at the hearing it is **ORDERED** that Plaintiff's Motion (Doc. 51) is **DENIED**.

**ORDERED** in Orlando, Florida on June 20, 2024.

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

- 6 -

Tab 124

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

                Plaintiff,

v.                                          Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),

                Defendant.
_____/

## <u>ORDER</u>

THIS CAUSE is before the Court on Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102) and Defendant's Response (Doc. 113) thereto.  For the reasons set forth below, the Motion will be denied.

On February 13, 2023, the Court issued a Case Management and Scheduling Order ("**CMSO**," Doc. 26) in this case.  As is relevant to the instant Motion, the CMSO provides that dispositive motions were due by July 2, 2024, and that a party may respond to a motion for summary judgment within thirty days after services of the motion.  (*Id.* at 1, 6).  Defendant timely filed its Motion for Final Summary Judgment (Doc. 76).  On her unopposed motions, Plaintiff was granted three extensions of time to respond to the Motion.  (Doc. Nos. 79, 80, 82, 83, 87, 89).  Plaintiff filed her summary judgment Response (Doc. 91) on August 19, 2024, and Defendant filed its Reply (Doc. 93) on September 3, 2024.

Plaintiff now moves to replace the Response with a corrected version thereof (the "**Corrected Response**") and asks the Court to accept accompanying supporting evidence.  Because Plaintiff cites Federal Rule of Civil Procedure 6(b)(1)(B) as the basis for her requested relief, the Court will treat the Motion as a request for extension of time to respond to Defendant's motion for summary judgment.

Federal Rule of Civil Procedure 6(b)(1)(B) provides that deadlines may be extended "for good cause" "after the time has expired if the party failed to act because of excusable neglect."  *See also Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 944 (11th Cir. 2015) ("A party seeking the extension of an already-expired scheduling order deadline must show both good cause *and* excusable neglect.").  "In determining whether a party has shown 'excusable neglect' warranting an extension, a court must consider all pertinent circumstances, including 'the danger of prejudice to the nonmovant, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'"  *Id.* (quoting *Advanced Estimating Sys., Inc. v. Riney*, 77 F.3d 1322, 1325 (11th Cir. 1996)).  To establish good cause, the party seeking the extension must establish that the schedule could not be met despite the party's diligence. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008); *see also Hermann v. McFarland*, No. 22-10644, 2022 WL 4489427, at *4 (11th Cir. Sept. 28, 2022).

Plaintiff argues that, despite her diligence, a medical emergency prevented her from editing her summary judgment response and forced her to file a draft version—the current Response—rather than the complete Corrected Response and supporting

exhibits.  Plaintiff further argues that Defendant will not be prejudiced by this relief because the Corrected Response includes only stylistic and formatting changes, rather than substantive revisions.

Plaintiff's arguments fall short.  The record shows that Plaintiff was well aware of the deadline to file her response to Defendant's Motion for Summary Judgment.  Indeed, Plaintiff requested, and was granted, three separate extensions to do so.  Nonetheless, Plaintiff failed to timely draft and file her Response and accompanying evidence. Although the Court recognizes that Plaintiff's medical issues are outside of her control, it must be noted that Plaintiff previously filed timely motions for extensions of time, and she offers no explanation for her failure to do so on this occasion.  And, after filing the Response, Plaintiff took fifteen days to notify the Court of her error, (*see generally* Doc. 92), and an additional twenty-nine days to file the instant Motion.  This does not reflect a diligent attempt to comply with Court deadlines or quickly remedy noncompliance.

Further belying Plaintiff's claim of diligence is the fact that although Plaintiff contends that she intended to file supporting affidavits with her Response, the Response does not cite any such affidavits and three of Plaintiff's proposed affidavits are dated *after* both the summary judgment response deadline *and* the filing of Defendant's Reply.  (Doc. 107-2 at 11, 17, 21).  It appears, therefore, that Plaintiff is not attempting to merely correct an unedited draft in good faith but is rather attempting to supplement her Response after having the benefit of reading Defendant's Reply, which undermines Plaintiff's argument regarding prejudice.  Indeed, if the Court were to grant the Motion, Defendant would need to file a supplemental reply, incurring additional costs and further delaying judicial proceedings at an already late stage.  At bottom, Plaintiff has not shown the diligence

3

necessary to support a finding of good cause, and the circumstances surrounding the Motion foreclose a finding of excusable neglect.

Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on November 1, 2024.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

4

Tab 125

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

        Plaintiff,

v.                                 Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),

        Defendant.
_____/

## ORDER

THIS CAUSE is before the Court on Plaintiff's Time-Sensitive Motion to Re-Open Discovery and Summary Judgment (Doc. 105) and Defendant's Response (Doc. 118) thereto.  For the reasons set forth below, the Motion will be denied.

On February 13, 2023, the Court issued a Case Management and Scheduling Order ("**CMSO**," Doc. 26) in this case.  As is relevant to the instant Motion, the CMSO provided that discovery would close on May 31, 2024, and that dispositive motions were due by July 2, 2024.  (*Id.* at 1).  On the final day of discovery, Plaintiff filed an "Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and *Daubert* Motions Deadline if Necessary ("**Discovery Motion**," Doc. 51), which United States Magistrate Judge Daniel C. Irick denied, finding that Plaintiff had failed to diligently comply with applicable deadlines.  (Doc. 72 at 3–6).

Plaintiff now moves to re-open discovery and the deadline to file a motion for summary judgment for at least sixty days, arguing that she has been unable to draft a motion for summary judgment because Defendant only recently filed its Answer and

Affirmative Defenses (Doc. 97) to the Second Amended Complaint (Doc. 34).  When a deadline appears in a scheduling order and a motion for more time is filed after the deadline, "Rule 16 is the proper guide for determining whether a party's delay may be excused." *Davis v. Wing Enters.*, No. 2:19-cv-780, 2021 WL 4478247, *1 (M.D. Fla. Sept. 30, 2021) (quoting *Destra v. Demings*, 725 F. App'x 855, 859 (11th Cir. 2018)).  Rule 16(b)(4) provides that "a schedule may be modified only for good cause and with the judge's consent."  *Id.* (quoting Fed. R. Civ. P. 16(b)(4)).  Under this standard, the party requesting the extension demonstrates good cause only if "the schedule cannot be met despite the diligence of the party seeking the extension."  *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (quotation omitted); *see also Howard v. Wilkinson*, No. 6:17-cv-1473-Orl, 2019 WL 10855186, at *1 (M.D. Fla. May 16, 2019) ("Rule 16(b)(4)'s 'good cause' standard is a rigorous one, focusing not on the good faith of or the potential prejudice to any party, but rather on the parties' diligence in complying with court-imposed deadlines." (citing *Sosa*, 133 F.3d at 1418)).

Apart from a conclusory statement that she has diligently attempted to comply with CMSO deadlines, Plaintiff fails to show diligence.  And the record likewise reveals none.  Plaintiff has been aware of the deadlines in this case since February 2023.  However, as Magistrate Judge Irick noted in his Order denying the Discovery Motion, Plaintiff delayed significantly in conducting discovery.  (Doc. 72 at 4–5).  Despite that denial, Plaintiff also waited until three months after the summary judgment deadline to file the instant Motion.  Therefore, to the extent that Plaintiff argues that the amended pleadings have delayed her dispositive motions, Plaintiff's lack of diligence in conducting discovery was a significant contributing factor.  Simply put, the record shows that with diligence, Plaintiff

could have timely completed discovery and filed dispositive motions, or at least, timely and properly moved for an extension of deadlines to permit compliance.  Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiff's Time-Sensitive Motion to Re-Open Discovery and Summary Judgment (Doc. 105) is **DENIED**.

      **DONE AND ORDERED** in Orlando, Florida on November 1, 2024.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

Tab 127

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARITZA REYES,**

   **Plaintiff,**

**v.**           **Case No: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M UNIVERSITY BOARD**
**OF TRUSTEES (FAMU),**

   **Defendant.**

---

## ORDER

   Pending before the Court is Plaintiff's Motion to Strike Defendant's Affirmative Defenses. Doc. 112 (the Motion). As an initial matter, the Court finds that the Motion is due to be denied because Plaintiff did not comply with Local Rule 3.01(g) and the Case Management Scheduling Order (CMSO). Pursuant to Local Rule 3.01(g), a movant must confer with the opposing party in a good faith effort to resolve the motion. The Court explains in the CMSO that:

> The term "confer" in Rule 3.01(g) requires a substantive conversation *in person or by telephone* in a good faith effort to resolve the motion without court action and **does not envision an exchange of ultimatums** by fax, letter, or e-mail.

Doc. 26 at 4 (emphasis added).

   Defendant represents that on October 14, 2024, Plaintiff sought to confer with Defendant's counsel regarding the Motion and, in response, Defendant's counsel "suggested the potential amendment of defenses to provide additional information and cure objections." Doc. 122 at 2. Plaintiff, in turn, demanded that the amended document be produced that day. *Id*. at 3. Since Defendant's counsel could not meet that deadline, counsel advised Plaintiff that the "motion was opposed at that time." *Id*. Even so, Defendant's counsel states that she proceeded to "reach out to

Plaintiff to continue the Parties' conferrals regarding amending the affirmative defenses to cure objections, and on October 25, 2024, Defendant provided Plaintiff with a proposed Amended Answer and Affirmative Defenses for consideration." *Id.* Plaintiff, however, has apparently "refused to advise Defendant as to whether the proposed revised Answer and Affirmative Defenses would remedy the alleged deficiencies set forth in the Motion to Strike." *Id.*

The Court does not deem this exchange to be a "good faith effort." Even if the Motion was due on October 15, 2024—Plaintiff contends that her deadline to move to strike the Answer and Affirmative Defendants was October 15, 2024—waiting until the eleventh hour to confer and giving counsel an ultimatum regarding an immediate deadline to amend does not comply with the spirit of the Local Rule or the CMSO.

Further, Defendant was clearly willing to work with Plaintiff to resolve her objections even after she filed the Motion. As a result, it is unclear what issues, if any, would remain for the Court's attention had Plaintiff responded to Defendant's efforts. Accordingly, the Motion is perhaps moot at least in part. So, not only has Plaintiff violated the Local Rules and Order of this Court, her delay regarding the conferral[1] and apparent rejection of Defendant's offer to resolve the issue requires the Court to expend resources where judicial intervention was possibly not needed.[2] The Court takes a dim view of such conduct.

---

[1] The Court recognizes that there were hurricanes in Florida after Defendant filed the Answer and before Plaintiff's October 15, 2024 deadline, and Plaintiff has pointed to those events to explain the time-sensitive nature of at least one filing. Doc. 110 at 4-6; Doc. 112 at 7. Even so, the hurricanes or other personal matters do not explain Plaintiff's failure to respond to Defendant's continued efforts to resolve this matter without Court intervention.

[2] Even though Defendant contends that the affirmative defenses are sufficient, it alternatively requests that it should be allowed to amend the pleading to provide additional factual information as it offered during the conferral. Doc. 122 at 5.

Also, with respect to the merits of the Motion, requests to strike affirmative defenses are disfavored.  Federal Rule of Civil Procedure 8(b) provides that when a party responds to a pleading, it must "state in short and plain terms its defenses to each claim asserted against it."  Fed. R. Civ. P. 8(b).  With respect to affirmative defenses, "[t]he purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it."  *Hassan v. U.S. Postal Service*, 842 F.2d 260, 263 (11th Cir. 1988) (citation omitted).

Pursuant to Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  A motion to strike should only be granted if "the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party."  *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995) (citations omitted).

Although "an affirmative defense may be stricken if it is legally insufficient, . . . striking a defense is a drastic remedy, which is disfavored by the courts."  *Adams v. JP Morgan Chase Bank, N.A.*, 2011 WL 2938467, at *1 (M.D. Fla. July 21, 2011) (citations and internal quotation marks omitted); *see also Somerset Pharm., Inc. v. Kimball*, 168 F.R.D. 69, 71 (M.D. Fla. 1996) ("Motions to strike on the grounds of insufficiency, immateriality, irrelevancy, and redundancy are not favored, often being considered as 'time wasters[.]'") (citation omitted).  "'An affirmative defense is insufficient as a matter of law only if: (1) on the face of the pleadings, it is patently frivolous, or (2) it is clearly invalid as a matter of law.'"  *Adams*, 2011 WL 2938467, at *1 (M.D. Fla. 2011) (citation omitted).

Here, Plaintiff seeks to strike all 13 of Defendant's Affirmative Defenses as insufficient and inappropriate, and Plaintiff requests that claims of lack of knowledge should be deemed

admitted.  Doc. 112 at 3 to 4.  Plaintiff also argues that the Court should strike the defenses as she "will be severely prejudiced because Plaintiff, at this point in the case, cannot conduct discovery or file a motion for summary judgment."  *Id*. at 6.

With respect to any challenge based on sufficiency, the Court finds that Defendant's defenses put Plaintiff on adequate notice.  Also, upon review of the defenses, the Court finds that they are not "patently frivolous" nor are they "clearly invalid as a matter of law."  To the extent Plaintiff contends that Defendant's defenses based on lack of knowledge are "inappropriate" because Defendant admitted facts that would undermine that assertion (*See* Doc. 112 at 4), the Court is not convinced that such defenses are insufficient as a matter of law.

Also, Plaintiff's blanket assertion regarding prejudice does not persuade the Court that she is entitled to relief.  While discovery is closed and Defendant has filed summary judgment, the Court does not agree that it should strike all defenses across the board because Plaintiff cannot obtain additional information through the discovery process.

Further, the Court agrees with Defendant that to the extent it incorrectly labeled a denial as an affirmative defense, the remedy is not to strike the defense but to treat it as a denial.  *See Premium Leisure, LLC v. Gulf Coast Spa Mfrs., Inc.*, 2008 WL 3927265, at *3 (M.D. Fla. Aug. 21, 2008) (declining to strike the defendant's defense and instead treating it as a denial) (citing *Home Mgmt., Sols., Inc. v. Prescient, Inc.*, 2007 WL 2412834, at *3 (S.D. Fla. Aug. 21, 2007)).

Finally, the Court notes that Plaintiff seems to challenge Defendant's statement that it reserves "the right to assert additional or other defenses or matters in avoidance after discovery progresses in this case."  Doc. 112 at 6; Doc. 97 at 33.  It is not clear, but to the extent Plaintiff seeks to strike this statement, the Court is not inclined to grant relief.  *See Traderplanet.com, LLC*

*v. Foundation for the Study of Cycles, Inc.*, 2014 WL 12620823, at *1 (M.D. Fla. May 22, 2014) ("[I]f the Court were to entertain motions to strike a defense that merely reserves a party's right to assert additional defenses, the Court would be inundated with frivolous motions because these 'reservation of rights to bring additional defenses' are frequently included in a defendant's answer. In other words, the Court's resources should not be wasted on such nominal issues.").

In sum, the Motion is due to be denied because Plaintiff has failed to comply with the Local Rules and the Court's Order and because Plaintiff has not demonstrated that the drastic remedy of striking the pleading is warranted.

Based on the foregoing, it is **ORDERED** that Plaintiff's Motion (Doc. 112) is **DENIED**.

**ORDERED** in Orlando, Florida on November 4, 2024.

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

Tab 144

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

MARITZA REYES,

        Plaintiff,

v.                            Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD OF
TRUSTEES (FAMU),

        Defendant.

_____/

### <u>ORDER</u>

      THIS CAUSE is before the Court on Plaintiff's Time-Sensitive Motion for Reconsideration ("**Motion for Reconsideration**," Doc. 130).  Therein, Plaintiff seeks reconsideration of the Court's November 1, 2024 Order (Doc. 124) denying the Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("**Motion to Replace**," Doc. 102).  For the reasons set forth below, the Motion will be denied.

### I.    BACKGROUND

      On February 13, 2023, the Court issued a Case Management and Scheduling Order ("**CMSO**," Doc. 26) in this case.  As is relevant to the instant Motion, the CMSO provides that dispositive motions were due by July 2, 2024, and that a party may respond to a motion for summary judgment within thirty days after services of the motion.  (*Id.* at 1, 6).  Defendant timely filed its Motion for Final Summary Judgment (Doc. 76).  On her unopposed motions, Plaintiff was granted three extensions of time to respond to the Motion.  (Doc. Nos. 79, 80,

82, 83, 87, 89).  Plaintiff filed her summary judgment Response (Doc. 91) on August 19, 2024, and Defendant filed its Reply (Doc. 93) on September 3, 2024.

Nearly one month later, after briefing was complete, Plaintiff then filed the Motion to Replace on October 2, 2024, asking the Court for leave to replace the Response with a corrected version thereof (the "**Corrected Response**") and to file accompanying supporting evidence.  On November 1, 2024, the Court denied the Motion to Replace.  In so doing, the Court found that Plaintiff had failed to establish her diligence in attempting to comply with applicable deadlines, and therefore could not show the good cause necessary to support an extension of time under Federal Rule of Civil Procedure 6(b)(1)(B).  (Doc. 124 at 3); *see also Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 944 (11th Cir. 2015) ("A party seeking the extension of an already-expired scheduling order deadline must show both good cause *and* excusable neglect.").  Plaintiff now asks the Court to reconsider its November 1, 2024 Order, arguing that relief therefrom is necessary to avoid manifest injustice.

## II.    LEGAL STANDARD

District courts are afforded considerable discretion to reconsider prior decisions.  *See Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1231–32 (11th Cir. 2010) (discussing reconsideration of interlocutory orders); *Lamar Advert. of Mobile, Inc. v. City of Lakeland*, 189 F.R.D. 480, 488–89, 492 (M.D. Fla. 1999) (discussing reconsideration generally and under Federal Rule of Civil Procedure 54(b)); *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D. Fla. 1994) (discussing reconsideration under Rule 59(e) and Rule 60(b)).  Courts in this District recognize "three grounds justifying reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice."  *McGuire v. Ryland Grp., Inc.*, 497

F. Supp. 2d 1356, 1358 (M.D. Fla. 2007) (quotation omitted); *Montgomery v. Fla. First Fin. Grp., Inc.*, No. 6:06-cv-1639-Orl, 2007 WL 2096975, at *1 (M.D. Fla. July 20, 2007).

"Reconsideration of a previous order is an extraordinary measure and should be applied sparingly." *Scelta v. Delicatessen Support Servs., Inc.*, 89 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000). "[M]otions for reconsideration should not be used to raise arguments which could, and should, have been previously made." *Id.* (quotation omitted). Stated differently, "[a] party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a motion for reconsideration." *McGuire*, 497 F. Supp. 2d at 1358 (quotation omitted). To permit otherwise would "essentially afford[] a litigant two bites at the apple." *Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1239 (11th Cir. 1985) (quotation omitted).

## III.    DISCUSSION

Plaintiff first seeks reconsideration on the basis that the Court failed to consider whether the interests of justice warranted granting the Motion to Replace, notwithstanding the Court's finding that Plaintiff had not shown the diligence necessary to support a finding of good cause. However, Plaintiff already raised this argument in the Motion to Replace. (Doc. 102 at 16–17). It therefore amounts to no more than disagreement with the Court's conclusions in the Court's November 1, 2024 Order and a plain attempt to "relitigate[ ] what has already been found lacking." *McGuire*, 497 F. Supp. 2d at 1358 (quotation omitted).

Next, Plaintiff argues reconsideration is appropriate because the Court failed to adequately account for how a medical emergency affected her ability to diligently comply with applicable deadlines. (Doc. 130 at 10–14). Insofar as Plaintiff repeats arguments previously raised, those arguments are not properly before the Court. *Scelta*, 89 F. Supp.

2d at 1320.  Likewise, to the extent that Plaintiff raises new arguments in the instant Motion, those arguments are inappropriate on a motion for reconsideration.  *Id.*

Even on the merits, however, Plaintiff's argument fails.  The Court again acknowledges that Plaintiff's medical emergency was beyond her control.  However, it is undisputed that Plaintiff was well aware of the applicable deadlines and that Plaintiff knew how to properly request an extension of time.  It is equally undisputed that rather than move for an emergency extension of time, Plaintiff made the "emergency decision" to file the Response without supporting evidence.  In the Motion to Replace, Plaintiff fails to explain why filing the Response was possible while seeking an extension of time was not.  Nor did Plaintiff explain why she continued to work on the Corrected Response in lieu of filing the Motion to Replace as quickly as possible.  In addition, the Motion to Replace fails to note, much less explain, why three declarations purporting to support the Corrected Response were dated *after* both the summary judgment response deadline *and* the filing of Defendant's Reply.  (Doc. 107-2 at 11, 17, 21).  The Court found that these gaps in the Motion to Replace precluded a finding of diligence, and nothing in the instant Motion convinces the Court to reconsider that conclusion.

Plaintiff also contends that the Court erred in its conclusion that granting the Motion to Replace would cause prejudice to Defendant.  To some extent, however, Plaintiff again repeats arguments already raised in the Motion to Replace.  Such repetitive arguments are not properly before the Court on a motion for reconsideration.  *Scelta*, 89 F. Supp. 2d at 1320.  Otherwise, Plaintiff raises arguments and authority not cited in the Motion to Replace. Because Plaintiff has "no right to raise new theories or arguments in a motion for

reconsideration," the Court likewise declines to address the remainder of Plaintiff's arguments on this point. *McGuire*, 497 F. Supp. 2d at 1358 (quotation omitted).

Plaintiff finally contends that the Court should grant reconsideration because Plaintiff is representing herself *pro se*[1] and the Court should not resolve the pending Motion for Summary Judgment without the evidence in Plaintiff's supporting declarations. Yet again, Plaintiff only repeats arguments already asserted in the Motion to Replace and thus fails to "present new facts or law of a strongly convincing nature" sufficient to warrant reconsideration under Rule 60(b)(3). *Lomax v. Ruvin*, 476 F. App'x 175, 177 (11th Cir. 2012); *see also Simon v. Taylor*, No. 8:13-cv-593-T, 2013 WL 9235654, at *1 (M.D. Fla. July 15, 2013) (denying reconsideration where movant "merely repeate[d] arguments that have been rejected and provide[d] no new grounds upon which reconsideration would be appropriate").

At any rate, the Court has made significant allowances in light of Plaintiff's *pro se* status. Indeed, Plaintiff has been granted six extensions of time for various deadlines, (Doc. Nos. 9, 11, 24, 25, 32, 33, 79, 80, 82, 83, 87, 89), in addition to leave to reply in support of two of Plaintiff's motions, (Doc. Nos. 58, 59, 61, 62). One extension came even though the Court noted that Plaintiff had not demonstrated good cause. (Doc. 33). Further, Plaintiff failed to diligently engage in discovery, inexplicably waiting more than one year after the discovery deadline was set to begin scheduling depositions. (Doc. 72 at 4–5). In total, the Court has found that Plaintiff failed to diligently litigate this case on three separate occasions. (Doc. Nos. 72, 124, 125). Despite her *pro se* status, Plaintiff is obligated to comply with all

---

[1] Plaintiff has been licensed to practice law in Florida since January 19, 2001. Member Profile, The Florida Bar, https://www.floridabar.org/directories/find-mbr/profile/?num=459951 (last visited Dec. 10, 2024).

applicable rules and Court orders.  The Motion does not persuade the Court to revisit its conclusion that Plaintiff failed to diligently do so.

## IV.     CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Plaintiff's Time-Sensitive Motion for Reconsideration (Doc. 130) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on December 10, 2024.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

Tab 126

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARITZA REYES,

        Plaintiff,

v.                                        Case No.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M UNIVERSITY BOARD
OF TRUSTEES (FAMU),

        Defendant.
_____/

## ORDER

THIS CAUSE is before the Court on Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination ("**Motion to Stay**," Doc. 106) and Defendant's Response (Doc. 115) thereto.  For the reasons set forth below, the Motion to Stay will be denied.

Plaintiff, a Latina woman, accepted a position as an assistant professor of law at the Florida A&M University College of Law ("**FAMU Law**") in March 2009.  (Doc. 34, ¶¶ 4, 25).  Plaintiff alleges that she was the first Hispanic person hired in a tenure-track position at FAMU Law and the first to apply for tenure.  (*Id.* ¶¶ 25, 36).  On August 25, 2022, while still employed by FAMU Law, Plaintiff filed this case alleging claims for discrimination, hostile work environment, and retaliation on the basis of race, color, national origin, and gender in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e *et seq.*, arising out of her employment and application for tenure.  (*See generally* Doc. Nos. 1, 34).  Approximately eighteen months after bringing this action, Defendant terminated Plaintiff's employment.  (Doc. 106 at 3).  Plaintiff now seeks an indefinite stay

of these proceedings pending the outcome of an administrative process related to the termination of her employment with Defendant.  (*Id.* at 2–4).

"The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."  *Clinton v. Jones*, 520 U.S. 681, 706 (1997); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").  In considering requests for a stay, the district court must consider "whether the stay would prejudice or disadvantage the non-moving party; whether the moving party would suffer a hardship or inequity if forced to proceed; and whether granting the stay would further judicial economy."  *United States v. Fed. Ins. Co.*, No. 6:19-cv-1784-Orl, 2020 WL 9455638, at *2 (M.D. Fla. Apr. 10, 2020), *report and recommendation adopted*, 2020 WL 9455622 (M.D. Fla. Apr. 28, 2020).  In addition, "the district court must limit properly the scope of the stay. A stay must not be 'immoderate.'"  *Ortega Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262,1264 (11th Cir. 2000) (quoting *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982)) (finding that an indefinite stay pending resolution of another action, entered by the district court, constituted an abuse of discretion); *see also Landis*, 299 U.S. at 257 ("The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits.").

Plaintiff argues that a stay is necessary because if this action is resolved, the doctrines of *res judicata* and collateral estoppel could bar her from raising claims related to her allegedly wrongful termination.  Plaintiff has, however, failed to convince the Court

that her concerns are warranted.  *Res judicata* bars only claims that "were raised in the prior action" or claims "that could have been raised previously."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003).  As noted above, Defendant did not terminate Plaintiff's appointment until approximately eighteen months after this action was filed, and approximately six months after Plaintiff filed her Second Amended Complaint (Doc. 34), at which point pleadings in this case had closed.  Because Plaintiff could not possibly have raised a wrongful termination claim in this action, it is unclear how such a claim could be precluded by *res judicata* should Plaintiff decide to pursue it.  Similarly, the collateral estoppel doctrine applies only if an issue of ultimate fact has been actually decided and is necessary to a valid and final judgment.  *See Delgado v. Fla. Dep't of Corr.*, 659 F.3d 1311, 1330 n.17 (11th Cir. 2011).  But Plaintiff's Motion reveals that a potential wrongful termination claim would arise from different facts, during a different time period, and involve a different decisionmaker from those at issue in this case. Accordingly, it likewise appears Plaintiff would bear no risk that collateral estoppel would preclude such a claim.  The Court finds that Plaintiff has failed to establish that the denial of the stay would inflict any hardship or inequity on Plaintiff.  The remaining factors also favor denial of the Motion to Stay.  This case has been ongoing for more than two years, and an indefinite stay of proceedings would seriously hamper judicial economy and impose significant additional litigation costs on Defendant.  The Court will not impose an indefinite stay at this late junction.

Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on November 1, 2024.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

Tab 131

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

     Plaintiff,

v.                                    CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

     Defendant.
_____

**<u>PLAINTIFF'S EMERGENCY MOTION FOR EXTENSION OF PRETRIAL DEADLINES</u>**

     Plaintiff, Maritza Reyes, respectfully requests that this Honorable Court, pursuant to the Court's inherent authority and the interests of justice, extend the pretrial deadlines until after the Court rules on the motions related to and including Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law ("Motion for Summary Judgment") (Doc. 76).[1] This Motion is being submitted on an emergency basis because the next pretrial deadline is November 22, 2024 and Plaintiff requests a ruling before that date for the reasons stated in this Motion.

_____

[1] These motions include Plaintiff's Time-Sensitive Motion for Reconsideration of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102) and Defendant's Motion to Strike Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Final Judgment. (Docs. 114, 130).

## **BACKGROUND**

1. On August 25, 2022, Plaintiff filed her Complaint. (Doc. 1).[2] Therefore, according to Federal Rule of Civil Procedure 4(m), Plaintiff had until November 23, 2022, to effect service of process upon Defendant.

2. On August 26, 2022, U.S. Magistrate Judge Embry J. Kidd entered an Order recusing himself and citing his and his family member's (wife's and father-in-law's) interactions and relationships with Defendant, including Judge Kidd's employment as an adjunct professor in Defendant's College of Law. (Doc. 4).

3. On August 26, 2022, the case was reassigned to U.S. Magistrate Judge Daniel C. Irick. (Doc. 7).

4. On September 1, 2022, the Court *sua sponte* dismissed Plaintiff's Complaint without prejudice because it found that "Plaintiff's Complaint [fell] into the first and third categories" of "shotgun" pleadings defined by the Eleventh Circuit in *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015). (Doc. 8 at 2). The Court gave Plaintiff <u>seven (7) days</u>, until Thursday, September 8, 2022, to file an amended complaint. (Doc. 8).[3]

---

[2] Because Plaintiff never practiced employment law, Plaintiff reviewed sample complaints for these types of employment cases. Plaintiff patterned the counts in her Complaint after a Fourth Amended Complaint filed by law professor Shaakirrah R. Sanders, a Black woman, for similar causes of action as Plaintiff's against her law school employer. *Sanders v. University of Idaho College of Law*, No. 1:19-CV-00225-BLW (D. Idaho Nov. 10, 2021) (Doc. 99). Professor Sanders's Fourth Amended Complaint allowed her to proceed to a ten-day jury trial on the merits of her case, which resulted in a mistrial on October 24, 2022. *Id.* at Docs. 120, 135, 207. The case was set for a second ten-day jury trial to start on September 18, 2023. (*Id.* at Doc. 225). The parties settled the case before the second trial.

[3] According to Federal Rule of Civil Procedure 15(a)(1), Plaintiff could have amended her Complaint once as a matter of course by no later than twenty-one (21) days after serving it, or twenty-one (21) days "after service of a responsive pleading" or "a motion under

5.   On September 8, 2022, Plaintiff filed a Time-Sensitive Motion for a <u>four-day extension</u> to file her amended complaint by Monday, September 12, 2022; the Court granted the brief extension. (Docs. 9, 11).

6.   On September 12, 2022, Plaintiff filed her Amended Complaint. (Doc. 10).

7.   On November 18, 2022, Plaintiff served her Amended Complaint upon Defendant. (Doc. 17). Therefore, pursuant to Federal Rule of Civil Procedure 12(a)(1)(A)(i), Defendant had until December 9, 2022 to file its response.

8.   On December 6, 2022, Defendant sought and received a <u>forty-five (45) day extension</u> to respond to Plaintiff's Amended Complaint. (Doc. 13). Plaintiff did not oppose the requested extension and the Court granted it. (Doc. 16). Therefore, Defendant had a total of <u>sixty-six (66) days</u> to file an answer.[4]

9.   On January 20, 2023, Defendant filed its First Opposed Motion to Dismiss Plaintiff's Amended Complaint as a Shotgun Pleading and to Strike Immaterial Allegations, and Alternative Motion for More Definite Statement ("First Motion to Dismiss"). (Doc. 22).[5]

---

Rule 12(b), (e), or (f), whichever is earlier." Federal Rule of Civil Procedure 15(m) further states that the plaintiff, after being notified by the Court of its intent to dismiss the action without prejudice for plaintiff's failure to effect service within ninety (90) days, must be granted an extension of "the time for service for an appropriate period" if "the plaintiff shows good cause for the failure [to effect service]." Fed. R. Civ. P. 4(m).

[4] When Plaintiff agreed to the lengthy extension, she was under the understanding that Defendant needed the extension to prepare an Answer and Affirmative Defenses (if any), which would have streamlined the discovery and motions in the case. However, instead, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint as a "shotgun" pleading. (Doc. 22).

[5] Defendant's attorney mistakenly attached the wrong PDF file (Doc. 21), but the mistake was corrected by a modification in the docket entry and by re-submitting the motion in Doc. 22.

10. On January 30, 2023, Plaintiff filed an Unopposed Motion for Extension of Time to File her Response to Defendant's First Motion to Dismiss. (Doc. 24). Plaintiff's response was due by Friday, February 10, 2023; Plaintiff requested a <u>three-day extension</u>, until Monday, February 13, 2023. (*Id.*). The Court granted the extension. (Doc. 25).

11. On February 13, 2023, Plaintiff filed her response seeking denial of Defendant's First Motion to Dismiss and respectfully requesting, in the alternative, leave of court to file an amended pleading <u>twenty-one (21) days</u> from the entry of the Court's order. (Doc. 28).

12. On September 15, 2023, the Court entered an Order granting in part Defendant's Motion to Dismiss without prejudice and gave Plaintiff <u>fourteen (14) days</u>, until Friday, September 29, 2023, to file an amended pleading. (Doc. 30 at 5-6). The second time, the Court dismissed Plaintiff's pleading based on the second category of "shotgun" pleadings stated in *Weiland*. (Doc. 30 at 5).[6]

13. On September 25, 2023, Plaintiff filed a Time-Sensitive Unopposed Motion for Extension of Time to File her Second Amended Complaint by October 9, 2023. Plaintiff requested a <u>ten-day extension</u>. Although United States Magistrate Judge Daniel C. Irick granted Plaintiff's request, which was unopposed and filed before the deadline, he stated the following in his Endorsed Order via a Docket entry (Doc. 33):

> Plaintiff must file an amended pleading on or before October 9, 2023. However, the Court will not grant further extensions because Plaintiff failed to monitor her email account or had other work commitments, nor would the stated cause qualify as good cause to extend a CMSO deadline. See Fed. R. Civ. P. 16(b)(4). As with all pro se parties, the Court strongly encourages

---

[6] In its First Motion to Dismiss, Defendant incorrectly argued that "Plaintiff's Amended Complaint suffer[ed] from the same deficiencies [as her Complaint]." (Doc. 22 at 2). The Court found otherwise. (Doc. 30 at 4). The Court stated: "Although Plaintiff incorporates by reference each factual allegation of her Amended Complaint into every claim for relief, unlike before, she does not incorporate each cause of action into each successive cause of action." (*Id.*).

Plaintiff to obtain the assistance of counsel in this matter and cautions Plaintiff that she must comply with the rules and orders of this Court. Finally, Plaintiff is cautioned that a motion to extend a deadline does not toll the deadline at issue while the motion pends. Signed by Magistrate Judge Daniel C. Irick on 9/24/2023.[7]

14. On October 9, 2023, Plaintiff filed her Second Amended Complaint. (Doc. 34).

15. On October 23, 2023, Defendant filed a Motion to Dismiss Plaintiff's Second Amended Complaint with Prejudice or in the Alternative Motion to Strike ("Second Motion to Dismiss"). (Doc. 35). At the beginning of its Second Motion to Dismiss, Defendant requested dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6); however, its entire argument was premised on the second category of *Weiland*'s "shotgun" pleading categories. (Doc. 35 at 2-10).

16. On November 13, 2023, Plaintiff filed her Response in Opposition to Defendant's Second Motion to Dismiss her Second Amended Complaint. (Doc. 36). Plaintiff argued that Defendant did not state the standard for a Rule 12(b)(6) motion in its Motion or Memorandum of Law and therefore did not meet its burden. (*Id.* at 13-14). Defendant did not allege, analyze, or argue anything about Plaintiff's factual allegations in reference to her causes of action. (*Id.*). Defendant also did not file a motion pursuant to Federal Rule of Civil Procedure 12(e), which would have required Defendant to "point out the defects complained of and the details desired." (*Id.* at 15).[8] Plaintiff advanced that she provided ample details to allow Defendant to respond to her Second Amended Complaint.

---

[7] The unopposed extension that Plaintiff requested was not an extension of a Case Management Scheduling Order (CMSO) deadline. The Local Rules require that parties must seek relief from the Court by way of a motion. Middle District L.R. Rule 3.01(k). Requests for extension of time via motion are allowed under the rules of this Court.

[8] "Under the Federal Rules of Civil Procedure, a defendant faced with a ['shotgun' pleading]" "is expected to move the court, pursuant to Rule 12(e), to require the plaintiff

17. Defendant's bare bone assertion that it filed its Second Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) allowed it, pursuant to Federal Rule of Civil Procedure 12(a)(4), to extend the period to file an answer until fourteen (14) days after the Court ruled on its October 23, 2023, Second Motion to Dismiss.

18. The Court's Case Management and Scheduling Order (CMSO), which was issued on February 13, 2023, stated the following deadlines (Doc. 26 at 1-2):

| | | |
|---|---|---|
| Disclosure of Expert Reports | | |
| | Plaintiff: | April 2, 2024 |
| | Defendant: | May 2, 2024 |
| Discovery Deadline | | May 31, 2024 |
| Dispositive Motions, and *Daubert* Motions | | July 2, 2024 |
| All Other Motions Including Motions *In Limine* | | October 2, 2024 |
| Meeting in Person to Prepare Joint Final Pretrial Statement | | October 25, 2024 |
| Joint Final Pretrial Statement | | November 4, 2024 |
| Trial Status Conference | | November 12, 2024 |
| Trial Term Begins | | December 2, 2024 |

19. On April 2, 2024, Plaintiff disclosed her expert report to Defendant.

20. On May 31, 2024, discovery closed. (Doc. 26 at 1).

21. On July 2, 2024, Defendant filed its Motion for Summary Final Judgment and Incorporated Memorandum of Law ("Motion for Summary Judgment"). (Doc. 76).

22. On July 17, 2024, August 2, 2024, and August 12, 2024, Plaintiff requested three (3) discrete extensions of time, for good cause, as the need arose, to file her Response in Opposition to Defendant's Motion for Summary Judgment ("Response") from the original deadline of August 1, 2024 until August 19, 2024. (Docs. 79, 82, 87), which the

---

to file a more definite statement." *Anderson v. District Bd. of Trustees of Cent. Fla. Community College*, 77 F.3d 364, 366 (11th Cir. 1996).

Court granted (Docs. 80, 83, 89). The three (3) unopposed extensions together added to a total of <u>eighteen (18) days</u>.

23. On August 19, 2024, Plaintiff filed her draft Response to Defendant's Motion for Summary Judgment. (Doc. 91). Due to unforeseen, exigent, extraordinary medical circumstances beyond her control, Plaintiff was not able to finalize and submit her final Response and Declaration with exhibits by August 19, 2024. (Doc. 92).

24. After seeking medical care, from August 22, 2024 to August 26, 2024, Plaintiff communicated with Defendant's counsel to advise them of the situation and inform them that she planned to seek leave of Court to file her Corrected Response and Declaration as soon as she was medically able to prepare said motion. Plaintiff told Defendant's counsel that she would include a request for an extension of time (fourteen (14) days or another time the Court deemed just and proper) for Defendant's Reply after Defendant received the Corrected Response and Declaration. Defendant's counsel opposed Plaintiff's request. (Doc. 92, ¶¶ 7-10, 12).

25. On September 3, 2024, Plaintiff contacted the Clerk's Office to find out if there was any way to make the Court aware of her medical circumstances and the reason why she filed a draft Response and no Declaration. A staff member in the Clerk's Office suggested (without giving advice) filing a notice. (Doc. 92, ¶ 18).

26. On September 3, 2024, at 12:25 PM, Plaintiff filed Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment ("Time-Sensitive Notice"). (Doc. 92). In her Time-Sensitive Notice, Plaintiff summarized for the Court what Plaintiff previously informed Defendant's counsel about regarding the exigent circumstances she was facing and how they interfered with

her ability to file her materials in response to Defendant's Motion for Summary Judgment. (*Id.*). In her Time-Sensitive Notice, Plaintiff also explained to the Court that she "needed time to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work required to finalize her Corrected Response and Declaration before communicating further with the Court through motion practice." (*Id.*, ¶ 4).[9] Plaintiff specifically stated: "The next deadline in the Court's Case Management and Scheduling Order is October 2, 2024, the deadline to file '[a]ll other Motions, including Motions *in Limine*.'" (*Id.*, ¶ 16) (citing Doc. 26 at 2)). Because Defendant opposed Plaintiff's request for the Court to accept her Corrected Response and Declaration, Plaintiff needed to prepare a very strong motion, with sufficient citation to case law (legal research), to hopefully persuade the Court to grant her the relief she requested despite Defendant's opposition. This required a lot more work with impaired vision and limitations on the time Plaintiff was able to view the computer screen. (Docs. 92, ¶14; 102, ¶ 7). During this time, Plaintiff also had to work on additional motions that she had to file by the Court's October 2, 2024 deadline for all other motions.

27. On September 3, 2024, at 9:34 PM, Defendant filed its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. (Doc. 93). Plaintiff's Reply hinged basically on Plaintiff's inability to file her Corrected Response and Declaration with exhibits.

---

[9] Plaintiff cannot overemphasize how losing her vision caused her to prioritize getting medical attention, giving her eyes a rest, and not causing further damage to her sight.

28. On September 9, 2024, the Court denied Defendant's Second Motion to Dismiss and gave Defendant until September 23, 2024 to file an answer to Plaintiff's Second Amended Complaint. (Doc. 94).

29. On September 9, 2024, the Court entered an Order referring this case to United States Magistrate Judge Leslie Hoffman Price to conduct a settlement conference.[10] (Doc. 95).

30. On September 9, 2024, Judge Leslie Hoffman Price entered an Order and Notice of Settlement Conference scheduling a settlement conference on October 24, 2024, and requiring the parties to confer by telephone, videoconference, or in person in a good faith effort to resolve the case on or before October 16, 2024.[11] (Doc. 96).

31. On September 23, 2024, Defendant filed its Answer and Thirteen (13) Affirmative Defenses. (Doc. 97).

32. On September 25, 2024, the Court, *sua sponte*, amended the CMSO. (Doc. 98). It changed the remaining deadlines for the Meeting in Person to Prepare Joint Final Pretrial Statement (to November 22, 2024), Joint Final Pretrial Statement (to December 2, 2024), Trial Status Conference (to December 10, 2024), and beginning of Trial Term (to February 3, 2025). (Doc. 98 at 1-2).

---

[10] Previously, on July 9, 2024, this Court entered an Order referring this case to United States District Court Judge Paul G. Byron to conduct a settlement conference. (Doc. 78). That referral was reassigned by the Order referring the Case to Judge Hoffman Price. (Doc. 95 at 1).

[11] After conferral, the parties had to deliver separate written summaries of the facts and issues of the case to Judge Hoffman Price's Chambers by October 17, 2024, at 5:00 p.m. (Doc. 96 at 2). The parties also had to speak separately by phone with Judge Hoffman Price on October 22, 2024. (*Id.* at 3).

33. On October 2, 2024, the parties had a deadline to file all other motions, including Motions *in Limine*. (Doc. 26 at 2).

34. On October 2, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration. (Doc. 102).

35. On October 2, 2024, Plaintiff filed Plaintiff's Notice of Filing Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("Notice"). (Doc. 103).

36. On October 2, 2024, Plaintiff filed Plaintiff's Motion *in Limine*. (Doc. 104).

37. On October 2, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion to Re-open Discovery and Summary Judgment. (Doc. 105).

38. On October 2, 2024, Plaintiff filed Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination. (Doc. 106).

39. On October 4, 2024, Plaintiff filed Plaintiff's Time-Sensitive Amended Notice of Filing Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("Amended Notice"). (Doc. 107).[12] This Amended Notice

---

[12] During this time, Florida residents, including Plaintiff, were preparing for Hurricane Milton. *See* Governor Ron DeSantis issued Executive Order (EO) 24-214, "Emergency Management – Tropical Storm Milton," declaring a state of emergency in 35

included six (6) witness declarations (Doc. 107-2) that could not be filed with the October 2, 2024 Notice (Doc. 103) due to a technical issue that needed to be resolved to be able to file them through the Court's Case Management/Electronic Filing System ("CM/ECF"). (Doc. 107, ¶¶ 2-5).

40. On October 15, 2024, Plaintiff filed Plaintiff's Motion to Strike Defendant's Affirmative Defenses. (Doc. 112).[13]

41. On October 16, 2024, Defendant filed Defendant's Response in Opposition to Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration. (Doc. 113).

42. On October 16, 2024, Defendant filed Defendant's Motion to Strike Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Final Judgment. (Doc. 114).

---

Florida counties ahead of the storm, including Orange County. MEMORANDUM: EXECUTIVE ORDER NUMBER 24-214 (Emergency Management – Tropical Storm Milton), Oct. 5, 2024, https://www.flgov.com/2024/10/05/emorandum-executive-order-number-24-214-emergency-management-tropical-storm-milton/.

[13] On October 14, 2024, Plaintiff filed her Time-Sensitive Motion for Extension of Time requesting a five-day extension to file her Motion to Strike and her Response to Defendant's Omnibus Motion *in Limine* due to issues dealing with two unexpected hurricanes (Helene followed by Milton). (Doc. 110). Prior to filing the Motion, Plaintiff conferred in good faith with Defendant's counsel, but Defendant's counsel opposed the five-day extension of time. On October 15, 2024, Defendant filed a Response in Opposition to Plaintiff's Time-Sensitive Motion for Extension of Time (five days). (Doc. 111). By the time of the deadlines to file her Motion to Strike (October 15) and Response (October 16), the Court had not yet ruled on Plaintiff's Time-Sensitive Motion for Extension of Time. On October 22, 2024, the Court denied Plaintiff's Time-Sensitive Motion for Extension of Time as moot after Plaintiff filed her Motion to Strike (Doc. 112) and Response (Doc. 117) by the deadlines. (Doc. 119).

43. On October 16, 2024, Defendant filed its Responses in Opposition to Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies after Wrongful Termination, Motion *in Limine*, and Time-Sensitive Motion to Re-Open Discovery and Summary Judgment. (Docs. 115, 116, 118).

44. On October 16, 2024, Plaintiff filed her Response in Opposition to Defendant's Omnibus Motion *in Limine*. (Doc. 117).

45. On October 24, 2024, the parties met for a settlement conference in the United States District Court in Orlando, as scheduled; Judge Leslie Hoffman Price declared an Impasse. (Doc. 121).

46. On October 29, 2024, Defendant filed its Response in Opposition to Plaintiff's Motion to Strike Defendant's Answer and Affirmative Defenses. (Doc. 122).

47. On October 30, 2024, Plaintiff filed her Response in Opposition to Defendant's Motion to Strike Plaintiff's Declarations. (Doc. 123).

48. On November 1, 2024, the Court entered three (3) separate Orders denying (a) Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102), (b) Plaintiff's Motion to Reopen Discovery and Summary Judgment (Doc. 105), and (c) Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106). (Docs. 124, 125, 126).

49. On November 4, 2024, the Court entered its Order denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112). (Doc. 127).

50. On November 6, 2024, Plaintiff filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders to inform the Court that she intended to file Motions for Reconsideration of three (3) Orders that were recently issued by the Court (Docs. 124, 125, and 127). (Doc. 128).[14]

51. On November 15, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion for Reconsideration of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102). (Doc. 130).

## **MEMORANDUM OF LAW**

Rule 16(b)(4) of the Federal Rules of Civil Procedure provides that "'[a] schedule may be modified only for good cause and with the judge's consent." There is a diligence requirement. *Knights v. Wyndham Vacation Ownership, Inc.*, Case No: 6:23-cv-1104-RBD-DCI, 2024 U.S. Dist. LEXIS 17525, at *5 (M.D. Fla. 2024). Plaintiff submitted this emergency motion before the pretrial deadlines she is seeking to extend. *Cf. Marc Irwin Sharfman M.D. P.A. v. Precision Imaging St. Augustine LLC*, No. 6:22-cv-642-WWB-DCI, 2024 U.S. Dist. LEXIS 90277, *2 (2024) (producing on last day of discovery deadline means meeting the deadline).

This Court recently cited its concern for additional costs that Defendant may incur to file a supplemental reply to Plaintiff's Corrected Response and Declaration in opposition to Defendant's Motion for Summary Judgment (if the Court were to provide leave for

---

[14] On November 7, 2024, U.S. Magistrate Judge Daniel C. Irick struck Plaintiff's Notice (Doc. 128). (Doc. 129). Judge Irick stated: "The rules of this court do not provide for the filing of a notice of intent to file a motion." (*Id.*).

Plaintiff to file them).  (Doc. 124 at 3). The Court considered this cost in its analysis of prejudice to Defendant. (*Id.*). Plaintiff respectfully submits that she has been highly prejudiced by the timing of the Court's ruling denying Defendant's Second Motion to Dismiss until after the discovery and dispositive motion deadlines expired. Defendant effectively received an extension of nearly twelve (12) months to file its highly deficient Answer and thirteen (13) Affirmative Defenses.[15]

As the Court recently acknowledged, Plaintiff faced medical issues "outside of her control" that made it impossible for her to file her final Response and Declaration (with exhibits) in response to Defendant's Motion for Summary Judgment. Plaintiff sought leave of Court to file her Corrected Response and Declaration; however, the Court denied her request. (Doc. 124). As a result, Plaintiff filed a Motion for Reconsideration on November 15, 2024. (Doc. 130). During conferral with Defendant's counsel about this Motion, Defendant's counsel informed Plaintiff that Defendant intends to file a response to Plaintiff's Motion for Reconsideration.

The Court recently amended the CMSO deadlines *sua sponte*. Plaintiff, who is proceeding *pro se*, and Defendant's counsel are required to engage in extensive work to meet the upcoming pretrial deadlines. Plaintiff respectfully submits that, in the interests

---

[15] Defendant's Answer and Affirmative Defenses violated the general rules of pleading in Federal Rule of Civil Procedure 8(b). Fed. R. Civ. P. 8(b). Many of its denials did not "fairly respond to the substance of the allegation" in violation of Federal Rule of Civil Procedure 8(b)(2). Defendant denied parts of allegations that are obviously true according to its own records, which is a violation of Rule 8(b)(4). Similarly, Defendant claimed lack of knowledge or information sufficient to form a belief about the truth of allegations after discovery had already closed and Defendant had the benefit of the evidence readily available to obtain the knowledge or information. Defendant asserted bare-bone conclusory allegations for its thirteen (13) Affirmative Defenses without alleging facts in support of each one. (Doc. 112, ¶ 3-6).

of justice, the Court should extend the pretrial deadlines until after the Court rules on the pending motions related to and including summary judgment. The Court has full discretion pursuant to its inherent power to amend its CMSO given the specific circumstances of this case. The Court recently extended the CMSO pretrial deadlines, *sua sponte*, sixteen (16) days after the Court entered its Order denying Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 94) and two (2) days after Defendant finally filed its Answer and thirteen (13) Affirmative Defenses (Doc. 97). (Doc. 98). The amended upcoming pretrial deadlines (November 22, 2024 and December 2, 2024) now fall right before and right after the upcoming Thanksgiving holiday. Plaintiff rescheduled plans at much hardship to her and her family to do her best to meet these amended deadlines. However, Plaintiff's health is still compromised. Additionally, as of the time of preparation of this Motion, Plaintiff is in South Florida taking care of her mother's medical issues, including meeting with her doctor. Plaintiff does not have the assistance of other attorneys or support staff to help her with the work required to meet the upcoming pretrial deadlines.

The Court can alleviate the prejudice to both parties if the Court grants an extension of the pretrial deadlines until the Court's rulings on the summary judgment matters. These rulings would help the parties to streamline the work required for the pretrial deadlines, including preparation of jury instructions, verdict form, *voir dire* questions, witness lists, exhibit lists, and trial briefs. Depending on the Court's rulings, the Court could subsequently schedule a status conference regarding new pretrial deadlines.[16] At this point in the case, extending the deadlines once again would further the interests of justice

---

[16] To date, the parties have not requested, and the Court has not held a status conference in this case.

and not be a major difference for the parties given that the Court already recently extended the deadlines. The cost-benefit analysis supports granting the request in this Motion.

Plaintiff suggested to Defendant's counsel that, as required in the CMSO (Doc. 26 at 7, § III.A.1.), the parties should continue to discuss settlement of the action before undertaking the extensive efforts needed to conduct final preparation of the case for trial. Defendant's counsel agreed and is in the process of communicating Plaintiff's offer to its client. However, the extensive work required by November 22, 2024 and December 2, 2024 would increase the costs perhaps unnecessarily.

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court grant the extension of time requested in this Motion and extend the pretrial deadlines until after the Court rules on the pending motions related to summary judgment.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Plaintiff certifies that, yesterday, Plaintiff conferred in good faith with Defendant's counsel who advised Plaintiff that she would need to contact her client before informing Plaintiff if Defendant opposed this motion. Today, Defendant's counsel informed Plaintiff that Defendant opposes this motion.

Dated this 19th day of November, 2024.

Respectfully submitted,

/s/ Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on November 19, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

<u>/s/ Maritza Reyes</u>
Plaintiff

Tab 133

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**MARITZA REYES,**

     **Plaintiff,**

**v.**                            **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

     **Defendant.**

_____

## <u>PLAINTIFF'S EMERGENCY MOTION FOR EXTENSION OF DEADLINE TO FILE JOINT FINAL PRETRIAL STATEMENT</u>

Plaintiff, Maritza Reyes, respectfully submits Plaintiff's Emergency Motion for Extension of Deadline to File Joint Final Pretrial Statement (the "Motion") and hereby requests that this Honorable Court, pursuant to the Court's inherent authority and the interests of justice, extend the deadline for the parties to file the Joint Final Pretrial Statement by seven (7) days until December 9, 2024. This Motion is being submitted on an emergency basis because the deadline for the Joint Final Pretrial Statement is Monday, December 2, 2024, which is the Monday after the Thanksgiving holiday. The Court will be closed on Thanksgiving Day, November 28, 2024. Plaintiff respectfully requests a ruling before that date (and the sooner the better) for the reasons stated in this Motion.

## BACKGROUND

1. On October 9, 2023, Plaintiff filed her Second Amended Complaint. (Doc. 34).

2. On October 23, 2023, Defendant filed a Motion to Dismiss Plaintiff's Second Amended Complaint with Prejudice or in the Alternative Motion to Strike ("Second Motion to Dismiss"). (Doc. 35).

3. On November 13, 2023, Plaintiff filed her Response in Opposition to Defendant's Second Motion to Dismiss her Second Amended Complaint. (Doc. 36).

4. The Court's Case Management and Scheduling Order (CMSO), which was issued on February 13, 2023, stated the following deadlines (Doc. 26 at 1-2):

| | | |
|---|---|---|
| Disclosure of Expert Reports | | |
| | Plaintiff: | April 2, 2024 |
| | Defendant: | May 2, 2024 |
| Discovery Deadline | | May 31, 2024 |
| Dispositive Motions, and *Daubert* Motions | | July 2, 2024 |
| All Other Motions Including Motions *In Limine* | | October 2, 2024 |
| Meeting in Person to Prepare Joint Final Pretrial Statement | | October 25, 2024 |
| Joint Final Pretrial Statement | | November 4, 2024 |
| Trial Status Conference | | November 12, 2024 |
| Trial Term Begins | | December 2, 2024 |

5. On April 2, 2024, Plaintiff disclosed her expert report to Defendant.

6. On May 31, 2024, discovery closed. (Doc. 26 at 1).

7. On July 2, 2024, Defendant filed its Motion for Summary Final Judgment and Incorporated Memorandum of Law ("Motion for Summary Judgment"). (Doc. 76).

8. On July 17, 2024, August 2, 2024, and August 12, 2024, Plaintiff requested three (3) discrete extensions of time, for good cause, as the need arose, to file her Response in Opposition to Defendant's Motion for Summary Judgment ("Response") from the original deadline of August 1, 2024 until August 19, 2024. (Docs. 79, 82, 87), which the

Court granted (Docs. 80, 83, 89). The three (3) unopposed extensions together added to a total of eighteen (18) days.

9.   On August 19, 2024, Plaintiff filed her draft Response to Defendant's Motion for Summary Judgment. (Doc. 91). Due to unforeseen, exigent, extraordinary medical circumstances beyond her control, Plaintiff was not able to finalize and submit her final Response and Declaration with exhibits by August 19, 2024. (Doc. 92).

10. After seeking medical care, from August 22, 2024 to August 26, 2024, Plaintiff communicated with Defendant's counsel to advise them of the situation and inform them that she planned to seek leave of Court to file her Corrected Response and Declaration as soon as she was medically able to prepare said motion. Plaintiff told Defendant's counsel that she would include a request for an extension of time (fourteen (14) days or another time the Court deemed just and proper) for Defendant's Reply after Defendant received the Corrected Response and Declaration. Defendant's counsel opposed Plaintiff's request. (Doc. 92, ¶¶ 7-10, 12).

11. On September 3, 2024, Plaintiff contacted the Clerk's Office to find out if there was any way to make the Court aware of her medical circumstances and the reason why she filed a draft Response and no Declaration. A staff member in the Clerk's Office suggested (without giving advice) filing a notice. (Doc. 92, ¶ 18).

12. On September 3, 2024, at 12:25 PM, Plaintiff filed Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment ("Time-Sensitive Notice"). (Doc. 92). In her Time-Sensitive Notice, Plaintiff summarized for the Court what Plaintiff previously informed Defendant's counsel about regarding the exigent circumstances she was facing and how they interfered with

her ability to file her materials in response to Defendant's Motion for Summary Judgment. (*Id.*). In her Time-Sensitive Notice, Plaintiff also explained to the Court that she "needed time to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work required to finalize her Corrected Response and Declaration before communicating further with the Court through motion practice." (*Id.*, ¶ 4).[1] Plaintiff specifically stated: "The next deadline in the Court's Case Management and Scheduling Order is October 2, 2024, the deadline to file '[a]ll other Motions, including Motions *in Limine.*'" (*Id.*, ¶ 16) (citing Doc. 26 at 2)).[2]

13. On September 3, 2024, at 9:34 PM, Defendant filed its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. (Doc. 93). Plaintiff's Reply hinged basically on Plaintiff's inability to file her Corrected Response and Declaration with exhibits.

---

[1] Plaintiff cannot overemphasize how losing her vision caused her to prioritize getting medical attention, giving her eyes a rest, and not causing further damage to her sight. Sudden loss of vision may be caused by the onset of a serious medical condition, including retinal detachment, stroke, and vitreous hemorrhage. *Sudden Vision Loss*, Cleveland Clinic, https://my.clevelandclinic.org/health/symptoms/24803-sudden-vision-loss. "Loss of vision is considered sudden if it develops within a few minutes to a couple of days. It may affect one or both eyes and all or part of a field of vision. Loss of only a small part of the field of vision (for example, as a result of a small retinal detachment) may seem like blurred vision." Christopher J. Brady, MD, Wilmer Eye Institute, Retina Division, Johns Hopkins University School of Medicine, *Sudden Loss of Vision*, Merck Manual, https://www.merckmanuals.com/home/eye-disorders/symptoms-of-eye-disorders/sudden-vision-loss. "Sudden retinal artery blockage can result from a blood clot or small piece of atherosclerotic material that breaks off and travels into the artery." *Id.*

[2] Because Defendant opposed Plaintiff's request for the Court to accept her Corrected Response and Declaration, Plaintiff needed to prepare a very strong motion, with sufficient citation to case law (legal research), to hopefully persuade the Court to grant her the relief she requested despite Defendant's opposition. This required a lot more work with impaired vision and limitations on the time Plaintiff was able to view the computer screen. (Docs. 92, ¶14; 102, ¶ 7). During this time, Plaintiff also had to work on additional motions that she had to file by the Court's October 2, 2024 deadline for all other motions.

14. On September 9, 2024, the Court denied Defendant's Second Motion to Dismiss and gave Defendant until September 23, 2024 to file an answer to Plaintiff's Second Amended Complaint. (Doc. 94).

15. On September 9, 2024, the Court entered an Order referring this case to United States Magistrate Judge Leslie Hoffman Price to conduct a settlement conference.[3] (Doc. 95).

16. On September 9, 2024, Judge Leslie Hoffman Price entered an Order and Notice of Settlement Conference scheduling a settlement conference on October 24, 2024, and requiring the parties to confer by telephone, videoconference, or in person in a good faith effort to resolve the case on or before October 16, 2024.[4] (Doc. 96).

17. On September 23, 2024, Defendant filed its Answer and thirteen (13) Affirmative Defenses. (Doc. 97).

18. On September 25, 2024, the Court, *sua sponte*, amended the CMSO. (Doc. 98). It changed the remaining deadlines for the Meeting in Person to Prepare Joint Final Pretrial Statement (to November 22, 2024), Joint Final Pretrial Statement (to December 2, 2024), Trial Status Conference (to December 10, 2024), and beginning of Trial Term (to February 3, 2025). (Doc. 98 at 1-2).

---

[3] Previously, on July 9, 2024, this Court entered an Order referring this case to United States District Court Judge Paul G. Byron to conduct a settlement conference. (Doc. 78). That referral was reassigned by the Order referring the Case to Judge Hoffman Price. (Doc. 95 at 1).

[4] After conferral, the parties had to deliver separate written summaries of the facts and issues of the case to Judge Hoffman Price's Chambers by October 17, 2024, at 5:00 p.m. (Doc. 96 at 2). The parties also had to speak separately by phone with Judge Hoffman Price on October 22, 2024. (*Id.* at 3).

19. On October 2, 2024, the parties met the deadline to file all other motions, including Motions *in Limine*. (Doc. 26 at 2). (Docs. 101-102, 104-106).

20. On October 15, 2024, with the Court's approval (Docs. 99-100), in accordance with the deadline provided by Federal Rule of Civil Procedure 12(f)(2), Plaintiff filed Plaintiff's Motion to Strike Defendant's Affirmative Defenses. (Doc. 112).[5]

21. On October 16, 2024, Defendant filed Defendant's Motion to Strike Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Final Judgment. (Doc. 114).

22. On October 24, 2024, the parties met for a Court-ordered settlement conference in the United States District Court in Orlando, as scheduled; Judge Leslie Hoffman Price declared an Impasse. (Doc. 121).

23. On November 1, 2024, the Court entered three (3) separate Orders denying (a) Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102), (b) Plaintiff's Motion to Reopen Discovery and Summary

---

[5] On October 14, 2024, Plaintiff filed her Time-Sensitive Motion for Extension of Time requesting a five-day extension to file her Motion to Strike and her Response to Defendant's Omnibus Motion *in Limine* due to issues dealing with two unexpected hurricanes (Helene followed by Milton). (Doc. 110). Prior to filing the Motion, Plaintiff conferred in good faith with Defendant's counsel, but Defendant's counsel opposed the five-day extension of time. On October 15, 2024, Defendant filed a Response in Opposition to Plaintiff's Time-Sensitive Motion for Extension of Time (five days). (Doc. 111). By the time of the deadlines to file her Motion to Strike (October 15) and Response (October 16), the Court had not yet ruled on Plaintiff's Time-Sensitive Motion for Extension of Time. On October 22, 2024, the Court denied Plaintiff's Time-Sensitive Motion for Extension of Time as moot after Plaintiff filed her Motion to Strike (Doc. 112) and Response (Doc. 117) by the deadlines. (Doc. 119).

Judgment (Doc. 105), and (c) Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106). (Docs. 124, 125, 126).

24. On November 4, 2024, the Court entered an Order denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112). (Doc. 127).

25. On November 6, 2024, Plaintiff filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders to inform the Court that she intended to file Motions for Reconsideration of three (3) Orders that were recently issued by the Court (Docs. 124, 125, and 127). (Doc. 128).[6]

26. On November 15, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion for Reconsideration of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102). (Doc. 130). This motion remains pending.

27. On November 19, 2024, Plaintiff filed Plaintiff's Emergency Motion for Extension of Pretrial Deadlines, including the November 22, 2024 (Meeting in Person) and December 2, 2024 (Joint Final Pretrial Statement) deadlines. (Doc. 131). This motion remains pending.

28. On November 22, 2024, Plaintiff and Defendant's counsel met for the required Meeting in Person to Prepare Joint Final Pretrial Statement. (Doc. 98 at 1). As required by the CMSO, Plaintiff and Defendant's counsel spent time discussing "settlement of the action before undertaking the extensive efforts needed to conduct final preparation of the

---

[6] On November 7, 2024, U.S. Magistrate Judge Daniel C. Irick struck Plaintiff's Notice (Doc. 128). (Doc. 129). Judge Irick stated: "The rules of this court do not provide for the filing of a notice of intent to file a motion." (*Id.*).

case for trial and to comply with the requirements of [the CMSO]." (Doc. 26 at 7, § III.A.1.).

As a result of those discussions, Plaintiff made an offer to settle this case during the in-person meeting on Friday, November 22, 2024. Defendant responded with a counteroffer on Monday, November 25, 2024. Plaintiff then counteroffered that same day (Monday). Plaintiff is awaiting a response to her November 25, 2024 counteroffer.[7]

29. At the in-person meeting on November 22, 2024, Plaintiff and Defendant's counsel met for four (4) hours and engaged in the discussions required by the CMSO, including the format of the pretrial statement, the tasks to be completed and the order in which these tasks must be completed, some of the facts (disputed and undisputed), and draft jury instructions (from the Eleventh Circuit pattern jury instructions). However, both sides are unavailable at different times this week, the week of the Thanksgiving holiday.

30. This morning, at 11:53 AM, as Plaintiff was engaged in ongoing conferral with Defendant's counsel about this Motion, Plaintiff received an automatic e-mail message generated by the Court's CM/ECF system advising that the Court entered an Order changing the date of the Trial Status Conference from December 10, 2024 (in person) to December 3, 2024 (via phone). (Doc. 132). Once Plaintiff read this email, she promptly notified Defendant's counsel, at 12:42 PM, and requested their updated position regarding the request in this Motion.

31. As of the time of the filing of this Motion, Plaintiff is waiting for a response from Defendant's counsel, including as to their availability for further conferral by phone as needed. Given the emergency nature of the request due to the upcoming deadline right

---

[7] The statements in this Motion regarding settlement discussions do not violate the text or purpose of Federal Rule of Evidence 408. They are only meant to inform the Court regarding the parties' ongoing settlement negotiations as required by the CMSO.

after the Thanksgiving holiday weekend and the Court being closed on Thanksgiving Day, Plaintiff advised Defendant's counsel that she would file this Motion today and inform the Court that Plaintiff and Defendant's counsel are engaged in ongoing conferral about this Motion. The decision to file this Motion today became more pressing once the Court entered its Order today (Doc. 132).[8]

**MEMORANDUM OF LAW**

Rule 16(b)(4) of the Federal Rules of Civil Procedure provides that "'[a] schedule may be modified only for good cause and with the judge's consent." There is a diligence requirement. *Knights v. Wyndham Vacation Ownership, Inc.*, Case No: 6:23-cv-1104-RBD-DCI, 2024 U.S. Dist. LEXIS 17525, at *5 (M.D. Fla. 2024). Plaintiff submitted this emergency motion before the deadlines she is seeking to extend. *Cf. Marc Irwin Sharfman M.D. P.A. v. Precision Imaging St. Augustine LLC*, No. 6:22-cv-642-WWB-DCI, 2024 U.S. Dist. LEXIS 90277, *2 (2024) (producing on last day of discovery deadline means meeting the deadline). The parties have been working to meet the upcoming December 2, 2024 deadline to file the Joint Final Pretrial Statement; however, conflicts in schedule are interfering with the parties' ability to complete this work during the week of the Thanksgiving holiday.

In *Classic Soft Trim, Inc. v. Albert*, this Court had to take the case "off the trial docket due to the parties' inability to draft a cohesive pretrial statement." No. 6:18-cv-1237-WWB-DAB, 2023 U.S. Dist. LEXIS 105346, at *3-4 (M.D. Fla. June 16, 2023). The parties in *Classic* were all represented by lawyers in law firms. In *State Farm Mut. Auto. Ins. Co. v.*

_____

[8] Plaintiff interpreted the Order to mean that the Court is currently reviewing the status of this Case; therefore, filing the Motion today will be time-efficient for the Court to promptly rule on this emergency Motion.

*Complete Care Centers, LLC*, this Court granted a seven-day extension for the parties to file "their joint final pretrial statement, trial briefs, and related documents." No. 6:20-cv-1240-WWB-EJK, 2022 U.S. Dist. LEXIS 243991, at *1-2 (M.D. Fla. July 5, 2022). The parties in *State Farm* were all represented by lawyers in law firms.

The Court recently amended its CMSO pretrial deadlines *sua sponte*. Plaintiff, who is proceeding *pro se*, and Defendant's counsel are required to engage in extensive work to meet the upcoming pretrial deadlines. The amended pretrial deadlines (November 22, 2024 and December 2, 2024) fell right before and right after the upcoming Thanksgiving holiday. Plaintiff rescheduled plans at much hardship to her and her family to return from South Florida to Orlando to attend the Meeting in Person by the November 22, 2024 deadline.[9] Plaintiff also canceled family plans during Thanksgiving week to continue working on the materials she must prepare for the Joint Final Pretrial Statement. These tasks have been made more difficult for Plaintiff and both parties because of the deficient Answer and thirteen Affirmative Defenses Plaintiff finally received on September 23, 2024, during a period of many deadlines in the Case. By this time, discovery was closed and the deadline to file summary judgment motions had passed.

Plaintiff and Defendant's counsel have different available times this week, with the Thanksgiving holiday in between. Plaintiff wants to avoid the parties' "inability to draft a cohesive pretrial statement," as in *Classic*, by the December 2, 2024 deadline. Plaintiff

---

[9] Defendant's counsel suggested a meeting on November 18, 19, or 20; however, Plaintiff was scheduled to be in South Florida at that time, including to meet with her mother's doctor to get results of recent medical tests. On November 19, 2024, Plaintiff filed an emergency motion to extend the pretrial deadlines, which Defendant opposed. (Doc. 131). Plaintiff then drove back to Orlando to meet on November 22, 2024, as agreed.

informed Defendant's counsel that, if needed, Plaintiff is prepared to meet to work on the Joint Final Pretrial Statement the weekend after Thanksgiving and on Monday; however, Plaintiff is concerned that this may cause another emergency medical situation like she faced during the time leading to and up to the deadline to file her response to Defendant's Motion for Summary Judgment.[10] Additionally, Defendant's counsel is not available to work throughout the weekend after Thanksgiving or on Monday (the day of the deadline).

The Court recently noted that Plaintiff has filed timely motions for extension of time in the past and therefore knows how to utilize this procedure when needed. (Doc. 124 at 3). Plaintiff is filing this emergency Motion before the upcoming deadline for the parties to file their Joint Pretrial Statement because, based on the tasks that must be done and the conflicting schedules of both sides, Plaintiff foresees that the parties will be unable to file a "cohesive pretrial statement" despite their diligence. To date, the CMSO has not been amended at the request of any of the parties.

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court grant the extension of time requested in this Motion and extend the deadline for the parties to file their Joint Final Pretrial Statement.

## LOCAL RULE 3.01(g) CERTIFICATION

Plaintiff certifies that she is engaged in ongoing conferral with Defendant's counsel about this Motion. Plaintiff is awaiting Defendant's counsel latest update regarding this Motion after the Court's recent Order re-scheduling the Trial Status Conference. Once

---

[10] Plaintiff's health is still compromised. Plaintiff does not have the assistance of other attorneys or support staff.

Plaintiff receives this update, Plaintiff will notify the Court accordingly via an updated Local

Rule 3.01(g) Certification.

Dated this 26th day of November, 2024.

Respectfully submitted,

/s/ Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 26, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff

Tab 135

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARITZA REYES,**

      **Plaintiff,**

**v.**                                                          **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

      **Defendant.**
_____

**PLAINTIFF'S EMERGENCY MOTION TO FILE A REPLY TO DEFENDANT'S**
**RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR**
**EXTENSION OF PRETRIAL DEADLINES**

On November 19, 2024, Plaintiff, Maritza Reyes, filed Plaintiff's Emergency Motion for Extension of Pretrial Deadlines ("Emergency Motion re Pretrial Deadlines"). (Doc. 131). On November 26, 2024, Defendant, Florida A&M University Board of Trustees, filed Defendant's Response in Opposition to Plaintiff's Motion re Mediation ("Defendant's Response re Pretrial Deadlines"). (Doc. 134). Plaintiff now files Plaintiff's Emergency Motion to File a Reply to Defendant's Response re Pretrial Deadlines ("Motion") pursuant to Local Rule 3.01(d). This Motion is being filed on an emergency basis because it impacts the upcoming Final Joint Pretrial Statement deadline on December 2, 2024, which falls on the Monday after the Thanksgiving holiday and the courthouse is closed tomorrow for Thanksgiving Day. Plaintiff respectfully requests a ruling on this Motion by today.

1. Plaintiff now seeks leave to reply to the latest misrepresentations made by Defendant's counsel, especially because Defendant's counsel used Defendant's Response re Pretrial Deadlines (Doc. 134), which it filed yesterday at 8:15 PM, to inject misrepresentations that also impact Plaintiff's Emergency Motion for Extension of

Deadline to File Joint Final Pretrial Statement ("Emergency Motion re Pretrial Statement"), which Plaintiff filed yesterday at 4:46 PM (Doc. 133). (*See* Composite Emails at Exhibit "1").[1]

2.   Plaintiff seeks to reply to factual misrepresentations and incorrect analysis of law in paragraphs two (2) to eight (8) of Defendant's Response re Pretrial Deadlines, including about the good cause and timeliness of Plaintiff's Emergency Motion re Pretrial Deadlines.[2] Plaintiff also seeks to specifically respond to the misrepresentations regarding what happened during the in-person meeting on November 22, 2024 when Defendant's counsel was not prepared to fulfill the requirements of the Court's Case Management and Scheduling Order ("CMSO") for the in-person meeting. (Doc. 26 at 7-8, § III.A.1.-4.).[3] (*See* Summary Email at Exhibit "2"). Additionally, for the first time at the

---

[1] Plaintiff was engaged in good faith conferral about her Emergency Motion re Pretrial Statement when Defendant's counsel (*See* Composite Emails at Exhibit "1"), rather than respond yesterday to this ongoing conferral, inappropriately used Defendant's Response re Pretrial Deadlines to attempt to mislead the Court with misrepresentations and thereby influence the Court to deny Plaintiff's Emergency Motion re Pretrial Deadlines (Doc. 131) and Plaintiff's Emergency Motion re Pretrial Statement (Doc. 133).

[2] Defendant's counsel's misrepresentations have caused the need for additional filings and rulings by the Court, including Plaintiff's motions to file replies to address the misrepresentations and misapplication to law. (*See e.g.,* Docs. 58, 58-1, 58-2). On October 29, 2024, in Defendant's Response in Opposition to Plaintiff's Motion to Strike Defendant's Affirmative Defenses, Defendant's counsel misrepresented facts to the Court regarding conferral with Plaintiff (Doc. 122, ¶¶ 8, 10). On November 4, 2024, based largely on Defendant's counsel's misrepresentations, the Court denied Plaintiff's Motion to Strike Defendant's Affirmative Defenses. (Doc. 127 at 1-2). This will now require Plaintiff to file a Motion for Reconsideration. Defendant has multiplied the expenses of this lawsuit, including with misrepresentations and by opposing Plaintiff's reasonable requests. To date, the parties have not filed a single joint motion in this case. Defendant's counsel has displayed personal animosity toward Plaintiff, who is proceeding *pro se*. This unprofessional animosity has unnecessarily multiplied the costs of this litigation, including Defendant's counsel's billable time. Plaintiff does not know if this litigation approach is being fueled by Defendant's representatives, Defendant's counsel, or both.

[3] Since the beginning of this lawsuit, Defendant's counsel refused to fulfill the settlement discussion requirements of the Federal Rule of Civil Procedure 26(f) conference. Defendant's counsel tried to do the same at the in-person meeting on November 22, 2024

in-person meeting, Defendant's counsel stated that she is unavailable in the days prior to the upcoming December 2, 2024 deadline, including because she has a trial starting on December 2, 2024. Plaintiff proposed that the professional way to handle the conflicts in availability on both sides would be to file a motion to extend the deadline to file the Final Joint Pretrial Statement, which is what Plaintiff did (*see* Doc. 133).

**WHEREFORE** Plaintiff respectfully requests this Honorable Court to enter an Order granting this Motion and giving Plaintiff leave to file a reply of up to five (5) pages within a reasonable time after the Court's Order if the Court will review Plaintiff's reply and issue a ruling by Friday, November 29, 2024.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Plaintiff certifies that she conferred in good faith with Defendant's counsel via email and phone and Defendant's counsel represented that they oppose this Motion.

Respectfully submitted this 27th day of November, 2024.

/s/ Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on November 27, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff

---

when Plaintiff insisted on adherence to the settlement discussion requirements of the CMSO. (Doc. 26 at 7, § III.A.1.). At Plaintiff's insistence, Defendant's counsel finally engaged in the CMSO's required settlement discussions. As a result of those discussions, Plaintiff made an offer in writing to settle this lawsuit during the in-person meeting on Friday, November 22, 2024. Defendant responded with a counteroffer in writing on Monday, November 25, 2024. Plaintiff then counteroffered in writing that same day (Monday). Plaintiff is awaiting a response to her November 25, 2024 counteroffer.

3

Tab 138

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARITZA REYES,**

     **Plaintiff,**

**v.**                                **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

     **Defendant.**
_____

## JOINT EMERGENCY REQUEST FOR A STATUS CONFERENCE REGARDING COORDINATION OF JOINT FINAL PRETRIAL STATEMENT

     Pursuant to the Court's Case Management and Scheduling Order ("CMSO"), Plaintiff, Maritza Reyes, and Defendant, Florida A&M University Board of Trustees, respectfully submit this Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement. (Doc. 26 at 9-10). Plaintiff and defense counsel have concluded that they will be unable to complete the joint pretrial materials in time for filing by the December 2, 2024 deadline (Doc. 98 at 1). This request is being submitted on an emergency basis because Plaintiff and defense counsel need the Court's guidance and relief prior to expiration of the December 2, 2024 deadline to file a Joint Final Pretrial Statement. (Doc. 98 at 1).

     1.  On November 22, 2024, Plaintiff and defense counsel met for the required Meeting in Person to Prepare Joint Final Pretrial Statement. As required by the CMSO, Plaintiff and defense counsel spent time discussing "settlement of the action before undertaking the extensive efforts needed to conduct final preparation of the case for trial and to comply

with the requirements of [the CMSO]." (Doc. 26 at 7, § III.A.1.). As a result of those discussions, Plaintiff made an offer to settle this lawsuit during the in-person meeting; Defendant responded with a counteroffer on Monday, November 25, 2024; and Plaintiff provided her own counteroffer that same day. Counsel for Defendant submitted Plaintiff's November 25, 2024 counteroffer to Defendant and anticipates receiving its response in the coming week.

2.   After the in-person meeting on November 22, 2024, Plaintiff and defense counsel continued working on their pretrial statement materials to meet the December 2, 2024, deadline for filing the Joint Final Pretrial Statement.

3.   On November 26, 2024, at 11:53 AM, the Court amended the date of the Trial Status Conference from December 10, 2024 to December 3, 2024.

4.   On November 26, 2024, at 4:46 PM, Plaintiff filed Plaintiff's Emergency Motion for Extension of Deadline to File Joint Final Pretrial Statement ("Emergency Motion re Joint Final Pretrial Statement") seeking a seven-day extension of the deadline to submit the Joint Final Pretrial Statement by December 9, 2024. (Docs. 133, 136).[1]

5.   On November 29, 2024, the Court amended the date of the Trial Status Conference from December 3, 2024 to January 15, 2024.

6.   Plaintiff and defense counsel recognize that pretrial materials must be completed in their entirety prior to submission to the Court, and that the materials are to be submitted jointly. "The Court will strike pretrial statements that are unilateral, incompletely executed, or otherwise incomplete. Inadequate stipulations of fact and law will be stricken.

---

[1] Plaintiff began conferring with defense counsel about her Emergency Motion re Joint Final Pretrial Statement before the Court entered its November 26, 2024 Order amending the date of the Trial Status Conference.

Sanctions may be imposed for failure to comply, including the striking of pleadings." (Doc. 26 at 8, § III.B.1.).

7. The Court provides a procedure to notify the Court if "counsel is unable to coordinate" compliance with the sections of the CMSO regarding preparation and filing of a Joint Final Pretrial Statement: "counsel shall timely notify the Court by written motion or request for a status conference." (*Id.* at 10, § III.C.).[2]

8. At this time, Plaintiff and defense counsel agree that it is necessary to request a status conference to seek the Court's guidance regarding options to fulfill the Court's compliance requirements with the CMSO, such that this case is fully ready for trial at the time the parties submit their Joint Final Pretrial Statement. The parties are having issues completing the pretrial materials, including regarding the scope of issues to be addressed considering the pending motions.

Respectfully submitted this 1st day of December, 2024.

/s/ Maritza Reyes, *Pro Se*
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

/s/ Sarah P. L. Reiner
Richard E. Mitchell, Esq.
Florida Bar No.: 0168092
rick.mitchell@gray-robinson.com
maryann.hamby@gray-robinson.com
Sarah L. Reiner, Esq.
Florida Bar No.: 520195
sarah.reiner@gray-robinson.com
roseann.foster@gray-robinson.com
Julie M. Zolty, Esq.
Florida Bar No.: 1036454
julie.zolty@gray-robinson.com
chantal.mccoy@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880

---

[2] On November 26, 2024, Plaintiff filed her Emergency Motion re Joint Final Pretrial Statement. (*See supra* ¶ 4).

Facsimile: (407) 244-5690
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on December 1, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff

Tab 145

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

      Plaintiff,

v.                                CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

      Defendant.
_____

**PLAINTIFF'S TIME-SENSITIVE MOTION FOR COURT CASE MANAGEMENT**

      Plaintiff, Maritza Reyes, submits Plaintiff's Time-Sensitive Motion for Court Case Management ("Time-Sensitive Motion") and respectfully requests that this Honorable Court, pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court's inherent authority, and the interests of justice, provide case management and guidance, including regarding the required Joint Final Pretrial Statement, pending motions, and legal issues. This Time-Sensitive Motion is being submitted on a time-sensitive basis because the parties did not submit the required Joint Final Pretrial Statement by the December 2, 2024 deadline and, at this point, Plaintiff and Defendant's counsel are not able to coordinate compliance with the Court's Case Management and Scheduling Order ("CMSO") without Court intervention. Plaintiff requests a ruling as soon as possible.

## I.    SUMMARY BACKGROUND

1. On October 9, 2023, Plaintiff filed her Second Amended Complaint. (Doc. 34).[1]

_____

[1] Plaintiff filed her Complaint on August 25, 2022. (Doc. 1). Therefore, she had until November 23, 2022, to effect service of process upon Defendant. Fed. R. Civ. P. 4(m).

2.   On October 23, 2023, Defendant filed a Motion to Dismiss Plaintiff's Second Amended Complaint with Prejudice or in the Alternative Motion to Strike ("Second Motion to Dismiss"). (Doc. 35).[2]

3.   On November 13, 2023, Plaintiff filed her Response in Opposition to Defendant's Second Motion to Dismiss her Second Amended Complaint. (Doc. 36).

4.   The Court's Case Management and Scheduling Order ("CMSO"), which was issued on February 13, 2023, stated the following deadlines (Doc. 26 at 1-2):

Disclosure of Expert Reports
                                   Plaintiff:                 April 2, 2024
                                   Defendant:           May 2, 2024

---

Plaintiff could have amended her Complaint once as a matter of course by no later than twenty-one (21) days after serving it, or twenty-one (21) days "after service of a responsive pleading" or "a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). However, on September 1, 2022, the Court *sua sponte* dismissed Plaintiff's Complaint without prejudice as a "shotgun" pleading and gave Plaintiff seven (7) days to file an amended complaint. (Doc. 8). Plaintiff sought and received an unopposed extension of <u>four (4) days</u> to file her amended pleading by Monday, September 12, 2022. (Docs. 9, 11). On September 12, 2022, Plaintiff filed her Amended Complaint (Doc. 10) and served it upon Defendant on November 18, 2022 (Doc. 17). On December 6, 2022, Defendant sought and received an unopposed extension of <u>forty-five (45) days</u> to respond to Plaintiff's Amended Complaint, which gave Defendant a total of sixty-six (66) days to file an answer. (Docs. 13, 16). When Plaintiff agreed to the lengthy extension, she was under the understanding that Defendant needed the time to prepare an Answer and Affirmative Defenses, which would have streamlined the discovery and motions in the case. Instead, Defendant filed its First Opposed Motion to Dismiss Plaintiff's Amended Complaint as a Shotgun Pleading and to Strike Immaterial Allegations, and Alternative Motion for More Definite Statement ("First Motion to Dismiss"). (Doc. 22). Plaintiff sought and received an unopposed extension of <u>three (3) days</u> to respond to the First Motion to Dismiss. (Docs. 24, 25). After Plaintiff filed her response seeking denial of Defendant's First Motion to Dismiss (Doc. 28), the Court, on September 15, 2023, entered an Order granting in part and denying in part Defendant's First Motion to Dismiss and giving Plaintiff leave to file an amended pleading by September 29, 2023. (Doc. 30 at 5-6). Plaintiff sought and received an extension of <u>ten (10) days</u> to file her Second Amended Complaint by October 9, 2023. (Docs. 32, 33).

[2] At the beginning of its Second Motion to Dismiss, Defendant requested dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), which allowed it, pursuant to Federal Rule of Civil Procedure 12(a)(4), to extend the period to file an answer until fourteen (14) days after the Court ruled on its Second Motion to Dismiss.

| | |
|---|---|
| Discovery Deadline | May 31, 2024 |
| Dispositive Motions, and *Daubert* Motions | July 2, 2024 |
| All Other Motions Including Motions *In Limine* | October 2, 2024 |
| Meeting in Person to Prepare Joint Final Pretrial Statement | October 25, 2024 |
| Joint Final Pretrial Statement | November 4, 2024 |
| Trial Status Conference | November 12, 2024 |
| Trial Term Begins | December 2, 2024 |

5.  On April 2, 2024, Plaintiff disclosed her expert report to Defendant.[3]

6.  On May 31, 2024, discovery closed. (Doc. 26 at 1).

7.  On July 2, 2024, Defendant filed its Motion for Summary Final Judgment and Incorporated Memorandum of Law ("Motion for Summary Judgment"). (Doc. 76).

8.  On August 19, 2024, Plaintiff filed her draft Response to Defendant's Motion for Summary Judgment. (Doc. 91).[4] Due to unforeseen, exigent, extraordinary medical circumstances beyond her control, Plaintiff was not able to finalize and submit her final Response and Declaration with exhibits. (Doc. 92).[5]

---

[3] Defendant refused to agree to Plaintiff's request for a brief extension of time to submit her workplace mobbing expert report, which was due on April 2, 2024. At the time, Plaintiff explained to Defendant's counsel that she was dealing with the unexpected, wrongful dismissal from her tenured faculty position which was about to become effective on April 5, 2024. Additionally, Plaintiff's expert was preparing to travel and unavailable to confer with Plaintiff during this time. Due to Defendant's refusal, Plaintiff had to submit the report without being able to confer with the expert. (Doc. 43 at n. 3). The only other option would have been to file a motion for extension of time that may not have been granted because Defendant would oppose it. The Court has only granted Plaintiff extensions of time that were unopposed by Defendant. *See supra* note 1, *infra* note 4.

[4] On July 17, 2024, August 2, 2024, and August 12, 2024, Plaintiff requested three (3) discrete extensions of time, for good cause as the need arose, to file her Response in Opposition to Defendant's Motion for Summary Judgment ("Response") from the original deadline of August 1, 2024 until August 19, 2024, which the Court granted (Docs. 79, 80, 82, 82, 83, 87, 89). The three (3) unopposed extensions together totaled <u>eighteen (18) days</u>. Defendant sought and received an unopposed <u>forty-five (45) day</u> extension to respond to Plaintiff's Amended Complaint. (Docs. 13, 16).

[5] Plaintiff communicated with Defendant's counsel about her medical situation to try to persuade Defendant and its counsel not to oppose a motion to file her Corrected Response and Declaration with exhibits. Defendant and its counsel opposed Plaintiff's

9. On September 3, 2024, Defendant filed its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. (Doc. 93). Defendant's Reply basically attacked Plaintiff's inability to file her Corrected Response and Declaration with exhibits (a "procedural technicality" and not really the merits of Plaintiff's facts and evidence).

10. On September 9, 2024, the Court denied Defendant's Second Motion to Dismiss and gave Defendant until September 23, 2024 to file an answer to Plaintiff's Second Amended Complaint. (Doc. 94).

11. On September 9, 2024, the Court entered an Order referring this case to United States Magistrate Judge Leslie Hoffman Price to conduct a settlement conference.[6] (Doc. 95).[7]

_____

request. This led to Plaintiff having to deal with the situation unilaterally as best she could, including by filing a Notice with the Court (Doc. 92), followed by a Motion (Doc. 102), which was denied (Doc. 124), and a Motion for Reconsideration (Doc. 130), which was also denied. (Doc. 144). In her requests to the Court (Docs. 102, 130), Plaintiff explained that she was able to file a draft Response (which she had been working on) but became incapacitated to the point of not being able to finalize her Response or prepare an emergency motion to seek an extension of time. (Docs. 92, ¶3; 102, ¶ 5; 130 at 9-10). Plaintiff advised the Court that she contracted COVID for the first time since the pandemic began and was still having difficulty concentrating. (Docs. 82, ¶3; 87, ¶3; 102, ¶¶ 2-3). She also explained that she "needed to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work to finalize the Corrected Response and Declaration before communicating further with the Court through [a motion to replace her draft Response]." (Docs. 92, ¶¶ 3-4; 102, ¶¶ 11-12; 130 at 11, 13). She also explained why she continued to finalize her materials, which included witness declarations (affidavits). (Docs. 102, ¶ 14; 130 at 13-14). Despite Plaintiff's explanations to the questions the Court raised, the Court decided against a finding of good cause, diligence, and excusable neglect. (Docs. 124 at 3-4; 144 at 4).

[6] Previously, on July 9, 2024, this Court entered an Order referring this case to United States District Court Judge Paul G. Byron to conduct a settlement conference. (Doc. 78). That referral was reassigned by the Order referring the Case to Judge Hoffman Price. (Doc. 95 at 1).

[7] On September 9, 2024, Judge Hoffman Price entered an Order and Notice of Settlement Conference scheduling a settlement conference on October 24, 2024, and requiring the parties to confer by telephone, videoconference, or in person in a good faith effort to resolve the case on or before October 16, 2024, followed by submitting individual written

12. On September 23, 2024, Defendant filed its Answer and thirteen (13) Affirmative Defenses. (Doc. 97).

13. On September 25, 2024, the Court, *sua sponte*, amended the CMSO. (Doc. 98). It changed the remaining deadlines for the Meeting in Person to Prepare Joint Final Pretrial Statement (to November 22, 2024), Joint Final Pretrial Statement (to December 2, 2024), Trial Status Conference (to December 10, 2024), and beginning of Trial Term (to February 3, 2025). (Doc. 98 at 1-2).

14. On October 2, 2024, the parties met the deadline to file all other motions, including Motions *in Limine*. (Doc. 26 at 2).

15. On October 15, 2024, Plaintiff filed Plaintiff's Motion to Strike Defendant's Affirmative Defenses. (Doc. 112).[8]

16. On October 24, 2024, the parties met for a settlement conference in the United States District Court in Orlando, as scheduled; U.S. Magistrate Judge Leslie Hoffman Price declared an Impasse. (Doc. 121).

17. On October 29, 2024, Defendant filed its Response in Opposition to Plaintiff's Motion to Strike Defendant's Answer and Affirmative Defenses. (Doc. 122).

18. On November 1, 2024, U.S. District Court Judge Wendy W. Berger entered three (3) separate Orders denying (a) Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for

---

summaries to her, and thereafter having separate phone conferences with her. (Doc. 96). The parties met these requirements and deadlines.

[8] Plaintiff diligently sought and received confirmation from the Court that she could file her Motion to Strike Defendant's Answer and Affirmative Defenses pursuant to the deadline provided by Federal Rule of Civil Procedure 12(f)(2). (Docs. 99, 100).

the Court to Accept Plaintiff's Declaration (Doc. 102), (b) Plaintiff's Motion to Reopen Discovery and Summary Judgment (Doc. 105), and (c) Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106). (Docs. 124, 125, 126).[9]

19. On November 4, 2024, U.S. Magistrate Judge Daniel C. Irick entered his Order denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112). (Doc. 127).

20. On November 15, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion for Reconsideration of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102). (Doc. 130).

21. On November 19, 2024, Plaintiff filed Plaintiff's Emergency Motion for Extension of Pretrial Deadlines, including the November 22, 2024 (Meeting in Person) and December 2, 2024 (Joint Final Pretrial Statement) deadlines ("Emergency Motion re Pretrial Deadlines"). (Doc. 131). This emergency motion was opposed by Defendant and remains pending.

---

[9] On November 6, 2024, Plaintiff diligently filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders to inform the Court that she intended to file Motions for Reconsideration of three (3) Orders that were recently issued by the Court (Docs. 124, 125, and 127). (Doc. 128). On November 7, 2024, U.S. Magistrate Judge Daniel C. Irick struck Plaintiff's Notice (Doc. 128) *sua sponte*. (Doc. 129). Judge Irick stated: "The rules of this court do not provide for the filing of a notice of intent to file a motion." (*Id.*). Plaintiff is familiar with the rules; however, she did not find any prohibition for the type of notice she filed. When she filed her Notice (Doc. 128), Plaintiff acted in good faith, in an effort to keep the Court informed.

22. On November 22, 2024, Plaintiff and Defendant's counsel met for the required Meeting in Person to Prepare Joint Final Pretrial Statement. (Doc. 98 at 1). At Plaintiff's insistence, as required by the CMSO, Plaintiff and defense counsel spent time discussing "settlement of the action before undertaking the extensive efforts needed to conduct final preparation of the case for trial and to comply with the requirements of [the CMSO]." (Doc. 26 at 7, § III.A.1.). As a result of those discussions, Plaintiff made an offer to settle this case during the in-person meeting on Friday, November 22, 2024. Defendant responded with a counteroffer on Monday, November 25, 2024. Plaintiff then counteroffered that same day (Monday). As of the filing of this Time-Sensitive Motion, Defendant has not responded to Plaintiff's November 25, 2024 counteroffer.[10]

23. After the in-person meeting on November 22, 2024, Plaintiff and Defendant's counsel continued working on their pretrial statement materials to meet the December 2, 2024 deadline to file the Joint Final Pretrial Statement. However, there were issues with miscommunication, unavailability, other work, contentious conferrals, time-consuming conflicting emails, failure to agree, and the Thanksgiving holiday.

24. On November 26, 2024, at 11:53 AM, the Court *sua sponte* amended the date of the Trial Status Conference from December 10, 2024 to December 3, 2024.

25. On November 26, 2024, at 4:46 PM, Plaintiff filed Plaintiff's Emergency Motion for Extension of Deadline to File Joint Final Pretrial Statement ("Emergency Motion re Joint Final Pretrial Statement") seeking a seven-day extension of the deadline to submit the

---

[10] On December 1, 2024, in a Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement, Defendant's counsel stated: "Counsel for Defendant submitted Plaintiff's November 25, 2024 counteroffer to Defendant and anticipates receiving its response in the coming week." (Doc. 138, ¶ 1).

Joint Final Pretrial Statement by December 9, 2024, to avoid conflicts with availability during Thanksgiving week. (Docs. 133, 136).[11] This emergency motion was also opposed by Defendant and remains pending.

26. On November 24, 2024, at 8:15 PM, Defendant filed Defendant's Response in Opposition to Plaintiff's Emergency Motion re Pretrial Deadlines ("Defendant's Response re Pretrial Deadlines"). (Doc. 134).

27. On November 27, 2024, Plaintiff filed Plaintiff's Emergency Motion to File a Reply to Defendant's Response re Pretrial Deadlines. (Doc. 135). This emergency motion was also opposed by Defendant and remains pending.

28. On November 29, 2024, the Court *sua sponte* amended the date of the Trial Status Conference from December 3, 2024 to January 15, 2025.

29. On December 1, 2024, Plaintiff, on behalf of both parties, filed a Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement ("Joint Emergency Request for a Status Conference"). (Doc. 138). This emergency request is unopposed and remains pending.

30. On December 10, 2024, Defendant filed Defendant's Omnibus Response in Opposition to Plaintiff's Motion for Leave to File Replies to Defendant's Response in Opposition to Plaintiff's Emergency Motion for Extension of Pretrial Deadlines (Doc. 135) and to Defendant's Response in Opposition to Plaintiff's Motion for Reconsideration (Doc. 139). (Doc. 141).

---

[11] Before the Court entered its November 26, 2024 Order amending the date of the Trial Status Conference, Plaintiff had already started conferral with Defendant's counsel about Plaintiff's intention to file her Emergency Motion re Joint Final Pretrial Statement.

## II.   <u>MEMORANDUM OF LAW</u>

A party may request a case management conference. *Klinakis v. Altus Jobs, LLC*, No. 6:22-cv-1756-RBD-RMN, 2023 U.S. Dist. LEXIS 169456, at *2-3 (M.D. Fla. Sept. 21, 2023). Additionally, Rule 16(a) of the Federal Rules of Civil Procedure provides:

> (a) Purposes of a Pretrial Conference. In any action, the court may order the attorneys and any unrepresented parties to appear for one or more pretrial conferences for such purposes as:
>
> > (1) expediting disposition of the action;
> > (2) establishing early and continuing control so that the case will not be protracted because of lack of management;
> > (3) discouraging wasteful pretrial activities;
> > (4) improving the quality of the trial through more thorough preparation; and
> > (5) facilitating settlement.

Fed. R. Civ. P. 16(a). Additionally, the Court's CMSO provides a procedure to notify the Court if a *pro se* plaintiff and defense counsel are unable to coordinate compliance with the Court's requirements for preparation and filing of a Joint Final Pretrial Statement: "counsel shall timely notify the Court by written motion or request for a status conference." (*Id.* at 10, § III.C.).

On November 26, 2024, Plaintiff filed her Emergency Motion re Joint Final Pretrial Statement. (Doc. 133). On December 1, 2024, the parties filed a Joint Emergency Request for a Status Conference. (Doc. 138). On December 2, 2024, the parties did not file the Joint Final Pretrial Statement. The parties continued to communicate about the pretrial materials; however, the contentious communications became ineffective and unproductive. By December 4, 2024, Defendant's counsel did not respond to Plaintiff's emails about the pretrial materials that she needed to prepare for an upcoming in-person meeting. Therefore, Plaintiff canceled that additional in-person meeting that was

9

scheduled for December 10, 2024.[12] Plaintiff realized that Defendant and Defendant's counsel were once again engaging in bad faith conduct as when they engaged in dilatory tactics about scheduling depositions only to run out the discovery deadline and accuse Plaintiff of not being diligent about seeking the depositions. (*See generally* Exhibit 1).

When Defendant and Defendant's counsel took advantage of Plaintiff's good faith and civility in the past with the scheduling of depositions, U.S. Magistrate Judge Irick told Plaintiff that she should have sought Court intervention. (*Id.* at 18:12-19). Recently, U.S. District Court Judge Berger questioned why Plaintiff did not file a motion for extension of time when she became medically incapacitated. (Doc. 124 at 3).[13] Following said guidance, Plaintiff sought Court intervention by filing three (3) opposed emergency motions regarding the pretrial deadlines (including the Joint Final Pretrial Statement December 2, 2024 deadline) (Docs. 131, 133, 135), and one (1) Joint Emergency

---

[12] Plaintiff canceled two prior meetings with Defendant's counsel, Julie Zolty, scheduled to be held the Saturday after Thanksgiving 2024, at 8:00 AM, and the Monday after Thanksgiving 2024, at 10:00 AM. Plaintiff and Defendant's counsel did not agree on the materials that should be prepared prior to those in-person meetings, to disclose, discuss, select, and mark exhibits at those meetings. Defendant's lead counsel, Sarah Reiner, was not available for those two (2) meetings. Ms. Reiner opposed Plaintiff's request for a seven-day extension (during Thanksgiving week) of the December 2, 2024 deadline for the Joint Final Pretrial Statement even though she knew she would be unavailable in the days prior to this deadline, including because she was preparing to start a trial on December 2, 2024, which she did not disclose to Plaintiff until the November 22, 2024 in-person meeting when Plaintiff sought her availability during Thanksgiving week and conflicts arose regarding availability. Ms. Reiner did not provide information Plaintiff needed prior to the in-person meeting. Then, Ms. Reiner and Ms. Zolty took turns on different days during Thanksgiving week (based on their availability) overwhelming Plaintiff with their emails requesting Plaintiff to do certain tasks on their schedule without coordinating these tasks with Plaintiff and her schedule. They were able to take time off because they took turns with the work on different days; however, they expected Plaintiff to work throughout Thanksgiving week without a break. They also did not provide the information Plaintiff needed.

[13] In her Motion for Reconsideration, Plaintiff reminded the Court that she explained why she was not able to file a motion at the point of physical incapacity. (Doc. 130 at 9-11).

Request for a Status Conference (Doc. 138). The Court has not ruled on the emergency motions or request. Plaintiff is now filing this Time-Sensitive Motion to request a case management conference to discuss the options available to the parties and the legal issues at this point given the circumstances and procedural posture of the case.

Plaintiff, as a *pro se* party, has conducted this litigation without requesting much Court intervention against a Defendant experienced in contentious litigation[14] who is represented by a large law firm with experience engaging in "uncooperative and borderline uncivil litigation conduct" requiring lots of Court intervention. *See Santana v. Telemundo Network Group LLC*, No: 6:20-cv-1157-WWB-LHP, 2022 U.S. Dist. LEXIS 42673, at *39 (M.D. Fla. March 10, 2022).

Defendant's representatives (whoever is fueling the contentiousness in this litigation), now with the assistance of Defendant's counsel, are using these proceedings to further abuse Plaintiff.[15] Defendant's counsel has an independent professional duty to not use offensive tactics or be disrespectful and discourteous to an adverse party.[16] Defendant's

---

[14] *See e.g.*, *Smith v. FAMU*, Case No. 6:24-cv-00457-PGB-RMN (M.D. Fla. 2024) (Docs. 56-57, 76-78, 88-89, 109, 111, 113, 116-118, 122, 126, 128-131, 137-138, 140, 146-147, 152-154, 156, 163, 171-172) (these were all discovery-related matters during the six (6) months the *Smith* case was in the U.S. District Court for the Middle District of Florida, not including the orders that were entered to deal with all these discovery matters).

[15] Since the beginning of this lawsuit, Defendant's counsel refused to fulfill the settlement discussion requirements of the Federal Rule of Civil Procedure 26(f) conference. This case may have settled since then. After that, Defendant's counsel also tried to avoid the required settlement discussions at the in-person meeting on November 22, 2024 when Plaintiff insisted on adherence to the settlement discussion requirements of the CMSO. (Doc. 26 at 7, § III.A.1.). At Plaintiff's insistence, Defendant's counsel finally engaged in the required settlement discussions, which resulted in offers and counteroffers, the last one of which remains pending as Defendant's counsel has not responded on behalf of her client.

[16] "A lawyer is not bound, however, to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued. See rule 4-1.2. The

counsel also has an independent professional duty to not deny reasonable requests for extension of time that do not prejudice their client.[17] Defendant's counsel is violating these duties. Defendant's counsel has subjected Plaintiff to unnecessary conflict during required conferrals and at the required in-person meeting for preparation of the Joint Final Pretrial Statement. Defendant's counsel uses conferrals as opportunities to antagonize Plaintiff and waste her time.[18] This is what happened during conferrals about the Joint Final Pretrial Statement. Plaintiff is reasonably concerned that this dysfunctional pattern of unprofessional and abusive conduct will continue if the Court does not intervene.[19]

## A. The *State Farm* Options

Before filing this Time-Sensitive Motion, Plaintiff diligently researched for options that the Court may be able to provide. She found a case, *State Farm Mutual Auto. Ins. Co. v. Complete Care Ctrs., LLC*, 6:20-cv-1240-WWB-EJK (M.D. Fla. 2020) ("*State Farm*"), in which this Court guided counsel to finally prepare a Joint Final Pretrial Statement that conformed with the requirements of Local Rule 3.06(c) and the CMSO. The attorneys in

---

lawyer's duty to act with reasonable diligence does not require the use of offensive tactics or preclude the treating of all persons involved in the legal process with courtesy and respect." Fla. R. Prof. Conduct 4.1.3, Comment.

[17] Fla. R. Prof. Conduct 4.1.3, Comment.

[18] In efforts to promote civility and professionalism, Plaintiff has repeatedly suggested recording the Local Rule 3.01(g) conferrals; however, Defendant's counsel has refused. (*see e.g.*, Doc. 50-2 at 4-5; Doc. 51-3 at 10). Recording would allow both sides to have an accurate record of what everyone said, to hopefully avoid misrepresentations to the Court about what happened and what was said during the conferrals. It may also lessen the contentiousness of the tone of the communications. Plaintiff noticed that Defendant's counsel's demeanor was very different (professional) during virtual hearings before Judge Irick.

[19] Defendant's wrongdoers continue workplace mobbing Plaintiff, now by the means Defendant's counsel is using in these proceedings with and under their guidance. Defendant's counsel often respond that they oppose reasonable extensions of time (e.g., five days after two hurricanes and seven days during Thanksgiving week) after checking with their client.

the *State Farm* case faced similar issues as Plaintiff's (recovering from COVID, medical tests, conflicts in scheduling during Thanksgiving week, personal matters, and emergency family medical issues) and this Court found good cause for granting extensions.

In *State Farm*, this Court provided several opportunities for the parties to complete the pretrial materials, including extension of pretrial deadlines for preparation of the joint final pretrial statement with the Court's guidance and oversight. The *State Farm* CMSO set the joint final pretrial statement deadline as June 7, 2022. (Doc. 24).[20] On May 18, 2022, the parties jointly filed a three-page motion seeking a seven-day extension of the CMSO deadlines for the meeting in person and the joint final pretrial statement. (Doc. 412). The parties stated:

> Good cause exists to extend the deadlines in the Case Management and Scheduling Order for two reasons. First, Plaintiffs' counsel has recently become ill and unable to attend meetings in person until May 27, 2022. Second, Defendants' counsel is not currently in Florida due to an emergency family medical issue that has arisen outside the state.

(*Id.* at 2). The Court agreed that counsel's stated need "to attend to personal matter[s]" was good cause to extend the deadlines. (Doc. 413 at 1) ("The Court finds that good cause has been shown for the extension of the remaining deadlines, which will also necessitate the extension of all trial deadlines in this case."). The parties requested the extension of the in-person meeting deadline from May 20, 2022 to May 27, 2022, the joint final pretrial statement deadline from June 7, 2022 to June 14, 2022, and the trial status conference from June 14, 2022 until the Court's availability. (Doc. 412 at 2). The Court

---

[20] The references to Documents (Doc.) in the paragraphs regarding *State Farm* are references to filings in the U.S. District Court for the Middle District of Florida, Orlando Division, which Plaintiff assumes are readily available to the Court through PACER or the Court's internal system. However, if the Court prefers, Plaintiff can provide these filings by a subsequent Notice.

gave the parties more time than they requested and extended the deadlines, respectively, to June 17, 2022, July 5, 2022, and July 12, 2022. (Doc. 413 at 2).

Subsequently, on July 1, 2022, the parties in *State Farm* filed a joint four-page motion requesting a discussion of "pending issues with the Court at the trial status conference on July 6, 2022 prior to submitting the joint final pretrial statement," which they sought to extend until July 12, 2022. (Doc. 421 at 2-3). As reasons for good cause, the parties stated that one of plaintiff's lawyers "had to attend to emergency family medical issues," all parties wanted to continue to confer "to discuss the final pretrial statement and other trial-related issues," and the parties thought a discussion of the issues with the Court at the status conference would help to "streamline the issues and allow the parties to cooperate more productively in jointly preparing" the pretrial statement. (*Id.* at 2). On July 5, 2022, the Court granted the parties' requests. (Doc. 422). On July 6, 2022, after the status conference, the Court extended the deadline for the joint final pretrial statement until July 20, 2022. (Doc. 426).

Thereafter, on July 14, 2022, the parties in *State Farm* sought an additional extension of the pretrial deadlines; however, the Court denied it and stated that the parties must file the joint final pretrial statement by July 20, 2022. (Docs. 427, 428). On July 21, 2022 (one day after the Court's deadline), the parties filed a not fully agreed-upon pretrial statement. (Doc. 429). On October 13, 2022, the defendants filed an opposed motion seeking to amend the pretrial statement. (Doc. 459). On November 23, 2022, the Court entered an Order denying the motion without prejudice and stating:

> The Court finds that the parties have not conferred in good faith pursuant to Local Rule 3.01(g) and that the present Motion is therefore premature. The parties are hereby given seven days to confer, and if such conferral is unsuccessful, the parties shall appear before United States Magistrate Judge

Embry J. Kidd to resolve the remaining issues regarding the Joint Pretrial Stipulation.

(Doc. 463 at 1). On November 30, 2022, the defendants renewed their motion, which was unopposed. (Doc. 464). They stated that they had "not yet resolved all of their differences, due in part to the intervening Thanksgiving holiday." (*Id.* at 1). They therefore requested, "in the interests of judicial economy," "an additional ten (10) days to continue their work so that they c[ould] minimize or eliminate the need for court intervention." (*Id.* at 2).

On December 2, 2022, the Court ordered as follows:

> THIS CAUSE is before the Court on Defendants' Unopposed Motion to Continue and Notice Regarding Local Rule 3.01(g) Conferral (Doc. 464), wherein the parties represent that they have not been able to resolve all of their disputes regarding the Joint Pretrial Stipulation. On October 13, 2022, Defendants filed a Motion to Modify Case Management and Scheduling Order (Doc. 459), seeking leave to move to strike the Joint Pretrial Stipulation. The Court denied the Motion without prejudice finding that the parties had not conferred in good faith pursuant to Local Rule 3.01(g). (Doc. 463). The Court gave the parties seven days to confer and resolve their remaining disputes, and ordered that a failure to do so would result in the matter being referred to Magistrate Judge Embry J. Kidd. The parties have failed to resolve their remaining disputes regarding the Joint Pretrial Stipulation, and in the interest of moving this litigation forward, the Court finds it necessary to refer this matter to Magistrate Judge Embry J. Kidd.

(Doc. 465 at 1). On December 7, 2022, Judge Kidd entered an order stating:

> The Court will hold a hearing on the outstanding issues with regard to the Final Pretrial Statement on December 12, 2022, at 9:30 a.m. The hearing will be in person, and the parties should be prepared to remain at the courthouse, under Court supervision, until all issues are resolved. Alternatively, the parties may file a joint notice on or before 2:00 p.m. on December 9, 2022, stating that all remaining issues have been resolved.

(Doc. 466). The parties did not resolve the issues by December 9, 2022; therefore, the Court held the hearing as scheduled. (Doc. 469). After the hearing, Judge Kidd granted the parties leave to file an amended joint final pretrial statement and a joint notice "setting forth their positions on the limited legal issue for which they [we]re seeking the Court's

clarification, as well as the facts that would be impacted by the ruling." (Doc. 470). Finally, with the Court's intervention and guidance, the parties met the CMSO's requirements on December 13 (joint pretrial stipulation)[21] and December 14, 2022 (disputed legal issues for the Court's determination). (Docs. 471, 472).

In *State Farm*, the parties were represented by counsel from large firms on both sides. They jointly requested extensions of time and the Court's guidance to prepare their joint final pretrial statement materials. They also accommodated the personal and health needs of the attorneys in the case and did not oppose requests for extension of the pretrial deadlines for such reasons.[22] The Court accommodated their requests.[23]

## B. **This Case Also Needs the Court's Intervention**

When Plaintiff made the difficult decision to file this case in this federal court, *pro se*, she expected a similar level of accommodation, civility, and cooperation as in *State Farm*.[24] Unfortunately for Plaintiff, this has not been the case.[25] Plaintiff's reasonable

---

[21] In *State Farm*, the joint pretrial statement was finally submitted over six (6) months after the initial CMSO deadline (Doc. 24), which was amended several times at the parties' request.

[22] The attorneys in *State Farm* disagreed on the legal issues and represented their clients zealously. However, they were civil when using their discretion over the means (such as extensions of time) to achieve their clients' lawful objectives of representation.

[23] The Court also helped the attorneys in *State Farm* (by issuing an Order to show Cause) when they forgot to file a Court-ordered Joint Notice because, as they explained, Plaintiff's lead counsel got sick with COVID and Defendants' lead counsel had a medical procedure. *State Farm*. (Docs. 217, 220).

[24] In *State Farm*, there were corporate entities on both sides of the case. In Plaintiff's case, she is an individual human being and Defendant is a state institution. The Court requires the same case filing fee from a corporate plaintiff as from a human being plaintiff. The docket sheet in *State Farm* shows that the case required a lot more Court intervention than this case.

[25] A reasonably accommodating approach to legal practice helps to mitigate the stress inherent in attorneys' work. On the other hand, attorneys who act uncivil and join with clients who want to harm the opposing parties create unnecessary stress. Incoming

requests for extension of time have been used to create a narrative that Plaintiff has not been diligent even though her requests were for good cause, diligently raised considering the circumstances, and did not interfere with the progress of the case.[26] The Court granted Plaintiff a total of thirty-five (35) days for discrete extensions of time, which were unopposed. (Docs. 11, 25, 33, 80, 83, 89).[27] The Court granted Defendant a total of forty-five (45) days for extension of time, which was unopposed. (Doc. 16).[28] Defendant and its counsel have opposed Plaintiff's reasonable requests which would have lessened the

---

Florida Bar President "[Roland] Sanchez-Medina pointed out that lawyers are among the most stressed professionals, with statistics showing that they are three and a half times more likely to commit suicide than non-lawyers." Mark D. Killian, *President Roland Sanchez-Medina, Jr., discusses stress, mental health, and the value of Bar involvement*, Florida Bar News, Nov. 15, 2024, https://www.floridabar.org/the-florida-bar-news/president-roland-sanchez-medina-jr-discusses-stress-mental-health-and-the-value-of-bar-involvement/.

[26] As part of competence, diligence, and professionalism, Plaintiff has provided "good cause" and "diligence" analysis and legal support for her requests for extension of time. Findings regarding "good cause" and "diligence" are fact-specific and even judge-specific. A judge may not find "good cause" or "diligence" in one case and regarding a party but may find that another party met these standards in another case with similar facts. Similarly, one judge may find "good cause" and "diligence" where another one might not, under the same facts. *See generally*, Amanda Peters, *What* Torres v. Madrid *Reveals About Fact Bias in Civil Rights Cases*, 50 Fla. St. U.L. Rev. 569 (2023) (analyzing that different judges characterize, interpret, draw inferences, and reach different conclusions based on the same facts as they also choose one side's argument of the facts versus another's).

[27] *See supra* notes 1, 4. The Court did not grant Plaintiff an extension of time (five (5) days) that was opposed by Defendant. (Docs. 110, 119). Plaintiff requested the five (5) days to file a Motion to Strike Defendant's Answer and Affirmative Defenses and respond to Defendant's Omnibus Motion *in Limine*. (Doc. 110). Plaintiff's request was prompted by good cause due to two hurricanes (Helene and Milton) in addition to several other Court deadlines during the same period when Plaintiff finally received Defendant's Answer and Affirmative Defenses (circumstances beyond Plaintiff's control). (*Id.*).

[28] The Court also effectively granted Defendant an extension of time to respond to Plaintiff's Second Amended Complaint, which was filed and served upon Defendant on October 9, 2023. (Doc. 34). Defendant filed its Second Motion to Dismiss on October 23, 2023 (Doc. 35), which was denied on September 9, 2024. (Doc. 94). Defendant finally filed an Answer and Affirmative Defenses on September 23, 2024. (Doc. 97).

need for Court rulings on opposed motions and additional motions.[29] The matter of Plaintiff's Corrected Response and Declaration (with exhibits), in opposition to Defendant's Motion for Summary Judgment, may have been resolved soon after Plaintiff first disclosed to Defendant's counsel the medical exigency (visual impairment) she faced and asked them to join her in resolving the matter without opposition (before they filed a reply), to make it easier for the Court to grant her request.[30] Defendant's counsel have even refused Plaintiff's reasonable and repeated requests for them to use a larger font in their emails while Plaintiff is dealing with visual impairment. Defendant's counsel's misrepresentations have caused the need for Plaintiff to file motions to file replies, which the Middle District Local Rules allow pursuant to motion by a party and order by the Court.[31]

---

[29] The Guidelines for Professional Conduct state: "Requests for reasonable extensions of time to respond to litigation deadlines, whether relating to pleadings, discovery, or motions, ordinarily should be granted between counsel as a matter of courtesy unless time is of the essence, and unless the Court or rules of procedure require a motion and order as to the requested extension, counsel should agree to extensions of time via email or other correspondence to create efficient and cost effective litigation, and to avoid unnecessary motion practice." "A lawyer should advise clients against the strategy of not granting time extensions for the sake of appearing '"tough."'" Guidelines for Professional Conduct, § B.9,10, *available at* https://www.floridabar.org/prof/regulating-professionalism/presources002/#b.

[30] This Court acknowledged that solo practitioners have more difficulty making a timely filing when they face medical circumstances. *Bethune-Cookman v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 6:22-cv-47-WWB-DAB, 2022 U.S. Dist. LEXIS 239447, at *5 (M.D. Fla. Dec. 23, 2022) (expressing sympathy toward an attorney facing medical issues but noting that the attorney worked in a law firm with other attorneys as opposed to being a solo practitioner). Plaintiff is proceeding *pro se*, by necessity, after nearly two (2) decades out of legal practice.

[31] In the Middle District of Florida, there is no reply permitted as a matter of right, "[e]xcept for a reply to a motion for summary judgment or a reply brief in a social security case." Otherwise, a party must seek leave of Court by way of a motion, which also requires conferral with the opposing party. Local Rule 3.01(d), (g). When Defendant's counsel includes misrepresentations in responses, she creates the need for Plaintiff to seek leave to file replies. Otherwise, the Court may use Defendant's counsel's misrepresentations

Plaintiff would need additional pages to state and document the myriads of ways in which Defendant's counsel has violated the spirit and substance of the Florida Rules of Professional Conduct and the U.S. District Court Middle District of Florida's expectations of civility and cooperation.[32] As Plaintiff stated during the hearing before Judge Irick on June 18, 2024, this may be an issue of Defendant's counsel following the client, Defendant's counsel fitting the client, or both. (Exhibit 1 at 36:2-13).[33] It may also be that Defendant and Defendant's counsel have not faced negative consequences when they engaged in uncivil, uncooperative, dilatory, obstructive conduct.[34]

---

and hold them against Plaintiff as it did in its Order denying Plaintiff's Motion to Strike Defendant's Answer and Affirmative Defenses (based largely on Defendant's counsel's misrepresentations about conferral). (Doc. 127 at 1-2).

[32] Defendant's counsel has even engaged in *ad hominem* attacks against Plaintiff with false accusations of abuse of the system and waste of judicial resources, including as recently as December 10, 2024. (Docs. 111, ¶ 12; 117, ¶ 15; 141 at 2). One of the *ad hominem* attacks was filed and sent to Plaintiff at 11:53 PM, on October 15, 2024 (Doc. 111), the night before the parties were scheduled to meet for a 1:00 PM settlement conferral as required by Court Order. (Doc. 96 at 2). Defendant's administrators and Defendant's counsel engaged in highly antagonistic conduct in the days before the required settlement conferral, which was futile and set to fail. It was also one more opportunity to antagonize Plaintiff (by means Plaintiff cannot disclose due to the confidentiality of settlement negotiations).

[33] "[A] lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so." Fla. R. Prof. Conduct 4.1.2, Comment.

[34] Defendant and Defendant's counsel refused to make then President Larry Robinson available for deposition even though Defendant and Defendant's counsel knew that President Robinson is a fact witness with unique, personal knowledge of and participation in the facts and circumstances of this case. In her Second Amended Complaint, Plaintiff provided specific dates and times when she communicated with President Robinson about matters that he had a duty to oversee, and also stated President Robinson's participation in the wrongdoing against her. (Doc. 34 at ¶¶ 109, 117, 118, 180, 181, 182, 185, 191, 197, 224, 225, 226, 228). Despite this, Plaintiff had to defeat Defendant's Motion for Protective Order (Docs. 37, 38, 39, 40, 43, 45, 49) and, *after that*, file and win a Motion to Compel (Docs. 50, 52, 54, 56, 57, 60, 64) to finally be able to take President Robinson's deposition; the deposition confirmed Plaintiff's allegations and President Robinson's involvement in wrongful actions against Plaintiff. Judge Irick did not assess attorney fees when he denied Defendant's Motion for Protective Order (Doc. 49) or when he granted Plaintiff's Motion to Compel (Doc. 64) although he expressed his disapproval when he

## C. **Legal Issues**

As in *State Farm*, the parties in this case also need guidance from the Court regarding legal issues they should address in the Final Joint Pretrial Statement. For instance, the timing of Defendant's Answer and thirteen (13) Affirmative Defenses, after discovery closed and after the deadline to file motions for summary judgment, has complicated the posture of this case and prejudiced Plaintiff's case. Defendant effectively received an extension of nearly twelve (12) months to file its highly deficient Answer and thirteen (13) Affirmative Defenses.[35] On November 4, 2024, based largely on Defendant's counsel's misrepresentations about conferral, the Court denied Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112) without reviewing the merit of her arguments about each affirmative defense. (Doc. 127 at 1-2).[36] Tied to this issue, Defendant and its counsel delayed scheduling depositions until after the discovery deadline and then

---

stated: "I don't understand why, when I order a deposition, it's not complied with, frankly, in my mind in a timely fashion it requires." (Exhibit 1 at 17:13-15).

[35] Defendant's Answer and Affirmative Defenses violated the general rules of pleading in Federal Rule of Civil Procedure 8(b). Fed. R. Civ. P. 8(b). Many of its denials did not "fairly respond to the substance of the allegation" in violation of Federal Rule of Civil Procedure 8(b)(2). Defendant denied parts of allegations that are obviously true according to its own records, which is a violation of Rule 8(b)(4). Similarly, Defendant claimed lack of knowledge or information sufficient to form a belief about the truth of allegations after discovery had already closed and Defendant had the benefit of the evidence readily available to obtain the knowledge or information. Defendant's insufficient Affirmative Defenses do not provide fair notice to Plaintiff about the nature of the defenses and the grounds upon which they rest. (Doc. 112, ¶ 3-6).

[36] Prior to its ruling, the Court had received notice of Plaintiff's need to file motions to file replies to respond to Defendant's counsel's misrepresentations. (*See e.g.,* Docs. 58, 58-1, 58-2). Defendant's counsel filed Defendant's Response to Plaintiff's Motion to Strike on October 29, 2024, at 10:01 PM, and Judge Irick entered his Order denying Plaintiff's Motion to Strike on November 4, 2024, at 9:13 AM. Plaintiff was in the process of seeking conferral and preparing a motion to file a reply as required by Local Rule 3.01(d); however, Judge Irick ruled rather quickly on a very substantive motion. (Doc. 127).

refused to make their administrators, including Provost Allyson Watson,[37] available absent a Court order extending the discovery deadline. When Plaintiff sought this extension, Defendant opposed it. (Docs. 51, 55).

On June 18, 2024, during the hearing on Plaintiff's Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and *Daubert* Motions Deadline if Necessary (Doc. 69), Defendant's counsel represented to the Court:

> I would, of course, to the extent that we file an answer and affirmative defenses, I anticipate that she would seek to potentially depose individuals with respect to those affirmative defenses, and I'm not sure what the Court would do in terms of the timeline with respect to trial and any number of things.

(Exhibit 1 at 26:25 – 27:5). However, after Defendant finally filed its deficient Answer and thirteen (13) Affirmative Defenses, it opposed Plaintiff's Motion to Reopen Discovery and Summary Judgment. (Docs. 105, 118).

Defendant's Affirmative Defenses are also tied to Plaintiff's wrongful termination. As Plaintiff advised the Court in Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106), Defendant's counsel asked Plaintiff, during her deposition, whether Plaintiff considered her termination further retaliation. (*Id.* at 4-5). Plaintiff responded in the affirmative. (*Id.* at 5). The Court denied Plaintiff's request for a stay pending resolution of the administrative remedies regarding her wrongful termination and dismissed her concerns about *res judicata* and collateral estoppel, although not definitively. (Doc. 126). The Court stated that "it is **unclear** how such a claim could be precluded by *res judicata* should Plaintiff decide to pursue it" and "it likewise **appears** Plaintiff would bear no risk that collateral estoppel would preclude

---

[37] Defendant submitted Provost Allyson Watson's Declaration in support of its Motion for Summary Judgment. (Doc. 75-1).

such a claim." (*Id.* at 3) (emphasis added on key words). However, Defendant, in its Response in Opposition to Plaintiff's Motion to Strike Defendant's Affirmative Defenses, acknowledged that it included affirmative defenses related to Plaintiff's termination. (Doc. 122 at 12-15).

Plaintiff's concerns about how Defendant may use *res judicata* and collateral estoppel in a subsequent lawsuit about her wrongful termination have been heightened after Defendant's administrators, to wrongfully deny her the Step 3 administrative review process of her wrongful termination, falsely alleged that her termination is being reviewed in the Middle District of Florida and misrepresented that Plaintiff said so. (*See* Exhibit 2). Plaintiff immediately responded and stated: "There is no cause of action in the Middle District of Florida for my termination." "Nothing in my correspondence stated that the denial of the FAMU Regulation Step 3 Review or whether there was 'just cause' to dismiss me from employment 'is currently under litigation with the federal courts in the Middle District of Florida.' You are making this up." (*See* Exhibit 3). Plaintiff further stated:

> FAMU Administrators, including you, are colluding to deny me the Step 3 review by the Division of Administrative Hearings ("DOAH") because there was no "just cause" to dismiss me from my tenured faculty position. You are creating the need for a future lawsuit, which will be more expensive for the State of Florida than a DOAH hearing. It is inconceivable to me how a State University is being negligently administered with total failure of its internal audit, ethics, and compliance functions. This is similar to what happened with the [recent] "Major Gift" fiasco when several administrators and internal functions failed the institution.[38]

---

[38] Tarah Jean & TaMaryn Waters, *Dubious $237 million donation to FAMU is 'fraudulent,' investigation's final report says*, TALLAHASSEE DEMOCRAT, Aug. 6, 2024, https://www.tallahassee.com/story/news/local/famu-news/2024/08/06/donation-to-florida-am-from-gregory-gerami-fraudulent-report-says/74685364007/. An investigation of the "Major Gift" fiasco was conducted by the Buchanan Ingersoll & Rooney law firm under the oversight of the Florida Board of Governors' Office of Inspector General. The investigation's report stated that President Larry Robinson, Provost Allyson Watson, General Counsel Denise Wallace, and other administrators were involved in the failure of

(*Id.*).

The claim that Plaintiff's termination is being reviewed in this case is the latest ploy to preclude Plaintiff from grieving her wrongful termination under the procedure required by Florida law. This is after Plaintiff was also instructed, by FAMU Deputy General Counsel Iris A. Elijah, not to contact the new FAMU Interim President, Dr. Timothy L. Beard, the designated University representative to provide the Step 3 grievance process (referral to the Florida Division of Administrative Hearings).[39] Ms. Elijah told Plaintiff that she should not contact the FAMU President because FAMU is represented by Rick Mitchell/Sarah Reiner regarding the internal processes.[40] Plaintiff knew this was incorrect because the FAMU Regulations explicitly state that the University President is charged with the Step 3 process, and she is supposed to communicate with him.

To confirm, Plaintiff reached out to Defendant's counsel to find out if GrayRobinson attorneys were also representing FAMU in its internal FAMU Regulation investigation and

---

the institutional functions and their duties. President Robinson and General Counsel Wallace have since resigned.

[39] The Step 1 and Step 2 processes were under the control of Provost Allyson Watson, the administrator who signed the letters wrongfully dismissing Plaintiff in a malicious, discriminatory, and retaliatory manner. Once Plaintiff exhausted Step 1 and Step 2, by going through the obviously biased, sham process meant to keep her busy providing evidence and running the clock for as long as possible, Provost Watson wrongfully denied her Step 3 review for dubious, unlawful reasons.

[40] Attorney Iris A. Elijah was Defendant's designated representative for the Court-ordered settlement conference before Judge Hoffman Price in this case. (Doc. 108). Plaintiff advised Ms. Elijah that the rule on communication with a party represented by counsel states: "This rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between 2 organizations, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter." Fla. R. Prof. Conduct 4-4.2, Comment. Also, "[p]arties to a matter may communicate directly with each other." *Id.*

grievance processes. Defendant's counsel once again engaged in dilatory tactics by refusing to provide a straight answer. (*See* Exhibit 4 – Composite of Emails). Plaintiff spent time from October 22, 2024 to November 14, 2024 in a back-and-forth of ten (10) emails with Defendant's counsel trying to get an answer about their scope of representation. (*Id.*).[41] Judge Irick saw what Plaintiff went through when he read the back-and-forth of emails about scheduling depositions. He stated: "I think that you've been given the runaround to a high degree, and it's just – I read all these emails and you cannot get a straight answer out of defense counsel, which is frustrating to the Court and everyone else." (Exhibit 1 at 18:12-16). Now, Defendant's counsel has potentially crossed the line from attorney representing a client to participant with the client in the retaliatory wrongful termination and the subsequent efforts to deny Plaintiff the Step 3 review provided by Florida law.[42]

Defendants' continued retaliation, including by wrongfully terminating Plaintiff as discovery ensued and the discovery deadline approached, also prejudiced her and her case. The delayed and deficient Answer and Affirmative Defenses, without an opportunity for discovery and summary judgment, further prejudiced Plaintiff's case. Plaintiff has tried

---

[41] After the Court-required settlement conference before Judge Hoffman Price, for some reason, Defendant's lead counsel, Ms. Reiner, became even more contentious with Plaintiff. During the settlement conference, the parties were in separate rooms and Ms. Reiner spent a lot of time alone with Defendant's representative, Deputy Counsel Iris Elijah. (Doc. 108). Judge Hoffman Price met separately with each side; therefore, the parties were not privy to those separate discussions. Was something said that day that emboldened Defendant's counsel to be even more unnecessarily adversarial with Plaintiff?

[42] *See e.g., Smith v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, No. 6:24-cv-457-PGB-RMN, 2024 U.S. Dist. LEXIS 146234, at *4 n.4 (M.D. Fla. Aug. 16, 2024) (granting renewed motion to amend complaint to add attorney Sarah Reiner as defendant in addition to previously added attorneys Richard Mitchell and Julie Zolty plus the GrayRobinson law firm for "their alleged involvement in Plaintiff's wrongful termination").

to deal with this prejudice through motion practice; however, the Court may not have a full picture of what has happened and is happening, and how all of it impacts preparation of the Final Joint Pretrial Statement and the factual and legal issues that should be addressed. This is another reason why this case needs the Court's case management and guidance as in *State Farm*.

### III.    <u>CONCLUSION</u>

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court make case management and guidance available in this case, as in *State Farm*, including regarding preparation of the Joint Final Pretrial Statement materials and consideration of the legal issues.

### <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Plaintiff certifies that Plaintiff conferred in good faith with Defendant's counsel via email and phone and they do not oppose the relief sought in this Time-Sensitive Motion; however, they do not join the motion.

Dated this 11th day of December, 2024.

Respectfully submitted,

<u>/s/ Maritza Reyes</u>, *Pro Se*
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

### <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on December 11, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

<u>/s/ Maritza Reyes</u>
Plaintiff

Tab 147

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

      Plaintiff,

v.                                     **CASE NO.: 6:22-cv-1525-WWB-DCI**

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

      Defendant.
_____

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF COURT'S ORDER DENYING
PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S AFFIRMATIVE DEFENSES**

      Plaintiff, Maritza Reyes, pursuant to the Court's inherent authority and the interests of justice, to consider the availability of new evidence and to correct clear error or manifest injustice, respectfully submits Plaintiff's Motion for Reconsideration of Court's Order Denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses ("Motion for Reconsideration") and requests that this Honorable Court reconsider its Order (Doc. 127) denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses ("Motion to Strike") (Doc. 112).

## I.     RELEVANT PROCEDURAL BACKGROUND

    1.  In this Motion for Reconsideration, Plaintiff refers to all judges who have entered orders in this lawsuit collectively as "the Court." The following judges have entered orders in this case: U.S. District Court Judge Wendy W. Berger ("Judge Berger"), U.S. Magistrate Judge Daniel C. Irick ("Judge Irick"), U.S. Magistrate Judge Leslie Hoffman Price ("Judge Hoffman Price"), and U.S. Magistrate Judge Embry J. Kidd ("Judge Kidd"). For purposes

of this Motion for Reconsideration, Plaintiff may also distinguish the judges by name for procedural and other reasons.[1]

2.  On October 9, 2023, Plaintiff filed her Second Amended Complaint. (Doc. 34).[2]

3.  On October 23, 2023, Defendant filed a Motion to Dismiss Plaintiff's Second Amended Complaint with Prejudice or in the Alternative Motion to Strike ("Second Motion to Dismiss"). (Doc. 35).[3]

_____

[1] For example, Judge Berger named Judge Irick in one of her Orders rather than refer to "the Court." (Doc. 125 at 1).

[2] Plaintiff filed her Complaint on August 25, 2022. (Doc. 1). Therefore, she had until November 23, 2022, to effect service of process upon Defendant. Fed. R. Civ. P. 4(m). Plaintiff could have amended her Complaint once as a matter of course by no later than twenty-one (21) days after serving it, or twenty-one (21) days "after service of a responsive pleading" or "a motion under Rule 12(b), (e), or (f), whichever [wa]s earlier." Fed. R. Civ. P. 15(a)(1). However, on September 1, 2022, Judge Berger *sua sponte* dismissed Plaintiff's Complaint without prejudice as a "shotgun" pleading and gave Plaintiff seven (7) days to file an amended complaint by September 8, 2022. (Doc. 8). Plaintiff sought and received an extension of four (4) days to file her amended pleading. (Docs. 9, 11). On September 12, 2022, Plaintiff filed her Amended Complaint (Doc. 10) and served it upon Defendant on November 18, 2022 (Doc. 17). On December 6, 2022, Defendant sought and received an unopposed extension of forty-five (45) days to respond to Plaintiff's Amended Complaint, which gave Defendant a total of sixty-six (66) days to file an answer. (Docs. 13, 16). When Plaintiff agreed to the lengthy extension, she was under the understanding that Defendant needed the time to prepare an Answer and Affirmative Defenses, which would have streamlined the discovery and motions in the case. Instead, Defendant filed its First Opposed Motion to Dismiss Plaintiff's Amended Complaint as a Shotgun Pleading and to Strike Immaterial Allegations, and Alternative Motion for More Definite Statement ("First Motion to Dismiss"). (Doc. 22). Plaintiff sought and received an unopposed extension of three (3) days to respond to the First Motion to Dismiss. (Docs. 24, 25). After Plaintiff filed her response seeking denial of Defendant's First Motion to Dismiss (Doc. 28), the Court, on September 15, 2023, entered an Order granting in part and denying in part Defendant's First Motion to Dismiss, and giving Plaintiff leave to file an amended pleading by September 29, 2023. (Doc. 30 at 5-6). Plaintiff sought and received an unopposed extension of ten (10) days to file her Second Amended Complaint by October 9, 2023. (Docs. 32, 33).

[3] At the beginning of its Second Motion to Dismiss, Defendant requested dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), which allowed it, pursuant to Federal Rule of Civil Procedure 12(a)(4), to extend the period to file an answer until fourteen (14) days after the Court ruled on its Second Motion to Dismiss.

4.  On November 13, 2023, Plaintiff filed her Response in Opposition to Defendant's Second Motion to Dismiss her Second Amended Complaint. (Doc. 36).[4]

5.  The Court's Case Management and Scheduling Order ("CMSO"), which was issued on February 13, 2023, stated the following deadlines (Doc. 26 at 1-2):

Disclosure of Expert Reports
|  |  |  |
|---|---|---|
| | Plaintiff: | April 2, 2024 |
| | Defendant: | May 2, 2024 |
| Discovery Deadline | | May 31, 2024 |
| Dispositive Motions, and *Daubert* Motions | | July 2, 2024 |
| All Other Motions Including Motions *In Limine* | | October 2, 2024 |
| Meeting in Person to Prepare Joint Final Pretrial Statement | | October 25, 2024 |
| Joint Final Pretrial Statement | | November 4, 2024 |
| Trial Status Conference | | November 12, 2024 |
| Trial Term Begins | | December 2, 2024 |

6.  On April 2, 2024, Plaintiff disclosed her expert report to Defendant.[5]

---

[4] Plaintiff argued that Defendant did not state the standard for a Rule 12(b)(6) motion in its Motion or Memorandum of Law and therefore did not meet its burden. (*Id.* at 13-14). Defendant did not allege, analyze, or argue anything about Plaintiff's factual allegations in reference to her causes of action. (*Id.*). Defendant also did not file a motion pursuant to Federal Rule of Civil Procedure 12(e), which would have required Defendant to "point out the defects complained of and the details desired." (*Id.* at 15). "Under the Federal Rules of Civil Procedure, a defendant faced with a ['shotgun' pleading]" "is expected to move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement." *Anderson v. District Bd. of Trustees of Cent. Fla. Community College*, 77 F.3d 364, 366 (11th Cir. 1996).

[5] Defendant refused to agree to Plaintiff's request for a brief extension of time to submit her workplace mobbing expert report, which was due on April 2, 2024. At the time, Plaintiff explained to Defendant's counsel that she was dealing with the unexpected, wrongful dismissal from her tenured faculty position which was about to become effective on April 5, 2024. Additionally, Plaintiff's expert was preparing to travel and unavailable to confer with Plaintiff during this time. Due to Defendant's refusal, Plaintiff had to submit the report without being able to confer with the expert. (Doc. 43 at n. 3). The only other option would have been to file a motion for extension of time that may not have been granted because Defendant would oppose it. The Court has only granted Plaintiff extensions of time that were unopposed by Defendant. *See supra* note 1, *infra* note 9.

3

7.   On May 31, 2024, before the discovery deadline expired, Plaintiff filed her Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and *Daubert* Motions Deadlines if Necessary. (Doc. 51). Defendant opposed her request. (Doc. 55).[6] After Plaintiff defeated Defendant's Motion for Protective Order and subsequently won a Motion to Compel the deposition of then President Larry Robinson,[7] Defendant and its counsel continued extending the dates for the depositions of four administrator deponents (Rica Calhoun, Cecil Howard, Joseph Maleszewski, and Allyson Watson) into late June and even into July 2024. (Doc. 67). The Court held a hearing on Plaintiff's Motion on June 18, 2024 (Doc. 69) and denied the relief requested in the Motion on June 20, 2024; therefore, Plaintiff did not take the depositions. (Doc. 72).

8.   On May 31, 2024 discovery closed. (Doc. 26 at 1).[8]

9.   On July 2, 2024, Defendant filed its Motion for Summary Final Judgment and Incorporated Memorandum of Law ("Motion for Summary Judgment"). (Doc. 76).

---

[6] Defendant and its counsel delayed scheduling depositions until after the discovery deadline and then refused to make their administrators available absent a Court order extending the discovery deadline. When Plaintiff sought this extension, Defendant opposed it. (Docs. 51, 55).

[7] Most discovery filings, hearings, and orders had to do with Defendant's refusal to make then President Larry Robinson (a key witness with personal knowledge and involvement in the allegations of wrongdoing against Plaintiff) available for deposition. (Docs. 37-40, 43, 45, 49-50, 52, 54, 56-57, 60, 64). Plaintiff began trying to schedule President Robinson's deposition since March 2024. (Doc. 51-3 at 12-13).

[8] Between May 7, 2024 and June 20, 2024, the parties required the Court's assistance mainly with deposition discovery matters, which were necessitated by Defendant's and Defendant's counsel's refusal to conduct deposition practice with the spirit of cooperation and civility required by the Middle District's Discovery Manual. (Docs. 37-40, 42-46, 48-52, 54-57, 60-64, 67-72).

10. On August 19, 2024, Plaintiff filed her draft Response to Defendant's Motion for Summary Judgment. (Doc. 91).[9] Due to unforeseen, exigent, extraordinary medical circumstances beyond her control, Plaintiff was not able to finalize and submit her final Response and Declaration with exhibits. (Doc. 92).[10]

11. On September 3, 2024, Defendant filed its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. (Doc. 93). Defendant's Reply basically attacked Plaintiff's inability to file her Corrected Response and Declaration with exhibits (a "procedural technicality," not the true merits of Plaintiff's facts and evidence).

---

[9] On July 17, 2024 (Doc. 79), August 2, 2024 (Doc. 82), and August 12, 2024 (Doc. 87), Plaintiff requested three (3) discrete extensions of time, for good cause as the need arose, to file her Response in Opposition to Defendant's Motion for Summary Judgment by August 19, 2024 (instead of the August 1, 2024 original deadline), which the Court granted (Docs. 80, 83, 89). The three (3) unopposed extensions together totaled <u>eighteen (18) days</u>. Defendant sought and received an unopposed extension of <u>forty-five (45) days</u> to respond to Plaintiff's Amended Complaint. (Docs. 13, 16).

[10] On August 22, 2024, Plaintiff communicated with Defendant's counsel about her medical situation to try to persuade Defendant and its counsel not to oppose a motion to file her Corrected Response and Declaration with exhibits. (Doc. 92, ¶¶ 7-13). Defendant and its counsel opposed Plaintiff's request and insisted on filing Defendant's Reply by September 3, 2024. This led to Plaintiff having to deal with the situation unilaterally as best she could, including by filing a Notice with the Court (Doc. 92), followed by a Motion (Doc. 102). Plaintiff explained that she was able to file a draft Response (which she had been working on) but became incapacitated to the point of not being able to finalize her Response or prepare an emergency motion to seek an extension of time. (Docs. 92, ¶3; 102, ¶ 5). Plaintiff advised the Court that she contracted COVID for the first time since the pandemic began, was still having difficulty concentrating, and, according to her doctor, her vision impairment may have been caused or exacerbated by COVID. (Docs. 82, ¶3; 87, ¶3; 92, ¶6; 102, ¶¶ 2-3). Plaintiff also informed the Court that she "needed to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work to finalize the Corrected Response and Declaration before communicating further with the Court through [a motion to replace her draft Response]." (Docs. 92, ¶¶ 3-4; 102, ¶¶ 11-12). She also explained that she continued to finalize her materials as her medical condition permitted. (Docs. 92, ¶14; 102, ¶¶ 12, 14).

12. On September 9, 2024, the Court denied Defendant's Second Motion to Dismiss and gave Defendant until September 23, 2024 to file an answer to Plaintiff's Second Amended Complaint. (Doc. 94).

13. On September 9, 2024, the Court entered an Order referring this case to Judge Hoffman Price to conduct a settlement conference. (Doc. 95).[11]

14. On September 23, 2024, Defendant filed its Answer and thirteen (13) Affirmative Defenses. (Doc. 97).

15. On September 25, 2024, Judge Berger *sua sponte* amended the CMSO. (Doc. 98). She changed the remaining deadlines for the Meeting in Person to Prepare Joint Final Pretrial Statement (to November 22, 2024), Joint Final Pretrial Statement (to December 2, 2024), Trial Status Conference (to December 10, 2024), and beginning of Trial Term (to February 3, 2025). (Doc. 98 at 1-2).

16. On October 2, 2024, the parties met the deadline to file all other motions, including Motions *in Limine*. (Doc. 26 at 2).

17. On October 14, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion to Extend Time to File Motion to Strike and to Respond to Defendant's Omnibus Motion *in Limine*, which

---

[11] On July 9, 2024, this Court entered an Order referring this case to U.S. District Court Judge Paul G. Byron to conduct a settlement conference. (Doc. 78). That referral was reassigned to Judge Hoffman Price. (Doc. 95 at 1). On September 9, 2024, Judge Hoffman Price entered an Order and Notice of Settlement Conference scheduling a settlement conference on October 24, 2024, and requiring the parties to confer by telephone, videoconference, or in person in a good faith effort to resolve the case on or before October 16, 2024, followed by submitting individual written summaries to her, and thereafter having separate phone conferences with her. (Doc. 96). The parties met these requirements and deadlines.

was referred to Judge Irick. (Doc. 110).[12] On October 15, 2024, Defendant filed its Response in Opposition to Plaintiff's Motion. (Doc. 111).

18. On October 15, 2024, Plaintiff filed Plaintiff's Motion to Strike Defendant's Affirmative Defenses ("Motion to Strike"). (Doc. 112).[13]

19. On October 24, 2024, the parties met for a settlement conference in the United States District Court in Orlando, as scheduled; Judge Hoffman Price declared an Impasse. (Doc. 121).

20. On October 29, 2024, Defendant filed its Response in Opposition to Plaintiff's Motion to Strike. (Doc. 122).

21. On November 1, 2024, Judge Berger entered three (3) separate Orders denying (a) Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102); (b) Plaintiff's Motion to Reopen Discovery and Summary

---

[12] Plaintiff's request for an extension of time of five (5) days was prompted by good cause due to two hurricanes (Helene and Milton) in addition to several other Court deadlines during the same period when Plaintiff finally received Defendant's Answer and Affirmative Defenses (circumstances beyond Plaintiff's control). (Doc. 110).

[13] Plaintiff diligently sought and received confirmation from the Court that she could file her Motion to Strike Defendant's Answer and Affirmative Defenses pursuant to the deadline provided by Federal Rule of Civil Procedure 12(f)(2). (Docs. 99, 100). However, Plaintiff needed, requested, and could have used an extra five (5) days to prepare her Motion to Strike. (Doc. 110). This time would also have provided additional time for conferral with Defendant's counsel; however, Defendant's counsel opposed the requested five (5) days, filed an *ad hominem* attack and misrepresentations against Plaintiff in response, and then claimed that it did not have sufficient time to cure the deficiencies, which Plaintiff conferred with Defendant's counsel about before filing her Motion to Strike. (*See generally* Doc. 111; Doc. 122 at ¶¶ 8, 10).

Judgment (Doc. 105); and (c) Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106). (Docs. 124, 125, 126).[14]

22. On November 4, 2024, Judge Irick entered his Order denying Plaintiff's Motion to Strike (Doc. 112). (Doc. 127).

23. On November 15, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion for Reconsideration of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102). (Doc. 130).

24. On November 19, 2024, Plaintiff filed Plaintiff's Emergency Motion for Extension of Pretrial Deadlines, including the November 22, 2024 (Meeting in Person) and December 2, 2024 (Joint Final Pretrial Statement) deadlines ("Emergency Motion re Pretrial Deadlines"). (Doc. 131). This emergency motion was opposed by Defendant (Doc. 134) and remains pending.

25. On November 22, 2024, Plaintiff and Defendant's counsel met for the required Meeting in Person to Prepare Joint Final Pretrial Statement. (Doc. 98 at 1).[15]

---

[14] On November 6, 2024, Plaintiff diligently filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of three (3) of the Court's November 2024 Orders (Docs. 124, 125, and 127). (Doc. 128). On November 7, 2024, Judge Irick *sua sponte* struck Plaintiff's Notice (Doc. 128). (Doc. 129). Judge Irick stated: "The rules of this court do not provide for the filing of a notice of intent to file a motion." (*Id.*). Plaintiff is familiar with the rules; however, she did not find any prohibition for the type of notice she filed. When she filed her Notice (Doc. 128), Plaintiff acted in good faith, to keep the Court informed.

[15] At Plaintiff's insistence, as required by the CMSO, Plaintiff and Defendant's counsel spent time discussing "settlement of the action before undertaking the extensive efforts needed to conduct final preparation of the case for trial and to comply with the requirements of [the CMSO]." (Doc. 26 at 7, § III.A.1.). As a result of those discussions, Plaintiff made an offer to settle this case during the in-person meeting on Friday, November 22, 2024.

26. After the in-person meeting on November 22, 2024, Plaintiff and Defendant's counsel continued working on their pretrial statement materials to meet the December 2, 2024 deadline to file the Joint Final Pretrial Statement. However, there were issues with miscommunication, unavailability, other work, contentious conferrals, time-consuming conflicting emails, failure to agree, and the Thanksgiving holiday.

27. On November 26, 2024, at 11:53 AM, Judge Berger *sua sponte* amended the date of the Trial Status Conference from December 10, 2024 to December 3, 2024.

28. On November 26, 2024, at 4:46 PM, Plaintiff filed Plaintiff's Emergency Motion for Extension of Deadline to File Joint Final Pretrial Statement ("Emergency Motion re Joint Final Pretrial Statement") seeking an extension of seven (7) days to submit the Joint Final Pretrial Statement by December 9, 2024, including to avoid conflicts with availability during Thanksgiving week. (Docs. 133, 136). This emergency motion was also opposed by Defendant (Doc. 142) and remains pending.

29. On November 26, 2024, at 8:15 PM, Defendant filed Defendant's Response in Opposition to Plaintiff's Emergency Motion re Pretrial Deadlines ("Defendant's Response re Pretrial Deadlines"). (Doc. 134).

_____

Defendant responded with a counteroffer on Monday, November 25, 2024. Plaintiff then counteroffered that same day (Monday). As of the filing of this Motion for Reconsideration, Defendant has not responded to Plaintiff's November 25, 2024 counteroffer. On December 1, 2024, in a Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement, Defendant's counsel stated: "Counsel for Defendant submitted Plaintiff's November 25, 2024 counteroffer to Defendant and anticipates receiving its response in the coming week." (Doc. 138, ¶ 1). Defendant met for a regularly scheduled Board meeting on December 5, 2024 and a special Board meeting on December 17, 2024.

30. On November 27, 2024, Plaintiff filed Plaintiff's Emergency Motion to File a Reply to Defendant's Response re Pretrial Deadlines. (Doc. 135). This emergency motion was also opposed by Defendant (Doc. 141) and remains pending.

31. On November 29, 2024, Judge Berger *sua sponte* amended the date of the Trial Status Conference from December 3, 2024 to January 15, 2025.

32. On December 1, 2024, Plaintiff, on behalf of both parties, filed a Joint Emergency Request for a Status Conference Regarding Coordination of Joint Final Pretrial Statement. (Doc. 138). This emergency request is unopposed and remains pending.

33. On December 3, 2024, Plaintiff filed Plaintiff's Motion to File a Reply to Defendant's Response in Opposition to Plaintiff's Motion for Reconsideration (Doc. 130) of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102). (Doc. 139). Defendant also opposed this Motion. (Doc. 141).

34. On December 9, 2024, Defendant filed Defendant's Omnibus Response in Opposition to Plaintiff's Motion for Leave to File Replies to Defendant's Response in Opposition to Plaintiff's Emergency Motion for Extension of Pretrial Deadlines (Doc. 135) and to Defendant's Response in Opposition to Plaintiff's Motion for Reconsideration (Doc. 139). (Doc. 141).

35. On December 9, 2024, Defendant filed Defendant's Response [in opposition] to Plaintiff's Emergency Motion for Extension of Time to File Joint Final Pretrial Statement. (Doc. 142).

36. On December 10, 2024, Judge Berger issued her Order denying Plaintiff's Time-Sensitive Motion for Reconsideration (Doc. 130) of Court's Order (Doc. 124) Denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's Declaration (Doc. 102). (Doc. 144).[16]

37. On December 11, 2024, Plaintiff filed Plaintiff's unopposed Time-Sensitive Motion for Court Case Management. (Doc. 145). This motion remains pending.

## II. <u>INTRODUCTION</u>

On October 15, 2024, Plaintiff filed her Motion to Strike. (Doc. 112). On October 29, 2024, Defendant filed its Response in Opposition to Plaintiff's Motion to Strike. (Doc. 122). On November 4, 2024, Judge Irick denied Plaintiff's Motion to Strike based largely on his adoption of Defendant's misrepresentation that Plaintiff did not comply with conferral as required by Local Rule 3.01(g) and the CMSO. (Doc. 127 at 1-2). Plaintiff now moves for reconsideration of said Order (Doc. 127).

Defendant has gained unfair advantage in this judicial process. By making a bare-bones assertion that it filed its Second Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),[17] Defendant effectively received an extension of time to file an answer until fourteen (14) days after Judge Berger denied its October 23, 2023 Second Motion to Dismiss on September 9, 2024. Defendant filed its Answer and thirteen (13) Affirmative

---

[16] Judge Berger denied Plaintiff's Motion for Reconsideration (Doc. 130) without allowing Plaintiff to file a Reply (Doc. 139). (Doc. 144).

[17] Fed. R. Civ. P. 12(a)(4). At the beginning of its Second Motion to Dismiss, Defendant requested dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6); however, its entire argument was premised on the second category of *Weiland*'s "shotgun" pleading categories. (Doc. 35 at 2-10).

Defenses on September 23, 2024. (Doc. 97). By that time, the deadlines for discovery and summary judgment had passed.

On October 2, 2024, Plaintiff filed Plaintiff's Time-Sensitive Motion to Reopen Discovery and Summary Judgment (Doc. 105). In said Motion, Plaintiff stated:

> Defendant had knowledge of Plaintiff's allegations since November 18, 2022. (Doc. 17). Plaintiff, on the other hand, received Defendant's Answer and Affirmative Defenses ten (10) days ago, as Plaintiff was preparing motion materials, which are due today [October 2, 2024]. Defendant's Answer includes thirteen (13) affirmative defenses. (Doc. 97). Plaintiff has been severely prejudiced by the timing of Defendant's Answer and Affirmative Defenses. Defendant received the advantage of more than sufficient notice of Plaintiff's allegations long before the end of discovery. In its Answer, Defendant "reserv[ed] the right to assert additional or other defenses or matters in avoidance after discovery progresses in this case." (*Id.* at 33).

(Doc. 105 at 2-3). Plaintiff also asserted: "Again, Plaintiff has had limited time to fully review Defendant's Answer and Affirmative Defenses; however, it is obvious that she will need discovery, including about the factual basis for the Affirmative Defenses." (*Id.* at 4). Plaintiff ended her Motion to Reopen Discovery and Summary Judgment by stating:

> Plaintiff is exercising diligence by filing this Motion soon after she received Plaintiff's Answer and Affirmative Defenses and by the deadline for all other motions. The reason for the need for this motion at this juncture in the case was beyond Plaintiff's control.
>
> **WHEREFORE** Plaintiff respectfully requests that this Honorable Court reopen discovery and summary judgment related solely to Defendant's Answer, Affirmative Defenses for at least sixty (60) days.

(*Id.* at 5). On November 1, 2024, Judge Berger denied Plaintiff's Time-Sensitive Motion to Reopen Discovery and Summary Judgment. (Doc. 125).[18] On November 4, 2024, Judge

---

[18] In her Order (Doc. 125), Judge Berger cited to Judge Irick's Order denying Plaintiff's Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and *Daubert* Motions Deadline if Necessary. (Doc. 125 at 2-3) (citing Doc. 72 at 3-6). That Order (Doc. 125) will be the subject of a separate Motion for Reconsideration.

Irick denied Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112). (Doc. 127).

### III.    <u>MEMORANDUM OF LAW</u>

A party may move for reconsideration of an order entered by the Court. *Local Access, LLC v. Peerless Network, Inc.*, No: 6:17-cv-236-WWB-EJK, 2021 U.S. Dist. LEXIS 257269, at *13 (M.D. Fla. Oct. 4, 2021) (rejecting a plaintiff's argument for sanctions against defendant beyond a date previously set by the Court and noting that plaintiff did not move for reconsideration of that prior Court order). The standard for reconsideration is as follows:

> District courts are afforded considerable discretion to reconsider prior decisions. *See Harper v. Lawrence Cnty.,* 592 F.3d 1227, 1231-32 (11th Cir. 2010) (discussing reconsideration of interlocutory orders); *Lamar Adver., Inc. v. City of Lakeland,* 189 F.R.D. 480, 488-89, 492 (M.D. Fla. 1999) (discussing reconsideration generally and under *Federal Rule of Civil Procedure 54(b)*); *Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D. Fla. 1994) (discussing reconsideration under *Rule 59(e)* and *Rule 60(b)*). Courts in this District recognize "three grounds justifying reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *McGuire v. Ryland Grp., Inc.,* 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007) (quotation omitted); *Montgomery v. Fla. First Fin. Group,* No. 6:06-cv-1639-Orl, 2007 U.S. Dist. LEXIS 52602, 2007 WL 2096975, at *1 (M.D. Fla. July 20, 2007).
>
> "Reconsideration of a previous order is an extraordinary measure and should be applied sparingly." *Scelta v. Delicatessen Support Servs., Inc.,* 89 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000). "[M]otions for reconsideration should not be used to raise arguments which could, and should, have been previously made." *Id.* (quotation omitted). Stated differently, "[a] party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a *motion for reconsideration*." *McGuire,* 497 F. Supp. 2d at 1358 (quotation omitted). To permit otherwise would "essentially afford[] a litigant two bites at the apple." *Am. Home Assurance Co. v. Gleen Estess & Assocs., Inc.,* 763 F.2d 1237, 1239 (11th Cir. 1985) (quotation omitted).

*Bent v. Wilson*, No. 6:21-cv-75-WWB-EJK, 2022 U.S. Dist. LEXIS 197831, at *3-4 (M.D. Fla. Oct. 31, 2022).[19] A motion for reconsideration should not "raise arguments which, and should, have been [previously] made." *Allstate Servicing, Inc. v. KG*, No. 5:21-cv-574-WWB-DAB, 2023 U.S. Dist. LEXIS 231786, at *4 (M.D. Fla. Nov. 20, 2023) (citations omitted). Therefore, motions for reconsideration should raise issues that were previously asserted but not decided. *Id.* at *6.

In *Arch Specialty Ins. Co. v. BP Inv. Partners, LLC*, this Court acknowledged that granting Defendant leave to assert affirmative defenses after discovery had already closed would "(1) require reopening discovery, (2) prejudice Plaintiff, and (3) delay the timely and efficient resolution of th[e] case." No. 6:18-cv-1149-WWB-DCI, 2020 U.S. Dist. LEXIS 171764, at *6-7 (M.D. Fla. April 1, 2020) (citing *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1342 (11th Cir. 2014) (citation omitted)). In this case, Plaintiff was substantially prejudiced by Judge Berger's denial of her request to reopen discovery after Plaintiff explained the need for discovery due to the time when Plaintiff finally received Defendant's Answer and Affirmative Defenses. Thereafter, Plaintiff was further prejudiced by Judge Irick's denial of her Motion to Strike without reviewing the merits of her arguments.

Judge Irick stated that he denied Plaintiff's Motion to Strike "[1] because Plaintiff has failed to comply with the Local Rules and the Court's Order and [2] because Plaintiff has not demonstrated that the drastic remedy of striking the pleading is warranted." (Doc. 127 at 5).

---

[19] In *Bent v. Wilson*, 2024 U.S. App. LEXIS 1820 (11th Cir. Jan. 26, 2024), the Eleventh Circuit reversed the Court's denial of the plaintiff's motion for reconsideration of the Court's order dismissing the plaintiff's second amended complaint with prejudice as a "shotgun" pleading. However, the Eleventh Circuit did not state that the Court's stated legal standard for reconsideration was incorrect.

As to his first reason, Judge Irick stated: "As an initial matter, the Court finds that the Motion is due to be denied because Plaintiff did not comply with Local Rule 3.01(g) and the Case Management Scheduling Order (CMSO)." (*Id.* at 1). However, in her Motion to Strike, Plaintiff included the required Local Rule 3.01(g) certification and stated that she conferred in good faith with Defendant's counsel by email and phone. (Doc. 112 at 13). Therefore, to reach his conclusion, Judge Irick ignored Plaintiff's certification and fully credited Defendant's counsel's allegations regarding the required conferral. (Doc. 127 at 1-2). In the first two (2) pages of his four and a half (4 ½) page order. (*Id.*).

Plaintiff was once again blindsided by Defendant's counsel's misrepresentations and perplexed as to why Judge Irick took Defendant's counsel at her word without giving Plaintiff an opportunity to reply to the allegations regarding conferral.[20] Prior to Judge Irick's Order denying Plaintiff's Motion to Strike, the Court had received notice of Plaintiff's need to file motions for leave to file replies to respond to Defendant's counsel's misrepresentations. (*See e.g.,* Docs. 58, 58-1, 58-2). Defendant's counsel filed Defendant's Response on October 29, 2024, at 10:01 PM, and Judge Irick entered his Order denying Plaintiff's Motion to Strike on November 4, 2024, at 9:13 AM. In her Motion to Strike, Plaintiff advised the Court, in a footnote about her pending Time-Sensitive Motion (for extension of five (5) days), that "Plaintiff may need to request leave of Court to file a

---

[20] Plaintiff considered that Judge Irick's familiarity with Defendant's counsel may have influenced his determination to believe her misrepresentations about the conferral with Plaintiff. *See e.g.,* *Muller v. Lake Forest Family Dentistry*, Case No. 6:19-cv-01215-WWB-DCI; *Holcomb v. Central Florida Regional Transit Authority*, Case No. 6:22-cv-00716-WWB-DCI; *Falce v. C&N Do, Inc.*, 6:23-cv-00334-RBD-DCI; *Fountain v. OnSite Employee Leasing, Inc.*, Case No. 6:24-cv-00355-PGB-DCI; *Dinatale v. U4G Group, LLC*, Case No. 6:16-cv-01392-RBD-DCI. However, Plaintiff has not given the Court any reason to discredit her Rule 3.01(g) certifications.

reply if Defendant file[d] a response to [her Motion to Strike]." (Doc. 112 at 3 n.2). Plaintiff was in the process of seeking conferral and preparing a motion for leave to file a reply as required by Local Rule 3.01(d); however, Judge Irick ruled rather quickly on a very substantive motion without entering an Order to Show Cause to allow Plaintiff an opportunity to refute Defendant's counsel's allegations regarding conferral. (Doc. 127).[21]

Judge Irick essentially made factual findings against Plaintiff regarding the required conferral based totally on Defendant's counsel's misrepresentations in Defendant's Response. Judge Irick concluded (without evidence other than Defendant's misrepresentations) that Plaintiff "violated the Local Rules and Order of this Court." (Doc. 127 at 2). In the footnote to this conclusion, Judge Irick stated:

> The Court recognizes that there were hurricanes in Florida after Defendant filed the Answer before Plaintiff's October 15, 2024 deadline, and Plaintiff has pointed to those events to explain the time-sensitive nature of at least one filing. Doc. 110 at 4-6; Doc. 112 at 7. Even so, the hurricanes or other personal matters do not explain Plaintiff's failure to respond to Defendant's continued efforts to resolve this matter without Court intervention.

(Doc. 127 at 2).[22] However, Judge Irick did not state that the filing he cited in the footnote (*Id.* at 2 n.1) was Plaintiff's Time-Sensitive Motion to Extend Time to File Motion to Strike and to Respond to Defendant's Omnibus Motion *in Limine* ("Time-Sensitive Motion") (Doc. 110). In her Time-Sensitive Motion, Plaintiff provided an almost day by day account of the circumstances she faced since September 23, 2024 (the date she received Defendant's

---

[21] Alternatively, Judge Irick could have scheduled a hearing as he did when Defendant filed its Time Sensitive Motion for Protective Order Precluding the Deposition of FAMU President Dr. Larry Robinson. (Doc. 38).

[22] In her Motion to Strike, Plaintiff stated: "Plaintiff, in comparison, received a much shorter period of time to consider Defendant's Answer and thirteen (13) Affirmative Defenses, including during a time when many deadlines came together at the same time and two (2) hurricanes hit Florida. (Doc. 110, ¶¶ 5-19)." (Doc. 112 at 7).

Answer and Affirmative Defenses) until October 14, 2024 (the date she conferred with Defendant's counsel about several pending matters in addition to her Motion to Strike).[23] (*Id.*, ¶¶ 5-18). Those circumstances, including two hurricanes that hit Florida back-to-back (Helene and Milton) and several Court deadlines, prompted Plaintiff's Time-Sensitive Motion requesting five (5) extra days to file her Motion to Strike and her Response to Defendant's Omnibus Motion *in Limine*. (*Id.*). Plaintiff's Time-Sensitive Motion was referred to Judge Irick (Doc. 110) and eventually denied as moot by Judge Berger after Plaintiff filed her Motion to Strike by the October 15, 2024 deadline because the Court did not rule on her Time-Sensitive Motion before then. (Doc. 119).

If Judge Irick had given Plaintiff an opportunity to defend against Defendant's counsel's misrepresentations, Plaintiff could have provided evidence such as the summary email she sent to Defendant's counsel on October 29, 2024, at 5:06 PM, refuting Defendant's counsel's misrepresentations and inviting Defendant's counsel to confer in a straight-forward manner. (*See* Exhibit 1).[24] This was after Defendant's counsel, in accordance with

---

[23] On October 14, 2024, Plaintiff and Defendant's counsel also conferred about (1) scheduling the Court-required settlement conferral (Doc. 96) which Defendant and its counsel made difficult to schedule; (2) Plaintiff's tentative motion for Court clarification about the requirements for the settlement conferral if Defendant's counsel continued to argue that conferral did not need to be conducted as explicitly stated in the Order (*Id.*); and (3) Defendant's Motion to Strike Plaintiff's Declarations, which Defendant subsequently filed on October 16, 2024 (Doc. 114).

[24] Due to Plaintiff's current visual impairment, the emails are in a huge font size that makes typing them and reading them easier on Plaintiff's vision. At this time, Plaintiff is only including as exhibits the emails wherein Plaintiff, contemporaneous with the conferrals, refuted Ms. Reiner's misrepresentations, which were obviously a setup for the misrepresentations she made in the Court filing. However, Plaintiff is prepared to submit the many emails about the conferrals, and provide context, if the Court deems it necessary. In efforts to promote civility and professionalism, Plaintiff has repeatedly suggested recording the Local Rule 3.01(g) conferrals (*see e.g.*, Doc. 51-3 at 10); however, Defendant's counsel has refused. Recording would allow both sides to have an accurate record of what everyone said, to hopefully avoid misrepresentations to the Court about

her pattern and practice, refused to provide Plaintiff with straight answers regarding conferral. Judge Irick had been made aware of Defendant's counsel's tactics in this regard. Judge Irick saw what Plaintiff went through when he read the back-and-forth of emails about scheduling depositions. (*See* Exhibit 2 at 18:12-16). During a hearing on June 18, 2024 ("the hearing") (Doc. 69), Judge Irick stated: "I think that you've been given the runaround to a high degree, and it's just – I read all these emails and you cannot get a straight answer out of defense counsel, which is frustrating to the Court and everyone else." (Exhibit 2 at 18:12-16).[25] Defendant's counsel did not respond to Plaintiff's October 29,

---

what happened and what was said during the conferrals. Due to the issues with misrepresentations to the Court, the phone conferrals are preceded and followed by back-and-forth emails documenting, discussing, and even agreeing to disagree about what happened and what was said during the conferrals. Plaintiff is further disadvantaged during these conferrals because she often deals with two-on-one counsel and must communicate with different attorneys that represent Defendant in this case. The emails and phone conferrals unnecessarily lead to more billable time for Defendant's counsel. Defendant's counsel also uses the phone conferrals as opportunities to antagonize Plaintiff and waste her time.

[25] On December 11, 2024, Plaintiff had to once again make the Court aware of the latest round of emails trying to get a straight answer from Defendant's counsel; this time about whether they were also representing Defendant in its internal, administrative proceedings and whether they considered those proceedings as "matters related to this litigation." (*See* Doc. 145-4). This was after FAMU Deputy General Counsel Iris A. Elijah, Defendant's representative for the Court-ordered settlement conference (Doc. 108), falsely told Plaintiff that she should not communicate with the FAMU President (to get the Step 3 grievance formal process before an administrative law judge) because GrayRobinson attorneys Rick Mitchell and Sarah Reiner are also representing Defendant in the processing of Plaintiff's internal administrative proceedings. This is against the stated provisions in the FAMU Regulations. When Plaintiff contacted the GrayRobinson attorneys to find out if this was true, Ms. Reiner refused to provide a straight answer in dilatory emails. Plaintiff spent time from October 22, 2024 to November 14, 2024 in a back-and-forth of ten (10) emails with Defendant's counsel to get an answer confirming that they do not represent Defendant in its internal proceedings and those internal proceedings are not "matters related to this litigation." The dilatory emails to keep Plaintiff from seeking the Step 3 grievance process from the FAMU President may have crossed the line from an attorney representing a client to an attorney joining with a client in wrongful conduct against Plaintiff. *See e.g., Smith v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, No. 6:24-cv-457-PGB-RMN, 2024 U.S. Dist. LEXIS 146234, at *4 n.4 (M.D. Fla. Aug. 16, 2024) (granting renewed motion to amend complaint

2024, 5:06 PM, email. Instead, at 10:01 PM that day, Defendant's counsel filed a Response

with the misrepresentations that Judge Irick used to make adverse findings against Plaintiff

regarding conferral (per Local Rule 3.01(g) and the CMSO) and deny her Motion to Strike.

(Docs. 122, ¶¶ 8, 10; 127 at 1-2).

Defendant knew as early as September 26, 2024 that Plaintiff intended to file her Motion

to Strike because Plaintiff conferred with Defendant's counsel to confirm that there was no

opposition to the Federal Rule of Civil Procedure 12(f)(2) deadline to file her Motion to

Strike. (Doc. 99). On October 14, 2024, Plaintiff conferred with Defendant's counsel about

the specific issues with the affirmative defenses. Defendant's counsel stated that she was

going to send Plaintiff proposed revisions possibly that day. In response, Plaintiff requested

that they be sent by midnight because the Court had not yet ruled on Plaintiff's opposed

Time-Sensitive Motion for extension of time to file her Motion to Strike (Doc. 110) and the

deadline was the next day. Defendant's counsel replied that, if she was not able to send

the proposed changes by midnight on October 14, 2024, that Plaintiff should represent to

the Court that Defendant opposed her Motion to Strike. Plaintiff did not give Defendant's

counsel an "ultimatum." In fact, it was disingenuous for Defendant's counsel to claim that

Defendant did not have sufficient time to cure the deficiencies *after Defendant and its*

*counsel opposed Plaintiff's request for an extension of five (5) days to file her Motion to*

*Strike.*[26] If Defendant and its counsel truly wanted to confer in good faith to cure the

_____

to add attorney Sarah Reiner as defendant in addition to previously added attorneys
Richard Mitchell and Julie Zolty plus the GrayRobinson law firm for "their alleged
involvement in Plaintiff's wrongful termination").

[26] Again, on October 14, 2024, Plaintiff requested an extension of five (5) days to file her
Motion to Strike and respond to Defendant's Omnibus Motion *in Limine*. (Doc. 110).
Plaintiff's request was prompted by good cause due to two hurricanes (Helene and Milton)
in addition to several other Court deadlines during the same period when Plaintiff finally

deficiencies, the extension of five (5) days that Plaintiff requested would have given them and Plaintiff additional time for conferral. If Defendant had agreed to cure the deficiencies during this time, there may not have been a need for Plaintiff's Motion to Strike. Defendant's counsel's misrepresentations about conferral, without an opportunity for Plaintiff to refute them, should not have served as the basis for the Court to find that Plaintiff did not comply with Local Rule 3.01(g) and the CMSO, and thereby deny her Motion to Strike.

Defendant's counsel also misrepresented what happened after Plaintiff filed her Motion to Strike. On October 21, 2024, Plaintiff reached out to Defendant's counsel for conferral about Plaintiff's motions for leave to file replies to reply to Defendant's recent misrepresentations in its responses. Defendant's counsel also sought to confer about its affirmative defenses. Plaintiff requested that Defendant's counsel send her proposed edits to the affirmative defenses by Wednesday, October 23, 2024, the day prior to the settlement conference on Thursday, October 24, 2024, so she would have time to review

---

received Defendant's Answer and Affirmative Defenses (circumstances beyond Plaintiff's control). (*Id.*). On October 15, 2024, at 11:53 PM, Defendant filed Defendant's Response in Opposition to Plaintiff's Time Sensitive Motion to Extend Time. (Doc. 111). Defendant, with assistance from its attorney(s), used the opportunity to respond to Plaintiff's Time-Sensitive Motion to Extend Time (Doc. 110) to make misleading allegations and, *without a single citation to case law*, argue and conclude that Plaintiff's basis to request the extension did not constitute good cause. Defendant also misrepresented to the Court that Plaintiff did not "aver that she was disproportionately affected by the storms." (Compare Doc. 111 at ¶ 4 with Doc. 110 at ¶ 16). Defendant did not state what specific prejudice it would suffer if the Court granted Plaintiff an extension of five (5) days due to the unforeseen, exigent storm circumstances included in her request. Additionally, Defendant, with its counsel's assistance, used its response opposing the extension of time to engage in an *ad hominem* attack against Plaintiff (Doc. 111, ¶ 12) the night before the parties were scheduled to meet for a 1:00 PM settlement conferral as required by Court Order (Doc. 96 at 2). Defendant's administrators and Defendant's counsel engaged in highly antagonistic conduct in the days before the required settlement conferral, which was futile and set to fail. The Court did not grant Plaintiff the extension of time. (Doc. 119). The Court has only granted Plaintiff discrete extensions of time that were unopposed by Defendant. (Docs. 25, 33, 80, 83, 89).

them before conferring by phone on Friday, October 25, 2024. Defendant's counsel can split the work among different attorneys; Plaintiff, proceeding *pro se*, cannot. Plaintiff is also still dealing with visual impairment. One of Defendant's attorneys (Sarah Reiner) attended the settlement conference while another one (Julie Zolty) was supposed to send Plaintiff the proposed edits to the affirmative defenses.[27] However, Ms. Zolty did not send Plaintiff the proposed edits as agreed because she said that she had to work on other emergency client matters. Therefore, the Friday, October 25, 2024, conferral had to be rescheduled to Monday, October 28, 2024. Contrary to what Defendant's counsel stated, Plaintiff did not refuse "to advise Defendant as to whether the proposed revised Answer and Affirmative Defenses would remedy the alleged deficiencies set forth in the Motion to Strike." (Doc. 122, ¶ 10). Defendant's counsel set up the conferral after Plaintiff's Motion to Strike to antagonize Plaintiff, not answer Plaintiff's questions regarding the conferral, start an argument with Plaintiff during the phone conferral (which ended the communication abruptly), not respond to Plaintiff's request for additional information, and immediately thereafter file its Response deceptively stating that Plaintiff refused to confer. (*See* Exhibit 3). Therefore, the Court should consider the new evidence Plaintiff provided and correct the clear error or manifest injustice that Defendant caused to the Court and Plaintiff with its misrepresentations.[28]

---

[27] Plaintiff must contend with the different attorneys that represent Defendant. These attorneys often team up two-on-one and divide the work while Plaintiff must single-handedly respond to their individual and joint tactics, plus their emails which require Plaintiff's detailed responses to try to guard against additional misrepresentations.

[28] At this point, the communications between Plaintiff and Defendant's counsel have become highly unproductive and ineffective. This is one of the reasons why Plaintiff requested the Court's intervention. (Doc. 145). Communications got worse after the Court-ordered settlement conference on October 24, 2024 when Defendant's counsel spent a lot

As to Judge Irick's second reason, he did not decide on the merits of Plaintiff's arguments regarding each of Defendant's affirmative defenses. Instead, Judge Irick summarily concluded that the affirmative defenses were sufficient to put Plaintiff on adequate notice. (Doc. 127 at 4). Plaintiff stated in her Motion to Strike:

> Defendant did not give Plaintiff "fair notice" of the nature of the defenses and the grounds upon which they rest. The defenses are stated so generally that they constitute no notice of the defenses that Defendant will raise at trial. As such, they should be stricken. *EEOC v. O'Reilly Auto.*, 2020 U.S. Dist. LEXIS 266330, at *7. Additionally, they should be stricken because, otherwise, Plaintiff will be severely prejudiced, including because Plaintiff, at this point in the case, cannot conduct discovery or file a motion for summary judgment. *See Ayers v. Consol. Constr. Servs. of SW Fla., Inc.*, No. 2:07-cv-123-FtM-29DNF, 2007 U.S. Dist. LEXIS 86596, at *1 (M.D. Fla. Nov. 26, 2007).

(Doc. 112 at 6) (internal footnote omitted). Plaintiff also stated the prejudice specifically as to the affirmative defenses. (Doc. 112 at 7-13). Judge Irick termed what Plaintiff stated as a "blanket assertion regarding prejudice" that did not "persuade the Court that she [was] entitled to relief." (Doc. 127 at 4). However, previously, during the hearing (Doc. 69) on Plaintiff's Expedited Short-Form Discovery Motion for Extension of Discovery Deadline and Dispositive and *Daubert* Motions Deadlines if Necessary (Doc. 51), Defendant's counsel and Judge Irick stated:

> **MS. REINER:** You know, your Honor, the other thing that we're dealing with here is that, because of the pending motion to dismiss, we have yet to actually answer the complaint in this case, and we are set for trial. So I think that there's some consideration that should be given with respect to the trial schedule there as well.

(Exhibit 2 at 24:11-16).

> **MS. REINER:** I would, of course, to the extent that we file an answer and affirmative defenses, I anticipate that she [Plaintiff] would seek to potentially depose individuals with respect to those affirmative defenses, and I'm not sure

_____

of time alone with Defendant's designated representative, Deputy General Counsel Iris A. Elijah (Doc. 108), and the parties met separately with Judge Hoffman Price.

what the Court would do in terms of the timeline with respect to trial and any number of things.

(*Id.* at 26:25-27:1-5).

> **THE COURT:** Just keep that in mind regarding your affirmative defenses, too. You know, I wouldn't – not that it's even an affirmative defense, but I wouldn't file the affirmative defense of the claim fails to state, you know, a cause of action, because now you've opened up all of discovery. You know, and it's also not an affirmative defense, so you shouldn't file it anyway. But I'm just saying, you know, you do that and, then, here we are.

(*Id.* at 31:12-19). In response to the Court's statements above, Defendant's counsel stated:

> **MS. REINER:** Well, I think, you know, I think at this point, Your Honor, that's -- you know, that's part of the basis of the motion to dismiss. So if the Court were to come back and say, "No, we're proceeding on the complaint as it stands," you know, then that's not something we would be -- we would be pleading as an affirmative defense.

(*Id.* at 32:20-25). However, contrary to what Defendant's counsel stated at the hearing, Defendant included the affirmative defense of failure to state a claim upon which relief can be granted for all Counts of Plaintiff's Second Amended Complaint. (Doc. 97 at 33).[29]

The assertions made during the hearing (evidence in the form of a transcript) support that Plaintiff was severely prejudiced by Defendant's delayed and deficient Answer and Affirmative defenses, including because Defendant did not state the factual basis for its affirmative defenses and Plaintiff can no longer seek discovery or file a motion for summary judgment. (Doc. 112 at 6). That is not a "blanket assertion regarding prejudice," it is a real, significant, substantiated assertion regarding prejudice, including substantial prejudice to Plaintiff and her case during preparation of the Joint Final Pretrial Statement. (*See* Doc. 145 at 20-21).

---

[29] Defendant also included affirmative defenses related to Plaintiff's wrongful termination (numbers 9, 10, 12 and 13). (Doc. 122 at 12-15).

Finally, after Judge Irick readily took Defendant's counsel at her word, he added that Plaintiff's "apparent rejection of Defendant's offer to resolve the issue require[d] the Court to expend resources where judicial intervention was possibly not needed." (Doc. 127 at 2).[30] However, Defendant caused the need for Plaintiff to seek a Court ruling regarding Defendant's deficient Answer and Affirmative Defenses.[31] Defendant knowingly filed its deficient Answer and Affirmative Defenses.[32] Defendant did not try in good faith to resolve its deficiencies during conferral before Plaintiff filed her Motion to Strike or thereafter.[33]

---

[30] As a *pro se* party, Plaintiff has conducted this litigation without requesting much Court intervention against a Defendant experienced in contentious litigation who is represented by a large law firm with experience engaging in "uncooperative and borderline uncivil litigation conduct" between attorneys on both sides and requiring lots of Court intervention. *See Santana v. Telemundo Network Group LLC*, No: 6:20-cv-1157-WWB-LHP, 2022 U.S. Dist. LEXIS 42673, at *39 (M.D. Fla. March 10, 2022).

[31] Before filing this case, Plaintiff obtained evidence to support her causes of action; *the evidence consisted overwhelmingly of Defendant's own records*. This is why Plaintiff was able to provide detailed allegations (including names, dates, and quotes) in her pleadings. Yet, in its Answer and Affirmative Defenses, Defendant claimed lack of knowledge about its own records. (Doc. 112 at 3-4). If Plaintiff had to rely on obtaining discovery from Defendant, Defendant would have unnecessarily obstructed discovery and multiplied the costs and work in this litigation even more, as it has done in this case and other cases. *See e.g.*, *Smith v. FAMU*, Case No. 6:24-cv-00457-PGB-RMN (M.D. Fla. 2024) (Docs. 56-57, 76-78, 88-89, 109, 111, 113, 116-118, 122, 126, 128-131, 137-138, 140, 146-147, 152-154, 156, 163, 171-172) (these were all discovery-related matters during the first six (6) months the case was in the U.S. District Court for the Middle District of Florida, not including the orders that were entered to deal with all these discovery matters).

[32] Defendant did not state its proposed amendments for the Court's review in its Response to Plaintiff's Motion to Strike. Defendant's Response was sixteen (16) pages; therefore, Defendant had four (4) additional pages to state its proposed amendments.

[33] Defendant has once again caused "the Court to expend resources where judicial intervention was possibly not needed." Plaintiff had to defeat Defendant's Motion for Protective Order (Docs. 37, 38, 39, 40, 43, 45, 49) and, *after that*, file and win a Motion to Compel (Docs. 50, 52, 54, 56, 57, 60, 64) to finally be able to take then President Larry Robinson's deposition. The deposition confirmed Plaintiff's allegations about President Robinson's involvement in wrongful actions against Plaintiff, including the decision to deny her promotion. Judge Irick did not assess attorney fees when he denied Defendant's Motion for Protective Order (Doc. 49) or when he granted Plaintiff's Motion to Compel (Doc. 64) although he expressed his disapproval when he stated: "I don't understand why, when I order a deposition, it's not complied with, frankly, in my mind in a timely fashion it requires.

## IV.   <u>CONCLUSION</u>

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court grant the relief requested in this Motion for Reconsideration, reconsider the merits of Plaintiff's Motion to Strike in its entirety and grant the relief requested therein. Plaintiff also respectfully requests leave to file a reply to Defendant's Response to her Motion to Strike.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Plaintiff certifies that she conferred in good faith with Defendant's counsel via phone and via email. Defendant opposes this Motion.

Dated this 18th day of December, 2024.

Respectfully submitted,

<u>/s/ Maritza Reyes</u>
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on December 18, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

<u>/s/ Maritza Reyes</u>
Plaintiff

---

I mean, so some of what you're saying, Ms. Reyes, I'm agreeing with, because then it requires an order from me setting a date. You know, I think that's almost ridiculous that it requires that." (Exhibit 2 at 17:13-18).

25

Tab 81-1

**Expert Report for**   Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793

March 31, 2024

Kenneth Westhues
Professor Emeritus, Sociology & Legal Studies
University of Waterloo, Canada

This report summarizes the research literature on workplace mobbing and applies it to the actions against Professor Maritza Reyes (Professor Reyes) at Florida Agricultural and Mechanical University (FAMU). She has requested this report in connection with her lawsuit against the FAMU Board of Trustees, but I do not write it as her advocate. My purpose here is to shed the light of disinterested scholarship on the evidence described below, to be as impartial and objective as possible in my assessment of this evidence in light of the relevant body of knowledge. My opinions in this report are based on the facts or data described below, which may be supplemented by additional facts or data as developed in this case.

Workplace mobbing has been the main subject of my research and scholarly writing for the past 25 years. My credentials as an expert on workplace mobbing are summarized in the abbreviated curriculum vitae appended to this report at the end, which includes links to dozens of my publications available online and a list of prior expert reports done for court cases and arbitrations.

**<u>Facts or Data Considered</u>**

(1) Professor Reyes's Second Amended Complaint in the United States District Court in Orlando, Case No. 6:22-cv-1525-WWB-DCI, dated 9 October 2023 (Complaint). This is a 96-page document of 303 numbered paragraphs. This document's importance for my purpose consists not in its legal claims, the seven counts in Paras. 232-303, but in its factual chronicle of actions and events in Paras. 12-231. This is the third complaint filed by Professor Reyes. My report assumes that evidence supports her factual assertions.

(2) Order entered by District Judge Wendy W. Berger dated 15 September 2023. The term "shotgun pleading," which appears six times in this court decision, is of particular significance in an analysis of Professor Reyes's Complaint from the point of view of workplace mobbing. A later section of this report explains what this means.

(3) Open letter of late February or early March 2024, from FAMU College of Law's Hispanic American Law Students Association (HALSA) to FAMU President Larry Robinson and Provost Allyson Watson. The letter describes the university's official intent to dismiss Professor Reyes and demands that she be kept in her tenured position in the College of Law.

(4) Provost Watson's intent-to-dismiss letter, dated 16 February 2024, attaching various FAMU regulations, email exchanges in the College of Law in early February, and a Compliance Review Form from FAMU's Chief Compliance and Ethics Officer Rica Calhoun, dated 9 February 2024. Dismissal is the severest action a university can take against a tenured professor, the final punishment, and therefore deserves closest attention in this or any other report on mobbing in the academic workplace.

(5) Professor Reyes's informative and comprehensive page about her background, work, and achievements on the website of the FAMU College of Law.

If additional evidence should change or contradict the facts or data in the documents listed above, this report would have to be revised accordingly. I am confident, however, having studied detailed documentation on hundreds of mobbing cases in universities, hospitals, and elsewhere, that I have reliably applied workplace mobbing principles and methods to the facts of Professor Reyes's case. I can also inform the factfinders about general principles of workplace mobbing.

## Additional Facts or Data Obtained Through Independent Research

I have also searched on Google for news reports of conflicts and turmoil in the FAMU College of Law in recent years. I have found many such reports in periodicals ranging from the CBC (Canadian Broadcasting Corp.) to the *Tallahassee Democrat* to *HBCU Buzz*. The reports have been about sexual harassment accusations, claims of discrimination and retaliation, alleged financial improprieties, accreditation difficulties, controversy over the high failure rate of FAMU Law graduates on the state bar exams,

and resignations from administrative positions. Numerous professors and administrators have been involved.

My purpose in reviewing these news reports was not to form an opinion about who was right and who was wrong in any particular dispute, but to gauge the extent of dissension and turmoil in the FAMU College of Law. I conclude from my cursory review that this is indeed a difficult work environment. The relevance of this finding is that workplace mobbing most commonly occurs in an overall context of uncertainty, squabbles and disputes. It is sometimes imagined that scapegoating some professor will magically make things better. More often, this merely confirms how bad things are.

## Definition and Conceptualization of Workplace Mobbing

In one of my most cited articles (*OHS Canada* 2003), I defined workplace mobbing as

> an impassioned, collective campaign by co-workers to exclude, punish, and humiliate a targeted worker. Initiated most often by a person in a position of power or influence, mobbing is a desperate urge to crush and eliminate the target. The urge travels through the workplace like a virus, infecting one person after another. The target comes to be viewed as absolutely abhorrent, with no redeeming qualities, outside the circle of acceptance and respectability, deserving only of contempt. As the campaign proceeds, a steadily larger range of hostile ploys and communications comes to be seen as legitimate.

An oft-quoted earlier definition comes from the Swedish psychologist Heinz Leymann, the principal founder of this research specialty. In a foundational article (*Violence and Victims* 1990) Leymann defined workplace mobbing as

> "ganging up on someone" or psychic terror. It occurs as schisms, where the victim is subjected to a systematic stigmatizing through, *inter alia*, injustices (encroachment of a person's rights), which after a few years can mean that the person in question is unable to find employment in his/her specific trade. Those responsible for this tragic destiny can either be workmates or management.

## The Burgeoning Body of Knowledge

As a scientific field, workplace mobbing is relatively young. In the early 1990s, Leymann took the term *mobbing,* as used earlier by Nobel Laureate Konrad Lorenz in his study of

nonhuman species, and applied it to a distinct phenomenon that sometimes occurs in human workplaces. Hence the term "workplace mobbing." Research in this area spread first in Europe, a little later in North America. When I began my studies in this area in the late 1990s, I was among fewer than a dozen social scientists in this field in Canada and the United States.

Over the past 30 years, thanks to the work of hundreds of scholars in many different academic disciplines, from psychology to engineering, business administration to medicine, a relatively coherent body of knowledge has been created. As one partial documentation of this fact, I attach as Appendix A the list of references from a paper by my colleague, Dr. Qingli Meng at Niagara University, in which she reviewed the literature and systematically distinguished between *mobbing* and the related term *bullying*. Dr. Meng presented this paper at the Annual Meeting of the American Society of Criminology in Philadelphia, in November 2023.

## Empirical Measurement

Like any concept used in a scientific discipline, *mobbing* must be measured in empirical terms, so that in the face of a particular workplace conflict, the researcher can say, "Yes, this is an instance of mobbing," or "No, this is something else."

By careful scientific measurement, mobbing can and must be distinguished from routine, justifiable punishment, up to and including dismissal, for violation of laws and policies essential for the workplace to fulfill its purposes. A law firm once asked me to assess impassioned, hostile actions against the president of a university as an instance of workplace mobbing. By my reading of the evidence, it appeared that this administrator had embezzled about $1 million from the institution and failed to report it as income, with the result that the IRS had brought criminal charges. I declined to write the assessment. There was indeed hostility toward this administrator from colleagues, professors, and students, but for good reason: for breaking the law and committing a serious crime.

Careful measurement also prevents mobbing from being confused with other forms of conflict in organizations, like factional rivalry (where opposing cliques square off against one another), personality conflicts (where two co-workers simply "rub one another the wrong way," on account of differences in manners, tastes, politics, or whatever), and

personal defects (like alcoholism, drug addiction, psychosis, or some other pathology that prevent fulfillment of job responsibilities). Mobbing is a distinct, momentous, devastating, and empirically identifiable form of conflict, a social process wherein some combination of peers, managers, and/or subordinates coalesce into a movement aimed at making the targeted worker's life miserable and in the longer run getting rid of him or her.

## Checklist of Mobbing Indicators

About 20 years ago I devised a checklist of 16 indicators for assessing whether or not and to what extent a given workplace conflict is an instance of mobbing. I and numerous other researchers have been using this checklist ever since to assess alleged or suspected cases in universities, hospitals, the police, public-service organizations, and elsewhere. The 16 indicators are shown below, and after each one, comments about Professor Maritza Reyes and her experiences at FAMU.

1. **By standard criteria of job performance, the target is at least average, probably above average.**  –  Paras. 12-15 of the Complaint summarize Professor Reyes's educational credentials, including an LL.M. from Harvard Law School. She joined the FAMU faculty in 2009. Later paragraphs describe the conflict-laden but ultimately successful proceedings for her promotion to Associate in 2012 and for tenure in 2015 (Para. 159). I have seen nothing in the documentation to suggest that Professor Reyes is less than average in her academic performance, and much evidence that she is above average.

2. **Rumors and gossip circulate about the target's misdeeds: "Did you hear what she did last week?"** – Given how many negative comments about her Professor Reyes reports in her Complaint, one must suspect that there have been many more behind the scenes. Examples that Professor Reyes reports include allegations by Professor Phyllis Taite in a memorandum to then Dean LeRoy Pernell about Professor Reyes's alleged conduct and Professor Taite's alleged concerns for her safety and alleged fear of Professor Reyes (Paras. 37-40); the unsubstantiated accusation by the College of Law Retention, Promotion and Tenure (RPT) Committee that Professor Reyes delivered her tenure application five minutes after a 5:00 PM non-deadline, which could potentially have resulted in denial of tenure and termination of employment (Paras. 46, 49); negative comments in Professor Reyes's peer class evaluations by

Professors Patricia Broussard, Ann Marie Cavazos, and Joe Grant (Paras. 58-59); unsubstantiated negative allegations by Professor Broussard during the RPT Committee tenure meeting about what students allegedly told her about Professor Reyes (Paras. 60-61); instructions to students by then Associate Dean Darryll Jones that they should file written complaints against Professor Reyes (Para. 61); allegedly defamatory allegations by Professor Jennifer Smith about Professor Reyes (Para. 90); false racial accusations by Professor Jeremy Levitt about Professor Reyes's conduct (Para. 95); IT/security director Shashi Persaud's report to FAMU Police about an alleged "vision" that Professor Jennifer Smith had about Professor Reyes harming a program assistant (Para. 107-108); false allegation by FAMU General Counsel Denise Wallace that Professor Reyes contacted the Office of the General Counsel in another state university about faculty meetings and the sunshine law when FAMU was sued by a law student for closing faculty meetings to students (Para. 109); more race-based accusations by Professor Levitt (Paras. 115-117); gossip about Professor Reyes when she was visiting at University of Florida College of Law (UF Law) (Para. 125); the "false, malicious, and frivolous" EOP Charge filed by Professor Broussard against Professor Reyes while Professor Reyes was visiting at UF Law, including claims that she was afraid of Professor Reyes and sought to avoid her (Paras. 130-133); the "bump incidents" (Paras. 136-138; 143); false rumors by Professor Jennifer Smith alleging that Professor Reyes had been "reprimanded" (Para. 170); "frivolous and malicious complaints" about Professor Reyes's conduct by Professors Patricia Broussard, Ann Marie Cavazos, and Emeritus Professor Nayaran Persaud (Para. 170); IT/security director Shashi Persaud's report of "active concern" about Professor Reyes to then incoming dean Felecia Epps (during her first week on the job) due to complaints by Professors Lundy Langston, Patricia Broussard, Deleso Alford Washington, and Phyllis Taite, and staff members Erica Polite and Pamela Leonard (Paras. 195); "false complaints" by Professors Broussard and Cavazos about Professor Reyes's conduct forwarded to then Dean Felecia Epps who used them to "counsel" Professor Reyes without giving her due process to respond to the allegations (Para. 196); false accusations by then Interim Dean Nicky Boothe-Perry and interim associate dean Phyllis Taite that Professor Reyes did not do her job regarding the certification of independent writing of two students (Paras. 198-199); false accusation by then Interim Dean Taite that Professor Reyes withheld grades (Para. 200); and false allegations about Professor Reyes's conduct by Dean Deidré Keller and Associate Dean Markita Cooper (Paras. 205-207) .

3. **The target is not invited to meetings or voted onto committees, is excluded or excludes self.** –  Many professors who sense hostility from colleagues voluntarily withdraw from participation in administrative committees. As I see the evidence, Professor Reyes has continued to be involved, especially in matters relevant to Hispanic students. These have often involved clashes with colleagues, including when she protested the exclusion of Hispanic students (Paras. 85-91). Then Dean Felecia Epps removed Professor Reyes from a faculty committee at the urging of Professor Jennifer Smith after Professor Reyes questioned Professor Smith about false rumors that she was spreading about Professor Reyes, including in meetings with students (Paras. 167-173). Professor Reyes was not invited to the faculty meeting with UF Law Dean who was invited to meet with FAMU Law faculty during the semester when Professor Reyes was visiting at UF Law (Para. 123-124). Professor Reyes describes being sabotaged in her role as chair of the faculty recruitment committee (Paras. 215-217). Professor Reyes was marginalized and alienated from colleagues and students as stated throughout her Complaint, including in paragraphs 93, 105, 116, 186, 198, 203, and 227.

4. **Collective focus on a critical incident that "shows what kind of man he really is."** There have been many incidents of conflict, including incidents of discrimination, harassment, and hostile work environment, as described in the Complaint. I have been unable, however, to identify what researchers describe as a "critical incident," an event considered to be definitive proof that the mobbing target does not belong, until the email exchanges of early February 2024. Professor Reyes's contribution to these exchanges, the emails she wrote, appear at this writing to be the "critical incident" researchers look for, since they are now being used to justify dismissal.

5. **Shared conviction that the target needs some kind of formal punishment, "to be taught a lesson."** – The hostility alleged by Professor Reyes in her Complaint has taken the form of withholding rewards (opposing her applications for promotion and tenure; denying promotion, refusing to assign an office with a window – Para. 204) more than of administering punishment. The dismissal letter of February 2024 has obviously changed this pattern. FAMU's intent now is to impose the ultimate punishment.

6. **Unusual timing of the decision to punish, e. g., apart from the annual performance review.** – The dismissal letter of February 2024 cannot be seen as

routine in any way. It is entirely *ad hoc,* in response to a flurry of emails less than two weeks before.

7. **Emotion-laden, defamatory rhetoric about the target in oral and written communications**. – Defamatory rhetoric reported in the Complaint consists of racially charged epithets like "white Hispanic."

8. **Formal expressions of collective negative sentiment toward the target, e. g. a vote of censure, signatures on a petition, meeting to discuss what to do about the target**. – The votes within the law faculty against Professor Reyes's promotion and tenure were not *ad hoc*, but they count as formal expressions of collective negative sentiment toward her. It is highly unlikely, almost unimaginable, that Provost Watson would have written the dismissal letter without collective pressure from some number of law professors, but I do not see evidence of this in the documents I have reviewed – that letter having been written just a month ago. I suspect such evidence will eventually come to light.

9. **High value on secrecy, confidentiality, and collegial solidarity among the mobbers**. – Professor Reyes alleges such a value in her Complaint, pointing to documents withheld from her, mobbers' arguments for "'confidentiality' of the process to keep everything secret while [the mobbers] violated the claimed 'confidentiality'" in efforts to harm Professor Reyes, and previously friendly colleagues being pressured to join in opposing her applications for promotion and tenure (Paras. 49, 175). Professor Reyes's Complaint describes "race-based group frenzy," "Black racial solidarity," and Black women's "sex/racial solidarity" among the mobbers (Paras. 108, 119, 194). It also describes Professor Reyes being targeted as a "litmus test to show racial solidarity" among the mobbers (Para. 202).

10. **Loss of diversity of argument, so that it becomes dangerous to "speak up for" or defend the target**. – Students have spoken up for Professor Reyes, as in their open letter and otherwise (Para. 207), but I find little evidence of law-college faculty doing so even when they witnessed Professor Reyes being attacked (Paras. 95, 116, 186, 229-230). A section of the Complaint is entitled, "Black Women Retaliated against Colleagues who tried to Defend Professor Reyes from Race Discrimination" (Paras. 99-106). Faculty members and Professor Reyes's program assistant were retaliated

against when they protested or did not join in efforts to harm Professor Reyes (Paras. 49(vi), 53-57, 71, 99-105-106, 174-175).

11. **The adding up of the target's real or imagined venial sins to make a mortal sin that cries for action**. –  A reasonable observer finds nothing in Professor Reyes's emails of early February 2024, her emails attached to the dismissal letter, that constitutes a "mortal sin." One suspects that the dismissal letter is actually based on the cumulation of objectionable assertions by Professor Reyes  about discrimination, harassment, and hostile work environment, over the preceding five or ten years.

12. **The target is seen as personally abhorrent, with no redeeming qualities; stigmatizing, exclusionary labels are applied**. – A section of the Complaint is about "The 'Dangerous' White Latina Narrative" (Paras. 107-109). In a predominantly African-American institution, to be accused of "anti/Black Caucasian critiques of progressive Black men" and a "defensive and white privileged victim-based response" is obviously exclusionary and stigmatizing (Paras. 95, 108, 115-117). There is also the issue of Black women's racial animus against Professor Reyes and a Black woman claiming, as Professor Lundy Langston did, that "Black women cannot be racist because of the racism they themselves experience" (Para. 102-103).

13. **Disregard of established procedures, as mobbers take matters into their own hands**. – The procedural roadblocks Professor Reyes faced in promotion and tenure proceedings can be understood as disregard of established procedures, though some of these are not uncommon in such proceedings in any university. The attempt to deny tenure and thereby terminate employment without review over an unsubstantiated claim that Professor Reyes submitted her materials five minutes late (Para. 49(ii) illustrates the kind of pettiness common among academics in hostile relation. The significance of these earlier roadblocks in Professor Reyes's case has become clear with the issuance of the dismissal letter.

14. **Resistance to independent, outside review of sanctions imposed on the target**. – The litigation at hand is Professor Reyes's appeal for independent, outside review of hostile actions against her, in particular the denial of promotion (Paras. 180-185). FAMU has sought to have the Complaint dismissed as "shotgun pleading."  The disciplinary sanction of overwhelming importance in the case of Professor Reyes is the Provost's letter of intent to dismiss. At this point, just a month after issuance of the letter,

it is too soon to tell how much and what kind of resistance to external review of it the FAMU administrators will mount.

15. **Outraged response to any appeals for outside help the target may make**. – . Professor Reyes has sought outside review in the form of her lawsuit. FAMU's motions to dismiss are the clearest evidence of its response. The intent to dismiss Professor Reyes from employment may also be considered a response. As with Indicator #14, it is too soon to say how FAMU administrators will respond to the HALSA open letter. Will it be with reason or outrage or silence? I am not aware of any response so far.

16. **Mobbers' fear of violence from target, target's fear of violence from mobbers, or both**. The clearest evidence of this indicator is the report to FAMU police in 2014 (Para. 107) about Professor Jennifer Smith's "vision" that Professor Reyes was going to harm a staff member by shooting her in the face (Para. 107). The staff member apparently had a panic attack when Professor Smith told her about her "vision" (Paras. 107, 165). There is also the report to FAMU Police about "the bump" by a Black female staff member, Erica Polite (Para. 138). There are also claims that others in the College of Law were afraid of Professor Reyes and considered her "dangerous" (Paras. 38, 104, 107, 108, 133-134, 147).

In sum, application of the standard checklist of indicators leads to the conclusion that, on the basis of the evidence considered in this report, the mobbing of Professor Maritza Reyes has indeed been underway for more than a decade at FAMU, and has now reached its final stage. Dismissal means formal elimination from the College of Law and possibly the end of Professor Reyes's academic career.

**The Issue of "Shotgun Pleading"**

To me or any expert on workplace mobbing, Judge Wendy Berger's Order of 15 September 2023 deserves careful consideration for its discussion of "shotgun pleading," which FAMU alleged described Professor Reyes's Complaint. I understand this term to mean (following review of numerous online sources) a complaint that sets forth an excessive number of facts with no clear organization and then asserts that those facts describe a cause of action. As one Florida law firm describes it, shotgun pleading "shoots an indiscriminate spray of imprecise information that disables the recipient from

being able to respond." Judge Berger showed a degree of sympathy for this characterization of Professor Reyes's Complaint.

I have read hundreds of complaints of workplace mobbing, the vast majority of which could be characterized to some extent as shotgun pleading. This is because most mobbing cases unfold as a long succession of aggressive acts, first by one mobber than by another, first one kind of attack and then a different kind. Mobbing by definition is a coordinated barrage of hostile actions toward the target by an identifiable network of people. It is death by a thousand cuts. Little by little, the target's life becomes so unbearable that he or she has a breakdown of physical or mental health, succumbs to stress, or leaves. That the attack comes as spray from a shotgun rather than as a single bullet does not diminish its force. Instead, it magnifies the force of the attack.

A case is easier for a court to understand and adjudicate when there is a single aggressor and a single but serious aggressive act, as when one man hits another man over the head with a baseball bat.

The value of the research on workplace mobbing is that it gives a court, as well as everyone else, a conceptual framework by which to be on the lookout for a kind of aggression that is perpetrated by numerous individuals and that consists of many different kinds of torment.

Harking back to Konrad Lorenz's classic research on mobbing among birds, the researcher of mobbing among humans can appropriately cite what often happens among chickens. Poultry farmers know well that chickens often gang up on one of their number in a hen house, perhaps a bird that is of a different color or is new to the flock. The sharp-beaked mobbers take turns pecking this target, sporadically but consistently. It is the bird at the bottom of the pecking order. No single peck does serious injury to the targeted bird, but the cumulative effect is to kill it. Workplace mobbing among humans shows the same pattern. There is no single perpetrator, but the damage inflicted is no less real for that. Indeed, the damage is sometimes mortal.

## Why Professor Reyes Has Been Mobbed

My study of the documentation pertaining to Professor Reyes's troubles is not comprehensive enough for me to state conclusively the main factors that have given

rise to a hostile coalition of her colleagues. I can, however, identify those factors tentatively, on the basis of general findings of research on academic mobbing.

My most succinct statement of conditions that increase a professor's vulnerability to being mobbed was in an article entitled "The Unkindly Art of Mobbing," in *Academic Matters: the Journal of Higher Education* (2006). Here are the five main factors I listed there:

- Foreign birth and upbringing, especially as signaled by a foreign accent;
- Being different from most colleagues in an elemental way (by sex, for instance, sexual orientation, skin color, ethnicity, class origin, or credentials);
- Belonging to a discipline with ambiguous standards and objectives, especially those (like music or literature) most affected by postmodern scholarship;
- Working under a dean or other administrator in whom, as Nietzsche put it, "the impulse to punish is powerful";
- An actual or contrived financial crunch in one's academic unit (according to an African proverb, when the watering hole gets smaller, the animals get meaner).

The documents I have reviewed do not say whether Professor Reyes was born in the United States or somewhere else, nor whether she speaks English with a non-American accent. Her complaint highlights, however, her identity as a "Hispanic/Latina, a woman of Spanish-speaking, Latin American origin" (Para. 4). It says she "was the first Hispanic/Latina/o hired in the tenure track and the first and only thus far to apply for tenure" (Para. 36). It is therefore plain that she differs in an elemental way, namely ethnicity and race, from the majority of her colleagues.

Numerous assertions in Professor Reyes's Complaint support the hypothesis that this elemental difference lies at the root of hostile actions against her:

> The majority clique that hijacked Professor Reyes's tenure process was driven by unlawfully discriminatory racial and racial/sex animus against Professor Reyes" (Para. 47).
>
> "Comments about race, color, and national origin have been prevalent in Professor Reyes's experiences at FAMU. There has also been a race-sex/gender aspect to the ongoing discrimination. There is a history of discrimination against Hispanics-Latinas in the College of Law" (Para. 78).
>
> "The comments about race, color, and national origin distinctions continued year after year" (Para. 83).

"There were also comments about a caste system depending on the national origin of immigrants. Black immigrants and immigrants from countries that are deemed Black are preferred. There is also a preference for dark skin color if someone is not Black" (Para. 84).

"Professor Reyes has been subjected to the constant message that Black professors who discriminate against her perceive her as a White Latina and place that label on her to denote that she is not Black in the Black-White binary of race that they promote" (Para. 97).

"Another constant message Professor Reyes gets is that Black ancestry is superior, that Blacks have a superior right to life in the United States than Latinos, and that she is supposed to accept inferior status, including by accepting the discrimination, disparate treatment, and hostilities without complaining" (Para. 98).

[The records of investigations] "show the deep racial hatred against Professor Reyes and how turning Professor Reyes into a 'dangerous White Latina' conjures up race-based group frenzy, including workplace mobbing" (Para. 108).

"The RPT Committee members who participated in the review and vote on Professor Reyes's 2018 application for promotion to full professor carried the discriminatory animus from the tenured process and their escalation of hostilities into the promotion process" (Para. 178).

Running as a theme through Professor Reyes's Complaint is that many colleagues and administrators have made an issue of the difference between them and her with respect to race, skin color, and heritage. They have accentuated this elemental difference, describing her as "White appearing," "White Latina," and "white Latin or Hispanic" (Paras. 97, 111).

Many professors in a minority situation defined by sex, race, or ethnicity, try to stay under the radar, lie low, and show quiet deference to the majority. Professor Reyes does not appear to be that kind of professor. She is not a shrinking violet. She is proud of her Hispanic identity and champions the cause of civil rights for Hispanic Americans. She is the faculty advisor of the Hispanic American Law Students Association (HALSA) in the FAMU College of Law (Para. 126). She opposes race discrimination against Hispanic/Latina/o students (Para. 85-91). I would hypothesize that her outspokenness in support of Hispanic issues, representation, and students in this predominantly African-American College of Law is a major reason why some colleagues, both women and

men, have coalesced into a movement against her, a movement that says to her in subtle and unsubtle ways, "You do not belong here," "this is a Black school" (Para. 83). Undoubtedly, of course, other factors have also contributed.

## My Letter to President Robinson and Provost Watson

My goal, as a researcher of workplace mobbing, is not just to understand this horrific social process but to remedy its ill effects and reduce its incidence, thereby to lessen needless human suffering and increase the productivity and livability of workplaces. My goal is to make life better for all concerned.

Provost Watson's letter of intent to dismiss Professor Reyes brings into focus all the lesser aggressions Reyes recounts in her Complaint. Now it is obvious to all that those lesser aggressions were part of a package, preludes leading up to the culminating aggressive act, official elimination from the faculty.

In an effort to forestall such an unfair and tragic event, I wrote a letter to FAMU President Robinson and Provost Watson on 13 March 2024. The letter is a fitting summary and conclusion of this report:

> Dear President Robinson and Provost Watson:
>
> I am a researcher of workplace conflict, especially in universities. In Canada, the United States and Europe, I have been called the world's leading authority on academic mobbing.
>
> The open letter of the FAMU Hispanic American Law Student Association, with respect to your intent to dismiss Professor Maritza Reyes from the faculty, has come to my attention. It has led me to begin studying this conflict.
>
> I am writing to urge you to slow down, to take time to compare the Reyes case with other dismissal cases at FAMU and elsewhere, to seek advice from top-flight lawyers far removed from local campus politics, and to be careful not to take precipitous action that may do more harm than good.

To any expert on workplace conflict, what leaps out from the HALSA letter is hastiness of decision amidst uproar. The dismissal letter, dated 16 February 2024, is based on emails Professor Reyes sent two weeks earlier to colleagues and students in the College. These were part of a flurry of emails circulated in the College by numerous faculty and students. The apparent impetus was the high failure rate of FAMU law grads on the Florida bar exams, the stepping down of Dean Deidré Keller, Professor Keller's circulation of her accusatory letter of resignation, and the attendant embarrassing publicity in the Tallahassee Democrat.

Any outside expert would advise you to slow down and let the dust settle from current conflict in the College before initiating dismissal proceedings against any of the protagonists – proceedings that may look suspiciously like scapegoating one person for collective problems.

I would refer you to my commentary on the widely publicized dismissal case of Professor Scott Gerber from the College of Law at Ohio Northern University, and to the earlier dismissals I discuss there of Professors Therese Warden and Uhuru Watson from Medaille College.

Best wishes in meeting all the challenges of governing FAMU in this tempestuous time, and in particular, in solving rather than exacerbating the problems in your College of Law.

Respectfully,

*Kenneth Westhues*

Kenneth Westhues, 31 March 2024

**Appendix A**

**Some of the main books, articles, and research reports about workplace mobbing. This list is reproduced from the paper by Dr. Qingli Meng, Niagara University, distinguishing *mobbing* from the related concept of *bullying,* presented at the Annual Meeting of the American Society of Criminology, Philadelphia, November 2023.**

Alderson, A.D., & Fahir İz. (1990). The Oxford English-Turkish Dictionary. ABC Publishing.

Beckmann, C. A., Cannella, B. L., & Wantland, D. (2013). Faculty perception of bullying in schools of nursing. Journal of Professional Nursing, 29(5), 287–294. doi:10.1016/j.profnurs.2012.05.012.

Behr, R. (2010). Almost everything you know is wrong: Review of Being wrong: Adventures in the margin of error. The Observer.

Coleman, B. (2004). Pragmatism's Insult: The Growing Interdisciplinary Challenges to American Harassment Jurisprudence. Employee Rights and Employment Policy Journal, 8(4), 239-314.

Crawford, C. M. (Ed) (2020). Confronting Academic Mobbing in Higher Education: Personal Accounts and Administrative Action. Editor. A volume in the Advances in Higher Education and Professional Development (AHEPD) Book Series. IGI Global.

Davenport, N., Schwartz, R. D., and Elliott, G. P. (1999). Mobbing: Emotional Abuse in the American Workplace. Ames, IA: Civil Society Publishing.

Duffy, M. (2009). Preventing workplace mobbing and bullying with effective organizational consultation, policies, and legislation. Consulting Psychology Journal: Practice and Research, 61(3), 242–262. doi:10.1037/a0016578.

Duffy, M., & Sperry, L. (2007). Workplace mobbing: Individual and family health consequences. The Family Journal (Alexandria, Va.), 15(4), 398–404. doi:10.1177/1066480707305069.

Einarsen, S., Hoel, H., & Notelaers, G. (2009). Measuring exposure to bullying and harassment at work: Validity, factor structure, and psychometric properties of the Negative Acts Questionnaire-Revised. Work and Stress, 23(1), 24–44. doi:10.1080/02678370902815673.

Faria, J. R., Mixon. Jr, F. G, & Salter, S. P. (2012). An economic model of workplace mobbing in academe. Economics of Education Review, 31(5), 720–726. doi:10.1016/j.econedurev.2012.04.004.

Friedenberg, J. H. (2008). The Anatomy of an Academic Mobbing. Hammerly Memorial Lecture given at the University of Waterloo on April 11, 2008. The event was co-sponsored by the Department of Sociology and the Program in Peace & Conflict Studies, and supported by a bequest from the estate of Hector Hammerly (1935-2006), late Professor of Linguistics at Simon Fraser University, Burnaby, BC.

Girard, R. (2001). I See Satan Fall Like Lightning. Maryknoll, NY: Orbis.

Ginsberg, B. (2011). The Fall of the Faculty: The Rise of the All-Administrative University and Why It Matters. New York: Oxford University Press.

Glendinning, P. M. (2001). Workplace bullying: Curing the cancer of the American workplace. Public Personnel Management, 30(3), 269–286. doi:10.1177/009102600103000301.

Gravois, J. (2006). Mob Rule: In departmental disputes, professors can act just like animals. Chronicle of Higher Education, 52(32), A10.

Harper, J. (2020). Bullied by the best: why the bully paradigm is a bad fit for understanding the mob. In C. M. Crawford (Ed.), Confronting Academic Mobbing in Higher Education: Personal Accounts and Administrative Action (pp. 29-43). IGI Global.1

Harper, J. (2013a). Surviving workplace mobbing: Identify the stages. Retrieved on January 19, 2019, from https://www.psychologytoday.com/us/blog/beyond-bullying/201303/surviving-workplace-mobbing-identify-the-stages

Harper, J. (2013b). Mobbed! What to Do When They Really Are Out to Get You. Tacoma: Backdoor Press.

Hodgins, M., & McNamara, P. M. (2017). Bullying and incivility in higher education workplaces: Micropolitics and the abuse of power. Qualitative Research in Organizations and Management, 12(3), 190–206. doi:10.1108/QROM-03-2017-1508.

Housker, J. E., & Saiz, S. G. (2006). Warning: Mobbing is legal, work with caution. Retrieved on January 21, 2019, from https://www.counseling.org/resources/library/vistas/vistas06_online-only/Housker.pdf.

June, A. W. (2009). "Mobbing" can damage more than careers, professors are told at conference. Retrieved from https://www.chronicle.com/article/Mobbing-Can-Damage-More-Than/47736.

Keashly, L., & Neuman, J. H. (2010). Faculty experiences with bullying in higher education: Causes, consequences, and management. Administrative Theory & Praxis, 32(1), 48–70. doi:10.2753/ATP1084-1806320103.

Khoo, S. B. (2010). Academic mobbing: Hidden health hazard at the workplace. Malaysian Family Physician, 5(2), 61–67. PMID:25606190.

Kvinnoforum (Foundation of Women's Forum), 2004. Status Report on Mobbing in the Workplace in Sweden. Daphne programme: Preventive Measures to Fight Violence against Children, Young People and Women, European Commission, Author, Sweden.

Leymann, H. (2000). The Mobbing Encyclopedia. (Files: 32100e, 32111e, 32120e, 32130e, 32170e, 32210e), http://www.leymann.se/English.

Leymann, H., & Gustafsson, A. (1996). Mobbing at work and development of post-traumatic stress disorders. European Journal of Work and Organizational Psychology, 5(2), 251-275.

Leymann, H. (1996). The Content and Development of Mobbing at Work. European Journal of Work and Organizational Psychology, 5(2), 165-184.

Leymann, H. (1993). Mobbing—Psychoterror am Arbeitsplatz und wie man sich dagegen wehren kann [Mobbing—psychoterror in the workplace and how one can defend oneself]. Reinbeck, Germany: Rowohlt.

Leymann, H. (1990). Mobbing and Psychological Terror at Workplaces. Violence and Victims, 5(2), 119-126.

Leymann, H. (1987). Självmord till följd av förh llanden i arbetsmiljön. Arbete, människa, miljö, 3, 155-169 [as summarized in Leymann 1990].

Lutgen-Sandvik, P., & Tracy, S. J. (2011). Answering five key questions about workplace bullying: How communication scholarship provides thought leadership for transforming abuse at work. Management Communication Quarterly, 26(1), 3–47. doi:10.1177/0893318911414400.

Martin, J. L., & Beese, J.A. (2018). Disappearing feminists: Remaining critical voices from academe. Forum on Public Policy Online, 1(22). Abstract retrieved from Walden University Library Databases.

McDonald, T. W., Stockton, J. D., & Landrum, R. E. (2018). Civility and academic freedom: Who defines the former (and how) may imperil rights to the latter. The College Quarterly, 21(1), n1. Retrieved from https://collegequarterly.ca/2018-vol21-num01-winter/civility-and-academic-freedom-who-defines-the-former-and-how-may-imperil-rights-to-the-latter.html

McDonald, T.W., Begic, S., & Landrum, R.E. (2020). The role of passive evil in perpetuating downward academic mobbing. In C. M. Crawford (ed.), Confronting Academic Mobbing in Higher Education: Personal Accounts and Administrative Action (pp. 44-67). IGI Global.

McKay, R., Arnold, D. H., Fratzl, J., & Thomas, R. (2008). Workplace bullying in academia: A Canadian study. Employee Responsibilities and Rights Journal, 20(2), 77–100. doi:10.100710672-008-9073-3.

Meiyun, F. U., Huawei, M. A., & Guoan, Y. U. E. (2014). Bystanders in workplace bullying: Roles, behaviors, and influence mechanism. Advances in Psychological Science, 22(6), 987–994. doi:10.3724/SP.J.1042.2014.00987.

Metzger, A. M., Petit, A., & Sieber, S. (2015). Mentoring as a way to change a culture of academic bullying and mobbing in the humanities. Higher Education for the Future, 2(2), 139–150. doi:10.1177/2347631115584119.

Namie, G. (2017). Workplace Bullying Institute U.S. Workplace Bullying Survey: September 2007 report. Retrieved from http://workplacebullying.org/multi/pdf/WBIsurvey2007.pdf.

Namie, G., & Namie, R. (2011). The bully-free workplace: Stop jerks, weasels and snakes from killing your organization. Hoboken, NJ: John Wiley and Sons, Inc.

Namie, G., & Namie, R. (2003). The bully at work: What you can do to stop the hurt and reclaim your dignity on the job. Naperville, IL: Sourcebooks.

Namie, G., & Namie, R. (2001). Workplace bullying. https://workplacebullying.org/. Accessed 10 November 2023.

Namie, G., & Namie, R. (2000). The Bully at Work. Amazon (USA), Chapters (Canada), or by mail from Devon, UK: Roundhouse Publishing.

Parker, K. A. (2014). The workplace bully: The ultimate silencer. Journal of Organizational Culture, Communications, and Conflict, 18(1), 169–185.

Pheko, M. M. (2018a). Authethnography and cognitive adaptation: Two powerful buffers against the negative consequences of workplace bullying and academic mobbing. International Journal of Qualitative Studies on Health and Well-being, 13(1), 1–12. doi:10.1080/17482631.2018.1459134.

Pheko, M. M. (2018b). Rumors and gossip as tools of social undermining and social dominance in workplace bullying and mobbing practice: A closer look at perceived perpetrator motives. Journal of Human Behavior in the Social Environment, 28(4), 449–465. doi:10.1080/10911359.2017.1421111.

Pompili, M., Lester, D., Innamorati, M., De Pisa, E., Iliceto, P., Puccinno, M., Nastro, P.F., Tatarelli, R., Girardi, P. (2008). Suicide risk and exposure to mobbing. Work, 31(2), 237-243.

Prevost, C., & Hunt, E. (2018). Bullying and mobbing in academe: A literature review. European Scientific Journal, 14(8), 1–15. doi:10.19044/esj.2018.v14n8p1.

Ross, D. B., & Sasso, M.T. (2020). Narcissistic and Sociopathic Leadership and the World of Higher Education: A Place for Mentoring, Not Mobbing. Chapter 4 in Confronting Academic Mobbing in Higher Education: Personal

Accounts and Administrative Action. Edited by Crawford, C. M. A volume in the Advances in Higher Education and Professional Development (AHEPD) Book Series. IGI Global.

Samier, E. (2008). The problem of passive evil in educational administration: Moral implications of doing nothing. International Studies in Educational Administration, 36(1), 2–21.

Scott, H. S. (2018). Extending the Duluth Model to workplace bullying: A modification and adaptation of the Workplace Power-Control Wheel. Workplace Health & Safety, 66(9), 444–452. doi:10.1177/2165079917750934 PMID:29582701.

Segal, L. (2010). The injury of mobbing in the workplace. Conflict Remedy. Retrieved from

https://conflictremedy.com/the-injury-of-mobbing-in-the-workplace/.

Seguin, E. (2016). Academic mobbing, or how to become campus tormentors. University Affairs. Retrieved from

https://www.universityaffairs.ca/opinion/in-my-opinion/academic-freedom-and-the-faith-based-university/.

Sepler, F. (2015). Workplace bullying: What it is and what to do about it. Journal of Collective Bargaining in the

Academy,0 (10), Article 42. Retrieved from http://thekeep.eiu.edu/jcba/vol0/iss10/42.

Staub, S. (2015). Mobbing in academia: Case analysis. International Journal of School and Cognitive Psychology, 2(2), 121. doi:10.4172/2469-9837.1000121.

Twale, D. J., & De Luca, B. M. (2008). Faculty incivility: The rise of the academic bully culture and what to do about it. San Francisco, CA: Jossey-Bass.

Tigrel, E.U., & Kokalan, O. (2009). Academic mobbing in Turkey. International Journal of Social Behavioral, Educational, Economic, Business and Industrial Engineering, 3(7), 1473-1481.

Vega, G., & Comer, D. R. (2005). Sticks and stones may break your bones, but words can break your spirit:  Bullying in the workplace. Journal of Business Ethics, 58(1-3), 101–109. doi:10.100710551-005-1422-7.

Westhues, K. (2006). The envy of excellence: Administrative mobbing of high-achieving professors. Lewiston, NY: Edwin Mellon Press.

Westhues, K. (2004). Workplace Mobbing in Academe: Case Studies and Analyses. The Edwin Mellen Press.

Westhues, K. (2003). The mobbings at Medaille College in 2002. New York Academe, 30 (1), 8-10

Westhues, K. (2002). Administrative Mobbing at the University of Toronto: The Trial, Degradation and Dismissal of a Professor During the Presidency of J. Robert S. Prichard. The Edwin Mellen Press.

Westhues, K., & Jansen, S.D. (1999). Eliminating professors: A guide to the dismissal process. The Canadian Journal of Higher Education, 29(2/3), 216.

Westhues, K. (1998). Eliminating Professors: A Guide to the Dismissal Process. Lewiston, NY: Edwin Mellen Press.

Yamada, D. C. (2004). Crafting A Legislative Response to Workplace Bullying. Employee Rights and Employment Policy Journal, 8, 475-516.

Yildirim, A., & Yildirim, D. (2007). Mobbing in the workplace by peers and managers: Mobbing experienced by nurses working in healthcare facilities in Turkey and its effect on nurses. Journal of Clinical Nursing, 16(8), 1444-1453. doi:10.1111/j.1365-2702.2006.01814.x.

Young, K. Z. (2017). Workplace bullying in higher education: The misunderstood academicus. Practical Anthropology, 39(2), 14–17. doi:10.17730/0888-4552.39.2.14.

Zapf, D., Knorz, C., & Kulla, M. (1996). On the relationship between mobbing factors, and job content, social work environment, and health outcomes. European Journal of Work and Organizational Psychology, 5(2), 215–237. Reviewdoi:10.1080/13594329608414856.

*CURRIULUM VITAE* – SCHOLARSHIP ON WORKPLACE MOBBING

2024

**Kenneth Westhues**

Professor Emeritus, Sociology & Legal Studies
University of Waterloo, Canada

Contact information: Email (preferred):    kwesthue@uwaterloo.ca
Telephone:              905-353-9602
Post:                      5419 River Road, Niagara Falls, Ontario
L2E3H1
Website:  http://www.kwesthues.com (includes full text of many recent publications, and
about a dozen in Spanish translation)

---

**Accolades**

"the world's leading authority on academic mobbing" – Peter W. Wood, President,
National Association of Scholars, USA, 2023. SOURCE

"der weltweit renommierteste Experte für Mobbing an Hochschulen – *Republik
magazine,* Switzerland, 2019. SOURCE

"a renowned scholar in the area of mobbing in academia" – Carla Gunn, *University
Affairs,* Canada, 2010. SOURCE

"the world expert on mobbing in universities" – Hugo A. Meynell, FRSC, Hector
Hammerly Memorial Lecture, Canada, 2008. SOURCE

---

**Books about workplace mobbing**

Editor and contributor of prefaces to one Spanish and two English volumes, 2010-2016,
Heinz Leymann and A. Gustafsson, *Why Nurses Commit Suicide: Mobbing in Health
Care Institutions,* and Heinz Leymann, *Workplace Mobbing As Psychological Terrorism:*

*How Groups Eliminate Members*, translated by Sue Baxter, Edwin Mellen Press. Leymann Translation Project. MORE

Editor, *The Anatomy of an Academic Mobbing: Two Cases.* Lewiston, NY: Edwin Mellen Press, 2008. MORE

*The Remedy and Prevention of Mobbing in Higher Education*. Lewiston, NY: Edwin Mellen Press, 2006, 251 pp. Mostly my own writing, with seven chapters by others. MORE

Editor, *Winning, Losing, Moving On: How Professionals Deal with Workplace Harassment and Mobbing*. Lewiston, NY: Edwin Mellen Press, 2005, 198 pp. MORE

Editor, *Workplace Mobbing in Academe*. Lewiston, NY: Edwin Mellen, 2004, 410 pp. MORE

*The Envy of Excellence: Administrative Mobbing of High-Achieving Professors.* Lewiston, NY: Edwin Mellen Press, 355 pp. + nine *Essays in Response*, 129 pp. Preliminary Canadian edition published in 2003. MORE

*Eliminating Professors: a Guide to the Dismissal Process*. Lewiston, NY: Edwin Mellen Press, for the Robert Kempner Collegium, 1998, 220 pp. MORE

**Shorter publications about workplace mobbing**

2023  "The Mobbing of Scott Gerber: a lesson for Ohio Northern University from Medaille University," on kwesthues.com. ONLINE
2022  "Woke vs Widdowson," on kwesthues.com. ONLINE
2022  "RIP Tomas Hudlicky, Professor of Chemistry and Canada Research Chair at Brock University," on kwesthues.com.  ONLINE
2022  "The nefarious role of a psychiatrist in the 2008 mobbing of Denis Rancourt, exposed at last in 2022," on kwesthues.com. ONLINE
2021  "Academic mobbing: state of the field in 2021," newsletter of the Society for Academic Freedom and Scholarship, April. ONLINE
2021  "Three stories and five questions arising from research on academic mobbing," *Beiträge zur Hochschulforschung,* Ausgabe 1-2, 118-127. ONLINE

2021  "Mobbing and hierarchies in academia," lecture, Max Planck Institute for Brain Research, 27 September. ONLINE

2020  "Update to *The Envy of Excellence*, two decades later," on kwesthues.com ONLINE

2019  "Making fast work of Ricardo Duchesne," on kwesthues.com. ONLINE

2019  "The Mobbing of Marcella Carollo, a female Italian astronomer," *Republik* 26 February 2019. ONLINE

2018  "The latest, 2018, report on recent advances and applications," on kwesthues.com. ONLINE

2016  "Youtube Videos for Grad Students: Risks of Enrolling for an Advanced Degree,"
on    kwesthues.com, June. ONLINE

2015  "The Scandal in Dalhousie Dentistry Seen through Five Different Lenses,"
presented at the Annual Meeting of the Society for Academic Freedom & Scholarship, 9
May,  Western University, London, ON. Published in the Society's *Newsletter*. ONLINE

2014  "Tom Flanagan's Finest Hour," on kwesthues.com, August. ONLINE

2014  "Virtual Mobbing and Mellen Press," on kwesthues.com, May. ONLINE

2013  "Modern vs. Postmodern Discourse, a Useful Distinction Regifted," on kwesthues.com in January, reprinted by *The American Conservative, La Tercera Cultura, A Voice for Men*, and others online. FULL TEXT

2013  "El Mobbing en el ámbito académico," en Florencia Peña Saint Martin, coord*., Develar al mobbing. Asegurar la dignidad en las organizaciones I (México D. F., EÓN). AQUÍ*

2012  Foreword, pp. vii-ix, to Maureen Duffy and Len Sperry, *Mobbing: Causes, Consequences, and Solutions* (Oxford University Press). HERE

2011  "El Mobbing y Cefaleas en Racimo – Historia Personal" "and related lectures, keynote presentation at the First Ibero-American Congress on Harassment at Work, Mexico City, also as part of a short course on workplace mobbing preceding the congress, sponsored by the National School of Anthropology and History.

2010  (with Joan Friedenberg and Mark Schneider) "Addressing Workplace Mobbing Situations in Consulting and Organizational Psychology," presented at the 118th Annual Meeting of the American Psychological Association, San Diego, August 12. Subsequently published on psychologistethics.net and mathforum.org, also HERE

2010  "Peltzing in Arkansas," a collection of papers by Joan Friedenberg, Richard Peltz, Mark Schneider and me presented at the Annual Meeting of the Association of American Law Schools, New Orleans, January. HERE

2009  "Ottawa's Dismissal of Denis Rancourt" HERE, "The Ouster of John Elliotson from University College London in 1838" HERE, and "A Story from the Rubber Room: Review of George L. Colon, *Confessions of a Rogue Teacher*" HERE.

2008  "Critiques of the Anti-Bullying Movement and Responses to Them," paper presented at the 6th International Conference on Workplace Bullying, Montreal, 5 June. HERE

2007  "Mobbing: a Natural Fact," lecture to the Graz Sociological Society, 23 January; abridgment in English available HERE

2007  "Alternative Policies on Workplace Decency," workshop presented to a joint meeting of employer, employee, and insurance representatives at The Council, Toronto, 23 April; now available HERE

2007  "Panel must explore in depth killer's experiences at school," *Richmond Times-Dispatch,* 24 August. Available online with related essays on the Virginia Tech massacre. HERE

2007  "Test yourself: Is It Bullying or Mobbing That Interests You More?" HERE "Math Profs Get Mobbed" HERE, and "Honor Roll – Ten Recent Articles on Mobbing in Academe," HERE, essays added to kwesthues.com along with updates of other webpages and a revision of my 2005 conference paper, "The Waterloo Strategy for Prevention of Mobbing in Higher Education" HERE.

2006  "Ten Choices in the Study of Workplace Mobbing or Bullying," Paper, Fifth International Conference on Workplace Bullying, Trinity College, Dublin, 15-17 June. HERE

2006  "The Unkindly Art of Mobbing," *Academic Matters* (fall 2006), pp. 18-19. HERE Reprinted as "El cruel arte del acoso psicológico" in F. Peña and S. Fernández, eds., *Mobbing en la academia mexicana* (ENAH 2016), and elsewhere.

2006  "Stephen Berman: Scapegoat," HERE

2006  "A Checklist of Mobbing Indicators," on kwesthues.com, reprinted on various blogs, also    in Sylvie St-Onge *et al., Relever les défis de la gestion des ressources humaines. HERE

2006  "Response to the Hammerly Essay on Mobbing," part of the collection of pages in memory of the late professor at Simon Fraser University, HERE

2006 "Background: the Story behind the Story – 'Mob Rule' in *The Chronicle*," the mainpage of the compilation of background and feedback on the Gravois article of 10 April, HERE

2006 "Twenty Academic Mobbing Cases, 2005-2006," UPDATED HERE

2006 "Sham Peer Review in Medicine," HERE

2006 "Defensible Eliminations," HERE

2006 "The Waterloo Strategy for Prevention of Mobbing in Universities," paper presented in the session on "Institutional Power and Equity (or Fairness): Taming Academic Imperialism." This session was sponsored jointly by the Canadian Societies for the Study of Education, Higher Education, and Educational Administration. Congress of the Canadian Federation of Humanities and Social Sciences, University of Western Ontario, London, 29 May. *Remedy and Prevention…* (2006) concludes with this paper. HERE.

2005 "Punishing academics for speaking out harms us all," opinion, *The Record*, 3 March.
    2004    "Preface" to E. Cavina, *Mobbing: Università & Ospedale* (Maria Pacini Fazzi), pp. 6-11.

2004 "The Deepening Crisis at Medaille College," *New York Academe* 31, Winter, pp. 1-2 (circulated initially in mid-2003). Reprinted in *Remedy and Prevention…,* 2006.

2004 "Conductor's firing was workplace mobbing," opinion, *The Record*, 26 July.

2003 "The Medaille Mobbings: Part Two," paper in the symposium, "The Crisis in Academic Freedom," Daemon College, Buffalo, NY, 8 March. In *Remedy and Prevention…* (2006).

2003 "The Mobbings at Medaille College in 2002," *New York Academe* 30, Winter, 1, 8-10. Circulated to trustees and senior officials of the college in 2002, later on the NY AAUP website, also in *Workplace Mobbing...* (2004) and *Remedy and Prevention…* (2006).

2002 "At the Mercy of the Mob," *Occupational Health and Safety (OHS) Canada* 18, December, pp. 30-36. Named one of the ten best articles of the year by the Canadian Business Press. Reprinted in *Workplace Mobbing in Academe* (2004). HERE

2002 "To Appease or Not: in Memory of Richard Henshel (1938-1997)," at the international conference, "Academic Freedom: U.S. and Canadian Perspectives," held at Medaille College, Buffalo, NY, 20-21 September 2002. The conference

was sponsored jointly by the college and the National Association of Scholars. HERE

2002   "Postmodernism, Political Correctness, and the Attacks of September 11." Paper presented at the annual meeting of the Society for Academic Freedom & Scholarship, London, May, later published on several websites and summarized in the *SAFS Newsletter* (September). HERE

2001   "SAFS and the Darker Forces," *Newsletter of the Society for Academic Freedom and Scholarship* No. 29, September, pp. 1-3. HERE

2001   "Workplace Fears of Murder Fed by Media Propaganda," *The Record*, 17 February.

2001   "Of Arbitration, Litigation, and Snowball Fights," *FAUW Forum* No. 107, April.

2001   "'The Difficult Professor': a Pernicious Concept," critique (collaborating with Davenport, Hammerly, Klatt, Mueller) for CAUT's Legal Conference, 2-3 March, Ottawa. HERE

2001   Review of R. Girard, *I See Satan Fall Like Lightning,* in *Catholic New Times*, 16 December. HERE

2000   "Beyond Liability: a Role for Responsible Management," address at the conference, "Workplace Bullying 2000: Redefining Harassment," Oakland, California, January.

1999   "A Test of the Biopolitics Hypothesis," *Sexuality & Culture* 3 (volume title: *The Politics of Sexuality*): 69-100.

1999   "Update on the Case of Dr. Ewa Lipczynska," published on the web at http://www.math.uwaterloo.ca/~shallit/lip1.html

1999   "Mobbing, Bullying, and Workplace Nastiness" (commentary on six books), *Good Work News* (Issue 58, September).

1997   Review of C. Bly, *Changing the Bully Who Rules the World*, in *Catholic New Times*, 30 March. HERE

1996   Review of S. P. Oliner and P. M. Oliner, *The Altruistic Personality: Rescuers of Jews in Nazi Europe*, in *Catholic New Times*, 28 April. HERE

**Workshops and oral presentations on workplace mobbing**

Kingston, ON, Queen's University, sponsored by the faculty association, 28 November 2012.

Toronto, ON, York University, Centre for Human Rights, 18 March 2010.

Waterloo, ON, conference for health professions on organizational ethics, 2009.

Waterloo, ON, conference on work-related stress, Suicide Prevention Council, 29 October 2009.

Belleville, ON, Loyalist College, jointly by union and administration, 27-28 November 2008.

Jacksonville, FL, University of North Florida, sponsored by the faculty union, 19 February 2008.

Toronto, ON, Ryerson University, sponsored by the faculty association, 8 March 2007.

Mount Forest, ON, North Wellington Health Care, 22 June 2007.

Port Huron, MI, St. Clair County Community College, senior administration, 9 June 2006.

Kitchener, ON, Canadian Organization of Symphony Musicians, 5 August 2005.

Buffalo, NY, Coalition of Faculty Associations of Western NY, 18 September 2004.

Charlottesville, VA, Virginia Association of Scholars, 13 November 2004.

Brisbane, Queensland, keynote at conference on workplace mobbing, 13-15 October, 2004.

Guelph, ON, Wellington County Public Sector Consortium, March 2003.

Guelph, ON, Guelph Chapter of OPIRG, 19 June 2003.

Toronto, ON, Humber College postgrad program in HRM, 16 January 2002.

Guelph, ON, Guelph Chapter of HRM Association of Ontario, 14 November 2002.

London, ON, Ontario Nurses Association locals, 7 November 2002.

London, ON, colloquium on star chambers, King's College, Western Univ., 23 January 2002.

Whistler, BC, College Institute Educators Assn. of BC, 25 May 2001.

Toronto, ON, provincial coordinators, Ontario Nurses Association, 14 December 2001.

Toronto, ON, ONA legal and administrative staff, 14 December 2001.

Waterloo, ON, Waterloo Rotary Club, 24 April 2001.

Waterloo, ON, new recruits, Waterloo Regional Police Service, 27 July 2000.

Fulton, MO, lecture on social elimination, Westminster College, November 1998.

Osage Beach, MO, AGM keynote, MO Sociological Assn, November 1998.

London, ON, colloquium on intolerance, Western Univ. sociology dept., November 1994.


**Testimony as expert witness**

2018   For *pro se* complainant physician in the UK, written commentary.

2017   For Norton Rose Fulbright Canada LLP, Ottawa, written assessment.

2017   For McCarthy Tétrault LLP, Toronto, written assessment.

2017   For *pro se* defendant physician in Ontario, written assessment.

2016   For *pro se* defendant physician in Alberta, written assessment.

2016   For *pro se* defendant physician in Nova Scotia, written assessment.

2014   For Gowlings, Ottawa, conflict involving a university administrator, written assessment..

2014   For Gowlings, Calgary, conflict involving a physician, written assessment.

2014   For Cavalluzzo, Toronto, grievance arbitration, OECTA v. school board, written submissions in July, oral examination and cross-examination, 11 November.

2013   For Johnston & Smith, Columbia, MO, professor's lawsuit against university, written assessment, deposition in February.

2013   For Johnston & Smith, Columbia, MO, academic administrator's lawsuit against university, written assessment, deposition in February.

2010   For Jude & Jude, Hattiesburg, MS; case in U. S. District Court, Chauncey M. Depree v. University of Southern Mississippi; written testimony in March, deposition in June.

2010   For Graham & Dunn, Seattle, WA; professor's lawsuit against university, written analysis only, June.

2008   For Raven, Cameron, Ballantyne & Yazbeck, Ottawa, grievance arbitration in the Public Service of Canada; written testimony only, 8 February.

2001   For Doug Christie, case in British Columbia Supreme Court, Vancouver, J. Osborne v. H. Hammerly; written testimony on 12 January, oral examination on 6 April.

2001   For a former professor at the University of Waterloo, her *pro se* case in the Ontario Court of Justice against administrators there, written testimony in 2000.


Five or six other cases in which I initially accepted a request to write an assessment of a conflict, but concluded, on review of documentation, that the research on mobbing did not apply.


**Conference organizing**

Member of the scientific committee for the Conference on Workplace Mobbing, Niagara University, Niagara Falls NY USA, scheduled for 21-23 July 2024. Chair of the committee is Richard Peltz-Steele, Registrar is Qingli Meng.

Member of the scientific committee for the 6th International Conference on Workplace Bullying, Montreal, 4-6 June 2008.

Appointed by the National Association of Scholars (U.S.) to the organizing committee (with B. Smith, H. Klatt, and W. Block) for a conference on political correctness in memory of Richard Henshel, held at Medaille College, Buffalo, NY, 20-22 September 2002.

**Citation in research literature**

A compilation of about 60 recent articles in academic journals that discuss or refer to my work is available online (HERE). Reflecting the interdisciplinary character of research on workplace mobbing, these journals are in psychology, law, education, medicine, public administration, nursing, and other fields.

---

**Career context**

Mobbing emerged as my principal research focus over the past 25 years, against a background of scholarship on work, organizations, and institutions.

From 1988 to 2015, I was on the Board of Directors of The Working Centre, a major nonprofit community organization in Kitchener, published a little book about in 1995, and contributed a foreword to the latest book about it, *Transition to Common Work* (Wilfrid Laurier University Press, 2015) by founders Joe and Stephanie Mancini.

I am author or editor of some dozens of articles and about ten books in other areas, from the sociology of religion to the history of the Boone's Lick region of Missouri. My books include two foundational volumes on my academic discipline: *First Sociology* (McGraw-Hill, 1982), and *Basic Principles for Social Science in Our Time* (St. Jerome's University Press, 1987).

**Biodata.** Born 1944, Missouri. Citizen of U.S.A. by birth and of Canada by naturalization in 1976. Married since 1972 to Anne Westhues, Professor Emerita of Social Work at Wilfrid Laurier University. We have one son, Jonathan Westhues, an electrical engineer.

**Schooling.** B.A. in philosophy, Conception College (Missouri), 1966; M.A. in sociology, Vanderbilt University, 1968; Ph.D. in sociology, Vanderbilt University, 1970. Nondegree study at the University of Colorado (1965), l'université de Montpelier (1971), CIDOC Mexico (1978).

**Academic appointments.** Professor, University of Waterloo, 1983-2011; Associate Professor, 1975-83; department chair, 1975-78. Assistant to Associate Professor with tenure, University of Western Ontario, 1972-75. Assistant Professor, University of Guelph, 1970-72. Lecturer to Assistant Professor, Fordham University, 1969-70. Visiting appointments at Universität Graz (Austria), 2006-07 and 1991-92; Memorial University of Newfoundland, 1982-83; Fordham University, 1979-80.

Tab 86

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

     Plaintiff,

v.                    CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

     Defendant.

_____

**PLAINTIFF'S NOTICE OF FILING RECORDINGS AND TRANSCRIPTS IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

     Plaintiff, Maritza Reyes, hereby files the recordings and transcripts listed below in support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law.

1. **Defendant/FAMU Division of Audit and Compliance Audio Recordings**

   a. College of Law Professor John Duncan

   b. College of Law Program Assistant Evett Collins

   c. College of Law Program Assistant Celia Westbrook

   d. College of Law Program Assistant Doranne Riggio

   e. College of Law Professor Phyllis Taite

   f. College of Law Professor Joe Grant

   g. College of Law Program Assistant Celia Westbrook (2nd Recording)

   h. College of Law Professor Maritza Reyes

2. **Defendant/FAMU Surveillance Video Recordings**

    a. February 9, 2015 - IT & Registrar Offices

    b. April 15, 2015 – Faculty Conference Room

    c. February 24, 2016 – Faculty Conference Room

    d. May 6, 2019 – First Floor Elevator Atrium

    e. May 6, 2019 – Third Floor Elevator Library/Faculty Suite Entrance

    f. January 15, 2020 – Faculty Conference Room

    g. January 13, 2022 – First Floor Elevator Atrium

3. **Deposition Transcripts**

    a. College of Law Professor LeRoy Pernell – May 9, 2024 (40 Exhibits)

    b. College of Law Professor Patricia Broussard – May 16, 2024 (29 Exhibits)

    c. Plaintiff Maritza Reyes – May 24, 2024 (11 Exhibits)

    d. FAMU President/Dr. Larry Robinson – June 20, 2024 (37 Exhibits)

Respectfully submitted this 12th day of August, 2024.

/s/ Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 12, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff

Tab 92

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARITZA REYES,**

      **Plaintiff,**

**v.**                        **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

      **Defendant.**
_____

**PLAINTIFF'S TIME-SENSITIVE NOTICE REGARDING PLAINTIFF'S RESPONSE AND DECLARATION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, Maritza Reyes, filed Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment on August 19, 2024. (Doc. 91). Plaintiff hereby files this Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment to inform the Court of exigent circumstances that may negatively impact the outcome of her case if the Court is not made aware of them.

1.      Starting on July 17, 2024, Plaintiff sought relief from this Court through time-sensitive and emergency unopposed motions for extension of time to respond to Defendant's Motion for Summary Judgment. (Docs. 79, 82, 87). The Court granted relief. (Docs. 80, 83, 89). On August 13, 2024, the Court gave Plaintiff until August 19, 2024 to file her Response. (Doc. 89).

2.      As she was preparing her materials, Plaintiff had medical issues with her eyesight which Plaintiff attributed to eye strain due to long hours working on the computer. She

was also suffering from a migraine headache.[1] Plaintiff put drops in her eyes and continued working. However, her vision worsened and became drastically impaired by Monday, August 19, 2024, to the point of partially losing vision in one eye and having blurry vision in the other one. This medical issue also happened unexpectedly a year before and two years before. Plaintiff was treated for the medical issue at the time. Plaintiff now wears glasses prescribed specifically for computer use.

3.      On August 19, 2024, Plaintiff was basically incapacitated and could not even prepare an emergency motion, which would have been the only way to communicate with the Court and seek relief by way of an emergency request for an extension of time.[2] Rather than miss the Court's August 19, 2024 deadline altogether, Plaintiff made the emergency decision to file her draft Response, which needed final edits, to avoid having the Court deem the Motion for Summary Judgment unopposed. However, Plaintiff was unable to submit her Declaration and supporting exhibits.

4.      After that, Plaintiff needed time to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work to finalize her Corrected Response and Declaration before communicating further with the Court through motion practice.

5.      On August 22, 2024, Plaintiff's ophthalmologist, who treated Plaintiff for the past two episodes with her eyesight and has continued treating her, told Plaintiff that she could resume computer use. However, Plaintiff's vision is still not back to her pre-episode

---

[1] Plaintiff has been treated for migraine headaches for the past couple of years.

[2] The Local Rules require that parties must seek relief by way of a motion. Middle District L.R. Rule 3.01(k).

normal. As she recovers, Plaintiff must pace her computer use and take breaks from the computer screen, sometimes for a day or two.

6.      On August 27, 2024, Plaintiff's primary care physician told Plaintiff that the issue with her eyes may have been caused or exacerbated by Covid.

7.      Plaintiff began to confer in good faith with Defendant's counsel about her medical issues on August 22, 2024, after she conferred with her ophthalmologist. At that time and since then, Plaintiff provided more information to Defendant's counsel about her medical situation, by email and by phone, than what she stated in this Notice. Plaintiff has been communicating with Defendant's counsel about the situation.

8.      On August 23, 2024, Defendant sent an email to Defendant's counsel stating:[3]

> I have been searching for a procedure for accommodations for lawyers or *pro se* parties who face medical issues during a lawsuit. Do you, Mr. Mitchell, or Ms. Reiner, know if any such procedures for accommodations exist? In your collective years of experience, have you come across a lawyer or *pro se* party who faced medical issues and needed accommodations during the litigation? If you have any information in this regard and provide it, I will greatly appreciate it.

9.      On August 24, 2024, Defendant's counsel replied that they are not aware of anything regarding accommodations and the issue has not come across in their practice.

10.    Plaintiff informed Defendant's counsel that she planned to move the Court to accept her Corrected Response and Declaration via a proper motion for this type of request. Plaintiff also informed Defendant's counsel that the corrections to her Response are mainly punctuation marks, outline numbers and consistent underlining of titles,

---

[3] Per Defendant's counsel's request, Plaintiff copies all attorneys (and assistants) assigned to Defendant's case in her communications with any of the attorneys. Defendant's attorneys also do the same (copy all of them).

Bluebook editing of the citations, citations to the Declaration and the record, page numbers at the bottom of the pages, and correct reference to Defendant's Motion for Summary Judgment (not Defendant's *Daubert* Motion) in the Conclusion section.[4]

11.     Plaintiff's Corrected Response and Declaration are crucial for her opposition to Defendant's Motion for Summary Judgment and her case overall. They will provide the Court with the record it needs to make a just summary judgment ruling on the merits of the evidence and the law.

12.     Plaintiff represented to Defendant's counsel that when she files her motion to seek the Court's relief, she will ask the Court to grant Defendant fourteen (14) days to file a reply.

13.     The last time Plaintiff contacted Defendant's counsel was August 26, 2024; she received an out of the office automatic reply. Plaintiff will again contact Defendant's counsel today to confer further about this situation.

14.     Plaintiff, in addition to finalizing her Corrected Response and Declaration, is also now preparing a substantive Motion to request the relief of having the Court accept her Corrected Response and Declaration beyond the deadline. Plaintiff is in the process of completing this work with limited time for computer use while allowing time to heal her eyes to avoid worsening her eyesight impairment. Plaintiff has permanent blurry vision at this time.

15.     Plaintiff has done her best to keep the Court apprised of the unexpected medical issues through her time-sensitive and emergency motions. The record in this case shows

---

[4] Plaintiff used the template for a prior response (her response to Defendant's *Daubert* Motion). By the point of Plaintiff's vision incapacity, she could not even read the document and make final edits.

that Plaintiff has followed the applicable rules, including not contacting the Court directly, by phone or email, about the exigent circumstances.[5]

16.     The next deadline in the Court's Case Management and Scheduling Order is October 2, 2024, the deadline to file "[a]ll other Motions, including Motions *in Limine*." (Doc. 26 at 2).

17.     Plaintiff reviewed the Local Rules and the Court's website to ascertain whether there is a procedure to provide this type of information to the Court. Plaintiff did not find any.

18.     Today, Plaintiff contacted the Clerk of Court to ascertain whether there is any way to apprise the Court in this type of situation. The Clerk's office responded that they cannot provide advice but suggested that a notice may be proper.

**WHEREFORE** Plaintiff respectfully requests that the Court take notice of the time-sensitive information Plaintiff provided in this Notice.

Respectfully submitted on September 3, 2024.

/s/ Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 3, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff

---

[5] *See* Middle District L.R. Rule 3.01(k).

Tab 102

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARITZA REYES,**

      **Plaintiff,**

**v.**                               **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

      **Defendant.**
_____

**PLAINTIFF'S TIME-SENSITIVE MOTION TO REPLACE PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH PLAINTIFF'S CORRECTED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND FOR THE COURT TO ACCEPT PLAINTIFF'S DECLARATION**

Plaintiff, Maritza Reyes, pursuant to Federal Rules of Civil Procedure 6(b)(1)(B) and 56(d)(3), respectfully requests that this Honorable Court grant her leave to replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Original Response") (Doc. 91) with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment ("Corrected Response") and also accept her Declaration in Support of Plaintiff's Original Response (Doc. 92) or Corrected Response (if the Court grants Plaintiff's request to replace her Original Response). This Motion is being submitted on a time-sensitive basis to hopefully get a favorable ruling in time to allow Defendant to file a reply thereby avoiding prejudice to Defendant.

**Exigent, Extraordinary, Unforeseen Circumstances**

1.     On July 17, 2024, Plaintiff filed Plaintiff's Time-Sensitive Unopposed Motion for Extension of Time to Respond to Defendant's Motion for Summary Judgment. (Doc. 79).

Plaintiff requested an extension of seven (7) days to respond to Defendant's Motion for Summary Judgment due to an unexpected medical emergency regarding her mother. (*Id.*). On July 19, 2024, the Court granted the Motion and gave Plaintiff until August 8, 2024 to respond to Defendant's Motion for Summary Judgment. (Doc. 80).

2.      On August 2, 2024, Plaintiff filed Plaintiff's Time-Sensitive Unopposed Motion for Extension of Time to Respond to Defendant's Motion for Summary Judgment. (Doc. 82). In her Motion, Plaintiff explained that she had to take her mother to South Florida to receive additional medical care. Plaintiff also explained that, while in South Florida, both she and her mother contracted COVID for the first time since the pandemic began. (*Id.*) On August 2, 2024, the Court granted the Motion and gave Plaintiff until August 12, 2024 to file her Response. (Doc. 83).

3.      On August 12, 2024, Plaintiff filed Plaintiff's Emergency Motion for Extension of Time to Respond to Defendant's Motion for Summary Judgment, which was unopposed. (Docs. 87, 88). Plaintiff explained that she had been actively working on her Response and planned to submit it by the deadline but was still dealing medical issues due to Covid, including difficulty concentrating, which was causing her difficulty to prepare her Response. (Doc. 87, ¶3). On August 13, 2024, the Court granted the Motion and gave Plaintiff until August 19, 2024 to file her Response. (Doc. 89).

4.      On August 19, 2024 and few days before that, Plaintiff had medical issues with her eyesight which Plaintiff attributed to eye strain due to long hours working on the computer. Plaintiff put drops in her eyes and thought she could continue working as she had done before. However, her vision became drastically impaired by Monday, August 19, 2024, to the point of partially losing vision in one eye and having blurry vision in the other one. This

medical issue also happened a year before and two years before. Plaintiff was treated for the medical issue at the time. Plaintiff's prolonged use of computer screen time in preparation of her Response may have been a factor that caused the recurrence of the medical issue. However, it was unexpected. The additional use of computer screen time was exacerbated by computer issues with document formatting which Plaintiff spent hours trying to resolve. Plaintiff sought remote technical assistance that did not resolve the issue but figured a run-around the issue; however, this run-around caused additional screen time and work for Plaintiff.[1]

5.      On the date of the August 19, 2024 deadline to submit her Response, Plaintiff kept trying to finalize her materials but was unable to properly read from the computer. Unfortunately, Plaintiff could not continue to work on her materials without possibly causing damage to her eyes. At that point, Plaintiff was basically incapacitated and could not even prepare an emergency motion, which would have been the only way for Plaintiff to communicate with the Court to seek relief by way of an emergency request for an extension of time to submit her Response and Declaration.[2]  Rather than miss the Court's deadline altogether, Plaintiff submitted a draft Response, which needed final edits. Plaintiff was unable to submit her Declaration and supporting exhibits.[3]

---

[1] Plaintiff does not have a law firm setup as she has not been in practice for over a decade. She did not have access to an IT person in house; she had to try to identify the technical problem and resolve it herself. After she could not, she sought remote technical assistance, which did not resolve the problem completely but gave Plaintiff an option to work around it although it took more time.

[2] The Local Rules require that parties must seek relief by way of a motion. Middle District L.R. Rule 3.01(k).

[3] Plaintiff decided to not further compromise her health. Plaintiff recalled the case of FAMU law professor Rhoda Cato whose health deteriorated as she pursued litigation against Defendant. *Cato v. Florida Agricultural & Mechanical University*, Case #: 6:19-cv-00099-PGB-EJK (M.D. Fla. 2019). She died not long after the case settled. Two of the

6.      The week of August 19, 2024, Plaintiff was still suffering from impaired vision. She was also suffering from a migraine headache.[4] She had to make a choice to prioritize her health and reduce the use of the computer. At that point, Plaintiff did not know what she would be able to do and when she could resume the computer use without causing further damage to her eyes.

7.      On August 22, 2024, Plaintiff's ophthalmologist, who treated Plaintiff for the past two episodes with her eyesight and has continued treating her, told Plaintiff that she could resume computer use. However, Plaintiff's vision is still not back to her pre-episode normal. The last time Plaintiff had a similar vision impairment, it took a few months to recover. The main problem is with reading, especially reading from a computer screen. Plaintiff must pace herself and take breaks from the computer screen.

8.      On August 27, 2024, Plaintiff's primary care physician told Plaintiff that the issue with her eyes may have been caused or exacerbated by Covid.

9.      Plaintiff conferred in good faith with Defendant's counsel about her medical issues on August 22, 2024, the day her doctor confirmed that there was no permanent damage and Plaintiff could resume computer use. Plaintiff provided more information to Defendant's counsel about her medical situation, by email and by phone, than what she stated in this Motion. Plaintiff has been communicating with Defendant's counsel about the situation since then.

10.     Plaintiff has done her best to keep the Court apprised of the unexpected medical issues through her time-sensitive and emergency motions. The record in this case shows

---

GrayRobinson attorneys who entered appearances in this case also represented Defendant in Professor Cato's case.

[4] Plaintiff has been treated for migraine headaches for the past couple of years.

4

that Plaintiff has followed the applicable rules, including not contacting the Court directly, by phone or email, about the exigent circumstances.[5]

11.     On August 19, 2024, Plaintiff made the emergency decision to file her draft Response to avoid having the Court deem the Motion for Summary Judgment unopposed. After that, Plaintiff needed to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work to finalize the Corrected Response and Declaration before communicating further with the Court through motion practice (this Motion).

12.     Plaintiff did not know when she would regain her vision sufficiently to complete her Declaration and Corrected Response. She had to prioritize her health. Therefore, she could not ask for an extension of time because she could not represent to the Court a date for said extension. Plaintiff did not even know if she would be able to do the required computer work to complete her Declaration and Corrected Response.

13.     On September 3, 2024, Plaintiff filed Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment. (Doc. 92). In her Notice, Plaintiff alerted the Court about the exigent, extraordinary, and unforeseen circumstances she has been facing.

14.     Plaintiff has been carefully allocating time daily, as her eyes permit, to work on the computer and be able to file her motions by the Court's October 2, 2024, deadline for all motions.

---

[5] *See* Middle District L.R. Rule 3.01(k).

**Deposition Evidence**

15.     Plaintiff spent thousands of dollars to take depositions and obtain transcripts.[6] Plaintiff filed the deposition transcripts with all exhibits. (Doc. 86). The deponents are all FAMU employees who provided evidence, including through their admissions, that support Plaintiff's causes of action.

16.     According to Defendant's own institutional records, President Larry Robinson was the ultimate decision-maker in the decision to deny Plaintiff promotion. He also received notice for years of the ongoing discrimination and hostilities against Plaintiff. Plaintiff reached out to him for help on many occasions.

17.     Former Dean LeRoy Pernell was the dean when Plaintiff was hired, when she went through her tenure process, when she was denied promotion, and throughout many of the years when Plaintiff endured discrimination, a hostile work environment, and retaliation.

18.     Professor Patricia Broussard was a member of the College of Law Retention, Promotion and Tenure ("RPT") Committee when Plaintiff applied for tenure and promotion; she was also the College of Law representative in the University Tenure and Promotion ("T&P") Committee during these same times. Professor Broussard was named throughout Plaintiff's Second Amended Complaint as one of the main harassers during the fifteen (15) years Plaintiff was employed in Defendant's College of Law.

---

[6] The deposition transcripts are identified as follows: Plaintiff Maritza Reyes – PL; President Larry Robinson – LR; Professor LeRoy Pernell – LP; and Professor Patricia ("Pat") Broussard – PB. The page and line numbers are included in parenthesis this way: PL(page#:line#), PL(page#:line#; page#:line#-page# line#), PL(page#:line#-page#), or PL(page#-page#). The deposition transcripts included exhibits for each deposition, which are cited this way: PL(page#:line#; Ex. #), PL(Ex. #), or PL(Ex. # at ).

19.     The depositions provide ample evidence (testimony, documents, and videos) to prove Plaintiff's causes of action. They also raise significant credibility issues, which also support Plaintiff's causes of action.

20.     To be able to take President Robinson's deposition, Plaintiff had to defeat Defendant's Time Sensitive Motion for Protective Order Precluding the Deposition of Dr. Larry Robinson ("Defendant's Motion for Protective Order"). (Doc. 37). Even after the Court denied Defendant's Motion for Protective Order (Doc. 49), Defendant did not produce President Robinson for a deposition. Plaintiff had to file Plaintiff's Expedited Motion to Compel FAMU President Larry Robinson's Deposition (Doc. 50), which the Court granted without awarding the requested expenses under Federal Rule of Civil Procedure 37. (Doc. 64).

21.     In his Declaration in support of Defendant's Motion for Protective Order, President Robinson (to avoid being deposed) conveniently stated that "[he] was not involved in the decision-making process when [Plaintiff's] application for promotion to full professor was denied in 2019." (Doc. 37-2, ¶ 9). However, during his deposition, he admitted that he was involved. LR(52:5-6; 66:15-67-12; 77:18-79:20). In his Declaration, President Robinson also stated that "the President or [his] designee make the final decision on tenure and promotion decisions." (Doc. 37-2, ¶ 6). However, during his deposition, President Robinson admitted that what he stated in his Declaration is "not entirely true." LR(63:21-64:7).

22.     During his deposition, President Robinson, a Black man, also admitted facts that support Plaintiff's causes of action, including *but not limited to*: the failure to follow the scholarship standard stated in the Faculty University Handbook during the review of

Plaintiff's application for promotion – LR(49:2-21; 54:1-9); the President's and Provost's reliance on the recommendations below – LR(67:7-12; 104:5-105:5); the contradictions between what he stated in his Declaration (Doc. 37-2, ¶ 6) for purposes of Defendant's Motion for Protective Order (Doc. 37) versus what he stated during his deposition about the process to approve applications for tenure – LR (64:1-9); the contradictions between what he stated in his Declaration (Doc. 37-2, ¶¶ 7-10) regarding his alleged non-involvement in the decision to deny Plaintiff's application for promotion to full professor and what he admitted during his deposition about his involvement in discussions about Plaintiff's application and decision - LR(52:5-6; 66:15-67:12; 77:18-79:20); his knowledge about the hostile work environment Plaintiff endured and his disregard for her repeated pleas for his help – (180:2-183:16-192:5; 199:13-201:5); Ex. 28); his failure to order an investigation after he was notified of the ongoing hostilities against Plaintiff, including the memorandum she submitted to him on November 13, 2019, detailing and documenting the emails wherein Professor Jeremy Levitt, a Black man, once again racially-gendered attacked Plaintiff including by applying a litmus test to question her racial identity, pitting Plaintiff against "Black Latina" Professor Nise Nekheba, ascribing to Plaintiff the mindset of a torturer and mass murderer Spanish conquistador, accusing Plaintiff of not understanding the diversity of Black people, and labeling Plaintiff a descendant of the "enslavers" of "[his] people" - (171:12-178-13; Ex. 26); and a lot more.

23.     During his deposition, Professor LeRoy Pernell (former long-term Dean and Interim Dean), a Black man, also provided evidence that support Plaintiff's allegations. He was Dean when Plaintiff was hired and when she applied for tenure. LP(19:2-5). He was Interim Dean when Plaintiff's application for promotion was denied. LP(21:11-17). Dean

Pernell received notice of many hostilities against Plaintiff, including serious allegations (by the same harassers, including Professor Broussard) that were made about her to him and University officials but were never provided to her; Dean Pernell did not think he had a duty to warn Plaintiff. LP(185:10-186:3). He stated: "I think matters that required action were forwarded to main campus for their intercession and I did not take any further steps." LP(186:1-3). Dean Pernell stated that he went along with the will of the RPT Committee; therefore, he did not recommend approval of Plaintiff's application for full professor. LP(Ex. 11 at 4).

24.     Despite evidence to the contrary, Dean Pernell denied that Wanda Aviles, a Latina administrative assistant, reached out to him about an incident between Ms. Aviles and Michelle Jackson, a Black female administrative assistant, in the Dean's Suite, right by his office. LP(164:15-21; 195:24-196:15; Ex. 35). That incident caused Ms. Aviles, the only non-Black employee in the Dean's Suite, to be transferred/demoted to another position outside of the Dean's Suite against Ms. Aviles's wishes; however, Ms. Jackson remained in the Dean's Suite. (Exhibit 1 at ¶¶ 17-19; 22-27).

25.     During her deposition, Professor Patricia Broussard, a Black woman, admitted that she attended the RPT Committee meeting on October 23, 2014 when Professor Ronald ("Ron") Griffin, a Black man, allegedly called the Black women in attendance "malicious, evil, racist, and vile" against Plaintiff during the review of her application for tenure. PB(49:1-50:21). Professor Broussard also admitted that the Black women who were called "racist" by Professor Griffin had the power to vote on Plaintiff's application. PB(51:19-52:5). Professor Broussard voted to deny Plaintiff tenure in 2015 and voted to deny her promotion to full professor in 2018. PB(24:5-13). Professor Broussard was also

the College of Law Representative in the University T&P Committee when the majority in that Committee also voted to deny approval of Plaintiff's application for tenure and subsequently her application for promotion to full professor. PB(22:3-10). Professor Broussard admitted in her class observation form (which she did not provide to Plaintiff in violation of the rules), during Plaintiff's tenure process, that she told students that they should complain to Associate Dean Darryll Jones about Plaintiff. PB(63:5-68:7; Ex. 9).

26.     During her deposition, Professor Broussard admitted her participation in many major incidents of harassment of Plaintiff. By way of example, Professor Broussard filed a Charge with the FAMU Office of Equal Opportunity Programs ("EOP") against Plaintiff on November 25, 2015 (the day before Thanksgiving), during the semester when Plaintiff was visiting/teaching at the University of Florida College of Law after her tenure was approved. Among many conclusory and false allegations (without evidentiary support), Professor Broussard accused Plaintiff of "jump[ing] out of a seat at a [faculty] meeting" on April 15, 2015 and invading her space when she was counting the votes. PB(Ex. 12 at ¶ 3). Professor Broussard said that she did not watch the video which she claimed showed the incident. PB(94:4-5). Plaintiff introduced the video during Professor Broussard's deposition. PB(133:16-134:15; Ex. 21). Professor Broussard also stated that she could not remember how she allegedly found out what she alleged in her EOP Charge about what others supposedly did and said. PB(92:9-19). Professor Broussard's allegations were refuted by evidence from witnesses and her EOP Charge was eventually dismissed; however, Plaintiff had to once again defend against her false accusations.

27.     Professor Broussard also raised an allegation of "slander" against Plaintiff in an EOP Charge. PB(86:14-19). However, she never stated any specific statements, dates

when alleged statements were made, or to whom Plaintiff allegedly slandered her. During her deposition, Plaintiff asked Professor Broussard, a law professor who teaches constitutional law, if her allegations met the definition of slander. PB(86:20-21; 88:15-17). Professor Broussard responded that it was not "slander" as in a lawsuit; instead, she said that Plaintiff "scandalized" her name "as Black people would say in the church." PB(88:18-25). The "slander" allegation was also eventually dismissed after Plaintiff had to defend against it during an EOP investigation. Throughout her deposition, Professor Broussard was faced with document and video evidence that showed her continuous harassment of Plaintiff.

28.     Professor Broussard also involved others in her efforts to harm Plaintiff. For example, on April 15, 2015 (during Plaintiff's tenure process), College of Law IT/Security Director Shashi Persaud sent a "Confidential" email to Dean Pernell and high-level University officials, including Provost Marcella David and Chief of Police Terence Calloway, stating that he had recently received a "verbal complaint from Professor Broussard stating that Professor Reyes harassed her during a faculty meeting." LP(Ex. 27). During the investigation of her EOP Charge, Professor Broussard claimed that Associate Dean Reginald Green and Director Shashi Persaud did and said things about the alleged incident, which, during the investigation, they denied.

29.     President Robinson, Dean Pernell, and Professor Broussard all provided evidence, including direct evidence, that supports Plaintiff's allegations about race and racism in support of her causes of action. LR(216:9-220:6); LP(216:25-218:23); PB(51:5-59:5; 60:1-63:4; 173:1-181:4). Plaintiff needs the opportunity to put all the evidence in

proper context before the Court through her Declaration and citations to her Declaration in her Corrected Response.

## Defendant Will Not Be Prejudiced

30.     Defendant has been aware of Plaintiff's facts and most of the evidence since Defendant was served with Plaintiff's initial detailed pleading on November 18, 2022. (Doc. 17). Defendant's experienced counsel attended all depositions and received all the exhibits in those depositions. The overwhelming majority of evidence in this case are Defendant's own records.

31.     Defendant has three experienced attorneys currently assigned to this case, with additional assistance from paralegals, administrative assistants, and other support staff. Therefore, it is competently represented with significant resources to prepare a reply to Plaintiff's Corrected Response and Declaration, if it chooses to do so.

32.     During conferral about this Motion, in efforts to persuade counsel not to oppose this Motion, Plaintiff offered to send Defendant's counsel a tracked changes version of the Corrected Response so Defendant's counsel could confirm that the corrections are not substantive.[7] The corrections are mainly punctuation marks, outline numbers and underlining of titles, Bluebook editing of the citations, citations to the Declaration, page numbers at the bottom of the pages, and correct reference to Defendant's Motion for Summary Judgment (not Defendant's *Daubert* Motion) in the Conclusion section.[8] The

---

[7] Plaintiff would have liked to request that the Court allow her to also make substantive changes; however, she decided to make it easier for the Court to hopefully grant this Motion by not making substantive changes to her Corrected Response.

[8] Some of the edits may be deemed scrivener's errors the correction of which will not prejudice Defendant because Defendant already received notice of the substance of Plaintiff's Original Response, which will remain in Plaintiff's Corrected Response. See *N.*

Corrected Response will serve to clarify the record, including because Plaintiff's conclusion refers to the wrong motion.[9]

33.     Plaintiff also represented to Defendant's counsel that she would ask the Court to grant it fourteen (14) days to file a reply. This way, Defendant would not be prejudiced and in fact would get additional time beyond the time already provided after it received Plaintiff's Original Response.

### In the Interest of Justice

34.     Plaintiff's Declaration is necessitated by the evidentiary burden placed on her by Eleventh Circuit and this Court's precedent in this type of case. She faces a higher burden than Defendant. Plaintiff has done her best to meet her burden while dealing with unexpected, extraordinary circumstances that impacted her health and ability to work during the time she was supposed to prepare her response to Defendant's Motion for Summary Judgment.

35.     Plaintiff throws herself upon the mercy of the Court and prays that this Court will accept the materials it should receive to make a just summary judgment ruling on the merits of the evidence and the law.

### MEMORANDUM OF LAW

Federal Rule of Civil Procedure 6(c)(2) states that "any opposing affidavit must be served at least 7 days before the hearing, unless the court permits service at another time." Fed. R. Civ. P. 6(c)(2). The Court's Case Management and Scheduling Order

---

*Brevard Hosp. Dist. v. McKesson Techs., Inc.*, Case No: 6:16-cv-637-Orl-40DCI, 2017 U.S. Dist. LEXIS 236540, at *19-22 (M.D. Fla. 2017).

[9] Plaintiff used the template for a prior response (her response to Defendant's *Daubert* Motion). By the point of Plaintiff's vision incapacity, she could not even read the document and make final edits.

states that the memorandum in opposition to a motion for summary judgment "shall be accompanied by affidavit(s) and other evidence in the form required by Federal Rule of Civil Procedure 56." (Doc. 26 at II.I.1.).

The Court may extend time for an act that must be done within a specified time, for good cause, "if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). "A schedule may be modified only for good cause and with the judge's consent." *Knights v. Wyndham Vacation Ownership, Inc.*, Case No: 6:23-cv-1104-RBD-DCI, 2024 U.S. Dist. LEXIS 17525, at *5 (M.D. Fla. 2024). "To establish good cause, the party seeking the extension must establish that the schedule could not be met despite the party's diligence." *Ashmore v. Sec'y, Dep't of Transp.*, 503 F. App'x 683, 685 (11th Cir. 2013) (citations omitted). The Court has total discretion over its own requirements, including for responses to motions for summary judgment. *Pinkston v. Univ. of S. Fla. Bd. of Trs.*, No. 8:18-cv-2651-T-33SPF, 2019 U.S. Dist. LEXIS 70777, at *9 (M.D. Fla. 2019) ("Regardless, even if USFBOT had not satisfied the requirements for responses to motions for summary judgment outlined on the undersigned's website, it is entirely within the Court's discretion to accept a non-conforming response and consider its arguments on the merits. And the merits of USFBOT's response to Pinkston's motion for summary judgment were too strong to ignore.").

"[T]here is a strong policy in this Circuit favoring resolution of cases on the merits." *Moore v. Adventist Health Sys. Sunbelt Healthcare Corp.*, No. 6:23-cv-1163-PGB-DCI, 2024 U.S. Dist. LEXIS 95818, at *4 (M.D. Fla. May 30, 2024) (citing *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003); *Fla. Physician's Ins. Co. v. Ehlers*, 8 F.3d 780, 783 (11th Cir. 1993). "Parties should feel that a district court has given them

their day in court." *Glover v. City of Pensacola*, 372 Fed. Appx. 952, 955-56 (11th Cir. 2010) (reversing a district court's summary judgment order in favor of defendant in an employment discrimination case). A summary judgment decision without review of the evidence, because the Court does not accept a party's untimely response and evidence, is a resolution on the merits that may impose "some harm, disadvantage, or restriction upon someone that is unnecessarily broad or does not result in any offsetting gain to anyone else or society at large." *Id.* at 954 (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004).

In *L. D. Woods v. Allied Concord Financial Corp.,* the Fifth Circuit allowed a crucial affidavit that was filed by the plaintiff-movant on the day of the trial/hearing of the motion for summary judgment. 373 F.2d 733 (5th Cir. 1967).[10] The Court has broad discretion to accept a response to a motion for summary judgment and affidavits beyond the deadline even when a party does not file a motion or show excusable neglect. See *Godoy v. Office of Bar Admissions*, No. 1:05-CV-0675-RWS, 2006 U.S. Dist. LEXIS 50654, at *4-10 (N.D. Ga. July 25, 2006) (citations omitted).

> In determining whether to grant a motion to extend deadlines under Rule 6(b)(1)(B), courts must consider: the danger of prejudice to the opposing party; the length of delay and its potential impact on the judicial proceedings; the reason for the delay, including whether it was within the reasonable control of the movant; and whether the movant acted in good faith.

*Moore*, 2024 U.S. Dist. LEXIS 95818, at *3 (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). "Excusable neglect encompasses

---

[10] The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

'inadvertence, mistake, or carelessness, *as well as . . . intervening circumstances beyond the party's control*.'" *Id.* at 5-6 (citing Pioneer, 507 U.S. at 388) (emphasis added).

In *Godoy*, the Defendants' neglectful participation in the litigation, fell "decidedly short of that which the Court would expect from a body entrusted by the State to help oversee the practice of law." 2006 U.S. Dist. LEXIS 50654, at *5. The court listed a litany of instances of Defendant's neglectful defense of the case. *Id.* "Generally, such neglect by a party would militate against any leniency or departure from the strict procedural guidelines established by the Local Rules." *Id.* at *5-6. However, the court allowed Defendant to file a belated response to Plaintiff's motion for summary judgment*,* including affidavits, *"sua sponte* and without a showing of excusable neglect." *Id.* at *4, 10.

The court in *Godoy* stated that "absent serious, actual prejudice to another party, district courts, often with circuit approval, have exercised the inherent authority to manage their docket so as to grant enlargements of time even when such extensions fall outside the literal scope of Rule 6(b)." *Id.* at *7 (citations omitted) (citing cases that permitted a litigant to file a late cross-motion for summary judgment and opposition to opponent's motion for summary judgment; a defendant "to file an answer six months after [the] original deadline, notwithstanding her failure to provide 'an adequate reason [,]' where [the] failure caused no prejudice to the plaintiff;" and affirming a magistrate judge's *sua sponte* acceptance of a late-filed motion for protective order). The court recognized that "award[ing] Plaintiff relief on a procedural technicality" would cause harm not only to the Defendant but also to the citizens of the State of Georgia because the summary judgment would decide the eligibility of individuals to sit for the bar exam. *Id.* at *7. Therefore, it accepted the late filed response and affidavits.

The decision in this case, as in *Godoy*, may serve purposes beyond Plaintiff's case, including for the College of Law, the State University System, and the State of Florida. Plaintiff brought this action against a State University System public university that Plaintiff alleges has knowingly permitted violations of anti-discrimination federal law within its law school. Administrators and law professors whose conduct is at issue in this case are training future lawyers in the FAMU College of Law. Therefore, the citizens of the State of Florida have an interest in the resolution of this case on the merits of the evidence and the law and not on "a procedural technicality" caused by unexpected health circumstances beyond Plaintiff's control.

This case is important. There are witnesses willing to come forward to help Plaintiff's cause and a higher cause. In employment cases, it is difficult for witnesses to come forward because most witnesses are employed by defendants and depend on them for their livelihood (employment and references). In a law school context, there are additional considerations that make it difficult for witnesses, including law students and alumni, to come forward with evidence against the institution. There are also cultural norms that militate against "snitching."

Thankfully, there are sometimes brave individuals who come forward to corroborate the account of facts that plaintiffs allege in employment cases. This Motion includes declarations from witnesses that Plaintiff disclosed in her Rule 26 initial disclosures: (1) Wanda Aviles (Exhibit "1"), (2) Nicole Dickerson (Exhibit "2"), (3) Guillermo Flores (Exhibit "3"), (4) Natalya Lopez (Exhibit "4"), (5) Charles Smith (Exhibit "5"), and (6) Celia Westbrook (Exhibit "6"). Ms. Aviles, Professor Smith, and Ms. Westbrook are former employees who resigned from the College of Law. Ms. Dickerson,

Ms. Lopez, and Mr. Flores are alumni from the College of Law. These witnesses corroborate the hostile work environment against Plaintiff, the race discrimination, and, more than that, they substantiate that such racial, hostile work environment is harmful beyond the damage to Plaintiff. Plaintiff's lawsuit is helping others by calling out the abuse and discrimination in a documented way.[11] It is also helping Defendant's College of Law.

> As the Supreme Court has recognized, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)*. Thus, "evidence of the employer's discriminatory attitude *in general* is relevant and admissible to prove race," gender, or other forms of unlawful discrimination. *Heyne v. Caruso, 69 F.3d 1475, 1479-80 (9th Cir. 1995)*.

*Sanders v. Univ. of Idaho, Coll. of Law*, 634 F. Supp. 3d 923, 929 (D. Idaho 2022). In *Sanders*, the Court found "that evidence of complaints and/or incidents of discrimination, bias, and retaliation involving both law students and faculty other than Plaintiff, and Defendants' reactions to those complaints and/or incidents, is admissible to show whether Defendants have general discriminatory animus. General discriminatory animus is, in turn, relevant and probative on the issue of whether Plaintiff was subjected to discrimination and retaliation on account of her gender and/or race." *Id.* at 930.

Plaintiff wants an opportunity to explain to the Court, with her Declaration and corresponding citations in her Corrected Response, how the general discriminatory animus led to the injuries and causes of action Plaintiff alleged in this lawsuit, including in context of how discrimination against other non-Black Latinas/os is relevant to the discrimination against Plaintiff. This is one more reason why Plaintiff's Declaration is

---

[11] After Plaintiff filed her EEOC Charge, Defendant hired more White people, including a White woman as a tenure-track law professor. PL(198:2-11; 267:12-22); PB(62:8-24).

important.

In *Moore*, Defendant filed its answer and affirmative defenses late. 2024 U.S. Dist. LEXIS 95818, at *5. Defendant "cite[d] to excusable neglect based on inadvertent 'unintentional calendaring error' and request[ed] that the Court accept the late pleading and deem the time for filing to be extended pursuant to Federal Rule of Civil Procedure 6(b)." *Id.* at 4. This Court found that Defendant did not miss the deadline in bad faith and the delay did not "unduly prejudice Plaintiff or stall the proceedings." *Id.* at 6 (citations omitted). The Court was persuaded that Defendant's untimely answer was due to excusable neglect. *Id.*

In this case, Plaintiff was diligently preparing her Response to Defendant's Motion for Summary Judgment;[12] however, the medical issues she faced due to Covid were unexpected and directly affected the cognitive abilities Plaintiff needed to prepare her Response.[13] With regard specifically to the recent medical issues with her eyesight, these were intervening circumstances beyond Plaintiff's control. They were sudden and (according to her doctor) possibly exacerbated by Covid plus Plaintiff's extensive use of computer screen time to conduct legal research, review materials/evidence, read electronic transcripts of depositions, and prepare her Response, Declaration  and time-

---

[12] On August 12, 2024, Plaintiff filed Plaintiff's Notice of Filing Recordings and Transcripts in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 86). These materials had to be filed directly with the Clerk of Court because they exceeded the Case Management/Electronic Filing System (CM/ECF)'s 50-megabyte limitation per document, and the audio and video recordings could not be uploaded through CM/ECF. Plaintiff was actively preparing to submit her Response on that date; however, the unexpected health issues made it impossible to do so.

[13] Plaintiff's Response to Defendant's Motion for Summary Judgment (including the Declaration) was document review intensive because of the evidentiary burden imposed on Plaintiff.

sensitive and emergency motions for extension of time.[14] Additionally, this work took Plaintiff a lot more time than usual due to the unexpected issues with Covid, concentration, and vision. Plaintiff's vision is still impaired.

Plaintiff is handling this litigation individually and *pro se*;[15] therefore, when she gets sick, she cannot pass the work to someone else.[16] Plaintiff has complied with her duties throughout this litigation despite the many disadvantages she faces.[17] Plaintiff has done her best to avoid or lessen the danger of prejudice to Defendant. The length of the delay was only as long as necessary for Plaintiff to regain sufficient vision to finalize her

---

[14] Plaintiff needed to review her deposition (353 pages), President Larry Robinson's deposition (330 pages), Professor LeRoy Pernell's deposition (289 pages), and Professor Patricia Broussard's deposition (278 pages), including to meet the page/line number citations required by the Court. Plaintiff does not have paralegals to help with this visually demanding, detailed work. Plaintiff also had to review many documents/evidence/exhibits.

[15] Plaintiff is proceeding *pro se* for reasons she does not think appropriate to discuss currently. However, if the Court thinks it relevant for Plaintiff to disclose the reasons, she will do so without waiving attorney-client privilege for communications regarding legal consultation. Without waiving attorney-client privilege, some issues that arise in cases like Plaintiff's against Defendant are issues of conflict of interest. *See, e.g.*, Order of Recusal. (Doc. 4). There are others.

[16] When two of Defendant's attorneys got sick, including with Covid, other attorneys stepped in to cover. Defendant has two partners and one associate currently assigned to defend it in this case (a third partner recently withdrew). Additionally, Defendant's counsel has the benefit of the resources and assistance that a large firm provides. Defendant can afford this experienced and well-supported representation thanks to state funds which Plaintiff does not have. Plaintiff is representing herself while unemployed and without an income after Defendant wrongfully terminated her from her tenured faculty position during the discovery phase of this litigation. Defendant has also kept Plaintiff extra busy going through its sham, unnecessarily delayed, internal grievance proceeding where her appeal/grievance remains pending. All of this has required Plaintiff's additional computer use.

[17] Defendant has not needed to file any motions to compel because Plaintiff has abided by the rules of civility and professionalism. She has conferred in good faith with Defendant's counsel to resolve matters within the parties' control without Court intervention, even to her detriment when she allowed Defendant to continue to delay depositions until it ran out the discovery deadline.

Corrected Response, Declaration, and this Motion (with legal research).[18] The reasons for the delay (the unexpected and unpredictable health issues) were not within Plaintiff's control. Plaintiff has acted in good faith by keeping the Court and Defendant's counsel informed, including via her time-sensitive and emergency motions for extension of time and direct communication with Defendant's counsel, by email and phone, with more detail about her medical issues.[19]

This case has proceeded in accordance with the Court's Case Management and Scheduling Order. (Doc. 26). On August 12, 2024, Plaintiff filed Plaintiff's Notice of Filing Recordings and Transcripts in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law. (Doc. 86).[20] The audio recordings, surveillance video recordings, transcripts, and attached exhibits are all evidence in support of Plaintiff's Response in opposition to

---

[18] Plaintiff hopes that the Court will consider that her health issues and the resulting delay with preparation of her materials burdened and prejudiced Plaintiff. Plaintiff did not envision or want the additional work, including the additional research and preparation of the prior emergency motions and this Motion. However, Plaintiff had no control over the unpredictable health issues.

[19] Plaintiff even asked Defendant's counsel if, in their collective years of experience, they knew of any way in which the Court accommodated a *pro se* party's or an attorney's medical needs, including on an emergency basis. Defendant's counsel responded that they do not know. Plaintiff searched the Court's website to find whether there are any rules or procedures regarding medical issues, including any accommodations that the Court may provide. Plaintiff found none.

[20] Due to the size of these materials, Plaintiff was instructed by the Clerk's Office to file them in the Courthouse (rather than electronically). Plaintiff assumed that Defendant received them when notice of filing was sent via email to all parties. As soon as Defendant's counsel contacted Plaintiff to let her know that they did not receive them, Plaintiff immediately uploaded the materials as instructed by Defendant's counsel through their firm's web portal.

Defendant's Motion for Summary Judgment. (Doc. 91). Plaintiff's Declaration will put this and other evidence in its proper context.

Plaintiff will keep the substance of her Corrected Response the same as her Original Response; therefore, Defendant already received her legal arguments since August 19, 2024. Defendant may choose to modify its original reply; however, Defendant's counsel is highly competent to do this expeditiously with the resources it has (three skilled attorneys working in the case). The evidence Plaintiff cited in her Declaration is not new to Defendant; most of the evidence comes from Defendant's own records. The detailed allegations in Plaintiff's pleadings provided notice to Defendant about Plaintiff's factual allegations since November 18, 2022. (Doc. 17). Plaintiff, on the other hand, did not receive Defendant's Answer and Affirmative Defenses until September 23, 2024, after the deadline to respond to Defendant's Motion for Summary Judgment. (Doc. 97). This factor should weigh heavily in favor of allowing Plaintiff to file her Corrected Response and Declaration, including in the analysis of prejudice to Plaintiff.

The Court recently, *sua sponte*, extended pretrial deadlines and the beginning of the trial term. (Doc. 98). The trial term is now set to begin on February 3, 2025. (*Id.* at 2). Plaintiff's Corrected Response and Declaration may aid Defendant and Plaintiff to narrow and resolve factual, evidentiary, and legal issues. Accordingly, it would be efficient for the litigation if the Court grants the relief Plaintiff requests. Defendant will not be prejudiced, especially if the Court grants it fourteen (14) days to file a reply or any other time the Court deems just and proper. *See Dudley v. United States*, No. 1:17-cv-00263, 2020 U.S. Dist. LEXIS 257174, at * (N.D. Ga. 2020) ("The Court granted Plaintiff a fourteen-day extension of time to respond to Defendant's motion, which further supports the lack of prejudice.").

For the foregoing reasons, Plaintiff moves this Court to find that there is good cause for the requests Plaintiff made in this Motion. Additionally, Plaintiff prays that this Court will hold, as it did in *Moore*, that Plaintiff meets the requirement of excusable neglect and accept Plaintiff's Corrected Response and Declaration.

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court grant the relief requested in this Motion.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Plaintiff certifies that she conferred in good faith with Defendant's counsel via phone and via email. Defendant opposes this Motion.

Dated this 2nd day of October, 2024.

Respectfully submitted,

<u>/s/ Maritza Reyes</u>
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on October 2, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

<u>/s/ Maritza Reyes</u>
Plaintiff

Tab 105

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARITZA REYES,**

      **Plaintiff,**

**v.**                                                    **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

      **Defendant.**
_____

**PLAINTIFF'S TIME-SENSITIVE MOTION TO RE-OPEN DISCOVERY AND**
**SUMMARY JUDGMENT**

     Plaintiff, Maritza Reyes, pursuant to Federal Rule of Civil Procedure 16(b)(4), respectfully requests that this Honorable Court re-open discovery and summary judgment for at least sixty (60) days.

1.      Plaintiff filed her Complaint on August 25, 2022. (Doc. 1). On September 1, 2022, the Court *sua sponte* dismissed Plaintiff's Complaint without prejudice. (Doc. 8). On September 12, 2022, Plaintiff filed her Amended Complaint. (Doc. 10).

2.      On November 18, 2022, Plaintiff effected service of process on Defendant (Doc. 17).

3.      On January 20, 2023, Defendant filed its First Motion to Dismiss. (Doc. 22). On February 13, 2023, Plaintiff filed her Response in Opposition to Defendant's First Motion to Dismiss. (Doc. 28). On September 15, 2023, the Court dismissed Plaintiff's Amended Complaint without prejudice. (Doc. 30).

4.      On October 9, 2023, Plaintiff filed her Second Amended Complaint. (Doc. 34). On October 23, 2023, Defendant filed its Second Motion to Dismiss with Prejudice or in the Alternative Motion to Strike. (Doc. 35). On November 13, 2023, Plaintiff filed her Response in Opposition to Defendant's Second Motion to Dismiss with Prejudice or in the Alternative Motion to Strike. (Doc. 36).

5.      On May 31, 2024, discovery closed. (Doc. 26 at 1).

6.      On September 9, 2024, the Court denied Defendant's Second Motion to Dismiss with Prejudice or in the Alternative Motion to Strike.

7.      On September 23, 2024, Defendant filed its Answer and Affirmative Defenses. (Doc. 97).

8.      On September 25, 2024, the Court, *sua sponte*, extended pretrial deadlines and the beginning of the trial term. (Doc. 98). The trial term is now set to begin on February 3, 2025. (*Id.* at 2).

9.      On September 26, 2024, Plaintiff filed Plaintiff's Time-Sensitive Unopposed Motion for Deadline to File Motion to Strike Pursuant to Time Allowed Under Federal Rule of Civil Procedure 12(f)(2). (Doc. 99).

10.     On September 27, 2024, the Court gave Plaintiff until October 15, 2024 to file a motion to strike. (Doc. 100).

11.     The Case Management Order, which was issued on February 13, 2023, set the deadline for all other motions as October 2, 2024. (Doc. 26).

## **MEMORANDUM OF LAW**

Defendant had knowledge of Plaintiff's allegations since November 18, 2022. (Doc. 17). Plaintiff, on the other hand, received Defendant's Answer and Affirmative Defenses

ten (10) days ago, as Plaintiff was preparing motion materials, which are due today. Defendant's Answer includes thirteen (13) affirmative defenses. (Doc. 97). Plaintiff has been severely prejudiced by the timing of Defendant's Answer and Affirmative Defenses. Defendant received the advantage of more than sufficient notice of Plaintiff's allegations long before the end of discovery. In its Answer, Defendant "reserv[ed] the right to assert additional or other defenses or matters in avoidance after discovery progresses in this case." (*Id.* at 33).

Currently, considering the workload to meet today's deadline with impaired vision, Plaintiff has only done a cursory review of Defendant's Answer. However, it is evident that many of its denials do not "fairly respond to the substance of the allegation" in violation of Federal Rule of Civil Procedure 8(b)(2). Defendant denies parts of allegations that are obviously true according to its own records, which is a violation of Rule 8(b)(4).[1] Similarly, Defendant claims lack of knowledge or information sufficient to form a belief about the truth of allegations, after discovery is already closed and Defendant had the benefit of the evidence readily available to obtain the knowledge or information.[2]

---

[1] For example, Plaintiff stated in her Second Amended Complaint that "then Associate Dean for Research and Faculty Development and Professor of Law Kenneth B. Nunn" prepared a Memo "(the 'Nunn Memo')," which "was appended to the Self Study that the FAMU College of Law presented to the ABA as part of the law school's application for full accreditation. The law school represented to the ABA that the Nunn Memo clarified the standards as requested by the ABA." (Doc. 34, ¶ 24). Plaintiff denied these facts which are undisputably stated in its own records, *in materials Defendant presented to the ABA for purposes of law school accreditation.* (Doc. 97, ¶ 24). Plaintiff asserts that her promotion to full professor was denied in violation of the standards provided to her, including the Nunn Memo. (Doc. 75-3 PL(128:10-131:5)).

[2] Plaintiff stated that she was hired for a tenure-track position. (Doc. 34, ¶ 25). Defendant answered that it "lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, therefore denied" (Doc. 97, ¶ 25) despite the fact that Defendant awarded tenure to Plaintiff because she was hired in the tenure track. Plaintiff stated the race and gender (not national origin) of the faculty members in the

Again, Plaintiff has had limited time to fully review Defendant's Answer and Affirmative Defenses; however, it is obvious that she will need discovery, including about the factual basis for the Affirmative Defenses. For example, in its Fifth Affirmative Defense, Defendant stated that it "cannot be liable under Title VII as it had in place legally sufficient anti-discrimination policies and reporting procedures, and exercised reasonable care to prevent and/or correct any discrimination, retaliation or harassment alleged by Plaintiff." In its Seventh Affirmative Defense, Defendant stated that employees "who acted in a discriminatory manner toward" Plaintiff were acting "outside the course and scope of the employee's employment" and Defendant did not condone or ratify said conduct, and/or the conduct "was undertaken without the knowledge or consent of the Defendant, and accordingly, Defendant is not liable." In its Tenth Affirmative Defense, Defendant stated that "Plaintiff's entitlement to any alleged relief is limited by the after-acquired evidence doctrine." These affirmative defenses require discovery, which could be used for a motion for summary judgment.

"To be clear: Rule 16(b)(4), not Rule 6(b) controls a request to extend a CMSO deadline. And this matters, because the Eleventh Circuit caselaw concerning Rule 16(b)(4) includes a requirement of diligence." *Knights v. Wyndham Vacation Ownership, Inc.*, Case No: 6:23-cv-1104-RBD-DCI, 2024 U.S. Dist. LEXIS 17525, at *5 (M.D. Fla.

---

College of Law Retention Promotion and Tenure Committee that reviewed her application for tenure. (Doc. 34, at ¶¶ 34-35). Plaintiff confirmed this race and gender information with Defendant's own records, which she produced for depositions. (Doc. 86 LP(Ex. 33)), (*Id.* PB(Ex. 4)). In response, Defendant answered that it "lacks knowledge or information sufficient to form a belief about each individual's race or national origin, therefore, all remaining allegations are denied." (Doc. 97, ¶¶ 34, 35). Defendant even denies findings of retaliation from its own Division of Audit and Compliance Report. (Doc. 97, ¶ 56); (Doc. 86 PB(Ex. 10)).

2024). *See Zagg Inc. v. Ichilevici*, Case No. 1:23-cv-20304-ALTMAN/REID, 2024 U.S. Dist. LEXIS 15956; 2024 WL 557899, *10 (S.D. Fla. Jan. 30, 2024) (finding good cause when reasons for the delay were outside of Plaintiff's control and Defendant did not articulate how it would be prejudiced); *Cf. Rodriguez v. Xie*, No. 6:18-cv-1911-Orl-EJK, 2020 U.S. Dist. LEXIS 242389, *5 (M.D. Fla. Sept. 2, 2020) (granting extension of discovery deadline).

Plaintiff is exercising diligence by filing this Motion soon after she received Plaintiff's Answer and Affirmative Defenses and by the deadline for all other motions. The reason for the need for this motion at this juncture in the case was beyond Plaintiff's control.

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court reopen discovery and summary judgment related solely to Defendant's Answer, Affirmative Defenses for at least sixty (60) days.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Plaintiff certifies that she conferred in good faith with Defendant's counsel via phone and via email. Defendant opposes this Motion.

Dated this 2nd day of October, 2024.

Respectfully submitted,

<u>/s/ Maritza Reyes</u>
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

5

**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that on October 2, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

                                 /s/ Maritza Reyes
                                 Plaintiff

Tab 130

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARITZA REYES,**

     **Plaintiff,**

**v.**                                                  **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")**

     **Defendant.**

_____

**<u>PLAINTIFF'S TIME-SENSITIVE MOTION FOR RECONSIDERATION OF COURT'S
ORDER DENYING PLAINTIFF'S MOTION TO REPLACE PLAINTIFF'S RESPONSE
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH
PLAINTIFF'S CORRECTED RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND FOR THE COURT TO ACCEPT
PLAINTIFF'S DECLARATION</u>**

Plaintiff, Maritza Reyes, pursuant to the Court's inherent authority and the interests
of justice, to correct clear error or manifest injustice, respectfully requests that this
Honorable Court reconsider its Order (Doc. 124) denying Plaintiff's Time-Sensitive Motion
to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary
Judgment with Plaintiff's Corrected Response and for the Court to Accept Plaintiff's
Declaration (Doc. 102) ("Motion for Corrected Response and Declaration"). This "Motion
for Reconsideration" is being submitted on a time-sensitive basis to hopefully get a
favorable ruling as soon as possible to allow Defendant to file a reply thereby avoiding
prejudice to Defendant and reducing the need for amendment of the remaining deadlines
in the Court's Case Management and Scheduling Order (CMSO) if possible.

## I.    RELEVANT PROCEDURAL BACKGROUND

1.  On October 2, 2024, Plaintiff filed (a) Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102) and (b) Plaintiff's Notice of Filing Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 103).[1]

2.  On October 4, 2024, Plaintiff filed Plaintiff's Time-Sensitive Amended Notice of Filing Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("Amended Notice"). (Doc. 107).[2] This Amended Notice included six (6) witness declarations: Wanda Aviles (Exhibit "1" dated 9/20/24); Nicole Dickerson (Exhibit "2" dated 9/25/24); Guillermo Flores (Exhibit "3" dated 10/1/24); Natalya Lopez (Exhibit "4" dated 8/18/24); Charles Smith (Exhibit "5" dated 8/17/24); and Celia Westbrook (Exhibit "6" dated 8/18/24) ("Witness Declarations"). (Doc. 107-2).[3]

---

[1] On October 2, 2024, Plaintiff also filed Plaintiff's Motion in Limine (Doc. 104), Plaintiff's Motion to Reopen Discovery and Summary Judgment (Doc. 105), and Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106).

[2] During this time, Florida residents, including Plaintiff, were preparing for Hurricane Milton.

[3] Between October 2, 2024 and October 4, 2024, Plaintiff worked to resolve a document upload error that was interfering with the filing of the six (6) Witness Declarations through

3.  On October 16, 2024, Defendant filed Defendant's Response in Opposition to Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("Response"). (Doc. 113).

4.  On November 1, 2024, the Court entered three (3) separate Orders denying (a) Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102), (b) Plaintiff's Motion to Reopen Discovery and Summary Judgment (Doc. 105), and (c) Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106). (Docs. 124, 125, 126).

5.  On November 4, 2024, the Court entered its Order denying Plaintiff's Motion to Strike Defendant's Affirmative Defenses (Doc. 112). (Doc. 127).

6.  On November 6, 2024, Plaintiff filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders to inform the Court that she intended to file Motions for Reconsideration of three (3) Orders that were recently issued by the Court (Docs. 124, 125, and 127). (Doc. 128).[4]

---

the Case Management/Electronic Filing System ("CM/ECF"). (Doc. 107, ¶¶ 2-5). After receiving instructions from the Clerk of Court and trying different options to fix the problem, Plaintiff was finally able to upload the Declarations, on October 4, 2024, through CM/ECF all in one (1) PDF composite document as Exhibits 1 through 6. (Doc. 107-2).

[4] On November 7, 2024, U.S. Magistrate Judge Daniel C. Irick struck Plaintiff's Notice (Doc. 128). (Doc. 129). Judge Irick stated: "The rules of this court do not provide for the filing of a notice of intent to file a motion." (*Id.*).

## II.    __INTRODUCTION__

The Court's decision to deny Plaintiff's Motion for Corrected Response and Declaration concentrated on a brief analysis of a few of the "pertinent circumstances" to arrive at its conclusions about Plaintiff's diligence, good faith, good cause, and excusable neglect. Selecting facts for consideration, applying them to judicially-developed standards, and reaching legal conclusions depends on "the eye of the beholder." *See Muldrow v. City of St. Louis*, 144 S. Ct. 967, 975, 978 (2024) (providing factual examples of decisions of appellate courts that were applying an incorrect "heightened-harm requirement" beyond the textual language of Title VII). Judges are human. Sometimes judges miss facts, differ from other judges on how they characterize and interpret the same facts, choose which version of the facts to believe and cite (one side or the other in the litigation), and draw inferences from facts through the lens of their experiences. *See generally*, Amanda Peters, *What* Torres v. Madrid *Reveals About Fact Bias in Civil Rights Cases*, 50 FLA. ST. U.L. REV. 569 (2023). Plaintiff's task in this Motion for Reconsideration is to persuade the Court to review the pertinent facts and issues Plaintiff raised but the Court did not consider or decide. Plaintiff will also seek to persuade the Court to find good faith and diligence in its consideration of the pertinent facts and circumstances to ultimately arrive at a finding of good cause and excusable neglect warranting the relief Plaintiff requested in her Motion for Corrected Response and Declaration.

Defendant has already damaged Plaintiff's academic career with its false allegations and wrongful termination. (*See* Doc. 47-1).[5] Now, it seeks to further damage Plaintiff's

---

[5] Most recently, Defendant wrongfully denied Plaintiff the Step Three formal process she has been waiting for since she subjected herself to Plaintiff's internal sham process

4

professional reputation via these proceedings with its cavalier misrepresentations (without citing to the record or producing exhibits), misleading allegations, *ad hominem* attacks, and unsupported legal arguments (without citing to legal authority); Plaintiff responds with citations to the record, exhibits, and legal research. (*See e.g.*, Docs. 53; 58; 65; 111; 114; Doc. 117, ¶¶ 1-15; Doc 123, ¶¶ 1-27; Doc. 123 at 4-5 n.3; ). Plaintiff requested to be excused from mediation because she asserted that mediation would be futile as she cannot agree to a non-disparagement clause that would be unenforceable, including because Defendant, through some of its employees, has disparaged and continues to disparage her. (Doc. 47 at 7-8).[6] This Court's record is something Plaintiff may need to explain in its full context, including potentially disparaging allegations about her diligence and good faith. Therefore, Plaintiff must respond to the attacks on her professional diligence and good faith in these proceedings. Plaintiff is limited on how she can do this.[7] The Court record is only part of what has transpired during this litigation.[8] This Motion for Reconsideration is an important part of the record.

---

starting in April 2024. The Step Three process was supposed to be a hearing before the Florida Department of Administrative Hearings.

[6] Defendant is a State institution that acts through its employees and Board Members. Plaintiff's lawsuit has called out the wrongful actions of some employees who harm the institution with their wronful conduct, including unlawful discrimination, hostile work environment, and retaliation.

[7] Plaintiff must comply with page limits; font, margin, and line spacing requirements; and any other order the Court deems just and proper. Earlier in the litigation, Plaintiff requested ten (10) extra pages for her response to Defendant's First Motion to Dismiss Plaintiff's Amended Complaint, to Strike, and Alternative Motion for More Definite Statement (Doc. 22) but Judge Irick denied her request. (Docs. 24-25).

[8] Plaintiff has had to engage in unnecessarily contentious email practice with Defendant's counsel. Emails are an intrical part of today's professional endeavors, including litigation practice. The majority of the emails between Plaintiff and Defendant's counsel have not been made part of the record in this case; there are many, often multiplied by Defendant's counsel's tactics. Emails are often necessary to try to guard against misrepresentations. (*See, e.g.*, Docs. 58, 58-1, 58-2).

### III.   <u>MEMORANDUM OF LAW</u>

A party may move for reconsideration of an order entered by the Court. *Local Access, LLC v. Peerless Network, Inc.*, No: 6:17-cv-236-WWB-EJK, 2021 U.S. Dist. LEXIS 257269, at *13 (M.D. Fla. Oct. 4, 2021) (rejecting a plaintiff's argument for sanctions against defendant beyond a date previously set by this Court and noting that plaintiff did not move for reconsideration of that prior Court order). This Court has stated the legal standard for reconsideration as follows:

> District courts are afforded considerable discretion to reconsider prior decisions. *See Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1231-32 (11th Cir. 2010) (discussing reconsideration of interlocutory orders); *Lamar Adver., Inc. v. City of Lakeland*, 189 F.R.D. 480, 488-89, 492 (M.D. Fla. 1999) (discussing reconsideration generally and under *Federal Rule of Civil Procedure 54(b)*); *Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D. Fla. 1994) (discussing reconsideration under *Rule 59(e)* and *Rule 60(b)*). Courts in this District recognize "three grounds justifying reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *McGuire v. Ryland Grp., Inc.*, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007) (quotation omitted); *Montgomery v. Fla. First Fin. Group*, No. 6:06-cv-1639-Orl, 2007 U.S. Dist. LEXIS 52602, 2007 WL 2096975, at *1 (M.D. Fla. July 20, 2007).
>
> "Reconsideration of a previous order is an extraordinary measure and should be applied sparingly." *Scelta v. Delicatessen Support Servs., Inc.,* 89 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000). "[M]otions for reconsideration should not be used to raise arguments which could, and should, have been previously made." *Id.* (quotation omitted). Stated differently, "[a] party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a *motion for reconsideration*." *McGuire,* 497 F. Supp. 2d at 1358 (quotation omitted). To permit otherwise would "essentially afford[] a litigant two bites at the apple." *Am. Home Assurance Co. v. Gleen Estess & Assocs., Inc.,* 763 F.2d 1237, 1239 (11th Cir. 1985) (quotation omitted).

*Bent v. Wilson*, No. 6:21-cv-75-WWB-EJK, 2022 U.S. Dist. LEXIS 197831, at *3-4 (M.D. Fla. Oct. 31, 2022).[9] A motion for reconsideration should not "raise arguments which, and

---

[9] In *Bent v. Wilson*, 2024 U.S. App. LEXIS 1820 (11th Cir. Jan. 26, 2024), the Eleventh Circuit reversed this Court's denial of the plaintiff's motion for reconsideration of the

should, have been [previously] made." *Allstate Servicing, Inc. v. KG*, No. 5:21-cv-574-WWB-DAB, 2023 U.S. Dist. LEXIS 231786, at *4 (M.D. Fla. Nov. 20, 2023) (citations omitted). Therefore, motions for reconsideration should raise issues that were previously asserted but not decided. *Id.* at *6.

A. **In the Interests of Justice**

In her Motion for Corrected Response and Declaration, Plaintiff requested that the Court grant Plaintiff the relief she requested in the interest of justice. (Doc. 102, ¶¶ 34-35). The Court did not decide whether the interests of justice warrant the Court's exercise of its inherent power to manage its docket and allow Plaintiff to submit her Corrected Response and Declaration (with supporting evidence). As Plaintiff stated in her Motion for Corrected Response and Declaration, the Court has inherent power to manage its docket "so as to grant enlargements of time even when such extensions fall outside the literal scope of Rule 6(b)." (*Id.* at 16) (citing *Godoy v. Office of Bar Admissions*, No. 1:05-CV-0675-RWS, 2006 U.S. Dist. LEXIS 50654, at *7 (N.D. Ga. July 25, 2006)).

In *Arch Specialty Ins. Co. v. BP Inv. Partners, LLC*, this Court granted reconsideration "in the interests of justice," citing the Eleventh Circuit's strong preference "to resolve matters on the merits as opposed to procedural technicalities" "to give every litigant its day in court." No. 6:18-cv-1149-WWB-DCI, 2020 U.S. Dist. LEXIS 171764, at *4-5 (M.D. Fla. April 1, 2020) (citing *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1342 (11th Cir. 2014) (citation omitted)). This Court granted reconsideration despite being "firmly convinced Defendant ha[d] not set forth any basis for reconsideration or leave to file an untimely

---

Court's order dismissing the plaintiff's second amended complaint with prejudice as a "shotgun" pleading. However, the Eleventh Circuit did not state that this Court's stated legal standard for reconsideration was incorrect.

answer." *Id.* at *4. This Court held: "Accordingly, despite Defendant's repeated and inexcusable neglect to justify its failure to timely answer, this Court, under its inherent authority to manage its docket and in the interests of justice, will allow the Clerk to docket Defendant's proposed Answer (Doc. 63-1) as its answer." *Id.* at *5.[10] The plaintiff in *Arch Specialty* was represented by several attorneys (from the Orlando, Florida, office of a large firm) and the defendant was also represented by several attorneys (some from a law firm in Fort Lauderdale, Florida, and one from Winter Park, Florida). *Id.* at *1. This Court also exercised its inherent power and considered and granted a defendant's motion to dismiss "[i]n the interests of justice," even though defendant's motion failed to comply with the Court's Standing Order. *Bent v. Riley*, No. 6:21-cv-75-WWB-EJK, 2022 U.S. Dist. LEXIS 167844, at *1, n.1 (M.D. Fla. Sept. 16, 2022).

The pertinent circumstances stated in Plaintiff's Motion for Corrected Response and Declaration, when fully considered, warrant this Court's exercise of its inherent power in the interests of justice in favor of Plaintiff's request to submit her Corrected Response and Declaration.

**B.** **Plaintiff Stated Facts and Explanations that Should Be Considered by the Court**

In her Motion for Corrected Response and Declaration, Plaintiff included facts and explanations that directly answered questions the Court raised in its Order. The Court did not consider these facts and explanations, including in its analysis of Plaintiff's diligence.

---

[10] The Court also held that the interests of justice did not "warrant granting Defendant leave to assert affirmative defenses or counterclaims" including because "discovery had already closed; therefore, [a]llowing the affirmative defenses and counterclaims at this time would: (1) require reopening discovery, (2) prejudice Plaintiff, and (3) delay the timely and efficient resolution of this case." *Id.* at *6-7.

Therefore, the Court used what it thought were missing facts and explanations as reasons to find lack of diligence and deny Plaintiff's Motion for Corrected Response and Declaration.

The Court correctly noted that "Plaintiff requested, and was granted, three separate ["timely"] extensions of time" to respond to Defendant's Motion for Summary Judgment. (Doc. 124 at 3). Plaintiff was diligent in seeking these discrete, brief extensions of time as the need arose for each one due to unexpected circumstances beyond Plaintiff's control. The three unopposed extensions added to a total of <u>eighteen (18) days</u>. (Docs. 79-80, 82-83, 87-89). The Court cited Plaintiff's "timely" requests for extensions of time to support that Plaintiff "was well aware of the deadline to file her response to Defendant's Motion for Summary Judgment," (Doc. 124 at 3) an awareness Plaintiff did not deny.[11] The Court also used these "previously filed timely motions for extensions of time," to question why and conclude that Plaintiff "offer[ed] no explanation for her failure to [file a timely motion for extension of time]" when she faced "a medical emergency [that] prevented her from editing her summary judgment response and forced her to file a draft version—the current Response—rather than the complete Corrected Response and supporting exhibits." (Doc. 124 at 2-3). However, in her Motion for Corrected Response and Declaration, Plaintiff explained that on August 19, 2024:

> Plaintiff was basically incapacitated and could not even prepare an emergency motion, which would have been the only way for Plaintiff to communicate with the Court to seek relief by way of an emergency request for an extension of

---

[11] In its Response, Defendant stated that "[Plaintiff] knew the deadline and had been given the courtesy of three prior extensions." (Doc. 113, ¶ 16). Plaintiff did not state that she did not know the deadline. On December 6, 2022, Defendant sought and received a <u>forty-five day extension</u> to respond to Plaintiff's Amended Complaint. (Doc. 13). Plaintiff did not oppose the requested extension and the Court granted it. (Doc. 16).

time to submit her Response and Declaration.[12]  Rather than miss the Court's deadline altogether, Plaintiff submitted a draft Response, which needed final edits. Plaintiff was unable to submit her Declaration and supporting exhibits.[13]

(Doc. 102, ¶ 5). Additionally, in her Time-Sensitive Notice (Doc. 92), which the Court cited

in its Order (Doc. 124 at 3), Plaintiff stated the same. (Doc. 92, ¶ 3).

The Court also added: "And, after filing the Response, Plaintiff took fifteen days to

notify the Court of her error,[14] (*see generally* Doc. 92) and an additional twenty-nine days

to file the instant Motion." (Doc. 124 at 3). However, the Court did not consider Plaintiff's

factual explanation:

> The week of August 19, 2024, Plaintiff was still suffering from impaired vision. She was also suffering from a migraine headache.[15] She had to make a choice to prioritize her health and reduce the use of the computer. At that point, Plaintiff did not know what she would be able to do and when she could resume the computer use without causing further damage to her eyes.
>
> On August 22, 2024, Plaintiff's ophthalmologist, who treated Plaintiff for the past two episodes with her eyesight and has continued treating her, told Plaintiff that she could resume computer use. However, Plaintiff's vision is still not back to her pre-episode normal. The last time Plaintiff had a similar vision impairment, it took a few months to recover. The main problem is with reading, especially reading from a computer screen. Plaintiff must pace herself and take breaks from the computer screen.

---

[12] Plaintiff also stated: "The Local Rules require that parties must seek relief by way of a motion. Middle District L.R. Rule 3.01(k)." (Doc. 102 at 3 n.2). This was to explain why Plaintiff could not readily communicate with the Court via a phone call or email.

[13] Plaintiff also explained: "Plaintiff decided to not further compromise her health. Plaintiff recalled the case of FAMU law professor Rhoda Cato whose health deteriorated as she pursued litigation against Defendant. *Cato v. Florida Agricultural & Mechanical University*, Case #: 6:19-cv-00099-PGB-EJK (M.D. Fla. 2019). She died not long after the case settled. Two of the GrayRobinson attorneys who entered appearances in this case also represented Defendant in Professor Cato's case." (Doc. 102 at 3-4 n.3).

[14] Plaintiff did not characterize the filing of her draft Response as an "error." Defendant characterized Plaintiff's draft Response as "an incorrect version." (Doc. 113, ¶ 16). Plaintiff characterized the filing of her draft Response as an "emergency decision" "to avoid having the Court deem the Motion for Summary Judgment unopposed." (Doc. 102, ¶ 11).

[15] "Plaintiff has been treated for migraine headaches for the past couple of years." (*Id.* at 12 n.12).

(Doc. 102, ¶¶ 6-7).

***

On August 19, 2024, Plaintiff made the emergency decision to file her draft Response to avoid having the Court deem the Motion for Summary Judgment unopposed. After that, Plaintiff needed to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work to finalize the Corrected Response and Declaration before communicating further with the Court through motion practice (this Motion).

Plaintiff did not know when she would regain her vision sufficiently to complete her Declaration and Corrected Response. She had to prioritize her health. Therefore, she could not ask for an extension of time because she could not represent to the Court a date for said extension. Plaintiff did not even know if she would be able to do the required computer work to complete her Declaration and Corrected Response.

On September 3, 2024, Plaintiff filed Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment. (Doc. 92). In her Notice, Plaintiff alerted the Court about the exigent, extraordinary, and unforeseen circumstances she has been facing.

(*Id.*, ¶¶ 11-13). Plaintiff also explained: "The length of the delay was only as long as necessary for Plaintiff to regain sufficient vision to finalize her Corrected Response, Declaration, and this Motion [for Corrected Response and Declaration] (with legal research)." (*Id.* at 20-21). In the footnote that accompanied this text, Plaintiff stated: "Plaintiff hopes that the Court will consider that her health issues and the resulting delay with preparation of her materials burdened and prejudiced Plaintiff. Plaintiff did not envision or want the additional work, including the additional research and preparation of the prior emergency motions and this Motion [for Corrected Response and Declaration]. However, Plaintiff had no control over the unpredictable health issues." (*Id.* at 21 n.18). *See Columbie v. Clear Blue Specialty Ins. Co.*, No. 2:23-cv-00889-SPC-NPM, 2024 U.S. Dist. LEXIS 151061, at *3-4 (M.D. Fla. July 21, 2024) (finding counsel's "untimely illness"

was excusable neglect) ("Plaintiffs also appear to have acted in good faith—there's no reason to believe they wanted this delay or gained any advantage from it, and there is certainly no evidence of bad faith."). Additionally, in her Time-Sensitive Notice (Doc. 92), which the Court cited in its Order (Doc. 124 at 3), Plaintiff stated the same. (Doc. 92, ¶¶ 3-5).

In her Time-Sensitive Notice, Plaintiff also explained that she "reviewed the Local Rules and the Court's website to ascertain whether there is a procedure to provide this type of [medical issue] information to the Court" but "did not find any." (Doc. 92, ¶ 17). On September 3, 2024, "Plaintiff contacted the Clerk of Court to ascertain whether there is any way to apprise the Court in this type of situation. The Clerk's office responded that they cannot provide advice but suggested that a notice may be proper." (Doc. 92, ¶ 18). Therefore, that same day, Plaintiff diligently filed her Time-Sensitive Notice. (Doc. 92).

In its Order, the Court also stated:

> Further belying Plaintiff's claim of diligence is the fact that although Plaintiff contends that she intended to file supporting affidavits with her Response, the Response does not cite any such affidavits and three of Plaintiff's proposed affidavits are dated after both the summary judgment response deadline and the filing of Defendant's Reply. (Doc. 107-2 at 11, 17, 21). It appears, therefore, that Plaintiff is not attempting to merely correct an unedited draft in good faith but is rather attempting to supplement her Response after having the benefit of reading Defendant's Reply, which undermines Plaintiff's argument regarding prejudice.

(Doc. 124 at 3). Plaintiff does not  know what Court referenced when it stated above: "Plaintiff contends that she intended to file supporting affidavits with her Response." Plaintiff stated: "Plaintiff was unable to submit her Declaration and supporting exhibits." (Doc. 102 at 3). Plaintiff also stated: "Plaintiff needs the opportunity to put all the evidence in proper context before the Court through her Declaration and citations to her Declaration

in her Corrected Response." (Doc. 102, ¶ 29). Plaintiff's draft Response to Defendant's Motion for Summary Judgment did not cite the Witness Affidavits because Plaintiff cited the Witness Affidavits in her Declaration (as evidence).[16] The Corrected Response, in turn, cited to Plaintiff's Declaration.

The dates of three (3) of the six (6) Witness Declarations that Defendant characterized as "troubling" in its Response (Doc. 113, ¶ 15) are the same ones the Court cited (September 20, 2024, September 25, 2024, and October 1, 2024) in reference to Plaintiff's good faith. (Doc. 107-2 at 11, 17, 21). However, Plaintiff was transparent with the Court when she stated in her Motion for Corrected Response and Declaration that "[a]fter [August 19, 2024], Plaintiff needed to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work *to finalize the Corrected Response and Declaration* before communicating with the Court through [her Motion for Corrected Response and Declaration]. (Doc. 102, ¶ 11) (emphasis added).

As for the dates of three (3) of the Witness Affidavits, the day before the Court issued its Order denying Plaintiff's Motion for Corrected Response and Declaration, Plaintiff stated (in her Response in Opposition to Defendant's Motion to Strike Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Final Judgment): "Defendant should not complain about the dates when Plaintiff was able to finally complete some of her Declarations because Plaintiff was transparent with the Court about not being able to finish the work due to the

---

[16] Defendant filed two Declarations in support of its Motion for Summary Judgment. (Docs. 75-1, 75-2). Both Declarations cited to attached evidence in the form of exhibits. Similarly, Plaintiff's Declaration cited to attached evidence in the form of exhibits and the Witness Declarations are exhibits.

vision impairment leading up to the August 19, 2024 deadline." (Doc. 123 at 11 n.12). The Court noted that "Plaintiff cite[d] Federal Rule of Civil Procedure 6(b)(1)(B) as the basis for her requested relief." (Doc. 124 at 2). Therefore, the Court treat[ed] the Motion as a request for extension of time to respond to Defendant's motion for summary judgment." (Doc. 124 at 2). Plaintiff understood her request the same way; therefore, she acted in good faith when she continued to finalize her materials as she represented to the Court. Throughout these proceedings, Plaintiff has never given the Court any reason to doubt her good faith.

   **C. <u>Prejudice Analysis</u>**

   In her Motion for Corrected Response and Declaration, Plaintiff advanced several reasons why Defendant would not be prejudiced. The Court did not consider these reasons in reaching its decision regarding prejudice.

   Plaintiff asserted that Defendant and its counsel have been aware of Plaintiff's facts and evidence (most of the evidence consists of Defendant's own records). (Doc. 102, ¶ 30). Defendant's counsel can prepare a reply to Plaintiff's Corrected Response and Declaration. (*Id.*, ¶ 31). Plaintiff conferred with Defendant's counsel in efforts to persuade counsel not to oppose Plaintiff's request and explained the nature of the corrections and even offered to send a tracked changes version of the Corrected Response. (*Id.*, ¶ 32). Plaintiff also requested that the Court grant Defendant fourteen (14) days to file a reply, "which would mean additional time beyond the time already provided after it received Plaintiff's Original [draft] Response." (*Id.*, ¶ 33). In her Motion for Corrected Response and Declaration, Plaintiff cited a case that held that granting Defendant fourteen (14) days to file a reply supported lack of prejudice. (Doc. 102 at 22) (citing *Dudley v. United States*,

No. 1:17-cv-00263, 2020 U.S. Dist. LEXIS 257174, at * (N.D. Ga. 2020)). The Court did not consider these arguments and facts in its prejudice analysis.

Defendant's only asserted claim of prejudice was that it would "need to file a supplemental reply" and that "[t]his will impede the Court's ability to appropriately consider and rule on the Motion for Summary Judgment within the current timeframe set for pretrial proceedings." (Doc. 113 at ¶ 10). "To establish prejudice" to the opposing party, the delay in filing a response to a motion for summary judgment "must 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" *E.C. v. Child Dev. Sch., Inc.*, 2011 U.S. Dist. LEXIS 112255, at *14-15 (M.D. Ala. 2011) (citing 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure,* § 2699 at 536-37 (2d ed. 1983)). In *E.C.*, the court held that the attorney's "representation of illness" "provided a ground" "sufficient to justify the delay in filing" the response to the motion for summary judgment late, was "an acceptable reason for the delay," and constituted "excusable neglect" even if the attorney "did not file a motion requesting an extension of time to respond to the summary judgment motion." *Id.* at *18-19. Prejudice, in the determination of excusable neglect, means "more than the prospect of protracted proceedings." *Ganier v. Ramsgate Ins., Inc.*, No. 8:17-cv-2463-T-26MAP, 2018 U.S. Dist. LEXIS 226823, at *3 (M.D. Fla. July 9, 2018) (citing *Coello v. La Cabana Mexican Rest.*, 2013 U.S. Dist. LEXIS 525, at *3 (N.D. Ala. Jan. 3, 2013)).

The Court's finding regarding prejudice was that Plaintiff would get to "supplement her Response after having the benefit of reading Defendant's Reply"[17] and "Defendant would

---

[17] In its Response, Defendant stated that Plaintiff is attempting to get "the benefit of correcting the deficiencies of her Response as outlined in Defendant's Reply." (Doc. 113

need to file a supplemental reply, incurring additional costs." (Doc. 124 at 3).[18] The Court did not consider that Defendant's six-page Reply was basically limited to arguing that the Court should grant its Motion for Summary Judgment based on the "procedural technicality" that Plaintiff did not cite to evidence in her draft Response and did not submit her Declaration. The first four and a half pages of Defendant's Reply are a recitation of the summary judgment legal arguments and case citations that are copied and pasted by defendants in similar replies,[19] arguing that a plaintiff did not cite to evidence. Therefore, Plaintiff did not get any benefit from reading Defendant's Reply.

Defendant did not cite any legal authority for the proposition that Plaintiff's review of its Reply constitutes prejudice,[20] especially prejudice warranting the manifest injustice that Plaintiff will suffer if the Court grants Defendant's Motion for Summary Judgment effectively because the Court did not accept Plaintiff's Corrected Response and Declaration. *See Bent v. Riley*, No. 6:21-cv-75-WWB-EJK, 2022 U.S. Dist. LEXIS 167844, at *5 (M.D. Fla. Sept. 16, 2022) (noting that "[p]laintiff offer[ed] no binding—or even persuasive—legal authority"). Moreover, as the Court properly noted, if the Court were to allow Plaintiff to file her Corrected Response and Declaration (with supporting evidence),

---

at 6). Defendant did not argue that this alleged "benefit" would prejudice it; rather, it argued that this "benefit" militated against "excusable neglect." (*Id.*).

[18] Defendant caused additional costs and judicial proceedings when Plaintiff had to defeat Defendant's Motion for Protective Order (Docs. 37-40, 43, 49) and, *after that*, Plaintiff had to file and win a Motion to Compel (Doc. 50, 52, 54, 56, 57, 60, 64) to finally be able to take former President Larry Robinson's deposition.

[19] Law firms have electronic repositories (databases) of the documents they file. It is fairly easy to copy and paste the legal standards from these documents. Attorneys in law firms also maintain their own document repositories of the cases they handle. Defendant's counsel has access to these repositories. Plaintiff does not.

[20] A plaintiff may request leave of Court to file a sur-response after reading a defendant's reply to plaintiff's response.

the Court would have to allow Defendant to file a supplemental reply. (Doc. 124 at 3). Defendant would then be in the same position it would have been if it had not opposed Plaintiff's request to submit her Corrected Response and Declaration, and the Court had accepted these materials.

The Court raised the matter of additional costs to prepare a supplemental reply. (Doc. 124 at 3). Defendant did not bring up the issue of costs and did not cite any legal authority for the proposition that the additional cost of preparing a second reply rises to the level of prejudice warranting manifest injustice to Plaintiff. Moreover, the Court did not consider that Defendant brought the extra costs upon itself. Defendant knew as early as August 22, 2024, nearly two (2) weeks prior to when it filed its Reply, that Plaintiff would file a motion requesting that the Court accept her Corrected Response and Declaration. On August 23, 2024, Defendant refused to join Plaintiff in a motion to seek this relief and request an extension of time for Defendant to file its Reply after Plaintiff filed her Corrected Response and Declaration. Defendant's refusal to accommodate Plaintiff's exigent, medical circumstances, caused the need for additional motions and responses. Defendant should not be rewarded for such incivility in response to Plaintiff's unforeseen, exigent, medical circumstances.[21]

---

[21] When lead Defendant's counsel in this case requested an extension of forty-five (45) days to respond to Plaintiff's Amended Complaint (Doc. 13), Plaintiff did not oppose the extension on the condition that Defendant's counsel would extend her the same professional courtesy if the need ever arose for her to request a similarly lengthy extension. The Court granted Defendant's unopposed extension, (Doc. 16), which gave Defendant a total of sixty-six (66) days to prepare and file a response. When Plaintiff agreed to the lengthy extension, she was under the understanding that Defendant needed the extra time to prepare an Answer and Affirmative Defenses, which would have streamlined the discovery and motions in the case. However, instead, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint as a "shotgun" pleading. (Doc. 22).

In her Motion for Corrected Response and Declaration, Plaintiff stated:

> The detailed allegations in Plaintiff's pleadings provided notice to Defendant about Plaintiff's factual allegations since November 18, 2022. (Doc. 17). Plaintiff, on the other hand, did not receive Defendant's Answer and Affirmative Defenses until September 23, 2024, after the deadline to respond to Defendant's Motion for Summary Judgment. (Doc. 97). This factor should weigh heavily in favor of allowing Plaintiff to file her Corrected Response and Declaration, including in the analysis of prejudice to Plaintiff.
>
> The Court recently, *sua sponte*, extended pretrial deadlines and the beginning of the trial term. (Doc. 98). The trial term is now set to begin on February 3, 2025. (*Id.* at 2). Plaintiff's Corrected Response and Declaration may aid Defendant and Plaintiff to narrow and resolve factual, evidentiary, and legal issues. Accordingly, it would be efficient for the litigation if the Court grants the relief Plaintiff requests. Defendant will not be prejudiced, especially if the Court grants it fourteen (14) days to file a reply or any other time the Court deems just and proper. *See Dudley v. United States*, No. 1:17-cv-00263, 2020 U.S. Dist. LEXIS 257174, at * (N.D. Ga. 2020) ("The Court granted Plaintiff a fourteen-day extension of time to respond to Defendant's motion, which further supports the lack of prejudice.").

(Doc. 102 at 22).

As Plaintiff trusts the Court understands, it is difficult for Plaintiff (out of respect and deference) to raise the fact that, due to the Court's delay in ruling (Doc. 94) on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 35), Plaintiff did not get the benefit of Defendant's Answer and Affirmative Defenses before the discovery deadline and the deadline to file motions for summary judgment.[22] Plaintiff infers that the Court must have good cause for this delay. On September 25, 2024, sixteen (16) days after the Court entered its Order denying Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 94) and two (2) days after Defendant finally

---

[22] Defendant filed a highly deficient Answer and Affirmative Defenses (Doc. 97), which Plaintiff moved to strike. (Doc. 112). However, Judge Irick denied Plaintiff's Motion to Strike Defendant's Affirmative Defenses based largely on his adoption of Defendant's misrepresentation that Plaintiff did not comply with conferral as required by Local Rule 3.01(g). (Doc. 127). Plaintiff now also needs to move for reconsideration of said order.

filed its Answer and Thirteen (13) Affirmative Defenses (Doc. 97), the Court, *sua sponte*, amended the CMSO. (Doc. 98). It changed the remaining deadlines for the Meeting in Person to Prepare Joint Final Pretrial Statement (to November 22, 2024), Joint Final Pretrial Statement (to December 2, 2024), Trial Status Conference (to December 10, 2024), and beginning of Trial Term (to February 3, 2025). (Doc. 98 at 1-2). Plaintiff respectfully submits that this *sua sponte* amendment supports that, to prevent manifest injustice to Plaintiff, the Court should allow her to submit her Corrected Response and Declaration and also allow Defendant to submit a reply even if this means entering another *sua sponte* amendment of the CMSO. The prejudice to Defendant if this happens would be slight to none considering the overall record in this case. The CMSO has never been extended at the request of the parties.

**D. The Resolution of the Case Should Not be Based on a "Procedural Technicality"**

In her Motion for Corrected Response and Declaration, Plaintiff raised that this case is important beyond its application to Plaintiff's causes of action and, as such, it should not be decided on a "'procedural technicality' caused by unexpected health circumstances beyond Plaintiff's control." (Doc. 102 at 17) (citing *Godoy*, 2006 U.S. Dist. LEXIS 50654, at *4-7, 10). The Court did not decide whether the importance of this case warrants granting Plaintiff the relief she requested so she can produce her evidence.

In her Motion for Corrected Response and Declaration, Plaintiff stated:

> The decision in this case, as in *Godoy*, may serve purposes beyond Plaintiff's case, including for the College of Law, the State University System, and the State of Florida. Plaintiff brought this action against a State University System public university that Plaintiff alleges has knowingly permitted violations of anti-discrimination federal law within its law school. Administrators and law professors whose conduct is at issue in this case are training future lawyers in the FAMU College of Law. Therefore, the citizens of the State of Florida have

19

> an interest in the resolution of this case on the merits of the evidence and the law and not on "a procedural technicality" caused by unexpected health circumstances beyond Plaintiff's control.

(Doc. 102 at 17). Plaintiff also noted the hiring changes (hiring of White faculty) that have resulted after Plaintiff filed her EEOC Charge and this lawsuit. (*Id.* at 18 n.11). After Defendant wrongfully fired Plaintiff from her tenured faculty position, FAMU College of Law Interim Dean Cecil Howard explained to Defendant, during a public meeting on October 24, 2024, that he went out of his way to prevent Professor D.C., a Latina instructor, from leaving the law school's teaching staff last year to go to another law school (after Plaintiff was fired), including by promoting her to Assistant Dean for Skills Instruction.[23] Plaintiff's courageous act of calling out discrimination, hostile work environment, retaliation, and wrongdoing in the College of Law, including now with evidence in this lawsuit,[24] will continue to help the College of Law and its stakeholders.

---

[23] This is the first time a Hispanic employee holds this type of administrative position. When Plaintiff served as Chair of the Faculty Recruitment Committee, the College of Law hired three (3) highly competent faculty members (based on qualifications after a competive, transparent recruitment process). Professor D.C. was hired as a full-time legal, research and writing instructor during this time. Professor D.C. is the first Hispanic alumni (man or woman) hired for a full-time teaching position. Professor M.D., a White man, was hired as Clinic Director with tenure. Plantiff was instrumental in getting his tenure recommendation approved in the College of Law Retention, Promotion and Tenure Committee when she protested the race discriminatory tactics that the same people who discriminated against her were using to defeat Professor M.D.'s tenure upon appointment. Professor A.I., a Black man, was also hired with tenure. (Doc. 34, ¶¶ 217, 222). After Plaintiff was fired, Defendant hired D.G-Q, a Hispanic man, as Mental Health Counselor in the College of Law.

[24] Before filing this case, Plaintiff obtained evidence to support her causes of action; the evidence consisted overwhelmingly of Defendant's own records. This is why Plaintiff was able to provide detailed allegations (including names, dates, and quotes) in her pleadings. If Plaintiff had to rely on obtaining discovery from Defendant, Defendant would have unnecessarily obstructed discovery and multiplied the costs and work in this litigation even more, as it has done in this case and other cases. *See e.g.*, *Smith v. FAMU*, Case No. 6:24-cv-00457-PGB-RMN (M.D. Fla. 2024) (Docs. 56-57, 76-78, 88-89, 109, 111, 113, 116-118, 122, 126, 128-131, 137-138, 140, 146-147, 152-154, 156, 163, 171-172)

E.  **The Court Should Consider Plaintiff's *Pro Se* Representation**

In her Motion for Corrected Response and Declaration, Plaintiff raised that she is "handling this litigation individually and *pro se*." (Doc. 102 at 20). Therefore, "when she gets sick, she cannot pass the work to someone else." (*Id.*). The Court did not decide whether Plaintiff's *pro se* status warranted granting her the relief she requested considering the unexpected disabling health issue she faced.

"The determination of what constitutes excusable neglect is generally an equitable one, taking into account the totality of the circumstances surrounding the party's omission." *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 934 (11th Cir. 2007) (citing *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 389, 395 (1993)). Health issues may constitute excusable neglect. *United States v. Calandra*, No. 22-13142, 2024 U.S. App. LEXIS 16521, at *2-3 (11th Cir. July 8, 2024); *see also Columbie*, 2024 U.S. Dist. LEXIS 151061, at *2-4 (finding that counsel's "untimely illness," the flu, constituted excusable neglect for not filing responses to motions).

As the Court has previously noted, Plaintiff, a licensed attorney, is proceeding *pro se* in this case. (Doc. 94 at 4). Plaintiff has never practiced employment law and has been out of practice for nearly two (2) decades. However, Plaintiff has proceeded in this litigation without getting the benefit of *pro se* or attorney status.[25] In *Bethune-Cookman v.*

---

(these were all discovery-related matters during the first six (6) months the case was in this District Court, not including the orders that were entered to deal with all these discovery matters).

[25] Throughout this litigation, Defendant has used Plaintiff's status as an attorney as both a sword and shield. Defendant has argued that Plaintiff should be held to a higher standard, including because she was a law professor, while at the same time it argued that Plaintiff is not entitled to attorney's fees. (*See e.g.,* Doc. 37 at 3). Defendant's counsel has not extended to Plaintiff the professional courtesy that should be provided to counsel in a case. (*See e.g.*, Docs. 44, 44-2, 46, 46-1, 46-2). As Plaintiff informed the Court on

*Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, this Court expressed sympathy toward an attorney facing medical issues and noted that health issues may make a timely filing more difficult for a solo practitioner than for an attorney who works in a law firm with additional attorneys. No. 6:22-cv-47-WWB-DAB, 2022 U.S. Dist. LEXIS 239447, at *5 (M.D. Fla. Dec. 23, 2022). In its Order, the Court made only a passing comment about Plaintiff's illness when it acknowledged that "Plaintiff's medical issues are outside of her control." (Doc. 124 at 3). The Court did not decide whether her illness, considering her status as a *pro se* attorney, with no other attorney to assist her, merited a finding of excusable neglect.

The Court stated that "[t]o establish good cause, the party seeking the extension must establish that the schedule could not be met despite the party's diligence." (Doc. 124 at 2) (citations omitted). The schedule that Plaintiff had to meet was the August 19, 2024 deadline. (Doc. 102, ¶ 5). The Court acknowledged that the emergency health issue Plaintiff faced was beyond her control.[26] Plaintiff continued to suffer from the vision

---

October 30, 2024, Defendant, through its counsel, engaged in an *ad hominem* attack, which was uncalled for, in response to Plaintiff's request for a five-day extension of time to file her Motion to Strike Defendant's recently filed Affirmative Defenses and to respond to Defendant's Omnibus Motion *in Limine*. (Doc. 123 at 4 n.3 (citing (Doc. 111; Doc. 117, ¶ 15)). The five-day extension request was due to issues dealing with two unexpected hurricanes (Helene followed by Milton). Plaintiff has not required the Court's latitude often provided to *pro se* parties who are not familiar with the Court's rules and procedures. *See e.g.*, *Makere v. Standard Ins. Co.*, Case No. 3:24-cv-00189-WWB-SJH. Plaintiff, as a *pro se* party who is also an attorney, has conducted her part of this litigation in accordance with the applicable rules and procedures. The record in this case, in its full and proper context, shows Plaintiff's diligence dealing with a Defendant intent on making even simple requests to file a reply contentious and opposed. (*See e.g.*, Docs. 56-2; 58-2). Plaintiff has been subjected to unreasonably hostile Rule 3.01(g) conferrals, which are required by the Local Rules. Plaintiff has also had to contend with constant misrepresentations of the facts, the record, and what she stated. (*See e.g.*, Docs. 56; 56-1; 58).

[26] Sudden loss of vision may be caused by the onset of a serious medical condition, including retinal detachment, stroke, and vitreous hemorrhage. *Sudden Vision Loss*,

impairment including to date. (Doc. 102, ¶¶ 6-8, 14). As Plaintiff explained, "[she] has been carefully allocating time daily, as her eyes permit, to work on the computer and be able to file her motions by the Court's October 2, 2024, deadline for all motions. (*Id.*, ¶ 14). Plaintiff has not missed a filing a deadline except for the August 19, 2024 filing deadline when she could not even prepare an emergency motion. (Doc. 102, ¶ 5).[27] Plaintiff prepared a "diligence timeline" from the facts she previously stated to hopefully help the Court to readily see how Plaintiff was diligently dealing with circumstances beyond her control. (Exhibit 1).

In her Motion for Corrected Response and Declaration, Plaintiff stated: "Plaintiff spent thousands of dollars to take depositions and obtain transcripts." (Doc. 102, ¶ 15). These transcripts were filed with the Court on August 12, 2024. (Doc. 86). If Plaintiff is not allowed to submit her Corrected Response and Declaration, she will not be able to cite to the transcripts of the depositions. The Court did not consider this in its Order. In addition to the financial cost, Plaintiff, as a *pro se* party, has overcome unnecessarily contentious deposition practice.[28] After the parties met for the Court-ordered settlement conference

---

Cleveland Clinic, https://my.clevelandclinic.org/health/symptoms/24803-sudden-vision-loss. "Loss of vision is considered sudden if it develops within a few minutes to a couple of days. It may affect one or both eyes and all or part of a field of vision. Loss of only a small part of the field of vision (for example, as a result of a small retinal detachment) may seem like blurred vision." Christopher J. Brady, MD, Wilmer Eye Institute, Retina Division, Johns Hopkins University School of Medicine, *Sudden Loss of Vision*, MERCK MANUAL, https://www.merckmanuals.com/home/eye-disorders/symptoms-of-eye-disorders/sudden-vision-loss. "Sudden retinal artery blockage can result from a blood clot or small piece of atherosclerotic material that breaks off and travels into the artery." *Id.*

[27] Plaintiff remembered Judge Irick's caution "that a motion to extend a deadline does not toll the deadline at issue while the motion pends." (Doc. 33). All of this was going through Plaintiff's mind as she was deciding what to do while putting her health at risk by continuing to work instead of heading to the doctor immediately.

[28] As a *pro se* party, Plaintiff has conducted this litigation without requesting much Court intervention against a Defendant experienced in contentious litigation who is represented

before U.S. Magistrate Judge Leslie Hoffman Price on October 24, 2024  (Doc. 121), Defendant's counsel, for some reason, has felt even more emboldened to be argumentative and contentious with Plaintiff.[29] On October 29, 2024, Defendant's counsel turned the Local Rule 3.01(g) conferral into an argument only to turn around that same day and misleadingly misrepresent to the Court, in its Response in Opposition to Plaintiff's Motion to Strike Affirmative Defenses, that "Plaintiff has refused to advise Defendant as to whether the proposed revised Answer and Affirmative Defenses would remedy the alleged deficiencies set forth in the Motion to Strike." (Doc. 123 at 4 n.3 (citing (Doc. 122, ¶ 10)). On November 4, 2024, based largely on Defendant's counsel's misrepresentation, U.S. Magistrate Judge Daniel C. Irick quickly denied Plaintiff's Motion to Strike Defendant's Affirmative Defenses. (Doc. 127). As a result, Plaintiff also needs to file a motion for reconsideration of said order.[30]

---

by a large law firm with experience engaging in "uncooperative and borderline uncivil litigation conduct" between counsel on both sides and requiring lots of Court intervention. *See Santana v. Telemundo Network Group LLC*, No: 6:20-cv-1157-WWB-LHP, 2022 U.S. Dist. LEXIS 42673, at *39 (M.D. Fla. March 10, 2022).

[29] In efforts to promote civility and professionalism, Plaintiff has repeatedly suggested recording the Local Rule 3.01(g) conferrals (*see e.g.*, Doc. 51-3 at 10); however, Defendant's counsel has refused. Recording would allow both sides to have an accurate record of what everyone said, to hopefully avoid misrepresentations to the Court about what happened and what was said during the conferrals. Due to the issues with misrepresentations to the Court, the phone conferrals are preceded and followed by back-and-forth emails documenting, discussing, and even agreeing to disagree about what happened and what was said during the conferrals. Plaintiff is further disadvantaged during these conferrals because she often deals with two-on-one counsel and must communicate with different attorneys that represent Defendant in this case. The emails and phone conferrals unnecessarily lead to more billable time for Defendant's counsel. In the end, Defendant's counsel opposes Plaintiff's reasonable requests even for replies. (*see e.g.*, Doc. 58-2). Defendant's counsel also uses the phone conferrals as opportunities to antagonize Plaintiff and waste her time.

[30] Judge Irick readily took Defendant's counsel at her word and stated that Plaintiff's "apparent rejection of Defendant's offer to resolve the issue require[d] the Court to expend resources where judicial intervention was possible not needed." (Doc. 127 at 2).

Plaintiff's *pro se* health compromised status, even if she is an attorney, should be considered favorably by the Court in its good cause and diligence analysis. The diligence timeline shows that Plaintiff acted diligently and in good faith and merits a finding of good cause and excusable neglect.

**IV.**    **CONCLUSION**

**WHEREFORE** Plaintiff respectfully requests that this Honorable Court grant the relief requested in this Motion for Reconsideration and allow Plaintiff to file her Corrected Response and Declaration (with supporting evidence).

**LOCAL RULE 3.01(g) CERTIFICATION**

Plaintiff certifies that she conferred in good faith with Defendant's counsel via phone and via email. Defendant opposes this Motion.

Dated this 15th day of November, 2024.

Respectfully submitted,

/s/ Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on November 15, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff

---

Thereafter, on November 6, 2024, in an over-abundance of caution and in good faith, to provide notice to the Court and possibly avoid it expending resources, Plaintiff filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders. (Doc. 128). The next day, November 7, 2024, Judge Irick *sua sponte* struck Plaintiff's Time-Sensitive Notice. (Doc. 129).

Tab 130-1

# Exhibit 1

## PLAINTIFF'S DILIGENCE TIMELINE

1.  **On July 1, 2024**, at 10:21 AM, Plaintiff sent opposing counsel an email informing them that she had to take her mother to the hospital on an emergency basis and may need to confer (regarding Defendant's *Daubert* Motion) from the hospital. (Appendix A). At 2:00 PM, Plaintiff conferred with opposing counsel by phone, while her mother was in the hospital. At that time, she told Defendant's counsel that she may need an extension of time to respond to the upcoming motion depending on how the medical situation with her mother progressed. Plaintiff explained that she is her mother's sole caregiver. (Doc. 79, ¶ 3).

2.  On **July 1, 2024**, at 4:12 PM, Defendant, Florida A&M University Board of Trustees, filed Defendant's *Daubert* Motion to Exclude Opinions of Plaintiff's Expert Kenneth Westhues, Ph.D. ("*Daubert* Motion") (Doc. 74). According to Middle District Local Rule 3.01(c), Plaintiff had until July 22, 2024 to respond.

3.  On **July 2, 2024**, Defendant filed Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law ("Motion for Summary Judgment") (Doc. 76). According to the Court's January 13, 2021 Standing Order, Plaintiff had until August 1, 2024 to respond.

4.  On **July 17, 2024**, Plaintiff filed Plaintiff's Time-Sensitive Unopposed Motion for Extension of Time to Respond to Defendant's *Daubert* Motion and Motion for Summary Judgment. (Doc. 79). Plaintiff requested an extension of seven (7) days to respond to

Defendant's *Daubert* Motion by July 29, 2024 and Defendant's Motion for Summary Judgment by August 8, 2024. (*Id.*, ¶¶ 1-2). The Court granted the extensions. (Doc. 80).

5. On **July 29, 2024**, Plaintiff timely filed her nineteen-page Response in Opposition to Defendant's *Daubert* Motion. (Doc. 81).

6. On "**August 1, 2024**, Governor Ron DeSantis declared a state of emergency in several counties, including Central and South Florida, due to an upcoming storm.[1]" (Doc. 82, ¶ 4).

7. On **August 2, 2024**, Plaintiff filed Plaintiff's Time-Sensitive Unopposed Motion for Extension of Time to Respond to Defendant's Motion for Summary Judgment. (Doc. 82). Plaintiff explained that, after her mother received emergency care in Central Florida, she had to take her to South Florida to receive additional, ongoing medical care. Plaintiff also explained that, while in South Florida, both she and her mother contracted COVID for the first time since the pandemic began and she had to prepare for the upcoming storm in both Central and South Florida. (*Id.*, ¶¶ 3-4). The Court granted the requested extension and gave Plaintiff until August 12, 2024 to respond. (Doc. 83).

8. On **August 12, 2024**, Plaintiff filed Plantiff's Emergency Motion for Extension of Time to Respond to Defendant's Motion for Summary Judgment. (Doc. 87). Plaintiff explained that "she did not expect that COVID would be as difficult as it has been and would exacerbate other medical issues." Plaintiff stated that, "[o]n August 5, 2024, Plaintiff saw her neurologist who administered tests and prescribed an additional medical test, which Plaintiff postponed" as of the date of the motion because she was actively working

---

[1] Devoun Cetoute, *Gov. DeSantis declares state of emergency as coming heavy rains might cause 'major disaster,'* THE MIAMI HERALD (AUG. 1, 2024), https://www.miamiherald.com/news/state/florida/article290676214.html.

to meet the August 12, 2024 deadline to file her response. (Doc. 87 at 2 n.2). Plaintiff offered "to explain further on the record if the Court deem[ed] it necessary and proper." (*Id.*). Plaintiff also stated that she was "also prepared to seek documentation from her neurologist about what happened at the medical appointment on August 5, 2024 if the Court require[d] it." (*Id.*). Plaintiff explained that she "ha[d] been actively working on her response and planned to complete it by [the August 12, 2024] deadline." (*Id.* at ¶ 3). She had "already filed her Plaintiff's Notice of Filing Recordings and Transcripts in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 86)."[2] (*Id.*). "However, the unforeseen health issues ha[d] made it extremely difficult to concentrate thereby requiring a lot more time than Plaintiff expected." (*Id.*, ¶ 3). Plaintiff further explained that she "submitted this motion before the time to submit her response expired and as soon as she realized that, despite her diligence, she w[ould] not be able to meet [the August 12, 2024] deadline." (*Id.* at 3) (citing *Cf. Marc Irwin Sharfman M.D. P.A. v. Precision Imaging St. Augustine LLC*, No. 6:22-cv-642-WWB-DCI, 2024 U.S. Dist. LEXIS 90277, *2 (2024) (producing on last day of discovery deadline [is deemed timely submitted])). (*Id.* at 3). Plaintiff added that "[d]ue to the way [she was] feeling, it took an inordinate amount of time and effort to prepare this

---

[2] The recordings consisted of eight (8) witness interviews that were audio recorded by Defendant's Division of Audit and Compliance investigator in the College of Law; eight (8) surveillance videos recorded by Defendant's security system in the College of Law; and four (4) deposition transcripts with accompanying exhibits. (Doc. 86). Plaintiff was instructed by the Clerk's Office to file these materials in the Courthouse because the materials exceeded the Case Management/Electronic Filing System (CM/ECF)'s 50-megabyte limitation per document, and the audio and video recordings could not be uploaded through CM/ECF.

simple motion [for extension of time]." (*Id.* at 3 n.3). The Court granted the requested extension and gave Plaintiff until August 19, 2024 to respond. (Doc. 89).

9. In summary, Plaintiff diligently and in good faith requested, *as the need arose*, three (3) discrete unopposed extensions of time to file her Response to Defendant's Motion for Summary Judgment, which the Court granted; thereby extending the deadline from August 1, 2024 until August 19, 2024 (Docs. 79-80, 82-83, 87-89). (Doc. 102, ¶¶ 1-3). Plaintiff demonstrated good cause and diligence for her requests for extension of time. *Knights v. Wyndham Vacation Ownership, Inc.*, Case No: 6:23-cv-1104-RBD-DCI, 2024 U.S. Dist. LEXIS 17525, at *5 (M.D. Fla. 2024). The unopposed extension of time for the three requests together was in total eighteen (18) days (August 1, 2024 to August 19, 2024).[3]

10. Plaintiff sought the first extension of time (seven (7) days) because she is her mother's sole caregiver and had to take her mother to the hospital on an emergency basis due to an unexpected medical issue. (Doc. 79, ¶ 3). Plaintiff sought the second extension of time (four (4) days) because she had to take her mother to South Florida for medical treatment (for the unexpected medical issue) and, while there, both Plaintiff and her mother contracted COVID for the first time since the pandemic began, which added to the medical burdens Plaintiff and her mother were facing. (Doc. 82, ¶ 3). Additionally, Plaintiff had to prepare for a storm. (*Id.*, ¶ 4). Plaintiff sought a third extension of time (seven (7)

---

[3] Defendant requested and received an unopposed forty-five (45) day extension to respond to Plaintiff's Amended Complaint. (Docs. 13, 16). Therefore, Defendant had a total of sixty-six (66) days to file an answer. When Plaintiff agreed to the lengthy extension, she was under the understanding that Defendant needed the extension to prepare an Answer and Affirmative Defenses, which would have streamlined the discovery and motions in the case. However, instead, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint as a "shotgun" pleading. (Doc. 22).

<u>days</u>) because "she did not expect that COVID would be as difficult as it has been and would exacerbate other medical issues." (Doc. 87, ¶ 3).

11. On **August 19, 2024**, Plaintiff faced unforeseen, exigent, extraordinary medical circumstances beyond her control. (Docs. 92, ¶¶ 2-3; 102, ¶¶ 4-5). In the days leading to the August 19, 2024 deadline, Plaintiff experienced medical challenges, including blurry vision and migraine headaches, which she attributed to being tired due to all the work she was doing, especially vision-intensive computer work. (Docs. 92, ¶¶ 2-3; 102, ¶¶ 4-5). She kept working as much as she could until she went suddenly blind in one eye and blurry on the other eye. (Docs. 92, ¶ 2; 102, ¶4). At that point, Plaintiff was physically unable to prepare an emergency motion for extension of time. (Docs. 92, ¶ 3; 102, ¶ 5). To avoid having the Court deem Defendant's Motion for Summary Judgment unopposed, Plaintiff filed a draft Response (her "Original Response"). (Docs. 92, ¶ 3; 102, ¶ 5). Plaintiff was unable to submit her Declaration and supporting exhibits. (Docs. 92, ¶ 3; 102, ¶ 5).

12. "After [**August 19, 2024**], Plaintiff needed time to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work to finalize her Corrected Response and Declaration before communicating further with the Court through motion practice." (Doc. 92, ¶ 4).

13. "**The week of August 19, 2024**, Plaintiff was still suffering from impaired vision. She was also suffering from a migraine headache.[4] She had to make a choice to prioritize her health and reduce the use of the computer. At that point, Plaintiff did not know what she would be able to do and when she could resume the computer use without causing

---

[4] Plaintiff has been treated for migraine headaches for the past couple of years. (Doc. 92 at 2 n.11).

further damage to her eyes." (Doc. 102, ¶ 6) (bolded font added). Plaintiff prioritized getting medical attention and saw her ophtalmologist on an emergency basis. (*Id.*, ¶ 7).[5]

14. Plaintiff could not communicate with the Court in the same way she could communicate with Defendant's counsel by email and phone to try to seek an agreement about how to accommodate the exigent, extraordinary, unforeseen medical circumstances Plaintiff was facing.

15. On **August 22, 2024**, after Plaintiff saw her ophtalmologist, Plaintiff began to confer in good faith with Defendant's counsel, by email and by phone, about her medical issues. (Doc. 92, ¶¶ 7-9). Plaintiff informed Defendant's counsel that she planned to file a motion asking the Court to accept her Corrected Response and Declaration.[6] She told Defendant's counsel that she would include a request for an extension of time (fourteen (14) days or another time the Court deemed just and proper) for Defendant's Reply after Defendant received the Corrected Response and Declaration.

16. On **August 23, 2024**, Plaintiff conferred by phone with Defendant's counsel and more fully explained the exigent circumstances that caused the need for her to seek leave of Court to file her Corrected Response and Declaration. That same day, after the phone conferral, Defendant's counsel responded via email:

---

[5] Plaintiff also tried to see her primary care physician but the office staff informed her that the doctor cancelled all appointments that week because she was sick with COVID. Plaintiff was not able to see her until August 27, 2024. (Doc. 102, ¶ 8).

[6] Plaintiff also informed Defendant's counsel that the corrections to her Original Response are mainly punctuation marks, outline numbers and consistent underlining of titles, Bluebook editing of the citations, citations to the Declaration and the record, page numbers at the bottom of the pages, and correct reference to Defendant's Motion for Summary Judgment (not Defendant's *Daubert* Motion) in the Conclusion section. (Doc. 92, ¶ 10).

> Thank you for speaking with me this afternoon. I am sorry to hear that you are not feeling well but unfortunately, we will be opposing your motion to file a corrected/revised response with the declaration. We don't think that filing the declaration or a revised response (even with no substantive changes) at this juncture would be timely given the extended deadline to file your response was Monday, August 19, 2024.

Plaintiff replied within the hour on that same day:

> Thank you for your email and for conferring with me by phone today. Like I offered when we spoke today, I could send you a tracked version of the changes to the Corrected Response, so you could confirm that there will be no substantive changes to my corrected submission. As I explained, I have not recovered from Covid but kept pushing through to get my Response done. I also had another episode of problems with my sight as a result of the extensive computer use I have been doing to prepare the Response and accompanying materials, which require a lot of screen time. I literally could not see; this happened for the first time two years ago and again a year ago. I have been seen by doctors for this medical issue, including this week after the latest episode. I had no idea it would happen again. As of today, my full vision has not returned. I did my best regarding my Response to your Motion for Summary Judgment, but I did not want to risk my life. As I told you, I kept thinking about FAMU College of Law professor Rhoda Cato who also filed a lawsuit against FAMU, which your law firm (Rick Mitchell) also handled. She got progressively sick during the litigation and died soon after the case settled. I am handling my own case in an area of law I never practiced, after being out of practice for 15 years, and without a law firm setup. I trust you can appreciate all the advantages you have on your side (number of attorneys handling the case, years of experience in this area of law, and all the support and resources). If one of you gets sick others can cover. You also have assistants and paralegals who probably help you with some of the work.

> Additionally, as I also shared with you, I had a computer issue that I worked for hours to try to fix. When I could not fix it, I contacted someone who tried to help me remotely but he could not fix it. The issue interfered with the formatting of my documents. It took me hours to get around this problem and additional use of my eyesight on the computer screen for this extra work.

On **August 23, 2024**, Plaintiff also asked Defendant's counsel if any of the several attorneys assigned to the case knew of any procedure for attorneys or *pro se* parties who face medical issues during a lawsuit to request medical accomodations. (Doc. 92, ¶ 8).

Defendant's counsel responded that "they are not aware of anything regarding accommodations and the issue has not come across in their practice." (*Id.*, ¶ 9).

17. Plaintiff knew that the Court was more likely to grant her request to file a Corrected Response and Declaration if it was not opposed. From August 23, 2024 until the time that Defendant filed its Reply on September 3, 2024, Plaintiff pleaded with Defendant's counsel to agree to accept her Corrected Response and Declaration. Defendant's counsel refused and insisted on filing its Reply by September 3, 2024.

18. Plaintiff searched through the Local Rules and Court's website to see if there was any way to notify the Court about what she was dealing with. There was no such information. (Doc. 92, ¶ 17).

19. On **September 3, 2024**, Plaintiff contacted the Clerk's office to find out if there was any way to make the Court aware of her medical circumstances and the reason why she filed a draft Response and no Declaration. A staff member in the Clerk's office suggested (without giving advice) filing a Notice.

20. On **September 3, 2024**, at 12:25 PM, Plaintiff filed Plaintiff's Time-Sensitive Notice Regarding Plaintiff's Response and Declaration in Opposition to Defendant's Motion for Summary Judgment ("Time-Sensitive Notice"). (Doc. 92). In her Time-Sensitive Notice, Plaintiff summarized for the Court what Plaintiff previously informed Defendant's counsel about regarding the exigent circumstances she was facing and how they interfered with her ability to file her materials in response to Defendant's Motion for Summary Judgment. (*Id.*). In her Time-Sensitive Notice, Plaintiff also explained to the Court that she "needed time to confirm that she would regain her vision sufficiently to be able to do the reading-intensive computer work required to finalize her Corrected Response and Declaration

before communicating further with the Court through motion practice." (*Id.*, ¶ 4).[7] Plaintiff specifically stated: "The next deadline in the Court's Case Management and Scheduling Order is October 2, 2024, the deadline to file '[a]ll other Motions, including Motions *in Limine*.'" (*Id.*, ¶ 16) (citing Doc. 26 at 2)). Because Defendant opposed Plaintiff's request for the Court to accept her Corrected Response and Declaration, Plaintiff needed to prepare a very strong motion, with sufficient citation to case law (legal research), to hopefully persuade the Court to grant her the relief she requested despite Defendant's opposition. This required a lot more work with impaired vision and limitations on the time Plaintiff was able to view the computer screen. (Docs. 92, ¶14; 102, ¶ 7). During this time, Plaintiff also had to work on additional motions that she had to file by the Court's October 2, 2024 deeadline for all other motions.

21. On **September 3, 2024**, at 9:34 PM, Defendant filed its Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. (Doc. 93).

22. On **September 9, 2024**, the Court denied Defendant's Second Motion to Dismiss and gave Defendant until September 23, 2024 to file an answer to Plaintiff's Second Amended Complaint.

23. On **September 23, 2024**, Defendant filed its Answer and Thirteen (13) Affirmative Defenses (Doc. 97) to Plaintiff's Second Amended Complaint, which Plaintiff filed on October 9, 2023 (Doc. 34).

24. On **September 25, 2024**, the Court, *sua sponte*, amended the CMSO and changed the deadlines for the Meeting in Person to Prepare Joint Final Pretrial Statement (to

---

[7] Plaintiff cannot overemphasize how losing her vision caused her to prioritize getting medical attention, giving her eyes a rest, and not causing further damage to her sight.

November 22, 2024), Joint Final Pretrial Statement (to December 2, 2024), Trial Status Conference (to December 10, 2024), and beginning of Trial Term (to February 3, 2025). (Doc. 98 at 1-2).

25. **On September 26, 2024**, in an over-abundance of caution, Plaintiff diligently filed a Time-Sensitive Unopposed Motion for Deadline to File Motion to Strike Pursuant to Time Allowed Under Federal Rule of Civil Procedure 12(f)(2). (Doc. 99). Plaintiff requested the twenty-one (21) days allowed by Rule 12 to file her Motion to Strike rather than only nine (9) days if she had to file it by the CMSO's October 2, 2024 deadline for "All Other Motions." (Doc. 26 at 2).[8] The Court granted Plaintiff the time allowed under Rule 12(f)(2) to file her Motion to Strike. (Doc. 100).

26. On **October 2, 2024**, Plaintiff filed Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102) and Plaintiff's Notice of Filing Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 103).[9]

---

[8] Technically, Plaintiff's request was not for an extension of time; it was a request for confirmation that she would receive the time she was supposed to receive under Rule 12(f)(2).

[9] On October 2, 2024, Plaintiff also filed Plaintiff's Motion in Limine (Doc. 104), Plaintiff's Motion to Reopen Discovery and Summary Judgment (Doc. 105), and Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106).

27. On **October 4, 2024**, Plaintiff filed Plaintiff's Time-Sensitive Amended Notice of Filing Declarations in Support of Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration ("Amended Notice"). (Doc. 107).[10] This Amended Notice included six (6) witness declarations: Wanda Aviles (Exhibit "1" dated 9/20/24); Nicole Dickerson (Exhibit "2" dated 9/25/24); Guillermo Flores (Exhibit "3" dated 10/1/24); Natalya Lopez (Exhibit "4" dated 8/18/24); Charles Smith (Exhibit "5" dated 8/17/24); and Celia Westbrook (Exhibit "6" dated 8/18/24) ("Witness Declarations"). (Doc. 107-2).[11]

28. On **October 16, 2024**, Defendant filed Defendant's Response in Opposition to Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration. (Doc. 113).

29. On **November 1, 2024**, the Court entered three (3) separate Orders denying Plaintiff's Time-Sensitive Motion to Replace Plaintiff's Response in Opposition to

---

[10] During this time, Florida residents, including Plaintiff, were preparing for Hurricane Milton. *See* Governor Ron DeSantis issued Executive Order (EO) 24-214, "Emergency Management – Tropical Storm Milton," declaring a state of emergency in 35 Florida counties ahead of the storm, including Orange County. MEMORANDUM: EXECUTIVE ORDER NUMBER 24-214 (Emergency Management – Tropical Storm Milton), Oct. 5, 2024, https://www.flgov.com/2024/10/05/emorandum-executive-order-number-24-214-emergency-management-tropical-storm-milton/.

[11] Between October 2, 2024 and October 4, 2024, Plaintiff worked to resolve a document upload error that was interfering with the filing of the six (6) Witness Declarations through the Case Management/Electronic Filing System ("CM/ECF"). (Doc. 107, ¶¶ 2-5). After receiving instructions from the Clerk of Court and trying different options to fix the problem, Plaintiff was finally able to upload the Declarations, on October 4, 2024, through CM/ECF all in one (1) PDF composite document as Exhibits 1 through 6. (Doc. 107-2).

Defendant's Motion for Summary Judgment with Plaintiff's Corrected Response in Opposition to Defendant's Motion for Summary Judgment and for the Court to Accept Plaintiff's Declaration (Doc. 102), Plaintiff's Motion to Reopen Discovery and Summary Judgment (Doc. 105), and Plaintiff's Motion to Stay Case Pending Exhaustion of Administrative Remedies After Wrongful Termination (Doc. 106). (Docs. 124, 125, 126).

30. On **November 6, 2024**, Plaintiff filed Plaintiff's Time-Sensitive Notice of Intent to File Motions for Reconsideration of the Court's Recent Orders to inform the Court that she intended to file Motions for Reconsideration of three (3) Orders that were recently issued by the Court (Docs. 124, 125, and 127). (Doc. 128).[12]

---

[12] On November 7, 2024, U.S. Magistrate Judge Daniel C. Irick struck the Notice. (Doc. 129). Judge Irick stated: "The rules of this court do not provide for the filing of a notice of intent to file a motion." (*Id.*).

## Appendix A



**Maritza Reyes <mreyesclaim@gmail.com>**

---

### Conferral re Time-Sensitive Motion to Stay Case

---

**M Reyes** <mreyesclaim@gmail.com>             Mon, Jul 1, 2024 at 10:21 AM
To: "Richard (Rick) E. Mitchell, Esq." <Rick.Mitchell@gray-robinson.com>
Cc: Julie Zolty <Julie.Zolty@gray-robinson.com>, Sarah Reiner <Sarah.Reiner@gray-robinson.com>, Maryann Hamby <Maryann.Hamby@gray-robinson.com>, Rose Ann Foster <RoseAnn.Foster@gray-robinson.com>, Chantal McCoy <Chantal.McCoy@gray-robinson.com>

Mr. Mitchell:

I need to take my mother to the hospital due to an unexpected emergency. I may need to do the conferral from the hospital. I will not be checking email. If you need to reach me, call my cell phone number.

Best,

Maritza Reyes

[Quoted text hidden]

Tab 47-1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARITZA REYES,

     Plaintiff,

v.                             CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

     Defendant.
_____

## <u>DECLARATION OF PLAINTIFF MARITZA REYES</u>

1.     My name is Maritza Reyes and I am over the age of eighteen (18) years of age and competent to make this Declaration upon my own personal knowledge and belief.

2.     On February 16, 2024, Florida Agricultural & Mechanical University ("FAMU") Provost Allyson L. Watson sent me a "Notice of Intent to Dismiss from Employment" (the "Notice").

3.     On March 28, 2024, Provost Allyson L. Watson issued a "Notice of Dismissal of Employment," which stated: "The reason for this employment action has been outlined in the 'Notice of Intent to Dismiss from Employment' delivered to you on February 16, 2024."

4.     The alleged "reason" for dismissal stated in the February 16, 2024 Notice was based on "communications" I sent "to faculty and students." The Notice also stated: "Copies of the communications mentioned above are attached and incorporated in this Notice of Intent to Dismiss from Employment ('Notice')." Those communications were emails.

5.     The Notice basically listed all the regulations that apply to employee conduct without specifying what section I was specifically charged under and what specifically about my emails violated which specific regulation section or subsection.

6.     The email communications that were attached to the Notice began with an "Important Notice" email dated February 1, 2024, which resigning College of Law Dean/Professor Deidre Keller sent to all faculty, all staff, and all students. Professor Keller's email was her notice of resignation effective immediately, which was a matter of public concern that was publicized on February 2, 2024 in a news article in the *Tallahassee Democrat* titled "*FAMU law school dean resigns as bar exam passage rates keep trending downward.*"[1]

7.     Several law professors, all Black (except for me), participated in the email communications from which Provost Allyson L. Watson, a Black woman, singled me out for dismissal.

8.     In my emails, I exercised freedom of expression and academic freedom on matters of public concern, including the type of speech I had engaged in before about FAMU matters of public concern (in emails and published articles).[2]

---

[1] Tarah Jean, *FAMU law school dean resigns as bar exam passage rates keep trending downward*, TALLAHASSEE DEMOCRAT, Feb. 2, 2024, https://www.tallahassee.com/story/news/local/famu-news/2024/02/02/famu-law-dean-resigns-amid-trend-of-lower-bar-exam-passage/72452205007/.

[2] *See e.g.,* Maritza I. Reyes, *FAMU BOT Must Consider Gender Biases*, Op-ed, TALLAHASSEE DEMOCRAT, Aug. 21, 2016, *available at* https://www.tallahassee.com/story/opinion/2016/08/21/famu-bot-must-consider-gender-biases/89086494/; Maritza I. Reyes, *FAMU Should Turn Audit Findings into Positive Change*, Op-ed, TALLAHASSEE DEMOCRAT, April 11, 2016, *available at* https://www.tallahassee.com/story/opinion/2016/04/11/famu-turn-audit-findings-positive-change/82907222/; Maritza I. Reyes, *FAMU Should Open More Meetings*, Op-ed, TALLAHASSEE DEMOCRAT, March 3, 2016, *available at* https://www.tallahassee.com/story/opinion/2016/03/03/famu-open-meetings/81275976/.

9.      Former Dean Deidre Keller provided her letter of resignation to the *Tallahassee Democrat*, which published it on February 6, 2024 in a story titled "*Former FAMU law dean says in resignation letter 'abusive' oversight was reason she quit.*"[3]

10.     I was charged for dismissal over speech in emails I sent on February 3, 2024 and February 5, 2024 in the email communications that followed former Dean Keller's resignation.

11.     Faculty, staff, and students had always been permitted to use the email listservs that former Dean Keller and other professors, including me, used to communicate about her resignation.

12.     Unlike the process provided to another tenured professor (over months) who was dismissed (over a year after a complaint was filed against her), I did not receive the same due process. In my case, *there was no complaint, no investigation, no opportunity to provide evidence during an investigation, no report with findings, no advice after the report and findings, and no time to consider any such report and findings and proceed according to the findings and recommendations.*

13.     The University did not prove that my emails constituted misconduct or misconduct warranting "just cause" dismissal of a tenured professor who had worked in the law school since 2009 without receiving any prior disciplinary action. This was a violation of FAMU's Regulations.

14.     On March 19, 2024, the American Association of University Professors ("AAUP") sent a letter to President Larry Robinson with copy to Provost Allyson Watson, Interim

---

[3] Tarah Jean, *Former FAMU law dean says in resignation letter 'abusive' oversight was reason she quit*, Tallahassee Democrat, Feb. 6, 2024, https://www.tallahassee.com/story/news/local/famu-news/2024/02/06/letter-famu-law-dean-says-trustees-others-stymied-her-success/72479100007/.

Associate Provost Reginald Perry, College of Law Interim Dean Cecil Howard, Faculty Senate President Professor Jamal A. Brown, and me, advising that, in an action to dismiss a professor, the burden should be on the University to prove by "clear and convincing evidence" that the professor engaged in misconduct warranting dismissal. The letter also stated FAMU's violations of "essential safeguards of academic freedom and tenure."

15.     I requested and attended a FAMU Regulation 10.120(3) Predetermination Conference on March 26, 2024 (the "Conference"). The University's "designated representative(s)" (the "Committee/Panel") during the Conference were three Florida Bar licensed attorneys and University employees (two of them were professors with administrative appointments and one of them was an administrator) who work in Tallahassee.

16.     At the Conference, I learned, for the first time, that the burden of proof at the Conference was on the employee to prove by a preponderance of the evidence that her version of the facts was more likely true than not. I did that.

17.     At the Conference, the Committee/Panel considered the Notice of Intent to Dismiss with all attachments, the documents I provided, my oral and written presentation, and my responses to their questions.

18.     In a document dated March 28, 2024, the Committee/Panel stated that after "thorough review and consideration":

> The committee has determined that there ☐ is/ ☒ is not sufficient support for the University's intended action and should therefore be ☐ affirmed/ ☒ not affirmed.

19.    On   March   28,   2024,   Provost   Allyson   L.   Watson   disregarded   the Committee/Panel's determination and issued the Notice of Dismissal of Employment terminating my employment effective April 5, 2024.

## <u>VERIFICATION</u>

I verify under penalty of perjury that the foregoing is true and correct.

Executed on May 23, 2024.

<u>/s/ Maritza Reyes</u>
Plaintiff

Tab 106-1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARITZA REYES,**

      **Plaintiff,**

**v.**                      **CASE NO.: 6:22-cv-1525-WWB-DCI**

**FLORIDA A&M**
**UNIVERSITY BOARD**
**OF TRUSTEES ("FAMU")**

      **Defendant.**
_____

## DECLARATION OF PLAINTIFF MARITZA REYES

1.     My name is Maritza Reyes and I am over the age of eighteen (18) years of age and competent to make this Declaration upon my own personal knowledge and belief.

2.     On February 16, 2024, Florida Agricultural & Mechanical University ("FAMU") Provost Allyson L. Watson sent me a "Notice of Intent to Dismiss from Employment" (the "Notice").

3.     On March 28, 2024, Provost Allyson L. Watson issued a "Notice of Dismissal of Employment," which stated: "The reason for this employment action has been outlined in the 'Notice of Intent to Dismiss from Employment' delivered to you on February 16, 2024."

4.     The alleged "reason" for dismissal stated in the February 16, 2024 Notice was based on "communications" I sent "to faculty and students." The Notice also stated: "Copies of the communications mentioned above are attached and incorporated in this Notice of Intent to Dismiss from Employment ('Notice')." Those communications were emails.

5.     The Notice basically listed all the regulations that apply to employee conduct without specifying what section I was specifically charged under and what specifically about my emails violated which specific regulation section or subsection.

6.     The email communications that were attached to the Notice began with an "Important Notice" email dated February 1, 2024, which resigning College of Law Dean/Professor Deidre Keller sent to all faculty, all staff, and all students. Professor Keller's email was her notice of resignation effective immediately, which was a matter of public concern that was publicized on February 2, 2024 in a news article in the *Tallahassee Democrat* titled "*FAMU law school dean resigns as bar exam passage rates keep trending downward.*"[1]

7.     Several law professors, all Black (except for me), participated in the email communications from which Provost Allyson L. Watson, a Black woman, singled me out for dismissal.

8.     In my emails, I exercised freedom of expression and academic freedom on matters of public concern, including the type of speech I had engaged in before about FAMU matters of public concern (in emails and published articles).[2]

---

[1] Tarah Jean, *FAMU law school dean resigns as bar exam passage rates keep trending downward*, TALLAHASSEE DEMOCRAT, Feb. 2, 2024, https://www.tallahassee.com/story/news/local/famu-news/2024/02/02/famu-law-dean-resigns-amid-trend-of-lower-bar-exam-passage/72452205007/.

[2] *See e.g.,* Maritza I. Reyes, *FAMU BOT Must Consider Gender Biases*, Op-ed, TALLAHASSEE DEMOCRAT, Aug. 21, 2016, *available at* https://www.tallahassee.com/story/opinion/2016/08/21/famu-bot-must-consider-gender-biases/89086494/; Maritza I. Reyes, *FAMU Should Turn Audit Findings into Positive Change*, Op-ed, TALLAHASSEE DEMOCRAT, April 11, 2016, *available at* https://www.tallahassee.com/story/opinion/2016/04/11/famu-turn-audit-findings-positive-change/82907222/; Maritza I. Reyes, *FAMU Should Open More Meetings*, Op-ed, TALLAHASSEE DEMOCRAT, March 3, 2016, *available at* https://www.tallahassee.com/story/opinion/2016/03/03/famu-open-meetings/81275976/.

9.      Former Dean Deidre Keller provided her letter of resignation to the *Tallahassee Democrat*, which published it on February 6, 2024 in a story titled "*Former FAMU law dean says in resignation letter 'abusive' oversight was reason she quit.*"[3]

10.     I was charged for dismissal over speech in emails I sent on February 3, 2024 and February 5, 2024 in the email communications that followed former Dean Keller's resignation.

11.     Faculty, staff, and students had always been permitted to use the email Listservs that former Dean Keller and other professors, including me, used to communicate about her resignation.

12.     Unlike the process provided to another tenured professor (over months) who was dismissed (over a year after a complaint was filed against her), I did not receive the same due process. In my case, *there was no complaint, no investigation, no opportunity to provide evidence during an investigation, no report with findings, no advice after the report and findings, and no time to consider any such report and findings and proceed according to the findings and recommendations.*

13.     The University did not prove that my emails constituted misconduct or misconduct warranting "just cause" dismissal of a tenured professor who had worked in the law school since 2009 without receiving any prior disciplinary action. This was a violation of FAMU's Regulations.

---

[3] Tarah Jean, *Former FAMU law dean says in resignation letter 'abusive' oversight was reason she quit*, TALLAHASSEE DEMOCRAT, Feb. 6, 2024, https://www.tallahassee.com/story/news/local/famu-news/2024/02/06/letter-famu-law-dean-says-trustees-others-stymied-her-success/72479100007/.

14.    On March 19, 2024, the American Association of University Professors ("AAUP") sent a letter to President Larry Robinson with copy to Provost Allyson Watson, Interim Associate Provost Reginald Perry, College of Law Interim Dean Cecil Howard, Faculty Senate President Professor Jamal A. Brown, and me, advising that, in an action to dismiss a professor, the burden should be on the University to prove by "clear and convincing evidence" that the professor engaged in misconduct warranting dismissal. The letter also stated FAMU's violations of "essential safeguards of academic freedom and tenure."

15.    I requested and attended a FAMU Regulation 10.120(3) Predetermination Conference on March 26, 2024 (the "Conference"). The University's "designated representative(s)" (the "Committee/Panel") during the Conference were three Florida Bar licensed attorneys and University employees (two of them were professors with administrative appointments and one of them was an administrator) who work in Tallahassee.

16.    At the Conference, I learned, for the first time, that the burden of proof at the Conference was on the employee to prove by a preponderance of the evidence that her version of the facts was more likely true than not. I did that.

17.    At the Conference, the Committee/Panel considered the Notice of Intent to Dismiss with all attachments, the documents I provided, my oral and written presentation, and my responses to their questions.

18.    On March 26, 2024, College of Law Interim Dean Cecil Howard issued his five-year post-tenure review to Plaintiff and assessed a rating of "Exceeds Expectations" (the highest rating) in all categories: teaching, research/scholarship, service, and overall. This post-tenure review was the recently legislatively enacted post-tenure review in Florida. I

was selected by the University in the first cohort to undergo post-tenure review (20% of faculty).

19.     In a document dated March 28, 2024, the Committee/Panel stated that after "thorough review and consideration":

> The committee has determined that there ☐ is/ ☒ is not sufficient support for the University's intended action and should therefore be ☐ affirmed/ ☒ not affirmed.

20.     On March 28, 2024, Provost Allyson L. Watson disregarded the Committee/Panel's determination and issued the Notice of Dismissal of Employment terminating my employment effective April 5, 2024.

21.     I have been stuck in Defendant's internal Regulation 10.206 appeal/grievance process since April 2024. Defendant has delayed every step of the process as long as possible. Currently, I am waiting to get answers to emails which I sent requesting the procedure to proceed to Step 3 of the process, which may finally be an administrative hearing outside of the institution.

## **VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2024.

/s/ Maritza Reyes
Plaintiff

Tab 140

<pre>
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3                                     :
     MARITZA REYES,                    :
 4                                     :
          Plaintiff,                   :
 5                                     :    Case No.:
                                       :    6:22-cv-1525-WWB-DCI
 6   v.                                :
                                       :    Orlando, Florida
 7                                     :    June 18, 2024
                                       :    10:32 a.m.
 8   FLORIDA A&M UNIVERSITY BOARD      :
     OF TRUSTEES (FAMU),               :
 9                                     :
          Defendant.                   :
10                                     :
                                       :
11
                 TRANSCRIPT OF MOTION HEARING (DOC. 51)
12             BEFORE THE HONORABLE DANIEL C. IRICK
                  UNITED STATES MAGISTRATE JUDGE
13   APPEARANCES:

14   For the Plaintiff:         Maritza I. Reyes
                                (Pro Se)
15
     For the Defendant:         Sarah P. L. Reiner
16                              Julie Zolty
                                GrayRobinson, P.A.
17                              301 E. Pine Street
                                Suite 1400
18                              Orlando, Florida 32801

19

20

21

22   Proceedings recorded by Zoom electronic recording.
     Transcript produced by computer-aided transcription.
23
                        Transcribed by:
24          Suzanne L. Trimble, RPR, WACCR, CRR
                  U.S. Official Court Reporter
25          (407) 900-8775 | trimblecourtreporter@outlook.com
     401 West Central Boulevard, Suite 4600, Orlando, Florida 32801
</pre>

1                     P R O C E E D I N G S

2            **THE COURTROOM DEPUTY:**  Case No. 6:22-cv-1525 Maritza

3    Reyes v. Florida A&M University Board of Trustees.

4            Counsel, please make your appearances for the record,

5    beginning with the plaintiff.

6            **MS. REYES:**  Maritza Reyes for the plaintiff.

7            **MS. REINER:**  Sarah Reiner and Julie Zolty for the

8    defendant, FAMU.

9            **THE COURT:**  All right.  Good morning, everyone.

10           We're here for the motion at document No. 51 in this

11   case.  I have the response and a reply from the parties.

12           That said, there was a request by plaintiff for

13   additional briefing.  Instead, I set this hearing and also gave

14   a reply, but I want to make sure all parties can make whatever

15   record they would like to make in relation to this and have the

16   opportunity to do so.

17           So, Ms. Reyes, it's your motion.  So I'm happy to hear

18   from you first on, really, any matter related to this motion.

19           **MS. REYES:**  Thank you, Your Honor.  May it please the

20   Court.

21           Your Honor, as you may know, employment cases are

22   David v. Goliath adversarial contests, with employers enjoying

23   many advantages.

24           And, by the way, Your Honor, how long do I have to

25   state my support of my motion, my argument?

1          **THE COURT:**  Well, how long -- how long do you think

2     you need?  I think we have some time.

3          **MS. REYES:**  Okay.

4          **THE COURT:**  Certainly you're not in a rush, but, you

5     know, what are you thinking?

6          **MS. REYES:**  I didn't -- I didn't know how you wanted

7     to split the time.  I don't think I'm going to be long.

8          **THE COURT:**  Okay.  I mean, usually I don't have

9     necessarily a set time for these things.  They go --

10         **MS. REYES:**  Okay.

11         **THE COURT:**  -- as long as necessary, but that's,

12    obviously, within reason.  So if you go, you know, 30 minutes,

13    that's probably not particularly --

14         **MS. REYES:**  I don't think so.

15         **THE COURT:**  Okay.  Well, as long as you're within

16    that, I think you're fine.

17         **MS. REYES:**  Okay.  So let me restart again.

18         **THE COURT:**  Sure.

19         **MS. REYES:**  Your Honor, employment cases are a

20    David versus Goliath adversarial contest with employers

21    enjoying many advantages over plaintiffs, who come to this

22    forum in desperate times and already compromised by the

23    circumstances of their employment.

24         Putting aside the clear advantages of the substantive

25    law in this circuit, employer defendants also enjoy practical

1    advantages in the discovery process.  Employers have control

2    over most of the evidence and witnesses.

3          Employer defendants generally have more financial

4    means to hire experienced lawyers and outspend plaintiffs.

5          In the case of a state institution like defendant,

6    FAMU gets the benefit of the purse of the state, and this can

7    be abused, including by increasing the costs of litigation

8    unnecessarily, which is what is happening in this case, even

9    with the limited discovery that plaintiff sought from

10   defendant, including the need to file a motion to compel the

11   deposition of President Larry Robinson, after defendant's

12   motion for protective order was denied.

13         It has also been difficult to file any reasonable

14   request unopposed.

15         As Your Honor stated in *Knights v. Wyndham Vacation*

16   *Ownership, Inc.*, Rule 16(b)(4) controls a request to extend a

17   CMSO deadline, and the Eleventh Circuit incorporates a

18   diligence requirement into this analysis.  Good cause and

19   diligence should be judged in terms of the circumstances of the

20   case.

21         In this district, the civil discovery manual states:

22   "Discovery in this district should be practiced with the spirit

23   of cooperation and civility."  It also states:  "An attorney

24   shall reasonably attempt to accommodate the schedules of

25   opposing counsel, parties, and witnesses in scheduling

5

1    discovery."

2         Federal Rule of Civil Procedure 1 states:  "That the

3    rules should be construed, administered, and employed by the

4    Court and the parties to secure the just, speedy, and

5    inexpensive determination of every action or proceeding."

6         The Civil Discovery Handbook states:  "Counsel, by

7    agreement, may conduct discovery after the formal completion

8    date but should not expect the Court to resolve discovery

9    disputes arising after the discovery completion date."

10        Specifically with regard to the depositions, the Civil

11   Discovery Handbook states:  "An attorney is expected to

12   accommodate the schedules of opposing counsel.  In doing so,

13   the attorney should normally prearrange a deposition with

14   opposing counsel before serving the notice.  If this is not

15   possible, counsel may unilaterally notice a deposition, while

16   at the same time indicating a willingness to be reasonable

17   about any unnecessary rescheduling."

18        It is with this rule background that this Court should

19   judge the good cause and diligence in plaintiff's

20   circumstances.  Diligence should not mean that plaintiff should

21   assume that she would need a year of battling over every

22   deposition by noticing them unilaterally, having to reschedule

23   them, responding to motions for protective order with requests

24   for sanctions, having to file motions to compel, all to get a

25   date for a deposition.

1    Interpreting diligence to require all this goes

2    against the purpose of the spirit of cooperation and civility

3    standard that this Court advocates.  It also goes against the

4    purpose of Federal Rule of Civil Procedure 1 by making

5    determination of the action more expensive, less speedy, and

6    less just.  It also goes against the scope of discovery,

7    including the proportionality aspect in Federal Rule of Civil

8    Procedure 26(b).

9    Plaintiff relied on defendant's counsels' continued

10   assertions that they would provide and secure dates for

11   depositions, plus plaintiff had secured defendant's counsels'

12   assurance that it would not require the 14 days' notice prior

13   to the depositions; therefore, plaintiff did not proceed to

14   schedule depositions unilaterally, only to have defendant's

15   administrators not show up or claim that they were not

16   available because it would not have been practical.

17   As was stated in *Iguana, LLC, v. Lanham* -- there, the

18   plaintiff's attorney scheduled the deposition after trying to

19   get dates and being unable to and told the Court that he did so

20   because there was a month left before the expiration of the

21   discovery deadline.  The Court responded, and I quote:  "This

22   approach to a simple scheduling conflict by Iguana's counsel

23   distracts from the serious issues presented in this case and

24   conflicts with the Court's expectations as to how discovery

25   should be conducted."

1          The Court extended the discovery period to finally

2     allow counsel to take the deposition.  The Court also

3     sanctioned both parties for other discovery violations.  At the

4     time the Court extended the discovery period, the parties had

5     already submitted motions for summary judgment.

6          In the interest of justice, judges must consider the

7     specific circumstances of the case in the good cause and

8     diligence analysis.

9          In this case, the administrators have more discretion

10    regarding their schedules than lower-level employees.

11    Plaintiff knows this firsthand because she saw how

12    administrators at FAMU were free to cancel meetings at the last

13    minute, schedule them at their whim, and show up to the law

14    school in short notice if they wanted to.

15          Lower level employees often have less control over

16    their schedules.  We all have the same 24 hours in a day.  Our

17    duties may not seem as important -- for some of us our

18    duties -- the duties of some of us may not seem as important,

19    but we still have to do them.

20          If defendant wanted to make its administrators

21    available for depositions, it could easily have done so.

22    Instead, it engaged in dilatory tactics, and this is why we are

23    here today, Your Honor.

24          As to the availability of counsel, defendant has four

25    lawyers from a big firm assigned to this case, three partners

1    and one associate.  Defendant's counsel has advised plaintiff

2    to copy all of them and their assistants in every email;

3    therefore, defendant has several lawyers handling and billing

4    for this case, and, therefore, competent to attend the

5    depositions.

6         As for plaintiff's diligence, the many emails, in

7    addition to the in-person conferrals, are evidence of her

8    diligence.  For this, I cite you to *Inspirations Nev., LLC v.*

9    *Med Pro Billing, Inc.*, finding that the emails showed the

10   details of the communications regarding attempts to schedule

11   the depositions.

12        And then, finally, at the last minute, as the deadline

13   for discovery closed, defendant's counsel, for the first time,

14   demanded that the depositions be in Tallahassee, Florida.

15   However, plaintiff stated from the beginning that she wanted

16   the depositions in person in Orlando, Florida.

17        As the Court found in *Brunson V. PHH Mortgage*

18   *Corporation*, a deponent who is an officer, director, or

19   managing agent of a party must show up as noticed, including as

20   to location of the deposition, citing *Botell v. United States*,

21   which held that the defendant must produce its managing agent

22   for deposition and incur the traveling expenses to bring him to

23   the United States.

24        In this case, as in *Botell*, the equities favored

25   taking the depositions of the administrators in person in

1    Orlando, Florida.  Defendant's counsel is located in Orlando.

2    The College of Law is located in Orlando.  Defendant and its

3    administrators undertook the duty to be responsible for

4    managing the College of Law.  Travel from north Florida to

5    central Florida is not a major burden for these high-level

6    administrators, whose travel arrangements are made by

7    administrative personnel and paid by defendant routinely.

8         Moreover, the academic year is over, which provides

9    more flexibility in the work of these administrators, and

10   plaintiff considered this as to the timing of her request.

11        In *Sovereign Health of Florida, Inc. v. City of Fort

12   Myers*, the Court held that depositions of parties' officers

13   must take place in Fort Myers, Florida, including because the

14   claims pertained to the activities of the facility located in

15   Fort Myers.  Plaintiff asserted that its corporate office,

16   corporate records, and most corporate offices were in

17   California and that its managerial and policymaking functions

18   were carried out in California.  However, the Court, which is

19   the Middle District of Florida, found that having two corporate

20   officers travel to Fort Myers did not impose a significant

21   financial burden on plaintiff.  The Court also extended the

22   discovery deadline and other deadlines to accommodate the

23   depositions and other pending discovery matters.

24        Plaintiff intends to introduce many exhibits during

25   the depositions, and handling the exhibits will be extra

1    difficult, not as effective, in a virtual deposition.  It will

2    also take more time to deal with the technology, including

3    potential glitches, bad connection, and opening and handling

4    files electronically.

5         Additionally, plaintiff will not get the benefit of

6    in-person examination, which has been recognized as an

7    important discovery method for in-person depositions, which are

8    an expensive discovery method.  Plaintiff should get the full

9    benefit of the expense she will incur and be allowed to take

10   the depositions in person in Orlando, Florida.

11        Moreover, with virtual depositions there's more room

12   for abuse.  For example, plaintiff's deposition was noticed by

13   defendant as an in-person deposition, then, at the last minute

14   and without requesting a stipulation from plaintiff,

15   defendant's counsel informed plaintiff that general counsel for

16   defendant would be attending virtually.

17        When the deposition began and plaintiff requested to

18   know who was attending on behalf of defendant, there were three

19   people attending.  This is more than what is allowed under the

20   rule, and these persons said that they were going to come in

21   and out, depending on their schedule.

22        Plaintiff had no way to monitor what was happening at

23   that level, including because Tallahassee was calling

24   defendant's counsel to discuss issues related to the deposition

25   as the deposition was taking place.

1          So in this case, moreover, defendant stated that he

2     could not stipulate as plaintiff requested for virtual

3     depositions; therefore, the depositions must in person.

4          Defendant asserts that it will not make the

5     administrators available for deposition until the Court rules

6     on this motion for extension.  Currently, President Robinson's

7     deposition is scheduled to be held on June 20, 2024, and

8     Provost Allyson Watson's deposition is scheduled to be held on

9     June 21, 2024; therefore, these depositions will not happen as

10    scheduled if the Court does not rule on this motion for

11    extension before then.

12         As for the claim that plaintiff only raised the issue

13    of needing 60 days' extension of discovery to try to get

14    counsel to join the case, plaintiff recollects that she

15    mentioned this to defendant's counsel after the last hearing

16    before this Court -- after the last hearing happened before

17    this Court, when the Court mentioned that it may be inclined to

18    provide an extension of discovery if plaintiff obtained legal

19    representation.

20         This discussion happened after the last deposition

21    that plaintiff took, the very contentious deposition of

22    Professor Patricia Broussard, when defendant's general counsel,

23    Denise Wallace, showed up unannounced, late, and interfered

24    with plaintiff's deposition.  It was a tough, long day.

25         Plaintiff, apparently, did not follow up about this in

1  an email and assumed that defendant's counsel remembered this

2  conversation, when plaintiff conferred about the extension of

3  time before filing this motion for extension.  Plaintiff has

4  spent a lot of time following up oral communications and emails

5  because defendant's counsel and plaintiff's recollection of

6  oral discussions have been different.

7         This time, plaintiff was apparently very exhausted

8  after the contentious deposition and did not follow up in

9  writing about the discussion.  However, if defendant's counsel

10  claims that any references to emails in this motion for

11  extension are not accurate, plaintiff will gladly provide the

12  emails to the Court, in addition to the ones she already

13  provided, which should be sufficient for the Court to judge her

14  diligence in trying to get the depositions scheduled before the

15  discovery deadline.

16         Wherefore, plaintiff prays that this Court will grant

17  her the relief she requested in her motion for extension,

18  including an extension of the discovery deadline, deposition of

19  defendant's administrators in Orlando, Florida, by a specific

20  date so defendant can hopefully make them available by said

21  date, an extension of the dispositive and *Daubert* motions to

22  accommodate the need for transcripts.

23         Thank you, Your Honor.

24         **THE COURT:**  I have some questions for you, Ms. Reyes.

25  First question is:  Do you intend to file a dispositive motion,

```
1    a motion for summary judgment?

2            MS. REYES:  At this time, I'm not sure, Your Honor.

3            THE COURT:  Do you intend to file a Daubert motion?

4            MS. REYES:  At this time, I'm not sure, Your Honor.  I

5    need to take these depositions.

6            THE COURT:  Has the defense disclosed any experts?

7            MS. REYES:  No.  Defense did not -- I'm sorry, the

8    Daubert motion -- yeah -- no, defense did not disclose any

9    experts.  I disclosed an expert.

10           THE COURT:  Okay.  So there's no basis for you to file

11   a Daubert motion.  Would you agree?

12           MS. REYES:  Unless it is to qualify my expert

13   beforehand, Your Honor.

14           THE COURT:  Well, I don't necessarily think that's the

15   subject of a Daubert motion, but I hear you.

16           Keller, the witness Keller --

17           MS. REYES:  Yes.

18           THE COURT:  It's my understanding of the timeline on

19   that witness that on March 19th, 2024, that's the first time

20   that this witness was discussed for scheduling a deposition,

21   and, then, in the defendant's response, it says "later," later

22   Keller retained private counsel, and you were directed to

23   contact that private counsel.  There's no definition, to me, as

24   to what "later" means, nor do I know whether or not you

25   contacted Keller's counsel.
```

1          Can you provide some additional -- and also let me

2     know, if there's no dispute as to Keller, let me know that too.

3     I wasn't entirely clear from the response and reply whether or

4     not Keller had been resolved.

5          **MS. REYES:**  Your Honor, I did contact professor Deidre

6     Keller's counsel.  She was a former law dean.  And counsel

7     stated that they would require a subpoena.  I engaged counsel

8     in communications about the fact that she is a managing

9     director, and I did not need to subpoena.  So those

10    communications -- that was a side-counsel communication that

11    happened.  And because I've been dealing with the other

12    depositions, I have had to, you know, put that on the side a

13    little bit, because my contention is that I didn't need to

14    subpoena Deidre Keller, that she should have been made

15    available by defendant --

16         And by the way, defendant kept telling me that they

17    were going to produce her for a deposition on April 26th, and,

18    then, after delaying and delaying and delaying, then they

19    claimed that because she said that she had an attorney that she

20    was not going to be available for deposition.

21         I informed defendant that she's still employed by

22    defendant.  She's still under their control.  And she's still a

23    managing officer, according to the case law, and so that is

24    also something that is pending, Your Honor.

25         **THE COURT:**  So can you tell me when you were informed

1      that Ms. Keller had an attorney, outside?

2             **MS. REYES:**  I don't want to misquote the date, Your

3      Honor, but I believe it was around April 22nd, but I can get

4      the exact date, Your Honor.

5             **THE COURT:**  And, then, when did you reach out to

6      Ms. Keller's attorney?

7             **MS. REYES:**  I believe I reached out the same day or

8      soon thereafter.  I can look at the emails, Your Honor.  And

9      even recently.

10            **THE COURT:**  You mentioned a case.  And I apologize if

11     I'm saying this incorrectly, but I thought the name of the case

12     you mentioned was *Iguana* --

13            **MS. REYES:**  Yes.

14            **THE COURT:**  -- or something like that.

15            **MS. REYES:**  Yes.

16            **THE COURT:**  Can you give me the case cite for that?

17            **MS. REYES:**  Yes, it's 2011 U.S., D-i-s-t, Dist. Lexis

18     12531, Middle District of Georgia, 2011.

19            **THE COURT:**  Okay.  Were any of the depositions that

20     are at issue here unilaterally noticed by you?

21            **MS. REYES:**  No, Your Honor.

22            **THE COURT:**  You know, the *Iguana* case, you know, I

23     tried to figure out what it was, and I did determine it was a

24     Middle District of Georgia case, so I'm glad you confirmed

25     that.

1          You know, they don't have the handbook that we have,

2     and I'm not really persuaded by that opinion in any way.  Our

3     handbook, in fact, as you read and as you stated, states that,

4     you know, if after conferring it doesn't work out, you need to

5     unilaterally notice the deposition or subpoena, but

6     unilaterally notice, to the extent it's -- that's something

7     that you have to avail yourself of, and it just was never done

8     in this situation.

9          So I'm not aware of any Middle District of Florida

10    authority that would say that you somehow should be sanctioned

11    or it's inappropriate to unilaterally notice a deposition if it

12    can't be agreed upon.  In fact, again, that's what our handbook

13    literally says.  So I'm just not persuaded in any way by that

14    *Iguana* case.

15             **MS. REYES:**  May I respond to that, Your Honor?

16             **THE COURT:**  Sure.

17             **MS. REYES:**  And I understand that, Your Honor, and I

18    was -- in all honesty, I was being guided by the Middle

19    District of Florida rules, in terms of cooperation and

20    civility, and I think that, in hindsight, I may not have

21    assumed that that was the spirit in which, you know, this was

22    happening, so I kept -- I kept waiting for the dates, because

23    counsel kept telling me in countless emails that in my

24    countless, you know, follow-ups that she was waiting for the

25    dates, and I thought that by the time that, you know, if I file

1    unilaterally and then I have to, according to the rule, be

2    available to change the dates and then I would have to, I

3    guess, do a motion to compel, I was trying to be civil and

4    coordinate with opposing counsel, because they kept telling me

5    that they were going to provide dates.

6         **THE COURT:**  I hear you saying that, Ms. Reyes, but I

7    just -- you know, I'm not buying that.  Look, this is one of

8    the most contentious cases I have on my docket.  You know, the

9    back-and-forth and the emails, especially from a law school,

10   and, frankly, a law professor is almost embarrassingly

11   contentious.

12        I don't understand why the parties can't figure out

13   dates.  I don't understand why, when I order a deposition, it's

14   not complied with, frankly, in my mind in a timely fashion it

15   requires.  I mean, so some of what you're saying, Ms. Reyes,

16   I'm agreeing with, because then it requires an order from me

17   setting a date.  You know, I think that's almost ridiculous

18   that it requires that.

19        But in light of all that and in light of everything

20   that's happened in this case and, frankly, in light of the

21   allegations in your complaint, which are highly contentious, I

22   just don't -- when you tell me that you're doing all these

23   things because you trust them and you think they're acting in

24   everyone's best interest and civilly, it rings hollow to me

25   because our rules and our orders allow for unilaterally

1    noticing depositions.  This is the poster child of a case that

2    would require such a thing.

3          And then, it's on the defendants to move for

4    protective order to avoid the depositions.  I mean, even in the

5    cases that you cited in your reply, that's exactly what

6    happened.  I mean, you know, you do a block quote at the end of

7    your reply, and you mention a case in which plaintiff was left

8    to set the depositions unilaterally, which was *Action Nissan*

9    *v. Hyundai*, and that's the absolutely appropriate thing for

10   somebody in your position to have done, and that just wasn't

11   done in this case in this situation.

12         So that's -- you know, although I think that you've

13   been given the runaround to a high degree, and it's just -- I

14   read all these emails and you cannot get a straight answer out

15   of defense counsel, which is frustrating to the Court and

16   everyone else -- you know, you had remedies that you could have

17   taken, and you chose not to, for whatever reason.  You know, I

18   would have been much more sympathetic had relief been sought

19   earlier in the case.

20         And so I just don't -- I don't know.  At this stage,

21   you know, I'm bound by the Eleventh Circuit law, and diligence

22   isn't, you know, how diligent were you once you asked.

23   Diligence is in the context on January 20th, 2023, discovery

24   opened in this case, and the first time I have a deposition

25   request is on March 19th, 2024, one of which I've ordered

1    because you requested relief, and, then, on May 6th, 2024, you

2    know, just a few weeks before discovery closes, we get four

3    more depos, and that's really what we're fighting over now.

4          So, you know, I take that into consideration.  It's

5    not how hard did you work once you requested it.  It's what

6    were you doing during the entire discovery period.

7          And, you know, being busy, having -- you know, another

8    frustrating thing about this case, to me, is I'm told how busy,

9    you know, law professors and administrators are and how it's so

10   difficult for them to schedule, and I have hundreds of cases on

11   my docket with doctors, lawyers, CEOs, other professionals.

12   Everyone has time to comply with court orders, and everyone is

13   busy, and there's nothing special about law professors or

14   assistant deans or deans or even presidents of law schools that

15   prevents them from being able to comply with court orders on a

16   timely basis.  So, you know -- you know, I'm just not -- those

17   kind of excuses just don't sway me one way or the other.

18         And I did suggest you get a lawyer, and you have not,

19   for whatever reason.  And so, you know, the issue there is:

20   You know, if you had gotten an attorney and that attorney had

21   requested additional time within the deadlines, then I would

22   have looked kindly on that request, not saying I would grant

23   it, but I would have considered it, and I think it would have

24   had some merit, and you can always hire an attorney during this

25   process at any time, but, you know, what happened up to the

1    case and up to that point, the attorney takes the case as he

2    finds it.  That's kind of what we generally say in these

3    situations, so whoever he or she may be, and if you do hire an

4    attorney, discovery is closed.  And so absent an order opening

5    it for some limited purpose or period of time, that's kind of

6    where we are right now.

7            You know, let me hear from defense in this case, and

8    then, Ms. Reyes, I'll come back --

9            MS. REYES:  Your Honor, may I get an opportunity after

10   that to respond to some of the factual statements you made,

11   including questions that you had as you were considering my

12   diligence?  I would appreciate that.

13           THE COURT:  Well, Ms. Reyes, if you would have just

14   waited for me to finish my sentence, I said that, "After I hear

15   from defendants, I'll come back to you for the last word."

16           MS. REYES:  Okay.  Thank you, Your Honor.

17           MS. REINER:  Sarah Reiner, Your Honor, on behalf of

18   defendant FAMU.

19           First, I would like to address a couple of the things

20   that were raised in Ms. Reyes's opening statements.  I think

21   it's important to note one of the things that she included is

22   that a party shall attempt to accommodate the schedules of

23   witnesses, other parties, et cetera.  And I think when

24   Ms. Reyes points to her case law, the circumstances within

25   those cases that she cites are very different and

 1    distinguishable from the ones that we're dealing with today.

 2         The initial complaint in this case -- she is correct.

 3    This case has been pending for 19 months, 19 months since the

 4    complaint was filed.  The initial complaint was dismissed sua

 5    sponte by the Court.  The first amended complaint was dismissed

 6    on motion by the Court.  The issues were not remedied, so

 7    defendant filed another motion to dismiss, which has been

 8    pending since November of 2023.

 9         The motions to dismiss are not -- were not filed as a

10    dilatory tactic.  They were not filed simply to delay or to

11    prohibit her entitlement to relief or anything like that.

12    Pleadings are important because they define the scope of the

13    case, and the complaint informs the defendant of what the

14    claims against it are.

15         From that point and throughout the course of this

16    case, Ms. Reyes has had every opportunity to engage in

17    discovery.  She did not serve a single written request for

18    discovery, no requests for production, no interrogatories,

19    nothing.  And only after our office reached out to her to

20    schedule her deposition did she ask for any depositions in this

21    case.

22         You know, with respect to her comment that we have

23    refused to produce the president pending the outcome of this

24    motion, that is not true.  He is scheduled for deposition on

25    the 20th, and that deposition, as ordered by the Court, is

1   going to go forward, regardless of what happens here today.

2   I'm not sure why she's saying otherwise.

3        In terms of the other depositions, our understanding

4   of the rule and the case management order is that if the

5   parties want to extend deadlines, including the discovery

6   deadline or dispositive motion deadlines and *Daubert* motion

7   deadlines, that's required -- permission of the Court is

8   required, and that requires good cause.

9        Further, as has been commented here, good cause for

10  granting an extension with respect to that case management

11  order, you know, typically it's only modified for good cause

12  with the judge's consent and that good cause standard is a

13  rigorous one.  It requires the Court to focus not on the good

14  faith or potential prejudice to a party, but on the moving

15  party's diligence in meeting the deadlines it seeks to modify.

16       And our position, Your Honor, has always been that

17  asking for these four or five depositions on May 6th, in the

18  midst of commencement ceremonies and the closing of a semester,

19  and, you know, all of those different things is not appropriate

20  diligence.

21       I understand that these individuals should be

22  available for deposition.  We have worked to obtain dates.

23       **THE COURT:**  Ms. Reiner, let me say this, because I

24  just -- I feel like everybody -- you can't use civility as a

25  sword and a shield.  Okay.  If Ms. Reyes had unilaterally

1    noticed these depositions on May 6th to occur on commencement,

2    I would have ordered them to occur.  I mean, this whole thing

3    about how law professors are the most busy people in the world

4    and they can't sit for depositions or prepare for them, to me,

5    is ridiculous, so I don't buy that at all.  And so this whole

6    thing with -- but you know what, that didn't happen.  So these

7    were not unilaterally set, and the time has passed.  So, to me,

8    it's neither here nor there.

9            But I'm constantly hearing this:  Oh, we're setting

10   this at the end of the academic year, and, you know, we're

11   doing this and we're that.  You know, it's just -- what I'm

12   looking at is what actually happened in this case, and what

13   actually happened was, you had a request concerning scheduling,

14   and nothing just happened because they weren't unilaterally set

15   and so there we are.  That's the issue that I see here.

16           **MS. REINER:**  With respect to -- with respect to the

17   rest of our argument, then, we would point to several cases

18   that we believe better fit and address the circumstances of

19   this one.  You know, first of all, *Sosa v. Airprint Systems*, we

20   were just referring to that.  That cite, Your Honor, is 133

21   F.3d 1417, Eleventh Circuit, 1998 case.

22           Again, we would also point to *Strubel v. Hartford*

23   *Insurance*.  You know, the cite on that one, Your Honor, is 2010

24   Westlaw 11507711.  That's a Middle District of Florida case

25   from 2010, June 18th, 2010.

1          You know, our primary argument here, Your Honor, is

2     that discovery was open from January of 2023.  That's really

3     where we are.  And in terms of scheduling these other five

4     depositions, we've already set aside dates in the event that

5     the Court orders they -- orders they occur.  We've already set

6     aside dates.

7          And the only thing we would ask, Your Honor, is

8     because we do intend to file a *Daubert* motion and we do intend

9     to file a summary judgment motion, was that those deadlines

10    also be extended.

11         You know, Your Honor, the other thing that we're

12    dealing with here is that, because of the pending motion to

13    dismiss, we have yet to actually answer the complaint in this

14    case, and we are set for trial.  So I think that there's some

15    consideration that should be given with respect to the trial

16    schedule there as well.

17         I don't want to hold the Court too long but --

18         **THE COURT:**  Let me address quickly those last couple

19    of points you made because, as far as filing a *Daubert* motion

20    and a motion for summary judgment, and having -- let's say I

21    order the depositions to go forward, right?  That doesn't mean,

22    necessarily, that you could use the depositions for *Daubert* or

23    for summary judgment.  Certainly, I can order that those

24    deposition transcripts not be used for those purposes.

25         Is it your request, though, that they be used for

1    those purposes?  Because if you're requesting that they be used

2    for the motion for summary judgment and for the *Daubert* motion,

3    then that, perhaps, changes, right?  Like, the motion almost

4    becomes less opposed.  I don't want to say unopposed.  But, I

5    mean, are you seeking to use these depositions for your own

6    purposes and would you like them to go forward now?

7             **MS. REINER:**  No, Your Honor.  That's not what we're

8    saying, but, you know, I won't know what the witnesses say

9    until we get there and until the depositions are conducted.  So

10   whether or not I would choose to order a transcript and attempt

11   to use it for one of those motions, you know, is something

12   that's unknown to me at this time.

13            I would be fine with an order that precludes their use

14   for those purposes, but, you know, at the same time, it's

15   just -- you know, without knowing what they're going to say,

16   it's difficult to evaluate.

17            But I do understand that you could order the

18   depositions without allowing their use for those purposes.

19            **THE COURT:**  The other thing that could happen here is,

20   when you answer, you could assert affirmative defenses.  Do you

21   intend to assert affirmative defenses?

22            **MS. REINER:**  Yes, Your Honor.  We do.

23            **THE COURT:**  So, again, this testimony or other things

24   may be relevant to those, and it may be that I get a request at

25   some point to open discovery for the purpose of conducting

1   discovery on affirmative defenses, because those are pleadings,

2   right?

3        So I'm not prejudging that in any way.  And a lot of

4   what that will come down to is whether or not the parties

5   seeking discovery had reason to get that discovery anyway or

6   had reason to know that those affirmative defenses were coming.

7   That's one thing that factors into it there.

8        But with that in mind, does that change your opinion

9   on any of these depositions, or is it your position none of

10  these depositions should go forward regardless?

11       **MS. REINER:**  Well, Your Honor, I mean, that's

12  difficult to answer because, right now, we don't know what the

13  Court is going to do with respect to the motion to dismiss,

14  because at this point, we've asked for a motion to dismiss with

15  prejudice based on the fact that it was dismissed two times

16  previously.  The Court -- you know, it could feasibly go away.

17  I'm not saying that it will.  And we have no idea when the

18  Court may issue its -- issue its order, and if it doesn't go

19  away, if it's not granted, then we would be responsible for

20  filing that answer and affirmative defenses.

21       So I think, just as a practical matter, the parties

22  are left at this juncture with, you know, a set of

23  circumstances that say, What if, and I don't know that I have

24  the responses or the answers.

25       I would, of course, to the extent that we file an

1    answer and affirmative defenses, I anticipate that she would

2    seek to potentially depose individuals with respect to those

3    affirmative defenses, and I'm not sure what the Court would do

4    in terms of the timeline with respect to trial and any number

5    of things --

6         THE COURT:  Just so you know, determining whether or

7    not you get an extension on dispositive motions or a trial is a

8    decision in the first instance is for the district judge, just

9    like the motion to dismiss and any dispositive motions here.

10   So I wouldn't and couldn't grant that kind of relief, at a

11   minimum, without conferring with the district judge and getting

12   her consent.  So, you know, that's just not before me, and it's

13   not relief I can grant today in relation to these motions.

14        But I will say that if an affirmative defense is put

15   in play in this case and if discovery is open for that limited

16   purpose, that doesn't mean the trial or anything else is going

17   to move, and in this situation, it could be that you're on a

18   very short timeline for this discovery, and it's going to be,

19   frankly, without much regard to your witnesses' schedules, and

20   they will be ordered to conduct depositions on a very short

21   timeline and able to prepare the case for trial appropriately.

22        So it may be that the depositions being conducted now

23   are much more -- much better for their schedule than if, you

24   know, in September or October, you know, I order depositions to

25   occur within 14 days.

1         Does that change your opinion at all?

2         **MS. REINER:**  Well, Your Honor, one of the things that

3    we have been working to do with respect to the setting of these

4    depositions is -- and, again, this brings me back to working on

5    how do we schedule them and how do we schedule them in a short

6    time frame, even prior to discovery, Your Honor -- or the close

7    of discovery, Your Honor.  One of the things that we've been

8    dealing with is -- and one of the things that we suggested was

9    a videotaped deposition.  These witnesses are up in

10   Tallahassee.  So to the extent that they're required to come

11   down here to Orlando, and I know that that may be required,

12   we're looking at, you know, a 520-mile round trip, and

13   two days -- you know, two days for each of the depositions

14   because plaintiff has indicated she's not willing to -- you

15   know, she wants her full seven hours with respect to each of

16   them.

17        With respect to stipulations related to a video

18   deposition, we have stipulated on behalf of FAMU that -- to the

19   extent any issues arise with respect to those depositions, that

20   the Middle District court would resolve those issues, as

21   opposed to the Northern District in Tallahassee, where the

22   witnesses would be sitting.

23        **THE COURT:**  Are all five of these witnesses sitting in

24   Tallahassee?

25        **MS. REINER:**  Just one of them is here in Orlando, Your

1    Honor, and so that one is not an issue, but the others -- the

2    president and then the four others are all in Tallahassee.

3         **THE COURT:**  Yeah, the president is already beyond --

4         **MS. REINER:**  And the president has already, yeah,

5    so --

6         **THE COURT:**  Let me ask you this.  I don't know the

7    answer to this question.  Is Tallahassee within 100 miles of

8    the Middle District of Florida?

9         **MS. REINER:**  Not to my knowledge -- within that -- you

10   know what, I looked at it from 100 miles from Orlando, Your

11   Honor, and it's not, but, candidly, I did not look at it --

12        **THE COURT:**  Surely not within 100 miles of Orlando.

13        **MS. REINER:**  I did not look at it from, like, the

14   outer borders of the district.  Let me see.

15        **THE COURT:**  I'm just looking at the rule again real

16   quick.  It's within 100 miles, so the deposition -- a subpoena

17   can command a person to attend trial, a hearing, or a

18   deposition within 100 miles of where the person resides, is

19   employed, or regularly transacts business in person.  So, you

20   know, I don't know if -- you know, I assume that in this case

21   we would have some kind of litigation over that.  I feel pretty

22   confident concerning the president, but I don't know enough

23   about these other witnesses to know whether or not they

24   regularly conduct business in person here in the Middle

25   District.  If they do, they're within the Court's subpoena

1    power, regardless of their position and as the defendant's

2    employee.  But, you know, I don't know if we're going to get to

3    that or not.  It may be that we need to get to that.

4         But I know we're only discussing this, kind of,

5    theoretically here in the context of, you know, what do you

6    want to do now?  Because I'm just warning you that whatever we

7    do later is going to be impacted by your decision now.  So if

8    you already have these depositions scheduled, they already have

9    time set aside, if you're able to file affirmative defenses and

10   discovery is allowed on those affirmative defenses, I would

11   assume it's reasonable to think that, you know, these witnesses

12   are going to come within the gamut of discovery on those

13   affirmative defenses, and then I'm going to order discovery to

14   happen very quickly, without much regard to the witnesses'

15   schedules because they had an opportunity to do it now, amongst

16   other things.  So I just want you to keep all that in mind.

17        **MS. REINER:**  Yes, Your Honor.  So what I would

18   suggest, in light of that, Your Honor -- and I'm thinking as I

19   go here.

20        **THE COURT:**  I have a hypothetical.  Look, your

21   position, to me -- and it's a reasonable one -- could just be

22   that we have a motion to dismiss pending, and we don't think

23   we'll ever file affirmative defenses.  So that's fine.  It's a

24   risk we'll take.  That would be completely reasonable.  I'll

25   just, kind of, leave it to you, because I don't want to

1    surprise you later by, you know, saying that, "Hey, you had

2    these set.  That was your chance.  Now do them within two

3    weeks," because that's probably what I'll say if discovery

4    opens.

5        MS. REINER:  What I would suggest, then, Your Honor,

6    is, you know, at this point in time if -- at this point in

7    time, I would suggest that we are going to stand our position,

8    just because we do have the motion to dismiss pending.  We may,

9    you know, to the extent that we file an answer, there may be

10   affirmative defenses, and we'll have to deal with the issue as

11   it comes at that point in time.

12       THE COURT:  Just keep that in mind regarding your

13   affirmative defenses, too.  You know, I wouldn't -- not that

14   it's even an affirmative defense, but I wouldn't file the

15   affirmative defense of the claim fails to state, you know, a

16   cause of action, because now you've opened up all of discovery.

17   You know, and it's also not an affirmative defense, so you

18   shouldn't file it anyway.  But I'm just saying, you know, you

19   do that and, then, here we are.

20       MS. REINER:  Well, I think, you know, I think at this

21   point, Your Honor, that's -- you know, that's part of the basis

22   of the motion to dismiss.  So if the Court were to come back

23   and say, "No, we're proceeding on the complaint as it stands,"

24   you know, then that's not something we would be -- we would be

25   pleading as an affirmative defense.  But I absolutely take your

1    point, Your Honor.

2         **THE COURT:**  Okay.  Anything else on that?  I'm going

3    to go back to Ms. Reyes, unless you have anything else.  I'm

4    happy to hear it.

5         **MS. REINER:**  No, Your Honor.  I think we -- I have a

6    couple of other pieces here that I wanted to point out.  I

7    don't know necessarily that you need them.  I think that you're

8    very familiar with the law in terms of what is diligence with

9    respect to the scheduling of depositions.

10         Again, let's see here.  So in terms of some of the

11    cases that plaintiff cites to, *Zagg* and *Rodriguez*, we feel that

12    those are distinguishable, based on the nature of the diligence

13    displayed.  You know, one dealt with reopening discovery for

14    the limited purpose of compelling certain financial documents.

15    Another one dealt with a slight extension, you know, and the

16    Court found that did not demonstrate diligence.  The plaintiff

17    did not demonstrate diligence in that case because they knew

18    about the underlying facts supporting for eight months prior to

19    its leave.

20         You know, Your Honor, our point here -- and I think

21    *Hunsaker* is a good case that we would cite to with respect to

22    this one.  You know, there was a lengthy discovery period, and

23    the plaintiff made no move to conduct either written discovery

24    or depositions over the course of 15 months.  And we don't

25    think -- regardless of what was occurring with her schedule,

1    you know, and certainly, Your Honor, I understand the

2    difficulties that Ms. Reyes has conveyed that she is facing,

3    but as a plaintiff, we think that there is -- when you choose

4    to file a lawsuit, there is a certain level of dedication and

5    diligence that you have to engage in in prosecuting that case.

6    And we don't think that her actions have reflected that.

7         To the extent that she raises the point of, you know,

8    issues that have occurred since February and the potential --

9    and the termination of her employment, again, we don't think

10   that those things reflect on her diligence for the, you know,

11   13, 14 months prior to that point.  And so we don't think that

12   good cause in this case has been shown for reopening the

13   discovery deadline.  Ms. Reyes has at all times, of course,

14   always been able to subpoena these witnesses as well, and to,

15   as you suggested, unilaterally schedule their dates, and she's

16   not done so.

17        And with respect to the other individual who is

18   represented now by independent counsel, she was clearly told

19   that she could subpoena that witness, and she has not done so.

20   So that raises the question for me, Your Honor, of whether or

21   not she was requesting that individual's deposition because she

22   really needed it and really wanted it or whether she was

23   requesting the deposition, you know, in part because we had

24   requested hers.  And, you know, at this point I think it was --

25   it was a delayed request, and I don't think that it reflects

1    the diligence necessary to support a good cause extension.

2           I think, finally, Your Honor, I would say that

3    defendants would be prejudiced by an extension of the discovery

4    deadline to the extent that it impacts the dispositive and

5    *Daubert* motion deadlines.

6           I know we already have the president's deposition

7    that's taking place on the 20th and so, you know, we're working

8    on that.

9           We do plan on filing a *Daubert* motion.  I know you

10   inquired of that with respect to Ms. Reyes.  We do plan on

11   filing one with respect to her expert, as we don't think he

12   is -- he is a qualified expert in this case.  So that is what

13   we would say, Your Honor.

14          The last thing I would address here -- one of the

15   issues that Ms. Reyes raised during her initial comments is

16   that we asked her to copy -- copy the other attorneys or

17   paralegal or assistant on the file.  And, Your Honor, I would

18   say we're not trying to be difficult there.

19          What that -- what that request was in response to was

20   a service email that we received from her.  It was service,

21   service of a document, I believe, and, you know, we have a

22   service list so that if I'm not available someone else receives

23   it, and, you know, that's why we ask that she copy the others,

24   as opposed to just me and my assistant.  That is just, you

25   know, a request that she copy the service list.

1          Okay.  And that's all I would say, Your Honor.  Thank

2     you very much for your time.

3          **THE COURT:**  Thank you, Ms. Reiner.

4          Ms. Reyes.

5          **MS. REYES:**  Yes.  Your Honor, I would only like to

6     note that you have a few minutes left, unless the Court wants

7     to extend.  I don't -- I want to go over some of the factual

8     assertions --

9          **THE COURT:**  Ms. Reyes, it's fine.

10         **MS. REYES:**  Yes.

11         **THE COURT:**  Just you can make whatever record you

12    want.  Okay.  You're fine.  I'm not holding you to any specific

13    timeline.

14         **MS. REYES:**  Okay.  Thank you, Your Honor.

15         So I wanted to first address some of the comments

16    because I am mindful of what the record may reflect.

17         You know, with regards to Your Honor -- unfortunately,

18    you're right.  The allegations in any pleading are contentious,

19    and I also did not expect that this would be happening in a law

20    school, much less law professors, but I also did not expect --

21    when you said that I was thinking that everybody was going to

22    be acting on their best interest, I was not talking about

23    defendant.  I was talking about my dealings with defense

24    counsel, because a lot of, you know, the language I cited in

25    terms of cooperation and civility is about the lawyers in the

1    case.

2         Now, I understand that, you know, either counsel has

3    to fit the style of their lawyers or lawyers -- you know, or

4    the style of their clients or clients find lawyers that fit

5    their style, but I was expecting that defense counsel in this

6    case, you know, would exercise good faith and let me know, for

7    example, if these defendants' dilatory tactics were going to

8    preclude my taking of their depositions, I would have expected

9    for defendant's counsel to be forthcoming about that with me so

10   that I could have filed unilateral notices, which by the way,

11   Your Honor, I did try to -- I served -- you know, the comment

12   Ms. Reiner made about service is I did serve notices of

13   deposition for all these witnesses.  You know, those do not

14   have to be served with the Court.  So I did serve notices of

15   depositions for all these witnesses, but I could not put dates

16   on them.  I put, you know, "to be determined."

17        **THE COURT:**  Ms. Reyes, I've just got to interrupt you.

18   I mean, that's the -- that's incorrect.  You absolutely --

19        **MS. REYES:**  Yes, I know.  And I know, Your Honor.  And

20   I know, and that's why I didn't come to the Court because I was

21   still trying to, in the spirit of cooperation and civility,

22   give defense counsel something that she could go to her client

23   with and say, "Listen, we have these notices of depositions.  I

24   need dates."

25        So when you stated that I was, you know, thinking,

1    even considering what has happened and what I alleged and I

2    know about defendants in terms of, you know, what they are

3    capable of doing, I was talking about defense counsel when I

4    talked about the spirit of civility and cooperation that I

5    expected.  And that's what I was being guided by and why I kept

6    delaying and delaying, trusting that what she was telling me

7    was, you know, accurate and that she would have told me that

8    these people were not going to be -- to make themselves

9    available for deposition without, you know, a motion to compel.

10          And with regards to the attorney situation, Your

11    Honor, you said that, you know, you would have been inclined --

12    although without, you know, saying you would rule -- to look

13    more favorably upon my request for the extension of discovery

14    had I had an attorney, and you said that attorneys have to take

15    cases as they find them, and that's the difficulty at this

16    point, right, because attorneys know that.

17          And so I have been in communication with an attorney

18    who would take the case but if the Court extended discovery.

19    So it's not like this attorney wants to make an appearance in a

20    case where he's not going to have any leeway as to, you know,

21    determining whether there should be additional discovery, even

22    in a shorter period of time.  So that's something that I'm

23    looking at.

24          And like I said, Your Honor, without violating, you

25    know, the privilege that comes with all the legal consultations

1     I had, in terms of looking for an attorney, I invited the Court

2     not to assume that I don't have a lawyer for a certain reason.

3     There are specific reasons why I do not have an attorney in

4     this case, including, you know, considering a lot of factors.

5          I had to file my pleading, Your Honor, against the

6     wall because the statute of limitations was running, and, in

7     all honesty, I did not want to file a lawsuit.  From the

8     allegations, you can see that it's been years and I put it off.

9     But it got to the point where I had to do something.  And the

10    statute of limitations was running after I received my right to

11    sue letter and there was an incident that finally prompted me

12    to make the decision, and at that point, Your Honor, I didn't

13    have the benefit of going to an attorney who would have

14    requested to do an investigation to be able to allege as I

15    alleged, because you are correct, Your Honor, it's very

16    difficult to fathom that this could be happening, much less

17    happening in a law school and an educational institution.

18         And so I had to consider that, Your Honor, and

19    consider that by signing that complaint as an attorney, I

20    didn't have to conduct an investigation because I was

21    basically, you know, stating the facts and putting myself on

22    the line with regards to those facts, where an attorney who did

23    not have personal knowledge of the facts would have had to

24    spend a lot more time to do investigation before filing a

25    complaint with allegations like that against a law school.

1          **THE COURT:**  Ms. Reyes, let me just stop you.  I don't

2     know that I agree with any of that.  But I'll just say this,

3     because there's been a lot of back and forth about this whole

4     attorney thing versus pro se.  And I said that -- you know,

5     I've used words like, "I would look kindly upon, I'm not going

6     to tell you how" -- I just want to be very clear.  If an

7     attorney came to me and said, "I need an additional 14 days or

8     21 days or something like that to get up to speed on the file,"

9     that's the only kind of cause or good thing I would consider in

10     relation to that.

11          It has nothing to do with filing pro se versus filing

12     with an attorney.  It has nothing to do with, if an attorney

13     files it I will look better on it than if a pro se person files

14     it.  It's none of that.

15          It's only that, if a new person comes into the case,

16     there does exist some cause to allow that person to get up to

17     speed on the case.  And while the general rule is, the attorney

18     takes the cases as they find it, you know, Courts sometimes

19     find that that attorney can get a little bit of time to get up

20     to speed on the case.

21          So that is the only context in which I think an

22     attorney matters in relation to this and other requests.  It

23     has nothing to do with your pro se status or that I would take

24     an attorney's request better or anything like that.

25          **MS. REYES:**  And, Your Honor, I was not -- I was not

1    thinking like that.

2           My analogy was just to the point that, you know, even

3    for filing a complaint like this one, lawyers would have needed

4    the time to investigate, you know, to at least do an

5    investigation of the facts, similar to if they were to come in

6    at this point, you know, like you said, they would need some

7    time to evaluate where we are in the case.  So that's with

8    regards to answering to that.

9           And then also, Your Honor, with the circumstances of

10   the case, right?  Perhaps just like Your Honor said, that you

11   find it difficult to believe what you are hearing, you know,

12   about what's happening with law professors, it's also

13   difficult -- you know, the facts of the case are made even more

14   difficult because of what happened in terms of my termination.

15   And as you noticed, Your Honor, I included with my motion as an

16   Exhibit 1 my declaration of what happened because I was not

17   expecting that.

18          So when I keep hearing from counsel that, "You should

19   have known when you filed this lawsuit, and you should have

20   known this and that," Your Honor, I did not expect that I would

21   be fired from my tenured position.  And what I want to say is,

22   similar to a judge that has to be fired for, you know, good

23   cause after a due process, you know, I did not expect, because

24   I would never engage in conduct that would warrant a good cause

25   dismissal.  So I had -- I relied on having my position.  So my

1    position has changed, and it's not within my control.

2         And I think what makes this case different and what I

3    was trying to find was -- in doing my legal research, I was

4    trying to find a case where a defendant would do something as

5    egregious as what was done in my case, which put me in a whole

6    different situation, because, you know, a lot of the employees

7    have at-will employment.

8         I gave up practice, Your Honor, and the benefits that

9    come with practice, which I'm missing right now, honestly,

10   because I'm so rusty.  I relied on my tenured position.  And so

11   that I think is something that needs to be considered in terms

12   of the circumstances, Your Honor.

13        And that's just to answer the constant defendant's

14   counsel telling me, "You should have known this when you filed

15   your lawsuit."  I didn't know this was going to happen, and I

16   didn't expect it.  Like I said, because I did not expect to do

17   anything and did not do anything warranting such dismissal.

18        So, here, we have a defendant who has taken control of

19   my time, my finances after I started this litigation, Your

20   Honor.  And so my circumstances have changed because of

21   defendant's actions, and I think that that's something that

22   should be considered.

23        Not to say that, you know, employees can't be -- you

24   know, can't be fired during a litigation, yes, they can.  But

25   I'm in a different circumstance because I had a tenured

1    position that I relied upon.  The standard is different for

2    dismissal.  And I knew I would not do anything that would put

3    in jeopardy that position, Your Honor --

4         **THE COURT:**  Ms. Reyes, I'm not sure what --

5         **MS. REYES:**  -- other than --

6         **THE COURT:**  I'm not sure what you're arguing here

7    because I don't -- I don't hear anything from the defense

8    concerning your termination that has anything to do with the

9    motions that are before me now.  So I'm not -- I feel like

10   we've gone a little bit far afield here.

11        You know, if you are saying that you did not conduct

12   discovery earlier because you had an ongoing employment

13   relationship, and once you were terminated you decided to

14   conduct discovery -- and I see you shaking your head no, so

15   maybe that's not it.  I don't -- I understand that you have,

16   you know -- you filed this lawsuit.  You certainly have

17   grievances against the defendant in this case.  But I'm not

18   sure how this impacts what I'm trying to decide here.

19        **MS. REYES:**  Okay.  Your Honor, my bringing it up and

20   why I have an exhibit that specifically addresses this and what

21   defendant's counsel continues to say is, "You knew when you

22   started this lawsuit.  You knew when you started this lawsuit."

23   I did not know that my employment circumstances and my

24   financial circumstances would change.  I did not know that I

25   would be involved all the time that I've been involved in the

1    internal grievance proceeding that I'm going through, Your

2    Honor.

3              That's within defendant's control and that has

4    interfered with my ability to handle, you know, my depositions,

5    to handle the discovery.  And I get, Your Honor, that, you

6    know, you may want to think --

7              **THE COURT:**  I don't see how this comes within what

8    we're talking -- on what date were you terminated?

9              **MS. REYES:**  I was -- the process to terminate me and

10   the whole situation that happened started in the first week of

11   February.

12             **THE COURT:**  Okay.  So this case, discovery had been

13   open for 13 months at that point.  You have to understand that

14   in the context of this case, that is what the Eleventh Circuit

15   directs me to look at.  And so I hear you.  You know, and I

16   said earlier that diligence isn't measured from the point at

17   which you begin trying.  Diligence is measured from the point

18   at which discovery opens.

19             So even if I were to take everything you're saying as

20   a basis that it would have affected your ability to -- you

21   know, anything happening in relation to this case, that doesn't

22   explain the 13 months prior.  So, you know, that's where I am.

23   And I don't think that going through grievance proceedings or,

24   you know, even being terminated affects your ability to notice

25   a deposition or conduct discovery in this case.

1          Everybody that I deal with in all of my cases,

2    including pro se persons, are, you know, dealing with the same

3    situations, every single person.  Every attorney has many cases

4    they're balancing.  Every doctor that is sued has many patients

5    that, you know, they have to deal with.  Every accountant,

6    every person who works an hourly wage, right, and has to work

7    their hourly wage while prosecuting a pro se case, you know,

8    and take care of their family has the same situations.

9          It's just that, you know, if I were to balance that in

10   every case, it would be impossible to manage our caseload.  So

11   I have to look at the entirety of the discovery process here.

12         **MS. REYES:**  Your Honor, my explanation is just by way

13   of -- because the last thing I want is for the record to term

14   me also as not diligent without an explanation of my reliance

15   on that I was going to be able to dedicate time to this case

16   during the time when I've been dedicating it otherwise to, you

17   know, the grievances and proceedings that I was not expecting

18   and that were not within my control and they were under the

19   control of defendant in this case.

20         So that's what I want to, you know, make the record

21   clear because you've raised, you know, the diligence

22   situation --

23         **THE COURT:**  I haven't raised the diligence situation.

24   The Eleventh Circuit has raised the diligence --

25         **MS. REYES:**  Yeah.  I know, Your Honor, but you have to

1    analyze it.

2         **THE COURT:**  Every time I get these requests before me,

3    I have to conduct a diligence assessment for the diligence of

4    the entire case, and once I received two of Ms. Reiner's emails

5    perhaps saying, "I don't know when the deposition is going to

6    be set," et cetera, et cetera, et cetera, I would have noticed

7    the deposition.  I mean, there's just -- and that's one email.

8         It doesn't matter how many grievance procedures you're

9    going through.  It doesn't matter if you're in the midst of a

10   termination process.  It's just sending an email saying, "I'm

11   noticing this deposition for May 15th at 2:00 p.m." and that's

12   it.

13        **MS. REYES:**  And you know with -- and to -- you know,

14   and like I said, Your Honor, I just want to make a record what

15   my intentions were and what interfered with those intentions,

16   in order to respond to, you know, to the diligence argument for

17   my sake and for the record, Your Honor.

18        **THE COURT:**  I appreciate that.  All right.  So I'm

19   going to take this under consideration, and, Ms. Reyes --

20        **MS. REYES:**  May I just make a few more points, Your

21   Honor, because --

22        **THE COURT:**  Sure.

23        **MS. REYES:**  -- counsel got over half an hour.  I was

24   keeping track of the time, and I limited myself to just

25   15 minutes; although, it's my motion.

1          So with regards to, you know, the factual accusation

2     that I didn't make a single request for discovery, I have --

3     like I said, I have discovery that I had obtained.  And I can

4     just imagine the contentious discovery issues that would have

5     arisen if I had been fighting for requests for productions and

6     requests for interrogatories.  We would have been here, you

7     know, hearing about those as well.

8          With regards to counsel's assertion that she doesn't

9     understand why I set that President Robinson's deposition --

10         **THE COURT:**  I'm not going to hear President Robinson's

11    deposition.  It's done.  It's set.  I don't want to hear about

12    that anymore.

13         **MS. REYES:**  But just for the fact that she did state

14    that it would be pending the outcome of this motion, Your

15    Honor, and I have it in an email.

16         **THE COURT:**  I don't need to hear anything else about

17    President Robinson's deposition.

18         **MS. REYES:**  Okay.  With regards to unilaterally

19    setting the depositions, again, Your Honor, for the reasons

20    stated in the case, even if it wasn't a Middle District of

21    Florida case, I did consider that it would have been, you know,

22    more of a hassle and perhaps taken more time than to rely on

23    defense counsel's assertions that she would get me the dates

24    within the discovery period, instead of waiting until, you

25    know, the end of the discovery period.

1          And I would like to cite the Court to *Bermudez*

2    *v. Equifax* case, which is 2008 U.S. Dist. Lexis 146068, in

3    support of my motion.

4          And as to the question of whether I wanted to take

5    former Dean Keller's deposition just because I really wanted or

6    because, you know, counsel asked for my deposition, I don't

7    think that that's courteous or civil to assume that I would

8    want to spend the money and the time that it takes to do a

9    deposition for some ulterior motive, other than to meet the

10   needs of my case.  And that is something I'm balancing, Your

11   Honor.  I'm balancing the cost of all of this discovery, which

12   depositions are a great discovery tool that I want and need,

13   but I'm also balancing the cost.

14         The issue of, you know, counsel being prejudiced by

15   the extension, I think that that can be cured with the Court's

16   assistance in terms of the dates.

17         And my comment about the fact that there are more than

18   one -- there's more than one attorney assigned to this case and

19   that I was asked to copy all of them was in reference to the

20   argument of availability that I have also heard, because in the

21   availability I have had to deal with counsel talking about

22   their availability -- her availability as an attorney, plus the

23   availability of the witnesses, and I just was saying that

24   there's more than one attorney assigned to this case in terms

25   of availability for deposition, so it's not only Ms. Reiner.

1   That's why I referred to that.

2         And if they're billing on the case, Your Honor, I

3   assume that they're keeping track and staying on top of it such

4   that they would have also been available for the depositions.

5         So that's with regards to my response, you know, to

6   the factual assertions that were made by defendant's counsel.

7         And I understand, you know, you had a lot of back and

8   forth with defense counsel about the possibilities.  I would

9   like to know if you see any possibilities here that you would

10  like to, you know, confer with me about or that I may inform

11  the Court about in the couple of minutes you may give me.

12        **THE COURT:**  No.  Ms. Reyes, I was just seeing whether

13  or not I could mediate a resolution, and I could not.

14        **MS. REYES:**  Okay.

15        **THE COURT:**  Anything else?

16        **MS. REYES:**  That will be it, Your Honor.

17        And by the way, one more thing, Your Honor.  Depending

18  on the ruling, we have a deposition scheduled for June 21 of

19  Provost Allyson Watson.

20        **THE COURT:**  I understand.

21        **MS. REYES:**  Okay.

22        **THE COURT:**  All right.  I will be entering a written

23  order.  So thank you all.  We'll be in recess.

24        **MS. REYES:**  Thank you, counsel.  Thank you, Your

25  Honor.

1          (WHEREUPON, this matter was concluded at 11:42 a.m.)

2

3                              -    -    -

4                    **CERTIFICATE OF REPORTER**

5     I certify that the foregoing is a correct transcript from the
      official electronic sound recording of the proceedings in the
6     above-titled matter.

7

8     s/Suzanne L. Trimble                          12/6/24
      Suzanne L. Trimble, CRR, RPR, WACCR           Date
9     U.S. Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tab 146

1
2

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

3

.......................................................
                                          :
4     **MARITZA REYES,**                   :
                                          :         Case Number:
5          Plaintiff,                      :         6:22-cv-01525-WWB-DCI
                                          :
6                                          :         Orlando, Florida
       v.                                  :         May 13, 2024
7                                          :         10:59 AM - 11:39 AM
       **FLORIDA A&M UNIVERSITY BOARD**    :
8      **OF TRUSTEES (FAMU),**             :
                                          :
9          Defendant.                      :
                                          :
10    .......................................:.................

11                **AMENDED TRANSCRIPT OF MOTION HEARING**
        **RE: [37] DEFENDANT'S TIME-SENSITIVE MOTION FOR PROTECTIVE ORDER**
12          **PRECLUDING THE DEPOSITION OF DR. LARRY ROBINSON**
                   **BEFORE THE HONORABLE DANIEL C. IRICK**
13              **UNITED STATES MAGISTRATE JUDGE**

14    REMOTE APPEARANCES:

15    For the Plaintiff:         Maritza I. Reyes, Esquire
                                 PO Box 5102
16                               Winter Park, Florida 32793
                                 *Pro Se*
17

18    For the Defendant:         Sarah P.L. Reiner, Esquire
                                 Julie Zolty, Esquire
19                               GRAYROBINSON, P.A.
                                 301 East Pine Street
20                               Suite 1400
                                 Orlando, Florida 32801

21

22    Audio Operator:  Tiffany Palmer
      Proceedings recorded by Zoom Video Communications.
23    Transcript produced by computer-aided transcription.

24           Zoom Video Communications recording transcribed by:
          Heather Suarez, RDR, CRR, FCRR, FPR-C, CA CSR #14538
25               (407) 801-8921 | heather@stenosuarez.com
          StenoSuarez, LLC; PO Box 3574; Orlando, Florida 32802

# T A B L E   O F   C O N T E N T S

### May 13, 2024

PAGE

[37] DEFENDANT'S TIME-SENSITIVE MOTION FOR PROTECTIVE ORDER
     Argument by Ms. Reiner .................................3
     Argument by Ms. Reyes ..................................6
     Comments and Clarification of the Court ..............11
     Further Discussion and Argument ......................13

OTHER MATTERS .........................................26

CERTIFICATE OF REPORTER ...............................33

TRANSCRIBER'S NOTE: This amended transcript incorporates the following amendment: the word "representation" changed to "reputation" on page 27, line 7.

1      P R O C E E D I N G S

2         (Proceedings commenced at 10:59 AM.)

3         **THE COURTROOM DEPUTY:**  Case Number 6:22-cv-1525,

4    Maritza Reyes v. Florida A&M University Board of Trustees.

5         Counsel, please make your appearances beginning with

6    the plaintiffs.

7         **MS. REYES:**  Maritza Reyes for plaintiff.

8         **UNIDENTIFIED SPEAKER:**  I can't hear anyone.

9         **THE COURT:**  Can we have appearances from the defense.

10        **MS. REINER:**  Yes.  Hello.  This is Sarah

11   (audio transmission gap) Robinson appearing for the defendant.

12   And then also we have with us Julie Zolty.

13        **THE COURT:**  All right.  Good morning, everyone.

14   We're here on a motion filed by the defense in this case; so

15   I'm happy to hear first from the movant and then from the other

16   side.

17        **MS. REINER:**  Yes, Your Honor.  And as a quick

18   precursor, have you had an opportunity to review the motion?

19        **THE COURT:**  Of course.

20        **MS. REINER:**  Okay.  Essentially, Your Honor, FAMU

21   seeks an order precluding plaintiff from taking the deposition

22   of Florida A&M University President Larry Robinson in this

23   action or at least at this time.  Your Honor, we think that the

24   motion is precluded by the Apex Doctrine.

25        We are two years (audio distortion).  This -- this

1    complaint was filed back in 2022.  We currently have a pending

2    motion to dismiss with prejudice before the Court.

3         We reached out to plaintiff in March in an abundance

4    of caution to schedule her deposition pending an order by the

5    Court.  At that time she indicated for the first time that she

6    wanted to take her own depositions and she wanted to -- the

7    first one she requested was the president,

8    President Larry Robinson.

9         At that point we indicated that we would not be

10   amenable to producing him.  No other depositions had been taken

11   in the case, not the provost, not any of the professors, not

12   anyone with firsthand knowledge.

13        If you look at the complaint at issue, Your Honor,

14   and, in specific, her allegations regarding the president, most

15   of them are made beginning in paragraph 109 and then continuing

16   forward, you know, that she sent an email to the president; but

17   she copied multiple other people on that same email, and

18   it's -- it's essentially -- the president was aware that

19   something was going on.  You know, copy the president provost,

20   copy the general counsel, copy the trustee, copied numerous

21   other people related to her email communications.

22        For that reason, Your Honor, we don't think that she

23   needs to start at the top of the mountain in terms of deposing

24   President Larry Johnson [sic].  We think that the law is -- is

25   clear and the rules are clear.  You know, you can discover

1    anything.  Discovery is open about any nonprivileged matter

2    relevant to the claimant or defense in proportion to the needs

3    of the case.

4            Protective orders are allowed.  Your Honor is able to

5    control the manner and order of discovery, and pursuant to the

6    Apex Doctrine, which you could say the Middle District handbook

7    practically codifies in terms of Section II.A.6. in its

8    consideration for senior management -- you know, the issue with

9    senior management, such as President Larry Johnson, is that

10   they're susceptible to numerous requests for depositions,

11   repetitive, abusive, harassing requests for depositions.  And

12   the Eleventh Circuit and the Middle District have made it clear

13   that if you want to go to the top of that mountain and if you

14   want to depose those senior members of management that you need

15   to establish that they have unique, nonrepetitive firsthand

16   knowledge of facts and that other less intrusive means are not

17   available, and we don't think that that's been done in this

18   case, Your Honor; and we don't think that that could be shown

19   as based on her own complaint allegations.

20           To the extent that she contacted Dr. Robinson, she

21   contacted multiple other people at the same time and copied

22   multiple other individuals.  We have just conducted our first

23   deposition in this case of another professor who she requested

24   after she requested Robinson, and we are working on dates for

25   additional professors and things that she has now requested as

1  well, keeping in mind, of course, that all of these requests

2  are coming with a May 31st deposition discovery deadline in

3  this case.

4          So, Your Honor, I think that otherwise the motion

5  kind of speaks for itself.  If you have any questions, I'm

6  happy to entertain those; and, otherwise, I would go ahead and

7  turn it over to Ms. Reyes to respond.

8          **THE COURT:**  All right.  Let me hear from Ms. Reyes.

9  Then, if I have any questions, I'll come back to the defense.

10          Ms. Reyes.

11          **MS. REYES:**  Good morning, Your Honor.

12          I have to start by saying that I am at a -- you know,

13  at a disadvantage because I haven't had a time to prepare my

14  response, and I would like that opportunity, Your Honor,

15  because I think that I can refute a lot of what counsel has --

16  has stated.

17          But I'm going to briefly say that I researched the

18  Apex Doctrine before deciding to proceed with, you know, the

19  deposition of Dr. Robinson, and this case does not fall within

20  the parameter of what the Apex Doctrine would prohibit.

21          I would like an opportunity also to respond to the

22  inaccuracies in the declaration of President Larry Robinson,

23  which was attached as Exhibit B to the -- to the motion.  For

24  example, he indicates that he delegated the decision-making

25  authority to the then-provost and vice president of academic

1    affairs, Maurice Edington.  This is the first time that

2    plaintiff has heard that, including when plaintiff was reaching

3    out directly to President Robinson and Provost Edington about

4    the situation that was happening with her application for

5    promotion.

6         Plaintiff tried to grieve the denial of the promotion

7    internally and was precluded specifically by

8    President Robinson, who engaged in sabotage tactics to sabotage

9    her ability to get that internal appeal.  This was stated in

10   the complaint.

11        And I can go into the complaint because I think that

12   counsel has misrepresented that it was only about emails that

13   President Robinson received.  I can go through paragraphs in

14   the complaint that show that it was about conduct.  It wasn't

15   only about, you know, being copied in an email.  It was he was

16   the recipient of the email because he was supposed to get that

17   email, he was supposed to get that information, and he was

18   supposed to respond; and he did respond on some occasions.  He

19   was an active participate in the denial of promotion.

20        And if I am able to file a response, Your Honor, I

21   will provide the institutional documents that show that what is

22   stated in this declaration of President Larry Robinson is

23   contrary to what the institutional documents state, which also

24   contrary to what plaintiff was led to believe all this time,

25   that she has been proceeding under the knowledge that the

1    president is the ultimate decision-maker at the point of an

2    application for promotion.

3        The -- the declaration misstates that the promotion

4    to full professor would be presented to the board of trustees

5    for approval.  That is incorrect.  It's only a tenure approval

6    that goes to the board of trustees.  Otherwise, the President

7    is the ultimate decision-maker.  And so I would like an

8    opportunity to respond to those allegations.

9        And I would like an opportunity also to provide case

10   law to show how the situation here is distinguishable from Apex

11   representatives who don't have firsthand knowledge and were not

12   active participants in what happened, you know, in the

13   allegations in the complaint.

14       As far as, you know, the language that was quoted

15   from the Middle District of Florida Discovery Handbook, it

16   specifies that the presumption is if the person doesn't have

17   more direct and firsthand knowledge.  Here President Robinson

18   would be the one who would have the more direct or firsthand

19   knowledge as to what happened with the denial of the promotion

20   application.

21       And as for Provost Maurice Edington, he is now an

22   Apex person at another HBCU in Washington, DC; so he's no

23   longer in the university.  So at this point it would be

24   President Robinson that I would have to question.

25       And the case law -- it states that if I choose to do

1    it by deposition because I can probe and question in a

2    different way than, for example, in other forms of discovery,

3    that I should be provided that leeway.  And I have to say that

4    with a witness like President Robinson, including a witness who

5    is able -- who provides this type of declaration, I would want

6    to probe by deposition because then I'm able to, you know, go

7    over all the inaccuracies in his declaration and other

8    testimony, Your Honor.

9            And as far as the deposition scheduling, I have to

10   say that a lot of, you know, changes have happened that were

11   not within plaintiff's control, including that at the beginning

12   of February, defendant wrongfully and in bad faith suspended

13   me, plaintiff, from my job, from my tenured position and

14   dismissed me from my tenured position and has had me since

15   February fighting the internal process to try to keep my job

16   and defend against the false allegations.  And so they've had

17   me fighting, fighting, fighting; and that -- that took time

18   from the time that I had scheduled for, you know, the work that

19   I was going to be doing in this case.

20           And I -- and I -- you know, and I believe that it is

21   in bad faith, Your Honor, the way that it was done.  I was a

22   tenured professor who worked at the law school for 15 years;

23   and wrongfully, all of a sudden, they fired me.

24           I went to the internal predetermination conference,

25   and a panel that the university themselves selected of three

1    Florida Bar-licensed attorneys who worked for the university

2    found that there was no allegation of misconduct that could be

3    proven by the university and that I should not be dismissed,

4    but the university proceeded with the dismissal anyways.  So

5    I've been dealing with all of that, Your Honor, and I will come

6    to the Court for relief on that because it has affected what

7    I've been able to do and also how the evidence has changed in

8    terms of the discovery that I will now need going forward

9    because the ongoing discrimination, hostile work environment,

10   and retaliation has now risen to the point of being dismissed

11   from my job, my tenured position that I earned, over a false

12   allegation of misconduct that the university did not prove.

13         So with all that, Your Honor, I have to say that I --

14   I want an opportunity to respond to this motion.  I think that,

15   you know, we need that to be able to have -- you know, for the

16   Court to have a full record of what's at stake here and for me

17   to be able to respond to Ms. Reiner's allegations of the

18   deposition scheduling, because a lot of the problems that

19   happened with the deposition scheduling -- and I can --

20   you know, I have the emails, Your Honor -- were because it took

21   her so long to get back to me with the dates that she had to

22   run by -- you know, by employees, by the university.  And so I

23   have the -- I have the emails, Your Honor, that sometimes it

24   took ten days for her to get back to me when we agreed that we

25   were going to be doing mutual depositions.

1    That said, we have been trying to work it out;

2    however -- however, some of the way that she portrayed,

3    you know, the scheduling of depositions is not accurate, and I

4    would like to state my side as to that as well.

5    **THE COURT:**  All right.  Well, there's a lot to unpack

6    there.  I'm not going to give any kind of rulings or indication

7    concerning a motion for extension of time.  I mean, that'll

8    have to come as it comes, and I just remind the parties that

9    when you seek an extension of a CMSO deadline proceeding under

10   Rule 16(b)(4), which requires that had you exercised diligence

11   in discovery throughout the entire process, you would or would

12   not have been able to meet the Court's deadlines.

13       And I just caution the parties that, you know,

14   deciding to start conducting depositions 10 months, 15 months,

15   18 months after discovery opens shows a lack of diligence in

16   conducting discovery.  And so if the first time a deposition is

17   requested is -- you know, discovery opened in this case in

18   February of 2023 -- right? -- so 15 months at least ago.  And

19   so, you know, if the first time we get deposition requests is

20   in April or March of this year, that's going to factor into the

21   Court's determination as to whether or not the parties

22   exercised diligence in conducting discovery.

23       Even if something happened in February that was,

24   you know, unforeseen, the Court's going to ask, "Well, for the

25   prior 12 months before that, why weren't any depositions

1    scheduled?  Why wasn't any paper discovery done?  You know,

2    what has happened in the case up to that point?" so the Court

3    can or cannot make a determination as to diligence under

4    Rule 16(b)(4).  So I just kind of caution you that that's the

5    approach we take in this district and this circuit and that

6    I'll be taking when looking at and considering any motion for

7    extension of time that I may receive concerning a CMSO

8    deadline.

9              So putting that aside, in every case also -- so in

10   every case that I do that's like this, most normal civil cases,

11   I enter an order of discovery motions.  Inexplicably, for some

12   reason, that wasn't entered in this case.  That will be

13   remediated following this hearing; so I'll enter my normal

14   order of discovery motions after this hearing.

15             In that order you'll see that I require an expedited

16   discovery process concerning any motion.  So it's a 500-page

17   motion responded to within five days with a 500-day response;

18   and then I either rule, have a hearing, or request additional

19   briefing.  That wasn't in place when this motion was filed; so,

20   obviously, the parties didn't follow it.

21             That said, if it would have been in place, then,

22   you know, we would have had a response and been able to resolve

23   this issue before the -- the deposition date.  And the reason I

24   set this hearing early, prior to the 14 days within which a

25   response can be filed normally under the local rules, is that

1    the deposition was set for May 17th.  So I needed to get this

2    before the parties because filing a motion doesn't toll any

3    deadline.  It doesn't stop any deposition from happening, and

4    so if the parties think that's the case, it's not, so I can

5    kind of address that head-on.

6              So right now what I still have is a deposition set

7    for May 17th with the plaintiff, I guess, requesting a full

8    14 days to respond.  I'm not really sure how that works.  So

9    either the Court has to grant some relief in relation to the

10   deposition or not or rule.  And so, you know, that's in

11   consideration too.

12             So, Ms. Reyes, I'll put that back to you.  I mean,

13   are you requesting -- are you requesting the Court grant this

14   in part to the extent that the deposition is, I guess, canceled

15   or postponed?

16             **MS. REYES:**  Your Honor, defendant and counsel for

17   defendant have known that I intended to take the deposition of

18   Dr. Robinson for long before the time that I noticed it, and

19   they never filed a motion for protective order until I noticed

20   the deposition.  So --

21             **THE COURT:**  Well, that's -- that's appropriate

22   because before a deposition is noticed, there's no reason to

23   file a motion.  So fine.  But the issue is you now want to

24   respond.  So you want to, I guess, file a full response prior

25   to the deposition being taken, but the deposition is set for

1    May 17th.  So what is it you're actually requesting of me?  Are

2    you going to file -- I mean, are you going to file today a full

3    response and then you want me to rule on it?

4            **MS. REYES:**  No.  I can't, Your Honor.  I'm in the

5    process right now -- first of all, I have a hearing in the

6    administrative proceeding that I'm going through because of

7    defendant's wrongful actions of dismissing me.  I have a

8    hearing today on that.  I'm also being deposed on Wednesday,

9    and then I'm also taking a deposition on Thursday in this case.

10           So, I mean, I guess, Your Honor, I would need -- and

11   I know, Your Honor, that I don't know if this factors into your

12   consideration, but I'm -- I'm looking at doing this pro se.

13   Think about a solo practitioner who's starting, you know,

14   working as a lawyer who has been out of practice for almost

15   two decades.  And I'm going -- you know, with a -- with a law

16   firm that has assigned three attorneys to this case and has a

17   lot of -- more resources when they file a motion, including

18   databanks where they have these form motions ready to be filed.

19   I have to, you know, respond from scratch.  So -- and I want to

20   do a good job for the Court, Your Honor, because I keep

21   hearing, you know -- they keep stating pro se and they keep

22   citing that I was a civil procedure professor a while back; so

23   I want to make sure that -- you know, that I give this the

24   time.

25           What would you recommend, Your Honor?

1    **THE COURT:** Well, I mean, you get 14 days under the

2    local rules to respond to a motion absent some order saying

3    something to the contrary. So in this case you would have

4    14 days to respond. I mean, the motion was filed on May 7th;

5    so your normal response deadline -- sorry. I'm having -- is

6    May 21st.

7    **MS. REYES:** Uh-huh.

8    **THE COURT:** So you see that -- if you want to respond

9    by the 21st, that's fine with me, but the deposition's going to

10   have to be moved or canceled -- right? -- because there's no

11   way -- and then, I mean, you're expecting a very busy Court

12   who's set aside hearing time to just resolve this issue to wait

13   until that and then come and rule before, you know, the close

14   of discovery, I guess. You know, I'm going to have to consider

15   that and rule on it.

16   I mean, look, I'll just give you kind of some

17   suggestion as to how I'm leaning here. I mean, to me, this

18   President Robinson is clearly an Apex individual; so, to me,

19   the question then only becomes does he have personal knowledge

20   and is that -- would -- would, you know, obtaining that

21   personal knowledge information that he may or may not have be

22   repetitious? Is there some --

23   **MS. REYES:** Uh-huh.

24   **THE COURT:** -- other person from whom the information

25   can be obtained? Have you deposed any lower people, or have

1    you conducted any paper discovery?  These are things that the

2    case law has me look at.

3            You know, if --

4            **MS. REYES:**  Uh-huh.

5            **THE COURT:**  -- Robinson was, you know, actively

6    involved in this and has personal knowledge, then, you know,

7    fine.  You could depose him to the extent that he has that kind

8    of information, you know.  But I, frankly, in preparation for

9    this hearing, looked at every single place in your complaint,

10   the current operative second amended complaint in which

11   "Robinson" was mentioned or --

12           **MS. REYES:**  Uh-huh.

13           **THE COURT:**  -- "the president" was mentioned even

14   absent the name Robinson next to it, and the only thing I'm

15   seeing is him being put on notice of things and then allegedly

16   failing to do things.  And I don't see how, with an Apex

17   individual, you have a basis to depose him if that's your

18   allegations.

19           Now, maybe you depose some other lower people and you

20   find out that they were directed by him or that he had some

21   additional involvement, and if that's the case, then it

22   would -- work your way up to the Apex individual, but normally

23   that's done as a process.  You know, you've done no

24   organizational deposition in relation to this.  You've done no

25   deposition of -- of lower people before the request.

1        I don't really understand how somebody leaving an

2   institution makes you no longer able to depose that person.

3   You mentioned that the provost has left the institution.  Well,

4   to the extent he has personal knowledge of what's happened in

5   this case, he's still an appropriate deponent and witness in

6   this case.  So I don't understand your whole argument because

7   this other person's went to some other HBCU.  You know, he may

8   not be their employee, but you can still subpoena and depose

9   that person if he has personal knowledge.

10       So, you know, there are people and things that you

11  haven't done under all the case law that I have seen that you'd

12  be required to do, and the allegations in the complaint don't

13  support the fact that an Apex individual is there.  I mean,

14  that's -- I'm telling you I've looked at all the case law they

15  cited, I've read your claimant, and that's where I'm coming

16  out.

17       If you want to respond knowing what I've said and

18  seeing their motion, that's fine, but you need to do so by

19  the 21st.  I mean, is that what you're asking --

20       **MS. REYES:**  Yes.

21       **THE COURT:**  -- for?

22       **MS. REYES:**  Yes.  And -- and, Your Honor, the fact

23  that -- what you stated right now leads me more to think of why

24  I need to respond, including to explain to the Court how the

25  promotion process works within FAMU, including to explain to

the Court how the statements in the declaration are incorrect,
including to state to the Court the participation of
President Robinson, because, on the one hand, I'm in a
situation where I'm facing a shotgun-pleading, you know,
situation if I put too much information; and then, on the other
hand, I'm facing another situation of why maybe I didn't
explain even more what was it that he did and didn't do and how
does that work in terms of making him an active participant
with knowledge -- with special knowledge that only he would
have because he's the ultimate decision-maker in a promotion
application.

So I would like an opportunity to respond,
Your Honor, and your suggestion that I send it by the 21st -- I
will make that work.

**THE COURT:** Okay, then. Well, I'll take this under
consideration, then, and I'll await a response by the 21st to
the motion. The deposition will be canceled pending this. I
would suggest to the parties, work on rescheduling the
deposition because pending the Court's ruling, it still needs
to occur by the 31st. It was properly noticed; so it needs to
occur by that time. So you need to give a date after the 21st,
giving the Court an opportunity rule, when this deposition can
take place.

I'm also going to direct the parties to confer --
you know, in some of the cases that were cited to me -- for

1    example, I think it's *Mansourian* where the Court found that the

2    person did need to testify.  There are reasonable restrictions

3    the Court can place on such a deposition.  In *Mansourian* the

4    Court only granted a three-hour deposition, and it was really

5    limited to information on which the person had personal

6    knowledge, so to avoid the fishing-expedition-type situation.

7         You know, I'm going to direct the parties to confer

8    on that as well.  You know, are there any accommodations here

9    that could be agreed to that could limit this?

10        For example, Ms. Reyes, if you have a handful of

11   points that you want to ask Dr. Robinson about that are

12   specific to whether or not he has personal knowledge or what he

13   did personally in this case, you know, I'd suggest you talk to

14   and confer with the defense about that, and perhaps that can be

15   done in, you know, two, three hours.

16        Like the Court in *Mansourian*, I don't believe that,

17   you know, the university -- that was UC Davis.  I don't believe

18   that FAMU is going to grind to a halt if Dr. Robinson has to

19   testify for two or three hours.  You know, UC Davis didn't.

20   So, you know, I think that that could be appropriate in this

21   case and it could resolve some of these issues, some other

22   restrictions concerning timing and possible subject matter.  So

23   I would just suggest that as well, and that may obviate the

24   need for anything further.

25        Because, look, if Ms. Reyes makes a compelling case

1    of personal knowledge or action or involvement in this by

2    Dr. Robinson, then in that situation, even if he's an Apex

3    individual, he'd be subject to deposition, and I'm likely to

4    strike a moderate kind of compromise position in an order, and

5    so I just kind of warn you about that too.

6           And it's highly unlikely that I would grant any

7    sanctions in relation to the motion.  So I know there's a

8    Rule 37 request as well.  Just already hearing what Ms. Reyes

9    has said, I'd probably find sanctions inappropriate.  And,

10   Ms. Reyes, I wouldn't spend a lot of time addressing whether

11   sanctions are appropriate in this case.

12          So that's -- that's kind of what I have right now.

13   So I'm just going to go around the room and see if there's

14   anything else I can do at this time or should -- or should

15   discuss.

16          So first from the defense, anything additional?

17          MS. REINER:  No, Your Honor.  We are happy to confer

18   with Ms. Reyes regarding scope and -- and time and -- and those

19   issues to try and resolve this matter.  You know, of course,

20   our opinion differs from hers in terms of, you know, the things

21   she's expressed here today, but we are always happy to confer

22   and -- and try and resolve the discovery matter.

23          THE COURT:  All right.  Ms. Reyes, anything further

24   today?

25          MS. REYES:  Judge, I just wanted to add that the

1    length of the deposition also will depend on the deponent.  I

2    just deposed LeRoy Pernell, who is now professor and was dean

3    of the law school before; and, you know, he at his deposition

4    said that he had, you know, met with counsel, GrayRobinson, and

5    that, you know, he had some preparation for his deposition.

6    But at his deposition it took so long because even if I showed

7    him a document that he authored or even if I showed him a

8    document that he received, he could not recall, could not

9    recall.  And I had to be, like, introducing and have him read

10   through the documents, Your Honor.

11        So sometimes -- and I thought I was going to get

12   through a lot faster because, in all honesty, Your Honor, I

13   have been very careful about the deposition scheduling because

14   it is very expensive; and I'm paying for this, and now I'm

15   paying for this unemployed.  So he made it so expensive for me

16   by going through that.  So I don't know how -- you know, if

17   President Robinson is going to be doing the same thing.

18        THE COURT:  You know, I would just -- as -- this is

19   something I say to everyone.  So I know that you're -- you're a

20   professor of law and you have been for a long time, but I tell

21   everyone to get an attorney.  And so, you know, there are

22   reasons, especially in a case like this with such contentious

23   issues -- and this is -- you know, this is a case for which, I

24   believe, if you win, you'd be entitled to attorneys' fees --

25   right? -- based on the statutes that are involved here.

1          So, you know, I would strongly suggest getting an

2     attorney because, you know, especially in depositions, this can

3     get contentious; and if you did have an attorney come into the

4     case, you know, that may be more of an argument for getting an

5     extension of time, to allow that person to get up to speed in

6     the case.  So, you know, I'm not saying that's going to be

7     dispositive of that issue or anything like that.  I don't want

8     to -- I don't want to say that.  But, look, this is for exactly

9     those kind of reasons.

10          I mean, you're telling me that law professors and

11     administrators at universities are going to be somewhat

12     problematic at depositions?  I would say yeah.  I mean,

13     that's -- you know, of course.  I mean, that's -- that's what I

14     would expect, unfortunately.  I'm not saying it's a good thing,

15     but I would expect, unfortunately, for, you know, law

16     professors and administrators high up in universities to be

17     difficult to depose.  You know, they're highly intelligent

18     people that know what they're doing and, you know, maybe want

19     to sway the proceedings one way or the other.  This is not a

20     surprise to me.

21          So, you know, having lawyers on both sides can kind

22     of cut through that and kind of deal with some of the

23     frustration that you have personally based on, you know, what

24     you allege has happened to you in this case and now deposing

25     people who are the exact people who allegedly discriminated

1  against you.  I mean, this can cause issues in the deposition.

2  So, you know, that's problematic.

3         The only thing I can say to you is this:  If a

4  witness is seriously obstructive in a deposition and that

5  obstruction prevents you from completing your deposition within

6  the time provided by the rules, that could form the basis of a

7  motion for an additional time to depose the witness; right?

8  I mean, there are -- there are remedies to these type of

9  situations.  So if somebody's being so obstructive that you

10  were unable to conduct the deposition within the time provided,

11  either by the Court in a limited deposition or the seven hours

12  provided by the rules, then, you know, that's something we can

13  address at that point.

14         But, you know, I'll look at both sides in that

15  situation; and, you know, you also have to be, you know, very,

16  very reasonable in what you're trying to do in your deposition

17  and targeted and, you know -- for example, you know, too many

18  times I just have -- I have people try to have witnesses

19  regurgitate what they said in lengthy written statements again.

20  I mean, you have it in the written statement.  You know, if

21  they admit that they sent that email, for example, you know,

22  having them again admit in a deposition the things that they

23  said in the email is probably a waste of time and probably not

24  necessary.  If it's clear they sent the email, well, then

25  that's your best evidence of what they said at the time, not

1    necessarily them saying it again at a deposition.

2           So I don't know that that happened, but I feel like

3    that happens a lot in these kind of situations.  So I would

4    just, you know, let you know that.

5           But that's all I have to kind of say about that.

6    Hopefully, that will give you some direction in conferring and

7    maybe, Ms. Reyes, will give you a little bit more comfort in

8    agreeing to a limitation because knowing the Court has some

9    ability to enforce if -- if the witness, you know, says, "Oh, I

10   only have two hours.  Well, let me just delay for two hours."

11   Well, the Court's not going to allow that.  You know, if we see

12   that happen in a deposition transcript, then we'll take care of

13   that.

14          But, you know, you're requesting also --

15          **MS. REYES:**  I have to say, Your Honor, that it wasn't

16   contentious.  I'm sorry, Your Honor.

17          **THE COURT:**  Okay.  That's fine.  If it wasn't

18   contentious, that's fine.

19          **MS. REYES:**  It wasn't contentious, but it was

20   difficult in the sense of, like you said, he wouldn't even

21   acknowledge his own memorandum that he authored.  Then I had to

22   go over the memorandum to try to refresh his memory and try

23   to -- and so that's what made it so difficult, the amount of

24   times of not recall when you're seeing that it was, you know,

25   an email that he sent, an email that he received.  So that's --

1   that's -- (audio transmission gap) made it difficult,

2   Your Honor.

3        But on a personal level, there was a level of, I

4   think, (indiscernible) because, to me, these are, you know,

5   fellow faculty members.  (Audio distortion.)  I -- I was very

6   frugal with the way I was scheduling my depositions because I

7   didn't want to be (audio distortion).

8        And at some point, Your Honor, in the future I will

9   hopefully explain why I don't have counsel at this time.  I

10  think that courts make a lot of assumptions about how easy it

11  is to get counsel, especially in this type of case.  I don't

12  have the resources that the State has (audio distortion),

13  you know, like a GrayRobinson type of firm; and there are not

14  many lawyers who are doing these cases, including we have a

15  defendant in the type of case that I have, Your Honor, that --

16  I mean, I could explain a lot more but (audio distortion)

17  recusal order that I have right at the beginning of this case,

18  Your Honor.

19       **THE COURT:**  Well, you know, I don't know if that ever

20  needs to be explained.  We'll deal with that when I can.  I

21  mean, I see many worse cases than yours alleging these kind of

22  violations where people have counsel.  So, you know, I don't

23  know exactly what's happened there, and it's not necessary for

24  me to know to really decide anything right now.

25       So I will leave that to you-all.  You know, I'd ask

1    for you-all to confer concerning this deposition, once again.

2    And then, Ms. Reyes, you can file a response by

3    the 21st.

4    **MS. REYES:**  Okay.

5    **THE COURT:**  And that's it.  We'll be in recess.

6    **MS. REYES:**  And, Your Honor, I think that

7    Ms. Reiner -- can we address extra things that Ms. Reiner and I

8    have conferred about?

9    **THE COURT:**  I mean, I will -- sure.  I will certainly

10   hear them, but it doesn't mean I'm going to decide them.  So if

11   you want to bring up some other things, I'm happy to hear them.

12   **MS. REYES:**  Okay.  Ms. Reiner -- one of the issues

13   that I'm having that I'm raising with Ms. Reiner is the issue

14   of mediation; and, you know, the research that I did is I have

15   to proceed to mediation -- the parties have to proceed to

16   mediation in good faith, and it's also about not wasting

17   resources if we know that we're not proceeding in a way.

18   I reached out to counsel for defendant, and there's

19   no confidentiality of any settlement agreement because this is

20   a public institution (audio distortion) confirm that.

21   There's also the issue of nondisparagement clause,

22   Your Honor.  I cannot agree to a nondisparagement clause, and I

23   could write -- like I said, you know, I suggested that I was

24   going to write a motion to be excused from mediation if they do

25   not agree to take away a nondisparagement from the

1    negotiations.  Otherwise, it's going to be -- and I have

2    research, Your Honor, as to why, when the -- when the entity is

3    the State why, you know, it's unwarranted to have a

4    nondisparagement clause.

5          And including, Your Honor, I cannot agree on -- you

6    know, because of what's happened already.  I've been -- I mean,

7    I have had my reputation soiled right now, because to fire a

8    tenured professor sends a message that something egregious must

9    have happened.  So a nondisparagement clause for whatever a

10   settlement they're going to offer when I lost my tenured

11   position, which gives me a security of employment that I

12   expected so long as I didn't engage in misconduct -- and I

13   never did, Your Honor, and I haven't either.  So a

14   nondisparagement clause for me is out of the table, and I think

15   it would be like expending resources that I don't have right

16   now to (audio distortion).  It will be wasting state resources,

17   Your Honor.

18         And I know there are agreements where professors do

19   not agree to nondisparagement clauses, including because our

20   First Amendments, freedom of speech, and our academic freedom

21   is so important for academics.

22         THE COURT:  So you could file whatever motions you

23   want in the case.  That's what I'll say first.  But I would

24   find it highly, highly, highly unlikely that the Court would

25   excuse you from mediation.  All parties that come before the

1    Court must be a part of mediation.

2            I'll say this, though:  At times United States

3    magistrate judges conduct mediation.  So if there was a serious

4    concern about the cost of mediation, we're free.  So if you-all

5    want to request a mediation before a United States magistrate

6    judge, that could probably happen.

7            Now, I'll say that we have one person already recused

8    from the case, and I don't know the recusal status of our other

9    two.  So, you know, we -- we'd do what we could in relation to

10   that, and you may have to go to Ocala or Tampa to get a

11   magistrate judge who's not of some connection to the

12   university.  This is right next door to us.  So I don't know.

13   For example -- I don't know.

14           **MS. REINER:**  Your Honor.

15           **THE COURT:**  Yeah.

16           **MS. REINER:**  If I may just very briefly.  The issue

17   came about because the original scheduling order -- excuse

18   me -- indicates Travis Hollifield will be the parties'

19   mediator.  It then came to our attention recently, apparently,

20   one of the professors retained Travis Hollifield to represent

21   them individually.  So we contacted Ms. Reyes and indicated we

22   need to pick, you know, a new mediator.  She at that point in

23   time indicated that, you know, unless we agree to certain

24   things in advance that she didn't see a point to mediation and

25   would be filing a motion to be excused from it.

1    THE COURT:  Well, Ms. Reiner, that's not going to

2    happen.  I mean, hopefully, I just -- hopefully, I disabused

3    everybody of that.

4    MS. REYES:  I'm sorry.  Your Honor, I didn't -- I

5    didn't -- that's not what I stated, and the reason --

6    THE COURT:  Hold on.

7    MS. REYES:  -- why it changed, Your Honor --

8    THE COURT:  Hold on.

9    MS. REYES:  -- is because they dismissed me.

10    THE COURT:  You have to hold on.  So -- so we're in

11    court right now.  So if I talk, you have to stop, and so if we

12    don't --

13    MS. REYES:  Yes, Your Honor.

14    THE COURT:  -- get that down, you'll just always have

15    to come in.

16    But let me just say, nobody's going to set conditions

17    on mediation.  Okay?  That's not something that happens.  It's

18    not something the Court's going to allow.  So I don't really

19    need to hear the back-and-forth about different specific

20    provisions in -- in a settlement agreement.

21    The only thing I'm trying to tell you is that if you

22    need a mediator and the mediator is no longer available, you

23    guys can, if you want, file a motion to have a magistrate judge

24    mediate.  I was just expressing some of the concerns about who

25    it might be, kind of talking through it in my head.  It's not

1    really your concern.  If you want -- if you want a magistrate

2    judge as a mediator, just file a motion and suggest that.  If

3    not, you-all are going to have to come up with another mediator

4    because the case will be mediated by the deadline.  And so the

5    deadline is coming up, and so we don't have a whole lot of time

6    to begin with.  So just -- that's all I was saying on that

7    issue.

8         Is there -- is there something else, Ms. Reyes, aside

9    from mediation?

10        MS. REYES:  Yeah.  I just don't want you to leave

11   with the -- with the understanding that I was requesting,

12   you know, a plural of things.  It was specific as to the

13   nondisparagement clause only, and it was only -- a situation

14   arose after I was dismissed because now that's when my

15   reputation has been ruined on a national level, and I cannot

16   agree to a nondisparagement clause.  So that's the reason why.

17   I don't want you to be misled into thinking I waited until now

18   to raise it because I knew before.  Things have changed.  So

19   that's -- that's all I want to say on that, Your Honor.

20        THE COURT:  I'm not going to discuss -- so mediation

21   and settlement discussions are privileged and private, and so

22   the fact that you-all are even trying to discuss terms on an

23   open record is inappropriate.  So I don't want to hear anything

24   about your settlement negotiations or discussions right now.

25        The only thing that I'm concerned about is that there

1    has to be a mediation, and currently there's a deadline, and so

2    without an extension, the mediation has to be by that deadline

3    in the CMSO.  So that's -- that's all I have to say.  And if

4    you need relief in regards to that, file a motion, and it'll be

5    considered by the Court.

6            Ms. Reyes, anything else?

7            MS. REYES:  Thank you.  Thank you for the suggestion,

8    Your Honor.

9            THE COURT:  Anything --

10           MS. REYES:  It's appreciated.

11           THE COURT:  Anything else, Ms. Reyes?

12           MS. REYES:  I don't think so.

13           Ms. Reiner, was there anything else that we discussed

14   before?

15           MS. REINER:  No.  Nothing other than the motion and

16   proceeding --

17           MS. REYES:  Okay.

18           MS. REINER:  -- with respect --

19           MS. REYES:  Thank you, Your Honor.

20           THE COURT:  Yeah.  You guys can't talk to each other

21   either.  I think you should -- this is -- this is court.  Okay?

22           MS. REYES:  I know.  I'm sorry, Your Honor.  This is

23   the first time ever I am in a court on Zoom.

24           THE COURT:  Okay.  Yeah.

25           MS. REYES:  So this is, like, totally new for me, and

| | |
|---|---|
| 1 | if -- and I'm sorry, Your Honor.  I'm going to have to get used |
| 2 | to it. |
| 3 | **THE COURT:**  That's fine.  But, you know, maybe we'll |
| 4 | just go to court next time.  But we are in court; so we'll just |
| 5 | make sure we hold all the kind of normal court procedures in |
| 6 | relation to this.  And we can't talk over each other.  We |
| 7 | can't -- the attorneys can't talk to each other.  You know, |
| 8 | this is just like we're in court. |
| 9 | But I appreciate everything you-all are hearing and |
| 10 | doing.  You're going to get -- you're going to get an order |
| 11 | soon that's on discovery motions.  That does not apply to your |
| 12 | response, Ms. Reyes.  So I don't -- |
| 13 | **MS. REYES:**  Uh-huh. |
| 14 | **THE COURT:**  -- (indiscernible) confusion.  Your |
| 15 | response can be a full 20-page response by the 21st.  Any |
| 16 | additional discovery motions that come forward will have to |
| 17 | comply with my order on discovery motions, which is about to |
| 18 | come out after this hearing.  So I'll just say that.  And |
| 19 | that'll allow me to resolve issues very quickly in relation to |
| 20 | the case at hopefully low expense to you-all relatively. |
| 21 | So that's it, and we'll be in recess.  Thank you. |
| 22 | **MS. REINER:**  Thank you. |
| 23 | **MS. REYES:**  Thank you. |
| 24 | (Proceedings concluded at 11:39 AM.) |
| 25 | |

1

**CERTIFICATE OF REPORTER**

2

3          I, HEATHER SUAREZ, RDR, CRR, FCRR, FPR-C, CA CSR,

4    DO HEREBY CERTIFY that the foregoing amended transcript is a

5    correct transcription of the official Zoom Video Communications

6    sound recording of the proceedings in the above-titled matter.

7

8          DATED this 16th day of December 2024.

9

10    _____

11                    Heather Suarez
                 Registered Diplomate Reporter
12                 Certified Realtime Reporter
               Federal Certified Realtime Reporter
13           Florida Professional Reporter-Certified #790
             California Certified Shorthand Reporter #14538

14

15

16

17

18

19

20

21

22

23

24

25

Tab 86(3)(a)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO:   6:22-cv-1525-WWB-DCI

MARITZA REYES,

       Plaintiff,

vs.

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU"),

       Defendant.

                /

DEPOSITION OF LEROY PERNELL

Taken on behalf of Plaintiff

| | |
|---|---|
| DATE TAKEN: | Thursday, May 9, 2024 |
| TIME: | 9:59 a.m. - 4:48 p.m. |
| LOCATION: | U.S. Legal Support - Orlando |
| | 20 N. Orange Avenue |
| | Suite 1208 |
| | Orlando, Florida 32801 |

Stenographically Reported By:
Christine L. Price, RPR, FPR-C
Notary Public, State of Florida at Large

1                    APPEARANCES

2   On behalf of the Plaintiff:

3       MARITZA REYES, ESQUIRE
        Law Office of Maritza Reyes
4       Post Office Box 5102
        Winter Park, Florida 32793-5102
5       (305) 308-8200
        mreyesesq@gmail.com

6

7   On behalf of the Defendant:

8       SARAH REINER, ESQUIRE
        Gray Robinson, P.A.
9       301 E. Pine Street
        Suite 1400
10      Orlando, Florida 32801
        (407) 843-8880
11      sarah.reiner@gray-robinson.com

12

13                 INDEX OF PROCEEDINGS

14  Deposition of:  LEROY PERNELL

15  Direct Examination by Ms. Reyes.......................5

16  Certificate of Oath.................................224
    Certificate of Reporter............................225
17  Witness Review Letter..............................226
    Errata Sheet.......................................227

18

19

20

21

22

23

24

25

1                          EXHIBITS

2    Number  Description                              Page

3    Exhibit 1     Pernell Resume.......................12

4    Exhibit 2     Letter - Pernell to Reyes 2/26/09......28

5    Exhibit 3     Letter - Harris to Reyes 3/30/09.......29

6    Exhibit 4     Memo - Nunn to Faculty 9/12/08.........41

7    Exhibit 5     Memo - Abrams to Reyes 9/17/18.........46

8    Exhibit 6     Report and Recommendation Fall 2011....55

9    Exhibit 7     Reyes Publications.....................64

10   Exhibit 8     Report and Recommendation 11/5/18......76

11   Exhibit 9     Email Composite 11/8/18................90

12   Exhibit 10    Exhibit A 11/26/18 Response to RPT.....92

13   Exhibit 11    Memo - Pernell to Edington 11/29/18....98

14   Exhibit 12    Expert report of Patrick Mason PhD....105

15   Exhibit 13    Email - Reyes to Pernell 11/28/18.....113

16   Exhibit 14    Letter from Sass 10/22/14.............121

17   Exhibit 15    Letter - Givens to Mangum 11/18/14....124

18   Exhibit 16    Charge of Discrimination 10/25/14.....128

19   Exhibit 17    Letter from Sass 10/30/14.............137

20   Exhibit 18    Letter - Gavin to Griffin 6/16/15.....141

21   Exhibit 19    Letter - Gavin to Langston 6/16/15....142

22   Exhibit 20    Letter - Pernell to Gavin 6/24/15.....143

23   Exhibit 21    Memo - Abate to Pernell 2/27/15.......146

24   Exhibit 22    Email - Langston to Pernell 2/19/15...149

25   Exhibit 23    Emails - Persaud - Reyes 3/17/15......153

1  Exhibit 24    Email - Persaud to Pernell 4/9/15.....157

2  Exhibit 25    Emails - Persaud to Green 4/15/15.....160

3  Exhibit 26    Email - Persaud to Holcombe 4/17/15...166

4  Exhibit 27    Email - McKnight to Gavin 4/19/15.....170

5  Exhibit 28    Memo - Taite to Pernell 8/15/14.......172

6  Exhibit 29    Emails - Gavin - Pernell 3/10/16......176

7  Exhibit 30    Email - Reyes to Pernell 10/15/14.....178

8  Exhibit 31    Letter - Givens to Mangum 1/11/16.....181

9  Exhibit 32    Committee Assignments 2014-2015.......186

10 Exhibit 33    2013-2014 Faculty List................189

11 Exhibit 34    2011-2012 Self-Study..................193

12 Exhibit 35    Email - Aviles to Pernell 8/16/10.....196

13 Exhibit 36    EEOC Dismissal and Notice of Rights...198

14 Exhibit 37    Letter - Gavin to Flores 12/15/08.....200

15 Exhibit 38    Letter - Flores to Gavin 12/19/08.....201

16 Exhibit 39    Faculty Evaluation Form 2012-2013.....207

17 Exhibit 40    RPT Mentoring.........................215

18

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2           THE COURT REPORTER:  Will you raise your right

3      hand.  Do you swear or affirm that the testimony you

4      are about to give in this cause will be the truth,

5      the whole truth, and nothing but the truth?

6           THE WITNESS:  Yes.

7  THEREUPON,

8                LEROY PERNELL,

9  having been first duly sworn, was examined and testified

10 as follows:

11                DIRECT EXAMINATION

12 BY MS. REYES:

13     Q.   So good morning.

14     A.   Good morning.

15          MS. REYES:  Maritza Reyes for the Plaintiff.

16     And?

17          MS. REINER:  This is Sarah Reiner, Gray

18     Robinson, for the Defendant.

19          MS. REYES:  Do you have any stipulations you

20     want to go over?

21          MS. REINER:  It's a discovery deposition, so I

22     think we'll approach things as we need to.

23          MS. REYES:  What about waiving or not signing?

24     I would like for the transcript to be signed.

25          MS. REINER:  Okay.  Well, I usually put that

1    question to the deponent and so we can address it

2    now.  Would you like to read?

3         THE WITNESS:  Sure.

4         MS. REINER:  Yes.

5  BY MS. REYES:

6    Q.   Well, with that, thank you.  Good morning,

7  Professor Pernell.  Is it okay Professor Pernell or do

8  you want Mr. Pernell?

9    A.   Whatever you prefer.

10    Q.   I'm used to Professor Pernell right now, so

11  I'll do that.  So you know my name is Maritza Reyes and

12  I'm here to question you as Plaintiff.  So I want to

13  start with your knowledge of the process first.  Have

14  you given prior depositions?

15    A.   Yes.

16    Q.   Okay.  And when and in what case?

17    A.   Over a span of years.  I can't even recall all

18  the cases.  I've been dean at two institutions and

19  connected with my positions at both institutions I've

20  had numerous depositions.

21    Q.   And more recently, which case would you say is

22  the most recent one?

23    A.   I'm not -- I'm not sure.

24    Q.   Okay.  Let me see if I can help you.  What

25  about the Jane Doe versus FAMU College of Law, did you

1    give a deposition in that one?

2        A.    I don't recall that.

3        Q.    What about Jennifer Smith v. FAMU?

4        A.    Yes, I did.

5        Q.    And Ka'juel Washington v. FAMU College of Law?

6        A.    I believe so, but I'm not certain.

7        Q.    Okay.  What about Rhoda Cato v. FAMU College of

8    Law?

9        A.    No.

10       Q.    And Tim Blevens v. FAMU College of Law?

11       A.    I don't remember if I've given a deposition

12   there.

13       Q.    But you have been deposed several times before?

14       A.    Yes.

15       Q.    So I just want to remind you because, you know,

16   you know the process, but I want to remind you to answer

17   the questions with words and not uh-huh or, you know,

18   head gestures because I want the court reporter to get

19   the words.  I'll help you through that.  I know

20   sometimes I may even do it myself.  But I want to get

21   the answer to the questions in words so the court

22   reporter can take them.

23            If you don't hear or understand, because I know

24   that I'm wearing a mask, it's usually not a problem for

25   me, but if you don't hear or understand a question,

1  please let me know so that I can clarify it, rephrase

2  it, to try to make sure that you understand what I'm

3  asking and I get the answer to the question that I'm

4  asking; are you okay with that?

5      A.   Yes.

6      Q.   Great.  Okay.  So let's start with, why do you

7  think you're here today?

8      A.   To give a deposition.

9      Q.   And what knowledge do you think you have with

10  regards to why you're here to give a deposition?

11      A.   I -- deposition in a case in which you are a

12  plaintiff is the only knowledge that I have.

13      Q.   Okay.  And so this takes me to, of course, I'm

14  going to ask you questions based on personal knowledge.

15  Um, did you prepare for your deposition -- and you hear

16  I'm already going um.  Did you prepare for your

17  deposition today?

18      A.   The only preparation is I did talk to

19  university counsel.

20      Q.   Okay.  Name of the university counsel?

21      A.   The Gray Robinson firm.

22      Q.   Okay.  And which lawyer?

23      A.   Ms. --

24           MS. REINER:  Reiner.

25      Q.   Sitting next to you?  Sarah Reiner?

1     A.   Sarah Reiner.

2     Q.   And when did you talk to her?

3     A.   Yesterday.

4     Q.   For how long?

5     A.   I don't recall.

6     Q.   Okay.  Did you go over topics or matters with

7   Ms. Reiner?

8          MS. REINER:  I'm going to object to -- on the

9     basis of attorney-client privilege.

10         MS. REYES:  Okay.  I'm not asking him what he

11    discussed.

12         MS. REINER:  You are.  You're asking what

13    topics we discussed.

14         MS. REYES:  No, I said, "Did you go over

15    topics?"

16  BY MS. REYES:

17    Q.   I don't want to know the topics or the matters,

18  I just want to know, did you discuss any topics or

19  matters with regard to the deposition?

20         MS. REINER:  Okay.  So yes or no, I guess.

21         MS. REYES:  Yes.

22    A.   Yes.

23    Q.   Did you?

24    A.   Yes.

25    Q.   Okay.  Did you go over questions --

1     A.   I'm not sure --

2     Q.   -- in preparation?

3     A.   I'm not sure I understand.

4     Q.   In the discussion, right, did counsel give you

5 questions, potential questions, for the deposition?

6     A.   I don't recall.

7     Q.   I don't want to know what was discussed, I just

8 want to know if in the prep if there were questions?

9     A.   If counsel asked me questions, yes, they asked

10 me questions.

11     Q.   But did they discuss any potential questions

12 you may have or I may ask today?

13     A.   I don't recall any.

14     Q.   Okay.  And you said that they asked you

15 questions, so I take it they went over your answers with

16 you?

17         MS. REINER:  I'm going to object to the form of

18    the question.

19     Q.   Okay.  When they asked you questions, did you

20 answer them?

21     A.   I answered questions that I was asked.

22     Q.   Did you review any documents in preparation for

23 your deposition today?

24     A.   None, other than I did quickly scan the amended

25 complaint that was filed in this case.

1    Q.   Okay.  Which complaint?

2    A.   It was the amended complaint.  I don't know of

3  any others.

4    Q.   Okay.  The amended complaint or the second

5  amended complaint?

6    A.   I have no idea.

7    Q.   Okay.

8    A.   I reviewed an amended complaint.

9    Q.   Okay.  And was that the only material from the

10  lawsuit that you reviewed?

11    A.   Yes.

12    Q.   Okay.  All right.  Well, with those questions,

13  let's get to some background questions about you.  To

14  begin with, your educational background.  What school

15  did you attend for undergrad?

16    A.   I attended Franklin & Marshall College.

17    Q.   And when did you graduate?

18    A.   In 1971.

19    Q.   Okay.  And what did you do after you graduated

20  from undergrad?

21    A.   What did I do?

22    Q.   Yeah.  Did you go to work?  Did you go to law

23  school?

24    A.   I went to law school the following fall.

25    Q.   And where did you go to law school?

1    A.   At The Ohio State University College of Law.

2    Q.   And when did you graduate from there?

3    A.   In 1974.

4    Q.   Okay.  And I noticed that you were thinking

5    about it.  I think I want to help you a little bit and

6    help myself, also, as I go through the questions.  I'm

7    going to enter an exhibit.  Your resume.  Which is

8    posted online.  Exhibit 1.

9         (Exhibit Number 1 was marked for

10        identification.)

11   Q.   Okay.  In case you want to reference it.

12        So have you ever been admitted as a practicing

13   attorney to any bar of any state?

14   A.   Yes.

15   Q.   Okay.  Which one?

16   A.   Ohio.

17        MS. REINER:  And I just want to make sure that

18        we are clear here.  Right now the exhibits are being

19        marked for purposes of the deposition; correct?

20        MS. REYES:  Yes.

21        MS. REINER:  Okay.

22        MS. REYES:  Do you have an objection?

23        MS. REINER:  In terms of admission.  Yeah,

24        admission is a different issue.  So right now we are

25        marking them for purposes of deposition.

1        MS. REYES:  So would you oppose the admission

2    of his resume?

3        MS. REINER:  Well, so far we haven't talked

4    about it.  So usually we would lay a foundation for

5    something like that before putting it in.

6        MS. REYES:  I didn't know if, you know, right

7    now, but okay.

8        MS. REINER:  Yeah.

9  BY MS. REYES:

10    Q.   So take a look at your resume.  And go through

11  the pages that are there.  Is that your resume?

12    A.   It appears to be a copy of my resume.

13    Q.   Okay.  It's an accurate depiction of your

14  resume, which you posted online?

15    A.   I believe it's accurate as was posted online.

16  There may be one or two pages missing.

17    Q.   Okay.  Up to page 9.  That's up to page 9.

18    A.   This goes page 1 through 9.

19        MS. REYES:  Yes.  Okay.  Do you have any

20    problem with admission of this exhibit at this

21    point?

22        MS. REINER:  For purposes of the deposition, no

23    -- no objection.  Of course we reserve objections

24    for purposes of trial.

25    Q.   All right.  So let's go through now and back to

1  the question of are you still licensed?  You said you

2  were licensed in Ohio?

3      A.   That is correct.

4      Q.   And you're still licensed in Ohio?

5      A.   Yes, I am.

6      Q.   Okay.  Have you ever been admitted as a member

7  eligible to practice in any federal courts?

8      A.   Yes.

9      Q.   Which ones?

10     A.   I've been admitted to practice of the Northern

11 District of Ohio -- United States District Court

12 Northern District Court of Ohio, the United States

13 District Court for the Southern District of Ohio, I've

14 been admitted to the United States Court of Appeals for

15 the Sixth Circuit, I've been admitted to the United

16 States Court of Appeals for the Eleventh Circuit, I've

17 been admitted to practice before the United States

18 Supreme Court.  I believe that those are all the federal

19 courts.

20     Q.   Okay.  And after you graduated from law school,

21 where did you work?

22     A.   I began working at the Columbus Legal Aid and

23 Public Defender Society.

24     Q.   Okay.  And where was that?  Columbus, Ohio?

25     A.   Where was that?  In Columbus, Ohio.

1    Q.   Okay.  And what was your title there?

2    A.   I was an attorney.

3    Q.   And after that, what was your next job?

4    A.   I went from there to -- back to The Ohio State

5 University as a clinical -- supervising attorney in the

6 clinical program at The Ohio State University College of

7 Law.

8    Q.   And was that a tenure-track position?

9    A.   That was not a tenure-track position.

10    Q.   Okay.  After that what did you do?

11    A.   I believe I became a visiting assistant

12 professor at The Ohio State University College of Law.

13    Q.   And was that a tenure-track position?

14    A.   That was not tenure-track.

15    Q.   What did you do after that?

16    A.   I was hired to be an assistant professor of law

17 at The Ohio State University College of Law.

18    Q.   And was that a tenure-track position?

19    A.   Yes, it was.

20    Q.   So after you were assistant professor, what was

21 your next title?

22    A.   My next title would have been associate

23 professor of law.

24    Q.   Okay.  And was that tenure-track or tenured?

25    A.   That was initially tenure-track and it was

1  tenured subsequently.

2      Q.   Okay.  After that, what was your next title?

3      A.   Professor of law.

4      Q.   Tenured professor of law?

5      A.   Yes.

6      Q.   And after that, what was your next title?

7      A.   I had a dual position as vice provost for

8  minority affairs at The Ohio State University and I also

9  served as of counsel to the firm of -- the Otto Beatty

10  law firm.

11      Q.   Okay.  While you were still a tenured professor

12  of law?

13      A.   Yes.

14      Q.   Okay.  And by the way, when did you earn

15  tenure?

16      A.   I'm not sure of the exact date.

17      Q.   It's not on your resume?

18      A.   Yeah, and I don't recall exactly.

19      Q.   Okay.  But it would have been in the time that

20  you were an associate professor?

21      A.   As far as I recall.

22      Q.   Because you said you started tenure-track?

23      A.   As far as I can recall.

24      Q.   And then after that, what was your next title?

25      A.   After what?

1    Q.    After the last one you told me about that you

2    were doing of counsel and you were working for the

3    office of minority affairs?

4    A.    Of counsel work prior to working -- prior to

5    being vice provost.

6    Q.    Okay.

7    A.    I closed down the practice -- the of counsel

8    practice when I became vice provost.

9    Q.    When you were vice provost, you were still a

10   tenured professor?

11   A.    That's correct.

12   Q.    What was your job after that, your position?

13   A.    I was -- I became dean of the Northern Illinois

14   University College of Law.

15   Q.    So you went from Ohio State University to

16   Northern Illinois University College of Law?

17   A.    That is correct.

18   Q.    Okay.  And you became a dean there?

19   A.    That is correct, and professor of law.

20   Q.    Okay.  And tenured professor of law?

21   A.    Yes.

22   Q.    Okay.  And then after that, what was your next

23   title?

24   A.    I -- when I left the Northern Illinois

25   University College of Law, I became dean of the Florida

 1  A&M University College of Law.

 2      Q.   And when you left Northern Illinois University

 3  College of Law, were you dean emeritus?

 4      A.   I was not dean emeritus, I was professor

 5  emeritus.

 6      Q.   Okay.  Because I saw the emeritus in your

 7  resume.  So you were professor emeritus.  And so when

 8  you came to the Florida A&M University College of Law,

 9  you came as dean?

10      A.   That is correct.

11      Q.   And professor of law?

12      A.   That is correct.

13      Q.   Tenured professor of law?

14      A.   That is correct.

15      Q.   And what was your next administrative title

16  after that?

17      A.   The next administrative title --

18      Q.   Yeah, because you were always professor of law;

19  right?

20      A.   Right -- would have been, I came back as

21  interim dean.

22      Q.   So let's make the transition there.  And that's

23  why I wanted you to have your resume available.  You

24  were a dean from when to when initially?

25      A.   I'm not sure.

1    Q.   It's right there on page 1.

2    A.   Whatever is stated on the resume there.

3    Q.   Okay.  It states January 1, 2008, to June 30,

4  2015?

5    A.   That sounds correct.

6    Q.   Okay.  And so what happened in 2015 that you

7  were no longer dean?

8    A.   I served two terms as dean and the decision was

9  they wanted to bring in a different dean.

10   Q.   And when you were hired as dean of Florida A&M

11 University College of Law, who was the president?

12   A.   Was James Ammons, I believe.

13   Q.   And who was the provost?

14   A.   I'm -- I can't recall her name.

15   Q.   Was it Cynthia Harris?

16   A.   No.

17   Q.   Okay.  But it was a woman?

18   A.   Yes.

19   Q.   Okay.  And then you said that two terms as dean

20 and a decision was made that they wanted someone else?

21   A.   I completed two terms.

22   Q.   Okay.  Who was president at that time?

23   A.   I am not certain.  I belive it -- I'm not

24 certain whether it was Ammons or his successor.  I don't

25 recall.

1      Q.   Okay.  So we're talking in 2015 when you went

2   from dean to professor, right, of law?

3      A.   Uh-huh.

4      Q.   And two terms expired?

5      A.   That's correct.

6      Q.   Okay.  And it was June 30, 2015.  Would Elmira

7   Mangum have been president at the time?

8           MS. REINER:  Object to form.

9      A.   I don't believe so -- I don't recall.

10     Q.   Okay.  And do you recall the provost at that

11  time?

12     A.   I believe the provost may have been Marcella

13  David.  I'm not sure.

14     Q.   Okay.  So you went back and you were a tenured

15  professor of law?

16     A.   That's correct.

17     Q.   And then they asked you to come back as interim

18  dean?

19     A.   That's correct.

20     Q.   I'm looking at your resume.  May 2, 2017, you

21  said?

22     A.   I have no reason to doubt that date.

23     Q.   Okay.  That's what it says there.  Who was the

24  president who asked you to come back?

25     A.   I am not certain whether it was still Mangum or

1  her successor.

2      Q.   Who was Mangum's successor?

3      A.   Robinson, I believe.

4      Q.   What's the first name?  Larry?

5      A.   I believe that's correct.

6      Q.   And when you said they asked you to come back,

7  who was the provost?

8      A.   I believe it was Rodner Wright.

9      Q.   And he was an interim provost?

10     A.   I don't know.  I don't recall.

11     Q.   And you served as interim dean until

12  April 2019?

13     A.   Is that a question?

14     Q.   Yes.

15     A.   Whatever it says on the resume.

16     Q.   So yeah, it says May 2, 2017 to April 2019.

17     A.   Yes.

18     Q.   And then in April 2019, who became dean?

19     A.   I believe -- I'm not certain, I believe that

20  there was an interim -- another interim dean.

21     Q.   Who was the other interim dean?

22     A.   I believe it was probably Darryll Jones.

23     Q.   Do you know why they -- and it was the

24  university president and provost, I take it, why they

25  switched from an interim dean, you, to another interim

1  dean, Darryll Jones?

2      A.   I had asked the provost on numerous occasions

3  to complete the dean search and that I didn't wish to be

4  interim dean forever.

5      Q.   Okay.  And so when you said that you asked them

6  to complete the dean search, when did they complete the

7  dean search?

8      A.   I don't recall.

9      Q.   Did Interim Dean Darryll Jones become the dean?

10     A.   I don't believe so.

11     Q.   Okay.  And so when you finished there -- so who

12  was the next permanent dean after these two interim

13  deans?

14     A.   I believe it was Felecia Epps.

15     Q.   Okay.  And who was the provost with Felecia

16  Epps?

17     A.   I don't recall.

18     Q.   So you went back April 2019 to date and you are

19  a tenured professor of law?

20     A.   That is correct.

21     Q.   Okay.  So just to make sure that I understand,

22  every time you were administrator at the FAMU College of

23  Law, you retained your tenured full professor

24  designation, also?

25     A.   That is correct.

1    Q.   Okay.  And when you came to the FAMU College of

2  Law, you came as a tenured full professor and as dean;

3  right?

4    A.   That is correct.

5    Q.   And how does that work, did it transfer your

6  tenure from Northern Illinois to FAMU?  Is that how it

7  happened or did you have to go through a review of your

8  tenure?

9    A.   That was up to the university.  When I agreed

10  to be dean, I agreed to be dean and professor of law.

11    Q.   Okay.

12    A.   How they went about doing that, I'm not

13  certain.

14    Q.   Do you recall how you went about it, if you had

15  to go through a process of applying for tenure again or

16  if it was just transferred?

17    A.   I do not recall any process.

18    Q.   Uh-huh.

19    A.   The agreement was when I took the deanship, I

20  would be professor of law.

21    Q.   Okay.  And you said you've been a dean, you

22  know, for many years in two law schools?

23    A.   That's correct.

24    Q.   Is there a usual of transferring tenure from --

25  you know, if a professor is tenured in a law school and

1  they go to another law school is there usually a

2  transfer of tenure?

3      A.   I don't know necessarily what is meant by the

4  phrase "transfer of tenure."  But once someone is

5  tenured at one university or one law school and takes a

6  position of equal or greater position at another

7  university, that is not unusual that that be with

8  tenure, also.

9      Q.   Uh-huh.  Okay.  And have you seen that process

10 happen in the FAMU College of Law in your time as dean

11 that somebody who was tenured in another law school came

12 to FAMU College of Law as tenured?

13     A.   I believe there have been hires with tenure.

14     Q.   And do you recall any of those hires with

15 tenure --

16     A.   I don't recall.

17     Q.   -- during your deanship?  No?

18     A.   I don't recall that.

19     Q.   Do you recall if Darryll Jones was one of them?

20     A.   I don't recall offhand.  I believe probably

21 was, but I don't know.

22     Q.   Who is Darryll Jones?

23     A.   He's a professor of law.

24     Q.   And which dean hired him?

25     A.   Well, no dean hires professors, the university

1  hires them.

2      Q.   Who was dean when he was hired?

3      A.   I was dean when he was hired.

4      Q.   Okay.  And do you recall if he transferred his

5  tenure?

6      A.   Again, I don't -- transfer suggests a process

7  that I can't speak to there being a process.

8      Q.   He came as a tenured professor?

9      A.   He came as a tenured professor, I believe,

10  because he had tenure where he came from.

11      Q.   Okay.  So in your resume, you listed that you

12  were a hearing officer of the university faculty review

13  panel.  What was that position about?

14      A.   When I was at The Ohio State University?

15      Q.   Yeah.

16      A.   That was a request and I don't recall whether

17  it was from the president's office or the provost's

18  office, it was quite some time ago.  But the position

19  involved being able to mediate disputes between faculty

20  members and other departments.

21      Q.   So would you consider that service -- a service

22  type of position in addition to your duties, service to

23  the university?

24      A.   It's certainly service to the university.

25      Q.   And about how long did you do that?

1      A.   I don't recall how long that lasted.

2      Q.   Okay.  And did you actually mediate?  Did you

3  do some of that work or, you know, you didn't have

4  anything to do during the time that you were appointed

5  for that?

6      A.   You're asking did I have cases --

7      Q.   Yeah.

8      A.   -- to participate?  Yes, I did.

9      Q.   Okay.  So I'm going to take you now to your

10  knowledge of Plaintiff Professor Reyes.

11      A.   Okay.

12      Q.   And it's going to be a little unusual speaking

13  in the third person, but I will get through it.

14      A.   I understand.

15      Q.   When did you first meet Professor Maritza

16  Reyes?

17      A.   I'm uncertain as to an exact date, but I

18  probably met her during the hiring process -- the

19  initial hiring process.

20      Q.   And during that hiring process, how did that

21  hiring process begin?  Is it related to the Association

22  of American Law Schools Recruitment Conference, for

23  example?

24      A.   Okay, which question do you want me to answer?

25      Q.   How did the process begin?

1      A.   There is a --

2      Q.   I was trying to help you.

3      A.   I understand.  When there is a position to be

4   filled -- faculty position to be filled, there is a

5   committee that is formed within the college of law,

6   usually having a name something -- I believe the name of

7   this committee was Faculty Recruitment Committee, I

8   believe that's still the name.  An ad is posted for the

9   position.  People apply.  One of the tools that the

10  hiring process uses and the committee uses is to

11  participate in the recruitment conference that the AALS

12  sponsors.

13       They typically gather information from persons

14  who are interested in teaching.  And the committee

15  determines who they are going to interview based on

16  people who are registered for that process, as well as

17  from other sources.

18       They conduct an initial interview or -- it's

19  not a job interview, as such, but an initial interview

20  to determine if they want to pursue further with an

21  individual.  And if they do want to pursue further with

22  the individual, that individual has to apply for a

23  position and then it usually goes to a full interviewing

24  process after law school.

25       Q.   So the application comes before they come for

1 the full interview?

2    A.   As far as I know.

3    Q.   Do you know if Professor Reyes had to go

4 through that, put the application first before --

5    A.   I don't know.

6    Q.   Okay.  And when you said ALS --

7    A.   Double A, LS.

8    Q.   That's the Association of American Law Schools?

9    A.   That is correct.

10    Q.   Okay.  And so that's how the process began, you

11 identified Professor Reyes through the ALS --

12    A.   That's a typical process and I work with the --

13 I'm making the assumption that that is how she came

14 through.

15    Q.   Do you recall when you extended an offer to

16 Professor Reyes?

17    A.   No, I don't know.  And I don't extend the

18 offer, the offer is extended by the university.

19    Q.   Okay.  Do you recall when you notified her that

20 there would be an offer extended?

21    A.   I do not know.  I don't recall.

22    Q.   Okay.  Let's mark this Exhibit 2, please.

23       (Exhibit Number 2 was marked for

24    identification.)

25    Q.   Do you recognize that letter?

1    A.   This appears to be a copy of a letter that

2 would have been sent to Professor Reyes.

3    Q.   And who was copied in that letter?

4    A.   Provost Cynthia Hughes-Harris.

5    Q.   So at the time when -- you know, when the

6 potential offer was being made, the provost was Cynthia

7 Hughes-Harris?

8         MS. REINER:  Object to form.

9    Q.   Who was the provost at the time when this offer

10 was -- or this letter where you were notifying her?

11    A.   The letter indicates that it was Cynthia

12 Hughes-Harris.

13    Q.   Okay.  And what is the date of the letter?

14    A.   February 26, 2009.

15    Q.   And you said that the dean does not extend the

16 offer.  Who extends the offer?

17    A.   The letter indicates that the formal letter of

18 offer comes from the senior vice president and provost

19 of Florida A&M University.

20    Q.   Okay.  And do you recall when Provost Cynthia

21 Hughes-Harris made the offer?

22    A.   No, I do not.

23    Q.   Exhibit 3, please.

24         (Exhibit Number 3 was marked for

25    identification.)

1      Q.    If you can take a look at Exhibit 3, please.

2   That has been marked as Exhibit 3.  And if you go to

3   page 2 of that letter, that two-page letter, what does

4   it say on the header on the margin at the top on the

5   left?  The first line on there.

6      A.    I assume you're referring to the language

7   "Offer Letter" to Professor Maritza I. Reyes?

8      Q.    Right.  And what is the date?

9      A.    That's March 30, 2009.

10     Q.    And is there -- on that page, that second page

11  of the letter, is there an acceptance by Professor

12  Reyes?

13         MS. REINER:  Object to form.

14     A.    There is --

15     Q.    What is on the bottom of the letter?

16     A.    At the bottom of the letter there is a

17  statement that begins:  I, a blank that was filled in

18  with Maritza Reyes, the above referenced offer of

19  employment with accept circled with the terms and

20  conditions described therein.  There appears to be a

21  signature and a date.

22     Q.    What is that date?

23     A.    It appears to be April 7, 2009.

24     Q.    Okay.  And when you say it appears, what do you

25  mean by that?

1      A.   That's what it appears.

2      Q.   Okay.  So let's talk about the time of that

3   date, April 7, 2009, and the offer, March 30, 2009.

4   Around that time, what was going on in the law school in

5   terms of accreditation?

6      A.   I'm not sure -- I'm not sure I understand the

7   question, but additionally, I don't know, you know,

8   what's going on.  I mean, there was a constant

9   accreditation process.  I assume that would have still

10  been happening.

11     Q.   Was the law school fully accredited by the

12  American Bar Association in March or April 2009?

13     A.   I don't recall the exact date of accreditation,

14  because when I came in, it had professional

15  accreditation and then we moved and was granted full

16  accreditation, but I don't recall exact dates.

17     Q.   Do you recall an article from the American Bar

18  Association Journal titled "Saving the Law School"?

19     A.   Yes, I believe there was such an article.

20     Q.   And you participated -- you were interviewed

21  for that article?

22     A.   Yes.

23     Q.   Okay.  So that article would have the date of

24  accreditation?

25     A.   I --

1     Q.   Could have the date.

2     A.   Yeah, I participated in the interview.

3     Q.   Okay.  Were you dean when the law school

4 applied for full accreditation --

5     A.   Yes.

6     Q.   -- by the American Bar Association?

7     A.   Yes.

8     Q.   Okay.  And in fact, how did your relationship

9 with the FAMU College of Law begin?

10    A.   How did the relationship begin?

11       MS. REINER:  Object to form.

12    Q.   Yes.

13       MS. REINER:  Object to form.  Compound.

14    A.   It began when I was hired as dean.

15    Q.   Okay.  Was there any consulting work before

16 that?

17    A.   I originally -- so yes, I'll modify my answer a

18 little bit.  There was -- the actual official start date

19 for me as dean, and I can't recall the exact date, but

20 prior to that date, there was a need to advise as to, I

21 guess some issues that were in the law school, so I did

22 consult with them prior to the official start date.

23    Q.   Because on your resume you listed January 1,

24 2008.

25    A.   Yes.

1    Q.   At that time would you have been doing

2  consulting work or already like the official dean?

3    A.   I don't recall when the exact date was that I

4  started as dean, but certainly there was a time prior to

5  that that I actually was consulting with them and my

6  official duties as dean had not begun at that time.

7  That could line up.

8    Q.   Okay.  All right.  So let's get back to the

9  hiring process for Professor Reyes.  What was the

10  faculty designation assigned to Professor Reyes when she

11  was hired?

12    A.   I don't recall.  The letter that you've marked

13  here would indicate that.

14    Q.   And what does it indicate?

15    A.   Assistant professor.

16    Q.   And was that tenure-track?

17    A.   That would have been tenure-track.

18    Q.   So you've been a dean for a long time and

19  professor of law and you went through the -- like, we

20  established that you started as assistant professor,

21  associate professor, full professor, and then tenure, of

22  course.  What is the difference between tenure-track and

23  not tenure-track in terms of that process?  Or what is

24  tenure-track?  How would you describe tenure-track with

25  your experience?

1    A.    Tenure-track normally refers to an individual

2  who is hired with the expectation that they will obtain

3  tenure and promotion if they adhere to the rules of the

4  institution and satisfy the reviewing process for that.

5          So a person is often, when they're new in

6  teaching, is hired as an untenured person.  And then

7  once they have met the criteria as determined by the

8  institution for promotion to associate professor, they

9  would apply for associate professor, that decision would

10  be made.

11          Typically -- or it's not unusual that the

12  promotion to associate professor may happen at the same

13  time that a tenure decision is made.  Although sometimes

14  it is not unusual that an individual would obtain the

15  rank of associate professor without tenure and then take

16  tenure later on.

17    Q.    And when you talked about -- there's criteria

18  you called it; right?  Where is that criteria stated?

19    A.    Well --

20          MS. REINER:  Object to form.

21    A.    -- each --

22          MS. REYES:  Can you be more specific?

23          MS. REINER:  Yes.  So in terms of form, what

24      criteria are you referring to?

25          MS. REYES:  The criteria that he just went

1    over.  He called it the criteria for getting tenure.

2         MS. REINER:  I think he talked about both

3    tenure and promotion.

4         MS. REYES:  No, we were speaking about tenure

5    -- well, if he's speaking about both criteria, and

6    promotion.

7    BY MS. REYES:

8    Q.   Where is the criteria for tenure?

9    A.   Where is it?

10   Q.   Yeah, where usually is it stated?

11   A.   It -- an institution will articulate what those

12   standards are usually within the rules and regulations

13   of that institution.  But there are also rules that

14   impact that, that are established by the university, as

15   well.

16   Q.   Okay.  So when you say the institution, what

17   are you referring to?

18   A.   The college of law.

19   Q.   Okay.  So the college of law and the university

20   criteria?

21   A.   I believe that's correct, yes.

22   Q.   And what about for promotion?

23   A.   The same would be true for promotion.

24   Q.   Okay.  Do you know if Professor Reyes was

25   provided a criteria that she would be expected to meet

1  in order to get tenure during her hiring process?

2      A.   I don't know that.

3      Q.   Would you say that it would be routine practice

4  for a law school to provide that criteria when they are

5  hiring a tenure-track professor?

6      A.   I can't say that at this point because each

7  school does it a little differently.

8      Q.   If Professor Reyes asked for that criteria with

9  you as dean or an associate dean in the FAMU College of

10  Law, would that have been provided to her?

11      A.   I can't speak as to what anyone else would do

12  or have done.

13      Q.   Okay.

14      A.   The person who is in the position has a copy,

15  as far as I know of the faculty -- often referred to the

16  faculty handbook, which includes the standards.  But

17  other than what requests were or were not made, I do not

18  recall.

19      Q.   Okay.  Is there any criteria for tenure in the

20  offer letter stated?

21      A.   The letter from Provost Harris that you showed

22  me before has a paragraph that indicates the

23  "reappointment or advancement in rank in the granting of

24  tenure in the academic unit are dependent upon

25  demonstrated excellence in teaching, research, and

1  meritorious service.  And the university and college

2  criteria for tenure emphasizes possession of appropriate

3  academic competencies, scholarly, creative activities

4  and contributions to the university and community."

5      Q.   And what is the line after that?

6      A.   "For your information I have enclosed a copy of

7  the tenure guidelines."

8      Q.   And then what's the next sentence after that?

9      A.   "You should be eligible to be considered for

10 tenure during the 2014-2015 academic year, therefore

11 you'll be required to apply for tenure no later than the

12 beginning of that academic year."

13     Q.   Okay.  So this letter refers to enclosing the

14 tenure guidelines?

15     A.   The letter --

16     Q.   You just read that.

17     A.   The letter is what I just stated.

18     Q.   Okay.  And you also read that "therefore you

19 would require -- therefore, you will be required to

20 apply for tenure no later than the beginning of that

21 academic year," right, the 2014-2015 academic year.

22 What does that mean?

23         MS. REINER:  Object to form.  Compound.

24         MS. REYES:  What's is the compound part?

25         MS. REINER:  It means you are asking multiple

1      different questions.

2           MS. REYES:  No, I know that.  What are the

3      multiple ones?

4           MS. REINER:  So you asked him again what the

5      letter says, then you asked him again what does it

6      mean.  Could you read back the question?

7               (Question read.)

8  BY MS. REYES:

9      Q.   So what does that mean that you are required to

10  apply for tenure during the 2014-2015 academic year?

11     A.   Well, I can't speak specifically for what --

12     Q.   That was the same question I had before?

13     A.   -- Cynthia --

14     Q.   I'm sorry.  You were required, what does it

15  mean?

16     A.   Shall I continue?

17     Q.   Yes.

18     A.   I can't speak specifically as to what a provost

19  means in a letter that she wrote, but based on what is

20  in this letter, and it would typically be for someone on

21  a tenure-track, must apply for and achieve tenure within

22  a stated period -- usually a stated period of time and I

23  would understand this letter to indicate that time.

24     Q.   Okay.  And remember at the beginning I said

25  that I was going to ask you, you know, to answer based

1 on your personal knowledge, so -- and we've established

2 that you've been a dean for a long time, including at

3 the FAMU College of Law.  So based on that knowledge as

4 dean that you served in the law school, what does that

5 mean that somebody is required to apply in the 2014-2015

6 academic year?  What happens if they don't?  To try to

7 clarify for you.

8      A.   Again, this is statements made by the provost

9 of the university, so I can't speak to what she means by

10 "required."  I can tell you that as a general matter,

11 someone who fails to obtain tenure within the time

12 established for them to obtain tenure could be subject

13 to nonrenewal.

14      Q.   Okay.  Have you heard the phrase "up or out" in

15 reference to tenure?

16      A.   I don't recall that phrase.

17      Q.   Okay.  So who was Kenneth Nunn?

18      A.   Kenneth Nunn was a faculty member who was hired

19 when I first came on board as dean, hired as an

20 associate dean, I believe, and with responsibilities

21 regarding academic growth and qualifications.

22      Q.   So earlier you said that for a faculty offer,

23 that comes from the provost, it does not come from the

24 dean; correct?

25           MS. REINER:  Object to form.

1    A.   Offers come from the university.

2    Q.   Okay.  And what about for administrators of the

3  law school, who makes the offer for an administrative

4  position?  Not the faculty position, but the

5  administrative part?

6    A.   That's no different.  The university at some

7  point must make that offer.  They may accept the request

8  of the immediate administrative office of the dean, but

9  individuals don't work for the dean --

10    Q.   Okay.

11    A.   -- they work for the university.

12    Q.   And do you have -- as dean, did you have any

13  participation in the hiring of Kenneth Nunn?

14    A.   Yes.

15    Q.   And did you recommend Kenneth Nunn for the

16  associate dean position?

17    A.   Yes.

18    Q.   Okay.  And did Kenneth Nunn begin working at

19  the college of law, the FAMU College of Law, before the

20  law school was fully accredited by the American Bar

21  Association?

22    A.   Yes, I believe he did.

23    Q.   Did he help with the preparation of the

24  documentation, application, paperwork that had to be

25  prepared as part of the application for full

1  accreditation?

2      A.   Yes.

3      Q.   Okay.  And did he author any memos that were

4  attached to the documents that were presented to the

5  American Bar Association during the application for full

6  accreditation?

7      A.   I don't recall.

8      Q.   Okay.

9           (Exhibit Number 4 was marked for

10     identification.)

11     Q.   Please take a look at Exhibit 4.  So Exhibit 4

12  is a memorandum.  It's dated September 12, 2008, to

13  tenured and tenure-track faculty from Kenneth B. Nunn,

14  re:  Publication Standards for Promotion and Tenure.

15          Have you seen this memorandum before?

16     A.   I believe I have.  I can't recall exactly when.

17     Q.   Do you recall if it was presented to the

18  American Bar Association for purposes of the documents

19  that were submitted for full accreditation?

20     A.   I don't recall whether this was included or

21  not.

22     Q.   Okay.  So let's talk a little bit about this

23  document.  In terms of Promotion to Professor and/or

24  Tenure, which would be on the second page.  Go to the

25  second page.

1    So starting at the header with the bolded, the

2 first -- the first bolded language, which is also

3 underlined, it says Promotion to Associate Professor.

4 It has a number 1 under it.  What does number 1 between

5 two parentheses say?

6    A.   Do you want me to read what it says?

7    Q.   Yes, please.

8    A.   "For purposes of promotion to associate

9 professor, Rule X.B.1.iii is interpreted to require the

10 completion of a scholarly manuscript that has been

11 accepted for publication.

12    Q.   And what does that X come from, that rule X?

13    A.   I have no idea.

14    Q.   Okay.  Let's go to page 1, please.  And please

15 read the first line in the first paragraph.

16    A.   "Publication standards for renewal, promotion,

17 and tenure are set forth in the faculty handbook at

18 Sections VIII, IX, and X."

19    Q.   And that ten right there, is that an X?

20    A.   Yes.

21    Q.   Okay.  So let's go back to page 2 where we

22 were.  And you read that for promotion to associate

23 professor, "it's interpreted to require completion of a

24 scholarly manuscript that has been accepted for

25 publication;" correct?  That's what it says?

1    A.   That's what Ken Nunn said, yes.

2    Q.   Okay.  And now let's go to the next underlined

3  and bolded language there.  Promotion to Professor

4  and/or Tenure.  So there's two different bolded

5  languages, right, one Promotion to Associate Professor

6  and one Promotion to Professor and/or Tenure; correct?

7    A.   Yes.

8    Q.   Okay.  So let's go to page 3.  And there's some

9  bolded language there.  Research & Scholarship.  And

10 under number one, same thing as we did on page 2, number

11 one between two parentheses, what does it say?  Please

12 read it.

13   A.   It says "for purposes of promotion to professor

14 and/or tenure, Rules VIIIA and IX are interpreted to

15 require the completion of at least two additional

16 scholarly works over that required for promotion to

17 associate professor."

18   Q.   Okay.  Now, you qualified before just a minute

19 ago.  What did you mean by that's what Ken Nunn said?

20   A.   He's the author of this memo.

21   Q.   Okay.  What would happen if a law school

22 submits documentation -- what could happen if a law

23 school submits documentation to the American Bar

24 Association for accreditation purposes, that it's not

25 what it purports to be when it's being used for

1  accreditation purposes?

2      A.   I don't understand that question at all.

3      Q.   When law schools submit documents to the

4  American Bar Association for full accreditation, are

5  they expected to provide accurate, correct -- accurate

6  information?

7      A.   Again, I'm not -- I really don't understand the

8  question.  I can tell you that documents that are

9  pertinent to the application are provided.  Whether or

10  not the documents are correct, incorrect, that's

11  something that the process determines.

12      Q.   And so what would happen if a law school

13  provides inaccurate information for the purpose of

14  getting full accreditation?

15      A.   I don't know how to answer that question.

16      Q.   Okay.

17      A.   You're asking me what someone else, another

18  agency would do.  I can't speak for them.

19      Q.   Okay.  In a law school, what is the mission of

20  a law school generally in terms of what are they

21  training?  What is the end goal of the legal training in

22  a law school?

23      A.   To provide a legal education.

24      Q.   And as part of providing a legal education, is

25  there a professionalism requirement?

1    A.    Students are required to take coursework

2  consistent with professionalism, yes.

3    Q.    And are there model rules of professional

4  conduct that apply to lawyers?

5    A.    I believe that there are in most jurisdictions.

6    Q.    Okay.  And would you say that -- you said that

7  you were a Florida -- I mean, you're licensed in Ohio

8  you said; right?

9    A.    That's correct.

10    Q.    Do you know if Kenneth Nunn was licensed

11  anywhere when --

12    A.    I don't know.

13    Q.    Okay.  Would Kenneth Nunn have provided

14  inaccurate information to the American Bar Association?

15    A.    I have no way of knowing that.

16    Q.    Okay.

17    A.    I'd have to read inside his head.

18    Q.    When you were a dean and the application for

19  the American Bar Association accreditation was

20  submitted, did you have to review that application as

21  dean of the law school?

22    A.    Did I have to review it?

23    Q.    Yeah.

24    A.    I did review it.

25    Q.    Okay.  You reviewed the application.  So if

1  this memorandum was in the application, would you have

2  reviewed it?

3      A.    Probably.  I don't recall reviewing this.  This

4  is generated by an associate dean, Nunn, for the

5  faculty, primarily, as his assessment of the publication

6  standards for promotion and tenure.

7      Q.    And do you know if the memorandum was provided

8  to Professor Reyes during her hiring process?

9      A.    I do not know.

10      Q.    Okay.

11            (Exhibit Number 5 was marked for

12      identification.)

13      Q.    Let me show you now what has been marked as

14  Exhibit 5.  And this is a five-page document.  At the

15  top, Memorandum to Maritza Reyes from Robert Abrams,

16  date 17, September, 2018, re:  Standards for Promotion

17  to Full Professor.

18            Okay.  I'm going to walk you through this

19  document starting on page 1.  The first bolded font

20  language that you see there, what does it say?

21      A.    Are you referring to the language that says

22  "Items Appearing" --

23      Q.    Yes.

24      A.    -- "in the 2002-2004 Faculty Handbook Approved

25  by the Provost with Selected Commentary" and there is a

1  footnote.

2      Q.   What does it say in footnotes?

3      A.   "The commentary appears in the footnotes and

4  represent the comments of 2018-19 Committee Chair

5  Professor Abrams.  The materials excerpted from the

6  Faculty Handbook are grouped by topics rather than in

7  the order in which they appear in the faculty handbook."

8      Q.   Okay.  So this memorandum is dated what at the

9  top?

10     A.   There was a date appearing of 17 September,

11 2018.

12     Q.   And that reference to the 2002-2004 Faculty

13 Handbook, what does that mean in terms of that's still

14 the applicable handbook?  So the 2002-2004 would have

15 been when it was first issued?

16     A.   I'm not sure what the question is.  The faculty

17 handbook that's entitled 2002-2004, I assume that is the

18 date it was originally generated.

19     Q.   So these standards are being applied, though,

20 in 2018?

21         MS. REINER:  I'm going to object.  Speculation.

22         MS. REYES:  He's the dean of the law school.

23         MS. REINER:  Well --

24         MS. REYES:  And he's a professor of law in the

25     law school.

1    MS. REINER:  I don't see anything on this

2    memorandum that indicates he received it or saw it

3    or anything.

4    MS. REYES:  We are talking about the faculty

5    handbook right now.  So he would know as dean, the

6    faculty --

7  BY MS. REYES:

8    Q.  Would you be familiar with the faculty handbook

9  of the college of law as dean?

10   A.  I was aware that it existed.

11   Q.  Would you even look at it as dean?

12   A.  Would I even look at it?

13   Q.  Yeah.  Would you look at the faculty handbook?

14  When somebody is a dean of the law school, do they look

15  at the faculty handbook?

16   A.  There are occasions when I've looked at the

17  faculty handbook, yes.

18   Q.  Okay.  So we're going to go by the title it has

19  in this memorandum.  So let's look at the different

20  categories.  You have A, Professor; B, Associate

21  Professor; and C, Assistant Professor; correct?

22   A.  That's what this memorandum says.

23   Q.  Okay.  And let me ask you, do you participate

24  in the -- in the process for a faculty member to become

25  a full professor?

1      A.   I'm not sure what you mean by participate in

2  the process.  Typically --

3      Q.   As dean.  Let me just say, did you participate

4  in the process, when you were dean, of applicants for

5  promotion to full professor?

6      A.   Again, I'm not sure what you mean by

7  "participate in the process."

8      Q.   Did you do any work, as dean, in terms of an

9  application for promotion to full professor?

10     A.   Did I do any work?

11     Q.   Yes.

12     A.   I worked all the time.

13     Q.   In the application for full professor?

14     A.   I don't know what you mean.

15     Q.   When a person in the law school submits an

16  application for full professor, does the application --

17  do the materials ever come to the dean of the law

18  school?

19     A.   The process for promotion and for tenure

20  involves a committee.  That committee generates a report

21  and that report comes to the dean.

22     Q.   So at some point something comes to the dean in

23  terms of the application?

24     A.   As dean I get a report.

25     Q.   So the dean participates in the process of --

1   after getting the report, of an application for

2   promotion to full professor; right?

3       A.   Oh, it's a question?  Again, I don't know what

4   you mean by participate.  As I indicated, the dean gets

5   a report.

6       Q.   And what did you do with the report when you

7   got it as dean for an application to full professor?

8       A.   When I get the report from the committee, I

9   review the committee's report, their findings, their

10  reasoning.  I then make -- consistent with the

11  standards, as I understand them, I then make an

12  assessment whether or not I agree or concur with that

13  report.

14      Q.   Would you consider that work, that that you

15  just described?

16      A.   Do I consider it work?

17      Q.   Work as dean.  Part of your work as dean?

18      A.   Are you talking about responsibilities?

19      Q.   Work.  Actually doing work.  When you're

20  reviewing, when you do everything that you described,

21  are you working as dean?

22      A.   I guess that would be called work.

23      Q.   Okay.  And so when you're doing that, how do

24  you review the report?  Do you -- do you look at the

25  faculty handbook or do you just go by the report?

1      A.   I look at many things.

2      Q.   Do you look at the faculty handbook?

3      A.   I look at the handbook, I look at the report

4  from the committee.

5      Q.   Okay.  So let's go back to this memorandum that

6  purports to have sections from the faculty handbook.

7  And I'm going to point you to page 2, underlined on page

8  2, so go to page 2, please.  And there's underline.  The

9  only letters underlined, it says "Promotion to

10  full-professor."  And then after that there is -- let me

11  see, if we count by paragraphs, although it's not

12  exactly, but one, two, the third paragraph under that

13  underline it says "Procedures".

14      A.   Yes.

15      Q.   Okay.  And in there it says "in determining

16  retention, promotion, and tenure, this committee will,

17  over a period of several months, conduct an extensive

18  review of a candidate's performance and scholarship."

19  And I'm going to skip one sentence -- oh, no, I'm not

20  going to skip, I'm going to read.  "Public service,

21  teaching, and scholarship are evaluated.  The review

22  encompasses the individual's full period of service on

23  the faculty from initial appointment to the present,

24  with appropriate consideration given to the candidate's

25  recent activities (interim between last recommendation

1  and present.)  The candidate is encouraged to submit a

2  statement directing attention to matters the candidate

3  believes important to the committee's evaluation and

4  providing the candidate's own assessment of his or her

5  performance.  Submission of materials by the candidate

6  in support of his/her application for promotion and/or

7  tenure must coincide with the university's schedule for

8  promotion and tenure as generated annually by -- from

9  the provost's office."

10         What I just read, is that what it says in that

11  paragraph there?

12     A.   You read that paragraph, yes.

13     Q.   Okay.  So I'm going to go to the next

14  paragraph, which starts with bolded Research &

15  Scholarship.  That's bolded and then I'm going to read

16  language that's not bolded, but italicized.

17         "Appraisal of accomplishment in research and

18  scholarship shall be based on a close reading of

19  published articles or works and obtaining the

20  professional opinions and independent review of

21  recognized authorities in the field of the published

22  articles or works.  A commitment must be demonstrated to

23  original research and legal scholarship and a

24  demonstrated ability to produce and publish scholarly

25  work of high quality.  The ability to critically

1 analyze, synthesize, and expound sophisticated factual

2 and legal subjects shall be shown."

3       What is the last sentence there?  Can you

4 please read that for me?

5    A.   There's a sentence that says "participation on

6 panels, in conferences, leadership, preparation of

7 statutes" --

8    Q.   I'm sorry, leadership or lectureships?

9    A.   Lectureships, I'm sorry -- "lectureships,

10 preparation of statutes and codes, book reviews, and

11 other evidence of scholastic commitment and recognized

12 ability shall be considered and weighed as such works

13 may merit."

14    Q.   Okay.  And again that's under the Research &

15 Scholarship section under the Promotion to

16 full-professor, underlined.

17       Okay.  Now I'm going to go to the next page,

18 page 3.  Okay.  In there right at the top, which is a

19 continuation of the description of the Research &

20 Scholarship on the prior page.

21       It states, "the committee recommends that

22 candidates seek publication of their articles in law

23 reviews.  Virtually all law reviews are student edited.

24 Competition for acceptance in the better review is

25 extremely intense.  Law review articles tend to be long

1   when compared with articles in other scholarly journals.

2   Typically, they contain a review of an entire subject

3   area as opposed to a single exposition of a new idea.

4   They are seldom co-authored."

5           And the next paragraph states, "both internal

6   and external reviews of scholarly work are used in

7   assessing the candidate's scholarship.  For each

8   scholarly work, reviews are obtained from at least one

9   member of this school's own faculty and from at least

10  two outside evaluators.  One or more committee members

11  will also read the works.  Evaluations obtained in

12  connection with earlier personnel actions involving the

13  candidate are also available."

14          And then in the next paragraph, which is the

15  last one on that page, "evaluators are chosen by the

16  committee.  Each candidate is permitted to submit a list

17  of outside evaluators from which one will be selected.

18  If the committee believes that none of the names

19  suggested are acceptable, the candidate will be given

20  the opportunity to submit additional names.  Letters of

21  all outside evaluators are attached to the papers with

22  regard to each proposed faculty action."

23          What I just read, is that what is stated there?

24      A.   You read what was stated there.  With a couple

25  of the paragraphs you've read there is an indication at

1  the end of the paragraph that the statement is not

2  complete from whatever source it came from.

3      Q.   There are ellipsis.  In the first paragraph, at

4  the end of that last sentence, right, there is an

5  ellipsis, three little dots?

6      A.   That's correct.

7      Q.   And then there's another one at the end of the

8  other one?

9      A.   That's correct.

10      Q.   But what I read is what is stated there?

11      A.   With the --

12      Q.   Not what's missing, but what is there, did I

13  just read what is stated there?

14      A.   Combined with those ellipsis, yes.

15      Q.   Okay.

16          (Exhibit Number 6 was marked for

17      identification.)

18      Q.   Please take a look at Exhibit 6.  And Exhibit 6

19  is titled Report and Recommendation of the Florida A&M

20  University College of Law Retention Promotion and Tenure

21  Committee.  Re: Application for Promotion of Assistant

22  Professor Maritza I. Reyes, Fall 2011.

23          Do you recall getting this report?

24      A.   I don't recall getting it.  I assume I did, but

25  I don't specifically recall it.

1    Q.   Okay.  Can you please read Footnote 1 on that

2  first page of that report?

3    A.   Footnote 1 indicates faculty handbook approved

4  by Provost Dr. Larry Robinson November 7, 2003.

5    Q.   Okay.  And do you see -- please look at Roman

6  numeral I where it says Summary of Findings.  Please

7  read what it says there.

8    A.   "For reasons set forth below the Florida A&M

9  University College of Law Retention, Promotion, and

10  Tenure Committee recommends promotion from the rank of

11  assistant professor to associate professor for Assistant

12  Professor Maritza Reyes.

13    Q.   Okay.  And please go to page 2.  And Roman

14  numeral IV Scholarship.  Go to the last paragraph under

15  Roman numeral IV Scholarship.

16    A.   That's not on page 2.

17    Q.   You are right, it's on page 3; right?  Yes,

18  let's go to page 3.  So Roman numeral IV Scholarship and

19  then go to the last paragraph under Scholarship before

20  "A."  And what is the beginning bolded language there?

21    A.   Reviews of Scholarship.

22    Q.   Okay.  Please read what it says after that.

23  Those two sentences after that.

24    A.   "In his/her third year, the faculty member must

25  have demonstrated satisfactory progress in scholarship.

1 Satisfactory progress should be defined to mean

2 completion of at least one substantial piece of

3 scholarship of the quality sufficient to indicate that

4 tenure will be awarded, assuming the growth."

5     Q.   Okay.  And so I want you to please take a look

6 now at the Nunn memo, which is marked as Exhibit 4.  And

7 go to page 2, please, of Exhibit 4.  And I'm going to

8 point you to the language that we went over already

9 "Promotion to Associate Professor, number (1) for

10 purposes of promotion to associate professor, Rule

11 X.B.1.iii is interpreted to require the completion of a

12 scholarly manuscript that has been accepted for

13 publication."

14        Is that language different than the language in

15 the report that says "should be defined to mean

16 completion of at least one substantial piece of

17 scholarship of the quality sufficient to indicate that

18 tenure will be awarded assuming the growth."

19     A.   The wording -- comparison of the wordings,

20 they're not the same wording.

21     Q.   Okay.  Would you say that quantitatively it is

22 the same?  It requires completion of one manuscript,

23 scholarly manuscript, or one piece of scholarship, so

24 quantitatively is the one the same?

25     A.   I don't understand the question.  And you say

1  "it" requires, what requires?

2     Q.   What the language says in the Reviews &

3  Scholarship of the report and the language in the

4  promotion to associate professor number one of the Nunn

5  memo, does it have a quantitative aspect, the language

6  in both?

7     A.   I can't really answer that.  Nunn wrote in his

8  memo, in the language you referred to, a reference to

9  the completion of a scholarly manuscript.

10     Q.   And what do you understand by a scholarly

11  manuscript?

12     A.   A scholarly manuscript.

13     Q.   Would one suffice?

14     A.   I don't know.  That's up to Ken Nunn.

15     Q.   Forget Ken Nunn and let's look at the language

16  itself in English.

17        MS. REINER:  I'm going to object.

18     Argumentative.

19        MS. REYES:  No I'm trying to help him because

20     he says he doesn't understand.

21        MS. REINER:  Okay.

22     Q.   So just from -- strictly, and I'm not talking

23  English as a speaking language, but English in just

24  looking at A, if we look at it, it says a scholarly

25  manuscript.  Would one qualify as "a"?

1    A.   Again, I'm not the author of this.  Ken Nunn is

2  the author.  So what Ken Nunn meant by a scholarly

3  manuscript, I can't speak to.

4    Q.   And I just want you to base it on your own

5  personal knowledge, not on Ken Nunn's knowledge right

6  now or what he thinks or what he wrote.  But if you read

7  in the English language "a scholarly manuscript," would

8  you understand a scholarly manuscript to be one?

9    A.   If I had written this --

10    Q.   Yeah.

11    A.   -- that might be an interpretation, but it

12  might not be the only interpretation.

13    Q.   Okay.  So let's go back now to the report.

14  Because the language in the report, does it include a

15  number aspect to it, a quantitative aspect to it?

16    A.   You're talking about the language that begins

17  "review of scholarship"?

18    Q.   Yes.

19    A.   So that this statement from -- I believe this

20  was from Abrams?

21    Q.   This is from the RPT Committee.

22    A.   Oh, this is the committee report?

23    Q.   Yes.

24    A.   So the committee report language there talks

25  about, in terms of review of scholarships, that "in the

1  third -- in his/her third year, the faculty member must

2  have demonstrated satisfactory progress in scholarship.

3  Satisfactory progress should be defined to mean

4  completion of at least one substantial piece."

5      Q.   So would that be numerical?  Quantitative?

6      A.   I would assume that's what the report says,

7  yes.

8      Q.   At least one?

9      A.   Right.

10     Q.   Okay.  Thank you.  And now go back please to

11 the report.  And that's the report of the promotion --

12 Retention, Promotion, and Tenure Committee of the

13 College of Law known as RPT Committee.

14     A.   Okay.

15     Q.   And under Internal Review on page number 4A,

16 Internal Review?

17     A.   Yes.

18     Q.   Can you please read the first sentence of that?

19     A.   "Assistant Professor Reyes' first published law

20 review article is entitled, 'Constitutionalization

21 Immigration Law:  The Vital Role of Judicial Discretion

22 in the Removal of Lawful Permanent Residents, unquote.

23 It was accepted by Temple Law Review in August 2011 with

24 an anticipated publication in Volume 84, Issue 3, Spring

25 2012."

1     Q.   Okay.  So that's the first sentence there.

2  Thank you.  And it is Constitutionalized Immigration

3  Law; right?

4     A.   Yes.

5     Q.   Okay.  And so it was accepted for publication

6  in August 2011 with anticipated publication in Spring

7  2012; right?

8     A.   That's what this says.

9     Q.   That's what it states?

10    A.   Yes.

11    Q.   What does that mean?  In your knowledge as

12  professor of law, as dean, you're familiar with law

13  reviews; right?

14    A.   I've had contact with law reviews, yes.

15    Q.   Okay.  Have you published in law reviews?

16    A.   Yes, I have.

17    Q.   Have you published law review articles?

18    A.   Yes, I have.

19    Q.   What does it mean when they say you have a date

20  of acceptance and then you have a different date of

21  anticipated publication?  What does that mean?  What is

22  the difference between those two dates?

23    A.   Typically, and I -- you know, first of all, I

24  can't say specifically what Temple meant or did not mean

25  in whatever it said.  But I would say typically, when

1 you submit an article to a law review, the law review

2 will indicate whether or not they agreed to publish or

3 not publish.  If they agree to publish, it was

4 considered accepted and you'll be told on a particular

5 date that it was accepted for publication.

6       Law reviews need an opportunity to edit the

7 article -- or the submitted piece and must meet their

8 own publication schedule so that they accept an article

9 for publication in anticipation that it will appear in a

10 certain volume at a certain time.  And I'm assuming that

11 that is what was intended by that sentence.

12     Q.  Okay.  Now, let's go back to the Nunn memo on

13 page 2.  And back to the same language under promotion

14 to associate professor number 1.  And it says "for

15 purposes of promotion to associate professor, Rule

16 X.B.1.iii is interpreted to require the completion of a

17 scholarly manuscript that has been accepted for

18 publication."

19     A.  Yes.

20     Q.  Okay.  So in the RPT Committee Report, they're

21 noting that Professor Reyes's one law review article was

22 accepted for publication at the time of the report.

23     A.  They are noting that her first published law

24 review article was accepted.

25     Q.  As of what date was it accepted?

1      A.   It appears to be in August of 2011.

2      Q.   Okay.  And what is -- on the first page, what

3   is the date at the top of that first page?  If you can

4   call it a date.  Is there a year there?  Do you see

5   where it says Fall 2011?

6      A.   Yes, I see where it says Fall 2011.

7      Q.   Okay.  Fall 2011.  And if we go back to the

8   memo, the anticipated -- I'm sorry, the report.  The

9   report.  On the same page of the internal review.  The

10  anticipated publication is Spring 2012; correct?

11     A.   That is correct.  That's what it says.

12     Q.   Okay.  So as of the date of the RPT Committee

13  Report, Fall 2011, that article had not yet been

14  published?

15     A.   I would guess that that would be true.  I can't

16  say for certain one way or the other, but --

17     Q.   I'm just asking you based on the language

18  that's included in the report.

19     A.   The language is what it is.  It talks about

20  anticipated publication date, it does not speak to an

21  actual publication date.

22     Q.   Okay.  So its anticipated publication is Spring

23  2012 is what it states there; right?

24     A.   In the Spring 2012 volume, yes.

25     Q.   So Fall 2011 is before Spring 2012?

1      A.   Yes.

2      Q.   Okay.

3           (Exhibit Number 7 was marked for

4      identification.)

5      Q.   Please take a look at what has been marked as

6  Exhibit 7.  And Exhibit 7 is a document of five pages

7  titled at the top Publications Professor Maritza Reyes.

8  Do you recall seeing this document before?

9      A.   No.

10     Q.   Okay.  Let's go through this document and just

11 see what's dated on here.  Under Law Reviews, how many

12 law reviews are listed?

13     A.   I believe you list -- you list six, I believe.

14     Q.   Okay.  And so going back to Exhibit 6, which is

15 the RPT Committee Report on Recommendation of

16 Application for Promotion of Assistant Professor to

17 Associate Professor.  When we were looking at page 4

18 under the Internal Review and we were talking about that

19 law review article, and you read that the title of that

20 article is "Constitutionalizing Immigration Law."

21          Do you see that on page 1 of the publications

22 list?

23     A.   I see that you've indicated it on this list,

24 yes.

25     Q.   Okay.  And what is the publication date of that

1  in the parentheses?

2     A.   I'm not quite sure that I can give you the

3  publication date, but I can give you the citation.

4     Q.   Let me not assume, are you familiar with law

5  review citation?

6     A.   Yes, I am.

7     Q.   And when law review citation includes a year in

8  parentheses, is that known as a publication date?

9     A.   Sometimes.

10     Q.   What else could it be?

11     A.   The year it came out -- sometimes if they get

12  off cycle on putting out a particular issue, the actual

13  year may not actually coincide with when the article

14  came out.

15     Q.   Would the citation -- to do proper Blue Book

16  citation according to the standards of law reviews,

17  would the citation require that they include the date,

18  the year of publication?

19     A.   They would -- it would require that they

20  include an official date as part of the citation.

21     Q.   Okay.  So let's look at that same law review

22  section on the publications page and going above

23  "Constitutionalizing Immigration Law," do you see other

24  law review articles?

25     A.   I see other things that are listed as law

1 reviews under Law Reviews.

2     Q.   Okay.  So assuming that these are law reviews,

3 let's go over them.  Above "Constitutionalizing

4 Immigration Law," you have a co-authored piece between

5 Professor Reyes, Angela Mae Kupenda, Angela

6 Onwuachi-Willig, O-n-w-u-a-c-h-i W-i-l-l-i-g, Stephanie

7 Wildman, and Adrien Katherine Wing and that was

8 published in the Berkeley Journal of Gender Law and

9 Justice in 2014.

10         And above that you have another law review

11 article titled "Opening Borders:  African Americans and

12 Latinos Through the Lens of Immigration."  And that was

13 published in the Harvard Latino Law Review in 2014.

14         And above that you have "Professional Women

15 Silenced by Man-Made Norms."  And that was published in

16 the Akron Law Review in 2015.

17         And then above that you have "In Memory of

18 Julie Chek" and that was published in the Florida A&M

19 University Law Review in 2015.  Correct?  That's what's

20 stated on here.

21     A.   Those things are stated underneath the heading

22 of Law Reviews.

23     Q.   Okay.  And let me ask you about that in memory

24 of.  Have you ever published any pieces in memory of?

25     A.   In memory of a --

1    Q.   A memoriam.

2    A.   Yes.

3    Q.   Somebody who has died.

4    A.   Yes.

5    Q.   Do you recall in memory of who you have

6  published?

7    A.   I've done several.

8    Q.   And were they in law review articles?

9    A.   You know, I think that depended on what you

10 mean by an article.  They are very often published --

11   Q.   I'm sorry, I should have said were they in law

12 review journals?

13   A.   Yes, very often law reviews or law journals

14 will publish that, that dedication.

15   Q.   Have you published in law review journals any

16 in memoriam dedications?

17   A.   Yes.

18   Q.   Okay.  And does publishing those in memoriams,

19 does it diminish your other work?  In other words, those

20 pieces are shorter pieces; right?

21   A.   I -- you know, that depends on the piece,

22 whether they're shorter or longer.  It's different --

23 they're different than other types of pieces that are

24 published.

25   Q.   And when you publish in memoriam, were you

1  expecting that to, you know, be the same as your

2  scholarly articles, the longer law review articles?

3      A.  I'm not sure what you mean by expected to be

4  the same.  I expected a memorial piece to be a memorial

5  piece.  It is not the -- it is not an exploration of

6  legal issues.

7      Q.  And would you say, though, that when you did

8  that, why did you publish in memorial pieces?

9      A.  Because I wanted to honor the persons who had

10 passed.

11     Q.  Okay.  And so law professors sometimes do that,

12 right --

13     A.  Yes.

14     Q.  -- in law review journals?

15     A.  That is a vehicle for publishing those, yes.

16     Q.  Okay.  So now I want to go back to the Nunn

17 memo.  Exhibit 4.  Now I want to take you to page 3.  Do

18 you need help?  Okay.  Page 3.  And under the heading

19 Research & Scholarship.  Number one again, and I'm going

20 to read.  "For purposes of promotion professor and/or

21 tenure, Rules VIIIA and IX are interpreted to require

22 the completion of at least two additional scholarly

23 works over that required for promotion to associate

24 professor."  Is that what it states on that page?

25     A.  That's what the Ken memo says.

1    Q.   Okay.  And so in the Ken memo?

2    A.   Nunn memo I should say.  I'm sorry.

3    Q.   Nunn memo.  We're going to call it the Nunn

4  memo.  At least two additional, is that a quantitative

5  number standard?

6    A.   It does mention the number two.

7    Q.   Okay.  So let's reconcile what we are looking

8  at here.  So we were looking at Fall 2011, Professor

9  Reyes submitted an unpublished manuscript that been

10  accepted for publication, but not yet published for

11  promotion from assistant professor to associate

12  professor.  It was reviewed and the committee

13  recommended that the promotion to associate professor be

14  granted; correct?

15    A.   What are you referring to?

16    Q.   I'm referring to the RPT Committee Report of

17  Fall 2011.

18    A.   Okay.

19    Q.   Remembering the first page we started with the

20  Summary of Findings?

21    A.   Yes.

22    Q.   And we read that it said that the committee

23  recommends promotion from rank of assistant professor to

24  associate professor for Assistant Professor Maritza

25  Reyes.  So that was the recommendation of the committee?

1    A.   Yes, that is the recommendation.

2    Q.   And it was based on that one unpublished, but

3 accepted for publication, law review article titled

4 Constitutionalizing Immigration Law?

5    A.   I can't tell if it was based on that or not

6 because I was not a member of that committee.  I can

7 only say what the document says.

8    Q.   Okay.  But in the document, and let me just go

9 back again to your extensive knowledge as dean of the

10 law school.  When you get the RPT Committee Reports,

11 which you have to review, you said, as part of the work

12 that you do to do your recommendation with regards to

13 promotion, do you have to go by what the committee

14 states in their report?  In other words, do you have to

15 believe what they state in the report is what they meant

16 to state?

17    A.   I can't answer that.  I just don't even

18 understand that question.

19    Q.   Okay.  In this report, if it says that they are

20 reviewing in the internal review under A, Internal

21 Review, that they reviewed this first published law

22 review article that has been accepted for publication,

23 but not yet published, as dean, would you take them at

24 their word, the RPT Committee?

25    A.   That they conducted an internal review?

1    Q.   Yes.

2    A.   Yes, I would assume that they conducted an

3  internal review.

4    Q.   Okay.  So let's go now to the External Review

5  on that same page.

6    A.   Uh-huh.

7    Q.   And let's read the first paragraph there.

8  Please read that.

9    A.   "Dean Kevin R. Johnson of U.C. Davis School of

10  Law considered Professor Reyes' article first-rate and

11  appropriate for promotion at a national law school.  He

12  further described the article as thoroughly researched,

13  well-written, and persuasively argued.  He concluded

14  that Professor Reyes' article is of high quality and

15  achieves the standard of excellence."

16    Q.   Okay.  And the next paragraph, please?

17    A.   "Professor Linda Kelly Hill states that Reyes

18  persuasively discusses legal challenges -- ellipsis,

19  legal challenges, and, Reyes, ellipsis, offered a fresh

20  basis for entitling criminal aliens to greater

21  protections.  Professor Kelly adds that by limited

22  statistical information which" --

23    Q.   I'm sorry, Professor Kelly adds that?

24    A.   Excuse me, I skipped a line.  "Professor Reyes

25  is, ellipsis, careful to recognize some of the

1  weaknesses in the parallels, such as those created by

2  limited statistical information which reports on the

3  removal of lawful permanent residents.  And Professor

4  Hill adds that Professor Reyes offered concrete

5  solutions in her analysis.  Professor Hill concludes

6  that she looks forward to reading the creative and

7  intelligent legal scholarship of Maritza Reyes for many

8  years."

9      Q.   Okay.  Then on the next page.  So now we've

10  gone through the internal review, the external review,

11  and now there's a conclusion at the top of that page.

12  Please read that conclusion, which is two sentences.

13      A.   "The RPT Committee is satisfied that Assistant

14  Professor Reyes has demonstrated satisfactory progress

15  in scholarship progress and that her article is of high

16  quality.  The RPT Committee highly encourages Professor

17  Reyes to continue producing quality scholarship."

18      Q.   So now that we read -- because before we were

19  going over what they were basing their conclusion on.

20  In this report, did they tell you as college of law dean

21  when they sent you the report, that they based it on

22  that one article that was internally and externally

23  reviewed?

24      A.   I have only what the report says.

25      Q.   Yeah, and that's all I'm asking.  Does the

1  report say that it was based on that one article?

2    A.   The report does not mention any -- I don't

3  believe it mentions any other article, other than the

4  one.

5    Q.   Okay.  So we have that one internally and

6  externally reviewed.  Now, let's go ahead and look at

7  the publications list again.

8         Taking aside the in memoriam piece and taking

9  aside the co-authored piece, are there two additional

10  law review articles beyond the "Constitutionalizing

11  Immigration Law" article listed there under Law Reviews?

12    A.   There is an article there that appeared

13  apparently in 2015, and one that was in 2014.

14    Q.   And that would be "Professional Women:

15  Silenced by Man-Made Norms" in the Akron Law Review in

16  2015?

17    A.   Yes.

18    Q.   And "Opening Borders:  African Americans and

19  Latinos Through the Lens of Immigration," in the Harvard

20  Latino Law Review in 2014; correct?

21    A.   That is correct.

22    Q.   Okay.  What number does the publications one

23  have?  Seven?  Are we on seven?

24         MS. REINER:  Do you have any more questions on

25     this document?

1      MS. REYES:  I know we have ten minutes until

2    noon.  Do you want to take a lunch break around

3    noontime?  What are your preferences?

4      MS. REINER:  You know, that's fine with me.

5    I'll defer, of course, to Professor Pernell in terms

6    of whether or not he wants to take a break.

7      THE WITNESS:  Doesn't make any difference.

8      MS. REINER:  I would suggest and I offer one

9    thing here in terms of a potential stipulation and

10    that is, you know, we would be willing to stipulate

11    to the extent you have documents such as this, that

12    the document speaks for themselves, so what's there

13    is there.  It may help in terms of questioning.

14      So rather than reading everything into the

15    record, if you want to just say "can you read this

16    portion" and then ask him questions about it, we'd

17    be happy to do that.

18      MS. REYES:  I'm not happy to do that because I

19    want to -- part of the questioning is going through

20    the specific language.  If you notice I was very

21    specific about language.

22      In other words, I can't say it is what it is

23    because I have to, for example, question "what does

24    A mean?"  So I can't assume that, if I don't go over

25    the language, that Professor Pernell would agree A

1    means what it means until we went through it and we

2    talked about it in terms of numbers.  So it's very

3    specific and that's why I'm going through the

4    language.

5          For other documents perhaps, but not -- and

6    this is like the crux of the matter.  So I need to

7    go over what does quantitative mean?  Is there a

8    quantitative standard?  What is the language on

9    there?  That's why I would like my discretion on

10   that, so I cannot stipulate.

11         MS. REINER:  Okay.

12         MS. REYES:  But thank you.  Maybe there are

13   some other documents that we can do that.

14         MS. REINER:  Okay.

15  BY MS. REYES:

16   Q.   So I want to show you -- and, by the way,

17  Professor Pernell, what are you looking at in terms of

18  lunchtime?

19   A.   I have no --

20   Q.   Okay.  Please mark this as Exhibit 8.

21         MS. REINER:  Do you anticipate or have an

22   approximate -- you know, how much longer we may go?

23   That may impact lunch time.

24         MS. REYES:  I don't know, but I'm thinking

25   maybe we can take a lunch break -- I want to finish

1      at least this section I'm going through, hopefully

2      by 12:30.

3            MS. REINER:  Okay.

4            MS. REYES:  So let's shoot for that.

5  BY MS. REYES:

6      Q.   So this has been marked as Exhibit 8.

7            (Exhibit Number 8 was marked for

8      identification.)

9      Q.   And Exhibit 8, it's titled Report and

10  Recommendation on Promotion of Associate Professor

11  Maritza Reyes, Florida A&M University College of Law,

12  Retention, Promotion, and Tenure Committee, November 5,

13  2018.  Okay.  So let's go to page 1, the Summary of

14  Findings.

15     A.   Okay.

16     Q.   Please read that one sentence there in Summary

17  of Findings.

18     A.   "For reasons set forth below, the Retention

19  Promotion, and Tenure Committee, Florida A&M College of

20  Law, recommends that Florida A&M University decline to

21  grant Associate Professor Reyes' application for

22  promotion to the rank of professor."

23     Q.   Okay.  And let's go under Scholarship.  And

24  where it says right under Scholarship, the bolded font,

25  Post-Tenure Publications.  What does it say there?

1    A.   "In the period since tenure, Associate

2  Professor Reyes has had two items published in law

3  reviews and has produced three blog posts in the

4  immigration field (citations available on her CV.)  The

5  law review publications (reproductions are included in

6  her scholarship materials on Interfolio) are," and then

7  it mentions -- you want me to mention both these

8  articles?

9    Q.   "In Memory of Julie Chek," the in memoriam,

10  right, that was published in the Florida A&M University

11  Law Review and the co-authored piece "Reflections on

12  Presumed Incompetent."

13    A.   Yes.

14    Q.   Okay.  So the comparison here would be from

15  tenure publications to the application for full

16  professor; right?

17    A.   If you're asking me, it does not sound correct.

18         MS. REYES:  Okay.  That's why we can't

19    stipulate because I have to go over the language

20    with him to what he thinks is correct or not.

21         MS. REINER:  Okay.

22         MS. REYES:  I'm talking to counsel by way of

23    explanation of the stipulation you offered.

24  BY MS. REYES:

25    Q.   All right.  So let's analyze what this means.

1   Post-Tenure Publications, what do you understand that to

2   mean?

3       A.   That those are publications after tenure.

4       Q.   Okay.

5       A.   You said tenure publications.

6       Q.   Yeah, post-tenure publications.

7       A.   Yes, but you had asked the question about

8   tenure publications.

9       Q.   What I was asking is in relation to tenure, is

10  the comparison where it says post-tenure, after tenure,

11  that they are comparing it to a tenure application?

12      A.   Again, I can't speak for the mind of the

13  committee, other than what's reflected in this report.

14      Q.   And I'm not asking you, I just want you to

15  speak, like I said, on personal knowledge, not on the

16  mind or knowledge of anybody else.

17      A.   Let me answer it.

18      Q.   Yes.

19      A.   What I can speak to is they -- this report

20  indicates that since the time of tenure, there have been

21  two publications.

22      Q.   So the comparison would be to tenure -- to the

23  time of tenure?

24      A.   I don't know what you mean by comparison.

25      Q.   You just stated since the time of tenure;

1  right?

2       A.   Since the time of tenure, there's been two

3  publications.

4       Q.   Okay.  Great.  Let's again -- let's go back to

5  the Nunn memo, please.  And that would be Exhibit 4.  Go

6  back to that language on page 3 on the Research and

7  Scholarship.  Number one.  And I'm going to read it to

8  make it quicker.  "For purposes of promotion to

9  professor and/or tenure, Rules VIII.A and IX are

10  interpreted to require the completion of at least two

11  additional scholarly works over that required for

12  promotion to associate professor."  That's what it says

13  on there; right?

14       A.   That's what the Ken -- that's what the Nunn

15  memo says, yes.

16       Q.   Okay.  Now, taking you back to the Report and

17  Recommendation of the RPT Committee on November 5, 2018,

18  on the Application of Associate Professor for Promotion

19  to Full Professor, and that would be Exhibit 9; right?

20       A.   I don't have a nine.

21            THE COURT REPORTER:  Eight.

22       Q.   Eight.  Please go to page 1.  Right at the

23  bottom paragraph.  And I'm going to go one, two, three,

24  four, starting on the fifth line all the way to the

25  right where it says "there."  Do you see the word

1  "there" there?

2      A.   Yes.

3      Q.   Okay.  What does it say, there what?  If you

4  could read that sentence.

5      A.   "There are no internal or external reviews of

6  scholarship.  As detailed in the Scholarship section of

7  this report, the COL, college of law, RPT Committee

8  concludes that all of the writings that qualify as major

9  scholarly works requiring both internal and external

10  reviews had been reviewed in support of previous

11  advancements for promotion to associate professor and

12  for the grant of tenure.  In similar fashion, the

13  sections of this report on Teaching and Service focus on

14  Reyes' teaching and service since the grant of tenure."

15      Q.   Okay.  So again, they are looking at it since

16  the grant of tenure, that's what it says on there what

17  you just read; right?

18      A.   That's what I read.

19      Q.   Okay.  So let's now go back to Exhibit 5, the

20  Robert Abrams memo.

21          MS. REINER:  I'm sorry, can we hold for a

22      second?

23          MS. REYES:  Yes.

24          MS. REINER:  On my Exhibit 8, I have four

25      pages.  Do you four pages, as well?

1      MS. REYES:  Yes, I have four pages.  Let's look
2   at the pages that we have.
3      MS. REINER:  Okay.  Because I think we're
4   missing page 2.
5      MS. REYES:  We have 1, 3, 5 and then there's
6   one that has no pages.
7      MS. REINER:  One that has no page number.
8      MS. REYES:  Yes.  So it seems we are missing
9   two.
10      MS. REINER:  Yes.
11      MS. REYES:  I won't be able to go over page 2,
12   but thank you for pointing that out because I will
13   get that.
14  BY MS. REYES:
15   Q.   But with what we have, the pages that we have.
16  Let's go back to the Robert Abrams memo, which is
17  Exhibit 5.
18   A.   Okay.
19   Q.   Go to page 3, please.  And so on that second
20  paragraph from the top, it says "both internal and
21  external reviews of scholarly work are used in assessing
22  the candidate's scholarship."  And then at the bottom,
23  the last sentence in that paragraph, says "evaluations
24  obtained in connection with earlier personnel actions
25  involving the candidate are also available;" correct?

1    A.   That's what it says.

2    Q.   Okay.  So going back to the report on

3  November 5, 2018.  The committee decided not to seek or

4  do internal or external reviews of scholarship for this

5  application; right?  On page 1.  Right there on page 1.

6  Where we read the "there" language.  That there are no

7  internal or external reviews of scholarship.  The

8  committee decided not to do external or internal reviews

9  of scholarship; right?

10   A.   I can say the report says no external or

11  internal reviews of scholarships.  As to what other

12  decision-making the committee made I do not know.

13   Q.   Okay.  So let me, because I thought maybe we

14  could get through that faster from your knowledge, but

15  let me inform that knowledge with, again, if I could go

16  back to Exhibit 5, the Robert Abrams memo.  On page 2

17  where it says "procedures."  Right under Promotion to

18  Full Professor underline, and it says procedures like

19  one, two, like three paragraphs, I think, or the second

20  paragraph, it starts with "Procedures" colon.  Do you

21  see that word "Procedures"?

22   A.   Yes.

23   Q.   Okay.  And it says "in determining retention,

24  promotion, and tenure this committee will, over a period

25  of several months, conduct an extensive review of a

1  candidate's performance and scholarship."

2          So it's this committee they are referring to,

3  this RPT Committee, right, from the faculty handbook;

4  would you agree with that?

5      A.   You've put several things together.  I agree

6  that that's what this says.  Whether it's from the

7  faculty handbook or not, I cannot say because this is

8  the statement of the author, Robert Abrams.  I can't say

9  that that is accurately -- an accurate statement of the

10 faculty handbook.

11     Q.   Okay.  But when we went over this memo, and I

12 guess I'm going to have to go over with you again.  On

13 page 1 of this memo when we started.  We said that

14 Professor Robert Abrams, the Chair of the RPT committee

15 that authored this on September 17, 2018, stated on

16 page 1 in bolded font "items appearing in the 2002-2004

17 faculty handbook approved by the provost with selected

18 commentary."  And he put a footnote.  The commentary is

19 included in the footnote.

20     A.   Yes.

21     Q.   But the language he included there, at least

22 that's what Professor Abrams stated in this memo, is

23 coming from the faculty handbook.  And we read that at

24 the beginning.

25     A.   He states that this language comes from the

1  handbook.

2  Q.  And by the way, did you appoint -- who

3  appointed Professor Abrams Chair of the RPT Committee?

4  A.  I don't recall.  I probably did.

5  Q.  In 2018.

6  A.  I probably did.  I don't recall for sure.

7  Q.  Were you dean of the law school around the time

8  of Fall 2018?

9  A.  I think I may have been interim dean.

10  Q.  We can look at your resume, if you want.  Yeah

11  you were interim dean according to your resume May 2,

12  2017 to April 2019.  So as interim dean, would you have

13  appointed the chair of the RPT Committee?

14  A.  Yes.

15  Q.  Okay.  So going back to, because we were

16  looking at the question of who would have ordered or not

17  ordered the evaluations -- internal-external evaluations

18  of scholarship; right?  So I'm going to go back to

19  page 1 of Exhibit 8.  The RPT Committee Report of

20  November 5, 2018.

21      There are no internal or external reviews of

22  scholarship.  Then it says "as detailed in the

23  scholarship section of this report, the COL RPT

24  Committee concluded that all of the writings that

25  qualify as major scholarly works, requiring both

1  internal and externally reviewed, had been reviewed in

2  support of previous advancements for promotion to

3  associate professor and for the grant of tenure."

4  That's what it states there?

5      A.   Yes.

6      Q.   Okay.  And based on that language and based on

7  what it states in the Robert Abrams memo as coming from

8  the faculty handbook, those prior internal and external

9  reviews, those evaluations obtained in connection with

10  those earlier personnel actions would have been

11  available to the RPT Committee; right?

12      A.   As far as I know they would have been available

13  to them.

14      Q.   Okay.  Now in that application for promotion to

15  full professor of -- in that report of November 5, 2018.

16  Go to page 5, please.  And that's numbered page 5.  It

17  says five at the bottom.  Where it says right from -- if

18  we start looking at it from the bottom of the page,

19  indented language in italics Committee Conclusion on

20  Teaching.  Bolded font.

21      A.   Yes.

22      Q.   Please read that.

23      A.   "The committee concludes that Associate

24  Professor Reyes meets the standard for excellence in

25  teaching required for promotion to the rank of professor

1  of law."

2       MS. REYES:  Okay.  You know what, I think we

3     may be missing six, too.

4       MS. REINER:  Actually I think we're missing

5     two --

6       MS. REYES:  And six.

7       MS. REINER:  -- four and possibly six.

8       MS. REYES:  You know what I think this was, a

9     copy of two pages -- it was a two-pager and when it

10     went through the machine, it skipped the ones in

11     between, so we'll get that.  But that's an easy one

12     because there is no problems with the service.

13  BY MS. REYES:

14     Q.  But let's just read what's there in terms of

15  page 5 on the bottom.  Where it says Evaluation of

16  Service, what does it say?

17     A.  Under Evaluation of Service, "the law school

18  expects faculty members to contribute to the academic,

19  professional, and nonprofessional communities of which

20  they are a part.  As set out in a summary fashion in the

21  service materials uploaded to Interfolio.  Associate

22  Professor Reyes is exceedingly active in all levels of

23  service, especially in the college of law and the

24  community."

25     Q.  Okay.  And so when you're looking at these

1  reports, the RPT Committee Reports.  There are generally

2  three sections, right, the scholarship, followed by the

3  teaching, and the service.

4      A.   There are those three sections.  What order

5  they are in --

6      Q.   In this report it seems like, even with the

7  pages that we are missing, we can see that scholarship

8  is on page 3, teaching is on page 5, and evaluation of

9  service is at the bottom of page 5.

10     A.   Yes.

11     Q.   So let's go to that last page that does not

12  have page numbers.  Please read that.

13     A.   "Attendance at the meeting of November 5, 2018,

14  at which the vote of Associate Professor Reyes'

15  application for tenure was considered" --

16     Q.   I'm sorry, application for what?

17     A.   "Application for promotion -- I'm sorry -- was

18  considered."  And then it drops down.  Present:  Abrams,

19  Boothe-Perry, Broussard, Cavazos, Griffin, Henslee,

20  Jones, Reaves, Smith, Taite.  Teller:  Cavazos,

21  Henslee."

22     Q.   Okay.  And so do you recognize those names?

23     A.   Yes.

24     Q.   And would you remember their first names just

25  by looking?  Because it seems like they are all last

1  names; right?

2      A.   I believe they are all last names.

3      Q.   Okay.  So would you recognize -- like could you

4  tell me like their names, please?  For Abrams, what is

5  the first name?

6      A.   I believe it's Robert.

7      Q.   Abrams.  Okay.  And for Boothe-Perry?

8      A.   Nicola I believe is the first name.

9      Q.   Does she also go by Nicky sometimes?

10      A.   I believe she does.

11      Q.   And Broussard?

12      A.   Patricia.

13      Q.   Does she also go by Pat sometimes?

14      A.   I believe so.

15      Q.   And Cavazos?

16      A.   Ann Marie.

17      Q.   And Griffin?

18      A.   Ronald.

19      Q.   Henslee?

20      A.   William.

21      Q.   Does he go by Bill sometimes?

22      A.   As far as I know, yes.

23      Q.   And Jones?

24      A.   I'm not sure which Jones this is, but I'm

25  assuming that it's Darryll Jones.

1    Q.   Okay.  So let's not assume.  Let's try to look

2  at the rules of -- this is the RPT Committee that's

3  reviewing a promotion to full professor; correct?  Who

4  is the other Jones you may be thinking of?

5    A.   Well, we have more than one Jones on the

6  faculty.  We had at that time Yolanda Jones, but she

7  would not have been qualified to be participating in

8  this decision.

9    Q.   So this has to be which Jones?

10    A.   I assume it's Darryll Jones.

11    Q.   He would have been the only tenured professor

12  with the last name Jones?

13    A.   That is correct.

14    Q.   And then Reaves?

15    A.   Rhonda.

16    Q.   Smith?

17    A.   I assume that is Jennifer.

18    Q.   Is there any other Smith that's a full

19  professor at this time?

20    A.   At this time, I think the other Smith had

21  changed their name.

22    Q.   In fact, we're getting to that name; right?

23    A.   Yes.

24    Q.   What is the next name?

25    A.   Taite, which is Phyllis, I believe is the first

1 name.  Used to be Smith.

2     Q.    Was she Smith?  Phyllis Smith?  Okay.  Yeah,

3 yeah.  So Phyllis Taite, was before Phyllis Smith.  Now

4 we have accounted for those.  How many do you count

5 present at that meeting when they voted?

6     A.    I'm counting ten.

7     Q.    Yeah, I'm counting ten, also.  Okay.  I'm going

8 to mark this as Exhibit 9, please.

9         (Exhibit Number 9 was marked for

10     identification.)

11     Q.    Please take a look at Exhibit 9.  And I'm going

12 to describe.  Exhibit 9 is a two-page document of emails

13 starting on the bottom of page 1 from Reyes, Maritza,

14 Wednesday, November 7, 2018, to LeRoy Pernell -- to

15 Pernell, LeRoy.  Subject:  Time to prepare my response

16 to report and recommendation of RPT committee, re:  My

17 application for promotion.

18         That's followed by another email above that

19 from LeRoy -- from Pernell, LeRoy sent Thursday

20 November 8, 2018, 10:03 a.m. to Reyes, Maritza.  Same

21 subject line:  Time to prepare my response to report and

22 recommendation of RPT committee re my application for

23 promotion.

24         And then right above that, the last of those

25 three emails is from Reyes, Maritza sent November 8,

1  2018, to Pernell, LeRoy, same subject line.

2      A.   I'm a little bit confused, you said right above

3  or below?

4      Q.   Right above the November 8th, 10:03 a.m. is

5  November 8, 4:14 p.m.  Thank you for noticing that that

6  they were on the same date, but they were just different

7  times.

8          So basically from the bottom of page 1 we start

9  with November 7, 2018, at 8:04 p.m., and then the next

10 one is November -- right above is November 8, 2018, at

11 10:03 a.m., and then above that is November 8, 2018,

12 4:14 p.m.

13         Okay.  So please read those -- that short email

14 right at the top of that page 1.  The one on November 8,

15 2018, 4:14 p.m., from Reyes, Maritza to Pernell, LeRoy.

16     A.   It says, "Dean Pernell, Thank you for your

17 response.  Has Professor Robert Abrams, Chair of RPT

18 Committee notified you that the committee, whoever

19 decided in the closed meetings, in parentheses, decided

20 not to submit my scholarship for external review?  This

21 is a violation of the process and procedures.  Can you

22 do something about this?  Please advise.  Thank you.

23 Professor Reyes."

24     Q.   Okay.  Do you recall if you -- if you did

25 anything about that request for assistance?

1    A.   I don't recall.  I don't recall specifically

2  what response I had.  This is making reference to the

3  committee process and part of that is I don't know exact

4  timing of when I received the report from committee.

5    Q.   Okay.  Please mark this as Exhibit 10.

6         (Exhibit Number 10 was marked for

7    identification.)

8    Q.   Please take a look at Exhibit 10.  This is

9  Exhibit 10.  And so Exhibit 10 is titled at the top

10  Exhibit "A" to Professor M. Reyes's 11-26-18 Response to

11  RPT Committee Report.  And it's a document with four

12  pages.

13         Starting on the first email on those four pages

14  would be on page 3 at the bottom from Pernell, LeRoy

15  sent Tuesday, November 13, 2018, to Reyes, Maritza,

16  followed by an email from Reyes, Maritza sent Tuesday,

17  November 13, 2018, at 4:40 p.m. to Pernell, LeRoy, and

18  then followed by an email from Pernell, LeRoy sent

19  Wednesday, November 14, 2018, 10:19 a.m. to Reyes,

20  Maritza, followed by an email from Reyes, Maritza sent

21  November 14, 2018, 10:56 a.m. to Pernell, LeRoy with a

22  cc to Abrams, Robert, followed by an email from Abrams,

23  Robert sent November 15, 2018, at 8:42 p.m. to Reyes,

24  Maritza; followed by an email from Reyes, Maritza sent

25  November 15, 2018, at 10:10 a.m. to Abrams, Robert;

1  followed by an email from Abrams, Robert to Reyes,

2  Maritza, November 17, 2018, at 10:04 a.m.

3         Did you follow that description of the time and

4  the dates?

5     A.   Not really.

6     Q.   So we'll go over it one at a time here.  So

7  let's start with the first email there from Pernell,

8  LeRoy November 13, 2018, which starts at the bottom of

9  page 3.

10    A.   Okay.

11    Q.   And on the next page, which would be page 4,

12 right at the top.  What is the subject line?

13    A.   This is Exhibit A.

14    Q.   No, right at the top in the subject, where it

15 says "subject."

16    A.   Report of the Committee -- report of the

17 College of Law RPT Committee.

18    Q.   It was sent importance marked what?

19    A.   High.

20    Q.   And what does it state?

21    A.   "Please see attachments, which include a memo

22 to Associate Professor Reyes regarding report of the RPT

23 Committee and report of the College of Law RPT

24 Committee."

25    Q.   Okay.  So then it -- the email says that LeRoy

1 Pernell sent that to Reyes, Maritza?  That's on the next

2 page right at the bottom.

3    A.   Yes.

4    Q.   Okay.  And so Reyes, Maritza responded to

5 Pernell, LeRoy.  "Dean Pernell, The Report of the

6 College of Law RPT Committee that you attached appears

7 to be an incomplete draft.  One, page 6 has a signature

8 line for the chair, Professor Robert Abrams, but it is

9 not signed.  Two, the signature page of the members of

10 the RPT Committee is missing.  Three, the reports from

11 prior decisions are incomplete, they are missing the

12 external reviews of my scholarship.  I need these

13 materials to prepare my response.  Please send them as

14 soon as possible.  Thank you.  Professor Reyes."

15         Is that what is stated there?

16    A.   That's what says, yes.

17    Q.   And in response, Pernell, LeRoy wrote what?

18    A.   "I have confirmed that the copy of the

19 committee report provided to you is an accurate copy of

20 the report sent to me by the committee."

21    Q.   Okay.  And so Reyes, Maritza then replied to

22 Pernell, LeRoy, but this time copying Abrams, Robert and

23 stated "Dean Pernell, I am copying Professor Rob Abrams,

24 chair of the RPT Committee, to request a fully executed

25 complete report.  What you received and sent to me is

1 not a complete report.  You state that the report you

2 provided to me via email yesterday 11/13 is quote an

3 accurate copy of the report sent to you by the

4 committee, end quote.  But you do not state that it is a

5 complete report because it obviously is not.  As I

6 explained in my prior email, the report is missing the

7 following:  One, page 6 of the report has a signature

8 line for the chair, Professor Robert Abrams, but it is

9 not signed.

10        Two, page 6 also states, quote, the signatures

11 of the members of the committee indicating that it --

12 this is the report of the committee are attached, end

13 quote.  These signatures are missing.

14        Three, Appendix 1 states that it includes a

15 classroom observation from Professor Rhonda Reaves, but

16 this classroom observation report is missing.

17        Four, Appendix 2 states that it includes the

18 past reports on application for tenure and application

19 for promotion to associate professor, but these reports

20 are missing all the external reviews of my scholarship."

21        And so there is a report there.  The next email

22 from Abrams, Robert that begins at the bottom of page 1.

23 At the bottom of page 1.  You're looking at page 2.

24    A.   Yes.

25    Q.   If you could go please to the bottom of page 1.

1   Where it says from Abrams, Robert to Reyes, Maritza, can

2   you read what that email says?

3       A.   It says "good evening, I'm trying to tie up all

4   of my responsibilities before I go to India next week.

5   I have completed everything except hashtag 4, adding the

6   copies of the actual outside evaluation and sent the

7   file back to the dean's office.  I do not have access to

8   those reviews and have asked the dean's office to insert

9   them at the appropriate places in the pdf, i.e., some

10  after the tenure review report and some after the

11  promotion report and provide the complete report to you.

12  I think that will mean I am no longer in the loop, other

13  than to upload the completed file to the Interfolio

14  after they have added those materials.  If any of that

15  changes, I will let you know."

16      Q.   Okay.  And then Reyes, Maritza replied to

17  Abrams, Robert.  And by the way, in that email, Abrams,

18  Robert did not copy Pernell, LeRoy, in the email that

19  you just read?

20      A.   Right.

21      Q.   So Reyes, Maritza only replied to Abrams,

22  Robert.  And stated "Rob, This piecemeal approach to

23  providing the full report to interim Dean Pernell is

24  problematic.  Please let me know when you send the

25  complete duly signed report to interim Dean Pernell.  In

1  the meantime, please send me the signature pages of the

2  report.  I need to incorporate that information in my

3  response.  And I do not want to wait until the last

4  minute.  And yes, please let me know if there are any

5  changes.  Thanks.  Maritza."

6         And then the next email, and the last one, is

7  the brief from Abrams to Reyes, Maritza and please read

8  that one.

9     A.   "This is everything I have at this time.  If

10  the dean's office sends me the external reviews from

11  your tenure and earlier promotion, I will send them a

12  revised report where they would have been inserted into

13  appendix.  Even though you don't have the external

14  reviews in the attached report, they were provided as

15  part of the previous processes so that you can draw on

16  them as needed."

17     Q.   Okay.  So this -- these emails and that one,

18  when we say Abrams, Robert he was the chair of the RPT

19  Committee that reviewed the application; correct?

20     A.   That's correct.

21     Q.   Okay.  And so in these emails he's

22  acknowledging that the committee sent you the report

23  without the external reviews?

24     A.   I -- that could be correct.  I have no reason

25  to say that that's not correct.  That seems to be the

1   suggestion of the emails.

2       Q.   Okay.  Let's go to page 2 and take it from a

3   suggestion to specifically what it states on the

4   document.  Right at the top of page 2, and when you

5   read, "I do not have access," which is the second line

6   -- the third line on page 2 at the top; right?

7       A.   "I do not have access to those reviews and I

8   have asked the dean's office to insert them at the

9   appropriate places in the pdf, i.e., some after tenure

10  review report and some after the promotion report and

11  provide the completed report to you."

12      Q.   Okay.  So that statement right there would say

13  that he didn't have them?

14      A.   That would be a conclusion you could make from

15  that.

16      Q.   And he passed the ball to you to provide them

17  to the dean's office?

18      A.   That's what he says in his memo.

19      Q.   Yes.

20          MS. REYES:  All right.  I think -- we have five

21      minutes until 12:30.  I think I can finish the

22      section I wanted to finish with regards to this.

23          MS. REINER:  Okay.

24          MS. REYES:  Hopefully.

25          (Exhibit Number 11 was marked for

1    identification.)

2    Q.   So I want you to take a look at what has been

3   marked as Exhibit 11.  And it's a memorandum.  It says

4   memorandum at the top.  Date:  November 29, 2018.

5    A.   Yes.

6    Q.   To Dr. Maurice Edington, Provost from LeRoy

7   Pernell, Interim Dean College of Law, re:  Application

8   for promotion to full professor for Maritza Reyes.

9        Do you recollect or are you familiar with this

10  report?

11   A.   I do recall this report, yes.

12   Q.   Did you prepare this report?

13   A.   Yes, I did.

14   Q.   Okay.  So at the bottom of that memorandum on

15  page 1, where it says the RPT Committee, which is I

16  think that would probably -- the third sentence because

17  there's a second sentence that starts the RPT Committee,

18  and there's a third sentence that starts the RPT

19  Committee.

20       And it says "The RPT committee voted to deny

21  promotion of Maritza Reyes to full professor by a vote

22  of 0 (yes) to 8 (no) with 2 abstentions."

23       Does that say that?

24   A.   It does say that.

25   Q.   Okay.  If we do the math from the 0 (yes), 8

1  (no), and 2 abstentions, how many people voted?  Well, I

2  should say, we count the numbers, what does that add up

3  to?

4      A.   The 8 and the 2 add up to 10.

5      Q.   Okay.  And do you recall when we went over the

6  report and recommendation of the RPT Committee, which is

7  Exhibit 8, and we went over who were present at the

8  meeting to vote and we listed all the names, including

9  with first names, do you recall that they added to ten?

10     A.   I believe they did.

11     Q.   Okay.  Do you want to go back to that report

12 and look to make sure that we added to the same thing,

13 10, and that would be Exhibit 8.  And that would be the

14 last page.  "Present."

15     A.   Yes, it adds up to 10.

16     Q.   All right.  So let's go to page 2.  There's a

17 second major paragraph because there's like some smaller

18 paragraphs at the top, but the one right in the middle

19 that begins with "the essence"?

20     A.   Okay.

21     Q.   And then go to the second sentence.  It's

22 qualifying, you know, the first sentence it seems, but

23 perhaps we need to read from the beginning.  So do you

24 want me to read it or do you want to read it?

25     A.   What is it you want me to do?

1     Q.   Okay.  Read "the essence."  That sentence.

2     A.   The paragraph?

3     Q.   Yeah, read the first two sentences.

4     A.   "The essence of the RPT Committee's report is

5  that the body of Associate Professor Reyes' published

6  works did not satisfy the qualitative standard of

7  excellence in scholarship.  In reaching that position,

8  the committee apparently placed weight on the absence of

9  any scholarship publications since 2014."

10    Q.   Okay.  So let's stop right there because that's

11  the first two sentences; right?  So "weight on the

12  absence of any scholarship publication since 2014."

13  When they are using the language "absence of any

14  scholarship publications," is that a numerical absence?

15    A.   I don't know what you're asking.

16    Q.   In other words, the word "any."  The absence of

17  any scholarship publications, is that that there were no

18  additional publications?

19    A.   It would suggest that the committee placed its

20  weight on the absence of any scholarship publication

21  since 2014.

22    Q.   Okay.  So when they named the next sentence,

23  those next articles that they named:  In memory of Julie

24  Chek" and the co-authored piece, "The Plenary Panel,"

25  "The Intersections of Race and Class for Women in

1  Academia Symposium.

2          What is -- well, in this case we don't have to

3  worry about whose head we are getting into because you

4  wrote this, so you can explain to this.

5          What do you mean by qualifying these two pieces

6  in terms of whatever you're stating in this paragraph?

7      A.    I don't understand the question.

8      Q.    What do you mean by "a multi-authored report on

9  a panel discussion - are not scholarly publications

10  within the standards of the college of law?"

11     A.    That was the conclusion of the committee.

12     Q.    So that's not your conclusion right there?

13     A.    I am reporting on, and there seems to be little

14  dispute, about the memorial piece and the paragraph

15  itself discusses what the committee based its opinion

16  on.

17     Q.    So when somebody stated "a multi-authored

18  report and a panel discussion are not scholarly

19  publications within the standards of college of law," is

20  that the committee's opinion or your opinion?

21     A.    That was the opinion of the committee reported

22  to me.

23     Q.    Okay.  So let's look at Exhibit 7,

24  Publications.  In this five-page document there are

25  different sections starting on page 1 with Law Reviews

1 and we have one, two, three, four, five, six items

2 bullet-pointed there under Law Reviews. And then next,

3 Online Legal Symposia - Refereed by Immigration

4 Scholars/Experts. And then we have one, two, three,

5 four listed under that. And then we have a section

6 Works in Progress. And we have one listed under that.

7 And then on that same page, page 2, we have another

8 section, Other Publications, Newspapers, Online

9 Opinions, and Blogs. And we have one, two, three, four,

10 five, six, seven, eight, nine, ten, eleven, twelve

11 bullet items listed under that. And then we have

12 Presentations, pages 3 to 5, and I'm not going to count,

13 I'm going to take it as what it states on the page,

14 unless you want me to count it? Would you like me to

15 count it?

16     A.   That's up to you.

17     Q.   Okay. So we'll take it as three to five as

18 stated on the page as several presentations. When you

19 were writing this report, did you consider, beyond the

20 "In Memory Of" and "The Intersections of Race and Class

21 for Women in Academia" articles, did you consider

22 anything else that was listed in the Publications pages

23 1 through 5 in coming up with your review of the

24 scholarship -- the research and scholarship?

25     A.   What I considered was the report of the

1  committee.  The report of the committee indicated that

2  they're -- made reference to these two pieces and

3  indicated that there were not scholarly publications

4  since 2014 at the time this committee report was

5  written.

6     Q.   So remember at the beginning when we talked

7  about whether you considered the faculty handbook when

8  you were making an assessment for your own

9  recommendation?  Did you look at the faculty handbook

10 when you were preparing this memo and assessing or

11 reviewing the application for promotion to full

12 professor of Professor Maritza Reyes?

13    A.   I don't recall whether I specifically looked at

14 the faculty handbook at this point or not.

15    Q.   So you're telling me that you went straight by

16 what the committee decided?

17       MS. REINER:  Objection.  Misstates his

18    testimony.

19    A.   I didn't say that.

20    Q.   So what is it that you guided yourself by in

21 reaching your decision?

22    A.   As I indicate in this report, I'm looking at

23 the report of the committee and considering their

24 rationale.

25    Q.   Okay.  And one final item that I think we may

1  be able to do that stipulation that you wanted to do.

2          (Exhibit Number 12 was marked for

3      identification.)

4      Q.   I'm going to give you Exhibit 12.  Have you

5  seen this document before, Professor Pernell?

6      A.   No.

7      Q.   So I'm going to describe this.  This was marked

8  as Exhibit 8 in case -- Federal case

9  4:18-cv-00409-RH-CAS Document 62-8 filed 4/15/19 stating

10  page 1 of 34 for the exhibit page.

11          This document is -- and I'm going to page 2, is

12  described as Florida A&M University Board of Trustees

13  Notice of Serving the Rule 26(a)(2) Expert Report of

14  Patrick L. Mason, PhD in the case of Jennifer Smith v.

15  Florida Agricultural and Mechanical University Board of

16  Trustees.

17          So have you ever seen this document, Professor

18  Pernell?

19      A.   No, I have not.

20      Q.   Okay.  So I'm going to walk you a little bit

21  through it and I'm going to go through it very quickly

22  hopefully.  On page 0 -- at the bottom marked page 0,

23  which comes after the second page of the notice of page

24  2 of 2, it says "An empirical examination of gender wage

25  inequality among faculty in the FAMU College of Law.

 1 And the name is Patrick L. Mason, PhD, Professor of

 2 Economics & Director, African American Studies, Florida

 3 State University.  It's dated March 11, 2019.  His email

 4 is plmason01@gmail.edu.  Okay.  So I'm going to point

 5 you to page 2.

 6         MS. REINER:  Okay.  I'm going to pause here a

 7     second.  I'd like to put an objection on the record

 8     to the extent that this is not an expert in this

 9     particular case, to the extent it is not an expert

10     report that has anything to do with this case.

11         MS. REYES:  But for deposition purposes, you

12     know, it's -- what, is it about the form?

13         MS. REINER:  No, I'm objecting to it because it

14     purports to be an expert report.  And this is not an

15     expert in this case.

16         MS. REYES:  But for deposition, do we make

17     those objections?

18         MS. REINER:  Yes, yes, to the extent this is an

19     expert report, you know, we want to object to it to

20     the extent that it's not an expert in this

21     particular case.

22         MS. REYES:  Okay.  But that's an objection

23     beyond the form; right?

24         MS. REINER:  Uh-huh.

25         MS. REYES:  Okay.

1  BY MS. REYES:

2     Q.   So let's go to page 2, Professor Pernell. At

3  the bottom on that paragraph right there, it says --

4  last paragraph at the bottom, it says "very high

5  productive faculty consists of 12 faculty." And then

6  they list these very high productivity faculty: Nicola

7  Boothe-Perry, Ann Marie Cavazos, Jonathan Fineman,

8  Maritza Reyes, and Deleso Alford. And they were

9  associate professors it says; right?

10        Now, are you aware of, from your knowledge as

11  dean of the college of law, of that list, which would be

12  the most junior faculty member in comparison; Nicola

13  Boothe-Perry, Ann Marie Cavazos, Jonathan Fineman,

14  Maritza Reyes, and Deleso Alford Washington, in terms of

15  when they began in the legal academy, from your

16  recollection of having been dean?

17     A.   A couple of them I can't recall. I don't

18  recall when Deleso Washington began.

19     Q.   Did she begin before Professor Maritza Reyes?

20     A.   I can't recall when she began.

21     Q.   Okay. But the others did begin before Maritza

22  Reyes?

23     A.   Yes.

24     Q.   Okay. And then next page, page 3. It's a

25  table of faculty -- table of faculty productivity by

1 gender, rank, and date of hire.  And you have Professor

2 Reyes, Maritza listed there with a number of

3 publications, 7, and citations, 67.

4      MS. REYES:  And I'm not going to go ahead and

5   do a comparison, but I guess we can stipulate that

6   it is what it is with your objection, even though it

7   goes beyond the form.  But this table states what it

8   states; right?  Whatever it states, that's what it

9   states.  Unless you want me to go through it.

10      MS. REINER:  Okay.  In terms of the

11   stipulation, I think we can say that, you know, the

12   document speaks for itself.

13      MS. REYES:  Right.

14      MS. REINER:  But we don't know anything about

15   the underlying calculations or how they were done or

16   the accuracy of them or anything like that.

17      MS. REYES:  In this table it states what it

18   states.  Just the numbers we have.

19      MS. REINER:  Exactly what's on the page is on

20   the page, yes.

21 BY MS. REYES:

22   Q.   All right.  So let's go now to page 5 and in

23 that last paragraph above Table 2.  The second sentence,

24 it states "unlike Cavazos, Brown and Harvey are low

25 productivity faculty and had no administrative

1  assignment.  Jonathan Fineman is the only male with very

2  high productivity.  Two women (Cavazos and Washington)

3  have an equal productivity rank, but higher salaries.

4  One woman (Maritza Reyes) has very high productivity and

5  the same salary, and one woman (Boothe-Perry) has the

6  same rank but a lower salary."

7          And then right under that there's a Table 2.

8  Gender and Salary of Associate Professors.  And it's

9  rating them according to their productivity rank from

10  low to high to very high.  And in that rating the

11  professors who have very high are Nicola Boothe-Perry,

12  Maritza Reyes, Deleso Alford Washington, Ann Marie

13  Cabazos, and Jonathan Fineman.

14          And of those that we listed are very high --

15  because I think we went over this before, the only one

16  you didn't know about was Professor Deleso Alford,

17  whether she was more junior.

18          But of the ones listed right now in this table,

19  is Professor Maritza Reyes the most junior of the ones

20  with the productivity rate of very high?  I can go over

21  the names again; Nicola Boothe-Perry; Reyes, Maritza;

22  Washington, Deleso Alford; Cabazos, Ann Marie; and

23  Fineman, Jonathan.

24      A.   I believe that with the exception of

25  Washington, that the others mentioned would all be

1    senior to --

2        Q.   Okay.

3        A.   -- to Reyes.

4        Q.   Okay.

5            MS. REINER:  Would you like the same

6        stipulation with respect to this page and the

7        question?

8            MS. REYES:  Yes.  It is what it is.

9            MS. REINER:  Again, we're not stipulating to

10       the accuracy of any of the underlying information or

11       how this came to be, but the page says what it says.

12           MS. REYES:  Yes.

13           MS. REINER:  Okay.

14           MS. REYES:  And the exhibit is what it is, a

15       FAMU submitted exhibits with one of its experts.

16           Okay.  So I think that we can leave it at that

17       and take a little bit of a lunch break.  So what

18       time do you want to come back?  How long would you

19       need?

20           THE WITNESS:  I don't care.

21           MS. REYES:  Professor Pernell?

22           THE WITNESS:  Doesn't make me any difference.

23           MS. REINER:  Let's take -- in terms of this

24       location, I'm not as familiar with it, I'm on the

25       other side.  But I assume there's something where we

1    could grab something to eat in 45 minutes.

2         MS. REYES:  Okay.  Yeah.  There's a lot of

3    stuff walking distance here.  So we'll be back at

4    1:30?

5         MS. REINER:  Yes, that sounds good.

6         MS. REYES:  We'll be back at 1:30.  Now we're

7    off the record.

8           (Lunch recess taken.)

9         MS. REYES:  Back on the record.  1:37 p.m.

10    Q.  So just one item that I think was left over

11  that I thought I had finished from questions about the

12  criteria for promotion to full professor.

13       So we talked about that the criteria is

14  included in the faculty handbook of the college of law.

15  And we started with looking at Rob Abrams's memo.  We

16  stated that it was coming from the 2002-2004 faculty

17  handbook.  And, in fact, the report of the RPT Committee

18  on the application for promotion to assistant professor

19  that was rendered in Fall 2011 included the footnote to

20  the faculty handbook approved by Dr. Robinson in 2003.

21       So has there been any change to that faculty

22  handbook?

23    A.  There's been a new faculty handbook since then.

24  I don't recall the exact date.

25    Q.  Right.  Okay.  And did you participate at all

1 in -- like who did the revisions to the faculty handbook

2 initially?

3  A.  Well, the process was one -- it was a

4 faculty-driven process.  So there was -- and it took a

5 fair amount of time.  So there were committees, I think

6 committees that went from over a couple of years, I

7 don't remember exactly which, of looking at

8 recommendations, holding discussions, taking

9 information.  Eventually they produced a draft of a new

10 handbook that the faculty then met on at least two,

11 maybe more, sessions to review, approve that handbook

12 and then forward it on to the provost's office, the

13 provost's office then makes its own comments on the

14 handbook, sometimes that results in the need for further

15 revisions.

16  Q.  Okay.  And so in your time as dean of the FAMU

17 College of Law, how many handbooks have there been?  How

18 many versions of the faculty handbook?

19  A.  Only those two than I can recall.

20  Q.  Those two.  So you are right now under the

21 second one?

22  A.  Yeah, that is correct.

23  Q.  Okay.  And when those revisions were happening,

24 for some of that time you had been back to the faculty

25 as a professor of law and no longer dean?

1    A.   I don't recall specifically.  I think that

2  between dean and interim dean maybe there might have

3  been some time.  I don't know for sure.  But I was still

4  interim dean when the second handbook was voted on by

5  the faculty.

6    Q.   Okay.  And was the second handbook approved

7  under your deanship?

8    A.   Yes.  I believe so.  And I can't say for sure.

9  But I know it went up to Tallahassee and there was a

10  long wait.  I can't remember exactly when the approval

11  came.  I can't say for sure.

12    Q.   Okay.  It could have been under interim dean

13  Nicky Boothe-Perry?

14    A.   I said I can't say for sure.

15    Q.   All right.  So let me mark this as Exhibit 13.

16      (Exhibit Number 13 was marked for

17      identification.)

18    Q.   And I'm going to show you what has been marked

19  as Exhibit 13.  And it's -- I'm going to identify it as

20  an email from Reyes, Maritza sent Wednesday,

21  November 28, 2018, to Pernell, LeRoy.  Subject:  Exhibit

22  Q - Proposed Changes to Full Professor Standard -

23  Discussed at Yesterday's Faculty Meeting.

24    A.   Uh-huh.

25    Q.   And I'm going to briefly read what it says on

1  that -- only on that first page.  "Dean Pernell, I

2  attach, as Exhibit Q to my response to the RPT Committee

3  Report, a one-page document with the proposed changes to

4  the Full Professor Standard.  Some of these proposed

5  changes were discussed at yesterday's special faculty

6  meeting.  I attended that meeting.

7        These proposed changes have not been approved.

8  However, they are additional evidence that the current

9  faculty handbook (the only approved one) does not

10  include (1) a quantitative standard, and (2) the, quote,

11  new scholarly writings since tenure, end quote,

12  standard.  These are now being proposed by the Faculty

13  Handbook Committee (chaired by Professor Phyllis Taite.)

14        The changes in red font in the document were

15  formatted in red font (by the Faculty Handbook

16  Committee) as additional changes to the prior proposed

17  changes to the faculty handbook.  This is the language

18  in red font, quote, and at least one of them must have

19  been produced since the last advancement whether for

20  promotion or tenure," period, end quote, underscored.

21        What I just read, is that what it states on

22  page 1 of that document email?

23      A.   Yes, you read that paragraph.

24      Q.   Okay.  So let's move on now to talk about

25  Professor Reyes in terms of you said that you met her

1  when you were dean and you participated in the faculty

2  recruitment process, not as a faculty member, not as a

3  member of the faculty recruitment committee, but as

4  dean.  And it would have been around the time when you

5  were describing the period of time in the "Saving the

6  Law School" ABA journal article.  What was happening in

7  the law school, the trying to get full accreditation.

8  I'm kind of like going back by what we have already

9  established.

10        So when Professor Reyes came on board as a

11  tenure-track assistant professor, was it her first

12  teaching experience?

13     A.   I don't know.  That was more than ten years

14  ago.  I don't recall.  My impression is it was, but I

15  can't recall for sure.

16     Q.   Okay.  Would she have been considered what in

17  the legal academy is called an entry level tenure-track

18  faculty member?

19     A.   The assistant -- when she was considered for

20  the position of assistant professor, that would have

21  been entry level tenure-track.

22     Q.   Okay.  And we established that that would have

23  been in 2009, so we're thinking like almost 15 years

24  ago.  Because she signed -- we established -- I mean, I

25  can pull the exhibit, if you want.  We established that

1    she accepted the offer, at least a signature that you

2    read, was in April of 2009; right?

3        A.    I guess.  If that's what the document says.

4        Q.    Okay.  So that would have been -- from that

5    period would have been 15 years.  How long had you been

6    dean, not only in the FAMU College of Law, but dean in

7    the prior law school by the point of 2009?

8        A.    Well, if we do the math, I started dean at

9    Northern Illinois in the Fall of '97.

10       Q.    We're not going to do the math.  We'll just say

11   since 1997 until 2009 you had been dean.  And what did

12   you see -- how did you see your role as dean in terms of

13   an entry level faculty member that was recruited under

14   your deanship?

15       A.    I don't know exactly what that means.  The

16   faculty went through the process of filling vacancies on

17   the faculty and it was important -- I think it was a

18   shared sense of importance the faculty had and I

19   certainly shared it with them, that we bring in good

20   people for that position.  People who have the potential

21   of succeeding.  In this instance on a tenure-track.

22             And very often we're looking -- very often

23   schools look to fill those positions with people who can

24   provide teaching in some very specific subjects where

25   you have holes and gaps in your curriculum.

1    Q.   And in your role as dean, did you -- did you

2  think that you had to play a part in guiding that

3  success of an entry level faculty member who was hired

4  under you as dean?

5    A.   I don't know what that necessarily means.

6  I wasn't necessarily -- I mean, if you're talking about

7  some type of mentor relationship, that wasn't the

8  function.

9    Q.   No, I wasn't thinking mentor relationship, I

10  was leaving it open-ended for you to tell me what you

11  thought your role would be in terms of when an entry

12  level faculty member is hired, if any, because you could

13  say no, I --

14    A.   I'm not sure what the question is asking.

15    Q.   Okay.  Who is Jeff Brown?

16    A.   He's a faculty member.

17    Q.   Okay.  And how do you know Jeff Brown?

18    A.   He is a faculty member, associate professor at

19  Florida A&M, and he was an associate professor, I

20  believe, associate professor at Northern Illinois.

21    Q.   So when did you meet Jeff Brown?

22    A.   I met him in the recruiting process when we

23  hired -- hired him for a faculty vacancy at Northern

24  Illinois University College of Law.

25    Q.   Northern Illinois.  Okay.  And at the time were

1  you dean --

2     A.   Yes.

3     Q.   -- at Northern Illinois --

4     A.   Yes.

5     Q.   -- University College of Law?

6     A.   Yes.

7     Q.   And was Jeff Brown at the time when he was

8  hired an entry level faculty member?

9     A.   I don't recall the exact -- he wasn't -- all I

10  can tell you for certain is that he was not hired with

11  tenure.  I don't remember what rank he was hired at.

12     Q.   Okay.  And after you came to the FAMU College

13  of Law, Jeff Brown also came to the FAMU College of Law?

14     A.   Yes, he did.

15     Q.   And initially how did he come?  What rank?  Was

16  he a tenure-track or -- was he tenured already?

17     A.   I believe he was tenured already, as far as I

18  can remember.

19     Q.   And did he come as a visiting professor or did

20  he come straight hired into the faculty?

21     A.   I don't specifically recall.  It could have

22  been he was hired straight on or he may have visited

23  first.  I don't recall.

24     Q.   Okay.  And as a visiting professor -- let's say

25  he came as a visiting professor, whose decision would it

1 have been for him to come in as a visiting professor?

2 Who would have made the decision at the college of law

3 level at that time?

4 　　A.　Typically visit offers are extended by the dean

5 usually with consultation with the faculty.

6 　　Q.　Now, how would you describe the role that you

7 played as dean from the time that you hired Jeff Brown

8 at Northern Illinois when you were a dean and then when

9 he comes here after you come here to the FAMU College of

10 Law, how would you describe that relationship that you

11 had in terms of did you participate in any, you know,

12 guidance or -- including in recruiting him to come to

13 the FAMU College of Law?

14 　　A.　I don't know what question you're asking.  You

15 had like five different questions there.

16 　　Q.　So, yeah.  Let me break them down.  Did you

17 recruit Jeff Brown to come to the FAMU College of Law?

18 　　A.　I don't know if -- I don't recall whether I

19 specifically recruited him or whether he made an

20 interest -- his interest known.  I don't recall.

21 　　Q.　Okay.  And you said that he went up for tenure

22 at Northern Illinois University College of Law?

23 　　A.　Yes, yes, he did.

24 　　Q.　Were you dean at that time?

25 　　A.　Yes, I was.

1    Q.   And what was your role in that process?  We

2  already went over how it happens in the FAMU College of

3  Law, you get a report from the RPT Committee and then

4  you do your own recommendation based on what the

5  committee decides.  What did you -- did you have any

6  role in that process for Jeff Brown at Northern Illinois

7  College of Law?

8    A.   The relation of a dean to a tenure decision is

9  pretty much the same at any school.  So I would have had

10  a report, in all likelihood, on whether or not he was to

11  be promoted.

12    Q.   Okay.

13    A.   I can't remember specifics because that was

14  quite some time ago.

15    Q.   Okay.  So let's go now to the tenure process

16  for Professor Reyes.  And do you recall at what point

17  Professor Reyes applied?

18    A.   No, I don't know exactly what point.

19    Q.   Let's go now to the year 2014.

20    A.   Okay.

21    Q.   And at that time were you dean?

22    A.   In 2014?

23    Q.   (Nods head.)

24    A.   I believe I was.

25    Q.   Yes, according to your CV -- your resume, you

1  were dean from January 1, 2008 to June 30, 2015.  So you

2  would have been dean through the 2014-2015 academic

3  year.

4      A.   That is correct.

5      Q.   Do you recall if you were dean when Professor

6  Reyes applied for tenure?

7      A.   I believe I was.

8      Q.   Okay.  During the time when Professor Reyes

9  applied for tenure, do you recall anything unusual

10  happening during the tenure process in terms of the

11  review of her application?

12      A.   No, define what you mean by unusual.

13      Q.   Did you get her application materials on time?

14      A.   I don't recall.

15      Q.   Okay.

16          (Exhibit Number 14 was marked for

17      identification.)

18      Q.   I want you to take a look at what has been

19  marked as Exhibit 14, which I'm going to describe as a

20  letter from the Law Offices of Cynthia N. Sass, PA --

21  that's S-a-s-s -- dated October 22, 2014.  It was sent

22  via email and U.S. Mail to Rodner B. Wright,

23  W-r-i-g-h-t, Provost, Florida A&M University.  Re:

24  Associate Professor Maritza Reyes College of Law

25  Exemption from Tenure Application Deadline.

1          Please go to page 3 of that letter.  All the

2   way at the bottom, bottom, bottom where it says "cc."

3   Who is cc'd on this letter?

4      A.   The letter indicates cc's went to President

5   Elvira Mangum, to me, and to Professor Reyes.

6      Q.   How is it addressed to you?

7      A.   It -- I assume it went to me as dean.

8      Q.   Okay.  Don't assume, read it exactly how it is.

9      A.   Says Dean LeRoy Pernell.

10     Q.   Let's look at that letter.  Do you remember

11  this letter?  Does it refresh your memory at all?

12     A.   No, it doesn't.

13     Q.   Okay.  So let's read some of it to see if it

14  brings you back to that time.  Okay.  Go to page 1.  And

15  I'm going to read that paragraph.  Please follow me.

16          "During her approximately six years of

17  employment with the college of law, Professor Reyes has

18  been subjected to a hostile work environment marked by

19  race and gender discrimination.  As Professor Reyes has

20  informed Dean LeRoy Pernell throughout her years of

21  employment, she, as a Latina, has been subjected to

22  disparate treatment and hostility that have affected the

23  terms and conditions of her employment at the college of

24  law.  A recent instance of this mistreatment is the

25  attempt to sabotage Professor Reyes' tenure application

1  on the basis of an allegation that she did not submit

2  her application and portfolio materials by the deadline

3  for delivery of her tenure materials.  Professor Reyes

4  has always maintained, and continues to maintain, that

5  she delivered her application to the designated place

6  and the designated person by the deadline.  Allegations

7  to the contrary amount to a witch hunt against Professor

8  Reyes."

9      Does that paragraph remind you of what happened

10  during the tenure process of Professor Reyes?

11      A.   No, it does not.

12      Q.   Okay.  Let's go to page 2, please.  Page 2.

13  I'm going to go to the third paragraph that begins with

14  "Professor Reyes has informed" and I'm going to read.

15      "Professor Reyes has informed me that you have

16  offered, through Dean Pernell, an opportunity for her to

17  apply for an exemption from her -- from the tenure

18  application deadline.  Dean Pernell assured Professor

19  Reyes that she can seek such an exemption without

20  waiving her right to demand any and all information

21  related to the allegation that her tenure application

22  was not timely and her right to respond to the same.

23  Dean Pernell also offered to submit a memorandum in

24  support of Professor Reyes' application for an

25  exemption."

1       Does that remind you anything about what was

2   happening at that time with Professor Reyes's

3   application?

4       A.   No, I don't remember.

5       Q.   Okay.

6            (Exhibit Number 15 was marked for

7       identification.)

8       Q.   Please take a look at Exhibit 15.  Exhibit 15

9   is a document on Florida Agricultural and Mechanical

10  University letterhead dated November 18, 2014 addressed

11  to Dr. Elmira Mangum, President.  Signed Richard E.

12  Givens.  With copies to several people.

13           Professor Pernell, please look at Exhibit 15,

14  page 1, right there where it says "copy to."  Please

15  read who it was copied to.

16      A.   Trustee Karl White, Board of Trustees; Rodner

17  Wright, Provost, Academic Affairs; Avery McKnight, Vice

18  President and General Counsel of Legal Affairs; LeRoy

19  Pernell, Dean FAMU College of Law; Maritza Reyes,

20  Professor FAMU College of Law; Jake Hakemoller --

21      Q.   I'm sorry, James?

22      A.   James Hakemoller, Audit Services/Investigations

23  Administrator.

24      Q.   Okay.  Does that remind you what this is about,

25  this document?

1    A.    Not really.  I don't recall the details on

2  this.

3    Q.    Okay.  So let's go through it.  On the second

4  page, which is marked again with the emblem of the

5  University at the top, Florida Agricultural and

6  Mechanical University and then it's titled Maritza Reyes

7  - FAMU College of Law Investigation Report, Case Number

8  14-10-0011.  November 18, 2014.  Division of Audit and

9  Compliance, Richard Givens, Vice President.

10        Okay.  So let's go to page 1.  Under

11  Methodology.  And then there's another header under that

12  to the left called Allegation.

13    A.    Uh-huh.

14    Q.    Please read that.

15    A.    "Maritza Reyes, a professor at the Florida A&M

16  University College of Law, did not submit her tenure

17  application by the September 12, 2014 5:00 -- I assume

18  it's p.m. -- deadline."

19    Q.    Okay.  So that's the allegation; right?

20        Does that refresh your memory about what was

21  happening with Professor Reyes's application?

22    A.    Not really.  Other than generally, I think

23  there was a question about time stamps or something I

24  seem to vaguely recall.  But other than that, I don't

25  recall the details.

1  Q. Well, that's a detail, right, the time stamp?

2 But do you remember that there was an allegation like

3 what is stated here?

4  A. I, as I said --

5   MS. REINER: Objection. Form.

6  A. I only remember that there was an issue. I

7 seem to recall about a time stamp, but other details

8 about that I don't recall.

9  Q. Okay. And with that detail you recall about

10 the time stamp. Is there anything about a time stamp in

11 the faculty handbook?

12  A. I don't recall anything.

13  Q. Okay. So when we were talking before about the

14 process of submitting applications, so the process of

15 submitting an application for tenure, who sets the

16 deadline in the schedule for when it has to be

17 submitted?

18  A. Are you talking about submission to the

19 university or within the college of law?

20  Q. Well, for submission of an application, can it

21 be submitted straight to the university in Tallahassee

22 for a law school professor?

23  A. I don't recall what the regulations were,

24 whether you had to do that first and the law school

25 would -- I just don't remember how that went.

1    Q.   Under the faculty handbook, and we went through

2  that process, right?  Who gets the application and

3  prepares the first report and recommendation?

4    A.   Okay.  That's two questions, which one do you

5  want --

6    Q.   Who gets the application at the college of law?

7    A.   I don't know.  Again, I don't recall whether

8  it's sent directly to the university or directly within

9  the college of law.  But the process involved -- would

10  involve once the application has been submitted, then

11  the RPT committee would begin its review.

12    Q.   And who determines on what date what the

13  deadline is for submission?  Is it at the college of law

14  or is it at the university?

15    A.   I don't recall.

16    Q.   Okay.  Who is Ronald Griffin?

17    A.   Ronald Griffin, I'm familiar with, is a faculty

18  member at the college of law.

19    Q.   And when did you first meet Ronald Griffin?

20    A.   Many years ago I first met him.  I can't tell

21  you what year.  I first met him when he was a professor

22  at Washburn and involved in the counsel and legal

23  education opportunity.

24    Q.   Okay.  And so he was a professor at Washburn

25  Law School.  How did he get to the FAMU College of Law?

1      A.   I believe he applied for a position at the FAMU

2 College of Law.

3      Q.   Did he first come as a visitor?

4      A.   I don't recall.

5      Q.   If he came as a visitor, assuming he came as a

6 visitor, would it have been when you were dean?

7      A.   Yes.

8      Q.   Okay.  So like you explained with Jeff Brown

9 for a visitor, it would have been under your

10 jurisdiction as dean?

11      A.   It would have been while I was dean.

12      Q.   Okay.  So do you recall during the time when

13 Professor Reyes was applying for tenure, a complaint

14 being filed against Professor Ronald Griffin by

15 Professor Lundy Langston?

16      A.   No, I don't recall that.

17      Q.   This is Exhibit 16.

18           (Exhibit Number 16 was marked for

19      identification.)

20      Q.   Please take a look at Exhibit 16.  I'm going to

21 describe Exhibit 16 as an official Florida A&M

22 University Charge of Discrimination/Harassment dated

23 10/25/14.  Checked faculty.  Name:  Lundy Langston.

24 Listing the department and/or persons discriminated

25 against you.  Name of person:  Ronald Griffin.

1  Department:  College of law.  And then it says:  See

2  attached.

3          So let's go to page 1 of the attachment.  And

4  it has an email there from Lundy Langston.  Sent Friday,

5  October 24, 2014, to Pernell, LeRoy, cc:

6  elmira.wright@famu.edu, Rodner Wright, Darryll Jones,

7  Pamela Leonard, Linda Barge-Miles, Carrie Gavin, John

8  Duncan, Lundy Langston, Leland -- Stephanie Leland, and

9  Avery McKnight.  The subject is:  Continued

10 Reprehensible Conduct in COL Promotion and Tenure

11 Meeting by Professor Ron Griffin.  Importance:  High."

12          Does this email refresh your memory about the

13 complaint against Professor Griffin by Professor Lundy

14 Langston?

15     A.    Not really.  This was ten years ago.  I -- I

16 mean, I don't have any reason to doubt that it was

17 filed, but I don't remember details about it.

18     Q.    Okay.  How many complaints of charge for

19 harassment have you -- do you remember in the FAMU

20 College of Law, faculty against faculty?

21     A.    I don't remember how many.

22     Q.    Okay.  So let's go over this one.  I'm going to

23 start with the first paragraph.  It says -- and I'm

24 going to start with the salutation.  "Dean Pernell, This

25 email serves as an official complaint against my

1  colleague, Professor Ron Griffin, for his conduct

2  referring to me and other female colleagues, in a COL

3  Promotion and Tenure Committee meeting" -- and when we

4  say COL, that means college of law -- "as being

5  malicious, evil, racist, and vile."

6  Does that terminology refresh your memory about

7  this complaint?

8  A.  No.

9  Q.  Okay.  So I'm going to read the next paragraph.

10  And I'm going to start from the third sentence where it

11  says "At the Promotion and Tenure -- at the Promotion

12  and Tenure Committee meeting that took place on

13  October 23, 2014, his conduct rises to the level of

14  being, quote, actionable, end quote.  In this meeting

15  while addressing the viewpoints expressed by African

16  American women committee members, he indicated that we

17  were being malicious -- quote, malicious, evil, racist,

18  and vile, end quote.  His statements were so

19  objectionable that one African American woman broke down

20  and began sobbing loudly and asking 'why would you use

21  such language about me?'  Another African American woman

22  stated, quote, I am not going to let you continue your

23  conversation by calling me racist.  What have I done

24  that would allow you to call me racist?  End quote.

25  While this woman spoke, he continued speaking and added

1 the word, quote, vile, end quote.  Two other African

2 American women committee walked out of the meeting.  His

3 comments were in response to committee discussions in

4 which he directed his comments to the people who

5 indicated that the application that was part of the

6 discussion was in the hands of the provost and that the

7 committee had to wait until we received further

8 instruction from the provost."

9         Does that refresh your memory?

10     A.   No, it does not.

11     Q.   Okay.  I think we're going to have to go

12 paragraph by paragraph just to make sure like at least

13 we get that the document states what it states.

14         So this is the complaint by Professor Lundy

15 Langston against Professor Ronald Griffin.  And it's in

16 regards to numbers 1, 2, 3, 4 on page 1.  "Individuals

17 were given notice that applications for promotion and

18 tenure had to be submitted on September 12, 2014, no

19 later than 5:00 p.m."

20         So do you see the connection between this

21 complaint by Professor Langston against Professor

22 Griffin and the Division of Audit and Compliance report

23 on November 18, 2014?

24     A.   No, I don't.

25     Q.   Okay.  I'm going to help you make that

1  connection.  Again, on the allegation in the report on

2  page 1, "Maritza Reyes, a professor at the Florida A&M

3  University College of Law, did not submit her tenure

4  application by the September 12, 2014, 5:00 deadline."

5          I'm going to guide you now to page 1 where it

6  says Disposition.

7      A.   Which document are you talking about?

8      Q.   I'm still in the same document.

9      A.   Same document being?

10     Q.   The same document being the Division of Audit

11  and Compliance Investigation, which is Exhibit 15.

12     A.   Okay.

13     Q.   And on that one I am on what is page 1, marked

14  page 1, but it's really in the document page 4.  Because

15  the prior three pages don't have page numbers on the

16  bottom.

17         So let's look at -- under Disposition on page

18  1, it says Disposition on the left in a heading.  It

19  says "our review disclosed that instructions for tenure

20  are contained in the University Faculty Handbook, the

21  College of Law Faculty Handbook, and in the Provost

22  Schedule.  The FAMU Faculty Handbook states that

23  applications for tenure are to be submitted at the

24  beginning of the faculty employee's sixth tenure-earning

25  year, in accordance with the Tenure and Promotion

1  Schedule provided by the provost."

2          So that's what we have here.  Do you agree that

3  it states that?

4      A.   Do I agree that what?

5      Q.   That it states that?

6      A.   You read the paragraph under Disposition?

7      Q.   Yes.

8      A.   You did read that paragraph.

9      Q.   So we're going to go by that.  So if the

10  schedule posted by the provost includes a date only,

11  September 12, 2014, for example, what is the

12  understanding of that as a deadline?

13      A.   I can't answer that.

14      Q.   Okay.  What is the understanding in academia

15  when -- or in law, when a deadline is stated as a date?

16      A.   There is no set understanding.  It could be end

17  of business, could be end of calendar day.

18      Q.   But if it doesn't state it and there's no rule

19  that interprets it or states how it should be

20  interpreted, if it just goes by a date?

21      A.   As I just indicated, there are several

22  different ways that could apply.

23      Q.   So currently, if somebody is to submit an

24  application through the Interfolio system that the

25  university uses now, and the date on the provost

1  schedule for application is just a date, what time would

2  that be?

3      A.   I can't answer that.

4      Q.   Okay.

5      A.   I'm not responsible for that system.  I wasn't

6  responsible for that system.

7      Q.   I'm going to move on, but I just want to be

8  clear that in your estimation, when a deadline includes

9  just a date without a time, without qualifying by the

10  end of business day, without a rule defining what it is,

11  that you're telling me that you don't know what a date

12  is as a deadline?  In other words, does the date

13  September 12, 2014, include all of the time on

14  September 12, 2014, up to 11:59 p.m.?

15     A.   I can't say for sure whether it does or

16  doesn't.

17     Q.   Okay.  So let's go back to the allegation of

18  late submission.  So let's go back to Exhibit 15.  From

19  what you're seeing here, what would you say is the

20  deadline that was at issue?

21     A.   I don't -- I can't answer that.  I don't

22  understand the question.

23     Q.   What do you think the reference by 5:00 p.m.

24  means?

25     A.   Are you talking about the language that appears

1  on the allegation?

2      Q.    Uh-huh.

3      A.    It says "did not submit her tenure application

4  by September 12, 2014, 5:00 deadline."

5      Q.    Deadline, okay.  And let's go now to page 2.

6  Right at the bottom of page 2, please read the last

7  paragraph there.

8      A.    "Since no official record exists as to the time

9  Professor Reyes' application was received, DAC cannot,

10  with certainty, assert that the completed tenure

11  application was received late.  Therefore, the

12  allegation that Professor Reyes' completed tenure

13  application was submitted late is unsubstantiated."

14      Q.    Okay.  And at the time when this application

15  was submitted, there was no electronic submission

16  available; correct?

17      A.    I don't know.  I don't recall.

18      Q.    Okay.

19      A.    That's probably true, but I don't recall.

20      Q.    Okay.  And do you know if there is now an

21  Interfolio electronic submission available for

22  application?

23      A.    It is my impression that there is.

24      Q.    Okay.  So remember earlier when we were

25  speaking about hiring somebody in the tenure-track and

1  what that meant in terms of when the person applies for

2  tenure?  And I asked you earlier if you knew the term

3  "up or out" when we read the language that the person in

4  the FAMU College of Law has to apply by the sixth year;

5  okay?  If you want me to, I can go back to that

6  language, but do you remember that we talked about that,

7  they have to apply by the sixth year?

8      A.   That is what the standards of the university

9  say.

10     Q.   So somebody who's hired tenure-track and worked

11  for six years to meet the standards and submits an

12  application for tenure, what would happen if that person

13  is denied tenure without a review of the application

14  over an unsubstantiated late submission of a time that

15  doesn't appear in the deadline that the provost stated?

16         MS. REINER:  Objection to form.

17     A.   I did not understand the question.

18         MS. REYES:  I was waiting for that.  I think I

19     was working it out in my mind.

20     Q.   So let me put it in this terms.  If somebody

21  comes in as a tenure-track professor and works for six

22  years to apply for tenure and then their application is

23  deemed late, what happens?

24     A.   I can't answer that question.  I don't know.

25  That's very case specific.

1    Q.    What if the application is not processed and

2    the university -- could the university say there was no

3    application, you didn't meet the six-year deadline?

4    A.    I can't speak for the university on that.

5    Q.    Okay.  So let me give you Exhibit 17.

6          (Exhibit Number 17 was marked for

7    identification.)

8    Q.    Take a look at Exhibit 17, which is a letter

9    from the Law Offices of Cynthia N. Sass, S-a-s-s, dated

10   October 30, 2014 sent to Avery McKnight, Esquire, Vice

11   President and General Counsel, Division of Legal

12   Affairs, Florida A&M University.

13         So this letter is coming from a law office.

14   And I'm going to guide you on page 1.  I'm going to

15   start with the first paragraph.  "Dear Mr. McKnight, I

16   write this letter on behalf of my client, Associate

17   Professor of Law Maritza Reyes.  On March 30, 2009, then

18   Provost Cynthia Hughes Harris made an offer of

19   employment in a tenure-earning position to Professor

20   Reyes.  Professor Reyes accepted the offer.  Under the

21   terms agreed upon, Professor Reyes was required to apply

22   for tenure no later than the beginning of the 2014-2015

23   academic year, which is the beginning of her sixth

24   tenure-earning year."

25         Next paragraph.  "The FAMU Faculty Handbook

1  (University Faculty Handbook) states that applications

2  for tenure are due to be submitted, quote, at the

3  beginning of the faculty employee's sixth tenure-earning

4  year, in accordance with the Tenure and Promotion

5  Schedule provided by the provost, end quote."

6          And it has a footnote to the University Faculty

7  Handbook section.  Continues, "The FAMU College of Law

8  Faculty Handbook (College of Law Faculty Handbook)

9  states:  Quote, submission of materials by the candidate

10  in support of his or her application for promotion

11  and/or tenure must coincide with the university's

12  Schedule for Promotion and Tenure as generated annually

13  from the Provost's Office, end quote."  Footnote to the

14  college of Law Faculty Handbook.

15          Next sentence, "the, quote, 2014-2015 Tenure

16  and Promotion Schedule, end quote, generated by the

17  university states that the deadline for applicants to

18  submit, quote, 25 copies of the Application for Tenure

19  and Promotion and one portfolio, end quote, this

20  academic year is September 12, 2014."  Footnote to

21  online resources, FAMU Faculty Resources.

22          Next, "Professor Reyes complied with the

23  university deadline and delivered her materials on

24  September 12, 2014, in accordance with instructions

25  given to her by Professor John Duncan, the Chair of the

1   College of Law 2014-2015 Retention, Promotion, and

2   Tenure Committee (RPT Committee)."

3        Does that refresh your memory about what was

4   happening more specifically and how even a lawyer was

5   involved, the general counsel was involved, you were

6   copied on an investigation from the Division of Audit

7   and Compliance, you were copied on a letter from this

8   lawyer, you were copied on a complaint filed by a

9   faculty member, Lundy Langston, against another faculty

10  member, Ronald Griffin, somebody whom you had known

11  since Washburn University time and who came to the law

12  school after you became dean?

13        Does this refresh your memory about what was

14  happening at that time with regards to Professor Reyes'

15  application for tenure?

16        MS. REINER:  I'm going to object.  Narrative.

17     And I don't think you've established foundation with

18     respect to this document to the extent that this is

19     not something that was apparently received or

20     directed to Professor Pernell.

21        MS. REYES:  No, I'm going to respond to your

22     objection.

23        MS. REINER:  Okay.

24        MS. REYES:  I am refreshing his memory at this

25     time.  I'm not introducing this into evidence.  I'm

1   using it just to refresh his memory and I'm asking

2   him if it does refresh his memory, coupled with the

3   other things that I have gone over with him that

4   were addressed to him.  He received a copy of the

5   Charge of Discrimination, he received a copy of

6   the -- according to the cc.  So all I'm doing is --

7   and I'll keep bringing some things to see if it

8   refreshes his memory and I'll keep asking him "does

9   it refresh your memory?"

10      MS. REINER:  So "does this document refresh

11   your memory?"  He's already said that those do not.

12      MS. REYES:  I was asking the cumulative at some

13   point.  So as I introduce more documents, I will ask

14   him if this document or even the accumulative of all

15   of them.

16  BY MS. REYES:

17      Q.   So at this point, does this document refresh

18  your memory?

19      A.   Does this document refresh my memory?

20      Q.   Yeah.

21      A.   No, I have no idea.  I've never seen this

22  before.

23      Q.   Okay.  And does the cumulative of the other

24  documents, Exhibit 15 -- well, it started with

25  Exhibit 14, Exhibit 15, Exhibit 16, do they refresh your

1  memory cumulatively?

2      A.   Not necessarily.  They all relate to events

3  that I do not at this point recall the details on and

4  those documents do not necessarily help me recall the

5  details.

6      Q.   Okay.  So let me go back to Exhibit 16, which

7  is the Charge of Discrimination/Harassment by Professor

8  Lundy Langston against Professor Ronald Griffin.  What

9  is Ronald Griffin's race?

10     A.   I believe he is African American.

11     Q.   Okay.  So do you know what happened at the end

12  of the investigation of this complaint?

13     A.   No, I do not.

14     Q.   Okay.

15         (Exhibit Number 18 was marked for

16     identification.)

17     Q.   I'm going to hand you what has been marked as

18  Exhibit 18.  And I'm going to describe it as a letter on

19  Florida Agricultural and Mechanical University

20  letterhead dated June 16, 2015, marked Confidential sent

21  to Professor Ronald Griffin.  On the bottom bottom of

22  that one page, can you please read who's copied?

23     A.   Marcella David, Provost and LeRoy Pernell,

24  Dean.

25     Q.   Okay.  Now I'm going to mark this as

1  Exhibit 19.

2          (Exhibit Number 19 was marked for

3      identification.)

4      Q.   I'm going to describe Exhibit 19.  I'm going to

5  describe it as a letter on Florida Agriculture and

6  Mechanical University letterhead marked confidential

7  dated June 16, 2015.  I'm sorry, Professor Pernell, can

8  I look at 19 for a minute?  I want to see the

9  difference.  This one is addressed to Professor Lundy

10 Langston.  And the one addressed to Professor Lundy

11 Langston, which is now Exhibit 19.  Please go to the

12 bottom and tell me who's copied.

13     A.   Marcella David, Provost, LeRoy Pernell, Dean.

14     Q.   Okay.  So I'm going to read the first paragraph

15 of that letter.  "Dear Professor Langston, The

16 investigation conducted by the Office of Equal

17 Opportunity Programs has revealed that your sex, age,

18 and race discrimination complaint filed against

19 Professor Ronald Griffin is unsubstantiated.  Professor

20 Griffin was found not to be in violation of University

21 Regulation 10.103 Non-Discrimination Policy and

22 Discrimination and Harassment Complaint Procedures."

23          Next paragraph.  "However, because of Professor

24 Griffin's unprofessional behavior at the RPT committee

25 meeting, EOP is recommending he receive a letter of

1   counseling.  Also a copy of the investigative report is

2   being provided.  Based upon the findings, Florida A&M

3   University is dismissing your complaint."

4           Now, let's read the letter addressed to

5   Professor Ronald Griffin, which is Exhibit 18.  And I'm

6   going to read the first paragraph.  "Dear Professor

7   Griffin, the investigation by the Office of Equal

8   Opportunity Programs has revealed that the sex, age, and

9   race discrimination complaint filed against you by

10  Professor Langston is unsubstantiated.  As you are

11  aware, the complaint was filed against you by Professor

12  Lundy Langston.  You were not found to be in violation

13  of University Regulation 10.103, Non-Discrimination

14  Policy and Discrimination and Harassment Complaint

15  Procedures."

16          Next paragraph.  "However, because of your

17  unprofessional behavior at the referenced RPT meeting,

18  EOP is recommending a letter of counseling to be

19  administered by the dean of the college of law.  Also, a

20  copy of the investigative report is being provided."

21          Did you issue a letter of counseling to

22  Professor Griffin?

23      A.   I don't recall.

24          (Exhibit Number 20 was marked for

25      identification.)

1      Q.   I'm going to give you what has been marked as

2   Exhibit 20.  I'm going to describe Exhibit 20.  It's a

3   letter on Florida Agriculture and Mechanical University

4   College of Law letterhead dated June 24, 2015 addressed

5   to Carrie M. Gavin, Director, Equal Opportunity

6   Programs, Florida Agriculture and Mechanical University

7   in Tallahassee, Florida.  Let's go to page 2 of that

8   letter.  Whose signature is on that -- or whose name is

9   under the signature on that letter?

10     A.   It is my name.  LeRoy Pernell.

11     Q.   What title?  In what capacity?

12     A.   Dean and professor of law.

13     Q.   Okay.  And who was cc'd on that letter?

14     A.   Interim Dean-Designee Darryll Jones, and

15  Marcella David, Provost.

16     Q.   And who else?

17     A.   Professor Ronald Griffin.

18     Q.   Okay.  And so in that letter can you please

19  read the first paragraph?

20     A.   "I am in receipt on June 24, 2015, of a report

21  and findings, marked confidential, from the Office of

22  Equal Opportunity Programs pertaining to its

23  investigation of a complaint against Professor Ronald

24  Griffin filed by Professor Lundy Langston.  This report

25  concludes that the complaint alleging a violation of

1  University Regulation 10.103 is unfounded.  The report

2  goes on further to recommend that a letter of counseling

3  as regards unprofessional behavior be administered by

4  the dean of the college of law."

5      Q.   Okay.  Did you administer that letter of

6  counseling?

7      A.   I do not recall.  It's not even clear from here

8  whether the letter of counseling was generated from my

9  office.

10     Q.   In fact, in this letter, you provide an

11  explanation to why you are not issuing the letter of

12  counsel.

13     A.   I provide a statement that "as of July 1st,

14  2015, I will no longer be serving as dean, Interim Dean

15  Jones will begin his decanal tenure at that time because

16  I will be unavailable to have a confidential" --

17     Q.   Unavailable or unable?

18     A.   "I will be unable as dean to have a

19  confidential communication prepared and delivered as

20  recommended prior to that date and further, will be

21  unable to engage in the appropriate follow-up to such a

22  communication prior to that date, I am forwarding the

23  aforementioned report to Interim Dean-Designee Darryll

24  Jones for his consideration of the recommendation and

25  whatever decanal action he might deem appropriate in

1  light of the same."

2     Q.   Okay.  Does this refresh your memory as to what

3  was happening in terms of the complaint against

4  Professor Griffin by Professor Langston?

5     A.   Not other than what the letter states.

6     Q.   Okay.

7          (Exhibit Number 21 was marked for

8     identification.)

9     Q.   I'm going to give you Number 21.  I'm going to

10 describe Exhibit 21 as a memorandum to Dean LeRoy

11 Pernell from Professor Randall S. Abate date

12 February 27, 2015 re:  Concerns Regarding the Review

13 Process and Vote on Professor Maritza Reyes' Tenure

14 Application.  Do you remember this memorandum?

15    A.   I don't remember it.

16    Q.   Does it refresh your memory about what was

17 going on in Professor Reyes' tenure review?

18    A.   Not necessarily.

19    Q.   Okay.  I'm going to go now to the first

20 paragraph, second sentence.  "This memorandum outlines

21 my concerns regarding substantive and procedural defects

22 in the review process and in the vote of Professor

23 Reyes' tenure application."

24          And then I'm going to go to the next paragraph

25 starting with the second sentence.  "Approximately one

1  month prior to the final committee vote, the RPT

2  committee voted 12-4 to prevent Professor Abrams and me

3  from voting on the tenure application of Professor

4  Reyes."  Who is Professor Randy Abate?

5      A.   He was a professor of law at the college of

6  law.

7      Q.   And what is his race?

8      A.   He is white.

9      Q.   And when he says Professor Abrams, who is

10  Professor Abrams?

11      A.   He was professor -- he is a professor of law at

12  the college of law.

13      Q.   Is that Professor Rob -- Robert Abrams?

14      A.   Yes.

15      Q.   And what is his race?

16      A.   He's white.

17      Q.   Okay.  And then I'm going to go to -- go to

18  page 2.  And I'm going to read starting in the middle

19  paragraph.  "One example of substantive harm involved

20  the solicitation of outside reviewers.  I was one -- I

21  was on the outside reviewers subcommittee and was

22  involved in vetting committee-selected reviewers.  After

23  a belabored process of seeking reviewers for two lengthy

24  articles on very short notice, one candidate magically

25  emerged as a willing reviewer.  I was not informed of

1 this candidate in the vetting process. This is not a

2 coincidence because I would not have approved this

3 outside reviewer if I had the opportunity to vet her.

4 More importantly, this, quote, hired gun, end quote,

5 outside reviewer made several unsubstantiated criticisms

6 in her review that sounded personal and unprofessional

7 and not driven by a review of the merits of the

8 scholarship. Not surprisingly, one of the RPT Committee

9 members confirmed during the committee's deliberations

10 that this African American outside reviewer is

11 well-known for being openly critical of leading Lat-Crit

12 Scholars, and two of the scholars she criticized in the

13 past went on to be leading scholars in the field.

14 Again, this is not a coincidence."

15           Okay. And let me go now to -- I'm going to go

16 back to page 1, the first full paragraph, the last two

17 sentences -- actually the last three sentences that

18 begins with "this outcome." "This outcome is

19 irrational, unsupported by the rules, and a dangerous

20 breech of process. Moreover, a committee comprised

21 largely of African American men and woman voted to

22 disenfranchise two white men who supported a Latina

23 candidate. This reality is particularly disturbing at a

24 school that prides itself on its crusade against

25 discrimination."

1     Does this refresh your memory about what was

2  happening with Professor Reyes' tenure process?

3     A.   No.

4     Q.   Okay.  Exhibit 22.

5          (Exhibit Number 22 was marked for

6     identification.)

7     Q.   Let me give you Exhibit 22.  Exhibit 22 is an

8  email from Lundy Langston sent February 19, 2015,

9  1:13 p.m. to LeRoy Pernell, cc:  Marcella David, Carrie

10 Gavin, and Shashi Persaud; subject:  Student email

11 complaints being discussed in RPT Committee.  And so I

12 want to ask you, Professor Pernell, who was Marcella

13 David?

14    A.   She was provost for Florida A&M University.

15    Q.   And who was Carrie Gavin?

16    A.   I believe her position was -- I'm stuck on her

17 exact title, but I think it was a kind of compliance

18 title.  She --

19    Q.   You wrote her a letter; right?

20    A.   -- investigated --

21         MS. REINER:  Please, let him finish his

22    response.

23    Q.   I'm sorry, I wanted to help him.

24    A.   She serves in the role -- she served in the

25 role of overseeing investigation of complaints.

1    Q.   Okay.  Let me take you back to, I think, what

2  has been marked as -- let me take a look at the

3  exhibits, please, Professor Pernell.  Exhibit Number 20.

4  Please take a look at Exhibit Number 20.  Is that a

5  letter you wrote?

6    A.   This appears to be a copy of a letter I wrote,

7  yes.

8    Q.   And you address Carrie Gavin; right?

9    A.   That is correct.

10    Q.   How did you address her?

11    A.   Director of Equal Opportunity Programs.

12    Q.   Okay.  So going back to Exhibit 22, who is

13  Shashi Persaud?

14    A.   He had an administrative position within the

15  law school that among his responsibilities was IT, which

16  would include email system.

17    Q.   Did he have any other responsibilities beyond

18  IT?

19    A.   He had some responsibilities regarding

20  oversight of security issues in the building.

21    Q.   Okay.  And so Lundy Langston's email is

22  addressed to you, and so it states "Dean Pernell, The

23  email below is one of the numerous emails that the COL's

24  promotion and tenure committee has received from

25  Professor Reyes regarding the ongoing tenure evaluation

1  being conducted by the COL's promotion and tenure

2  committee."

3          And then she goes on to say, and I'm going to

4  skip one, two sentences, just to go to where she starts

5  "although."  "Although I am concerned about the

6  allegations raised in the email below, as I am regarding

7  the other emails sent by Professor Reyes, I am seriously

8  concerned about the email below because of the bolded

9  notation, quote, there is no more on this to follow,

10 period, end quote.  I am concerned about what appears to

11 be, at least to me, the threatening nature of the

12 statements.  I really don't know what is meant by,

13 quote, there is more to follow, end quote."

14         And so she attached -- the email that she's

15 referring to is an email that was sent by Reyes, Maritza

16 on February 18, 2015, 3:51 p.m. to RPT committee members

17 and cc:  LeRoy Pernell.  And let's try -- I'm going to

18 try to identify the language that Professor Langston

19 said she found the threatening nature of the statements

20 that there is more on this to follow.  Is that the only

21 language in bolded font in Professor Reyes' email --

22     A.    I don't know.

23     Q.    -- that you see on page 2?

24     A.    I see a number of points that are bolded on

25 page 2.

1    Q.   Okay.  And so let's go to page 3, is there also

2  more bolded language?

3    A.   Yes, there is.

4    Q.   So on that last paragraph, Professor Reyes

5  stated -- the last full paragraph that begins with "the

6  fact."  "The fact that a student, parentheses, or

7  students, end parentheses, knew that the, quote,

8  complaint, end quote, emails were going to be discussed

9  in the RPT Committee, parentheses, even before some of

10  the members knew, parentheses, shows the bad faith

11  behind this newest ploy.  There will be more on this to

12  follow.  The RPT Committee has opened the door for my

13  response once again, parentheses, more on this to

14  follow, end parentheses, period.  The RPT Committee is

15  now enabling students to target me and slander my

16  credentials and professional reputation, parentheses,

17  more on this to follow, parentheses, period.  The tenure

18  process is not supposed to be a slander fest."

19         Next paragraph.  "How low is the RPT Committee

20  going to go in my tenure process?  Every time I think it

21  has hit bottom, I am a shocked by the next ploy, which I

22  am never notified about by the RPT Committee or the

23  dean."

24         Did you notify Professor Reyes of the

25  allegation that Professor Langston made about the,

1  quote, there's more to come that Professor Reyes

2  included in this email being somehow a threatened nature

3  statement?

4       A.   I'm not sure I understand that question.  But

5  let me just say I do not recall this email or responses

6  to it.

7       Q.   Okay.

8       A.   Things could or could not have happened.  I

9  don't recall.  This was some time ago.

10      Q.   Okay.  This will be Exhibit 23.

11           (Exhibit Number 23 was marked for

12      identification.)

13      Q.   I'm going to give you Exhibit 23 and I'm going

14  to describe these as a composite of emails of one, two,

15  three, four, five pages.  Take a minute, please, to look

16  at them.

17           And I'm going to describe Exhibit 23 as at the

18  top on page 1 an email marked from Shashi Persaud to

19  Reyes, Maritza and Green, Reginald; cc: Pernell, LeRoy;

20  subject:  Re: Status Request Re: Incident with

21  Ms. Polite on February 9, 2015.  And there's an

22  attachment described as IT Security Cam 2-9-15.mp4.

23           Do you remember anything about an incident that

24  could be described as an incident with Ms. Polite

25  involving some kind of IT security camera video?

1    A.   I do recall an incident involving Ms. Polite

2  and I think that there was a camera video that was part

3  of the investigation then.

4    Q.   And when you say the investigation, first of

5  all, in the "to" line there is Reginald Green.  Who is

6  Reginald Green?

7    A.   The associate dean for administration.

8    Q.   Okay.  And so when you say that there was an

9  investigation.  Who conducted that investigation?

10    A.   Well, since the allegation was of, in essence,

11  criminal conduct, the investigation was conducted

12  internally in the security and ultimately referred to

13  law enforcement to review, as well.

14    Q.   Okay.  And who made the complaint?

15    A.   The initial complaint was made by Maritza

16  Reyes.

17    Q.   Okay.  So let's go to the initial complaint.

18  Let's start on page 3 at the bottom -- well, actually,

19  on page 4, right at the top.  It says "on February 10,

20  2015, at 9:49 a.m., Reyes Maritza,

21  maritza.reyes@famu.edu wrote:

22         "Good morning Mr. Persaud, by way of reminder,

23  below is an email I sent to you in January 2012 advising

24  you of a situation when Ms. Polite was very rude to me

25  when students were present in the room and could

1  overhear her rudeness towards me.

2         There had been other instances where Ms. Polite

3  had been rude to me before then when I sought IT

4  services, but I did not report them.  The incident in

5  January 2012 was so egregious that I decided to report

6  it.  After that, to avoid further problems, I avoided

7  interacting with Ms. Polite when I need assistance with

8  IT issues or with other work assigned to Ms. Polite.  I

9  ask my program assistant to make any requests that have

10 to be run by Ms. Polite or I contact Mr. Mujica directly

11 when I need IT services.

12        I reported the incident to you yesterday

13 because now it became an issue of physical contact when

14 I am walking in work areas where I need to walk.  The

15 bump on my left shoulder that she gave me as we passed

16 by each other did not feel like an accidental bump, it

17 felt like an intentional bump.  This is beyond

18 unprofessional.

19        Please preserve the video of yesterday's

20 activity in the office space right outside your office.

21 I want to see it."

22        Did you see that video, Professor Pernell?

23    A.   No, I've never seen the video.

24    Q.   Okay.  But you know that you considered this

25 for reporting if -- you made a decision that it was

1 raising criminal conduct you said?  Is that what you

2 said?

3     A.   That's what was alleged in the complaint.

4     Q.   Did you talk to Professor Reyes about it?

5     A.   Do you want me to answer it?

6     Q.   Yes.  Go ahead, please.

7     A.   The complaint alleges that this individual,

8 Ms. Polite, intentionally bumped into someone and that

9 would constitute a battery and therefore was

10 investigated as such.

11     Q.   Are you done?

12     A.   Yes.

13     Q.   Who is Erica Polite?

14     A.   She had an administrative position within IT, I

15 believe.

16     Q.   Okay.  And so that would have been under the

17 supervision of -- you said Shashi Persaud was in charge

18 of IT?

19     A.   Yes.

20     Q.   So if Professor Reyes reported to Shashi

21 Persaud, her supervisor, could she have been reporting

22 it as an employment matter and not a criminal matter?

23     A.   I have no idea.

24     Q.   Did you speak with Professor Reyes about the

25 incident?

1    A.    I received the report an incident happened and

2  there had been a complaint about this, in essence a

3  battery, and I asked it be investigated to determine if

4  that had occurred.

5    Q.    Did you speak with Professor Reyes about the

6  incident?

7    A.    I was not investigating on that, so I referred

8  it to people whose expertise is in investigation.

9    Q.    Did you speak with Professor Reyes about the

10  incident?

11    A.    I think I just answered it.

12    Q.    Actually, sir, this is a yes or no question.

13  Did you speak with Professor Reyes about the incident?

14    A.    I did not.  I referred the matter for

15  investigation.

16    Q.    Okay.  Thank you for the answer.

17        (Exhibit Number 24 was marked for

18    identification.)

19    Q.    I'm going to give you Exhibit 24.  And I'm

20  going to describe Exhibit 24 as an email from Persaud,

21  Shashi sent Thursday, April 9, 2015, 10:05 a.m. to

22  Pernell, LeRoy.  Subject:  Incident review.

23        And it's a two-page document, although the

24  second page only has "thank you."  So let's concentrate

25  on page 1.  It begins with an email from Shashi Persaud

1 to Terence Calloway on March 30, 2015 at 3:47 p.m., with

2 a cc to Reginald Green.  The subject is Incident Review.

3 Who is Terence Calloway, Professor Pernell?

4      A.   I am not sure.  I believe he headed -- he had a

5 law enforcement position with the university.

6      Q.   Okay.

7      A.   Security police.

8      Q.   Maybe that explains the salutation "chief."  So

9 let me read that.  "Chief, if you get a moment, I have a

10 faculty member, parentheses, Professor Maritza Reyes,

11 end parentheses, who is alleging an incident took place

12 between herself and another employee, parentheses, Erica

13 Polite, end parentheses.  Specifically she states the

14 employee purposely pushed her as they were passing.  Can

15 you please independently review the attached video and

16 let us know what your unbiased assessment would be."

17          And the second page is just that "thank you"

18 that I said was there.

19      A.   Uh-huh.  Yes.

20      Q.   And unbiased assessment would be -- is really

21 the last part of that email.  So after that we have a

22 response from Terence Calloway on March 30, 2015, at

23 4:13 p.m. to Shashi Persaud and this is what he

24 responds.  "Does Professor Reyes wish to make a police

25 report?  Would she like to pursue battery charges or

1    does she want it handled inhouse?"

2        A.   I don't know what you're referring to.  I don't

3    have that.

4            MS. REYES:  It's right there on page 1.

5            MS. REINER:  It's right here.  Very tiny

6        writing.

7        A.   Oh.

8        Q.   Do you want me to read it again?

9        A.   No, that's all right.

10       Q.   After that Shashi Persaud responds on March 30,

11   2015, at 4:25 p.m. to Mr. Calloway, "She is awaiting a

12   review inhouse and has not asked for a police report,

13   parentheses, yet, end parentheses, period.  Dean Pernell

14   has asked me to send the video to you for your opinion

15   given how vehement this professor has been in the past.

16   I do not believe there was anything intentionally done

17   here or any malice whatsoever."  This is what Shashi

18   Persaud is saying to Chief Calloway after he told him

19   that he wants an unbiased assessment.

20           So in response to that email.  Chief Calloway

21   states to Persaud, Shashi, with copy now to Reginald

22   Green.  "Shashi, we have reviewed the video and based on

23   our opinion, the suspect moved to the right to avoid

24   contact with Professor Reyes.  We have generated a

25   report number and will make contact with both parties.

1   Can you please provide phone numbers for Professor

2   Reyes."

3           MS. REINER:  Is there a question regarding this

4       other exhibit?

5           MS. REYES:  Not yet.

6           (Exhibit Number 25 was marked for

7       identification.)

8       Q.   I'm going to give you what has been marked as

9   Exhibit 25.  So I'm going to describe Exhibit 25 as a

10  document of eight pages.  It's a compilation of emails

11  starting at the top on page 1 from Shashi Persaud to

12  Reginald Green and LeRoy Pernell.  And he states, and

13  I'm going to read, and I just want to know, are you

14  following?  Do you know where I am, Professor Pernell?

15      A.   I believe I do.

16      Q.   Okay.  "Professor Reyes's behavior seems

17  passive, but it is deeply disturbing.  There are a

18  growing number of incidents with the university where

19  she is rationalizing a perceived wrong or threat that

20  does not exist.  In addition to escalating verbiage, I

21  see many warning signs that leave me cause for concern.

22  This patterned and repetitive feeling that she is being

23  persecuted can evolve into aggression if it is not given

24  adequate attention.  We will do everything we can to

25  mitigate any incident, but I do strongly recommend that

1  employee relations be involved, as security is not

2  equipped or trained to handle this situation

3  appropriately."

4          Do you recall getting that email, Mr. Pernell?

5      A.   No, I don't recall getting this one.

6      Q.   Now that you're reading it, as dean, if you got

7  this email, would it raise any concerns in your mind?

8      A.   Not necessarily.

9      Q.   Somebody saying that a faculty member is

10 causing concern about something that could evolve into

11 aggression that requires adequate attention, that would

12 not raise any concerns for you?

13     A.   That was one person's view.  I did not view it

14 as necessarily a matter of concern.

15     Q.   Did you speak with Professor Reyes about this?

16     A.   I did not.

17     Q.   Okay.  So I'm going to go to the email

18 underneath, which is from Professor Reyes to -- and by

19 the way, Professor Reyes is not copied in that email

20 from Shashi Persaud; right?

21     A.   I don't see who the -- what copies --

22     Q.   At the top where it says to.

23     A.   But it doesn't indicate whether copies were

24 sent or not.

25     Q.   Well, it would say cc like the one on the

1  bottom, which I'm going to go over next.  Is there a cc

2  line in that email?

3      A.    No, there is not.

4      Q.    Okay.  So there is only a to line; right?

5      A.    There is no cc line.

6      Q.    Okay.  So there's only a to line; correct?

7      A.    Well, there's a to, from, sent, and subject.

8      Q.    Okay.  So we have a to line that says to

9  Reginald Green and LeRoy Pernell; correct?

10     A.    That is what it says, yes.

11     Q.    Okay.  So do you see Professor Maritza Reyes

12  anywhere in the from, sent, to, or subject?

13     A.    No.

14     Q.    Okay.  So let's go to underneath that one.

15  There's the email from Professor Reyes, Maritza, sent on

16  Wednesday, 4/15/2015 at 3:23 p.m. to Reginald Green, cc:

17  LeRoy Pernell and Shashi Persaud.  And I'm going to read

18  and I'm going to ask you to follow because at the end

19  I'm going to ask you if what I read is what is stated in

20  this email.  And I may not read the whole thing, but I

21  may go through one paragraph or two at a time.

22          "Associate Dean Green, Thank you for your

23  response.  I do not understand why I was not notified

24  that this matter had been sent to Tallahassee University

25  police for handling, especially because I requested a

1  status from you on several occasions.  Moreover,

2  Tallahassee University police never contacted me."

3       Next paragraph.  "I requested an investigation

4  by Ms. Polite's direct supervisor, Mr. Persaud.  He

5  chose to submit the matter to you and you assured me

6  that you would be in contact with me, but you never

7  contacted me.  Dean Pernell never contacted me either."

8       Next paragraph.  "University Sergeant Folson's

9  phone message was a conclusion determining that no

10  criminal charges would be filed.  Therefore, he

11  conducted a criminal investigation.  It was very telling

12  that he conducted an, quote, investigation, end quote,

13  and reached a conclusion without ever contacting me."

14       Next paragraph.  "The investigation that I

15  requested was an employment investigation.  Are you

16  going to conduct that investigation?  If you notice in

17  the email thread below, I sent an email to Mr. Persaud

18  reporting an incident when Ms. Polite was extremely rude

19  to me on the phone, parentheses, in the presence of

20  students, end parentheses, in January 2012.  No one

21  contacted me after that to discuss the matter or come up

22  with a plan of action as to how to handle it."

23       Next paragraph.  "The recent push incident was

24  yet another incident.  I have a right to be free from

25  hostilities while I perform my job duties.  I reported

1  this latest incident because the situation had now

2  escalated into physical contact.  Are you now telling me

3  that the only way to address these situations is if the

4  university police in Tallahassee make a determination as

5  to whether criminal charges can be filed, question mark.

6  In other words, only behavior that rises to the level of

7  criminal behavior gets investigated and acted on, end

8  quote."

9         Next paragraph.  "If I wanted a criminal

10 investigation, I would have contacted the Orlando Police

11 Department, which is the police department that has

12 jurisdiction because the incident happened here in

13 Orlando.  Again, I ask for a FAMU employment

14 investigation."

15        Next paragraph.  "How did the FAMU College of

16 Law handle the situation when Ms. Wanda Aviles was

17 almost physically accosted right outside of Dean

18 Pernell's office?  My recollection is that changes were

19 immediately made and Ms. Aviles was removed from her job

20 in the dean's suite, even though she did not start the

21 situation."

22        Next and last paragraph.  "Please let me know

23 what steps you, parentheses, and/or Dean Pernell,

24 parentheses, plan to take to make sure that the staff

25 gets the message that I must be treated as other

1  professors, without any hostilities.  This is a

2  professional environment.  All employees must understand

3  that the treatment that professors receive must not be

4  based on whether they, quote, like, end quote, or,

5  quote, do not like, end quote, a particular person or

6  whether a, quote, clique, end quote, likes or does not

7  like a particular person.  There must be no disparate

8  treatment."

9          Is that, what I just read, what the email

10  states?

11      A.   You just read the email.

12      Q.   Okay.  Did you ever talk with Professor Reyes

13  about her email, the one that I just read?

14      A.   I think I already indicated I did not talk to

15  Professor Reyes.

16      Q.   Well, that was about a prior email.  I'm

17  talking about this one right here where she specifically

18  asked for a plan from either Green, Reginald Green,

19  and/or Dean Pernell?

20      A.   I did not speak to Professor Reyes.

21      Q.   Okay.  Did Professor Reyes receive a copy of

22  the video?

23      A.   I don't know.

24      Q.   Please take a look at Exhibit 23.

25      A.   Okay.

1    Q.   Right at the top is an email from Persaud

2  Shashi to Reyes, Maritza, Reginald Green, with cc to

3  Pernell, LeRoy.  Please read what that email says.

4    A.   "I write to request a status" --

5    Q.   I'm sorry, no.  Let me see what the number is.

6  What's the number?

7    A.   You said 23.

8    Q.   Yes.  So read the one -- the email right at the

9  top.  So this is the email right here from Shashi

10  Persaud right at the top that starts with "Professor

11  Reyes."

12    A.   "Professor Reyes, as per instruction by Dean

13  Green, I have attached the requested video."

14    Q.   Okay.

15         (Exhibit Number 26 was marked for

16    identification.)

17    Q.   I'm going to give you what has been marked as

18  Exhibit 26.  And that's an email, one-page document

19  email, from Shashi Persaud sent April 17, 2015, at

20  8:27 a.m. to Drew Holcombe; cc:  Adrienne Snyder;

21  Subject:  Confidential; Attachments:  Langston

22  Complaint, Taite Complaint, Erica Complaint.  Because

23  you are not copied on this email, I'm just going to go

24  ahead and read it.  And by the way, who is Drew

25  Holcombe?

1    A.   I'm not sure what his exact title was.

2    Q.   Where does he work?

3    A.   In Tallahassee.

4    Q.   Okay.  And who is Adrienne Snyder?

5    A.   I believe at that time, 2015, she was basically

6  dealing with HR issues.

7    Q.   And where is she?  In Tallahassee?

8    A.   In the college of law.

9    Q.   In the college of law in Orlando?

10    A.   Yes.

11    Q.   So in this email Mr. Persaud says, "Good

12  morning Mr. Holcombe, I would like to bring an employee

13  safety concern to your attention regarding consistent

14  complaints against law professor Maritza Reyes.  The

15  safety and security of the law school is my

16  responsibility and I have noted a number of cases from

17  different employees that show a pattern of harassment

18  from Professor Reyes.  It [sic] totality, this has me

19  very concerned.  I have attached three specific

20  complaints, and most recently received an additional

21  verbal complaint from Professor Pat Broussard stating

22  that Professor Reyes harassed her during a faculty

23  meeting.

24        My own safety concerns for the college of law

25  are thus.  Professor Reyes's behavior seems passive, but

1  it is deeply disturbing.  There are a growing number of

2  incidents with the University where she is rationalizing

3  a perceived wrong or threat that does not exist.  In

4  addition to escalating verbiage, I see many warning

5  signs that leave me cause for concern.  She has

6  demonstrated an obsessive compulsion beyond reasonable

7  reaction that indicates there could be an escalation of

8  her behavior to impulsive physical aggression if this is

9  not given adequate attention.  There are enough

10  complaints where I think counseling, mediation, or some

11  kind of EAP evaluation would be warranted; however, I am

12  open to your professional opinion."

13          Professor Pernell, did you ever hear of this?

14      A.    Hear of this email?

15      Q.    This particular email, yes.

16      A.    No.

17      Q.    And did you speak with Shashi Persaud about all

18  of these concerns?

19      A.    I don't recall that I talked with him about all

20  of these.

21      Q.    Have you ever spoken with Professor Reyes about

22  any of such concerns?

23      A.    No, I don't believe I have.

24      Q.    Was Professor Reyes ever made aware that all

25  these concerns were being raised about her?

1    A.   I have no way of answering it.

2    Q.   Did you make her aware?

3    A.   I told you I never spoke to her.

4    Q.   Okay.  So you never made her aware of that,

5    okay.  So let me go ahead --

6         MS. REINER:  Objection.  Misstates what he just

7    said.

8         MS. REYES:  Let me restate the question then.

9    Q.   Have you ever made Professor Reyes aware of all

10   these discussions that were happening in this email, for

11   example?

12   A.   As I indicated I have never had a conversation

13   with her about matters raised in this email.

14   Q.   Okay.  And to backtrack to the Erica Polite

15   incident, why did you refer the matter to Tallahassee

16   police and not Orlando police?

17   A.   Tallahassee police oversees security for the

18   college of law.

19   Q.   Do they have jurisdiction in the college of law

20   for criminal incidents?

21   A.   Yes, they do.

22   Q.   So if there is a criminal incident today, for

23   example if a student gets attacked in the law school,

24   who would they call?

25   A.   That's a different question.

1    Q.    Uh-huh.

2    A.    Now, they might call -- there are any number of

3  avenues open to a student who would be attacked,

4  including the FAMU police, the Orlando police, or

5  internal security.

6    Q.    How does FAMU police have jurisdiction in

7  Orlando?

8    A.    The college of law is part of the Florida A&M

9  University.

10    Q.    Are you aware of any time where Associate Dean

11  Reginald Green has told students that FAMU police have

12  no jurisdiction in Orlando?

13    A.    I am not familiar with any of those

14  conversations from him.

15    Q.    Okay.  And when students have been attacked or

16  had incidents in the law school, has FAMU police come to

17  do police reports?

18    A.    I have no way of knowing that.

19    Q.    Okay.

20          (Exhibit Number 27 was marked for

21    identification.)

22    Q.    I'm going to give you Exhibit 27.  And I'm

23  going to describe this exhibit.  The document is three

24  pages from Avery McKnight to Carrie Gavin; cc:  Drew

25  Holcombe, Shashi Persaud, Marcella David, LeRoy Pernell,

1  Donald Palm, Joyce Ingram, William Hudson, Terence

2  Calloway, Bryan Smith, Stephanie Leland.  And again,

3  it's marked confidential.  Are you familiar with this

4  email?

5      A.   I don't recall.  I haven't seen it before.

6      Q.   But you were copied in the email?

7      A.   Yes, that's what the cc indicates.

8      Q.   Okay.  Do you want me to go over the email or

9  is it okay if I just describe it?

10     A.   That's up to you.

11     Q.   Okay.  In terms of -- because I'm going to ask

12 you if my description is accurate.  This seems to be

13 more of the same type of communication that Shashi

14 Persaud had sent on April 17th to Drew Holcombe about

15 Professor Reyes.  And so I'm just going to take not the

16 entire email, but I'm going to start from page 3, which

17 seems like the same type of language that he used in the

18 email that he sent before raising concerns about

19 Professor Reyes.  And on page 2, at the bottom, he,

20 again, raises that Professor Pat Broussard stated that

21 Professor Reyes harassed her during a faculty meeting.

22          Do you recall being present during a faculty

23 meeting when Professor Reyes allegedly harassed

24 Professor Broussard?

25     A.   No, I do not.

1    Q.    If you were to see a video of such a meeting

2  where you were present and there was interaction between

3  Professor Broussard and Professor Reyes -- let me

4  rephrase that.  If you had been present in a meeting

5  where Professor Reyes and Professor Broussard interacted

6  and there had been harassing behavior, would you have

7  noticed it?

8    A.    I have no way of being able to answer that.

9    Q.    As dean, would you have noticed such behavior?

10    A.    Being dean or not being dean has nothing to do

11  with it.  There's no way for me to answer it.

12    Q.    Okay.  That's an answer.  I will take your

13  answer.  Who is Phyllis Taite?

14    A.    A professor -- she was a professor of law at

15  the Florida Agriculture and Mechanical University

16  College of Law.

17         (Exhibit Number 28 was marked for

18    identification.)

19    Q.    Okay.  I'm going to give you what has been

20  marked as Exhibit 28.  This is two pages and it's a

21  memorandum on Florida Agricultural and Mechanical

22  University College of law letterhead dated August 15,

23  2014, to Dean LeRoy Pernell from Phyllis Taite.

24  Subject:  Request for Assistance.

25         Do you remember this memorandum?

1     A.   I don't recall the specifics of it.  I do
2  recall that I received a memorandum on this topic.
3     Q.   Okay.  So let me just, at the beginning of that
4  memorandum, read, "I am reporting behavior that I
5  consider harassing and unacceptable towards me.
6  Attached, please find a copy of a series of emails I
7  have received from Professor Maritza Reyes.  In these
8  email series you will find that I have made repeated
9  requests that she stop sending me offensive,
10  inflammatory, and accusatory comments.  With each
11  request she has escalated her response.  These emails
12  are not professional in nature, nor do they serve any
13  other purpose than to harass the recipient.  This is why
14  I am seeking further action."
15       Once you received that notice of harassing
16  behavior, Dean Pernell, did you speak with Professor
17  Reyes?
18     A.   No, I did not.  I referred this matter to the
19  provost's office.
20     Q.   And do you know if anybody spoke with Professor
21  Reyes?
22     A.   No, I do not.
23     Q.   Okay.  And the timing of this is August 15,
24  2014 -- by the way, the emails are not attached to this
25  memorandum, so we cannot review what the emails state.

1  Before we established that Professor Reyes applied for

2  tenure in the Fall 2014.  And would August 15, 2014, be

3  within that time of Fall 2014?

4      A.   Yes.

5      Q.   In the academic year?

6      A.   In the law school academic year, that probably

7  would be considered Fall.

8      Q.   Okay.  So let me take you to page 2.  And let

9  me go to paragraph 3 that begins "thus far."  "Thus far

10 I have taken steps to avoid Professor Reyes in person

11 because I have some concern for my safety when I stop

12 replying (which I've already done) or when she finds out

13 about my complaint.  I print to other printers because

14 the closest printer to my office is also the closest to

15 hers.  I now walk the longer path to the female restroom

16 because the shortest path is also the path she would

17 likely take.  Finally, I keep my office door closed

18 because I don't want to be surprised by her presence.  I

19 believe I have done all that I can reasonably be

20 expected to do under the circumstances."

21         When you read that, did that raise concerns for

22 you?

23     A.   It raised significant enough concerns I

24 referred this matter to the provost's office since it

25 would involve potentially personnel action.

1    Q.   And when you say personnel action, would there
2 be personnel action against a professor making a false
3 claim of this type, also?
4    A.   I suppose it could be.
5    Q.   Okay.  And under, you know, the due process,
6 because this is an allegation -- Professor Taite did not
7 copy Professor Reyes, did she, in this memo?
8    A.   Not that I know of.
9    Q.   Okay.  And so Professor Reyes would not have
10 known anything about what Professor Taite was stating in
11 this memo?
12   A.   I can't answer that.
13   Q.   Okay.  You said that you found it a serious
14 concern?
15   A.   Yes.
16   Q.   Did you follow up as to what happened after you
17 submitted it to the university?
18   A.   I heard nothing further from the university
19 about it.
20   Q.   So my question again, did you follow up?
21   A.   I heard nothing further from them.  I didn't
22 make any specific inquiries of them, but I waited their
23 response and I did not get a response.
24   Q.   Okay.  What is the number on this one,
25 Professor Pernell?

1        A.    It is 28.

2              (Exhibit Number 29 was marked for

3        identification.)

4        Q.    I'm going to give you what has been marked as

5   Exhibit 29.  It's a one-page document with two emails.

6   It's from -- well, the first email, which is on the

7   bottom, is from Carrie Gavin sent March 10, 2016, to

8   LeRoy Pernell.  Subject: COL complaints.  Importance is

9   high.  Do you remember this email, Professor Pernell?

10       A.    I don't recall this specific email.

11       Q.    Okay.  So let me just read what Carrie Gavin

12  stated.  "Good morning Dean Pernell, The FAMU Office of

13  Equal Opportunity Programs is currently investigating

14  several complaints involving employees at the FAMU

15  College of Law.  In order to ensure a thorough

16  investigation, please answer the following questions:

17            During your tenure as dean of the FAMU College

18  of Law, did you ever have to counsel or discipline

19  Professor Patricia Broussard, Professor Maritza Reyes

20  and/or Mr. Shashi Persaud, question mark.  If so, please

21  explain the circumstances.  Three, if you are not the

22  supervisor of Broussard, Reyes or Persaud, please tell

23  me who was."

24            Were you the supervisor of Patricia Broussard,

25  as dean of the college of law?

1    A.   I don't know if I would describe it as a

2  supervisory relationship.  But I was the dean, she was a

3  faculty member.

4    Q.   Okay.  And was Professor Maritza Reyes a

5  faculty member?

6    A.   Yes.

7    Q.   And what about Shashi Persaud?

8    A.   He was not a faculty member.

9    Q.   Okay.  Were you his supervisor?

10    A.   Not his immediate supervisor.

11    Q.   Okay.  Who was his immediate supervisor?

12    A.   It would have been Reginald Green.

13    Q.   And who was Reginald Green's immediate

14  supervisor?

15    A.   It would have been me.

16    Q.   Okay.  And then what was your response?  Please

17  read your response, Professor Pernell, that you sent on

18  March 14, 2016, at 10:53 a.m.

19    A.   "Any personnel disciplinary action taken by me

20  is documented in the personnel file.  I do not currently

21  recall any personnel disciplinary action taken by me as

22  dean as to the named individuals.  Any formal complaints

23  regarding the individuals mentioned were forwarded as

24  per protocol to the academic affairs.  I cannot answer

25  your question as to counsel in that request -- in that

1 the request is vague and I am unable to discern its

2 meaning or intent."

3     Q.  Are you familiar with -- in your role as dean,

4 are you familiar with the FAMU Regulation that specifies

5 the types of disciplinary actions to which tenured

6 faculty members can be subjected?

7     A.  No, I'm not.

8     Q.  Are you aware that a letter of counseling is

9 not disciplinary action under the regulations?

10     A.  I just said I'm not familiar with it.

11     Q.  Okay.  I'm just going to ask specifically to

12 get it on the record.  Are you aware that there is such

13 a disciplinary action as a letter of reprimand?

14     A.  I think I've already answered your question,

15 I'm not familiar with the disciplinary actions that are

16 contained in what you refer to.

17     Q.  Besides the regulations and besides of them

18 being contained on, in your knowledge as dean, have you

19 ever had to discipline a faculty member, a tenure

20 faculty member?

21     A.  At the college of law, no, I have not.

22     Q.  Okay.

23         (Exhibit Number 30 was marked for

24     identification.)

25     Q.  I'm going to give you Exhibit 30.  I'm going to

1 describe Exhibit 30 as a document of two pages of

2 emails. And I'm going to go to page 1 and describe it

3 as from Reyes, Maritza, date, October 15, 2015, at

4 1:29 p.m. to LeRoy Pernell, cc'd to several faculty

5 members which were the RPT Committee Members. Subject:

6 Request for protection for program assistance and staff.

7 I'm going to read some parts of it, not all of it.

8          On the second paragraph, "in light of Associate

9 Dean Bullock's and Chair Duncan's conduct, I write to

10 request, in addition to what I request in the attached

11 memo, that Associate Dean Bullock and Chair Duncan be

12 instructed that they must stop harassing and

13 manipulating program assistants or any other members of

14 staff in their efforts to create support for their

15 allegations against me. They should also not retaliate

16 against program assistants or other members of staff who

17 refuse to go along with their efforts to try to create

18 support for their allegations against me."

19          Now, do you know what conduct Professor Reyes

20 is referring to?

21     A.   No, I do not.

22     Q.   And who is Bullock?

23     A.   She was associate dean.

24     Q.   And her full name was?

25     A.   Joan Bullock.

1      Q.    Joan Bullock.  And Duncan, Chair Duncan, what

2    is his full name?

3      A.    John.

4      Q.    Okay.  I'm going to, because I want to put in

5    context the conduct.  On the first paragraph, which I'm

6    addressing to "Good afternoon Dean Pernell, yesterday

7    evening I circulated the attached memorandum to the

8    members of the RPT Committee.  I stopped by your office

9    to see you yesterday afternoon, among other things

10   because I wanted to confer with you about it before

11   sending it; however, you were busy with the visit of

12   President Magnum and her team.  Because time is of the

13   essence, I decided that I should not wait any longer

14   before apprising the RPT Committee of the situation that

15   has developed after Associate Dean Bullock took her

16   allegation of timeliness to the provost, and Chair

17   Duncan refused to provide information to me, but

18   provided it to the provost without getting my side of

19   the facts.  Going outside of the process and interfering

20   with the process is very serious."

21           Did you do anything about the request that

22   Professor Reyes made here to protect the program

23   assistants?

24      A.    There are no details here that would have

25   caused me to do anything with this.

1      Q.    Did you speak with Professor Reyes to get the

2   details?

3      A.    No, I did not.

4           (Exhibit Number 31 was marked for

5      identification.)

6      Q.    I'm going to give you what has been marked as

7   Exhibit 31.  And I'm going to describe this exhibit as a

8   document of eight pages starting with a letter on

9   letterhead of Florida Agricultural and Mechanical

10   University dated January 11, 2016, addressed to Elmira

11   Mangum, President, signed Richard Givens, copied to, and

12   I'm going to read the copy to:  Board of Trustees;

13   Marcella David, Provost, Academic Affairs; Angela

14   Felecia Epps, Dean, College of Law; Darryll Jones,

15   Professor, Interim Dean, College of Law; Joan Bullock,

16   Associate Dean, College of Law; Celia Westbrook, Faculty

17   Program Assistant; Deidre Melton, Internatal

18   Auditor/Investigator.

19           Who is Celia Westbrook, Professor Pernell?

20      A.    I believe she was a program assistant.

21      Q.    Okay.  Did she assist Professor Reyes?

22      A.    I do not know.

23      Q.    Okay.  Let's go to page 1 in the report, which

24   would be really page 4, but it's numbered page 1 at the

25   bottom.  And I'm going to read in the background.  "On

1 October 30, 2014, the Division of Audit and Compliance

2 opened Investigation Case Number FAMU-14-10-0001 upon

3 request from Rodner Wright, Interim Provost, and Vice

4 President for Academic Affairs.  This investigation

5 involved the tenure application process of Professor

6 Maritza Reyes.  During the course of this investigation,

7 program assistant Celia Westbrook participated in the

8 investigation by providing pertinent information through

9 the interview process.  The case was closed and the

10 report released on November 18, 2014.  Due to

11 Ms. Westbrook's participation in this investigation, she

12 is protected from retaliation.

13         On August 12, 2015" -- that's in the next

14 paragraph -- "the Division of Audit and Compliance

15 opened Investigation Case Number FAMU 15-08-0004.  This

16 investigation is to review Ms. Westbrook's allegation of

17 retaliation as a result of her cooperation in the

18 Division of Audit and Compliance Investigation."

19         And I'm not going to read the case number

20 because we already went over that.  The next line is

21 "Ms. Westbrook contends that Associate Dean Joan

22 Bullock, her direct supervisor, retaliated against her

23 by giving her a performance evaluation score 33 points

24 lower than the previous year's evaluation score."

25         And then the next paragraph.  "Ms. Westbrook is

1  one of four faculty program assistants at the Florida

2  Agricultural and Mechanical University College of Law."

3        Is what I just read what is stated on the parts

4  that I read, Professor Pernell?

5     A.   You've read paragraphs from this document.

6     Q.   Okay.  So now I'm going to go to page 2 under

7  Allegation.  And under Allegation there are two

8  paragraphs that are numbered.  So number one, I'm going

9  to read -- well, I'm going to go to the sentence right

10  before that that describes what's going to happen in

11  those two numbers.

12        "Ms. Westbrook believes she was retaliated

13  against as a result of the following two events related

14  to DAC Investigation Case Number FAMU-14-10-0011."

15        Number 1, "Associate Dean Joan Bullock made an

16  allegation to the Retention, Promotion, and Tenure (RPT)

17  Committee that Professor Reyes had not submitted her

18  application on September 12, 2014, by the 5:00 p.m.

19  deadline.  As a result, Professor John Duncan and

20  Associate Dean Joan Bullock questioned Celia Westbrook

21  regarding the events of September 12" -- and I believe

22  there is a typo there because it says 2015, but in the

23  prior reference it's 2014 -- "and requested she write a

24  written statement regarding these events.  Ms. Westbrook

25  declined the request to submit a written statement."

1          Number 2, "Ms. Westbrook believes that

2     Associate Dean Bullock may have found out about an

3     incident that Professor Reyes disclosed to the Division

4     of Audit and Compliance investigator during her

5     interview about Dean Bullock's allegation against

6     Professor Reyes.  The incident referred to involves

7     Associate Dean Bullock taking and copying one of

8     Professor Reyes' class sign-in sheets off of

9     Ms. Westbrook's desk.  Associate Dean Bullock

10    subsequently asked Ms. Westbrook not to inform Professor

11    Reyes of her actions; however, Ms. Westbrook had already

12    informed Professor Reyes."

13          Okay.  So let me now just go straight to

14    page 4.  Right at the bottom the last two paragraphs.

15    Starting with "in conclusion."  "In conclusion,

16    Ms. Westbrook's allegation of retaliation by Associate

17    Dean Joan Westbrook" -- again is a mistake, I think they

18    meant to say Joan Bullock -- "during her February 2,

19    2015 performance evaluation is substantiated based on

20    the circumstantial evidence obtained during the

21    investigation.  Although it is AD Bullock's

22    responsibility to complete the performance evaluations,

23    the difference between the score given by AD Bullock and

24    the professors was not adequately explained and

25    documented."

1          The next paragraph.  "The circumstantial

2     evidence appears to indicate there is a causal

3     relationship between Ms. Westbrook's participation in

4     the investigation and the decrease in the performance

5     evaluation score, based on the factors discussed above."

6          Is what I just read stated on that page and in

7     those paragraphs of that report?

8     A.   You read those two paragraphs from the

9     document.

10     Q.   Okay.  Now, Professor Pernell, based on what we

11     have been going over about these different incidents

12     happening surrounding Professor Reyes, and Professor

13     Reyes not being copied in the emails, but being copied

14     in the memorandums about all the allegations that were

15     being made, are you familiar, sir, with the term

16     "workplace mobbing"?

17     A.   No, I am not.

18     Q.   Okay.  And when you, as dean, who apparently

19     were getting all these emails, were getting all these

20     notifications, did you at any point think that you

21     should speak with Professor Reyes to warn her about all

22     that was being said about her?

23     A.   Did I believe it was appropriate to warn

24     Professor Reyes?

25     Q.   Yeah.

1    A.   I think matters that required action were

2  forwarded to main campus for their intercession and I

3  did not take any further steps.

4    Q.   Okay.  So let's look at the RPT Committee at

5  the time because some of this -- a lot of this

6  surrounded the application for tenure.  Even though

7  there is even subsequent to that, but I want you to look

8  at -- first let me mark this as Exhibit 32.

9         (Exhibit Number 32 was marked for

10     identification.)

11    Q.   Here's Exhibit 32.  I want you to look at the

12  composition of the RPT Committee as of 2014-2015 when

13  Professor Reyes applied for tenure.

14    A.   Yes.

15    Q.   Okay.  And I'm going to go over the race of the

16  members of the committee.  And by the way, when the

17  chair, John Duncan, did you appoint him as chair of the

18  committee?

19    A.   Yes, I did.

20    Q.   Okay.  What is his race?

21    A.   He's African American.

22    Q.   And the next one Randy Abate?

23    A.   As I indicated before he's white.

24    Q.   Okay.  And John Duncan, is he a man?

25    A.   Yes.

1    Q.   And Randy Abate, is he a man?

2    A.   Yes.

3    Q.   So he's a white man?

4    A.   Yes.

5    Q.   If you could tell me race and gender, I'd

6  appreciate it.

7         MS. REINER:  I'm just going to interpose an

8         objection here real quick.  No foundation.  What

9         exactly is this document?  Is it part of another

10        document?  Is it something you created?

11        MS. REYES:  No, this is the committee

12        assignments that Professor Pernell would issue as

13        dean.

14  BY MS. REYES:

15   Q.   So, Professor Pernell, in your role as dean, do

16  you assign -- with the help of associate deans,

17  committee members to committees for each academic year?

18   A.   I assign members of the faculty to committees.

19   Q.   Okay.  And you said that you selected Professor

20  John Duncan as chair?

21   A.   That is correct.

22   Q.   Okay.  And so would this document be the type

23  of document that you then circulate to the faculty to

24  notify them that these are their committee assignments?

25   A.   I probably would have circulated this or

1  something very much like this.

2      Q.   Okay.  So let's go over the members of the RPT

3  Committee and because of the allegations in this

4  lawsuit, I'm going to ask you to tell me from your

5  knowledge the gender and race of each of the members.

6      A.   Okay.

7      Q.   So John Duncan, you said he is African

8  American, male?

9      A.   Yes.

10     Q.   Randy Abate?

11     A.   He is a white male.

12     Q.   Robert Abrams?

13     A.   White male.

14     Q.   Deleso Alford?

15     A.   African American female.

16     Q.   Patricia Broussard?

17     A.   African American female.

18     Q.   Jeff Brown?

19     A.   African American male.

20     Q.   Joan Bullock?

21     A.   African American female.

22     Q.   Ann Marie Cavazos?

23     A.   Latina female.

24     Q.   Okay.  Why would you describe Ann Marie Cavazos

25  as Latina?

1    A.   It was my understanding that she was Latina and

2  she has, from what I understand, Spanish as her first

3  language.

4    Q.   As her first language?

5    A.   Yes.

6    Q.   You've spoken with her in Spanish?

7    A.   I don't speak Spanish, so I have not spoken to

8  her in Spanish.

9    Q.   How do you ascertain that she has Spanish as a

10  first language?

11    A.   That is my understanding from conversations

12  with her.  I've never -- I've never looked her up to

13  determine whether or not she was --

14    Q.   Do you see that last name Cavazos as a Spanish

15  language last name?

16    A.   I can't associate that one way or the other.

17    Q.   Are you aware that Professor Cavazos is married

18  to a Hispanic male with Cavazos as the last name?

19    A.   No, I was not aware.

20    Q.   So --.

21        (Exhibit Number 33 was marked for

22    identification.)

23    Q.   I'm going to give you what has been marked as

24  Exhibit 33.  And I'm going to describe this document as

25  a two-page document.  At the top 2013-2014.  And in very

1   small print titled Florida A&M University College of Law

2   Faculty 2013-2014.  And I'm going to describe it as a

3   document that was filed in case -- Federal case

4   4:14-cv-00540-RH-CAS Doc. 39-3 filed 5/19 -- May 19,

5   2015.  And I know that it is very small print, Professor

6   Pernell, but if you go down the line you will see it.

7   Maybe if you start from the bottom.  The first name on

8   the bottom Jennifer Smith, Maritza Reyes, Phyllis Taite,

9   Joseph Hurt, Renee Allen, Reginald Mitchell, and then

10  Ann Marie Cavazos.  What is her race listed as?

11      A.   On this document it lists her race as black.

12      Q.   Okay.  And her gender?

13      A.   Female.

14      Q.   Okay.  So go back to the list.  For Markita

15  Cooper?

16      A.   African American female.

17      Q.   John Fineman?

18      A.   White male.

19      Q.   Joe Grant?

20      A.   Black male.

21      Q.   Ronald Griffin?

22      A.   Black male.

23      Q.   Bill Henslee?

24      A.   White male.

25      Q.   Darryll Jones?

1      A.    Black male.

2      Q.    Lundy Langston?

3      A.    Black female.

4      Q.    Jeremy Levitt?

5      A.    Black male.

6      Q.    Nicky Boothe-Perry?

7      A.    Black female.

8      Q.    Rhonda Reaves?

9      A.    Black female.

10     Q.    Omar Saleem?

11     A.    Black male.

12     Q.    Shiv Persaud?

13     A.    I don't know how they -- how he's listed on

14  that, but it may be listed as Asian.

15     Q.    Okay.  In fact, if we go a little bit above Ann

16  Marie Cabazos on that list, you will find Shiv Persaud,

17  and you are correct, he's listed as male, Asian.

18           Okay.  So of this list, are there any Latina

19  faculty, now that we know that officially Professor

20  Cabazos on this list is listed as black female.  Are

21  there any Latina faculty?

22     A.    Not compared --

23     Q.    On the RPT Committee?

24     A.    Not on the RPT Committee as compared to

25  Document 33.

1    Q.   Now the RPT Committee, who are the members of

2  the RPT Committee in the FAMU College of Law?

3    A.   The entire committee is composed of all tenured

4  faculty.

5    Q.   Okay.  As of 2014-2015, you have the list of

6  all the tenure faculty.  Had there been to your

7  knowledge any Latino man or woman tenure faculty?

8    A.   I don't know of any.

9    Q.   Okay.  And while we're on the document.  The

10  one that I gave you as Exhibit 33 -- maybe not on that

11  one.  Hold on a minute, please.  Yes, if you go to

12  page 2 on Exhibit 23.

13    A.   23?

14    Q.   Yes, we have somebody listed by the name of

15  Nise Nekheba?

16    A.   On what page of 23?

17    Q.   No, 33.  Exhibit 33.  Who is Nise Nekheba?

18    A.   She was a faculty member.

19    Q.   Okay.  And if you go on page 2 and starting

20  from the top and you go down, do you see Nise Nekheba

21  there?

22    A.   Yes, I do.

23    Q.   How is her race listed?

24    A.   Black.

25    Q.   And gender?

1      A.   Female.

2      Q.   Okay.  And then if you go to page 1.  And right

3   from the bottom the second name, Maritza Reyes.

4      A.   Yes.

5      Q.   How is her race listed?

6      A.   Hispanic.

7      Q.   And her gender?

8      A.   Female.

9      Q.   Okay.  I'm going to give you one more exhibit

10   here.  Exhibit 34.

11          (Exhibit Number 34 was marked for

12      identification.)

13      Q.   And I'm going to describe this exhibit as two

14   pages.  The first page is 2011-2012 Self-Study on

15   Florida A&M University College of Law titled.  It's not

16   the complete 2011-2012 Self-Study, it just has page 97

17   from that self-study.

18          Going to that self-study page,

19   Professor Pernell, in the first paragraph, when they are

20   describing the race of the faculty, what is the race of

21   the faculty beginning with "comprising" in the number

22   26?

23      A.   It says "comprising 26 African American, 15

24   Caucasian, 3 Latina, 1 black Latina, 1 Caribbean-East

25   Indian."

1    Q.   Now, when we have three Latina, it would have

2    been -- you could have had Latinas not on the tenure

3    track; correct?

4    A.   That is correct.

5    Q.   Okay.  And what is the distinction in your mind

6    between Latina and black Latina?  Why was that

7    distinction made?

8    A.   I'm not sure.

9    Q.   Okay.  And I'm going to take you back to

10   Exhibit 33.  On page 1 of Exhibit 33.  If you could go

11   down the race category from the top and find the first

12   Hispanic listed there.

13   A.   The first Hispanic listed is Eunice Caussade.

14   Q.   Is she a tenure-track faculty member?

15   A.   No, she's not.

16   Q.   Is she tenured?

17   A.   I don't believe so.

18   Q.   Would you know if she's tenured, as dean, from

19   the time that you were there as dean?

20   A.   You're talking about when I was dean?

21   Q.   Eunice Caussade?

22   A.   She was not tenured while I was dean.

23   Q.   Was she tenure-track?

24   A.   As far as I know she was not on the normal

25   tenure-track.  They've done some things with the

1  tracking outside the normal tenure, I don't know where

2  she falls on that, but she was not tenure-track.

3       Q.   Okay.  Was she a member of the RPT Committee we

4  went over?

5       A.   No.

6       Q.   So if she would have been tenured, she would

7  have been a member?

8       A.   If she would have been tenured, yes.

9       Q.   Okay.  So let's go down to the next Hispanic,

10  what was the name?

11       A.   Rebecca Olavarria.

12       Q.   Okay.  Was she tenure-track?

13       A.   She was not tenure-track.

14       Q.   Was she tenured?

15       A.   She was not tenured.

16       Q.   Okay.  So then we go down the line and the next

17  Hispanic would have been -- what's the name?

18       A.   Maritza Reyes.

19       Q.   Okay.  And was she tenure-track when she was

20  hired?

21       A.   Yes, she was.

22       Q.   And was she tenured eventually?

23       A.   Eventually, yes.

24       Q.   Okay.  Dean Pernell -- I mean, Professor

25  Pernell, who is Wanda Aviles?

1    A.    I believe she was a program assistant or

2  administrative assistant.

3    Q.    And where does she work?  What area of the law

4  school?  What offices would have seen her in contact

5  or learned of her?

6    A.    I don't recall exactly what office.  She may

7  have been in the dean suite in support of one of the

8  associate deans.

9    Q.    And do you know why she left the dean suite?

10    A.    No, I do not.

11    Q.    Okay.  Was there ever an incident against -- an

12  incident between Professor Aviles and another, or more

13  than one, black administrative assistants in the dean

14  suite?

15    A.    Not that I know of.

16    Q.    Okay.  Did she ever reach out to you, Wanda

17  Aviles?

18    A.    No, she did not.

19    Q.    Okay.

20          (Exhibit Number 35 was marked for

21    identification.)

22    Q.    So this is a two-page document with very light

23  ink from Aviles, Wanda to LeRoy Pernell dated August 17,

24  2010, 5:16 p.m.  And it states Subject:  Need to have

25  some time with you.  Can you read what it says there,

1 Professor Pernell?

2    A.   From page 2?

3    Q.   Yeah.

4    A.   "I regret that throughout this whole moving

5 situation you and I have not sat down to talk about this

6 prior to and/or after the move.  Therefore I was

7 wondering if you have time to -- time for me to meet

8 with you today?  I was away Thursday and Friday of last

9 week; otherwise, I would have tried to meet with you

10 then.  Please let me know if it may be possible for me

11 to meet with you today."

12    Q.   Do you recall -- I want to make sure because I

13 think that you answered it before, but I want to make

14 sure.  Do you recall getting this email of her reaching

15 out to you?

16    A.   No, I don't recall this.

17    Q.   Okay.  And is she still employed in the FAMU

18 College of Law?

19    A.   Not that I know of.

20    Q.   Okay.  Is Rebecca Olavarria still employed in

21 the FAMU College of Law?

22    A.   I'm not sure, quite frankly.  I don't think so,

23 but I'm not sure.

24    Q.   Do you know Carmenelisa Perez-Kudzma?

25    A.   I believe she was a writing instructor at one

1   point.

2       Q.   Okay.  And is she in the FAMU college of law

3   today?

4       A.   No, she's not.

5       Q.   Do you know why she left?

6       A.   No, I do not.

7       Q.   Do you know if she made any claims of

8   discrimination?

9       A.   I am not sure.  I think that there was a

10  complaint of -- some personnel complaint she had.

11  I don't remember the details of it.

12           (Exhibit Number 36 was marked for

13       identification.)

14       Q.   Okay.  I'm going to give you what's been marked

15  as Exhibit 36.  And I'm going to describe Exhibit 36 as

16  a U.S. Equal Employment Opportunity Commission Dismissal

17  and Notice of Rights Letter issued to Carmenelisa

18  Perez-Kudzma.  So in the cc on the bottom, what does it

19  say there, Professor Pernell?

20       A.   CC Florida A&M University in care of Avery

21  McKnight, Esquire, Office of the General Counsel.

22       Q.   So at some point Carmenelisa Perez-Kudzma made

23  a complaint with the EEOC regarding her employment in

24  the Florida A&M University College of Law from this

25  letter that you see there.  Is that something that we

1  can assume?

2     A.    I won't engage in an assumption on that.  This

3  is a dismissal and notice of rights.  That's all I can

4  say about it.

5     Q.    And dismissal and notice of rights when the

6  EEOC issues it, it tells the employee they have a right

7  to proceed to file a case in federal court; correct?

8     A.    I don't -- I can't state that.  I no longer

9  profess to be an expert in EEOC, so I can only go by

10 what this says.

11    Q.    Okay.  So let's go by what it says.  Do you see

12 on the bottom where it says "notice of suit rights"?

13    A.    Yes.

14    Q.    Okay.  Under Notice of Suit Rights, can you --

15 can you read what it says in the first paragraph?

16    A.    "Title VII, the Americans with Disability Act,

17 the Genetic Information Nondiscrimination Act, or the

18 Age Discrimination Act in Employment Act.  This will be

19 the only notice of dismissal and your right to sue that

20 we will send you.  You may file a lawsuit against the

21 respondents under federal law based on this charge in

22 federal or state court.  Your lawsuit must be filed

23 within 90 days, underlined, of your receipt of this

24 notice; or your right to sue based on this charge will

25 be lost. (The time limit for filing suit based on a

1  claim under state law may be different.)"

2     Q.   Okay.  So this -- the right to sue in federal

3  or state court?  This is stated; right?

4     A.   As to these specific acts; Title VII, the ADA

5  Act, Genetic Information, Nondiscrimination Act, or the

6  Age Discrimination Act, this is what is typically known

7  as a right to sue letter.

8     Q.   Okay.  Thank you.  Do you know Guillermo

9  Flores?

10    A.   No, I do not.

11    Q.   Have you ever heard that name?

12    A.   No, no.

13       (Exhibit Number 37 was marked for

14    identification.)

15    Q.   I'm going to give you what's been marked as

16  Exhibit 37.

17       MS. REINER:  May we after this exhibit take a

18    quick break?

19       MS. REYES:  Yes.

20    Q.   Okay.  So I'm going to describe this as a

21  two-page letter on letterhead of Florida Agricultural

22  and Mechanical University, Tallahassee, Florida dated

23  December 15, 2008, marked confidential.  Sent certified

24  mail to Mr. Guillermo Flores at an address in Orlando,

25  Florida.

1          And it states:  "Dear Mr. Flores, The

2    investigation conducted by the Office of Equal Community

3    Programs has revealed that your complaint alleging

4    discrimination based on race and national origin against

5    Dr. Jeremy Levitt could not be substantiated.

6    Dr. Levitt was found not to be in violation of

7    University Regulation 10.103 Non-Discrimination Policy

8    and Discrimination and Harassment Complaint Procedures.

9    Based upon the findings, Florida A&M University is

10   dismissing your complaint."

11          Now can we go to page 2.  By the way, is that

12   an accurate reading of what is stated on this letter?

13   A.    In that first paragraph, yes.

14   Q.    And on page 2, in the copy, can you please read

15   the names and titles of people who are copied?

16   A.    Yes, Dr. James H. Ammons, Dr. Cynthia

17   Hughes-Harris, LeRoy Pernell, Esquire, Avery McKnight,

18   Esquire.

19   Q.    Do you now remember Mr. Flores, Guillermo

20   Flores?

21   A.    No, I don't remember him.

22   Q.    Was he -- you don't remember?  Okay.

23   A.    I don't remember him.

24          (Exhibit Number 38 was marked for

25       identification.)

1     Q.   Okay.  This is Exhibit 38.  And this is a

2   letter, one-page document.  It's a letter from Guillermo

3   Flores Jr. dated December 19, 2008, to Mrs. Carrie Gavin

4   Director, Equal Opportunity Programs Tallahassee,

5   Florida.  And it states, "Dear Carrie, I have received

6   the response to my complaint today.  I am amazed that

7   the complaint is dismissed given the amount of persons

8   and information provided to your office.  I am also

9   surprised a visit to our school never took place.  I had

10  previously shared my concerns regarding a less than

11  thorough investigation.  I still share this sentiment.

12  This letter shall serve as a request for the complete

13  investigatory report.  I look forward to the receipt of

14  same."

15         Is that an accurate reading of that letter?

16     A.   You read what that letter says, yes.

17         MS. REYES:  So we'll take a break.

18             (Break taken from 4:09 p.m. to 4:16 p.m.)

19  BY MS. REYES:

20     Q.   So in the copy that I finished reading from

21  Mr. Flores, is it stated there was a complaint filed

22  against Professor Jeremy Levitt?  So are you familiar

23  with any other complaints against Professor Jeremy

24  Levitt?

25     A.   Any other complaints?

1    Q.   Yeah.

2    A.   Offhand, I can't think of any.

3    Q.   Okay.  And who is Professor Jeremy Levitt?

4    A.   He's a professor at the college of law.

5    Q.   And how did you meet Professor Jeremy Levitt?

6    A.   I met him initially as a lecturer when I was at

7    NIU College of law.  I invited him to give a lecture at

8    NIU.

9    Q.   And how is it that you came to know him to

10   invite him to give a lecture?

11   A.   I don't recall exactly.  It had something to do

12   with his expertise in the area of international law and

13   I think we were looking for a speaker on international

14   law.

15   Q.   Okay.  And where was he when you invited him--

16   when you were at NIU College of Law, where was he

17   working at the time?

18   A.   I believe he was on the faculty at DePaul

19   College of Law.

20   Q.   Okay.  And how did he come to the faculty of

21   the FAMU College of Law?

22   A.   We recruited him when I first got there.  He

23   was, at that point, on faculty at Florida International

24   University and he was recruited to come to the college

25   of law to be a faculty member at FAMU.

1    Q.   Okay.  And when he was recruited from Florida

2    International University College of Law, what was his

3    faculty rank?

4    A.   I don't recall.  I believe it was -- I don't

5    recall.  I would just be guessing.

6    Q.   Would there be institutional documents that

7    would state what his faculty rank was when he came to

8    the FAMU College of Law?

9    A.   I'm sure that there would be.

10    Q.   Okay.  And when he came as -- was he a faculty

11    member, an administrator, or both when he came to the

12    FAMU College of Law?

13    A.   I believe his position as a faculty member

14    included an associate dean position, as well.  So that

15    would have been administrative.

16    Q.   Okay.  And what kind of associate dean?

17    A.   We were attempting to establish a center on --

18    in international justice and so he was heading up those

19    programs.

20    Q.   And how long did he stay in that role?

21    A.   I don't recall.

22    Q.   Is he in that role today?

23    A.   No, he's not.

24    Q.   And when did he -- why did he stop being in

25    that role?

1    A.   I know he resigned from -- officially resigned

2  from that role.

3    Q.   Was there any issue raised about him during the

4  ABA site visits?

5    A.   Any issue raised?

6    Q.   Any other issues to the ABA site visitors about

7  him?

8    A.   I don't know, that would have been between

9  those faculty members and the site team.

10    Q.   And the site team didn't speak with you about

11  any such issues?

12    A.   Not specifically as to Professor Levitt.

13    Q.   And is there anything included in any of the

14  ABA site visit reports mentioning something about an

15  administrator harassing faculty?

16    A.   I don't recall that.

17    Q.   Did any faculty members make any allegations

18  that he harassed them?

19    A.   Allegations to whom?

20    Q.   In the law school.

21    A.   That doesn't tell me to whom the allegation.

22    Q.   To the office of Equal Opportunity Programs?

23    A.   I wouldn't know.

24    Q.   In a lawsuit.

25    A.   I wouldn't know.

1    Q.   You stated at the beginning that you gave a

2  deposition in the Jennifer Smith v. FAMU College of Law

3  case?

4    A.   Yes.

5    Q.   Were there any allegations in that case about

6  Jeremy Levitt?

7    A.   I do not recall any.

8    Q.   Okay.  Do you recall the case of Barbara

9  Bernier v. Jeremy -- I'm sorry, Barbara Bernier v. FAMU?

10    A.   I don't recall the details on that.

11    Q.   Who was Barbara Bernier?

12    A.   She was a faculty member at the college of law.

13    Q.   Is she there now?

14    A.   No, she is not.

15    Q.   Do you know why she left?

16    A.   I can -- I know that she at one point resigned.

17    Q.   And did she file the lawsuit before or after

18  she resigned?

19    A.   I believe she had filed an action before she

20  resigned.

21    Q.   Do you know if in the lawsuit her cause of

22  action included constructive discharge?

23    A.   I don't recall that.

24    Q.   Okay.  Now, let me take you back to Professor

25  Reyes.  Did you ever have a chance as dean or an

1  opportunity to evaluate Professor Reyes' performance in

2  the FAMU College of Law?

3      A.   I believe I did.

4      Q.   And in your recollection, what was her

5  performance?

6      A.   I believe that in the evaluations that I did of

7  her were positive.

8          (Exhibit Number 39 was marked for

9      identification.)

10      Q.   I'm going to give you what's been marked as

11  Exhibit 39.

12          MS. REYES:  By the way, do you want a stapler?

13      Is that what you are asking for?

14          MS. REINER:  Yeah, I was going to look for a

15      stapler.

16          MS. REYES:  Because I'm carrying one.

17          MS. REINER:  Oh, are you?

18          MS. REYES:  I just remembered.

19          MS. REINER:  Okay.

20  BY MS. REYES:

21      Q.   Okay.  So let's go over Exhibit Number 39.  And

22  I'm not going to go over all the evaluations, I'm just

23  going to use this one evaluation as a representative

24  sample as you have evaluated Professor Reyes.

25          And this is a three-page document for the

1  evaluation period 2012-2013.  And Part A is Teaching

2  Effectiveness, Part B is Research and Creative Ability,

3  Part C is Performance in Service.  And the ratings are 0

4  Not Applicable, 1 Poor, 2 Fair, 3 Good, 4 Very Good, and

5  5 Excellent.

6         In that evaluation, Professor Pernell, when you

7  were dean of the FAMU College of Law, what did you

8  assign to Professor Reyes?

9     A.   What did I assign?

10    Q.   Yeah, what did you assign?  What was checked in

11 evaluation?

12    A.   What was my evaluation of her?

13    Q.   Uh-huh.

14    A.   This is the annual evaluation and all the

15 applicable areas were checked as Excellent.

16    Q.   Okay.  And in terms of the FAMU College of Law,

17 what is Professor Reyes's status right now, to your

18 knowledge?

19    A.   I don't know.

20    Q.   Have you heard anything about what -- where she

21 is or what she's doing?

22    A.   Not really.  Other than she's not at the

23 college of law, but other than that, I have no idea.

24    Q.   Do you know why she's not at the college of

25 law?

1    A.   No, I do not.

2    Q.   Who is the dean of the college of law right

3 now?

4    A.   That's a good question.  There is an interim

5 dean at this point, Cecil Howard.

6    Q.   So interim.  They have another interim dean?

7    A.   They have an interim dean now, yes.

8    Q.   And before that interim dean was there a

9 permanent dean?

10   A.   Yes.

11   Q.   What was the name of the permanent dean?

12   A.   Her name was Deidre Keller.

13   Q.   And when did she stop being dean?

14   A.   It was earlier in this academic year, but I

15 don't recall exactly what date.

16   Q.   Okay.  In this academic year.  And why did she

17 stop being dean?

18   A.   She resigned.

19   Q.   How do you know that she resigned?

20   A.   She sent a letter, a copy letter to the faculty

21 saying she resigned.

22   Q.   How did she let the faculty know that she was

23 resigning?

24   A.   I just indicated she sent a letter.

25   Q.   How?  By mail?  By email?

1    A.   I believe that a copy of the letter was

2  provided to faculty members by email.

3    Q.   Okay.  And before she provided a copy of the

4  letter, did she provide notice by email before providing

5  the letter?

6    A.   I don't understand.

7    Q.   Did she send an email providing notice of her

8  resignation --

9    A.   Yes.

10    Q.   -- without providing the letter first?

11    A.   Well, no, I didn't say that.  My knowledge of

12  her resignation was the letter that she sent indicating

13  that she was resigning and the effective date

14  immediately.

15    Q.   Okay.  And when you say the letter, do you mean

16  in the body of the email stating that she was resigning

17  effective immediately?

18    A.   No, I mean it was a letter that she composed

19  and provided copies to the faculty indicating she had

20  resigned.

21    Q.   Okay.  So you do not recall -- well, do you

22  recall participating in an email -- responding to an

23  email from Professor Keller where she notified the

24  faculty that she was resigning effective immediately in

25  an email without attaching a letter?  Do you recall

1  responding?

2      A.   I don't recall that.

3      Q.   Do you recall responding at all in terms of her

4  resignation?

5      A.   I don't recall.  I may have sent a response

6  indicating -- given the fact that I'm a past dean, that

7  I understand the situations sometimes develop where it's

8  necessary to resign.

9      Q.   Okay.  And how did Dean Keller provide her

10  resignation?

11      A.   I don't understand.

12      Q.   Well, before I said was it by letter?  You said

13  it was an email.

14      A.   No, I said it was a letter --

15      Q.   Right.

16      A.   -- indicating she was resigning.

17      Q.   And how did she send that letter to the

18  faculty?

19      A.   She sent it by email.

20      Q.   She sent it by email?

21      A.   Yes.

22      Q.   And was that letter sent only -- or was her

23  notice of resignation sent only to faculty?

24      A.   I do not know.

25      Q.   You don't know if it was sent to students and

1  like staff, everybody together?

2       A.   I do not know.

3       Q.   Okay.  So let me take you back to your time as

4  dean.  Are you familiar with college of law Listservs?

5       A.   Yes.

6       Q.   Okay.  And, for example, are you familiar with

7  college of law Listerv call faculty?

8       A.   Yes.

9       Q.   What about COL staff?

10      A.   I'm not familiar with that.

11      Q.   What about COL students?

12      A.   I'm not familiar with that.

13      Q.   All right.  In your time as dean, did you allow

14  faculty to participate in emails freely?

15      A.   By freely I did not -- best way I can respond

16  is saying I did not put any restrictions on -- I never

17  attempted to put any restrictions on faculty emails.

18      Q.   Did you ever discipline a faculty member for

19  sending emails?

20      A.   No, I did not.

21      Q.   And today, as of today, can faculty send emails

22  to the Listservs directly like they used to?

23      A.   I don't know the answer for that.  Excuse me, I

24  don't know the answer to that because I don't control

25  that.  That's what they can or can't do.  There was, to

1  my knowledge, some communication indicating that faculty

2  were not supposed to use the, quote, Listserv anymore.

3      Q.   Okay.  But you never prohibited --

4      A.   No, I didn't.

5      Q.   -- faculty when you were dean?

6      A.   No, I did not.

7      Q.   And, Professor Pernell, are you currently

8  involved in a lawsuit?

9      A.   Yes, I am.

10     Q.   Okay.  And what is your role in that lawsuit?

11     A.   I am a plaintiff.

12     Q.   Lead plaintiff?

13     A.   Yes.

14     Q.   Okay.  And who are you suing right now?

15     A.   I believe it is -- the list of defendants is a

16 little fuzzy sometimes, but I believe it was the board

17 of trustees of various universities and the

18 over-governing board.

19     Q.   The Florida Board of Governors?

20     A.   I believe they are among the Defendants.

21     Q.   Uh-huh.  And because you are a professor of

22 law, in a nutshell, can you tell us what you're suing

23 about?

24     A.   I am the lead plaintiff in a case, there are, I

25 believe -- I may be off on the number, I believe there

1 are seven plaintiffs that we are suing for injunctive

2 relief regarding the state's attempt through a bill

3 known as HB7 to prohibit, deter, or otherwise penalize

4 faculty from talking about race and critical race

5 theory, in particular.

6     Q.   Why did you file that lawsuit or accept to be

7 lead plaintiff?

8     A.   Because I believe that the actions of the state

9 enacting this law was unconstitutional and in violation

10 of my First and Fourteenth Amendment rights.

11     Q.   And who is representing you in that lawsuit?

12     A.   I'm being represented by the American Civil

13 Liberties Union National, the Florida American Civil

14 Liberties Union, the NAACP Legal Defense Fund, and the

15 firm of Ballard & Spahr out of Philadelphia.

16     Q.   And are they providing that representation pro

17 bono to you?

18     A.   Yes.

19     Q.   Free of charge?

20     A.   Yes.

21     Q.   What about to the other plaintiffs?

22     A.   As far as I know that is true for them, as

23 well.

24     Q.   And where is the lawsuit right now?  What

25 stage?

1    A.    The -- the federal suit, the judge in

2  Tallahassee issued an injunction against the State of

3  Florida enjoining enforcement of this law in a

4  preliminary injunction.  That preliminary injunction is

5  currently on appeal to the United States Court of

6  Appeals for the Eleventh Circuit and that case will be

7  heard in -- the oral arguments will be heard in June.

8  The case, otherwise, is in the stage of being prepared

9  for trial.

10    Q.    And as a result of your involvement in that

11  lawsuit, have you participated in publicity in the news,

12  talking about it?  In the media?  Online?

13    A.    Yes.

14    Q.    Okay.  When was the last time you participated?

15    A.    I don't even remember.  I do it so often, I

16  can't remember the last time.

17    Q.    Yeah, okay.  Just one quick question that I

18  think I forgot when I was talking before -- before I got

19  into this topic of interest that I wanted to close with.

20  Just forgetting this one exhibit ruined it for me, but

21  we will try.  Here we go.  40.

22         (Exhibit Number 40 was marked for

23    Identification.)

24    Q.    Are you familiar with this document?

25    A.    No, I am not.

1     Q.   No?  Okay.  When you go down -- this is a

2  two-page document.  It's titled at the top RPT

3  Mentoring.  And it has a list of names, one column;

4  Scholarship Mentor, another column; and Teaching &

5  Service Mentor, another column.

6     A.   Okay.

7     Q.   Under the RPT Mentoring, do you see when you

8  get to the name of Maritza Reyes who is assigned as her

9  scholarship mentor?

10     A.   This document would indicate Jeremy Levitt.

11     Q.   And who was assigned as her teaching and

12  service mentor?

13     A.   This would indicate me.

14     Q.   And do you recall any of this in terms of being

15  assigned as a mentor?

16     A.   No, I do not.  I've never seen this before.

17     Q.   Were you in a faculty meeting where this was

18  distributed?

19     A.   I've never seen it before.

20     Q.   Okay.  If there were a video of such a meeting

21  that shows that you were there and you received this

22  document, would it refresh your memory then, seeing it

23  on video?

24     A.   I don't think so.

25     Q.   Okay.  Are you aware of any allegations by

1    Professor Maritza Reyes that Professor Jeremy Levitt

2    harassed her?

3        A.   I'm not aware of any.

4        Q.   Are you aware of any allegations by Professor

5    Reyes that Professor Jeremy Levitt called her racial

6    names?

7        A.   No, I'm not aware of that.

8        Q.   Did you ever get an email or emails where

9    Professor Jeremy Levitt called Professor Reyes race

10   names?

11       A.   I do not recall receiving any email like that.

12       Q.   Okay.  How would you perceive the term "white

13   Latin" or "Hispanic with white privilege?"  Would that

14   be a racialized term?

15       A.   I'm not quite sure what racialized means in

16   that context.  It appears to be a term that's trying to

17   be racially descriptive.

18       Q.   So under critical race theory, because you said

19   in your lawsuit you are suing to have the right to talk

20   about those subject matters, so are white, Latin or

21   Hispanic with white privilege, under critical race

22   theory would that be a descriptive term and not a

23   racialized term?

24       A.   That's not a term that is particularly

25   pertinent to critical race theory.  Critical race theory

1  focuses more on racism and systems and how systems

2  function as a result of it.

3      Q.   Okay.  And what about somebody calling somebody

4  a "descendant of enslavers of black people?"  A black

5  man calling a Latina -- a black male professor calling a

6  Latina professor a "descendant of enslavers of black

7  people," would that be a term that you would find

8  racialized?

9      A.   I don't know what the phrase "racialized"

10  means.

11      Q.   To have a race connotation or ties to race?

12      A.   The term that you just mentioned specifically

13  includes race, but other than that I don't know anything

14  about that term.

15      Q.   Okay.

16      A.   It's not a term I would ever use.

17      Q.   And in your role as dean, if you had heard, or

18  seen in an email, that a black male professor was

19  calling a Latina professor those names, what would --

20  would you have had any reaction as dean?

21      A.   I don't know.  It's hard -- that's a

22  speculation I can't necessarily answer because I'd have

23  to know the context.

24      Q.   Okay.  All right.  Is there anything that I

25  asked you that you want to clarify, that you want me to

Tab 86(3)(b)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO:  6:22-cv-1525-WWB-DCI

MARITZA REYES,

       Plaintiff,

vs.

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU"),

       Defendant.

                      /

DEPOSITION OF PATRICIA A. BROUSSARD

Taken on behalf of Plaintiff

| | |
|---|---|
| DATE TAKEN: | Thursday, May 16, 2024 |
| TIME: | 11:05 a.m. - 4:29 p.m. |
| LOCATION: | U.S. Legal Support - Orlando |
| | 20 N. Orange Avenue |
| | Suite 1208 |
| | Orlando, Florida 32801 |

Stenographically Reported By:
Christine L. Price, RPR, FPR-C
Notary Public, State of Florida at Large

1                    APPEARANCES

2  On behalf of the Plaintiff:

3     MARITZA REYES, ESQUIRE
       Law Office of Maritza Reyes
4      Post Office Box 5102
       Winter Park, Florida 32793-5102
5      (305) 308-8200
       mreyesesq@gmail.com

6

7  On behalf of the Defendant:

8     SARAH REINER, ESQUIRE
       Gray Robinson, P.A.
9      301 E. Pine Street
       Suite 1400
10     Orlando, Florida 32801
       (407) 843-8880
11     sarah.reiner@gray-robinson.com

12 ALSO PRESENT:

13    Dr. D. Denise Wallace, Esquire, Vice President and
    General Counsel for Florida A&M University

14

15

16                INDEX OF PROCEEDINGS

17 Deposition of:  PATRICIA A. BROUSSARD

18 Direct Examination by Ms. Reyes.......................5

19 Certificate of Oath................................224
    Certificate of Reporter...........................225
20 Witness Review Letter.............................226
    Errata Sheet......................................227

21

22

23

24

25

1                               EXHIBITS

2    Number   Description                                      Page

3    Exhibit 1      Witness fee check......................9

4    Exhibit 2      Ballot for tenure.....................25

5    Exhibit 3      2014-2015 Sign-up Sheet RPT Committee..27

6    Exhibit 4      2013-2014 Faculty List................29

7    Exhibit 5      Promotion Report 11-5-18..............35

8    Exhibit 6      Nunn memo.............................43

9    Exhibit 7      Statement Broussard to Leland 1-28-15..49

10   Exhibit 8      2011-2012 Self-Study..................56

11   Exhibit 9      Classroom visit.......................64

12   Exhibit 10     Investigation report-Celia Westbrook...71

13   Exhibit 11     Investigation Interview...............72

14   Exhibit 12     Charge of Harassment 11-25-14.........81

15   Exhibit 13     Email Green to Gavin 1-27-16..........94

16   Exhibit 14     Email Persaud to Reyes 12-7-15........97

17   Exhibit 15     Clubs/Organizations Letter of Intent..104

18   Exhibit 16     Charge of Discrimination 4-24-15......107

19   Exhibit 17     Document - Broussard to Gavin 5-7-15..118

20   Exhibit 18     Email McKnight to Holcombe 4-18-15....122

21   Exhibit 19     Narrative 2-16-15.....................128

22   Exhibit 20     Email Reyes to Gavin 2-2-16...........130

23   Exhibit 21     Faculty Meeting Video.................141

24   Exhibit 22     Email Thomas to McDonald 9-9-16.......141

25   Exhibit 23     Email - Taunya Banks 3-19-18..........152

1  Exhibit 24   Email - Shelly Page  8-19-20..........167

2  Exhibit 25   Handwritten note 12-4-09..............171

3  Exhibit 26   Memo Reyes to FAMU 11-13-19...........172

4  Exhibit 27   Investigative Report FAMU............181

5  Exhibit 28   First floor video....................201

6  Exhibit 29   Third floor video...................207

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2            THE COURT REPORTER:  Will you raise your right

3       hand.  Do you swear or affirm that the testimony you

4       are about to give in this cause will be the truth,

5       the whole truth, and nothing but the truth?

6            THE WITNESS:  Yes, I do.

7  THEREUPON,

8                 PATRICIA A. BROUSSARD,

9  having been first duly sworn, was examined and testified

10 as follows:

11           MS. REYES:  Okay.  I'm Maritza Reyes.  I'm here

12      for Plaintiff.

13           MS. REINER:  My name is Sarah Reiner with Gray

14      Robinson here for the Defendant, FAMU.

15           MS. REYES:  And I just want to get on the

16      record that I'm not waiving the reading of the

17      transcript and signing of the transcript.

18           MS. REINER:  Okay.

19                 DIRECT EXAMINATION

20 BY MS. REYES:

21      Q.   So with that, let's get started.  Good morning,

22 Professor Broussard.

23      A.   Good morning, Professor Reyes.

24      Q.   So, as you know, my name is Maritza Reyes.  And

25 I'm going to be questioning you today as Plaintiff.

1    A.   Uh-huh.

2    Q.   Please state your name for the record.

3    A.   Patricia A. Broussard, B-r-o-u-s-s-a-r-d.

4    Q.   And so I'm going to ask you some questions.

5    A.   Uh-huh.

6    Q.   You should answer them based on your personal

7  knowledge.  You should answer with words and not sounds

8  like huh-uh and gestures that sometimes we make, like

9  nodding or shaking your head.  This is because, of

10 course, the court reporter is taking down words for the

11 transcript.

12        If you don't hear or understand something that

13 I may ask, feel free to let me know so I can repeat it,

14 rephrase it, or clarify it as needed.  This way you

15 answer the question that I am asking.

16        Do you understand these instructions?

17   A.   I do.

18   Q.   Okay.  Have you given a deposition before?

19   A.   Yes.

20   Q.   Okay.  When and in what case?

21   A.   I don't know when.  I don't remember when.  But

22 it was in the Barbara Bernier case.

23   Q.   Okay.  Barbara Bernier v. FAMU College of Law?

24   A.   Yes.

25   Q.   What about in the Jennifer Smith v. FAMU

1 | College of Law?

2 |     A.   No.

3 |     Q.   Okay.  Did you testify at trial in those cases?

4 |     A.   I don't -- in those cases or in the Barbara

5 | Bernier?

6 |     Q.   Well, Barbara Bernier settled before trial, I

7 | believe.

8 |     A.   So I --

9 |     Q.   So did you testify in the Jennifer Smith v.

10 | FAMU College of Law case?

11 |     A.   When was this?

12 |     Q.   Did you testify at trial?

13 |     A.   I don't recall there being a trial for the

14 | Jennifer Smith case.

15 |     Q.   Okay.

16 |     A.   I don't know.

17 |     Q.   So you don't recall being a witness in a

18 | courtroom in a trial for the Jennifer Smith case?

19 |     A.   No, I don't.  Huh-uh.

20 |     Q.   Okay.  And Professor Broussard, how did you get

21 | here today?

22 |     A.   I'm sorry?

23 |     Q.   How did you get here today?  Did you drive?

24 |     A.   I drove and parked in the lot.

25 |     Q.   Okay.  Are you taking any medications or any

1  substances that may impair your testimony today?

2      A.   I am taking medication for high blood pressure.

3      Q.   Okay.  But it won't impair your testimony?

4      A.   No, it will not.

5      Q.   And what is your current occupation?

6      A.   I am a professor of law at Florida A&M

7  University College of Law.

8      Q.   And what is your race identification?

9      A.   What is my?

10     Q.   Race?

11     A.   What is my race?

12     Q.   Yes, identification.

13     A.   African American.

14     Q.   Okay.

15     A.   Or black.

16     Q.   And what is your sex/gender identification?

17     A.   Female.

18     Q.   And so I want to get through the statutory

19  witness fee.  Did you request the statutory witness fee?

20     A.   Yes.

21     Q.   Okay.  So I'm going to give you a check for the

22  $40 statutory witness fee.

23     A.   Thank you.

24     Q.   And I want you to mark this as Exhibit 1,

25  please.

1         (Exhibit Number 1 was marked for

2     identification.)

3     Q.   So I'm going to give you now what has been

4 marked as Exhibit 1.  Is that an exact copy of the check

5 that I just gave you?

6     A.   Yes, it is.

7     Q.   Okay.  Thank you.  And you can leave -- what

8 we're going to do is like put the exhibits right there

9 so you can refer to them.

10     A.   All right.

11     Q.   Are you represented by counsel in this

12 deposition?

13     A.   I'm only represented to the extent that I fall

14 under the umbrella of the university, so yes.

15     Q.   Uh-huh.  Under the umbrella of the university?

16     A.   Uh-huh.

17     Q.   Did you prepare for your deposition today?

18     A.   I don't know what you mean by prepare.

19     Q.   For example, when you prepare -- your

20 understanding of prepare, when you prepare to teach

21 class --

22     A.   Right.

23     Q.   -- you go through a certain preparation.

24     A.   Correct.

25     Q.   Did you do any preparation for today's

1    deposition?

2        A.   No, I did not.

3        Q.   Okay.  Did you speak with anyone about your

4    deposition today?

5        A.   Yes, I spoke with the attorney from Gray

6    Robinson and they informed me that I would be having a

7    deposition and where it would be.

8        Q.   Which attorney?

9        A.   The attorney who is sitting here now.

10       Q.   Sarah Reiner?

11       A.   Sarah Reiner, uh-huh.

12       Q.   And did you go over topics or matters in

13   preparation for your deposition today?

14       A.   Not really, no.

15       Q.   Did you go over questions?

16       A.   Did she ask me questions?

17       Q.   Did you go over questions for the deposition

18   today with anyone?

19       A.   I'm not sure what you mean.

20       Q.   In terms of what kind of questions may be asked

21   at a deposition.

22       A.   Just very, very broadly, that you would ask

23   questions, that I was to answer them honestly.  That you

24   have -- I think you filed a lawsuit and there was some

25   topics in the lawsuit that probably would be discussed.

1    Q.   Okay.

2    A.   And I told them I had not read your lawsuit.

3    Q.   Okay.  And that was going to be one of my

4  questions, so I'll get to that.

5    A.   Okay.  Okay.

6    Q.   And so did you go over any answers to potential

7  questions with anyone?

8    A.   No.

9    Q.   Did you review any documents in preparation for

10  your deposition today?

11    A.   No, I did not.  I'm not sure I have any

12  documents to review.

13    Q.   Okay.

14    A.   Because I don't know what the subject matter

15  is.

16    Q.   So have you looked at any of the pleadings

17  filed in this case?

18    A.   No.

19    Q.   Okay.  And do you know the plaintiff in this

20  case?

21    A.   Yes.

22    Q.   How do you know the plaintiff?

23    A.   I work with the plaintiff at Florida A&M

24  College of Law.

25    Q.   And do you know the defendant in this case?

1  University Promotion and Tenure.

2      A.    No, not to my knowledge.

3      Q.    Were you the college of law representative in

4  the University Tenure and Promotion Committee that

5  reviewed Professor Maritza Reyes's 2014 application for

6  tenure?

7      A.    2014.  If I was on the committee in 2014, I was

8  part of it, yes.

9      Q.    Uh-huh.

10     A.    Yes.

11     Q.    And what was your vote in the University Tenure

12 and Promotion Committee on Professor Reyes's application

13 for tenure?

14     A.    Abstain.

15     Q.    And why did you abstain?

16     A.    Because I did not think it was appropriate to

17 vote for you -- for Professor Reyes twice.

18     Q.    But you explained before that it's expected --

19     A.    No, what I explained before is that it is not

20 unusual --

21     Q.    Let me just finish the question for a moment.

22          MS. REINER:  Yes.

23     Q.    If you let me finish the question, and then,

24 you know.  You explained before it was not unusual

25 because the member of the University Tenure and

1  Promotion Committee has to be a member of the College of

2  Law Retention, Promotion, and Tenure Committee.

3      A.   Correct.

4      Q.   So they're always going to be expected to vote

5  at the University Tenure and Promotion Committee level.

6  Is there any rule that says that a person cannot vote if

7  they are a member of one committee and the other?

8      A.   No, there is no rule.  But I abstained.

9      Q.   You made a choice to abstain?

10     A.   Yes.

11     Q.   Okay.  When you abstain and when there is a

12  vote taken at the University Tenure and Promotion

13  Committee, did you sign the ballot?

14     A.   No, that's not the way it's done at the

15  university level.  At the university level, it's all

16  anonymous.

17     Q.   Okay.

18     A.   So you don't say out loud, you don't give any

19  indication of what your vote is going to be.

20     Q.   And were you the college of law representative

21  in the University Tenure and Promotion Committee that

22  reviewed Professor Maritza Reyes's 2018 application for

23  full professor?

24     A.   Yes -- well --

25     Q.   2018.

1     A.   2018.  I think.  I'm not sure, but I think I
2  was.
3     Q.   And how did you vote at that time?
4     A.   I abstained.
5     Q.   And what was your vote in the College of Law
6  Retention, Promotion, and Tenure Committee that reviewed
7  Professor Reyes's application for tenure?
8     A.   It was no.
9     Q.   And what was your vote in the College of Law
10 Retention, Promotion, and Tenure Committee that reviewed
11 Professor Maritza Reyes's 2018 application for promotion
12 to full professor?
13    A.   It was no.
14    Q.   And what was your vote in the College of Law
15 Retention, Promotion, and Tenure Committee that reviewed
16 Professor Reyes's 2020 application for promotion to full
17 professor?
18    A.   It was no.
19    Q.   Were you present during the vote of the 2020
20 application for full professor?
21    A.   At the law school?
22    Q.   Uh-huh.  Were you present in the RPT Committee
23 that voted on Professor Reyes's application for full
24 professor?
25    A.   I believe so.

 1      Q.   And that's when you voted no?

 2      A.   Yes.

 3      Q.   Okay.  Were faculty required to sign ballots

 4   when they voted at the College of Law Retention,

 5   Promotion, and Tenure Committee for tenure or for

 6   promotion?

 7      A.   I'm going to say I believe so, yes.

 8      Q.   Hold on just a minute, please.

 9           (Exhibit Number 2 was marked for

10      identification.)

11      Q.   I'm going to show you what's been marked as

12   Exhibit Number 2.  And it's a ballot of the tenure vote

13   on Professor Maritza Reyes's application for tenure.

14      A.   Okay.

15      Q.   So I'm going to show it to you.

16           Do you remember that ballot?

17      A.   No.

18      Q.   Are there any signatures on that ballot?

19      A.   No.

20      Q.   Okay.  So let me ask you again, maybe if that

21   refreshes your memory or it changes your answer.  When

22   faculty in the College of Law Retention, Promotion, and

23   Tenure Committee vote on an application for tenure or

24   promotion, do they sign the ballot?

25      A.   I don't recall ever seeing a ballot like this.

1 What I remember seeing was a summary ballot that had

2 what everybody's votes were, and for tenure they were

3 all "no."  From what I remember the ballot looking like.

4 I don't remember seeing anything like this.

5    Q.  Okay.  So are you saying that you haven't --

6 this was not the ballot that they used because you've

7 never seen a ballot like this, that you didn't

8 participate in this ballot used for the tenure vote of

9 Professor Maritza Reyes's application for tenure?

10    A.  So you're saying in two thousand -- what year

11 was this?

12    Q.  It would have been the only time she applied,

13 which would have been in 2014.  But it was extended to

14 2015.

15    A.  I don't recall seeing this ballot.

16    Q.  Okay.  And you still will say that professors

17 signed the ballots when they --

18    A.  So what I recall us signing and what I recall

19 seeing at the university, because one of the things that

20 the dean has to submit is the ballot, so what I recall

21 seeing was it was a list -- it wasn't anything like

22 this, it was a list and people signed off saying that

23 this is what our vote was.  I don't recall seeing

24 anything -- I just don't recall that.

25    Q.  Okay.  All right.

1    MS. REINER:  I'm going to pause here for a

2    second and ask, I haven't received copies of those.

3    MS. REYES:  That's right.  I keep forgetting.

4    You know that I took care of you last time and I

5    hope today you brought a stapler.  There's your

6    copy.  I have your copies for you.  Thank you for

7    reminding me.  By the way, I didn't give you a copy

8    of Exhibit 1.

9    MS. REINER:  No.

10   MS. REYES:  Here you go.

11   MS. REINER:  Thank you.

12   MS. REYES:  I think that's it; right?  Is that

13   number 2?  Don't let me forget in case I forget;

14   okay?

15   BY MS. REYES:

16   Q.   Let's go back now to the vote on Professor

17   Reyes's application for tenure.  Can you mark this as

18   Exhibit 3?

19   (Exhibit Number 3 was marked for

20   identification.)

21   Q.   I'm going to give you what's been marked as

22   Exhibit Number 3.

23   A.   Thank you.

24   Q.   And it's a sign-up sheet from the 2014-2015

25   Retention, Promotion, and Tenure Committee that was

1   chaired by Professor John Duncan.

2       A.   By whom?

3       Q.   Professor John Duncan.  It says the name right

4   at the top.

5       A.   Okay.

6       Q.   Have you seen this type of form to sign up for

7   meetings of the College of Law Retention, Promotion, and

8   Tenure Committee?

9       A.   Yes.

10      Q.   And did you sign this particular attendance

11  sheet?

12      A.   Yes, it says -- yeah, that's my signature, yes.

13      Q.   Okay.  So I'm going to go over the names in

14  this sign-up sheet.

15      A.   Okay.

16      Q.   And then if you could let me know the race and

17  gender of each of the members.  Let's go over the names

18  on that list.  Randy Abate.  What is his race and

19  gender?

20      A.   Are you asking me to speculate or are you -- I

21  don't know what they identify with.  Are you saying

22  physically?

23      Q.   How does he identify or how has he been

24  identified by the faculty?  Let me help you out.  I'm

25  going to give you some records of the identification

1  that is used within the school.

2          (Exhibit Number 4 was marked for

3     identification.)

4     Q.   I'm going to give you what's been marked as

5  Exhibit No. 4.  This is a list from Florida A&M

6  University College of Law Faculty 2013-2014 that has --

7  it's a salary list, but it also includes the gender and

8  race of all the different employees.  This is from

9  2013-2014.

10    A.   Thank you.

11    Q.   And I know that it's very small font.

12    A.   Yeah, I can't read this.

13    Q.   So I'm going to try to walk you through and

14 state -- I'm going to look through this and as I look

15 through this, right, we're looking for Randy Abate.

16    A.   Okay.

17    Q.   And Randy Abate is stated gender:  Male, and

18 white.  Is that how you perceived him?

19    A.   Perceived him?  Yes.

20    Q.   And what about Rob Abrams?

21    A.   White, yes.  Male and white.

22    Q.   What about Deleso Alford?

23    A.   Black female.

24    Q.   What about Nicky Boothe-Perry?

25    A.   Black female.

1    Q.   What about Pat Broussard?

2    A.   Black female.

3    Q.   Jeff Brown?

4    A.   Black male.

5    Q.   Joan Bullock?

6    A.   Mixed race, female.

7    Q.   Okay.  Let's see how she identifies in the

8  list.  In the list of Joan Bullock.

9    A.   Who made up this list?

10   Q.   The university.  It comes from the Jennifer

11 Smith case.  Her case.  The university filed it.  So for

12 purposes of now we're going to just -- you know, counsel

13 later on --

14   A.   Can I just clarify with you?

15   Q.   Yes.

16   A.   I thought that you asked me to -- how I

17 identify them.

18   Q.   Yeah.

19   A.   Okay.  So mixed race.

20   Q.   No, how do they self-identify and I guess

21 officially how they identify.  But if you identify them

22 different --

23   A.   Right.

24   Q.   -- you identify Joan Bullock as mixed race?

25   A.   Yes.

1      Q.   And what would be the mixed race?

2      A.   She's Asian and African American.  I think her

3  mother was either Chinese or Japanese or something like

4  that.  So I always identify her --

5      Q.   And her father was?

6      A.   African American.

7      Q.   Okay.  In the list she's identified as

8  female --

9           MS. REYES:  Come on in.

10               (Ms. Wallace joins deposition.)

11  BY MS. REYES:

12      Q.   So in the list she's identified as female and

13  black.

14      A.   Well, that's what the list says, but I thought

15  you asked me --

16      Q.   Correct.  I'm just --

17      A.   Okay.

18      Q.   -- telling you --

19      A.   Okay.

20      Q.   -- what the list says.

21      A.   Okay.

22           MS. REINER:  And if we could -- I think we are

23      starting to speak over each other again, so --.

24           MS. REYES:  Yes.  I think that we're getting

25      into faculty mode in a minute, but let's go back to

1    deponent mode.

2         MS. REINER:  And which exhibit -- so I can be

3    clear, which exhibit are you questioning her on?

4         MS. REYES:  Exhibit 3.

5         MS. REINER:  Exhibit 3.

6         MS. REYES:  Exhibit 3 comparing to Exhibit 2.

7         MS. WALLACE:  And do you want to put me on the

8    record?

9         MS. REINER:  Yes, we can.

10        MS. REYES:  Exhibit 3 -- wait, what is the

11   number on that other one?

12        THE WITNESS:  Four.

13        MS. REYES:  Exhibit 3 comparing to Exhibit 4.

14        MS. REINER:  Okay.  And for the record, we've

15   had another individual --

16        MS. REYES:  Yes, please state your appearance.

17        MS. WALLACE:  I'm Dr. Denise Wallace, Vice

18   President and General Counsel for Florida A&M

19   University.

20   BY MS. REYES:

21   Q.   Back to Ann Marie Cavazos.

22   A.   Black Trinidadian, yes.

23   Q.   Okay.  But just race specifically.

24   A.   Black.

25   Q.   And gender?

```
 1      A.   Female.

 2      Q.   And Markita Cooper?

 3      A.   Black female.

 4      Q.   And John Duncan?

 5      A.   Black male.

 6      Q.   And Jonathan Fineman?

 7      A.   White male.

 8      Q.   Joe Grant?

 9      A.   Black male.

10      Q.   Ron Griffin?

11      A.   Black male.

12      Q.   Bill Henslee?

13      A.   White male.

14      Q.   Darryll Jones?

15      A.   Black male.

16      Q.   Lundy Langston?

17      A.   Black female.

18      Q.   Jeremy Levitt?

19      A.   Mixed race.

20      Q.   Okay.  So I'm going to look through the list --

21      A.   Uh-huh.

22      Q.   -- and see how we have him listed here.  He's

23 listed as black male on the list.  But that's okay, you

24 have your answer and this is the official list that I'm

25 just comparing.  Rhonda Reaves?
```

1    A.   Black female.

2    Q.   Omar Saleem?

3    A.   Black male.

4    Q.   Shiv Persaud?

5    A.   Indian.

6    Q.   And gender?

7    A.   Male.

8    Q.   Jennifer Smith?

9    A.   Black female.

10   Q.   And Phyllis Taite?

11   A.   Black female.

12   Q.   Okay.  At the time, and from this list that

13 we're looking at, the Retention, Promotion, and Tenure

14 Committee, and by the way, Professor Broussard -- let me

15 withdraw that and -- what is the qualification to be a

16 member of the College of Law Retention, Promotion, and

17 Tenure Committee?

18   A.   You have to have tenure.

19   Q.   So it's all the tenure faculty?

20   A.   Yes.

21   Q.   Okay.  So we're looking at this list.  All

22 these members -- faculty members are tenure faculty as

23 of 2014-2015?

24   A.   Yes.

25   Q.   They are, okay.  So when you look at the list,

1 are there any Hispanic or Latino tenure faculty in this

2 2014-2015 list?

3    A.   I don't know.  No, not according to what we've

4 identified so far.

5    Q.   Okay.  And are there any -- in terms of the

6 women on the faculty --

7    A.   Yes.

8    Q.   -- and the tenure faculty --

9    A.   Yes.

10    Q.   -- at this time, are all the women black women?

11    A.   With the exception of Joan Bullock, she was

12 mixed race.

13    Q.   She's mixed with black?

14    A.   Yes.

15    Q.   Okay.  And so now let's talk about the vote on

16 promotion to full professor of Professor Reyes.

17         (Exhibit Number 5 was marked for

18    identification.)

19    Q.   So I'm going to give you, Professor Broussard,

20 what's been marked as Exhibit 5.  Are you familiar with

21 that document?  Have you seen it before?

22    A.   I don't know.  I don't remember if I've seen it

23 before, but it looks like a document that I would see

24 and that I would sign, but I can't -- I don't remember

25 it with specificity, but if I signed it, then I saw it.

1    Q.   Okay.  Can you go to page 6, please?  Because

2  you're going to see on the numbered pages there is a

3  page 6, but then there was a page that was inserted

4  without a page number after page 6.

5    A.   Yes.

6    Q.   And the numbers are on the right margin.  So

7  after page six there is a page that has signatures;

8  right?

9    A.   Correct.

10    Q.   Is your signature there?

11    A.   Yes.

12    Q.   Okay.  And go to the last page, please.

13    A.   Okay.

14    Q.   Can you please read.  It's just one sentence

15  there.  What does it say?

16    A.   "Attendance at the meeting of November 5, 2018,

17  at which the vote of Associate Professor Reyes'

18  application promotion was considered."

19    Q.   Okay.

20    A.   And then you want me to --

21    Q.   Yes, please.  Who was present?

22    A.   Abrams, Boothe-Perry, Broussard, Cavazos,

23  Griffin, Henslee, Jones, Reaves, Smith, Taite.  Then it

24  says tellers:  Cavazos and Henslee.

25    Q.   And because they're already listed above,

1  right, they're already listed.  It seems that tellers --

2  does that mean the counters?

3      A.   I don't know.

4      Q.   So the tellers, but they are already listed at

5  the top in the first names that you listed, right,

6  Cavazos and Henslee?

7      A.   Yes.

8      Q.   So if you count the present, how many were

9  present?

10      A.   One, two -- oh, one, two, three, four, five,

11  six, seven, eight, nine, I think that's correct.  One,

12  two, three, four, five, six, seven, eight, nine, ten.

13  Is that ten?

14      Q.   Yes.

15      A.   Ten, uh-huh.

16      Q.   Okay.  And are all those who were present on

17  the vote of Associate Professor Reyes' 2018 application

18  for promotion, were they also members of the College of

19  Law RPT Committee that reviewed the tenure application

20  of Professor Maritza Reyes?

21      A.   I would say yes.

22      Q.   Okay.  I want you to take a look at Exhibit

23  Number 3, which we already went over, which was the

24  committee --

25      A.   Uh-huh.

 1      to summarize that it says that the committee

 2      concluded that Professor Reyes met the standard for

 3      excellence to be promoted to professor of law with

 4      regards to teaching.  And that Professor Reyes met

 5      the standard for excellence to be promoted to

 6      professor of law with regards to service.  But I

 7      want to now talk about the scholarship standard.

 8           THE WITNESS:  Uh-huh.  So I'm sorry, where are

 9      you?

10  BY MS. REYES:

11      Q.   I'm going to take you back now to page

12  number 3.

13      A.   Okay.  Page number 3.  Okay.

14      Q.   Okay.  And so with regards to the scholarship

15  standard, do you recall what the committee found with

16  regards to scholarship?

17      A.   No, I don't recall.

18      Q.   Okay.  So then let's go to -- at the top of

19  page 5.

20      A.   Okay.

21      Q.   And we're going to stipulate that it says what

22  it says, that they found that -- the committee concluded

23  that "Professor Reyes did not meet the standard for

24  excellence in scholarship required for promotion to the

25  rank of professor of law."

1          Do you recall, Professor Broussard, why it was

2    that the committee found that Professor Reyes did not

3    meet that standard?

4         A.   No.

5         Q.   Okay.  Let's look at the post-tenure law review

6    publications on page 4.  And in the second paragraph

7    under Evaluation of Post-Tenure Law Review it says that

8    "the committee decided not to submit Professor Reyes's

9    publications for external review as part of the review

10   of this application."  Do you know why the committee

11   decided not to do that?

12        A.   No.  I don't remember.  I don't recall.

13        Q.   Okay.  So let's -- I'm going to read for you on

14   page 4 that second paragraph where it starts "the

15   college of Law RPT Committee."  And I'm going to go to

16   the second sentence.  "The college of law has not

17   previously sought additional external reviews of

18   scholarship that had previously been reviewed as part of

19   the RPT process.  The committee considered Associate

20   Professor Reyes' memorandum and reaffirmed its decision

21   to decline to send out either the new writings or the

22   previously reviewed writings."

23          Does that refresh your memory as to why the

24   committee decided not to send the scholarship for

25   external review?

1      A.    No.

2      Q.    Okay.  Are you familiar, Professor Broussard,

3  with what's called in the college of law, the Nunn Memo?

4      A.    The Nunn Memo.  I've heard the term, but I

5  don't know what it references, but I have heard the

6  term.

7      Q.    Do you know who Kenneth Nunn is?

8      A.    Yes.

9      Q.    Okay.  Who is he?

10      A.    Kenneth Nunn was a visiting -- I think he was a

11  visiting professor who was also, if I recall correctly,

12  a dean.  But he was a visitor who was also a dean.

13      Q.    Okay.  An associate Dean?

14      A.    I don't -- I don't know the rank.

15      Q.    Or was he a dean of the law school like a

16  "dean" dean?

17      A.    Oh, no, he wasn't the dean of the law school.

18      Q.    Associate dean?

19      A.    Or assistant.  I don't know.  He was not the --

20  he was a dean, but I do recall he was not the dean.

21      Q.    Okay.

22            (Exhibit Number 6 was marked for

23      identification.)

24      Q.    And so I'm going to give you what has been

25  marked as Exhibit 6.  Please take a look at it.

1      A.   Thank you.

2      Q.   And Exhibit Number 6 is a memorandum consisting

3   of three pages.  It's dated September 12, 2008.

4      A.   Okay.

5      Q.   It's addressed to Tenured and Tenure-Track

6   Faculty.

7      A.   Okay.

8      Q.   From Kenneth B. Nunn.

9      A.   Okay.

10     Q.   The re is:  Publication Standards for Promotion

11  and Tenure.  Were you a member of the faculty of the

12  FAMU College of Law on September 12, 2008?

13     A.   Yes.

14     Q.   Okay.  Now, that you have looked at this memo,

15  does it refresh your memory as to if at any point had

16  you seen it before?

17     A.   No.  The only thing I remember is that there

18  was a memo and that Ken Nunn wrote it.  But no, it

19  doesn't refresh anything.  This is 2008?

20     Q.   Yes.  Dated 2008.

21     A.   Like 14 years ago?

22     Q.   Yes, dated 2008 there.

23     A.   No, I don't recall it.

24     Q.   And do you recall if the memo that you remember

25  was attached to the materials that were submitted by the

1  law school to the American Bar Association for

2  accreditation?

3     A.   I don't -- I don't know.

4     Q.   If there was such a document and it was noted

5  -- okay, let me backtrack.  What is a self-study in

6  regards to an application or review of accreditation by

7  the American Bar Association of the law school?  What is

8  a self-study?

9     A.   I think it's sort of like self-explanatory that

10  a self-study is where the entity, be it the law school

11  or someone at the university, they lay out what's going

12  on at the school, who their faculty is, what the --

13  basically, you know, the student population, the staff

14  population, you just give a report on what's happening

15  at the law school.

16     Q.   And who prepares that self-study?

17     A.   I don't know.  I think that from what I can

18  recall, maybe a dean and a faculty committee, and maybe

19  a dean.  I don't know.

20     Q.   As a faculty member, did you ever participate

21  in preparation of that self-study, approval of the

22  self-study by a vote of the faculty?  Did you ever

23  participate in that in your time as a faculty member of

24  the FAMU College of Law?

25        MS. REINER:  Objection.  Compound.

1    A.   In a self-study?

2    Q.   Yes, did you ever participate?

3    A.   I don't recall if I participated or not.

4    Q.   So let me backtrack, when the law school is

5    preparing this self-study --

6    A.   Yes.

7    Q.   -- do you recall if they ever called the

8    faculty into a meeting to go over the self-study?

9    A.   So I don't know what year you are referring to.

10   Q.   Any self-study that you remember in any year

11   for a self-study.  Did they ever call the faculty into a

12   meeting to go --

13   A.   I, as a non-tenured faculty member, can never

14   be -- recall being called into a meeting.  Before I had

15   tenure, anything of that magnitude, I don't recall that.

16   Q.   Do you recall a meeting where Jeremy Levitt was

17   in charge of coming into the meeting and bringing

18   together the meeting when he was associate dean and you

19   participated, including in email exchanges, about that

20   meeting regarding the self-study; do you recall that?

21        MS. REINER:  Objection.  Form.

22   A.   No, I don't recall that.

23   Q.   Let's go now to -- so I'm going to repeat, but

24   just because we already established it, that you were a

25   member of the College of Law RPT Committee when

1 Professor Reyes applied for tenure in Fall 2014?

2    A.   Yes.

3    Q.   And what happened, did anything happen during

4 the tenure process of Professor Reyes's application for

5 tenure with regard to processing of her application?

6 The timing of the processing?

7    A.   I'm unclear what you mean.

8    Q.   Did anything happen to delay the processing of

9 the application?

10    A.   To delay?

11    Q.   Uh-huh.

12    A.   I don't recall it being delayed.  No, I don't

13 recall that.

14    Q.   Do you recall any allegation that the process

15 of the application should not go forward?

16    A.   The process of the application should not go

17 forward?

18    Q.   Uh-huh.

19    A.   Could you be more specific?  I'm not clear on

20 what you're trying to say.

21    Q.   Okay.  Was there any -- was there anything that

22 stopped the review of the application of Professor Reyes

23 for tenure in the College of Law Retention, Promotion,

24 and Tenure Committee after she submitted it to the

25 committee?

 1    A.   Okay.  As far as I can recall, there was an
 2  allegation that the application was late.
 3    Q.   Uh-huh.
 4    A.   But that was the extent of my knowledge or my
 5  involvement in that.
 6    Q.   And how late was it?
 7    A.   I have no idea.  I was totally dealing with
 8  personal problems then, so I have no idea.
 9    Q.   Okay.  And when that was going on in the RPT
10  Committee -- which are the meetings of the RPT Committee
11  open to nonmembers?
12    A.   I believe the rule is that if it's a
13  non-personnel matter they are, but if they are a
14  personnel matter, they are not.
15    Q.   Okay.  So when the RPT Committee was reviewing
16  Professor Reyes's application for tenure, were those
17  meetings open?
18    A.   As far as I can recall, no.
19    Q.   Okay.  So during those meetings when the
20  committee was deciding whether to go forward with the
21  application, was there any incident that you recall
22  where you were emotionally distraught about the
23  incident?
24    A.   Yes.
25    Q.   What was it?

 1    A.   One of the professors, one of the senior

 2  professors yelled at all of the black women and accused

 3  the black women of being horrible, terrible people.  And

 4  I didn't know the source of that, but as I said, there

 5  was some really terrible things happening in my life at

 6  that time and I started crying because I couldn't

 7  imagine someone making those kind of allegations on a

 8  general basis against black women.

 9    Q.   Okay.  And I'm going to give you an exhibit.

10    A.   Okay.

11         (Exhibit Number 7 was marked for

12    identification.)

13    Q.   What's been marked as Exhibit Number 7.

14    A.   Okay.

15    Q.   And I'm going to describe that exhibit.

16    A.   Okay.

17    Q.   It's a statement to Stephanie Leland from

18  Patricia Broussard, Re:  EOP investigation dated

19  January 28, 2015.  Do you remember this statement that

20  you made?

21    A.   I don't see my signature on this, but if you

22  say it's from me and if it -- no, I don't remember the

23  specific statement, but the document speaks for itself.

24    Q.   Uh-huh.  Yes.  And so let's see in number one.

25    A.   Okay.

1     Q.   And by the way, this statement comes from the

2   EOP investigation file.

3     A.   Okay.  Okay.

4     Q.   So number one, there is language in italics;

5   right?

6     A.   Yes.

7     Q.   Okay.  Can you read that language, please?

8     A.   Under number one, "On October 23rd, 2014,

9   during a Retention, Promotion, and Tenure Committee

10   meeting (RPT) Professor Ron Griffin allegedly expressed

11   that some individuals were being 'malicious, evil,

12   racist, and vile.'  To the best of your ability, give an

13   account of what transpired during this conversation."

14   So I think this was a question that I was asked to

15   answer.

16     Q.   Uh-huh.

17     A.   Okay.

18     Q.   And is that language that is quoted,

19   "malicious, evil, racism, and vile," is that the

20   language you said before was horrible language?

21     A.   Yes.

22     Q.   Okay.  What was he referring to when he made

23   that?  What was the discussion about?

24     A.   I think to my -- what I recall, we were in

25   discussion if this is -- let me see the date.  This may

1  have been -- I don't want to speculate because the date

2  you said, the date is different.  But I think it was in

3  reference to Professor Reyes's application for tenure, I

4  believe.

5      Q.   And what do you think he meant by racist?

6      A.   Well, I think that's why I cried.

7           MS. REINER:  Objection.  Form.

8      A.   I have no idea.

9      Q.   When Professor Griffin used the word racist --

10     A.   Yes.

11     Q.   -- did he give any indication what he meant by

12  that?

13     A.   No.

14     Q.   What is your understanding of the word racist?

15     A.   It's somebody who discriminates against someone

16  based upon their race.

17     Q.   Okay.

18     A.   And who has the power to impact that decision.

19     Q.   Did the RPT Committee -- the women in the RPT

20  Committee, did they have the power to impact the

21  decision on whether Professor Reyes would be voted on

22  for tenure or not?

23     A.   I don't know what you mean "the women."

24     Q.   Did they have the power to vote.  The women who

25  were on the RPT Committee and were the subject of being

 1   insulted, being called racist --

 2       A.   Right.

 3       Q.   -- did they have the power to vote on Professor

 4   Maritza Reyes's application for tenure?

 5       A.   Yes.

 6       Q.   And so you said that, you know, you were very

 7   emotional at that meeting.

 8       A.   Uh-huh.

 9       Q.   Insulted like that.  Would you consider

10   yourself a racist?

11       A.   Absolutely not.

12       Q.   How do you know that you're not a racist?

13       A.   I'm not sure I understand the question.

14       Q.   Just your personal knowledge.

15       A.   Because I accept people for who and what they

16   are.  I look beyond their race, their gender, their

17   creed, and I respond to people in a manner in which I

18   reflect back the way they respond to me.  So no, under

19   no circumstances do I consider myself a racist.

20       Q.   And do you believe that black people can be

21   racist?

22       A.   I believe anybody can be racist.

23       Q.   Okay.  So I'm going to take you back to your

24   statement on page 2 of that statement at the top, right

25   under number 3.

1    A.   Okay.

2    Q.   Please read the italics at the top?

3    A.   "Professor Griffin also allegedly stated one

4 true minority in the building -- only true minority in

5 the building give an account."

6    Q.   An account of?

7    A.   Your understanding of the statement.

8    Q.   Yeah.  And so what was your understanding of

9 the statement and did you disagree with it?

10   A.   Yes, I disagreed with it.

11   Q.   Why?

12   A.   Because I thought that the whole notion of --

13 so you want me to interpret what I said?  I just want to

14 be clear.

15   Q.   Yeah, because they told you to give an account

16 of your understanding of the statement and you did.

17   A.   Right.

18   Q.   So what was your understanding of the

19 statement?  Your account of that.

20   A.   My understanding of the statement was that he

21 was saying in some way that black women who had been so

22 discriminated against through history, would turn around

23 and discriminate against another woman because she was

24 Latino is reprehensible.

25        And that -- I didn't understand where that came

1  from because there were other Latina women on the

2  faculty.  We voted all of them in.  We welcomed them

3  when they came in.  So I didn't understand from -- and

4  I'm piecing together from memory and from what I wrote.

5  I don't understand how you reached the conclusion that

6  any -- anything that occurred in that meeting had

7  anything to do with her race.

8      Q.  That was Professor Griffin's understanding, so

9  let me go back to what you stated there because --

10     A.  No, that was my understanding.

11     Q.  Okay.  So --

12     A.  You asked me what I understood.

13     Q.  Yes.

14     A.  Okay.

15     Q.  So let me go back to the statement there that

16  you said about there were other Latinas and we voted

17  them in; right?

18     A.  Uh-huh.

19     Q.  Which other Latinas were you referring to when

20  you said -- in that statement you said that "I was a bit

21  confused about the statement because there are at least

22  three other Latino women on the faculty."

23     A.  Correct.

24     Q.  Who are they?

25     A.  Nise Nekheba, who had -- Nise Nekheba had been

1  an instructor and she was very, very bright and very,

2  very ambitious, she was voted onto the faculty.

3      Q.   And let me just go one by one.  Let me stop you

4  for just one by one.

5          MS. REINER:  No, she needs to be able to finish

6      the answer to the question.

7      Q.   So I'm going to go -- what was the first Latina

8  that you remember in terms of one of the three?  You

9  said Nise Nekheba?

10         MS. REINER:  Objection.  Asked and answered.

11     Q.   Okay.  You said Nise Nekheba?

12     A.   That's the first name I gave.

13     Q.   Yes.

14     A.   But that's not the first person I remember.

15     Q.   Okay.  So what was the first name you gave just

16  now?

17     A.   Nise Nekheba.

18     Q.   How does Nise Nekheba identify racially?

19     A.   As far as I know she is Latina.

20     Q.   Okay.  So let's take a look at the exhibit that

21  we have here marked with the race categories.

22     A.   Okay.

23     Q.   I believe it's marked as Exhibit 4.

24     A.   Okay.

25     Q.   And let's find Nise Nekheba in that exhibit.

1    A.   This is so small.  Nise Nekheba.

2    Q.   And she's on page 2.

3    A.   Oh, thank you.

4    Q.   I think she's nine from the top.

5    A.   Female black is what it says.

6    Q.   Okay.  So it's identified as black.

7    A.   But I thought you asked me what I knew her as?

8    Q.   Yes.

9    A.   Afro Latina, Puerto Rican.

10   Q.   So let me now show you -- we're going to mark

11   another exhibit.  And that's why I wanted to take it one

12   at a time, Professor Broussard.  Could you mark this,

13   please.

14        (Exhibit Number 8 was marked for

15        identification.)

16   Q.   I'm going to show you what's been marked as

17   Exhibit Number 8.

18   A.   Okay.  Thank you.

19   Q.   And this is an excerpt from the 2011-2012,

20   Florida A&M University College of Law Self-Study.

21   A.   Correct.

22   Q.   And I'm going to go to -- the excerpt is from

23   page 97.

24   A.   Yes.

25   Q.   And if you go to the first paragraph under

1  where they list the numbers of professors in each rank.

2     A.   Yes.

3     Q.   It states the difference of faculty members

4  racially and ethnically.

5     A.   Yes.

6     Q.   And it says 26 African Americans, 15

7  Caucasians, 3 Latina, 1 Black-Latina, and 1 Caribbean-

8  East Indian.

9     A.   Uh-huh.

10    Q.   Do you understand why there was a distinction

11 made between the 3 Latina and 1 Black-Latina?

12    A.   My -- I would only be speculating.

13    Q.   Uh-huh.

14    A.   But from my speculation, Nise always identified

15 as Black-Latina/Afro-Latina.  That's the way she

16 identified herself.  That's why she changed her name to

17 Nise Nekheba.

18    Q.   Right.  Okay.  So that was 1 of 3 that you said

19 in addition to; right?  Three other Latinas?

20    A.   Right.

21    Q.   So we have one who identified as

22 Afro-Latina/Black-Latino.  Who was the other Latina?

23 The next one.

24    A.   I think it was Eunice Caussade.  That was two.

25    Q.   And is she a tenure-track professor?

1    A.   She is a clinician.

2    Q.   Is she a tenure-track professor?

3    A.   Not to my knowledge.

4    Q.   And who was the other one?

5    A.   I honestly don't remember.

6    Q.   Let's look at the list again here.

7    A.   Okay.

8    Q.   You can go down where it says race and find

9 Hispanic.  On the first page.

10    A.   Oh, yeah, yeah, Rebecca Olavarria.

11    Q.   And was she a tenure-track professor?

12    A.   I have no idea.

13    Q.   What does she teach?

14    A.   Where does it say what she teaches?

15    Q.   Was she a legal research writing instructor?

16    A.   I don't remember what she taught.  I remember

17 who she is, I don't remember what she taught.

18    Q.   Do you remember if she was tenure-track?

19    A.   I don't remember.

20    Q.   Is she at the law school at this time?

21    A.   No.

22    Q.   Why did she leave?

23    A.   I have no idea.

24    Q.   Okay.  So was Professor Maritza Reyes the first

25 Latina, in your recollection, to apply for tenure in the

1  FAMU College of Law?  In your recollection of the time

2  that you were there.

3       A.   To apply for tenure?

4       Q.   Yes.

5       A.   As far as I know, yes.

6       Q.   Okay.  So taking you back again to what was

7  happening and the reason why, you know, Professor

8  Griffin made the statements that he made.  And you told

9  me that there was an allegation of late submission of an

10 application by Professor Reyes for tenure.

11      A.   Yes.  This is for tenure, yes.

12      Q.   And was there an investigation?

13      A.   As I said earlier, I was like really engrossed

14 in some personal problems, so I have no idea.

15      Q.   Did at any point the word came from somebody

16 that the RPT Committee had to review the application for

17 tenure?

18      A.   Did the word come?

19      Q.   Yeah.  Did somebody tell the RPT Committee you

20 have to review the application for tenure for Professor

21 Maritza Reyes?

22      A.   I don't recall.

23      Q.   Did the College of Law RPT Committee review the

24 application for tenure of Professor Reyes?

25      A.   Yes.

1     Q.    And so when you said that Professor Griffin

2  made those statements to the black women who were in the

3  committee, all the women who were in the Retention,

4  Promotion, and Tenure Committee at that time were black

5  women; right?

6     A.    I don't know.

7     Q.    We went over the list already.

8     A.    Off the top of my head, I can't remember the

9  list.

10     Q.    The list we had gone over, the 2014-2015.

11     A.    Yeah, I don't remember if there was a white

12  woman in there or a white man.

13     Q.    Let's look at the list because I would like to

14  see if there was a white woman.

15     A.    What exhibit is that?

16     Q.    It's going to be the exhibit right there.  This

17  one.  What number is it?

18     A.    I don't know.

19     Q.    Exhibit Number 3.

20     A.    Number three.

21     Q.    Was there a white woman?

22     A.    Looks from the list and from your category, no.

23     Q.    Okay.  Has there ever been a white woman in the

24  tenured faculty of the FAMU College of Law?

25     A.    I honestly don't know.  I can't off the top --

1   I've been there -- it's been 19 years.  I have no idea.

2       Q.   During your time that you've been there, has

3   there ever been a white women on the College of Law

4   Retention, Promotion, and Tenure Committee?

5       A.   I don't know.  I can't remember.  In the whole

6   time?  In the whole 19 -- I can't remember.

7       Q.   Okay.  Is there a white woman currently in the

8   tenure faculty of the FAMU College of Law?

9       A.   Do you have a list of who's there now that I

10  could look at?

11          MS. REINER:  Well, I'm going to go ahead and

12      just ask you to answer the questions that she --

13      answer the question she asked.

14      A.   I don't know.  I mean, off the top of my

15  head --

16          MS. REINER:  That's fine.

17      A.   -- I don't know who's tenured and who's not.

18  And if there is a white woman, I don't know.

19      Q.   So is Priscilla Harris a white women?

20      A.   Yes.

21      Q.   Is she a tenured professor?

22      A.   No, she's the director of the writing program.

23      Q.   And in the legal research and writing -- in the

24  legal writing program, are there other white women?

25      A.   Are there what?

1    Q.   White women.

2    A.   Did you say are there other?

3    Q.   Other white women.

4    A.   Yes.

5    Q.   Are any of them in the legal writing program

6 tenured?

7    A.   No, it's not a tenure-track position, no.

8    Q.   Okay.  Are there any other white women teaching

9 full-time in the FAMU College of Law, other than the

10 ones in legal writing now?

11   A.   Yes.

12   Q.   Who?

13   A.   Kara Consuelo.

14   Q.   Kara Consalo.

15   A.   Thank you.

16   Q.   Yes.

17   A.   Kara.  I'm trying to go around the building --

18 around the office.  Not that I can think of, no.

19   Q.   Is Kara Consalo tenured?

20   A.   She's tenure-track.

21   Q.   Is she tenured?

22   A.   No.

23   Q.   And when was Kara Consalo hired?

24   A.   I believe it was two years ago.

25   Q.   Okay.  Do you know when Professor Maritza Reyes

 1  filed this lawsuit?

 2      A.   No.

 3      Q.   Do you know if it was more than two years ago?

 4      A.   No.

 5      Q.   Okay.  So I'm going to take you now to when you

 6  were part of the RPT Committee that was reviewing

 7  Professor Maritza Reyes' application for tenure.  Did

 8  you participate in class observations of Professor

 9  Reyes's classes?

10      A.   Yes.

11      Q.   Okay.  And which class?

12      A.   I can't remember.  I don't know.

13      Q.   And as part of that process, did you have to

14  fill out some peer evaluation forms?  Your class

15  observation forms.

16      A.   Yes.

17      Q.   And when you filled out those forms, does the

18  form say that you're expected to meet -- and the faculty

19  handbook says, which tracks the language in the form,

20  that you had to meet with Professor Reyes to give her

21  feedback about your observation of her class?

22      A.   I believe so, yes.

23      Q.   Did you meet with her to give her feedback?

24      A.   I'm assuming that I did, but I don't know.

25      Q.   Okay.

1          (Exhibit Number 9 was marked for

2     identification.)

3     Q.   I'm going to give you what I've marked as

4  Exhibit Number 9 and it's Classroom Visit at the top.

5  Course:  Evidence -- course name.  Instructor:

6  Professor Maritza Reyes.  Evaluator:  Professor Patricia

7  Broussard.  The date of the visit is 9/24/14.

8     A.   Uh-huh.

9     Q.   When you review this document, do you remember

10 filling out this document?

11    A.   Do I remember filling it out?  Huh-uh.  I'm

12 going to say yes, because it's got my name on it, but

13 no, I don't remember with specificity.  But yes, this

14 looks like something I would do.

15    Q.   Okay.  So go to the last page.

16    A.   Okay.

17    Q.   There's a number 19 there.  And number 19 says

18 "was there a follow-up discussion after class by the

19 evaluator with the instructor?"  What was your answer?

20    A.   "No, not sure it is appropriate under the

21 circumstances."

22    Q.   Why did you not think that it was appropriate

23 under the circumstances?

24    A.   So if you will allow me -- the paragraph above

25 refreshes my memory, if you will allow me to respond.

1    Q.   Uh-huh.

2    A.   I had been approached by some students who

3    complained about Professor Reyes.  And I informed them

4    that it was inappropriate for them to come to me and

5    complain about one of my colleagues and I was not in

6    charge of the faculty.  And the appropriate person is

7    the academic dean.  And I just at that point thought

8    that it would be problematic if I met with Professor

9    Reyes under those circumstances.

10    Q.   So you thought it was inappropriate to give

11    feedback about the students who came to you?

12    A.   Yes.

13    Q.   Okay.

14    A.   I did.

15    Q.   What about feedback about your own

16    observations?

17    A.   Seems to me like I probably would have talked

18    to you, but there's a possibility I didn't.  Let me just

19    for the record say --

20    Q.   What does it say there?

21    A.   I don't recall.

22    Q.   Okay.  It says "was there a follow-up

23    discussion after the class by the evaluator with the

24    instructor?"  Does it say yes or no on number 19?

25    A.   It says "no."  But you asked me why.

 1      Q.   No, I asked you --

 2      A.   Okay.

 3      Q.   -- you said that you probably would have and

 4  did, so I want to qualify, did you meet with Professor

 5  Reyes to discuss, not the students, but to discuss your

 6  observations?

 7      A.   If it says no, then it was no.

 8      Q.   Let's go back to qualify what happened with the

 9  students.  Go back to page 2, please.

10      A.   Okay.

11      Q.   When you were there to do your peer

12  observation --

13      A.   Yes.

14      Q.   -- of Professor Broussard, did you open a

15  conversation with students?

16      A.   No.

17      Q.   Can we go back to page number 2 of Exhibit

18  number -- what number does it have there?  Nine?

19      A.   Uh-huh.

20      Q.   Exhibit Number 9.  In the paragraph under

21  number 18 it says -- first paragraph under the

22  underlying paragraph, it says -- what does it say there?

23  Please read it.

24      A.   It says "I talked to a few students after class

25  for their impression of the class and three stated that

1 Professor Reyes was on her best behavior during our

2 visit and that she can be erratic and derogatory under

3 did the guise of rigor, but acted differently because

4 visitors were in the class."

5    Q.   Okay. So let me stop right there. You made a

6 choice to talk to a few students after class for their

7 impressions of the class; correct?

8    A.   Correct.

9    Q.   So then you did approach students to talk about

10 Professor Reyes's class?

11    A.   I thought your question was did I approach

12 students during the class. No, I approach them as I do

13 with every evaluation I do, I ask students their

14 impression of the class, yes.

15    Q.   And students feel free to make these kinds of

16 assertions to you?

17    A.   They made them.

18       MS. REINER: Objection. Speculation.

19    Q.   Well, they did. Students told you that?

20    A.   Correct.

21    Q.   Okay. And then you say in the next paragraph

22 that about a week later a few students approached you to

23 make formal complaints; right?

24    A.   Yes.

25    Q.   And you said "I will not discuss a colleague,

1      Q.   And what is her gender?

2      A.   Female.

3      Q.   Do you know anything about an incident between

4   Erica Polite and Professor Reyes?

5      A.   When?

6      Q.   An incident.  Any kind of incident that would

7   stick in your mind between Erica Polite and Professor

8   Maritza Reyes.

9      A.   Could be you more specific?  I don't know what

10  you're talking about.

11     Q.   Anything you remember between Professor Reyes

12  and Erica Polite.

13     A.   No.

14     Q.   Who is Celia Westbrook?

15     A.   Celia Westbrook is the -- she was the -- what's

16  the title that we use?  She was an assistant to the

17  different professors at the law school.  And she was my

18  -- she was my assistant.

19     Q.   Do you know if she also assisted Professor

20  Reyes?

21     A.   Yes.

22     Q.   Was there any time, any investigation, related

23  to Celia Westbrook in which you participated?

24     A.   I can't remember.  I don't know of an

25  investigation.

```
 1            (Exhibit Number 10 was marked for

 2       identification.)

 3       Q.   I'm going to give you what's been marked as

 4   Exhibit Number 10.

 5       A.   Thank you.

 6       Q.   And this is a College of Law Investigation

 7   Report of Celia Westbrook.

 8       A.   Okay.

 9       Q.   It was conducted -- it's conducted by the

10   Division of Audit and Compliance under Richard Givens,

11   Vice President.  And it has the logo and the title at

12   the top, Florida Agriculture and Mechanical University.

13            And I'm going to walk you through page 2,

14   please, at the bottom.  And page 2 at the bottom and it

15   states -- we're going to stipulate that the record is

16   what it purports to be, something related to an

17   investigation into Ms. Westbrook's annual performance

18   and the fact that she alleged that there was retaliation

19   by Associate Dean Jean Bullock after Ms. Westbrook

20   refused to join in efforts to -- in the investigation of

21   Professor Reyes's application for tenure.

22            Do you remember the incident?

23       A.   I'm confused.  I don't know what this document

24   is.  Can I look through it?

25       Q.   Yes, look through it, please.
```

1       A.   Thank you.

2       Q.   And for the purpose of time Professor

3   Broussard, at this point does it refresh your memory?

4       A.   I'm still not clear what the document is.

5       Q.   So let me give you something else that may help

6   you more directly to it.  Maybe you haven't seen the

7   document.  So let's put it aside for a minute and I'm

8   going to give you something else.

9            (Exhibit Number 11 was marked for

10       identification.)

11      Q.   I'm going to give you what's been marked as

12  Exhibit Number 11.

13      A.   Okay.

14      Q.   And Exhibit Number 11 is on University FAMU

15  letterhead, Florida Agricultural and Mechanical

16  University, Division of Audit and Compliance, FAMU

17  Administration Center.  And then it's Investigation

18  Interview, Westbrook versus Bullock:  Retaliation.  And

19  it has case number FAMU-14-08-004.

20      A.   Okay.

21      Q.   And it says Background Information.

22  Interviewee:  Professor Patricia Broussard.

23      A.   Okay.

24      Q.   Date:  September 17, 2015.

25           And the second page of that is the same.

1  Interviewee:  Professor Patricia Broussard.  Date:

2  September 17, 2015.  It's two different people who

3  authored the form.  So go ahead and read it and see if

4  that refreshes your memory about what the Westbrook

5  versus Bullock retaliation was about.

6      A.  No, it doesn't.  Did you hear me?

7      Q.  I'm sorry, no.

8      A.  No, it doesn't.

9      Q.  It doesn't remind you?

10     A.  No.

11     Q.  Because we are saying the documents are what

12  they purport to be, this comes from the FAMU

13  investigation file.  In the file of the investigation

14  they have this report or statement that they took from

15  you.

16         And for number 5, it says "have you ever made a

17  complaint regarding Ms. Westbrook to Dean Bullock?  If

18  so, what was the complaint about and when was it made?"

19         And the answer that they wrote there is "no

20  because she doesn't want any trouble.  Has been accused

21  of conspiracy in the past."

22         Do you remember making that statement at any

23  point?

24     A.  I don't remember, but I probably don't doubt

25  that I made it.

1    Q.   And why is it that you don't doubt that you

2  made it?

3    A.   Well, because in the past I've been accused of

4  conspiracy by Professor Reyes, so I didn't -- I knew

5  that she was very, very close with Celia and that Celia

6  would, a lot of times, not have time to do other

7  people's work because she was working for Professor

8  Reyes.  And so I generally just didn't want any trouble,

9  any more grief, so I don't doubt that I would have said

10  this.

11    Q.   So it was your perception that Celia Westbrook

12  was doing more work for Professor Reyes than other

13  professors?

14    A.   Yes.

15    Q.   And what did you base that perception on?

16    A.   Many times she couldn't do something, she was

17  busy with Professor Reyes.  She was running things off

18  or doing things and I had to do things for myself.

19         Now, I want to clarify, this is very early on.

20  And probably later Celia became more available to the

21  other faculty that she was supposed to be serving.  But

22  at this particular time, from what I recall, she would

23  say "I don't have time.  I can't do it."  And she would

24  indicate she had to help you or she would be in your

25  office and we couldn't get to her -- I'm sorry, I can't

1  speak for the other professors.  I couldn't get to her.

2     Q.   Do you know where Celia Westbrook is from?

3     A.   Brazil.

4     Q.   Okay.  And did you evaluate Ms. Westbrook?

5     A.   Oh, I'm sure I have in the past.

6     Q.   And with regards to the evaluation that is

7  noted in number 4 here, the answer that apparently they

8  have reported for you is that you evaluated her and

9  again, "just don't want any trouble, easier to say she's

10  great instead of an investigation."

11     A.   Yes.  Yes.

12     Q.   Before this, which you don't remember -- you

13  said that this investigation, you don't remember.

14     A.   No.

15     Q.   Uh-huh.  And before that, do you remember if

16  Celia had ever filed any complaints against anybody?

17     A.   If Celia had?

18     Q.   Yeah.

19     A.   Not to my knowledge.  I have no idea.

20     Q.   Okay.  Had anybody ever accused you of treating

21  Celia unfairly?

22     A.   Not to my knowledge.

23     Q.   Okay.  But you were afraid that somebody may do

24  that?

25     A.   As I said earlier --

1        MS. REINER:  Object to form.

2    Q.   Were you afraid that somebody may do that?

3    A.   Yes.

4    Q.   Okay.

5    A.   Professor Reyes.

6    Q.   Okay.  And where does this fear from Professor

7    Reyes come at this point?  We're talking on

8    September 17, 2015.  What did you base that fear of

9    Professor Reyes on?

10   A.   Probably just on emails and some of the things

11   she said in meetings and some of the way she behaved

12   towards me and other faculty.

13   Q.   And like what?  Give us an example.  What did

14   she accuse you of?

15   A.   She accused me of being a bully.  She accused

16   me of sabotaging her.  She accused me of -- if I would

17   say "good morning," she would say "it wasn't good" and

18   "it's not morning" and just generally, just very, very

19   negative towards me.

20   Q.   So when you said "good morning" to Professor

21   Reyes, she would respond "it's not good," "it is not

22   morning?"

23   A.   That was the attitude that I got for her, that

24   I was in some way infringing upon her space by trying to

25   be kind to her.

1    Q.   And how were you kind to Professor Reyes?

2    A.   Well, initially when she came I greeted her.  I

3 was so thrilled to have her.  I was really, really

4 happy.  I told her -- I specifically remember telling

5 her how glad I was that she was coming to the law school

6 because I thought that it was so important that our

7 students see other -- see themselves in the faculty.

8         We went to a couple of events together.  I

9 remember very clearly going into her office when she

10 first started and saying "if there's anything I can do

11 for you, let me know."  Because I do that with all new

12 people.  And I did that with her.

13         And I remember we laughed because I told her

14 that when you -- I was under the impression you hadn't

15 taught before -- that Professor Reyes hadn't taught

16 before.  And I remember telling you that one of the

17 things about a professor had to do, was they had to

18 develop their voice.  They had to decide how they were

19 going to approach, what their teaching style was going

20 to be.

21         And I said "you have to be firm to start off

22 and then you can ease up as time goes on.  But if you

23 come in and you want to be everybody's friend and you

24 want to be kind and then you try to get stern at the

25 end, then you just look crazy."  And we laughed about

1 that. I remember that. Because I remember walking over

2 to her office. So I really liked Professor Reyes a lot,

3 so I was so taken aback when all of this negativity

4 starting pulling out of her.

5     Q.   So you remember all of that; right?

6     A.   I do.

7     Q.   But you still don't remember the incident that

8 happened and the statements that you gave, you don't

9 remember those?

10     A.   No, I remember my interactions with people more

11 so than I would a written document. And I remembered

12 that -- and Professor Reyes is part of the reason I

13 remembered it. Do you want me to go on?

14     Q.   No, I'm sure you could go on.

15     A.   Okay.

16     Q.   But we're going to leave it at that.

17     A.   Okay.

18     Q.   Do you remember the interactions with the

19 investigators that were investigating --

20     A.   No.

21     Q.   You don't remember your interactions with that?

22     A.   No, I don't.

23     Q.   And you remember your interactions with Celia

24 Westbrook?

25     A.   Generally, yes.

1     Q.   Okay.  And around that time that you said that

2  she was working on Professor Reyes's work, was she doing

3  your work?

4     A.   Not a lot of it at that time, no.  Later on she

5  -- she started doing much more later on.  I would say

6  maybe three or four years later she actually became my

7  right arm.  She was fabulous.  She was available.  She

8  was absolutely wonderful.  But that was later on, not

9  during this time period.

10     Q.   And was Professor Reyes still working at the

11  college of law and assigned to Ms. Westbrook when she

12  became your right hand?

13     A.   As far as I know, yes.  Yes.  Yes.

14     Q.   All right.  So when you talk about Professor

15  Reyes --

16     A.   Uh-huh.

17     Q.   -- have you filed complaints against Professor

18  -- have you complained to anyone about Professor Reyes?

19     A.   Have I complained to anyone?

20     Q.   Yeah.

21     A.   I'm sure I have.

22     Q.   Who can you remember?  Because you said you

23  remember interactions with people.

24     A.   Yeah, yeah.

25     Q.   Who do you remember you complained to Professor

1  Reyes about -- I mean about Professor Reyes?

2      A.    Professor Rhonda Reaves and I have talked.

3  Professor Cavazos and I have talked.  And probably, I'm

4  sure that when Professor Reyes filed a grievance against

5  me, I responded with a grievance against her.  So

6  that --

7      Q.    Let's -- it's narrative right now, right, so I

8  don't need a narrative right now.  So let's break it

9  down.

10         MS. REINER:  And I'd, again, ask you to let her

11     complete her sentences, her response.

12     Q.    Yeah, but if she's going to go into a

13  narrative, she's going to eat up my time.  So if we

14  could give me some leeway and some breaking it down.

15  Because I was asking about your complaints about

16  Professor Reyes.  What have you complained?  And then

17  you got into Professor Reyes complained about you.  So I

18  want to stick to --

19     A.    Then let me finish.

20     Q.    Yes.  I want to stick to that.  But if you

21  could hurry up because the time is running.

22     A.    So in responding to Professor Reyes, I was

23  going to tell you who I complained to, Carrie Gavin at

24  the university.

25     Q.    So let's go back to -- you said that Professor

1  Reyes filed a grievance against you?

2      A.    Uh-huh.

3      Q.    When did she file a grievance against you?

4      A.    I don't remember.  It was somewhere between

5  2010 and 2018.  I don't remember with specificity when

6  it was.

7      Q.    And you said that you filed a grievance in

8  response to Professor Reyes's grievance?

9      A.    Yes.

10            (Exhibit Number 12 was marked for

11      identification.)

12      Q.    I'm going to give you what has been marked as

13  Exhibit Number 12.  And I'm going to describe it as a

14  document that has the name Patricia Broussard, the

15  submission date is 11/25/15.

16      A.    Yes.

17      Q.    It is notarized with a signature of Patricia

18  Broussard at the bottom.  Do you recognize this

19  document?

20      A.    I -- my name.  I signed and all of that.  So I

21  -- it's mine, but I don't have any special -- it's not

22  in the forefront of my brain, no, I would have to review

23  it.

24      Q.    How many times have you filed a complaint

25  against a fellow faculty member?

1      A.    Against a fellow faculty -- never.  Just

2  Professor Reyes.

3      Q.    And you don't remember, though, right now?

4      A.    No.

5      Q.    Okay.  So let's go to -- this is a three-page

6  document.

7      A.    Okay.

8      Q.    And in the third page --

9      A.    Yes.

10      Q.    -- what is the last three lines on the left

11  margin of that third page?

12      A.    I'm sorry?

13      Q.    The signatures at the bottom.  What does it

14  say?

15      A.    On the third page?

16      Q.    Yes.  At the bottom.

17      A.    "Respectfully submitted, Patricia A. Broussard,

18  November 24, 2015.

19      Q.    And do you remember what it is that you

20  complained about regarding Professor Reyes?

21      A.    I guess the document sort of speaks for itself.

22      Q.    Yes, it does.

23      A.    I had become hospitalized because of the stress

24  from dealing with Professor Reyes and I filed this in

25  response to that.

1      Q.    Okay.  So you were hospitalized?

2      A.    Yes.

3      Q.    When were you hospitalized?

4      A.    Probably in 2015 I was diagnosed with AFib.

5      Q.    And you attributed your hospitalization to

6  Professor Reyes?

7      A.    And all of the stress, the constant stress

8  always, yes.

9      Q.    And what is it that you stated in this

10  complaint with regards to the reason for that?

11      A.    My stress?  What was the reason for my stress?

12      Q.    Yes.

13      A.    I kind of think that the document speaks for

14  itself.

15      Q.    Uh-huh.

16      A.    It was just one thing after another.  No matter

17  what I did, it was wrong.  No matter what I did, it was

18  suspect.  No matter what I did, it was bullying.  And I

19  was, you know, going through, as I said, some personal

20  stuff in my life.  And the combination of what I was

21  going through and the constant barrage of emails and

22  complaints and I was just --

23      Q.    Do you have any of those emails or complaints?

24      A.    I probably don't, but the university might.

25      Q.    Did you attach any of those emails or

1  complaints to your charge that you filed on November --

2  do you see them here?

3      A.   No.

4          MS. REINER:  Object to form.  Charge.  Are you

5      referring to this?

6      Q.   To this document right here.

7      A.   Do I see any of the emails?

8      Q.   Yeah, do you see any of the emails attached to

9  this document?

10     A.   No, I wouldn't attach them because all of

11  Professor Reyes's emails went to the university, so they

12  already had them.

13     Q.   Okay.  So let's go over what's stated on here

14  to understand what the basis of your stress could have

15  been.  Let's go to the third paragraph.

16     A.   Which page are you on?

17     Q.   On the second page.

18     A.   Okay.

19     Q.   In the third paragraph it says "for the past

20  year, Ms. Reyes has sent and circulated a series of

21  slanderous emails, both inside and outside the

22  university.

23     A.   Uh-huh.

24     Q.   And by the way, do you refer to your colleagues

25  as Ms. Reyes, for example, versus Professor Reyes?

1   when we interchangeably -- you will call me Patricia

2   Broussard, I will call you Maritza Reyes, so there are

3   times where that has occurred, yes.

4       Q.   But in writing in an actual document --

5       A.   I'm sorry?

6       Q.   In writing, in actual documents, did Professor

7   Reyes call you Ms. Broussard?

8       A.   You mean ever?

9       Q.   Yes.

10      A.   I would say yes.

11      Q.   Okay.

12      A.   She has called me Ms. Broussard in documents,

13  yes.

14      Q.   So let's go to this third paragraph here.  It

15  says "for the past year, Ms. Reyes has sent and

16  circulated a series of slanderous emails, both inside

17  and outside the university.  These falsehoods have

18  defamed me to my colleagues and created a hostile work

19  environment, which impacts my health on a daily basis."

20           Okay.  Do you teach First Amendment?

21      A.   Yes.

22      Q.   Are you familiar with the elements of slander?

23      A.   Yes.

24      Q.   Okay.  Did you state in here anything that you

25  allege was slanderous or falsehoods that have defamed

1    you?

2        A.    I think the inside and outside the university,

3    when I've been approached by people outside the

4    university, who have told me that they've received

5    emails from you, yes.

6        Q.    Okay.  Who has told you that?

7        A.    Just at different conferences, different people

8    have come up and said, you know, "what's going on with"

9    -- they called you Maritza Reyes, they didn't call you

10   Professor Reyes.  "What's going on with Maritza Reyes?

11   She says that you all are mistreating her" and stuff

12   like that.

13       Q.    Who are these people?

14       A.    Different -- different people I've run into at

15   conferences.

16       Q.    What name?

17       A.    Audrey McFarlane.

18       Q.    Audrey McFarlane?

19       A.    Uh-huh.

20       Q.    Okay.  And how do you know Audrey McFarlane?

21       A.    From conferences, just from going to

22   conferences.

23       Q.    And does she tell you how she knows Professor

24   Reyes?

25       A.    I mean, I didn't go into a long -- when

1  somebody comes up to you and says "what are you all

2  doing?  Why are you mistreating?"  Blah, blah, blah.

3  I don't go into "how do you know her" and all that.

4  I wouldn't have that conversation with her.  It's not my

5  business how she knows you.

6      Q.   Anybody else?

7      A.   The professor at the University of Mississippi

8  who's a friend of yours.  What is her name?  I can't

9  remember her name off the top of my head.  She stopped

10 me at a conference and said "you should be ashamed of

11 yourself for what Professor Reyes is going through."

12 And I was like "what are you talking about?"  Yeah.  But

13 she's a friend of yours, so you probably know who I'm

14 talking about.

15     Q.   What was it, though?  Because for slander,

16 right, it has to be something that is not true.  What

17 was it that was told to you?

18     A.   So first of all, we are not talking

19 constitutional law, legal term, we are talking about as

20 black people would say in the church "you scandalized my

21 name," which means you said something negative about me.

22 You may -- we're not talking about I'm filing a lawsuit

23 and I'm alleging the elements of slander.  We're talking

24 about you saying something negative and wrong about me.

25 You know, that "we don't like you," that "I don't like

1  you," that, you know, that I'm mean to you, that -- just

2  on and on and on about how you say -- you claim that

3  because you're Latino we don't like you.  And I just

4  can't imagine saying something like that about you.

5  That you don't like me because I'm black.  I can't

6  imagine the impression that that would leave with

7  somebody for me to make a comment like that about you.

8  So that's very hurtful to say --

9      Q.   Okay.  Professor Broussard, we're getting into

10  a narrative, so I'm going to have to stop with the

11  answer.  But I'm going to ask you, do you have any proof

12  of what the allegations that you're making right now

13  about what these people told you?

14          MS. REINER:  I'm going to object, again, to the

15      extent she's once again cut off our client's

16      response to the question.

17      Q.   Okay.  Do you have any proof?

18      A.   What would --

19      Q.   Any type of -- in writing, an email, where

20  these people that allegedly told you this, stated it?

21      A.   In writing?

22      Q.   Uh-huh.

23      A.   Or in an email?

24      Q.   Yes.

25      A.   No, this is in person.

1    Q.   So we are going by your narrative of what you

2  alleged people told you that Professor Reyes said to

3  them?

4         MS. REINER:  Object to form.

5    Q.   We're going by a narrative?

6    A.   Just like we go by your narrative, we're going

7  by mine.

8    Q.   We're not going by a narrative now, Professor

9  Broussard.  Because I'm not telling you what my

10  narrative is or what I could say about you.

11    A.   Okay.

12    Q.   You are telling me what you heard that people

13  said that Professor Reyes said about you.

14    A.   No, I'm not telling you what I heard.  I'm

15  telling you what people said to me about that you had

16  said about me.

17    Q.   Did you hear them when they were telling that?

18  How did you get the information from them?  You said you

19  didn't get them in writing; right?

20         MS. REINER:  Object.  Asked and answered.

21    Q.   Did you get it in writing?

22    A.   These are people at a conference that I'm

23  talking to who told me verbally.

24    Q.   Okay.  So when they told you, you heard them?

25    A.   Yes.

1    Q.   Okay.  So that's what you heard about Professor

2  Reyes saying that?  You heard --

3         MS. REINER:  Objection.  Asked and answered.

4    A.   That's what I heard, yes.

5    Q.   All right.  So with regards to the charge that

6  you're making and you're getting notarized --

7    A.   Uh-huh.

8    Q.   -- did you state any statements, any of the

9  slanders and falsehoods, did you state it anywhere in

10 here?

11   A.   No.

12   Q.   Okay.

13   A.   Well, no, I haven't read this, so I don't know.

14   Q.   In paragraph 3 what did you say?

15   A.   You accuse me of always getting to count the

16 votes.

17   Q.   So let's stop there.  Let's talk about that.

18 You said that "in addition, in one incident last year,

19 Ms. Reyes jumped out of a seat at a meeting at which I

20 had been asked to count the votes we had just taken on

21 some matter, and attempted to push her way into my space

22 while declaring 'you always get to count the votes, let

23 me do it.'  The incident was caught on tape and Dean

24 Green was so upset by it that he asked the chief of

25 security, Shashi Persaud, to save the tape of the

1    incident;" right?

2        A.    Uh-huh.

3        Q.    So if we have -- in your memory, you remember

4    that Professor Reyes tried to push her way into your

5    space?

6        A.    Yes.

7            MS. REINER:   Object to the form of the

8        question.

9        Q.    And what's stated here, right, you said that

10   Dean Green was so upset by it.  How do you know that

11   Dean Green was so upset by it?

12       A.    So I am relying upon this document, and because

13   it's notarized, that it asserts the truth of what is

14   stated within, but for me to go back and try to remember

15   how I know all of this, I can't remember, but this -- if

16   this is a contemporaneous document with my memory and

17   with the incident, I'm going to rely upon it.  But I

18   don't want to make something up and say this is how I

19   knew, I'm just going to rely on this document.

20       Q.    Okay.  And so at the time when you prepared

21   this document, which is a notarized document?

22       A.    Yes.

23       Q.    Did you state how you found out that Dean Green

24   was allegedly so upset by it?

25       A.    So --

 1    Q.   Does it state?

 2    A.   -- here again, this is 2015.  I have no idea

 3  what the -- what the facts were behind the document at

 4  the time.  So I don't remember.

 5    Q.   But is there anywhere in this document in that

 6  paragraph, does it state how you found out that Dean

 7  Green was allegedly so upset by it?

 8    A.   I don't know how to answer that.

 9    Q.   Read that and tell me if it states there how

10  you found out.

11    A.   I don't -- well, let me just say this, because

12  I wrote the document.  I don't know why it was necessary

13  for me to put in what you want me to say in the document

14  because I don't know.

15    Q.   I'm not asking that.  I'm just asking if it's

16  there.  Because you were informing for a charge to an

17  official entity of the university; right?  And so for

18  purposes of that, you didn't choose to inform of how you

19  found out that your allegation that Dean Green was so

20  upset by it?

21    A.   I am assuming it was based on what I saw at the

22  time from him.  But I don't know because it's not in the

23  document and I didn't think it was a requirement of the

24  document at the time, I guess.

25    Q.   And in the next sentence it says "the incident

1   was caught on tape.  And Dean Green was so upset by it

2   that he asked the chief of security, Shashi Persaud, to

3   save the tape of the incident."

4           Did you ever watch that tape?

5       A.   I wouldn't have any reason to watch the tape.

6   That would be under Dean Green's purview.

7       Q.   Okay.

8           (Exhibit Number 13 was marked for

9       identification.)

10      Q.   I'm going to give you what's been marked as

11  Exhibit Number 13.

12      A.   Thank you.

13      Q.   And it is starting at the top with an email

14  from Reginald Green sent Wednesday, January 27, 2016, to

15  Carrie Gavin.  Subject:  Questions.  And it's basically

16  that email and an email at the bottom from Carrie Gavin

17  dated January 26, 2016, to Green, Reginald with

18  questions.

19          And in this email Carrie Gavin states

20  "Associate Dean Green, please answer the attached

21  questions from Professor Reyes.  Your answers will also

22  be used in the EOP Investigations.  If you have any

23  questions about this request, please contact me.  Thank

24  you."

25          Associate Dean Green responds.  "Ms. Gavin,

1 please find attached my responses to the questions

2 attached.  It is true that I instruct -- it is true I

3 instructed Mr. Persaud to save a portion of the video

4 which is characterized as, quote, the incident, end

5 quote, in this investigation.  I was not at the meeting.

6 I did not witness, quote, the incident, end quote.  I

7 have not seen the video.  This should conclude any

8 further questions regarding my knowledge of or

9 involvement in this investigation."

10      So Associate Dean Green here, is he denying

11 knowledge of the incident that you're saying that he was

12 so upset by it?

13   A.   I don't know.

14      MS. REINER:  Objection.  Form.

15   A.   I have no idea, but I notice --

16      MS. REYES:  What is your objection?

17      MS. REINER:  My objection, number one,

18   foundation.  She's not a party to this agreement.

19   She hasn't spoken with Reginald Green or Carrie

20   Gavin, so what you're trying to do is -- it's

21   hearsay.

22      MS. REYES:  The objection is going into a

23   narrative, too.

24      MS. REINER:  Yeah, it is.

25      MS. REYES:  And a hearsay objection at a

1  deposition, you know, it's not --

2      MS. REINER:  You're asking her to comment on

3  something that she's not a party to.

4      MS. REYES:  I'm asking her to compare

5  writings --

6      MS. REINER:  And you're asking her to

7  speculate.

8      Q.   I'm asking her to compare writings that she has

9  in front of her.  So please compare the writing at

10 Exhibit Number 13 with what you have in Exhibit

11 Number 12, and tell me --

12     A.   So I note the dates are different.  One is in

13 2015 and one is in 2016 and there's a possibility that

14 there were other incidents that occurred between then

15 and now that he's speaking to, so I have no idea.

16         I know for a fact that he was at the meeting

17 because he comforted me.  So I don't know which meeting

18 he's talking about in January 27th of 2016 as compared

19 to what happened with my filing my thing.

20         And I don't know who else filed a complaint

21 against you or what else was going on during that time

22 period.  So I can't say what the relationship is between

23 Exhibit 13 and Exhibit 12.

24     Q.   Okay.  So let's look at the dates.  The date on

25 the document that you signed and notarized is dated

1  November 25, 2015; right?

2      A.   Correct.

3      Q.   And the email from Reginald Green and Carrier

4  Gavin is dated January 6, 2016; right?

5      A.   Correct.

6      Q.   So that would have been December/January;

7  right?

8      A.   Correct.

9      Q.   So it would have been two months after that,

10  after you submitted your charge?

11      A.   Correct.

12      Q.   Okay.

13          (Exhibit Number 14 was marked for

14      identification.)

15      Q.   I'm going to give you what's been marked as

16  Exhibit Number 14.

17      A.   Thank you.

18      Q.   And it's an email from Shashi Persaud dated

19  December 7, 2015.  The subject is:  Letter to Provost

20  and video of faculty meeting.  And I'm going to go back

21  to your document that you signed and notarized dated --

22  which is Exhibit 12, November 25, 2015, where you stated

23  in the third paragraph --

24      A.   I'm sorry, I wasn't paying any attention.

25  What?

1    Q.   We'll do Exhibit Number 12.

2    A.   Okay.

3    Q.   The second page.  Third paragraph.  Back to the

4    same language what you state.  "The incident was caught

5    on tape and Dean Green was so upset by it that he asked

6    the chief of security, Shashi Persaud, to save the tape

7    of the incident.  Mr. Persaud not only saved the tape

8    but wrote to the university advising the provost that he

9    felt Ms. Reyes was unstable and potentially dangerous."

10         So there was a writing, okay, that you alluded

11   to here.

12   A.   Uh-huh.

13   Q.   Did you ever see that writing?

14   A.   Did I receive what writing?

15   Q.   Did you see the writing that you said happened

16   here?  You said that "he wrote to the university."  Did

17   you ever see that writing?

18   A.   I'm a little bit confused.  What writing?

19   Q.   You said the verb "wrote".

20   A.   Where are you -- what paragraph?

21   Q.   In the third paragraph where it says "Mr.

22   Persaud not only saved the tape, but wrote to the

23   university."  Did you ever see what he wrote?

24   A.   Did I ever see what -- no.  I wouldn't be privy

25   to that, no.

1     Q.    And how do you know that he wrote?

2     A.    Because he told me.

3     Q.    Okay.  So let's read Exhibit Number 14.

4     A.    Okay.

5     Q.    This is a message from Shashi Persaud and it's

6  in response to an email from Professor Reyes dated

7  December 7, 2015, which says "good afternoon,

8  Mr. Persaud, Professor Patricia Broussard has stated

9  that you sent a letter to Provost Marcella David in

10  reference to me and a video of a faculty meeting.

11  Please send me a copy of said letter and the video."

12         Shashi Persaud responds that same day.  "I've

13  never sent a letter or a video to Provost David."

14         Do you see that?  Does it state that?

15     A.    Yes, that's what it states.

16     Q.    All right.  Just what it purports to be?

17         MS. REINER:  Okay.  I want to clarify here.

18     The document speaks for itself.

19         MS. REYES:  Yes.

20         MS. REINER:  But that does not mean that it is

21     substantiating the underlying information.

22         MS. REYES:  It's speaking for itself.

23         MS. REINER:  Yes.

24         MS. REYES:  It's speaking for itself.

25         MS. REINER:  In terms of it purporting what it

1    is.

2         MS. REYES:  It speaks for itself.  Yes.

3  BY MS. REYES:

4    Q.   Let's go to the fourth paragraph in that page

5  where you state that "in addition to all of the internal

6  confusion that Ms. Reyes has wrought, I have been

7  maligned by colleagues at other law schools who have

8  remarked on how terrible it is that I, along with other

9  colleagues, have conspired against Ms. Reyes."

10        Can you give me names of who it is at other law

11  schools who remarked on that?

12    A.   No, I honestly cannot remember from 2013-14,

13  how long had you been there?  2010, 2011, 2012, 2013,

14  2014, I can't remember that far back who the individuals

15  were.

16    Q.   Okay.  And in the next page?

17    A.   Yes.

18    Q.   The first paragraph.  It says something about

19  HALSA.

20    A.   Yes.

21    Q.   The Hispanic American Law Student Association.

22    A.   Yes.

23    Q.   What was that about?

24    A.   From my recollection, Professor Reyes was doing

25  a visitorship at -- she was away -- she wasn't at the

1   law school, she was away, I think at the University of

2   Florida State or she was away, Professor Reyes.

3       Q.   At the University of Florida?

4       A.   Okay, Professor Reyes was away.  And I was at

5   school late one evening and tell me if I'm going on too

6   much.

7       Q.   Yes, go ahead.  I'll stop you.

8       A.   So I was at school late and these two students

9   ran up to me frantic.  And I believe Rob Abrams was

10  still in the building, too, and they said the university

11  -- the student government is getting ready to

12  discontinue HALSA because we don't -- Professor Reyes is

13  not here and technically speaking that means we don't

14  have an advisor.  And I would like -- would you be our

15  advisor?  I was like "no, I don't want to do it.  No."

16  And they said, "please, we are going to get kicked off

17  of campus if somebody doesn't do it."  And I said "okay,

18  I'll do it, but I'll only do it in name only and I will

19  only -- as soon as Professor Reyes gets back, it's hers.

20  Name only, I'll do it to keep HALSA from being

21  disbanded."  And that was that.

22      Q.   Did you contact Professor Reyes about the

23  situation?

24      A.   I don't think that was appropriate.

25      Q.   Okay.  Did you contact Professor Reyes about

1  the situation?

2      A.   No, because I didn't think it was appropriate.

3      Q.   Okay.  And why didn't you think it was

4  appropriate?

5      A.   I didn't think it was appropriate because I

6  have been an advisor and every year I go to -- the

7  university has training for advisors.  And one of the

8  things they stress over and over again in training is

9  that the organizations belong to the students.  And the

10  students are the ones who came to me, these students.

11          And I just didn't want any confusion.  I didn't

12  want Professor Reyes to think that I was trying to usurp

13  her position.  But the main reason was I don't know how

14  to get in touch with Professor Reyes.  And my

15  understanding when they came to me was that this is do

16  or die.  If somebody doesn't sign up by a certain time,

17  we're getting kicked off the campus.

18      Q.   Do you know if Professor Reyes --

19          MS. REINER:  Can we pause just a second and let

20      me wield this noise?

21      Q.   Did you try to send Professor Reyes an email

22  through her FAMU email?

23      A.   No.

24      Q.   Okay.  And you said that the organizations

25  belong to the students?

1      A.   Yes.

2      Q.   And you have been a faculty advisor?

3      A.   Yes.

4      Q.   And you work with Professor Reyes at the time

5   as a faculty member?

6      A.   Yes.

7      Q.   And you didn't think it appropriate to -- did

8   you think it appropriate, faculty to faculty, to contact

9   her to let her know, at least in an email, that this was

10   going on?

11      A.   No.

12           MS. REINER:  Objection.  Asked and answered.

13      A.   The time was of the essence.  I mean, they were

14   frantic.  It was something -- I tell you, I honestly did

15   not want to do.  I swear to you I did not want to do it

16   and I did it for them because I knew, knowing Professor

17   Reyes's temperament, that it would be a problem.

18      Q.   And you did it?

19      A.   Oh, yeah.  I signed for it right then and there

20   to help them out.

21      Q.   And you didn't send them to Professor Abrams

22   who was still in the building, also?

23      A.   They had been to him already.  They said they

24   had been to everybody and nobody would touch it.  No

25   professor would take over for them.  That's what they

 1   said.  No professor would take over.

 2       Q.   Can you please mark this?

 3           (Exhibit Number 15 was marked for

 4       identification.)

 5       Q.   I'm going to give you what's been marked as

 6   Exhibit 15.

 7       A.   Thank you.

 8       Q.   Who signed that letter?

 9       A.   Who signed this letter?

10       Q.   Yes.  I'm going to show you what is titled

11   Clubs/Organizations/Greek Advisor/Co-Advisor Letter of

12   Intent.

13       A.   Okay.

14       Q.   And it says Advisor, Maritza Reyes.

15       A.   Okay.

16       Q.   So do you see there Professor Reyes's -- what

17   looks like Professor Reyes's signature dated October 27,

18   2015?

19       A.   Yes.

20       Q.   And at the bottom, do you see the name of the

21   president of the organization named as Heidy Ortiz?

22       A.   Yes.

23       Q.   And also dated October 27, 2015?

24       A.   Yes.

25       Q.   Was Ms. Ortiz one of the students who came to

1  talk to you about becoming the faculty advisor of HALSA?

2     A.   I honestly can't remember.  I don't know who

3  the two students were.  I don't remember their names.

4     Q.   Would you have asked to speak with the

5  president of HALSA before making such a decision?

6     A.   No.

7     Q.   Any students that came up to you to speak on

8  behalf of HALSA, you would have said okay?

9     A.   Well, seeing how it was 4:30 and they said at

10  5:00 they were going to get cut off, yeah.

11     Q.   Did the president of HALSA come to you about

12  it?

13     A.   I don't know.  I don't know who the two

14  students were.  I don't know if it was Heidy or not.  I

15  don't remember who the two students were.  This was nine

16  years ago.

17     Q.   How did you effectuate the change?

18     A.   I don't think I did.  I think I told them I

19  would do it and I think they just went right there on

20  the computer right then and there and put my name in.

21     Q.   And you didn't have to fill out any form or

22  sign any form?

23     A.   No, huh-uh.  I don't believe -- let me say

24  this, I don't remember filling out any form because like

25  I said, I was very reluctant about doing this and I

1  wanted to do it to help them.

2      Q.   How was your health at the time you were doing

3  it?

4      A.   How was my health?

5      Q.   Yeah.

6      A.   Probably pretty bad.  Uh-huh.

7      Q.   But you did it?

8      A.   Absolutely.

9      Q.   Even though you said that you were, you know,

10  concerned because of Professor Reyes's temperament you

11  called it?

12      A.   Yes, yes, but Professor Reyes wasn't in the

13  vicinity.  So I knew by the time she was back in the

14  vicinity, I would no longer be, so it wasn't an issue.

15  I wouldn't interact with Professor Reyes.

16      Q.   How long did you stay as HALSA's faculty

17  advisor?

18      A.   So I think it was perhaps maybe 9 or 10 weeks.

19  I don't know.  It was just for -- it was from the time

20  they came to me until the end of the semester.

21      Q.   And the next year, were you faculty advisor of

22  HALSA again?

23      A.   No, I think Professor Reyes was back.  I

24  believe Professor Reyes was back.  I don't remember why

25  I would continue if Professor Reyes was back.

1    Q.   Okay.  So to your recollection, you stopped

2  being faculty advisor when Professor Reyes returned?

3    A.   To my recollection -- well, let me put it this

4  way, I stopped being it.  I don't know what was in the

5  database on main campus, but it was at that point that I

6  stopped being the -- I stopped considering myself the

7  advisor, but I don't know what the database in the

8  university said.

9    Q.   Okay.

10         (Exhibit Number 16 was marked for

11    identification.)

12    Q.   I'm going to give you what's been marked as

13  Exhibit Number 16.

14    A.   Thank you.

15    Q.   In Exhibit Number 16 is Florida A&M University

16  Charge of Discrimination and Harassment.  And the name

17  is Maritza Reyes.  It's dated 4/24/15.  And under the

18  list of department or persons that discriminated against

19  you, on that page number 1, Professor Broussard.

20    A.   Okay.

21    Q.   Page number 1.  No, the page number 1, the one

22  that you just turned, the charge itself.

23    A.   Okay.

24    Q.   The notarized form.

25    A.   Okay.

1      Q.   On the notarized form.

2      A.   Okay.

3      Q.   On B, where it says "list the department inner

4   persons that discriminated against you.

5      A.   Uh-huh.

6      Q.   Who does it name?

7      A.   Wait a minute, you tell me which --

8      Q.   On B on the charge.  On B.

9      A.   The College of Law RPT Committee.

10     Q.   Does it name you individually?

11     A.   On this document?

12     Q.   Yes.

13     A.   No.

14     Q.   Okay.  So let's go now to the statements

15   themselves.  So let's go to page number 6.

16     A.   Okay.

17     Q.   And there's specific allegations there where --

18   there's a Broussard marking on there; right?

19     A.   Yes.

20     Q.   And there's specific allegations about conduct

21   by Professor Patricia Broussard?

22     A.   Yes.

23     Q.   Okay.  And so there is on page 6, on page 7, on

24   page 8, on page 9, specific allegations and bullet

25   points; right?

1    A.   Yes.

2    Q.   Okay.  So I'm going to go on page 6.

3    A.   Okay.

4    Q.   It says "Professor Patricia Broussard, a member

5    of the RPT Committee and the College of Law

6    representative in the university-wide Tenure and

7    Promotion Committee, approached my students (at the

8    beginning of their 2L year) in violation of the peer

9    evaluation process to elicit negative gossip about me in

10   my class.  She was supposed to be conducting a peer

11   evaluation (class observation) of my teaching, not

12   student evaluations of my teaching.  Student evaluations

13   are administered at the end of the semester and faculty

14   members are not supposed to be involved in student

15   evaluations.

16        Professor Broussard approached my students to

17   ask them about me in my class, right at the beginning of

18   the semester, at the beginning of my tenure process as I

19   was establishing a rapport with students who had never

20   taken any of my classes before because I generally do

21   not want L courses."

22        When we went over your class observation

23   before, you admitted that you approached students after

24   you visited Professor Reyes's class to observe the

25   class.  And you approached students and spoke with them

1   about Professor Reyes?

2       A.   Uh-huh.

3       Q.   And they complained about you?

4       A.   Yes.

5       Q.   So is this bullet point accurate?

6       A.   No.

7       Q.   What is not accurate about it?

8       A.   Which?  The one --

9       Q.   The one that I just read.

10      A.   Yeah, this whole thing about -- what's

11  incorrect about that is from -- it appears that what

12  this is is Professor Reyes's interpretation.  I mean

13  negative gossip.  I've never solicited negative gossip

14  about Professor Reyes.

15          In approaching the students, we are all walking

16  out together and they are saying, "yeah, she was on her

17  best behavior today."  So I said "what do you mean?"  So

18  it wasn't with me leading them or anything.  So I don't

19  agree with Professor Reyes's interpretation of the --

20  how she interpreted what I said in my report.  I think

21  that's her interpretation.

22      Q.   So you just stated that the students were

23  leaving and they made a comment that she was on her best

24  behavior?

25      A.   Correct.

1    Q.   And you said "oh, what do you mean?"

2    A.   No, I don't think there was a break in the

3  conversation.  I think there was "she was on her best

4  behavior today because you were there."  It wasn't a

5  back and forth question.

6    Q.   You said "oh, what do you mean" to the students

7  in response to the question?

8    A.   Possibly.  I don't remember.  It was a back and

9  forth.

10   Q.   Can you please read back her response when she

11  said "and I said what do you mean?"

12            (Answer read.)

13   Q.   So you did ask them "what do you mean?"

14   A.   If it says that, yeah, I said that "what do you

15  mean," yes, uh-huh.

16   Q.   Okay.  So let's go now to the second bullet on

17  page 7.

18   A.   Yes.

19   Q.   It says "Professor Pat Broussard and Associate

20  Dean Darryll Jones, both members of the RPT Committee,

21  denied me an opportunity to resolve any issues with the

22  four students before advising them to file written

23  complaints against me right at the beginning of the fall

24  2014 semester.  Neither Professor Broussard, nor

25  Associate Dean Jones ever discussed the student issues

1    with me."

2            In your class observation form, you stated that

3    you told the students to go to Associate Dean Jones.

4        A.   Correct.

5        Q.   You did not tell -- did you tell them to go to

6    Professor Reyes?

7        A.   I told the students, and I reiterated, and I

8    hope you would have done the same thing, it is not my

9    business, it is not -- I am not the person that you come

10   to to complain about one of my colleagues.  If you have

11   a complaint, you go to the academic dean who's in charge

12   of the faculty.  I've never advised anybody to put

13   anything in writing.  That's not my business.  That's

14   not my role.

15       Q.   So my question is, at any point did you tell

16   the students to go to Professor Reyes and talk to her?

17       A.   No.

18       Q.   Okay.  And you say that you don't discuss your

19   colleagues --

20       A.   Correct.

21       Q.   -- with students.

22       A.   Correct.

23       Q.   So when you asked them "what do you mean" when

24   they were making a comment that she was on her best

25   behavior today, what kind of discussion were you opening

1  with that?

2      A.    I just didn't know --

3            MS. REINER:  Object to form.

4      A.    I didn't know what they were talking about.

5      Q.    Uh-huh.

6      A.    I had no idea.  When the students approached me

7  before about you, they went into a litany of your

8  wrongs.  And I said "nope, stop it."  Here, when they

9  said she was on her island, "what are you talking about?

10  I don't know what you're talking about."  Because there

11  was no preface.  There was no preface to it.

12      Q.    But you engaged them in those conversations?

13      A.    I said "what are you talking about?"

14      Q.    All right.  So let's go to bullet point number

15  three on that page.  It says "the RPT Committee denied

16  me an opportunity to respond to its ploy to use the four

17  student complaints in my tenure process.  I only learned

18  about this ploy after a student warned me on

19  February 11, 2015, the date when the teaching

20  subcommittee disclosed the ploy to the entire RPT

21  Committee."

22            So those students who you told to complain to

23  Associate Dean Jones, went and complained and they

24  became four student complaints.  Do you remember those

25  complaints?

1      A.    They wouldn't have written complaints to me.  I

2   have no idea what you are talking about.

3      Q.    Were they written complaints that were used in

4   the RPT Committee?

5      A.    I have no idea.

6      Q.    Did you take minutes -- if you were taking

7   minutes of the RPT Committee, because you said you were

8   a secretary --

9      A.    Uh-huh.

10      Q.    -- do you recall putting anything about that in

11   your minutes?

12      A.    No, I don't recall that.

13      Q.    Okay.  Let's go to the next page.

14      A.    Yes.

15      Q.    Where it says Broussard at the bottom on

16   page 8.

17      A.    Uh-huh.

18      Q.    And on page 9, the first bullet point there's a

19   little arrow, the next page.  I'm just guiding you

20   towards Broussard, then there's an arrow.  The first

21   bullet point says "the RPT Committee executed this ploy

22   in tandem with ploy number one.  Three professors; Pat

23   Broussard, Ann Marie Cavazos, and Joe Grant rushed to

24   review my evidence and professional responsibility

25   classes right at the beginning of Fall 2014."  Did you

1  go and review Professor Reyes's classes right at the

2  beginning of Fall 2014?

3      A.   Well, first let me object to the "ploy," the

4  term "ploy."  I have no idea why there was a ploy.  And

5  I had no idea --

6      Q.   But I'm asking you did you go?

7      A.   I have no idea did I rush to your class.

8      Q.   But that was not the question, Professor

9  Broussard.

10      A.   So what was the question?

11      Q.   The question is did you go to review my classes

12  at the beginning of Fall 2014?

13      A.   I think we established that.  Yeah.

14      Q.   Okay.

15      A.   But it wasn't a ploy and there was no rush.

16  And I didn't assign myself to your committee, I was

17  assigned to your committee.

18      Q.   Okay.  And then go to the third bullet point.

19      A.   Okay.

20      Q.   It says "the individual professors (Broussard,

21  Cavazos, and Grant), the teaching subcommittee, and the

22  RPT Committee violated the mandate in the College of Law

23  Faculty Handbook that requires that class observers meet

24  with the professor to provide feedback.  None of the

25  three professors met with me."

1      Have we established that you did not meet with

2  Professor Reyes?

3      MS. REINER:  Object to form.

4    A.   Yeah, but my problem is is you're using your

5  own writings to document that the truth is asserted

6  therein of what you already wrote and by using terms

7  like "ploy" and all of that.

8    Q.   Okay.  But in bullet point number three, is

9  there anything about the word "ploy" in bullet point

10  number three?

11    A.   So I don't know.  I can't answer for what

12  Professor Cavazos did or what Professor Grant did, but I

13  think it says in the report that I gave for you that I

14  didn't meet with you because I didn't want any trouble

15  from you.

16    Q.   Okay.  And when you say you didn't want any

17  trouble from me, what kind of trouble were you

18  expecting?

19    A.   Sort of like the trouble that is exhibited by

20  this report.  I mean, just anything that I say, anything

21  that I do becomes a ploy.  Anything -- any criticism of

22  you, be it in order to help you or a valid criticism is

23  some kind of conspiracy, so I don't -- I don't like

24  that.

25    Q.   Okay.

1    A.   It bothers me to be involved in nonsense.

2    Q.   So knowing -- with that knowledge and that fear

3  that you had, why did you go review my classes?  Because

4  you didn't have to; right?  You didn't have to go?

5    A.   I did.  I was assigned to go review your

6  classes.  So as part of my duty on the RPT, we're given

7  -- I mean, that's the expectation, that we go in and we

8  review your classes.  And I'm concerned because you got

9  a really good review from me for your classes, so I

10  don't know what the problem was.

11    Q.   I think it's an opinion and we're going beyond

12  the question, Professor Broussard.

13        MS. REINER:  Objection.  Argumentative.

14    Q.   I think that is an opinion and we're going

15  beyond the question.  So let's get back to what is

16  stated on there; right?  And back to -- let me withdraw

17  that.

18        You were afraid of a reaction from me?

19    A.   Yes.

20    Q.   But you went and reviewed my classes?

21    A.   Yes.

22    Q.   Okay.  You were afraid of a reaction from me,

23  but you became the HALSA faculty advisor without ever

24  contacting me?

25    A.   Yes.

1      Q.   Okay.

2      A.   Absolutely.

3      Q.   Okay.

4      A.   Because duty comes and service comes before my

5   fears.

6      Q.   So let me show you --

7      A.   Are we done with this?

8      Q.   For now.

9           MS. REINER:  I just want to note real quickly

10      it's 1:24.

11           MS. REYES:  I'm going to finish I think with

12      this one question.

13           (Exhibit Number 17 was marked for

14      identification.)

15      Q.   I'm going to show you what's been marked as

16   Exhibit Number 17.

17      A.   Thank you.

18      Q.   And it's a document, a one-page document dated

19   May 7, 2015.

20      A.   Yes.

21      Q.   It's addressed to Carrie Gavin, Director, Equal

22   Opportunity Programs.

23      A.   Yes.

24      Q.   And it's re:  Reyes complaint dated April 27,

25   2015.

1    A.   Yes.

2    Q.   Okay.  And it says, "Dear Ms. Gavin," one

3 sentence, it says, "I categorically deny all allegations

4 of Ms. Reyes's complaint.  Sincerely, Patricia

5 Broussard."  Is that what you stated?

6    A.   Yes.

7         MS. REYES:  I think that we can take the lunch

8    break now.  So it's going to be 1:30 to?

9         MS. REINER:  I think 1:30 to 2:15 or so should

10    do it.

11         MS. REYES:  That should do it.

12         MS. REINER:  Okay.  All right.

13         (Lunch break taken from 1:26 p.m. to 2:18 p.m.)

14 BY MS. REYES:

15    Q.   So let's continue where we were discussing

16 before some follow-ups that I have.  So, Professor

17 Broussard, what did understand by the term "evidence"?

18    A.   The legal definition of evidence would be proof

19 through witnesses, through documents, through external

20 information, such as did it rain on May the 3rd?  Those

21 kinds of things.

22    Q.   Okay.  And so in comparison, right, because you

23 brought up the example of if it rained on May the 3rd --

24    A.   Uh-huh.

25    Q.   -- if you were to say it rained on May the

1     A.   Yes.

2     Q.   Who is he?

3     A.   Shashi used to be -- excuse me, please -- in

4  charge of our IT department.

5     Q.   Okay.  And who's Carrie Gavin?

6     A.   Carrie Gavin used to be -- I'm pretty sure

7  she's retired, but she used to be the person that you

8  contacted for -- what is it -- is it -- I'm not sure

9  what her title was, but she took -- she handled

10  complaints, she handled grievances, she handled all

11  that, I think -- yeah.

12     Q.   Okay.  And so when you're looking at Exhibit

13  Number 18, right, and you have these names; Marcella

14  David, she was a provost; correct?

15     A.   Yes.

16     Q.   And LeRoy Pernell, was he the college of law

17  dean?

18     A.   Yes.

19     Q.   Okay.  And so this email is being authored by

20  Avery McKnight and addressed to "good afternoon

21  Mr. Persaud?"

22     A.   Uh-huh.

23     Q.   Well, actually it's being authored by Drew

24  Holcombe, but it's being sent from Avery McKnight's

25  email and it's addressing "good afternoon Mr. Persaud;"

1   right?

2      A.   Uh-huh.

3      Q.   And then underneath there, because it's all

4   lumped together it seems, there is a from Shashi Persaud

5   at the bottom.

6      A.   Uh-huh.

7      Q.   Dated April 17, 2015, to Drew Holcombe with a

8   cc to Adrienne Snyder and the subject is confidential.

9   Who is Adrienne Snyder?

10     A.   Adrienne Snyder is the person at the law school

11  who used to -- I don't know what her -- I can't remember

12  what her title was, but she's currently chief of staff

13  to the dean.

14     Q.   Okay.  Was she in human resources at the law

15  school at some point --

16     A.   Yes.

17     Q.   -- doing some kind of human resources work?

18     A.   Yes.

19     Q.   Okay.  So when you go to the page at the bottom

20  and I'm going to read.  Mr. Shashi Persaud is the same

21  name, right, that you included in your Charge of

22  Discrimination/Harassment Form, which is Exhibit

23  Number 12, when you named him for sending a letter and

24  in regards to what transpired allegedly at some faculty

25  meeting where you felt like Professor Reyes invaded your

1  space.  Is that the same Shashi Persaud?

2     A.   Yes.

3     Q.   Okay.  And who is Shiv Persaud?

4     A.   He's my colleague.  He's a professor of law --

5  he's a professor at the law school.

6     Q.   And what is the relationship between Shashi

7  Persaud and Shiv Persaud?

8     A.   I believe they're brothers.

9     Q.   And who is Narayan Persaud?

10    A.   Narayan.

11    Q.   Narayan Persaud.

12    A.   Narayan?

13    Q.   Yes.

14    A.   He's their father.

15    Q.   And what is his relationship to the university?

16    A.   He's retired.

17    Q.   He retired from where?

18    A.   The university.

19    Q.   From doing what?

20    A.   Um, I believe, among other things, he was a

21  professor of law.

22    Q.   Okay.

23    A.   I mean, I'm sorry, a professor, not a professor

24  of law.

25    Q.   Okay.  And was there any time when you spoke

1   with Mr. Narayan Persaud about Professor Reyes?

2       A.   I can't recall.

3       Q.   Do you know if Professor Emeritus Narayan

4   Persaud ever complained about Professor Reyes?

5       A.   Do I know if he ever complained about

6   professor --

7       Q.   Yes.

8       A.   The father Narayan?

9       Q.   Yes.

10      A.   Oh, I have no idea.

11      Q.   Okay.  Did you ever complain about Professor

12  Reyes to Provost Marcella David?

13      A.   Oh, yes, I'm sure I did.  I can't be specific,

14  but I probably did.  I would say yes.

15      Q.   Okay.  And did you ever complain about

16  Professor Reyes to Felecia Epps -- Dean Felecia Epps,

17  who was dean at the law school?

18      A.   I don't remember.  I could have.  I don't know.

19      Q.   Did you ever complain about Professor Reyes to

20  Dean LeRoy Pernell?

21      A.   I can't remember.

22      Q.   Did you ever complain about Professor Reyes to

23  interim Dean Nicky Boothe-Perry?

24      A.   I can't remember that I did to Interim Dean

25  Nicky Boothe-Perry.

1    Q.    So going back to Shashi Persaud, what is your

2  relationship with Narayan Persaud?

3    A.    He was the president of the faculty senate and

4  so I knew him through the faculty senate.  He was

5  friendly.  We -- I mean, we didn't have like what you

6  would consider a relationship, but we were colleagues

7  and we both worked for the faculty senate and we laughed

8  and talked and exchanged niceties with each other.

9    Q.    Okay.  So let's go back to Exhibit 18.

10    A.    Uh-huh.

11    Q.    At the bottom on the page -- on page 2, which

12  is only one page, but it's a page 2 here, and it says

13  from Professor Broussard stating "and most recently

14  received an additional verbal complaint from Professor

15  Pat Broussard stating that Professor Reyes harassed her

16  during a faculty meeting."

17    A.    Uh-huh.

18    Q.    Do you remember what report you made to

19  Mr. Persaud about that, Shashi Persaud?

20    A.    Do I remember what verbal report?

21    Q.    Yeah.

22    A.    No.

23    Q.    No?

24    A.    This is 2015, what, 9 years --

25    Q.    Do you remember what faculty meeting it was?

1    A.   No.

2    Q.   Okay.  Is it the same faculty meeting, though,

3  that you would have been recounting in your charge?

4    A.   I don't know.

5    Q.   Okay.  You said that you don't speak with

6  students about professors, about your colleagues; right?

7    A.   I don't.

8    Q.   Did you speak with them about Professor Reyes?

9    A.   No.

10   Q.   Okay.

11        (Exhibit Number 19 was marked for

12   identification.)

13   Q.   I'm going to show you what's been marked as

14  Exhibit 19.

15   A.   Thank you.

16   Q.   Take a look at it, please.

17   A.   Okay.

18   Q.   Exhibit 19 is half a page document dated

19  February 16, 2015, at the top.  It's been redacted to

20  take off the student's names for FERPA purposes at the

21  time.

22        And the document is, we said, accepted for what

23  it purports to be.  And it's talking -- it's a narrative

24  of what somebody is saying about what you said about

25  Professor Reyes, including regarding her Harvard

1  training.  And also about you approaching students.  The

2  second paragraph about you approaching students about

3  something that happened with a grade that needed to be

4  changed.  And you were engaging the students about that

5  and saying that you understood the student's position

6  and the matter.

7          Does this refresh your memory about any

8  conversations you would have had with students?

9     A.   No, I have no idea what this document is, where

10 it came from, or who the students are.  I have no

11 recollection of doing anything like this.  Especially

12 the Harvard-trained stuff.  I would never say that.

13    Q.   So if these student were to testify --

14    A.   Yes.

15    Q.   -- what would you say about their testimony if

16 it is what it is in the statement?

17    A.   I would say to the student that perjury is very

18 serious.

19    Q.   Yes, it is.

20    A.   And you have to be very careful that you don't

21 perjure yourself when you make allegations like this.

22 That is all I would say to them, if they ask.  But more

23 likely than not, I probably wouldn't say anything to

24 them.

25    Q.   Okay.

1          (Exhibit Number 20 was marked for

2     identification.)

3     Q.   I'm going to give you Exhibit 20.  We're

4  keeping them there.

5     A.   Okay.  Thank you.

6     Q.   So I'm going to give you Exhibit 20, which is

7  an email from Maritza Reyes to Carrie Gavin.  The

8  subject is Professor Reyes v. Professor Broussard

9  Complaint.  It's dated February 2, 2017, -- I mean 2016.

10    A.   Yes.

11    Q.   2016.  And it's relating to retaliation that

12 Professor Reyes is alleging against Professor Broussard.

13    A.   Uh-huh.

14    Q.   And it includes numbered paragraphs.

15    A.   Correct.

16    Q.   In terms of specific situations that have been

17 happening; right?

18    A.   Uh-huh.  Yes.

19    Q.   So I'm going to take you to page 3 on there.

20 Number 38.

21    A.   Okay.

22    Q.   There it says "for years after I joined the

23 faculty of the FAMU College of Law as a tenure-track

24 member of the faculty, Professor Broussard has

25 undermined me and harassed me."

1         Number 39.  "For years after I joined the

2   faculty of the FAMU College of Law as a tenure-track

3   member of the faculty, Professor Broussard has harassed

4   me by interfering with my relationships with my

5   colleagues."

6         40.  "For years after I joined the faculty of

7   the FAMU College of Law as a tenure-track member of the

8   faculty, Professor Broussard has harassed me by

9   interfering with my relationships with my students."

10         41.  "For years after I joined the faculty,

11   Professor Broussard has made derogatory comments about

12   me to students."

13         When you received -- do you recall receiving

14   this complaint, Professor Broussard?

15      A.   I don't.

16      Q.   Was it before or after -- let's compare the

17   dates, okay?  So this would be marked as exhibit -- what

18   is the exhibit number of this that I just gave you?

19      A.   20.

20      Q.   20?  Okay.  So let's compare Exhibit 20 to

21   Exhibit 12.

22      A.   Okay.

23      Q.   Which is what you authored.  So Exhibit 12.

24   You got it?

25      A.   No, I was looking for the paper clip.

1    Q.   Here you go.

2    A.   Thank you.

3    Q.   Okay.  So when you look at Exhibit 12, what is

4  the date on Exhibit 12, which is your complaint against

5  Professor Reyes?

6    A.   11/25/2015.

7    Q.   Okay.  And what is Professor Reyes's complaint

8  dated?

9    A.   2/2/16.

10    Q.   Earlier you said you only complained about

11  Professor Reyes after she filed a complaint against you;

12  is that correct?

13    A.   Yes.

14    Q.   Okay.  But in these documents, if you compare

15  them, you would have charged -- you would have filed a

16  charge against her before she filed a charge against

17  you.

18    A.   Actually, it is my memory that Professor Reyes

19  filed more than one charge against me.  There were

20  numerous charges that she filed against me.  So I don't

21  know which one you're referencing.

22    Q.   Of the documents we've gone over, and do you

23  have those charges, Professor Broussard?

24    A.   Oh, no, I don't have those.

25    Q.   Okay.

1    A.    But I do recollect that there was more than one

2    adverse action filed against me by Professor Reyes.

3    Q.    Okay.  And when we say adverse action, we are

4    talking about charge in the EOP charges; right?

5    A.    I'm sorry?

6    Q.    We're talking about EOP charges?

7    A.    Is that what we're talking about?

8    Q.    Yes, that's what we're talking about.

9    A.    Yes.

10    Q.    Okay.  And a minute ago you said that we have

11    to be very careful under penalty of perjury; right?

12    A.    Correct.

13    Q.    Are you saying Professor Reyes filed more than

14    one charge against you, EOP charge?

15    A.    That's my recollection, yes.

16    Q.    Okay.  I'm going to enter into evidence, if we

17    can, if the technology permits, a video.

18         MS. REINER:  Do you have a copy of the video

19    for purposes of marking it?

20         MS. REYES:  Yes, I have it right here.  As soon

21    as I show it.

22         MS. REINER:  So I assume you want to mark it

23    for identification purposes --

24         MS. REYES:  Yes, for identification purposes.

25         MS. REINER:  -- to the deposition.  Okay.

1                    (Video playing.)

2    BY MS. REYES:

3        Q.    Professor Broussard, when you are looking at

4    this video, do you see yourself in that video?

5        A.    Yes.

6        Q.    Okay.  And do you recall what this video is?

7        A.    No.

8        Q.    Okay.  Where is that video taking place, for

9    identification purposes?

10       A.    It looks like it's in the faculty -- on the

11   fourth floor in the faculty lounge.

12       Q.    Okay.  So I'm showing for identification

13   purposes a video that's titled Faculty Conference Room

14   4/15/15, which I obtained directly from the university,

15   more specifically from the security department.

16             So when we were talking about before, Professor

17   Broussard, about the faculty meeting where you felt like

18   somebody went into your space.

19       A.    Uh-huh.

20       Q.    This would have been the date of that meeting?

21       A.    I have no idea.

22       Q.    It's the date that is in the documents that we

23   were looking at.  April 15, 2015.

24       A.    But isn't that Dean Green sitting over there on

25   the couch?

1    Q.   No, that's Tshaka Randall.

2    A.   Who?

3    Q.   Tshaka Randall.

4    A.   Oh, okay.

5    Q.   Yes.

6    A.   No, I don't know when this is.

7    Q.   And so at the time of that meeting, right, in

8  your charge, you said it was about counting the votes?

9    A.   Yes.

10   Q.   Do you recall if there is a counting of the

11 votes that happened at this meeting?

12   A.   No, I don't recall.

13              (Video continues playing.)

14   Q.   Okay.  What are you doing there, Professor

15 Broussard?

16   A.   I'm collecting paper.

17   Q.   And what paper is that for?

18   A.   I have no idea.

19              (Video continues playing.)

20   Q.   Okay.  So you collected all these papers, and

21 they're not like 8 1/2 by 11 pieces of paper, but they

22 are small little pieces of paper; right?

23   A.   I don't -- I don't know.

24   Q.   Are you counting those papers right now?

25   A.   I am counting papers there, yes.

1    Q.   Okay.  And who comes to you right there in the

2    red?

3    A.   I can't see her face.

4    Q.   Let me go ahead and rewind a little bit.  Okay.

5    So let me rewind here so that we can see the face.

6         So you're coming.  Who's coming behind you

7    right there?  Who's the person behind you that's wearing

8    the black shirt, long, with pants?  Who is that person?

9    A.   I don't know, I can't tell from here.  I don't

10   know.

11   Q.   Is it Cori Harvey?

12   A.   It could be.

13   Q.   Uh-huh.  Do you need to put on your glasses?

14   A.   No, I see -- these are for reading.

15   Q.   Okay.  So somebody else is going to come up to

16   you in red.  And let's go back to the person who just

17   came here.  Can you see what she does to you right

18   there?  Does she touch you?

19   A.   Yes.

20   Q.   Okay.  And who is the person in red?  Can you

21   tell who it is?

22   A.   No.

23   Q.   Can you tell if it's Lundy Langston?

24        MS. REINER:  Objection.  Asked and answered.

25   Q.   Can you tell if it's Lundy Langston?

 1      A.   I can't tell who it is, no.

 2      Q.   So this person comes up to you and what does

 3  she do, she just goes back; right?  And then Professor

 4  Reyes, can you see Professor Reyes comes up to you, too?

 5      A.   Is that you?  That's you?

 6      Q.   I'm asking you.  Can you tell?

 7      A.   I can't tell from here, but I'll accept it.

 8      Q.   Do you want to get closer?

 9      A.   No.  I'll accept that that's Professor Reyes.

10      Q.   I'm not telling you that it is, I'm asking you.

11  Can you tell if it is Professor Reyes?

12      A.   I don't know.

13      Q.   Okay.

14      A.   It appears to be Professor Reyes, yes.

15      Q.   And then what does Professor Reyes do there?

16      A.   What is she doing?

17      Q.   Yeah, what is she doing?

18      A.   I don't know what she's doing.

19      Q.   She comes up next to you.  Let's see what she

20  does.  So she's next to you, then there's another

21  faculty member who comes in, so there's three of you

22  there; right?

23      A.   Yes.

24      Q.   Okay.  Do you consider that Professor Reyes

25  there is invading your space?

1    A.   I don't know what my -- I don't know what the

2  conversation was and I don't know what my thought

3  process was at that time.

4    Q.   Is the other professor who is there with you

5  invading your space?

6    A.   I don't know what the conversation was about

7  and I don't know what was going on at the time.

8    Q.   Okay.  Earlier you said that you wanted to help

9  Professor Reyes when she got hired, that you were always

10 so friendly and nice to her.  The fact that Professor

11 Reyes comes up and participates with you and are you

12 reciprocating that?

13   A.   Well, I thought that you got hired in 2009 and

14 this is 2015.

15   Q.   Uh-huh.

16   A.   I think a lot transpired.

17   Q.   By 2015?

18   A.   Yeah, yeah.

19   Q.   Such that you would not welcome Professor Reyes

20 coming to you and participating in the counting of the

21 votes?

22   A.   I don't know what the circumstances were.  I

23 don't recall what was said and I don't know why I

24 reached the conclusion that you were in my space and

25 wouldn't leave.  I don't know.  I can't recall that.

1    Q.   Okay.  So let's see what Professor Reyes does

2  after the votes get counted.  So some papers are going

3  on the table.  People are counting votes.  There's three

4  women there.

5         MS. REINER:  I'm going to object to the extent

6     that you're narrating.  The video speaks for itself.

7         MS. REYES:  The video speaks for itself, but I

8     want to get it on the record.

9         MS. REINER:  So can we watch the video?

10        MS. REYES:  But I want to also get it on the

11     record.

12        MS. REINER:  Well, to the extent it's going to

13     be attached, it will be an exhibit to the

14     deposition.

15        MS. REYES:  But I have to follow with the

16     questions, too; right?

17  BY MS. REYES:

18    Q.   At this point, Professor Broussard, is

19  Professor Reyes touching you in any way?

20    A.   I don't know.  She's on the other side of me.

21  I have no idea.

22    Q.   And then what is she doing there?

23    A.   Walking away.

24    Q.   And she sits down.  Does she sit down?

25    A.   Yes.

1    Q.   Okay.  So this is the video -- this is the

2    video of the meeting where you said that Professor Reyes

3    was in your space and let me --

4         MS. REINER:  Objection.  Misstates the

5         evidence.  No foundation to that.

6    Q.   In the document that you prepared as a charge,

7    you alluded to a meeting that happened and that Shashi

8    Persaud was told about and that Associate Dean Green was

9    told about and that they saved the video; correct?

10   A.   Yes.

11   Q.   Yes?

12   A.   They told me that they saved the video.  But I

13   don't see a date stamp on this one.

14   Q.   There's a date stamp right here.

15   A.   Okay.  So what does that say?

16   Q.   It says faculty Conference 4/15/2015.  That

17   date stamp comes from the law school.

18   A.   Okay.

19   Q.   They put that on the surveillance video.

20        MS. REINER:  Objection.  Misstates evidence.

21   Q.   Okay.  So with regards to that video, do you

22   see on that video Associate Dean Reginald Green?

23   A.   Well, I thought that was Reginald Green over on

24   the couch, so I don't -- I don't know.  So if you would

25   allow me, he doesn't sit there.  You see where the

1  ladder is?  That's usually where Dean Green sits.  So I

2  couldn't tell if he's in the room or not.

3      Q.   And do you recall that we have an exhibit into

4  evidence that is an email from Associate Dean Green that

5  stated that he was not present at the meeting?

6      A.   I remember that you showed me that document,

7  yes.

8      Q.   Okay.  And you said the way that you perceived

9  things by 2015 from Professor Reyes would be different?

10     A.   Probably.

11     Q.   You would not want her in your space?

12     A.   Probably not, yes, that's correct.

13     Q.   Okay.  Do you recall a time in 2016 where you

14  complained to Provost Marcella David about Professor

15  Reyes in writing?

16     A.   No, I don't recall it.

17     Q.   Uh-huh.

18     A.   Huh-uh.

19          THE COURT REPORTER:  Are you marking the video

20     as 21?

21          MS. REYES:  Yes.

22          (Exhibit Number 21 was marked for

23     Identification.)

24          (Exhibit Number 22 was marked for

25     identification.)

1  BY MS. REYES:

2      Q.   So with regards to this Exhibit 22, it's marked

3  at the top Ana McDonald-Gargollo, G-a-r-g-o-l-l-o.  But

4  it's an email really from Shira Thomas to Ana

5  McDonald-Gargollo.  And the subject is Response Notice

6  of Slander.

7      A.   Uh-huh.

8      Q.   Underneath there is an email from Patricia

9  Broussard dated September 9, 2016 to Marcella David, cc

10  Shira Thomas.  Subject:  Response Notice of Slander.

11  And Marcella David, would that be the provost of the

12  university at the time?

13      A.   Oh, you're asking me?

14      Q.   Yes.

15      A.   Yes.

16      Q.   All my questions are to you, Professor

17  Broussard.  And who is Shira Thomas?

18      A.   At the time, 2016?  I don't remember.

19      Q.   Would she be in the office of the general

20  counsel?

21      A.   I don't know.

22      Q.   Okay.  And so in this -- do you recall anything

23  about what you complained about regarding Professor

24  Reyes?

25      A.   Can I read it?

1     Q.   Yeah, just briefly and see if it refreshes your

2  memory.

3     A.   Okay, I've read it.

4     Q.   And so, Professor Broussard, what were you

5  complaining about at that time?

6     A.   I don't know.  But from this it looks like you

7  had sent a series of emails out.

8     Q.   In fact, on the -- I'm sorry, go ahead.

9     A.   I'm done.

10    Q.   Oh, okay.  In the last paragraph on page 1,

11  right, you stated, "I have studiously attempted to

12  ignore the slander and libel from Professor Reyes.

13  I teach First Amendment and understand that everyone is

14  entitled to voice an opinion.  I also understand that

15  adults are allowed to dislike each other.  What is not

16  allowed is a continued baseless onslaught against

17  someone's reputation and character followed by a

18  resounding silence from the university.  I am asking

19  that both you and the general counsel's office simply

20  note you have received this email."

21         Do you specify or do you include here any of

22  the alleged slander and libel that Professor Reyes

23  engaged in against you?

24    A.   I don't know if this is the full email.

25    Q.   But in that paragraph, do you see anything

 1    there?

 2        A.    No.

 3        Q.    Okay.  What about in the paragraph above that,

 4    which is paragraph 3?

 5        A.    Are you saying --

 6        Q.    Yeah.  Do you see any of the specifics that you

 7    allege that Professor Reyes slandered you?

 8        A.    I think it's more laid out in the paragraph

 9    above.

10        Q.    Okay.  What do you have in the paragraph above

11    where it says that she slandered you?

12        A.    She did -- I was attacked, I haven't been in

13    contact.  So I have been accused of trying to derail her

14    career.

15        Q.    Where are you right there?

16        A.    It says "I was once attacked by Professor

17    Reyes."

18        Q.    Let's go by the line.  One, two, three, four,

19    the fifth line?  I think it's the fifth line, right, in

20    the second paragraph?

21        A.    Oh, I thought you were asking me where --

22        Q.    Right.  I want to know where we are.

23        A.    I noticed that you had done something to me.  I

24    was once again attacked by Professor Reyes.  I have not

25    had contact with her in years.  I have not discussed her

1  with my colleagues or students because I was accused of

2  that.

3     Q.   Does it say that?  Does it say "because I was

4  accused of that" in there?

5     A.   I think it's implied.  I have never attempted

6  to derail her career.  I think implicit --

7     Q.   Not implied, I want you go straight by what you

8  stated here.

9     A.   Yeah.

10    Q.   Not implied, I want you to read straight what

11  you stated here?

12    A.   Okay.  But you implied stuff on the video.

13    Q.   I was asking you.

14    A.   Okay.

15    Q.   So stated here, does it give any specifics

16  about what the slander is, what the slander of you is?

17    A.   Yeah, but I don't know what else was included

18  with this document.

19    Q.   Okay.

20    A.   So I just have the page one.

21    Q.   I'm just asking you about this document.  On

22  this document, does it state anything about what the

23  slander is?

24    A.   No.

25    Q.   Okay.  And in the first paragraph, right,

1 you're stating once again that Professor Reyes -- and

2 I'm going to read the last sentence in the first

3 paragraph.  "Professor Reyes's behavior has impacted my

4 health, reputation, and my ability to feel safe in the

5 work environment;" correct?

6     A.   I'm sorry, I was looking at the part where --

7     Q.   It says "Professor Reyes's behavior" --

8     A.   -- it says "I attached your" --

9     MS. REINER:  Let's not talk over each other

10    again.

11     A.   I'm sorry.  I was reading where it said that

12 you attached --

13     Q.   Okay.  So I'm reading --

14     A.   There was an attachment.

15     Q.   I'm reading --

16     A.   Where are you reading?

17     Q.   First paragraph.

18     A.   Okay.

19     Q.   Last sentence.

20     A.   Okay.

21     Q.   "Professor Reyes's behavior has impacted my

22 health, reputation, and ability to feel safe in the work

23 environment."

24     A.   Okay.

25     Q.   Is that what you stated there?

1    A.    That's what it says, yes.

2    Q.    And so this is, again, a repetition of what you

3    had stated before about your health and you were in the

4    hospital at some point because of Professor Reyes;

5    correct?

6    A.    Correct.

7          MS. REINER:  Objection.  Form.

8    Q.    And by this point, Professor Broussard --

9    A.    Yes.

10   Q.    -- would you say -- like you said, by 2015

11   things had changed?

12   A.    Yes.

13   Q.    For purposes of your health, were you avoiding

14   Professor Reyes?

15   A.    Yes.

16   Q.    And how were you avoiding her?

17   A.    I wouldn't read her emails because many times

18   they included my name in it and I -- it would only upset

19   me and my doctor advised me not to be upset.  If I saw

20   her coming in the door, I'd go in another door.  I tried

21   not to make any contact with her.

22   Q.    How did you do that, saw her coming in the door

23   and you went to another door?

24   A.    For example, when you come into where the

25   faculty enters into our offices, you could go several

1  different ways to get to your office.  And if I would

2  see you going one way, I would go the other because our

3  offices were right across from each other.

4      Q.   Did you ever have any physical altercation with

5  Professor Reyes?

6      A.   Altercation?

7      Q.   Yeah, like something like you would avoid her

8  physically?

9      A.   I want to make sure I'm clear about your

10  question.  Are you asking me is there a reason why I

11  would want to avoid you?

12      Q.   Yeah, physically.

13      A.   Yeah, because I didn't want -- if there were no

14  witnesses, I didn't want any allegations made against

15  me.

16      Q.   Did Professor Reyes -- let me withdraw that.

17          So you were afraid to be with her physically?

18      A.   Correct.

19      Q.   Okay.  And that would have been by 2015, the

20  time of this video when it was in the faculty meeting?

21      A.   Six years after she came, yes.

22      Q.   Okay.  2015.  And you said that when she came,

23  right, let's go back to what you stated about when she

24  came.  In the hiring process, right, the faculty would

25  review Professor Reyes?

1      A.   Uh-huh.

2      Q.   And they would take a vote?

3      A.   Uh-huh.

4      Q.   And at the time of that vote, under Florida

5  law, are the faculty required to sign the ballots?

6      A.   Yes.

7      Q.   Okay.  So when the hiring process was going on,

8  did you sign the ballot voting for Professor Reyes?

9      A.   I believe if that was the rule, I would have

10  had to have done that.

11      Q.   And if Professor Reyes was qualified for the

12  job --

13      A.   Yes.

14      Q.   -- how would you have explained not voting for

15  her at that time?

16      A.   How would I have explained it?

17      Q.   Yeah.

18      A.   I don't think I would have to give an

19  explanation.

20      Q.   So if Professor Reyes came in and she was a

21  Latina qualified professor --

22      A.   Yes.

23      Q.   -- and you had to sign the ballots at the time,

24  right --

25      A.   Yes.

1          MS. REINER:  Object to form.

2      Q.    -- you would have?

3      A.    Yes.

4      Q.    Okay.  And do you recall if you voted to hire

5  Professor Reyes?

6      A.    Yes.

7      Q.    Now, Professor Broussard, are there situations

8  where somebody can get hired and there can still be

9  discrimination against them later on?

10      A.    I can't speculate on that.  I mean, I don't

11  understand the question.

12      Q.    Okay.  Do you -- as part of your scholarship,

13  do you write on issues of race?

14      A.    I write on issues of race, but more in the

15  civil rights vein about voting rights, about female

16  genital mutilations, about women's rights, about rape

17  and war, those kind of things.  So my scholarship is

18  more in tune with civil rights; voting rights and

19  women's rights.

20      Q.    And do you write about discrimination against

21  black women?

22      A.    I don't think I've specifically done an article

23  that was solely based on discrimination against black

24  women.  I've done articles -- I've done at least one

25  article on generically how black women have been treated

1  historically.  But it has been based not only on race,

2  but on gender.  So it's not just black women are --

3  because I think in one of my articles I actually say I

4  understand that other women are discriminated against,

5  but that's not what the focus of this article is.

6      Q.   But it was on black women at that focus; right?

7      A.   Correct.

8      Q.   So let me explain.  That's to sort of give the

9  background for trying to clarify my question to you

10  about do you think that somebody could get hired in a

11  workplace and there still could be race discrimination

12  against them after they got hired?

13      A.   I don't know.  I would have to have more facts

14  and know more about it.  Just generically speaking, I

15  don't know.  I mean, anything is possible.

16      Q.   Does it happen?

17      A.   Does it happen?

18      Q.   Yeah.  Does discrimination in the workplace

19  happen to some people?

20      A.   Oh, sure, it does.

21      Q.   And does it happen to people who work in the

22  legal academy, in law schools?

23      A.   I don't know.  I'm going to say yes.

24      Q.   Do you know Terry Smith?

25      A.   Yes.

1    Q.   Okay.  And Terry Smith, what was his race?

2    A.   Terry was black.

3    Q.   Okay.  And he was a black male; right?

4    A.   Yeah.

5    Q.   Okay.  And do you remember a time in the

6  Minority listserv where there were -- there were

7  exchanges about him facing discrimination at the law

8  school where he was, DePaul Law School?

9    A.   I don't specifically remember that, but it

10  might have happened, yeah.

11    Q.   Okay.

12         (Exhibit Number 23 was marked for

13    identification.)

14    Q.   I'm going to give you what's been marked as

15  Exhibit 23.

16    A.   Thank you.

17    Q.   Exhibit Number 23 is an email from the

18  Association of American Law School Section of Minority

19  Groups.  It's a listserv that was sent on behalf of

20  Taunya, T-a-u-n-y-a, Banks, B-a-n-k-s, from the

21  University of Maryland Law School on March 19, 2018?

22    A.   Uh-huh.

23    Q.   And the subject was Academic Freedom Within Our

24  Community.

25    A.   Uh-huh.

1    Q.   Take a look at that email, Professor Broussard,

2  and tell me if you remember what that was about.

3         MS. REINER:  I'd like to pause here for a

4    second.  Are you entering this as a composite

5    because --

6         MS. REYES:  Yes.

7         MS. REINER:  -- like many others it appears to

8    be more than one email.

9         MS. REYES:  Yes, there's more than one email.

10   It's a total of one, two, three, four, five pages.

11   A.   I don't remember this, but I'm sure that it

12 occurred, but just off the top of my head, I don't

13 remember.

14   Q.   Okay.  Go to page 3 in there.

15   A.   Yes.

16   Q.   Do you see at the bottom of page 3 -- what does

17 it say at the bottom of page 3 in the last two lines?

18   A.   It says "thank you so much for this

19 information.  I am appalled" and then it fades out.

20   Q.   If fades out; right?

21   A.   Patricia A. Broussard, Professor of Law.

22   Q.   So you participated in this email exchange from

23 what it says on here?

24   A.   I don't know.  I think participated is a strong

25 word.  I've read it and I commented on it.

1    Q.   So go to page 2, please.

2    A.   Yes.

3    Q.   And you see four names above the signature line

4  of Taunya Lovell Banks, there are four names.  Whose

5  names are those?

6    A.   Taunya Lovell Banks, Tanya Hernandez, Audrey

7  McFarlane, and Rhonda Reaves.

8    Q.   Is that Audrey McFarlane the person that you

9  said that told you --

10    A.   Yes.  She's one of the persons, yes.

11    Q.   Okay.  And just to make sure for the record,

12  that told you that Professor Reyes had said something to

13  her about you?

14    A.   Yes, that she had heard something about me from

15  her, yes.

16    Q.   And who is Rhonda Reaves?

17    A.   Rhonda Reaves is our colleague at the law

18  school.  She's a professor.  Professor of law.

19    Q.   And who is Taunya Lovell Banks?

20    A.   She is a professor at -- I think she is at -- I

21  think she's at the University of Maryland.

22    Q.   Yeah, because she sent the email from there;

23  right?

24    A.   No, that's -- is that from --

25    Q.   It says Banks.

1    A.   Oh, I didn't know if she was from the

2  University of Baltimore or the University of Maryland.

3    Q.   It's Maryland.

4    A.   Okay.

5    Q.   And the next name, Tanya Hernandez, who is she?

6    A.   She's a professor at a school in New York, a

7  Latina professor who writes extensively on race and

8  gender.  And she's at -- is it Hofstra?  I'm not sure.

9  I know she's a professor in the academy.

10    Q.   Is she at Fordham?

11    A.   Is she at what?

12    Q.   Fordham.  Fordham Law School.

13    A.   That might be it.  I don't remember.

14    Q.   How does she identify racially?

15    A.   I have no idea.

16    Q.   Okay.  You said she's a Latina?

17    A.   She writes on Latina issues.

18    Q.   Does she identify as Afro-Latina?

19    A.   I don't know.  I don't know.

20    Q.   Okay.  And so Taunya Lovell Banks, how does she

21  identify racially?

22    A.   I have no idea.

23    Q.   If you -- how would you describe -- do you know

24  who Taunya Lovell Banks is?

25    A.   Yes.

1    Q.    Okay.  How would you describe her racially?

2    A.    She could be mixed race, she could be African

3  American, she could be Latina.  I mean, from physically

4  looking at her, I'd probably say any of the above.

5    Q.    What about Rhonda Reaves?

6    A.    Oh, I think Rhonda Reaves, I know her family,

7  so I think she identifies as African American.

8    Q.    Okay.  And so this email when it's going on,

9  you know, we're going to say that it is what it's stated

10  to be; right?

11    A.    Okay.  Yes.

12    Q.    So they are talking about something is

13  happening to Terry at DePaul Law School.  And I'm going

14  to go to the third paragraph.

15    A.    On what page?

16    Q.    On page 1.

17    A.    Okay.

18    Q.    And the last two sentences.  "Similarly, his

19  scholarship has advocated on behalf of minority

20  professors facing discipline for expressing unpopular

21  views" --

22    A.    I'm sorry, where are you again?

23    Q.    I'm on the third paragraph, the last two

24  sentences, the one that starts with "similarly."

25    A.    Okay.

1    Q.   "Similarly, his scholarship has advocated on

2    behalf of minority professors facing discipline for

3    expressing unpopular views, even views with which he

4    vehemently disagrees.  As he has stated, when speech is

5    circumscribed, the first group to have the limited

6    speech standard applied to control and limit them will

7    be people of color."

8         And I'm going to now take you to the last two

9    lines.  The last paragraph on that page that begins "the

10   year before last, Terry wrote an open letter to his

11   university's president when disciplinary action was

12   threatened against black undergrads who protested an on

13   campus speech by provocateur, Milo Yiannopolous.  Terry

14   worked with the students behind the scene to defend

15   themselves."

16        Okay.  And then the next paragraph, right under

17   that paragraph, begins with "such advocacy."  "Such

18   advocacy not does always make you popular and can come

19   at high personal cost.  Steadily asserting what you

20   believe is just and fair when all others are convinced

21   that it is more polite or politically expedient to be

22   silent and go along with the status quo, has always been

23   Terry's way."

24        The next paragraph.  "The effort to discharge

25   Terry for his unpopular views implicates us all.  We may

1  feel safe because we wouldn't say what Terry has said.

2  But the effort to de-tenure him is the canary in the

3  coal mine for us all.  It is fundamentally unfair and

4  destructive of tenure as protection of academic freedom

5  to target someone for de-tenuring because they have

6  espoused, quote, unpopular, end quote, views or

7  inconvenient opinions."

8       Do you know what it was that these faculty

9  members were protesting about what Terry Smith was

10  apparently going through at that time?

11     A.   I'm not clear what you're asking me.

12     Q.   I'm asking when you said in your email that you

13  read "thank you so much for this information" and you

14  said "I am appalled," what were you appalled about?

15     A.   I don't remember, but probably about what is

16  written in the letter.  What they allege happened.

17     Q.   That somehow he was being discriminated

18  against?

19       MS. REINER:  I'm going to object to the extent

20     that that's speculation.  And the portion that

21     you're talking about appears to be incomplete.

22     Q.   Okay.  So then let's go back to on page -- to

23  not speculate and see if this helps you to understand

24  what they're talking about, Professor Broussard.

25     A.   Uh-huh.

1    Q.    On page 3.

2    A.    Uh-huh.

3    Q.    At the top of page 3, do you see an email there

4  from Jeremy Levitt?  It's right at the top.  It says

5  from Association --

6    A.    Yes, yes, yes.

7    Q.    -- on behalf of Levitt, Jeremy; right?

8    A.    Uh-huh, uh-huh.

9    Q.    It's dated Monday, March 19, 2018.

10   A.    Yes.

11   Q.    Can you please read what it says in the body of

12 the email?

13   A.    "I support Terry Smith."

14   Q.    No, right above.  You skipped one line.  The

15 first line.

16   A.    "I sounded the warning bell at DePaul years

17 ago.  I support Terry Smith and know all too well his

18 woes at DePaul.  I was the only African American male

19 member of the law faculty at DePaul College of Law.

20 Upon joining, I immediately noticed that it was an

21 inhospitable environment.  Although Terry's lawsuit

22 mistakenly states that I was terminated or involuntarily

23 left; the truth is more distressing.  I chose to leave

24 after experiencing what I believe acute racial animus

25 and disparate treatment by certain colleagues after the

1  loss of my wife."

2      Q.   Okay.  So in this email, does it help you to

3  understand if there was protesting of race

4  discrimination, if race discrimination was involved

5  against black -- you know, in this case black men, Terry

6  Smith and Jeremy Levitt, does it help you understand

7  what you were appalled about?

8      A.   I thought it was about -- more about the fact

9  that the students were protesting this person who was

10  obviously a horrible advocate for some really vile and

11  draconian methods and that because of him supporting the

12  students, he was being -- they were threatening to take

13  away his tenure.

14     Q.   Uh-huh.  Again, I'm going to take you to

15  page 1.

16     A.   Okay.

17     Q.   On the third paragraph.  The last two sentences

18  that I already read, where the authors of this email,

19  right, stated that "similarly, his scholarship has

20  advocated on behalf of minority professors facing

21  discipline for expressing unpopular views, even views

22  with which he vehemently disagrees."  So was there

23  something about the scholarship of Terry Smith?

24     A.   Was there something about the --

25     Q.   About the scholarship in terms of what they

1  were saying made him the target of --

2      A.   About his scholarship?

3      Q.   Yeah.

4      A.   I don't know, because I cite him throughout my

5  last, latest article.  I used him as the basis for my

6  last article.  So it could have been the subject matter

7  of his article, in addition to the position he took on

8  Yiannopolous, so --

9      Q.   But he was hired at DePaul Law School; right?

10     A.   Yes.

11     Q.   So if they hired him, the faculty wanted him

12  there, right, when they hired him?

13     A.   I don't know.

14     Q.   And Jeremy Levitt said that he also faced

15  issues at DePaul in that email?

16     A.   That's what he says in that email.

17     Q.   But DePaul hired Jeremy Levitt; right?

18     A.   As far as I know, yes.

19     Q.   So if they hired him, wouldn't it say that they

20  wanted him?

21     A.   I have no idea what went on at DePaul.

22     Q.   But it seems like there's a possibility, at

23  least with the account of what's happening here, that

24  people can get hired in a law school and still face

25  discrimination after they're hired.

1           MS. REINER:  Object to form.

2      Q.   Is that a possibility?  It's a hypothetical?

3  Is it possible that someone can get hired at a law

4  school, a minority person, and later on get

5  discriminated against racially?

6      A.   Hypothetically, yes, but I think it could also

7  happen with a white person, so it doesn't have to be a

8  minority.

9      Q.   But we're talking minority here because I'm

10 talking about these specific professors; okay?

11     A.   Oh, I thought you were talking hypotheticals.

12 I was just adding on your hypothetical.

13     Q.   No, because if you noticed earlier on I asked

14 you if you, a minority, could be a racist.

15     A.   Uh-huh.

16     Q.   And we talked about your definition of racism,

17 anybody who has the power.  And if you recall, I also

18 asked you if an entire group of black women in the RPT

19 committee had the power to vote against somebody who

20 wasn't a black women; right?

21          MS. REINER:  Object to form.

22     A.   If they had the power.

23     Q.   The power to vote against the tenure

24 application, for example.

25     A.   But implicit in that is they're voting against

1 the person because of their race and that doesn't make

2 any sense.

3      Q.   I'm saying do they have the power?  Did they

4 have the power to take a vote against a person's tenure

5 application?

6           MS. REINER:  Object to form.

7      Q.   Did they have the power to vote?

8      A.   Did they have the power to vote?

9      Q.   Yes.

10      A.   They had the right to vote.

11      Q.   Correct.  And did they have the power to vote

12 at that time against a tenure application?

13      A.   I don't know what you mean by power.  Are you

14 saying the right to vote?  They had the opportunity?  Is

15 that what you're saying?

16      Q.   When you gave your definition of racism

17 before --

18      A.   Yes.

19      Q.   -- you said that it would implicate that

20 somebody had to have power to do some harm to somebody

21 else based on race.

22      A.   Yeah, but I don't know what the power has to do

23 with the vote.

24      Q.   Okay.  Does the vote give somebody power over a

25 decision?

1     A.   I'm going to say --

2          MS. REINER:  I'm going to object to form real

3     quick.  Are you talking about a specific vote or are

4     you talking about a vote in general?

5          MS. REYES:  I'm trying to help Professor

6     Broussard understand what I'm asking.  So that's why

7     I'm walking through the vote.

8          MS. REINER:  That's why I'm trying to ask you

9     as well.

10         MS. REYES:  Once I get there, then I'm going to

11    get to the specifics to try to see if she

12    understands what voting means.

13    A.   So the reason I'm having trouble because of the

14 specificity.

15    Q.   Right.

16    A.   If you're talking about do they have the

17 ability to influence the decision, the only problem I

18 had with the question is that all the men do, too.

19    Q.   Yes, but I'm not asking about the men right

20 now, I'm just asking specifically; right?

21    A.   Okay.

22    Q.   Because we were talking about Professor Griffin

23 called the women, you said in your statement, it was the

24 women that he called racist.

25    A.   Uh-huh.

1    Q.   So do the women have, by way of their vote,

2 power over the decision of a tenure application in the

3 RPT Committee?

4    A.   I will answer by saying yes, but so do the men.

5    Q.   Okay.

6    A.   Okay.

7    Q.   So with regards to, you know, the comment that

8 you made that also the men had the power --

9    A.   Uh-huh.

10    Q.   -- has there been any situation or circumstance

11 that made you complain about Professor Jeremy Levitt?

12    A.   I don't know.  I can't remember.

13    Q.   At the beginning you said that you gave a

14 deposition in the Barbara Bernier v. FAMU College of Law

15 case.

16    A.   Correct.

17    Q.   And in that complaint, what was that complaint

18 about?

19    A.   What was Barbara's complaint?

20    Q.   Yeah, Barbara Bernier's complaint.

21    A.   Oh, I don't -- I don't remember.  I -- I don't

22 remember specifically what it was about.  What year was

23 that?

24    Q.   I think that would have been 2009.

25    A.   Oh, gosh, I can't even remember what I just had

1    for lunch.  Nope.

2        Q.   So with regards to the deposition, do you

3    remember why you testified in a deposition in that case?

4        A.   Why she called me in?  No, I don't remember

5    much of that.

6        Q.   Before there was a lawsuit there, was there an

7    investigation done by the FAMU Equal Opportunity

8    Programs?

9        A.   Before whose lawsuit?

10       Q.   Before there was a lawsuit by Barbara Bernier,

11   was there an investigation, an internal investigation?

12       A.   I don't remember.

13       Q.   Did you participate in that investigation?

14       A.   I don't remember.

15       Q.   Going back to the topic of race, Professor

16   Broussard --

17       A.   Yes.

18       Q.   -- does it say something about a law school if

19   they do not have, for example, representation of a

20   certain minority group -- of members of a certain

21   minority group?  In your mind, in your estimation, does

22   it say something about a law school?

23       A.   Not necessarily, no.

24       Q.   Is there something wrong if they don't have

25   representation of somebody of a certain minority group?

1      A.    It depends.

2            MS. REINER:  Objection.  Asked and answered.

3      Q.    And how does it depend?

4      A.    Well, it may be such a horrible place that

5  nobody wants to apply there or work there.  I have no

6  idea, but I don't think that's a dispositive just from

7  the optics, there could be a lot of reasons.  I don't

8  know.

9      Q.    Okay.

10           (Exhibit Number 24 was marked for

11     identification.)

12     Q.    I'm going to hand you what has been marked as

13 Exhibit 24.  And it's an email again from the

14 Association of American Law School Section on Minority

15 Groups.

16     A.    Uh-huh.

17     Q.    It was sent on behalf of Shelly Page.

18     A.    Uh-huh.

19     Q.    August 19, 2020.  Who is Shelly Page?

20     A.    Shelly Page is a professor at the University of

21 Southern Illinois Law School and she was a visitor at

22 FAMU Law School.

23     Q.    Okay.  Is she a friend of yours?

24     A.    Yes.

25     Q.    Okay.  So let me take you to -- on page 1,

1  right under Shelly Page, right under her signature line,

2  do you see where it states "on August 19, 2020, at

3  12:38 p.m. Broussard, Patricia wrote:  I did not want to

4  mention the fact there are no black folks."  What are

5  you talking about there, Professor Broussard?

6      A.   I don't know.  I don't know the context when

7  she said they had five faculty members -- five black

8  faculty members listed online, 5 out of 88 listed

9  online.  I don't know what that's referencing.

10      Q.   Okay.  Let's go back to the second page because

11  I think that's where the email thread begins with an

12  email from Mitchell Crusto dated August 19, 2020.

13          MS. REINER:  I believe there's one prior email.

14          MS. REYES:  Yeah, at the top.

15      Q.   So let's start with the one at the top where it

16  says Mitchell Crusto.  Or let's start with the one at

17  the bottom.  On August 19, 2020, at 10:03 a.m., Risa

18  Goluboff wrote "meet 10 professors joining the

19  University of Virginia School of Law."  Then Mitchell

20  Crustor responded.

21      A.   Crusto.  Mitch Crusto.

22      Q.   Crusto.  By the way, do you know Mitch Crusto?

23      A.   I met him a couple of times because he came --

24  he's a black professor, I think at Tulane, and he came a

25  couple of times and was interviewed, but we never hired

1  him.

2     Q.   And is he related to anybody on the college of

3  law faculty?

4     A.   I think -- I'm not 100 percent sure, so I don't

5  want to say, but I think he's a distant relative of

6  Professor Jennifer Smith.

7     Q.   Okay.  How do you know Professor Jennifer

8  Smith?

9     A.   She's a colleague.

10    Q.   Is she your friend?

11    A.   We are -- I wouldn't -- we are friendly, yes.

12    Q.   Okay.  So when he says "but no black faculty;"

13  right?  And then now does that put in context what it

14  was that they were talking about after the announcement

15  that the University of Virginia hired 10 professors but

16  none of them apparently were black?

17    A.   I think that's what the email was about.  That

18  the Dean Risa Goluboff must have sent out a message

19  saying we've got all of this new faculty.  And then it

20  looks like Mitch said "awesome, but no black faculty?"

21  And then maybe what you're referring to is that Shelly

22  then says "they have 5 black faculty members listed."

23    Q.   But before that you said "I did not want to

24  mention the fact that there are no black folks."

25    A.   I said that at the end.  It looks like mine

1    came at the end.  This is the first page and this is the

2    second page.

3        Q.    Right.  But it came before Shelly's email;

4    right?  Because yours was sent at 12:38 p.m. on

5    August 19, 2020, and hers was sent August 19, 2020, at

6    1:24 p.m.; correct?

7        A.    The Association of American Law Schools replied

8    to by Shelly -- yes, uh-huh.  Okay.

9        Q.    So hers would have been the last one really.

10        A.    Yes.

11        Q.    So in your mind does it say something that a

12    law school would not have black folks?

13        A.    May I?

14        Q.    Yes.  I asked you.

15        A.    I was the president of the African American

16    Parents Association at the University of Virginia for

17    four years.  It's where my son attended, so I was very

18    well aware of the fact that they had a huge, huge, huge,

19    amount of -- a big faculty.  Great, great big faculty.

20    I was down there probably every other week or so and

21    there were no people of color whatsoever on the faculty.

22    And the response was always "we can't find qualified

23    people."

24        Q.    Okay.  So back to when I was asking you in

25    regards to Jeremy Levitt.

 1      A.   Yes, uh-huh.

 2           (Exhibit Number 25 was marked for

 3      identification.)

 4      Q.   I'm going to show you what's been marked as

 5 Exhibit 25.  This is a two-page handwritten document.

 6      A.   Okay.

 7      Q.   At the top it says Patricia Broussard,

 8 December 4, 2009.  This comes from the file that the

 9 university kept of the Professor Barbara Bernier v.

10 Jeremy Levitt internal investigation.  And so this

11 purports to be the handwritten notes of the person who

12 apparently spoke with Patricia Broussard on December 4,

13 2009.  Do you remember that conversation at all?

14      A.   No, and this -- I didn't write this.

15      Q.   No, you did not.  I said it purports to be,

16 according to the investigation file, the notes of the

17 person who spoke to Professor Broussard on December 4,

18 2009.

19      A.   I don't know who this person is and I don't

20 know what this is.

21           MS. REINER:  And I'm just going to object in

22      terms of foundation.

23      Q.   So I just want to use it to refresh your

24 memory.  Can you read and tell me if it refreshes your

25 memory?

1    A.   No, it doesn't.  I don't remember this at all.

2  And nobody signed it?

3    Q.   It's the hand notes.  We can ask the university

4  to produce the entire file and it will be there, then we

5  can question whether they keep accurate records or not,

6  but this is what they have in their file.  When you're

7  claiming that there is fear, that the women are afraid,

8  do you remember if the women were afraid of Professor

9  Jeremy Levitt at the time of the Barbara Bernier

10  complaint?

11         MS. REINER:  Objection.  Misstates evidence.

12    A.   I can't remember.

13    Q.   I'm asking from her recollection.  Can you

14  remember if they were afraid of the --

15    A.   I don't remember.  I can't remember.

16  Generally, I don't know.

17         MS. REINER:  I would just pause and say it's

18     3:23.  I recall you saying you may need to make a

19     phone call.

20         THE WITNESS:  Yes, I did when I went to the

21     bathroom.

22         MS. REYES:  So we're almost done.

23         THE WITNESS:  I can stay until 4:00.

24         (Exhibit Number 26 was marked for

25     identification.)

1    Q.   I'm going to give you what's been marked as

2  Exhibit 26.

3    A.   Thank you.

4    Q.   Do you recall getting that memo -- Exhibit 26

5  is a memorandum of 14 pages.  It's authored by Maritza

6  Reyes as Associate Professor, FAMU College of Law.  And

7  it's addressed FAMU College of Law Faculty, FAMU

8  President Larry Robinson, FAMU Provost Maurice Edington,

9  FAMU General Counsel Denise Wallace, FAMU EOP Director

10  Carrie Gavin.  Do you remember getting this memorandum,

11  Professor Broussard?

12    A.   No.

13    Q.   You don't.  Okay.  So I'm going to take you to

14  -- let's go to page 8.  Well, the memo ends at page 14

15  -- well, no, actually, no, page 8.  I'm sorry, page 8.

16    A.   Okay.

17    Q.   And at the bottom of page 8, all the way at the

18  bottom, there's an email that says from Jeremy Levitt to

19  Maritza Reyes dated October 23, 2019?

20    A.   Wait a minute.  From --

21    Q.   Jeremy Levitt.

22    A.   On page 8?

23    Q.   Page 8 at the bottom.

24    A.   But nothing else is on there except that.

25    Q.   No, just that.  Then the next page, page 9 is

 1  where the email is; right?

 2      A.   Okay.

 3      Q.   And in that email, do you remember anything

 4  about reading an email where Professor Jeremy Levitt

 5  called Professor Reyes racial names and attacked her

 6  racially?

 7      A.   No.

 8      Q.   Okay.  If you had read such an email, would you

 9  have remembered that type of racial attack?

10      A.   If it was an email exchange between Professor

11  Reyes and Professor Levitt, I wouldn't have read it.

12      Q.   Okay.  So let's say you didn't read it.

13      A.   Okay.

14      Q.   What would you say about the fact that

15  Professor Jeremy Levitt would call Professor Reyes, in

16  an email with copy to colleagues, racial names like

17  "white Latin" or "Hispanic with white privilege," say

18  that "her people were enslavers of black people," how

19  would you react to that type of --

20      A.   Well, without knowing the context, and I'll

21  tell you why I say that, if I may.  Without knowing the

22  context, because we've talked a lot about transparency

23  and freedom of speech.  So I don't know the context of

24  if he was trying to teach a lesson or if he was being

25  nasty.  So I don't know which it was.  I think it was

1  just him being nasty.  It was wrong.  But if he's trying

2  to do a history lesson or something like that within an

3  email, I might not like it, but I would not attach any

4  kind of animus to it.

5       Q.   And what kind of history lesson would be

6  imparted by calling Professor Reyes "a descendant of

7  enslavers of black people"?

8       A.   You don't want my opinion; do you?

9       Q.   If you want to give it.

10      A.   He could be -- I don't know.  It could be about

11  the diaspora and what happened when the slave shift

12  stopped in certain countries.  I don't know.  I don't

13  know what he meant because, like I said, I didn't read

14  this stuff.  I didn't read his stuff either.

15      Q.   If you were to say that somebody is a

16  descendent of enslavers of black people --

17      A.   Uh-huh.

18      Q.   -- would you have to know something about their

19  ancestry to be able to assess whether you can state

20  something like that?

21      A.   I have no idea.  I don't know.  I have an Irish

22  grandfather, so I have no idea.

23      Q.   Okay.  And when you talk about your Irish

24  ancestry, right, because you just brought it up --

25      A.   Yes.

1    Q.   -- could somebody say that you are also a

2  descendant of enslavers of black people?

3    A.   Oh, absolutely.  I think most black people are

4  because most black women were raped by white enslavers

5  therefore, consequently, your relatives are going to be

6  people who enslaved you and who enslaved other people,

7  so that's logical.  I mean, it's kind of logical that if

8  you have somebody in your family that looks like me,

9  they didn't get that way because somebody said "baby, I

10  love you, do you want to marry me?"  That it was

11  probably a rape involved.  But I cannot deny the fact

12  that the man who raped my great grandmother, who is

13  still a relative of mine, who enslaved people.

14    Q.   And were there relationships -- and are there

15  black people who have white ancestry that does not come

16  as a result of rape?

17    A.   Of course.

18    Q.   In regards to Professor Reyes, what do you

19  think would make Professor Levitt make an assessment

20  that she is a descendant of enslavers of black people?

21        MS. REINER:  Objection.  Speculation.

22    A.   I have no idea what was going on his head.

23  I don't know.

24    Q.   Okay.  So going back to your knowledge of your

25  scholarship and race.  In one of your articles you speak

1  to the silence of black women to protect black men.

2      A.    Uh-huh.  Uh-huh.

3      Q.    If Professor Levitt is engaging in a racist

4  attack against Professor Reyes -- or an attack against

5  Professor Reyes, have you ever stepped in to help

6  Professor Reyes?

7      A.    To help Professor Reyes?  I always felt that

8  Professor Reyes could hold her own.  I would never

9  interfere because I don't know the context and because I

10 backed out of all that stuff, I have no idea.

11     Q.    Would you say that the faculty and all of the

12 employees of the FAMU College of Law are majority black?

13          MS. REINER:  Object to form.

14     A.    Would I say what?

15     Q.    Are the faculty and most of the -- and all of

16 the employees, including the faculty of the FAMU College

17 of Law numberwise majority black people?

18     A.    Can I just add a little something, if you would

19 permit me?

20     Q.    Yes.

21     A.    I came from Howard University Law School and

22 the same is true there.  I interviewed at Texas Southern

23 and same is true there.  Every other HBCU in the

24 country --

25     Q.    Yeah, but we're talking about FAMU College of

1  Law.

2      A.    I'm just trying to give you the context.  So

3  without the context of saying HBCU, so most of the

4  people are probably going to be people of color.  So

5  yes, to your answer, but with the context that we

6  haven't talked about --

7      Q.    The reason why --

8      A.    -- is that it's an HBCU.

9      Q.    Yes, the reason why -- no, I just want the

10  numbers.  Acknowledge the numbers.

11      A.    Okay.

12      Q.    And would you say that in that workplace

13  environment, Professor Reyes, as a Latina, and the only,

14  at the time, tenured Latina, would be a minority

15  numberwise?

16      A.    You're asking for my perception?

17      Q.    Yes.

18      A.    I've always thought of Professor Reyes as a

19  person of color.  I've never separated her out from me.

20  I always looked at her -- I always looked at us on equal

21  ground in that she was both female and a person of

22  color.

23      Q.    Okay.

24      A.    So to that extent I never said, "oh, she's

25  Latina."  You're a person of color to me.

 1      Q.   I'm sorry, are you finished?  I think I cut you

 2   off.

 3      A.   Yes.

 4      Q.   Okay.  Is that sort of like color blindness?

 5      A.   No, because I believe if you're color blind you

 6   don't see me, but I saw you as a person of color from

 7   the diaspora as opposed to -- I wasn't thinking of you

 8   -- I never thought of you like in terms of she's from

 9   Spain, for example, or from some place like that.

10   I just saw you because I think you shared with me that

11   your father was from Bluefields, Nicaragua and your

12   mother was, I believe, Dominican.

13      Q.   No, no.

14      A.   Well, I knew your dad was --

15      Q.   But we're not going to get into a conversation.

16      A.   I'm just answering your question.  I always saw

17   you as a person of color.  I never made the distinction

18   and put you into a category.  I just saw you as the same

19   as me, a woman of color.

20      Q.   So you saw Professor Reyes --

21      A.   Yes.

22      Q.   -- not as a Latina who was different from the

23   black faculty in the law school?

24      A.   No, I saw you as a Latina person of color.  I

25   saw you as one of them -- the same as me.

1    Q.   So do you think that Professor Reyes would have

2  the same right at the FAMU College of Law to claim color

3  as a black faculty member?

4    A.   I have no idea what she would be able to claim.

5  I don't know.

6    Q.   But you saw her --

7    A.   I'm telling you my perception.

8    Q.   You saw her same as black people?

9    A.   I saw her as a person of color, yes.

10   Q.   Okay.  Did you see her as a Latina?

11   A.   A Latina person of color.

12   Q.   Okay.

13   A.   As opposed to -- like I said, as opposed to

14  someone from the Spanish diaspora or European.

15   Q.   Okay.  So as a Latina, was she in the minority

16  like in terms of how many Latinas there were, even if

17  you saw them in color -- as of color, Latinas versus how

18  many could say that they were African American?  Was she

19  in a minority?

20   A.   She was one of the few Latina and Hispanic

21  people that we had at the law school, yes.

22   Q.   Okay.  And so -- and you thought that she could

23  hold her own --

24   A.   Yes.

25   Q.   -- against a majority black, including a black

1  male and black men and black women, possibly saying

2  things like what Professor Jeremy Levitt said?

3          MS. REINER:  Object to form.

4      A.   I thought she held herself very well.

5      Q.   All right.  Let's talk about where Professor

6  Reyes is right now.

7      A.   Okay.

8      Q.   What do you know about Professor Reyes's status

9  in the law school?

10     A.   Very little and I choose that on purpose.  It's

11 none of my business.

12     Q.   Okay.  Have you heard any rumors?

13     A.   No.

14         MS. REINER:  Objection.  Speculation.

15     A.   No.  Huh-uh.

16     Q.   I'm calling for hearsay actually, but have you

17 heard any rumors?

18     A.   I can honestly say no, nobody has talked to me

19 or mentioned your name at all.

20     Q.   Okay.  And what about Professor Jennifer Smith,

21 what is her status?

22     A.   My understanding is that she's no longer

23 employed by the Florida A&M University College of Law.

24     Q.   Okay.  Can you please mark this as an exhibit.

25         (Exhibit Number 27 was marked for

 1  litigation?

 2       A.   Yes, I am very aware of what it is.

 3       Q.   Are you aware that counsel, Ms. Reiner, is here

 4  representing Defendant?

 5       A.   Yes, I understand.

 6       Q.   And I am representing Plaintiff.

 7       A.   She's not coaching me.

 8       Q.   And I am representing Plaintiff.

 9       A.   You're representing yourself, yes, I understand

10  that.

11       Q.   And this is a litigation matter.

12       A.   Uh-huh.

13       Q.   Okay.  Let's go to page 4.

14       A.   Okay.

15       Q.   At this time I'm going to read right above on

16  December 18, 2023, it says then again --

17       A.   I'm sorry, where are you?

18       Q.   Right above on December 18, 2023, from the

19  bottom -- from the bottom where it says --

20       A.   Okay.

21       Q.   -- on December 18, 2023.  Right above that

22  there's a paragraph.  And it says "then again in

23  December Professor Broussard relayed that she was in the

24  stall of the ladies room when she overheard a few

25  students discussing how badly MW felt because of her

1  conduct regarding the incident."

2      A.   Yes.  That's what I just relayed to you.

3      Q.   So you heard it in the bathroom stall?

4      A.   I was in the bathroom in the stall and two

5  students were talking about it outside.  I guess they

6  were washing their hands.  I don't know what they were

7  doing.

8      Q.   Which bathroom?

9      A.   The bathroom on the third floor.  The only

10 bathroom we have.  The women's bathroom on the third

11 floor.

12     Q.   Okay.  Is that the only bathroom that we have

13 on the third floor?  When you say the only bathroom, do

14 you mean the one that the students use, the one that the

15 faculty use, which bathroom on the third floor?

16     A.   The faculty bathroom only has one person at a

17 time.  This is the stalls on third floor.

18     Q.   And you heard students saying this?

19     A.   Yes.

20     Q.   Who were the students?

21     A.   I have no idea.  And I wasn't going to show my

22 face.

23     Q.   So this is one more where you heard people

24 saying things?

25     A.   I think the whole thing is hearsay.

1    Q.   But it's one more where you don't remember the

2   names of who said it?

3    A.   I don't know who it was.  I was in the stall,

4   the students were talking.

5    Q.   Coincidently they were talking about MW.

6    A.   I don't know if was coincidental or not.

7   I can't answer whether it was coincidental.  But that's

8   what their conversation was about.

9    Q.   And so the students were saying that -- let me

10   go on the next line.

11    A.   Okay.

12    Q.   It says, "again MW was concerned about her own

13   behavior and was physically ill about her conduct

14   towards me.  It appeared to me that MW's concern was

15   largely concern because I was a former partner with the

16   firm."  So this is Professor Jennifer Smith --

17    A.   Correct.

18    Q.   -- speaking about what you said that you heard

19   in the bathroom stalls --

20    A.   Correct.

21    Q.   -- about the student who filed the complaint is

22   saying -- the students are saying that she's

23   remorseful --

24    A.   Correct.

25    Q.   -- about her own conduct?

1     A.   Correct.

2     Q.   And yet she filed a complaint?

3     A.   Who filed a complaint?

4     Q.   The student.

5     A.   I'm assuming that the student -- I never went

6     beyond this.  I'm assuming that the student filed a

7     complaint.

8     Q.   Okay.

9     A.   I don't know about what MW did at all.

10    Q.   And let's go to page 6.

11    A.   Okay.

12    Q.   Do you see some text messages -- some photocopy

13    of text messages on page 6?

14    A.   Yes.

15    Q.   Okay.  And one of them says "hey, I had" -- the

16    one text message that says Thursday, October 20, 2022,

17    it says "hey, I had a hurricane makeup class in 253

18    until 10:30, and one of Reyes's students, parentheses,

19    Hispanic blonde, parentheses, was so rude because we

20    were in the classroom."  Did Professor Jennifer Smith

21    tell you about that text?

22    A.   Did she tell me about the text?

23    Q.   Yes.

24    A.   No.

25    Q.   Did she tell you -- in her description, did she

1 describe the student as one of Reyes's students,

2 Hispanic blonde, was so rude when she discussed the

3 matter with you?

4     A.   No, she just said that she'd come into the

5 classroom to prepare for you, that you sent her in ahead

6 of time.

7     Q.   And when they said that -- when Professor Smith

8 alleged that Professor Reyes sent the student in, do all

9 professors tell all students to be in the classroom --

10 do you tell your students to be in the classroom by the

11 time that you come into class?

12     A.   So I don't allow students to come into the

13 classroom while I'm still teaching.

14     Q.   I'm saying when you're going to teach a

15 class --

16     A.   No, no, no, I don't say everybody be in the

17 classroom.  I think that's kind of implicit, so I don't

18 ever have to say "be in the classroom before I get

19 there," no.

20     Q.   What do professors say to students in a

21 syllabus?

22     A.   Uh-huh.

23     Q.   You are expected to be in the classroom, set up

24 for class when we begin -- when I show up to begin

25 class.  Is that a norm; do you think?

1    A.   I don't know if it's a norm, but I don't see

2  anything wrong with it.

3    Q.   And would that statement then mean that --

4  let's say if Professor Reyes made that statement to

5  students that you're supposed to be in the classroom set

6  up for class, does that mean that Professor Reyes told

7  MW specifically, on the day MW went into the classroom,

8  go and tell Professor Smith that I am coming in there

9  and I want you set up?

10    A.   I have no idea.

11    Q.   Okay.  Did Professor Smith provide any proof to

12  you that Professor Reyes told MW specifically to go that

13  day and tell Professor Smith "I need to be in the

14  classroom to set up?"

15    A.   So when Professor Smith told me this, it had

16  just happened and I just listened.  She said that that's

17  what the student said.  So I don't know proof.  I don't

18  know how you prove it.  I don't know how I would prove

19  that or how she would prove it to me.  That's what she

20  said happened.

21    Q.   So the student came in and said "we are

22  expected to be set up for class here."

23    A.   Is that what she told me the student said?

24    Q.   I'm going to finish the question.

25    A.   Okay.

1    Q.   If the student came in and said "Professor

2  Smith, Professor Reyes will be coming in soon to start

3  class and we're supposed to be set up," do you

4  understand that to mean that Professor Reyes told her to

5  go in that day and tell Professor Smith that that day

6  specifically?

7    A.   That's not what Professor Smith told me.

8    Q.   What did Professor Smith tell you?

9    A.   She said the student came in the room and

10  yelled, "what are you doing in here?  Professor Reyes is

11  getting ready to have class and I have to set up for

12  her."  And yelled at her.  She didn't tell me the way

13  you put it that we're expected to be in class.  It

14  wasn't that kind of benign, "oh, I'm so sorry for

15  interrupting you," she said the student barged into the

16  room and screamed at her.

17    Q.   But she didn't tell you that Professor Reyes

18  told the student that day specifically to go and tell

19  Professor Smith that?

20       MS. REINER:  Objection.  Misstates evidence.

21    Q.   Is that what you're saying now?

22    A.   No, no, I'm saying that that is what the

23  student said to her.  That is what she said to me that

24  the student said to her.  I have no idea what Professor

25  Reyes's role in all of this was, if anything.  I don't

1    Q.   But I want to show you another exhibit.  I'm

2  going to enter another video.  Now, Professor Broussard,

3  to wrap this up, would it be fair to say that you said

4  that by 2015, you felt that Professor Reyes being in

5  your space was a problem?

6    A.   Yes.

7    Q.   And you were trying to avoid her at all costs?

8    A.   Yes.

9    Q.   Physically?

10   A.   Yes.

11   Q.   Has Professor Reyes ever done anything to you

12  physically Professor Broussard?

13   A.   Physically?

14   Q.   Yes.

15   A.   Not as far as I know.

16   Q.   Would you know if somebody had done something

17  to you physically?

18   A.   I have no idea if I was in a crowd and somebody

19  inadvertently pushed me and, I mean, I can't imagine

20  somebody on purpose doing something.  I probably

21  wouldn't even pay attention if something inadvertent

22  happened, yeah.

23   Q.   Okay.  Has anything inadvertent happened with

24  Professor Reyes, like somebody pushing you when

25  Professor Reyes was around.

1    A.    Somebody pushing me --

2    Q.    Yeah, did anybody push you in the college of

3 law?

4    A.    Not to my knowledge.  Well, let me say this,

5 I've been in crowds and I've been pushed, but I've never

6 connected "oh, somebody pushed me."  If we are in a

7 crowded space and I get moved, I just accept that.

8    Q.    Okay.  I'm going to mark the next video as what

9 will be --

10         THE COURT REPORTER:  28.

11         (Exhibit Number 28 was marked for

12    identification.)

13    Q.    I'm going to show you -- I am showing right now

14 a video from the College of Law Surveillance Security

15 Department.  It's marked 5/6/2019.  May 6, 2019.  And do

16 you recognize where this video is in terms of the law

17 school, Professor Broussard?

18    A.    It looks like it's the steps in the atrium on

19 the first floor.

20    Q.    And are there elevators there?

21    A.    Yes.

22    Q.    Okay.  And how many elevators are there in that

23 atrium?

24    A.    In that particular atrium there are two.

25    Q.    There are two elevators.  And are they side by

1  side?

2      A.   Yes.

3      Q.   Okay.  Do you recognize the faculty member, the

4  male faculty member who's walking right there?

5      A.   No.

6      Q.   Okay.  Let me get it closer.  Okay.  Do you

7  recognize the faculty member who is walking with a cart

8  and pulling a cart?

9      A.   No.

10     Q.   Okay.  Would it surprise you to know that

11 that's Professor Reyes?

12     A.   No, if you say it is.

13     Q.   Do you want to get closer to see if you

14 recognize?

15     A.   I still won't be able to, no matter if I got

16 closer.

17     Q.   Does that appear to be Professor Joe Grant

18 walking with a female student?

19     A.   From the physicality of the outline of the body

20 it does, yes.

21     Q.   And would you recognize, walking in the

22 background, coming from the hallway, would you recognize

23 that's Professor Broussard, yourself, and Professor Ann

24 Marie Cavazos?

25     A.   Yes.

1    Q.   And where are you walking towards there?

2    A.   Towards the hall, towards the -- looks like

3  we're coming from the clinic area and we're walking

4  towards the center of the building.

5    Q.   Okay.  And what is Professor Reyes doing at

6  that point?

7    A.   Looks like we're walking.

8    Q.   Professor Reyes, what is she doing?

9    A.   She's getting on the elevator.

10    Q.   What do you do?

11    A.   Running to catch the elevator to get on

12  upstairs.

13    Q.   Okay.  So you ran to get into the elevator with

14  Professor Reyes?

15    A.   No, I ran to get into the elevator to get up to

16  the third floor.  And actually, if I can interject, I

17  have claustrophobia, so I was really glad that there

18  were other people on the elevator because I don't like

19  to ride elevators by myself.

20    Q.   But you would have been with Professor Cavazos

21  anyways?

22    A.   Yeah, so we rushed to get to the elevator

23  because it was there.  Plus the elevators break a lot.

24  You know that.

25    Q.   But there's another elevator right next to that

1   one.

2       A.   Well, I don't think we ran especially to catch

3   up with you.

4       Q.   Okay.  But before you said you do everything

5   you can to avoid Professor Reyes and being alone with

6   her.

7       A.   Yeah, I do.  I wasn't alone with you, I was

8   there with Professor Cavazos.  She was there.

9       Q.   And Professor Cavazos, what's your relationship

10  with Professor Cavazos?

11      A.   She is the acting academic dean, she is a

12  colleague, and she is a friend.

13      Q.   Okay.  And has Professor Cavazos been involved

14  in filing complaints against Professor Reyes?

15      A.   I have no idea.

16      Q.   Has she ever spoken with you about complaints

17  about Professor Reyes?

18      A.   I'm sure, yes.

19      Q.   And was Professor Cavazos, when we were going

20  over the class observation forms, was Professor Cavazos

21  another faculty member who went to visit the classes at

22  the same time that you did during Professor Reyes's

23  tenure process?

24      A.   You mean in the classroom with me?

25      Q.   No, just that semester.

1    A.   Oh, I don't know.

2    Q.   When we were reading the bullet points before

3 in the document that was Professor Reyes's complaint and

4 we were going over the things, you know, do you remember

5 that included Professor Cavazos joined with you and

6 Professor Joe Grant in terms of the class observation

7 forms and stating statements in the class observation

8 forms that they never told Professor Reyes about?

9    A.   If that's what your document said, that's what

10 your document said, yes.  I'm confused.

11   Q.   So let's just -- the video speaks for itself in

12 terms of what's happening.  We have Professor Reyes --

13 do you see Professor Reyes rushing to push the buttons

14 in the elevator to get in and then you run and you press

15 the button?  Why are you pressing the button?

16        MS. REINER:  Again, I'm going to object to your

17    narrative.

18   Q.   Yes, I'm asking, what is Professor Reyes doing

19 in terms of getting in the elevator?

20   A.   I have no idea.  She's getting ready to go up.

21 I think you're getting ready to ride up.

22   Q.   What are you doing running and pushing?  What

23 are you doing?  Why are you running?

24        MS. REINER:  Objection.

25   A.   I have no idea.

1        MS. REINER:  Asked and answered.

2    A.   I'm trying to catch the elevator.  I do that

3  even now.  I don't get on elevators by myself.

4    Q.   But again, would you have been by yourself if

5  you had been with Professor Cavazos?

6        MS. REINER:  Objection.  Asked and answered.

7    Q.   Would you have been by yourself if you were

8  with Professor Cavazos?

9    A.   But the elevator would have been gone.

10    Q.   So were you in a rush to get somewhere?

11    A.   Yes, probably.  I probably was.

12    Q.   Where would you have been in a rush?  Were you

13  going to teach class?

14    A.   I have no idea.  But I was in a rush to go up

15  apparently.  I think, like you said, the video speaks

16  for itself.

17    Q.   Okay.  So there you got in the elevator running

18  after.  So let's see what happens with the elevator.

19  Once you get in, what does Professor Reyes do?

20    A.   She gets out.

21    Q.   Uh-huh.

22    A.   With her hand in the air.

23    Q.   Uh-huh.  As in a hand in the air?

24    A.   Yeah.

25    Q.   Who is trying to avoid who from there?

1    A.   It looks like you got out of the elevator, so I

2    don't know.

3    Q.   Okay.  And where would Professor Reyes go after

4    that if she wants to get up?

5    A.   I don't know.

6    Q.   Is there another elevator that can take faculty

7    up?

8    A.   Oh, there's an elevator and stairs, yes.

9    Q.   But is there another elevator --

10   A.   Yes.

11   Q.   -- other than the two in the atrium?

12   A.   In the library.

13   Q.   And where does that take faculty to if they

14   want?

15   A.   It takes faculty to the second floor, to the

16   third floor, and to the fourth floor.

17   Q.   Okay.  I'm going to mark this other one as a

18   separate exhibit.

19        (Exhibit Number 29 was marked for

20        identification.)

21   Q.   Professor Broussard, where is this?

22   A.   It appears to be the area outside of the -- oh,

23   I'm sorry -- the faculty offices on the third floor.

24   Q.   Is that the other elevator you were talking

25   about?

1      A.   Yes, uh-huh.

2      Q.   Okay.  So you could get to that part of the

3   third floor, which is in the faculty -- outside of the

4   faculty offices; is that it?

5      A.   Yes.

6      Q.   And so if you came from the other elevator, you

7   could still get there?

8      A.   Yes.

9      Q.   Okay.  And does it show that you got there?

10     A.   Yes.

11     Q.   And who are you there with?

12     A.   Claudine Beale, Ann Marie, and myself.

13     Q.   When you ran to the elevator that Professor

14  Reyes was getting in, you said that you were in a rush

15  to get to the third floor.

16     A.   Yes, uh-huh.

17     Q.   But now you -- where are you here?  You're

18  outside of the elevator that is the other elevator;

19  right?

20     A.   Yes.

21     Q.   Okay.  Now, if Professor Reyes left the other

22  elevator and she's taking the elevator from the library

23  into this other one, where can she get out of?

24     A.   Since I didn't know what floor you were going

25  on, I don't know.  You could get off anywhere between

1   the second, third, and fourth floor.

2      Q.   But in the third floor, would that be where the

3   faculty offices are?

4      A.   Yes.

5      Q.   Okay.  So this is the third floor to enter the

6   faculty offices?

7      A.   Yes.

8      Q.   And Professor Cavazos and you are standing

9   right outside that elevator?

10     A.   Yes.

11     Q.   Were you in a rush to get somewhere at that

12  point, Professor Broussard?

13     A.   I don't know.  I don't remember.  I don't know

14  if I had gotten to -- I don't know if I had to go to the

15  bathroom.  I don't know.  But I was standing there

16  talking to Claudine and Ann Marie and Professor -- Dean

17  Cavazos.

18     Q.   Right by the elevator?

19     A.   Right where we walked up to Claudine, where

20  Claudine stopped and that's where we were talking to

21  her.

22     Q.   Who gets out of that elevator?

23     A.   You get out of the elevator.  Professor Reyes

24  gets out of the elevator.

25     Q.   Okay.  And she heads toward the faculty

1   offices?

2       A.   I assume so, yes.

3       Q.   Does that door lead to the faculty offices?

4       A.   Yes.

5       Q.   Okay.  Is that the only thing that there is --

6   when you go through that door, Professor Broussard, is

7   there only faculty offices there?

8       A.   There's a lounge in there.  A faculty lounge in

9   there.  There's the desk where the assistants sit.  All

10  of that.

11      Q.   Okay.  And at that point that the video is

12  going on and you're there with Professor Cavazos, do you

13  see the hand gesture that Claudine Beale is making right

14  there?

15      A.   Yes.

16      Q.   And when she's pointing in the direction of

17  where Professor Reyes went into the door --

18      A.   No.

19      Q.   -- is there any conversation -- what is the

20  conversation at that point there?

21      A.   So just to give you some context.  The provost

22  -- Provost Edington, the president, and a group of folks

23  had come from main campus that day to give a

24  presentation.  And as a result of the presentation --

25  well, no, as a result of them being on campus, Claudine

1   was responsible for the food.  So Mildred and Claudine

2   put together the food.  And we were laughing because we

3   said -- I remember this, we were thanking her for the

4   food and said, "have you eaten yet?"  And she took the

5   spoon and said, "yeah I've done all the work, but I

6   haven't eat yet."  We were laughing about the fact that

7   she was complaining over "I do all of this work" and

8   yada, yada, yada, "but I haven't eaten yet.  I haven't

9   got to the food yet."  So that is the conversation that

10  I am 1,000 percent sure both Claudine and Dean Cavazos

11  will tell you we were having about the food, the

12  presentation because she really -- I don't remember if

13  you remember that day, but she laid out -- they laid out

14  a beautiful spread for main campus.  So that's what we

15  were talking about, talking about the fact she had done

16  all the work and she didn't get any of the food.

17      Q.   Are you done?

18      A.   Yes.

19      Q.   Okay.  So you have very vivid memories about

20  that; right?

21      A.   I do.  I do.

22      Q.   How do you -- in your mind, what is it that you

23  remember vividly versus all the answers you gave me

24  today you didn't recall, you don't remember?

25      A.   So I don't know -- you will accuse me of giving

1  you a narrative, but I'll give you the brief narrative

2  to help you understand it.  I grew up poor and in the

3  projects on the west side of Chicago and --

4       Q.   Professor Broussard, I'm sorry --

5       A.   I'm getting ready to connect it for you, if you

6  allow me.

7       Q.   It's going beyond, I'm sorry.

8       A.   No, it's my explanation on food.  I remember

9  what I ate for my prom because I was always obsessed

10  with food because I never had enough and so that's why I

11  remember the conversation was about food because food is

12  one of my obsessions.  Growing up I never had enough, so

13  that's -- ask me anything about food, and I can tell you

14  about food because it's just -- it's a childhood thing.

15       Q.   With that, because you have taken time with the

16  narrative and all, would you say that you are a great

17  story teller, Professor Broussard?

18       A.   Story teller?

19       Q.   Yes.

20       A.   Um, I think that depends on what day you catch

21  me.  I can be articulate, but I'm not a story teller to

22  the extent I make stuff up, but I do -- I do -- because

23  I am a teacher, and I believe I was born a teacher, I

24  believe that communication is very, very important.

25       Q.   Have you heard of the term "workplace mobbing"?

1      A.    I've heard of the term through an article that

2  Professor Reyes wrote.

3      Q.    And in terms of workplace mobbing, does it

4  imply a group dynamic to work place -- to the mobbing

5  situation?

6      A.    Only from the context of what I have heard

7  about from Professor Reyes's scholarship that that's the

8  way she uses the term.

9      Q.    Okay.

10     A.    I don't know if that is, in fact, the way the

11 term is interpreted.

12     Q.    And within the concept of workplace mobbing and

13 the different personalities that they could be, are you

14 familiar with the scholarship on, from workplace mobbing

15 scholarship, right, like describing personality types

16 that would participate and lead a mobbing, for example?

17 Are you familiar with the two-headed snake personality

18 type?

19     A.    No.

20     Q.    Are you familiar with the meany personality

21 type?

22     A.    No.

23     Q.    Are you familiar with the screamer personality

24 type?

25     A.    No.

Tab 86(3)(d)

1                UNITED STATES DISTRICT COURT

               MIDDLE DISTRICT OF FLORIDA

2                   ORLANDO DIVISION

3                 CASE NO:  6:22-cv-1525-WWB-DCI

4  MARITZA REYES,

5       Plaintiff,

6  vs.

7  FLORIDA A&M
    UNIVERSITY BOARD
8  OF TRUSTEES ("FAMU"),

9       Defendant.

10                           /

11

12       VIDEOTAPED DEPOSITION OF LARRY ROBINSON

13         Taken on behalf of Plaintiff

14

15

16   DATE TAKEN:          Thursday, June 20, 2024

17   TIME:               10:00 a.m. - 5:37 p.m.

18   LOCATION:          U.S. Legal Support
                       20 N. Orange Avenue
19                     Suite 1208
                       Orlando, Florida 32801
20

21

22

23

24         Stenographically Reported By:
          Christine L. Price, RPR, FPR-C
25     Notary Public, State of Florida at Large

1                    APPEARANCES

2   On behalf of the Plaintiff:

3       MARITZA REYES, ESQUIRE
        P.O. Box 5102
4       Winter Park, Florida 32793
        (305) 308-8200
5       mreyesclaim@gmail.com

6

    On behalf of the Defendant:
7
        SARAH REINER, ESQUIRE
8       Gray Robinson, P.A.
        301 E. Pine Street
9       Suite 1400
        Orlando, Florida 32801
10      (407) 843-8880
        sarah.reiner@gray-robinson.com
11

12  Also Present:

13      Ashley Sepulveda, Camera Operator

14

15

16

17

18

19

20

21

22

23

24

25

1                     INDEX OF PROCEEDINGS

2     Deposition of:  LARRY ROBINSON

3     Direct Examination by Ms. Reyes......................5
      Cross-Examination by Ms. Reiner...................258
4     Redirect Examination by Ms. Reyes.................261

5     Certificate of Oath...............................267
      Certificate of Reporter...........................268
6     Witness Review Letter.............................269
      Errata Sheet......................................270

7

8                         EXHIBITS

9     Number  Description                             Page

10    Exhibit 1      Notice of Deposition..................14

11    Exhibit 2      2018-2019 Tenure Schedule.............15

12    Exhibit 3      Letter - Pernell to Reyes 2/26/09......23

13    Exhibit 4      Letter - Harris to  Reyes 3/30/09......24

14    Exhibit 5      Letter - Mangum to Reyes 6/15/15.......25

15    Exhibit 6      Email chain Bullock/Wright 10/7/14.....31

16    Exhibit 7      2014-2015 Tenure Schedule.............39

17    Exhibit 8      Faculty Handbook......................41

18    Exhibit 9      Memo - Wright to Givens 10/24/14.......57

19    Exhibit 10     Robinson Declaration..................61

20    Exhibit 11     Letter - Edington to Reyes 7/24/19.....69

21    Exhibit 12     Email composite 8/5/19................70

22    Exhibit 13     Charge of Discrimination..............83

23    Exhibit 14     Dismissal and Notice of Rights........84

24    Exhibit 15     Letter - Edington to Reyes 8/7/19......87

25    Exhibit 16     Reyes publications....................91

1   Exhibit 17      Memo Pernell - Edington 11/29/18.......98

2   Exhibit 18      2022 Hooding Ceremony Faculty.........117

3   Exhibit 19      2022 Hooding Ceremony Program.........122

4   Exhibit 20      Emails - Request for appointment......130

5   Exhibit 21      Emails - Step Two Review.............143

6   Exhibit 22      Email Reyes to Robinson 3/2/17 11:28..148

7   Exhibit 23      Email Robinson to Reyes 3/2/17 1:07...152

8   Exhibit 24      Email Reyes to Robinson 3/2/17 3:17...152

9   Exhibit 25      Jane Doe v. A&M Order.................161

10  Exhibit 26      Memorandum Reyes to FAMU 11/13/19.....171

11  Exhibit 27      FAMU Regulations.....................178

12  Exhibit 28      Email Reyes to Robinson 2/13/24.......183

13  Exhibit 29      Email Reyes to Watson 2/15/24.........192

14  Exhibit 30      Notice of Intent to Dismiss..........201

15  Exhibit 31      Excerpt from Edington depo...........223

16  Exhibit 32      Pernell Announcement.................249

17  Exhibit 33      Email Boothe-Perry to Faculty 4/16/19.250

18  Exhibit 34      Memorandum Reyes to Robinson 6/18/19..252

19  Exhibit 35      Document 62-5 pages 366-380..........254

20  Exhibit 36      FAMU 2015-2016 Budget................256

21  Exhibit 37      FAMU Fundamentals 2024...............264

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT REPORTER:  Will you raise your right

3      hand.  Do you swear or affirm that the testimony you

4      are about to give in this cause will be the truth,

5      the whole truth, and nothing but the truth?

6          THE WITNESS:  I do.

7   THEREUPON,

8                    LARRY ROBINSON,

9   having been first duly sworn, was examined and testified

10  as follows:

11         MS. REYES:  Maritza Reyes for the Plaintiff,

12     and Plaintiff.

13         MS. REINER:  Sarah Reiner for the Defendant,

14     FAMU.

15         MS. ELIJAH:  Iris Elijah Deputy General Counsel

16     for FAMU.

17                 DIRECT EXAMINATION

18  BY MS. REYES:

19     Q.   So good morning.

20     A.   Good morning.

21     Q.   Again, thank you for being here today.

22     A.   Uh-huh.

23     Q.   And so let's just go through some of the

24  logistics.  Have you given a deposition before?

25     A.   Yes.

1      Q.    Okay.  And when was that?

2      A.    Probably in the last 60 days or so.

3      Q.    Okay.  So it's fresh in your mind, but I'm

4  going to just, you know, go through the usual in terms

5  of what I'm going to be doing.  So today I'm going to be

6  questioning you.

7            And I want to make sure that if you don't

8  understand a question, you let me know.  And if, you

9  know, you want me to clarify or, you know, you want more

10 reference for the question, please let me know.

11           Also, is it okay if I address you as

12 Dr. Robinson?

13     A.    That will be fine.

14     Q.    Okay.  So Dr. Robinson it will be.  And by the

15 way, did you drive here today?

16     A.    I drove yesterday.

17     Q.    But you drove?

18     A.    Uh-huh.

19     Q.    Do you take any medication that you think could

20 impair your answering the questions, understanding the

21 questions, anything like that?

22     A.    No.

23     Q.    Okay.  And when you said that you've given a

24 deposition before, what case was it in?

25     A.    I believe it was in the Michael Johnson case.

1   I don't know.  I think so.

2       Q.   And where was it?

3       A.   Huh?

4       Q.   Where?  Geographically, what city?

5       A.   I was in Tallahassee.

6       Q.   In Tallahassee?  I was just looking for my

7   glasses.  Okay.  And before that, when was the prior

8   deposition to that?

9       A.   I don't recall.

10      Q.   Okay.  How long ago?  Do you recall?

11      A.   Within the last year.

12      Q.   Okay.  So why do you think you're here today

13  for this deposition?

14      A.   Because you requested me to be here.

15      Q.   Okay.  And what do you -- like, before you came

16  to the deposition today, did you read any of the

17  pleadings in the case, that would be a complaint, the

18  complaint that is pending right now is the second

19  amended complaint.  Did you read it?

20      A.   Yes, I did.

21      Q.   Okay.  And did you confer with counsel about

22  what you were going to be doing here today?

23      A.   Yes.

24      Q.   Okay.  Just so in terms of preparation, what

25  kind of preparation did you do?

1    A.   Just read that document.  That's all.

2    Q.   Okay.  All right.  So let's just go over, to

3  begin, a little bit about yourself in terms of FAMU.

4  Because I know you've been at FAMU for a while and I

5  want to have a timeline.  Because you've been in

6  administration for a while; right?

7    A.   Uh-huh.

8    Q.   So how long have you been at FAMU?

9    A.   Well, I started as a visiting professor in

10 1995.

11   Q.   Okay.

12   A.   And then I officially joined FAMU's payroll in

13 January of 1997.

14   Q.   Okay.  I'm sorry, you said you officially

15 joined?

16   A.   FAMU's payroll in January of 1997.

17   Q.   So let me understand that.  When you were a

18 visiting professor, you were not on the FAMU payroll?

19   A.   No.

20   Q.   Okay.  So you stayed on the payroll of your

21 institution?

22   A.   I was at Lockheed Martin, yes.

23   Q.   Okay.  Okay.  And so January 19 --

24   A.   '97.

25   Q.   You became an assistant professor?

1    A.    No.  I became professor and director of the

2  Environmental Sciences Institute.

3    Q.    So you came in as a full professor?

4    A.    Yes, I did.

5    Q.    Wow.  Okay.  Was it a full professor with

6  tenure?

7    A.    Yes, uh-huh.

8    Q.    That's a double wow.  Okay.  And what college

9  did you come into?

10    A.    The Environmental Sciences Institute.

11    Q.    And are you still affiliated with that college?

12    A.    Yes, I am a tenured distinguished professor at

13  the university.  But my affiliation is with the

14  Environmental Sciences Institute in terms of tenure.

15    Q.    Okay.  All right.  And so now I want to speak

16  about your leadership roles at FAMU.

17    A.    Uh-huh.

18    Q.    So you said that you came as director into the

19  Environmental Sciences Institute?

20    A.    Uh-huh.

21    Q.    So that was 1997 to like what year?

22    A.    2003.

23    Q.    Uh-huh.  And after that, what was your next

24  role?

25    A.    I was provost and vice president for academic

 1  affairs.

 2      Q.    And what years was that?

 3      A.    From, I believe, May of 2003 to August of 2005.

 4      Q.    Okay.  And after that, what was your next role?

 5      A.    I went back to the faculty rank as professor in

 6  the Environmental Sciences Institute.

 7      Q.    Okay.  Until you returned to be an

 8  administrator again?

 9      A.    In 2007 I was asked to serve as interim

10  president at the university.

11      Q.    And when you say interim president, would the

12  title also be chief executive officer?

13      A.    Yes, uh-huh.

14      Q.    Okay.  And then after that?

15      A.    So I went back to the Environmental Sciences

16  Institute, but I served as science advisor for USDA's

17  Corporate State, Education, and Extension Service, which

18  is today the National Institute of Food and Agriculture.

19  So they pay FAMU half of my salary, FAMU paid, you know,

20  the other half and I spent half of my time in DC, half

21  of my time in Tallahassee, and so forth.  Did that until

22  2009.

23          MS. REYES:  And, Madam Court Reporter, are you

24      getting everything?

25          THE COURT REPORTER:  Yeah, I am.

 1          MS. REYES:  Okay.  Okay.

 2          THE COURT REPORTER:  Thanks.

 3     Q.   All right.  And then in 2009 you had another

 4  administrative position; right?

 5     A.   In 2009 I was asked to serve as the vice

 6  president for research.

 7     Q.   Okay.  And until when?

 8     A.   Until May of 2010.

 9     Q.   And what happened after May 2010?

10     A.   So May the 10th, 2010, I was sworn in as the

11  assistant secretary of commerce for the -- what really

12  was a position at the National Oceanic and Atmospheric

13  Administration serving as NOAA's deputy administrator.

14     Q.   All right.  In DC?

15     A.   Yes.

16     Q.   Okay.  And you came back to FAMU?

17     A.   Yes, I did.

18     Q.   When?

19     A.   In November of 2011.

20     Q.   And in what role?

21     A.   Special assistant to the president.

22     Q.   And after that?

23     A.   So I served in that capacity until sometime in

24  the spring of 2012 when I was asked to serve -- excuse

25  me -- as provost again.  I can't remember the exact time

1   frame, but maybe March, April, May time frame, something

2   like that.

3        Q.   As provost?

4        A.   Yes.

5        Q.   But you didn't stay provost for too long before

6   you went to your next position; right?

7        A.   Yes, uh-huh.

8        Q.   Okay.  So what was the next one?

9        A.   That was interim president.

10       Q.   From?

11       A.   That was in June/July of 2012 until I guess the

12  permanent president came in April of 2014.

13       Q.   Okay.

14       A.   April the 1st of 2014.

15       Q.   Okay.  And when you say the permanent president

16  came, who was it?

17       A.   Dr. Elmira Mangum.

18       Q.   Okay.  When did she come?

19       A.   I think her appointment date was April the 1st,

20  2014.

21       Q.   So before that you were the interim?

22       A.   Uh-huh.

23       Q.   Okay.  And who was -- who was the provost when

24  you were interim?

25       A.   That's a good question.  At one point it was

1  Debra Austin, I think.  And I don't remember all of the

2  details exactly, but at some point she left and I can't

3  remember who the person was.

4       Q.   You appointed the provost at that point?

5  Because you were the interim president then; right?

6       A.   Yeah, I just can't remember who it was.

7       Q.   Was it Rodner Wright?

8       A.   That's correct.  Thank you.

9       Q.   Okay.  And then after that, Elmira Mangum was

10  there April 1st, 2014, and then she left?

11       A.   (Witness nods head.)

12       Q.   Did you become interim, again, president?

13       A.   Yes.

14       Q.   Okay.  From?

15       A.   In September of 2016.

16       Q.   Until when?

17       A.   Until November of 2017.

18       Q.   Which at that point you had the permanent

19  appointment; right?

20       A.   The board selected me as president then.  I

21  probably wouldn't refer to it as permanent, there is no

22  such thing.

23       Q.   Okay.  I thought I recalled, I wasn't sure, I

24  remember when you spoke at the board meeting.

25       A.   Uh-huh.

1    Q.    And I thought somebody made the comment like

2    "now you're permanent" or something like that.  I don't

3    know.  It stuck in my head.

4    A.    That's what they say, yes.

5    Q.    Okay.  So you have been in the president role

6    since 2017?

7    A.    That's correct.

8    Q.    Until now.  Okay.  Well, I have to acknowledge

9    that I have a cheat sheet right here from the website

10    because I wanted to have the timeline of the dates

11    because some of the questions I'm going to be asking

12    you, I wanted to see in what role you were in those

13    times.  So I'm going to be asking questions about that.

14         Okay.  So let's start with -- oh, and I'm going

15    to introduce the first exhibit into evidence.  Please

16    mark it.

17         (Plaintiff's Exhibit Number 1 was marked for

18         identification.)

19    Q.    I'm going to show you what has been marked as

20    Exhibit 1.  Have you seen that document?

21    A.    What is the date on it?

22    Q.    If you go to page 2.

23    A.    Oh, yeah.  Okay.  Uh-huh.

24    Q.    Okay.  So please tell me, have you seen it?

25    A.    Yes.

1     Q.   Okay.  So what's marked as Exhibit 1 is

2  Plaintiff's Third Amended Notice of Taking Deposition of

3  FAMU President Larry Robinson in this case.  That's for

4  the record.  So we have as Exhibit 1.

5          Okay.  So I'm going to get to the gist of, I

6  think, the main questions that I want to go over in

7  regards to my promotion decision.  And I think that one

8  of the, you know, difficulties we're going to have --

9  maybe not difficulty, but something that we have to

10  manage is that because I am acting pro se and

11  representing myself, I'm going to be referring to myself

12  as Professor Reyes, the role that I had during the

13  situations that I'm going to be asking you about.

14     A.   Uh-huh.

15     Q.   Sometimes I may say "I", because I forget and

16  you may answer the question in the same way.  I think

17  that we'll keep the record straight, but I just wanted

18  to put that on the record.

19          So I'm going to ask you now about fall of 2018.

20          (Plaintiff's Exhibit Number 2 was marked for

21     identification.)

22     Q.   And I'm going to give you what has been marked

23  as Exhibit 2.  Dr. Robinson, are you familiar with that

24  document?

25     A.   It looks like our standard tenure promotion

1   schedule, yes.

2        Q.   For what year?

3        A.   It says 2018 to 2019.

4        Q.   Okay.  And when is the deadline to apply for --

5   to submit applications?

6        A.   It appears to be September the 21st, 2018.

7        Q.   And at that point, through what system were the

8   applications submitted?

9        A.   Via this Interfolio system.

10        Q.   Do you recall when FAMU started using

11   Interfolio for the applications?

12        A.   No, I don't.

13        Q.   So that's the date of the application when I

14   submitted my application -- when Professor Reyes

15   submitted her application for promotion to full

16   professor.

17             And I want to use this exhibit to go over the

18   steps that happened after the application is submitted.

19   And I'm going to do it by the deadlines that are listed

20   here.

21             So after an application is submitted, then the

22   next thing is the College of School Committee submits

23   recommendations to the dean.  At the law school, do you

24   know what committee that would be?

25        A.   No, I don't.

1     Q.   Are you familiar with the term Retention,

2  Promotion, and Tenure Committee?

3     A.   I do.  I am, yes.  But I assume that must be

4  your committee.

5     Q.   Okay.

6     A.   It's called something different in different

7  places, though.

8     Q.   What is it called in your college?

9     A.   We don't have a -- we don't have various

10 colleges and schools, it's just one college, so it's

11 called a Tenure Promotion Committee, period, yeah.

12    Q.   Okay.  So after -- because at the college of

13 law we have the Retention, Promotion, and Tenure

14 Committee.  So after that committee, then it goes to --

15 what is the next step?

16    A.   Deans submit recommendations, applications, and

17 portfolios to University Promotion and Tenure Committee.

18    Q.   Okay.  And after that, what is the next step?

19    A.   The University Tenure and Promotion Committee

20 holds organizational meetings and start review of

21 applications.

22    Q.   Okay.  And then what's the next step?

23    A.   The University Committee submits tenure

24 recommendations to the provost.

25    Q.   Okay.  And then the next step?

1      A.    Last day to withdraw application, University

2  Committee submits promotion recommendations to the

3  provost.

4      Q.    Okay.  So I want to look at those two different

5  dates, right, because for -- in this schedule you have

6  February 2019, right, for the recommendation for tenure

7  to the provost?

8      A.    Uh-huh.

9      Q.    And you have March 15, 2019, for the

10 recommendation for promotion to the provost?

11     A.    Uh-huh.

12     Q.    Why are there two different dates for the

13 tenure and promotion?

14     A.    Because ultimately the tenure decisions have to

15 go to the Board of Trustees.  They make the final

16 decision regarding that.  Promotions are determined at

17 the provost level.

18     Q.    Okay.  And what is the difference between

19 tenure and promotion?

20     A.    Well, there's several differences.  One is

21 depending upon where you are in your appointments or

22 your ranking could be promoted from assistant to an

23 associate, an associate to full professor, and that

24 could happen coincidentally with tenure, sometimes not

25 in some colleges and schools, but tenure is sort of

1  along a commitment to the faculty's standing at the

2  university, so --

3      Q.   And in terms of -- is there a difference in

4  terms of compensation?

5      A.   At each of those ranks that a -- that occur

6  during the promotion process, there is a salary increase

7  that occurs, yeah.

8      Q.   So is there a difference in compensation in

9  terms of tenure and promotion?

10     A.   Not necessarily, unless the tenure involves a

11 promotion at the same time.

12     Q.   Okay.  So let me clarify.  If it's only tenure,

13 is there compensation -- is there extra compensation?

14 Does it come with a compensation increase for just

15 tenure?

16     A.   That's not -- no, not to my understanding, no.

17     Q.   Okay.  But for promotion it would come with a

18 -- does it come with a salary increase?

19     A.   Generally, yes, uh-huh.

20     Q.   Okay.  And do you know the percentage increase

21 for -- from assistant to associate?

22     A.   I don't anymore.  I remember it used to be 9

23 percent, but it was 13 percent or something now,

24 something in that order, but I don't know the exact

25 number.

1    Q.   Okay.  And for -- but would we -- could you say

2  that it would be higher from associate to full

3  professor?

4    A.   No, I couldn't say that.

5    Q.   That it wouldn't be -- so it would be the same

6  percentage as from assistant to associate?

7    A.   I couldn't say one way or the other.

8    Q.   Okay.  But this information is readily

9  available, right, to the faculty?

10    A.   Yes, it is.

11    Q.   Okay.  And, in fact, how do they allocate the

12  percentages?  Is there negotiation with the Board of

13  Trustees?  With the faculty?  How does that happen, the

14  allocation of the percentage increase for promotion?

15    A.   Well, whatever that number is by college, that

16  amount of money goes to that college in the schools

17  coffers and then it's applied to the faculty members'

18  salaries.  There may be some consideration to the number

19  of people in the process, but in general we made a

20  commitment that once that promotion occurred, we would

21  apply that increase.

22    Q.   And so how does bargaining come into the

23  picture in terms of deciding the percentage?

24    A.   I think it may be in the collective bargaining

25  agreement that ultimately decides what that number is;

1  right?  And so that's pretty much the extent of it, to

2  my knowledge.

3      Q.    Is the college of law a member of the

4  bargaining unit?

5      A.    Not to my knowledge.

6      Q.    So how would the percentage be set for the

7  college of law?

8      A.    I would -- I would assume through your

9  processes associated with the provost and so forth, but

10  I'm not sure exactly how that happens.

11      Q.    Does the college of law get the benefit of, in

12  a way, getting the same percentage as the bargaining --

13  the units that are on the bargaining agreement?

14      A.    I don't know for sure.

15      Q.    Okay.  See, I'm asking the questions, I know

16  the answer, but I'm asking the questions.  I almost want

17  to say something, but good enough for the answer.

18  Because I know that some of these things you may not

19  know like I do because I went through the promotion so

20  -- process and I knew the information at that time.

21          So let me go now to -- I submitted an

22  application for promotion.  And when we went through the

23  different steps that we just did in the schedule, you

24  said that the tenure application is submitted earlier

25  because it has to go to the Board of Trustees.

1     A.    Yes.

2     Q.    But the promotion application does not; right?

3     A.    That's correct.

4     Q.    Okay.  And so what is the last step for a

5  promotion application under the timeline?

6     A.    Well, the final step is -- in terms of the

7  review process is by the provost and then I get the

8  pleasure of notifying applicants of the decision.  But

9  the decision is actually made by the provost.

10     Q.    Dr. Robinson, are you familiar with the

11  university faculty handbook?

12     A.    I know there's one, yes.

13     Q.    And I thought I had printed -- if not, we're

14  going to have to come back to it because I thought I had

15  brought a copy of the university faculty handbook.

16          Do you know the date of the university faculty

17  handbook that is being used?

18     A.    No, I don't.

19     Q.    In academia could a faculty handbook from 2004

20  still be used today in 2024?

21     A.    In general?

22     Q.    Uh-huh.

23     A.    That's possible, yes.

24     Q.    Okay.  But right now you don't know how old the

25  faculty handbook is for the university?

1    A.   I know that there have been some revisions made

2  in the last two or three years and probably there is a

3  new one in place, but I don't know the exact dates and

4  specifics around when it got approved and stuff.

5    Q.   Okay.  So I'm going to now go to some documents

6  in terms of Professor Reyes's hiring.  And I'm going to

7  mark this as exhibit --

8         THE COURT REPORTER:  Three.

9    Q.   Three.

10        (Exhibit Number 3 was marked for

11    identification.)

12   Q.   I'm going to show you Exhibit 3.  Please take a

13 look at it.

14   A.   (Witness complies.)

15   Q.   Could you please describe what I just handed to

16 you?

17   A.   This is a letter from former Dean Leroy Pernell

18 recommending that you be appointed to the faculty of the

19 Florida A&M University college of law as an assistant

20 professor.

21   Q.   And what is the date of that letter?

22   A.   February the 26, 2009.

23   Q.   And on that date, what was your role in the

24 university?

25   A.   I think in February of 2009 I was still in my

1  role as professor and science advisor at USDA.

2      Q.   Okay.  So you were not in a provost role at

3  FAMU?

4      A.   Not on that date.  I came back later in 2009 as

5  the VP for Research, yeah.

6      Q.   And who was the provost?

7      A.   I can't recall.

8      Q.   Do you see in the letter, it's signed by the

9  dean, is there a cc at the bottom of the letter?

10     A.   Yes.  Yes, there is.

11     Q.   Who is listed in cc?

12     A.   Provost Cynthia Hughes Harris.

13     Q.   Okay.  So when I was hired, Dean Pernell was

14 the dean and Provost Cynthia Hughes Harris was the

15 provost, who was the president at that time?

16     A.   2009?  I think Dr. James Ammons was.

17     Q.   Yes.  Okay.

18          (Exhibit Number 4 was marked for

19     identification.)

20     Q.   So I'm going to hand you what's been marked as

21 Exhibit 4.  Please take a look at it.

22     A.   (Witness complies.)

23     Q.   How would you describe that document?

24     A.   I would describe it as an offer letter to you

25 from Provost Cynthia Hughes Harris.

1    Q.   And what is the date of the offer?

2    A.   March the 30th, 2009.

3    Q.   Okay.  And on the second page, what is the date

4  of the acceptance?

5    A.   It was signed on April the 7th of 2009.

6    Q.   And who signed it?

7    A.   Maritza Reyes.

8    Q.   Okay.

9         (Exhibit Number 5 was marked for

10        identification.)

11    Q.   I'm going to give you what's been marked as

12  Exhibit 6.

13        MS. REINER:  Six?

14        MS. REYES:  Five.

15        MS. REINER:  Is this five?

16        MS. REYES:  Five.  It's five; right?

17    Exhibit 5.

18    Q.   How would you describe that, Dr. Robinson?

19    A.   This is a letter from former president Elmira

20  Mangum advising you of the board approval of your

21  nomination for tenure.

22    Q.   And what is the date on that?

23    A.   June 15th, 2015.

24    Q.   And who was the provost at the time?

25    A.   At that time?  I don't know -- oh, I see, it

1  looks like doctor -- or returning Marsella David, right.

2      Q.   Okay.  So during those processes, you were not

3  in a provost or president role?

4      A.   That's correct.

5      Q.   Okay.  Now, during the tenure process, and

6  looking back, I think that I gave you one of the

7  exhibits, it's the schedule; right?

8      A.   Uh-huh.  Uh-huh.

9      Q.   When you look at those dates in the schedule,

10  is there a time next to the dates?

11      A.   There is in most cases and there is a date in

12  some cases in terms of day of the month, yes.

13      Q.   I'm sorry, I don't understand.  Is there --

14      A.   Some of them have, for example, September

15  the 21st, 2018, some of them have June 2019.

16      Q.   Okay.  But there is a date?

17      A.   Yes.

18      Q.   Is there a time?  A clock time?  An hour time?

19      A.   No.

20      Q.   Okay.  How long -- what is the rule for

21  somebody to apply for tenure?  How many years do they

22  have to apply for tenure?

23      A.   Well, that varies.  It could be -- you know, in

24  general, a person must apply within -- before the end of

25  that sixth year.  However, time can be awarded upon

1  appointment, like in my case, or years could be waived

2  based upon prior experiences and so forth.  But the

3  general timeline for which it must be approved or not is

4  within the sixth year of appointment as a faculty member

5  at the university.

6      Q.   So let's talk about somebody -- because faculty

7  get hired in different roles; right?  Do faculty get

8  hired in different roles?

9      A.   Yes, some are teaching faculty, some are

10  research faculty, some are tenure earning faculty and

11  that tenure could be based upon the six-year general

12  rule coming in an assistant professor typically or all

13  the way from tenure to employment, but there are

14  different categories, visiting professors as I was, you

15  know, for a brief period and so forth, yeah.

16      Q.   So what is the difference between non-tenure

17  track and tenure track faculty in general?

18      A.   I think you just specified it.  In the

19  non-tenure track role you are not progressing towards

20  tenure, in a tenure track role you are.  I mean, clearly

21  that's the primary difference.

22      Q.   And what happens to tenure-track faculty if

23  they don't apply for tenure by the sixth year?

24      A.   Well, what could happen, depending upon the

25  circumstances, that they get a notice of nonrenewal and

1  they will typically have a year, you know, to stay on

2  the payroll before they have to be removed from the

3  university's ranks.

4      Q.   So have you heard of the term "up or out"?

5      A.   I haven't heard of that.

6      Q.   Okay.  If you hear the term "up or out" and you

7  apply it to the tenure application time, how do you

8  understand that --

9          MS. REINER:  Objection.

10     Q.   -- or do you?

11     A.   I've never heard the term applied to tenure or

12 anything, so --

13         MS. REYES:  I'm sorry, did I hear an objection?

14         MS. REINER:  Yes.

15         MS. REYES:  Oh, from you?  Okay.  I thought I

16     heard it from over there.

17         MS. REINER:  No.

18         MS. REYES:  Okay.  And what is the objection?

19         MS. REINER:  I said objection.  Form.

20         MS. REYES:  Okay.  And what is the form?

21         MS. REINER:  He already said he hadn't heard

22     the term.

23         MS. REYES:  Right, so I changed question.

24         MS. REINER:  Speculation.

25         MS. REYES:  Right, but speculation is not form.

1        MS. REINER:  Yes, it is.  Speculation -- well,
2     you typically object to form and then you can
3     clarify, so I'm clarifying.
4        MS. REYES:  That's why I wanted him to say that
5     he -- if he can't and if he doesn't apply it, that's
6     fine.
7  BY MS. REYES:
8     Q.   So if you hear the term "up or out," can you
9  analogize that, based on your knowledge, to what you
10 told me just now about the application of a tenure-track
11 faculty member in the six-year, and the terminal year
12 that they get, and then they have to be -- to leave the
13 university?
14    A.   I hadn't heard it before, so I would only be
15 speculating as to what it might mean.  Maybe that's a
16 term they use at the law school, but I haven't heard
17 that in the main campus environment.
18    Q.   Okay.  But the explanation that you gave,
19 right, it's a traditional understanding that -- is it
20 the traditional understanding that a faculty member in
21 the sixth year -- if a faculty member in the sixth year
22 doesn't apply and they get the terminal year, then
23 that's time to leave the university?
24    A.   Yeah, but there can be some extenuating
25 circumstances, as I'm sure you know.  There could be a

1  person with health issues given time off to deal with

2  that.  Sometime people's assignments might change along

3  the way and the provost could take that into

4  consideration, as well.  But in general the sort of

5  six-year rule is in play.

6      Q.   And what happens if someone applies for tenure

7  and tenure is denied?

8      A.   To the person?

9      Q.   (Nods head.)

10     A.   Well, they would typically -- in that denial

11 they would be informed, you know, the one-year extension

12 and, you know, what happens after that termination and

13 so forth.

14     Q.   And what happens after that termination of the

15 one year?

16     A.   I have -- typically they go on to other things;

17 right?

18     Q.   Okay.

19     A.   Typically.

20     Q.   Now, with regards to promotion, what happens if

21 someone applies for a promotion from assistant to

22 associate professor and -- let me strike that and

23 rephrase.

24         Is there a deadline for someone to apply from

25 assistant to associate for promotion?

1      A.    Not to my knowledge.  In general, some

2   college's and school's specific requirements might have

3   something in there about that, so I have to know what

4   those requirements are.  Some of them have a requirement

5   of years of service to go from associate to full and so

6   forth.

7           But in general, what typically happens, is not

8   universal, is that an assistant professor, upon awarding

9   of tenure, would go to the associate professor role.

10  Typically speaking.  Some colleges and schools they

11  don't do it that way.  And everybody understands it that

12  way that you have to apply separately for any rank above

13  assistant professor.

14     Q.    Okay.  And what happens generally if somebody's

15  denied a promotion?  Is it like with tenure that they

16  get a terminal year?

17     A.    No.  You still maintain your current rank,

18  right, and based upon the eligibility requirements for

19  that particular college or school, you could apply later

20  on in your tenure.

21     Q.    Okay.  So let me show you what I'm going to

22  mark as Exhibit 6.

23          (Exhibit Number 6 was marked for

24      identification.)

25     Q.    And please take a little time to review it and

1  if you could review it from the page 3 -- well, really

2  it's page 2 because, you know, the emails that start

3  chronologically start from page 2 and then go up.

4      A.   Okay.

5      Q.   And so how would you describe this document?

6      A.   It's a series of emails between a Joan Bullock,

7  who is Associate Dean for Teaching and Faculty

8  Development at the law school and then Provost Rodner

9  Wright.

10     Q.   And having read the emails, what is that

11 communication about?

12          MS. REINER:  Objection.  Form.  Foundation.

13     Q.   Let's go through the emails.  So let's start

14 from page 3.

15     A.   Page 3.

16     Q.   What do you see at the top -- on page 3, would

17 you describe what you see.

18     A.   Well, page 3 is blank.

19     Q.   But it's the legal way, we have to set the

20 foundation, so that's why -- I know that you're looking

21 at me like "why do we have to say that?"  But what do

22 you see there?

23     A.   Well, it's just an address.

24     Q.   And what address is it?

25     A.   Tallahassee, Florida 32307, a phone number and

1  fax number, and it looks like a photo that I can't make

2  out.

3      Q.   Okay.  And so let's go now to page 2 from the

4  bottom.

5      A.   Okay.

6      Q.   Can you please describe what that -- is it an

7  email?

8      A.   Yes, it is.

9      Q.   And can you describe the email "from," "to,"

10 "date," "subject?"

11     A.   Yeah, the email is from Rodner Wright and it is

12 to Joan Bullock and the subject is precedent for 5 p.m.

13 cut-off.

14     Q.   And what is the date?

15     A.   It is October the 6th, 2014.

16     Q.   Okay.  And then above that, what is the next

17 email?

18     A.   It's from Joan Bullock, again to Rodner Wright

19 on Tuesday, October the 7th, 2014, at 10:10 a.m.  Once

20 again, the precedent -- the subject is the precedent for

21 5 p.m. cut-off.

22     Q.   And then above that, what is the next email?

23     A.   It's from Rodner Wright to Joan Bullock on

24 October the 7th, 2014, at 10:54 a.m.  The subject is

25 precedent for 5 p.m. cut-off.

1      Q.    Okay.  So now we're up to page 1.

2      A.    Okay.

3      Q.    And from the bottom, what is that email?

4      A.    It is from Joan Bullock to -- Tuesday,

5  October 7th, 2014, at 11:08 a.m. to Rodner Wright and

6  the topic is precedent for a 5 p.m. cut-off.

7      Q.    And above that email?

8      A.    This is from Joan Bullock.

9      Q.    I'm sorry.  The one that you just finished it

10  was from Joan -- was it from Joan Bullock to Rodner

11  Wright at 11:08 a.m. on October 7, 2014?

12      A.    Yes, uh-huh.

13      Q.    So what is the one right above it in the middle

14  of the page?

15      A.    Oh, it's from Rodner Wright to -- on October 7,

16  2014, at 12:10 a.m. to Joan Bullock subject, again,

17  precedent for 5 p.m. cut-off.

18      Q.    And was it 12:10 a.m. or 12:10 p.m.?

19      A.    12:10 p.m.  I'm sorry.

20      Q.    Okay.  And above that, the last email at the

21  top.

22      A.    Excuse me.  It's from Joan Bullock on Tuesday,

23  October the 7th, 2014, at 12:21 p.m. to Rodner Wright,

24  precedent for 5:00 p.m. cut-off is the subject again.

25      Q.    Okay.  And as we sat here today and I gave it

1  to you, did you have time to read it?

2      A.    Yes.

3      Q.    And do you understand the content of the

4  conversation that's going on in those emails from the

5  reading that you did just now?

6      A.    Yes.

7      Q.    And so can you describe what your understanding

8  is on the content of that communication that's going on

9  in these emails that you just read here?

10      A.    Well, apparently there's a discussion between

11  Associate Dean Bullock and Provost Rodner Wright

12  regarding the time frame for submitting applications and

13  that timeline being 5:00 p.m.

14      Q.    And is that timeline in the schedule for the

15  2013 -- 2014-2015 academic year that you have in front

16  of you?

17      A.    Well, this is -- what I have in front of me is

18  the 2018-2019.

19      Q.    Oh, I'm sorry that's the 2018-2019?

20      A.    Yes.

21      Q.    Does the 2018-2019 have a -- a time?

22      A.    No, it doesn't.

23      Q.    And do they usually have a time, the yearly

24  schedules?

25      A.    I haven't typically seen a time, yes, but I

1  don't know about 2014 because it's not -- it's not in

2  front of me.

3      Q.   And what time are they saying that there was a

4  submission in the email that you read?

5      A.   They are saying, in one of the emails on page 1

6  from Associate Dean Bullock to Provost Rodner Wright,

7  the following:  The program assistant who was designated

8  as the person to take receipt of the application was

9  still sitting at her desk when it was delivered at

10  5:05 p.m.  Normally the program assistant would have

11  left by 5:00 p.m.

12          MS. REINER:  We'll stipulate on the record that

13      the document speaks for itself and says what it

14      says.

15          MS. REYES:  Okay.  But you wanted foundation,

16      that's why I'm walking him like that.

17          MS. REINER:  Well, foundation in that he's not

18      copied on it, he didn't receive it, he wasn't part

19      of the discussions --

20          MS. REYES:  Right.  That's why.

21          MS. REINER:  -- or anything like that.

22          MS. REYES:  But that's why I was asking him

23      from who to who.  And then when I gave the question

24      of "what do you understand from it?"  So that's why

25      I have to set the foundation for like we can go

1    through each one and read it like that.

2         MS. REINER:  Okay.  And I'm just referring to

3    personal knowledge.

4         MS. REYES:  But I may want to stipulate, I may

5    not, some of the documents we want to go through

6    them.

7         MS. REINER:  Okay.

8         MS. REYES:  So we'll take each one as they go.

9    BY MS. REYES:

10        Q.    So 5:05 p.m. is the time that they have there;

11   right?

12        A.    That the application was delivered at 5:05 p.m.

13        Q.    And, Dr. Robinson, if you were to see the

14   schedule for the 2014-15 academic year and it looked

15   like the schedule for the 2018-2019 with no time, where

16   would a deadline like that come from?

17        A.    Like what?

18        Q.    Like the 5:00 p.m. deadline.

19        A.    I think it's normal business hours for the

20   university.

21        Q.    And you said that it would take six years for

22   somebody to be able to apply for tenure.

23        A.    Well, you apply in your sixth year.  At the

24   beginning of your sixth year.

25        Q.    So somebody could be in the university working

1   for six years towards tenure, right, and applying at

2   that point?

3       A.   You apply at the beginning of your sixth year,

4   so you would have had five years at the university.

5   Under normal circumstances, yes.  It could be less.

6       Q.   So they'd working -- somebody, an assistant

7   professor -- came in as an assistant professor and has

8   been working six years for tenure and what happens if

9   because of an allegation of 5:05 p.m., of a time that's

10  not in the schedule, the person does not get their

11  tenure application processed, what could happen?

12      A.   A variety of things.  And I don't know what

13  happened in this particular case.  In fact, I don't even

14  know whose application we're referring to -- that's

15  being referred to here in this document.

16      Q.   Okay.  Without a name or, you know, we don't

17  know who it was in the emails, it doesn't say who it

18  was; right?

19      A.   Uh-huh.

20      Q.   But as president and somebody who, you know,

21  has been in academia for the length of time that you

22  have been, would you allow that situation to keep

23  somebody from submitting their application after they

24  had worked for six years in the university?

25      A.   So just to reiterate, first you submit the

1    application after five years, you have to submit it in

2    your six years, so you don't have six years under your

3    belt yet unless there was extenuating circumstances,

4    otherwise you'd already missed the deadline.

5              I think it's up to the provost, the dean, and

6    the others to deal with that on a case-by-case basis.

7    I'm not certain how I would have handled that myself had

8    I been in that situation.

9        Q.   So five minutes of a non-deadline that's not

10   stated could have kept somebody, if the dean and the

11   provost decided that "we're going to deny this person

12   the right to be reviewed over a five-minute allegation

13   that somebody made of a 5:00 p.m. time that did not

14   appear on the schedule," the dean and the provost and

15   the person who made the allegation would have discretion

16   to decide?

17             MS. REINER:  Object to form.

18       Q.   Would they have discretion to decide?

19       A.   They do, yes.  That's why they are in the

20   positions to make those kind of decisions, yes.

21       Q.   Okay.

22             MS. REYES:  It's Exhibit 7; right?

23             THE COURT REPORTER:  Yes.

24             (Exhibit Number 7 was marked for

25       identification.)

1      Q.   I'm going to show you Exhibit 7.  Please take a

2   look at that.  Can you describe what that document is?

3   What is the heading on the document?

4      A.   2014/2015 Tenure and Promotion Schedule.

5      Q.   And does it have dates on there?

6      A.   Yes, it does.

7      Q.   Is it similar to the 2018 one that I gave you

8   in terms of having the list and dates?

9      A.   Similar, but not identical, yes.

10     Q.   Okay.  What is the difference?

11     A.   There are a couple of places on this one, even

12  in the header, is a little bit different.  The deadlines

13  are different.

14     Q.   Different dates, different years; right?

15     A.   Exactly.  Even dates within the year are

16  different, right.  Uh-huh.

17     Q.   Do either of them have a time next to the

18  deadlines?

19     A.   No.

20     Q.   And what does the university -- do you know

21  what the university handbook says about what guides the

22  time to submit an application?

23     A.   No, I don't.

24     Q.   Okay.  And so you said that people could decide

25  that those five minutes -- that five-minute allegation

1    could keep somebody from applying for tenure and being

2    denied tenure; right?

3          MS. REINER:  Objection.  Asked and answered.

4    A.    Yes.

5    Q.    Okay.  So let me show you --

6          (Exhibit Number 8 was marked for

7    identification.)

8    Q.    I'm going to give you Exhibit 8.  What is the

9    first page on that exhibit?

10   A.    It says the Florida Agriculture and Mechanical

11   University's Faculty Handbook.

12   Q.    Okay.  And since we're saying what it is, what

13   it purports to be.  I mean, I can go through every page,

14   but counsel said that we could say that it is what it

15   purports to be, so I'm going to say that this document

16   is the faculty handbook that appears online in the

17   university, that is posted in the university.

18         MS. REINER:  I'm going to clarify.  What I'm

19         stipulating to is that it says what it says.  Not

20         that it is what it purports to be.

21         MS. REYES:  Okay.  It says what it purports to

22         say.

23         MS. REINER:  It says what is says, yes.

24   BY MS. REYES:

25   Q.    So if you look at the bottom of page 1.  They

1  have some dates; right?  And they're year dates?

2      A.    Uh-huh.

3      Q.    What is the first year date that it says there

4  and read what it says, please.

5      A.    Well, in the block it says:  Published 1987

6  through '88 by the Handbook Committee.  Revised 2007,

7  Academic Policy Review Committee.  Approved by the

8  University Faculty Senate, April 2008.  And accepted by

9  the General Faculty, September the 23rd, 2008.

10     Q.    Okay.  So I'm going to take you now to pages 2,

11 3, and 4.  And briefly, would you agree that those pages

12 are a table -- they say that they are a table of

13 contents?

14     A.    Yes.

15     Q.    Okay.  With different -- do they have different

16 sections?

17     A.    Yes.

18     Q.    Okay.  So let's go now to the next page after

19 that, which is page 14.  Because this is not the entire

20 faculty handbook, it's some pages.  So this purports to

21 be and say that it's page 14.  At the bottom of page 14,

22 what does it say in terms of the header of the section

23 all the way at the bottom?

24     A.    Governance.

25     Q.    Okay.  And so let's go to the next page, page

1   15.  What do the underlined, bolded headers say there?

2        A.    Board of Governors, Board of Trustees.

3        Q.    Okay.  And can we agree or do you agree -- do

4   you agree that what it says there, it's a brief

5   description for the Board of Governors and the Board of

6   Trustees and the roles that they serve in the

7   university?

8        A.    Yes.

9        Q.    Let's go to the next page that I have is page

10  21.  What is the header on there?

11       A.    University President.

12       Q.    And what is the first line -- what is the first

13  -- please read the first line.

14       A.    "The president is the chief executive officer

15  of the university and the corporate secretary of the

16  Board of Trustees and is responsible for the operation

17  and administration of the university."

18       Q.    And can you read the last line?

19       A.    "The stability of the university is the faculty

20  in whom the quality of the educational program resides."

21       Q.    And as president, are you both president and

22  faculty?

23       A.    Currently I am -- I do have a faculty

24  appointment.  I am a distinguished service faculty

25  member, but I'm not serving in any faculty-related roles

1   at the current time.  Other than being a principal

2   investigator on a research committee, but I don't teach

3   classes and I don't have the time to supervise students.

4        Q.   But do you have your faculty title and rank?

5        A.   I am a distinguished professor, yes.

6        Q.   And if you stop being president tomorrow, could

7   you back -- could you go back to the faculty?

8        A.   It would depend on the circumstances; right?  I

9   could be removed from this position for a variety of

10  reasons; voluntarily, by the board for cause, and that

11  would then determine the circumstances regarding what I

12  went back to or if I went back to anything at all.

13       Q.   Do you know of any president that has been

14  removed by the board in recent years?

15       A.   We have had, I think, three presidents to

16  resign, right, their positions at the university since

17  I've been -- well, actually four, if we go back to

18  Dr. Humphries, yes.

19       Q.   And you mentioned President Ammons?

20       A.   Uh-huh.

21       Q.   And he resigned?

22       A.   Uh-huh.

23       Q.   Was there anything going on in the university

24  at the time of his resignation, in terms of that the

25  university was dealing with major, that was publicized

 1  in the news, for example?

 2          MS. REINER:  Objection.  Form.

 3      A.  You have to be more specific because there's

 4  something always going on in this environment.

 5      Q.  Yeah, okay.  So was there anything related to

 6  the death of a student happening at the time and being

 7  dealt with in the university at the time?

 8          MS. REINER:  Objection.  Form.

 9      A.  In 2011 there was a hazing death of a student

10  in the band that occurred here in Orlando, yes.

11      Q.  And so was -- you said it was due to hazing;

12  right?

13      A.  I say that, but that was the ultimate outcome,

14  yes.

15      Q.  Okay.  And was that publicized in the news?

16      A.  Yes, it was.

17      Q.  Okay.  And President Ammons resigned?

18      A.  Yes, he did, but, you know, I don't know if

19  that was exactly the reason because several months later

20  he resigned, yes.

21      Q.  Okay.  I just wanted to understand what a for

22  cause removal would mean for a president --

23      A.  Uh-huh.

24      Q.  -- who's also a faculty member; right?

25      A.  Uh-huh.

1      Q.    So we have the situation with the hazing.

2   Okay.  So -- but are there presidents that have gone

3   back, and you mentioned Dr. Humphries; right?

4      A.    Uh-huh.

5      Q.    Did Dr. Humphries go back to the faculty?

6      A.    He came actually to the law school, right.

7   Right away, so the answer is yes.

8      Q.    So let's go to the next page, please.  So page

9   22 you have -- what is the header at the top?

10     A.    Provost and Vice President for Academic

11  Affairs.

12     Q.    And the next header?

13     A.    College Schools and Institute.

14     Q.    Okay.  And then on the next page what is the

15  header?

16     A.    Deans.

17     Q.    Okay.  So under the Deans, can you read the

18  last paragraph on that page, page 23?

19     A.    "The dean is the presiding officer of the

20  faculty in his/her unit and represents his/her unit on

21  the Academic Deans' Counsel and advisory body to the

22  Provost and Vice President for Academic Affairs on

23  academic policy matters.  The dean may also serve on the

24  faculty in one of the divisions/departments."

25     Q.    Okay.  Let's go to the next page.  Page 24.

 1  What are the headers on there?

 2      A.    The first is Faculty, the second is Vice

 3  President of Physical Affairs, the third is Vice

 4  President for University Development and the fourth is

 5  Vice President for Information Technology.

 6      Q.    Okay.  And at the top where -- the first

 7  sentence underneath the header Faculty, can you please

 8  read that?

 9      A.    "The faculty consists of those employees

10  holding the rank of instructor, assistant professor,

11  associate professor, or professor in one of the academic

12  units of the university."

13      Q.    So there are specific ranks to qualify as

14  faculty.  Are there specific ranks?

15      A.    Yes.

16      Q.    Okay.  So let's go to the next page.

17            What is the header on there?

18      A.    Faculty Promotion.

19      Q.    Okay.  And please read the first sentence under

20  that header.

21      A.    "Faculty Promotion.  Faculty promotion is the

22  appointment to a higher academic or equivalent rank or

23  class and may also be combined with an application for

24  tenure."

25      Q.    Okay.  And in number two, what is the faculty

1  promotion criteria stated there?

2      A.   "The criteria shall include meeting the minimum

3  quantifications for the appointment to the rank or

4  position.  In addition, promotions shall be justified by

5  the faculty employee's proven increased skills in

6  performance of duties, increased knowledge in the field

7  of specialty, potential for professional growth, and

8  increased recognition of the faculty member as an

9  authority in his/her field."

10     Q.   Okay.  And so let's go now to page -- the next

11 page, which is -- what page is that?  The next one.

12     A.   41.

13     Q.   41.  So on page 41, please read where it says

14 at the top c.  Little c.

15     A.   "Candidates must meet the minimum number of

16 publications required by their respective colleges,

17 schools or institute for tenure and/or promotion.  For

18 promotion to full professor, these publications must be

19 performed during the tenure of the faculty member as an

20 associate professor."

21     Q.   Okay.  So before when we were going over how to

22 walk from assistant to associate to full professor and

23 we made a distinction between -- you made a distinction

24 and explained that tenure and promotion are different;

25 correct?

1      A.    Uh-huh.

2      Q.    So what does that mean, that -- what you just

3  read.  "For promotion to full professor, these

4  publications must be performed during the tenure of the

5  faculty member as associate professor."

6      A.    It means that publications prior to that won't

7  be counted, prior to their promotion to associate

8  professor.  So you get to the level of associate

9  professor and in most colleges and schools they require

10  a number of publications and that's that.

11          Now, there's another requirement typically from

12  associate to full, but the clock starts over on

13  publications when it's considered for promotion from

14  associate to full.

15      Q.    So is there -- so there's a comparison from

16  associate professor, because it says that they have to

17  be performed during the tenure as associate.  So what

18  happens as associate is what's compared at the full

19  application?

20      A.    That's correct.  For promotion for

21  publications.

22      Q.    Okay.  And so let's go to number four on there

23  on page 41.  What does it say?

24      A.    "Application for promotions shall be submitted

25  to the university and reviewed in accordance with the

1    tenure and promotion schedule provided by the provost."

2        Q.    Okay.  And so the schedules that you have in

3    front of you that I gave you for 2014-2015, is that the

4    schedule that is provided by the provost?

5        MS. REINER:  Object to form.

6        A.    This is very likely a promotion -- tenure

7    promotion schedule provided to the faculty by the

8    provost or some designee, yes.

9        Q.    So by the rule that we just read, is that the

10   schedule that rules in terms of the university faculty

11   handbook?

12       A.    Well, in terms of the handbook?

13       Q.    Yeah, in terms of what you just read in here in

14   the university handbook.

15       A.    The university handbook doesn't provide the

16   guidance for administering the university.  This

17   document here, that one provides -- what this one says

18   is what guided the tenure promotion schedule for

19   2014-2015, yeah.

20       Q.    But is there a difference because let's go over

21   what it said.  What you just read that said on number

22   four "applications for promotion shall be submitted to

23   the university and reviewed in accordance with the

24   tenure and promotion schedule provided by the provost."

25       A.    Exactly.

1      Q.    So if that is provided by the provost --

2      A.    Uh-huh.

3      Q.    -- then that is matching what it says here;

4  isn't it?

5      A.    It is, but this doesn't dictate.  The faculty

6  handbook doesn't dictate the schedule.

7      Q.    Okay.  It doesn't dictate the dates?

8      A.    Yes, uh-huh.

9      Q.    But when they say they don't say anything about

10 dates, it's just whatever dates the provost comes up

11 with?

12     A.    Right.

13     Q.    Okay.  So there is an agreement in terms of the

14 university handbook and the provost schedule?

15           MS. REINER:  Object to form.

16     A.    On some things and hopefully most things, yes.

17     Q.    Okay.  And let's go to the next page, please.

18 On number six there, what does it say?

19     A.    "Promotion applications shall be notified of

20 the recommendations from the supervisor,

21 department/division, college/school/institute, dean, and

22 University Committee."

23     Q.    Is there any notification there from the

24 provost?

25     A.    It doesn't identify the provost in line 6

1  there.

2      Q.    What page are we on right now?

3      A.    On page 42.

4      Q.    Okay.  And what does it say on number seven?

5      A.    "The president has the final authority to

6  approve or deny promotions."

7      Q.    Okay.  And what is the next header on that

8  page?

9      A.    Faculty Tenure.

10      Q.    Okay.  And at the bottom of page 2 -- I mean

11  42, I'm sorry, page 42, number 2, what is that header?

12      A.    Definition of Tenure.

13      Q.    Okay.  And so if you go to the bottom of that

14  definition and if you could please read the last two

15  sentences.

16      A.    "Tenure assures the faculty employee security

17  of employment and immunity from reprisals or threats due

18  to an intellectual position or belief which may be

19  unpopular.  Tenure shall be in an academic

20  department/division or other appropriate organizational

21  unit."

22      Q.    And what does that mean "the tenure is in the

23  academic department/division or other appropriate

24  organizational unit?"

25      A.    Well, you know, we have thirteen colleges and

1  schools.  Some of them have departments, some of them

2  have divisions, and the faculty member would have to be

3  tenured in one of those places.

4      Q.   Can somebody transfer with tenure from one

5  college to another within the university?

6      A.   That can be considered by the provost, right,

7  and upon review, it could possibly happen.

8      Q.   Can somebody who doesn't have tenure transfer

9  and get tenure?

10      A.   So at any point in that tenure process if a

11  person, if agreed upon, agreed to by the provost, could

12  move to another college school with that approval.  And

13  then, of course, another discussion would have to occur

14  with regard to time accrued and how that would apply in

15  this second case -- or the second position, as well.  So

16  it is not forbidden, but it's something that has to be

17  reviewed carefully by the provost.

18      Q.   Okay.  So let's go to the next page, please.

19  What page do you have there?

20      A.   43.

21      Q.   And 43.  And what is the title at the top

22  bolded there?

23      A.   Criteria for Tenure.

24      Q.   Okay.  Can you please read -- please read the

25  first sentence.

1     A.    "The criteria for faculty tenure shall be

2   provided to all tenure-earning faculty upon hire."

3     Q.    And why is that?  Why is the criteria provided

4   upon hire?

5     A.    So that -- so that each new faculty member will

6   understand what they need to do to get through that

7   process and get started as early as possible.

8     Q.    Because when they get the criteria for hire,

9   are they working those six years towards that criteria?

10          MS. REINER:  Object to form.

11    A.    Five years.

12    Q.    Five years to apply?

13    A.    Uh-huh.

14    Q.    Yes.  Are they working towards that?

15    A.    Well, you would hope, yes.

16    Q.    Okay.  So let's go to the next page.  What page

17  do you have, please?

18    A.    44.

19    Q.    And what is the next bolded header there?

20    A.    Tenure in the University.  (c) Tenure in the

21  University.

22    Q.    Please read that section.

23    A.    "A faculty employee who has been granted tenure

24  by the Board of Trustees shall have the status of

25  permanent member of the faculty and be in the continuing

1  employment of the university until he or she:  Resigns,

2  retires, is dismissed for just cause under the provision

3  of the university -- of university rules or the BOT/UFF

4  Collective Bargaining Agreement, or is discontinued

5  pursuant to the layoff provisions in the university's

6  regulations, and the BOT/UFF Collective Bargaining

7  Agreement."

8      Q.   Are you familiar with the term "at will

9  employment?"

10     A.   Yeah.

11     Q.   And is there a difference between tenure and at

12 will employment?

13     A.   Well, I think, and this is where -- I think we

14 have to be careful.  What we do at the university can't

15 trump, you know, state law.  We have to be consistent

16 with that.

17          And I tell people a lot of the time when I have

18 had the opportunity to speak with faculty that tenure

19 doesn't prevent you from being terminated if you violate

20 any rules therein, there's nothing that will prevent you

21 from having consequences based upon rebelling state law

22 and rules and so forth.  That is something I try to

23 communicate all of the time.

24     Q.   Uh-huh.  But is that different than at will

25 employment?

1     A.    I really don't know the legal nuances there.

2     Q.    Uh-huh.

3     A.    I just know that, you know, because you're

4  tenured doesn't exempt you from following the rules like

5  everybody else.

6     Q.    All right.  Number three, to dismiss a faculty

7  member that is tenured, what does three require?

8     A.    "Is dismissed for just cause under the

9  provision of the university rules or the BOT/UFF

10  Collective Bargaining Agreement."

11     Q.    What do you understand by that term "just

12  cause"?

13     A.    That there is a sufficient reason deemed by the

14  provost ultimately that the faculty member is not

15  performing or acting in accordance with existing

16  policies or creating a climate for successful education

17  of students, which is the primary role of faculty.

18     Q.    And so the provost have -- does the provost

19  have full discretion to determine what's just cause?

20     A.    I think the provost will confer with legal and

21  HR before making such a decision.

22     Q.    Do you take part in the decision to dismiss a

23  faculty member, who's tenured, for just cause?

24     A.    No.  The recommendation and the circumstances

25  determine, as I said, by the provost and I am generally

 1  informed.

 2      Q.   When are you informed?

 3      A.   It depends upon the circumstances.  Before the

 4  dismissal occurs.

 5      Q.   Okay.  So we're going to, you know, keep the

 6  faculty handbook there for a minute because we are going

 7  to return to it.  Because I want to return briefly now

 8  to -- I'm having a hard time today getting myself

 9  situated with my exhibits.

10          (Exhibit Number 9 was marked for

11      identification.)

12      Q.   I'm going to give you what's been marked as

13  Exhibit 9.

14      A.   This is it?

15      Q.   Yes.  Please take a look at it.

16          MS. REINER:  Ms. Reyes, do you have a copy for

17      me?

18          MS. REYES:  Oh, thank you.

19          MS. REINER:  That's okay.  Thank you.

20          MS. REYES:  I didn't have a good night's sleep

21      last night, so I'm a little bit --

22          MS. REINER:  That's okay.  I understand the

23      feeling.

24  BY MS. REYES:

25      Q.   Please describe that document.

1      A.   Well, the title -- the title perhaps is --

2    under the response is Associate Professor Maritza Reyes

3    alleged late submittal of her tenure application.

4      Q.   And what is the date of that document?

5      A.   October the 24th, 2014.

6      Q.   And who is the author, according to what it

7    says there?

8      A.   Rodner Wright.

9      Q.   And what is the title of Rodner Wright?

10     A.   Interim provost and vice president for academic

11   affairs.

12     Q.   And who is it sent to?

13     A.   It's to Rick Givens, the vice president for

14   audit and compliance.

15     Q.   And on October 24, 2014, what was your role in

16   the university?

17     A.   I think I had come back from sabbatical and I

18   was back in my role as professor in the Environmental

19   Sciences Institute.

20     Q.   Okay.  So before when we were looking at the

21   emails from Joan Bullock and Rodner Wright, and that was

22   Exhibit 6, and at that time it did not state the name of

23   the professor.

24     A.   I thought they did, but yes, I have that.

25     Q.   Yeah.  So in the emails it did not state the

 1  name; right?

 2      A.   Okay.  Uh-huh.

 3      Q.   So now that you see that memo that you just

 4  described --

 5      A.   Uh-huh.

 6      Q.   -- do they describe those -- do they have a

 7  list there in the bullet points?

 8      A.   Yes.

 9      Q.   And how are those bullet points described in

10  the line right above them?

11      A.   "I am including the following documents and

12  emails (see list below) to aid you in your review."

13      Q.   And so there are dates of the emails and from

14  who to who?

15      A.   So the first on Sunday, October the 5th, 2014,

16  is from Joan Bullock to Rodner Wright.  Sunday, October

17  the 6th, 2014, from Joan --

18      Q.   Is it Sunday again?

19      A.   Monday, I'm sorry.

20      Q.   Yeah.

21      A.   Monday, October the 6th, 2014, from Joan

22  Bullock to Rodner Wright.  On Tuesday, October the 7th,

23  2014, from Joan Bullock to Rodner Wright.  Thursday,

24  October the 23rd, 2014, from Elmira Mangum to Rodner

25  Wright and Friday, October the 24th, 2014, from Lundy

1  Langston to LeRoy Pernell.  And Tuesday, October

2  the 14th, 2014, a memorandum and binder from Associate

3  Professor Maritza Reyes to President Elmira Mangum.

4      Q.   Okay.  And what is the first sentence in that

5  document?

6      A.   Oh.

7      Q.   Please read it.

8      A.   "By way of this memorandum I am requesting that

9  the Office of Audit and Compliance review the

10  circumstances surrounding the above referenced issue."

11      Q.   So now that we have a name to the five-minute

12  allegation of the 5:00 p.m. deadline that did not appear

13  in the provost schedule that we went over, which is the

14  schedule that the university handbook states is supposed

15  to be the schedule, now that we have that as predicate,

16  right, of all of that, did Professor Reyes get tenure?

17          MS. REINER:  Object to form.

18      A.   I think so, yes.

19      Q.   Okay.  And what is the audit and compliance

20  department at FAMU?

21      A.   So there are several administrative divisions

22  in the university.  That is now the division of audit

23  because the board of governors required us to break out

24  audit -- compliance from audit, so we have a compliance

25  and ethics officer, as well as a VP for audit that looks

1  into allegations and weighs the fraud and abuse.

2  Compliance looks, you know, more broadly into issues of

3  the type that we're talking about now where it wasn't

4  necessarily to weigh the fraud and abuse, but it is

5  something worthy of review, so it's a little bit

6  different structure than we had in 2014.

7       Q.   Okay.  So while we are on the handbook, I

8  believe it's nine; right?

9            THE COURT REPORTER:  Ten.

10           (Exhibit Number 10 was marked for

11      identification.)

12      Q.   Okay.  I'm going to give you what's been marked

13  as Exhibit 10.  Are you familiar with that document,

14  Dr. Robinson?

15      A.   Yes.

16      Q.   What is that document?

17      A.   That's a Declaration of President Larry

18  Robinson.

19      Q.   And for what purpose was that declaration

20  prepared?

21      A.   The case where Maritza Reyes is the plaintiff

22  and the Florida A&M Board of Trustees is a defendant,

23  yes.

24      Q.   And how many pages is it?

25      A.   It is two pages.

1      Q.   And what is the date -- is there a signature

2   there under a title?  What is the title on that second

3   page?

4      A.   Larry Robinson, President of Florida A&M

5   University.

6      Q.   And what is the bolded title and underlined

7   title?

8      A.   Verification.

9      Q.   And can you read the sentence right under that?

10     A.   "I verify" -- oh, under Verification, "I verify

11  under penalty of perjury that the foregoing is true and

12  correct."

13     Q.   And it was executed on what date?

14     A.   May the 2nd, 2024.

15     Q.   Okay.  So now let's go over to -- there are

16  paragraphs -- are there paragraphs by number on that

17  page -- on those two pages?

18     A.   Yes.

19     Q.   Okay.  So let's go to number 5 on page 1.

20  Please read that.

21     A.   "Under the university's regulations governing

22  the promotion and tenure process for college of law

23  faculty, the Retention, Promotion, and Tenure Committee,

24  ("RPT Committee") review the faculty member's

25  application for tenure and make a recommendation as to

1  whether the faculty member meets the criteria for being

2  nominated for tenure."

3  　　　Q.　　And then what is number 6?

4  　　　A.　　"Once the RPT Committees make their

5  recommendation, the president or my designee make the

6  final decision on tenure and promotion decisions."

7  　　　Q.　　Okay.　So when we were going over the

8  university handbook, you made a difference between

9  promotion and tenure.

10 　　　A.　　Uh-huh.

11 　　　Q.　　And even in the application deadline for

12 promotion and tenure.

13 　　　A.　　Uh-huh.

14 　　　Q.　　And do you recall telling me that the earlier

15 deadline for tenure is because it has to go to the Board

16 of Trustees?

17 　　　A.　　Normally we try to get it to the Board of

18 Trustees in time for them to make a decision prior to

19 the upcoming fall semester.　And such that the faculty

20 members can be informed accordingly, yes.

21 　　　Q.　　Okay.　But what you just read on number six in

22 this declaration, it says that the president or your

23 designee made the final decision on tenure and promotion

24 decisions?

25 　　　A.　　Well, that's not entirely true.

1        Q.   Okay.

2        A.   Prior to making the recommendation to the board

3    for tenure, I do not -- the president does not make the

4    final decision on tenure.

5        Q.   So who is the final decision-maker on tenure?

6        A.   The recommendation for me goes to the board,

7    the board votes, and awards tenure.  That's by statute.

8        Q.   And so what is the difference in terms of who

9    makes the final decision for promotion?

10       A.   It's within the university and that was

11   delegated as it says to provost and vice president of

12   academic affairs.

13       Q.   But what does the faculty handbook say about

14   it?

15       A.   I don't know and it really doesn't matter

16   because we don't operate under that, right, we operate

17   by Board of Trustees, regulations, and state policy.

18   And this is a document that we try to work closely with

19   the faculty with -- in the spirit of sharing governance;

20   right?  We're accountable to the Board of Trustees.

21       Q.   Okay.  But I want to go back to what has been

22   marked as an exhibit, the university handbook that you

23   have there.

24       A.   Okay.

25       Q.   The pages of the university handbook, which is

1  Exhibit 8.  And if you could find there page 42.

2      A.   Uh-huh.

3      Q.   And so on page 42, if you go at the top where

4  it says (7).

5      A.   Uh-huh.

6      Q.   Please read that.

7      A.   "President has the final authority to approve

8  or deny promotions."

9      Q.   Okay.  So are you telling me that what it says

10 on the faculty handbook is not what happens?  Is it what

11 happens or not?

12     A.   The president has the final authority unless

13 delegated, which is what I have authority to do.  And I

14 delegated that to the provost and vice president of

15 academic affairs.

16     Q.   And so you said that you've served as interim

17 president and as president for many years?

18     A.   Well, it depends on what you call me, but --

19     Q.   And so have you delegated the authority to the

20 provost in all of those years that you served?

21     A.   Yes, uh-huh.

22     Q.   And how does that delegation happen?

23     A.   So that's a letter or formal delegation of

24 authority letter that we issue.  And I think our lead

25 counsel can provide a copy of that, yes.

1   Q.   And so let's talk about, because you just read

2   the declaration that was filed in the case of Maritza

3   Reyes v. Florida Agriculture and Mechanical University

4   Board of Trustees.  And in this document on page --

5   number 7, please read what you said there.

6   A.   What document?

7   Q.   In the declaration right there, number --

8   Exhibit 10.

9   A.   "I did not make the final decision to decline

10  to promote Maritza Reyes to the position of full

11  professor in 2019."

12  Q.   Okay.  Did you have any discussions -- who made

13  the final decision?

14  A.   The provost.

15  Q.   And did you have any discussions with the

16  provost about the decision?

17  A.   Yes, but I can't remember any details.

18  Q.   Was Maritza Reyes the only applicant for

19  promotion when you had those discussions?

20  A.   I doubt that.

21  Q.   Are there notes of those discussions?

22  A.   No.

23  Q.   So how do those discussions happen?

24  A.   In the same way we're talking here.

25  Q.   Uh-huh.

1      A.    Except they're not recorded.

2      Q.    And so what is the content of the communication

3  in terms of the discussion?  For example, do you recall,

4  not the specifics necessarily, but what kind of

5  discussion is it?  What kind of criteria matters are

6  discussed?

7      A.    Basically it's what the committees that

8  recommended, the deans that recommended, and that's

9  about it.  I really don't -- it's hard to delve into the

10  details of every promotion or every tenure decision at

11  the university.  There is a lot of people, a lot of

12  time.

13          As I said, I am more than pleased to be the

14  person that shares the good news, but otherwise I

15  delegate the decision-making to those people in the

16  ranks and who can better decide what's good or what's

17  bad regarding the faculty performance.

18      Q.    Okay.  And who is the supervisor of the

19  provost?

20      A.    Currently its the chief operating officer.

21      Q.    Okay.  And who is it right now?

22      A.    Dr. Donald Palm.

23      Q.    And who was the supervisor of the provost,

24  which at the time that you said here that you did not --

25      A.    It was me in 2019.

1      Q.    And who was the provost?

2      A.    Dr. Maurice Ellington, I believe.

3      Q.    So you were his direct supervisor at that time?

4      A.    Uh-huh.

5      Q.    What criteria did he use to make the decision

6   that you delegated to him?

7      A.    I don't know.

8            MS. REINER:  Object to form.

9      A.    I don't know.

10     Q.    Did he use any criteria?

11           MS. REINER:  Object to form.

12     A.    I have no doubt that he did.  I just don't know

13   which one he used.

14           MS. REYES:  I'd love to hear what objection is

15      that.  Did you -- "did he use any criteria?"

16           MS. REINER:  Speculation.  Foundation.

17           MS. REYES:  He's his supervisor.

18           MS. REINER:  Yes, but he just said he didn't

19      know.

20           MS. REYES:  Yeah, but I -- he said that after

21      he answered the question.

22           MS. REINER:  You can go ahead.  I was just

23      stating my objection to the form.

24           MS. REYES:  I know I can go ahead.

25   BY MS. REYES:

1    Q.   I can go ahead.  Dr. Robinson, as supervisor of

2    the provost in these decisions, you told me there's a

3    writing of delegation; right?  That I can -- you said I

4    can -- somebody can get it from the general counsel?

5    A.   Uh-huh.

6    Q.   What do you delegate in that writing?

7    A.   The authority for him to make decisions

8    regarding faculty, primarily and other staff in the

9    division of academic affairs.

10   Q.   Is there any criteria stated in that

11   delegation?

12   A.   I don't have the details of delegation in front

13   of me now.  In terms of tenure promotion?

14   Q.   Uh-huh.

15   A.   I don't think it specifies that.

16   Q.   Okay.  And by the way, I want to say that if

17   you want to take a break, you know, anybody who is in

18   here who wants to take a break, feel free.  Because I

19   know sometimes you may have to go to the restroom or

20   just take a little walk or even stand up.  I know that

21   that's one thing I do now.

22       MS. REINER:  Thank you.

23       (Exhibit Number 11 was marked for

24       identification.)

25   Q.   I'm going to give you what's been marked as

1  Exhibit 11.  How would you describe that document?

2      A.   This is a letter to Maritza Reyes from former

3  provost and vice president for academic affairs, Maurice

4  Edington, that says "after careful consideration of your

5  application and supporting documentation, I regret to

6  inform you that your application for promotion has been

7  denied."

8      Q.   And what is the date on that letter?

9      A.   July the 24th, 2019.

10     Q.   And who is copied on that letter?

11     A.   Larry Robinson and Nicky Boothe-Perry, Interim

12  Dean College of Law.

13     Q.   Okay.  And what was your title at that time?

14     A.   I was president at the time.

15     Q.   Okay.  Because you said you had a conference

16  with Provost Edington before the decision was made.  So

17  was it before this letter was issued?

18     A.   Very likely, yes.

19     Q.   Okay.  Do you know how long before?

20     A.   No, I don't.

21     Q.   Okay.

22          (Exhibit Number 12 was marked for

23     identification.)

24     Q.   I'm going to give you what's been marked as

25  Exhibit 12.  Please take a look at that.  It's a

1   composite exhibit of emails.  And I want us to start

2   from the last page.  What page is that?

3       A.   This is page 6 of 6.

4       Q.   Okay.  And if you could identify the date,

5   time, and from whom this email was sent and to whom it's

6   addressed.

7       A.   I can't determine that from --

8       Q.   Is there any line there with a date, time,

9   email?

10      A.   Oh, yeah, July 17th, but that's not a typical

11  email in the sense that the ones before were actual

12  emails.

13      Q.   Are you familiar with the process of when

14  somebody responds and attaches the email, it's

15  responding to an email that sometimes the line will come

16  like that in the email of the person who did it?  For

17  example, go to page 5.  Who is responding there to the

18  email?  Does that email look more like what you consider

19  an email address?

20      A.   Yes, it does.

21      Q.   And from who is it?

22      A.   So the one at the top is from --

23      Q.   At the bottom.  We're going to go from the

24  bottom, yes.

25      A.   The one from the bottom is from Maurice

1  Edington to Maritza Reyes.

2       Q.    And who is copied on there?

3       A.    Larry Robinson.

4       Q.    And who else?

5       A.    Genyne Boston.

6       Q.    And what is the subject line?

7       A.    "Re:  Request for decision on my application

8  for promotion to full professor."

9       Q.    And what does it say there?

10      A.    "Hello, Professor Reyes, You will be provided

11  notification of the outcome of your application for

12  promotion within next week."

13      Q.    Okay.  So now let's go back to page 6.  Are you

14  familiar with that when somebody responds to an email,

15  sometimes the email that was the original to which they

16  are responding can have a line like that?

17      A.    Yes, I've seen it before.  But it is a little

18  bit unusual since all of the other ones are handled in

19  the form that they have been as in Exhibit Number 6,

20  but --.

21      Q.    Could you go to your email, Dr. Robinson?

22      A.    My email?

23      Q.    Uh-huh.  Could you go to your email.  Because

24  you were copied in this email; right?

25      A.    Uh-huh.

1      Q.   Were you copied in this email from

2  Dr. Edington?

3      A.   The one on July the 17th?  Yes, I was.

4      Q.   Okay.  So let's go to the content of the email

5  that he seems to be responding to to see if we can see

6  it from the content.

7      A.   Okay.

8      Q.   In the email on page 6.  Please read what it

9  says in terms of addressing and what it says.

10      A.   It says, "Good afternoon President Robinson and

11  Provost Edington, I trust you are both well.  As you

12  know, I have previously requested information about my

13  application for promotion, which I submitted by

14  September 21st, 2018, in accordance with the 2018-2019

15  tenure and promotion schedule (2018-2019 T&P Schedule).

16  To date, I have not received a response.

17          The 2018-2019 T&P schedule states that the

18  university tenure & promotion committee submits

19  permission -- promotion recommendations to the provost

20  in April 2019.  I have not received notice of said

21  recommendation.

22          The 2018-2019 tenure & promotion schedule

23  states that the provost submits promotion

24  recommendations to the president in April/May 2019.

25  I have not received notice of said recommendation.

1              In 2018-2019, T&P schedule states that the

2     president notifies promotion applicants of decisions in

3     June 2019.  I have not received notice of said decision.

4              I was just informed that the office of academic

5     affairs is in the process of printing 2019-2020

6     contracts for faculty of the college of law.  I need to

7     know if that contract will provide for my promotion to

8     full professor.  I once again request information I am

9     supposed to receive.  Thank you, Maritza Reyes."

10         Q.   So now the email that looks more like the email

11    you're used to on page 5.  What is the response again?

12         A.   On page 5?

13         Q.   Yes.  Page 5 at the bottom.  The email you read

14    before.

15         A.   "You will be provided notification of the

16    outcome of your application for promotion within the

17    next week."

18         Q.   Does that seem like a response to what you just

19    read?

20         A.   It appears to be.

21         Q.   Okay.  Let's go again above that to, you know,

22    more of a traditional email that you're used to.

23         A.   Uh-huh.

24         Q.   And from who to who is that one?

25         A.   It's from Maritza Reyes to Maurice Edington and

1  cc'd to Larry Robinson and Genyne Boston.

2      Q.   Okay.  And please read that one.

3      A.   "I am following up on your email of July the

4  17th, in response to my request for the decision on my

5  application for promotion.  You said I would be notified

6  within the next week.  Do you know on what date?  The

7  deadline for notification was in June, so I have been

8  waiting with plans on hold, in case I need to deal with

9  what I need to do.  I am traveling to a professional

10  conference next week and would like to know the outcome

11  before then.  I just learned that you are at the law

12  school today.  I must have just missed you, I am in my

13  office now.  I was here last week, also."

14      Q.   Okay.  And during this time period in

15  July 2019, if a faculty member is not a full-year

16  faculty member, just a nine-month faculty member, and --

17  do they get paid if somebody is not working during the

18  summer?

19      A.   It would depend upon who they are working for.

20  Typically nine-month faculty don't get paid during the

21  summer, unless they have, as you do at the law school,

22  this special program to provide them summer stipends or

23  there are research grants that provide them summer

24  stipends.  And a lot of our nine-month faculty have

25  those.

1          So does it automatically allow?  Just that the

2   state part typically does, except the money used to pay

3   the law school faculty is state funds, which is a bit

4   unusual, unless they are teaching.

5       Q.   Do you know how many faculty at the college of

6   law get those stipends during the summer?

7       A.   No, I don't.

8       Q.   Do you know the amount of the stipend?

9       A.   No, I don't.

10      Q.   Do you know if Professor Reyes had the stipend

11  when she was there in July of 2019?

12      A.   No, I don't.

13      Q.   Okay.  Let's go to page 4.  And that email

14  there, which is again one of the ones that -- more

15  traditional ones that you are used to looking at.

16      A.   Uh-huh.

17      Q.   From who to who?

18      A.   So there is one here dated Tuesday, July the

19  23rd at -- 2019 at 4:06 p.m. from you, Maritza Reyes, to

20  Maurice Edington cc'ing Larry Robinson and Genyne

21  Boston.

22      Q.   And what does it say?

23      A.   "Request for decision on my application for

24  promotion -- excuse me -- to full professor."

25      Q.   And can you please read the first paragraph?

1    A.    "Good afternoon Provost Edington, I regret that

2    I need to follow up once again on the status of the

3    decision on my application for promotion to full

4    professor.  This is not my fault.  The stated date for

5    notification was June 2019.  I will not re -- I will not

6    re-note here the history of my request and your

7    responses and non-responses."

8         Q.    Okay.  And the next paragraph?

9         A.    "I write once again today because I was just

10   notified that my contract for 2019-2020 is at the salary

11   of associate professor.  Does this mean that my

12   application for promotion to full professor was denied?

13   I need to know because there are legal considerations,

14   including the date when I received notice of the denial

15   for the -- of the promotion.  I was also told I must

16   sign the 2019-2020 contract by this Friday, in

17   parentheses 7/26/19."

18        Q.    So I'm going to refer you back to what was

19   marked as Exhibit 11, which is the letter that was dated

20   July 24, 2019.

21        A.    Uh-huh.

22        Q.    And so in the next email on page -- let's go to

23   page 2.  Right under the signature line of Maurice

24   Edington, Ph.D. --

25        A.    Uh-huh.

1      Q.    -- do you see a line again with an email like I
2  told you sometimes when they are appended because the
3  other person has responded, they just have a line with
4  the date, time, and the name and email of the person who
5  wrote them?
6      A.    Yes.
7      Q.    What is that date?
8      A.    On August 5th, 2019, at 4:02 p.m. Maritza Reyes
9  wrote.
10     Q.    Uh-huh.  And what is the header there?
11     A.    It says "Good afternoon President Robinson, I
12  trust you are well.  I write directly to you because
13  pursuant to the university guidelines, you are the
14  administrator charged with making the decision on
15  applications for promotion and notifying applicants.
16         According to the schedule for applications
17  published during the 2018-2019 academic year, you were
18  supposed to notify applications of the promotion
19  decisions in June of 2019.  As the emails below and
20  other show, I have requested decisions at different
21  levels, but never received them.  On July 17th" --
22     Q.    Okay.  We're going to stop with that paragraph
23  because that's a long email.  So we're just going to say
24  that it purports to say what it says.
25         But on that paragraph -- I just want to focus

1   on that paragraph.  After the "I trust you are well" in

2   the next sentence, right, where it says "I write

3   directly to you because pursuant to the university

4   guidelines you are the administrator charged with making

5   the decision on applications for promotion and notifying

6   applicants."

7            Is Professor Reyes there under an understanding

8   that you are the final decision-maker you think

9   according to that sentence?  Is that what it conveys?

10           MS. REINER:  Object to form.

11      A.   It conveys that, but that's not correct.

12      Q.   Okay.

13      A.   As I said earlier, I've delegated the decision

14  of promotion to the provost and I do inform applicants

15  of the outcome of their promotion.

16      Q.   So when Professor Reyes addressed that email to

17  you, did you respond -- in this email thread that you

18  see here, did you respond and say "Professor Reyes, I

19  don't make the decisions?"

20      A.   I don't recall.

21      Q.   So the next paragraph -- I mean, the next email

22  at the top.  From who is that email and to whom?

23      A.   Now what page are we on?

24      Q.   On page 2 at the top.

25      A.   It's from Maurice Edington to Maritza Reyes,

1  cc'ing Larry Robinson, Judge Belvin Perry Jr., Genyne

2  Boston.

3       Q.   Okay.  What does it say?

4       A.   It says "Request for decision on my application

5  for promotion to full professor."  It says "Hello,

6  Professor Reyes, I have checked with the staff in my

7  office and they have indicated that the attached letter

8  was mailed (via regular mail) to the address below on

9  July the 25th, P.O. Box 5102, Winter Park, Florida

10 32793.  This is the address that the university has on

11 file for you.  Please confirm whether the letter was

12 received at this address."

13      Q.   So now take a look at the letter that's been

14 marked as Exhibit 11.  Is that the address?

15      A.   No, this is addressed to the law school.

16      Q.   And do you know if the letter was received by

17 Professor Reyes?

18      A.   I don't know.

19      Q.   Did she ever write to you to let you know that

20 she didn't receive it in an email?  I'm not saying in

21 those, but --

22      A.   I don't recall.

23      Q.   Okay.  Did she ever -- do you recall if she

24 ever wrote to you and said that she actually received a

25 public record that showed that it was sent to a wrong

1  address in Tallahassee?

2      A.   I don't --

3      Q.   And it was returned to the university?

4      A.   I don't recall.

5      Q.   Would it refresh your memory if you saw a

6  "return to sender" envelope?

7      A.   Perhaps, yeah.

8      Q.   Well, it wouldn't refresh your memory because

9  did you ever see the "return to sender" envelope?

10     A.   I don't recall.

11     Q.   Okay.  So let's go to page 1 here.  Can you

12 please tell me from who to who is that email?

13     A.   It's from Maritza Reyes on Monday, October the

14 5th to --

15     Q.   I'm sorry, is it October?

16     A.   August.  Monday, August the 5th, 2019 to

17 Maurice Edington, cc'ing Larry Robinson, Belvin Perry,

18 and Genyne Boston.

19     Q.   Okay.  And what is the salutation line and the

20 first paragraph, please?

21     A.   So it says, "Provost Edington, the mailing

22 address is correct; however, I did not receive a letter

23 that was allegedly sent via regular U.S. mail on

24 July the 25th, 2019.  My understanding of these -- is

25 that these types of letters are supposed to be sent with

1   some form of request for confirmation of when the letter

2   was received (as in U.S. return receipt requested.)

3   Your office did not follow this procedure.  Therefore,

4   notification of the decision, for procedural,

5   administrative, and legal purposes is today,

6   parentheses, August 5, 2019."

7        Q.   Okay.  Please read the next paragraph.

8        A.   "The letter is dated July 24th.  I sent you an

9   email on July the 23rd once again requesting the

10  decision; however, you never responded to my email.  You

11  could have responded and provided the letter via email

12  then.  Instead you waited until the first day of the

13  semester to give me the bad news.  And you did not even

14  bother to confirm whether I received the letter.  This

15  is not a professional or collegial way to treat a member

16  of the faculty who has dutifully provided excellence of

17  caring to the law school for the past ten years."

18       Q.   Okay.  And so what is that "excellence with

19  caring?"  Does that ring a bell with you?

20       A.   That's our university motto.

21       Q.   Okay.  And on the first paragraph in the last

22  sentence, do you understand -- do you have any

23  understanding of what Professor Reyes means when she

24  says "notification of the decision for procedural,

25  administrative, and legal purposes is today August 5,

1  2019?"

2      A.   I don't know what she meant.

3      Q.   Okay.  Are you informed when a faculty member

4  files an EEOC charge?

5      A.   I think so, but I can't assume that I did it

6  all the time, but I believe so.

7           MS. REYES:  Thirteen; right?

8           THE COURT REPORTER:  Yes.

9           (Exhibit Number 13 was marked for

10     identification.)

11     Q.   I'm going to give you what's been marked as

12 Exhibit 13.  Have you seen that charge?

13     A.   I don't recall specifically.

14     Q.   Generally?  Do you recall generally?

15     A.   I don't even know what the difference is.  I

16 don't recall seeing this one.

17     Q.   Do you recall being aware that Professor Reyes

18 filed an EEOC charge?

19     A.   Yes, somewhere it came to my attention, yes.

20     Q.   What is the date of this EEOC charge?  If you

21 look at page -- the first page at the bottom on the

22 left, is there a date there?

23     A.   "Digitally signed by Maritza Reyes on 5/29/2020

24 at 9:43 a.m. Eastern Daylight Time."

25     Q.   Do you recall in reference to that date more or

1  less -- do you recall when you learned that

2  Professor Reyes had filed an EEOC charge?

3      A.   No, I don't.

4      Q.   And what is the procedure for who would let you

5  know?

6      A.   Typically this goes to legal or the EEOC, which

7  at that time were in the same office, and then they

8  would inform me about the matter, yes.

9      Q.   Who is they?

10      A.   Legal.

11      Q.   Legal?  And when you mean legal, do you mean

12  the office of the general counsel?

13      A.   Yes, uh-huh.

14      Q.   Okay.

15           (Exhibit Number 14 was marked for

16      identification.)

17      Q.   Please take a look at what has been marked as

18  Exhibit 14.  What is the title of that document?

19      A.   U.S. Equal Employment Opportunity Commission

20  Dismissal of Notice of Rights.

21      Q.   Does it say "Dismissal of"?

22      A.   Dismissal and Notice of Rights.

23      Q.   Dismissal and Notice of Rights; correct?

24      A.   That is correct.

25      Q.   Okay.  And who is it addressed to?

1      A.   To -- I can't get that first name.  Carmenelisa

2   Perez-Kudzma, Kudzma.

3      Q.   I almost went into professor mode for a moment,

4   Dr. Robinson.  It reminded me of the classroom when my

5   students did not want to pronounce certain things and I

6   made them.  But I'm going to go back into pro se

7   plaintiff here mode.

8          Okay.  So in that charge that you see there, in

9   that document that you see there --

10      A.   Uh-huh.

11      Q.   -- would you get copies of these types of

12   documents?  Do you understand what this document is?

13      A.   I really have no recollection of this or

14   receiving one of these.  If I did, it would be through

15   legal counsel.

16      Q.   Okay.

17      A.   And if it did come to me, it would go directly

18   to legal counsel anyway.

19      Q.   What is -- there is a number on that document

20   where it says on the left under the "to" line the EEOC

21   charge number.  What is the EEOC charge number?

22      A.   510 2009 --

23      Q.   Is there a dash after the 510?

24      A.   Yes.  510-2009-02450.

25      Q.   And when you see those numerical numbers in

1  that way -- you worked for the USDA; right?

2      A.    I was -- yes.  I was not on their payroll, I

3  was on FAMU's payroll, but I was an advisor to them.

4      Q.    Some government entities, when they use these

5  kind of dates, could you sometimes see from those

6  numbers the year of this document?

7      A.    You know, there is so much gobbledygook in the

8  federal sector I couldn't figure anything out.  There

9  was an acronym for everything and a process for

10  everything and I was too much focused on the substance,

11  as opposed to process.  So if you say so, it does have a

12  date, I don't know.

13      Q.    I'm not going to say so, I'm going to ask you.

14  In that number of that EEOC charge, do you see a year

15  there?  Something that looks like a year?

16      A.    I see something that looks like a year, yes.

17      Q.    What year would that be?

18      A.    It would be 2009.

19      Q.    Okay.  For a charge number.  And then let's go

20  to the bottom of the document on the right side.  Do you

21  see a date there?

22      A.    May the 6th, 2013.

23      Q.    Okay.  Let's go now to talk about -- do you

24  want to take a break now because it's like 12:05?

25      A.    No, we got -- we're ready to go to 1:00.  We

1  have lunch coming at 1:00.

2      Q.   Oh, you have reservations?

3          MS. REINER:  No, we're going to have some food,

4      some sandwiches and things --

5          MS. REYES:  Oh, brought in?

6          MS. REINER:  Yeah.  But thank you.

7          MS. REYES:  You're welcome.  I'm going to mark

8      this as Exhibit 15.

9          (Exhibit Number 15 was marked for

10     identification.)

11     Q.   I'm going to give you what's been marked as

12  Exhibit 15.  How would you describe that document,

13  Exhibit 15?

14     A.   Well, it says in the title, Promotion Denial

15  Explanation.

16     Q.   What is the date on that document?

17     A.   August the 7th, 2019.

18     Q.   And who is it addressed to?

19     A.   It's addressed to Maritza Reyes.

20     Q.   Who's the author of the document?

21     A.   Maurice Edington, Provost and Vice President

22  for Academic Affairs.

23     Q.   And please read the first paragraph.

24     A.   "Dear Professor Reyes, Thank you for inquiry

25  submitted to the Office of Academic Affairs on August

1  the 5th, 2019.  This letter comes as a follow up to your

2  recent application for promotion in the college of law

3  at Florida A&M University.  Upon review of your

4  promotion application and supportive documentation, it

5  was determined that your request for promotion to full

6  professor be denied based on failure to satisfy the

7  criteria specific to scholarship."

8       Q.   Okay.  Does it state what the criteria is?

9       A.   In the following paragraph?

10      Q.   Uh-huh.

11      A.   Did you want me to read that?

12      Q.   Before we read that.  I was asking you if you

13  gave the provost any criteria?

14      A.   Well, I don't give them to them.

15      Q.   Right.

16      A.   They were developed by colleges and schools.

17      Q.   So I was going to get to it.  Let me finish the

18  question.  So before you said you didn't give them any

19  criteria?

20      A.   Uh-huh.

21      Q.   So my question was going to be, and then you

22  can answer that, where would the criteria come from?

23      A.   The colleges and schools develop the tenure

24  promotion criteria that are ultimately approved through

25  a process involving the vice president and the provost,

1    yes.

2        Q.   And so do different colleges have different

3    criteria --

4        A.   Yes.

5        Q.   -- in FAMU?

6        A.   Yes.

7        Q.   Okay.  And so would the provost know the

8    criteria for each college?

9        A.   The provost would have access to them.  You can

10   go and get them online for each of the colleges and

11   students, yeah.

12       Q.   Would the provost do a review of the specific

13   criteria and apply his own judgment to the decision?

14       A.   I would hope so, yes.

15       Q.   So let's go then to the next paragraph and see

16   what Provost Edington replied here.

17       A.   Okay.

18       Q.   Okay.  So please read it.

19       A.   "According to the criteria, faculty may be

20   awarded promotion by satisfying the following

21   requirement:  'Promotion to full professor.  Accorded by

22   two-thirds vote of the faculty upon a showing that an

23   individual has achieved excellence in teaching,

24   scholarship, research, and service.'

25            To date, since being tenured in 2015, you

1  introduce three documents to satisfy this requirement.

2  One, 'In Memory of Julie Chek'" -- I guess that's how

3  you pronounce it?

4      Q.   Yes.

5      A.   -- "(a memorial); and two, 'Reflections on

6  Presumed Incompetent:  The Intersections of Race and

7  Class for Women in Academia Symposium' (a panel

8  discussion); and three, 'Congress Did Not Give the

9  President Unfettered Discretion to Exclude Immigration'

10  (a blog post).  According to the standards outlined in

11  the College of Law Faculty Handbook, Sections VIII and

12  X, research and scholarship should be -- should

13  evidence, quote, A commitment...to original research of

14  legal scholarship and a demonstrated ability to produce

15  and publish scholarly work of high quality, end quote.

16  The documents you provide lack the qualities outlined in

17  the research and scholarship standards for faculty.

18  Pursuant to FAMU Regulation 10.203, you are afforded the

19  right" --

20      Q.   I'm sorry, 10 point what?

21      A.   10.206, I'm sorry.  I don't know where the

22  three came from.  "You are afforded the right to grieve

23  the promotion process.  Please contact the Office of

24  Academic Affairs if you have additional questions."

25      Q.   Okay.  Please mark this as Exhibit 16.

1          (Exhibit Number 16 was marked for

2      Identification.)

3      Q.    I'm going to give you what has been marked as

4  Exhibit 15?

5          THE COURT REPORTER:  16.

6      Q.    Oh, 16.  Exhibit 16.  And I'm going to ask you

7  if you have ever seen what an application for full

8  professor looks like in the Interfolio system.

9      A.    No, I haven't in that system, but I've seen

10  them otherwise, yes.

11      Q.    And so before Interfolio system, how did you

12  see those applications?  How were they submitted?

13      A.    So just so you know, I chaired the

14  university-wide committee on tenure promotion from 1997

15  until I became provost in 2003 and they were submitted

16  hard copy, faculty-submitted binders, you know,

17  everything in there from books to copies of

18  publications, et cetera.  Many of them rivaling what you

19  have here today; right?  So that was the old method,

20  this portfolio, now they're on a much higher level and

21  sophistication, I believe.  And I wish they had done

22  that during my time.

23      Q.    They are now electronically?

24      A.    That's correct.

25      Q.    Yeah.  So when you're looking at, though, in

1  print, let's look at how the document is described.

2  What is the header of that document?

3      A.    Publications - Professor Maritza Reyes.

4      Q.    Okay.  And how many pages is that document?

5      A.    It says 1 of 5.

6      Q.    Okay.

7      A.    So five pages.

8      Q.    Okay.  So can you please read those first two

9  paragraphs?

10     A.    "Articles published by law professors are

11 generally published in law review journals.  In fact,

12 the College of Law Faculty Handbook specifies that

13 faculty should strive to publish in law review journals.

14 I uploaded my law review articles in the 'other

15 publications' section because this is what Professor

16 Abrams, the Chair of the College of Law RPT Committee,

17 instructed me to do.

18         Some of my online publications are refereed by

19 scholars/experts in the area of immigration law and

20 policy.  Therefore, Professor Abrams instructed me to

21 upload them in the 'refereed article' section of the

22 application."

23     Q.    Okay.  And so what is the first header under

24 that paragraph?

25     A.    Law Reviews.

1    Q.   And how many bullet points do you count there

2    in terms of how many law reviews are listed there?

3    A.   Six.

4    Q.   Okay.  And now let's look at Exhibit 15, which

5    was the letter from Provost Maurice Edington dated

6    August 7, 2019.  In that letter he listed 1, 2 and 3;

7    correct?  In the letter, I'm saying, did he use numbers

8    -- in the letter do you see the numbers 1, 2 and 3?

9    A.   Yes, I do.

10   Q.   Okay.  And so would number 1 -- what is the

11   title of number 1 in Provost Edington's letter?

12   A.   "In Memory of Julie Chek" (a memorial).

13   Q.   And where do you see that in the publications

14   list that has been marked as Exhibit 16?

15   A.   It's the first bullet under Law Reviews.

16   Q.   Okay.  And then going back to Provost

17   Edington's letter where it says 2.  What does it say

18   there?

19   A.   "Reflections on Presumed Incompetence:  The

20   Intersections of Race and Class for Women in Academia

21   Symposium" (a panel discussion).

22   Q.   And where do you see that in the publications

23   list?

24   A.   I don't.  Maybe I'm missing it.  My eyes are

25   getting tired.  But I don't see it in the law review

1  list.  Am I missing it?

2      Q.   Is there anything in the fourth bullet point

3  that would refresh your memory?

4      A.   Oh, yeah, there it is.  Yes, there it is,

5  number 4.

6      Q.   Okay.  And so let's look now back to the letter

7  by Provost Edington.

8      A.   Okay.

9      Q.   And in number 3 there, what does it say?

10     A.   "Congress Did Not Give the President Unfettered

11 Discretion to Exclude Immigration" (a blog post).

12     Q.   Okay.  Do you see that under Law Reviews?

13     A.   I may have been missing it again.

14     Q.   Let's go to the next header.  What's the next

15 header?

16     A.   On which document?

17     Q.   On page 1.

18     A.   Online Legal Symposia - Referred by Immigration

19 Scholars.

20     Q.   Is it referred or --

21     A.   Refereed by Immigration Scholars/Experts.

22     Q.   What do you understand, Dr. Robinson, by

23 "refereed by experts"?

24     A.   Well, it's self-explanatory.

25     Q.   For academics maybe.  For the record, let's

1  explain it.  What does it mean?

2      A.   For a person, in general, who has expertise to

3  attest to the quality of the work the individual is

4  presenting, either orally or in writing.

5      Q.   Okay.  And so if these publications are

6  refereed by experts, for them to be published, do they

7  have to be approved by the experts when they're

8  refereed?

9      A.   Not necessarily because from the review process

10 to the journal is an editorial board and I would answer

11 that there's typically not the standard they

12 automatically get published following peer review; okay?

13     Q.   So they get published after peer review?

14     A.   Not necessarily.  There's an editorial board

15 that determines if they go to the journal proceedings

16 and so forth.  So they are generally in the proceedings

17 for an oral or in the journal for the written

18 manuscripts.

19     Q.   And you're writing -- I mean, you are answering

20 the question based on your knowledge as an academic in

21 what discipline?

22     A.   Environmental science, environmental chemistry,

23 environmental policy, you know, nuclear chemistry, and

24 as a reviewer on many occasions myself.

25     Q.   Are you familiar with the discipline of law, of

1  legal scholarship?

2      A.   No.

3      Q.   Okay.  If Professor Reyes included letters from

4  the immigration referees of these articles, specifying

5  that these articles were of high quality, and that they

6  have to make the decision before they were published,

7  would that seem to you like a professional blog or a

8  non-refereed blog?

9      A.   I have no way to distinguish the two, so --

10      Q.   Okay.  But you didn't see Professor Reyes's

11  application on Interfolio; right?

12      A.   No.

13      Q.   Okay.  Let's go to count, in this Online Legal

14  Symposia - Refereed by Scholars/Experts, how many are

15  listed there?

16      A.   One, two, three, four.

17      Q.   Okay.

18      A.   Uh-huh.

19      Q.   And then what is the next title?

20      A.   Work-in-Progress.

21      Q.   And how many are listed there?

22      A.   One.

23      Q.   Okay.  And then in the next title, what does it

24  say?

25      A.   Other Publications - Newspapers, Online

1  Opinions and Blogs.

2      Q.    Okay.  And how many are listed there?

3      A.    10 on page 2 and a total of 12 between Page 2

4  and 3.

5      Q.    And so does Professor Reyes make a distinction

6  between the header on page 2, Other Publications -

7  Newspapers, Online Opinions, and Blogs and the header on

8  page 1 Online Legal Symposia - Refereed by Immigration

9  Scholars/Experts?

10     A.    Yes.

11     Q.    So let's go back to Provost Edington's letter

12 and find number 3 that he referred to as a blog post.

13 Does it appear under blog posts on page 2 or does it

14 appear under Online Legal Symposia - Refereed by

15 Immigration Scholars/Experts on page 1?

16     A.    The former on page 1.

17     Q.    And when you say the former --

18     A.    Under Legal Symposia.

19     Q.    Refereed by Immigration Scholars/Experts?

20     A.    Uh-huh.

21     Q.    Now, let's go to page 3 in the publications

22 list, which is Exhibit 16.  What is the header on that

23 page?

24     A.    Presentations - Professor Maritza Reyes.

25     Q.    And how many bullet points are there?

1     A.   The fourteen on page 3.

2     Q.   How many on page 4?

3     A.   I was trying to get the total.  I think there's

4  46 total.

5     Q.   You are very -- you are very quick and fast

6  with the bullet points and the math.  I'm going to trust

7  your math.

8     A.   I could be off by one or two, so --.

9     Q.   In hindsight I'm thinking I should have

10  numbered them, but thank you for the math.  So we are

11  going to presume that that math is correct.  Did you see

12  this publications list?

13     A.   No.

14     Q.   Do you know if Provost Edington saw this

15  publications list?

16     A.   No.

17     Q.   Okay.

18          (Exhibit Number 17 was marked for

19      identification.)

20     Q.   I'm going to give you what has been marked as

21  Exhibit 17.  And we're not going to read this entire

22  letter, but we're going to identify it.  Well, it's not

23  titled as a letter, I think.  What is it titled as on

24  page 1?

25     A.   Application for Promotion to Full Professor for

 1  Maritza Reyes.

 2      Q.   Okay.  But the title at the top of this

 3  document.

 4      A.   (No response.)

 5      Q.   On the left at the top.

 6      A.   It's a memorandum.

 7      Q.   Okay.  So it's not titled as a letter; is it?

 8      A.   Well, in the same way the others were, I guess,

 9  you know.  But anyway, it's a memorandum.

10      Q.   Okay.  So we have a memorandum here?

11      A.   Uh-huh.

12      Q.   And what is the date of that memorandum?

13      A.   November the 29th, 2018.

14      Q.   And who is it addressed to?

15      A.   To Dr. Maurice Edington, Provost from LeRoy

16  Pernell, Interim Dean, College of Law.

17      Q.   And from who is it -- I mean, in regards to

18  what is the subject?

19      A.   Application for Promotion to Full Professor for

20  Maritza Reyes.

21      Q.   Let's go to page 2 on that document.  And let's

22  go to the middle paragraph there.  Do you see a middle

23  paragraph there that begins with "the essence"?

24      A.   Yes.

25      Q.   Please read that paragraph.

1    A.   "The essence of the RPT Committee's report is

2    that the body of Associate Professor Reyes' works did

3    not satisfy the qualitative standard of excellence in

4    scholarship.  In reaching that position the committee

5    apparently placed weight on the absence of any

6    scholarship publications since 2014."  Then it has a one

7    there.  "There seems to be a little dispute -- there

8    seems to be little dispute that the student memorial

9    piece 'In memory of Julie Chek,' 10 FAMU -- Florida A&M

10   University L. Rev. ix. 2014 and Professor Reyes' 'The

11   Intersections of Race and Class for Women in Academia

12   Symposium' - The Plenary Panel 29 Berkeley J. Gender L.

13   & Just. 195 (2014) - a multi-authored report on a panel

14   discussion - are not scholarly publications within the

15   standards of the college of law."

16   Q.   Okay.  So let's stop right there and compare

17   this memorandum to Provost Edington's letter that's been

18   marked as Exhibit 15.  So we're comparing Exhibit 15 to

19   Exhibit 17.

20   A.   Uh-huh.  Okay.

21   Q.   Do you see the same publications listed in that

22   paragraph?

23   A.   I see the first "In Memory of Julie Chek" and I

24   see "The Intersections of Race and Class" are two of the

25   three that are in Dr. Edington's letter.

1      Q.    Okay.  And what is that date?  What date did

2   they say?

3      A.    The letter from Dean Pernell?

4      Q.    Yes.

5      A.    Is November the 29th, 2018.

6      Q.    Okay.  No, I'm sorry, in the paragraph that you

7   read in the memorandum from Dean Pernell, what is the

8   date since -- the publication since what date in the

9   middle of the paragraph that you read before?

10      A.    Since 2014.

11      Q.    Since 2014.  Where do you think they are

12   getting that date from?

13      A.    Well, I assume that that's the date since your

14   promotion to associate professor.  And as we discussed

15   earlier, those -- the clock starts over in terms of

16   publications for the track of full professor.

17      Q.    So it would be from the date of promotion to

18   associate professor, what publications have been

19   published until the date of the application?

20      A.    Yes.

21      Q.    Okay.  So let's go back to the publications

22   list.  Okay.  How many items in those bullet points?

23      A.    Which category?

24      Q.    How many items have -- do they have there from

25   2014?

1      A.    Which category?

2      Q.    After 2014.  All of them.  Let's start with Law

3  Reviews.

4      A.    One, two, three.  I can't tell the date of the

5  fourth one.  Maybe I'm overlooking it.  The fifth one

6  was 2012.  And the sixth one was 2008.

7      Q.    If we change that date from 2014 to 2011, how

8  many publications would there be in the law reviews?

9      A.    There would be one, two, three -- there would

10  be three.  Because there's --

11      Q.    From 2011?

12      A.    Yeah, because I can't ascertain a date for the

13  fourth item.  Actually four, yeah.  Okay.  Uh-huh.

14      Q.    Let's see, what's the first bullet point here?

15      A.    2015.

16      Q.    And the second bullet point here?

17      A.    2015.  Next one is 2014.  Oh, I see the next

18  one is 2015.  And the last one would be before twenty --

19  2011 would be the 2012 article.

20      Q.    So that would be five items under Law Reviews?

21      A.    Uh-huh.

22      Q.    How many under Online Legal Symposia - Refereed

23  by Immigration Scholars/Experts?

24      A.    What am I looking for?

25      Q.    After 2011, the dates.

1      A.   There would be four.

2      Q.   Okay.  And we're not going to go over all the

3   others, we're just going to leave it at that with those.

4           Now, you mentioned that you were in the

5   promotion and tenure committee in the chair position for

6   some years.  Go ahead, Dr. Robinson, I'm going to do the

7   same.

8      A.   Yes.

9      Q.   So when that committee undertakes a review --

10  well, I guess under your leadership, and by the way, I

11  guess you preceded Dr. Abazinge?

12     A.   I believe so.

13     Q.   Is he still in that committee in chair?

14     A.   I think so.

15          MS. REINER:  Object to form.

16     Q.   Is he still chair of the committee?

17     A.   I don't know for sure.

18     Q.   Okay.  When you were chair of that committee,

19  what is it that the committee did when they got an

20  application for promotion to full professor?

21     A.   First of all the committee represented all of

22  the colleges and schools and there was a mechanism to

23  determine how many representatives you got from each

24  college and school.  And we would -- we would review the

25  applications and then we would discuss them at the

1    meeting.  And during that process we would try to reach

2    consensus on applications in terms of the outcome.  And

3    ultimately we would provide our recommendations to the

4    provost and vice president for academic affairs.

5        Q.   As you know, in your declaration you wrote that

6    the Retention, Promotion, and Tenure Committee

7    participates at the college of law in the review?

8        A.   Yes.

9        Q.   So what happens to that committee

10   recommendation when it gets to the University Committee?

11       A.   All of those are considered and one of the

12   things I used to emphasize to the committee on tenure,

13   that our decisions are only advisory, so don't be

14   disappointed if the provost decides to go in a different

15   direction.  But we would -- we would definitely, you

16   know, review those decisions from former committees,

17   whether it was an RPT committee or the college committee

18   or the division committee or the department committee,

19   along with those of the deans, as well.  But none of

20   those, as I told our committee members in our own

21   decisions, were final.  It was only recommendations for

22   advisory.

23       Q.   And so as we were going through the

24   publications list, and as we were discussing what's a

25   referee, what your understanding of referee is, would

1  you know what the standard for what is considered legal

2  scholarship is?

3      A.   I wouldn't, but the committee would have

4  representation from the law school who would share that

5  information with the other members, right?

6      Q.   So for each college, let's say in this case the

7  college of law, there is a representative in the

8  committee?

9      A.   At least one, could be more than one.

10     Q.   And that number of how many representatives a

11 college has in that committee is based on what?

12     A.   The number of tenured faculty, right?  And

13 there is a formula somewhere in the faculty handbook or

14 the collective bargaining agreement that specifies that.

15 I used to know that, but it should be there.

16     Q.   Okay.  So let's say there is only one from the

17 college of law.

18     A.   Uh-huh.

19     Q.   One representative.  So you -- the

20 representative would help the committee, would guide the

21 committee to determine what is legal scholarship?

22     A.   Uh-huh.

23     Q.   Okay.  I have, I think, one more exhibit.

24 I think we're going to have time.  I have -- I swear,

25 today I'm having a very difficult time with my exhibits.

1  I think I'm doing pretty good for not having slept much

2  last night.  I think I may have left that exhibit.

3          How does the committee at the university --

4  Tenure and Promotion Committee, how do they issue their

5  recommendation?  Is it in writing?

6      A.   Yes, they typically submit that to the provost

7  in writing, yes.  It may be a conversation -- I don't

8  know how they do it now, between the chair committee and

9  the provost, as well, so --.

10     Q.   Okay.  Because we have compared -- just now, we

11  have compared, for example, the provost letter to

12  Professor Reyes with Dean Pernell's memo to Professor

13  Reyes and they both seem to be using the same type of --

14  you know, the scholarship -- signing the same

15  scholarship criteria; correct?

16     A.   Uh-huh.

17     Q.   And their interpretation of why it failed.

18     A.   Uh-huh.

19     Q.   If the -- if the University Tenure and

20  Promotion Committee also worded it the same way and they

21  said that the criteria failed for the same reason.

22  We're going to have three of them.  It would be the

23  dean, before that the RPT Committee, and then the

24  university basically saying the same thing about the

25  criteria for scholarship; correct?

1      A.   Uh-huh.

2      Q.   Which is the first committee that writes the

3   recommendation?

4      A.   It starts in the colleges and schools, so it

5   would be the RPT Committee, yeah.

6      Q.   Uh-huh.  And --

7      A.   In the case of the law school, anyway.

8      Q.   When you were in the tenure and promotion

9   committee, did you select external reviewers?

10     A.   No, that wasn't part of our processing.

11     Q.   So what -- how do you -- is there any review of

12  external reviewer reviews in the tenure and promotion

13  committee?

14     A.   At the university level, once again, the

15  committee is composed of individuals from the colleges

16  and schools who have the expertise to, you know, opine

17  on scholarship and other elements of the tenure

18  criteria.

19          Some colleges and schools may use outside, you

20  know, consultants before coming to the University

21  Committee.  That's a practice in some institutions.

22  I don't know if anybody at FAMU is using that model

23  currently, but that's what some institutions do.

24     Q.   And that usually would be arranged at the first

25  committee, which would be in the college of law the RPT

1    Committee?

2        A.    Yes, it would happen there first.

3        Q.    And you keep saying that, you know, each

4    college has a representative, so that representative of

5    each school would bring the knowledge of their

6    interpretation of the scholarship for their college.

7        A.    Uh-huh.

8        Q.    Could those same persons serve in both the RPT

9    Committee and the University Committee?

10       A.    That's possible.

11       Q.    And would that bring some consistency in terms

12   of what they decided at the RPT Committee level and then

13   coming in and informing the University Committee about

14   that?

15       A.    That's possible.  But just remember the

16   committee has the RPT Committee's decision and rationale

17   at their disposal, as well.  So they review all of that,

18   too.

19       Q.    They review the record of RPT Committee?

20       A.    Yes.  Well, they should.

21       Q.    Now, does the University Tenure and Promotion

22   Committee, do any independent review of the materials in

23   the application?

24       A.    Yes.

25       Q.    And how does it do that?

 1     A.    Well, in the old days we had the articles, you

 2   know, in our hand and we could review them.  And then

 3   today it's much easier where it's electronic, you can

 4   figure that out in minutes as opposed to hours and days

 5   as we had to do in the past.  But yeah, that's a way to

 6   verify that a publication was published in journal X,Y

 7   or Z and what the dates were and so forth.

 8         But, you know, ultimately you had a fairly

 9   large group of people who were involved in that process

10   and that led to some very, I think, good discussions

11   about these issues of scholarship and so forth.

12     Q.    So what year were you in the committee?

13     A.    So I was first chair committee starting in the

14   fall semester of 1997 and through the fall semester of,

15   you know, 2002, you know, early part of 2003, I became

16   provost in May of 2003.  So obviously I couldn't serve

17   on that committee after that.

18     Q.    Okay.  I'm looking at the dates to ask you the

19   next question.  Did you review any college of law

20   faculty applications during your time?

21     A.    I think during my tenure at the law school,

22   other than maybe some were on appointment, you know, but

23   I don't think the law school had fully developed all of

24   that process by 2002 when I chaired the committee, so

25   I'm not sure about that.  But I don't think that I had

1  the privilege of doing that.  I was provost in 2004 when

2  the college received its provisional accreditation, you

3  know, but I don't think, and I could be wrong, that any

4  applications for the law school came to me in that time

5  frame.

6      Q.    Because the law school was re-established by

7  legislation in what year?

8      A.    I think that may have been around '98/'99 time

9  frame, something like that.

10     Q.    Maybe 2000 legislation out there?

11     A.    Around that time frame, I was actively

12  enrolled, but yeah.

13     Q.    Okay.  And then they had some years where they

14  had to, you know, get planning and get going.  And then

15  that's when they started in operations.  That was the

16  reason for my asking the dates because I wanted to see

17  if it was during that time frame.  So from your

18  recollection, was it likely that you reviewed any --

19     A.    It was not likely.

20     Q.    -- law school applications?  Okay.

21          Now, going back to the application of Professor

22  Reyes for promotion to full professor, in Provost

23  Edington's letter it states there's a grievance process;

24  right?

25     A.    Yes.

1      Q.    Okay.  And what is that grievance process?

2      A.    It's FAMU Regulation 10.206.

3      Q.    Are you familiar with regulation 10.206?

4      A.    I don't know the details of it, but I know it

5  exists, yes.

6      Q.    Do you know if Professor Reyes tried to or did

7  submit a grievance under Regulation 10.206?

8      A.    I'm not sure.

9      Q.    If there were emails sent to you, would that

10 refresh your memory?

11     A.    That might.

12     Q.    Okay.  And let me ask you about the emails,

13 Dr. Robinson.  Do you delete emails from your FAMU email

14 system?

15     A.    No.

16     Q.    So you preserve your emails?

17     A.    Uh-huh.

18     Q.    Do you have a FAMU issued phone?

19     A.    I have a FAM -- I have a phone that I use for

20 FAMU business, but it's a number and an account that

21 I've been paying for long before I arrived in this

22 position, so --.

23     Q.    So it's your own phone, own cell phone?

24     A.    It's mine.

25     Q.    And do you text employees?

1     A.   At times I do, yes.

2     Q.   Would you have texted with Provost Edington?

3     A.   About some things for sure, uh-huh.

4     Q.   Do you text with Provost Alison Watson?

5     A.   Yes.

6     Q.   Do you text with the Division of Audit,

7   Mr. Maleszewski?

8     A.   Maleszewski.

9     Q.   Do you text with him?

10     A.   Yes.

11     Q.   Okay.  Do you text with Ethics and Compliance

12   Chief Officer Rica Calhoun?

13     A.   Yes.

14     Q.   Do you text with members of the Board of

15   Trustees?

16     A.   Yes.

17     Q.   Do you text with students?

18     A.   Every now and then some will get my number,

19   yes.

20     Q.   And what is your number?  Is it readily

21   available?

22     A.   Yes.  I'd rather the world didn't have it, but

23   it's not something that's published anywhere, but --

24   like my office number, but I try to keep it as private

25   as I can, but you know.

1      Q.   So if I asked you for your phone number here,
2  would you feel comfortable?

3      A.   No.

4      Q.   And I will respect that Dr. Robinson because I
5  respect your privacy.  But you do use that phone for
6  business?

7      A.   Yes, I do.

8      Q.   Okay.  And do you have family members who live
9  with you right now?

10     A.   Yes, uh-huh.

11     Q.   Who?

12     A.   My wife and my oldest daughter.

13     Q.   Okay.  And what are their names?

14     A.   Sharon Robinson, my wife; Nicole Robinson, my
15  daughter.

16     Q.   Would you say they accompany you sometimes to
17  public engagements related to your work?

18     A.   Yes, they do.

19     Q.   And their names and pictures appear in the FAMU
20  publications?

21     A.   Yes, they do.

22     Q.   Are they a little bit of an extension of your
23  role in the university?

24     A.   Well, I have to make sure people understand
25  that although my wife is called "the first lady" --

1      Q.    I'm sorry, what is she called?

2      A.    She's called "the first lady."

3      Q.    Okay.

4      A.    But she has a job -- full-time job all of her

5   own.  And she tries to accommodate me for various

6   events, but -- you know, and that's the extent of it.

7   And I enjoy having her around.  I think she serves as a

8   role model, but she has no obligation to the university

9   in the way that I do.

10     Q.    But she has become known because she is a first

11  lady?

12     A.    Uh-huh.

13     Q.    Okay.  And you said you have one daughter

14  living with you?

15     A.    Uh-huh.

16     Q.    Does she also attend events?

17     A.    Yes, she does.

18     Q.    And do you have any more children beyond that?

19     A.    I have two other daughters and a niece that my

20  wife and I raised.

21     Q.    Okay.  And are they also participating in the

22  public aspects of the university?

23     A.    One daughter lives in Atlanta, you know, works

24  for Deloitte.  They come to things like --

25     Q.    Is she an accountant?

1     A.   She has a degree in public health from the

2   University of Texas, Houston.  And no, she's not an

3   accountant, but she works on something related to

4   hospital billing and finances and so forth.

5          And then my youngest daughter lives in Boston,

6   just started on the faculty at one of the Harvard

7   hospitals.  She is a PA neuropsych. and they do

8   occasionally get home and attend various family

9   functions.

10    Q.   Harvard is -- that's something like people --

11    A.   It's a good thing she took after her mother.

12    Q.   So let's talk about Harvard a little bit.  Do

13  you remember if Professor Reyes ever reached out to you

14  about her Harvard degree being excluded from the College

15  of Law Commencement Program?

16    A.   I do recall the email exchange.  I don't recall

17  the outcome.

18    Q.   Okay.  Do you recall what you did about it?

19    A.   Other than make sure people were aware that you

20  had a concern; right?  And they are the people who fix

21  those kinds of things.

22    Q.   What is your title in the university?  Is it

23  chief executive officer?

24    A.   Yeah, I mean, president and -- what is it?

25  There's a different title in terms of our relationship

1    to the board; right?  But I'm basically the secretary to

2    the board essentially, so --.

3        Q.    A question like that, would it be referred to

4    Academic Affairs or the Office of the General Counsel?

5        A.    I think that's an Academic Affairs question,

6    yeah.

7        Q.    And why is it an Academic Affairs question?

8        A.    Because it dealt with faculty members.  It

9    didn't deal with anything that was of a legal matter, in

10   my opinion.

11       Q.    Uh-huh.

12       A.    So I think between the provost, the dean, and

13   all those people who work on those programs, that they

14   have the capacity to figure that out.  They can refer to

15   legal, if they'd like, if they needed them to figure it

16   out.

17       Q.    And why would they refer to legal?

18       A.    I said if they needed to, that's at that

19   disposal, right.

20       Q.    So if the college of law -- and by the way,

21   have you attended a commencement -- what the law school

22   calls the Hooding Ceremony?

23       A.    I've only missed one and that was the most

24   recent one because of the tornados that impacted that

25   campus the day before, so since 2017 I've attended all

1   of them.

2        Q.   And have you seen what the Hooding Program

3   looks like?

4        A.   I've seen it and I've experienced it.

5        Q.   Okay.  Oh, and I meant the written Hooding

6   Program, the booklet.

7        A.   I can't recall any specifics about that, yeah.

8        Q.   Okay.  So when Professor Reyes reached out to

9   you and said, "I need help because my Harvard degree is

10  not being listed in the College of Law Hooding Program,"

11  what did you think about that?

12       A.   I thought it was something that the provost and

13  others, you know, would resolve.

14       Q.   Okay.

15            (Exhibit Number 18 was marked for

16       identification.)

17       Q.   I'm going to give you what has been marked as

18  Exhibit 18.

19            MS. REINER:  Ms. Reyes, maybe we can --

20            MS. REYES:  This will be it because we have

21       five minutes.  Yes.

22            THE WITNESS:  Take your time.  We've got all

23       day.

24       Q.   So I'm giving you this one page, Exhibit 18.

25  Can you describe -- how would you describe this document

1  having it in front of you?

2      A.   It's a document entitled 2022 -- excuse me --

3  Hooding Ceremony Faculty Participation.

4      Q.   Uh-huh.  And who is it from/to?

5      A.   It's from Claudine Beale -- it's from Claudine

6  Beale to Maritza Reyes.

7      Q.   What date is that?

8      A.   April the 8th, 2022, at 10:48 a.m.

9      Q.   What is the subject of the email?

10     A.   "Thank you for registering for the 2022 Hooding

11 Ceremony Faculty Participation."

12     Q.   Okay.  And so if you go down the document, do

13 you see a section there called Regalia Order

14 Information?

15     A.   Yes, I do.

16     Q.   What is the question -- the first question on

17 there?

18     A.   "If you are participating in the Hooding

19 Ceremony, will you need rental academic regalia?"

20     Q.   And what is the next question?

21     A.   "If you need rental regalia, please provide the

22 information below."

23     Q.   Okay.  And what information do they seek first?

24     A.   The highest degree.

25     Q.   And in this form, what is the answer that --

1 because you said it came from Claudine Beale to

2 Professor Reyes as a thank you for registering for the

3 Hooding for 2022.

4       A.    Uh-huh.

5       Q.    So what is the highest degree listed by

6 Professor Reyes there?

7       A.    The LLM.

8       Q.    And what is the next information that is

9 required?

10      A.    "Name of the institution from which your

11 highest degree was conferred."

12      Q.    And what is the answer there?

13      A.    "Harvard University, Harvard Law School."

14      Q.    So what is the rule in academia in terms of the

15 regalia that faculty wear?  Is it the highest university

16 degree?

17      A.    Typically, yes.  I mean, there's an order of

18 colors in terms of the hooding that represents the

19 institution, as well as the discipline which the person

20 received their degree and those are the colors that form

21 the hood; right?  And there may be some other

22 stipulations about the type of, you know --

23      Q.    Head wear?

24      A.    Head wear and all of that, but the one I'm most

25 familiar with is the colors of the hood is

1  distinguished, as well as the gown itself --

2      Q.  Uh-huh.

3      A.  -- which distinguishes, I think, PhD or

4  advanced degree have three slashes, presidents have four

5  slashes on the sleeves.  But the biggest one has to do

6  with the colors on the hood.  And most people want to

7  make sure this is right.

8      Q.  So this explanation that you gave me to

9  somebody who is not in academia, it seems a little -- is

10 it elaborate?  Does it have meaning?

11     A.  To somebody outside of academia, it would be

12 elaborate probably.

13     Q.  Does it have meaning for academics?

14     A.  I guess it does mean something to people who

15 work very hard to receive all those degrees, yes.

16     Q.  And so when you have this form that is asking

17 for this information, in the commencement program it

18 lists the regalia by the faculty colors?

19     A.  Well, I don't know what's in the program.  In

20 the law school I don't know what's in the program

21 regarding faculty for the university in general.  I

22 don't know what they say, other than giving the faculty

23 rank, colors for education, et cetera.  We generally, on

24 the university side, it may be different for the law

25 school, and may be different in certain hooding

1  ceremonies that individual colors the students have.  We

2  typically don't list the faculty unless they are there

3  in the element of supervisors for either master's or PhD

4  degrees and so forth.

5      Q.  And what I was going to ask, it's not about the

6  list of the faculty, but if there is a section that says

7  regalia colors and they list all the universities and

8  the colors of the universities, would listing Harvard

9  University, if a faculty member has a highest degree

10 from there and is wearing the colors from that school

11 because they have to do it according to the form, would

12 that be accurate?  Reasonable?  Expected?

13     A.  Yes, if a program or listing exist, yeah, that

14 would be reasonable.

15     Q.  Okay.  Did you ask Professor Reyes or did she

16 provide that to you when she reached out to help you?

17 Did she send you the --

18     A.  So what I recall is making sure that the

19 provost and others received this, you know, concern you

20 raised so they could handle it appropriately.

21         MS. REYES:  Okay.  We are exactly at 1:00 and I

22     don't want you to miss your delivery in terms of

23     getting cold or something.

24         MS. REINER:  I'm actually more worried about

25     the ladies room.

1          MS. REYES:  Okay.  We're going to stop now and

2      go off the record.

3          (Lunch break from 1:00 p.m. to 1:52 p.m.)

4          MS. REYES:  We can go back on the record,

5      please.

6      Q.    I hope you guys had a good lunch.

7      A.    Yes, very good.

8          MS. REINER:  Yes.

9      Q.    So, Dr. Robinson, when we left off, we were

10  speaking about that Harvard degree.  And you said that

11  you would like to see what that looks like in terms of

12  the College of Law Hooding Program, so I'm going to give

13  you what's going to be marked as Exhibit --

14          THE COURT REPORTER:  19.

15      A.    -- 19.

16          (Exhibit Number 19 was marked for

17      identification.)

18      Q.    Please take a look at it right here -- oh, no,

19  it's right there.  By the way, before we start, during

20  lunch did you have -- did you discuss any of the

21  questions that I went over with you with your counsel or

22  with the general counsel?  I don't want the content of

23  it, just did you have discussions about any of the

24  evidence we went over or any of the questions that I

25  went over?

1      A.   Yes.

2      Q.   And based on that, do you want to make any

3   clarifications?

4      A.   I think counsel may, when we get to the end,

5   have some redirect, but for now, unless you think

6   otherwise?  Are you ready to go?

7           MS. REINER:  Yeah, just continue.

8           MS. REYES:  So you're going to have some

9        redirect based on the discussion you had during

10       lunch?

11          MS. REINER:  Yeah, I -- yeah, I may have a

12       couple of questions where I wasn't clear on exactly

13       what you all were saying, yes.

14          MS. REYES:  Okay.

15          MS. REINER:  But I expect it to be brief, just

16       one or two.

17          MS. REYES:  Okay.  And then I'll clarify as

18       needed, also.

19          MS. REINER:  Yes.

20   BY MS. REYES:

21      Q.   Okay.  So let's go ahead and take a look at

22   that exhibit.  Nineteen.  And I'm going to direct you to

23   the first page.  What is the title of that, please?

24      A.   2022 Hooding Ceremony Program FAMU College of

25   Law.

1    Q.    Okay.  And turn the page, please.  And what do

2  you have next?

3    A.    Florida A&M University Annual Hooding Ceremony

4  Spring 2022 with the date and location.

5    Q.    Okay.  And then what do you have next?

6    A.    Candidates for Hooding for 2021 - 2022.

7    Q.    And what does it list there?

8    A.    Apparently these are the candidates who are

9  graduating in the law school.

10   Q.    Okay.  And what do you have next?

11   A.    It has faculty.

12   Q.    And in the faculty section, what do they list?

13   A.    The faculty name and their status in terms of

14  professor, instructor, director, and so forth.

15   Q.    Okay.  So faculty title and rank?

16   A.    Yes.

17   Q.    Because there's a difference in terms of rank.

18  What do we mean by rank and what do you understand by

19  rank when we talk about rank in terms of faculty?

20   A.    Pretty much refer to associate, assistant, full

21  professor, you know, and who is visiting, I guess it's

22  not really a rank position, but instructor, assistant,

23  associate, and full those are the typical rankings.

24   Q.    Okay.  Does it list, of the faculty, do you see

25  under the names or rank, do you see the universities

1  that they attended?

2      A.   No.

3      Q.   Okay.  So let's go to the next section.  What

4  is the next section called?

5      A.   Academic Regalia.

6      Q.   Okay.  And under Academic Regalia, what does it

7  list?

8      A.   There is an opening paragraph and it lists the

9  universities and their colors.

10     Q.   And so if you go down the list, do you see

11  Harvard University there?

12     A.   Howard.  I see Howard University.

13     Q.   What's above Howard?

14     A.   Georgetown University.

15     Q.   So you're looking because -- are they listed

16  alphabetically?

17     A.   Well, not exactly because before the university

18  -- before Georgetown you have the University of Florida,

19  so I don't know exactly.

20     Q.   So maybe they counted Florida as the F before

21  G?

22     A.   Yeah, I guess they could have done it that way

23  it appears, yeah, uh-huh.

24     Q.   But even if they are not alphabetically or

25  however they did it, is Harvard University listed there?

1     A.    I do not see Harvard University.

2     Q.    So let's go back to the faculty side.  Do you

3   see Maritza Reyes listed there?

4     A.    Yes, I do.

5     Q.    Okay.  And if Maritza Reyes, according to the

6   order form that I showed you before, is wearing the

7   Harvard regalia --

8     A.    Yeah.  What's the question now?

9     Q.    If Maritza Reyes is wearing the Harvard

10  regalia?

11    A.    Is she wearing it?

12    Q.    If she's wearing it.  Because according to the

13  form that you have as an exhibit, right, what did she

14  have to order?

15    A.    Oh, what form was that?

16    Q.    That would be the exhibit with the order from

17  Claudine Beale.  It would be -- yes, that's it.

18    A.    That was 18.

19    Q.    Number 18.

20    A.    Yes, uh-huh.

21    Q.    So Maritza Reyes would wear, according to that

22  form, the highest degree regalia, which would be

23  Harvard?

24    A.    According to what you ordered here, yes.

25    Q.    Well, did she have to order that -- what do

1  they ask for?  What is the question there in terms of

2  what has to be ordered?  What does the form state?

3       A.   On the Regalia Order Information, it says, "If

4  you are participating in the Hooding Ceremony, will you

5  need rental regalia?"  And the response was, "No, I have

6  my own academic regalia."

7       Q.   What is the next requirement to put in there?

8       A.   "If you need rental regalia, please provide the

9  information below."  "Highest degree."  "LLM."  "Name of

10 the institution from which your highest degree was

11 conferred."  "Harvard University, Harvard Law School."

12 "City and state of the institution from which your

13 highest degree was conferred."

14      Q.   Okay.  So if they require the highest degree

15 regalia and Professor Reyes wears her highest degree

16 regalia, the Harvard degree regalia, but her regalia is

17 not listed on the form, would her regalia be excluded?

18      A.   I have no idea.  But I don't think that stop --

19 I hope it didn't stop you from wearing it; right?

20      Q.   No, I'm saying would it be excluded from the

21 list of the regalia of colors?  Would Harvard degree be

22 excluded from the regalia colors?

23      A.   Well, it is excluded.

24      Q.   Correct.  So would the colors that Professor

25 Reyes is wearing not have a description in the academic

 1  regalia colors?

 2      A.   Well, it's not here.  So what exactly is the

 3  question?

 4      Q.   The question is -- I'm sorry, I was just

 5  thinking that you were getting my question before lunch.

 6      A.   Uh-huh.

 7      Q.   The question is if Professor Reyes is wearing

 8  the colors of Harvard, and Harvard is not listed on

 9  there, would there be a description of Professor Reyes's

10  colors in the Academic Regalia section?

11      A.   So assuming that it should have been here; is

12  that the question?

13      Q.   No, the question is would Professor Reyes's --

14  were Professor Reyes's colors excluded from that form?

15      A.   Harvard University is not on this form.

16      Q.   Okay.  So when you said that you forwarded this

17  to Academic Affairs, did you ever follow up with them?

18      A.   No.

19      Q.   Did you ever follow up with Professor Reyes?

20      A.   No.

21      Q.   Okay.  And are you sure you forwarded it to

22  Academic Affairs?

23      A.   I think I did.  I'm not totally sure.  I think

24  I did, uh-huh.

25      Q.   But the logic that you explained is what

1  reminds you that you would have forwarded it to Academic

2  Affairs?

3      A.   It is an Academic Affairs issue, sure.

4      Q.   Okay.  And so has Professor Reyes reached out

5  to you about other matters?

6      A.   I have that in a number of emails from

7  Professor Reyes over the years.

8      Q.   Do you know how long Professor Reyes has been

9  in the -- was a professor in the FAMU College of Law?

10     A.   I don't know the exact time frame, no.

11     Q.   But you have a document there that says that

12  she received tenure in 2015?

13     A.   I guess that is the case, so yeah.

14     Q.   And so if from 2015 -- and if tenure would be

15  awarded -- in her sixth year she would be awarded

16  tenure?

17     A.   Uh-huh.

18     Q.   And we subtract from 2015 those six years, what

19  year would that be that she had started?

20     A.   2009 time frame or something like that.

21     Q.   Okay.  And from 2009 until 2024 that she was

22  still in the law school, how long would that be?

23     A.   It's like 15 years.

24     Q.   So over 15 years you have gotten some emails

25  from Professor Reyes?

1      A.   Yes, I have.

2      Q.   Do you remember when the first email was?

3      A.   No, I don't.

4           (Exhibit Number 20 was marked for

5      identification.)

6      Q.   I'm going to give you what has been marked as

7   Exhibit Number 20.  And I'm going to ask you to describe

8   the document by how many page numbers first.  How many

9   pages do you have, to make sure you have all the pages?

10     A.   I have four pages.

11     Q.   And do they have the pages at the bottom?

12     A.   Page numbers are at the bottom, yes.

13     Q.   Okay.  So let's go to page 4.  What do you have

14  at page 4?

15     A.   It's "Maritza Reyes, Associate Professor of

16  Law, Florida A&M University College of Law," per the

17  phone number.

18     Q.   So does that look like a signature line for

19  Maritza Reyes at the end of an email?

20     A.   A signature file, it does, uh-huh.

21     Q.   So let's go to page 3.

22     A.   Okay.

23     Q.   And so reading again from the bottom, and I'm

24  asking you to do it like that because with the emails,

25  the way they print is the oldest one is usually on the

1    bottom.  So here, reading from the bottom of page 3.

2        A.    Okay.

3        Q.    Who sends the email and to whom and what date?

4        A.    This email came from Maritza Reyes to Larry

5    Robinson, Request for Appointment by Faculty Member.

6        Q.    And the date?

7        A.    June the 19th, 2013, at 7:54 p.m.

8        Q.    And in that date, Dr. Robinson, what would be

9    your title at FAMU?

10       A.    During that period I was the interim president.

11       Q.    Okay.  And so let's read that email.  That's a

12   very brief email.  What does it say?

13       A.    "Dear President Robinson, We met briefly when

14   we were introduced by Dr. Humphries during the recent

15   College of Law Hooding Ceremony.  At that time I asked

16   if it is possible for faculty to set up appointments to

17   meet with you and you responded in the positive.  I now

18   write to request an appointment sometime in mid or late

19   July.  I will be traveling from Orlando or from Miami

20   for the appointment.  I look forward to hearing from you

21   and scheduling an appointment at your earliest

22   convenience."

23       Q.    And what is the end of that email?

24       A.    "Thank you."

25       Q.    Okay.  And so did you respond to that email?

1  Is there a response above that?

2      A.    Yes.  That day June 19th, 2013 at 9:09 p.m.  An

3  email from Larry Robinson to Maritza Reyes cc'ing Ora

4  Mukes with the subject:  Request for Appointment by

5  Faculty Member reads "Please contact Ms. Mukes about a

6  date and time.  Larry Robinson."

7      Q.    And who is Ora Mukes?

8      A.    She was my administrative assistant at the

9  time.

10     Q.    So she would have been the one doing your

11 scheduling?

12     A.    Uh-huh.

13     Q.    Okay.  And so if you go to -- there's an email

14 above that, but it starts really on page 2, right, at

15 the bottom of page 2.  What does that email say?  From

16 who to who, what date?

17     A.    So there's an email from Maria Reyes to Larry

18 Robinson request --

19     Q.    Maria?

20     A.    Maritza Reyes to Larry Robinson, Request for

21 Appointment by Faculty Member dated Sunday, August the

22 4th, 2013, at 12:15 a.m.  "Dear President Robinson."

23     Q.    And the next page.

24     A.    "I cannot believe that it has become mission

25 impossible to -- to schedule an appointment with you

1   through your secretary.  I just learned that you will be

2   in the law school for orientation on Monday.

3   Unfortunately, I will not be there because I will be

4   presenting during a panel on Monday at the Southern

5   Association of Law Schools Conference in Palm Beach."

6       Q.   Next paragraph, please.

7       A.   "It may be easier to schedule an appointment

8   directly.  If you can do this, please call me on my cell

9   phone at" --

10      Q.   And we don't have to state the phone because I

11  have the same reservations as you do for privacy.

12      A.   "I never heard about the proposed date that I

13  have submitted to your secretary and right now with the

14  conference and the beginning of the school year, I would

15  not be able to drive to Tallahassee until after the

16  middle of August.  However, as I mentioned before, if

17  you plan to be in the Central Florida area in the near

18  future, please let me know and maybe we can set up an

19  appointment -- set up an appointment while you are here.

20  Thank you, Maritza Reyes."

21      Q.   Okay.  And so let's now go to page 2.  And was

22  there a response from you?

23      A.   I -- I don't know, but I'll --

24      Q.   On page 2 above the one that you just read, is

25  there a response from Larry Robinson?  Right above the

1  Reyes, Maritza message that you just read.

2      A.   Oh, it reads from me, Larry Robinson, to

3  Maritza Reyes, cc'ing Ora Mukes.  Title being Request

4  for Appointment by Faculty Member.  And I wrote "You

5  were a no-show at a previously scheduled meeting.  Safe

6  travels.  Larry Robinson."

7      Q.   And what is the email above that?

8      A.   It's an email from Maritza Reyes and on the

9  23rd of July, 2013 at 4:29 p.m.  To Ora S. Mukes,

10 Request for Appointment by Faculty Member.

11     Q.   Please read it.

12     A.   It reads, "Ms. Mukes, I do not understand.

13 I never received notice that an appointment had been

14 scheduled.  Please make sure and let President Robinson

15 know that I am not rescheduling an appointment.  I am

16 still trying to schedule it for the first time.

17          I have to attend a conference during the week

18 of August the 5th and classes begin during the week of

19 August the 12th, so I have a tight schedule during the

20 first two weeks in August.  This is why I requested an

21 appointment in July, but I never received a response to

22 my proposed dates.

23          Does President Robinson plan to travel -- to

24 visit the Central Florida area during fall 2013?

25 Otherwise, is he available for an appointment in

1  Tallahassee on Friday, August 16th or Friday, August

2  the 23rd.  Thank you for your assistance.  Professor

3  Reyes."

4      Q.   Okay.  And so let's go now to -- there is an

5  email right above that, but it really begins at the

6  bottom of page 1; right?  And so on that bottom of

7  page 1, what is that email from/to?

8      A.   So that's one from Ms. Ora S. Mukes to

9  Maritza Reyes.

10     Q.   No, the one right under that.

11     A.   It says, "Please check" --

12     Q.   No, right under that.  The email right here

13  that begins there.

14     A.   Oh, from Maritza Reyes on Sunday, October 4th,

15  2013 at eleven --

16     Q.   August the 4th or October the 4th?

17     A.   I keep getting those two months mixed up.

18  August the 4th, 2013, 11:46 a.m. to Larry Robinson

19  cc'ing Ms. Mukes.  Request for Appointment by Faculty

20  Member.  Would you like me to read it?

21     Q.   Please read it, yes.

22     A.   "I never received notice of a previously

23  scheduled meeting and I continue to write to you

24  directly because I sensed that you may be getting

25  different information than I have received about the

1 scheduling of our meeting.  Below is the last email I

2 sent to Ms. Mukes asking her to make sure and make you

3 aware that I had received no notice of any appointment.

4 The process of scheduling the appointment has been

5 disconcerting and frustrating.  I have all the emails.

6 Here is my last email to Ms. Mukes to which I have not

7 received a response."

8     Q.    Okay.  And now we can go back to page 1 and

9 read above the one that you started reading from

10 Ms. Mukes and to who is it?

11     A.    It's from -- wait a minute.  Okay.  Yeah, it's

12 from Ms. Ora S. Mukes on 8/5th -- 8/5/2013 at 9:11 a.m.

13 to Maritza Reyes.  Request for Appointment by Faculty

14 Member.  And it reads, "Please check your email because

15 I did give you a date and time."

16     Q.    And above that, the email, who is it from and

17 to.  And we know that it's the same subject line, so --

18 but what is the next email?

19     A.    From Maritza Reyes to -- August the 5th, 2013,

20 9:31 a.m. to Ms. Ora S. Mukes.

21     Q.    And please read what it says.

22     A.    "Hello Ms. Mukes, As I asked you before, please

23 forward that email to me to see when you sent it and why

24 it is not in my email.  I asked you this in a prior

25 email, but I did not get a response.  Did you wonder why

1  I never confirmed?  It was because I did not receive any

2  such email.  Please forward it to me from your sent

3  folder so I can ask the IT guys to check into why I did

4  not receive it."

5       Q.   And how does it end?

6       A.   "Thank you.  Professor Reyes."

7       Q.   And then the top in response to that, what does

8  Ms. Mukes respond to Professor Reyes?  Read that,

9  please.

10       A.   August the 5th, 2013, at 10:05 a.m.  It reads

11  "Ms. Reyes, currently that is not the issue, but I will

12  again make another appointment for the month of

13  September.  September 11th through the 13th is not

14  available and I will work with you to set up an

15  appointment for you to see Dr. Robinson."

16       Q.   Okay.  And above that, what does Maritza Reyes

17  respond to Ora Mukes on Tuesday, August 6th, 2020 -- I

18  mean 2013?

19       A.   "Ms. Mukes, I respectfully disagree and believe

20  that your last notification of the prior appointment is

21  still an issue.  I once again request that you forward

22  to me the email where you confirmed the appointment.  I

23  do not appreciate that President Robinson thinks that I

24  did not keep an appointment and you keep insisting that

25  you sent me an email notifying me of the appointment,

1    which I never received.  I need to check with IT as to

2    why such an important email did not make it to my inbox.

3    I hope that you -- that we will finally be able to

4    schedule an appointment and this time please request

5    confirmation from me -- excuse me -- via email about the

6    appointment date and time so both sides will have

7    confirmation of the appointment.  Thank you.

8    Professor Reyes."

9        Q.    Okay.  Were you copied in that email to

10   Ms. Mukes?

11       A.    No, I was not.

12       Q.    And were you copied in the email below to

13   Ms. Mukes?

14       A.    No, I was not.

15       Q.    Okay.  So Professor Reyes did not copy you in

16   either email when she is discussing with Ms. Mukes her

17   concern about President Robinson thinking that she

18   didn't show up to an appointment with him?

19       A.    So October --

20       Q.    October?

21       A.    -- 6th -- on August the 6th, the email you sent

22   to Ms. Mukes does not include me as a cc.  On August

23   the 5th, the email that you sent to Ms. Mukes -- that

24   she sent to you did not include me as a cc.  And the

25   email that she sent to you on August the 5th did not

1   include me as a cc.

2       Q.   Okay.  So do you recall this happening that

3   Professor Reyes was coming to Tallahassee to meet with

4   you?

5       A.   Vaguely.  I think that has been nine years --

6   well, eleven years.

7       Q.   Yeah.  And twelve.  2013 -- well, no, we're at

8   2023, right.  You're better at the math than I am.  So

9   at that point in 2013, if Professor Reyes started

10  working at the FAMU College of Law in 2009, would she be

11  considered an academia -- and she started as an

12  assistant professor, would she be considered a junior

13  faculty member or a senior faculty member?

14      A.   She would be considered an assistant professor;

15  right?  And I never used the terminology junior versus

16  senior.

17      Q.   Okay.

18      A.   But I think your title then was assistant

19  professor versus associate versus full.  I try to stick

20  with those titles.

21      Q.   And do you understand the concern of an

22  assistant professor thinking that the president of the

23  university thinks that she missed an appointment?

24      A.   I can understand that, yeah.

25      Q.   Okay.  So that's the first communication, it

1  seems, from Professor Reyes from an introduction from

2  Dr. Humphries when you were in person at the College of

3  Law Hooding Ceremony?

4      A.    Apparently, yes.

5      Q.    Who is Dr. Humphries?

6      A.    Dr. Humphries was a former president of Florida

7  A&M University.  The person responsible for me coming to

8  the university, by the way.  And I think one of our

9  greatest leaders ever at the institution.  And a great

10  person on top of all of that.

11      Q.    When was the last time you saw Professor Reyes

12  in person before today?

13      A.    I can't recall.

14      Q.    Do you recall our brief conversation in the

15  hallway just now before we came to the -- from lunch?

16      A.    I had a brief conversation where you introduced

17  me to your mother before we went to lunch.

18      Q.    Oh, well, actually you said, "oh, is that your

19  mom?"  Did you say, "Is that your mom?"

20      A.    Uh-huh.

21      Q.    Then you came to, which I appreciated.

22  Although she was a little bit taken aback, to tell you

23  the truth, you know, given the circumstances like you

24  said.  And I know we're going into a little bit of

25  conversation right now, I'm not asking a question

1  because I think that, you know, the fact that I am a

2  plaintiff but we were working together and talking about

3  these situations.

4         So when was the last time when we had that

5  conversation that I mentioned that I had seen you in

6  person?

7      A.   I think you said it was at Dr. Humphries'

8  funeral.

9      Q.   And so was there a funeral ceremony or

10 celebration of his life in Tallahassee?

11     A.   Yes, there was.

12     Q.   Okay.  And how many faculty members from the

13 college of law do you recall seeing there?

14     A.   I don't recall.

15     Q.   Do you recall seeing Professor Reyes?

16     A.   I don't recall seeing you there, but now that

17 you reminded me.  But I don't recall.

18     Q.   Do you recall that -- where you were standing

19 with your wife at the end of the funeral?

20         MS. REINER:  I'm going to object based on

21      relevance.

22     A.   I don't.

23         MS. REYES:  Relevance is not an objection

24      during depositions you know.

25         MS. REINER:  Yes.

1      MS. REYES:  So if you object to form, object to

2    form.  But relevance is not an objection.  So please

3    do not get argumentative.

4      MS. REINER:  Object to form.  Relevance.

5    Foundation.

6    Q.   So do you recall where you were with your wife

7  at the end of the ceremony?

8    A.   I don't recall.

9    Q.   Okay.  Would you say that a faculty member

10  traveling to the university in Tallahassee to pay

11  respect to somebody like Dr. Humphries would be part of

12  the "excellence with caring" motto?

13    A.   Yes.

14    Q.   And at FAMU, for the people who don't know

15  FAMU, would that be relevant, "excellence with caring"?

16    A.   That's our motto.

17    Q.   Yes.

18    A.   And it's not just a motto, it's how we operate,

19  yes.

20    Q.   Try to show caring with excellence?

21    A.   Uh-huh.

22    Q.   So now I'm going to show you what has been

23  marked as -- I believe it's going to be Exhibit 20?

24      THE COURT REPORTER:  One.

25    Q.   21.

1          (Exhibit Number 21 was marked for

2      identification.)

3      Q.    And this is a composite exhibit.  And by

4   composite, I mean more than one email.  And you'll see

5   by the number of pages where it's a little different

6   than the other ones that we have seen where we have

7   page 1, page 2, page 3, page 4.  So go to the last page.

8   And on that last page is the first email.  What date

9   does it have?

10     A.    January the 24th at -- 2017 and 8:07 a.m.

11     Q.    Okay.  And then go two pages before that on

12  page 1.  What date does that email have?

13     A.    Is this right?

14     Q.    Yes.

15     A.    Okay.  There are two.

16     Q.    The one at the top.

17     A.    Thursday, January the 19th, 2017, at 10:05 a.m.

18     Q.    Okay.  And then on page 1, what do you have on

19  that exhibit?

20     A.    This page?

21     Q.    At the top, what date?

22     A.    Thursday, January the 5th, 2017, at 5:49 p.m.

23     Q.    Okay.  And why I'm bringing up the dates in

24  that way is because in all the emails we've been doing

25  and looking at today, they started from the earlier date

1   on the bottom -- I mean, I should say -- yeah, the

2   earlier date on the bottom to the most current date at

3   the top.  But in this one we are starting with the

4   oldest date first, which would be January 5; okay?  So

5   the first page right there.

6          So on that first page of January 5, who is that

7   email from and to?

8      A.    The email is from Maritza Reyes to Rodner

9   Wright and cc's Larry Robinson.

10     Q.    And what is the subject?

11     A.    Request for 10.206(8) Step Two Review of my

12  Complaint submitted on 11/18/16.  And with a title of a

13  file underneath there.  I guess that's an attachment.

14     Q.    Uh-huh.  And what is the attachment titled?

15     A.    Prof. Reyes request 10.206 Step Two Review.pdf.

16     Q.    And what is 10.206?  What is that regulation

17  about?  I think you mentioned it earlier today.

18     A.    Yeah, I think it's about complaints regarding

19  abuse or, you know, noncompliance and things of that

20  nature, so --.

21     Q.    Abuse?

22     A.    That's my recollection.  I could be wrong.

23     Q.    Okay.  So let's put down 10.206.  So when you

24  read that email, if you go to Paragraph 4 where it

25  starts "On December 6, 2016," please read that.

1     A.    "On December the 6th, 2016, Interim President

2  Robinson, through the FAMU Office of the General

3  Counsel, provided a decision via email refusing to

4  provide the Step One meeting provided by the Regulation.

5  You were copied in that email."

6     Q.    Next paragraph, please?

7     A.    "In overabundance of caution, I write -- now

8  write to you to request the Step Two review provided by

9  subsection (8) of the Regulation.  I understand that

10  other college of law professors have received the

11  benefit of the process provided."

12     Q.    Next paragraph, please.

13     A.    "I do not agree with the decision not to

14  provide the Step One meeting provided in the Regulation.

15  However, I do not want it to be said that I did not

16  exhaust the procedures of Regulation 10.206.  This is

17  why I'm requesting a Step Two review of my Complaint and

18  the decision not to provide a Step One meeting."

19     Q.    Next, please.

20     A.    "I respectfully request that decisions be

21  provided in a formal writing (a memorandum or a

22  letter)."

23     Q.    Okay.

24     A.    "Best, Maritza Reyes."

25     Q.    And so do you know -- does this remind you

1   about what that Step Two complaint or that 10.206

2   complaint was about?

3       A.   I think it was a whistleblower complaint.

4       Q.   Okay.  What was it blowing the whistle on?

5       A.   I don't recall now.

6       Q.   But when Professor Reyes is writing this to

7   Provost Rodner Wright at the time, is she copying you?

8   At the top of the email, are you copied?

9       A.   On this email, yes.

10      Q.   So she copied you when she was saying this

11  about the 10.206; right?

12      A.   Yes.

13      Q.   And in the next email, which is the next page,

14  what is that?  From who to who and who's copied and

15  what's the date, please?

16      A.   It's from Maritza Reyes on Thursday,

17  January the 19th, 2017, at 10:05 a.m. to Larry Robinson

18  and Rodner Wright and Shira Thomas for the

19  Whistleblower's Act Report Re:  Request for 10.206

20  Section (8) Step Two Review of my Complaint submitted

21  11/18/16.

22      Q.   Okay.  And so that is a short email.  If you

23  could read that, please.

24      A.   "Interim President Robinson, Provost Wright,

25  and Acting General Counsel Thomas.  I followed the

1   procedure outlined in Regulation 10.206 for submission

2   of my complaint.  I requested Step One and Step Two

3   reviews of my complaint, but have not received the

4   procedure outlined in the regulation.

5          I now write to blow the whistle on the

6   administration's failure to follow FAMU's regulation.

7   I am submitting this report under Florida's

8   Whistleblower Act.  Please let me know how I need to

9   proceed.  Thank you."

10      Q.   And were you copied in that email?

11      A.   The email was directed to me, yes.

12      Q.   Okay.  And so let's go to the last page of

13   that.

14      A.   Okay.

15      Q.   Who is that email from and to?

16      A.   This email is from Richard Givens on

17   January the 24th, 2017, at 8:07 a.m. to Maritza Reyes

18   with the subject matter:  Whistleblowing allegation.

19      Q.   And what is the message there?  What does it

20   say?

21      A.   "Professor Reyes, Your complaint sent to

22   Dr. Robinson regarding the administration's failure to

23   follow university regulations has been referred to my

24   office to determine whether your complaint meets the

25   requirements for whistleblower status.  Please provide a

1  summary of your complaint and supporting documentation

2  to assist us in making the determination."

3      Q.    And who signed it?

4      A.    Rick Givens.

5      Q.    And who is Rick Givens?

6      A.    At the time he was the vice president for audit

7  and compliance.

8      Q.    And why, do you recollect, if you denied, like

9  as Professor Reyes is saying here, that step 10.206

10  complaint process?

11     A.    I don't recall that.  But I do recall like this

12  and other matters where things as whistleblower waste,

13  fraud, and abuse are identified forwarding these to the

14  appropriate authorities on campus, as obviously this

15  happened with Mr. Givens, yes.

16     Q.    Okay.  And so you forwarded it to Mr. Givens?

17     A.    Uh-huh.

18     Q.    Okay.

19          (Exhibit Number 22 was marked for

20      identification.)

21     Q.    I'm going to show you what's been marked as

22  Exhibit 22.

23          MS. REYES:  Can you reach it?  Okay.

24     Q.    Would you please tell us at the top what does

25  it say -- who is it from, to, date, and the subject?

1      A.    It is from Maritza Reyes on March the 2nd,

2    2017, 11:28 a.m. to Larry Robinson.  Subject:  Academic

3    Mobbing - Bullying - Hazing.

4      Q.    And how is it marked in terms of importance?

5      A.    High.

6      Q.    And please read what it says.

7      A.    "President Robinson, I hope you are well.

8    I write to you because I am being systematically mobbed.

9    I have tried to get help at the law school level, the

10   dean level, the provost level, the EOP level, the DAC

11   level, and nothing has been done to help me.

12         Here is the -- an article that describes what I

13   have experienced and continue to experience - an

14   'academic mobbing.'"  And here you have, I guess, a link

15   to a story.

16     Q.    And can you read that link?

17     A.    Http://www.universityaffairs.ca/opinion/in-my-

18   opinion/academic-mobbing-become --

19   academic-mobbing-become-campus-tormentors.

20     Q.    Okay.  Please keep reading.

21     A.    "Forwarding this request to you -- to your

22   selected interim provost, Rodner Wright, will not work.

23   I have already reached out to him after the latest

24   incident -- incident, being removed from the Student

25   Disciplinary Committee after its chair, Professor

1  Jennifer Smith, asked her personal friend and ally, Dean

2  Felecia Epps, to remove me.  Dean Epps removed me

3  without even talking to me before reaching her decision.

4  There is a lot more than this.

5         This is not the first time that I've been

6  excluded, including through faculty and administrative

7  actions.  I am constantly publicly humiliated in front

8  of my peers.  I am undermined in faculty-student

9  interactions.  The bullying and mobbing -- and mobbing

10  are pervasive."

11     Q.   Keep going, please.

12     A.   "It is my faith in a loving God, the support of

13  family and friends, the inspiration of serving my

14  students, my legal training, and my firm identify that

15  help me to remain whole and strong in my principles and

16  convictions.  I do not allow the bullying and mobbing to

17  define me.  I do not internalize it.  I now research on

18  workplace bullying and mobbing.  And I aim to help

19  others.  All this said, the bullying and mobbing are

20  hurtful.

21         Abuse should not be tolerated by the

22  university, a state institution.  State employees should

23  not be empowered to use institutional processes to bully

24  and mob a fellow employee.  I should not be forced to

25  endure bullying and mobbing as conditions of my

1  employment.

2         You lived through the hazing scandal.  You must

3  have learned a lot in that process.  What if Robert

4  Champion had reached out directly to you for help and

5  told you that he was being hazed?  What would you have

6  done?

7         I'm now reaching out to you for help to tell

8  you that I am being bullied and mobbed.  What will you

9  do?

10        I look forward to a prompt and humane response.

11 Best, Maritza Reyes, J.D., Associate Professor of Law at

12 the college of law."

13    Q.   Okay.  And do you recall, Dr. Robinson, getting

14 this email?

15    A.   Yes, uh-huh.

16    Q.   Do you recall if you had any reaction to the

17 email?

18    A.   Yeah.  As I would -- you asked what I would

19 have or wouldn't have done in Robert Champion, the same

20 thing I did here is to forward this to the appropriate

21 parties to review.

22    Q.   Okay.  And who did you forward -- who would you

23 have forwarded it to?

24    A.    In this particular case it would have very

25 likely, and I don't know the particulars, it would have

1  gone to legal counsel, it would have gone to EEOC, which

2  is in the legal office, and so forth, as well as the VP

3  for Audit and Compliance.

4        Q.   And -- okay.  Mark this exhibit, please.

5             (Exhibit Number 23 was marked for

6        identification.)

7        Q.   I'm going to give you Exhibit 23.  Do you see

8  that at the top email -- the top email on this is a

9  reply to Professor Reyes's email that you just read?

10       A.   That's correct.

11       Q.   Okay.  And so what was your reply from who and

12 to what did you do with the email?

13       A.   So this is from Larry Robinson, Thursday,

14 March the 2nd, 2017, at 1:07 p.m. to Professor -- to

15 Maritza Reyes and Ms. Carrie Gavin.  Subject:  Academic

16 Mobbing, Bullying, and Hazing.

17       Q.   And what did you say in that email?

18       A.   "Profess Reyes, I am forwarding your email to

19 Ms. Carrie Gavin, EEO Director, for review and to

20 determine what actions are needed."

21       Q.   Okay.

22            (Exhibit Number 24 was marked for

23       identification.)

24       Q.   I'm going to give you now what's been marked as

25 Exhibit 24.  Who is that email from/to?

1     A.   This is from Maritza Reyes to Larry Robinson on

2   March the 2nd, 2017, at 3:17 p.m.

3     Q.   Okay.  And if you go through that email, how

4   many pages is it?

5     A.   Well, the document that you provided me, I

6   don't know if it is one continuous email or not.  It

7   has --

8     Q.   Does it have page numbers at the bottom?

9     A.   It's four pages.

10     Q.   Does it have page numbers on the bottom?

11     A.   Uh-huh.

12     Q.   Okay.  So on the page 4.  Does it have anything

13   on page 4 really?

14     A.   It has Associate Professor of Law, College of

15   Law.

16     Q.   And what does it have on page 3?  Is that the

17   email you read before?

18     A.   It appears to be, yes.

19     Q.   Okay.  And what does it have on page 2, at the

20   bottom of page 2?  Is that your reply that you went over

21   just now?

22     A.   Uh-huh.

23     Q.   Okay.  So let's go to page 1.  And so what does

24   Professor Reyes reply to you after you stated that you

25   were forwarding your email to Ms. Carrie Gavin, the EEO

1  Director?  Please read that?

2      A.   So this was from Maritza Reyes to Larry

3  Robinson on March the 2nd, 2017 at 3:17 p.m. to Larry

4  Robinson.  "President Robinson, Please note that when I

5  reached out to you today, I did not do it as a

6  regulation 10.103 Complaint.

7          I would have submitted a regulation 10.103

8  Complaint to Carrie Gavin, Director of Equal Opportunity

9  Program and Labor Relations.  But that is not what I am

10  doing.  I am trying to get help directly from you and

11  your office.

12          Ms. Gavin already reviewed a Regulation 10.103

13  complaint I submitted to her after the mayhem in my

14  tenure process.  I provided a detail -- a detailed

15  summary of all the violations of the rules in my tenure

16  process.  A faculty member who participated in the

17  closed, secret RPT Committee meetings called what was

18  done to me as -- to what -- to what was done to me what

19  it was, malicious, racist" --

20      Q.   I'm sorry, is there a quote in that?

21      A.   Yeah.

22      Q.   Please read the quote.

23      A.   "Malicious, racist, vile, end quote.

24  Ms. Gavin's investigation and report did not help me.

25  She did not recommend any discipline for any of the many

1   violations of my tenure process.

2          Instead, in a related EOP investigation, during

3   my tenure process, Ms. Gavin recommended that the

4   faculty member who tried to defend my tenure process be

5   disciplined after one of the womens who -- women who

6   torments me, Lundy Langston, filed a complaint against

7   her for stating" --

8       Q.   Against her?

9       A.   That's what it says -- against him, I'm sorry.

10  -- "against him for stating the obvious - his informed

11  opinion that what they were doing to me was malicious,

12  racist, and vile."

13      Q.   And are there quotes around that language?

14      A.   Yes, it is.

15      Q.   Okay.  Please continue.

16      A.   "Langston disseminated her complaint against

17  him, with false allegations about me, throughout all

18  levels where my application for tenure was going to be

19  reviewed.  This was in clear violation of the EOP

20  procedure and the tenure process.  I did not even know

21  this was happening.  It has been so ugly.

22          After my tenure process in fall 2015, I went on

23  a one-semester visit to UF Law.  I drove from

24  Gainesville to Tallahassee to meet with Provost Marcella

25  David to ask her for help.  Based on what my tormentors

1  had already done, I knew they were going to continue to

2  escalate the hostilities when I returned with tenure.  I

3  knew that their ploys were now going to require setting

4  me up for a quote, just cause dismissal.  I asked

5  Provost David to come up with an individualized plan to

6  help me.  She did not.

7          The mobbing continued.  Toward the end of the

8  semester when I was away, fall 2015, one of my

9  tormentors, Professor Patricia Broussard, filed a

10  frivolous, malicious, and false Regulation 10.103

11  complaint against me.  During that investigation, I

12  substantiated that Professor Broussard's legal charge in

13  the complaint was false and without any basis in fact of

14  law.  I asked Ms. Gavin to recommend discipline against

15  Professor Broussard under Regulation 10.103(d) for

16  filing a false complaint and knowingly providing false

17  testimony, but Ms. Gavin did not recommend that

18  Professor Broussard be disciplined.

19          Then, Shashi Persaud, the IT/security officer,

20  who is involved in the faculty politics (like his dad,

21  Narayan Persaud), filed a Regulation 10.103 Complaint

22  against me.  Shashi's complaint piggybacked on

23  Broussard's complaint.  Again, I asked Ms. Gavin to

24  recommend discipline under Regulation 10.103(d) for

25  filing a false complaint and knowingly providing false

1  testimony, but Ms. Gavin did not recommend that Shashi

2  Persaud be disciplined."

3          You want me to continue?

4      Q.   Yes, please.

5      A.   "So you see, the EOP process has been used to

6  bully me and mob me.  The EOP has empowered the mobbing

7  to continue.  My tormentors file all kinds of false

8  charges against me that they do not substantiate and

9  they suffer no consequences.  This is part of the

10  systematic nature of mobbing I am going through.  When I

11  ask for help, I get mobbed again.

12          During my tenure process I reached out to

13  Interim Provost Wright.  When I found out that he was

14  part of the derailment of my process.  He is the one who

15  gave approval to stop my process, which would have meant

16  the denial of tenure without review of the merits of my

17  application.  Provost Wright did this over an

18  unsubstantiated allegation by then Associate Dean Joan

19  Bullock, another of my tormentors that I submitted my

20  application at 5:04 p.m. (instead of 5:00 p.m.)  It was

21  a setup.  Provost Wright did not provide me with any due

22  process.  He never contacted me to get my side of the

23  story before he ordered my tenure process be stopped.

24  He only responded after my attorney contacted him.

25          Dean Epps has participated in the mobbing since

1    she arrived in spring 2016, paren, when I returned from

2    the UF -- from UF Law.  I am wondering whether she was

3    tasked with creating the record of just cause required

4    for my dismissal now that I am tenured.  She has

5    violated my rights to due process and has soiled my

6    personnel file with false conclusions based on more

7    false complaints that she refused to provide to me.  As

8    you know, Provost Wright and you have refused to review

9    my Regulation 10.203" --

10        Q.    I'm sorry?

11        A.    -- "206 complaint in this regard.  The Division

12   of Audit and Compliance has also refused to investigate

13   the failure to comply with FAMU's Regulation 10.206.  I

14   am wondering if my only recourse is to get help is

15   outside of FAMU.

16        Have you watched The Quad on BET?  I feel like

17   I'm living in a similar miniseries where anything can be

18   done to me, but this is my reality, it is not fiction.

19        Your office, the President's office, needs to

20   help me come up with an individualized plan to stop the

21   bullying and mobbing I am being subjected to as part of

22   the everyday conditions of my employment.  Please do not

23   pass this request for assistance to anyone else.  Please

24   do not 'pass the buck.'  Thank you.  Maritza Reyes J.D.,

25   Associate Professor of Law."

1      Q.    Do you recall getting this email?

2      A.    I don't recall this specifically, right.

3      Q.    But if you had gotten an email like this from a

4   faculty member who signs it as associate professor of

5   law, what do you think you would have done?

6      A.    Well, what I would typically do is refer this

7   to the people at the university whose job it is to

8   review or investigate these matters.

9      Q.    But if the faculty member is saying to you,

10  because you -- did you -- now, do you understand from

11  this email what Professor Reyes's 10.206 complaint was

12  about?

13     A.    I understand from her perspective it is about

14  the things that were happening at the law school.

15     Q.    And specifically in the paragraph where she

16  said that it was -- let's see what paragraph.  The one

17  about then Dean Felecia Epps.  The paragraph on page 2

18  that begins with "Dean Epps" where she said --

19     A.    Uh-huh.

20     Q.    -- that she had soiled her reputation, that she

21  had violated her rights to due process, that she was

22  joining in the mobbing and that you and Provost Wright

23  have refused to process a 10.206 complaint that she

24  filed against Felecia Epps and that the Division of

25  Audit and Compliance had also failed to investigate the

1  failure to comply with that FAMU Regulation 10.206.  Do
2  you now understand what that was about?
3      A.   I understand what's in this letter, okay, and
4  that's the extent of my understanding in terms of what
5  happened.  But once again, my job as president is to
6  make sure these kinds of complaints get to the right
7  people in the university environment to handle.
8      Q.   So if Robert Champion, because that was
9  something that was asked in the letter, had reached out
10  to you and said, "I'm being hazed, please help me," what
11  would you have done?  Would you have referred it?
12      A.   Yes.  Uh-huh.  To someone to do an
13  investigation because, you know, I just can't assume
14  Mr. Champion was being hazed until someone independently
15  helped to determine that; right?
16      Q.   And would you have followed up to see what
17  happened?
18      A.   Through the processes that I just identified,
19  yes.
20      Q.   Did you follow up to see what happened with
21  Professor Reyes?
22      A.   I believe I was kept in the loop of what
23  happened in all of these cases.  But I don't know the
24  specifics or the timeline and so forth.
25      Q.   Did you ever follow up with Professor Reyes?

 1     A.   I don't think I talked to Professor Reyes about

 2  these matters because, you know, I've got so many emails

 3  from Professor Reyes, I felt like I was on The Quad in

 4  terms of the number of things that she reported.

 5     Q.   How many emails do you think you have gotten

 6  from Professor Reyes?

 7     A.   I don't know exactly.

 8     Q.   Did you ever speak with Professor Reyes?

 9     A.   Yes, we have spoken before.

10     Q.   About any of the emails that she sent you

11  asking for help?

12     A.   I don't recall.

13     Q.   Okay.  And when you say about the law school,

14  and you referred Professor Reyes to Carrie Gavin; right?

15  And she would have been the equal opportunity program's

16  person?

17     A.   Yeah.  And she's -- also at that time she was

18  in the legal counsel office, I believe.  The Office of

19  Legal Counsel.

20     Q.   Okay.  I'm going to mark this, please.  I'm

21  going to mark this as Exhibit 25.

22          (Exhibit Number 25 was marked for

23     identification.)

24     Q.   Dr. Robinson, what is the first page of that

25  document at the top?  How would you describe this?

1      A.   It says University -- United States District

2   Court Middle District of Florida Orlando Division, Jane

3   Doe, Plaintiff versus the Board of Trustees Florida A&M

4   University.

5      Q.   Okay.  And how many pages is this document by

6   going by the number of pages on the bottom?

7      A.   17.

8      Q.   Okay.  And before we move on to -- for me to

9   ask you if you understand or know what this document is

10  about, why is it that when somebody sues FAMU, they sue

11  the Board of Trustees of Florida A&M University?

12     A.   Because they are the body of record for the

13  institution, yeah.

14     Q.   So when individuals do things that harm, FAMU

15  has to answer for them?

16     A.   That's correct.

17     Q.   But it's the only way for people who are harmed

18  to be able to file a lawsuit because it has to be

19  against the FAMU Board of Trustees?

20     A.   I don't know if it has to be, but that's

21  typically what happens; okay?  I mean you can sue

22  anybody at any time --

23     Q.   Well, yes.

24     A.   -- in America.

25     Q.   But if it's for a violation that happened in

1  the university.

2      A.   Yes, this is typically the Board of Trustees.

3      Q.   So that's why we have these lawsuits against

4  FAMU.  So let's go to -- in this order.  Are you

5  familiar with this case of Jane Doe v. FAMU Board of

6  Trustees?

7      A.   No, I am not.

8      Q.   Do you know that it was a case -- do you know

9  if it was a case from the law school?

10     A.   I don't.  I'm not familiar with the case.

11     Q.   Okay.  So let's go to page 2, right, on Roman

12  numeral I where it says Background.  What does the first

13  sentence say?

14     A.   "This case is about whether FAMU is liable for

15  the sexual harassment and assault plaintiff suffers at

16  the hands of one of its admissions coordinators, Orenn

17  Fells."

18     Q.   Okay.  And the next line, please.

19     A.   "Plaintiff was an aspiring FAMU law student."

20  Do you want me to read --

21     Q.   That's, I think, sufficient in terms of -- so

22  they describe the plaintiff as a FAMU law student;

23  correct?

24     A.   That's correct.

25     Q.   Okay.  And so let's go to page 3.

1    A.   "As an aspiring law student," so I don't know

2  if she was admitted or not, so --.

3    Q.   So would it be something to do with the college

4  of law?

5    A.   Well, that's the only place we have a law

6  school.

7    Q.   Uh-huh.

8    A.   But they could have been trying to get into the

9  prelaw program or whatever, I just don't know the

10  details.

11    Q.   But it would have been which college?

12    A.   So in the College of Social Sciences, Arts, and

13  Humanities now that we have, you know, a prelaw degree

14  program and it's part of the law school somehow.

15    Q.   Okay.  So maybe we need to read a little bit

16  more to find out if it was specifically at the law

17  school.  So go to page 3.  And in that middle paragraph

18  there where it says "feeling anxious," please read that

19  line.

20    A.   "Feeling anxious and overwhelmed by the assault

21  and Fells' continued harassment, plaintiff met with the

22  Director of Student Affairs Garry Harrington on December

23  the 4th, 2017, seeking a referral to counseling services

24  at the law school."

25    Q.   So are we clear -- are you clear where it was

1    that it was happening as it states it in the order?

2        A.   Law school, uh-huh.

3        Q.   Okay.  Do you know who Garry Harrington is?

4        A.   No, I don't.

5        Q.   Okay.  And so go to the next paragraph, please

6    and read the first sentence there.

7        A.   "Harrington immediately contacted his

8    supervisor Dean Reginald Green and met with LeRoy

9    Pernell, the interim dean of the college of law.  He

10   also wrote a formal statement regarding plaintiff's

11   complaint -- complaint -- claims, which was forwarded to

12   the general counsel's office and to Carrie Gavin, the

13   school's Title IX Coordinator."

14       Q.   Let me stop you right there.  Do you know who

15   Dean Reginald Green is?

16       A.   Yes, I do.

17       Q.   And where is he a dean?

18       A.   He's an associate dean, I believe, at the

19   college of law.

20       Q.   And do you know who LeRoy Pernell is?

21       A.   He's a former dean, an interim dean of the FAMU

22   College of Law.

23       Q.   Okay.  So I'm not going to -- we're not going

24   to go over the entire document, but I will point you to

25   some discrete parts.  And so Carrie Gavin, the person to

1  whom the claim was forwarded, is that the same Carrie

2  Gavin to whom you forwarded --

3       A.    Yes.

4       Q.    -- my email?

5       A.    Yes, uh-huh.

6       Q.    Okay.  Go to page 5, please.  And on the last

7  paragraph at the bottom that starts with "upon."  What

8  does it say there?

9       A.    It says, "Upon conclusion of this cursory --

10 cursory investigation, Gavin found plaintiff's claims

11 were not substantiated.  Gavin offered no reasoning for

12 this finding.  See i.d. -- see id.  She summarizes

13 Fells' and plaintiff's diverging positions but made no

14 credible -- credible -- credibility determinations

15 despite gathering evidence, corroborating plaintiff's

16 statements and contradicting Fells.  Gavin quoted one

17 and only one witness" -- this is on page 6.

18      Q.    Uh-huh.

19      A.    -- "in summarizing evidence in the case, that

20 of Green, who says Fells is the least likely person I

21 would have thought would be accused of such

22 allegations."

23      Q.    Keep going, please:

24      A.    "Despite the unexplained weight Gavin seemed to

25 place in Green's opinion, it appears Gavin never

1  followed up with Green either; had she done so, it would

2  have revealed that during the investigation a student

3  came to Green with additional allegations of Fells'

4  impropriety - casting serious doubt on his character

5  assessment of Fells (as well as providing additional

6  evidence Gavin could have pursued.)  Green never told

7  the other student to contact Gavin regarding the

8  investigation or otherwise acted upon this complaint."

9      Q.    Okay.  So we're going to skip a little bit and

10  go to page 7.  And right above where it says Legal

11  Standards, that short paragraph there, what does it say?

12      A.    "So plaintiff sued FAMU under Title IX 42

13  U.S.C. 1983, and state law negligence.  (Doc. 56.) Both

14  parties now move for summary judgment.  Briefing

15  complete, this matter -- the matter is ripe."

16      Q.    Okay.  So plaintiff sued FAMU; right?

17      A.    Uh-huh.

18      Q.    But who did the actions that we're talking

19  about here?

20      A.    Who allegedly did the actions?

21      Q.    Yes.

22      A.    It was the gentleman whose name was called out

23  here.

24      Q.    Okay.  But FAMU has to respond for this --

25      A.    Yes.

 1        Q.   -- in court?

 2        A.   Uh-huh.

 3        Q.   Okay.  So let's go now to page 11, please.  The

 4    bottom paragraph.  Okay.  Well, actually go to the top

 5    paragraph on the third line.  After the parenthesis on

 6    the third line where it says "and while"?

 7             MS. REINER:  Where did you say?  I'm sorry.

 8        Q.   The third line from the top, so the right of

 9    the parentheses.

10        A.   Okay.  I see it, uh-huh.

11        Q.   Please read that.

12        A.   "And while the school began an

13    investigation" --

14        Q.   And I'm sorry, can you please read the

15    quotes -- in quotes?

16        A.   "And while the school began an investigation,

17    in quotes, into Fells within days, it was a sham that

18    ultimately resulted in Fells' exoneration.  The

19    investigation report is a mere six pages and focuses

20    only on one incident, the library dispute, Plaintiff's

21    complaints the sexual harassment was ongoing over a long

22    period of time, and Fells physically forced her to

23    perform oral sex in a parking garage."

24        Q.   Keep going, please.

25        A.   "Of the three main participants to this

1  complaint - Plaintiff, Fells, and Harrington - the only

2  person Gavin fully interviewed was Fells, the man

3  accused of sexual assault.  Gavin never asked to

4  formally interview plaintiff, only speaking to her

5  briefly on the phone.  And Gavin never spoke to

6  Harrington."

7       Q.  Okay.  Keep going, please.

8       A.  "Gavin didn't attempt to collect evidence that

9  could have corroborated plaintiff's version of events

10  and she ignored what corroborating evidence she did

11  have.  She heavily relied on a biased statement from

12  Green, yet despite his professed support for Fells,

13  Green admitted that during the investigation he received

14  yet another student complaint about Fells and again

15  failed to take any action, not bothering to refer the

16  student to Gavin to aid in her investigation.

17       Instead, after summarizing the results, in

18  quotes, of this superficial investigation and the

19  relevant FAMU regulations, Gavin simply concludes,

20  quote, based upon the EOP investigation, the allegations

21  were not substantiated, end quote."

22       Q.  Okay.  Do you understand what it means when a

23  court says that it was a "sham investigation"?  What do

24  you understand by that term, "sham investigation"?

25       A.  It was bogus, it wasn't thoroughly done; right?

1    Q.   And who was Carrie Gavin's supervisor?

2    A.   I believe she reported to the general counsel

3  at that time, but I don't recall exactly, but I think

4  that's the case.

5    Q.   Do you know if she was disciplined for this

6  sham investigation?

7    A.   I'm not aware of that.

8    Q.   Was she fired for this sham investigation?

9    A.   I'm not aware of that.

10   Q.   Okay.  And when they said that -- when they

11 referred to Green, would that be Dean Green from the law

12 school, the same Dean Green we started reading from

13 here?

14   A.   Associate Dean Green, yes.

15   Q.   And when they said he had information that

16 another student reported, but he didn't tell Gavin about

17 it or tell the student there was an ongoing

18 investigation, would that be something to discipline an

19 employee for?

20   A.   Possibly, yes, uh-huh.

21   Q.   Was Dean Green fired?

22   A.   Not to my knowledge.

23   Q.   Okay.  Okay.  I think we're going to move from

24 this one.  Did anybody say anything to you about this

25 case, President Robinson?

1    A.   I don't recall specifically, but I do vaguely

2  remember some discussions, I just can't remember who and

3  when.

4    Q.   Was it covered in the news that a FAMU law

5  student had filed a sexually -- a sexual harassment

6  complaint?  Do you recall if -- if it was covered in the

7  news?

8    A.   I don't recall that.

9    Q.   Okay.  Please mark that.

10        (Exhibit Number 26 was marked for

11   identification.)

12   Q.   I'm going to give you what's been marked as

13  Exhibit 26.  Do you recall getting that memorandum?

14   A.   I don't recall.

15   Q.   Who is that memorandum to?

16   A.   It's to the FAMU College of Law Faculty, FAMU

17  President Larry Robinson, FAMU Provost Maurice Edington,

18  FAMU General Counsel D. Denise Wallace, FAMU EOP

19  Director Carrie Gavin.

20   Q.   And who is it from?

21   A.   It's from Maritza Reyes, Associate Professor of

22  FAMU College of Law.

23   Q.   What is the date?

24   A.   October the 23rd.

25   Q.   Is it October?

1      A.    It is October.

2      Q.    The date on it?

3      A.    October the 20th -- oh, the date on the memo is

4  November the 13th, 2019.

5      Q.    Is October your favorite month, Dr. Robinson?

6      A.    It is.  It's when I got married, but anyway.

7      Q.    Okay.  So let's look at this memo, how many

8  pages is it?

9      A.    It says 1 of 14.

10     Q.    Okay.  And so can you look at the memo and tell

11 me up to what page is the actual memo and where does the

12 appendix to the memo begin?

13     A.    The memo appears to end on page 5, the appendix

14 begins on page 6.

15     Q.    And the appendix is from page 6 to what?

16     A.    I assume to 14, unless there's something else.

17     Q.    Well, what does page 6 and the next page look

18 like to you?  Do they look like it's one appendix?

19     A.    It --

20     Q.    And are page 6 and 7 different than page 8?

21     A.    Well, it says Appendix on page 6 and 7 and it

22 says Composite Exhibit on page 8, so I don't know if

23 that's still considered to be an appendix or separate

24 components all together.

25     Q.    It's a legal term.  Composite exhibit.  How is

1  it described as a composite exhibit?  The title at the

2  top, how does it describe it?

3      A.    Composite Exhibit A, quotes, to 11/13/19,

4  Professor M. Reyes, Memorandum.  Parentheses -- excuse

5  me -- Response to Professor J. Levitt Email Attack --

6  excuse me -- on 10/23rd/19.

7      Q.    Okay.  And what does it have on those pages

8  there, in pages 8 to 14?  Are those -- are those emails?

9      A.    It appears to be emails, yes.

10     Q.    Okay.  So let's look at the memo itself because

11 the memo is fewer pages.  It's only four and a half

12 pages.  So on the memo itself, what does the first

13 paragraph there say?  Please read it.

14     A.    "Some of you may have been here over a decade

15 ago when former Professor Barbara Bernier filed an

16 internal complaint against Professor (and then associate

17 dean) Jeremy Levitt.  I had just been hired.  The

18 investigation was conducted by Director Carrie Gavin,

19 the FAMU's EOP office.  No one contacted me about the

20 Bernier versus Levitt internal investigation.  I learned

21 that some of you were contacted and remained silent or

22 said that you did not see anything.  Some of you said

23 you were afraid, in quotes.  How do you feel now about

24 what you said or did not say during that investigation?

25 What are you doing now?  I will not remain silent

1  because Dr. King exhorted, in quotes, our lives begin to

2  end the day we become silent about things that matter,

3  end quote."

4     Q.   So what is the next paragraph, please?

5     A.   "I must respond to Levitt's dangerous and

6  abusive allegations (See Composite Exhibit A.)  He made

7  unsupported accusations and brought misrepresentations

8  about me and what I have stated with the clear intent of

9  harassing me, damaging my reputation, and promoting

10  additional racial animus against me.  Therefore, I

11  cannot afford to leave his false allegations

12  unchallenged.  This is by no means an academic exchange.

13  This by response/defense to Levitt's discrimination and

14  harassment, which instructional -- institutional actors

15  have been aware of.  Again, I became his target as soon

16  as I began working here."

17     Q.   Okay.  And then there is a listing there of --

18  a summary of the paragraph -- of paragraphs that follow;

19  right?  So let's go just through the summary.

20     A.   "In summary, Levitt, in his email

21  correspondence dated October 23rd, 2019, 2:56 p.m.:

22  a) began by insulting me and self-servingly claiming

23  there are no EO concerns raised by his harassment."  I

24  guess see paragraph 1.  "b) applied some type of litmus

25  test to question my racial identity."  See paragraph 2.

1  I guess that's what that means; right?

2      Q.   Uh-huh.

3      A.   "Used a reference to former colleague

4  N. Nekheba to set up a false race-based accusation

5  against me.  See paragraph 3.  d) described to me the

6  thinking" --

7      Q.   Described or ascribed?

8      A.   I'm sorry, "d), ascribed to me the thinking of

9  a torturer and mass murderer of indigenous people, from

10 which I have ancestry.  See paragraph 3.  Falsely

11 alleged that I admitted not understanding the diversity

12 of black people.  See paragraph 4.  f) determined that I

13 do not have the superior knowledge and experience he

14 claims about race, ethnicity, color, gender and religion

15 in the U.S.," quote -- I don't see -- yeah -- "race

16 ethnicity, race, color, gender, and religion in the

17 U.S., quote, because, according to him, my experience is

18 not morally equivalent -- equivalent to his.  See

19 section 5.  g) labeled me a descendant of the enslavers

20 of, quote, his people."

21     Q.   And is enslavers in quote?

22     A.   Enslavers is in quotes.  And "of his people,

23 end quote.  And -- see paragraph 5.  And h) criticized

24 the definition of Latino I used in an article in 2008 in

25 the Harvard Law School student newspaper.  See

1  paragraph 5."

2     Q.    Okay.  So now that you read that, does it

3  refresh your memory about this memo?

4     A.    I still don't specifically recall seeing a

5  memo.

6     Q.    And so because Professor Reyes copied the

7  provost, the general counsel, and also the EOP director,

8  would they have talked to you about this?

9     A.    They could have.  And by the way, you copied

10 all the right people in terms of needing to be aware of

11 these allegations.

12    Q.    And on page -- if you go to page 8, which I

13 want you to have your finger on page 8 at the same time

14 you have it on page 1, please.  Because I'm going to

15 look at when Professor Reyes wrote "In summary, Levitt

16 in his email correspondence dated October 23, 2019, a

17 2:56 p.m.," which is on page 1, the summary.

18         Now I want you to go to page 8 and see that

19 bottom email and see if it's the same October 23,

20 2:56 p.m. at the bottom of that email.

21    A.    Yes.

22    Q.    Who is that from?

23    A.    It's from Jeremy Levitt.

24    Q.    To who was it sent?

25    A.    To Maritza Reyes and Phyllis Taite.

1      Q.   And who else is copied?

2      A.   The college of law faculty.

3      Q.   And how does the college of law faculty get

4   copied on that; is that a list serve?

5      A.   Apparently it is.

6      Q.   And what is the list serve name?

7      A.   COL underscore Faculty, college of law at FAMU

8   dot edu.

9      Q.   And so Professor Levitt sent that email to the

10   entire faculty?

11      A.   Assuming that they were on the list serve.

12      Q.   And we're going to -- for the sake of moving on

13   from that, say that the document reads as it does.

14      A.   The document?

15      Q.   Reads as it does.  Rather than going and then

16   start reading it.  But does this report have the type of

17   allegations that would raise concerns for the group of

18   people that it was directed to?

19      A.   Yeah.  As I said earlier, you -- what you also

20   sent to the college of law faculty, but also the

21   provost, general counsel, and Director Gavin would have

22   been the appropriate people to look into these matters,

23   yes.

24      Q.   And did Professor Levitt send his email that

25   Professor Reyes is responding to to the college of law

1  faculty?

2      A.    According to the email at the bottom of page 8,

3  yes.

4      Q.    So in Professor Reyes' explanation of why she

5  had to respond with copies to the college of law faculty

6  in regards to the accusations that were made, which we

7  can go over the document if you want, but do you think

8  it was something very serious, the type of allegations

9  that she made here?

10     A.    Yeah, these are, you know.  Yeah, uh-huh.

11     Q.    Do you know if anybody followed up with her?

12     A.    I'm not certain that they did.

13     Q.    Okay.

14           (Exhibit Number 27 was marked for

15     identification.)

16     Q.    I'm going to give you what's been marked as

17  Exhibit 27.  Can you please tell me what the title of

18  that document is?

19     A.    This is Florida A&M University Regulation 1.019

20  University Code of Conduct.

21     Q.    Are you familiar with this document,

22  Dr. Robinson?

23     A.    I am familiar with the code of conduct, yes.

24     Q.    Okay.  And so let's go to the code of conduct

25  on page 8.  And under number (18) on page 8, what is the

1  title of that section?

2      A.    Reporting Suspected Violations.

3      Q.    And can you please read that?

4      A.    "Members of the university community are

5  required to report violations of applicable university

6  policy, government contracts, and grant requirements, as

7  well as state and federal laws and regulations.  Prompt

8  reporting of possible violations is required as it gives

9  the university the opportunity to investigate the matter

10 and take corrective action where needed.

11         Complaint -- complainants may initially report

12 their concerns through their normal management chain of

13 command, beginning with one's immediate supervisor.  If

14 it is inappropriate to report to the immediate

15 supervisor -- excuse me -- (e.g., the suspected

16 violation -- excuse me -- by the manager or the

17 complainant is generally uncomfortable) individuals may

18 go to a higher level of management within the college,

19 department, or report directly to the Office of

20 Compliance and Ethics, Office of General Counsel,

21 Division of Audit, the Office of Human Resources or the

22 Office of Equal Opportunity Programs.

23         Managerial and supervisory personnel must

24 maintain an open-door policy and take proactive measures

25 to ensure their staff that the institution supports a

1  culture that values ethical behavior and compliance."

2      Q.   Okay.  So let me stop there.  Is the message in

3  that -- what is the message in that paragraph?  Does

4  FAMU encourage reporting of potential compliance

5  violations; state, federal violations?

6      A.   Yes.

7      Q.   And would reporting of situations like what

8  Professor Reyes reported or the situation that was

9  happening with the law student, early reporting to

10 somebody in a position to do something about it, could

11 it have saved -- in the case of the student, could it

12 have saved FAMU from a lawsuit?

13          MS. REINER:  Objection.  Foundation.

14     A.   I just don't know the timing of when certain

15 things happened, but reporting in and of itself doesn't

16 stop a lawsuit; right?  Because most of the time people

17 are reporting something that's already happened.  And

18 you know, lawsuits can come at any time in the process.

19          But no, you know, there's no guarantee that

20 lawsuits won't come, no matter how well you try to work

21 to create this environment of compliance and

22 accountability.  In the university environment they tend

23 to come from all directions and we just emphasize to our

24 employees that any violations that come to their

25 attention are reported promptly.

1       Q.    So would reporting early -- if the goal is,

2   apparently, if they are encouraging reporting, is it

3   because potentially reporting could stop a situation

4   from getting worse and giving rise to a lawsuit?

5       A.    It could stop the situation from getting worse,

6   but it won't necessarily stop a lawsuit.

7       Q.    If it prevents a situation?

8       A.    That's another matter.  It may determine --

9   help determine the outcome of the lawsuit, but it

10  doesn't necessarily stop the lawsuit from happening.

11      Q.    In the case of a sexual harassment situation,

12  if an employee knows that there is another employee

13  sexually harassing, could reporting save future victims

14  from sexual harassment, at least?

15      A.    I think in any case where sexual harassment is

16  alleged to any administrator or faculty member, one of

17  the things we cover with them clearly is that they need

18  to report it promptly, yes.

19      Q.    So could reporting save some future victims?

20      A.    We think that that's part of what could happen

21  and that's one of the reasons we ask for prompt

22  reporting of these things.

23      Q.    And if a future victim is saved so that sexual

24  harassment doesn't happen to that victim, right, would

25  that save a lawsuit because that victim would not have

1  anything to report?

2          MS. REINER:  Objection.  Form.

3      A.   Well, in a case of a person who hasn't been

4  harassed, yeah.  But in the case of a victim already,

5  you know, there's no guarantee that a lawsuit might not

6  occur, right, no matter how promptly you respond to the

7  matter.

8      Q.   But could the next victim be safe?

9      A.   That's true.

10     Q.   Okay.  So go to page 10, please.  What does

11  number (21) there say?

12     A.   "Retaliation.  Members of the university

13  community are prohibited from engaging in retaliation

14  against another for reporting compliance or ethics

15  related concerns or participating in an investigation

16  due to such reports.  Findings of retaliation are

17  independent of the underlying claim of violation and

18  will result in disciplinary action, up to and including

19  termination, in accordance with applicable university

20  regulations, policies, and collective bargaining

21  agreements."

22     Q.   So if Professor Reyes reached out to you,

23  because you said you had emails from her, about what was

24  happening in the law school --

25     A.   I got some emails from you, of course.

1      Q.   -- and she was reporting certain things, would

2    that be in accordance with the policy of encouraging

3    this -- they call it a managerial open policy, I think

4    they called it.  On page 8, where they said "managerial

5    and supervisory personnel must maintain an open-door

6    policy and take proactive measures to assure their staff

7    that the institution supports a culture that values

8    ethical behavior and compliance."

9           Are you a managerial staff member?

10     A.   Yes, I'm an administrator of the university.

11     Q.   The ultimate -- would you consider yourself the

12   ultimate manager at FAMU in terms of the highest rank

13   manager?

14           MS. REINER:  Object to form.

15     A.   Yes, as president, yes.

16     Q.   Okay.

17           (Exhibit Number 28 was marked for

18     identification.)

19     Q.   I'm going to give you what's been marked as

20   Exhibit 28.  Can you please read at the top of that

21   email who is it from and to who it is?

22     A.    It's from Maritza Reyes to Larry Robinson,

23   Joseph Maleszewski, Allyson Watson, Reginald Perry,

24   Cecil Howard, D. Denise Wallace, and Rica Calhoun.

25     Q.   And what is the subject line?

1      A.    Demand for Audit Investigation of Office of

2  Ethics and Compliance Investigation of MW versus

3  Jennifer Smith Complaint.

4      Q.    Okay.

5      A.    Twenty -- you know, I guess these are --

6      Q.    Attachments?

7      A.    These are attachments, yeah.

8      Q.    Okay.  So -- but let's look at this email and

9  see, the first email begins really on page -- on the

10 last page of this email thread; right?  So if you go to

11 page 4.  Well, actually page 3.  Do you see a header of

12 an email at the bottom?  What is that email from and to?

13     A.    It's from Maritza Reyes, February the 12th,

14 2024, 6:16 p.m. to Larry Robinson.  And it cc's Joe

15 Maleszewski, Allyson Watson, Reginald Perry, Cecil

16 Howard, Denise Wallace.

17     Q.    And is it the same subject line you read

18 before?

19     A.    I believe it is.  Demand for an Investigation

20 of the Office of Ethics and Compliance Investigation of

21 MV versus Jennifer Smith Complaint.

22     Q.    MW.  And do you know why Professor Reyes would

23 write MW?

24     A.    I have no idea.

25     Q.    Could it be to protect a student's name?

1      A.    I have no idea.

2      Q.    Okay.  Did you read this email before today?

3      A.    Yes, I did.

4      Q.    And what did you do when you received this

5   email?

6      A.    Well, I sent you a reply an hour or so later,

7   replying to that whole distribution list.  "Hello

8   Professor Reyes, We will review this matter and respond.

9   Thank you and please be safe.  Larry Robinson."

10     Q.    Okay.  And in the email that Professor Reyes

11  sent you, when she said that she wanted an investigation

12  of how the office of ethics and compliance handled the

13  situation, who is the person in charge of office of

14  ethics and compliance?

15     A.    It's Rica Calhoun.

16     Q.    And in the email that Professor Reyes sent you

17  on February 12 at 6:16 p.m., is Rica Calhoun's name

18  named in the cc line?

19     A.    No, it's not.

20     Q.    But then you reply to Professor Reyes at

21  7:37 p.m.; right?

22     A.    Uh-huh.

23     Q.    Is Rica Calhoun's name on there?

24     A.    Yes, it is.

25     Q.    And why did you add Rica Calhoun?

1      A.    Because it is a perceived violation of an

2  ethical issue and they need to be informed.

3      Q.    But in the email that Professor Reyes was

4  reporting, did she not specifically name Rica Calhoun as

5  the violator of the Office of Ethics and Compliance

6  Regulations?

7      A.    Yeah, but if you -- that is in the email as you

8  indicated.

9      Q.    And -- okay.  So let's go to the next email on

10  page 2.  Professor Reyes now is replying to the email

11  where you told her that you were going to review the

12  matter and respond; right?  And that is on Monday,

13  February 12, 2024, 7:29 p.m.  What does she say in the

14  email?  Please read where it says "hello."

15      A.    "Hello, President Robinson:  Thank you for your

16  response.  Please tell Provost Watson and Interim Dean

17  Howard to respond to my request for assistance so that I

18  can be safe as you said.  I still have not heard from

19  either of them about Professor Darryll Jones' email

20  attacks against me on 2/5/24 and 2/6/24, in email on

21  2/6/24, which he sent to me and all employees of the

22  college of law, he abused and defamed me and also

23  incited, quote, his people to harm me.

24            Provost Watson and Interim Dean Howard were

25  copied on those emails.  Professor D. Jones engaged in a

1   course of conduct that caused me to be in reasonable

2   fear of harm.  His contact caused me substantial

3   physical and emotional distress.  I got sick.  Provost

4   Watson and Interim Dean Howard's failure to respond and

5   address the attacks has increased the harm and distress.

6        I requested to be allowed to teach classes

7   synchronously -- synchronously via Zoom for a couple of

8   classes, but permission was denied.  Therefore, I had to

9   cancel class.  I will now have to schedule makeup class

10  time.

11       I asked Provost Watson and Interim Dean Howard

12  to let me know what they plan to do to discipline

13  Professor D. Jones for his misconduct and what they plan

14  to do to ensure my safety when I am in the law school.

15  I am still waiting to hear from them.  I am also

16  concerned about Professor Jennifer Smith's continued

17  harassment.  My safety now depends upon -- depends on

18  how FAMU handles all these racial attacks and the

19  measures it takes or does not take to ensure my safety."

20       Q.   And what is the next sentence?

21       A.   "I am fulfilling my duty to report.  All of you

22  are now on notice.  FAMU Regulation 10.103(5)(b) states:

23  An employee in a supervisory -- supervisory capacity who

24  has knowledge of a complaint involving another

25  supervisor, subordinate, employee supervised by another

1   supervisor, or student in the class of another

2   supervisor who does not take appropriate corrective

3   action or report the matter directly to the president or

4   university EOP officer will be subject to counseling or

5   disciplinary action.  Disciplinary action may include a

6   written reprimand, suspicion -- suspension or dismissal.

7   The nature of the counseling or disciplinary action

8   shall be gathered by the seriousness of the offense."

9       Q.   Okay.  So do you remember getting this email,

10  President Robinson -- Dr. Robinson?

11      A.   Yes, ma'am.

12      Q.   And what did you do when you got this email?

13      A.   Well, the good thing about the email, as I said

14  earlier, all the appropriate parties are indicated on

15  this distribution list.  These are the people, right,

16  who have been assigned to look into matters of this

17  type; right?

18      Q.   Do you know anybody that contacted

19  Professor Reyes about this?

20      A.   I don't know.

21      Q.   Okay.  And do you know what it is that would

22  happen with the MW student?

23      A.   I didn't even know if that was a student.

24  I have no idea who that was.

25      Q.   So let's go to page 3.  On page 3 there is an

1   email February 12, 2024, 6:16:22 p.m. from Maritza Reyes

2   to you with copies to everybody except -- that you

3   mentioned before except Rica Calhoun; right?

4        A.   Uh-huh.

5        Q.   I just want you to read the first two

6   paragraphs of that email, please?

7        A.   "Hello President Robinson, I have written

8   emails to you before asking for assistance; however, you

9   have a failed to address the foundational discrimination

10  and hostile education and work environment issues I have

11  raised.  As I told you before, it seems similar to the

12  way FAMU ignored hazing until it was too late to save a

13  student's life."  I mean I think it's deplorable to make

14  that comparison, but anyway, "I am now writing on behalf

15  of a law student who has been and sometimes -- and

16  continues to be harassed and retaliated against by

17  Professor Jennifer Smith.  You should know the student's

18  name already; I reference her by her first name, last

19  initials (MW) or last name -- or her last name, first

20  name initials (WM).  I received some of the

21  documents" --

22       Q.   I received?  I'm sorry?

23       A.   "I reviewed some of the documents that

24  Professor Jennifer Smith filed on January the 29th,

25  2024, in the public court record -- in the public court

1  record of her case against FAMU in Orange County,

2  Florida, Case No. 2023-CA-016035-O.  In these documents

3  Professor Smith disclosed MW's identity and even posted

4  her picture.  She also filed texts that prove the racial

5  nature of Professor Smith's harassment of MW.  The day

6  of the initial incident, October the 20th, 2022,

7  Professor Smith sent a text to Associate Dean Reginald

8  Green describing MW as one of Reyes's students, in

9  parenthesis, Hispanic blonde was so rude, quote,

10  aggressive rude, quote, like a fight rude, quote.  In

11  the texts, there are questions about whether MW is

12  brown."  They have it in quotes.  "The evidence shows

13  that the way Professor Smith reacted to MW was based on

14  Professor Smith's identification of MW as Latina and was

15  focused on MW's race.

16          It is so egregious that Professor Smith

17  enlisted the help of alumnus -- of an alumnus, EPJ, to

18  reach out to a student, DJ, to get information on MW,

19  including pictures from MW's social media account.

20          In the past EPJ targeted the Latina Editor in

21  Chief of FAMU's Law Review.  This was when EPJ was

22  co-author with Professor Jennifer Smith of an article

23  that was published in the FAMU Law Review.  At that time

24  that Latina student also suffered a traumatic experience

25  as a result of EPJ's harassment."

1      Q.    Okay.  And maybe the next short paragraph, too,

2   to get the message of like the next question that I'm

3   going to ask you.

4      A.    "The law school has purposely ignored my pleas

5   for help with the racial attacks.  I am not only -- not

6   only one racially attack -- I'm not the only one

7   racially attacked, some students like MW are also

8   racially attacked.  There is a clear pattern for some

9   black law professors targeting and encouraging students

10  to target Hispanics/Latina/o/x students."  What is that?

11  Anyway, "These professors are the same ones who have

12  white racially targeted me.  Professor Jennifer Smith

13  has insisted on calling me white Latina after I

14  repeatedly told her and others that I am -- I'm only

15  described as Latina, not white.  I've been called white

16  appearing, white Hispanic and white privilege and a

17  descendant of enslavers of black people, including in

18  emails copied to colleagues.  There is an effort to fuel

19  fear about Latinas/Latinos, quote, taking over or taking

20  what belongs to black people.  This fuels racial hatred

21  and discrimination."

22     Q.    And in the next paragraph there is a reference

23  to emails from Professor Darryll Jones of 2/5/24 and

24  2/6/24.  Do you know what that was about, those emails

25  on 2/5 and 2/6?

1      A.    No, I don't.

2      Q.    When you read this email, did you try to find

3  out what those emails were about?

4      A.    I leave that to the people who have been

5  charged to do that, Professor Reyes.

6            (Exhibit Number 29 was marked for

7      identification.)

8      Q.    I'm going to give you what's been marked as

9  Exhibit 29.  And what are the page numbers at the bottom

10 of this group of emails?

11     A.    It's page 1, 2, 3, 4, 5, and 6.

12     Q.    Okay.  And on page 6, it's really the end of an

13 email, right, at the top of page 6?

14     A.    Okay.

15     Q.    But there's a link; right?  It looks like a

16 link to an article?  Is it a link to an article?  What

17 does it look like to you?

18     A.    It looks -- at the -- at the bottom of the

19 page?

20     Q.    At the top of page 6.

21     A.    Page 6, yes, it looks like a link.

22     Q.    And what does it look like a link to?

23     A.    Well, it reads www.tallahassee.com/

24 story/news/local/famu-news/2024/02/06/letter-famu-law-

25 dean-says-trustees-others-stymied-her-success.

1      Q.    Do you know what that link is to?

2      A.    Apparently it's an article or story in the

3    electronic version of the Tallahassee newspaper, the

4    Tallahassee Democrat.

5      Q.    Do you get the Tallahassee Democrat?  Do you

6    get the news stories from them?

7      A.    I don't subscribe, but they do come to the

8    office and sometimes I'll have time to read them and

9    sometimes I don't.

10     Q.    So they give you the printed version?

11     A.    Yeah.

12     Q.    You get the printed version?

13     A.    Yeah, and sometimes they don't.  Sometimes I

14   never see them and nobody knows what happened to them,

15   so --.

16     Q.    Okay.  And so what date is the email on page 5?

17   What date is that?

18     A.    February the 6th, 2014, at 11:03 a.m.

19     Q.    And who is it from?

20     A.    It's from Maritza Reyes to the College of Law

21   Faculty, College of Law Staff, Provost -- well, Allyson

22   Watson, Cecil Howard.

23     Q.    And the subject line?

24     A.    Subject:  Latest Tallahassee Article - Deidre's

25   Letter of Resignation Got Out.

1      Q.   So were you aware of Dean Deidre Keller's

2  resignation at the law school?

3      A.   Yes, I was.

4      Q.   Did you see her letter of resignation?

5      A.   I don't recall seeing it.

6      Q.   Do you know if it was published in the

7  Tallahassee Democrat?

8      A.   I'm not certain of that either.

9      Q.   And do you know if she provided it to the

10 Tallahassee Democrat?

11     A.   I'm not aware of that.

12     Q.   So after that, on page 4 there's an email

13 there.  Who is that email from and to?

14     A.   So there's an email from Darryll K. Jones on

15 February the 6th, 2024, 11:47 a.m. to Maritza Reyes,

16 College of Law Faculty, College of Law Staff, Provost

17 Allyson Watson, Interim Dean Cecil Howard.

18     Q.   Are there staff members who would be considered

19 staff or employees who are also law students?

20     A.   I think, you know, we offer it for students,

21 I'm not certain about how it works with the law school,

22 but yes, it's not unusual.

23     Q.   Do you know if they have law students employed

24 in the college of law library, for example?

25     A.   I don't know that for certain, but I wouldn't

1  be surprised if they did.

2      Q.   Okay.  And so have you read this email that

3  Darryll Jones wrote and sent to everybody on February 6,

4  2024?

5      A.   I have not read this email.

6      Q.   I'm not going to sit and read it through here

7  right now, but it is what it is.  And I'm just going to

8  summarize the content of it, not to sit here and have

9  you read it.

10     A.   Uh-huh.

11     Q.   Calling into question Professor Reyes's decency

12  and calling on his people, and quote, to tell Professor

13  Reyes to shut up, among other things that I'm not going

14  to read right now.  And so let's go to page 2 -- no,

15  let's go to page 3 -- no, I'm sorry, page 2.  It is

16  page 2.  On page 2 do you see an email at the bottom?

17  Who is it from and to?

18     A.   There's an email from Maritza Reyes to Allyson

19  Watson, cc'd to Cecil Howard.

20     Q.   And what is that dated?

21     A.   February the 6th, 2024, 2:01 p.m.

22     Q.   Okay.  And if you could please just read the

23  first paragraph and the salutation.

24     A.   So the subject is Your Response to COL

25  Professor Jones's Attack Against Me Today.  And it

1  reads, "Good afternoon Provost Watson, I'm writing to
2  find out if your February the 6th, 2024, 1:02 p.m. email
3  to all students was your response to Darryll Jones's
4  vicious, racial, defamatory, personal attack against me
5  in his email today, February the 6th, 2024 -- excuse
6  me -- at 11:47 a.m., with copies to all faculty, all
7  staff, Interim Provost Cecil Howard and to you.  I
8  received his email as I was preparing for my afternoon
9  class, which I had to cancel after I read his email and
10 immediately got emotional -- emotionally and physically
11 sick."

12       Q.   Okay.  Read the next paragraph, please.

13       A.   "This institution has permitted Darryll Jones
14 to abuse me and discriminate against me for years, just
15 like it has also permitted Professor Jeremy Levitt and
16 others to do the same.  The race-based aspect to the
17 discrimination is once again evident in Professor
18 Jones's latest email attack.  This sentence alone drives
19 home the message of his racially discriminatory intent."

20       Q.   And the next sentence, is it in quotes?

21       A.   In quotes it reads "Senator -- Senator Maritza
22 -- Maritza McCarthy is gleefully intent on heaping more
23 pain on this black woman."

24       Q.   Is that the end of the quote?

25       A.   End quote, yeah.  "Professor Darryll Jones used

1  a black woman's choice to resign as dean, in the way she

2  chose to do it, as an opportunity to attack me, a Latina

3  who has been racially attacked in this workplace for

4  years, including by Professor Jones."  I don't know who

5  is Maritza McCarthy?

6      Q.   Are you familiar with any reference to like

7  Senator McCarthy?  Because I think that the quote is

8  Senator Maritza McCarthy.

9      A.   Yeah.

10     Q.   Okay.  What is the next paragraph, please?

11     A.   "Nothing I stated warranted Professor Darryll

12  Jones's public and heinous attack against me in this

13  state university system workplace.  Former Dean Deidre

14  Keller started the email exchange with her email about

15  her resignation to all faculty, all staff, and all

16  students.  After that, she sent her resignation letter

17  to us.  My emails did not include her letter.

18  I provided transparency to faculty, staff, and students

19  when some people were feeding the rumor mill and blaming

20  you and Associate Provost Cecil Howard by saying that

21  you asked Deidre to resign.  Now I am being turned into

22  the racialized scapegoat in this HBCU law school.

23  I wonder if this was part of the plan of the person who

24  leaked Deidre's letter to the Tallahassee Democrat.

25          I am awaiting your response, with a copy to all

1    faculty and all staff who received Darryll Jones's email

2    attack against me.  If your email to all students at

3    1:02 p.m. today was meant to be your response to Darryll

4    Jones's attack against me, please let me know."

5        Q.    Okay.  And so after that on page 2 above, whose

6    email is that from and to and the date, please?

7        A.    Are you referring to the February 12th?

8        Q.    Yes, February 12, 2024, 6:47 p.m.

9        A.    Okay.  So there's an email from Maritza Reyes

10   February 12th at 6:47 p.m. to Allyson Watson and Cecil

11   Howard.  The subject being Your Response to College of

12   Law Professor Darryll Jones's Attack Against Me Today.

13           "Good evening Provost Watson and Interim

14   Provost Howard.  I still have not heard from either of

15   you about Professor Darryll Jones's email attack against

16   me on 2/5/24 and 2/6/24 and his email on 2/6/24, which

17   he sent to me and all employees of the college of law.

18   He abused and defamed me and also incited, parentheses,

19   his people to harm me.  Both of you received those

20   emails.  Professor Jones engaged in a course of conduct

21   that caused me to be in reasonable fear of harm.  His

22   conduct -- his conduct caused me substantial physical

23   and emotional distress.  Your failure to respond and

24   address the incident has increased the harm and

25   distress.  I requested to be allowed to teach class

1  synchronously via Zoom, but permission was denied.

2  Therefore, I had to cancel class tomorrow.  I will now

3  have to schedule make-up class time.  Please let me know

4  what you plan to do to discipline Professor Jones for

5  his conduct and what you plan to do to ensure my safety

6  when I am in the law school.  Best, Professor Reyes."

7      Q.   Okay.  Does that email now, because -- were you

8  copied in those emails?

9      A.   No, I'm not copied on these emails.

10     Q.   So Professor Reyes did not send -- that's not

11 one of the ones that she sent to you?

12     A.   My name is not included on this email.

13     Q.   But you were included in the one that's been

14 marked as Exhibit 28; right?

15     A.   This --

16     Q.   The one from Professor Reyes to you and copies,

17 you were copied in that one?

18     A.   Yes.

19     Q.   In those emails Professor Reyes referenced the

20 April -- I mean, the February 5 and 6 emails that you

21 have now read.

22     A.   Uh-huh.

23     Q.   Okay.  And on that email at page 1.

24     A.   Which one?

25     Q.   The email marked as Exhibit 28.  The one that

1  went to you.

2      A.   Uh-huh.

3      Q.   Do you remember when you were reading the top

4  of that you said there are attachments there.  But you

5  didn't read the attachments' names.  So what are the

6  attachments of that email?  What are the titles of those

7  attachments?

8      A.   So I assume it starts with 2017 DV Arrest

9  Affidavit for -- versus Darryll Jones, 2018 DV Arrest

10 Affidavit -- Affidavit for a Karla Jones -- a Karla

11 Jones, and a 2023 DV Arrest Affidavit for Karla Jones.

12     Q.   Do you know anything about these arrests?

13     A.   No.

14     Q.   Okay.  I'm sorry?

15     A.   I don't know even know, what is DV?

16     Q.   Domestic violence?

17     A.   Oh, okay.  No, I wasn't aware.

18     Q.   Okay.  And so when Professor Reyes attached

19 them to this email and explained why she was afraid of

20 Professor Darryll Jones calling on his people and spoke

21 about the abuse that had happened before, did you open

22 those attachments?

23     A.   No.  Because I was counting on my team members

24 who are on this distribution list.  Once again, General

25 Counsel Wallace, Ms. Calhoun, Joe Maleszewski, and the

1  provost and the associate -- interim associate provost,

2  yes.

3      Q.  So do you know if any of them followed up with

4  Professor Reyes?

5      A.  I don't know.

6      Q.  And what is the date on that Exhibit 28?

7      A.  It is February the 13th, 2024 at 2:07 p.m.

8          (Exhibit Number 30 was marked for

9      identification.)

10     Q.  I'm going to give you what's now marked as

11 Exhibit 30.  Please review just the first two pages of

12 that exhibit, please.

13     A.  Okay.  This is dated February 16, 2024.

14     Q.  And I just meant like review it, so -- because

15 I was going to ask you a question.  Just take a look at

16 it before I ask you to identify it, please.  And not

17 read it exactly, but -- because my question is --

18 perhaps I'm going to ask it and then you tell me.  Have

19 you seen this document before?

20     A.  I think so, yes.

21     Q.  When did you see it?

22     A.  I'm not certain.

23     Q.  Okay.  Now I'm going to ask you, what is the

24 date on the document?

25     A.  The date is February the 16th, 2024.

1      Q.   And now can you please describe what you were

2   going to describe?

3      A.   This is a certified mail document marked

4   Confidential with a title of Notice of Intent to Dismiss

5   from Employment.

6      Q.   And who is it addressed to?

7      A.   Maritza Reyes.  Maritza Reyes.

8      Q.   Okay.  And in the first paragraph of this

9   document, what does it say?  Please read it.

10      A.   "Dear Professor Reyes:  Pursuant to Florida

11   Agriculture and Mechanical University, quote, FAMU Board

12   of Trustees' Regulations, 1.019 University Code of

13   Conduct, 5.003 Electronic Connectivity, 10.111

14   Disruptive Conduct, 10.120 Predetermination Procedures

15   for Tenured and Permanent Status Faculty and University

16   Support Personnel System Employees, and 10.205

17   Disciplinary and Separation from Employment Actions for

18   Faculty, you are hereby notified of the university's

19   intent to dismiss you from employment on Friday,

20   March 29th, 2024."

21      Q.   Okay.  And so would you have discussed -- well,

22   you said before that you discussed the firing, the

23   dismissal of Professor Reyes before it happened.  When

24   would you have discussed that?

25      A.   I couldn't give you a particular date.

1      Q.   Around -- can you give me a period of time

2   before February 16, which is the date on this letter?

3      A.   It was probably in that time frame when the

4   provost indicated that she had made this decision.

5      Q.   And did you have a discussion with the provost

6   about this decision?

7      A.   I wanted to make sure that she has, typically

8   when we do these kind of things, checked all the boxes

9   with legal counsel and HR.

10      Q.   Okay.  And what are those boxes?

11      A.   Legal counsel and HR.

12      Q.   Okay.  And so when you say checked the boxes --

13      A.   Uh-huh.

14      Q.   -- what is it that they would do?

15      A.   Well, they identify the form of the letter or

16   the content of the letter and so forth, right.

17      Q.   So when you read in paragraph one those

18   regulations --

19      A.   Uh-huh.

20      Q.   -- which part of the regulations was violated?

21   Do any of them include a subsection or section of the

22   regulation?

23      A.   You would have to confer with the provost

24   regarding --

25      Q.   I'm just asking in the letter itself, do any of

1    them include a subsection?

2         A.    Not apparently to me anyway, no.

3         Q.    So go to page 3, please.  And they don't have

4    pages because the letter is the first two pages, but on

5    page 3.  What is the title of that page?

6         A.    The Florida Agriculture and Mechanical

7    University Regulation 1.019 the University Code of

8    Conduct.

9         Q.    Okay.  How many pages is that regulation?

10        A.    It indicates that there are 11 pages here.

11        Q.    And how many subsections within that document?

12   Those 11 pages, how many subsections?

13        A.    It appears to be 23 paragraphs, or subsections,

14   if you want to call them.

15        Q.    Okay.  And so let's go back to page 1 of the

16   letter.  What is the first regulation listed in that

17   first paragraph?

18        A.    Regulation 1.019 University Code of Conduct.

19        Q.    And does it state which of those 11 pages and

20   23 paragraphs is being charged as a violation by

21   Professor Reyes?

22        A.    No.

23        Q.    So let's go to the next page after that

24   eleventh page of Regulation 1.019.  What does it state

25   on there?  What is the title of that?

1    A.    Regulations of Florida A&M University 5.003

2  electronic connectivity.

3    Q.    And how many pages is that one?

4    A.    That's four pages apparently.

5    Q.    How many sections, in terms of numbers, and

6  subsections, in terms of letters?

7    A.    Well, there is a section one with an A through

8  G, there's a section two with an A through D, a section

9  four --

10   Q.    Three is at the top of page 2; right?

11   A.    Yeah.  Three with A through D; four with A

12 through N; five, one paragraph; 6, one paragraph.

13   Q.    So let's go back to page 1.  Which subsection

14 of 5.00 -- is there any subsections stated there for

15 5.003 listing as a violation?

16   A.    You mean in terms of the letter?

17   Q.    In terms of the letter on page 1.

18   A.    No.

19   Q.    So let's go to the next regulation after that

20 one.  What is it titled?

21   A.    It's titled Disruptive Conduct.

22   Q.    What number is that?

23   A.    10.111.

24   Q.    Okay.  So let's go there.

25   A.    Okay.

1       Q.      How many sections and subsections does that one

2   have?

3       A.      This one is a one-pager, apparently, with three

4   subsections.

5       Q.      And within number two, how many subsections are

6   there?

7       A.      There is a 2a through e.

8       Q.      Okay.  Now, let's go to that page, 10.111,

9   number (1).  What is the title of that section?

10      A.      The title of the regulation is Disruptive

11  Conduct.

12      Q.      And number (1), what is underlined in number

13  (1)?

14      A.      Disruptive Conduct.

15      Q.      And how is it stated there?

16      A.      It says "Faculty Administrative and

17  Professional, and USPS employees who intentionally act

18  to impair, interfere with, or obstruct the orderly

19  conduct, processes, and functions of the university

20  shall be subject to appropriate disciplinary action by

21  the university authorities."

22      Q.      And within that definition and the conversation

23  that we had in terms of a regulation with a duty to

24  report, is reporting on violations listed as disruptive

25  conduct?

1      A.    Under the definition for disruptive conduct it

2  includes -- it says "shall include, but not limited to,

3  the following:  Violence or threat of violence against

4  an employee, student or guest at the university; theft,

5  conversion or misuse or willful damage or destruction of

6  university property or of the property of employees of

7  the university; c, interfering with the freedom of

8  movement by -- of any employee or guest of the

9  university; d, deliberate impediment to or interference

10  with the rights of others to enter, use, or leave any

11  university facility, service, or scheduled activity, or

12  in carrying out their normal functions or duties; and e,

13  deliberate interference with academic freedom and

14  freedom of speech of any employee or guest of the

15  university."

16      Q.    And what does it say in number 3?

17      A.    "The disciplinary action to be imposed against

18  an employee for any act of disruptive conduct may

19  include a written reprimand, suspensions, or dismissal

20  from employment from -- with the university.  The

21  penalty that is imposed will depend upon the seriousness

22  of the offense and any aggravating or mitigating

23  circumstances."

24      Q.    Okay.  So on the letter, you already said that

25  10.111 does not specify any subsection, right, it's just

1  the entire 10.111?

2      A.   Yes.

3      Q.   Okay.  Let's go after 10.111.  What is the next

4  regulation?

5      A.   10.120.

6      Q.   Okay.  And so would that be the

7  predetermination of procedures, right, or is that -- but

8  is that a regulation that lists misconduct?

9      A.   I'd have to refer to the regulations.

10     Q.   Okay.  So let's go to 10.120, which I believe

11  is after 10.205?

12     A.   Uh-huh.

13     Q.   What is the title of that subsection?

14     A.   Predetermination Procedures for Tenured and

15  Permanent Status Faculty and University Support

16  Personnel System Employees.

17     Q.   And so what does it mean, a predetermination

18  procedure?

19     A.   I don't know.  I mean, in legal terms or --

20     Q.   In the terms as you as an academic as the CEO

21  of the university understand it.

22     A.   Yeah, so there's been a process or some type of

23  assessment or evaluation associated with tenure and

24  whatever the issue is at hand.

25     Q.   Okay.  And so go to page 2, number 3.  Where it

1  says "conference."

2      A.    Uh-huh.

3      Q.    What is the title -- I mean, could you read

4  that first sentence?

5      A.    "Conference, Section 3.  The conference must be

6  conducted by the designated representatives of the

7  president as follows:  The purpose of the conference

8  shall be to hear the employee's response to the charges

9  in order to protect the employee from erroneous or

10  arbitrary adverse action; to afford the university an

11  opportunity to re-evaluate its position after reviewing

12  the information presented by the employee, and to

13  thereafter make a recommendation to affirm or alter the

14  disciplinary action as may be warranted."

15     Q.    Okay.  So let me stop you there and ask you, do

16  you understand what this conference is about because it

17  says that it has to be conducted by the designated

18  representative of the president?

19     A.    Yes.

20     Q.    So did you choose the designated

21  representative?

22     A.    The provost is the designated university

23  official.

24     Q.    So would the provost handle the conference?

25     A.    Along with whomever he decided needed to be

 1  there.

 2      Q.   And so because you said that you spoke with the

 3  provost about the dismissal of Professor Reyes, did you

 4  speak with her about what was happening and who would

 5  serve in the conference?

 6      A.   No, I did not.

 7      Q.   Do you know who served in the conference?

 8      A.   No, I do not.

 9      Q.   Do you know the outcome of the conference?

10      A.   No, I do not.

11      Q.   If the conference decided that there should be

12  no termination, would the provost be required to follow

13  that?

14      A.   No.  As I said about tenure and promotion,

15  those are recommendations.  They're not binding on the

16  university officials.

17      Q.   And if the panel of the conference is a

18  three-person panel of attorneys, for example --

19      A.   Uh-huh.

20      Q.   -- and they find that there was no just cause

21  to dismiss --

22      A.   Uh-huh.

23      Q.   -- and the provost still dismisses, would that

24  be something that you review as president?

25      A.   The provost did talk to me about that and made,

1   I think, a determination that she wanted to move

2   forward.

3       Q.   And so what role do you have in that

4   determination?

5       A.   None whatsoever.  I supported her decision.

6       Q.   So your role was as a supporter?

7       A.   Well, you can say it that way.

8       Q.   But I'm saying how did you say it?  You said

9   you supported her in the decision.

10      A.   I supported the decision in that, you know, I

11  agree that she could move forward, yeah.

12      Q.   Okay.  And why did you agree that she could

13  move forward?

14      A.   Because I had given her the authority to review

15  such matters and I was convinced that she had done her

16  due diligence there.

17      Q.   Okay.  And what due diligence convinced you?

18      A.   Huh?

19      Q.   What due diligence convinced you?

20      A.   Most of the matters she had down here, I think,

21  in her investigation.

22      Q.   And what did she do here?

23      A.   In this letter I think it outlines what her --

24  the basis of her decision was.

25      Q.   All the regulations that FAMU has?

 1    A.   Huh?

 2    Q.   She listed all the regulations of conduct that

 3 FAMU has without specifying any subsection.

 4    A.   I think if you read down further it does go

 5 into some of the details regarding why she formed a

 6 decision to move forward.

 7    Q.   Okay.  So let's go to page 1, at the bottom of

 8 page 1.

 9    A.   Uh-huh.

10    Q.   What is the reason in terms of -- okay, let's

11 go to page 2.  Page 2, at the top of page 2 in the first

12 sentence that begins with "copies."  What does it say?

13    A.   Where are you?

14    Q.   The page 2.  Where it says copies.

15    A.   Which document are you referring to?

16    Q.   The letter, the letter itself, page 2, that

17 sentence that begins with "copies."  What does it say

18 there?

19    A.   Oh, "copies of this and other communication

20 mentioned above are tasked and incorporated in this

21 notice of intent to dismiss from employment and, quote,

22 notice."

23    Q.   Okay.  Now, go to the notice itself and see

24 what communications were attached here.  Are there

25 emails there?

1      A.   I don't know what you are referring to now.

2      Q.   In the back of -- after all the regulations we

3  just went over, do you see any emails there?  After the

4  last regulation, do you see emails?

5      A.   Yeah, there apparently are some emails there.

6  There are.

7      Q.   Did you review those emails?

8      A.   No.

9      Q.   And so as the notice says, that the basis for

10  dismissal is the emails that are attached.

11      A.   There's a paragraph on page 1 that provides the

12  reason --

13      Q.   Uh-huh.

14      A.   -- for -- of the letter the provost talks about

15  and I don't think I see attached emails in there.

16      Q.   And ultimately she says that it's these

17  communications that are a part of this notice that are

18  copied in here and attached and incorporated, so she

19  incorporated them into the letter; correct?

20      A.   "Copies of the communications mentioned above

21  are attached and incorporated in this notice of intent

22  to dismiss from employment."

23      Q.   Did you review any of the emails yourself?

24      A.   No.

25      Q.   How long has Provost Allyson Watson been with

1    the university?

2        A.    She served as dean of the college of education,

3    I don't know, for several years.  Probably less than

4    five years.

5        Q.    Okay.  Several years or less than five years?

6        A.    I don't know the exact time that she served as

7    dean there and really turned that program around and

8    then I think for a year or two as provost.

9        Q.    Okay.  And how long did we say, when we did the

10   math at the beginning, has Professor Reyes been at FAMU?

11       A.    Longer than two years.

12       Q.    Was it 15 years that we said?

13       A.    I mean, yes, I assume.

14       Q.    Did we do the math from 2009 to 2024?

15       A.    Yeah.

16       Q.    Uh-huh.

17       A.    That's -- that's -- that's longer -- yeah,

18   that's 15 years.

19       Q.    Was Carrie Gavin fired from her position?

20       A.    I don't believe so, I think she retired.

21       Q.    Was Darryll Jones fired from his position?

22       A.    Not to my knowledge.

23       Q.    Was Jeremy Levitt fired from his position?

24       A.    Not to my knowledge.

25       Q.    What race is Carrie Gavin?

1      A.    I assume she's African American, but you can't

2   tell just by looking.

3      Q.    And what race is Jeremy Levitt?

4      A.    Once again, you know, I assume that he's

5   African American, but I can't tell by looking.

6      Q.    Do you know how he self-describes?

7      A.    No, I don't.

8      Q.    Have you read any of his obits or articles?

9      A.    No, I haven't.

10     Q.    And what about Darryll Jones?

11     A.    Same thing.  Appears to be African American.

12     Q.    And what race does Professor Reyes appear to

13  be?

14     A.    You know, Hispanic.

15     Q.    Uh-huh.  Okay.  And what race is Provost

16  Allyson Watson?

17     A.    Once again, if I saw Allyson Watson in Miami,

18  she would appear to be Hispanic.

19     Q.    But how does she self-describe at FAMU?

20     A.    I really don't know.  But I think she

21  identifies as black, African American, but, you know,

22  she could easily physically fit the description of

23  Hispanic.

24     Q.    Pass you mean?

25     A.    Huh?

1      Q.   Pass?  Quote "pass" pass?  Can African

2   Americans pass -- can some African American pass --

3   quote, pass?

4      A.   As what?

5      Q.   As other race.

6      A.   Yeah, there are stories about that, yeah.

7      Q.   Can some white people "pass" as another race?

8      A.   Yeah, they can.

9      Q.   Can some Hispanics "pass" as another race?

10     A.   Well, you know, you have to be careful about

11  race and ethnicity, right, because race, you know, is

12  black, white, maybe Asian.  But, you know, ethnicity,

13  even upon black folks, if you look, they would ask you

14  to identify if you are black versus Hispanic because

15  there are some black folks who classify themselves

16  ethnically, I mean, as Hispanic.  It's really difficult

17  to figure out because a lot of people going to FAMU -- I

18  found out I had 25 high school units from Puerto Rico

19  that we identified as Hispanic, they self-identified as

20  Caucasians, so it works all kinds of ways.

21     Q.   So people can self-identify you because you

22  didn't want to identify Jeremy Levitt as black because

23  you said you don't know; right?

24     A.   I try not to get into the whole issue -- I just

25  see people, you know.  And I don't get into the issue of

1  race or ethnicity unless they want to talk about that.

2  It has no bearing on the people we hire or we fire.

3      Q.   So would you say you're color blind?

4      A.   That's probably right, uh-huh.

5      Q.   Okay.  And when you were talking about race and

6  when we got into can Hispanics "pass" and you said

7  there's a difference in ethnicity and race, so do you

8  consider Hispanic a race or an ethnicity?

9      A.   An ethnicity.  Because you can be black

10 Hispanic, you can be Puerto Rican Hispanic, you can be

11 Mexican Hispanic, you know, it's just such an

12 interesting, you know, category of people who can fall

13 into that category.

14     Q.   And so if a Hispanic says that for them -- are

15 you familiar with the definition of Hispanics in the

16 U.S. census?

17     A.   Of Spanish descent, I think that's the

18 definition.  But there are some nuances; right?  And I

19 -- I just remember in my days in New Mexico, I referred

20 to a person who looked Mexican, as such, and I was given

21 a staunch lesson in the difference between Hispanics,

22 descendants of Isabella versus, you know, descendants of

23 the Aztecs and the Incas of Peru, so there's a lot of

24 variation there, you know, and I just let people decide

25 what they want to be.

1    Q.   And so your knowledge now of Hispanics and

2    race, from what you're relating now, is based on the

3    experiences that you've had with some people that you've

4    talked to?

5    A.   And that I've worked with and so forth over the

6    years, yeah.

7    Q.   And are there variations within black people?

8    A.   Yeah, uh-huh, yeah.

9    Q.   And so are there variations within white

10   people?

11   A.   Yeah.

12   Q.   So are there variations with Asians?

13   A.   Oh, yeah.

14   Q.   So what makes the variations among Hispanics

15   different?

16   A.   I didn't say it was.  I mean, it's what people

17   choose to be, what their origins are, what their

18   cultures are, what they eat, drink, enjoy in terms of

19   music and other things that somehow -- sometimes defines

20   who people identify with.  Skin color isn't always the

21   determinant in matters like that.

22   Q.   And so are there black people that could

23   identify as something other than black?

24   A.   Yeah, they could identify Hispanic, they could

25   identify as white if they choose; right?  People can

1  choose to be what they want.  And what you see and what

2  they think of themselves could be entirely different.

3      Q.   And could Hispanics, some Hispanics, choose to

4  describe themselves as race Hispanic?

5      A.   I'm not familiar with the -- I mean, that's

6  possible, right, because you can look at the forms and

7  they designate, you know; African American, white,

8  Hispanic or black.  And then they ask you in some

9  instances whether or not you're black, you're African

10  American or black Hispanic, it just depends; right?

11      Q.   But in the beginning when you were saying

12  black, white, or Asian, what did you mean by that in

13  terms of the racial categories?

14      A.   So those are primary racial categories, I

15  believe.  And there may be a lot of sub categories to

16  that.

17      Q.   And do you think that there is some Hispanics

18  who will not fit in either the white, the black, or the

19  Asian category?

20      A.   I think if that's what they choose to do,

21  people can fit wherever they want.  And I'm not the one

22  to be the judge of that.

23      Q.   Do you think you can fit wherever you want?

24      A.   I fit as an African American and I'm satisfied

25  with that.

1      Q.    Could you fit as a white person?

2      A.    I've never even entertained the notion.

3      Q.    So could there be Hispanics that don't

4  entertain the notion of fitting within the white

5  category or the black category you think?

6      A.    It could be possible, yes.

7      Q.    Okay.  So I'm going to now ask you about the

8  perceived -- do you perceive of the decision that was

9  made to dismiss Professor Reyes?  Any potential for

10  somebody to look at it and think "why was she dismissed

11  over emails, when other people have not been dismissed

12  for covering up sexual harassment, sending emails where

13  they're clearly abusing -- a man abusing a woman, and

14  other violations that, you know, some employees, that

15  have been alleged against some employees."  Do you think

16  that some people would perceive that there was an

17  injustice for firing Professor Reyes over the emails

18  that were attached to this notice?

19           MS. REINER:  Object to the form.

20      A.    I really can't attest to other people and their

21  circumstances, but I think each case when it comes to

22  matters like this has to stand on its own.  And, you

23  know, the next case will be different for the next

24  person; right?  I mean, the set of circumstances will be

25  different.  So trying to compare them, I don't think, is

1   appropriate for me to do and I don't think our legal

2   counsel and HR people are -- and the provost are looking

3   at the circumstances around that individual at that

4   particular time.

5           And, you know, it is not entirely -- you know

6   impossible that these other things and these other

7   people would be looked at, as well.  But for now, in

8   this particular case, this was based on the provost's

9   assessment of this particular situation.

10      Q.   So the provost has the privilege to charge

11  Professor Reyes under the entire code of conduct?

12          MS. REINER:  Object to form.

13      A.   As I said, there are pieces --

14      Q.   And let me correct that, just so we get it.

15  Does the provost have the privilege to charge a tenured

16  faculty member, in this case Professor Reyes, a Latina

17  faculty member, with the entire code of conduct?

18          MS. REINER:  Object to form.

19      A.   Once again, I think --

20          MS. REYES:  I'm sorry, let me allow your

21      counsel.  Does the provost have the privilege to

22      charge a faculty member under the entire code of

23      conduct?  Please specify.

24          MS. REINER:  Misstates facts in evidence.

25          MS. REYES:  What is the facts not in evidence?

1        MS. REINER:  You're saying that she charged you

2    under the entire code and I don't think that that's

3    actually the evidence in the case.

4        MS. REYES:  We just went over -- I'm not going

5    to argue with you, but I think that it is evident

6    that he answered already that we already went over

7    the fact that all of these are the regulations and

8    none of them specify a subsection.  So we're going

9    to --

10       MS. REINER:  We went over what's in the

11   package, but I think that will be up to the provost.

12       MS. REYES:  We're going to leave it at that

13   because I think it will be obvious for the record

14   what was charged.

15 BY MS. REYES:

16   Q.   Does the provost have the privilege to charge

17 as she did in Paragraph 1 of the letter?

18       MS. REINER:  Object to form.

19   A.   I think there are sections of Paragraph 1 in

20 these different regulations that apply in this case.

21 And yes, she does have authority to do so.

22   Q.   Okay.  If you did not review the emails, how do

23 you decide that she has the authority to do so?

24   A.   She has delegated authority as per her position

25 as provost and vice president of academic affairs.

1    Q.    And who is her supervisor?

2    A.    Currently it's the chief operating officer.

3    Q.    And do you have any oversight?

4    A.    The chief operating officer does report to me,

5    yeah.

6    Q.    Okay.  And when a situation like this would

7    happen -- because do the regulations say that they have

8    to review mitigating circumstances, that they have to

9    charge and discipline based on the seriousness of the

10   offense, is there any review of the provost's authority

11   in that regard?

12   A.    The provost, as I said, in consultation with

13   legal counsel and HR, that's where they discuss those

14   matters.

15   Q.    Okay.

16         (Exhibit Number 31 was marked for

17   identification.)

18   Q.    I'm going to give you what's been marked as

19   Exhibit 31.

20         MS. REINER:  Before we ask, I just wanted to

21   see, it's 4:28.  About how much longer do you think?

22         MS. REYES:  I don't know.  I think we're going

23   to do it like my deposition, except I'm taking a lot

24   less breaks than we did with mine.

25         MS. REINER:  No, I mean, I'm asking do you have

 1      any --

 2           MS. REYES:  I don't know.  It depends on how we

 3      get through the evidence, but, I mean, I'm going to

 4      get to the seven hours possibly.

 5           MS. REINER:  Okay.  Well, I'm asking for a

 6      time, I guess, because we started at 10:00; right?

 7           MS. REYES:  We started at 10:00, but we took

 8      the lunch break.

 9           MS. REINER:  45-minute break and --

10           MS. REYES:  Yeah.

11           MS. REINER:  Thank you.

12           MS. REYES:  It will be shorter than you took

13      for mine.

14           MS. REINER:  Okay.

15  BY MS. REYES:

16      Q.   Okay.  So let's look at what has been marked as

17  exhibit -- what number is that, Dr. Robinson?

18      A.   31.

19      Q.   Okay.  So for Exhibit 31, how would you

20  identify the first page?

21      A.   This is a -- plaintiff filed in the

22  United States District Court Northern District of

23  Florida, Jennifer Smith, Plaintiff versus Florida

24  Agriculture & Mechanical University Board of Trustees as

25  the defendant.

1      Q.    And what is this?  What document is this?

2      A.    This is the deposition of Maurice Edington held

3   on Monday, April the 8th, 2019.

4      Q.    And let's go to -- because this is an excerpt

5   of that deposition, but if you notice at the top, does

6   it have markings at the top of the page?

7      A.    Yeah, it's the case number, a filed date, and

8   indicating that this is page 2 of 539 pages.

9      Q.    Okay.  And so when we go to the next page, what

10  page of those 539 pages is the next one?

11     A.    It seems to be a cover page and the page

12  numbers don't start until the next page.

13     Q.    But at the top of there where it says page

14  something --

15     A.    Okay.  At the top it says page 216 of 539.

16     Q.    And what is that document titled?

17     A.    Florida Agricultural and Mechanical University

18  College of Law, Self Study, Part 1, SEQ Narrative

19  Responses, March 4 through the 6th, 2019.

20     Q.    And are you familiar with this document?

21     A.    No.

22     Q.    So when the law school does a self study, does

23  the president have any role in that?

24     A.    I don't.  It goes through the provost as chief

25  academic officer.

1      Q.    Okay.  And so now let's go to the next page.

2   And we'll go through some of those sections and I'm

3   going to point you to them and then I'm going to ask you

4   if what I'm pointing to is what you see on this page.

5      A.    Okay.

6      Q.    So this at the top is marked page 217 of 539.

7      A.    Uh-huh.

8      Q.    And it's titled 2018-2019 Self Study?

9      A.    Uh-huh.

10     Q.    Site Evaluation Questionnaire - Narrative

11  Responses.

12     A.    Uh-huh.

13     Q.    To be used for site visits occurring in

14  2018-2019.  What are those site visits?

15     A.    Well, I'm assuming that they are referring to

16  the bar, you know, which is an accredited entity for the

17  college of law.

18     Q.    Okay.  And so there is a description of what

19  information that they have to include apparently.  Is

20  that your understanding that the information that they

21  include is because this is required information?

22     A.    Yes.  Uh-huh.

23     Q.    Okay.  So let's go now to page 5.

24     A.    Okay.

25     Q.    At the top of page 5 under (d) --

1     A.    Uh-huh.

2     Q.    -- in that first paragraph, what does it say

3 there, please?

4     A.    It says, "If the dean was" --

5     Q.    No, under the (d).

6     A.    That's what I'm reading.  Under (d)?

7     Q.    Yeah, under (d).  Under that paragraph (d) the

8 intended language where it begins "in May"?

9     A.    "In May of 2015, LeRoy Pernell, Dean of the

10 College of Law announced that he would be leaving his

11 post and returning to his full-time faculty position.

12 Under the direction of Marcella David, former provost

13 and vice president for academic affairs, the university

14 partnered with Greenwood/Asher & Associates, Inc. in

15 search for the new dean.

16         In addition, the university established a

17 search committee chaired by Ann Wead Kimbrough, former

18 dean of the FAMU college of school of journalism and

19 graphic communication.  The search committee consisted

20 of 13 members, 6 law school faculty, 2 staff, 2

21 students, 1 university representative, and one alumnus.

22 The full committee is listed below."

23     Q.    Okay.  And so when you were interim president,

24 was Dean LeRoy Pernell the dean?

25     A.    Yes, he was during the 2012 time frame through

1  April 2014, yeah.

2      Q.    Okay.  And so after you were interim dean at

3  that time?

4      A.    Interim president.

5      Q.    Interim dean -- I mean interim president at the

6  time, there was another president who came in?

7      A.    Yes.

8      Q.    And that would have been who?

9      A.    That would have been doctor -- Jesus, I'm

10  losing --

11      Q.    Let me rephrase the question.

12      A.    Her name -- Jesus, I'm blanking out on that.

13  Dr. Elmira Mangum --

14      Q.    Okay.

15      A.    -- was the president who started in 2014, yes.

16      Q.    And so did she hire Marcella David as provost?

17      A.    Yes.

18      Q.    And so let's go to the bottom of page 5.  And

19  by the way, and who hired Dean Epps, Felecia Epps as

20  dean of the law school?

21      A.    I think Provost David did.

22      Q.    So let's go to page 5 at the bottom, what does

23  it say there starting in May of 2017?

24      A.    "In May of 2017, Dean Epps was asked to return

25  to the faculty and professor and former dean, LeRoy

1  Pernell, was appointed by the university as the interim

2  dean at Florida A&M University.  The appointment of the

3  interim dean is the -- a responsibility that's within

4  the purview of the provost and vice president for

5  academic affairs.  A search for the permanent dean at

6  the college of law has been announced.  However, the

7  process has not been announced."

8      Q.   So when they say "was asked to return to the

9  faculty," what does that mean?  Was asked to step down

10  as dean?

11      A.   Asked to step down as dean and return -- or go

12  to the faculty ranks, in this case, because I don't

13  think she was there initially.  So yes, that's what that

14  means.

15      Q.   And in May of 2017, who was the president of

16  FAMU?

17      A.   Well, I was interim -- well, I was still the

18  interim president at that time, uh-huh.

19      Q.   And who was the provost?

20      A.   Doctor -- well, Rodner Wright, I believe, may

21  have been Maurice Edington at that time.  Somewhere in

22  there we switched.  I can't remember exactly when.

23      Q.   So because Dr. Wright was provost before in

24  2014, you brought him back as interim provost?

25      A.   Uh-huh.

1      Q.   Okay.  So let's go to the next page on page 8,

2   under (f).  Do you see that little (f) there?  What does

3   it say there?  Please read what it says -- not under

4   (f), but right (f) -- next to (f) where it starts

5   "describe".

6      A.   Okay.  "Jennifer Smith versus FAMU BOT."

7      Q.   No, I'm sorry, I want you to read above it so

8   that we know what it is that is going to be under that

9   subsection.

10     A.   Okay.  "Describe any significant litigation

11  affecting the law school or the university or other

12  entity of which it is a part, if applicable, and

13  summarize the applicable insurance provider, policy

14  limits, and deductibles.  Provide a summary as to how

15  the law school or the university will fund the

16  deductible and any potential losses outside of the

17  insurance policy coverage, if applicable.  Note --

18  excuse me -- significant litigation is litigation that

19  has the potential to negatively affect the current or

20  anticipated financial resources available to the law

21  school or the university's or the law school's

22  accreditation."

23     Q.   So what is the insurance coverage for the law

24  school or the university?

25     A.   So there's a -- what is it called?  The state

1  has a -- has a process and funds to work with us to

2  address certain legal matters.  They put a cap on that,

3  I believe, at 200,000 plus dollars --

4      Q.    Uh-huh.

5      A.    -- to support certain forms of litigation for

6  the university; okay?  And that is when we have these

7  discussions about these matters and so forth, that group

8  works with our legal team to help us, you know, decide a

9  path forward; okay?

10     Q.    And so the 200,000 limit, is that per claim?

11     A.    Yes, uh-huh.

12     Q.    And how many claims can a university have under

13 those limits?

14     A.    I'm not sure if there's a limit.  I don't even

15 know if that is the case at all.  I just don't know.

16     Q.    Do they pay for attorney's fees?

17     A.    In some cases they will, yes.

18     Q.    But I'm saying when the university has

19 litigation, who pays the attorney's fees?

20     A.    Well, it depends on the outcome.  It could be

21 the plaintiff's accountant -- the attorney that pays.

22     Q.    Okay.  Let me rephrase.  Who pays the

23 attorney's fees to represent the university?

24     A.    Yeah, well, we pay that person -- those

25 persons.  And sometimes we can recover that based upon

1   the outcome of the suit.

2      Q.   And when you say "we" pay, who is "we"?

3      A.   We is the university, uh-huh.

4      Q.   So does it come from the university's budget,

5   the attorney's fees?

6      A.   Yes.

7      Q.   So for the representation of lawsuits that

8   arise from situations that happen in the law school,

9   does that come from the university's budget?

10      A.   Yes, uh-huh.

11      Q.   And what is that line item called?

12      A.   I don't know the exact title of it, but there

13   is a budget that is included each year by the legal

14   counsel and I just don't know the exact line item for

15   it.

16      Q.   Does the state appropriate monies directly to

17   that line item?

18      A.   No, we have to take monies that are

19   appropriated to the university and find a way to address

20   those issues out of our basic appropriation from the

21   university -- I mean, from the legislature.

22      Q.   So the total amount of attorney's fees would be

23   reported in the budget -- would it be reported in the

24   budget of the university?

25      A.   We do provide an update on that to the board

1  periodically as to where we are on that at least.  I

2  think maybe on a quarterly basis, actually.

3      Q.    And is that a public record?

4      A.    I don't know for sure because these legal

5  matters are handled a lot differently than normal, you

6  know, matters are.  But I don't know the answer to that.

7      Q.    Is the budget a public record?

8      A.    Yeah, I believe that is a public record.

9      Q.    So if these legal fees are line items in the

10 budget, they would be -- the amounts would be public

11 record?

12     A.    If they are -- if they are written in that

13 manner verbatim; okay?  It may just say the office of

14 the legal counsel and so forth in the budget document

15 itself.

16     Q.    Okay.  And with regards to the $200,000 per

17 claim, let's go to page 9 of this document, please.  On

18 the bottom where it says Litigation Funding.

19     A.    Uh-huh.

20     Q.    Can you please read that?

21     A.    "The negligence and discrimination claims will

22 be addressed by the Florida Department of Financial

23 Services, Division of Risk Management" -- that's the

24 entity I was referring to earlier -- "which is the State

25 of Florida self-insurance trust fund.  Premiums are paid

1  by legislative appropriations.  Any losses in excess of

2  the statutory coverage limits of 200,000 per claim" --

3  which I stated earlier -- "and 300,000 aggregate must be

4  addressed by specific legislative actions, specifically

5  a claims bill.  The breach of contract matter will be

6  addressed by appropriate university funding sources,

7  including, if necessary, direct support organizations.

8  Nevertheless, we do not anticipate that the referenced

9  litigation will have a direct negative impact to

10 resources available to the college of law."

11      Q.   Okay.  So what do they mean -- when I was

12 asking you before the $200,000 per claim, what does it

13 mean 300,000 aggregate?

14      A.   You know, I guess they mean if it's more than

15 that in a given calendar year, now you've got to go to

16 the legislature even for a single claim that's over

17 200,000 to get what's called a claims bill; right?  And

18 the legislature could approve that item, specifically if

19 they choose to do so.

20      Q.   Was there a lawsuit when -- the hazing that we

21 talked about before, was there a lawsuit against FAMU?

22      A.   Yes.

23      Q.   And was that settled within the limits of this

24 200,000 per claim or 300,000 aggregate?

25      A.   I believe so, yes.

1      Q.   So that claim settled for 200,000?

2      A.   Well, in terms of what we paid.  There may have

3   been other sources of funds to support the overall

4   settlement.  I just don't remember the details; okay?

5   But the --

6      Q.   Do you remember if they went to the legislation

7   for the extra?

8      A.   No, I don't think we did.

9      Q.   Okay.

10     A.   There's not a high probability of that

11  happening.

12     Q.   Okay.  So when they say here "specific

13  legislative action by a claims bill," that's not the

14  only way to get extra funding?

15     A.   No, it also talks about the direct support

16  organizations such as the Alumni Association.

17     Q.   I'm sorry, the what?

18     A.   The Alumni Association, the Booster Club, and

19  the FAMU Foundation, those are our other -- those are

20  our three official direct support organizations.

21     Q.   And they would have paid for the hazing case?

22          MS. REINER:  Object to form.

23     A.   I didn't say that they did.  And, in fact, I'm

24  not sure who and how much that was in total, so I don't

25  know the particulars around that.

1      Q.   But did someone pay for the extra, over the

2  amount allowed, under this insurance plan?

3      A.   I'm not sure if there was an extra over.  But

4  if it was, clearly we would still be in the case if it

5  wasn't paid, so --.

6      Q.   And these lawsuits that are listed on page 8

7  and page 9 --

8      A.   Uh-huh.

9      Q.   -- why do they have to be listed?

10     A.   Because I think they're put in if anybody wants

11 to know if there were any such lawsuits out there, as

12 you said, that might impact the law school or impact the

13 law school's accreditation.  And these were, trying to

14 be as transparent as possible, provided at this

15 particular time.

16     Q.   Okay.  And let's go to page 11 on here.  I'm

17 sorry, before we move on from the financial aspect of

18 it, let's go to page 10.  On the bottom of page 10 under

19 (b).

20     A.   Uh-huh.

21     Q.   And, you know, when it's talking there on page

22 (b) about "the charges and costs assessed against the

23 resources generated by the law school," that's talking

24 about the budget of the law -- is that talking about the

25 budget of the law school?

1     A.    Yes.  Apparently so, yes.

2     Q.    Where does the budget of the law school come

3  from?

4     A.    General appropriation, as well as tuition and

5  fees.

6     Q.    And general appropriation from where?

7     A.    The Florida legislature.

8     Q.    Does the college of law have a separate

9  appropriation directly to the college of law?

10    A.    At one time it did.  But over the years, I

11 don't think that was maintained.  And I think they're in

12 the general operating budget under the Division of

13 Academic Affairs.  I don't know that for sure.  That was

14 the case when it was originally reopened, right, to

15 ensure that it got all the monies that were directed

16 towards it.

17        The problem was, and still is, that those funds

18 alone are not sufficient to support the law school, so

19 we have to provide additional funds to help make it

20 whole.  Even in light of the fact that, as you know,

21 enrollment has decreased significantly over the last few

22 years.

23    Q.    Let's go to page 11.  What is the title at the

24 top of that page?

25    A.    Non-Discrimination, Equality of Opportunity,

1  Diversity and Inclusion.

2      Q.   And when they say at number 13, Standard 205,

3  can you read what it says there?

4      A.   "Does the law school's nondiscrimination policy

5  regarding faculty and staff prohibit discrimination on

6  the basis of race, color, religion, national origin,

7  gender, sexual orientation, age, or disability?"

8      Q.   And what is the response there?

9      A.   Yes, it does.

10      Q.   Okay.  And what does the next section ask on

11  (b)?

12      A.   "Describe how the law school fosters and

13  maintains equality of opportunity for faculty and staff

14  without discrimination or segregation on the basis of

15  race, color, religion, national origin, gender, sexual

16  orientation, age, or disability."

17          And it reads, "It is the policy of Florida A&M

18  University that each member of the university community

19  is permitted to work or attend class in an environment

20  free of any form of discrimination including race,

21  religion, color, age, disability, sex, sexual

22  harassment, sexual orientation, gender identity, gender

23  expression, marital status, national origin, and veteran

24  status as prohibited by the state and federal statutes.

25  This commitment applies to all areas affecting students,

1  employees, applicant -- applicants for admissions --

2  admissions, and applicants for employment.  It is also

3  relevant to the university's selection of contractors,

4  suppliers of goods and services, and any employment

5  conditions and practices."

6      Q.   So this is what the law school in these

7  documents is representing to the American Bar

8  Association -- is this what the law school is

9  representing to the American Bar Association Accrediting

10  Body?

11      A.   Yes.

12      Q.   Okay.  And how, with regards to the emails that

13  we were going over with -- earlier, that Darryll Jones

14  sent to Professor Reyes and the emails that Jeremy

15  Levitt -- Professor Jeremy Levitt sent to Professor

16  Reyes, how would that fit in terms of this policy that

17  the law school has?

18      A.   As it states, the university policy is the same

19  and it prohibits all of these things here that we talked

20  about and in whatever way those intersects with these,

21  then those things become subject to the conditions of

22  the university, as well.

23      Q.   So specifically with the emails that we went

24  over today authored by Darryll Jones and Jeremy Levitt

25  that included references to race directed at Professor

1  Reyes, how would those be handled under this policy?

2      A.   Well, I think it is first an investigation has

3  to be taken into whether those matters arise to this

4  level.  And then, of course, that would determine what

5  the consequences were for individuals who were in

6  violation of the university policy on a case-by-case

7  basis.

8      Q.   And what made the emails that Jeremy Levitt

9  sent, the emails that Darryll Jones sent, different than

10  the emails -- in terms of the consequences, right, did

11  Professor Reyes's emails include anything about racial

12  attack against anyone?

13     A.   I'm not aware of that.

14     Q.   Did Professor Reyes call anybody names in those

15  emails?

16     A.   I'm not aware of that.

17     Q.   And so when this policy is being applied, is it

18  being applied such that it maintains a nondiscrimination

19  policy regarding how the dismissal or the disciplinary

20  process is applied in the law school to faculty?

21          MS. REINER:  Object to form.

22     A.   I don't know the how part that you're referring

23  to.  I mean, each case is different.  The consequences,

24  as I said before, in those regulations or codes of

25  conduct range -- disciplinary actions have a variety of

1  outcomes, from a letter to a conference to dismissal

2  from employment.  So there is always a range of

3  activities or outcomes for individuals found in

4  violation of our policies.

5      Q.   Did you have a conference with Professor Reyes

6  before she was dismissed?

7      A.   No, I didn't.

8      Q.   Did Provost Watson have a conversation with

9  Professor Reyes before she was dismissed?

10     A.   I'm not aware of that.

11     Q.   Did Interim Dean Cecil Howard have a conference

12  with Professor Reyes before she was dismissed?

13     A.   I'm not aware of that either.

14     Q.   Was Interim Dean Cecil Howard involved in the

15  decision to dismiss Professor Reyes?

16     A.   I'm not aware of his involvement.

17     Q.   Is there any guideline or any policy in writing

18  about how a dismissal decision of a tenured faculty

19  member is done at FAMU?

20     A.   I think, once again, tenure does not exclude

21  anyone from all of the rules and regulations.

22     Q.   Right.  But that was not my question.

23     A.   But that's my answer.

24     Q.   Okay.

25     A.   You are not exempted from university policy

1  because you're tenured, right, because you're visiting.

2  If you're on our campus, the rules apply to everybody;

3  okay?

4      Q.   What do you mean because you're visiting?

5      A.   Even if you're a visiting professor, even if

6  you're a visitor on our campus --

7      Q.   Right.

8      A.   -- you know, you still have to adhere to the

9  university guidelines.

10     Q.   So my question again was does the university

11 have any written guidelines for the dismissal of a

12 tenured professor for just cause?

13     A.   As I just said, a tenured professor would be

14 subject to the code of conduct as would any other

15 faculty, tenured or non, staff member, et cetera, at the

16 university.

17     Q.   And how do -- for example, how do

18 administrators at the university with the privilege,

19 power or authority to charge and dismiss a tenured

20 faculty member, how do they select which faculty member

21 should be dismissed and who should not?

22     A.   I think, as I said, it's done on a case-by-case

23 basis based on the circumstances at that time.

24     Q.   To your knowledge, who was involved in the

25 decision to dismiss Professor Reyes?

1      A.   All I'm aware of is the provost; right?  And I

2  don't know whom else, other than legal counsel, as I

3  said, and HR, who may have been involved in helping her

4  with the decision she made.

5      Q.   Okay.  Let's go to the bottom of page 11.  What

6  is the title of number 14?

7      A.   Standard 205 (Students).

8      Q.   And what does it say there in (a) and what is

9  the response?

10     A.   "Does the law school's nondiscrimination policy

11  regarding students and student admissions prohibit

12  discrimination on the basis of race, color, religion,

13  national origin, gender, sexual orientation, age, or

14  disability?"

15     Q.   And what is the answer?

16     A.   "Yes.  The College of Law's nondiscrimination

17  policy is applicable to the student admissions process

18  and to students once they are admitted to FAMU."

19     Q.   And what does (b) ask for?

20     A.   Say it again.

21     Q.   What does (b) ask for?

22     A.   "Explain how the law school fosters and

23  maintains equality of opportunity for students without

24  discrimination or segregation on the basis of race,

25  color, religion, national origin, gender, sexual

1  orientation, age, or disability."

2      Q.   And what is the response there?

3      A.   "The College of Law fosters and maintains

4  equality of opportunity for students without

5  discrimination or segregation through the university's

6  CEDAR program, through various student organizations,

7  Christian Legal Society, BLSA, the Black Law Student

8  Association, Women's Law Caucus, HALSA, Hispanic

9  American Student Association, Student Federalist

10 Society, Stonewall LGBTQ Student Organization, Asian

11 Pacific Law Students's Association, and American Civil

12 Liberties Union."

13     Q.   Are you aware if Professor Reyes was the only

14 Latino or Hispanic professor in the FAMU College of Law

15 tenured?

16     A.   No, I wasn't aware.

17     Q.   Are you aware Professor Reyes is the faculty

18 advisor of the Hispanic American -- was the faculty

19 advisor of the Hispanic American Law Students

20 Association?

21     A.   I am now, yes.

22     Q.   And how did you become aware of that?

23     A.   As I read through documents in preparation for

24 today's discussion.

25     Q.   What kind of documents?

1    A.    The documents that I said earlier, the primary

2    case description, a complaint that you made, and other

3    things, yeah.

4    Q.    Did you receive any letters from the Hispanic

5    American Law Students Association when Professor Reyes

6    was noticed for dismissal?

7    A.    Yes, I did.

8    Q.    Did you receive a signed letter sponsored by

9    the Hispanic American Law Students Association and

10   signed by over 200 professors from across the

11   United States, law professors, in regards to the

12   intended dismissal of Professor Reyes?

13   A.    I believe I did, yes, uh-huh.

14   Q.    Did you receive a letter from the Association

15   of American University Professors protesting the way

16   that Professor Reyes was being treated in terms of the

17   lack of due process?

18   A.    Yes, I did.

19   Q.    Did you receive a letter from a coalition of

20   minority organizations protesting the dismissal of

21   Professor Reyes?

22   A.    That one I don't recall, but perhaps I did.

23   Q.    Did you receive emails and letters from

24   students --

25   A.    Yes, I have.

1    Q.   -- protesting?

2         Did you read them?

3    A.   Yes, I did.

4    Q.   Did you respond to any of them?

5    A.   No, I did not.

6    Q.   Okay.  Did you respond to any of the

7    organizations?

8    A.   No, I did not.

9    Q.   Okay.  And how do you consider that in terms of

10   the answers that the law school is providing for how it

11   fosters and maintains this environment for students when

12   they're protesting something like that and you don't

13   respond to them?

14        MS. REINER:  Object to form.

15   A.   Because I think those matters were best handled

16   at the law school itself; right?

17   Q.   And how were they handled at the law school?

18   A.   Through the same mechanism of students speaking

19   with deans, and the provost did this on a regular basis,

20   to talk to students and faculty alike about issues.  And

21   I doubt that this issue didn't come up in some of those

22   conversations along the way.

23   Q.   Let's go to page 14, please.  Under number 16

24   where it says Standard 206(b).  Please describe that.

25   A.   It says "Describe the law school's concrete

1   actions that demonstrate the law school's commitment to

2   having a full-time faculty that is diverse with respect

3   to gender, race, and ethnicity.  Provide details of

4   recruiting and hiring efforts for the current and

5   previous two academic years (AALS interviews, campus or

6   other interviews, etc., for tenured, tenure-track, and

7   contract faculty)."

8       Q.   And what was the response to those efforts?

9       A.   "Faculty members come from a wide variety of

10  private and public agencies and organizations.  Their

11  prior experience as law professors, military officers,

12  public defenders, judges, government lawyers,

13  international civil servants, and members of law firms

14  of various sizes -- excuse me -- and practice areas are

15  impressive and invaluable.  The college's faculty is

16  also broadly diverse by reference to gender, race, and

17  ethnicity."

18      Q.   Is the faculty of the college of law widely

19  diverse with regards to representations of Latinos if it

20  doesn't have any Latino or Hispanic tenured faculty?

21      A.   It doesn't state it here.  It says with regard

22  to gender, race, and ethnicity.  So having a Latinda --

23  Latina faculty member contributes to that overall

24  diversity.

25      Q.   But do you need a Latina faculty member to have

1   the diversity that you think would meet this

2   requirement?

3       A.   It could be diverse through other groups;

4   right?  But the fact is we had a Latina faculty at the

5   law school and I think your statement is accurate from

6   that perspective.

7       Q.   Could you have -- in your opinion, could you

8   have a faculty that meets the diversity requirement if

9   it's an all black faculty?

10      A.   It could be diverse because of gender; right?

11  Even ethnicity, since all black faculty aren't the same.

12  Some of them could indeed be Hispanic and that's a level

13  of diversity that's important, as well.

14      Q.   Black and Hispanic?

15      A.   Yeah, that's diverse.  I mean, it could be.

16  And I think gender is just as important, as well, right,

17  as race and ethnicity.

18      Q.   Could you have a faculty that's an all white

19  faculty be diverse?

20      A.   Once again, it could be diverse with regard to

21  gender and/or ethnicity, right.

22      Q.   And so universities having all white faculty

23  would meet their -- you think would meet the

24  requirements of diversity according to the ABA standard

25  here that they are asking about?

1    A.   I don't know what they're asking for and what

2 metric they use to evaluate that.  But I am certain that

3 they would consider gender as part of that decision, as

4 well.

5    Q.   Okay.  So would you have diversity if you had

6 an all black male faculty?

7    A.   Once again, unless they were -- there were no

8 ethnic -- ethnicic -- ethnictic --

9    Q.   Ethnicity.

10    A.   -- ethnicity differences, then you wouldn't

11 necessary call that diverse, but it could be diverse

12 from other perspectives not mentioned here by age,

13 tenure, you know, former occupation, and so forth that

14 others consider to be very important, as well.

15    Q.   What about an all black women faculty?

16    A.   Once again, the same answer to that; right?  I

17 don't think that's what the ABA means, but I think it's

18 important for them to make that assessment as opposed to

19 me speculating about it.

20    Q.   Okay.  So let's --

21         (Exhibit Number 32 was marked for

22    identification.)

23    Q.   I'm going to give you what's been marked as

24 Exhibit 32.  And earlier you said that at some point

25 Dean Pernell stepped down in 2015?

1      A.   Yes.

2      Q.   Were you the president at the time?

3      A.   No.  In 2015 I was back in the faculty ranks?

4      Q.   So it would have been Elmira Mangum at that

5  time?

6      A.   Yes.

7      Q.   And so this announcement, how -- it's sent in

8  the form of a letter; okay?  So did you see this

9  announcement when it was made?

10     A.   I said I heard about it, but I don't recall

11  seeing this specific letter.

12          (Exhibit Number 33 was marked for

13      identification.)

14     Q.   I'm going to give you what has been marked as

15  Exhibit 33.  Can you please describe what you see there

16  in exhibit -- that one page, Exhibit 33?

17     A.   So it's an email from Nicky Boothe-Perry, who

18  was the interim dean at the college of law.

19     Q.   Well, in there, in that email we're going to

20  get to her title at the time when she sent the email.

21     A.   Okay.

22     Q.   So right now, so let's look at her name at the

23  top.

24     A.   It's Nicky Boothe-Perry.

25     Q.   And when was it sent?

1      A.    April the 16th, 2019, at 9:21 a.m.

2      Q.    And who was it sent to?

3      A.    The college of law faculty.

4      Q.    Is that with the list serve called faculty?

5      A.    I believe it's the same list serve we referred

6   to several times today.

7      Q.    And what is the subject of that?

8      A.    Emergency Town Hall Meeting - today at

9   11:00 a.m.

10      Q.    And what does it say in the message?

11      A.    "Good morning colleagues, Happy Tuesday.

12   Please see attached re:  Provost town hall meeting this

13   morning at 11:00 a.m.  Have a great day.  Nicky."

14      Q.    And what is her title underneath that?

15      A.    Underneath that is Nicky Boothe-Perry, Esquire,

16   Professor of Law, Associate Dean of Academic Affairs,

17   Florida A&M University -- Florida Agriculture &

18   Mechanical University College of Law.

19      Q.    And you referred to her initially -- why did

20   you refer to her as interim dean?

21      A.    Because I think at some point she did serve in

22   that capacity.

23      Q.    Do you know if this emergency town hall was the

24   town hall when she was named interim dean?

25      A.    I did know that, yeah.

1      Q.   Do you know how Deidre Keller announced her

2   resignation?

3      A.   I really don't know, but I've read through here

4   via email or something to the faculty.  I really don't

5   know.

6      Q.   Okay.  Let's go to the notice of dismissal of

7   Professor Reyes.  That document.

8      A.   You're going to have to excuse me, I've got to

9   take a two-minute break, if you don't mind.

10          MS. REYES:  I'm going to take a little break,

11      too.

12          THE COURT REPORTER:  Off the record?

13          MS. REYES:  Off the record, please.

14          (Break taken from 5:09 p.m. to 5:13 p.m.)

15          MS. REYES:  Let's go back on the record,

16      please.

17          (Exhibit Number 34 was marked for

18      identification.)

19   BY MS. REYES:

20      Q.   Dr. Robinson, I'm going to give you what has

21   been marked as Exhibit 34.  And so I'm handing you a

22   memo that is a four-page memo.

23      A.   Yes.

24      Q.   And it's addressed to Dr. Larry Robinson,

25   President FAMU, and Dr. Maurice Edington, Provost FAMU

1   from Attorney Maritza Reyes, Associate Professor, FAMU

2   College of Law, re:  Application for promotion to full

3   professor dated June 28, 2019.

4       A.    Uh-huh.

5       Q.    Do you remember getting this memo?

6       A.    I don't specifically remember this, no.

7       Q.    Okay.  So we're going to state that it is what

8   it purports to state.  And it states what it purports to

9   state.  And in a summary way, it's a memo before

10  Professor Reyes received the decision on her promotion

11  -- the denial of promotion in August of 2019.

12          And in this memo she is bringing to your

13  attention a report that was attached by FAMU in

14  documents in a lawsuit in the United States District

15  Court for the Northern District of Florida as described

16  in the bottom paragraph, second, under the table.  Take

17  a look at that, that paragraph, please.  That starts "I

18  have an additional piece of evidence."

19      A.    Okay.

20      Q.    And it's a report by FAMU's expert, Dr. Patrick

21  L. Mason, Professor at Florida State University.  And in

22  his report Dr. Mason examined the scholarly productivity

23  of professors employed by Florida A&M University College

24  of Law.  And Professor Reyes is informing you and

25  Provost Edington that she was found in the cohort of

1   faculty of very high productivity.  Are you aware of

2   that report?

3       A.   No, I'm not.

4       Q.   Okay.

5            (Exhibit Number 35 was marked for

6       identification.)

7       Q.   I'm going to give you what has been marked as

8   Exhibit 35.  What number does it have at the top?  What

9   numbers does it have at the top of the document?

10      A.   Case 4:18-cv-00409-RH-CAS Document 62-5 --

11  excuse me -- filed 04/15/19, Page 366 of 539.

12      Q.   Okay.  And so we're going to quickly go to --

13  go to page 2, please.

14      A.   Okay.

15      Q.   And on the bottom paragraph, please read where

16  it starts "very high productivity".

17      A.   "Very high productivity faculty consists of 12

18  faculty (43 percent of associate professors and

19  professors) with citations, publications, or citation

20  per publication exceeding the median productivity level.

21  Very high productivity faculty have 50 to 81 citations.

22  Nicola Boothe-Perry, Ann Marie Cavazos, Jonathan

23  Fineman, Maritza Reyes, and Deleso Alford Washington

24  were associate professors during 2015-2016.  All other

25  faculty in this group are -- are were professors during

1  2015 through 16."

2      Q.    Okay.  So let me stop you there because I just

3  want to make sure at that time when they were -- are

4  they talking about Professor Reyes being still an

5  associate professor at that time?

6      A.    I don't know because I'm confused by the

7  sentence that said "all other faculty in this group were

8  -- are were professors," so you know.

9      Q.    So would Professor Reyes, when they say were

10  associate professors during 2015-2016, would that

11  include Professor Reyes there?

12      A.    Yes, uh-huh.

13      Q.    Because, in fact, Professor Reyes's application

14  for promotion was denied in 2019, so she would not have

15  been a full professor in 2015-2016?

16      A.    Yeah, I was wondering that.  The way the

17  sentence is written has two verbs and that's --

18      Q.    Okay.  So would you agree that Professor Reyes

19  was an associate professor at that time?

20      A.    According to this documentation, yes.

21      Q.    And do you know if Professor Reyes, within the

22  group that's cited there, was -- had fewer years in

23  academia than all the others that are cited there?

24      A.    I don't know the answer to that, yeah.

25      Q.    Okay.  When you received this memo, and this

1   was attached to this memo, do you remember even if you

2   looked at it?

3       A.   I don't recall receiving this and that doesn't

4   mean I didn't, I just don't recall it.

5       Q.   Okay.  I'm going to give you what's been marked

6   as Exhibit Number 36.

7            (Exhibit Number 36 was marked for

8       identification.)

9       Q.   Again, please read the numbers at the top of

10  that document.

11      A.   Case 4:18-cv-00409-RH-CAS Documents 62-5 filed

12  4/15/19 Page 499 of 439.

13      Q.   Okay.  And what is the title of that?

14      A.   Florida A&M College of Law 2015-2016 Budget -

15  Final.

16      Q.   Okay.  And under revenues -- so the revenues

17  would be right at the top of the budget; right?  How

18  many items are there under Revenue?

19      A.   Under Revenues there's university appropriation

20  -- well, under university appropriation there's

21  education and general, we refer to it as E&G, university

22  budget allocation and total allocation.  And there's a

23  subcategory there off to the right UF (Reyes).

24  Apparently that had to be your salary when you were

25  there.

 1    Q.   Okay.  And how much was that?

 2    A.   $66,744.09.

 3    Q.   So were you aware that the university -- well

 4  the college of law budget received a windfall of

 5  66,744.09 when Professor Reyes went to visit at UF law?

 6         MS. REINER:  Object to form.

 7    A.   A windfall?  I wouldn't consider it a windfall.

 8  But no, I was not aware that they paid, but I don't

 9  think that's unusual, right, because as I said, when I

10  went to the U.S. Department of Agriculture, they paid

11  FAMU half of my salary.  I never saw it.

12    Q.   Yeah.  So Professor Reyes remained on the FAMU

13  salary.  Professor Reyes remained on the FAMU salary.

14  FAMU would charge -- would FAMU charge UF Law?

15    A.   Uh-huh.

16    Q.   And when they would charge UF Law, would that

17  be the 66,744.09 that FAMU received and made it into a

18  line budget called UF (Reyes)?

19    A.   I assume that's the case, yes.

20         MS. REYES:  Okay.  And on that positive note of

21         Professor Reyes brought money to FAMU in addition to

22         everything else, you can have your questions now.

23         MS. REINER:  Okay.  I'm just going to object to

24         the form.  I don't know if that was going to be a

25         question or whatnot, but anyway.  I'd like to take a

1    stack, and hopefully I'll do this pretty quickly

2    here.

3                         CROSS-EXAMINATION

4    BY MS. REINER:

5         Q.   First of all, President Robinson, do you recall

6    testifying today or being asked questions regarding

7    faculty regalia --

8         A.   Yes, I do.

9         Q.   -- to be worn?

10        A.   Uh-huh.

11        Q.   Okay.  Do you have any personal knowledge of

12   how the decision is made regarding what faculty regalia

13   will be listed on a -- on the program for the ceremony?

14        A.   No, I don't.

15        Q.   Okay.  Do you have any personal knowledge of

16   whether other universities that other faculty attended

17   were also excluded from the program?

18        A.   No, I don't.

19        Q.   Okay.  I'm going to take you to what has been

20   marked as Exhibit 5 to the deposition for identification

21   purposes.  It was one of the earliest ones.

22   I apologize.

23        A.   I had these in order, but I got them back out

24   of order.

25             MS. REYES:  If you put them in order now, that

1    would be great.

2        A.    That's what I had done and then I got them out

3    of order.  Oh, there are the first ones.  That's 2.  4

4    and 5, yes.  One-pager?

5        Q.    Yes, it's a one-page document.  And that

6    letter, I believe, was identified as a June 15th, 2015,

7    letter to Ms. Reyes; is that correct?

8        A.    That is correct.

9        Q.    Okay.  And it was informing her that at its

10   June 10th, 2015, meeting, the Board of Trustees approved

11   her for tenure; is that correct?

12       A.    That's correct.

13       Q.    So at least as of June 15th -- excuse me,

14   June 10th, 2015, Ms. Reyes had tenure with FAMU; is that

15   correct?

16       A.    That is correct.

17       Q.    Okay.  And as part of applying for tenure, I

18   believe Ms. Reyes asked you some questions regarding the

19   application process with respect to tenure and

20   promotions; do you recall?

21       A.    Yes.

22       Q.    Okay.  I'd like you to turn to Exhibit 16, if

23   you would, please.  And this is Ms. Reyes's publications

24   list.

25       A.    I see 15.  16?

1      Q.   Yes.

2      A.   Okay.

3      Q.   Looks like this.

4      A.   Yeah.  This one?  Okay.  All right.

5      Q.   I believe it should be 16.

6      A.   Yes.

7      Q.   Okay.  So based on your knowledge of the tenure

8  and promotion process, when they're considering the

9  scholarly aspect of someone's application, articles that

10  they've written, things that they've published, things

11  of that nature, do they -- for each promotion that is

12  requested, or when someone requests tenure, do they

13  consider the full body of their work?

14      A.   No, not in general.  Typically if for

15  promotion, certainly in the case of full professor,

16  they'd look at publications after the promotion to

17  associate professor.  And in the interesting event --

18  case we have here, I think the whole idea there is to

19  avoid double-counting publications, right, and looking

20  at the scholarship after a certain point and -- but in

21  general, they typically only look at publications in the

22  time frame the person was in that category.

23      Q.   So if someone was in -- was an associate

24  professor and they were applying for tenure, would the

25  committee look at articles and publications that were

1   written between the period the person became an

2   associate professor and the period they applied for

3   tenure?

4       A.   Yes.

5       Q.   Okay.  Ms. Reyes applied for -- and received

6   tenure in June of 2015.

7       A.   Uh-huh.

8       Q.   So in evaluating her application for full

9   professor in 2018, what would they look at in terms of

10  scholarly articles?

11      A.   They'd typically look at what happened after

12  twenty -- 2015.

13      Q.   Okay.  So what happened after she obtained

14  tenure?

15      A.   Yeah.

16           MS. REINER:  Okay.  I think those are my only

17      two questions at this time.

18           MS. REYES:  I'm going to now have to ask some

19      questions with regards to that because your

20      testimony now has changed from what you said earlier

21      today.

22                   REDIRECT EXAMINATION

23  BY MS. REYES:

24      Q.   Earlier today you went on the record to say

25  that for an application to promotion to full professor,

1  and we read from the university handbook, the

2  application is judged in terms of the scholarship from

3  the last promotion to the next promotion.  So it would

4  have been from the time that a professor applied for

5  associate professor to the time that the person applied

6  for full professor.

7       A.   I think your case is unique because tenure came

8  in between that.  That's considered, technically, you

9  know, more important than getting a promotion.  And what

10 it does -- what it's an interesting case for is do you

11 double count scholarly works during the time frame?  And

12 I think that's what's happening in the current case and

13 perhaps the faculty at the college of law and the RPT

14 Committee was attempting to avoid that.

15      Q.   During lunch or at any time during a break

16 today, and during this deposition, did you speak about

17 that subject matter with counsel?

18      A.   Yes.

19      Q.   And according to the -- I mean, I want you to

20 take a look now -- and your answer was yes?

21      A.   Uh-huh.

22      Q.   I want you to take a look at Exhibit Number 8,

23 the university Handbook.

24      A.   Okay.

25      Q.   And go to Page 41, please.

1      A.    Okay.

2      Q.    And if you could please read -- just straight

3  read on c from the top.

4      A.    "Candidates must meet the minimum number of

5  publications required by their respective colleges,

6  schools, or institute for tenure and/or promotion.  For

7  promotion to full professor, these publications must be

8  performed during the tenure of the faculty member as an

9  associate professor."

10     Q.    Okay.  And so now I want you to go back to the

11  exhibit of the publications that you were looking at

12  before with counsel.

13     A.    What exhibit is that?

14     Q.    You just had it.  Ms. Reiner just pointed you

15  to it.

16     A.    What's the number you have?

17     Q.    It's right there.

18           MS. REINER:  16, I think it is.  16.

19     Q.    I think it's right there.  No?

20     A.    No, see, that's what I've been --

21     Q.    You were just looking at it.

22     A.    14, 15, there it is, 16.

23     Q.    You found it right there; right?

24     A.    Uh-huh.

25     Q.    So Professor Reyes received an associate

1  professor promotion effective 2011.  She would have been

2  -- when does an assistant professor apply for promotion

3  to associate professor?  In what year?

4      A.    It depends upon the college or school's rules.

5  In some cases an assistant professor gets automatic

6  promotion when they receive tenure to associate

7  professor.

8      Q.    Let's keep it to when Professor Reyes received

9  tenure.  So if Professor Reyes, you know, received

10  tenure, let's say in 2012.  We went over the -- you know

11  from here which articles would have been considered for

12  her promotion to associate professor.

13      A.    So yes, that's your interpretation, but the RPT

14  Committee probably looked at it based upon the time

15  after your tenure before it was made.

16      Q.    So is that different, though, than what you

17  just read in the university handbook?

18      A.    It is, uh-huh.

19      Q.    Okay.  All right.  So I have just one more

20  exhibit I have forgotten.  And we'll close with this

21  one.

22            (Exhibit Number 37 was marked for

23        identification.)

24      Q.    I'm going to give you what's been marked as

25  Exhibit Number 37.  What is that, Dr. Robinson?  What is

1  that document?

2      A.    This is entitled FAMU Fundamentals 2024 Halfway

3  Point Reminder.

4      Q.    What is it?

5      A.    FAMU Fundamentals 2024 Halfway Point Reminder.

6      Q.    And what is that?

7      A.    So every year we have a set of courses that we

8  provide to our faculty/staff online for them to take

9  within a certain time frame.

10     Q.    And what kind of courses is that?

11     A.    They could be everything from cyber security,

12 you know, things related to harassment, EEO issues,

13 Title IX issues.  There is a series of modules in there.

14     Q.    Are those courses required by the Florida Board

15 of Governors?

16     A.    No, but they're required by us.

17     Q.    So there's no requirement --

18     A.    They're required by us.

19     Q.    And when you say "us"?

20     A.    The university, yes.

21     Q.    By the university.  Does the university have to

22 report on completion of those courses to the Florida

23 Board of Governors?

24     A.    We don't have to, but sometimes we do; right?

25     Q.    And so who's the person in charge of that

1   program?  Who sent that email?

2       A.    This is from Ms. Rica Calhoun.

3       Q.    And what is her title?

4       A.    She is the chief compliance and ethics officer.

5       Q.    Uh-huh.  And is Ms. Rica Calhoun the person

6   that you added to the email when Professor Reyes blew

7   the whistle about her not following the investigation

8   procedures and covering up discrimination in the

9   situation of the student?

10          MS. REINER:  Object to form.

11      A.    Yes, those allegations were made.  I included

12  Ms. Calhoun on the email distribution.

13          MS. REYES:  Okay.  I think that will be it,

14      Dr. Robinson.  And we are done.  Thank you.

15          THE WITNESS:  Thank you.

16          MR. REYES:  Oh, I'm going to look through them

17      like usual.  So we're going to go off the record.

18          MS. REINER:  We're going to read.

19          (The deposition was concluded at 5:37 p.m.)

20          (Reading and signing of the deposition was not

21      waived by the witness and all parties.)

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF ORANGE

4

5        I, Christine L. Price, Registered Professional

6    Reporter, Notary Public, State of Florida, certify that

7    the witness, LARRY ROBINSON, personally appeared before

8    me on the 20th day of June, 2024, and was duly

9    sworn/affirmed.

10

11       Signed this 16th day of July, 2024.

12

13   Identification:  Florida driver's license

14

15              *Christie Price*

16              _____

17              Christine L. Price, RPR, FPR-C
                Notary Public, State of Florida
18              My Commission # HH 298762
                My Commission Expires:  October 1, 2026
19
                CHRISTINE PRICE
20              MY COMMISSION # HH 298762
                EXPIRES: October 1, 2026
21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF ORANGE

4

5        I, Christine L. Price, Registered Professional

6    Reporter, do hereby certify that I was authorized to and

7    did stenographically report the deposition of LARRY

8    ROBINSON; pages 1 through 270; that a review of the

9    transcript was requested; and that the transcript is a

10   true record of my stenographic notes.

11

12       I further certify that I am not a relative, employee,

13   attorney, or counsel of any of the parties, nor am I a

14   relative or employee of any of the parties' attorneys or

15   counsel connected with the action, nor am I financially

16   interested in the action.

17

18       DATED this 16th day of July, 2024.

19

20

21

22   _Christine Price_____

23   Christine L. Price, RPR, FPR-C
     Registered Professional Reporter
24

25

WITNESS NOTIFICATION LETTER

July 16, 2024

LARRY ROBINSON
c/o SARAH REINER, ESQUIRE
Gray Robinson, P.A.
301 E. Pine Street
Suite 1400
Orlando, Florida 32801
sarah.reiner@gray-robinson.com

In Re:  MARITZA REYES vs FLORIDA A&M
        Deposition taken on 6/20/2024
        U.S. Legal Support Job No. 6635596-002

The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

We respectfully request that the witness complete their review within 30 days and return the errata sheet to our office at the below address or via email to: southeastproduction@uslegalsupport.com.

Sincerely,

Christine L. Price, RPR, FPR-C
U.S. Legal Support, Inc.
Transcript Production
16825 Northchase Drive
Suite 800
Houston, Texas 77060

cc via transcript:

Maritza Reyes, Esq.

1                          ERRATA SHEET

2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3          IN RE:  MARITZA REYES vs FLORIDA A&M
               DEPOSITION OF:  LARRY ROBINSON
4                  TAKEN ON:  6/20/2024
            U.S. Legal Job No:  6635596-002
5
    PAGE     LINE     CHANGE     REASON
6   _____

7   _____
    _____
8   _____
    _____
9   _____
    _____
10  _____
    _____
11  _____
    _____
12  _____
    _____
13  _____
    _____
14  _____
    _____
15  _____
    _____
16  _____
    _____
17  _____
    _____
18  _____
    _____
19  _____
    _____
20  _____
    _____
21  _____
    _____
22  Under penalty of perjury, I declare that I have read the
    foregoing document and that the facts stated in it are
23  true.

24
    _____
25  LARRY ROBINSON                      Date

Tab 75-3

Maritza Reyes
May 24, 2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:  6:22-cv-1525-WWB-EJK

MARITZA REYES,

      Plaintiff,

v.

THE FLORIDA AGRICULTURAL AND
MECHANICAL UNIVERSITY BOARD
OF TRUSTEES,

      Defendant.
_____/

VIDEO-RECORDED DEPOSITION OF

MARITZA REYES


Friday, May 24, 2024

9:31 a.m. - 5:36 p.m.

Location:  GrayRobinson, PA
301 East Pine Street
Suite 1400
Orlando, Florida 32801


Stenographically reported by
Leah S. Cooney, RPR, FPR


Job No.:  362459

Maritza Reyes
May 24, 2024

Page 2

 1   APPEARANCES:

 2   On behalf of Plaintiff

 3       Maritza Reyes, Esquire
         Appearing pro se
 4       PO Box 5102
         Winter Park, Florida 32793
 5       mreyesclaim@gmail.com

 6   On behalf of Defendant

 7       Sarah P.L. Reiner, Esquire
         Julie M. Zolty, Esquire
 8       GrayRobinson, PA
         301 East Pine Street
 9       Suite 1400
         Orlando, Florida 32801
10       407-843-8880, FAX-407-244-5690
         sarah.reiner@gray-robinson.com
11       julie.zolty@gray-robinson.com

12
     ALSO PRESENT:
13
     Alex Rampone, videographer
14
     Ashley Sepulveda, videographer
15

16   ALSO PRESENT VIA ZOOM:

17   Dr. Denise Wallace, Esquire, FAMU general counsel

18   Iris Elijah, Esquire, FAMU deputy general counsel and
     corporate representative
19
     Kentayvia Coates, Esquire, FAMU associate general
20   counsel

21

22

23

24

25

Maritza Reyes
May 24, 2024

```
                                                      Page 3
 1                    I N D E X

 2
    Testimony of MARITZA REYES
 3
          Direct Examination By Ms. Reiner         11
 4
    Certificate of Oath............................ 270
 5
    Certificate of Reporter........................ 271
 6

 7
                      INDEX OF EXHIBITS
 8                    DEFENDANT'S EXHIBITS

 9   Exhibit 1     Notice                          16

10   Exhibit 2     Complaint                       17

11   Exhibit 3     Rule 26 disclosures            43

12   Exhibit 4     3/30/2009 Cynthia Hughes       70
                   Harris  letter
13
     Exhibit 5     James Ammons 6/18/2012 letter  75
14
     Exhibit 6     Employment Contract            77
15
     Exhibit 7     2014/2015 Tenure and           81
16                 Promotion Schedule

17   Exhibit 8     Standards                      83

18   Exhibit 9     4/28/2015 University Tenure    94
                   and Promotion Committee
19                 recommendation

20   Exhibit 10    6/15/2015 Elmira Mangum       103
                   letter
21
     Exhibit 11    11/5/2018 Report and          118
22                 Recommendation on Promotion

23   Exhibit 12    7/24/2019 Maurice Edington    171
                   letter
24   Exhibit 13    8/17/2019 Maurice Edington    180
                   letter
25
```

Maritza Reyes
May 24, 2024

Page 4

                     1          CONTINUED INDEX OF DEFENDANT'S EXHIBITS

2    Exhibit 14      7/21/2021 Larry Robinson        188
                     letter
3
     Exhibit 15      EEOC Charge of Discrimination    197
4
     Exhibit 16      Interrogatory answers            240
5

6

7                      CERTIFIED QUESTIONS

8    The following questions were not answered during the
     direct examination of Martiza Reyes by Attorney Reiner:
9
     Page 32, line 15
10
     Page 37, line 22
11
     Page 48, line 7
12
     Page 66, line 2
13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

 1  The following proceedings began at 9:31 a.m.:

 2       THE VIDEOGRAPHER:  We are now on the record and

 3  the time is 9:31 a.m.  This is the video-recorded

 4  deposition of Maritza Reyes in the matter of Maritza

 5  Reyes v. The Florida Agricultural and Mechanical

 6  University Board.

 7       This deposition is being held in Orlando,

 8  Florida on May 24, 2024.  The videographer is Alex

 9  Rampone, and the court reporter is Leah Cooney, both

10  in association with Lexitas legal services.

11       Counsel please announce their appearances for

12  the record.

13       MS. REINER:  This is Sarah Reiner, representing

14  Florida A&M University for purposes of the

15  deposition.

16       MS. REYES:  My name is Maritza Reyes, and I'm

17  plaintiff, proceeding pro se.

18       MS. ZOLTY:  Julie Zolty with GrayRobinson on

19  behalf of Florida A&M Board of Trustees.

20       THE STENOGRAPHER:  Ms. Reyes, if you'd raise

21  your right hand, please, to be sworn.

22       Do you swear or affirm the testimony you're

23  about to give will be the truth, the whole truth,

24  and nothing but the truth?

25       MS. REYES:  I do.

Page 6

```
 1   THEREUPON,

 2                       MARITZA REYES

 3   was called as a witness and, having first been duly

 4   sworn, testified as follows:

 5          MS. REINER:  Thank you for being here today,

 6       Ms. Reyes.  I understand that you are familiar with

 7       the deposition process, but we're going to go

 8       through some ground rules first.  We'd like to start

 9       by going through any stipulations, objections.

10          We have here with us today a videographer for

11       purposes of the deposition.  You've also brought

12       your own videographer for your own audio recording.

13       And we reserve objections.  You know, we previously

14       objected to a second set of recording devices or to

15       your own recording of the deposition.  So we're

16       going to reserve objections related to that.  And

17       we'll just put that on the record.

18          We also have with us here today our corporate

19       representative.  And I don't know that that was

20       stated previously, but she is appearing remotely

21       from Tallahassee.  And that is Dr. Denise Wallace,

22       general counsel for Florida A&M University.

23          So I wanted to put that on the record as well.

24       And with that, I think we can begin.

25          MS. REYES:  I also have some objections to put
```

Page 7

 1    on the record.

 2          MS. REINER:  Okay.  Go ahead.

 3          MS. REYES:  So I want to put an objection with

 4    regards to the attendance of the corporate

 5    representative remotely.  We did not stipulate to

 6    remote attendance.  The deposition was noticed for

 7    in-person attendance.

 8          And I want to, for the record, to make sure

 9    that the only person attending remotely is the

10    corporate representative, Denise Wallace.  So if we

11    could find that out, please, on the record.

12          MS. REINER:  Okay.

13          MS. REYES:  She's on mute.

14          MS. REINER:  I believe she's on mute.

15          DR. WALLACE:  This is Dr. -- good morning.

16    This is Dr. Denise Wallace.  I am attending,

17    however, there -- there is some scheduling

18    conflicts, so there may be also another attorney

19    from my office that will attend when I've got to go

20    off and attend to a previous -- well, not

21    previously, but something that came up, a personal

22    issue that emerged, which is why I'm not there in

23    person.

24          But that person, if they should have to

25    substitute in for me, they will let my counsel know

Page 8

1   and will come on the record and state who they are.

2          I'm vice president, general counsel of Florida

3   A&M -- Florida A&M University, the corporate rep at

4   this time.

5          MS. REYES:  Okay.  I will also note --

6          MS. ELIJAH:  And good morning.  This is Iris

7   Elijah, and I'm the deputy general counsel for

8   Florida A&M University.

9          DR. WALLACE:  Okay.  Then Ms. Elijah -- to the

10  extent that I have a conflict, Ms. Elijah will be

11  also representing.  But I will not probably be

12  attending remote because I've got something that

13  came up that may have me breaking away from this

14  deposition.

15         MS. REINER:  Okay.  So --

16         MS. COATES:  And -- I'm sorry.  Good morning.

17  This is Kentayvia Coates, associate general counsel.

18  I am appearing as Suite 304.

19         MS. REINER:  Okay.  So we need to -- can we --

20  who will be the corporate representative for Florida

21  A&M University?

22         MS. REYES:  This is a problem that I foresaw

23  and why I raised the objection.

24         MS. REINER:  Okay.  Wait.  I'm asking --

25         MS. REYES:  I understand that there's a

Page 9

 1    question here.

 2         MS. COATES:  She is muted.  But I guess at this

 3    time the corporate rep is the general counsel.

 4    However, as she previously stated, there are other

 5    things happening right now.  And so we just want to

 6    make sure an attorney from our office is present at

 7    all times for this deposition.

 8         DR. WALLACE:  And this is Dr. Wallace.  I'm

 9    sorry.  I was muted.  But I am the corporate rep.

10         MS. REINER:  Okay.  Okay.  So I think that

11    we're clear on what's happening.

12         We understand that you object to the presence

13    of anyone other than the corporate representative.

14    Is that correct?

15         MS. REYES:  I would like to -- I would like to

16    state my objection when you're done, when you let me

17    have my chance.

18         MS. REINER:  Okay.  Go ahead and state your

19    objection.

20         MS. REYES:  My objection -- and -- and this is

21    what I foresaw as a problem.  First of all,

22    according to the discovery manual, only one

23    representative is the one who gets to attend.

24         And the swapping off -- we have three people

25    right now.  And the swapping off, I think that they

Page 10

```
 1    should agree right now who is the person who's going

 2    to serve as a representative of the university

 3    throughout the entire deposition today.

 4         So if Dr. Wallace -- if Denise Wallace doesn't

 5    have the time to be there, like, the whole time, I

 6    think that we need to agree, and only one person is

 7    the one who needs to attend right now.  According to

 8    the discovery manual, that's the rule.

 9         MS. REINER:  Okay.

10         MS. REYES:  So if you could please let me know

11    who it's going to be.

12         MS. REINER:  Well, what we're going to do is

13    we're going to go off the record for a second and

14    I'm going to communicate with them and determine --

15    and determine how we want to proceed, and then we'll

16    go back on the record.  Okay.  Let me step out.

17         THE VIDEOGRAPHER:  Going off the record.  Time

18    is 9:38 a.m.

19         (Off the record from 9:38 a.m. to 9:48 a.m.)

20         THE VIDEOGRAPHER:  We're back on the record.

21    The time is 9:48 a.m.

22         MS. REINER:  Thank you very much for letting us

23    take a moment there.  For clarity with respect to

24    the deposition, Iris is going to serve as the

25    corporate representative throughout the course of
```

Page 11

1    the deposition.  Attorneys Coates and Wallace are

2    attending solely in their capacity as attorneys for

3    FAMU.

4         MS. REYES:  Just to clarify, who's Iris?

5         MS. ZOLTY:  The deputy general counsel.

6         MS. REINER:  Deputy general counsel.

7         MS. REYES:  Okay.  Can you -- can you please

8    state the name, please, Iris, for the record?

9         MS. ZOLTY:  Elijah.

10        MS. REINER:  Elijah.

11        MS. REYES:  How do you spell it, please?

12        MS. REINER:  Let me look it up.

13        MS. ZOLTY:  I think common spelling.  I-r-i-s.

14   Elijah is E-l-i-j-a-h.

15        MS. REYES:  Okay.  I'm still objecting under

16   the local -- on the discovery manual, only one --

17   one representative can attend for, you know, the

18   party.  And you have now Attorney Coates, Attorney

19   Wallace, you say, and Attorney Elijah attending.

20   That's three.

21        MS. REINER:  Okay.  Your objection is noted.

22   And with that, we can go ahead and proceed.

23                   DIRECT EXAMINATION

24   BY MS. REINER:

25   Q.   Okay.  So as we started to say earlier, I know

Page 12

 1   you're familiar with the deposition process.

 2   Essentially this is going to be a question-and-answer

 3   session.  If at any time you don't understand a question

 4   that I ask, please feel free to let me know.  I'm happy

 5   to rephrase it or to repeat it for you.

 6            You understand, of course, that you are under

 7   oath and must tell the truth, correct?

 8       A.   Yes, I do.

 9       Q.   And that you are testifying here today under

10   penalty of perjury?

11       A.   Of course.

12       Q.   Okay.  We will need to speak up -- and I say

13   this also because you are wearing your mask -- just to

14   ensure that we get an appropriate recording.

15            MS. REINER:  If at any point in time there is a

16       problem with the audio, please let us know.

17   BY MS. REINER:

18       Q.   In terms of the deposition, when we respond to

19   questions, if you could answer orally, as you have been,

20   with a yes or no as opposed to shaking or nodding your

21   head or something like that so that we can have a clear

22   record, we'd appreciate that.  Again, if you don't

23   understand a question or something, let me know, and I'm

24   more than happy to clarify it.

25            Okay.  One other thing I would like to be clear

1   about from the beginning is that if upon reflection you

2   think that an answer needs some clarification, for

3   instance, you remember a few questions down the road

4   that you forgot to say something, please let me know,

5   and we can attempt to clarify your prior response or

6   supplement it as necessary.

7           If you need a break, we will take a break.

8   Just let us know.  If you are tired or there's something

9   that's impacting your ability to testify, please let us

10  know that as well.

11          Are you under -- taking any medications that

12  would impact your ability to recall anything or to

13  participate in the deposition today?

14  A.   I am not sure about that.  I do take a

15  medication.  It's a cardiovascular medication.  So,

16  medically, I've been having some issues with, you know,

17  being extra exhausted.  So I don't know how that may --

18  you know, may be affecting me.  And so just for the

19  record.

20  Q.   Okay.

21  A.   And I am not feeling well.  But, you know,

22  that's a given that I'm not feeling well.  I have a

23  headache right now.  And so -- but I'm doing my best and

24  I will do my best during this deposition.

25  Q.   Okay.  Is there any medication or any illness

Page 14

1  that is impacting your ability to recall things?

2      A.   I have not been diagnosed with anything that

3  specifically would do that, but I have been getting

4  treated for migraines.  And so I don't know, you know,

5  medically exactly.

6           You know, part of the situation that's

7  happening is that I'm -- you know, I've had medical

8  issues as a result of all the stress that I've been

9  under.

10     Q.   Okay.  But as we sit here today and as we

11  prepare to go through this deposition, there's nothing

12  that you're aware of that is going to prevent you from

13  giving honest and truthful answers as we sit here today?

14     A.   My intent is to give honest and truthful

15  answers.

16     Q.   Okay.  And if at any point in time that there

17  is something that you cannot recall or there is some

18  medical issue or something, please let us know.  Okay?

19  And then we can pause as necessary to figure out where

20  to go from there.  Okay?

21           If you don't know an answer, please say that

22  you don't know the answer.  Again, if you're tired or

23  confused, please let us know that you're tired or

24  confused.  Again, we can take a break if we need to.

25           If you answer a question that I ask, I'm going

Maritza Reyes
May 24, 2024

1   to assume that you understood the question and that you

2   gave your best recollection.  If you think that a

3   document might help you remember an answer to a question

4   or give you more -- or provide us with a more accurate

5   answer or enable you to, you know, refresh your

6   recollection, please let us know.  If we have it,

7   then -- then, you know, we can use that.

8          But generally today, unless we provide you with

9   a document, we want your -- your answers based on your

10  personal knowledge and your personal recollection.

11         Do you understand the instructions that I've

12  given or have any questions about them?

13     A.   About the instructions, I think I understand

14  the instructions.  But I do want to go on the record and

15  state that because I am proceeding pro se, I'm going to

16  also have to be responsible for making objections.  And

17  so, you know, the objections that, you know, we would

18  make in a deposition.  And so I think that we have to be

19  clear for the record that that's part of, you know, my

20  role today.

21     Q.   Okay.  Well, we will take any objection, you

22  know, as we move forward and address them as we go.  But

23  I understand that you are saying that you plan on making

24  objections as you are here pro se.

25     A.   If needed.

Maritza Reyes
May 24, 2024

1      Q.   Okay.  Do you agree to follow the instructions

2  and everything that we've discussed this morning?

3      A.   Yes, as I understood them.

4      Q.   Okay.  We're here based on a complaint that you

5  have filed against the defendant, Florida A&M

6  University; is that correct?

7      A.   Yes.

8      Q.   And for purposes of the deposition today, I'm

9  going to refer to them as FAMU.  Okay?  So we all know

10  who we're talking about.

11          I'm going to show you first --

12      A.   And may I state something procedural for the

13  record before we begin too?  Because I'm proceeding pro

14  se, when I came in, this notepad was blank.  But I will

15  be taking notes, you know, that are part of my work

16  product as we go along.

17      Q.   I understand.

18      A.   Okay.

19      Q.   Okay.  And did you receive a notice to appear

20  for this deposition today?

21      A.   Yes.

22      Q.   Okay.

23          (Defendant's Exhibit 1 was marked for

24      identification.)

25

Page 17

 1  BY MS. REINER:

 2      Q.   I'm going to hand you what's been marked as

 3  Exhibit 1 to the deposition for identification purposes.

 4  And can you identify that document for me, please?

 5      A.   It says it's Defendant's Third Amended Notice

 6  of Taking Videotaped Deposition of Plaintiff.

 7      Q.   Okay.  And does that notice provide that you

 8  are to appear here today at 9:30 a.m. for purposes of

 9  your deposition?

10      A.   Yes.  And I did.

11      Q.   Okay.

12           (Defendant's Exhibit 2 was marked for

13           identification.)

14  BY MS. REINER:

15      Q.   I'm now going to provide you with what's been

16  marked as Exhibit 2 to the deposition for identification

17  purposes.

18           Now that you've had an opportunity to flip

19  through that document, can you identify that document

20  for us?

21      A.   I flipped through the document only to check

22  the page numbers at the bottom to make sure I had all

23  the page numbers.  I did not flip through the document

24  for the content.

25           But I do see that I have what is titled Second

Maritza Reyes
May 24, 2024

Page 18

1  Amended Complaint, Demand for a Jury Trial, and Request

2  for Permanent Injunctive Relief in case number

3  6:22-cv-1525-WWB-DCI, Maritza Reyes, plaintiff, v.

4  Florida A&M University (FAMU), Filed in the United

5  States District Court, Middle District of Florida,

6  Orlando Division.  And the pages that I counted were 96

7  pages.

8      **Q.   Okay.  And are you familiar with that document?**

9      A.   Yeah.  If this is exactly what I filed in

10  court, yes, I am familiar with it.

11      **Q.   Okay.  And so to the extent that this is a copy**

12  **of the second amended complaint that you filed with the**

13  **district court related to this case, did you prepare**

14  **that document?**

15      A.   Yes, I did.

16      **Q.   Okay.  Do you contend that everything in the**

17  **second amended complaint is true and correct?**

18      A.   Upon information and belief when I prepared the

19  document, everything was as stated.

20      **Q.   Okay.  Do you continue to contend that the**

21  **allegations within the complaint and the causes of**

22  **action you bring within the complaint are valid?**

23      A.   Yes.

24      **Q.   Okay.  And the allegations within the complaint**

25  **form and serve as the basis for your claims against**

Page 19

```
 1   FAMU?

 2       A.   As of the filing of this second amended

 3   complaint.

 4       Q.   Okay.  And those claims against FAMU are for

 5   discrimination, correct?

 6       A.   I'm going to refer to the allegations and the

 7   claims.  I think that the document speaks for itself.

 8       Q.   Okay.

 9       A.   So we can go through.

10       Q.   Do you recall without reference to the document

11   whether or not you brought a claim for discrimination?

12       A.   I do know that I did bring claim -- that one of

13   the claims was for discrimination.

14       Q.   Okay.

15       A.   But I think that the document states more

16   specifically --

17       Q.   Yes.

18       A.   -- what those claims are.  And so I can go

19   through and give you the different counts in the second

20   amended complaint.

21       Q.   Okay.  And all I'm asking right now is if you

22   brought a claim for discrimination.  And I'm asking you

23   based on your personal knowledge.

24       A.   Okay.  And, to be clear, can you define what

25   type of discrimination?
```

Page 20

1      Q.    Okay.  That's what I'm asking you for.

2      A.    Okay.  So then I'm going to go through and tell

3  you what the discrimination counts that I alleged in the

4  complaint.

5      **Q.    Okay.  So you are going to use that document to**

6  **refresh your recollection regarding what claims you**

7  **brought; is that correct?**

8      A.    To state -- to state specifically what I meant

9  by discrimination when I stated it.  So, for example,

10  count 1, I said:  Discrimination in the terms of

11  conditions of employment in violation of Title VII,

12  race.

13     **Q.    Okay.**

14     A.    Count 2, discrimination in the terms and

15  conditions of employment in violation of Title VII,

16  color.  Count 3, terms -- in the terms and conditions of

17  employment in violation of Title VII, sex and sex-race.

18          Those are the discrimination counts that I

19  stated in the second amended complaint.

20     **Q.    Okay.  So when you say that you have been**

21  **alleged -- or you've been discriminated against on the**

22  **basis of your race, what do you mean by that?**

23     A.    As I state in the complaint, my race is

24  Hispanic/Latina.

25     **Q.    Okay.  And what do you mean when you say you**

Page 21

1  have been discriminated against because you are

2  Hispanic/Latina?  In what manner?

3      A.    I have been treated different than

4  non-Hispanic/Latina who are in the same faculty

5  classification as I am.  I am the only Hispanic/Latina

6  in the tenure frank [sic]; the first Hispanic/Latina to

7  be hired in the tenure track.

8      Q.    Is that -- are you finished?

9      A.    Yeah.

10      Q.    I wanted to make sure I didn't cut you off.

11            Okay.  What do you mean when you say that you

12  are discriminated against based on your color?

13      A.    I have been told that because some of the --

14  some of the people who have discriminated against me

15  view me as a light-skinned Latina, that they make a

16  difference in the color of dark skin versus light skin.

17  So in that way I have been referred to in terms of my --

18  what they describe as my light skin color.

19      Q.    Okay.  And what do you refer to when you say

20  that you have been discriminated against based on sex

21  and/or sex-race?

22      A.    There has been gender discrimination, sex

23  discrimination because I am a woman.  But also there is

24  the combination of a woman who is Hispanic, a Latina.

25      Q.    Okay.  Now, can you provide -- because it's

1  possible not everybody reading this transcript is going

2  to necessarily understand certain distinctions.

3          Can you describe for us what you mean when

4  you -- when you talk about Hispanic and Latina?  So tell

5  us what it is to be Hispanic first.

6      A.   Okay.  So the term Hispanic as it has developed

7  in the United States and as it is used in the U.S.

8  census form, it denotes someone from Latin-American,

9  Spanish-speaking ancestry.  I would have to look right

10 now at the definition exactly in the U.S. census form,

11 but that's how Hispanic has been defined in the United

12 States.

13     Q.   Okay.  And is there a difference between

14 Hispanic and Latina?

15     A.   Well, there could be a difference for some

16 people.  For example, is there a difference between

17 Anglo and white?  For some people there might be.  Some

18 people may use it interchangeably.  So that's how some

19 people may use Latino, Latina, Hispanic.

20          I use it as -- to describe something similar to

21 Hispanic, but to denote more how the term has developed

22 in the United States to include an identity beyond just

23 the Spanish-speaking ancestry.

24          So it's a term that has developed in the United

25 States.  Just like you could have -- some people would

Page 23

```
 1   describe as black versus African American or they could

 2   describe as both.  So some of us could use Hispanic and

 3   Latina like I do.

 4       Q.   Okay.  Now, we've talked a bit about the

 5   discrimination claims and just some basic information

 6   there.  Can you tell us about the other claims in your

 7   complaint?  And by that I am referring to counts, I

 8   believe, 4 -- or let's see.  4, 5, 6 are for hostile

 9   work environment.

10       A.   Okay.  What page are you on, Counsel?

11       Q.   I am on page -- beginning on page 91 of the

12   complaint.  You also reference race, color, and then sex

13   and sex-race with respect to your hostile work

14   environment claims.

15            So my question here is:  How do you define

16   hostile work environment?

17       A.   Before I prepared my complaint, I did research

18   in terms of the legal definition of hostile work

19   environment.  And so normally, there would be an

20   objection, calls for a legal conclusion, right?  But

21   because -- because I did some legal research about it, I

22   define it as the term is defined for purposes of a legal

23   cause of action.

24       Q.   But what I am asking you for is, in your own

25   words, what is a hostile work environment?
```

Maritza Reyes
May 24, 2024

Page 24

1      A.   Like I said, Counsel, I define it as it is

2  defined for legal purposes.  And that's why I included

3  it as a count of my second amended complaint.

4      **Q.   Okay.  I understand your response.**

5           **What I am trying to elicit from you is what is**

6  **it about your interactions with FAMU that caused you to**

7  **bring a hostile work environment claim?**

8      A.   FAMU is an entity.  It -- it -- it functions

9  through institutional actors, through employees.  So are

10  you saying -- when you say -- clarify, please.  When you

11  refer to "FAMU," what do you refer to?

12     **Q.   Why do you believe -- what do I refer to when I**

13  **refer to FAMU?**

14     A.   Mm-hmm.

15     **Q.   You've brought a claim against FAMU.**

16     A.   Correct.

17     **Q.   You've sued the university, asserting that you**

18  **were subjected to a hostile work environment.**

19     A.   Yes.

20     **Q.   What do you base that allegation on?**

21     A.   Because legally I have to bring the claim

22  against FAMU, the entity.  That's -- that's why I'm

23  suing them, because legally I have to bring it against

24  the entity itself, the Florida A&M University Board of

25  Trustees.  I researched, and there's case law that I had

Maritza Reyes
May 24, 2024

Page 25

1    to bring the claim against them as named as that.

2         Q.    Okay.  Are you saying that you don't believe

3    that FAMU did anything wrong, but that you were required

4    to bring the claim against them as the entity?

5         A.    No.

6         Q.    Okay.

7         A.    I'm not saying that.

8         Q.    So then who do you contend the bad actor was

9    that caused you to bring the complaint against FAMU?

10        A.    FAMU acts through institutional actors, so the

11   bad actors are the institutional actors that I named in

12   my second amended complaint.

13        Q.    Who are the institutional actors?

14        A.    We'd have to go through the facts.  Because I

15   don't want to -- you know, I said that I wanted to be

16   truthful and as accurate as possible.  So we can go

17   through the bad actors that I named in my second amended

18   complaint.

19        Q.    Let me ask you this as you are reviewing that:

20   Do you contend that every individual who worked at FAMU

21   that is claimed in your complaint is a bad actor for

22   purposes of FAMU, or do you believe certain individuals

23   hold institutional responsibility, so to speak, for the

24   actions?

25        A.    I would have to go through the different

1  allegations in my complaint to be able to answer that

2  question.  So if you can be more specific as to a

3  specific allegation, a specific person, a specific name

4  in my complaint, then I can tell you whether I

5  considered them bad actors in terms of what I stated in

6  that specific allegation paragraph of my complaint.

7      **Q.   Okay.**

8      A.   My second amended complaint.

9      **Q.   Okay.  So let me give you an example.  One of**

10  **the things that's been referred to in your complaint is**

11  **the -- I believe it's the RTP Committee.**

12      A.   No.  No RTP.  There's an RPT.

13      **Q.   RPT.  I'm sorry.**

14      A.   Yes.

15      **Q.   I switched my letters.  The RPT Committee.  And**

16  **that committee is made up of various FAMU personnel; is**

17  **that correct?**

18      A.   The RPT Committee, which is short abbreviation

19  for the Retention, Promotion, and Tenure Committee of

20  the College of Law, is made up of all the tenured law

21  professors.

22      **Q.   Okay.  So looking at who makes up the RPT**

23  **Committee, do you contend that all of those individuals,**

24  **for instance, to the extent that they did not recommend**

25  **you for tenure, are bad actors?**

Page 27

1    A.   Counsel, I think you need to clarify because in

2  my complaint I stated specifically who participated in

3  the review and decisions.

4         And then I also want to clarify as to I think

5  that we're using the term "bad actors" that you used.

6    Q.   Yeah.

7    A.   What do you mean by "bad actors"?

8    Q.   Well, you allege throughout your complaint that

9  various individuals, professors at FAMU, have engaged in

10 behavior that you disagree with, and that serves as the

11 basis for your complaint.  Some of the behavior is that

12 they didn't recommend you for -- for tenure.  Some of

13 the behavior is you feel like one of them bumped you in

14 the hallway.

15        So there are any number of different

16 allegations throughout the course of your complaint that

17 you make regarding individuals and that you say are

18 discriminatory or retaliatory in nature in support of

19 your complaint.

20        So for ease of reference, you have -- you have

21 referred to those individuals or -- or you have referred

22 to their actions.  And what I'm saying -- and correct me

23 if I'm wrong -- do you consider those actions to be

24 inappropriate actions?

25    A.   First of all, I'm going to object to

Page 28

1  mischaracterization of behavior I disagree with.  I

2  think that you need to be more specific in terms of what

3  specific behavior you're calling behavior I disagree

4  with.

5          So if you could point me to a specific behavior

6  in the complaint, then I can tell you how I characterize

7  that behavior.

8      **Q.    Okay.  Well, this is a discovery deposition.**

9  **And I don't have to point to things in the complaint.  I**

10  **just gave you examples of that behavior, a bump in the**

11  **hallway and the decision not to recommend you for**

12  **tenure.**

13          **So with respect to those two examples, do you**

14  **consider that bad behavior or improper behavior or, you**

15  **know, bad or improper behavior on the part of those**

16  **individuals?**

17      A.   So, Counsel, you are the one who asked me to

18  identify the second amended complaint.  And you are

19  referring to specific actions in the second amended

20  complaint.  So, again, if you want me to, you know,

21  respond to a question about a specific situation, then I

22  think that you need to be clear in terms of what it is

23  that you're referencing.

24          Now, if -- if somebody -- because if somebody

25  bumps somebody, right, we need to know who, we need to

Page 29

 1  know the context for me to be able to answer.  So who

 2  are you talking about in terms of bumping somebody?

 3      Q.   No.  And these are my questions.  So, first of

 4  all, I'm not referring to the complaint at this point in

 5  time.  I'm asking a general question.  So let me

 6  rephrase it for you.  Or let me ask you a more simple

 7  question.

 8          Do you -- do you -- do you allege or have you

 9  alleged in your complaint or otherwise that another

10  professor or individual employed by FAMU bumped you

11  while walking in the hallway?

12      A.   Yes.  I have alleged that Professor Patricia

13  Broussard bumped me.

14      Q.   Okay.  Okay.  Did you complain about Patricia

15  Broussard bumping you in the hallway?

16      A.   I did not complain because I didn't want to be

17  accused of complaining.  Because you have to put in

18  context, the bumping had to do with I had also before

19  been bumped by another FAMU employee, Erica Polite.  And

20  at the time of that situation, I complained.  And I

21  suffered great retaliation and negative consequences

22  about it.

23          And so when Professor Patricia Broussard, who

24  knew about that situation and was friends with the

25  person who did it, Erica Polite, bumped me, I decided

Page 30

1 not to complain to avoid further retaliation.  So that's

2 why I did not complain.

3    Q.   Okay.  Here I'm going to pause for a moment.

4 First, I'm going to move to strike the response as

5 nonresponsive.

6         I asked you simply:  Were you bumped?  And you

7 can read back the question.  I did not ask you for a

8 narrative on anything.  So what I'd like you to do is

9 respond to the question that I am asking throughout the

10 course of the deposition --

11    A.   So I'm going to --

12    Q.   -- and refrain from narration.  Okay?

13    A.   Okay.  I'm going to remind you that I'm here

14 pro se, but I'm also making objections for myself.  And

15 I'm going to ask the court reporter to please read the

16 question.  Because my recollection is you asked me if

17 I -- you didn't ask me just if I got bumped.  You asked

18 me if I complained.  Can we read back if that was the

19 question?

20    Q.   Yes, that was the question.  But that's a yes

21 or no question.  Did you complain?  Were you bumped and

22 did you complain?  Yes, I was bumped --

23    A.   I'm going to --

24    Q.   -- and, yes, I complained.

25    A.   I'm going to tell you, Counsel, what you said

Page 31

1  at Professor Broussard's deposition when I was taking

2  the deposition and you were on the other side and you

3  told me to let the witness answer the question.  So I'm

4  going to ask you to let me answer the question.

5         At the time, I also said that they were

6  narrative answers, and you told me to let the witness

7  finish her answer.  And so I'm going to remind you of

8  that and tell you that I'm answering your question.

9         If you want to rephrase the question, then

10  that's fine.  But I don't think that you should be, you

11  know, telling me to stop my answer because that's the

12  way that I'm answering to the best of my ability and

13  knowledge.  I want to be truthful and honest and put in

14  context why I would consider a bump to be hostile work

15  environment and discrimination.  It's in the context of

16  what was happening in the other bump.

17     Q.   Okay.  And I'm going to state please answer the

18  question you're responding to -- or please respond to

19  the question that I've asked.

20     A.   I did.

21     Q.   And I did allow you to finish your question.

22  And that's the difference between today and Broussard

23  was that you didn't actually allow her to finish

24  speaking.  I allowed you to finish speaking, and then I

25  moved to strike the response based on it being

1  nonresponsive.  But in any event, let's go ahead and

2  move on.

3      A.   I disagree, Counsel.  But, yes, let's move on.

4      Q.   Yes.  Let me go ahead and move on.  Let's go a

5  little bit through, and we'll get back to some of these

6  more specific factual issues.

7           Let's talk a little bit about your background.

8  Have you had any experience attending or -- well, let me

9  ask you this.  I know you've attended.  Have you had any

10 experience testifying at a deposition before?

11     A.   This is my first deposition.

12     Q.   Okay.  Have you had any experience testifying

13 at a trial as a witness or as a party?

14     A.   No.

15     Q.   Okay.  What is your date of birth?

16     A.   ███████████.

17     Q.   What year?

18     A.   Do we have to state the year --

19     Q.   Yes.

20     A.   -- for privacy purposes, Counsel?

21     Q.   Yes, we have to state the year.

22     A.   And how is that -- I didn't state any of that

23 in my complaint.

24     Q.   This is a discovery deposition.  It's perfectly

25 acceptable for me to ask you your date of birth

Page 33

1    including the year.

2        A.    I'm going to object on the -- on my right to

3    privacy, including because it's not going to lead to

4    anything relevant to my complaint other than perhaps age

5    discrimination.

6        **Q.    Okay.**

7        A.    So I'm going to object on my right to privacy.

8    Including because this video -- this is a video

9    deposition, which potentially may become a public

10   record.

11       **Q.    Okay.  Are you finished?**

12       A.    Yes.

13       **Q.    Okay.  We're going to limit our objections for**

14   **purposes of the deposition.  If you have an objection to**

15   **the form of the question or something of that nature,**

16   **then go ahead and object.**

17            **But, again, I'm going to ask you for your date**

18   **of birth.  We can black out -- to the extent that this**

19   **is attached for submission to the court, we can black**

20   **out your last four of your -- the year of your birth.**

21   **But that's not a reason for you to refuse to respond**

22   **here today.**

23       A.    Objections on right to privacy are proper for

24   depositions.  And so I am going to object on that

25   because I don't think you can block it from the video

1  once it's out there.  I don't want to be subjected to

2  identify theft.

3      **Q.   Okay.**

4      A.   You know, and, like I said, unless there was an

5  issue of age discrimination.

6      **Q.   So for purposes of the record, what you're**

7  **saying at this point in time is that you're refusing to**

8  **provide your date of birth based on an objection -- a**

9  **privacy objection, correct?**

10     A.   Objection to mischaracterizing.  I provided my

11 month and date of birth.  I'm just objecting.  I'm

12 trying to protect the year.

13     **Q.   Okay.**

14     A.   So as to protect my privacy.

15     **Q.   Okay.  The objection is noted and we will**

16 **address that with the court accordingly.**

17          **For the record, what is your gender?**

18     A.   I am a woman.

19     **Q.   Okay.  And where do you live?**

20     A.   I live in Orlando, Florida.

21     **Q.   Okay.  And what is your address?**

22     A.   PO Box 5102, Winter Park, Florida 32793.

23     **Q.   Okay.  And I'm asking for the physical address,**

24 **not a PO Box.**

25     A.   Okay.  That's the address that I have always

Page 35

1  used for my employment.

2      Q.   Okay.  I'm asking for the physical address of

3  your residence.

4      A.   Again, Counsel, that's information that I don't

5  want in a public record in terms of, you know, you chose

6  to do a video deposition that will now become a public

7  record because FAMU is a state institution.

8      Q.   That's not a basis to refuse to provide an

9  answer in this deposition.  And just because the

10  deposition is being taped today, that doesn't

11  necessarily mean that it is going to become a public

12  record.  So --

13      A.   But it may.

14      Q.   -- I'm going to -- I'm going to ask again that

15  you provide the address.  The court has specific rules

16  related to redaction and submission of documents that

17  may contain private information.  And those would be

18  followed in terms of prior to anything being submitted

19  in the court record.

20           So, again, if you could provide your -- your

21  address.

22      A.   Counsel, the State of Florida for state

23  employees deems the type of information that you're

24  requiring as limited-access records.  And so, because

25  this is material that will become a public record, I am

1  choosing to safeguard that information.

2  **Q.  Okay.  So you are refusing to respond to the**

3  **question based on your objection as stated, correct?**

4  A.  I am providing the address that I have used for

5  my employment.  It's the address that FAMU has always

6  had.  It's also the address that I use in all my -- in

7  all my mailing materials.  That's the address that I use

8  because I want to safeguard from identify theft.

9  **Q.  Okay.  So the objection is noted for the**

10 **record.  And, again, we'll address that with the court**

11 **as necessary.**

12        **Does anyone else live with you at your address?**

13 A.  Can you clarify as to live with me?  What do

14 you mean live with me?

15 **Q.  Does anyone else reside with you at your**

16 **address?**

17 A.  From time -- well, my mother sometimes lives

18 with me.

19 **Q.  Has your mother --**

20 A.  But it's different from resides.

21 **Q.  Okay.**

22 A.  So what do you mean by "resides"?

23 **Q.  Who stays with you at your home?**

24 A.  My mother sometimes stays with me.

25 **Q.  Okay.  Has your mother stayed with you at your**

1 home during the -- at any point during the period that

2 your allegations cover?

3     A.   Yes.

4     Q.   Okay.  Have you spoken with your mother about

5 the allegations in your complaint?

6     A.   Yes.

7     Q.   Have you spoken with anyone else other than

8 your mother regarding the allegations in your complaint?

9     A.   I've spoken with all the people listed in my

10 initial disclosures, and I've spoken probably to a lot

11 of other people.

12     Q.   When you say you've spoken to "a lot of other

13 people," are those individuals co-workers or former --

14 current or former co-workers with respect to FAMU, or

15 are they individuals not affiliated with FAMU?

16     A.   Both.

17     Q.   During the course of your employment with FAMU,

18 who else has lived with you at any point other than your

19 mother?

20     A.   My son.  My son has lived with me some, you

21 know, years ago.

22     Q.   And what is your son's name?

23     A.   And, again, I researched this before, Counsel.

24 I'm going to object on the right to privacy because my

25 son is an adult and he's not named as a witness in my

Maritza Reyes
May 24, 2024

Page 38

 1  initial disclosures.  And so I'm going to protect his

 2  privacy.

 3      Q.   Okay.  So are you saying that you're not going

 4  to provide the name of your son who would be a potential

 5  witness to this case?

 6      A.   My son is an adult who -- he doesn't live with

 7  me.  He doesn't reside with me.  He wasn't listed as a

 8  witness in the case.

 9           And I'm going to object that this is for the

10  purposes of harassing the witness and embarrassing the

11  witness.

12      Q.   Okay.  We're going to, I think, pause here a

13  moment as we may need to seek guidance from the court.

14  So let's go ahead and go off record and take a break for

15  a moment.

16      A.   Okay.

17      Q.   And then let's take a look at that.

18           THE VIDEOGRAPHER:  Going off the record.  The

19      time is 10:37 a.m.

20           (Off the record from 10:37 a.m. to 10:44 a.m.)

21           THE VIDEOGRAPHER:  We're back on the record.

22      Time is 10:44 a.m.

23           MS. REINER:  Okay.  What we're going to do in

24      the interest of moving this along is certify the two

25      questions that she has not responded to.  And to the

Maritza Reyes
May 24, 2024

Page 39

1      extent that it continues to happen, then we will

2      call the court.  But for now, let's move through and

3      get to the substance.

4  BY MS. REINER:

5      Q.   So you've said that you don't want to provide

6  your son's name.  We've certified that question.  And to

7  the extent necessary, we're going to address that with

8  the court.

9           Has anyone else lived with you other than your

10 son or your mother?

11     A.   No.

12     Q.   Okay.  You've not provided a specific physical

13 address for your home.  Do you -- where do you live in

14 Orlando?

15     A.   Winter Park, Florida.

16     Q.   How long have you resided in Winter Park,

17 Florida?

18     A.   When I moved here to take the job at the FAMU

19 College of Law, I started residing in Winter Park,

20 Florida.  And I stayed there for some years, and then I

21 left for -- I don't remember -- like, three or four

22 years.  And then I went back to Winter Park, Florida.

23 And when I left, I resided in Orlando, Florida.

24     Q.   Okay.  Have you spoken with any of your

25 neighbors regarding either when you were in Winter Park,

Maritza Reyes
May 24, 2024

Page 40

1  when you left and went to Orlando, or when you came back

2  to Winter Park, have you spoken with any of your

3  neighbors regarding the allegations of your lawsuit?

4      A.   No.

5      Q.   Do you attend a church?

6      A.   I have attended church.

7      Q.   Have you spoken with any of your fellow church

8  attendees regarding the allegations of your lawsuit?

9      A.   In the past, when I have attended church, yes,

10 I have.

11     Q.   And who are those individuals?

12     A.   One of them is Lyndol Michael.  She's named in

13 the disclosures that I provided.

14     Q.   Okay.

15     A.   In the initial disclosures, she is listed

16 there.

17     Q.   Okay.  Is there anyone else that you have

18 spoken with or anyone that is not listed in your initial

19 disclosures?

20     A.   I do not recall exactly because -- I don't

21 know -- could have been something like we were talking

22 about prayer requests or something like that.  But then

23 I don't recall specifically.

24          I may have spoken with somebody.  Her first

25 name is Barbara, but I don't recall her last name.

Page 41

 1      Q.   Okay.  What is your -- or let me ask you this:

 2  Do you participate in any other groups on a regular

 3  basis, be it, you know, a group, you know, like a hobby

 4  group or anything like that where you may have spoken to

 5  someone regarding your allegations?

 6      A.   Can you be more clear about what you mean by

 7  "groups"?

 8      Q.   Yeah.  So, for instance, some people are

 9  members of, like, a running club and they go running

10  every week or something with a group of people.

11           Are you a member of any other organizations

12  where you may have spoken with individuals there

13  related -- regarding the allegations of your complaint?

14      A.   So the question now is different.  It's not

15  groups now, it's organizations.

16      Q.   Well, I'm using that interchangeably, a group

17  or an organization.

18      A.   Okay.  Because as an organization, I understand

19  that differently.  Because, for example, The Florida Bar

20  is an organization.

21      Q.   Okay.  I've just defined it and given you an

22  example.  So, for instance, a running club or a knitting

23  club or a pottery club or -- a club, a group, an

24  organization.  Do you participate in any of those?

25      A.   I do not participate in a running club, a

Page 42

1  knitting club, or a pottery club.

2      Q.   Okay.  Do you participate in any other kind of

3  club, group, or organization similar to those?

4      A.   What do you mean by "similar to those"?  See,

5  that's what I don't -- I want to be accurate in my

6  answer, but I want to understand exactly what you mean.

7  Because I don't want to -- I don't want to leave

8  something out that I consider an organization versus you

9  consider an organization.

10     Q.   Okay.

11     A.   So I need to be clear what you're talking

12  about.

13     Q.   Ms. Reyes, it's a very simple question.  Do you

14  participate in any group of people who get together on a

15  regular basis for a hobby or otherwise?

16     A.   I don't participate in a -- in a group of

17  people that gets together on a regular basis for a

18  hobby.

19     Q.   Okay.  Do you participate in any groups on --

20  or get together with any individuals on a regular basis?

21     A.   What do you mean "on a regular basis"?

22     Q.   On a planned basis.  So a weekly, a monthly

23  basis.

24     A.   No.

25     Q.   Okay.  So do you have any close friends that

Page 43

1    you have spoken with about the allegations on your

2    complaint that are not listed in your Rule 26

3    disclosures?

4        A.    Do you have my disclosures?

5        Q.    Yes, we do have your Rule 26 disclosures.

6    We'll go ahead and mark those as exhibit --

7              MS. ZOLTY:   3.

8              MS. REINER:  -- 3 to the deposition.

9              (Defendant's Exhibit 3 was marked for

10       identification.)

11   BY MS. REINER:

12       Q.    There we go.  Marking these as Exhibit 3 for

13   identification purposes.

14             Now that you've had an opportunity to flip

15   through Exhibit 3, can you identify that document for

16   us?

17       A.    This is titled Plaintiff's Federal Rule of

18   Civil Procedure 26(a)(1) Initial Disclosure.

19       Q.    Okay.  Now, is that a document that you

20   yourself prepared?

21       A.    Yes.

22       Q.    Okay.  And is all of the information in it true

23   and accurate to the best of your knowledge?

24       A.    This document was prepared on March 28, 2023,

25   and as of the date of preparation, it was true and

Page 44

1  accurate.

2      Q.    Okay.  Can you recall or are you aware of any

3  other individual that should be added to your disclosure

4  in terms of -- strike that.

5          Are there any other individuals not included in

6  your disclosure that have substantial knowledge

7  regarding the allegations in your complaint?  And by

8  that I mean personal knowledge.

9      A.    Okay.  That's what -- so substantial knowledge,

10  personal knowledge in terms of -- what do you mean by

11  "personal knowledge"?  That they witnessed something --

12      Q.    Yes.

13      A.    -- or that I told them something?

14      Q.    No.  First I'm asking about witness, that they

15  actually witnessed, have personal knowledge of events in

16  your complaint.  Is there anyone not listed here?

17      A.    Objection as to speculation.

18          I would have to speculate about, like, if other

19  people have personal knowledge and they witness it; I

20  may not know it.

21      Q.    I'm asking you about your knowledge as we sit

22  here today.  I'm not asking you to speculate about other

23  people.  I'm asking you, do you know if there is someone

24  with personal knowledge of the events that you complain

25  of and allege in your complaint that's not listed on

Page 45

1  here?

2      A.   The basis of my second amended complaint

3  includes some of the facts, but my second amended

4  complaint also says that it's about ongoing retaliation.

5  So to that extent -- and I would have to review.

6          Because, as you know, because I wanted to be as

7  forthcoming as possible in terms of my recollection of

8  everybody who would have personal knowledge, I listed --

9  I see here that I have 127 parties.  And some of that,

10  for example, does not include -- some are the more

11  recent ones.  So I have to review all of this to refresh

12  my memory in terms of my recollection.

13          But I think I would add Interim Associate Dean

14  Cecil Howard of the FAMU College of Law.

15     Q.   Okay.

16     A.   Because --

17     Q.   Okay.  Are you finished?  Is that your complete

18  answer?

19     A.   No, that's not my complete answer because I

20  would have to -- to my recollection, I would have to

21  think.  Like I said, there's a lot of -- let me go

22  through -- I would have to go through -- I would have

23  to -- because you asked me to my knowledge who I know

24  may have knowledge of my complaint.  And I think we

25  would need to add whoever changed in the defendant's

Page 46

1  board of trustees.  We would need to add the security

2  officers in the FAMU College of Law.

3      Q.   Okay.

4      A.   We would need to add law students who

5  witnessed, including law students who work in the

6  College of Law library.

7           I'm trying to recall somebody's name.  We would

8  need to add Compliance and Ethics Chief Officer -- I

9  think is her title -- Rica Calhoun.  Although I think

10  she's already listed.  Rica Calhoun is 31 on page 4.

11      Q.   Okay.

12      A.   Okay.  To my recollection, from March 2023

13  until now, to update this, a friend of mine, her name is

14  Moradel.  I can't remember her last name right now.

15      Q.   Would you spell her first name for us, please?

16      A.   M-o-r-a-d-e-l.

17      Q.   And what specific --

18      A.   She's a friend.

19      Q.   What I was going to say is what specific

20  personal knowledge does Moradel have regarding the

21  allegations in your complaint?

22      A.   What I have shared with her.

23      Q.   Okay.  So she has not witnessed a specific

24  event, she has just spoken with you; is that correct?

25      A.   Yes.

Page 47

1    Q.   What is your phone number?

2    A.   Counsel, I think that you're asking the same

3 types of questions which I have already objected to on

4 the basis of privacy and my fears of identity theft.

5        If you recall, when I took the depositions of

6 Professor Leroy Pernell and Professor Pat Broussard,

7 Patricia Broussard, I didn't ask them for their date of

8 birth, I didn't ask them for their address, I didn't ask

9 them for their phone number to protect identity issues

10 and right of privacy.

11       So, you know, if we're going to certify these

12 questions in terms of potentially embarrassing me,

13 harassing me with these types of questions, then I --

14 I'm not going to put that on a public record.

15    Q.   Is that an objection?

16    A.   Yes, that's an objection.

17    Q.   Okay.

18    A.   And an answer.

19    Q.   Okay.  I'm going to move to strike it to the

20 extent that it's -- purports to be an answer.

21       The question is:  What was your phone number?

22    A.   Then it's an objection.

23    Q.   Then it's an objection.  Okay.

24       We are asking for your phone number.  Well, let

25 me ask you this:  Do you send text messages to people?

Page 48

1      A.   Yes, but I don't text with anyone at work.

2      **Q.   Okay.  I just asked if you text with people.**

3      A.   Yes.

4      **Q.   Okay.  What is the phone number that you use to**

5  **send text messages?**

6      A.   My phone number.

7      **Q.   And what is your phone number?**

8      A.   That's the objection that I just put on the

9  record.  Asked and answered.

10     **Q.   Okay.  We're going to certify that question as**

11  **well.**

12     A.   And objection.  Harassing the witness.

13  Embarrassing, harassing the witness.

14     **Q.   Okay.  Have you had the same phone number**

15  **throughout your employment with FAMU?**

16     A.   Yes, I've had the same phone number.

17     **Q.   Have you used that phone to communicate with**

18  **individuals related -- regarding events set forth in**

19  **your complaint?**

20     A.   To my recollection, no.

21     **Q.   Okay.  So you haven't used that phone to call**

22  **people to talk about the events in your complaint?**

23     A.   To talk?

24     **Q.   Yes.  To communicate, to talk.**

25     A.   Yeah, to speak on the phone.  Yes.

Page 49

```
 1      Q.   Okay.  Have you sent text messages to any of
 2  the individuals that are listed within your complaint?
 3      A.   I seldom text, but maybe.
 4      Q.   Do you text with students?
 5      A.   Yes.  Sometimes, yes.
 6      Q.   Okay.  Have you exchanged text communications
 7  with any of the students that you list in your Rule 26
 8  disclosures?
 9      A.   Yes.
10      Q.   Is that phone number connected with any social
11  media accounts that you hold, like Facebook or something
12  similar to that?
13      A.   No.
14      Q.   Okay.  Have you sent text messages to and from
15  any of the trustees that you list in your Rule 26
16  disclosures?
17      A.   No.
18      Q.   Have you sent or exchanged text messages with
19  any of FAMU's other employees?
20      A.   In when?  Over the past 15 years?
21      Q.   Yeah.  At any point during the course of your
22  employment with FAMU.
23      A.   Probably.
24      Q.   Okay.  To your recollection, have you exchanged
25  text messages with any of your fellow FAMU employees
```

Page 50

1    regarding the events set forth in your complaint?

2        A.   I can't recall.

3        Q.   Have you preserved text messages that you've

4    sent to and from individuals on your phone?

5        A.   Whatever I have sent since I have this phone,

6    it's what I have.

7        Q.   And what kind of phone is that?

8        A.   It's a -- I think it's an iPhone.

9        Q.   And how long have you had that iPhone?

10       A.   I can't recall exactly.

11       Q.   Have you had it more than a year?

12       A.   Probably.

13       Q.   More than two years?

14       A.   Maybe.

15       Q.   Have you used that text -- that phone to text

16   or communicate with students?

17       A.   Asked and answered.

18       Q.   No, I'm asking about that specific phone.

19       A.   You asked me that before.

20       Q.   Okay.  Then let me clarify.

21            Have you used other phones to text with any of

22   the students listed on your Rule 26 disclosure?

23       A.   What do you mean by "other phones"?

24       Q.   Well --

25       A.   Other phone numbers?  What do you mean by

Page 51

1    "other phones"?

2        Q.   Okay.  So I asked you if you'd preserved text

3    messages --

4        A.   Yes.

5        Q.   -- on -- on that phone.

6        A.   Yes.

7        Q.   Or I asked you if you preserved text messages.

8        A.   Yes.

9        Q.   You said that if they were on that phone.

10       A.   Yes.

11       Q.   So now I am trying to determine who in

12   particular you may or may not have texted with using

13   that particular phone.

14       A.   Yes.  I told you.

15       Q.   Okay.

16       A.   You asked me about the students.  Yes, I said

17   that probably.

18       Q.   Okay.  Have you discussed any of the specific

19   details of your complaint against FAMU with any of the

20   students listed on your Rule 26 disclosures?

21       A.   And can you tell me about the scope in time?

22   Like, discuss when?  As of the filing of this?

23       Q.   At any point in time.

24       A.   In my disclosures, I listed -- it says current

25   and former law students.

Page 52

1      Q.   Yes.

2      A.   So is your -- can you clarify the question as

3  current and former law students that I have listed here?

4  You want me to go through that list?

5      Q.   So what I'm asking you is have you exchanged or

6  have you spoken with any of these individuals who are

7  listed as current -- current or former students

8  regarding the allegations of your complaint?

9      A.   A few of them who are attorneys now.

10     Q.   Okay.  And which ones have you spoken with

11 regarding the allegations of your complaint?

12     A.   I've spoken with Nicole Dickerson, Natalya

13 Lopez, Nicole Londono.  And all of those are alumni.

14     Q.   And I do not see Nicole -- oh.  Londono.  Here

15 she is.  Okay.

16     A.   And when you say -- I need clarification.  I

17 didn't -- I didn't necessarily talk to them about my

18 complaint.

19     Q.   Did you speak with them about the events that

20 are -- that you experienced at FAMU while a member of

21 the faculty?

22     A.   Yes.

23     Q.   Okay.

24     A.   Some of -- some of them witnessed some of them

25 too.

Maritza Reyes
May 24, 2024

Page 53

1      Q.   Okay.  Well, let's start first who did you

2   speak with?  You've mentioned Nicole Dickerson --

3      A.   Yes.

4      Q.   -- Natalya Lopez and Nicole Londono.  Is there

5   anyone else on this list?

6      A.   Who did I speak with?  Okay.  Because if you

7   notice, if I listed them, it's because they're

8   witnesses.  They have per- -- they have some knowledge.

9   And so I felt I had to disclose them of the events.

10         But your question is more specific about me

11   speaking to them about some of the events?

12      Q.   Yes.  Did you speak to any of them about the

13   events?  For instance, did you call Jessica Ramos and

14   say, You're never going to believe what just happened to

15   me?

16      A.   No.

17      Q.   You know, I experienced this?

18      A.   No.  But she -- she -- she saw what happened,

19   some of the events in the complaint.  Because Jessica

20   Ramos --

21      Q.   That's not what I asked.  Remember to --

22      A.   Yes.

23      Q.   -- answer the question that I asked.

24         So your response is no, you did not --

25      A.   You know --

Page 54

1      Q.   -- relay to her --

2      A.   -- honestly, I cannot recall what

3  I specifically -- this is like -- I listed several, and

4  over -- and they are over the span of several years

5  because I worked in the law school for 15 years.  So the

6  difference between them having knowledge because they

7  witnessed something versus because I spoke with them, I

8  cannot recall.

9      Q.   Okay.  From this list of individuals, who has

10 personal knowledge of events?  Who witnessed an event?

11     A.   Potentially all of them.

12     Q.   Okay.  You indicate in your list that you are

13 in the process of obtaining their individual contact

14 information.  Did you do so?

15     A.   No.  I don't have their contact information

16 right now.

17     Q.   Have you spoken with any of these individuals

18 since the date of your service of these disclosures?

19     A.   Yes.

20     Q.   Okay.  Who have you spoken with since then?

21     A.   I can't recall exactly as to all because

22 there's a long list.  But I can tell you that I've

23 spoken with Nicole Dickerson.  I've spoken with Danielle

24 Johnson.  I've spoken with Michelle Wanamaker.  I've

25 spoken with Natalya Lopez.  I've spoken with Nicole

Page 55

 1    Londono.  I've spoken with Suwana Jean Janvier.

 2          I think -- I'm not sure -- I've spoken with

 3    Sheray Patillo.  I've spoken with Noel Berrios.  I've

 4    spoken with Lauren Robertson.  I've spoken with Mikayla

 5    Almeida, I think.  I've spoken with Diana Guerrero.

 6    I've spoken with Guillermo Flores.  I think I've spoken

 7    with Mariam Haidara.

 8          And when I say "spoken," your question was just

 9    spoken in general, not about specific content.  And so I

10    want to clarify that that's what I'm answering.

11       Q.   Okay.  And does that all -- is that all of the

12    individuals that you've spoken with since the date of

13    your service of these disclosures?

14       A.   Is that all of the individuals that I have

15    spoken with?

16       Q.   All of the --

17       A.   Can you be more specific?

18       Q.   All the individuals from this list?

19       A.   From this list, yes.

20       Q.   Okay.  Now, in terms of your background, can

21    you tell us where you graduated from high school?

22       A.   Norland Senior High School.

23       Q.   And where did you attend college?

24       A.   In Florida Atlantic University.

25       Q.   Okay.  When did you graduate from college?

Page 56

 1    A.    And by the way, that's one college.  I attended
 2 more than one college.
 3    Q.    Okay.  Then what were the other colleges that
 4 you attended?
 5    A.    Florida Atlantic University, Nova Southeastern
 6 University, Harvard Law School.
 7    Q.    Okay.  Did you obtain degrees from each of
 8 those schools?
 9    A.    Yes.
10    Q.    Okay.  So tell me the school and the degree.
11    A.    Florida Atlantic University, a bachelor's
12 degree in science and accounting.  And I did also MBA
13 studies.
14    Q.    Did you receive an MBA?
15    A.    No.  I went to law school.
16    Q.    Okay.  Next college or university?
17    A.    Nova Southeastern University College of Law.
18    Q.    And did you obtain your JD from Nova?
19    A.    Yes.  Juris doctor.
20    Q.    Okay.  You mentioned two others.  What were
21 they and what degrees did you earn?
22    A.    I mentioned Harvard Law School.  That's where I
23 got my LLM.
24    Q.    Okay.  And what is an LLM?
25    A.    It's a Master of Laws.  It's a degree beyond

Page 57

1 the juris doctor degree.

2     Q.    Okay.  In what area?

3     A.    Well, the Harvard Law School degree is

4 specifically for the graduates of JD law schools in the

5 United States who want to embark on a teaching career,

6 on a law teaching career.

7     Q.    Okay.  So it's not an LLM of taxation or

8 something like that; it deals specifically with becoming

9 an educator within a law school?

10     A.    Becoming a law professor.

11     Q.    Becoming a law professor.

12           Okay.  And what was the other school that you

13 mentioned in your degree there?

14     A.    I think I mentioned them all.

15     Q.    Okay.  Okay.  After obtaining your LLM, did you

16 immediately begin teaching?  Did you practice for a

17 time?  What was your career path at that point?

18     A.    My LLM was my transition from practice to

19 teaching.

20     Q.    Okay.  Where did you practice law?

21     A.    In Miami.

22     Q.    Okay.  Who did you practice law with in Miami?

23     A.    I started my legal career at a law firm in

24 Miami, Holland & Knight.

25     Q.    How long were you with Holland & Knight?

Maritza Reyes
May 24, 2024

Page 58

1      A.    I want to say I was there from 2000 to sometime

2   in -- I think it was 2002.  But I started -- wait, no --

3   yeah.  But I started with them also as a summer

4   associate.  So it would have been -- I think it would

5   have been 1999.  So I was a summer associate, and then I

6   was an associate.

7      **Q.    So you were a summer associate and you were an**

8   **associate from -- following your graduation in 2002?**

9      A.    I believe sometime in 2002.

10     **Q.    Okay.  What date did you obtain your JD?**

11     A.    In 2000.

12     **Q.    And was it May of 2000?**

13     A.    I don't recall exactly when they conferred the

14  degree, but it would have been, I think, May or June of

15  2000.

16     **Q.    And upon graduating and receiving your JD, you**

17  **went to work for Holland & Knight?**

18     A.    Yes.

19     **Q.    Okay.  At that point in time, had you passed**

20  **The Florida Bar?**

21     A.    Yes.

22     **Q.    And you remained there until 2002?**

23     A.    Sometime in 2002.

24     **Q.    Okay.  Where did you go following Holland &**

25  **Knight?**

Page 59

1    A.    I went into a federal clerkship.

2    **Q.    And who was your federal clerkship with?**

3    A.    United States District Court for the Southern

4    District of Florida.

5    **Q.    And did you work with a particular district**

6    **court judge?**

7    A.    I did.

8    **Q.    Who did you work with?**

9    A.    I want to protect his privacy too.

10   **Q.    Who did you work with at the -- that's --**

11   **that's not a basis for an objection.**

12   **         Who did you work with in the United States**

13   **District Court for the Southern District of Florida?**

14   A.    The Honorable Wilkie Ferguson, Jr.  May he rest

15   in peace.

16   **Q.    Okay.  How long did you work with Judge Wilkie**

17   **Ferguson, Jr.?**

18   A.    Until he died.

19   **Q.    Okay.  Do you recall when that was?**

20   A.    I don't recall exactly.

21   **Q.    At that point, did you continue to work for the**

22   **United States District -- Southern District Court?**

23   A.    For a time, yes.

24   **Q.    Okay.  And did you work under a different judge**

25   **there?**

Page 60

```
 1     A.   No.
 2     Q.   Okay.  What did you do while there, if you
 3   weren't assigned to a specific judge?
 4     A.   Finish up the work after Judge Ferguson died.
 5     Q.   Following -- when did you leave the United
 6   States District Court?
 7     A.   I can't recall exactly right now.
 8     Q.   Okay.  Where did you go next?
 9     A.   Then I went to another firm.
10     Q.   What firm did you go to?
11     A.   Berger Singerman.
12     Q.   And how long were you with Berger Singerman?
13     A.   I was there -- that was my transition, like,
14   right after the federal court.  I was there a few
15   months, but I don't remember exactly how many.
16     Q.   What did you do after Berger Singerman?
17     A.   Then I went back to the United States District
18   Court for the Southern District of Florida.
19     Q.   When you left Berger Singerman, did you resign
20   from your employment there?
21     A.   Yes.
22     Q.   Okay.  And did you resign to return to the
23   Southern District?
24     A.   Yes.
25     Q.   Okay.  And what did you do when you returned to
```

Page 61

```
 1  the Southern District?

 2      A.   I was a law clerk again.

 3      Q.   And who did you clerk for at that point?

 4      A.   He's not deceased, I don't think.  Well, yeah.

 5  William Turnoff.  I don't think he's a judge anymore.  I

 6  think he retired.

 7      Q.   Okay.  And how long did you clerk for William

 8  Turnoff?

 9      A.   I think a couple of years.

10      Q.   Why did you leave the Southern District of

11  Florida?

12      A.   Because I got sick.

13      Q.   And when did that occur?

14      A.   Oh, my goodness.  I can't remember exactly.  I

15  don't want to give the wrong year.

16      Q.   Okay.

17      A.   So I can't remember exactly.

18      Q.   What did -- how did you become sick?

19      A.   I had to have surgery.

20      Q.   And is that a medical condition that you

21  continue to have today?

22      A.   No.

23      Q.   Was it a medical condition that you had during

24  the course of your employment with FAMU?

25      A.   No.
```

Maritza Reyes
May 24, 2024

Page 62

1      Q.    What did you do after you left the Southern

2  District after clerking for William Turnoff?

3      A.    After I got better, I went -- that's when I

4  made the transition to Harvard Law School.

5      Q.    So that's when you decided to teach?

6      A.    No.  I decided to teach during my second year

7  of law school at Nova Southeastern University.

8      Q.    Okay.

9      A.    And every job that I had was to pursue a career

10  in law teaching.  So all the things that I have listed

11  before you are the traditional credentials of a law

12  professor, which would be starting in law school when I

13  found out, would be law review, would have been big firm

14  experience, it would have been federal clerkships.

15            And the Harvard LLM was close to the last item

16  on the list of traditional credentials before embarking

17  on my teaching career.  But I decided since my second

18  year of law school.

19      Q.    Okay.  So following -- after leaving the

20  Southern District, you attended Harvard for the LLM.

21  How long was that -- was that --

22      A.    I graduated from Harvard -- it's a one-year

23  curriculum.  A one-year academic curriculum.

24      Q.    Okay.  Following that, what did you do?

25      A.    I went on the teaching market.

Page 63

1       Q.     And explain to us what the teaching market is.

2       A.     It's almost a one-year process.  I mean, I'm

3    going through the traditional teaching market

4    credentials.  There's an organization called the

5    Association of American Law Schools, and they have a

6    recruitment process for academics.

7              And so, you know, you submit your materials,

8    and then law schools select and invite you to meet with

9    them in Washington, D.C., at the annual faculty

10   recruitment conference.

11             And then after that, if schools are interested

12   and the applicant is interested, then you visit the

13   schools and give a job talk presentation.  And then

14   after that, you know, that's when you decide, like, if

15   schools are interested and you're interested.

16             So it's a -- it's a year-long process.

17      Q.     Was FAMU the first school that you were engaged

18   by after you began that process?  Have you -- have you

19   ever worked at any other law school?

20      A.     I was going to ask you to clarify that.

21   "Engaged by," you mean teaching?

22      Q.     Yes, teaching.

23      A.     Teaching was my -- FAMU College of Law was my

24   first teaching experience.  They -- they recruited me

25   from that ALS faculty recruitment conference.

Page 64

1      Q.   Okay.  Now, before we go further into your --

2  your teaching experience with FAMU, I just want to

3  clarify a few things here in terms of some background

4  questions.

5           We've talked about who resided with you during

6  the -- you know, during your course of employment with

7  FAMU.  Have you been married during that period of time?

8      A.   No.  I have remained unmarried.

9      Q.   Okay.  Have you been involved in any other

10  prior litigation prior to this lawsuit?

11      A.   I can't recall exactly, but I don't think so

12  because I've never given a deposition.  But wait a

13  minute.  I think I -- I think I filed a lawsuit against

14  a swimming pool company at one point, like a small

15  claims lawsuit.  But that was years ago.

16      Q.   Okay.

17      A.   And involved in a lawsuit, I was involved in my

18  divorce proceeding, but that was many years ago, before

19  I started working at the FAMU College of Law.

20      Q.   Okay.  Following your employment, the date of

21  your initial employment with FAMU, have you had any

22  contact with your -- your ex-husband?

23      A.   No.

24      Q.   Okay.  Have you ever discussed the events

25  related to FAMU and this lawsuit with your ex-husband?

Page 65

```
 1     A.   I -- asked and answered.

 2          I said I haven't had any contact.

 3     Q.   Okay.  Let me clarify those two questions then.

 4          In terms of contact, have you -- let me -- have

 5  you had any phone contact with him at all?

 6     A.   No.

 7     Q.   Okay.  Have you seen him in person?

 8     A.   No.

 9     Q.   Did you have any children from that marriage?

10     A.   Yes.

11     Q.   Okay.  And that would be the son that you

12  referred to previously?

13     A.   That's one of them.

14     Q.   Okay.  What other children?

15     A.   I have another adult son who never resided with

16  me during the time that I have worked in the FAMU

17  College of Law.  And that's why when you asked me the

18  question, it was only the one.

19     Q.   Okay.

20     A.   Yeah.

21     Q.   Other than your two adult sons, do you have any

22  other children?

23     A.   No.

24     Q.   Okay.  Have you spoken with your other adult

25  son regarding your lawsuit?
```

Maritza Reyes
May 24, 2024

Page 66

1    A.   Yes.

2    **Q.   Okay.  And what is his name?**

3    A.   I'm going to object.  He's not a witness.  He

4  knows that I filed a lawsuit, but he's not a witness in

5  the case.

6    **Q.   Well, you have not listed him as a witness in**

7  **the case, correct?**

8    A.   Correct.

9    **Q.   Okay.**

10   A.   He doesn't have personal knowledge.

11   **Q.   Okay.  We're going to go ahead and certify that**

12  **question as well.**

13   A.   And objection.  Harassing the witness,

14  embarrassing.

15   **Q.   Ms. Reyes, the only thing we're trying to**

16  **determine are the names of potential witnesses.**

17   A.   Mm-hmm.

18   **Q.   And you've indicated you have two sons and**

19  **you've spoken with your sons.  So all we're trying to do**

20  **is determine what knowledge they may have.**

21   A.   Okay.

22   **Q.   And that's not harassment.  Okay?**

23   A.   My objection remains though.

24   **Q.   Yes, your -- your objection --**

25   A.   That's fine.

Page 67

1      Q.    -- is on the record.

2            So military background.  Have you ever been

3   involved in any branch of the military?

4      A.    No.

5      Q.    All right.  So now we're going to turn to FAMU.

6   You've indicated your employment with them began after

7   you received your LLM?

8      A.    Yes.

9      Q.    And that you were recrui- -- excuse me --

10  recruited by FAMU.  Can you tell us about that

11  recruitment process?  How did it begin?

12     A.    It began at the -- when they invited me, they

13  contacted me and invited me to meet with them.  And I

14  believe that it was then Dean Leroy Pernell contacted me

15  and invited me to meet with them at the Association of

16  American Law Schools recruitment conference in

17  Washington, D.C.

18     Q.    Okay.  And did you meet with Dean Pernell?

19     A.    I met with a committee of faculty and it

20  included Dean Pernell.

21     Q.    Does the committee of faculty have a specific

22  name?

23     A.    I was not part of the faculty at that time when

24  they invited me, so I don't know if they had a specific

25  name at that time.

Page 68

1      Q.    Where did that committee meet with you?

2      A.    In Washington, D.C.

3      Q.    What was the purpose of the meeting in

4  Washington, D.C.?

5      A.    To -- I guess you would consider it like a

6  first type of interview.

7      Q.    Did they ask you questions about your

8  background, your education?

9      A.    Yes.

10     Q.    Okay.  Did they ask you about your teaching

11  goals?

12     A.    Yeah, I -- I think so, yes.

13     Q.    Okay.

14     A.    It's been -- it was, like, 16 years ago at

15  least.

16     Q.    Okay.  Do you recall the year that that

17  occurred?

18     A.    It would have been, I think, 2008.  I think.

19     Q.    Okay.  After that initial meeting in D.C., did

20  you have further meetings with Dr. Pernell -- sorry --

21  Dean Pernell or anyone else from FAMU?

22     A.    Yes.  I was then invited to do a job talk

23  presentation, which meant that I came to a law school

24  for a full-day interview, preceded by meeting with two

25  faculty members, the -- the evening before.

Page 69

1      Q.    What's a job talk presentation?

2      A.    So a job talk presentation in the legal

3  academy, law schools, is when you come -- when a faculty

4  member or an applicant comes in and presents -- usually

5  it's going to be on a topic of scholarship.

6      Q.    And so you gave your job talk presentation?

7      A.    Yes.

8      Q.    Do you recall who was present?

9      A.    I didn't even know them at the time, so I don't

10  recall exactly who was present.  But it was some faculty

11  members.

12     Q.    Following the job talk presentation, were there

13  additional interviews?

14     A.    I don't recall exactly if -- if there were.

15  Because it's a full day of interviews.  There -- I think

16  that there were because the job talk is in the middle

17  of -- towards the middle of the day.  Maybe.  I'm not

18  sure if there were more interviews.  But there were

19  interviews before the job talk.  I'm not sure if there

20  were more after, but there may have been.

21     Q.    After the job talk and the day of interviews,

22  were there additional interviews or meetings prior to

23  you obtaining an offer of employment with FAMU?

24     A.    The job talk day and the interview day was the

25  last type of meetings.

Maritza Reyes
May 24, 2024

Page 70

1      Q.   Were you provided with an offer for employment
2  by FAMU?

3      A.   Yes, eventually.

4      Q.   Okay.  When did you receive that offer of
5  employment?

6      A.   I can't recall exactly.  And -- and I have to
7  clarify that the offer came in first in terms of a phone
8  call that I received from Dean Leroy Pernell.  And then
9  the offer came later.  He sent me a letter.  And then
10 later I got a letter also from the provost.

11     Q.   Okay.

12     A.   So the offer was communicated in different ways
13 at different times.

14     Q.   Okay.  Now, Dean Pernell was a part of the
15 interview process, I believe you mentioned, correct?

16     A.   Yes.

17     Q.   Did he personally call you to tell you that the
18 offer was coming?  Is that what you --

19     A.   That's what I remember.

20     Q.   I'm going to show you what's been marked as
21 Exhibit 4 to the deposition.

22          (Defendant's Exhibit 4 was marked for
23          identification.)

24          THE VIDEOGRAPHER:  Counsel, are you able to
25          take a five-minute break after this exhibit?

Maritza Reyes
May 24, 2024

Page 71

 1          MS. REINER:  Absolutely.

 2   BY MS. REINER:

 **3**      Q.   Okay.  Can you identify that exhibit for us?

 4      A.   So this is a letter dated March 30, 2009,

 5   addressed to me from Provost Cynthia Hughes Harris.

 **6**      Q.   And is that your correct post office box for

 **7**   the time you were in Miami?

 8      A.   Yes.  At the time I was in Miami, that was my

 9   address that I used.  It was also a PO Box.

**10**      Q.   Okay.  Did you recall -- do you recall

**11**   receiving this letter?

12      A.   Yes.

**13**      Q.   Okay.  And turning to page 2 of that letter, is

**14**   that your signature at the bottom accepting the offer of

**15**   employment?

16      A.   Yes.

**17**      Q.   Okay.  And what is the date of that acceptance?

18      A.   April 7, 2009.

**19**      Q.   Okay.  And what employment were you offered

**20**   with the FAMU College of Law?

21      A.   As it states on the letter, a full-time

22   tenure-earning position as assistant professor in the

23   College of Law.

**24**      Q.   Okay.  And what was your start date with

**25**   respect to that employment?

Page 72

1      A.    I don't remember.

2      Q.    Okay.  Was the appointment for a specific

3  period of time or academic year?

4      A.    Well, the academic year -- it wasn't for a

5  specific period of time.  In terms of when you're a

6  tenure-track professor, you are hired with the

7  assumption that it continues.

8      Q.    Okay.  Does the letter state that it's for a

9  specific period?

10     A.    The letter states that it begins in the

11  academic year of August 10, 2009.  For the academic

12  year, would have been 2009-2010.

13     Q.    Okay.  And does it say that it ends on May 18,

14  2010?

15     A.    The academic year ends on that date, yes.

16     Q.    Okay.

17     A.    For the 2009-2010.

18     Q.    Okay.  Did you continue your employment with

19  FAMU after that date?

20     A.    Yes.

21     Q.    Okay.  So at this point, you had been recruited

22  by FAMU and hired for -- given an offer, accepted that

23  offer.  Did you then begin teaching for FAMU?

24     A.    Yes, after that.

25     Q.    Okay.  And when you took up your position as an

Page 73

1   assistant professor in the College of Law, what were you

2   teaching?

3        A.   I believe I started with evidence and

4   immigration law.

5        Q.   Okay.  Who do you report to as an assistant

6   professor within the College of Law?

7        A.   The dean.

8        Q.   And is the dean the individual who would

9   address employment issues during the course of your

10   employment?

11        A.   Yes.  Well, what do you mean by "employment

12   issues"?

13        Q.   So, for instance, if in terms of evaluation --

14        A.   Yes.  Evaluations, yes.

15        Q.   -- performance -- performance.  You know, are

16   you performing well?  Are you performing poorly?

17   Conduct issues.  Would those things be addressed by the

18   dean?

19        A.   Whose conduct?

20        Q.   Your conduct as --

21        A.   Yes.

22        Q.   -- a professor.

23        A.   Yes.

24        Q.   Yes.

25        A.   The dean is considered the supervisor of the

Page 74

1  law faculty.

2      Q.   Does this appear to be -- before we leave

3  Exhibit 4, does this appear to be a true and accurate

4  copy of the letter you received conveying the offer?

5      A.   It appears to be, yes.

6      Q.   Okay.  At some point, did you seek promotion to

7  associate professor?

8      A.   Yes.

9      Q.   Okay.  Do you recall when that was --

10         MS. REINER:  Wait.  We're going to pause there.

11     I believe you wanted to take a quick break.

12         THE VIDEOGRAPHER:  Thank you.

13         THE WITNESS:  I think we all wanted to take a

14     quick break.

15         THE VIDEOGRAPHER:  Off the record at 11:45.

16         (Off the record from 11:45 a.m. to 12:22 p.m.)

17         THE VIDEOGRAPHER:  We are back on the record.

18     The time is 12:22 p.m.  Starting media 2.

19  BY MS. REINER:

20     Q.   All right.  So I believe as we were going off

21  the record, I just started to ask you about your

22  promotion to associate professor.  Do you recall that

23  question?

24     A.   Yes.

25     Q.   Okay.  And you were promoted to associate --

Page 75

1      A.   But just refresh my memory.  Just I don't want

2  to assume because it was before the -- but I remember

3  something about a promotion to associate professor.

4      **Q.   Okay.**

5      A.   But what was your question?

6      **Q.   Okay.  So were you promoted to associate**

7  **professor?**

8      A.   Yes.

9      **Q.   Okay.  Do you recall when that occurred?**

10     A.   I think I applied in 20 -- I would have been in

11  my third year.  So I think I applied in 2010, and it

12  would have been effective 2011.  That's what I think.

13          (Defendant's Exhibit 5 was marked for

14      identification.)

15  BY MS. REINER:

16     **Q.   Okay.  I'm going to show you what's been marked**

17  **as Exhibit 5 to the deposition for identification**

18  **purposes.**

19     A.   So that refreshes my memory.

20     **Q.   Okay.  Just one second.**

21     A.   Mm-hmm.

22     **Q.   You've been shown what's been identified as**

23  **Exhibit 5 to the deposition.  Can you identify that**

24  **document?**

25     A.   Yes.  It's a letter dated June 18, 2012,

Page 76

1  addressed to me from President James Ammons.

**2**      **Q.   Okay.**

3      A.   With copy to Dr. Larry Robinson, Provost and

4  Vice President, and Mr. Leroy Pernell, Dean.

**5**      **Q.   Okay.  And is that the correct PO Box for you**

**6  in Winter Park at that point in time?**

7      A.   Yes.  That's the PO Box that I have always used

8  since I have resided here in Central Florida.

**9**      **Q.   Okay.  And does that letter inform you that**

**10  your application for the promotion to the rank of an**

**11  associate professor was approved?**

12      A.   Yes.

**13**      **Q.   Okay.  And what is the date on that letter?**

14      A.   I identified it as June 18, 2012.

**15**      **Q.   Okay.  Does that help refresh your recollection**

**16  related to your promotion to professor?**

17      A.   Yes.  I applied in 2011, which would have been

18  during my third year, like I said, and it was effective

19  2012.

**20**      **Q.   Okay.  Can you turn with me to the second page**

**21  of that document?  Can you identify that for me?**

22      A.   This is a document called Employment Contract,

23  Florida A&M University faculty.  It's signed both by --

24  well, it's signed by Larry Robinson, August 7, 2012, and

25  signed by me August 14, 2012.  And it's -- it says

Page 77

1  special conditions, promotion.

2      Q.   Okay.  Now, do you recall if that employment

3  contract accompanied the letter reflected on page 1?

4      A.   No, it did not.

5      Q.   Okay.  So for purposes of Exhibit 5, we're just

6  going to make Exhibit 5 the letter from President James

7  H. Ammons.  And I'm going to mark separate as Exhibit 6

8  the contract for Florida A&M.  And I'm going to go ahead

9  and provide that separate to you.  There we go.

10         (Defendant's Exhibit 6 was marked for

11         identification.)

12 BY MS. REINER:

13     Q.   Okay.  So you received the letter telling you

14 that you'd been promoted to associate professor.  And

15 then at some point after that, I'm assuming you were

16 provided with the contract, the employment contract; is

17 that correct?

18     A.   Yes, because I signed this in August 14, 2012.

19     Q.   Okay.  How long were you an associate

20 professor?

21     A.   I don't want to get it wrong, the dates, the

22 dates, because I want to make sure that I'm right.  So

23 if I was an associate professor from -- the letter said

24 20 -- effective 2012.

25     Q.   Let me strike that and ask you --

Page 78

```
 1      A.   I think nine years.
 2      Q.   Okay.  Let me strike that and let me ask you a
 3  different question.
 4           When you were promoted to associate professor,
 5  did that promotion, was it accompanied by a raise in
 6  your compensation package?
 7      A.   Yes.
 8      Q.   Okay.  Did you have any additional duties as an
 9  associate professor?
10      A.   I don't think so.  I don't -- I don't recall
11  exactly, but I don't think that there are additional
12  duties.  It's just a change in rank.
13      Q.   Okay.  So you weren't required to teach any
14  additional classes, to pick up a larger load or anything
15  like that?  It was just --
16      A.   Oh, I started --
17      Q.   -- a change in rank?
18      A.   -- teaching a big load from when I started.
19      Q.   Okay.  But that wasn't part of your promotion
20  process, in other words?
21      A.   No, but it was meeting the qualifications.
22      Q.   Okay.  So following your promotion to associate
23  professor, you increase -- you received an increase in
24  your salary, correct?
25      A.   Yes.
```

Page 79

 1      Q.    Okay.  How does that work in subsequent years?

 2            So after you receive your initial promotion to

 3    associate professor, and then prior to being given

 4    tenure, does FAMU have a process for, you know,

 5    evaluating performance and increasing salaries in

 6    between those periods of time?

 7      A.    FAMU for years did not give us annual raises.

 8      Q.    Okay.

 9      A.    So we didn't have an opportunity to get raises.

10    So basically my recollection is what you call a raise,

11    the only way to get a raise was to get promotion.

12      Q.    Okay.  So you were given an adjustment to your

13    com- -- to your compensation package upon becoming an

14    associate professor.  Did you then thereafter apply for

15    tenure?

16      A.    Yes.

17      Q.    Okay.  And what was the tenure application

18    process?

19      A.    It's similar to the promotion process, but

20    tenure you don't get a raise.

21      Q.    Okay.

22      A.    You get security of employment.

23      Q.    Okay.  When you apply for tenure, how is -- how

24    is the granting or denial of tenure determined?  Is

25    there a specific committee that determines it, a

Page 80

1   specific person that determines it -- that determines

2   it?  What's your understanding of that process?

3       A.   My understanding is that the process begins by

4   submitting an application to the College of Law

5   Retention, Promotion, and Tenure Committee.

6       Q.   Does the committee then evaluate your

7   application?

8       A.   They -- they have to make arrangements for

9   external review of scholarship, internal review of

10  scholarship, peer evaluation of classes, review the

11  materials, I believe.

12          I don't know.  I was not in the committee when

13  they were reviewing my tenure application.  I don't know

14  what they did.

15      Q.   Okay.  And who is that tenure -- or that

16  committee made up of?

17      A.   It would have been the tenure faculty when I

18  applied.

19      Q.   Okay.  And is that both -- following tenure,

20  you can also be promoted from associate professor to

21  full-time professor, right?  So it's tenure, and then

22  you applied in 2018 to be promoted again to full

23  professor?

24      A.   Yes.  I applied in 2018 for a promotion to full

25  professor.

Page 81

1    Q.   Okay.  So is the committee that determines

2  tenure, is it made up of only tenured faculty who have

3  been promoted to full professor, or is it any tenured

4  faculty member?

5    A.   The tenured faculty.  It's any tenured faculty.

6    Q.   Okay.

7    A.   For the tenured application.

8    Q.   For the tenured application.  So they make

9  arrangements for external and internal review, they

10  review the documents.  At some point does that committee

11  provide a recommendation related to tenure?

12    A.   Yes.

13        (Defendant's Exhibit 7 was marked for

14    identification.)

15  BY MS. REINER:

16    Q.   Okay.  I'm going to show you now what's being

17  marked here as Exhibit 7 to the deposition.  If you want

18  to take a moment to review that.

19    A.   Mm-hmm.

20    Q.   Now that you've had a chance to take a look at

21  that, can you identify that document for me?

22    A.   It is titled 2014-2015 Tenure and Promotion

23  Schedule.

24    Q.   Now, is this a document that you've seen

25  before?

Page 82

1    A.    If it is the 2014-2015 Tenure and Promotion

2    Schedule that was posted at that time, then it is.  But

3    I don't have -- I can't -- I mean, it seems to be what

4    it purports to be.  I don't know if it's the one that I

5    received, but it looks like this would have been --

6    that's how it looked like when I saw it.

7        Q.    Okay.  And what is the tenure -- the purpose of

8    the tenure and promotion schedule?

9        A.    To advise applicants and everybody involved in

10   the process of the deadlines.

11       Q.    Okay.  And so when you applied for tenure, is

12   it correct that you would have reviewed this promotion

13   schedule to make sure that you submitted your

14   application and requisite materials and things on a

15   timely basis?

16       A.    Yes.

17       Q.    Okay.  And after submission, it seems to

18   indicate that there are -- that there are certain

19   meetings and reviews that take place prior to a decision

20   being made.

21            Do you know who makes the final decision

22   regarding tenure?

23       A.    My understanding is that the final decision

24   regarding tenure goes to the board of trustees.

25       Q.    Okay.

Page 83

1    A.    But let me qualify that if it's -- if it's

2  recommended to go to the board of trustees.  I don't

3  know how exactly it would work if it's not recommended,

4  who would be the final decision-maker then.

5    Q.    When someone is applying for -- for tenure,

6  what is considered in making that determination?  I know

7  that we've talked about materials, but what are the

8  standards for -- for being awarded tenure?

9    A.    The standards under the faculty handbook are

10  scholarship, teaching, and service.

11    Q.    Okay.  I'm going to show you what has been

12  marked as Exhibit A to the deposition.  8.  Sorry.  I

13  think I said A.  Exhibit 8.

14         (Defendant's Exhibit 8 was marked for

15    identification.)

16  BY MS. REINER:

17    Q.    Okay.  Now that you've had a chance to review

18  that briefly, can you tell me what that document is or

19  can you identify that document?

20    A.    These are three pages with no page numbers.

21  They look like the standards that were -- that are

22  included -- that are included in the faculty handbook.

23  But I don't have the entire faculty handbook, so I don't

24  know where exactly, but it looks like the standards.

25  It's three pages.

Page 84

1    Q.   Okay.

2    A.   And it's titled VIII.  Standards for Faculty.

3    Q.   Okay.

4    A.   And then Roman numeral -- that's page -- the

5  first page that doesn't have a page number.  And then

6  the next page, it says:  IX.  Standards of Teaching,

7  Scholarship & Research, and Service.  And it goes on to

8  the next page.

9    Q.   Okay.  So looking at this document, would you

10  agree with me that the first page under section VIII,

11  Standards for Faculty, lists the standard for a

12  professor, an associate professor, and an assistant

13  professor?

14    A.   This is not all the standards.  It's some of

15  the standards.

16    Q.   No, and I'm talking about this particular

17  document.

18    A.   Okay.  The particular document does say here

19  professor, associate professor, and assistant professor.

20  And there are three paragraphs related to that.

21    Q.   Okay.  Now, you've mentioned something

22  called -- you mentioned some categories for evaluation

23  or some tenets.  I believe teaching, research and

24  scholarship, and then service were those areas; is that

25  correct?

Page 85

1    A.    Yes.

2    Q.    Okay.  Can you tell me what your understanding

3  of the requirement is with respect to teaching in order

4  to achieve promotion, for instance?

5    A.    Promotion to what?

6    Q.    Let's say -- let's say -- let's stick with your

7  tenure.  In terms of evaluating tenure.

8    A.    Okay.  Let's --

9    Q.    So I'll take the word "promotion" and rephrase.

10         So with respect to tenure, what is the standard

11  that you -- you must display with respect to teaching?

12   A.    I would have to see the faculty handbook

13  specifically with regards to tenure to tell you how the

14  word -- the wording of the phrasing of what the standard

15  is.  So I would like -- it's in the -- in the faculty

16  handbook.

17   Q.    Okay.  For now I'd like to -- to stick with

18  this document that's been marked as Exhibit 8.  Can you

19  tell me generally what the expectations are with respect

20  to teaching at FAMU?  And, to clarify, the expectations

21  for an associate professor, I believe you were at the

22  time, in terms of their teaching requirements.

23   A.    Well, we have to teach the courses that we're

24  assigned.  So can you clarify what else do you want --

25   Q.    So, obviously, teaching is a part of it,

Page 86

1   conducting the actual course and the coursework.  Are

2   there other things that were required under that

3   teaching component?

4           Were you required to do -- engage with students

5   in other manners or provide other types of -- of

6   teaching services to FAMU and the university as a part

7   of that component?

8       A.   Yes.  And I have to say that to be technical

9   about it, where it fits in terms of sometimes teaching

10  versus service, for example, I would have to look at the

11  faculty handbook to see where they fit what, right?

12  Because some of those from my recollection, I may tell

13  you that they're teaching, but they may be service.

14          And so teaching, you -- you're supposed to be

15  available.  I'd meet with students for office hours.  I

16  also supervised independent research as part of teaching

17  too.  I'm trying to be specific about the categories

18  that would fit into teaching versus service, which, you

19  know, it's also a lot of activities with the students.

20          So, yeah, extensive interactions with students

21  beyond the classroom.

22      Q.   What about the component of research and

23  scholarship?  What are the things that make up that

24  particular component?

25      A.   That would be -- and, again, I would prefer to

Maritza Reyes
May 24, 2024

Page 87

1  be looking specifically at the faculty handbook to see

2  what would fit under that.  So going from my memory, the

3  fact that I don't name something doesn't mean that it

4  would fall under the faculty handbook.

5          From my recollection right now, because I don't

6  have the faculty handbook in front of me, on the

7  research and scholarship, it would include obviously the

8  research that we do, the scholarship that we publish,

9  the conferences that we attend where we present our

10 scholarship, the talks that we give related to, you

11 know, research, scholarship, related to the topics in

12 which, you know, we can speak as academics.

13         And when I mean publications, it's, you know,

14 all the types of publications that I listed in the

15 faculty handbook as part of scholarship.

16     **Q.   Okay.  So when you were planning on applying**

17 **for tenure, is it correct that you would have been**

18 **thinking about meeting each of the component**

19 **requirements, for instance, teaching, research and**

20 **scholarship and then service, leading up to your**

21 **application -- to submitting your application?**

22     A.   From the moment you -- I -- I -- you know, you

23 seek a tenure-track position, you -- you ask for the

24 requirements.  And I did.  And I asked for the

25 requirements, and I got the requirements.  And I was --

Page 88

1  the whole six years before the tenure application, I was

2  working towards meeting those requirements and exceeding

3  them.

4      Q.   Okay.  So you applied for tenure, correct?

5      A.   Yes.

6      Q.   And is there an interview process also with

7  respect to a tenure application, or is it just written

8  submissions?

9      A.   It's just -- I wasn't interviewed, no.  You

10  just submit your application.

11      Q.   Okay.  And at some point, did you receive a

12  determination or were you advised of a determination

13  regarding tenure?

14      A.   Yes.

15      Q.   Okay.  And what was that -- what was that

16  determination?

17      A.   And when you say "determination," you say the

18  final determination?

19      Q.   Yes, the final -- the final determination.

20      A.   My tenure was approved.

21      Q.   Okay.  How does approval of tenure work?  So is

22  it the Retention, Promotion, and Tenure Committee we've

23  talked about before that approves tenure, or from the

24  point of their evaluation is there a further process for

25  approval of tenure?

Page 89

1     A.    Okay.  I'm going to refer to the 2014-2015

2  Tenure and Promotion Schedule.

3     Q.    Okay.

4     A.    And as you see here, it begins with the

5  applicant submitting an application.  Then they would

6  be -- in the College of Law, it would be the College of

7  Law Retention, Promotion, and Tenure Committee would

8  submit the recommendation to the dean of the law school.

9          Then the dean of the law school would submit

10  the recommendation to the University Promotion and

11  Tenure Committee.  Then the University Promotion and

12  Tenure -- University Tenure and Promotion Committee

13  would submit a recommendation to the provost.

14          Then the provost would submit the tenure

15  recommendation to the president.  Then the president

16  would submit recommendation to the board of trustees.

17  And then the board of trustees would approve a tenure

18  recommendation.

19     Q.    Okay.  Do you have any personal knowledge of

20  the frequency with which recommendations that are made

21  throughout that process are either followed or not

22  followed by the -- with respect to subsequent decisions

23  and what -- let me clarify that for you.

24          So let's say that the -- for instance, in your

25  process, my understanding is that the Retention,

Page 90

1    Promotion, and Tenure Committee did not recommend

2    tenure; is that correct?

3         A.   Some of them did; some of them didn't.

4         Q.   Okay.  Was there an overall recommendation for

5    tenure from the committee?

6         A.   Well, they have to go -- they -- they have to

7    go by the majority number.

8         Q.   Okay.

9         A.   So -- and I don't recall what they termed as a

10   majority number at the time.  But the majority number

11   that they had was that they did not recommend, the

12   Retention, Promotion, and Tenure Committee.

13        Q.   So the Retention, Promotion, and Tenure

14   Committee did not recommend an -- did not recommend.

15   But then it goes through a further process.  So they

16   convey their recommendation, I guess you could say, up

17   the chain, correct?

18        A.   That is if they process the application and

19   they do everything that they're supposed to do, then

20   there is something for the next level to review.  But if

21   they don't process and do what they're supposed to do,

22   like we talked about before, like the external

23   scholarship reviews or the internal scholarship reviews,

24   then the next levels would not have something to review.

25             But if -- we're talking about my tenure, right?

Page 91

1      Q.    Yes, we're talking about your tenure.

2      A.    Okay.  So with my tenure application, the

3   College of Law Retention, Promotion, and Tenure

4   Committee submitted the materials to the next level,

5   which would have been College of Law Dean Leroy Pernell

6   at that time.

7      Q.    Do you know whether Dean Pernell recommended

8   you for tenure or not?

9      A.    He did.

10      Q.    Okay.  So then that recommendation was

11   forwarded to the University Promotion and Tenure

12   Committee, correct?

13      A.    The University Tenure and Promotion Committee.

14      Q.    Yes.  Okay.  And did that committee also

15   recommend promotion -- or sorry -- recommend tenure?

16      A.    Yeah, we have to keep them straight because I

17   want to make sure that I answer the question that you're

18   asking.

19           That committee, again, my recollection is that

20   some of them did, some of them did not.

21      Q.    Okay.

22      A.    And the -- with the majority number that

23   they -- that they had, and that's where the committee --

24   remember I -- I think I mentioned -- or maybe I didn't

25   mention.

Page 92

1              But I did mention in my complaint that

2  Professor Patricia Broussard was both in the College of

3  Law Retention, Promotion, and Tenure Committee, and then

4  in the University Promotion and Tenure Committee.

5              And so my recollection is that they did not.

6       **Q.   Okay.  So your recollection is that the**

7  **University Tenure and Promotion Committee did not**

8  **recommend you for tenure; is that correct?**

9       A.   Yes.  That's my recollection.

10      **Q.   Okay.  Would that recommendation then go up to**

11 **the provost?**

12      A.   Yes.

13      **Q.   Okay.  Did the provost recommend you for**

14 **tenure?**

15      A.   The provost at that time was -- let me recall.

16 It was Marcella David.  It was, I think, the first time

17 that the FAM- -- that FAMU had a provost who was a law

18 professor.  So her faculty appointment was as a law

19 professor.  So she was a very experienced law professor

20 before she came.  And she was the provost.  And she

21 reviewed my application for tenure.

22      **Q.   Okay.  I'm going to move to strike that.**

23           **My only question to you was:  Did the**

24 **provost --**

25           MS. REINER:  Could you read back my question,

Page 93

 1    actually?

 2         (The question was read back by the court

 3    reporter.)

 4         THE WITNESS:  Objection to the striking of my

 5    answer.  That was my witness answer.

 6         Provost Marcella David, a law professor,

 7    recommended me for tenure.

 8  BY MS. REINER:

 9    Q.   Okay.  What happened next?  Once the provost

10  makes recommendation for tenure, does that go to the

11  president?

12    A.   Yes.

13    Q.   Okay.  And did the president make a

14  recommendation to the board of trustees?

15    A.   Yes.  President Elmira Mangum recommended --

16  I -- you know, I assume that's how it got to the board

17  of trustees, but the president at that time that

18  reviewed it was Elmira Mangum.

19    Q.   And did the president, Mangum, recommend you

20  for tenure to the board of trustees?

21    A.   Yes.

22    Q.   Okay.  And were you awarded tenure?

23    A.   Yes.

24    Q.   Okay.  I'm going to show you now -- actually,

25  I'm not.

Page 94

1          (Defendant's Exhibit 9 was marked for

2      identification.)

3   BY MS. REINER:

4      Q.   I'm going to show you now what's being marked

5   as Exhibit 9 to the deposition.  Careful.  The sticker's

6   coming off.  Okay.  I'm going to show you what's been

7   marked as Exhibit 9 to the deposition.

8          Now, you mentioned a moment ago that you

9   believed you recalled that the university committee did

10  not recommend you --

11     A.   Right.

12     Q.   -- for termination?

13     A.   I'm sorry, for termination?

14     Q.   Sorry.  Did not recommend you for tenure.

15     A.   I was terminated recently.

16     Q.   I'm asking you about tenure.

17     A.   Okay.

18     Q.   So I believe you said that they did not

19  recommend you for tenure.  Does this Exhibit 9 assist

20  you in recalling that?

21     A.   Well, I told you that --

22     Q.   Does it refresh your recollection?

23     A.   I didn't need my recollection refreshed.  I

24  stated that they did not recommend me.

25     Q.   Okay.  I thought you said you weren't sure but

Page 95

 1  you believe they did?

 2      A.   No.  I knew.

 3      Q.   Okay.  So this correspondence, can you identify

 4  this correspondence for us?

 5      A.   It's a letter dated April 28, 2015.  It is

 6  addressed to me and it is signed by Michael Abazinge,

 7  who was the chair of the University Tenure and Promotion

 8  Committee that reviewed my application for tenure and

 9  also my application for promotion to full professor.

10      Q.   Okay.  And this letter conveys to you that

11  the --

12      A.   Oh.  And I forgot to say that it's copied to

13  Marcella David, Provost, and Leroy Pernell, Dean.

14      Q.   Okay.  And that's Dean Pernell who did

15  recommend you for tenure, correct?

16      A.   Correct.

17      Q.   Okay.

18      A.   And Marcella David who also recommended me for

19  tenure.

20      Q.   Yes, and Marcella.

21          Did -- do you recall receiving this letter?

22      A.   I think I recall that because -- yeah, I think

23  I recalled it because this was part of the

24  discrimination that you were asking me about before.

25      Q.   Okay.  So I just asked you if you recalled

Maritza Reyes
May 24, 2024

Page 96

1    receiving the letter.  That's it.  Do you recall

2    receiving the letter?

3         A.   I recall receiving the letter because it was a

4    discrimination.

5         Q.   Okay.  I'm --

6         A.   That's how I recalled it.

7         Q.   Okay.

8         A.   Let me answer -- let me finish my answer.  And

9    that's my answer.

10        Q.   Okay.  But I didn't ask you why you recall it.

11   I just asked you if you did.

12             Okay.  So is this your PO Box here?

13        A.   Yes.  It's the same PO Box --

14        Q.   It's the same?

15        A.   -- that I've had since I've been here in

16   Central Florida.

17        Q.   Okay.  Now, you've indicated that you think the

18   committee's -- the committee declining to recommend you

19   for tenure is a discriminatory act; is that correct?

20        A.   Well, this piggybacked.  Because the reason

21   that they gave was the setup that happened in the

22   College of Law Retention, Promotion, and Tenure

23   Committee as a result of all the discrimination that was

24   happening in that committee, which I outlined in my

25   second amended complaint.

Page 97

1      Q.    Okay.

2      A.    And so they -- they didn't do an independent

3    review.   They just go by what the College of Law

4    Retention, Promotion, and Tenure Committee said.

5      Q.    Okay.  And I'm going to again move to strike

6    that as nonresponsive and ask --

7      A.    And I'm going to object to let the witness

8    answer the question.

9      Q.    But that's not the question.

10           My question is:  Did you view their failure to

11   recommend you for tenure as a discriminatory act against

12   you?

13     A.    That's exactly what I just answered.

14     Q.    Okay.  The answer is yes or no.  I did view it

15   as a discriminatory act against me, or no, I did not

16   discriminate it --

17     A.    Okay.

18     Q.    -- view it as a discriminatory act?

19     A.    You cannot tell me how to answer.  I am the

20   witness, and I am going to answer how I think I

21   understand your question and how the answer goes.

22   Because I have to answer based on my personal knowledge.

23   You're answering the way that you want to hear it.

24           But if you ask me -- ask me the question again,

25   I will answer it fully for you in the way that I can

Page 98

1  answer as a witness.

2      Q.   Okay.  But you need to answer the question that

3  I'm asking.

4      A.   Yes, that's what I'm answering.

5      Q.   I'm not asking you to go beyond it.

6           Okay.  So, again, do you view the denial of --

7  strike that.

8           Do you view the University Tenure and Promotion

9  Committee recommendation as a discriminatory act against

10  you?  Do you -- do you view that committee's failure to

11  recommend you for tenure as a discriminate -- as a

12  discrete discriminatory act against you?

13      A.   See, that's -- I cannot answer your question

14  the way you're asking it because it is not a discrete

15  act.

16      Q.   You don't see the recommendation or failure to

17  recommend as a discrete act of discrimination -- as an

18  example of discrimination?

19      A.   Yes, it is tied to that.  But it's tied because

20  this -- the record that they get builds upon.  They only

21  get a record from what the College of Law Retention,

22  Promotion, and Tenure Committee prepare.

23           And so if that is the discrimination of the

24  College of Law Retention, Promotion, and Tenure

25  Committee, that is what carries into the discrimination

1  that happened at the University Tenure and Promotion

2  Committee.

3      Q.   Okay.  So is it your testimony here today that

4  you believe the retention -- the retention and promotion

5  committee at the college level discriminated against you

6  by failing to recommend you for tenure?

7      A.   They discriminated against me by the way in

8  which they handled my application, the way that they

9  treated me different than nonblack faculty members, the

10  way that they set up all the process and put me through

11  an investigation, the way of the false allegations.

12         That's how they -- you asked me how they

13  discriminated against me and I'm answering.  And I can't

14  answer how you want it.  And you can move to strike

15  again, but I have to answer the question as I -- based

16  on my personal knowledge.

17      Q.   Okay.

18         MS. REINER:  Can you read the question back,

19      please?

20         (The question was read back by the court

21      reporter.)

22         THE WITNESS:  Yes, they discriminated against

23      me.

24  BY MS. REINER:

25      Q.   Is it also your testimony today that you

Maritza Reyes
May 24, 2024

Page 100

1  believe that the university committee -- so we've talked

2  about the college committee, but you believe that the

3  university committee discriminated against you by not

4  recommending you for tenure because they just accepted

5  the determination of the college committee below?

6      A.   I was not in the -- in the committee.  But the

7  reason that they gave on Exhibit 9 is exactly the reason

8  that the College of Law Retention, Promotion, and Tenure

9  Committee set up as part of the discrimination and all

10  the ploys that they did in the College of Law Retention,

11  Promotion, and Tenure Committee.

12          When they said -- because the specific reason

13  that the University Tenure and Promotion Committee gave

14  in Exhibit 9, it says:  The reason for disapproval is

15  inadequate evidence of scholarly publications as

16  indicated by the internal and external reviewers.

17          That was set up solely by the College of Law

18  Retention, Promotion, and Tenure Committee.

19      Q.   Okay.  So scholarly publications is a

20  requirement of or is one of the tenets that you have to

21  meet in order to obtain tenure, correct?

22      A.   Yes.

23      Q.   Okay.  Is it possible that the college

24  committee -- that the retention and promotion committee

25  just didn't think there was adequate evidence of

Page 101

 1  scholarly publications?

 2      A.   That's where the discrimination happened,

 3  because there was.  And that's why there were dissenting

 4  reports specifying that there was and that the ones who

 5  discriminated against me wanted to set it up in the way

 6  that University Tenure and Promotion Committee qualified

 7  it.

 8          Because they said, as indicated by the internal

 9  and external reviewers, which was what was set up in the

10  College of Law Retention and Promotion and Tenure

11  Committee.  Because the internal and external reviewers

12  at that level, they did find that it was adequate

13  evidence of scholar -- scholarly publication.

14          But the discriminators in the College of Law

15  Retention, Promotion, and Tenure Committee, wrote it up

16  in a different way.  And that's why there were some

17  faculty who prepared dissenting reports.

**18      Q.   Okay.  And so those are faculty members of that**

**19  particular committee --**

20      A.   Yes.

**21      Q.   -- that you are taking issue with in terms of**

**22  what they did during the course of processing your**

**23  application?**

24      A.   They discriminated and set up from the

25  beginning how the discrimination would carry all the way

Page 102

1  to the top.

2      Q.   Okay.  But it didn't carry all the way to the

3  top, correct?

4      A.   Thankfully, we had Marcella David, who was a

5  very experienced law professor who had just -- she had

6  recently come to the FAMU university system with a lot

7  of experience as a law professor in a much higher-rank

8  law school, reviewing tenure and promotion applications

9  of law professors.  And she was able to do an

10  independent review.

11      Q.   Okay.  But Marcella Davis wasn't the only

12  person who -- who approved you or recommended you for

13  tenure.  Dean LeRoy Pernell did as well, correct?

14      A.   He said he did an independent review.

15      Q.   But I'm asking did he recommend you for tenure?

16      A.   Yes.

17      Q.   Okay.  And so, ultimately, the process in place

18  by FAMU resulted and the review process itself resulted

19  in you receiving tenure?

20      A.   Because Marcella David and Elmira Mangum did

21  not follow the discrimination.

22      Q.   I'm not asking you why.  I'm just asking,

23  ultimately, did the process in place at FAMU result in

24  you receiving tenure?

25      A.   The process when Marcella David and Elmira

Maritza Reyes
May 24, 2024

Page 103

1  Mangum were provost and president did result in me

2  getting tenure.

3      Q.   Okay.  And Marcella David, as provost, and

4  Leroy Pernell, as dean, they were part of the school's

5  tenure promotion process?

6      A.   Yes.  Leroy Pernell, Marcella David, and Elmira

7  Mangum.

8      Q.   Okay.

9           (Defendant's Exhibit 10 was marked for

10     identification.)

11  BY MS. REINER:

12     Q.   I'm now going to show you what's been marked as

13  Exhibit 10 to the deposition for identification

14  purposes.

15     A.   Yes.

16     Q.   Can you identify that document for me, please?

17     A.   It's a letter dated June 15, 2015, addressed to

18  me.  It is signed by Elmira Mangum, PhD, President, with

19  copy to Marcella David, Provost and Vice President for

20  Academic Affairs, and Leroy Pernell, Dean.

21     Q.   Okay.  And is that your correct address at the

22  time?

23     A.   It is the same PO Box that I've had since I've

24  lived in Central Florida.

25     Q.   And do you recall receiving this letter?

Page 104

1      A.   Yes.

2      Q.   Okay.  And do you agree that this letter

3   informs you that your -- your tenure was approved?

4      A.   Yes.

5      Q.   Okay.

6      A.   At the board of trustees meeting on June 10,

7   2015.

8      Q.   Okay.  And so from that point on, you were a

9   tenured -- a tenured professor, correct, with FAMU?

10     A.   Yes.  June 10, 2015.

11     Q.   Okay.  Following that, did you -- following

12  your approval of tenure, did you continue to teach

13  courses there at FAMU?

14     A.   Yes.

15     Q.   Okay.  And did your duties change at all

16  with -- following your -- your tenure approval?

17     A.   Yes.  At that point, I became a member of the

18  College of Law Retention, Promotion, and Tenure

19  Committee, which has additional duties.

20     Q.   Okay.  And what are those duties?

21     A.   They're -- they're changed from year to year

22  depending on the needs.  So I can't tell you every year

23  since then what the duties were.  Depending on whatever

24  was needed from the committee.

25          But if there were applications for tenure,

Maritza Reyes
May 24, 2024

1  applications for promotion, in my case it would have

2  been to associate professor, then -- then the committee

3  has to prepare those applications and go through the

4  process that we just described.

5      Q.   And have you participated in that process?

6      A.   Yes.

7      Q.   What is your role on that committee in terms of

8  evaluating someone for tenure?

9      A.   I am a member of the committee, and so the role

10 changes from year to year depending on the needs.

11     Q.   Generally, what do you do as a member of the

12 committee?

13     A.   Well, you review the materials.  Well, and I

14 have to qualify and take it back because I can only say

15 what I do as a member of the committee.

16     Q.   Yes.  That's fine.

17     A.   In my view, I have only reviewed since -- since

18 I was a member of the committee, only one person applied

19 for tenure.

20     Q.   And who was that?

21     A.   That was Yolanda Jones.

22     Q.   Okay.

23     A.   And I'm going to qualify that a little bit

24 more.  There were others that applied -- they didn't

25 apply, but they transferred or they were hired with

Maritza Reyes
May 24, 2024

Page 106

1  tenure.  But Yolanda Jones was the only one who applied

2  who was already in the law school that I -- to my

3  recollection.

4      Q.   Okay.  And when you say transfer applied, if

5  someone has taught at another law school, they may have

6  obtained tenure there, correct?

7      A.   Yes.

8      Q.   And so someone coming from another law school

9  may transfer in with tenure, so to speak; is that

10  correct?

11      A.   Yes.

12      Q.   Okay.  In that case, would the committee

13  conduct any review, or is that even necessary if

14  someone's already coming in or they received tenure

15  elsewhere?

16      A.   There is a review, but it's a different review.

17  It's an expedited review.

18      Q.   Okay.  And what is the difference with an

19  expedited review?

20      A.   The committee -- because they were already

21  tenured and they are tenured somewhere, the committee

22  would take the materials that they bring with them, like

23  the external reviews that were conducted when they

24  applied for tenure wherever they applied, the record

25  wherever they applied.  That's when they transfer with

Maritza Reyes
May 24, 2024

Page 107

1  tenure.

2        And there's a similar expedited review when

3  somebody comes in and the committee has to decide

4  whether they should get tenure upon appointment.

5     Q.   Okay.

6     A.   But they bring all their materials, generally,

7  with them.  And sometimes -- so that's expedited in

8  terms of the College of Law RPT Committee does not start

9  the process in the fall and carry it into the entire

10  academic year.

11     Q.   Okay.  So are -- is it your contention that

12  Yolanda Jones' tenure process was more similar to yours

13  in that she did not come in with tenure?

14     A.   It wasn't more similar to mine because she

15  wasn't discriminated during the College of Law RPT

16  Committee process.

17     Q.   Okay.  I'm going to object again and move to

18  strike.

19        I'm asking you if her process was similar to

20  yours because she didn't have tenure when she started

21  prior to coming to FAMU?

22     A.   She applied like I did, but her process was not

23  similar to mine.

24     Q.   Okay.  So how did -- we've talked about the

25  process in terms of the tenure and promotion schedule --

Maritza Reyes
May 24, 2024

Page 108

1      A.   Yes.

2      Q.   -- that you received.

3      A.   Yes.

4      Q.   Was a tenure and promotion schedule

5  published -- is it published each year?

6      A.   Yes.

7      Q.   Okay.  And so whoever may be eligible for

8  tenure would look to that schedule each year to

9  determine what their deadlines are?

10     A.   Yes.

11     Q.   Okay.  And so would Yolanda Jones have had a

12  tenure and promotion schedule that she had to comply

13  with?

14     A.   Yes.

15     Q.   Okay.  Did she submit an application for

16  tenure?

17     A.   Yes.

18     Q.   Okay.  Was it evaluated by the committee?

19     A.   Yes.

20     Q.   Did you conduct personally a review of her

21  materials?

22     A.   Yes.

23     Q.   Okay.  Did you -- did that include reviewing

24  her articles and publications for -- for -- for

25  instance, the scholarship tenet of the application

Page 109

1  process?

2      A.   My recollection is that I did, but I was not a

3  member of the scholarship subcommittee.

**4      Q.   Okay.  Is there a subcommittee to -- for -- for**

**5  each portion of the application, so teaching,**

**6  scholarship, and then also service?**

7      A.   It's very different.  Because with her it was

8  so expedited that I think, like, she didn't have all the

9  subcommittees that they assigned to me.  And that was

10  part of the discrimination.

11          So I -- you know, I -- I don't recall that she

12  had several committees.  I think it was -- it was

13  Patricia Broussard, I think, who took over that.  And it

14  was very different than my process.

**15      Q.   Okay.  Who was in charge of your process?**

16      A.   At the time, I wasn't in the committee.

17  Because those are closed meetings.

**18      Q.   Okay.**

19      A.   So -- but at the time, it was John Duncan.  But

20  there were people in the committee who took over my

21  process, the ones who set up the discrimination.  And it

22  included -- you know, I named Patricia Broussard, Lundy

23  Langston in my complaint.  I listed all the names with

24  the actions that they did.

**25      Q.   Okay.  Right now all I'm asking you --**

Maritza Reyes
May 24, 2024

1           MS. REINER:  Can you read back the question,

2      please?

3           (The question was read back by the court

4      reporter.)

5  BY MS. REINER:

6      Q.   Who was in charge of the process for you?

7      A.   The College of Law Retention, Promotion, and

8  Tenure Committee would have been in charge.  But, I

9  mean, what do you mean by "in charge"?

10     Q.   So you made the comment that the same -- that

11 Broussard was not in charge of your tenure process.

12 Who -- who was in charge of yours?

13     A.   No.  She was -- she was in charge in terms of

14 the ploys that were done.

15     Q.   Okay.  Is there --

16     A.   She was in charge with others.

17     Q.   Okay.  Is there an individual who, for

18 instance, chairs the committee?

19     A.   Is that the question?

20     Q.   Yes.

21     A.   Who was the chair?

22     Q.   No.  I'm asking you is there an individual that

23 chairs the committee?

24     A.   Yes.

25     Q.   Okay.  Who was the chairman of the committee

Page 111

1  the year that you went through the -- the tenure

2  process?

3      A.   The tenure process chair of the College of Law

4  RPT Committee in the 2014-2015 academic year was John

5  Duncan.

6      Q.   Okay.  Who was the chair in the year that

7  Yolanda Jones went through the process?

8      A.   I do not remember, but it was not John Duncan.

9      Q.   Okay.  Were there any other changes between

10  your year and Yolanda Jones' year in terms of the

11  make-up, the membership of the committee, different

12  people?

13      A.   I was a member of the committee.

14      Q.   Okay.  Is that the only change in terms of

15  membership of the committee?

16      A.   To my recollection.  But I would have to look

17  at the list and see if we hired anybody that came into

18  the committee.  To my recollection, it was only me.

19      Q.   Okay.  Did you vote for Yolanda Jones to

20  receive tenure?

21      A.   Yes.

22      Q.   Okay.  Did you feel she was qualified for

23  tenure?

24      A.   Yes.

25      Q.   Okay.  Were you a part of any of the

Maritza Reyes
May 24, 2024

Page 112

1  subcommittees with respect to her tenure evaluation?

2      A.    No.

3      Q.    Okay.

4      A.    Patricia Broussard took it over.  And I don't

5  even think we had a subcommittee.

6      Q.    Now, at some point, did you also apply for a

7  promotion to full professor?

8      A.    Yes.

9      Q.    Okay.  Do you recall when that was?

10     A.    I applied in 2018, I believe.

11     Q.    Okay.  And what was your process for applying

12  for the promotion to full professor?

13     A.    That year it was different than the prior

14  applications for tenure and promotion because it was the

15  first time that I used the Interfolio application

16  system, which I believe FAMU had implemented the year

17  before, 2017, when I wanted to apply.

18          But I could not apply because they did not give

19  me the information for the Interfolio system.  So that

20  was different, the way to apply.

21     Q.    What's the Interfolio system?

22     A.    It's an electronic system that is administered

23  by a third party and universities contract with them.

24     Q.    Okay.  Do you know the third party that handles

25  the system?

Maritza Reyes
May 24, 2024

Page 113

 1      A.   It's called Interfolio.

 2      **Q.   That's the name of -- okay.**

 3      A.   I believe so.

 4      **Q.   Okay.  Now, is Interfolio essentially just kind**

 5  **of a database that you submit things into?**

 6      A.   I -- I don't know if technically they are

 7  considered a database.  I know that you submit the

 8  materials to them, and through their technology, they

 9  make it available electronically.  Rather than, you

10  know, you having to submit actual hardcopies like we

11  had -- like I had to submit before for my tenure

12  application and for my promotion to associate

13  application.

14          So it's electronic and -- which is better

15  because then there's a recording of when you submit your

16  materials.  I wish they had been electronic before.

17      **Q.   Okay.  So in terms of the Interfolio system,**

18  **what I understand from what you've said is that it is**

19  **the electronic system you submit -- you use to submit**

20  **your materials, but they are not involved in the**

21  **evaluation process?**

22      A.   Oh, no.

23      **Q.   Okay.  So the evaluation process is still**

24  **conducted via the university personnel, correct?**

25      A.   Yes.

Page 114

1    Q.    For promotion to full professor?

2    A.    Yes.

3    Q.    Okay.  And how does that work?  So you

4  showed -- you walked us through the tenure process

5  previously.  How does the promotion to full professor

6  work?

7    A.    So I'm going to go back and take a look at the

8  2014-2015 Tenure and Promotion Schedule.

9         One difference is that if you notice in the

10  2014-2015 Tenure and Promotion Schedule, it says the

11  applicants submit 25 copies of the application for

12  tenure and promotion and one portfolio.

13         And so that's what I had to do when I applied

14  for promotion to associate professor and promotion for

15  tenure because they did not have the Interfolio

16  electronic application system.  So that was different.

17         But you still submit an application for -- when

18  I submitted for promotion, submitted an application

19  through Interfolio.  So all the materials that I

20  submitted before in print in those portfolios, this time

21  I submitted them electronically through Interfolio.

22         After the application, then it went -- supposed

23  to go to the College of Law Retention, Promotion, and

24  Tenure Committee.  And then the College of Law

25  Retention, Promotion, and Tenure Committee submits a

Page 115

1  recommendation to the College of Law dean.  And when I

2  say "recommendation," it's the decision of the

3  committee.

4           And then the dean -- that's how it's supposed

5  to work.  I don't know how it worked in my process

6  because I was not behind the scenes.

7       Q.   Okay.

8       A.   So I'm just going how it's supposed to work.

9           Then the dean would submit -- and I don't know

10 if they submit anymore because I don't know how it works

11 with Interfolio when they make it available to the next

12 committee, which would be the University Tenure and

13 Promotion Committee.

14      Q.   Okay.

15      A.    And then at some point, that committee also

16 makes its decision recommendation.  And the provost

17 reviews it according to this.  And then the provost

18 makes a recommendation to the president.  And then the

19 president reviews it, decides.  And for a promotion,

20 that's the end of it because it does not go to the board

21 of trustees.

22      Q.   Okay.  So with respect to the process, now you

23 have Interfolio that's being used.  And as I understand

24 it, you are qualifying your remarks on the process

25 because we don't know if there is a specific submission

Page 116

1  or if it's just made available.

2           In other words, is there an affirmative action

3  by the dean to then send it on to the university

4  committee, or is it just made available to the

5  university committee via Interfolio once -- once the

6  dean submits his recommendation?

7           Is that what you're saying in terms of process?

8      A.   It's what I'm saying that I don't know how that

9  works on that side.

10     Q.   Okay.  So putting the technology aside though,

11  you would agree that it -- the process is still that the

12  retention, promotion -- Retention, Promotion, and Tenure

13  Committee conducts its review and makes a recommendation

14  to the dean.  The dean then makes a recommendation to

15  the university committee.  The university committee then

16  makes a recommendation to the provost, and that the

17  provost then makes a recommendation to the president

18  with respect to promotion.

19     A.   Okay.  I don't -- I think that we need some

20  clarification when you say to, to, to at those steps,

21  right?  They each make recommendations.

22     Q.   Yes.

23     A.   Yes.  And so -- and there's a timing, I think,

24  to the recommendations so that the College of Law

25  Retention, Promotion, and Tenure Committee may --

Page 117

 1  because the College of Law Retention, Promotion, and

 2  Tenure Committee basically sets it up for the higher

 3  levels.  They are the ones who determine whether the

 4  scholarship gets reviewed or not.  They are the ones

 5  that determine whether -- you know, the materials that

 6  go into recommendation.

 7          So they are the ones at the College of Law

 8  Retention, Promotion, and Tenure Committee who determine

 9  what the next levels get to review or not.

10      Q.   But all of that information is contained within

11  the Interfolio system, correct?

12      A.   No.  Not if -- for example, if the College of

13  Law Retention, Promotion, and Tenure Committee does not

14  seek external scholarship reviews or does not do

15  internal scholarship reviews or does not do peer

16  teaching class evaluations, then there's nothing there

17  because they're supposed to put that in there.

18      Q.   Yes.  But -- but my question is a little -- a

19  little bit different.

20          Whatever is -- is placed into the Interfolio

21  system is then in the system and available for review

22  by -- by -- at subsequent stages, correct?

23      A.   Whatever is placed.

24      Q.   Yes.  Whatever is put into the system is

25  available thereafter for review by the dean or by the

Maritza Reyes
May 24, 2024

Page 118

1   university committee in terms of access?

2      A.   Okay.  And, see, I don't -- I don't -- I don't

3   think I can answer that because I don't know what's

4   available to those --

5      Q.   Okay.

6      A.   I've never been in the University Tenure and

7   Promotion Committee, so I don't know.  And I don't know

8   what's available to them in Interfolio.  And I don't

9   know -- I don't -- I just don't know because I've never

10  seen it from those levels.

11     Q.   Okay.  And so you would not have personal

12  knowledge of what they may have accessed or reviewed or

13  how they may have access to that information during the

14  process?

15     A.   No, I don't know how they access it.

16     Q.   Okay.

17          (Defendant's Exhibit 11 was marked for

18     identification.)

19  BY MS. REINER:

20     Q.   I'm going to show you what's been marked as

21  Exhibit 11 to your deposition.

22     A.   Yes.

23     Q.   Okay.  Can you identify for us what has been

24  marked as Exhibit 11 to the deposition?

25     A.   This is titled Report and Recommendation on

Maritza Reyes
May 24, 2024

1  Promotion of Associate Professor Maritza Reyes, Florida

2  A&M University College of Law Retention, Promotion, and

3  Tenure Committee, date November 5, 2018.  And it's --

4  it's a six-page document with page numbers with two

5  additional doc- -- sheets, documents, due to additional

6  pages without page numbers.

7      **Q.    Okay.  And those two additional pages without**

8  **page numbers reflect attendance at the meeting of**

9  **November 5, 2018, and they appear to reflect signature**

10  **of College of Law RPT Committee professors?**

11      A.    Okay.  Object to the form.  Compound.

12      **Q.    Okay.**

13      A.    Can we take one at a time?

14      **Q.    Yes.  So I'm just describing the last two pages**

15  **that are not numbered.**

16      A.    Yes.

17      **Q.    So would you agree with me that the last page,**

18  **we'll start from the back that is not numbered, is one**

19  **that identifies or appears to be a signature page --**

20      A.    Yes, for --

21      **Q.    -- for the RTP Committee members?**

22      A.    The last page that is -- that is not numbered

23  is described as signature of College of Law RPT

24  Committee professors of law, indicating that the

25  attached report dated November 7, 2018, is the one in

Page 120

1  relation to the candidacy of Associate Professor Maritza

2  Reyes for promotion to the rank of professor.

3         And there are signatures under that.  The

4  signatures of Robert Abrams, Nicola Boothe-Perry,

5  Patricia Broussard, Ann Marie Cavazos, John Duncan,

6  Joseph Grant, Ronald Griffin, William Henslee, Darryll

7  Jones, Rhonda Reaves, Jennifer Smith, and Phyllis Taite.

8      **Q.   Okay.  And the page that is right before that**

9  **one, would you agree with me that that attendance --**

10  **that that purports to be a record of attendance?**

11     A.   Yeah, it's a document that says:  Attendance at

12  the meeting of November 5, 2018, at which the vote of

13  Associate Professor Reyes' application for promotion was

14  considered.

15         It lists as present Abrams, Boothe-Perry,

16  Broussard, Cavazos, Griffin, Henslee, Jones, which would

17  be Darryll Jones, Reaves, Smith, which would be Jennifer

18  Smith, and Taite.  And the tellers, or the ones who

19  counted, were Cavazos and Henslee.

20     **Q.   Okay.  So those two documents purport to relate**

21  **to this November -- to the November 5, 2018, meeting**

22  **that resulted in the generation of this report; is that**

23  **correct?**

24     A.   Those documents seem to relate to the vote on

25  that report.  Or on -- the vote on the application.

Page 121

 1    Q.   Yes.  And then this report was generated

 2  related to that, correct?

 3    A.   It seems so.

 4    Q.   Okay.  So have you seen this Exhibit 11 before?

 5    A.   Yes.

 6    Q.   Okay.  And does this document relate to your

 7  application for promotion to full professor?

 8    A.   Yes.

 9    Q.   Okay.  And does this application decline to

10  recommend you -- or sorry.  Does this application --

11  strike that.

12         Does this report convey that the Retention,

13  Promotion, and Tenure Committee declined to recommend

14  you for promotion to full professor?

15    A.   Yes.

16    Q.   Now, we've spoken before about the various

17  tenets that are evaluated.  So teaching, research, and

18  scholarship and circumstance.

19         With respect to the committee's conclusions,

20  what was the committee conclusion regarding teaching?

21    A.   On page 5, it states:  Committee conclusion on

22  teaching.  The committee concludes that Associate

23  Professor Reyes meets the standard for excellence in

24  teaching required for promotion to the rank of professor

25  of law.

Maritza Reyes
May 24, 2024

Page 122

1    Q.   Okay.  And what was the committee conclusion on
2  service?
3    A.   On page 6, it states:  Committee conclusion on
4  service.  The committee concludes that Associate
5  Professor Reyes meets the standard for service set forth
6  in the faculty handbook for promotion to the rank of
7  professor of law.
8    Q.   Okay.  So the committee indicated that you'd
9  met the requirements with respect to teaching and with
10 respect to service, correct?
11   A.   Yes.
12   Q.   Okay.  What about with respect to scholarship?
13 Did they conclude that you met the requirements with
14 respect to scholarship?
15   A.   At the bottom of page 4, and then following at
16 the top of page 5, it states:  Committee conclusion on
17 scholarship.  Overall, the committee concludes that
18 Associate Professor Reyes does not meet the standard for
19 excellence in scholarship required for promotion to the
20 rank of professor of law.
21   Q.   Okay.  Now, looking at that section on
22 scholarship that is on pages -- let's see here -- 3, and
23 4, reviewing those, why did the committee indicate that
24 you had not met the requirements with respect to
25 scholarship?

Maritza Reyes
May 24, 2024

Page 123

```
 1    A.   Because they discriminated against me and set
 2  forth a standard that it was not the standard.
 3    Q.   No.  Move to strike.
 4         MS. REINER:  Can you read back the question,
 5    please?
 6         THE WITNESS:  Objection.  You asked the
 7    question why, and I gave you my answer based on my
 8    personal knowledge.
 9         MS. REINER:  Okay.
10         THE WITNESS:  But it's not -- every time that
11    you don't get an answer that it's the one that you
12    seem to want, you strike my answer.  And I think
13    that, you know, I'm going to object to harassing the
14    witness when you don't get an answer that you want.
15         MS. REINER:  I'm asking you a specific
16    question.
17         THE WITNESS:  Yes.
18         MS. REINER:  I'm not asking you for your
19    opinion on why something occurred.  I'm asking you
20    what the report indicates.
21         THE WITNESS:  Can you repeat the question,
22    please?
23         MS. REINER:  Can you repeat the question,
24    please?
25
```

Page 124

```
 1          (The question was read back by the court

 2     reporter.)

 3          THE WITNESS:  And the answer is because they

 4     discriminated and stated a standard that was not the

 5     standard.  That is exactly my answer to that

 6     question.

 7 BY MS. REINER:

 8     Q.   And, again, I'm going to move to strike.  I

 9 asked you specifically with respect to pages 3 and 4 --

10     A.   Yes.

11     Q.   -- why did that indicate that you'd not met the

12 scholarship requirement?

13     A.   Okay.  What is it that you want me to answer

14 when you say why did they indicate?

15     Q.   So in terms of the evaluation of your

16 scholarship, what within this report did they say with

17 respect to scholarship?  What did -- we'll rephrase it.

18 Strike that question.

19          What did they say regarding your scholarship in

20 the report?

21     A.   Do you want me to read?  I can read the

22 entire -- I can read the scholarship.  What do you want

23 me to read?  What is the answer that you want to that

24 question from reading from here?

25     Q.   No.  Let me break it down for you further.
```

Maritza Reyes
May 24, 2024

Page 125

1    A.   Yes.

2    Q.   In terms of scholarship, did they evaluate your

3  publications?

4    A.   No.

5    Q.   Okay.  Does this report refer to post-tenure

6  publications?

7    A.   It -- it does refer to that.

8    Q.   Okay.  Does it -- does it have a section

9  entitled Publications Evaluated in Relation to the Award

10  of Tenure in 2014?

11    A.   And that's what I'm confused as to when I

12  answer my question based on my personal knowledge.  That

13  is an incorrect standard because they were supposed to

14  evaluate in relation to the promotion to associate

15  application, not the tenure.

16    Q.   So is it your contention as we sit here today

17  that even though they had already evaluated these

18  argue -- these -- these articles in regards to your

19  award of tenure, that they had to reevaluate them as

20  opposed to relying on their prior evaluation?

21    A.   See, that is a very -- you know -- because I

22  have personal knowledge of how the process works, I

23  cannot answer the question like you are asking it

24  because it's a compound question.

25    Q.   Okay.

1      A.   So if you could ask it one at a time, and then

2   I can explain in terms of the relation of the

3   scholarship part from associate to tenure to full

4   application, including in reference to what was stated

5   to me as what the standards were.  Then I can answer it.

6   But I can't answer it like you're asking it right now.

7      **Q.   Okay.  So we agree that -- that you submitted**

8   **information when you sought promotion to associate**

9   **professor in 2012, correct?**

10     A.   Yes.

11     **Q.   Okay.  And at 2012 -- in 2012, they would have**

12  **evaluated that information including, it looks like here**

13  **based on page 3, publication information?**

14     A.   I submitted at the time one article that was

15  not yet published but it was accepted for publication.

16     **Q.   Okay.  And as it was accepted for publication,**

17  **the committee considered it?**

18     A.   Yes.

19     **Q.   And they granted you promotion to associate**

20  **professor, correct?**

21     A.   Yes.

22     **Q.   Okay.  And then you applied for tenure.  And**

23  **when you applied for tenure, you submitted additional**

24  **articles in support of that application, correct?**

25     A.   Yes.

Maritza Reyes
May 24, 2024

Page 127

1      Q.    Okay.  And at that point in time, they

2   evaluated those articles for purposes of determining

3   whether or not you should be given tenure, correct?

4      A.    Yes.

5      Q.    Okay.  Does the tenure process include external

6   evaluations as well?

7      A.    Yes.

8      Q.    Okay.  So would the articles that you provided

9   with respect to your tenure application have undergone

10  external evaluation during that process?

11     A.    Not all of them.

12     Q.    Okay.  So --

13     A.    And not for promotion to full professor.

14     Q.    No, I'm just talking about --

15     A.    Yes.

16     Q.    -- the tenure process right now.

17     A.    Yes.

18     Q.    Okay.  So in the tenure process, articles may

19  be sent for external review?  Publications are sent for

20  external review?

21     A.    Yes.

22     Q.    Okay.  Is it your contention that even though

23  those articles have already been sent for external

24  review once, that they need to be sent for external

25  review again if -- in terms of your -- your request for

Page 128

1  full -- for promotion to full professor?

2      A.   If you want an external reviewer to evaluate

3  based on a record of articles up to the time when you

4  are applying to promotion to full professor, then yes,

5  they can -- they can be sent the entire record of

6  scholarship.

7          But that's what -- they didn't send anything

8  out and they didn't evaluate the articles that they were

9  supposed to evaluate for a promotion to full professor.

10     **Q.   So it's your contention that they should have**

11  **considered for your promotion to full pro- -- full**

12  **professor the articles that you wrote and from the time**

13  **that you joined FAMU through to your application, even**

14  **though those articles had already been evaluated with**

15  **respect to the associate professor and tenure process?**

16     A.   The standard is in terms of the NUNN memo that

17  was provided to me.  It's N-U-N-N memo, which explained

18  what it is that they were supposed to look at in terms

19  of the new publications.

20          In the promotion to full professor, they were

21  supposed to look at publications after the application

22  to associate professor promotion.  So it's comparison

23  from promotion to promotion.

24     **Q.   Now, let me stop you right there.  So you are**

25  **saying that the NUNN memo, this NUNN memo that you speak**

Maritza Reyes
May 24, 2024

Page 129

1  of would have required them to include all of these

2  articles in their evaluation of your application to

3  become a full professor?

4       A.   Well, actually, the faculty handbook and the

5  NUNN memo set the standard for.  And of course they

6  considered the record of scholarship.

7       Q.   Now, you've mentioned this NUNN memo.  Is that

8  an official College of Law policy?

9       A.   Yes.

10      Q.   Okay.  And how do you -- on what -- on what do

11  you base that answer?

12      A.   Well, that's what the College of Law told the

13  American Bar Association accrediting body where they

14  appended it to the 2008 self-study that they used when

15  they wanted -- when they were trying to get full

16  accreditation as an ABA-accredited law school.

17      Q.   Okay.  So you're talking about something in

18  2008.  I'm talking about what is considered the policy

19  and procedure at the time in 2018 that you were applying

20  for promotion to full professor.

21      A.   Yes.  In 2018, the faculty handbook was the one

22  from 2004-2005.  That was the faculty handbook that had

23  remained.  So when you talk about policy and academic,

24  the -- it's when it's enacted and when it's still in

25  force.

Page 130

 1               So the faculty handbook was from 2004-2005, if

 2   I'm correct.  Or it may have been even from before that,

 3   but I think it was from 2004.

 4               And the NUNN memo was, I think, from 2008.  And

 5   it was appended to the American Bar Association

 6   accrediting materials that the College of Law

 7   represented to the ABA that those were the standards for

 8   promotion and tenure.  Because they said -- the ABA had

 9   criticized the law school for not being clear in the

10   standards as -- as stated in the faculty handbook and

11   what they were supposed to be.

12               So then the law school represented to the ABA

13   accrediting body that the NUNN memo clarify the

14   standards.

15       **Q.   Okay.  So you are referring to a document that**

16   **was submitted to the ABA for purposes of the promotion**

17   **process.  Do you have any personal knowledge of whether**

18   **or not that was formally adopted or what the process**

19   **would be to formally adopt, you know, something that has**

20   **been recommended in a memo --**

21       A.   It was --

22       **Q.   -- with respect to the college?**

23       A.   It was given to me during -- I asked for the

24   standards, and when I asked for the standards, they gave

25   me the standards in the faculty handbook in the NUNN

Page 131

1  memo.  So that's what I received when I was hired.

**2**      Q.   **Okay.**

3      A.   And during my time in the law school, there was

4  ready reference to the NUNN memo during our discussions

5  as faculty.

**6**      Q.   **Okay.**

7      A.   And I'm going to add too that, when I was an

8  associate, when I applied for -- you asked me in terms

9  of policy.  I'm going to -- I'm going to answer that

10  question of how it was adopted.

**11**      Q.   **Yes.**

12      A.   When I was applying for associate, there was a

13  question as to how something should be interpreted in

14  terms of whether the article that was accepted for

15  publication was considered for purposes of the

16  application for associate.  Because the faculty handbook

17  didn't say that.  And so the NUNN memo says that an

18  article that is accepted for publication would qualify.

19          And so I recall specifically that because the

20  NUNN memo said that, my article that was accepted for

21  publication was the article that was reviewed for my

22  application to promotion to associate professor.

23          So I not only relied on the memo, received the

24  memo, but the memo was applied in my process to

25  associate professor.

Page 132

1    Q.   Okay.  In looking at this report that we've

2  marked as Exhibit 11, it lists all of your publications,

3  both with respect to those that were evaluated with

4  respect to your associate professor position, those

5  evaluated related to the award of tenure, and then your

6  post-tenure publications on page 3.

7    A.   Okay.  Objection.  Compound.  And also, no, it

8  does not list all my publications.  So if you could

9  break up the question because it does not list all my

10  publications.

11    Q.   Okay.  I'm going to ask you to not interrupt me

12  until I'm finished.  I hadn't posed a question yet.  I

13  was just directing you to a specific location in the

14  document.

15       So on page 3 it lists publications related to

16  your promotion to associate professor, publications

17  related to the award of tenure in 2014, and then

18  post-tenure publications.

19       Are there any additional post-tenure

20  publications that you submitted to the committee when

21  you applied for full promotion?  That is my question.

22    A.   The way the publications is described and the

23  way that the scholarship is described in the faculty

24  handbook, there were additional materials that were

25  considered scholarship that were not listed here

Page 133

1  post-tenure.

2      Q.   Okay.  I'm asking you what you submitted

3  because I understand that there's a process pursuant to

4  which you submit things via Interfolio.

5           Did you submit anything other than these two

6  post-tenure publications when you submitted your

7  application for full professor?

8      A.   Yes.  There were a lot more materials that

9  qualified in the scholarship section that I submitted

10 with my application.

11     Q.   Can you give me an example of those?

12     A.   Like, for example, they don't have the

13 peer-reviewed immigration articles that I submitted.

14     Q.   And what do you mean by "peer-reviewed

15 immigration articles"?

16     A.   They are articles that I published in --

17 immigration-specific online publications.

18     Q.   And what do you mean by an online publication?

19     A.   For example, the immigration professor's blog

20 is one of them.  There's the crimmigration blog.

21 Because today there are publications in print, but there

22 are also publications online.

23     Q.   Okay.  Anything else that you contend other

24 than the immigration articles?  Anything else that was

25 submitted?

Maritza Reyes
May 24, 2024

Page 134

1      A.    They were supposed to have reviewed also and

2  consider as part of scholarship, according to the

3  faculty handbook, presentations at conferences.

4            And I'm going to object that this is misleading

5  in terms of you're making me go through a standard that

6  is not the standard.  So I want to say on the record

7  that this is not -- it wasn't publications post tenure

8  standard.  It was publications post associate professor

9  promotion.

10     Q.    And I'm going to object and move -- I'm going

11  to move to strike that because there was no question

12  pending.  So, again --

13     A.    I'm going to object that you don't let me

14  answer the question according to how I understand the

15  question and how I can answer from my personal

16  knowledge.

17     Q.    That objection is noted.  Please listen to the

18  question I'm asking.

19            Are there any other articles or submissions

20  that you submitted through the Interfolio system related

21  to this post-tenure period of time?

22     A.    I'm going to have to ask for the Interfolio

23  system list that I submitted because I did have a list

24  that I submitted.  And so I'm going to rely on the list

25  that I submitted through the application system to the

Page 135

1  Interfolio.  My list of scholarships, it's listed all

2  there.  And it's not -- it's beyond this.

3      Q.   Okay.  Is there anything else that you can

4  recall other than the immigration articles that you

5  submitted via the Interfolio system?  And I'm just

6  asking for your personal knowledge and memory at this

7  point.

8      A.   Yes.  My -- my -- I believe that it included

9  perhaps my work in progress.  But I'm going to rely on

10  the list that I submitted.

11      Q.   Okay.  What is your understanding of why the

12  post-tenure -- or excuse me -- why the RPT Committee --

13  strike that.

14          Why would the RPT Committee consider one

15  particular writing to be a scholarly writing and not

16  another?  Can you explain that term to us?  What is a

17  scholarly writing?

18      A.   Objection as to speculation as why would the

19  RPT Committee consider one particular scholarship versus

20  another.

21          I don't know how -- why they would do that.  I

22  can't get in their heads of why they did it.  I think it

23  was discrimination.

24      Q.   Okay.  So you are not aware of why they

25  considered some of your articles to meet that criteria

1   and others to not meet that criteria?

2       A.   Discrimination.

3       Q.   Okay.  That's your opinion is that you think it

4   was discrimination, correct?

5       A.   Yes.  The way that they set up the wrong

6   standard.  It was the same people who discriminated in

7   the tenure process.

8       Q.   Okay.  And by saying they "discriminated in the

9   tenure process," you believe that the actions they took

10  related to that process were based on discrimination?

11      A.   Yes.

12      Q.   Okay.  Were any of those individuals -- did

13  you -- did you ever speak to them about why they made

14  the decision they did?  Did you have any conversation

15  with any members of the committee related to their

16  determination?

17      A.   At the time, they accused me when I reached out

18  in emails or -- I reached out in memos.  They falsely

19  accused me behind the scenes, which nobody ever told me.

20  But by the point that they had made the recommendation

21  and decision, I found out about it, and so I was not

22  going to reach out because I was afraid of another

23  accusation.

24           But there's plenty of evidence to show that

25  discrimination that they did during my tenure process.

Page 137

1    Q.   Okay.  So, for instance, to the extent that

2  Broussard, Professor Broussard was a member of the

3  tenure committee, did you ever ask her:  Professor

4  Broussard, did you vote for me or against me in terms of

5  tenure?

6    A.   She kept claiming that whenever that the issue

7  would come up of even, for example, I thought that the

8  votes should be signed, she kept claiming that that was

9  confidential.  And they didn't sign the ballots of the

10  votes.

11    Q.   Okay.  Did you ever ask her if she voted

12  against you because you were Latina?

13    A.   Professor Broussard is one of the ones who had

14  been accusing me behind the scenes.  And, as you know,

15  in her deposition she said that -- that she got sick

16  from, you know, like, me asking questions or sending

17  emails.  And so I tried to not, you know, engage in

18  anything that then she could have accused me of.

19         And so I was not about to go, you know,

20  individually, one on one, and ask her something like

21  that.  Especially because she was clear that -- she kept

22  saying the tenure votes had to be confidential and

23  secret.

24    Q.   Okay.  So you -- that's a no, you did not ask

25  her if she voted against you because you were Latina?

Page 138

1    A.    No, I would not have asked that question

2  because I already know what the answer would have been.

3    **Q.    Okay.  And you believe that the answer is yes?**

4    A.    I believe that that's the reason, but I don't

5  believe she would ever admit to it.

6    **Q.    Okay.  And you weren't a part of the committee;**

7  **you weren't a part of the discussions --**

8    A.    No.

9    **Q.    -- obviously?**

10   A.    No.

11   **Q.    Okay.  What about any of the other members of**

12 **the committee?  Did you talk to any of them about the**

13 **reasoning behind the decision?  Did you ask -- I'll stop**

14 **there.**

15   A.    Again, I was accused of reaching out to the

16 committee during my tenure process with my questions.

17   **Q.    Okay.**

18   A.    Behind the scenes.  That was used against me,

19 the fact that I was asking questions about the process

20 and why they were doing the discrimination that they

21 were doing.

22   **Q.    Okay.**

23   A.    And so I didn't want to be accused of anything

24 else, and so I was not going to be reaching out and

25 asking them how they voted because they would have

Maritza Reyes
May 24, 2024

Page 139

1  accused me of something else.

2      Q.   Okay.  Now, you'd been recruited by FAMU,

3  correct?

4      A.   Yes.

5      Q.   You'd been hired by FAMU as an assistant

6  professor?

7      A.   Mm-hmm.

8      Q.   Correct?

9      A.   Yes.

10     Q.   You'd been given tenure through the tenure

11 process, correct?

12     A.   I earned tenure.

13     Q.   Yes.  But you'd been given tenure or awarded

14 tenure through that process, correct?

15     A.   Yes.  My tenure was approved.

16     Q.   Yes.

17     A.   Despite the discrimination.

18     Q.   Move to strike.

19          My question to you is this:  Why would the

20 university hire you in the first place if it intended to

21 then discriminate against you based on your race or

22 being Latina?  Why would it have given you -- why would

23 you have received the promotions that you did?

24     A.   That's a compound question.  Which one do you

25 want me to answer?  Why did they hire me?  Why did they

Page 140

1  promote me?  What is it?

2     Q.   It's a single -- so why would they do -- why

3  would they -- what you are saying is that they hired

4  you, they promoted you multiple times, but then all of a

5  sudden --

6     A.   No, I didn't say -- objection.

7  Mischaracterizes what I said.  I didn't say that they

8  promoted me multiple times.  They promoted me once to

9  associate professor.

10     Q.   And they gave you tenure.

11     A.   That's not a promotion.

12     Q.   Okay.  So I was clear previously.  They hired

13  you?

14     A.   Objection as to that you were clear previously.

15  It was a compound question and I didn't understand it.

16     Q.   Okay.  Then we'll start over again --

17     A.   Yes.

18     Q.   -- so that you do understand.  Okay?

19          Why do you take the position that the actions

20  of the university are -- are discriminatory towards you?

21  Let's start there.

22     A.   Okay.  Your question is:  Why do you take the

23  position that the actions of the university are

24  discriminatory towards you?

25          As to what?  As to my promotion application for

Page 141

1  tenure?  As to my -- as to -- I mean, as to my

2  application for tenure?  As to my application for

3  promotion that was denied?  What is it?

4     Q.   Well, I would say that's for you to answer.

5  Your complaint lists everything from the time you

6  were -- characterizes everything from the time you were

7  hired forward as some sort of slight or something based

8  on discrimination.

9          I'm asking you -- and let's be specific -- with

10 respect to counts 1 through 3, you talked about your --

11 their failure to promote you to full professor in 2018,

12 correct?  Counts 1 through 3.

13    A.   Let me go through it.  Yeah, count 1 is

14 discrimination and count 2 is discrimination and count 3

15 is discrimination.

16    Q.   Okay.  And that discrimination deals with their

17 failure to promote you to full professor in 2018,

18 correct?

19    A.   Are you finished with the question?

20    Q.   Yes.

21    A.   Okay.  Because I'm going to object to the

22 characterization of slight.  I didn't say anything about

23 some sort of slight, s-l-i-g-h-t.  That's not -- I

24 didn't allege some sort of slight in my complaint.  I

25 alleged discriminatory action s.

Page 142

 1              So if you, you know, give me the question as to

 2   counts 1 and 3, I'm going to write it down so we object

 3   to this -- I mean, so we don't get into what is it that

 4   you asked.  And I want to make sure I understand.

 5              MS. REINER:  Can you please read back the

 6       question for us?  Just the last question.

 7              (The question was read back by the court

 8       reporter.)

 9              THE WITNESS:  The discrimination "that."  What

10       is "that"?

11              MS. REINER:  Can you read back the sentence

12       prior?

13              (The question was read back by the court

14       reporter.)

15              THE WITNESS:  With regards to discrimination on

16       counts 1, 2, and 3, if you notice, I reallege

17       paragraphs 1 through 231 in my second amended

18       complaint.  So those are the facts of the

19       discrimination that I allege in counts 1 through 3.

20   BY MS. REINER:

21       Q.    Okay.  Looking at page 88, count 1.

22       A.    Mm-hmm.

23       Q.    Can you read paragraph 236 to me, please?

24       A.    Yes.  That is one -- 236 in counts 232 to 241

25   of count 1, that's one of the allegations.

Page 143

1          It says:  Defendant discriminated against

2   plaintiff based on her race, Hispanic/Latina, by failing

3   to promote her to full professor when she applied in

4   2018.

5          Q.   Okay.  So are you alleging that there was any

6   other adverse action other than their failure to promote

7   you when you applied for full professor in 2018?

8          A.   What do you mean by "adverse action," Counsel?

9   How do you define that?

10         Q.   So an adverse action -- an adverse action is an

11  action that is taken against someone.  An adverse

12  employment action.  So termination, demotion.  There

13  could be a number of different things that are defined

14  in the law as adverse action.

15         Here you've alleged a failure to promote.  Are

16  you alleging that a failure to promote is the ad- -- is

17  the adverse action they took against you in -- let's

18  see.  This complaint -- this count deals with race.  So

19  count 1, are you alleging that they failed to promote

20  you to full professor when you applied in 2018 because

21  of your race?

22         A.   Yes.

23         Q.   Okay.  Are you alleging that they did or did

24  not do something else because of your race?  Is there

25  another adverse action that you're alleging they took --

Page 144

1      A.   Okay.

2      Q.   -- because of your race?

3      A.   And I'm taking your definition that I wrote

4  here.  All the actions that they take against someone

5  because of my race, those are alleged throughout my

6  complaint.  All the actions that they took against me

7  because of my race.

8           Like the way that they misstated, mis- -- they

9  didn't use the standard that they were supposed to use

10 for promotion to full professor.  They did all the ploys

11 that they had in my tenure process.  They created an

12 entire environment of race discrimination against me at

13 all levels of review including by going behind the

14 scenes and making allegations about me.

15          So, yeah, that's why I allege that.  I

16 incorporated paragraphs 1 through 231 to provide

17 additional actions they took against me because of my

18 race.

19     Q.   Okay.  Are you familiar with Title VII?

20     A.   I've never practiced employment law.

21     Q.   Okay.

22     A.   I know that there's a Title VII.  I'm familiar

23 enough that I have become familiar in terms of this

24 preparation of this complaint, but I'm not -- I haven't

25 gotten paid or represented any persons in this type of

Page 145

 1  representation.

 2      Q.   Okay.  What is your understanding of the kind

 3  of action that would support an allegation of

 4  discrimination?

 5      A.   From my recollection is when I did the research

 6  to do my complaint is that a denial of promotion is,

 7  under Title VII, adverse action.

 8      Q.   Okay.  So have you heard that -- you know, in

 9  terms of specific discrete actions, a refusal to hire,

10  discharging an individual, or discriminating against

11  someone with respect to terms and conditions of their

12  employment like compensation and certain privileges of

13  employment, is it your understanding that taking those

14  actions because of someone's race or color is what is

15  prohibited by the law?

16      A.   It includes that.

17      Q.   Okay.  So we've already discussed failure to

18  promote in 2018.  Are you saying that the university

19  engaged in any other action with respect to your

20  compensation or terms and privileges of employment?

21      A.   That's compound.  Please restate.  Objection as

22  to form.

23      Q.   Okay.  You've -- other than their failure to

24  promote, has the university taken any other adverse

25  action against you related to your employment?

Page 146

```
 1      A.   They have permitted and condoned a hostile work

 2 environment.  That has tied with the discrimination that

 3 I have faced, because the hostile work environment, it's

 4 for the same reasons.

 5           And they have permitted all the situations that

 6 have happened that I alleged in my complaint, including

 7 putting me through investigations over false

 8 allegations, including through ignoring my requests for

 9 assistance when I was dealing with the discrimination

10 and the different -- different actions that were

11 happening against me.

12           So all of that the university has permitted.

13      Q.   Okay.

14      A.   As part of the discrimination that I have

15 alleged.

16      Q.   Let me ask you this:  Were you promoted to full

17 professor subsequently?

18      A.   Yes.

19      Q.   Okay.  When did that occur?

20      A.   It occurred after I filed my EEOC charge.

21      Q.   What date did that occur?

22      A.   It was effective, I believe, 2021.

23      Q.   Okay.  What was the process for evaluating your

24 second application for promotion to full professor?

25      A.   Clarification of -- you want me to go through
```

Maritza Reyes
May 24, 2024

Page 147

1  again the process as stated in here?

2     **Q.   Was it the same as it was previously?  Did you**

3  **have to submit through Interfolio?**

4     A.   On my part, the process was the same.

5          On the other part, it may have been different

6  because a lot of the discriminators from the prior

7  application -- and you said "the same."  So I'm

8  asking -- you asked me to compare them.

9          There were different College of Law RPT

10 Committee members who participated in the review of my

11 application for promotion that I submitted in 2020 than

12 the ones who did my application in 2018.

13    **Q.   Who was different?**

14    A.   I don't have the list in front of me right now,

15 but I can tell you that from the list of 2018 to my

16 recollection, Boothe-Perry was not part of the decision

17 in 2020 application.  Patricia Broussard wasn't part of

18 it either.  Ann Marie Cavazos wasn't part of it either.

19 William Henslee wasn't part of it either.  Phyllis Taite

20 wasn't part of it either.  And I believe Jennifer Smith

21 wasn't part of it either.

22          So basically, like, the majority of the

23 discriminators from 2018 were not in the application

24 that I submitted in 2020.

25    **Q.   Now, you keep referring to individuals from the**

Page 148

1  RPT Committee as "discriminators."

2      A.   Yes.

3      Q.   Is that belief -- is that based on your belief

4  that they did not like you because of the fact you're

5  Latina?

6      A.   That's my belief, that they discriminated

7  against me because I'm Latina.

8      Q.   Okay.  And so when you say they discriminated

9  against you because they're [sic] Latina, are you

10  referring to their failure to recommend you for tenure

11  previously?

12      A.   No.  It includes all the acts that I allege in

13  my complaint that they have done for many years because

14  I'm Latina.

15      Q.   Okay.  Why do you believe that it's because

16  you're Latina?

17      A.   Because the overall environment and the message

18  that the specific people that I have named., the

19  constant referring to me as white Latina.  Sometimes in

20  meetings telling me, This is a black school, when I try

21  to speak.  The constant message that they sent that

22  we -- you know, that they wanted black people and that I

23  was not black and that I was considered to them a white

24  Latina.

25           And so that's why I believe that it's been race

Page 149

 1  discrimination, color discrimination.

 2      Q.   Who specifically made the comment that you are

 3  a white Latina?

 4      A.   From the list of the ones that participated in

 5  2018, Jennifer Smith made that comment.  Darryll Jones

 6  also made comments about my Latina identity.  His --

 7  "This is a black school" response was -- you know, I

 8  heard it from Phyllis Taite.  I've heard it from

 9  Patricia Broussard.

10      Q.   Have any of those individuals made any specific

11  color -- or made any specific comments related to your

12  sex?

13      A.   When I say a combination, there's the gender

14  aspect to it.  And Darryll Jones has specifically made

15  comments that will go to the combination of sex and

16  gender.

17           And I think that all of them also have made

18  comments in terms of -- and that's why I put it in the

19  same count.  The combination of sex and gender, which

20  being Latina, being nonblack, and being a nonblack

21  woman.  If you notice, like, all of the women that are

22  listed here are black women.  Nicky Boothe-Perry,

23  Patricia Broussard, Ann Marie Cavazos, Rhonda Reaves,

24  Jennifer Smith, Phyllis Taite.

25           So I was the only nonblack woman in the

Page 150

1  tenured.  And so I -- that's the message that I got,

2  that black women wanted the tenured faculty to be, you

3  know, black women.  And there was even during my tenure

4  process a faculty member who called the group of black

5  women who are in this, you know, group of

6  discriminators, he called them allegedly racist --

7      Q.   Well --

8      A.   -- against me in the tenure process.

9      Q.   We've talked about the tenure process.  And I

10  understand that you think generally that actions

11  taken -- well, strike that.

12          With respect to the tenure and promotion

13  process, and so this committee specifically, does that

14  committee, other than making a recommendation to the

15  dean, does it have any other authority or does it take

16  any other action in terms of the employment process?

17      A.   Are you finished?

18      Q.   Yeah.

19      A.   I just want to make sure that I don't -- you

20  don't say that I interrupted you.

21          They have all the power, as you see what they

22  did here.  Because they applied the wrong standard to

23  me.  They set up whatever they want to set up in terms

24  of the external and internal reviews whether they do

25  them or not.

Page 151

1              So within the process, they have the power

2       basically to set up the denial from the beginning if

3       they want to, which is what they did in this report.

4              So they have that authority to take action in

5       terms of how they set up the process from the beginning,

6       which is the same thing that they did with my tenure

7       process.  But Marcella David was a law professor who was

8       able to do an independent review when she was provost

9       and did.

10      Q.   Well, what I see is someone who was promoted --

11      was promoted -- excuse me.

12             What I see is someone who was hired and then

13      promoted and then had their tenure approved, and then

14      was again later promoted to full professor, albeit in

15      2021.

16             So my question to you is:  What authority other

17      than making a recommendation does that committee really

18      have?

19      A.   Are you --

20      Q.   Mm-hmm.

21      A.   Okay.  The committee, based on the composition

22      of who the committee is, had the authority to make my

23      life a living hell and discriminate against me, which is

24      what they have done.  You asked me.  I have the question

25      specifically here.

Page 152

1          The committee has engaged in all the actions

2    that I outlined in my second amended complaint.  The

3    committee did everything that they could to deny me

4    tenure and taint the process all the way to higher

5    levels of review.

6          By providence, we had a president, Elmira

7    Mangum, and provost Marcella David, who did not go along

8    with that.  And you asked me why I was able to get

9    tenure and promotion to associate professor, for

10   example.  Well, you asked me why I was hired, promoted,

11   tenure approved.

12          So why I was hired, I explained in my

13   complaint, my second amended complaint, that I was hired

14   at the time that the law school was seeking full

15   accreditation from the ABA.  They had been criticized

16   for their hiring practices.  I was the first entry-level

17   faculty member hired through the competitive national

18   search of the ALS.  So that's when I was hired.

19          And I had outstanding credentials for hiring.

20   So I would have been -- you know, the ABA had criticized

21   the hiring practices, and then they hired me in the

22   traditional process with the credentials for a

23   tenure-track professor.

24          And then when I applied for promotion to

25   associate professor, I also excelled in everything that

Page 153

1   I had to do.  And at the time, the American Bar

2   Association was also visiting the law school for the

3   reaccreditation process.

4         So you asked me why.  I think timing had to do

5   with what the -- you know, at the time, some of these

6   people who discriminated against me, if you notice, the

7   composition of the committee that approved my promotion

8   to associate professor is different than the composition

9   of the committee that approved my promotion to full

10  professor.

11        In fact, at the time when I applied for

12  associate professor, the College of Law Retention,

13  Promotion, and Tenure Committee did not include the

14  associate professors.  But several of the discriminators

15  here complained to the ABA about not being included in

16  that committee.  And they were -- eventually they got

17  their way and they got into the committee as associate

18  professors.  And that's when they reviewed my

19  application for tenure.

20  **Q.   Okay.  So, again, I'm asking you about the**

21  **authority that that committee holds.  So I'm not asking**

22  **you to opine on your personal belief related to why**

23  **anything happened.  I am asking you a specific question.**

24  **Other than being able to make a recommendation**

25  **regarding tenure or promotion, what authority does the**

Page 154

1    committee hold?  Can they take any other official

2    action?

3         A.   Yes.

4         Q.   What is that?

5         A.   I just told you.  They can take the official

6    action of deciding to set up an application for denial

7    by the way in which they select or not select external

8    reviewers, conduct the internal review.  All the

9    authority that they have to do the initial actions in

10   the committee, that's authority.

11        Q.   Can they do anything other than make a

12   recommendation regarding promotion or tenure?

13        A.   Yes.  They can set up the application for

14   denial by the way they exercise their authority in the

15   College of Law Retention, Promotion, and Tenure

16   Committee process.

17        Q.   Does the committee make the hiring decision?

18        A.   Of who?

19        Q.   Of anyone.

20        A.   Well --

21        Q.   Does the -- does the retention and promotion

22   committee make a determination of who will and who will

23   not be hired?  Do they have that decision-making

24   authority?

25        A.   As part of the faculty, they do.

Page 155

1      Q.   No.   I'm asking you who has the decision-making

2  authority with respect to FAMU in the hiring process?

3      A.   Of who?  What kind of professor?

4      Q.   Let's take you.

5      A.   Okay.

6      Q.   When you were hired, who made the ultimate

7  hiring decision regarding your employment?

8      A.   There are several levels just like with the

9  tenure application.  So there's -- there's -- there's

10 levels of being, you know, the faculty participates, the

11 dean participates.

12         I don't know if they had a committee at the

13 time that did it.  I wasn't there for -- on the inside

14 of my hiring, so I don't know how they did it at the

15 time.  But in my hiring, I take -- I mean, I guess I

16 would speculate, but my understanding is that the

17 faculty, the dean, the provost, and the president.

18     Q.   What is your understanding of the word

19 "ultimate"?

20     A.   It depends on the context of what ultimate --

21 ultimate sport, ultimate challenge.  It depends on the

22 context of how you're using the -- as an adjective.

23     Q.   When I ask you who the ultimate decision-maker

24 is, what do you understand that to mean?

25     A.   Decision-maker in what?

Page 156

1      Q.    Your hiring.

2      A.    I don't know who the ultimate decision-maker is

3    because it could stop at prior levels of review and

4    never get to the one -- like, depending on, for example,

5    if there's a denial at the faculty level, it will never

6    get up to the president level.

7           I'm thinking for the hiring decision, for

8    example, if the dean and the faculty don't decide to

9    hire somebody, they're the ultimate decision-makers.

10     Q.    Okay.  What about with respect to the promotion

11   process?  Who is the ultimate decision-maker with

12   respect to the promotion process?

13     A.    The president.

14     Q.    Okay.  What about the tenure process?  Who is

15   the ultimate decision-maker with respect to the tenure

16   process?

17     A.    And, again, I'm going to qualify with regards

18   to the tenure process.  How you define -- you asked me

19   how I define "ultimate," right?  And I told you it

20   depends on what it qualifies.  So I'm going to take

21   ultimate decision-maker.

22          At the College of Law tenure application level,

23   the ultimate decision-maker could be the College of Law

24   Retention, Promotion, and Tenure Committee.  It could be

25   that if they were able to exercise their authority to

Page 157

1  derail the process.  So they could become the ultimate

2  decision-maker.

3       Q.   Your -- are you telling me that they could

4  override the decision -- let's take your process again,

5  your tenure process.

6       A.   Yes.

7       Q.   Okay.  They recommended no in terms of tenure.

8  Dean Pernell then said yes.  Can they override Dean

9  Pernell's recommendation?

10      A.   Okay.  You asked me the question:  Who was

11  ultimate decision-maker?  And I told you they could

12  become the ultimate decision-maker if they derail an

13  application, which is what they tried to do for my

14  tenure application when they falsely accused me of

15  submitting my application five minutes after a

16  non-deadline that was not stated in Exhibit 7, which

17  only stated September 12, 2014, without a time.

18           So that's --

19      Q.   Again --

20      A.   -- ultimate decision-maker.

21      Q.   No.  Move to strike the response as

22  nonresponsive.

23           I'm asking you who the ultimate decision-maker

24  is with respect to the tenure process?

25      A.   Objection to not taking the answer of the

Maritza Reyes
May 24, 2024

Page 158

1   witness.  Every time that you don't get an answer that

2   it is what you want, it seems, you move to strike.  And

3   it's, you know, very -- you know, I just feel like it's

4   harassing me.

5          This is the way that I answer based on my

6   personal knowledge.  And you don't have the same

7   personal knowledge that I have.  So I'm basing -- you

8   told me at the beginning of the deposition, and my

9   understanding is that I have to answer based on my

10  personal knowledge.  And that's what I'm doing to the

11  best of my abilities.  I'm even now writing the

12  questions to make sure that, you know, I understand

13  exactly and can read it back to you.

14         When you asked me who the ultimate

15  decision-maker is, I told you it could be in the hiring

16  process if -- if the ultimate decision-maker at the

17  bottom level does not allow it to go forward, that's the

18  ultimate decision-maker with regards to that.

19         If the RPT Committee sets it up such that it

20  cannot be reviewed at higher levels, they become the

21  ultimate decision-maker.

22     Q.    But we're looking at the process.

23     A.    Right.

24     Q.    In terms of the process, the ultimate

25  decision-maker is the person who has the ability to

Maritza Reyes
May 24, 2024

Page 159

1  actually make that decision to hire or fire or promote

2  or something of that nature.  The RPT Committee makes

3  recommendations.  So let me phrase it a different way.

4        Does the RPT Committee do anything other than

5  make a recommendation with respect to its committee

6  activities?

7        A.   Yes.

8        Q.   Okay.  What are those things?

9        A.   They decide how the application is going to be

10 reviewed in the RPT Committee.  They decide who's going

11 to take control over the process.  They decide who's

12 going to be the external reviewers.  They decide who's

13 going to be the internal reviewers.  They decide, you

14 know, who is going to go and do the peer evaluation

15 reviews.

16       They decide what standards they're going to

17 apply.  They decide how they're going to write up the

18 report.  They decide whether they're going to make false

19 allegations to try to derail a tenure application.  They

20 decide, you know, a lot of actions that become part of

21 the ultimate decision depending on how they set it up.

22       Q.   Okay.  And then they write a report --

23       A.   Yes.

24       Q.   -- or a recommendation --

25       A.   Yes.

Page 160

1    Q.   -- that says this individual should be given

2  tenure or should not be given tenure.

3           Once they issue that report, do they have

4  further involvement?

5    A.   I don't know.  Because, for example, in the

6  case of my applications both for tenure and promotion,

7  Patricia Broussard was a member of the College of Law

8  RPT Committee and she was a member of the University

9  Tenure and Promotion Committee.

10          And then I also know that a lot of these

11 members of the College of Law RPT Committee were going

12 behind the scenes and accusing me of all kinds of things

13 to higher level administrators, which tells me that

14 potentially they could have a say to go behind the

15 scenes to higher levels.

16          And Patricia Broussard has official access to

17 have a say at the University Tenure and Promotion

18 Committee also.

19    Q.   Okay.  I didn't ask you about individuals.  I

20 asked you about the committee.  Once the committee makes

21 its recommendation, does it have any involvement beyond

22 that, the committee?

23    A.   The committee is made up of the individuals.

24    Q.   If Dean Pernell -- and he did.  Dean Pernell

25 said, I recommend Maritza Reyes for tenure.  Can the RPT

Page 161

1  Committee then come back and say, We reject your

2  recommendation, Dean Pernell?

3     A.   In that particular specific scenario, no.

4     Q.   Okay.  Can the RPT Committee refuse to allow

5  Dean Pernell to submit his recommendation to the

6  university committee?

7     A.   Yes, they can.

8     Q.   So they can tell Dean Pernell that he is not

9  allowed to submit his recommendation to the university

10 committee?

11    A.   Well, that's what happened in my tenure

12 process.

13    Q.   No.  What I am asking is different.  So was --

14 well, let me clarify.

15         Was Dean Pernell's recommendation submitted as

16 part of your tenure process?

17    A.   Asked and answered.

18         Yes.

19    Q.   Okay.  Now, I understand that the university

20 committee also did not recommend, correct?

21    A.   Asked and answered.

22         Yes.

23    Q.   Okay.  If the university -- this is a

24 hypothetical.  If the university had recommended you for

25 tenure, the university committee, could the RPT

Page 162

1    Committee have overridden the university committee

2    recommendation?

3         A.   I don't think so.

4         Q.   Okay.  Ultimately, is the president the

5    individual who determined whether or not you would

6    receive tenure or be approved for tenure?

7         A.   Okay.

8         Q.   Or sorry.  Ultimately --

9         A.   Ultimately.

10        Q.   -- the board of trustees determines tenure,

11   correct?

12        A.   Ultimately -- see, the word "ultimately" -- and

13   you asked me before how do I define ultimately, right?

14        Q.   Mm-hmm.

15        A.   Ultimately, in a tenure application, it could

16   be the president if the president decides not to

17   recommend to the board of trustees.  So in that case,

18   the president could be the ultimately.  But if the

19   president decides to recommend to the board of trustees,

20   then the ultimately goes to the board of trustees.

21        Q.   Okay.  So within that process, can the RPT

22   Committee take that decision out of the president's

23   hands once it's -- you've got a recommendation from Dean

24   Pernell, you've got a recommendation from the university

25   committee, you've got a recommendation from the provost,

Maritza Reyes
May 24, 2024

Page 163

1  and then it goes to the president.

2          Can the RPT Committee take that decision-making

3  authority out of the hands of the president?

4      A.  Officially, no.

5      Q.  Okay.  What about with respect to the promotion

6  process?  Can the RPT Committee take that

7  decision-making authority out of the hands of the

8  president?

9      A.  I don't know.  Because if he follows the

10  discrimination, then -- then that authority is carrying

11  forward, which is what I believe happened in my process.

12      Q.  But what I'm asking is -- let's say they

13  differ.  Okay?  Can the RPT Committee take the

14  decision-making authority away from the president?  Once

15  the recommendations have been made and it's gotten to

16  the president, can they then say, Nope?

17      A.  No, the RPT Committee cannot do that.

18      Q.  Okay.  So the president has the ultimate

19  authority once -- once the application has gone through

20  the process and people have made their recommendations,

21  the president has the ultimate authority to make the

22  determination regarding whether or not the individual

23  will receive promotion?

24      A.  May I answer the question how I want to answer

25  and can answer it based on my personal knowledge?

Page 164

1      Q.    I'm asking about the process, the formal

2  process.

3      A.    So may I answer it how I understand your

4  question?

5      Q.    Yes.  Go ahead and answer how you understand my

6  question.

7      A.    Okay.  If the RPT Committee taints the process

8  from the beginning and the president goes along with

9  that and uses that as the basis for the denial of

10  promotion, then basically the president is -- is

11  being -- is going along with the College of Law RPT

12  Committee discrimination at the bottom, and it carries

13  all the way to the top.

14      Q.    I understand your position on that.

15            But there are several steps within the process

16  that helps to avoid that type of situation.  And, in

17  fact, that was the case in your tenure process, correct?

18      A.    Because Marcella David did an independent

19  review and based it on her own knowledge and experience

20  as a law professor.  And she came in from -- she didn't

21  have the discriminatory intent.

22      Q.    Okay.  Do you believe that -- that Dean Pernell

23  had a discriminatory intent?

24      A.    At the point of -- when?  When he --

25      Q.    When he approved your tenure.  When he

Page 165

1  recommended you for tenure.

2      A.   I don't know if he had discriminatory intent.

3  I know that he recommended me.

4      Q.   Yes.

5      A.   Yeah, but I don't know what he thinks, you

6  know, in terms of discriminatory intent.  I'm not in his

7  mind.

8      Q.   Okay.  When you refer to "the discriminators,"

9  are you referring to Dean Pernell?

10     A.   I'm referring to the -- when I referred to "the

11  discriminators" before, I was looking at the ones in

12  this document, the ones that I pointed out from

13  November 5, 2018, who voted in my associate professor

14  application for promotion and were the same ones who set

15  up the discrimination in the prior tenure process and

16  were the same ones that a committee member who was in

17  those meetings called racist, malicious, vile against

18  me.

19          So those are the ones on that basis, is that I

20  refer to as the discriminators.

21     Q.   Okay.  Let me ask you very specifically who by

22  name do you believe discriminated against you?

23     A.   I have the names in the second amended

24  complaint in the different situations that I listed in

25  terms of the discrimination that I have faced.  So do

Maritza Reyes
May 24, 2024

Page 166

1    you want me to go through the names?

**2        Q.    If we have to, yes.**

3        A.    Okay.

4            THE VIDEOGRAPHER:  Counsel, I'm sorry to

5        interrupt.  But when she's done with that, can we

6        take a five?

7            MS. REINER:  Yes.  Absolutely.

8            THE WITNESS:  You know what?  This is going to

9        take me a little bit.  Do you want to take five now?

10        Because this is going to take a little bit.

11            MS. REINER:  While you look at the complaint?

12            THE WITNESS:  Yeah.

13            MS. REINER:  Okay.  I'm fine.  We can go off

14        the record while she reviews the complaint.

15            THE VIDEOGRAPHER:  Off the record.  The time is

16        2:45 p.m.

17            (Off the record from 2:45 p.m. to 2:50 p.m.)

18            THE VIDEOGRAPHER:  We are back on the record.

19        The time is 2:50 p.m.  Starting media 3.

20            (The question was read back by the court

21        reporter.)

22            THE WITNESS:  To start, I want to say that the

23        ones who discriminated against me are all named in

24        my second amended complaint, the individuals who are

25        named, in case I leave somebody out.

Page 167

1        But then I want to qualify when looking at the

2    ones, for example, who voted on my application for

3    promotion to full professor in November 5, 2018, I

4    would say Nicky Boothe-Perry, Patricia Broussard,

5    Ann Marie Cavazos, Bill Henslee, Darryll Jones,

6    Jennifer Smith, Phyllis Taite.

7        And I believe that Rhonda Reaves, Rob Abrams,

8    and Ron Griffin went along to get along as part of

9    what I described in my complaint as workplace

10   mobbing.  And also because when I -- when they were

11   part of the committee for my tenure process, they

12   were retaliated against by some of these people who

13   were there in the vote for my 2018 application.

14       For example, Griffin had to contend with a

15   complaint being filed against him for standing up in

16   my tenure process against what they called the

17   racism against me by the women who were named here,

18   who they all participated in the investigation

19   against him.

20       And Rob Abrams also was targeted.  He's a white

21   male, and he was denied the right to vote on my

22   application for tenure when he was deemed favorable

23   to me.

24       And Rhonda Reaves was also pressured after she

25   wrote a dissenting report in my tenure process when

Page 168

1    she didn't go along with what the discriminators

2    were doing.

3         So by the point of my application for

4    promotion, they were outnumbered by the

5    discriminators in that vote.  And I believe that

6    they went along with the discrimination as part of

7    workplace mobbing.

8  BY MS. REINER:

9    Q.   Okay.  So --

10   A.   Looking at the vote from 2018.

11   Q.   Okay.  Is there anyone outside the membership

12 of the RPT Committee that you assert discriminated

13 against you?

14   A.   Yes.  Provost Maurice Edington and President

15 Larry Robinson also participated.  And by that point, by

16 the process of my application, Leroy Pernell also went

17 along.

18   Q.   And you believe that Larry Robinson, Leroy

19 Pernell, and Maurice Edington discriminate -- well,

20 let's take them one at a time.

21        How do you believe that Maurice Edington

22 discriminated against you?

23   A.   He went along with the black race agenda that

24 the discriminators that I named before were pushing.

25   Q.   But what specific action did he take?

Maritza Reyes
May 24, 2024

Page 169

1    A.   He participated in the process of the denial

2  and went along with what the discriminators wanted him

3  to do.  And in support of -- and this is something that,

4  you know, that's why I termed it a gender, sex, race,

5  color and how the discrimination worked in terms of the

6  environment.

7         Once the environment was set up for, you know,

8  all these black women don't want this Latina to get the

9  promotion, then that took over in terms of black agenda,

10 black men going, you know, for it because, you know, Ron

11 Griffin was targeted by the black women who are listed

12 here --

13    Q.   Okay.  I'm asking you --

14    A.   -- when he defended me.

15    Q.   -- about Maurice Edington.

16    A.   That's what I'm explaining of how it --

17    Q.   Okay.

18    A.   -- he worked into.

19    Q.   Okay.  So how did Maurice -- what action did

20 Maurice Edington take that was discriminatory?

21    A.   For year --

22    Q.   Did he vote against you?  Did he make a

23 recommendation?  What specific action did he take that

24 you feel was discriminatory?

25    A.   For years I reached out to him about the

Maritza Reyes
May 24, 2024

Page 170

1  discrimination.  He went along with it.  For years I

2  reached out to Larry Robinson about the discrimination,

3  and he went along with it.  And then they were both part

4  of my promotion process for denial.

5      Q.   What about Leroy Pernell?  What specifically

6  did he do that you allege was discriminatory?

7      A.   Well, he piggybacked on the discrimination of

8  the College of Law Retention, Promotion, and Tenure

9  Committee because he went along with how they set it up

10  by applying the wrong standard and going along with

11  their pretext for discrimination that they used.

12           I mean, they didn't -- they didn't come out and

13  say -- because when you asked me did -- am I going to

14  ask them, Did you -- did you not vote for me because

15  you're a Latina?  I don't think sophisticated people

16  like this, you know, would generally -- law professors

17  and lawyers are going to tell me, We didn't vote for you

18  because you're Latina.

19           So that's why I never asked that question.  But

20  their actions and the comments otherwise were constantly

21  the message that they treated me negatively different,

22  including in how they processed my applications, because

23  I was not black.

24      Q.   And, again, I'm asking you specifically with

25  respect to Pernell.  Dean Pernell.

Maritza Reyes
May 24, 2024

Page 171

1     A.    Yes.  I'm telling you.  He went along with the

2  discrimination that they set up from the College of Law

3  RPT Committee and chose a black agenda of "I'm going to

4  stick with the black people who don't want this Latina."

5     **Q.    Okay.  So you believe that he made the decision**

6  **in the 2018 promotion process --**

7     A.    Yes.

8     **Q.    -- not to recommend you for promotion because**

9  **you are Latina?**

10     A.    Because -- yeah, he believed and by that

11  point -- I'm going to answer.  Are you finished with

12  your question?

13     **Q.    Yes.**

14     A.    Okay.  So I believe that he went along with the

15  discrimination that happened in the RPT Committee.

16  Including because by that point he was interim dean.  He

17  was returning to interim dean from the faculty and knew

18  he was going to return to the faculty after.

19     **Q.    Okay.**

20         (Defendant's Exhibit 12 was marked for

21         identification.)

22  BY MS. REINER:

23     **Q.    We're going to show you what's been marked as**

24  **Exhibit 12 to the deposition.  Can you identify that**

25  **document for me?**

Maritza Reyes
May 24, 2024

Page 172

1      A.   This is a letter dated July 24, 2019, signed by

2  Maurice Edington, Provost; copy Larry Robinson,

3  President; Nicky Boothe-Perry, Interim Dean.

4      **Q.   Okay.  And is that a letter that you recall**

5  **receiving?**

6      A.   I don't -- I didn't receive it on the date that

7  it says on there.

8      **Q.   Okay.  This has an address of 201 Beggs Avenue,**

9  **Orlando, Florida 32801.  Was that your address at the**

10 **time?**

11     A.   That's not my address.

12     **Q.   Okay.  Do you know whose address that is?**

13     A.   That was the address of the law school.  But I

14 didn't receive it in the law school.  And I -- I would

15 have to check the alleged letter that was supposedly

16 sent to me because I am not sure that this is an

17 accurate representation of the letter.

18     **Q.   Okay.**

19     A.   I would have to compare because there was --

20 part of the discrimination that Maurice Edington and

21 Larry Robinson engaged in -- I'm just telling you that

22 this letter, I don't --

23     **Q.   That's fine.  I just asked you --**

24          MS. REINER:  Can you read back the question?

25          THE WITNESS:  If I received it.

Maritza Reyes
May 24, 2024

Page 173

1          (The question was read back by the court

2     reporter.)

3 BY MS. REINER:

4     Q.   That was the extent of the question.

5     A.   The law school.

6     Q.   Okay.  Do you recall receiving notice that your

7 application for promotion had been denied?

8     A.   Yes.  Eventually.

9     Q.   Do you recall receiving a letter that your

10 application for promotion had been denied?

11    A.   Eventually.  But I'm not sure it was this

12 letter.

13    Q.   Okay.  Did you --

14    A.   And, Counsel, do you have copies of these for

15 me?  Because, remember, when we were in my depositions,

16 you were asking me for copies.

17    Q.   Yes, we do.

18    A.   Okay.  So if you could please get them so I

19 could be marking them.  Like I gave them to you as we

20 went along.  Remember you were asking me?  I could keep

21 this?

22    Q.   Well, you've got copies in front of you.

23    A.   Right.  So I'm going to keep -- these are the

24 ones that I get to take with me?

25    Q.   These are -- these are the official ones.

Page 174

1    A.    Okay.  So which ones are mine?

2          MS. REINER:  Let's go off the record for a

3    second.

4          THE VIDEOGRAPHER:  Going off the record.  The

5    time is 3:01 p.m.

6          (Off the record from 3:01 p.m. to 3:03 p.m.)

7          THE VIDEOGRAPHER:  We are back on record.  Time

8    is 3:03 p.m.

9          THE WITNESS:  Counsel, I need to state an

10   objection for the record.  I'm going to object to

11   counsel for defendant going off the record to make

12   argumentative statements to me and accusations that

13   she does not want on the record.  I don't have any

14   control over the record, it seems.  So she's telling

15   the court reporter and the videographer to go off

16   the record when I don't want to go off the record,

17   including to make allegations.

18         For example, when I wanted the exhibits and I

19   requested them, just like she did before in my

20   depositions that I was taking, she made an

21   allegation that whether I was suggesting that she

22   was going to somehow do something to the exhibits.

23   And I never said anything like that.  I'm shocked by

24   such an allegation, including obviously why she

25   wasn't on the record when she did it.

Maritza Reyes
May 24, 2024

Page 175

1        I wanted the exhibits just like she wanted.

2   And counsel for defendant has repeatedly in filings

3   with the court stated that I'm a lawyer, that I'm a

4   Florida Bar attorney, and holding me to a standard

5   of a lawyer but is not treating me like a lawyer as

6   I'm trying to do my job both as a plaintiff to the

7   best of my ability, but also to represent myself,

8   including for asking for the same treatment that I

9   gave her in terms of the exhibits.  That's all that

10  I was asking for.

11       So and I -- and this going off the record and

12  on the record, I object.  I want to stay on the

13  record to avoid these types of allegations that

14  she's making off the record.

15       Thank you.

16       MS. REINER:  Is that your objection?

17       THE WITNESS:  That's my objection, yes.

18       MS. REINER:  Okay.

19       THE WITNESS:  I want to stay on the record.

20       MS. REINER:  Okay.  Well, we went off the

21  record because you asked us to pull additional

22  copies, other than the ones you've got sitting in

23  front of you, together.  We are doing so, but we

24  didn't want to do that and waste time on the record

25  and risk the clarity of the transcript.

Page 176

 1          So we will remain on the record --

 2          THE WITNESS:  For the duration.

 3          MS. REINER:  -- and move forward from here.

 4          THE WITNESS:  But that was not the point of why

 5      we went off the record, Counsel.  Objection to --

 6          MS. REINER:  Counsel, we're --

 7          THE WITNESS:  -- mischaracterization.

 8          MS. REINER:  Counsel, we're not going to engage

 9      in back and forth.  This is just a discovery

10      deposition.

11          THE WITNESS:  I understand, Counsel.  But you

12      can --

13          MS. REINER:  You're welcome to have copies of

14      all of the documents.  We have copies here for you.

15      Julie is putting them together for you.

16          THE WITNESS:  And you said --

17          MS. REINER:  And you also have copies in front

18      of you right now that you've been given throughout

19      the course of the deposition.  So there's no

20      question that you're going to receive copies.

21          THE WITNESS:  But that was not the point,

22      Counsel.  The point was that when I asked if I could

23      mark on these, you made it a point in the prior

24      depositions every time I forgot to give you one as

25      you were giving it -- as I was giving it to the

Maritza Reyes
May 24, 2024

Page 177

1  witness, you made a point in your prior depositions

2  of requesting immediately that I give you a copy.

3      And so when you told me that I had these copies

4  in front of me, I asked if I could mark as I went

5  along, just like you had the benefit of that, if

6  that was a problem.  You said that Julie could get

7  together the extra copies.  We didn't need to go off

8  the record for that.

9      MS. REINER:  Ms. Reyes, I'm not going to engage

10  in an argument with you regarding how a deposition

11  is to progress.  I suggest that we get back to

12  asking questions and you responding to them so that

13  we can go ahead and wrap this up in a timely

14  fashion.

15      THE WITNESS:  And that's what I want to do,

16  Counsel.

17      MS. REINER:  Wonderful.

18      THE WITNESS:  But I don't want to be

19  harassed --

20      MS. REINER:  Wonderful.

21      THE WITNESS:  -- during this deposition,

22  including with you going off the record to make

23  harassing and argumentative comments --

24      MS. REINER:  We didn't --

25      THE WITNESS:  -- and accusations against me.

Page 178

 1          MS. REINER:  Again, we didn't go off the record

 2      so that I could make any comments.  You made the

 3      comment that you need to compare and make sure that

 4      what we gave you later on, that what Julie was

 5      pulling together was the same as what you were

 6      looking at.

 7          THE WITNESS:  I didn't make that comment.

 8      Objection to mischaracterization.  And you -- and

 9      you are causing me to have to defend myself because

10      you are making allegations and accusations.

11          I wanted to have my copies to make sure that I

12      could mark as I went along.  Just like you did.  And

13      so I don't -- I don't appreciate that you're going

14      off the record to make these kinds of allegations

15      and creating an argument and then taking it back and

16      saying that you don't want to argue with me.

17          MS. REINER:  We understand your objection.

18      It's noted on the record.  Of course, disagree with

19      it, but it's noted on the record.  Okay?

20          THE WITNESS:  Okay.  So let's stay on the

21      record.

22          MS. REINER:  So let's continue with this

23      deposition as we go forward.

24  BY MS. REINER:

25      Q.   All right.  So you've previously been handed

Page 179

1    what was marked as Exhibit 12, which was a

2    correspondence pursuant to which you were advised that

3    your promotion had been denied.  I'm now going to hand

4    you -- or actually strike that.

5            Subsequent to receiving notice that your

6    promotion was being denied, did you reach out to

7    question the reasoning for that?

8        A.   Okay.  And so I'm going to answer now that the

9    reason why this exhibit -- I am not sure it's what I

10   received in terms of the notice that my permission was

11   denied -- I mean the promotion was denied is because

12   there was an issue with Provost Edington and President

13   Robinson as to when they sent me the notification.

14           And so that's what I have on my personal

15   knowledge that I want to be a chance to explain that

16   there was a controversy about when they gave me the

17   decision.  And I don't know if this was the letter that

18   they gave me because there was an issue with them

19   alleging that they had given me the decision by a

20   certain date and me not receiving it, including how that

21   played into the time that I had to appeal the decision.

22           So I asked about the decision and I was

23   discriminated against in that way too --

24       Q.   Okay.

25       A.   -- when they didn't give me the information

Page 180

 1  that I needed and they didn't give me the appeal process

 2  that I needed.

 3      Q.   Okay.  Again, I'm going to move to strike as

 4  nonresponsive.

 5           The only question I asked you was on receiving

 6  notice -- and I didn't say that letter.  But on

 7  receiving notice the promotion had been denied, did you

 8  reach out to someone to question or challenge the

 9  denial?

10      A.   Yes, I reached out to somebody to question and

11  challenge the denial.

12      Q.   Okay.  Did you receive any kind of

13  correspondence from Maurice Edington related to the

14  reason for your denial?

15      A.   I recall that I did, I think.  Yes.

16      Q.   Okay.

17           (Defendant's Exhibit 13 was marked for

18      identification.)

19  BY MS. REINER:

20      Q.   I'm going to show you now what's been marked as

21  Exhibit 13 to the deposition for identification

22  purposes.

23           Okay.  Now, do you -- or can you identify for

24  us this August 7, 2019, communication?

25      A.   It's a letter dated August 7, 2019, addressed

Page 181

1  to me at the -- it just doesn't have an address.  It

2  says College of Law, Orlando, Florida 32801.

3          I don't know when I received this letter

4  because that was the issue with they did the letters one

5  date, but they don't provide them until subsequent

6  dates.  So I don't know when I received this letter.

7          It's signed by Maurice Edington, Provost, with

8  a copy to Nicky Boothe-Perry, Interim Dean.

9      Q.   Okay.  Now, you mentioned that you -- following

10  denial of the promotion, that you reached out to

11  question that decision.  Does this -- did you reach out

12  to the Office of Academic Affairs to question that

13  decision?

14      A.   I don't remember -- I reached out to -- I don't

15  remember exactly, but I remember that I -- if it was

16  academic affairs.  Because when you say academic

17  affairs, Edington, Maurice Edington is in academic

18  affairs.  So I reached out to -- I may have reached out

19  to him and President Robinson.  And that's how.  But I

20  am not certain of when I received this letter.

21      Q.   Okay.  Can you read the first sentence of the

22  letter for me, please?

23      A.   Thank you for your inquiry submitted to the

24  Office of Academic Affairs on August 5, 2019.

25      Q.   Okay.  Do you recall whether or not you

Page 182

1  submitted an inquiry to Edington or to the Office of

2  Academic Affairs on or about August 5, 2019?

3     A.   I don't know -- what do you mean by "inquiry"?

4  I remember I asked.

5     Q.   Let's start there.  Let me clarify for you.

6          After receiving your note -- or after receiving

7  notice of the denial of promotion, did you ask why it

8  was denied?

9     A.   Yes, I asked.  And the reason is I didn't get

10  the notice of denial of promotion until August.  And so

11  I would have been asking -- I'm just not certain that it

12  would have been August 5, 2019.

13     Q.   Okay.

14     A.   But I did get the notice in August 2019.

15     Q.   Okay.  Were you advised that you could grieve

16  the denial?

17     A.   Yes, but then I was denied the process to

18  grieve it.

19     Q.   Okay.  And how did that occur?

20     A.   It was a very deceptive ways that they did it.

21  It was -- it involved -- you asked me why.  So I'm going

22  to give you the why.  Because why is a broad question as

23  to how it occurred.

24          The way that they implemented it was that

25  Provost Edington told me that I should contact

Maritza Reyes
May 24, 2024

Page 183

1  somebody -- I don't remember who it was -- I think it

2  was Janine Boston -- about how I -- the process would

3  work.  And then -- and there may have been somebody else

4  in the office of the general counsel at another point.

5  I think it was Denise Wallace, but I'm not sure.  I

6  named it in my complaint, and that's what I'm trying to,

7  you know, find it.

8           And then when I went to the other person, they

9  kept going me round and about in emails and not

10 providing the information that I needed to file the

11 appeal and running the time for me to file the appeal.

12     Q.   Okay.  So was there a specific grievance

13 process, to your knowledge?

14     A.   There was supposed to be, but I was never given

15 the process.

16     Q.   Okay.  Did you request the process?

17     A.   Yes.  Over and over.

18     Q.   Okay.  Did you ever submit anything as a

19 grievance?  Did you even -- did you submit, for

20 instance, a letter?

21     A.   I sent -- I sent emails asking for what it was,

22 how they wanted me to submit it, and what was supposed

23 to submit it, and the information I was supposed to

24 submit.  And I never got it.  It kept going around,

25 sending me from one person to another.

Page 184

```
 1              And then the one person claiming -- at one
 2  point they even returned me to Provost Maurice Edington.
 3  And I said, He's the one who told me from the beginning
 4  to go to you and to you, and now you're giving me back
 5  to Provost Maurice Edington.  And, meanwhile, they run
 6  the time.
 7       Q.   Looking at this letter that has been marked as,
 8  I believe, Exhibit 13, if I'm not mistaken, do you see
 9  reference to a FAMU regulation in that letter?
10       A.   Yes.
11       Q.   Okay.  Did you obtain or seek a copy of that
12  regulation?
13       A.   I accessed the regulation.
14       Q.   Okay.  You accessed that regulation?
15       A.   Yes.  But under that regulation, they have to
16  tell you you have to -- they have to be the ones to
17  assign who the step one representative is, they have to
18  assign how you're going to submit it, they have to
19  provide the documents that you need to submit it.  And
20  that's what they kept throwing me from person to person
21  and never provided it to me.
22       Q.   Okay.  So your position is that you attempted
23  to use the grievance process but weren't able to do so.
24  Would that be accurate?
25       A.   I was sabotaged in using the process.
```

Maritza Reyes
May 24, 2024

Page 185

1      Q.   You did not or were not able to use the
2  process?
3      A.   I was not allowed to use the process.
4      Q.   Okay.  So did the determination stand with
5  respect to your denial of promotion?
6      A.   Yes.
7      Q.   Okay.  Was there any process beyond the
8  grievance process that you could have or did try to use
9  to reverse the decision?
10     A.   To my understanding, that was the only internal
11  process available.
12     Q.   Okay.  Now, subsequent to -- subsequent to the
13  denial of your promotion, you continued to be employed
14  at FAMU, correct?
15     A.   Yes.
16     Q.   Okay.  You continued to teach and to work with
17  students?
18     A.   Yes.
19     Q.   Did you continue to be a part of the tenure
20  committee, the tenure and promotion committee?
21     A.   I continued to be a part of the Retention,
22  Promotion, and Tenure Committee of the College of Law.
23     Q.   Okay.  Following the denial of your promotion,
24  were you demoted at all from your prior -- from your
25  prior position?

Page 186

1    A.    What do you mean by "demoted"?

2    Q.    So did you -- because you did not -- because

3  you were not promoted -- strike that.  Let me make a

4  better question for you.

5          After being denied promotion, did you remain in

6  your prior position?

7    A.    Yes.

8    Q.    Okay.  Did your salary remain the same?

9    A.    Yes.

10   Q.    Okay.  Did your benefits and everything remain

11  the same?

12   A.    Yes.

13   Q.    Okay.  So in terms of the denial of the

14  promotion, what -- had you been given the promotion,

15  what would you have received as part of that promotion

16  package?

17   A.    I would have received -- I believe it was a

18  15 percent pay raise.  I would have received a window

19  office.  I would have become a member of the full

20  professors in the College of Law Retention, Promotion,

21  and Tenure Committee of full professors.  And I would

22  have received additional considerations given to full

23  professors.

24   Q.    What are those?

25   A.    I'm not sure of all of them.  Sometimes they

Page 187

1  have been cited that -- sharing certain committees as

2  full professor, for example, to be chair of a committee.

3       Q.   Okay.  Is there an increase in pay associated

4  with chairing a committee?

5       A.   No.

6       Q.   Okay.  You mentioned a moment ago that you

7  would have been a full professor on the tenure and

8  promotion committee.  Does full professor have a

9  different voting status on that committee?

10      A.   As a full professor, you can vote on -- if

11  you're a full professor, you can vote on applications

12  for full professor.

13      Q.   Okay.  If you are just a tenured professor and

14  are not a full professor, what can you vote on in the

15  tenure and promotion committee?

16      A.   If you're a tenured associate professor, you

17  can vote on tenure and you can vote on applications for

18  associate professor.

19      Q.   Okay.

20      A.   For promotion to associate professor.

21      Q.   Okay.  And other than that voting distinction,

22  are there any other distinctions with respect to the

23  committee between a full and an associate professor?

24      A.   Well, those distinctions in academia are

25  distinctions that could impact employment in terms of

Page 188

1   your standing.  So those are the distinctions that, you

2   know, you get to chair committees, which goes on your

3   resume as a chair of a committee.  And you get to

4   consider applications for full professor and you get --

5   you get consideration of other things within the law

6   school.  You get priority over associate professors.

7       **Q.   I didn't ask you for the distinction.  I asked**

8   **you if there was anything else.**

9           MS. REINER:  So would you read back the

10      question?  Thank you.

11          (The question was read back by the court

12      reporter.)

13          THE WITNESS:  There could be in terms of

14      preference, preferences to the full professor versus

15      the associate professor.

16          (Defendant's Exhibit 14 was marked for

17      identification.)

18  BY MS. REINER:

19      **Q.   Okay.  I'm going to show you now what has been**

20  **marked as Exhibit 14 to the deposition and ask if you**

21  **can identify that document for us.**

22      A.   Yes.

23      **Q.   Okay.  And what is that document?**

24      A.   And can I now get the copy?

25          THE WITNESS:  Do you have the copy?

Maritza Reyes
May 24, 2024

Page 189

```
 1        MS. ZOLTY:  Yeah, I have one.
 2        THE WITNESS:  Okay.  But for this one, if we
 3   could start from this one and start catching -- I
 4   don't want you to give me all of them right now, but
 5   just so that I can have it right here so in case I
 6   want to note it.
 7        MS. ZOLTY:  No, that's fine.  I just don't want
 8   them --
 9        THE WITNESS:  Okay.
10        MS. ZOLTY:  -- to get mixed up.
11        THE WITNESS:  Yeah, because these say exhibit;
12   those don't, right?
13        MS. REINER:  I'm going to move to strike the
14   back and forth regarding the exhibits.
15        Can you read back the question for me, please?
16        THE WITNESS:  Thank you.
17        (The question was read back by the court
18   reporter.)
19        THE WITNESS:  So Exhibit 14 is a doc- -- is a
20   letter dated July 21, 2021.  And this letter is
21   addressed to me.  And this time it has my correct
22   address, my PO Box address, which that has always
23   been my address.
24        And it's signed by Larry Robinson, copied to
25   Maurice Edington, Herbert Bailey, and Deidre Keller,
```

Maritza Reyes
May 24, 2024

Page 190

 1     dean of the law school.

 2  BY MS. REINER:

 3     Q.   Okay.  Now, can you tell us, did you receive

 4  that document?

 5     A.   Yes.

 6     Q.   Okay.  And does that document reflect your

 7  promotion to the rank of full professor?

 8     A.   Yes.

 9     Q.   Okay.  And what was the date of your promotion?

10     A.   It says on the letter that it's effective

11  August 9, 2021.

12     Q.   Okay.  And do you recall that to be correct?

13     A.   Yes.

14     Q.   Okay.  So following the initial denial of your

15  promotion in 2018, did you subsequently reapply to

16  become a full professor at FAMU?

17     A.   After I filed my EEOC charge, I reapplied.

18     Q.   Okay.  I'm going to move to strike as

19  nonresponsive.

20          The question was:  After your denial, did you

21  reapply to become a full professor?

22     A.   Yes.  After I filed my EEOC charge.

23     Q.   Okay.  So the answer to the question is yes.

24          Now, were you -- were you required to submit

25  additional documents through the folio process?

Page 191

1     A.    I was supposed to submit everything again.

2     Q.    Okay.  And was that through the folio process?

3  Was that still in place at the time?

4     A.    Interfolio, yes.

5     Q.    Interfolio, yes.  Okay.

6           And did you submit an application --

7     A.    Yes.

8     Q.    -- for evaluation?

9           Did you support -- did you submit supporting

10  documentation?

11    A.    Yes.

12    Q.    Okay.  Did you support additional articles or

13  publications?

14    A.    I must have because it was a different date by

15  that point.

16    Q.    Okay.  At this point in time, did the

17  following -- did the prior process still apply that the

18  first evaluation would be done by the committee, the

19  College of Law committee?

20    A.    Yes.

21    Q.    RPT Committee?

22    A.    Yes.  The application was -- they were the

23  first ones to review.

24    Q.    Okay.  And when they reviewed it, did they

25  determine that you would be recommended?

Maritza Reyes
May 24, 2024

Page 192

 1    A.    And I want to qualify.  When you say the RPT

 2  Committee, it was not the same committee that reviewed

 3  my application.  In terms of the membership of the ones

 4  who voted, it was not the same committee that voted on

 5  my application that I submitted in 2018.

 6    Q.    I'm asking not about individual members, I'm

 7  asking about the process.

 8          So was -- you submitted the materials.  Did it

 9  then go to the RPT Committee for evaluation?

10    A.    To the RPT Committee -- the 2021 RPT Committee.

11    Q.    Whoever was on it at that time?

12    A.    On the 2020-21 RPT Committee.

13    Q.    Okay.  Did that committee make a

14  recommendation?

15    A.    Yes.

16    Q.    Okay.  What was that recommendation?

17    A.    They recommended that I -- that my application

18  be approved for full professor.

19    Q.    Okay.  Was that recommendation then forwarded

20  to the dean?

21    A.    Yes.

22    Q.    Okay.  What did the dean recommend?

23    A.    And this was a different dean.  It was then

24  Deidre Keller at that point.  She was the new dean.

25    Q.    That's correct.

Maritza Reyes
May 24, 2024

Page 193

 1     A.    Yes.

 2     Q.    **What did the dean recommend?**

 3     A.    Dean Keller recommended that it be approved.

 4     Q.    **Okay.  What about the provost -- or sorry --**

 5   **the university committee?  Did it then go to the**

 6   **university committee?**

 7     A.    Yes.

 8     Q.    **Okay.  And what was their recommendation?**

 9     A.    They recommended -- they said that they

10   followed the recommendation of the RPT Committee.

11     Q.    **Okay.  What was the recommendation of the**

12   **university committee?**

13     A.    They followed the recommendation of the RPT

14   Committee, which approved.

15     Q.    **Okay.  So the university committee approved.**

16   **That's the question I asked.**

17     A.    They recommended approval.

18     Q.    **Yes.  Okay.**

19           **After the university committee recommended**

20   **approval, did it go to the provost?**

21     A.    I assume they followed the process.

22     Q.    **Okay.  Do you know what the recommendation of**

23   **the provost was?**

24     A.    I received this letter telling me that it was

25   approved.

Maritza Reyes
May 24, 2024

1      Q.    Okay.  And the letter is from who?

2      A.    From the president, Larry Robinson.

3      Q.    Yes.  Okay.  I'm asking you specifically are

4  you aware of whether or not the provost recommended

5  approval?

6      A.    I don't recall if I got a letter telling me

7  what the provost recommended.

8      Q.    Okay.  Did anyone else tell you what the

9  provost recommended?

10     A.    I do not recall.  Because I don't -- I don't

11  think with any of the others, I don't -- I don't think

12  that there was a note -- was there anything in the

13  exhibits about what the provost recommended before?  I

14  don't think there was anything.  It goes to the

15  president.

16     Q.    Yes.  After -- after the provost, correct, as

17  part of the process?

18     A.    I assume that that's the process, but you're

19  asking me whether the provost ever notified me of the

20  provost recommendation.

21     Q.    No.  I'm not asking if you received notif- --

22  I'm not asking you if the provost notified you.  I'm

23  asking you if you know what the provost recommendation

24  was?

25     A.    I assumed, but I don't know because the -- the

Maritza Reyes
May 24, 2024

Page 195

 1  notification that I got was from the president.

 2      Q.   Okay.  Do you know who the provost was at that

 3  time?

 4      A.   Maurice Edington.

 5      Q.   Okay.  But you do not know whether or not

 6  Maurice Edington recommended you for promotion or not?

 7      A.   I can't recall if I got notification of that.

 8      Q.   Okay.  Were you approved by the president for

 9  promotion?

10      A.   Asked and answered.

11           It's what the letter states.

12      Q.   Okay.  I'm not asking what the letter states.

13  I was just asking you were you approved by the

14  president?

15      A.   As the letter states, I was approved.

16      Q.   Okay.  At any point in time, did you receive an

17  increase in your compensation package?

18      A.   I received an increase in salary.

19      Q.   Yes.  Were there any other additional benefits

20  that you received upon becoming a full professor?

21      A.   No.  I was denied the benefits I was supposed

22  to receive.

23      Q.   What benefits were those?

24      A.   I didn't get my window office.

25      Q.   Okay.

Page 196

```
 1     A.   And I also didn't get to chair committees at
 2  some points when I should have as full professor.
 3     Q.   Okay.  What committees did you not get to
 4  chair?
 5     A.   Well, we -- I don't get to necessarily decide
 6  which committees, but it's assigning a chair position to
 7  full professors.
 8          So I was -- for example, there was years -- and
 9  I don't remember.  I put it in my complaint, I believe,
10  when I was the only full professor who was at the law
11  school for the academic year who did not get assigned to
12  chair a committee.
13     Q.   Okay.  Did you make a request to chair
14  committees?
15     A.   Yes.
16     Q.   Okay.  What committees did you ask to chair?
17     A.   I can't remember for the particular year, but I
18  did request to chair a committee.  In fact, I requested
19  to chair again the Faculty Recruitment Committee.
20     Q.   Who determines who will chair a committee?
21     A.   My understanding is that the dean of the law
22  school determines that.  So it would have been -- at
23  that time when I became a full professor, it would have
24  been Dean Deidre Keller.
25     Q.   Had Dean Deidre Keller previously been part of
```

Page 197

1  the teaching faculty?

2      A.    Previously to what?

3      **Q.    Prior to becoming dean, had she been just a**

4  **professor on the faculty?**

5      A.    No.  She came externally.

6      **Q.    Okay.  Do you recall when she came?  Did she**

7  **come straight in in the position of dean?**

8      A.    Yes.

9      **Q.    Okay.  Do you recall where she came from?**

10     A.    I don't recall exactly.  I -- I don't want to

11  misstate.

12     **Q.    Okay.**

13     A.    Somewhere in the Midwest, I think.  A law

14  school in the Midwest.

15     **Q.    Okay.  Is it your contention here today that,**

16  **to the extent she did not assign you to chair a**

17  **committee, that she was discriminating against you on**

18  **the basis of your race or color?**

19     A.    I think that she participated in the hostile

20  work environment on the basis of race, color, and sex.

21  And the combination too.  What I alleged in the counts

22  in my complaint.

23         (Defendant's Exhibit 15 was marked for

24     identification.)

25

Page 198

1  BY MS. REINER:

2      Q.   I'm going to show you what's now been marked as

3  Exhibit 15 to the deposition.  Okay.  Can you identify

4  that document for me that's been marked as Exhibit 15, I

5  believe?

6      A.   This is a charge of discrimination filed with

7  the Equal -- with the EEOC.  And it's -- it was

8  digitally signed by me on May 29, 2020.  It's four pages

9  with two pages being the actual form of the charge and

10  then the two other pages are notifications from the EEOC

11  of a privacy act statement and other things.

12     Q.   Okay.  Is this a true and correct copy of your

13  charge of discrimination?

14     A.   To my recollection -- I don't have my actual

15  charge.  To my recollection, it is what it purports to

16  be.

17     Q.   Okay.  Looking down on this document, about

18  halfway down on the first page, do you see where it says

19  "Discrimination based on"?

20     A.   Yes.

21     Q.   Okay.  You have talked about -- there are

22  several boxes checked there?

23     A.   Yes.

24     Q.   So with respect to race, what do you -- what do

25  you characterize your race as?

Maritza Reyes
May 24, 2024

Page 199

1      A.    In the charge of discrimination, on the second

2   page at the bottom of the box, I said:  I believe I have

3   been subjected to unlawful discrimination because of my

4   race.  And I put in parentheses Latina.

5      Q.    Okay.  And so looking at that particular

6   paragraph, you would confirm that to the extent the box

7   "sex" is checked, that you were referring to female?

8      A.    Yes.

9      Q.    Color, you are saying light-skinned?

10      A.    Mm-hmm.

11      Q.    National origin, Nicaraguan?

12      A.    Yes.

13      Q.    Okay.  And then you also allege retaliation,

14   correct?

15      A.    Yes.

16      Q.    Now, you've also checked a box that says

17   "other"?

18      A.    Yes.

19      Q.    Can you tell us what you -- what that box

20   stands for, what you intended?

21      A.    The hostile work environment.  And at the

22   time -- and this is at the time of COVID.  COVID, you

23   know, was -- the EEOC was dealing with the COVID, and I

24   remember the process was very difficult to get this

25   done.

Page 200

1           And in the other, I also told them to specify

2    that the denial of promotion was also discrimination in

3    terms of pay because I did not get my raise because I

4    was denied promotion.

5       Q.   Okay.  So hostile work environment is a cause

6    of action.  It's not, you know, a protected class or

7    something of that nature.

8           So are you -- what did -- what did you intend

9    "other" to be in terms of a protected class?

10      A.   Also, because they told me that they could not

11   put together race and sex, the "other" was that

12   combination of Latina, race, and sex.

13      Q.   Okay.  So the "other" was for race and sex and

14   then also because you didn't get the pay raise?

15      A.   Yes.

16      Q.   Okay.

17      A.   And the hostile work environment.  That's what

18   I meant it to be.  That's from my personal knowledge.

19      Q.   Okay.  Do you, as we sit here today, maintain

20   that all of the information set forth in this charge is

21   true and correct?

22      A.   Yes.

23      Q.   Other than the information that you have added

24   to your complaint, the additional detail within the

25   complaint that you filed, and particularly right now the

Maritza Reyes
May 24, 2024

Page 201

1  operative second amended complaint, is there anything

2  else that you contend constitutes discrimination?

3      A.   In my charge I stated continuing action.  And

4  it was, you know, as of the time of the charge.  But the

5  retaliation has continued.

6      Q.   Okay.

7      A.   The discrimination, the hostile work

8  environment, and the retaliation continued.

9      Q.   Okay.  So let's take first the discrimination.

10         What do you assert are -- or how do you assert

11  you've been treated differently based on your race?

12     A.   In the conditions of employment.

13     Q.   And what specifically?

14     A.   For example, I have -- I was denied a window

15  office for years.  Everything that could be made hostile

16  for me was made hostile for me.  In the day to day, in

17  the week to week.

18     Q.   Okay.

19     A.   And -- yeah.

20     Q.   So one of the things you've talked about before

21  is the failure to promote in 2018 --

22     A.   Yes.

23     Q.   -- and that that was discriminatory.  You've

24  also now referenced the denial of -- of, you know, the

25  window office.

Maritza Reyes
May 24, 2024

Page 202

1           What other specific things do you believe that
2  you have not received because of discrimination based on
3  your race?

4      A.   Equal treatment as black faculty members of my
5  rank.

6      Q.   Okay.  Other than the window office, failure to
7  promote in 2018, and your reference to equal treatment,
8  is there anything else that you feel you have been
9  specifically denied as a result of discrimination based
10  on your race?

11      A.   Due process.

12      Q.   Is there anything else?

13      A.   My tenure position.

14      Q.   And with respect to your tenure position, are
15  you referring -- are you referring to termination?

16      A.   Yes.

17      Q.   Okay.  Has termination from employment -- when
18  did that occur?  What date?

19      A.   I was noticed for termination, I believe, on
20  February 16, 2024.  Noticed for dismissal.  Notice of
21  intent to dismiss.

22      Q.   Okay.  Has the dismissal become final?

23      A.   Yes.

24      Q.   What reason was given for the dismissal?

25      A.   I'm not clear on the reason because the letter

Page 203

1  of dismissal was not clear on the reason, but it was

2  based on emails that I sent.

3         Although it wasn't very clear, the notice of

4  dismissal said that the basis was emails, and they

5  attached them to the notice of intent to dismiss.  And

6  then the letter of dismissal said that the reason was

7  what was stated in the notice of intent to dismiss.  So

8  the emails that I sent.

9      Q.   Okay.  Other than the window office, the denial

10  of the promotion in 2018, and then the termination in --

11  which you received notice of in 2016, are there any

12  other specific --

13      A.   I'm sorry.  The termination that I got in 2016,

14  you said?

15      Q.   Oh, sorry.  Did I say 2016?  I meant February

16  16, 2024.

17      A.   Yes.

18      Q.   Yes.  Other than those things, is there

19  anything else that you feel that you were denied or, you

20  know, did not receive because of discrimination?

21      A.   I think that you forgot in the list due

22  process, which we had said, and equal treatment.

23      Q.   Yes.  But I'm talking about -- let me clarify

24  for you.

25         I'm talking about specific -- specific items

Maritza Reyes
May 24, 2024

1   like a promotion, a change in wages, benefits, things of

2   that nature.  So we'll keep equal -- equal treatment and

3   due process on the list, but are there any other

4   specific things that you feel that you were denied as a

5   result of discrimination?  I think you mentioned

6   previously a specific committee, assignment to -- as a

7   committee chair?

8       A.   A chair of committee and -- yeah, chair of

9   committees.

10      Q.   Okay.  All right.  Do you maintain that those

11  are the same things that you have been denied because of

12  your color and sex and sex-race?

13      A.   Yes.  They're all tied together --

14      Q.   Okay.

15      A.   -- in the way that the discrimination happens

16  in the law school.

17      Q.   Okay.  So with respect to your claims, you

18  believe that discrimination based on race, color, sex,

19  and sex-race led to these specific acts that the -- the

20  denial of equal treatment, due process, denial -- or

21  nonreceipt of a window office, denial of your initial

22  request for promotion and then termination, and then the

23  denial of a committee chair position?

24      A.   Yes.

25      Q.   Okay.  Now, why do you believe that these

Page 205

1  things are based on sex?  Have there been specific

2  comments related to your sex by anyone?

3     A.   Yes.  The reference to I'm not a black woman.

4     Q.   Okay.

5     A.   The constant allegations behind the scenes

6  about me in regards to black women.

7     Q.   Were any of the -- were any of the comments

8  that you've talked about being made behind the scenes,

9  were any of them made by Dean Pernell?

10    A.   What comments?  In what -- in any of the

11 comments behind the scenes?  What do you mean?

12    Q.   Okay.  So a moment ago you said that there were

13 comments being made behind the scenes related to not

14 being a black woman and your sex and things like that.

15         Have you -- were any of the comments that were

16 made by the people you've referred to as discriminators,

17 were any of them made by Dean Pernell?

18    A.   He went along with it.  When I -- especially

19 when I complained to him about -- about it.

20    Q.   Okay.  I'm not asking if he went along with

21 something.  I'm asking if he made any comments about

22 your -- your race?

23    A.   Not to me.

24    Q.   Okay.  Are you aware of him making any comments

25 to you or anyone else about your color?

Page 206

1    A.   Not to me.

2    Q.   Okay.  Are you aware of him making comments to

3  you or anyone else about your sex?

4    A.   Specifically comments, no.

5    Q.   Okay.  What do you mean by "specifically

6  comments, no"?

7    A.   He's a law professor and a lawyer.  He's

8  sophisticated.  He's not going to make comments to me

9  about my race or gender, you know.  I don't think that's

10  how it works.

11    Q.   Okay.  What about your sex-race?  Have you

12  heard of him making any comments related to your

13  sex-race?

14    A.   No.

15    Q.   Okay.  What about with respect to Maurice

16  Edington?  Have you heard of any comments by him

17  regarding your race?

18    A.   No.

19    Q.   Have you heard of any comments by him regarding

20  your color?

21    A.   No.

22    Q.   Have you heard of any comments by Maurice

23  Edington regarding your sex?

24    A.   No.

25    Q.   Have you heard of any comments regarding -- by

Page 207

1    Maurice Edington regarding your sex-race?

2       A.   No.

3       Q.   What about with respect to -- to President

4    Robinson?  Have you heard of any comments regarding your

5    race by him?

6       A.   And I know where the line of questioning -- I

7    think I'm following where you're going.

8            But both Larry Robinson and Maurice Edington

9    were made aware by me of comments, racial comments that

10   were made about my race and the combination of race and

11   sex.  And so to that extent, they condoned the comments

12   by going and not doing anything about them.

13      Q.   Okay.  I'm going to move to strike as

14   nonresponsive.

15           My question was:  Have you heard of any

16   comments by professor -- or by professor -- President

17   Robinson regarding your race?

18      A.   Again, I'm going to state in terms of --

19      Q.   I'm not asking about notice he may have

20   received.  I'm asking have you heard any comments by him

21   about your race?

22      A.   I don't work with them.  They work in

23   Tallahassee.  I work in Orlando.

24      Q.   So the answer to that question is no?

25      A.   I have -- I don't have much communications with

Maritza Reyes
May 24, 2024

Page 208

1  them on a one on one.  Our communications were mostly

2  via email.

3      Q.   Okay.  And at no point in time with respect to

4  your email communications has he made a comment about

5  your race?

6      A.   To my recollection, no.

7      Q.   Okay.  What about with respect to your color?

8  Has President Robinson ever made a comment, to your

9  knowledge, or have you been told he's made a comment

10  about your sex -- or sorry -- your color?

11      A.   To my knowledge, no.

12      Q.   Okay.  Has President Robinson ever made a

13  comment or have you been told he's made a comment about

14  your sex?

15      A.   No.

16      Q.   Okay.  Has President Robinson ever made a

17  comment or have you been told he's made a comment about

18  your sex-race?

19      A.   They're not going to make those comments to me

20  so that I can hear them.

21      Q.   I asked if you'd been told --

22      A.   And nobody's going to tell me that from the

23  institution.

24      Q.   So the answer is no, correct?  You've never

25  heard that he's made a comment about your sex-race?

Page 209

 1    A.   I have never heard, but I don't know if others

 2  have heard.

 3    Q.   Okay.  What about with respect to Deidre

 4  Keller?  Have you ever been told that Deidre Keller has

 5  made a comment about your race?

 6    A.   Deidre Keller did make a comment about my race

 7  in terms of when I complained about being treated

 8  different and not as a black woman.  She commented that,

 9  to her, diversity meant that you could have all black

10  people and they would -- that would be diverse because

11  black people are diverse in their own group, so that you

12  could have a group of all black people and you would

13  have diversity.

14         And it was in reference to me talking to her

15  about, complaining about disparaging comments that were

16  made about me in reference to a black female professor

17  who was a visiting professor.

18    Q.   Okay.  And who was that visiting professor?

19    A.   I believe her name was Shelly Page.

20    Q.   Okay.  Are you familiar with the term HB --

21  HBSU?

22    A.   HBCU.

23    Q.   Historical -- HBCU --

24    A.   HBCU.

25    Q.   -- historic black college and university?

Page 210

 1    A.   Yes.

 2    Q.   Okay.  And what does that term refer to?

 3    A.   It refers to the history of some colleges being

 4  black, dating to the time of segregation.

 5    Q.   Okay.  And are there a group of colleges

 6  throughout the country who share that common element?

 7    A.   There are several HBCUs.

 8    Q.   Okay.  And that's because, like you said, of

 9  the history of segregation?

10    A.   Yes.  There were white institutions and then

11  there were black institutions.

12    Q.   Okay.

13    A.   But now they're all integrated.

14    Q.   Yes.

15    A.   Supposed to be.

16    Q.   Do you know when that occurred?

17    A.   Well, we had Brown v. Board of Education, the

18  decision.

19    Q.   Yes.

20    A.   I don't know when they implemented it because

21  it would depend on the particular institutions.  I don't

22  know when FAMU implemented it, although I understand

23  that at some point they were told that they had to

24  integrate.

25    Q.   Okay.  Do you recall -- do you know how long

Page 211

1  FAMU has been integrated?

2     A.   For a long time.  But I don't know the exact

3  date.

4     Q.   Okay.  Okay.  What about Nicky Boothe-Perry?

5  Have you ever been told that Nicky Boothe-Perry made a

6  comment about your race?

7     A.   I think that she made a comment about my race,

8  yes, during -- they -- the group of women who were

9  called racist against me by Ronald Griffin, all of them

10 made comments about my race, I believe.

11    Q.   Were those comments within your presence?  Do

12 you have personal knowledge of that?

13    A.   Sometimes --

14    Q.   Were you at the --

15    A.   Sometimes they have made comments about my race

16 in front of me, yes.

17    Q.   Okay.  So I'm asking you about things within

18 your personal knowledge.

19    A.   Yes.

20    Q.   Or things that you have specifically been told.

21 So let me go back so we can clarify.  And I think that

22 maybe I had not yet asked you about the other categories

23 with respect to Deidre Keller.  So let me ask that real

24 quick first.

25         With respect to Deidre Keller, have you ever

Page 212

1  been told that she had made comments regarding your

2  color?

3      A.   No.

4      Q.   Okay.  With respect to Keller, have you ever

5  been told or heard her make comments about your sex?

6      A.   Well, in that conversation that we had, it was

7  a combination of race and sex.

8      Q.   Okay.  And you are referring to the

9  conversation you had regarding diversity?

10     A.   Regarding no specific complaints about me being

11 discriminated by her.

12     Q.   Okay.  So when did that conversation take

13 place?

14     A.   That conversation took place at about the time

15 when the issue came up with the disparaging comments

16 that were made about me to her in her view and my

17 complaint about why she allowed it to happen.

18          And then having a discussion of -- you know,

19 she was a diversity, equity, and inclusion person

20 before.  And me telling her, you know, like, You would

21 not -- you would have protested this if this were being

22 done in the predominantly white institution that you

23 came from when you were a diversity, equity, and

24 inclusion person if it had been done to a black woman.

25     Q.   So I'm asking specifically about that.  You

Maritza Reyes
May 24, 2024

Page 213

1    said that someone else made the comment.  Who is that?

2         A.   Well, no.  She made the comment about -- in

3    terms of when I said that she told me that diversity

4    would mean that -- that -- because I said, you know,

5    This is happening to me in an institution where it's,

6    you know, all black faculty in the tenured positions.

7    And she said, Well, there's diversity within the black

8    community, so all black people could be un- -- you could

9    have diversity if it's all black people.

10        Q.   Okay.  What I'm asking you about is the

11   underlying communication.  You indicated that comments

12   were made to her and you asked her why she allowed it to

13   happen.

14        A.   Yes.

15        Q.   So I'm asking you who made the comments to her?

16        A.   It was two black students.

17        Q.   Okay.  And who are those students?

18        A.   I don't have their names.

19        Q.   And what were the comments by the students?

20        A.   They were making comments about the fact

21   that -- and I think that they were being egged on by

22   other people.  But it was about -- and this goes to the

23   hostile work environment and the mood of the law school.

24        Q.   What were the comments by the students?

25        A.   And so to give you the background of the

Maritza Reyes
May 24, 2024

Page 214

1  comments, the comments were to the extent that they

2  wanted a black professor, a black woman, who was Shelly

3  Page.  She was a visitor teaching in the law school at

4  the time.  I think that it was the evidence course in

5  the evening that I was teaching.  But they were not

6  students in the class.

7      **Q.    Okay.  Did those students make those comments**

8  **to you?**

9      A.    They made them to Deidre Keller.

10     **Q.    Okay.**

11     A.    And I believe that Markita Cooper was also

12  present.

13     **Q.    Okay.  Are you aware of any comments by**

14  **Keller -- sorry, not Keller, I'm switching back again --**

15  **now Nicky Boothe-Perry regarding your color?**

16     A.    I think, but I'm not sure she made comments

17  about my race and color.  During the investigation of

18  the complaint against Ronald Griffin when he called them

19  racist against me.  Racist, vicious, and malicious or

20  something like that, as they alleged.

21     **Q.    Okay.  So you are aware of or you think you've**

22  **heard of comments she made during an investigation**

23  **process?**

24     A.    Oh, no.  It's in the records of the

25  investigation.

Page 215

1    Q.   But that's what I'm seeking to clarify.

2    A.   Yes.

3    Q.   So in terms of the investigation process.

4         Okay.  What were those comments?

5    A.   It's how they describe me racially.

6    Q.   How did they describe you?

7    A.   Some of them described me as, like,

8    white-appearing.  White-appearing.  White Latina.

9    Q.   Okay.  And who specifically said you were a

10   white-appearing or white Latina?

11   A.   I don't remember specifically who it was

12   because it's been a while since I looked at those

13   records of the investigations from when I learned about

14   them.

15   Q.   Okay.  Regarding Nicky Boothe-Perry, have you

16   ever heard of her -- heard her or heard of her making

17   comments about your sex?

18   A.   Like, what do you mean "comments about my sex"?

19   That I'm a woman?

20   Q.   Yes.  So you've -- you've made allegations of

21   discrimination based on sex.  Have you ever heard her --

22   heard it alleged that she made a comment about your sex?

23   A.   But the comments that they made were in terms

24   of contrasting we with themselves as black women.  So

25   that's the discrimination, that I'm not a black woman.

Maritza Reyes
May 24, 2024

Page 216

1  And so that's --

**2**     Q.    So with respect to Nicky Boothe-Perry, you were

**3**  talking about a sex-race comment --

4     A.    Yes.

**5**     Q.    -- as you would classify it --

6     A.    As in terms of --

**7**     Q.    -- not just you being a woman, not just sex?

8     A.    She may have made also about the fact, you

9  know, that I'm a woman.  But it's -- it's in terms of

10  not being a black woman.

**11**     Q.    Okay.  So your race --

12     A.    In addition to --

**13**     Q.    -- and your sex?

14     A.    Yes.

**15**     Q.    Okay.

16     A.    In addition to being a Latina or

17  white-appearing.

**18**     Q.    Who is Herbert Bailey?

19     A.    It says that he's the vice president of fiscal

20  management.  That's what it says on Exhibit 14 in the

21  letter.

**22**     Q.    Yes.  Are you familiar with Herbert Bailey?

23     A.    I don't know who exactly he is.  I mean, I've

24  heard the name.

**25**     Q.    Okay.  Do you have any allegation regarding

Page 217

1  Herbert Bailey?

2       A.    No.  I don't know who he is.

3       Q.    Okay.  You mentioned previously the process

4  with respect to the difference between your -- I don't

5  know if it was promotion or tenure process -- and that

6  of Professor Jones.  Do you recall that testimony

7  earlier?

8       A.    Yes.  Yolanda Jones.

9       Q.    Yolanda Jones, yes.  Do you contend that

10  Ms. Jones was treated more favorably than you?

11      A.    Yes.

12      Q.    Okay.  Based on the nature of her tenure

13  process?

14      A.    Yes.

15      Q.    Okay.

16      A.    And that she's a black woman.

17      Q.    Okay.  Is there anyone else that you believe

18  was treated more favorably than you who is outside your

19  protected class?

20      A.    Patricia Broussard.

21      Q.    Okay.

22      A.    In fact, I mean, Ann Marie Cavazos, Nicky

23  Boothe-Perry, Phyllis Taite.

24      Q.    Did Broussard and Boothe-Perry and Phyllis

25  Taite, did they all go through --

Maritza Reyes
May 24, 2024

 1     A.    And Ann Marie Cavazos.

 2     **Q.    Ann Marie Cavazos.  Did they all go through the**

 3  **tenure process?**

 4     A.    Yes.

 5     **Q.    Okay.  Were you present at that point in time?**

 6     A.    I was at the law school at that point in time.

 7     **Q.    Okay.  What is it about their tenure processes**

 8  **that you feel was more favorable than yours?**

 9     A.    They didn't get any of the discrimination that

10  I got.  They were not falsely accused.  They -- nobody

11  tried to derail their application.  Nobody tried to stop

12  their process from going forward.

13     **Q.    Patricia Broussard, are you aware of whether or**

14  **not she came to the college with tenure?**

15     A.    She didn't have tenure.  She didn't -- she

16  didn't even come as tenure track.

17     **Q.    Okay.  Do you know when she came to the**

18  **college?**

19     A.    I don't know exactly.  She stated it in her

20  deposition, but I can't recall exactly right now.

21     **Q.    Okay.  What specifically about their processes**

22  **makes you feel they were treated more favorably?  I know**

23  **you've said discrimination you experienced generally,**

24  **but is there something about the process specifically**

25  **that was done differently?**

Maritza Reyes
May 24, 2024

Page 219

 1    A.   Yes.  They -- they -- they got the process

 2  according to the faculty handbook.  I did not.

 **3**    **Q.   Okay.  Do you know who was on the committee for**

 **4  Patricia Broussard?**

 5    A.   No, I don't -- I mean, I don't remember.  I

 6  don't recall.

 **7**    **Q.   Okay.**

 8    A.   I would have to get the list.  That would have

 9  been -- I mean, I think she must have applied for tenure

10  over ten years ago.  So I would not remember the names

11  of the committee at the time.

**12**    **Q.   Okay.  What about with the others -- the other**

**13  individuals that you named?  Do you know who was part of**

**14  their tenure committees?**

15    A.   Yeah, some of the same ones that were part of

16  my committee.

**17**    **Q.   Okay.  And when you say that they received**

**18  things the way they were supposed to or the process --**

19    A.   Yes.

**20**    **Q.   -- was the way it was supposed to be, what**

**21  specifically are you referring to?  Is there a specific**

**22  portion of the process or the review process that they**

**23  received that you did not?**

24    A.   Yes.

**25**    **Q.   Okay.  What is that?**

Page 220

1    A.   That would have been the process at the College

2  of Law Retention, Promotion, and Tenure Committee and

3  then all the way up.

4    **Q.   Okay.  But with respect to the tenure and**

5  **promotion committee, what specifically did the committee**

6  **provide them that it didn't provide you?  What**

7  **opportunity?**

8    A.   The faculty handbook tenure process, what they

9  were supposed to receive in terms of how the application

10  was supposed to be handled.  They didn't have to -- they

11  didn't go through all the investigation that I had to go

12  through.  They didn't -- they didn't have to do all the

13  extra work that I had to do to challenge the

14  discrimination that was happening as I was applying.

15         And, you know, Patricia Broussard, my

16  recollection is that she got -- she got approved even

17  though there was a recommendation not to have her be

18  tenured or full professor at the College of Law

19  Retention, Promotion, and Tenure Committee.  But Leroy

20  Pernell approved her.

21    **Q.   Okay.  Did -- did each of those individuals**

22  **submit applications for tenure or promotion?**

23    A.   Yes.

24    **Q.   Okay.  At that point in time, was the process**

25  **the same as it was for you in terms of you submit the**

Page 221

1   application, then it's reviewed by the tenure and

2   promotion committee at the college level, it's reviewed

3   by the dean, and then the university, and then the

4   provost, and then up to the president?  Was that process

5   still the same?

6        A.   Yes.

7        Q.   Okay.

8        A.   It was the same faculty handbook.

9        Q.   Okay.  Is there anyone else that you believe as

10  a comparator that was treated more fairly than you,

11  other than the individuals you've named so far?

12       A.   And Yolanda Jones.

13       Q.   Yes, you talked about Yolanda Jones.

14       A.   Shiv Persaud.

15       Q.   And who is that?

16       A.   He's a professor.

17       Q.   Okay.  And when did Professor Persaud come on

18  board?  Was that with respect to the tenure process as

19  well?

20       A.   What do you mean --

21       Q.   Strike that.  That's a compound.  That's a

22  compound question.  Let me --

23            With respect to Professor Persaud, was that

24  professor there before you or after you?

25       A.   He was not a tenure-track professor before me.

Page 222

1    Q.   Okay.

2    A.   But he was -- I think he was there as some kind

3  of visitor professor, and then he got a special deal of

4  how they put him into the tenure track.  And it was

5  President Larry Robin- -- it was Larry Robinson, I

6  believe, involved in that because his dad was a

7  professor at the university and the president of the

8  faculty senate.

9         So he got some kind of deal where, in

10  contravention of what it said in the faculty handbook,

11  he got credit for the time that he was a visiting

12  professor.  So even though he was on the tenure track

13  after I was on the tenure track, he was permitted to

14  apply a year before I was permitted to apply.

15    Q.   Okay.  Is there anyone else?

16    A.   To my recollection, those were the ones who

17  applied.

18    Q.   Okay.  One of the other things that you have

19  asserted within your second amended complaint is claim

20  for a hostile work environment.

21    A.   Yes.

22    Q.   And again you refer to, you know, race, color,

23  sex, and sex-race with respect to the hostile work

24  environment claims.  So my question to you is:  What is

25  the basis for the hostile work environment claim?

Page 223

1     A.    Objection.  Calls for a legal conclusion that I

2  would have -- need a lot of time to go over in my whole

3  contention of why it was a whole hostile work

4  environment, including many allegations in my

5  complaints.

6          And I don't want to risk you saying that it's

7  going to be a narrative because it would have to be a

8  narrative of why I believe that it's a hostile work

9  environment.  But I believe that it is -- for the

10  reasons that I stated in my complaint coupled with how

11  it works together including the workplace mobbing.

12     Q.    Okay.  So let me ask you this:  How do you

13  define -- or when you use the phrase "hostile work

14  environment," what do you mean?

15     A.    It's an environment that is so pervasively,

16  severely discriminatory over years of subjecting a

17  person to indignities that are persistent over years.

18  And it's what I also termed as "workplace mobbing."

19     Q.    Okay.  And those are terms and things that

20  you've gone through in your complaint, correct?

21     A.    Yes.

22     Q.    Okay.  Is there anything that you have not

23  mentioned in your complaint that you, as we sit here

24  today, believe contributes to the hostile work

25  environment?

Page 224

1    A.   I -- I -- I don't recall everything that I

2 mentioned in my complaint to be able to say that is

3 there anything else that I may say today.  I have a

4 96-page complaint, and I tried to be very detailed, but

5 it didn't include everything that I could have included

6 in terms of actions that happened on a daily basis.

7         But everything -- like, my -- my daily work was

8 made extremely difficult.  I did not get the treatment

9 that black faculty members got.

10   Q.   Okay.

11   A.   And it was pervasive, severe, ongoing.

12   Q.   Okay.  Well, that is essentially language that

13 may be taken from case law.  But I'm asking for specific

14 examples in addition to what you have already put in

15 your complaint.

16         So are there any specific events that you

17 constitute -- that you constitute -- that you contend

18 also created the hostile work environment?

19   A.   Yeah, the constant message that I should accept

20 inferior treatment or third-class treatment because I am

21 not black.

22   Q.   Did someone come up to you and say you should

23 accept third-class treatment because you were not black?

24   A.   No, the --

25   Q.   What specifically did they do or say?

Maritza Reyes
May 24, 2024

Page 225

1     A.    They would say, This is a black school.  When I

2  would try to participate, the answer would be, This is a

3  black school.

4           The targeting of even students.  And when

5  Latino students brought up the discrimination also, the

6  ignoring that, the -- me behind the scenes also trying

7  to help the students by raising the complaints of the

8  discriminations against -- the discrimination against

9  Latino students and the institution allowing it,

10  including discrimination against me and Latino students

11  by a professor who calls us names and the institution

12  knowing this and allowing it.

13     **Q.    Who are you referring to?**

14     A.    Professor Jeremy Levitt.

15     **Q.    Okay.  And what names has Professor Jeremy**

16  **Levitt called you?**

17     A.    He called me a white Latina or Hispanic with

18  white privilege.  He said that my people were enslavers

19  of his people.  He said that our ancestors were on

20  different sides of the boat, referencing, I guess, the

21  slave ships.  He called me all kinds of names.

22           And I detailed those in a memorandum that I

23  sent to President Larry Robinson, Maurice Edington, the

24  entire faculty.  Because he called me those names in

25  writing in emails that I attached to the memorandum.

Page 226

1    Q.   Okay.

2    A.   And he calls -- he also does the same, you

3 know, similar things on race to students.

4    **Q.   Okay.  Is Professor Levitt a member of the --**

5 **was he a member of the tenure committee?**

6    A.   He's a member.  He's a tenured professor.

7    **Q.   Okay.  Was he a member of the tenure committee**

8 **that made a determination with respect to not**

9 **recommending you for tenure?**

10   A.   I think he was on sabbatical at the time.  But

11 I think your question right now was about the hostile

12 work environment, right?

13   **Q.   No.  Now my question is about Levitt, so.**

14   A.   Okay.  Because I was answering still about the

15 hostile work environment.

16   **Q.   So with respect to Levitt, was he on the**

17 **committee that made the decision not to recommend you**

18 **for -- for tenure?  I believe you said you thought he**

19 **was on sabbatical.**

20   A.   I think he was on sabbatical both when I went

21 up for tenure and when I went -- when -- on my

22 application for promo- -- he's not on the list of the

23 ones who reviewed or voted on my application for

24 promotion.

25   **Q.   Okay.  Who are the students that Professor**

Page 227

1    Levitt has made comments to?

2        A.    One of them is Mr. Berrios.  He's in the list

3    of witnesses that I -- Noel is his first name.  And I

4    believe it's Berrios, B-e-r-r-i-o-s.

5        Q.    Okay.

6        A.    And there are other students.

7        Q.    Okay.  Other than -- returning to the hostile

8    work environment question.

9             Other than the comments that you've just gone

10   through with me, people say that it's a black school,

11   targeting of Latina students, you believe, Professor

12   Levitt -- Professor Levitt's comments, are there

13   anything else that you feel contributed to the hostile

14   work environment?

15       A.    Yes.  During faculty meetings, my participation

16   was made very hostile.  It was very hostile to me during

17   faculty meetings.

18            And with regards to the race situation, for

19   example, there was a meeting when Dean Keller and her

20   staff were going over the statistics of an analysis of

21   the data with regards to bar passage of black students.

22   And I asked if there was an analysis with regards to the

23   bar passage of Hispanic students.

24            And they answered that there wasn't.  And I

25   asked was there data for them.  And they said yes, there

Maritza Reyes
May 24, 2024

1  was data.  And I said, Well, I think that we should also

2  analyze that.  Because it was in terms of minority

3  students and how they were doing on bar passage.

4        And it was very hostile the way that I was

5  treated for raising something that they should have

6  thought about, which to me sent the -- more of the same

7  message of the discrimination.

8     Q.  Okay.

9     A.  And by the way, even though I requested it, it

10 was never done.

11    Q.  Okay.  How do you know it was never done?

12    A.  It was never presented to the faculty like the

13 black statistics were presented.

14    Q.  So you know it was never presented, but you

15 don't know if someone took a look at it internally?

16    A.  Well, the point was, to get the equal

17 treatment, it was going to be presented to the faculty.

18 That's what I requested.  I didn't request for somebody

19 to just do it.  I requested for it to be presented to

20 the faculty like the data for the black students was

21 presented.

22    Q.  Okay.  And when did this occur?

23    A.  I don't remember the specific date, but Dean

24 Keller was the dean.

25    Q.  Okay.  So tell me what your teaching schedule

Page 229

1   was at the time of your -- at the time you became a

2   tenured faculty member.

3       A.   What do you mean by "teaching schedule"?

4       Q.   Well, let me back up for you.

5            So when you were hired, did you teach a certain

6   number of classes per day?  Were you on campus every

7   single day of the week or only part time?  What was your

8   schedule in terms of being on campus and teaching or

9   having office hours?

10      A.   So what was my schedule in 2014?

11      Q.   Yeah.  Well, let's take it from the beginning.

12  So 2009, I believe, is when you were hired, correct?

13      A.   Yeah.

14      Q.   Okay.  So what was a normal schedule?

15      A.   Oh, I worked around the clock.

16      Q.   Okay.

17      A.   And I was in the law school -- in 2009 and all

18  those years, I was in the law school working at least

19  six days a week.

20      Q.   Okay.  What does your typical day consist of?

21      A.   Oh, my goodness.  I have to answer a lot of

22  student emails.  I have to prepare my classes.  I have

23  to attend and teach the classes.  I have to do committee

24  work, whatever committee work I have to do.  I have to

25  attend committee meetings, faculty meetings.  I also

Page 230

1  prepare for conferences that I may be doing to present.

2  I attend conferences.  I participate in community

3  events, attend community events.

4          So there's a lot that's going on.  Meet with

5  students.

6      Q.   How often do you have faculty meetings?

7      A.   When I was faculty secretary, we had faculty

8  meetings twice a month.  Faculty meetings, I'm talking,

9  are different than the faculty committee meetings.  So

10 there's a difference.  We have faculty meetings and

11 faculty committee meetings.

12     Q.   Okay.  So faculty meetings are two times a

13 month.  How often are faculty committee meetings?

14     A.   It could fluctuate.  Some committees is once a

15 week.

16     Q.   What faculty committees were you a part of?

17     A.   I was part of -- of course I was part of the

18 RPT Committee once I became tenured.

19     Q.   And how often did that committee meet?

20     A.   It fluctuated from year to year depending on

21 the work that we had to do.

22     Q.   Okay.

23     A.   So there's no specific.

24     Q.   Okay.  Was it on average once a month?

25     A.   No.  There were some times when we were, for

Page 231

1  example, reviewing for -- when we were doing work for

2  accreditation, site visits, when we were doing review of

3  the faculty handbook, we had meetings sometimes once a

4  week.  And sometimes when we were not as busy and we

5  didn't have applications to review, then maybe we had

6  meetings once a month.

7      Q.   Okay.

8      A.   But that was only, like, one committee.

9      Q.   Okay.  What other faculty committees were you

10  on?

11      A.   I'm going to have to rely on my committee list

12  on the resume that I have that the university has.  I

13  can't remember the committees every year since 2009.

14  But they're all listed in my CV.

15      Q.   Okay.

16      A.   And in the application materials that I

17  submitted.

18      Q.   Okay.  So some committees may meet once a week

19  or some may meet once a month.  Faculty meetings could

20  take place two times a month?

21      A.   Or one time a month.

22      Q.   Or one time a month.

23           What other interactions do you have on a

24  general basis with faculty members?

25      A.   It's mostly the committee meeting work and the

Maritza Reyes
May 24, 2024

Page 232

1  faculty meetings.  And then, you know, in passing, of

2  course, in the law school.

3      Q.   Where is your office located in the law school?

4      A.   In the third floor.

5      Q.   Okay.  Are all the offices there?

6      A.   No.

7      Q.   Whose offices are on the third floor?

8      A.   It has changed over the years since 2009.  So

9  when I started in 2009, it was basically what we call

10  the -- the doctrinal faculty.  And then they added the

11  legal research and writing faculty later on.  And then

12  they added the academic success faculty.  And then you

13  have some clinical faculty in the first floor.

14      Q.   Okay.  How often do faculty members -- how

15  often do you leave your office throughout the course of

16  the day once you get there and you start working?  Are

17  you generally in your office most of the time or --

18      A.   It fluctuates from semester to semester, year

19  to year depending on the schedule of classes, whether

20  they schedule me to teach at what time, how many days a

21  week they schedule me, how many credits I'm teaching,

22  how many students I'm supervising for independent

23  research, when I meet with students for special

24  appointments, when I meet with them for office hours,

25  when I have to attend even, you know, specialty faculty

Page 233

```
 1  meetings sometimes, or when I have to prepare materials

 2  for conferences that I am going to when I need to be

 3  there to prepare -- do some of my work for my research.

 4        If fluctuates.

 5     Q.   Do you socialize with other faculty members

 6  when you're there for work?

 7     A.   What do you mean "socialize"?

 8     Q.   Do you talk to -- stop and talk to them in the

 9  hallways or carry out conversations throughout the day

10  or, you know, meet in the break room between classes and

11  things of that nature?

12     A.   There's not usually meeting in the break room.

13  But if I see people that are there at the time, some

14  people, yes, you know, I may have small talk.

15     Q.   Okay.  Have you ever had any issues with

16  someone while engaging in that small talk?

17     A.   What do you mean "issues"?

18     Q.   Well, I mean, have you ever -- you know,

19  generally when you stop and speak with someone in the

20  hallway, are the conversations cordial?  You know, have

21  there ever been any comments made to you during the

22  course of those conversations that you've initiated that

23  you thought were discriminatory?

24     A.   There were initially, until I avoided the

25  people who made those comments.  And so there have been
```

Maritza Reyes
May 24, 2024

Page 234

1  situations where I have, you know -- that's part of the

2  hostile work environment.  Are we still talking about

3  that?

4      Q.   I'm asking you generally about your

5  interactions with the co-workers.

6      A.   There have been situations where I have had

7  negative interactions as part of committee work too.

8      Q.   But right now what I'm talking about is just

9  your daily interactions when you run into people in the

10  hallway or you initiate a conversation as you sit and

11  small talk or something.

12         Have -- have you experienced any discrimination

13  with respect to the conversations that you've engaged

14  in?

15     A.   I don't -- I didn't seek out conversations --

16  and by the way, it's from a period of 2009 until we're

17  talking about 2024 before I was dismissed.

18         So and there were some situations, like, for

19  example, with Jeremy Levitt when I first got there.  He

20  made comments to me that were discriminatory.  Darryll

21  Jones made comments to me, discriminatory.  So I avoided

22  small talk with them or I avoided having conversations

23  with them.

24     Q.   Okay.

25     A.   I also avoided having conversations with people

Maritza Reyes
May 24, 2024

Page 235

1  that I knew had engaged in hostile work environment

2  against me before, like Patricia Broussard.  So I would

3  avoid the ones that had already made those

4  discriminatory type of comments.

5      Q.   Okay.  We've talked about your hostile work

6  environment claim.  We've talked about the

7  discrimination claims.

8          Now, with respect to your retaliation claim,

9  you filed your charge of discrimination on -- let's see

10 here.  What was that date again?  May 29, 2020?

11     A.   Yes.

12     Q.   Do you contend that that was a protected

13 activity?

14     A.   Filing my discrimination charge?

15     Q.   Yes.

16     A.   Yes.

17     Q.   Okay.  And what type of retaliation do you

18 contend you experienced following the filing of your

19 charge?

20     A.   I stated -- I stated it in count 7 of my

21 complaint.  And so I think that this is also tied to

22 some of the events that have happened before in terms of

23 the ongoing harassment, the pervasiveness of, you know,

24 the discriminatory treatment and the hostilities against

25 me.

Maritza Reyes
May 24, 2024

Page 236

1     Q.    Okay.  Let me ask you this:  What was -- what
2  do you contend your first protected activity was?

3     A.    I think it was -- and when you mean -- what do
4  you mean by "protected activity"?

5     Q.    So when you bring a claim for retaliation,
6  generally you've engaged in a protected activity.

7     A.    Yes.

8     Q.    Such as filing a charge of discrimination.

9     A.    Yes.

10     Q.    And as a result of engaging in that protected
11  activity, there's been some sort of retaliatory action
12  taken.  So I'm asking what you contend your first
13  protected activity was.

14     A.    Well, I -- I complained about the
15  discrimination during my tenure process when I got an
16  attorney.  I had to retain an attorney.  And she sent
17  letters to the university when the College of Law
18  Retention, Promotion, and Tenure Committee members were
19  derailing my tenure process by trying to not process it
20  so that there would not be any record to go to -- what
21  you called before -- the ultimate decision-makers.  So
22  they would basically become the ultimate
23  decision-makers.

24         So my attorney sent letters to the university
25  informing them of the discrimination.  So I would say

Page 237

1  that would be my first time where I did something

2  official to complain of the discrimination.

3      Q.   Okay.  And so following that protected

4  activity, which occurred -- when did you apply for

5  tenure again?

6      A.   That would have been --

7      Q.   2014?

8      A.   Yeah.

9      Q.   So following that protected activity, did you

10 file a charge of discrimination with the EEOC within a

11 year of that protected activity?

12     A.   No, I did not.

13     Q.   Okay.  So your first charge of discrimination

14 with the EEOC of Florida Commission is the one that

15 we've labeled as Exhibit 16, correct?

16          MS. REINER:  Is it Exhibit 16?

17          MS. ZOLTY:  15.

18 BY MS. REINER:

19     Q.   15.  I apologize.

20     A.   Yes.

21     Q.   Exhibit 15.

22     A.   Yes.  But I did file an internal with the Equal

23 Opportunity Programs within the university.  I did file

24 a charge of discrimination against the College of Law

25 Retention, Promotion, and Tenure Committee.

Page 238

1    Q.    Okay.  And when was that filed?

2    A.    That would have been -- I believe it was in

3  2015.

4    Q.    Okay.  So what do you contend is the

5  retaliation that has occurred since that protected

6  activity in 2014?

7    A.    Well, after I filed the charge against the

8  College of Law Retention, Promotion, and Tenure

9  Committee, those same people that I filed the charge

10  against are the ones who discriminated against me in my

11  promotion application in 2018.

12    Q.    Okay.  So we know the application process in

13  2018.  You contend that that -- that denial was

14  retaliatory?

15    A.    Retaliatory, discriminatory, and hostile work

16  environment.

17    Q.    Okay.  Other than failing to promote in 2018,

18  what other retaliation has occurred?

19    A.    The ongoing hostile work environment.

20    Q.    Okay.  And other than what you termed the

21  "ongoing hostile work environment," what specific

22  retaliation has occurred?

23    A.    Well, I got fired recently.

24    Q.    Okay.  Do you contend that that is a

25  retaliatory action?

Maritza Reyes
May 24, 2024

Page 239

1      A.   Yes.

2      Q.   **And what do you contend that is in retaliation**

3  **for, the filing of your complaint?**

4      A.   I believe -- I mean, I haven't, you know, done

5  discovery on that.  And that is still ongoing.  But,

6  yeah, it was retaliatory and it was because I complained

7  of the discrimination.

8      Q.   **Okay.  Is there anything else other than the**

9  **termination from your employment or the failure to**

10 **promote?  And then you also mentioned the hostile work**

11 **environment.  Anything else you feel that was**

12 **retaliatory?**

13     A.   Well, I think that that includes it all in

14 terms of the ongoing hostile work environment.

15     Q.   **Okay.**

16     A.   The denial -- we've gone over the denial of the

17 office window, the denial of the chair positions, the

18 different treatment in terms of the opportunities

19 that -- you know, black faculty who are full professors

20 get versus I get.

21     Q.   **Okay.**

22     A.   The conditions of employment that I get versus

23 what black faculty get.

24     Q.   **Okay.  So you contend all of those are**

25 **retaliatory in nature?**

Maritza Reyes
May 24, 2024

Page 240

1    A.   Yes.

2    Q.   Okay.  I'm going to hand you what's been --

3         THE STENOGRAPHER:  Can we take a quick break if

4    you're going to go to another one?

5         MS. REINER:  Yes.  We'll go off the record here

6    for a moment and take a quick break.  I hopefully

7    don't have too much longer.

8         THE VIDEOGRAPHER:  Going off the record.  The

9    time is 4:42.

10        (Off the record from 4:42 p.m. to 4:47 p.m.)

11        THE VIDEOGRAPHER:  We are back on the record.

12   The time is 4:47 p.m.  Starting media 4.

13        (Defendant's Exhibit 16 was marked for

14   identification.)

15 BY MS. REINER:

16   Q.   All right.  I am now going to hand you what has

17 been marked as Exhibit 16 to the deposition.

18   A.   Yes.

19   Q.   And do you recognize that document?

20   A.   Yes.

21   Q.   And are those your responses to our

22 interrogatories in this case?

23   A.   Correct.

24   Q.   Okay.  I'd like you to flip to the back page if

25 you can -- or sorry.  If you will, page 27 of 27.

Maritza Reyes
May 24, 2024

Page 241

1      A.   Yes.

**2      Q.   And you see that there is an oath there?**

3      A.   Yes.

**4      Q.   Can you read that to me?**

5      A.   I declare that the answers to the foregoing

6  interrogatories are true and correct to the best of my

7  knowledge and belief.

8           Signed by me on June 22, 2023.

**9      Q.   Okay.  And you confirmed that that is your**

**10  electronic signature?**

11      A.   Yes.

**12      Q.   Okay.  And, as we sit here today, do you**

**13  confirm that all of the information within these**

**14  interrogatories is true and correct under penalty of**

**15  perjury?**

16      A.   As of June 22, 2023, when I signed it, yes.

**17      Q.   Okay.**

18      A.   By the way, my headache is getting terrible

19  right now.  So I just want to let you know.

**20      Q.   Okay.**

21      A.   Because you said at the beginning that I should

22  let you know.

**23      Q.   Absolutely.**

**24           Okay.  You have, as we have established**

**25  throughout the course of the day, filed a lawsuit**

Maritza Reyes
May 24, 2024

Page 242

1    alleging discrimination, hostile work environment, and

2    retaliation against FAMU.

3            My question is dealing now with damages.  So

4    what do you contend are your specific damages with

5    respect to the claims that you've asserted?

6    A.   And so that's -- that's a question in terms of

7    what I alleged are damages as a result of what happened

8    as of January 22nd -- I mean, I'm sorry -- June 22,

9    2023, when I submitted this.

10            I stated my damages there, I believe, on

11   page --

12   Q.   Let's look at interrogatory number 7, if

13   that'll assist you.

14   A.   Yes.

15   Q.   Okay.  So with respect to interrogatory

16   number 7, is there any change to the calculations that

17   you provided for?

18   A.   And I think that I'm just talking from my

19   personal knowledge and on a factual basis.  There has

20   been a major change in terms of I was terminated.  So I

21   lost my employment.  At the time, I was still employed

22   in the university.  So --

23   Q.   So in terms of loss of income that you detail

24   here in answer 7, which you indicated was for the two

25   years you were denied promotion, you would add to that

Page 243

1   **income lost related to your termination; is that**

2   **correct?**

3       A.   Well, income also lost for the time after I

4   submitted the document when I was still employed.

5   Because if I submitted this in 2023, then it would have

6   been for the time from that time to the time that I was

7   still employed, the difference.

8            I'm sorry.  See, my headache is just -- I

9   confused the question.

10      **Q.   Okay.**

11      A.   I'm getting very tired right now.

12      **Q.   I'm sorry.**

13      A.   It's just flushing right now.

14      **Q.   Okay.**

15      A.   And it's five minutes until 5:00, and we said

16  we're going to go to 5:00.  I've been here for nearly

17  seven hours.

18      **Q.   Well --**

19      A.   At 5:00.

20      **Q.   -- we're going to finish these questions and**

21  **then close the deposition.**

22           **So would you agree that you are asking for**

23  **compensation related to the loss of your employment?**

24      A.   I -- I didn't put that in my complaint

25  because --

Page 244

1      Q.    It hadn't happened yet?

2      A.    Yeah.  It hadn't happened yet.

3      Q.    Okay.  Now, are you asking that?  Would you add

4  that to this computation of damages?

5      A.    I don't know if by law I can do that.  I would

6  have to research that.

7      Q.    Okay.  Regarding categories of loss with

8  respect to interrogatory number 8, you've talked about a

9  loss of enjoyment of life.

10     A.    Yes.

11     Q.    And mental anguish, insomnia, sleeplessness,

12  nightmares and things of that nature.

13            Are you alleging that these things are examples

14  of the emotional harm and distress that you've

15  experienced?

16     A.    Yes.

17     Q.    Okay.  And have you thought about what that

18  damage may mean to you in terms of in monetary terms?

19     A.    I have thought that, I think -- I mean, I think

20  the jury would have to decide what the compensatory

21  damages would be in terms of this.  But it has been

22  horrific what I have been through.

23     Q.    Okay.

24     A.    And, you know, people who have been through a

25  workplace mobbing like I have, it's -- it's -- it's

Page 245

1  going to be something -- you know, it's something

2  that -- it's very hard to quantify.

3      Q.   Okay.  Let me ask you this:  Insomnia,

4  sleeplessness, how does that relate to FAMU's conduct?

5      A.   The dealing with the daily things, the

6  constantly feeling like I was being accused of false

7  things, I was subjected to investigations.

8           Every time I went into the law school, it was

9  potentially:  What is the next accusation?  People

10  saying things behind the scenes that were horrific about

11  me and nobody telling me about it and then me finding

12  out through other investigations where the records were

13  provided.

14          And then knowing after that that I was not

15  imagining what I was feeling, but it was happening

16  behind the scenes.  And I knew that something was

17  happening.  And I knew that all the things that were

18  being done to me in addition to I -- I got confirmation

19  that there was so much more being done to me that I

20  wasn't being told about.

21          All of that.  You know, and every day the

22  dealing with -- from the little things to the major

23  things that I had to deal with.

24      Q.   Okay.

25      A.   I -- I did take it home.

Page 246

1      Q.    Okay.  And so your contention is that FAMU's

2   conduct was -- is that carried on by the individual

3   members of the RTP Committee -- or the RPT Committee

4   behind the scenes.  Isn't that accurate?

5      A.    In front and behind.  Like I said, what was

6   done in front of the scenes was horrific enough.  But

7   then, in addition to that, there was a lot of behind the

8   scenes that I didn't even know about.

9           Like, the same -- you know, some of the same

10  women who were claiming that Ronald Griffin wrongfully

11  called them racist and vicious and vile against me were

12  going and filing complaints all the way to the

13  university, to the security officer, making it seem like

14  I was a risk, a danger.  And nobody ever talked to me

15  about that, that they were tainting my reputation all

16  the way to the university level.

17          And so, of course, knowing that I'm working in

18  that type of environment and that no matter how many

19  times I asked for assistance, including from President

20  Robinson, Provost Maurice Edington, Dean Pernell, Dean

21  Keller, nobody did anything to help me and they kept

22  allowing it.

23     Q.    How -- you've indicated that you've experienced

24  all kinds of emotional harm --

25     A.    Yes.

1     Q.   -- sleeplessness, distress, difficulty focusing

2   and concentrating.  Have you seen any health care

3   professionals related to those issues?

4     A.   Yeah, I've been seeing my doctors, including

5   for the migraines that I have experienced.

6     Q.   And who are those doctors?

7     A.   So I'm seeing a neurologist and my primary care

8   physician.  But it wasn't specific for -- like, I went

9   to try to explain why I was feeling the insomnia, the

10  sleeplessness.  And their response was -- I did not tell

11  them specifically -- I was embarrassed to say

12  specifically what I was dealing with at work, to tell

13  you the truth.

14         But I did allude that it -- you know, I was

15  dealing with difficult work situations.  However, I

16  didn't go in to explain everything that I was dealing

17  with or the specifics of what I was dealing with.  I

18  didn't tell them about that.

19    Q.   Okay.  So you didn't specifically attribute

20  these things to FAMU at the time you saw your doctors?

21    A.   Sometimes I mentioned that it was a work

22  situation.

23    Q.   Okay.  Who is the neurologist that you're

24  seeing?

25    A.   His last name is ███████.

1    Q.   Okay.  And who is Dr. ██ affiliated with?

2    A.   What do you mean?

3    Q.   Is it a specific practice or is it Florida

4  Hospital or another health care facility?

5    A.   He has his office.

6    Q.   He has his own office.

7         And what about your primary care physician?

8  Who is that?

9    A.   Dr. ████.

10   Q.   ██ --

11   A.   ██████, I believe.

12   Q.   Okay.  And do you know Dr. ██'s first name?

13   A.   No.

14   Q.   What about --

15   A.   That's how -- I mean, that's how I remember

16  him, Dr. ██.

17   Q.   And what about Dr. ██████?

18   A.   I believe her first name is █████.  ████████,

19  I think.

20   Q.   And when was the last time you saw Dr. ██?

21   A.   It's not only him, but now they push you into

22  the nurse practitioners.  So --

23   Q.   In terms of his practice?

24   A.   -- in his office -- yeah.  I don't know.

25  Maybe, like, a couple of months, three months ago.  I

 1   don't remember exactly.

 2        Q.   Okay.  What about Dr. ███████████?  When was

 3   the last time you saw your primary care physician?

 4        A.   Maybe, like, a month ago.

 5        Q.   Okay.

 6        A.   I know that after the notice of intent to

 7   dismiss, I really -- this -- this all increased even

 8   more.

 9        Q.   After we filed a motion to dismiss?

10        A.   No, the notice of intent to dismiss me from

11   employment.

12        Q.   Oh, regarding your employment.

13        A.   Yes.

14        Q.   Okay.  What about any psychologist or

15   psychiatrist or a social worker?  Have you seen any of

16   those?

17        A.   No.  Due to my Christian faith, I rely more on

18   prayer, Biblical meditation.

19        Q.   So you haven't seen a psychologist or

20   psychiatrist, a mental health professional?

21        A.   No.

22        Q.   Okay.  Are there certain things that you used

23   to do that you no longer do because of the emotional or

24   stress that you've experienced?

25        A.   Yes.  I avoid -- I avoid interactions where

Page 250

1  people may ask me about my job.

2  **Q.  Do you continue to see and speak with your**

3  **mother and your two sons?**

4      A.   With -- I'm sorry.  Can I --

5  **Q.  Hmm?**

6      A.   Can we take a break?

7           MS. REINER:  Yeah, we can take a break for a

8      moment.

9           THE VIDEOGRAPHER:  Off at 5:01.

10          (Off the record from 5:01 p.m. to 5:03 p.m.)

11          THE VIDEOGRAPHER:  We are back on record.  Time

12     is 5:03 p.m.

13  BY MS. REINER:

14  **Q.  So we were speaking a moment ago -- I think I**

15  **had just asked you if you are still engaging with and**

16  **communicating with your mother and your sons and other**

17  **family members?**

18     A.   Yeah, but not in the same way.  Not in the same

19  way.

20  **Q.  Okay.  Do you see them with the same**

21  **frequency --**

22     A.   No.

23  **Q.  -- that you did before?**

24         **Okay.  And how has that frequency changed?**

25     A.   What do you mean?  In terms of numbers?

Page 251

1      Q.   Yes.  So with respect to your mother, for

2  instance, do you -- is there a particular reason that

3  you attribute to FAMU that you do not see your mother as

4  frequently as you did before?

5      A.   There were so many times in terms of my family

6  interactions where dealing with all that I was going

7  through at FAMU did not allow me to spend the time with

8  my family.

9           And also because I was busy dealing with

10  investigations, preparing memos to defend against the

11  allegations, gathering all kinds of evidence to respond

12  to the false allegations.  So working around the clock

13  to do my job in an excellent way while also constantly

14  defending against all the workplace mobbing that I was

15  going through.

16           So that took time from me being able to be with

17  them.  I also did not want to expose them to what I was

18  going through.

19      Q.   Okay.  Are there any other individuals that you

20  don't see as frequently or that your relationship has

21  changed with?

22      A.   Friends.

23      Q.   Okay.  And who would those individuals be?

24      A.   Friends and professional colleagues too.

25  Because I didn't want people to ask me things like, How

Maritza Reyes
May 24, 2024

Page 252

1 is your job going?  I didn't want to deal with that.

2   Q.   Okay.  Who are some of the friends and

3 professional colleagues that you have not engaged with?

4   A.   There's so many, I mean, for me to go down the

5 list.

6   Q.   Okay.

7   A.   But Lyndol, for example, is one.

8   Q.   And how do you spell Lyndol's name?

9   A.   It's -- she's on my list of --

10   Q.   On the Rule 26 disclosures?

11   A.   Yeah, she's in there.

12   Q.   Okay.  Do you travel or had you ever travelled

13 before?  Have your -- has your travel pattern changed --

14   A.   Yes.

15   Q.   -- or things you do on a daily basis?

16   A.   Well, that's compound, different question.  By

17 travel versus --

18   Q.   Yep.  Okay.  So let's ask the first --

19   A.   Which one do you want me --

20   Q.   Let's deal with the travel first.  How's that

21 changed?

22   A.   And by "travel," what kind of travel do you

23 mean?

24   Q.   Well, you know, some people take trips places

25 or vacations or what have you.  So just travel in

Page 253

1  **general, how has that changed?**

2      A.   My travel in general has changed.  Because I

3  was so busy dealing constantly with so many allegations,

4  investigations.  I mean, everything that I had to go

5  through.

6           The tenure process, during that entire tenure

7  process and the aftermath.  Gearing up to it, then the

8  promotion process, and then dealing with all the

9  aftermath.  It took so much time away that I didn't get

10  to travel to see my family in South Florida, for

11  example, like I did before tenure applications.  Because

12  the -- the discrimination and the hostile work

13  environment increased exponentially during tenure and

14  after.

15           It had been escalating, but I think that

16  once -- and this goes to the question, I think.  You

17  asked me to clarify at the beginning of your

18  instructions if I ever remember something else that --

19  and I think that your questions now are triggering more

20  memories in me about the emotional aspect of things and

21  the attacks.

22           So when you asked me about travel, I used to be

23  able to go to my family in South Florida and be with

24  friends and be with colleagues a lot more pre that

25  application for tenure.

Page 254

1         And I think that that goes to when you asked

2  me:  Well, they hired you?  And I told you when they

3  hired me, when they were trying to get full

4  accreditation.  And when they started to increment the

5  hostility, and I didn't leave.  I stayed and I applied

6  for tenure.

7         And then the ones who didn't want me here were

8  the ones who came after me in the tenure process because

9  tenure is an upper out -- if I didn't get tenure, I

10 would have been without a job.

11        And so that goes to, like, when they hired me.

12 But I think that they just hired me and they -- they

13 used me and abused me.  And then by the time the tenure

14 process came, that's what happened.

15        So I didn't get to travel to see my family

16 because I spent so much time and all of that extra

17 things that I had to deal with.

18        I also stopped traveling to conferences, to

19 professional conferences be- --

20    **Q.   So -- sorry about that.**

21    A.   Yeah.

22    **Q.   I was going to say how often pre-tenure did you**

23 **travel to see your family?**

24    A.   Oh, I was going there almost every weekend.

25    **Q.   And then post tenure?**

Page 255

1    A.   It got less and less.  It got less.  Once a

2  month.

**3    Q.   How often do you see your family in South**

**4  Florida now?**

5    A.   Me traveling there, it's even less now.  And --

6  yeah.  And I even sometimes when they want to come,

7  sometimes I'm dealing with something and I would tell

8  them no.  I would make excuses.

**9    Q.   Pre-tenure, how often did they come up here to**

**10  visit you?**

11    A.   Because I was mostly going there.

**12    Q.   Okay.**

13    A.   But they would -- you know, it was -- I just

14  remember there was a drastic change, and it has gotten

15  worse and worse over the years because I avoid and

16  because I'm always -- I've been always busy dealing with

17  something.

**18    Q.   Okay.  In terms of the physicians that you have**

**19  seen, you've indicated a neurologist.  What specifically**

**20  have you been diagnosed with by that neurologist, if**

**21  anything?**

22    A.   That's the thing that -- you know, they can't

23  find a diagnosis in terms of physical, it seems.  So

24  it's almost like -- it always comes back to it must be

25  stress.

Page 256

1    Q.   Okay.  And what about your primary care

2  physician?  Has that physician given any specific

3  diagnosis?

4    A.   Well, she told me that the stress will kill me.

5    Q.   Are there any things -- any other things in

6  your life that have caused stress?  For instance, like

7  the passing of a loved one or a pet or anything like

8  that?

9    A.   My dog died some years ago, but I had him for a

10  long time, so.  And I was able to care for him from when

11  he was a pup until his quality of life and, you know, he

12  was -- you know, we knew it was coming.  So as much as

13  that was stressful, it doesn't -- I mean, that was more

14  like a loss of the grieving, not -- not stressful.  That

15  wasn't stressful.

16       My grandmother died, but she died -- and that

17  was what was horrific about it was that she was in my

18  home -- that was one of the situations where I was going

19  through the tenure process.  I couldn't travel to South

20  Florida.  And she knew that I was going through

21  something.  Sorry.

22    Q.   Did your grandmother travel up here?

23    A.   She came here and she died here after she

24  traveled here.  She died in my home as I was going

25  through the tenure process.

Maritza Reyes
May 24, 2024

Page 257

1    Q.   Okay.

2    A.   She died right after Thanksgiving in 2014 when

3    I was going through the investigation.

4         Thank you.

5    Q.   Okay.  So did she come up for Thanksgiving?

6    A.   She came up to see me because I think she knew

7    something was wrong because I kept -- I couldn't go to

8    visit them.  And she insisted on coming to see what was

9    wrong.

10   Q.   Okay.  That's always difficult, the loss of a

11   family member.

12   A.   Well, in the circumstances, it was difficult.

13   Q.   Yeah.  Have -- have there been any other losses

14   or events that you think have contributed to your stress

15   or -- or impacted you?

16   A.   It has been all my work.

17   Q.   So you attribute all of your emotional

18   distress, all of your -- I think some of it was insomnia

19   and sleeplessness and those different things you list in

20   your interrogatory.  You attribute that all to the

21   conduct of FAMU --

22   A.   Yes.

23   Q.   -- is that correct?

24   A.   Yes.

25   Q.   Okay.  Is there anything else other than what

Page 258

1  you've listed in that interrogatory that you attribute

2  to the conduct of FAMU in terms of damages?

3     A.   The loss of my academic career.  The sabotage

4  of the time that I could have devoted to my scholarship,

5  to my conferences that I could have gone to.

6     Q.   Okay.  Have you started looking for alternate

7  employment?

8     A.   Yes.

9     Q.   Okay.  And what have you done to look for

10  alternate employment?

11     A.   I have contacted deans.  But while I'm under

12  the cloud of an allegation, it's -- it's -- it's nearly

13  impossible.

14     Q.   What deans have you contacted?

15     A.   I contacted the dean of St. Thomas Law School.

16     Q.   And -- okay.  Anyone else at St. Thomas other

17  than the dean?

18     A.   No.

19     Q.   Okay.  What about any other schools or deans?

20     A.   I had spoken with the dean of Barry Law School.

21     Q.   And who is that dean?

22     A.   Leticia Diaz.

23     Q.   And who is the dean of the St. Thomas Law

24  School that you spoke with?

25     A.   Her last name is Nunez-Navarro.

Page 259

1    Q.   Okay.

2    A.   But it's -- it was very -- it's very difficult

3  because I'm still going through an appeal process.  I

4  can't be very forthcoming about, you know, all that's

5  going on.  And -- and also it's very late in the

6  academic process at this point.  Plus the questions of

7  what misconduct could have warranted a tenured professor

8  to be terminated is an issue that is coming up.

9    Q.   Okay.  Continuing with the line of questioning,

10  other than the dean at St. Thomas Law School, Barry Law

11  School, have you sought alternate employment anywhere

12  else?

13    A.   I'm looking in Florida.

14    Q.   Okay.

15    A.   And it's not like going from one law firm to

16  another.  I have family circumstances of why I work in

17  Florida and why I work in Central Florida.  So it's not

18  like there are many law firms -- there are many law

19  firms.  But as a faculty member, they are limited in

20  terms of the law schools, so.

21    Q.   What are the family circumstances that limit

22  you to working in Central Florida?

23    A.   Well, St. Thomas is in South Florida.

24    Q.   Okay.  What are the family circumstances that

25  make you want to work in Central Florida?

Page 260

1    A.   I need to be where I can take care of my

2  mother.

**3    Q.   Okay.  How long have you been taking care of**

**4  your mother?**

5    A.   My whole life it seems.  I mean, since I was a

6  child, I think I was -- as soon as I -- I mean, I think

7  at least ten years old I was helping my mother.

8         And then I think that coming as immigrants to

9  this country, that took on a different role because then

10  I was the one who first learned the language.  So I

11  became, you know, the person who took care of things.

12  So ever since then, I've been taking care of her.

**13    Q.   When -- when your mother is not with you, where**

**14  does she live or who does she live with?**

15    A.   In South Florida.

**16    Q.   And who is located in South Florida?**

17    A.   My mother.

**18    Q.   So are we talking about your grandmother?**

19    A.   No -- well, when my grandmother was alive, she

20  was also in South Florida.

**21    Q.   Okay.  But I'm asking about your mother.  You'd**

**22  indicated that sometimes your mother stays with you?**

23    A.   Yes.

**24    Q.   When she's not with you here, does she stay**

**25  with someone else in South Florida, or does she have her**

1  own home?

2      A.   No, she had her own home.

3      **Q.   Okay.  Does she still have her own home?**

4      A.   We're in the process of deciding that.  Because

5  I helped her with that, and now I don't have my job.  So

6  we don't know if she's going to be able to keep her own

7  home because now I can't help her like I used to.

8      **Q.   Does anyone else -- do you have any other**

9  **family in South Florida other than your mother?**

10     A.   Yes.  Currently my -- one of my sons.  One of

11  my adult sons.

12     **Q.   And where does your son live?**

13     A.   In Miami.

14     **Q.   Okay.  And how old is your adult son in Miami?**

15     A.   I may get it wrong.  I think he's in his ███

16  ███.

17          And it's 5:25 right now.

18     **Q.   Okay.  Your other son lives here locally?**

19          THE WITNESS:  By the way, how many hours have

20      we gone already?

21          THE VIDEOGRAPHER:  I believe we have about

22      18 minutes left.  But I can give you an accurate

23      time if we go off and check.

24          THE WITNESS:  18 minutes left to what?

25          THE VIDEOGRAPHER:  Out of the seven hours.

Page 262

 1          THE WITNESS:  Okay.

 2          THE VIDEOGRAPHER:  If you want an exact time, I

 3     can check, but --

 4          THE WITNESS:  What was the question?

 5   BY MS. REINER:

 6     **Q.   Yes.  So you have one son who's in his** ▓▓▓▓▓

 7   **that lives in Miami?**

 8     A.   Yes.

 9     **Q.   And then one son who is how old, the other son?**

10     A.   I believe my other one is ▓.

11     **Q.   Okay.  And where does he live?**

12     A.   He lives in Pennsylvania.

13     **Q.   Okay.  Do they share any responsibility in**

14   **terms of taking care of your mother or anything like**

15   **that?**

16     A.   No.

17     **Q.   Do you consider either of them dependents?  So**

18   **do either of your sons --**

19     A.   On me?

20     **Q.   Yes.**

21     A.   No.

22     **Q.   Okay.  Let me just take a moment here and scan**

23   **through.**

24          MS. REINER:  Okay.  If we can just take a

25     one-minute break.  We're going to step outside and

Page 263

1    have a talk real quick and make sure that we're

2    finished and that would --

3          THE VIDEOGRAPHER:  Going off the record.  Time

4    is 5:23 p.m.

5          (Off the record from 5:23 p.m. to 5:27 p.m.)

6          THE VIDEOGRAPHER:  We are back on the record.

7    Time is 5:27 p.m.

8  BY MS. REINER:

9      Q.   Okay.  Okay.  So last question here for you.

10          As you've mentioned contacting the dean of

11  St. Thomas Law School and the dean of Barry Law School,

12  have you done anything else in terms of looking for work

13  since the time of the termination, so --

14      A.   Yes.  I've been looking online to see what's

15  available.

16      Q.   Have you limited your search to --

17      A.   Florida.

18      Q.   -- Florida?

19      A.   More specifically Central and South Florida.

20      Q.   And have you limited your search to teaching --

21  college of law teaching positions?

22      A.   Yes.

23      Q.   Have you looked --

24      A.   To teaching positions.

25      Q.   Okay.  To teaching positions?

Page 264

```
 1     A.   Yes.

 2     Q.   Okay.  What teaching positions other than

 3   college of law positions have you looked at?

 4     A.   Oh.  Well, when you said college of law, I

 5   should have qualified law teaching.

 6     Q.   Okay.  So you've contacted those two deans,

 7   you've been looking online for positions within Florida,

 8   and specifically Central Florida, correct?

 9     A.   Central and, yeah, South Florida.

10     Q.   Central and South.  And the positions you've

11   been looking at are law teaching positions?

12     A.   Mm-hmm.

13     Q.   So both within law schools and within other

14   colleges within a university?

15     A.   I categorized them about, like, law teaching.

16   And basically what's come up, it's been -- like, it

17   would be law school.

18     Q.   Okay.  So you haven't been looking at, you

19   know, other, like, undergraduate instructor positions?

20     A.   I categorize them as law, so whatever it pulls

21   from law.  But I also have to qualify that because of

22   the charge that I'm dealing with, for example, the

23   charge for the alleged misconduct, which I'm still

24   trying to figure out, but it was however they charged

25   it, I don't qualify right now for state positions.
```

Maritza Reyes
May 24, 2024

Page 265

1          Including, for example, I think that it says

2    that I don't qualify for state postsecondary and even,

3    like, schools.  So that limits in terms of, you know,

4    the state institutions.

5        Q.    Okay.

6        A.    And then -- and so I reached out to deans of

7    private institutions.  And -- oh, I forgot to tell you.

8    I did reach out to the dean of Florida State University.

9    I don't remember her name right now.

10       Q.    Okay.

11       A.    But -- but that was, you know -- I'm in a very

12   difficult situation because I'm still appealing the

13   termination.  And so I have to explain all of that.  And

14   I have to -- it's very difficult right now to be

15   applying for --

16       Q.    Okay.

17       A.    -- law teaching positions.

18       Q.    And if you were to win your appeal, would you

19   seek reinstatement to the law school?

20       A.    Well, that is the purpose of the appeal.

21       Q.    Okay.  And so you do want to return to the law

22   school?

23       A.    I'm seeking reinstatement to my tenured

24   position.

25       Q.    Okay.  So they're kind of two different

Page 266

1    questions there.  So I know that you're seeking

2    reinstatement.  Assuming that you were provided with

3    reinstatement, you would again become a tenured

4    professor with FAMU, correct?

5        A.   Yes.

6        Q.   Okay.  In the event that happens, do you wish

7    to remain a tenured professor at FAMU, or would your

8    intention be to go elsewhere based on your experience?

9        A.   I don't know what -- right now my -- my goal is

10   to see what's going to happen with my reinstatement.

11   Because if I don't have a tenure position -- and one of

12   the things when I talked to the dean at St. Thomas, she

13   told me outright, she said, Your focus right now needs

14   to be to -- you know, if you get a tenured position,

15   that's different in terms of transferring to another

16   place.

17           But my goal right now is to clear my name of

18   the false allegation of misconduct over emails that have

19   nothing to do with misconduct so that I clear my name

20   and I'm reinstated to a tenured-faculty position, which

21   I earned.

22       Q.   Okay.  Okay.  And I asked that last question

23   because you've -- you've, during the course of the day,

24   made many statements about the treatment that you've

25   experienced --

Maritza Reyes
May 24, 2024

Page 267

1      A.   Yes.

2      Q.   -- at FAMU.

3      A.   Yes.

4      Q.   And so the natural question that for me flows

5  from that is:  If that has been your experience --

6      A.   Yes.

7      Q.   -- why would you want to return to that?

8      A.   Yeah.  And, like I said, I want my

9  reinstatement right now because I need to clear the

10  record of the false allegation.

11      Q.   Okay.

12      A.   And at the same time, my hope has always been,

13  including when I filed my complaint, that when -- when

14  they finally see this in writing and I called out -- I

15  think that it has -- I think that I have made it better

16  for other people.  Because after I filed my complaint,

17  they hired, for example -- and I complained that they

18  discriminated in the hiring of white people -- they have

19  hired white people.

20          And I think that my discrimination complaint

21  has helped so that the people who did this to me know

22  that I've called them on it.

23          And there is a new interim associate dean.  His

24  name is Cecil Howard.  And the provost who fired me is

25  in the university in Tallahassee.  According to what I

1  have heard, Dean Deidre Keller did not have any say over

2  the decision.  Interim Associate Dean Howard told the

3  students who protested that it was the university's

4  decision in Tallahassee.

5          And a committee of the university that reviewed

6  my materials when I went to the predetermination

7  conference stated that there was no basis for dismissal,

8  but the provost still dismissed me.

9      Q.  Okay.

10     A.  So --

11     Q.  Okay.  And so Cecil Howard said that they were

12  not involved?

13     A.  He seemed to tell the students that it was at

14  the university decision in Tallahassee by the provost

15  and, I guess, you know, President Robinson.

16     Q.  Okay.  All right.  So as you sit here today, if

17  you were to be reinstated, that's the first step.  And

18  then you do not know whether you would opt to continue

19  there or look elsewhere?

20     A.  I don't know.

21     Q.  Okay.

22     A.  My goal and my focus right now is to clear my

23  name and to clear the allegation of misconduct with

24  regards to that process, which is different than when I

25  started with this complaint because I wasn't fired at

Maritza Reyes
May 24, 2024

Page 269

1   that time.

**2        Q.    Okay.**

3        A.    And you said that was your last question,

4   right?

5             MS. REINER:  Yeah.  I think we are all

6        finished.  Thank you very much.  All right.

7             THE VIDEOGRAPHER:  Going off at 5:36 p.m.

8             THE STENOGRAPHER:  Do you need to order the

9        transcript today or the video?

10            MS. REINER:  I will -- can you send me an email

11       and I will give you a call or I'll shoot you an

12       email or shoot you a response.

13            (The deposition concluded at 5:36 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Maritza Reyes
May 24, 2024

Page 270

1              CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA

5    COUNTY OF ORANGE

6

7

8         I, the undersigned authority, certify that

9    MARITZA REYES personally appeared before me, was duly

10   sworn on the 24th of May 2024, and provided photo

11   identification.

12

13        Signed this 11th day of June 2024.

14

15                        LEAH S. COONEY
                          Notary Public - State of Florida
16                        Commission # HH 152632
                          My Comm. Expires Sep 25, 2025
17                        Bonded through National Notary Assn.

18

19

20

21        _____
          Leah S. Cooney, RPR, FPR
22        Notary Public, State of Florida
          My Commission No.: HH 152632
23        Expires:  September 25, 2025

24

25

Maritza Reyes
May 24, 2024

Page 271

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF SEMINOLE

5

6            I, LEAH S. COONEY, RPR, FPR, do hereby certify

7    that I was authorized to and did stenographically report

8    the foregoing videoconference deposition of MARITZA

9    REYES, pages 5 through 269; that a review of the

10   transcript was requested; and that the transcript is a

11   true record of my stenographic notes.

12           I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18           Dated this 11th day of June 2024.

19

20

21

22           _____

23           LEAH S. COONEY, RPR, FPR

24

25

_____

**Exhibits**
_____

**362459MReyes052
424 Ex 001**
 3:9 16:23
 17:3

**362459MReyes052
424 Ex 002**
 3:10 17:12,16

**362459MReyes052
424 Ex 003**
 3:11 43:9,12,
 15

**362459MReyes052
424 Ex 004**
 3:12 70:21,22
 74:3

**362459MReyes052
424 Ex 005**
 3:13 75:13,
 17,23 77:5,6

**362459MReyes052
424 Ex 006**
 3:14 77:7,10

**362459MReyes052
424 Ex 007**
 3:15 81:13,17
 157:16

**362459MReyes052
424 Ex 008**
 3:17 83:13,14
 85:18

**362459MReyes052
424 Ex 009**
 3:18 94:1,5,
 7,19 100:7,14

**362459MReyes052
424 Ex 010**
 3:20 103:9,13

**362459MReyes052
424 Ex 011**
 3:21 118:17,
 21,24 121:4
 132:2

**362459MReyes052
424 Ex 012**
 3:23 171:20,
 24 179:1

**362459MReyes052
424 Ex 013**
 3:24 180:17,
 21 184:8

**362459MReyes052
424 Ex 014**
 4:2 188:16,20
 189:19 216:20

**362459MReyes052
424 Ex 015**
 4:3 197:23
 198:3,4
 237:21

**362459MReyes052
424 Ex 016**
 4:4 237:15,16
 240:13,17

_____

**1**
_____

**1**
 16:23 17:3
 20:10 77:3
 141:10,12,13
 142:2,16,17,
 19,21,25
 143:19 144:16

**10**
 72:11 103:9,
 13 104:6,10

**10:37**

 38:19,20

**10:44**
 38:20,22

**11**
 118:17,21,24
 121:4 132:2

**11:45**
 74:15,16

**12**
 157:17
 171:20,24
 179:1

**127**
 45:9

**12:22**
 74:16,18

**13**
 180:17,21
 184:8

**14**
 76:25 77:18
 188:16,20
 189:19 216:20

**15**
 49:20 54:5
 103:17 186:18
 197:23 198:3,
 4 237:17,19,
 21

**16**
 68:14 202:20
 203:16
 237:15,16
 240:13,17

**18**
 72:13 75:25
 76:14 261:22,
 24

**1999**
 58:5

_____

**2**
_____

**2**
 17:12,16
 20:14 71:13
 74:18 141:14
 142:16

**20**
 75:10 77:24

**2000**
 58:1,11,12,15

**2002**
 58:2,8,9,22,
 23

**2004**
 130:3

**2004-2005**
 129:22 130:1

**2008**
 68:18 129:14,
 18 130:4

**2009**
 71:4,18 72:11
 229:12,17
 231:13 232:8,
 9 234:16

**2009-2010**
 72:12,17

**201**
 172:8

**2010**
 72:14 75:11

**2011**
 75:12 76:17

**2012**
 75:25 76:14,

19,24,25
77:18,24
126:9,11

**2014**
125:10 132:17
157:17 229:10
237:7 238:6
257:2

**2014-2015**
81:22 82:1
89:1 111:4
114:8,10

**2015**
95:5 103:17
104:7,10
238:3

**2016**
203:11,13,15

**2017**
112:17

**2018**
80:22,24
112:10 119:3,
9,25 120:12,
21 129:19,21
141:11,17
143:4,7,20
145:18
147:12,15,23
149:5 165:13
167:3,13
168:10 171:6
190:15 192:5
201:21 202:7
203:10
238:11,13,17

**2019**
172:1 180:24,
25 181:24
182:2,12,14

**2020**
147:11,17,24
198:8 235:10

**2020-21**
192:12

**2021**
146:22 151:15
189:20 190:11
192:10

**2023**
43:24 46:12
241:8,16
242:9 243:5

**2024**
5:8 202:20
203:16 234:17

**20th**
32:16

**21**
189:20

**22**
241:8,16
242:8

**22nd**
242:8

**231**
142:17 144:16

**232**
142:24

**236**
142:23,24

**24**
5:8 172:1

**241**
142:24

**25**
114:11

**26**

43:2,5 49:7,
15 50:22
51:20 252:10

**26(a)(1)**
43:18

**27**
240:25

**28**
43:24 95:5

**29**
198:8 235:10

**2:45**
166:16,17

**2:50**
166:17,19

---

**3**

**3**
20:16 43:7,8,
9,12,15
122:22 124:9
126:13 132:6,
15 141:10,12,
14 142:2,16,
19 166:19

**30**
71:4 262:10

**304**
8:18

**30s**
261:16 262:6

**31**
46:10

**32793**
34:22

**32801**
172:9 181:2

**3:01**
174:5,6

**3:03**
174:6,8

---

**4**

**4**
23:8 46:10
70:21,22 74:3
122:15,23
124:9 240:12

**4:42**
240:9,10

**4:47**
240:10,12

---

**5**

**5**
23:8 75:13,
17,23 77:5,6
119:3,9
120:12,21
121:21 122:16
165:13 167:3
181:24 182:2,
12

**5102**
34:22

**5:00**
243:15,16,19

**5:01**
250:9,10

**5:03**
250:10,12

**5:23**
263:4,5

**5:25**
261:17

Maritza Reyes
May 24, 2024

3

**5:27**
  263:5,7
**5:36**
  269:7,13

---

**6**

**6**
  23:8 77:7,10
  122:3
**6:22-cv-1525-**
**wwb-dci**
  18:3

---

**7**

---

**7**
  71:18 76:24
  81:13,17
  119:25 157:16
  180:24,25
  235:20
  242:12,16,24

---

**8**

---

**8**
  83:12,13,14
  85:18 244:8
**88**
  142:21

---

**9**

---

**9**
  94:1,5,7,19
  100:7,14
  190:11
**91**
  23:11
**96**

**18:6**
**96-page**
  224:4
**9:30**
  17:8
**9:31**
  5:1,3
**9:38**
  10:18,19
**9:48**
  10:19,21

---

**A**

**A&m**
  5:14,19 6:22
  8:3,8,21 16:5
  18:4 24:24
  76:23 77:8
  119:2
**A-L**
  248:10
**a.m.**
  5:1,3 10:18,
  19,21 17:8
  38:19,20,22
  74:16
**ABA**
  130:7,8,12,16
  152:15,20
  153:15
**ABA-ACCREDITED**
  129:16
**Abazinge**
  95:6
**abbreviation**
  26:18
**abilities**
  158:11

**ability**
  13:9,12 14:1
  31:12 158:25
  175:7
**Abrams**
  120:4,15
  167:7,20
**Absolutely**
  71:1 166:7
  241:23
**abused**
  254:13
**academia**
  187:24
**academic**
  62:23 72:3,4,
  11,15 103:20
  107:10 111:4
  129:23
  181:12,16,17,
  24 182:2
  196:11 232:12
  258:3 259:6
**academics**
  63:6 87:12
**academy**
  69:3
**accept**
  224:19,23
**acceptable**
  32:25
**acceptance**
  71:17
**accepted**
  72:22 100:4
  126:15,16
  131:14,18,20
**accepting**
  71:14

**access**
  118:1,13,15
  160:16
**accessed**
  118:12
  184:13,14
**accompanied**
  77:3 78:5
**accounting**
  56:12
**accounts**
  49:11
**accreditation**
  129:16 152:15
  231:2 254:4
**accrediting**
  129:13 130:6,
  13
**accurate**
  15:4 25:16
  42:5 43:23
  44:1 74:3
  172:17 184:24
  246:4 261:22
**accusation**
  136:23 245:9
**accusations**
  174:12 177:25
  178:10
**accused**
  29:17 136:17,
  19 137:18
  138:15,23
  139:1 157:14
  218:10 245:6
**accusing**
  137:14 160:12
**achieve**
  85:4

act
  96:19 97:11,
  15,18 98:9,
  12,15,17
  198:11

action
  18:22 23:23
  116:2 141:25
  143:6,8,10,
  11,12,14,17,
  25 145:3,7,
  19,25 150:16
  151:4 154:2,6
  168:25
  169:19,23
  200:6 201:3
  236:11 238:25

actions
  25:24 27:22,
  23,24 28:19
  109:24 136:9
  140:19,23
  144:4,6,17
  145:9,14
  146:10 150:10
  152:1 154:9
  159:20 170:20
  224:6

activities
  86:19 159:6

activity
  235:13 236:2,
  4,6,11,13
  237:4,9,11
  238:6

actor
  25:8,21

actors
  24:9 25:10,
  11,13,17

26:5,25 27:5,
7

acts
  25:10 148:12
  204:19

actual
  86:1 113:10
  198:9,14

ad-
  143:16

add
  45:13,25
  46:1,4,8
  131:7 242:25
  244:3

added
  44:3 200:23
  232:10,12

addition
  216:12,16
  224:14 245:18
  246:7

additional
  69:13,22
  78:8,11,14
  104:19 119:5,
  7 126:23
  132:19,24
  144:17 175:21
  186:22 190:25
  191:12 195:19
  200:24

address
  15:22 34:16,
  21,23,25
  35:2,15,21
  36:4,5,6,7,
  10,12,16
  39:7,13 47:8
  71:9 73:9

103:21 172:8,
9,11,12,13
181:1 189:22,
23

addressed
  71:5 73:17
  76:1 95:6
  103:17 180:25
  189:21

adequate
  100:25 101:12

adjective
  155:22

adjustment
  79:12

administered
  112:22

administrators
  160:13

admit
  138:5

adopt
  130:19

adopted
  130:18 131:10

adult
  37:25 38:6
  65:15,21,24
  261:11,14

adverse
  143:6,8,10,
  11,14,17,25
  145:7,24

advise
  82:9

advised
  88:12 179:2
  182:15

affairs
  103:20
  181:12,16,17,
  18,24 182:2

affecting
  13:18

affiliated
  37:15 248:1

affirm
  5:22

affirmative
  116:2

afraid
  136:22

African
  23:1

aftermath
  253:7,9

age
  33:4 34:5

agenda
  168:23 169:9
  171:3

agree
  10:1,6 16:1
  84:10 104:2
  116:11 119:17
  120:9 126:7
  243:22

Agricultural
  5:5

ahead
  7:2 9:18
  11:22 32:1,4
  33:16 38:14
  43:6 66:11
  77:8 164:5
  177:13

albeit
 151:14
Albers
 248:9,17
 249:2
Alex
 5:8
alive
 260:19
allegation
 24:20 26:3,6
 145:3 174:21,
 24 216:25
 258:12 266:18
 267:10 268:23
allegations
 18:21,24 19:6
 26:1 27:16
 37:2,5,8
 40:3,8 41:5,
 13 43:1 44:7
 46:21 52:8,11
 99:11 142:25
 144:14 146:8
 159:19 174:17
 175:13
 178:10,14
 205:5 215:20
 223:4 251:11,
 12 253:3
allege
 27:8 29:8
 44:25 141:24
 142:19 144:15
 148:12 170:6
 199:13
alleged
 20:3,21 29:9,
 12 141:25
 143:15 144:5

146:6,15
172:15 197:21
214:20 215:22
242:7 264:23
allegedly
 150:6
alleging
 143:5,16,19,
 23,25 179:19
 242:1 244:13
allowed
 31:24 161:9
 185:3 212:17
 213:12
allowing
 225:9,12
 246:22
allude
 247:14
Almeida
 55:5
ALS
 63:25 152:18
alternate
 258:6,10
 259:11
alumni
 52:13
amended
 17:5 18:1,12,
 17 19:2,20
 20:19 24:3
 25:12,17 26:8
 28:18,19
 45:2,3 96:25
 142:17 152:2,
 13 165:23
 166:24 201:1
 222:19

American
 23:1 63:5
 67:16 129:13
 130:5 153:1
Ammons
 76:1 77:7
analysis
 227:20,22
analyze
 228:2
ancestors
 225:19
ancestry
 22:9,23
and/or
 21:21
Anglo
 22:17
anguish
 244:11
Ann
 120:5 147:18
 149:23 167:5
 217:22 218:1,
 2
announce
 5:11
annual
 63:9 79:7
answering
 31:8,12 55:10
 97:23 98:4
 99:13 226:14
answers
 14:13,15 15:9
 31:6 241:5
anymore
 61:5 115:10

apologize
 237:19
appeal
 179:21 180:1
 183:11 259:3
 265:18,20
appealing
 265:12
appearances
 5:11
appearing
 6:20 8:18
appears
 74:5 119:19
appended
 129:14 130:5
applicant
 63:12 69:4
 89:5
applicants
 82:9 114:11
application
 76:10 79:17
 80:4,7,13
 81:7,8 82:14
 87:21 88:1,7,
 10 89:5 90:18
 91:2 92:21
 95:8,9 99:8
 101:23
 108:15,25
 109:5 112:15
 113:12,13
 114:11,16,17,
 18,22 120:13,
 25 121:7,9,10
 125:15 126:4,
 24 127:9
 128:13,21
 129:2 131:16,

22 133:7,10
134:25 140:25
141:2 146:24
147:7,11,12,
17,23 153:19
154:6,13
155:9 156:22
157:13,14,15
159:9,19
162:15 163:19
165:14 167:2,
13,22 168:3,
16 173:7,10
191:6,22
192:3,5,17
218:11 220:9
221:1 226:22,
23 231:16
238:11,12
253:25

**applications**
102:8 104:25
105:1,3
112:14 160:6
170:22
187:11,17
188:4 220:22
231:5 253:11

**applied**
75:10,11
76:17 80:18,
22,24 82:11
88:4 105:18,
24 106:1,4,
24,25 107:22
112:10 114:13
126:22,23
131:8,24
132:21 143:3,
7,20 150:22
152:24 153:11

219:9 222:17
254:5

**apply**
79:14,23
105:25 112:6,
17,18,20
159:17 191:17
222:14 237:4

**applying**
83:5 87:16
112:11 128:4
129:19 131:12
170:10 220:14
265:15

**appointment**
72:2 92:18
107:4

**appointments**
232:24

**approval**
88:21,25
104:12,16
193:17,20
194:5

**approve**
89:17

**approved**
76:11 88:20
102:12 104:3
139:15 151:13
152:11 153:7,
9 162:6
164:25 192:18
193:3,14,15,
25 195:8,13,
15 220:16,20

**approves**
88:23

**April**
71:18 95:5

**area**
57:2

**areas**
84:24

**argue**
125:18 178:16

**argument**
177:10 178:15

**argumentative**
174:12 177:23

**arrangements**
80:8 81:9

**article**
126:14
131:14,18,20,
21

**articles**
108:24 125:18
126:24 127:2,
8,18,23
128:3,8,12,14
129:2 133:13,
15,16,24
134:19 135:4,
25 191:12

**aspect**
149:14 253:20

**assert**
168:12 201:10

**asserted**
222:19 242:5

**asserting**
24:17

**assign**
184:17,18
197:16

**assigned**
60:3 85:24
109:9 196:11

**assigning**
196:6

**assignment**
204:6

**assist**
94:19 242:13

**assistance**
146:9 246:19

**assistant**
71:22 73:1,5
84:12,19
139:5

**associate**
8:17 45:13
58:4,5,6,7,8
74:7,22,25
75:3,6 76:11
77:14,19,23
78:4,9,22
79:3,14 80:20
84:12,19
85:21 105:2
113:12 114:14
119:1 120:1,
13 121:22
122:4,18
125:14 126:3,
8,19 128:15,
22 131:8,12,
16,22,25
132:4,16
134:8 140:9
152:9,25
153:8,12,14,
17 165:13
187:16,18,20,
23 188:6,15
267:23 268:2

**association**
5:10 63:5

67:15 129:13
130:5 153:2

**assume**
15:1 75:2
93:16 193:21
194:18

**assumed**
194:25

**assuming**
77:15 266:2

**assumption**
72:7

**Atlantic**
55:24 56:5,11

**attached**
33:19 119:25
203:5 225:25

**attacks**
253:21

**attempt**
13:5

**attempted**
184:22

**attend**
7:19,20 9:23
10:7 11:17
40:5 55:23
87:9 229:23,
25 230:2,3
232:25

**attendance**
7:4,6,7 119:8
120:9,10,11

**attended**
32:9 40:6,9
56:1,4 62:20

**attendees**
40:8

**attending**
7:9,16 8:12
11:2,19 32:8

**attorney**
7:18 9:6
11:18,19
175:4 236:16,
24

**attorneys**
11:1,2 52:9

**attribute**
247:19 251:3
257:17,20
258:1

**audio**
6:12 12:16

**August**
72:11 76:24,
25 77:18
180:24,25
181:24 182:2,
10,12,14
190:11

**authority**
150:15 151:4,
16,22 153:21,
25 154:9,10,
14,24 155:2
156:25 163:3,
7,10,14,19,21

**Avenue**
172:8

**average**
230:24

**avoid**
30:1 164:16
175:13 235:3
249:25 255:15

**avoided**

233:24
234:21,22,25

**award**
125:9,19
132:5,17

**awarded**
83:8 93:22
139:13

**aware**
14:12 44:2
135:24 194:4
205:24 206:2
207:9 214:13,
21 218:13

─────────────

**B**

─────────────

**B-E-R-R-I-O-S**
227:4

**B-E-R-S**
248:11

**bachelor's**
56:11

**back**
10:16,20
30:7,18 32:5
38:21 39:22
40:1 60:17
74:17 92:25
93:2 99:18,20
105:14 110:1,
3 114:7
119:18 123:4
124:1 142:5,
7,11,13
158:13 161:1
166:18,20
172:24 173:1
174:7 176:9
177:11 178:15

184:4 188:9,
11 189:14,15,
17 211:21
214:14 229:4
240:11,24
250:11 255:24
263:6

**background**
32:7 55:20
64:3 67:2
68:8 213:25

**bad**
25:8,11,17,21
26:5,25 27:5,
7 28:14,15

**Bailey**
189:25
216:18,22
217:1

**ballots**
137:9

**bar**
41:19 58:20
129:13 130:5
153:1 175:4
227:21,23
228:3

**Barbara**
40:25

**Barry**
258:20 259:10
263:11

**base**
24:20 129:11

**based**
15:9 16:4
19:23 21:12,
20 31:25 34:8
36:3 97:22
99:15 123:7

125:12 126:13
128:3 136:10
139:21 141:7
143:2 148:3
151:21 158:5,
9 163:25
164:19 198:19
201:11 202:2,
9 203:2
204:18 205:1
215:21 217:12
266:8

**basic**
23:5

**basically**
79:10 117:2
147:22 151:2
164:10 232:9
236:22 264:16

**basing**
158:7

**basis**
18:25 20:22
27:11 35:8
41:3 42:15,
17,20,21,22,
23 45:2 47:4
59:11 82:15
164:9 165:19
197:18,20
203:4 222:25
224:6 231:24
242:19 252:15
268:7

**be-**
254:19

**began**
5:1 63:18
67:6,12

**Beggs**

172:8

**begin**
6:24 16:13
57:16 67:11
72:23

**beginning**
13:1 23:11
101:25 151:2,
5 158:8 164:8
184:3 229:11
241:21 253:17

**begins**
72:10 80:3
89:4

**behalf**
5:19

**behavior**
27:10,11,13
28:1,3,5,7,
10,14,15

**belief**
18:18 148:3,6
153:22 241:7

**believed**
94:9 171:10

**benefit**
177:5

**benefits**
186:10
195:19,21,23
204:1

**Berger**
60:11,12,16,
19

**Berrios**
55:3 227:2,4

**Biblical**
249:18

**big**
62:13 78:18

**Bill**
167:5

**birth**
32:15,25
33:18,20
34:8,11 47:8

**bit**
23:4 32:5,7
105:23 117:19
166:9,10

**black**
23:1 33:18,19
148:20,22,23
149:7,22
150:2,3,4
168:23 169:8,
9,10,11
170:23 171:3,
4 202:4
205:3,6,14
209:8,9,11,
12,16,25
210:4,11
212:24 213:6,
7,8,9,16
214:2 215:24,
25 216:10
217:16 224:9,
21,23 225:1,3
227:10,21
228:13,20
239:19,23

**blank**
16:14

**block**
33:25

**blog**
133:19,20

**board**
5:6,19 24:24
46:1 82:24
83:2 89:16,17
93:14,16,20
104:6 115:20
162:10,17,19,
20 210:17
221:18

**boat**
225:20

**body**
129:13 130:13

**Boothe-perry**
120:4,15
147:16 149:22
167:4 172:3
181:8 211:4,5
214:15 215:15
216:2 217:23,
24

**Boston**
183:2

**bottom**
17:22 71:14
122:15 158:17
164:12 199:2

**box**
34:22,24
71:6,9 76:5,7
96:12,13
103:23 189:22
199:2,6,16,19

**boxes**
198:22

**branch**
67:3

**break**
13:7 14:24
38:14 70:25

74:11,14
124:25 132:9
233:10,12
240:3,6
250:6,7
262:25

**breaking**
8:13

**briefly**
83:18

**bring**
18:22 19:12
24:7,21,23
25:1,4,9
106:22 107:6
236:5

**broad**
182:22

**brought**
6:11 19:11,22
20:7 24:15
225:5

**Broussard**
29:13,15,23
31:22 47:6,7
92:2 109:13,
22 110:11
112:4 120:5,
16 137:2,4,13
147:17 149:9,
23 160:7,16
167:4 217:20,
24 218:13
219:4 220:15
235:2

**Broussard's**
31:1

**Brown**
210:17

**builds**
98:20

**bump**
28:10 31:14,
16

**bumped**
27:13 29:10,
13,19,25
30:6,17,21,22

**bumping**
29:2,15,18

**bumps**
28:25

**busy**
231:4 251:9
253:3 255:16

---

**C**

**calculations**
242:16

**Calhoun**
46:9,10

**call**
39:2 48:21
53:13 70:8,17
79:10 232:9
269:11

**called**
6:3 63:4
76:22 84:22
113:1 150:4,6
165:17 167:16
211:9 214:18
225:16,17,21,
24 236:21
246:11
267:14,22

**calling**
28:3

**calls**
23:20 223:1
225:11 226:2

**campus**
229:6,8

**candidacy**
120:1

**capacity**
11:2

**cardiovascular**
13:15

**care**
247:2,7
248:4,7 249:3
256:1,10
260:1,3,11,12
262:14

**career**
57:5,6,17,23
62:9,17 258:3

**Careful**
94:5

**carried**
246:2

**carries**
98:25 164:12

**carry**
101:25 102:2
107:9 233:9

**carrying**
163:10

**case**
18:2,13 24:25
38:5,8 66:5,7
105:1 106:12
160:6 162:17
164:17 166:25
189:5 224:13
240:22

**catching**
189:3

**categories**
84:22 86:17
211:22 244:7

**categorize**
264:20

**categorized**
264:15

**caused**
24:6 25:9
256:6

**causing**
178:9

**Cavazos**
120:5,16,19
147:18 149:23
167:5 217:22
218:1,2

**Cecil**
45:14 267:24
268:11

**census**
22:8,10

**Central**
76:8 96:16
103:24
259:17,22,25
263:19 264:8,
9,10

**certified**
39:6

**certify**
38:24 47:11
48:10 66:11

**chain**
90:17

**chair**
95:7 110:21

Maritza Reyes
May 24, 2024

10

111:3,6 187:2
188:2,3
196:1,4,6,12,
13,16,18,19,
20 197:16
204:7,8,23
239:17

**chairing**
187:4

**chairman**
110:25

**chairs**
110:18,23

**challenge**
155:21 180:8,
11 220:13

**chance**
9:17 81:20
83:17 179:15

**change**
78:12,17
104:15 111:14
204:1 242:16,
20 255:14

**changed**
45:25 104:21
232:8 250:24
251:21
252:13,21
253:1,2

**characterizatio
n**
141:22

**characterize**
28:6 198:25

**characterizes**
141:6

**charge**
109:15 110:6,

8,9,11,12,13,
16 146:20
190:17,22
198:6,9,13,15
199:1 200:20
201:3,4
235:9,14,19
236:8 237:10,
13,24 238:7,9
264:22,23

**charged**
264:24

**check**
17:21 172:15
261:23 262:3

**checked**
198:22 199:7,
16

**Chief**
46:8

**child**
260:6

**children**
65:9,14,22

**choosing**
36:1

**chose**
35:5 171:3

**Christian**
249:17

**church**
40:5,6,7,9

**circumstance**
121:18

**circumstances**
257:12
259:16,21,24

**cited**
187:1

**Civil**
43:18

**claim**
19:11,12,22
24:7,15,21
25:1,4
222:19,25
235:6,8 236:5

**claimed**
25:21

**claiming**
137:6,8 184:1
246:10

**claims**
18:25 19:4,7,
13,18 20:6
23:5,6,14
64:15 204:17
222:24 235:7
242:5

**clarification**
13:2 52:16
116:20 146:25

**clarify**
11:4 12:24
13:5 24:10
27:1,4 36:13
50:20 52:2
55:10 63:20
64:3 65:3
70:7 85:20,24
89:23 130:13
161:14 182:5
203:23 211:21
215:1 253:17

**clarity**
10:23 175:25

**class**
117:16 200:6,
9 214:6

217:19

**classes**
78:14 80:10
229:6,22,23
232:19 233:10

**classification**
21:5

**classify**
216:5

**classroom**
86:21

**clear**
9:11 12:21,25
15:19 19:24
28:22 41:6
42:11 130:9
137:21
140:12,14
202:25 203:1,
3 266:17,19
267:9 268:22,
23

**clerk**
61:2,3,7

**clerking**
62:2

**clerkship**
59:1,2

**clerkships**
62:14

**clinical**
232:13

**clock**
229:15 251:12

**close**
42:25 62:15
243:21

**closed**
109:17

cloud
  258:12
club
  41:9,22,23,25
  42:1,3
co-workers
  37:13,14
  234:5
Coates
  8:16,17 9:2
  11:1,18
colleagues
  251:24 252:3
  253:24
college
  26:20 39:19
  45:14 46:2,6
  55:23,25
  56:1,2,16,17
  63:23 64:19
  65:17 71:20,
  23 73:1,6
  80:4 89:6
  91:3,5 92:2
  96:22 97:3
  98:21,24 99:5
  100:2,5,8,10,
  17,23 101:10,
  14 104:18
  107:8,15
  110:7 111:3
  114:23,24
  115:1 116:24
  117:1,7,12
  119:2,10,23
  129:8,12
  130:6,22
  147:9 153:12
  154:15
  156:22,23
  160:7,11

164:11 170:8
171:2 181:2
185:22 186:20
191:19 209:25
218:14,18
220:1,18
221:2 236:17
237:24 238:8
263:21 264:3,
4
colleges
  56:3 210:3,5
  264:14
color
  20:16 21:12,
  16,18 23:12
  145:14 149:1,
  11 169:5
  197:18,20
  199:9 204:12,
  18 205:25
  206:20 208:7,
  10 212:2
  214:15,17
  222:22
com-
  79:13
combination
  21:24 149:13,
  15,19 197:21
  200:12 207:10
  212:7
comment
  110:10 149:2,
  5 178:3,7
  208:4,8,9,13,
  17,25 209:5,6
  211:6,7
  213:1,2
  215:22 216:3

commented
  209:8
comments
  149:6,11,15,
  18 170:20
  177:23 178:2
  205:2,7,10,
  11,13,15,21,
  24 206:2,4,6,
  8,12,16,19,
  22,25 207:4,
  9,11,16,20
  208:19 209:15
  211:10,11,15
  212:1,5,15
  213:11,15,19,
  20,24 214:1,
  7,13,16,22
  215:4,17,18,
  23 227:1,9,12
  233:21,25
  234:20,21
  235:4
Commission
  237:14
committee
  26:11,15,16,
  18,19,23
  67:19,21 68:1
  79:25 80:5,6,
  12,16 81:1,10
  88:22 89:7,
  11,12 90:1,5,
  12,14 91:4,
  12,13,14,19,
  23 92:3,4,7
  94:9 95:8
  96:18,23,24
  97:4 98:9,22,
  25 99:2,5
  100:1,2,3,5,

6,9,11,13,18,
24 101:6,11,
15,19 104:19,
24 105:2,7,9,
12,15,18
106:12,20,21
107:3,8,16
108:18
109:16,20
110:8,18,23,
25 111:4,11,
13,15,18
114:24,25
115:3,12,13,
15 116:4,5,
13,15,25
117:2,8,13
118:1,7
119:3,10,21,
24 121:13,20,
21,22 122:1,
3,4,8,16,17,
23 126:17
132:20
135:12,14,19
136:15 137:3
138:6,12,16
147:10 148:1
150:13,14
151:17,21,22
152:1,3
153:7,9,13,
16,17,21
154:1,10,16,
17,22 155:12
156:24 158:19
159:2,4,5,10
160:8,9,11,
18,20,22,23
161:1,4,6,10,
20,25 162:1,
22,25 163:2,

6,13,17
164:7,12
165:16 167:11
168:12 170:9
171:3,15
185:20,22
186:21 187:2,
4,8,9,15,23
188:3 191:18,
19,21 192:2,
4,9,10,12,13
193:5,6,10,
12,14,15,19
196:12,18,19,
20 197:17
204:6,7,8,23
219:3,11,16
220:2,5,19
221:2 226:5,
7,17 229:23,
24,25 230:9,
11,13,18,19
231:8,11,25
234:7 236:18
237:25 238:9
246:3 268:5

**committee's**
96:18 98:10
121:19

**committees**
109:12 187:1
188:2 196:1,
3,6,14,16
204:9 219:14
230:14,16
231:9,13,18

**common**
11:13 210:6

**communicate**
10:14 48:17,
24 50:16

**communicated**
70:12

**communicating**
250:16

**communication**
180:24 213:11

**communications**
49:6 207:25
208:1,4

**community**
213:8 230:2,3

**company**
64:14

**comparator**
221:10

**compare**
147:8 172:19
178:3

**comparison**
128:22

**compensation**
78:6 79:13
145:12,20
195:17 243:23

**compensatory**
244:20

**competitive**
152:17

**complain**
29:14,16
30:1,2,21,22
44:24 237:2

**complained**
29:20 30:18,
24 153:15
205:19 209:7
236:14 239:6
267:17

**complaining**
29:17 209:15

**complaint**
16:4 18:1,12,
17,21,22,24
19:3,20 20:4,
19,23 23:7,
12,17 24:3
25:9,12,18,21
26:1,4,6,8,10
27:2,8,11,16,
19 28:6,9,18,
20 29:4,9
32:23 33:4
37:5,8 41:13
43:2 44:7,16,
25 45:2,4,24
46:21 48:19,
22 49:2 50:1
51:19 52:8,
11,18 53:19
92:1 96:25
109:23 141:5,
24 142:18
143:18 144:6,
24 145:6
146:6 148:13
152:2,13
165:24
166:11,14,24
167:9,15
183:6 196:9
197:22
200:24,25
201:1 212:17
214:18 222:19
223:10,20,23
224:2,4,15
235:21 239:3
243:24
267:13,16,20
268:25

**complaints**
212:10 223:5
225:7 246:12

**complete**
45:17,19

**Compliance**
46:8

**comply**
108:12

**component**
86:3,7,22,24
87:18

**composition**
151:21 153:7,
8

**compound**
119:11 125:24
132:7 139:24
140:15 145:21
221:21,22
252:16

**computation**
244:4

**concentrating**
247:2

**conclude**
122:13

**concluded**
269:13

**concludes**
121:22 122:4,
17

**conclusion**
23:20 121:20,
21 122:1,3,16
223:1

**conclusions**
121:19

condition
61:20,23

conditions
20:11,15,16
77:1 145:11
201:12 239:22

condoned
146:1 207:11

conduct
73:17,19,20
106:13 108:20
154:8 245:4
246:2 257:21
258:2

conducted
106:23 113:24

conducting
86:1

conducts
116:13

conference
63:10,25
67:16 268:7

conferences
87:9 134:3
230:1,2 233:2
254:18,19
258:5

conferred
58:13

confidential
137:9,22

confirm
199:6 241:13

confirmation
245:18

confirmed
241:9

conflict
8:10

conflicts
7:18

confused
14:23,24
125:11 243:9

connected
49:10

consequences
29:21

consideration
188:5

considerations
186:22

considered
26:5 73:25
83:6 113:7
120:14 126:17
128:11 129:6,
18 131:15
132:25 135:25
148:23

consist
229:20

constant
148:19,21
205:5 224:19

constantly
170:20 245:6
251:13 253:3

constitute
224:17

constitutes
201:2

contact
54:13,15
64:22 65:2,4,
5 182:25

contacted
67:13,14
258:11,14,15
264:6

contacting
263:10

contained
117:10

contend
18:16,20
25:8,20 26:23
133:23 167:14
201:2 217:9
224:17
235:12,18
236:2,12
238:4,13,24
239:2,24
242:4

content
17:24 55:9

contention
107:11 125:16
127:22 128:10
197:15 223:3
246:1

context
29:1,18
31:14,15
155:20,22

continue
18:20 59:21
61:21 72:18
104:12 178:22
185:19 250:2
268:18

continued
185:13,16,21
201:5,8

continues
39:1 72:7

continuing
201:3 259:9

contract
76:22 77:3,8,
16 112:23

contrasting
215:24

contravention
222:10

contributed
227:13 257:14

contributes
223:24

control
159:11 174:14

controversy
179:16

conversation
136:14 212:6,
9,12,14
234:10

conversations
233:9,20,22
234:13,15,22,
25

convey
90:16 121:12

conveying
74:4

conveys
95:10

Cooney
5:9

Cooper
214:11

copied
  95:12 189:24

copies
  114:11
  173:14,16,22
  175:22
  176:13,14,17,
  20 177:3,7
  178:11

copy
  18:11 74:4
  76:3 103:19
  172:2 177:2
  181:8 184:11
  188:24,25
  198:12

cordial
  233:20

corporate
  6:18 7:4,10
  8:3,20 9:3,9,
  13 10:25

correct
  9:14 12:7
  16:6 18:17
  19:5 20:7
  24:16 26:17
  27:22 34:9
  36:3 46:24
  66:7,8 70:15
  71:6 76:5
  77:17 78:24
  82:12 84:25
  87:17 88:4
  90:2,17 91:12
  92:8 95:15,16
  96:19 100:21
  102:3,13
  103:21 104:9
  106:6,10
  113:24

117:11,22
120:23 121:2
122:10 126:9,
20,24 127:3
130:2 136:4
139:3,8,11,14
141:12,18
161:20 162:11
164:17 185:14
189:21 190:12
192:25 194:16
198:12 199:14
200:21 208:24
223:20 229:12
237:15 240:23
241:6,14
243:2 257:23
264:8 266:4

correspondence
  95:3,4 179:2
  180:13

counsel
  5:11 6:22
  7:25 8:2,7,17
  9:3 11:5,6
  23:10 24:1
  27:1 28:17
  30:25 32:3,20
  35:4,22 37:23
  47:2 70:24
  143:8 166:4
  173:14 174:9,
  11 175:2
  176:5,6,8,11,
  22 177:16
  183:4

count
  20:10,14,16
  24:3 141:13,
  14 142:21,25
  143:18,19

149:19 235:20

counted
  18:6 120:19

country
  210:6 260:9

counts
  19:19 20:3,18
  23:7 141:10,
  12 142:2,16,
  19,24 197:21

couple
  61:9 248:25

coupled
  223:10

courses
  85:23 104:13

coursework
  86:1

court
  5:9 18:5,10,
  13 30:15
  33:19 34:16
  35:15,19
  36:10 38:13
  39:2,8 59:3,
  6,13,22 60:6,
  14,18 93:2
  99:20 110:3
  124:1 142:7,
  13 166:20
  173:1 174:15
  175:3 188:11
  189:17

cover
  37:2

COVID
  199:22,23

created
  144:11 224:18

creating
  178:15

credentials
  62:11,16 63:4
  152:19,22

credit
  222:11

credits
  232:21

crimmigration
  133:20

criteria
  135:25 136:1

criticized
  130:9 152:15,
  20

current
  37:14 51:24
  52:3,7

curriculum
  62:23

cut
  21:10

CV
  231:14

Cynthia
  71:5

---

**D**

---

D-E-B-R-A
  248:18

D.C.
  63:9 67:17
  68:2,4,19

dad
  222:6

daily
  224:6,7 234:9

Maritza Reyes
May 24, 2024

15

245:5 252:15

**damage**
244:18

**damages**
242:3,4,7,10
244:4,21
258:2

**danger**
246:14

**Danielle**
54:23

**dark**
21:16

**Darryll**
120:6,17
149:5,14
167:5 234:20

**data**
227:21,25
228:1,20

**database**
113:5,7

**date**
32:15,25
33:17 34:8,11
43:25 47:7
54:18 55:12
58:10 64:20
71:17,24
72:15,19
76:13 119:3
146:21 172:6
179:20 181:5
190:9 191:14
202:18 211:3
228:23 235:10

**dated**
71:4 75:25
95:5 103:17

119:25 172:1
180:25 189:20

**dates**
77:21,22
181:6

**dating**
210:4

**David**
92:16 93:6
95:13,18
102:4,20,25
103:3,6,19
151:7 152:7
164:18

**Davis**
102:11

**day**
69:15,17,21,
24 201:16
229:6,7,20
232:16 233:9
241:25 245:21
266:23

**days**
229:19 232:20

**deadlines**
82:10 108:9

**deal**
222:3,9
245:23 252:1,
20 254:17

**dealing**
146:9 199:23
242:3 245:5,
22 247:12,15,
16,17 251:6,9
253:3,8
255:7,16
264:22

**deals**
57:8 141:16
143:18

**dean**
45:13 67:14,
18,20 68:21
70:8,14 73:7,
8,18,25 76:4
89:8,9 91:5,7
95:13,14
102:13 103:4,
20 115:1,4,9
116:3,6,14
117:25 150:15
155:11,17
156:8 157:8
160:24 161:2,
5,8,15 162:23
164:22 165:9
170:25
171:16,17
172:3 181:8
190:1 192:20,
22,23,24
193:2,3
196:21,24,25
197:3,7
205:9,17
221:3 227:19
228:23,24
246:20
258:15,17,20,
21,23 259:10
263:10,11
265:8 266:12
267:23 268:1,
2

**deans**
258:11,14,19
264:6 265:6

**Debra**

248:18 249:2

**deceased**
61:4

**December**
32:16

**deceptive**
182:20

**decide**
63:14 107:3
156:8 159:9,
10,11,12,13,
16,17,18,20
196:5 244:20

**decided**
29:25 62:5,6,
17

**decides**
115:19
162:16,19

**deciding**
154:6 261:4

**decision**
28:11 82:19,
21,23 115:2,
16 136:14,21
138:13 147:16
154:17 155:7
156:7 157:4
159:1,21
162:22 171:5
179:17,19,21,
22 181:11,13
185:9 210:18
226:17 268:2,
4,14

**decision-maker**
83:4 155:23,
25 156:2,11,
15,21,23
157:2,11,12,

20,23 158:15,
16,18,21,25

**decision-makers**
156:9 236:21,
23

**decision-making**
154:23 155:1
163:2,7,14

**decisions**
27:3 89:22

**declare**
241:5

**decline**
121:9

**declined**
121:13

**declining**
96:18

**deemed**
167:22

**deems**
35:23

**defend**
178:9 251:10

**defendant**
16:5 143:1
174:11 175:2

**defendant's**
16:23 17:5,12
43:9 45:25
70:22 75:13
77:10 81:13
83:14 94:1
103:9 118:17
171:20 180:17
188:16 197:23
240:13

**defended**
169:14

**defending**
251:14

**define**
19:24 23:15,
22 24:1 143:9
156:18,19
162:13 223:13

**defined**
22:11 23:22
24:2 41:21
143:13

**definition**
22:10 23:18
144:3

**degree**
56:10,12,25
57:1,3,13
58:14

**degrees**
56:7,21

**Deidre**
189:25 192:24
196:24,25
209:3,4,6
211:23,25
214:9 268:1

**Demand**
18:1

**demoted**
185:24 186:1

**demotion**
143:12

**denial**
79:24 98:6
145:6 151:2
154:6,14
156:5 164:9
169:1 170:4
180:9,11,14

181:10 182:7,
10,16 185:5,
13,23 186:13
190:14,20
200:2 201:24
203:9 204:20,
21,23 238:13
239:16,17

**denied**
141:3 167:21
173:7,10
179:3,6,11
180:7 182:8,
17 186:5
195:21 200:4
201:14 202:9
203:19 204:4,
11 242:25

**Denise**
6:21 7:10,16
10:4 183:5

**denote**
22:21

**denotes**
22:8

**deny**
152:3

**depend**
210:21

**dependents**
262:17

**depending**
104:22,23
105:10 156:4
159:21 230:20
232:19

**depends**
155:20,21
156:20

**deposition**
5:4,7,15 6:7,
11,15 7:6
8:14 9:7
10:3,24 11:1
12:1,18
13:13,24
14:11 15:18
16:8,20 17:3,
6,9,16 28:8
30:10 31:1,2
32:10,11,24
33:9,14 35:6,
9,10 43:8
64:12 70:21
75:17,23
81:17 83:12
94:5,7 103:13
118:21,24
137:15 158:8
171:24
176:10,19
177:10,21
178:23 180:21
188:20 198:3
218:20 240:17
243:21 269:13

**depositions**
33:24 47:5
173:15 174:20
176:24 177:1

**deputy**
8:7 11:5,6

**derail**
157:1,12
159:19 218:11

**derailing**
236:19

**describe**
21:18 22:3,20
23:1,2 215:5,

Maritza Reyes
May 24, 2024

17

6
describing
119:14
detail
200:24 242:23
detailed
224:4 225:22
details
51:19
determination
83:6 88:12,
16,17,18,19
100:5 136:16
154:22 163:22
185:4 226:8
determine
10:14,15
51:11 66:16,
20 108:9
117:3,5,8
191:25
determined
79:24 162:5
determines
79:25 80:1
81:1 162:10
196:20,22
determining
127:2
developed
22:6,21,24
devices
6:14
devoted
258:4
diagnosed
14:2 255:20
diagnosis

255:23 256:3
Diana
55:5
Diaz
258:22
Dickerson
52:12 53:2
54:23
died
59:18 60:4
256:9,16,23,
24 257:2
differ
163:13
difference
21:16 22:13,
15,16 31:22
54:6 106:18
114:9 217:4
230:10 243:7
differently
41:19 201:11
218:25
difficult
199:24 224:8
247:15
257:10,12
259:2 265:12,
14
difficulty
247:1
digitally
198:8
DIRECT
11:23
directing
132:13
disagree
27:10 28:1,3

32:3 178:18
disapproval
100:14
discharging
145:10
disclose
53:9
disclosure
43:18 44:3,6
50:22
disclosures
37:10 38:1
40:13,15,19
43:3,4,5
49:8,16
51:20,24
54:18 55:13
252:10
discovery
9:22 10:8
11:16 28:8
32:24 176:9
239:5
discrete
98:12,14,17
145:9
discriminate
97:16 98:11
139:21 151:23
168:19
discriminated
20:21 21:1,
12,14,20
99:5,7,13,22
100:3 101:5,
24 107:15
123:1 124:4
136:6,8 143:1
148:6,8 153:6
165:22 166:23

168:12,22
179:23 212:11
238:10 267:18
discriminating
145:10 197:17
discrimination
19:5,11,13,
22,25 20:3,9,
10,14,18
21:22,23 23:5
31:15 33:5
34:5 95:24
96:4,23
98:17,18,23,
25 100:9
101:2,25
102:21
109:10,21
135:23 136:2,
4,10,25
138:20 139:17
141:8,14,15,
16 142:9,15,
19 144:12
145:4 146:2,
9,14 149:1
163:10 164:12
165:15,25
168:6 169:5
170:1,2,7,11
171:2,15
172:20 198:6,
13,19 199:1,3
200:2 201:2,
7,9 202:9,9
203:20 204:5,
15,18 215:21,
25 218:9,23
220:14 225:5,
8,10 228:7
234:12 235:7,

9,14 236:8,
15,25 237:2,
10,13,24
239:7 242:1
253:12 267:20

**discriminations**
225:8

**discriminators**
101:14 147:6,
23 148:1
150:6 153:14
165:8,11,20
168:1,5,24
169:2 205:16

**discriminatory**
27:18 96:19
97:11,15,18
98:9,12
140:20,24
141:25
164:21,23
165:2,6
169:20,24
170:6 201:23
223:16 233:23
234:20,21
235:4,24
238:15

**discuss**
51:22

**discussed**
16:2 51:18
64:24 145:17

**discussion**
212:18

**discussions**
131:4 138:7

**dismiss**
202:21 203:5,
7 249:7,9,10

**dismissal**
202:20,22,24
203:1,4,6
268:7

**dismissed**
234:17 268:8

**disparaging**
209:15 212:15

**display**
85:11

**dissenting**
101:3,17
167:25

**distinction**
187:21 188:7

**distinctions**
22:2 187:22,
24,25 188:1

**distress**
244:14 247:1
257:18

**district**
18:5,13 59:3,
4,5,13,22
60:6,17,18,23
61:1,10 62:2,
20

**diverse**
209:10,11

**diversity**
209:9,13
212:9,19,23
213:3,7,9

**Division**
18:6

**divorce**
64:18

**doc-**
119:5 189:19

**doctor**
56:19 57:1

**doctors**
247:4,6,20

**doctrinal**
232:10

**document**
15:3,9 17:4,
19,21,23
18:8,14,19
19:7,10,15
20:5 43:15,
19,24 75:24
76:21,22
81:21,24
83:18,19
84:9,17,18
85:18 103:16
119:4 120:11
121:6 130:15
132:14 165:12
171:25
188:21,23
190:4,6
198:4,17
240:19 243:4

**documentation**
191:10

**documents**
35:16 81:10
119:5 120:20,
24 176:14
184:19 190:25

**dog**
256:9

**drastic**
255:14

**due**
119:5 202:11
203:21 204:3,

20 249:17

**duly**
6:3

**Duncan**
109:19 111:5,
8 120:5

**duration**
176:2

**duties**
78:8,12
104:15,19,20,
23

---

**E**

**E-L-I-J-A-H**
11:14

**earlier**
11:25 217:7

**earn**
56:21

**earned**
139:12 266:21

**ease**
27:20

**Edington**
168:14,19,21
169:15,20
172:2,20
179:12 180:13
181:7,17
182:1,25
184:2,5
189:25 195:4,
6 206:16,23
207:1,8
225:23 246:20

**education**
68:8 210:17

educator
  57:9

EEOC
  146:20
  190:17,22
  198:7,10
  199:23
  237:10,14

effective
  75:12 76:18
  77:24 146:22
  190:10

egged
  213:21

electronic
  112:22
  113:14,16,19
  114:16 241:10

electronically
  113:9 114:21

element
  210:6

elicit
  24:5

eligible
  108:7

Elijah
  8:6,7,9,10
  11:9,10,14,19

Elmira
  93:15,18
  102:20,25
  103:6,18
  152:6

email
  208:2,4
  269:10,12

emails
  136:18 137:17

183:9,21
203:2,4,8
225:25 229:22
266:18

embark
  57:5

embarking
  62:16

embarrassed
  247:11

embarrassing
  38:10 47:12
  48:13 66:14

emerged
  7:22

emotional
  244:14 246:24
  249:23 253:20
  257:17

employed
  29:10 185:13
  242:21 243:4,
  7

employee
  29:19

employees
  24:9 35:23
  49:19,25

employment
  20:11,15,17
  35:1 36:5
  37:17 48:15
  49:22 60:20
  61:24 64:6,
  20,21 67:6
  69:23 70:1,5
  71:15,19,25
  72:18 73:9,
  10,11 76:22

77:2,16 79:22
143:12 144:20
145:12,13,20,
25 150:16
155:7 187:25
201:12 202:17
239:9,22
242:21 243:23
249:11,12
258:7,10
259:11

enable
  15:5

enacted
  129:24

end
  115:20

ends
  72:13,15

engage
  86:4 137:17
  176:8 177:9

engaged
  27:9 63:17,21
  145:19 152:1
  172:21 234:13
  235:1 236:6
  252:3

engaging
  233:16 236:10
  250:15

enjoyment
  244:9

enslavers
  225:18

ensure
  12:14

entire
  10:3 83:23

107:9 124:22
128:5 144:12
225:24 253:6

entitled
  125:9

entity
  24:8,22,24
  25:4

entry-level
  152:16

environment
  23:9,14,16,
  19,25 24:7,18
  31:15 144:12
  146:2,3
  148:17 169:6,
  7 197:20
  199:21 200:5,
  17 201:8
  213:23
  222:20,24,25
  223:4,9,14,
  15,25 224:18
  226:12,15
  227:8,14
  234:2 235:1,6
  238:16,19,21
  239:11,14
  242:1 246:18
  253:13

equal
  198:7 202:4,7
  203:22 204:2,
  20 228:16
  237:22

equity
  212:19,23

Erica
  29:19,25

escalating
253:15

essentially
12:2 113:4
224:12

established
241:24

Ethics
46:8

evaluate
80:6 125:2,14
128:2,8,9

evaluated
108:18 121:17
125:9,17
126:12 127:2
128:14 132:3,
5

evaluating
79:5 85:7
105:8 146:23

evaluation
73:13 80:10
84:22 88:24
112:1 113:21,
23 124:15
125:20 127:10
129:2 159:14
191:8,18
192:9

evaluations
73:14 117:16
127:6

evening
68:25 214:5

event
32:1 46:24
54:10 266:6

events

44:15,24
48:18,22 50:1
52:19 53:9,
11,13,19
54:10 64:24
224:16 230:3
235:22 257:14

eventually
70:3 153:16
173:8,11

evidence
73:3 100:15,
25 101:13
136:24 214:4
251:11

ex-husband
64:22,25

exact
211:2 262:2

EXAMINATION
11:23

examples
28:10,13
224:14 244:13

exceeding
88:2

excelled
152:25

excellence
121:23 122:19

excellent
251:13

exchanged
49:6,18,24
52:5

excuse
67:9 135:12
151:11

excuses
255:8

exercise
154:14 156:25

exhausted
13:17

exhibit
16:23 17:3,
12,16 43:6,9,
12,15 70:21,
22,25 71:3
74:3 75:13,
17,23 77:5,6,
7,10 81:13,17
83:12,13,14
85:18 94:1,5,
7,19 100:7,14
103:9,13
118:17,21,24
121:4 132:2
157:16
171:20,24
179:1,9
180:17,21
184:8 188:16,
20 189:11,19
197:23 198:3,
4 216:20
237:15,16,21
240:13,17

exhibits
174:18,22
175:1,9
189:14 194:13

expectations
85:19,20

expedited
106:17,19
107:2,7 109:8

experience

32:8,10,12
62:14 63:24
64:2 102:7
164:19 266:8
267:5

experienced
52:20 53:17
92:19 102:5
218:23 234:12
235:18 244:15
246:23 247:5
249:24 266:25

explain
63:1 126:2
135:16 179:15
247:9,16
265:13

explained
128:17 152:12

explaining
169:16

exponentially
253:13

expose
251:17

extensive
86:20

extent
8:10 18:11
26:24 33:18
39:1,7 45:5
47:20 137:1
173:4 197:16
199:6 207:11
214:1

external
80:9 81:9
90:22 100:16
101:9,11
106:23 117:14

127:5,10,19,
20,23,24
128:2 150:24
154:7 159:12

**externally**
197:5

**extra**
13:17 177:7
220:13 254:16

**extremely**
224:8

---

**F**

---

**Facebook**
49:11

**faced**
146:3 165:25

**facility**
248:4

**fact**
87:3 138:19
148:4 153:11
164:17 196:18
213:20 216:8
217:22

**facts**
25:14 45:3
142:18

**factual**
32:6 242:19

**faculty**
21:4 52:21
63:9,25
67:19,21,23
68:25 69:3,10
74:1 76:23
80:17 81:2,4,
5 83:9,22,23
84:2,11

85:12,15
86:11 87:1,4,
6,15 92:18
99:9 101:17,
18 122:6
129:4,21,22
130:1,10,25
131:5,16
132:23 134:3
150:2,4
152:17 154:25
155:10,17
156:5,8
171:17,18
196:19 197:1,
4 202:4 213:6
219:2 220:8
221:8 222:8,
10 224:9
225:24
227:15,17
228:12,17,20
229:2,25
230:6,7,8,9,
10,11,12,13,
16 231:3,9,
19,24 232:1,
10,11,12,13,
14,25 233:5
239:19,23
259:19

**failed**
143:19

**failing**
99:6 143:2
238:17

**failure**
97:10 98:10,
16 141:11,17
143:6,15,16
145:17,23

148:10 201:21
202:6 239:9

**fairly**
221:10

**faith**
249:17

**fall**
87:4 107:9

**false**
99:11 146:7
159:18 245:6
251:12 266:18
267:10

**falsely**
136:18 157:14
218:10

**FAM-**
92:17

**familiar**
6:6 12:1
18:8,10
144:19,22,23
209:20 216:22

**family**
250:17 251:5,
8 253:10,23
254:15,23
255:3 257:11
259:16,21,24
261:9

**FAMU**
11:3 16:9
18:4 19:1,4
24:6,8,11,13,
15,22 25:3,9,
10,20,22
26:16 27:9
29:10,19 35:7
36:5 37:14,
15,17 39:18

45:14 46:2
48:15 49:22,
25 51:19
52:20 61:24
63:17,23
64:2,7,19,21,
25 65:16
67:5,10 68:21
69:23 70:2
71:20 72:19,
22,23 79:4,7
85:20 86:6
92:17 102:6,
18,23 104:9,
13 107:21
112:16 128:13
139:2,5 155:2
184:9 185:14
190:16 210:22
211:1 242:2
247:20 251:3,
7 257:21
258:2 266:4,7
267:2

**FAMU's**
49:19 245:4
246:1

**fashion**
177:14

**favorable**
167:22 218:8

**favorably**
217:10,18
218:22

**fears**
47:4

**February**
202:20 203:15

**federal**
43:17 59:1,2

60:14 62:14

**feel**
12:4 27:13
111:22 158:3
169:24 202:8
203:19 204:4
218:8,22
227:13 239:11

**feeling**
13:21,22
245:6,15
247:9

**fellow**
40:7 49:25

**felt**
53:9

**female**
199:7 209:16

**Ferguson**
59:14,17 60:4

**figure**
14:19 264:24

**file**
183:10,11
237:10,22,23

**filed**
16:5 18:4,9,
12 64:13 66:4
146:20 167:15
190:17,22
198:6 200:25
235:9 238:1,
7,9 241:25
249:9 267:13,
16

**filing**
19:2 51:22
235:14,18
236:8 239:3

246:12

**filings**
175:2

**final**
82:21,23 83:4
88:18,19
202:22

**finally**
267:14

**find**
7:11 101:12
183:7 255:23

**finding**
245:11

**fine**
31:10 66:25
105:16 166:13
172:23 189:7

**finish**
31:7,21,23,4
60:4 96:8
243:20

**finished**
21:8 33:11
45:17 132:12
141:19 150:17
171:11 263:2
269:6

**fire**
159:1

**fired**
238:23 267:24
268:25

**firm**
57:23 60:9,10
62:13 259:15

**firms**
259:18,19

**fiscal**
216:19

**fit**
86:11,18 87:2

**fits**
86:9

**five-minute**
70:25

**flip**
17:18,23
43:14 240:24

**flipped**
17:21

**floor**
232:4,7,13

**Flores**
55:6

**Florida**
5:5,8,14,19
6:22 8:2,3,8,
20 16:5 18:4,
5 24:24
34:20,22
35:22 39:15,
17,20,22,23
41:19 55:24
56:5,11 58:20
59:4,13 60:18
61:11 76:8,23
77:8 96:16
103:24 119:1
172:9 175:4
181:2 237:14
248:3 253:10,
23 255:4
256:20
259:13,17,22,
23,25 260:15,
16,20,25
261:9 263:17,

18,19 264:7,
8,9 265:8

**flows**
267:4

**fluctuate**
230:14

**fluctuated**
230:20

**fluctuates**
232:18 233:4

**flushing**
243:13

**focus**
266:13 268:22

**focusing**
247:1

**folio**
190:25 191:2

**follow**
16:1 102:21

**force**
129:25

**foregoing**
241:5

**foresaw**
8:22 9:21

**forgot**
13:4 95:12
176:24 203:21
265:7

**form**
18:25 22:8,10
33:15 119:11
145:22 198:9

**formal**
164:1

**formally**
130:18,19

forthcoming
45:7 259:4

forward
15:22 141:7
158:17 163:11
176:3 178:23
218:12

forwarded
91:11 192:19

found
62:13 136:21

frank
21:6

free
12:4

frequency
89:20 250:21,
24

frequently
251:4,20

friend
46:13,18

friends
29:24 42:25
251:22,24
252:2 253:24

front
87:6 147:14
173:22 175:23
176:17 177:4
211:16 246:5,
6

full
69:15 80:22,
24 81:3 95:9
112:7,12
114:1,5
121:7,14
126:3 127:13

128:1,4,9,11,
20 129:3,15,
20 132:21
133:7 141:11,
17 143:3,7,20
144:10
146:16,24
151:14 152:14
153:9 167:3
186:19,21,22
187:2,7,8,10,
11,12,14,23
188:4,14
190:7,16,21
192:18 195:20
196:2,7,10,23
220:18 239:19
254:3

full-day
68:24

full-time
71:21 80:21

fully
97:25

functions
24:8

_____ G _____

gathering
251:11

gave
15:2 28:10
69:6 96:21
100:7,13
123:7 130:24
140:10 173:19
175:9 178:4
179:16,18

Gearing

253:7

gender
21:22 34:17
149:13,16,19
169:4 206:9

general
6:22 8:2,7,17
9:3 11:5,6
29:5 55:9
183:4 231:24
253:1,2

generally
15:8 85:19
105:11 107:6
150:10 170:16
218:23 232:17
233:19 234:4
236:6

generated
121:1

generation
120:22

get along
167:8

give
5:23 14:14
15:4 19:19
26:9 61:15
63:13 79:7
87:10 112:18
133:11 142:1
176:24 177:2
179:25 180:1
182:22 189:4
213:25 261:22
269:11

giving
14:13 176:25
184:4

goal
266:9,17
268:22

goals
68:11

good
7:15 8:6,16

goodness
61:14 229:21

graduate
55:25

graduated
55:21 62:22

graduates
57:4

graduating
58:16

graduation
58:8

grandmother
256:16,22
260:18,19

Grant
120:6

granted
126:19

granting
79:24

Grayrobinson
5:18

great
29:21

grievance
183:12,19
184:23 185:8

grieve
182:15,18

grieving
  256:14

Griffin
  120:6,16
  167:8,14
  169:11 211:9
  214:18 246:10

ground
  6:8

group
  41:3,4,10,16,
  23 42:3,14,16
  150:4,5
  209:11,12
  210:5 211:8

groups
  41:2,7,15
  42:19

Guerrero
  55:5

guess
  9:2 68:5
  90:16 155:15
  225:20 268:15

guidance
  38:13

Guillermo
  55:6

———————

**H**

Haidara
  55:7

halfway
  198:18

hallway
  27:14 28:11
  29:11,15
  233:20 234:10

hallways
  233:9

hand
  5:21 17:2
  179:3 240:2,
  16

handbook
  83:9,22,23
  85:12,16
  86:11 87:1,4,
  6,15 122:6
  129:4,21,22
  130:1,10,25
  131:16 132:24
  134:3 219:2
  220:8 221:8
  222:10 231:3

handed
  178:25

handled
  99:8 220:10

handles
  112:24

hands
  162:23 163:3,
  7

happen
  39:1 212:17
  213:13 266:10

happened
  53:14,18 93:9
  96:21 99:1
  101:2 146:6
  153:23 161:11
  163:11 171:15
  224:6 235:22
  242:7 244:1,2
  254:14

happening
  9:5,11 14:7

hallways

31:16 96:24
  146:11 213:5
  220:14
  245:15,17

happy
  12:4,24

harassed
  177:19

harassing
  38:10 47:13
  48:12,13
  66:13 123:13
  158:4 177:23

harassment
  66:22 235:23

hard
  245:2

hardcopies
  113:10

harm
  244:14 246:24

Harris
  71:5

Harvard
  56:6,22 57:3
  62:4,15,20,22

HB
  209:20

HBCU
  209:22,23,24

HBCUS
  210:7

HBSU
  209:21

head
  12:21

headache
  13:23 241:18

243:8

heads
  135:22

health
  247:2 248:4
  249:20

hear
  97:23 208:20

heard
  145:8 149:8
  206:12,16,19,
  22,25 207:4,
  15,20 208:25
  209:1,2 212:5
  214:22
  215:16,21,22
  216:24 268:1

held
  5:7

hell
  151:23

helped
  261:5 267:21

helping
  260:7

helps
  164:16

Henslee
  120:6,16,19
  147:19 167:5

Herbert
  189:25
  216:18,22
  217:1

high
  55:21,22

higher
  117:2 152:4
  158:20

160:13,15

**higher-rank**
102:7

**hire**
139:20,25
145:9 156:9
159:1

**hired**
21:7 72:6,22
105:25 111:17
131:1 139:5
140:3,12
141:7 151:12
152:10,12,13,
17,18,21
154:23 155:6
229:5,12
254:2,3,11,12
267:17,19

**hiring**
152:16,19,21
154:17 155:2,
7,14,15
156:1,7
158:15 267:18

**Hispanic**
21:24 22:4,5,
6,11,14,19,21
23:2 225:17
227:23

**Hispanic/latina**
20:24 21:2,5,
6 143:2

**historic**
209:25

**Historical**
209:23

**history**
210:3,9

**Hmm**
250:5

**hobby**
41:3 42:15,18

**hold**
25:23 49:11
154:1

**holding**
175:4

**holds**
153:21

**Holland**
57:24,25
58:17,24

**home**
36:23 37:1
39:13 245:25
256:18,24
261:1,2,3,7

**honest**
14:13,14
31:13

**honestly**
54:2

**Honorable**
59:14

**hope**
267:12

**horrific**
244:22 245:10
246:6 256:17

**Hospital**
248:4

**hostile**
23:8,13,16,
18,25 24:7,18
31:14 146:1,3
197:19 199:21
200:5,17

201:7,15,16
213:23
222:20,23,25
223:3,8,13,24
224:18
226:11,15
227:7,13,16
228:4 234:2
235:1,5
238:15,19,21
239:10,14
242:1 253:12

**hostilities**
235:24

**hostility**
254:5

**hours**
86:15 229:9
232:24 243:17
261:19,25

**How's**
252:20

**Howard**
45:14 267:24
268:2,11

**Hughes**
71:5

**hypothetical**
161:24

-------

**I**

**I-R-I-S**
11:13

**I-S-A**
247:25

**identification**
16:24 17:3,
13,16 43:10,
13 70:23

75:14,17
77:11 81:14
83:15 94:2
103:10,13
118:18 171:21
180:18,21
188:17 197:24
240:14

**identified**
75:22 76:14

**identifies**
119:19

**identify**
17:4,19 28:18
34:2 36:8
43:15 71:3
75:23 76:21
81:21 83:19
95:3 103:16
118:23 171:24
180:23 188:21
198:3

**identity**
22:22 47:4,9
149:6

**ignoring**
146:8 225:6

**illness**
13:25

**imagining**
245:15

**immediately**
57:16 177:2

**immigrants**
260:8

**immigration**
73:4 133:13,
15,19,24
135:4

immigration-
specific
 133:17

impact
 13:12 187:25

impacted
 257:15

impacting
 13:9 14:1

implemented
 112:16 182:24
 210:20,22

impossible
 258:13

improper
 28:14,15

in-person
 7:7

inadequate
 100:15

inappropriate
 27:24

include
 22:22 45:10
 87:7 108:23
 127:5 129:1
 153:13 224:5

included
 24:2 44:5
 67:20 83:22
 109:22 135:8
 153:15 224:5

includes
 45:3 145:16
 148:12 239:13

including
 33:1,3,8 46:5
 126:4,12
 144:13 146:6,

8 170:22
171:16
174:17,24
175:8 177:22
179:20 223:4,
11 225:10
246:19 247:4
265:1 267:13

inclusion
 212:19,24

income
 242:23 243:1,
 3

incorporated
 144:16

incorrect
 125:13

increase
 78:23 187:3
 195:17,18

increased
 249:7 253:13

increasing
 79:5

increment
 254:4

independent
 86:16 97:2
 102:10,14
 151:8 164:18
 232:22

indicating
 119:24

indignities
 223:17

individual
 25:20 29:10
 44:3 54:13
 73:8 110:17,

22 145:10
160:1 162:5
163:22 192:6
246:2

individually
 137:20

individuals
 25:22 26:23
 27:9,17,21
 28:16 37:13,
 15 40:11
 41:12 42:20
 44:5 48:18
 49:2 50:4
 52:6 54:9,17
 55:12,14,18
 136:12 147:25
 149:10
 160:19,23
 166:24 219:13
 220:21 221:11
 251:19,23

inferior
 224:20

inform
 76:9

information
 18:18 23:5
 35:4,17,23
 36:1 43:22
 54:14,15
 112:19 117:10
 118:13 126:8,
 12,13 179:25
 183:10,23
 200:20,23
 241:13

informing
 236:25

informs

104:3

initial
 37:10 38:1
 40:15,18
 43:18 64:21
 68:19 79:2
 154:9 190:14
 204:21

initially
 233:24

initiate
 234:10

initiated
 233:22

Injunctive
 18:2

inquiry
 181:23 182:1,
 3

inside
 155:13

insisted
 257:8

insomnia
 244:11 245:3
 247:9 257:18

instance
 13:3 26:24
 41:8,22 53:13
 73:13 85:4
 87:19 89:24
 108:25 110:18
 137:1 183:20
 251:2 256:6

institution
 35:7 208:23
 212:22 213:5
 225:9,11

institutional
  24:9 25:10,
  11,13,23
institutions
  210:10,11,21
  265:4,7
instructions
  15:11,13,14
  16:1 253:18
instructor
  264:19
integrate
  210:24
integrated
  210:13 211:1
intend
  200:8
intended
  139:20 199:20
intent
  14:14 164:21,
  23 165:2,6
  202:21 203:5,
  7 249:6,10
intention
  266:8
interactions
  24:6 86:20
  231:23 234:5,
  7,9 249:25
  251:6
interchangeably
  22:18 41:16
interest
  38:24
interested
  63:11,12,15
Interfolio

112:15,19,21
113:1,4,17
114:15,19,21
115:11,23
116:5 117:11,
20 118:8
133:4 134:20,
22 135:1,5
147:3 191:4,5
interim
  45:13 171:16,
  17 172:3
  181:8 267:23
  268:2
internal
  80:9 81:9
  90:23 100:16
  101:8,11
  117:15 150:24
  154:8 159:13
  185:10 237:22
internally
  228:15
interpreted
  131:13
interrogatories
  240:22 241:6,
  14
interrogatory
  242:12,15
  244:8 257:20
  258:1
interrupt
  132:11 166:5
interrupted
  150:20
interview
  68:6,24 69:24
  70:15 88:6

interviewed
  88:9
interviews
  69:13,15,18,
  19,21,22
investigation
  99:11 167:18
  214:17,22,25
  215:3 220:11
  257:3
investigations
  146:7 215:13
  245:7,12
  251:10 253:4
invite
  63:8
invited
  67:12,13,15,
  24 68:22
involved
  64:9,17 67:3
  82:9 113:20
  182:21 222:6
  268:12
involvement
  160:4,21
iphone
  50:8,9
Iris
  8:6 10:24
  11:4,8
Isa
  247:25 248:1,
  16,20
Isa's
  248:12
issue
  7:22 14:18
  34:5 101:21

137:6 160:3
179:12,18
181:4 212:15
259:8
issues
  13:16 14:8
  32:6 47:9
  73:9,12,17
  233:15,17
  247:3
item
  62:15
items
  203:25
IX
  84:6

———————

J

James
  76:1 77:6
Janine
  183:2
January
  242:8
Janvier
  55:1
JD
  56:18 57:4
  58:10,16
Jean
  55:1
Jennifer
  120:7,17
  147:20 149:5,
  24 167:6
Jeremy
  225:14,15
  234:19

Jessica
53:13,19

job
39:18 62:9
63:13 68:22
69:1,2,6,12,
16,19,21,24
175:6 250:1
251:13 252:1
254:10 261:5

John
109:19 111:4,
8 120:5

Johnson
54:24

joined
128:13

Jones
105:21 106:1
108:11 111:7,
19 120:7,16,
17 149:5,14
167:5 217:6,
8,9,10
221:12,13
234:21

Jones'
107:12 111:10

Joseph
120:6

Jr
59:14,17

judge
59:6,16,24
60:3,4 61:5

Julie
5:18 176:15
177:6 178:4

July

172:1 189:20

June
58:14 75:25
76:14 103:17
104:6,10
241:8,16
242:8

juris
56:19 57:1

jury
18:1 244:20

———————————

**K**

———————————

Keller
189:25 192:24
193:3 196:24,
25 209:4,6
211:23,25
212:4 214:9,
14 227:19
228:24 246:21
268:1

Kentayvia
8:17

kill
256:4

kind
42:2 50:7
113:4 145:2
155:3 180:12
222:2,9
252:22 265:25

kinds
160:12 178:14
225:21 246:24
251:11

knew
29:24 95:2
171:17 235:1

245:16,17
256:12,20
257:6

Knight
57:24,25
58:17,25

knitting
41:22 42:1

knowing
225:12 245:14
246:17

knowledge
15:10 19:23
31:13 43:23
44:6,8,9,10,
11,15,19,21,
24 45:8,23,24
46:20 53:8
54:6,10
66:10,20
89:19 97:22
99:16 118:12
123:8 125:12,
22 130:17
134:16 135:6
158:6,7,10
163:25 164:19
179:15 183:13
200:18 208:9,
11 211:12,18
241:7 242:19

———————————

**L**

———————————

labeled
237:15

Langston
109:23

language
224:12 260:10

larger
78:14

Larry
76:3,24
168:15,18
170:2 172:2,
21 189:24
194:2 207:8
222:5 225:23

late
259:5

Latin-american
22:8

Latina
21:15,24
22:4,14,19
23:3 137:12,
25 139:22
148:5,7,9,14,
16,19,24
149:3,6,20
169:8 170:15,
18 171:4,9
199:4 200:12
215:8,10
216:16 225:17
227:11

Latino
22:19 225:5,
9,10

Lauren
55:4

law
24:25 26:20
39:19 45:14
46:2,4,5,6
51:25 52:3
54:5 56:6,15,
17,22 57:3,4,
6,9,10,11,20,

22,23 61:2
62:4,7,10,11,
12,13,18
63:5,8,19,23
64:19 65:17
67:16 68:23
69:3 71:20,23
73:1,4,6 74:1
80:4 89:6,7,
8,9 91:3,5
92:3,17,18,19
93:6 96:22
97:3 98:21,24
100:8,10,17
101:10,14
102:5,7,8,9
104:18 106:2,
5,8 107:8,15
110:7 111:3
114:23,24
115:1 116:24
117:1,7,13
119:2,10,23,
24 121:25
122:7,20
129:8,12,16
130:6,9,12
131:3 143:14
144:20 145:15
147:9 151:7
152:14 153:2,
12 154:15
156:22,23
160:7,11
164:11,20
170:8,16
171:2 172:13,
14 173:5
181:2 185:22
186:20 188:5
190:1 191:19
196:10,21

197:13 204:16
206:7 213:23
214:3 218:6
220:2,18
224:13
229:17,18
232:2,3
236:17 237:24
238:8 244:5
245:8 258:15,
20,23 259:10,
15,18,20
263:11,21
264:3,4,5,11,
13,15,17,20,
21 265:17,19,
21

**Laws**
56:25

**lawsuit**
40:3,8 64:10,
13,15,17,25
65:25 66:4
241:25

**lawyer**
175:3,5 206:7

**lawyers**
170:17

**lead**
33:3

**leading**
87:20

**Leah**
5:9

**learned**
215:13 260:10

**leave**
42:7 60:5
61:10 74:2
166:25 232:15

254:5

**leaving**
62:19

**led**
204:19

**left**
39:21,23 40:1
60:19 62:1
261:22,24

**legal**
5:10 23:18,
20,21,22 24:2
57:23 69:2
223:1 232:11

**legally**
24:21,23

**Leroy**
47:6 67:14
70:8 76:4
91:5 95:13
102:13 103:4,
6,20 168:16,
18 170:5
220:19

**Leticia**
258:22

**letter**
70:9,10 71:4,
11,13,21
72:8,10 74:4
75:25 76:9,13
77:3,6,13,23
95:5,10,21
96:1,2,3
103:17,25
104:2 172:1,
4,15,17,22
173:9,12
179:17 180:6,
25 181:3,6,

20,22 183:20
184:7,9
189:20 190:10
193:24 194:1,
6 195:11,12,
15 202:25
203:6 216:21

**letters**
26:15 181:4
236:17,24

**letting**
10:22

**level**
90:20 91:4
99:5 101:12
156:5,6,22
158:17 160:13
221:2 246:16

**levels**
90:24 117:3,9
118:10 144:13
152:5 155:8,
10 156:3
158:20 160:15

**Levitt**
225:14,16
226:4,13,16
227:1,12
234:19

**Levitt's**
227:12

**Lexitas**
5:10

**library**
46:6

**life**
151:23 244:9
256:6,11
260:5

light
  21:16,18

light-skinned
  21:15 199:9

limit
  33:13 259:21

limited
  259:19
  263:16,20

limited-access
  35:24

limits
  265:3

list
  49:7,15 52:4
  53:5 54:9,12,
  22 55:18,19
  62:16 111:17
  132:8,9
  134:23,24
  135:1,10
  147:14,15
  149:4 203:21
  204:3 219:8
  226:22 227:2
  231:11 252:5,
  9 257:19

listed
  37:9 38:7
  40:15,18 43:2
  44:16,25 45:8
  46:10 49:2
  50:22 51:20,
  24 52:3,7
  53:7 54:3
  62:10 66:6
  87:14 109:23
  132:25 135:1
  149:22 165:24
  169:11 231:14

258:1

listen
  134:17

lists
  84:11 120:15
  132:2,15
  141:5

litigation
  64:10

live
  34:19,20
  36:12,13,14
  38:6 39:13
  260:14 261:12
  262:11

lived
  37:18,20 39:9
  103:24

lives
  36:17 261:18
  262:7,12

living
  151:23

LLM
  56:23,24
  57:7,15,18
  62:15,20 67:7

load
  78:14,18

local
  11:16

locally
  261:18

located
  232:3 260:16

location
  132:13

Londono

52:13,14 53:4
  55:1

long
  39:16 50:9
  54:22 57:25
  59:16 60:12
  61:7 62:21
  77:19 210:25
  211:2 256:10
  260:3

longer
  240:7 249:23

looked
  82:6 215:12
  263:23 264:3

Lopez
  52:13 53:4
  54:25

loss
  242:23 243:23
  244:7,9
  256:14 257:10
  258:3

losses
  257:13

lost
  242:21 243:1,
  3

lot
  37:10,12
  45:21 86:19
  102:6 133:8
  147:6 159:20
  160:10 223:2
  229:21 230:4
  246:7 253:24

loved
  256:7

Lundy

109:22

Lyndol
  40:12 252:7

Lyndol's
  252:8

---

**M**

M-O-R-A-D-E-L
  46:16

made
  26:16,20 62:4
  80:16 81:2
  82:20 89:20
  110:10 116:1,
  4 136:13,20
  149:2,5,6,10,
  11,14,17
  155:6 160:23
  163:15,20
  171:5 174:20
  176:23 177:1
  178:2 201:15,
  16 205:8,9,
  13,16,17,21
  207:9,10
  208:4,8,9,12,
  13,16,17,25
  209:5,16
  211:5,7,10,15
  212:1,16
  213:1,2,12,15
  214:9,16,22
  215:20,22,23
  216:8 224:8
  226:8,17
  227:1,16
  233:21,25
  234:20,21
  235:3 266:24
  267:15

mailing
36:7

maintain
200:19 204:10

major
242:20 245:22

majority
90:7,10 91:22
147:22

make
7:8 9:6 15:18
17:22 21:10,
15 27:17
77:6,22 80:8
81:8 82:13
86:23 91:17
93:13 113:9
115:11 116:21
142:4 150:19
151:22 153:24
154:11,17,22
158:12 159:1,
5,18 163:21
169:22
174:11,17
177:22 178:2,
3,7,11,14
186:3 192:13
196:13 206:8
208:19 209:6
212:5 214:7
255:8 259:25
263:1

make-up
111:11

makes
26:22 82:21
93:10 115:16,
18 116:13,14,
16,17 159:2

160:20 218:22

making
15:16,23
30:14 83:6
134:5 144:14
150:14 151:17
175:14 178:10
205:24 206:2,
12 213:20
215:16 246:13

male
167:21

malicious
165:17 214:19

management
216:20

Mangum
93:15,18,19
102:20 103:1,
7,18 152:7

manner
21:2

manners
86:5

manual
9:22 10:8
11:16

Marcella
92:16 93:6
95:13,18,20
102:4,11,20,
25 103:3,6,19
151:7 152:7
164:18

March
43:24 46:12
71:4

Mariam
55:7

Marie
120:5 147:18
149:23 167:5
217:22 218:1,
2

Maritza
5:4,16 6:2
18:3 119:1
120:1 160:25

mark
43:6 77:7
176:23 177:4
178:12

marked
16:23 17:2,
12,16 43:9
70:20,22
75:13,16
77:10 81:13,
17 83:12,14
85:18 94:1,4,
7 103:9,12
118:17,20,24
132:2 171:20,
23 179:1
180:17,20
184:7 188:16,
20 197:23
198:2,4
240:13,17

market
62:25 63:1,3

marking
43:12 173:19

Markita
214:11

marriage
65:9

married
64:7

mask
12:13

Master
56:25

material
35:25

materials
36:7 63:7
80:11 82:14
83:7 91:4
105:13 106:22
107:6 108:21
113:8,16,20
114:19 117:5
130:6 132:24
133:8 192:8
231:16 233:1
268:6

matter
5:4 246:18

Maurice
168:14,19,21
169:15,19,20
172:2,20
180:13 181:7,
17 184:2,5
189:25 195:4,
6 206:15,22
207:1,8
225:23 246:20

MBA
56:12,14

meant
20:8 68:23
200:18 203:15
209:9

Mechanical
5:5

media
49:11 74:18

166:19 240:12

**medical**
14:7,18
61:20,23

**medically**
13:16 14:5

**medication**
13:15,25

**medications**
13:11

**meditation**
249:18

**meet**
63:8 67:13,
15,18 68:1
86:15 100:21
122:18 135:25
136:1 230:4,
19 231:18,19
232:23,24
233:10

**meeting**
68:3,19,24
78:21 87:18
88:2 104:6
119:8 120:12,
21 227:19
231:25 233:12

**meetings**
68:20 69:22,
25 82:19
109:17 148:20
165:17
227:15,17
229:25 230:6,
8,9,10,11,12,
13 231:3,6,19
232:1 233:1

**meets**
121:23 122:5

**member**
41:11 52:20
69:4 81:4
104:17 105:9,
11,15,18
109:3 111:13
137:2 150:4
152:17 160:7,
8 165:16
186:19 226:4,
5,6,7 229:2
257:11 259:19

**members**
41:9 68:25
69:11 99:9
101:18 119:21
136:15 138:11
147:10 160:11
192:6 202:4
224:9 231:24
232:14 233:5
236:18 246:3
250:17

**membership**
111:11,15
168:11 192:3

**memo**
128:16,17,25
129:5,7
130:4,13,20
131:1,4,17,
20,23,24

**memorandum**
225:22,25

**memories**
253:20

**memory**
45:12 75:1,19
87:2 135:6

**memos**

136:18 251:10

**men**
169:10

**mental**
244:11 249:20

**mention**
91:25 92:1

**mentioned**
53:2 56:20,22
57:13,14
70:15 84:21,
22 91:24 94:8
129:7 181:9
187:6 204:5
217:3 223:23
224:2 239:10
247:21 263:10

**message**
148:17,21
150:1 170:21
224:19 228:7

**messages**
47:25 48:5
49:1,14,18,25
50:3 51:3,7

**met**
67:19 122:9,
13,24 124:11

**Miami**
57:21,22,24
71:7,8
261:13,14
262:7

**Michael**
40:12 95:6

**Michelle**
54:24

**mid**
261:15 262:6

**middle**
18:5 69:16,17

**Midwest**
197:13,14

**migraines**
14:4 247:5

**Mikayla**
55:4

**military**
67:2,3

**mind**
165:7

**mine**
46:13 107:14,
23 174:1

**minority**
228:2

**minute**
64:13

**minutes**
157:15 243:15
261:22,24

**mis-**
144:8

**mischaracteriza
tion**
28:1 176:7
178:8

**Mischaracterize
s**
140:7

**mischaracterizi
ng**
34:10

**misconduct**
259:7 264:23
266:18,19
268:23

misleading
134:4

misstate
197:11

misstated
144:8

mistaken
184:8

mixed
189:10

Mm-hmm
24:14 66:17
75:21 81:19
139:7 142:22
151:20 162:14
199:10 264:12

mobbing
167:10 168:7
223:11,18
244:25 251:14

moment
10:23 30:3
38:13,15
81:18 87:22
94:8 187:6
205:12 240:6
250:8,14
262:22

monetary
244:18

month
34:11 230:8,
13,24 231:6,
19,20,21,22
249:4 255:2

monthly
42:22

months
60:15 248:25

mood
213:23

Moradel
46:14,20

morning
7:15 8:6,16
16:2

mother
36:17,19,24,
25 37:4,8,19
39:10 250:3,
16 251:1,3
260:2,4,7,13,
17,21,22
261:9 262:14

motion
249:9

move
15:22 30:4
32:2,3,4 39:2
47:19 92:22
97:5 99:14
107:17 123:3
124:8 134:10,
11 139:18
157:21 158:2
176:3 180:3
189:13 190:18
207:13

moved
31:25 39:18

moving
38:24

multiple
140:4,8

mute
7:13,14

muted
9:2,9

—————————

**N**

—————————

N-U-N-N
128:17

named
25:1,11,17
37:25 40:12
109:22 148:18
166:23,25
167:17 168:24
183:6 219:13
221:11

names
66:16 109:23
165:23 166:1
213:18 219:10
225:11,15,21,
24

narration
30:12

narrative
30:8 31:6
223:7,8

Natalya
52:12 53:4
54:25

national
152:17 199:11

natural
267:4

nature
27:18 33:15
159:2 200:7
204:2 217:12
233:11 239:25
244:12

necessarily
22:2 35:11
52:17 196:5

needed
15:25 104:24
180:1,2
183:10

negative
29:21 234:7

negatively
170:21

neighbors
39:25 40:3

neurologist
247:7,23
255:19,20

Nicaraguan
199:11

Nicky
149:22 167:4
172:3 181:8
211:4,5
214:15 215:15
216:2 217:22

Nicola
120:4

Nicole
52:12,13,14
53:2,4 54:23,
25

nightmares
244:12

nobody's
208:22

nodding
12:20

Noel
55:3 227:3

non-deadline
157:16

non-hispanic/
latina
21:4
nonblack
99:9 149:20,
25
nonreceipt
204:21
nonresponsive
30:5 32:1
97:6 157:22
180:4 190:19
207:14
Norland
55:22
normal
229:14
note
8:5 182:6
189:6 194:12
noted
11:21 34:15
36:9 134:17
178:18,19
notepad
16:14
notes
16:15
notice
16:19 17:5,7
53:7 114:9
142:16 149:21
153:6 173:6
179:5,10
180:6,7
182:7,10,14
202:20 203:3,
5,7,11 207:19
249:6,10

noticed
7:6 202:19,20
notif-
194:21
notification
179:13 195:1,
7
notifications
198:10
notified
194:19,22
Nova
56:5,17,18
62:7
November
119:3,9,25
120:12,21
165:13 167:3
number
18:2 27:15
47:1,9,21,24
48:4,6,7,14,
16 49:10 84:5
90:7,10 91:22
143:13 229:6
242:12,16
244:8
numbered
119:15,18,22
numbers
17:22,23
50:25 83:20
119:4,6,8
250:25
numeral
84:4
Nunez-navarro
258:25

NUNN
128:16,25
129:5,7
130:4,13,25
131:4,17,20
nurse
248:22

_____

O

oath
12:7 241:2
object
9:12 27:25
33:2,7,16,24
37:24 38:9
66:3 97:7
107:17 119:11
123:13 134:4,
10,13 141:21
142:2 174:10
175:12
objected
6:14 47:3
objecting
11:15 34:11
objection
7:3 8:23
9:16,19,20
11:21 15:21
23:20 33:14
34:8,9,10,15
36:3,9 44:17
47:15,16,22,
23 48:8,12
59:11 66:13,
23,24 93:4
123:6 132:7
134:17 135:18
140:6,14
145:21 157:25

174:10
175:16,17
176:5 178:8,
17 223:1
objections
6:9,13,16,25
15:16,17,24
30:14 33:13,
23
obtain
56:7,18 58:10
100:21 184:11
obtained
106:6
obtaining
54:13 57:15
69:23
occur
61:13 146:19,
21 182:19
202:18 228:22
occurred
68:17 75:9
123:19 146:20
182:23 210:16
237:4 238:5,
18,22
offer
69:23 70:1,4,
7,9,12,18
71:14 72:22,
23 74:4
offered
71:19
office
7:19 9:6 71:6
86:15 181:12,
24 182:1
183:4 186:19
195:24

201:15,25
202:6 203:9
204:21 229:9
232:3,15,17,
24 239:17
248:5,6,24

**officer**
46:8 246:13

**officers**
46:2

**offices**
232:5,7

**official**
129:8 154:1,5
160:16 173:25
237:2

**Officially**
163:4

**one-minute**
262:25

**one-year**
62:22,23 63:2

**ongoing**
45:4 224:11
235:23
238:19,21
239:5,14

**online**
133:17,18,22
263:14 264:7

**operative**
201:1

**opine**
153:22

**opinion**
123:19 136:3

**opportunities**
239:18

**opportunity**
17:18 43:14
79:9 220:7
237:23

**opposed**
12:20 125:20

**opt**
268:18

**orally**
12:19

**order**
85:3 100:21
269:8

**organization**
41:17,18,20,
24 42:3,8,9
63:4

**organizations**
41:11,15

**origin**
199:11

**Orlando**
5:7 18:6
34:20 39:14,
23 40:1 172:9
181:2 207:23

**outlined**
96:24 152:2

**outnumbered**
168:4

**outright**
266:13

**outstanding**
152:19

**overridden**
162:1

**override**
157:4,8

---

**P**

---

**p.m.**
74:16,18
166:16,17,19
174:5,6,8
240:10,12
250:10,12
263:4,5,7
269:7,13

**package**
78:6 79:13
186:16 195:17

**pages**
18:6,7 83:20,
25 119:6,7,14
122:22 124:9
198:8,9,10

**paid**
144:25

**paragraph**
26:6 142:23
199:6

**paragraphs**
84:20 142:17
144:16

**parentheses**
199:4

**Park**
34:22 39:15,
16,19,22,25
40:2 76:6

**part**
14:6 15:19
16:15 28:15
67:23 70:14
78:19 85:25
86:6,16 87:15
95:23 100:9

103:4 109:10
111:25 126:3
134:2 138:6,7
146:14 147:4,
5,16,17,18,
19,20,21
154:25 159:20
161:16 167:8,
11 168:6
170:3 172:20
185:19,21
186:15 194:17
196:25
219:13,15
229:7 230:16,
17 234:1,7

**participate**
13:13 41:2,
24,25 42:2,
14,16,19
225:2 230:2

**participated**
27:2 105:5
147:10 149:4
167:18 168:15
169:1 197:19

**participates**
155:10,11

**participation**
227:15

**parties**
45:9

**party**
11:18 32:13
112:23,24

**passage**
227:21,23
228:3

**passed**
58:19

passing
232:1 256:7

past
40:9 49:20

Pat
47:6

path
57:17

Patillo
55:3

Patricia
29:12,14,23
47:7 92:2
109:13,22
112:4 120:5
147:17 149:9,
23 160:7,16
167:4 217:20
218:13 219:4
220:15 235:2

pattern
252:13

pause
14:19 30:3
38:12 74:10

pay
186:18 187:3
200:3,14

peace
59:15

peer
80:10 117:15
159:14

peer-reviewed
133:13,14

penalty
12:10 241:14

pending
134:12

Pennsylvania
262:12

people
9:24 21:14
22:16,17,18,
19,25 37:9,
11,13 41:8,10
42:14,17
44:19,23
47:25 48:2,22
109:20 111:12
136:6 148:18,
22 153:6
163:20 167:12
170:15 171:4
205:16
209:10,11,12
213:8,9,22
225:18,19
227:10
233:13,14,25
234:9,25
238:9 244:24
245:9 250:1
251:25 252:24
267:16,18,19,
21

per-
53:8

percent
186:18

perfectly
32:24

performance
73:15 79:5

performing
73:16

period
37:1 64:7
72:3,5,9

134:21 234:16

periods
79:6

perjury
12:10 241:15

Permanent
18:2

permission
179:10

permitted
146:1,5,12
222:13,14

Pernell
47:6 67:14,
18,20 68:20,
21 70:8,14
76:4 91:5,7
95:13,14
102:13 103:4,
6,20 157:8
160:24 161:2,
5,8 162:24
164:22 165:9
168:16,19
170:5,25
205:9,17
220:20 246:20

Pernell's
157:9 161:15

Persaud
221:14,17,23

persistent
223:17

person
7:9,23,24
10:1,6 26:3
29:25 65:7
80:1 102:12
105:18 158:25

183:8,25
184:1,20
212:19,24
223:17 260:11

personal
7:21 15:10
19:23 44:8,
10,11,15,19,
24 45:8 46:20
54:10 66:10
89:19 97:22
99:16 118:11
123:8 125:12,
22 130:17
134:15 135:6
153:22 158:6,
7,10 163:25
179:14 200:18
211:12,18
242:19

personally
70:17 108:20

personnel
26:16 113:24

persons
144:25

pervasive
224:11

pervasively
223:15

pervasiveness
235:23

pet
256:7

Phd
103:18

phone
47:1,9,21,24
48:4,6,7,14,

16,17,21,25
49:10 50:4,5,
7,15,18,25
51:5,9,13
65:5 70:7

**phones**
50:21,23 51:1

**phrase**
159:3 223:13

**phrasing**
85:14

**Phyllis**
120:7 147:19
149:8,24
167:6 217:23,
24

**physical**
34:23 35:2
39:12 255:23

**physician**
247:8 248:7
249:3 256:2

**physicians**
255:18

**pick**
78:14

**piggybacked**
96:20 170:7

**place**
82:19 102:17,
23 139:20
191:3 212:13,
14 231:20
266:16

**places**
252:24

**plaintiff**
5:17 17:6
18:3 143:2

175:6

**Plaintiff's**
43:17

**plan**
15:23

**planned**
42:22

**planning**
87:16

**played**
179:21

**plenty**
136:24

**ploys**
100:10 110:14
144:10

**PO**
34:22,24 71:9
76:5,7 96:12,
13 103:23
189:22

**point**
12:15 14:16
28:5,9 29:4
34:7 37:1,18
49:21 51:23
57:17 58:19
59:21 61:3
64:14 72:21
74:6 76:6
77:15 81:10
88:11,24
104:8,17
112:6 115:15
127:1 135:7
136:20 164:24
168:3,15
171:11,16
176:4,21,22,
23 177:1

183:4 184:2
191:15,16
192:24 195:16
208:3 210:23
218:5,6
220:24 228:16
259:6

**pointed**
165:12

**points**
196:2

**policy**
129:8,18,23
131:9

**Polite**
29:19,25

**pool**
64:14

**poorly**
73:16

**portfolio**
114:12

**portfolios**
114:20

**portion**
109:5 219:22

**posed**
132:12

**position**
71:22 72:25
87:23 132:4
140:19,23
164:14 184:22
185:25 186:6
196:6 197:7
202:13,14
204:23 265:24
266:11,14,20

**positions**
213:6 239:17
263:21,24,25
264:2,3,7,10,
11,19,25
265:17

**post**
71:6 134:7,8
254:25

**post-tenure**
125:5 132:6,
18,19 133:1,6
134:21 135:12

**posted**
82:2

**postsecondary**
265:2

**potential**
38:4 66:16

**potentially**
33:9 47:12
54:11 160:14
245:9

**pottery**
41:23 42:1

**power**
150:21 151:1

**practice**
57:16,18,20,
22 248:3,23

**practiced**
144:20

**practices**
152:16,21

**practitioners**
248:22

**prayer**
40:22 249:18

pre
  253:24
pre-tenure
  254:22 255:9
preceded
  68:24
predetermination
  268:6
predominantly
  212:22
prefer
  86:25
preference
  188:14
preferences
  188:14
preparation
  43:25 144:24
prepare
  14:11 18:13
  98:22 105:3
  229:22 230:1
  233:1,3
prepared
  18:18 23:17
  43:20,24
  101:17
preparing
  251:10
presence
  9:12 211:11
present
  9:6 69:8,10
  87:9 120:15
  214:12 218:5
  230:1
presentation

63:13 68:23
69:1,2,6,12
presentations
  134:3
presented
  228:12,13,14,
  17,19,21
presents
  69:4
preserved
  50:3 51:2,7
president
  8:2 76:1,4
  77:6 89:15
  93:11,13,15,
  17,19 103:1,
  18,19 115:18,
  19 116:17
  152:6 155:17
  156:6,13
  162:4,16,18,
  19 163:1,3,8,
  14,16,18,21
  164:8,10
  168:14 172:3
  179:12 181:19
  194:2,15
  195:1,8,14
  207:3,16
  208:8,12,16
  216:19 221:4
  222:5,7
  225:23 246:19
  268:15
president's
  162:22
pressured
  167:24
pretext
  170:11

prevent
  14:12
previous
  7:20
previously
  6:13,20 7:21
  9:4 65:12
  114:5 140:12,
  14 147:2
  148:11 178:25
  196:25 197:2
  204:6 217:3
primary
  247:7 248:7
  249:3 256:1
print
  114:20 133:21
prior
  13:5 35:18
  64:10 69:22
  79:3 82:19
  107:21 112:13
  125:20 142:12
  147:6 156:3
  165:15 176:23
  177:1 185:24,
  25 186:6
  191:17 197:3
priority
  188:6
privacy
  32:20 33:3,7,
  23 34:9,14
  37:24 38:2
  47:4,10 59:9
  198:11
private
  35:17 265:7
privilege
  225:18

privileges
  145:12,20
pro
  5:17 15:15,24
  16:13 30:14
pro-
  128:11
problem
  8:22 9:21
  12:16 177:6
procedural
  16:12
procedure
  43:18 129:19
proceed
  10:15 11:22
proceeding
  5:17 15:15
  16:13 64:18
proceedings
  5:1
process
  6:7 12:1
  54:13 63:2,6,
  16,18 67:11
  70:15 78:20
  79:4,18,19
  80:2,3 82:10
  88:6,24
  89:21,25
  90:15,18,21
  99:10 102:17,
  18,23,25
  103:5 105:4,5
  107:9,12,16,
  19,22,25
  109:1,14,15,
  21 110:6,11
  111:2,3,7
  112:11

113:21,23
114:4 115:5,
22,24 116:7,
11 118:14
125:22 127:5,
10,16,18
128:15
130:17,18
131:24 133:3
136:7,9,10,25
138:16,19
139:11,14
144:11 146:23
147:1,4
150:4,8,9,13,
16 151:1,5,7
152:4,22
153:3 154:16
155:2 156:11,
12,14,16,18
157:1,4,5,24
158:16,22,24
159:11
161:12,16
162:21 163:6,
11,20 164:1,
2,7,15,17
165:15
167:11,16,25
168:16 169:1
170:4 171:6
180:1 182:17
183:2,13,15,
16 184:23,25
185:2,3,7,8,
11 190:25
191:2,17
192:7 193:21
194:17,18
199:24 202:11
203:22 204:3,
20 214:23

215:3 217:3,
5,13 218:3,
12,24 219:1,
18,22 220:1,
8,24 221:4,18
236:15,19
238:12 253:6,
7,8 254:8,14
256:19,25
259:3,6 261:4
268:24

**processed**
170:22

**processes**
218:7,21

**processing**
101:22

**product**
16:16

**professional**
249:20 251:24
252:3 254:19

**professionals**
247:3

**professor**
29:10,12,23
31:1 47:6
57:10,11
62:12 71:22
72:6 73:1,6,
22 74:7,22
75:3,7 76:11,
16 77:14,20,
23 78:4,9,23
79:3,14
80:20,21,23,
25 81:3
84:12,13,19
85:21 92:2,
18,19 93:6

95:9 102:5,7
104:9 105:2
112:7,12
114:1,5,14
119:1 120:1,
2,13 121:7,
14,23,24
122:5,7,18,20
126:9,20
127:13 128:1,
4,9,12,15,20,
22 129:3,20
131:22,25
132:4,16
133:7 134:8
137:2,3,13
139:6 140:9
141:11,17
143:3,7,20
144:10
146:17,24
151:7,14
152:9,23,25
153:8,10,12
155:3 164:20
165:13 167:3
187:2,7,8,10,
11,12,13,14,
16,18,20,23
188:4,14,15
190:7,16,21
192:18 195:20
196:2,10,23
197:4 206:7
207:16
209:16,17,18
214:2 217:6
220:18
221:16,17,23,
24,25 222:3,
7,12 225:11,
14,15 226:4,

6,25 227:11,
12 259:7
266:4,7

**professor's**
133:19

**professors**
26:21 27:9
102:9 119:10,
24 153:14,18
170:16
186:20,21,23
188:6 196:7
239:19

**Programs**
237:23

**progress**
135:9 177:11

**prohibited**
145:15

**promo-**
226:22

**promote**
140:1 141:11,
17 143:3,6,
15,16,19
145:18,24
159:1 201:21
202:7 238:17
239:10

**promoted**
74:25 75:6
77:14 78:4
80:20,22 81:3
140:4,8
146:16
151:10,11,13,
14 152:10
186:3

**promotion**
26:19 74:6,22

75:3 76:10,16
77:1 78:5,19,
22 79:2,11,19
80:5,24 81:22
82:1,8,12
85:4,5,9
88:22 89:2,7,
10,11,12
90:1,12,13
91:3,11,13,15
92:3,4,7
95:7,9 96:22
97:4 98:8,22,
24 99:1,4
100:8,11,13,
18,24 101:6,
10,15 102:8
103:5 104:18
105:1 107:25
108:4,12
110:7 112:7,
12,14 113:12
114:1,5,8,10,
12,14,18,23,
25 115:13,19
116:12,18,25
117:1,8,13
118:7 119:1,2
120:2,13
121:7,13,14,
24 122:6,19
125:14 126:8,
19 127:13
128:1,4,9,11,
20,22,23
129:20 130:8,
16 131:22
132:16,21
134:9 140:11,
25 141:3
144:10 145:6
146:24 147:11

150:12 152:9,
24 153:7,9,
13,25 154:12,
15,21 156:10,
12,24 160:6,
9,17 163:5,23
164:10 165:14
167:3 168:4
169:9 170:4,8
171:6,8
173:7,10
179:3,6,11
180:7 181:10
182:7,10
185:5,13,20,
22,23 186:5,
14,15,20
187:8,15,20
190:7,9,15
195:6,9
200:2,4
203:10 204:1,
22 217:5
220:2,5,19,22
221:2 226:24
236:18 237:25
238:8,11
242:25 253:8

**promotions**
139:23

**proper**
33:23

**protect**
34:12,14 38:1
47:9 59:9

**protected**
200:6,9
217:19 235:12
236:2,4,6,10,
13 237:3,9,11
238:5

**protested**
212:21 268:3

**provide**
15:4,8 17:7,
15 21:25 34:8
35:8,15,20
38:4 39:5
77:9 81:11
86:5 144:16
181:5 184:19
220:6

**provided**
34:10 39:12
40:13 70:1
77:16 127:8
128:17 184:21
242:17 245:13
266:2

**providence**
152:6

**providing**
36:4 183:10

**provost**
70:10 71:5
76:3 89:13,14
92:11,13,15,
17,20,24
93:6,9 95:13
103:1,3,19
115:16,17
116:16,17
151:8 152:7
155:17 162:25
168:14 172:2
179:12 181:7
182:25 184:2,
5 193:4,20,23
194:4,7,9,13,
16,19,20,22,
23 195:2
221:4 246:20

267:24 268:8,
14

**psychiatrist**
249:15,20

**psychologist**
249:14,19

**public**
33:9 35:5,6,
11,25 47:14

**publication**
101:13
126:13,15,16
131:15,18,21
133:18

**publications**
87:13,14
100:15,19
101:1 108:24
125:3,6,9
127:19
128:19,21
132:2,6,8,10,
15,16,18,20,
22 133:6,17,
21,22 134:7,8
191:13

**publish**
87:8

**published**
108:5 126:15
133:16

**pull**
175:21

**pulling**
178:5

**pulls**
264:20

**pup**
256:11

**purport**
120:20

**purports**
47:20 82:4
120:10 198:15

**purpose**
68:3 82:7
265:20

**purposes**
5:14 6:11
16:8 17:3,8,
17 23:22 24:2
25:22 32:20
33:14 34:6
38:10 43:13
75:18 77:5
103:14 127:2
130:16 131:15
180:22

**pursuant**
133:3 179:2

**pursue**
62:9

**push**
248:21

**pushing**
168:24

**put**
6:17,23,25
7:3 29:17
31:13 47:14
48:8 99:10
117:17,24
149:18 196:9
199:4 200:11
222:4 224:14
243:24

**putting**
116:10 146:7
176:15

---

**Q**

---

**qualifications**
78:21

**qualified**
101:6 111:22
133:9 264:5

**qualifies**
156:20

**qualify**
83:1 105:14,
23 131:18
156:17 167:1
192:1 264:21,
25 265:2

**qualifying**
115:24

**quality**
256:11

**quantify**
245:2

**question**
9:1 12:3,23
14:25 15:1,3
23:15 26:2
28:21 29:5,7
30:7,9,16,19,
20,21 31:3,4,
8,9,18,19,21
33:15 36:3
39:6 41:14
42:13 47:21
48:10 52:2
53:10,23 55:8
65:18 66:12
74:23 75:5
78:3 91:17
92:23,25 93:2
97:8,9,10,21,

24 98:2,13
99:15,18,20
110:1,3,19
117:18 123:4,
7,16,21,23
124:1,6,18,24
125:12,23,24
131:10,13
132:9,12,21
134:11,14,15,
18 138:1
139:19,24
140:15,22
141:19 142:1,
6,7,13
151:16,24
153:23 157:10
163:24 164:4,
6 166:20
170:19 171:12
172:24 173:1,
4 176:20
179:7 180:5,
8,10 181:11,
12 182:22
186:4 188:10,
11 189:15,17
190:20,23
193:16
207:15,24
221:22 222:24
226:11,13
227:8 242:3,6
243:9 252:16
253:16 262:4
263:9 266:22
267:4 269:3

**question-and-
answer**
12:2

**questioning**

207:6 259:9

**questions**
12:19 13:3
15:12 29:3
38:25 47:3,
12,13 64:4
65:3 68:7
137:16
138:16,19
158:12 177:12
243:20 253:19
259:6 266:1

**quick**
74:11,14
211:24 240:3,
6 263:1

---

**R**

---

**race**
20:12,22,23
23:12 139:21
143:2,18,21,
24 144:2,5,7,
12,18 145:14
148:25 168:23
169:4 197:18,
20 198:24,25
199:4 200:11,
12,13 201:11
202:3,10
204:18 205:22
206:9,17
207:5,10,17,
21 208:5
209:5,6
211:6,7,10,15
212:7 214:17
216:11 222:22
226:3 227:18

**racial**

Maritza Reyes
May 24, 2024

42

207:9

**racially**
215:5

**racism**
167:17

**racist**
150:6 165:17
211:9 214:19
246:11

**raise**
5:20 78:5
79:10,11,20
186:18 200:3,
14

**raised**
8:23

**raises**
79:7,9

**raising**
225:7 228:5

**Ramos**
53:13,20

**Rampone**
5:9

**rank**
76:10 78:12,
17 120:2
121:24 122:6,
20 190:7
202:5

**reaccreditation**
153:3

**reach**
136:22 179:6
180:8 181:11
265:8

**reached**
136:17,18
169:25 170:2

180:10
181:10,14,18
265:6

**reaching**
138:15,24

**read**
30:7,15,18
92:25 93:2
99:18,20
110:1,3 123:4
124:1,21,22,
23 142:5,7,
11,13,23
158:13 166:20
172:24 173:1
181:21 188:9,
11 189:15,17
241:4

**reading**
22:1 124:24

**ready**
131:4

**real**
211:23 263:1

**reallege**
142:16

**reapplied**
190:17

**reapply**
190:15,21

**reason**
33:21 96:20
100:7,12,14
138:4 179:9
180:14 182:9
202:24,25
203:1,6 251:2

**reasoning**
138:13 179:7

**reasons**
146:4 223:10

**Reaves**
120:7,17
149:23 167:7,
24

**recall**
13:12 14:1,17
19:10 40:20,
23,25 44:2
46:7 47:5
50:2,10 54:2,
8,21 58:13
59:19,20 60:7
64:11 68:16
69:8,10,14
70:6 71:10
74:9,22 75:9
77:2 78:10
90:9 92:15
95:21,22
96:1,3,10
103:25 109:11
112:9 131:19
135:4 172:4
173:6,9
180:15 181:25
190:12 194:6,
10 195:7
197:6,9,10
210:25 217:6
218:20 219:6
224:1

**recalled**
94:9 95:23,25
96:6

**recalling**
94:20

**receive**
16:19 56:14
70:4 79:2

88:11 111:20
162:6 163:23
172:6,14
176:20 180:12
190:3 195:16,
22 203:20
220:9

**received**
67:7 70:8
74:4 77:13
78:23 82:5
106:14 108:2
131:1,23
139:23 172:25
179:10 181:3,
6,20 186:15,
17,18,22
193:24 194:21
195:18,20
202:2 203:11
207:20
219:17,23

**receiving**
58:16 71:11
95:21 96:1,2,
3 102:19,24
103:25 172:5
173:6,9
179:5,20
180:5,7 182:6

**recent**
45:11

**recently**
94:15 102:6
238:23

**recognize**
240:19

**recollection**
15:2,6,10
20:6 30:16

Maritza Reyes
May 24, 2024

45:7,12,20
46:12 48:20
49:24 76:15
79:10 86:12
87:5 91:19
92:5,6,9
94:22,23
106:3 109:2
111:16,18
145:5 147:16
198:14,15
208:6 220:16
222:16

**recommend**
26:24 27:12
28:11 90:1,
11,14 91:15
92:8,13 93:19
94:10,14,19,
24 95:15
96:18 97:11
98:11,17 99:6
102:15
121:10,13
148:10 160:25
161:20
162:17,19
171:8 192:22
193:2 226:17

**recommendation**
81:11 89:8,
10,13,15,16,
18 90:4,16
91:10 92:10
93:10,14
98:9,16
115:1,2,16,18
116:6,13,14,
16,17 117:6
118:25 136:20
150:14 151:17

153:24 154:12
157:9 159:5,
24 160:21
161:2,5,9,15
162:2,23,24,
25 169:23
192:14,16,19
193:8,10,11,
13,22 194:20,
23 220:17

**recommendations**
89:20 116:21,
24 159:3
163:15,20

**recommended**
83:2,3 91:7
93:7,15 95:18
102:12 130:20
157:7 161:24
165:1,3
191:25 192:17
193:3,9,17,19
194:4,7,9,13
195:6

**recommending**
100:4 226:9

**record**
5:2,12 6:17,
23 7:1,8,11
8:1 10:13,16,
17,19,20 11:8
12:22 13:19
15:14,19
16:13 33:10
34:6,17 35:5,
7,12,19,25
36:10 38:14,
18,20,21
47:14 48:9
67:1 74:15,
16,17,21

98:20,21
106:24 120:10
128:3,5 129:6
134:6 166:14,
15,17,18
174:2,4,6,7,
10,11,13,14,
16,25 175:11,
12,13,14,19,
21,24 176:1,5
177:8,22
178:1,14,18,
19,21 236:20
240:5,8,10,11
250:10,11
263:3,5,6
267:10

**recording**
6:12,14,15
12:14 113:15

**records**
35:24 214:24
215:13 245:12

**recrui-**
67:9

**recruited**
63:24 67:10
72:21 139:2

**recruitment**
63:6,10,25
67:11,16
196:19

**redaction**
35:16

**reevaluate**
125:19

**refer**
16:9 19:6
21:19 24:11,
12,13 89:1

125:5,7
165:8,20
210:2 222:22

**reference**
19:10 23:12
27:20 126:4
131:4 184:9
202:7 205:3
209:14,16

**referenced**
201:24

**referencing**
28:23 225:20

**referred**
21:17 26:10
27:21 65:12
165:10 205:16

**referring**
23:7 28:19
29:4 130:15
147:25
148:10,19
165:9,10
199:7 202:15
212:8 219:21
225:13

**refers**
210:3

**reflect**
119:8,9 190:6

**reflected**
77:3

**reflection**
13:1

**refrain**
30:12

**refresh**
15:5 20:6
45:11 75:1

Maritza Reyes
May 24, 2024

44

76:15 94:22

**refreshed**
94:23

**refreshes**
75:19

**refusal**
145:9

**refuse**
33:21 35:8
161:4

**refusing**
34:7 36:2

**regular**
41:2 42:15,
17,20,21

**regulation**
184:9,12,13,
14,15

**Reiner**
5:13 6:5 7:2,
12,14 8:15,
19,24 9:10,18
10:9,12,22
11:6,10,12,
21,24 12:15,
17 17:1,14
38:23 39:4
43:8,11 71:1,
2 74:10,19
75:15 77:12
81:15 83:16
92:25 93:8
94:3 99:18,24
103:11 110:1,
5 118:19
123:4,9,15,
18,23 124:7
142:5,11,20
166:7,11,13
168:8 171:22

172:24 173:3
174:2 175:16,
18,20 176:3,
6,8,13,17
177:9,17,20,
24 178:1,17,
22,24 180:19
188:9,18
189:13 190:2
198:1 237:16,
18 240:5,15
250:7,13
262:5,24
263:8 269:5,
10

**reinstated**
266:20 268:17

**reinstatement**
265:19,23
266:2,3,10
267:9

**reject**
161:1

**relate**
120:20,24
121:6 245:4

**related**
6:16 18:13
35:16 41:13
48:18 64:25
76:16 81:11
84:20 87:10,
11 121:2
132:5,15,17
134:20
136:10,15
145:25 149:11
153:22 180:13
205:2,13
206:12 243:1,
23 247:3

**relation**
120:1 125:9,
14 126:2

**relationship**
251:20

**relay**
54:1

**relevant**
33:4

**relied**
131:23

**Relief**
18:2

**rely**
134:24 135:9
231:11 249:17

**relying**
125:20

**remain**
176:1 186:5,
8,10 266:7

**remained**
58:22 64:8
129:23

**remains**
66:23

**remarks**
115:24

**remember**
13:3 15:3
39:21 46:14
53:21 60:15
61:14,17
70:19 72:1
75:2 91:24
111:8 173:15,
20 181:14,15
182:4 183:1
196:9,17

199:24 215:11
219:5,10
228:23 231:13
248:15 249:1
253:18 255:14
265:9

**remind**
30:13 31:7

**remote**
7:6 8:12

**remotely**
6:20 7:5,9

**rep**
8:3 9:3,9

**repeat**
12:5 123:21,
23

**repeatedly**
175:2

**rephrase**
12:5 29:6
31:9 85:9
124:17

**report**
73:5 118:25
119:25
120:22,25
121:1,12
123:20
124:16,20
125:5 132:1
151:3 159:18,
22 160:3
167:25

**reporter**
5:9 30:15
93:3 99:21
110:4 124:2
142:8,14
166:21 173:2

174:15 188:12
189:18

**reports**
101:4,17

**represent**
175:7

**representation**
145:1 172:17

**representative**
6:19 7:5,10
8:20 9:13,23
10:2,25 11:17
184:17

**represented**
130:7,12
144:25

**representing**
5:13 8:11

**reputation**
246:15

**request**
18:1 127:25
183:16
196:13,18
204:22 228:18

**requested**
174:19 196:18
228:9,18,19

**requesting**
177:2

**requests**
40:22 146:8

**required**
25:3 78:13
86:2,4 121:24
122:19 129:1
190:24

**requirement**
85:3 100:20

124:12

**requirements**
85:22 87:19,
24,25 88:2
122:9,13,24

**requiring**
35:24

**requisite**
82:14

**research**
23:17,21
84:7,23
86:16,22
87:7,8,11,19
121:17 145:5
232:11,23
233:3 244:6

**researched**
24:25 37:23

**reserve**
6:13,16

**reside**
36:15 38:7

**resided**
39:16,23 64:5
65:15 76:8

**residence**
35:3

**resides**
36:20,22

**residing**
39:19

**resign**
60:19,22

**respect**
10:23 23:13
28:13 37:14
71:25 85:3,
10,11,19 88:7

89:22 112:1
115:22 116:18
121:19 122:9,
10,12,14,24
124:9,17
127:9 128:15
130:22 132:3,
4 141:10
145:11,19
150:12 155:2
156:10,12,15
157:24 159:5
163:5 170:25
185:5 187:22
198:24 202:14
204:17 206:15
207:3 208:3,7
209:3 211:23,
25 212:4
216:2 217:4
220:4 221:18,
23 222:23
226:8,16
234:13 235:8
242:5,15
244:8 251:1

**respond**
12:18 28:21
30:9 31:18
33:21 36:2
251:11

**responded**
38:25

**responding**
31:18 177:12

**response**
13:5 24:4
30:4 31:25
53:24 149:7
157:21 247:10
269:12

**responses**
240:21

**responsibility**
25:23 262:13

**responsible**
15:16

**rest**
59:14

**restate**
145:21

**result**
14:8 96:23
102:23 103:1
202:9 204:5
236:10 242:7

**resulted**
102:18 120:22

**resume**
188:3 231:12

**retain**
236:16

**retaliated**
167:12

**retaliation**
29:21 30:1
45:4 199:13
201:5,8
235:8,17
236:5 238:5,
18,22 239:2
242:2

**retaliatory**
27:18 236:11
238:14,15,25
239:6,12,25

**retention**
26:19 80:5
88:22 89:7,25
90:12,13 91:3

Maritza Reyes
May 24, 2024

46

92:3 96:22
97:4 98:21,24
99:4 100:8,
10,18,24
101:10,15
104:18 110:7
114:23,25
116:12,25
117:1,8,13
119:2 121:12
153:12
154:15,21
156:24 170:8
185:21 186:20
220:2,19
236:18 237:25
238:8

**retired**
61:6

**return**
60:22 171:18
265:21 267:7

**returned**
60:25 184:2

**returning**
171:17 227:7

**reverse**
185:9

**review**
27:3 45:5,11
62:13 80:9,10
81:9,10,18
83:17 90:20,
24 97:3
102:10,14,18
105:13
106:13,16,17,
19 107:2
108:20 116:13
117:9,21,25

127:19,20,24,
25 144:13
147:10 151:8
152:5 154:8
156:3 164:19
191:23 219:22
231:2,5

**reviewed**
82:12 92:21
93:18 95:8
105:17 117:4
118:12 131:21
134:1 153:18
158:20 159:10
191:24 192:2
221:1,2
226:23 268:5

**reviewer**
128:2

**reviewers**
100:16 101:9,
11 154:8
159:12,13

**reviewing**
25:19 80:13
102:8 108:23
122:23 231:1

**reviews**
82:19 90:23
106:23
115:17,19
117:14,15
150:24 159:15
166:14

**Reyes**
5:4,5,16,20,
25 6:2,6,25
7:3,13 8:5,
22,25 9:15,20
10:10 11:4,7,

11,15 18:3
42:13 66:15
119:1 120:2
121:23 122:5,
18 160:25
177:9

**Reyes'**
120:13

**Rhonda**
120:7 149:23
167:7,24

**Rica**
46:9,10

**risk**
175:25 223:6
246:14

**road**
13:3

**Rob**
167:7,20

**Robert**
120:4

**Robertson**
55:4

**Robin-**
222:5

**Robinson**
76:3,24
168:15,18
170:2 172:2,
21 179:13
181:19 189:24
194:2 207:4,
8,17 208:8,
12,16 222:5
225:23 246:20
268:15

**role**
15:20 105:7,9

260:9

**Roman**
84:4

**Ron**
167:8 169:10

**Ronald**
120:6 211:9
214:18 246:10

**room**
233:10,12

**round**
183:9

**RPT**
26:12,13,15,
18,22 107:8,
15 111:4
119:10,23
135:12,14,19
147:9 148:1
158:19 159:2,
4,10 160:8,
11,25 161:4,
25 162:21
163:2,6,13,17
164:7,11
168:12 171:3,
15 191:21
192:1,9,10,12
193:10,13
230:18 246:3

**RTP**
26:11,12
119:21 246:3

**rule**
10:8 43:2,5,
17 49:7,15
50:22 51:20
252:10

**rules**
6:8 35:15

run
  184:5 234:9

running
  41:9,22,25
  183:11

_____

**S**

_____

s-l-i-g-h-t
  141:23

sabbatical
  226:10,19,20

sabotage
  258:3

sabotaged
  184:25

safeguard
  36:1,8

salaries
  79:5

salary
  78:24 186:8
  195:18

Sarah
  5:13

scan
  262:22

scenario
  161:3

scenes
  115:6 136:19
  137:14 138:18
  144:14
  160:12,15
  205:5,8,11,13
  225:6 245:10,
  16 246:4,6,8

schedule
  81:23 82:2,8,

13 89:2
107:25 108:4,
8,12 114:8,10
228:25 229:3,
8,10,14
232:19,20,21

scheduling
  7:17

scholar
  101:13

scholarly
  100:15,19
  101:1,13
  135:15,17

scholarship
  69:5 80:9,10
  83:10 84:7,24
  86:23 87:7,8,
  10,11,15,20
  90:23 108:25
  109:3,6
  117:4,14,15
  121:18
  122:12,14,17,
  19,22,25
  124:12,16,17,
  19,22 125:2
  126:3 128:6
  129:6 132:23,
  25 133:9
  134:2 135:19
  258:4

scholarships
  135:1

school
  54:5 55:21,22
  56:6,10,15,22
  57:3,9,12
  62:4,7,12,18
  63:17,19

68:23 89:8,9
102:8 106:2,
5,8 129:16
130:9,12
131:3 148:20
149:7 152:14
153:2 172:13,
14 173:5
188:6 190:1
196:11,22
197:14 204:16
213:23 214:3
218:6 225:1,3
227:10
229:17,18
232:2,3 245:8
258:15,20,24
259:10,11
263:11 264:17
265:19,22

school's
  103:4

schools
  56:8 57:4
  63:5,8,11,13,
  15 67:16 69:3
  258:19 259:20
  264:13 265:3

science
  56:12

scope
  51:21

search
  152:18
  263:16,20

secret
  137:23

secretary
  230:7

section
  84:10 122:21
  125:8 133:9

security
  46:1 79:22
  246:13

seek
  38:13 74:6
  87:23 117:14
  184:11 234:15
  265:19

seeking
  152:14 215:1
  265:23 266:1

segregation
  210:4,9

seldom
  49:3

select
  63:8 154:7

self-study
  129:14

semester
  232:18

senate
  222:8

send
  47:25 48:5
  116:3 128:7
  269:10

sending
  137:16 183:25

Senior
  55:22

sentence
  142:11 181:21

separate
  77:7,9

September
  157:17

serve
  10:2,24  18:25

serves
  27:10

service
  54:18  55:13
  83:10  84:7,24
  86:10,13,18
  87:20  109:6
  122:2,4,5,10

services
  5:10  86:6

session
  12:3

set
  6:14  48:18
  50:1  99:10
  100:9,17
  101:5,9,24
  109:21  122:5
  123:1  129:5
  136:5  150:23
  151:2,5
  154:6,13
  159:21  165:14
  169:7  170:9
  171:2  200:20

sets
  117:2  158:19

setup
  96:21

severe
  224:11

severely
  223:16

sex
  20:17  21:20,

22  23:12
149:12,15,19
169:4  197:20
199:7  200:11,
12,13  204:12,
18  205:1,2,14
206:3,23
207:11
208:10,14
212:5,7
215:17,18,21,
22  216:7,13
222:23

sex-race
  20:17  21:21
  23:13  204:12,
  19  206:11,13
  207:1  208:18,
  25  216:3
  222:23

shaking
  12:20

share
  210:6  262:13

shared
  46:22

sharing
  187:1

sheets
  119:5

Shelly
  209:19  214:2

Sheray
  55:3

ships
  225:21

Shiv
  221:14

shocked

174:23

shoot
  269:11,12

short
  26:18

show
  16:11  70:20
  75:16  81:16
  83:11  93:24
  94:4,6  103:12
  118:20  136:24
  171:23  180:20
  188:19  198:2

showed
  114:4

shown
  75:22

sic
  21:6  148:9

sick
  61:12,18
  137:15

side
  31:2  116:9

sides
  225:20

sign
  137:9

signature
  71:14  119:9,
  19,23  241:10

signatures
  120:3,4

signed
  76:23,24,25
  77:18  95:6
  103:18  137:8
  172:1  181:7
  189:24  198:8

241:8,16

similar
  22:20  42:3,4
  49:12  79:19
  107:2,12,14,
  19,23  226:3

simple
  29:6  42:13

simply
  30:6

Singerman
  60:11,12,16,
  19

single
  140:2  229:7

sit
  14:10,13
  44:21  125:16
  200:19  223:23
  234:10  241:12
  268:16

site
  231:2

sitting
  175:22

situation
  14:6  28:21
  29:20,24
  164:16  227:18
  247:22  265:12

situations
  146:5  165:24
  234:1,6,18
  247:15  256:18

six-page
  119:4

skin
  21:16,18

Maritza Reyes
May 24, 2024

49

**slave**
225:21

**sleeplessness**
244:11 245:4
247:1,10
257:19

**slight**
141:7,22,23,
24

**small**
64:14 233:14,
16 234:11,22

**Smith**
120:7,17,18
147:20 149:5,
24 167:6

**social**
49:10 249:15

**socialize**
233:5,7

**solely**
11:2 100:17

**somebody's**
46:7

**someone's**
106:14 145:14

**son**
37:20,25
38:4,6 39:10
65:11,15,25
261:12,14,18
262:6,9

**son's**
37:22 39:6

**sons**
65:21 66:18,
19 250:3,16
261:10,11
262:18

**sophisticated**
170:15 206:8

**sort**
141:7,23,24
236:11

**sought**
126:8 259:11

**South**
253:10,23
255:3 256:19
259:23
260:15,16,20,
25 261:9
263:19 264:9,
10

**Southeastern**
56:5,17 62:7

**Southern**
59:3,13,22
60:18,23
61:1,10 62:1,
20

**span**
54:4

**Spanish-
speaking**
22:9,23

**speak**
12:12 25:23
48:25 52:19
53:2,6,12
87:12 106:9
128:25 136:13
148:21 233:19
250:2

**speaking**
31:24 53:11
250:14

**speaks**

19:7

**special**
77:1 222:3
232:23

**specialty**
232:25

**specific**
26:2,3,6
28:2,3,5,19,
21 32:6 35:15
39:12 46:17,
19,23 50:18
51:18 53:10
55:9,17 60:3
67:21,24
72:2,5,9
79:25 80:1
86:17 100:12
115:25 123:15
132:13 141:9
145:9 148:18
149:10,11
153:23 161:3
168:25 169:23
183:12 202:1
203:12,25
204:4,6,19
205:1 212:10
219:21
224:13,16
228:23 230:23
238:21 242:4
247:8 248:3
256:2

**specifically**
14:3 19:16
20:8 27:2
40:23 54:3
57:4,8 85:13
87:1 124:9
131:19 149:2,

14 150:13
151:25 165:21
170:5,24
194:3 201:13
202:9 206:4,5
211:20 212:25
215:9,11
218:21,24
219:21 220:5
224:25
247:11,12,19
255:19 263:19
264:8

**specifics**
247:17

**speculate**
44:18,22
155:16

**speculation**
44:17 135:18

**spell**
11:11 46:15
252:8

**spelling**
11:13

**spend**
251:7

**spent**
254:16

**spoke**
54:7 258:24

**spoken**
37:4,7,9,10,
12 39:24
40:2,7,18,24
41:4,12 43:1
46:24 52:6,
10,12 54:17,
20,23,24,25
55:1,2,3,4,5,

6,8,9,12,15
65:24 66:19
121:16 258:20

**sport**
155:21

**St**
258:15,16,23
259:10,23
263:11 266:12

**staff**
227:20

**stages**
117:22

**stand**
185:4

**standard**
84:11 85:10,
14 121:23
122:5,18
123:2 124:4,5
125:13 128:16
129:5 134:5,
6,8 136:6
144:9 150:22
170:10 175:4

**standards**
83:8,9,21,24
84:2,6,11,14,
15 126:5
130:7,10,14,
24,25 159:16

**standing**
167:15 188:1

**stands**
199:20

**start**
6:8 53:1
71:24 107:8
119:18

140:16,21
166:22 182:5
189:3 232:16

**started**
11:25 39:19
57:23 58:2,3
64:19 73:3
74:21 78:16,
18 107:20
232:9 254:4
258:6 268:25

**starting**
62:12 74:18
166:19 240:12

**state**
8:1 9:16,18
11:8 15:15
16:12 20:8,23
31:17 32:18,
21,22 35:7,22
72:8 174:9
207:18 264:25
265:2,4,8

**stated**
6:20 9:4
18:19 20:9,19
26:5 27:2
36:3 94:24
124:4 126:4
130:10 147:1
157:16,17
175:3 201:3
203:7 218:19
223:10 235:20
242:10 268:7

**statement**
198:11

**statements**
174:12 266:24

**states**

18:5 19:15
22:7,12,22,25
57:5 59:3,12,
22 60:6,17
71:21 72:10
121:21 122:3,
16 195:11,12,
15

**statistics**
227:20 228:13

**status**
187:9

**stay**
175:12,19
178:20 260:24

**stayed**
36:25 39:20
254:5

**stays**
36:23,24
260:22

**STENOGRAPHER**
5:20 240:3
269:8

**step**
10:16 184:17
262:25 268:17

**steps**
116:20 164:15

**stick**
85:6,17 171:4

**sticker's**
94:5

**stipulate**
7:5

**stipulations**
6:9

**stop**
31:11 128:24

138:13 156:3
218:11 233:8,
19

**stopped**
254:18

**straight**
91:16 197:7

**stress**
14:8 249:24
255:25 256:4,
6 257:14

**stressful**
256:13,14,15

**strike**
30:4 31:25
44:4 47:19
77:25 78:2
92:22 97:5
98:7 99:14
107:18 121:11
123:3,12
124:8,18
134:11 135:13
139:18 150:11
157:21 158:2
179:4 180:3
186:3 189:13
190:18 207:13
221:21

**striking**
93:4

**student**
229:22

**students**
46:4,5 49:4,7
50:16,22
51:16,20,25
52:3,7 86:4,
15,19,20
185:17

213:16,17,19,
24 214:6,7
225:4,5,7,9,
10 226:3,25
227:6,11,21,
23 228:3,20
230:5 232:22,
23 268:3,13

**studies**
56:13

**subcommittee**
109:3,4 112:5

**subcommittees**
109:9 112:1

**subjected**
24:18 34:1
199:3 245:7

**subjecting**
223:16

**submission**
33:19 35:16
82:17 115:25

**submissions**
88:8 134:19

**submit**
63:7 88:10
89:8,9,13,14,
16 108:15
113:5,7,10,
11,15,19
114:11,17
115:9,10
133:4,5 147:3
161:5,9
183:18,19,22,
23,24 184:18,
19 190:24
191:1,6,9
220:22,25

**submits**
114:25 116:6

**submitted**
35:18 82:13
91:4 114:18,
20,21 126:7,
14,23 130:16
132:20 133:2,
6,9,13,25
134:20,23,24,
25 135:5,10
147:11,24
161:15 181:23
182:1 192:5,8
231:17 242:9
243:4,5

**submitting**
80:4 87:21
89:5 157:15

**subsequent**
79:1 89:22
117:22 179:5
181:5 185:12

**subsequently**
146:17 190:15

**substance**
39:3

**substantial**
44:6,9

**substitute**
7:25

**success**
232:12

**sudden**
140:5

**sued**
24:17

**suffered**
29:21

**suggest**
177:11

**suggesting**
174:21

**suing**
24:23

**Suite**
8:18

**summer**
58:3,5,7

**supervised**
86:16

**supervising**
232:22

**supervisor**
73:25

**supplement**
13:6

**support**
27:18 126:24
145:3 169:3
191:9,12

**supporting**
191:9

**supposed**
86:14 90:19,
21 114:22
115:4,8
117:17 125:13
128:9,18,21
130:11 134:1
144:9 183:14,
22,23 191:1
195:21 210:15
219:18,20
220:9,10

**supposedly**
172:15

**surgery**
61:19

**Suwana**
55:1

**swapping**
9:24,25

**swear**
5:22

**swimming**
64:14

**switched**
26:15

**switching**
214:14

**sworn**
5:21 6:4

**system**
102:6 112:16,
19,21,22,25
113:17,19
114:16
117:11,21,24
134:20,23,25
135:5

---

**T**

**taint**
152:4

**tainting**
246:15

**taints**
164:7

**Taite**
120:7,18
147:19 149:8,
24 167:6
217:23,25

**taking**

Maritza Reyes
May 24, 2024

13:11 16:15
17:6 31:1
101:21 144:3
145:13 157:25
174:20 178:15
260:3,12
262:14

**talk**
22:4 32:7
48:22,23,24
52:17 63:13
68:22 69:1,2,
6,12,16,19,
21,24 129:23
138:12 233:8,
14,16 234:11,
22 263:1

**talked**
23:4 64:5
83:7 88:23
90:22 100:1
107:24 141:10
150:9 198:21
201:20 205:8
221:13 235:5,
6 244:8
246:14 266:12

**talking**
16:10 29:2
40:21 42:11
84:16 90:25
91:1 127:14
129:17,18
203:23,25
209:14 216:3
230:8 234:2,
8,17 242:18
260:18

**talks**
87:10

**Tallahassee**
6:21 207:23
267:25 268:4,
14

**taped**
35:10

**targeted**
167:20 169:11

**targeting**
225:4 227:11

**taught**
106:5

**taxation**
57:7

**teach**
62:5,6 78:13
85:23 104:12
185:16 229:5,
23 232:20

**teaching**
57:5,6,16,19
62:10,17,25
63:1,3,21,22,
23,24 64:2
68:10 72:23
73:2 78:18
83:10 84:6,23
85:3,11,20,
22,25 86:3,6,
9,13,14,16,18
87:19 109:5
117:16
121:17,20,22,
24 122:9
197:1 214:3,5
228:25 229:3,
8 232:21
263:20,21,24,
25 264:2,5,
11,15 265:17

**technical**
86:8

**technically**
113:6

**technology**
113:8 116:10

**tellers**
120:18

**telling**
31:11 77:13
148:20 157:3
171:1 172:21
174:14 193:24
194:6 212:20
245:11

**tells**
160:13

**ten**
219:10 260:7

**tenet**
108:25

**tenets**
84:23 100:20
121:17

**tenure**
21:6,7 26:19,
25 27:12
28:12 79:4,
15,17,20,23,
24 80:5,13,
15,17,19,21
81:2,11,22
82:1,7,8,11,
22,24 83:5,8
85:7,10,13
87:17 88:1,4,
7,13,20,21,
22,23,25
89:2,7,11,12,
14,17 90:1,2,

5,12,13,25
91:1,2,3,8,
11,13,15
92:3,4,7,8,
14,21 93:7,
10,20,22
94:14,16,19
95:7,8,15,19
96:19,22
97:4,11 98:8,
11,22,24
99:1,6 100:4,
8,11,13,18,21
101:6,10,15
102:8,13,15,
19,24 103:2,5
104:3,12,16,
18,25 105:8,
19 106:1,6,9,
14,24 107:1,
4,12,13,20,25
108:4,8,12,16
110:8,11
111:1,3,20,23
112:1,14
113:11 114:4,
8,10,12,15,
24,25 115:12
116:12,25
117:2,8,13
118:6 119:3
121:13
125:10,15,19
126:3,22,23
127:3,5,9,16,
18 128:15
130:8 132:5,
17 134:7
136:7,9,25
137:3,5,22
138:16
139:10,12,13,

Maritza Reyes
May 24, 2024
53

14,15 140:10
141:1,2
144:11 148:10
150:3,8,9,12
151:6,13
152:4,9,11
153:13,19,25
154:12,15
155:9 156:14,
15,18,22,24
157:5,7,14,24
159:19 160:2,
6,9,17,25
161:11,16,25
162:6,10,15
164:17,25
165:1,15
167:11,16,22,
25 170:8
185:19,20,22
186:21 187:7,
15,17 202:13,
14 217:5,12
218:3,7,14,
15,16 219:9,
14 220:2,4,8,
19,22 221:1,
18 222:4,12,
13 226:5,7,9,
18,21 236:15,
18,19 237:5,
25 238:8
253:6,11,13,
25 254:6,8,9,
13,25 256:19,
25 266:11

**tenure-earning**
71:22

**tenure-track**
72:6 87:23
152:23 221:25

**tenured**
26:20 81:2,3,
5,7,8 104:9
106:21 150:1,
2 187:13,16
213:6 220:18
226:6 229:2
230:18 259:7
265:23 266:3,
7,14

**tenured-faculty**
266:20

**term**
22:6,21,24
23:22 27:5
135:16 209:20
210:2

**termed**
90:9 169:4
223:18 238:20

**terminated**
94:15 242:20
259:8

**termination**
94:12,13
143:12
202:15,17,19
203:10,13
204:22 239:9
243:1 263:13
265:13

**terms**
12:18 20:10,
14,16 21:17
23:18 26:5
28:2,22 29:2
35:5,18 44:4,
10 45:7,12
47:12 55:20
64:3 65:4

70:7 72:5
73:13 85:7,22
86:9 101:21
105:7 107:8,
25 110:13
111:10,14
113:17 116:7
118:1 124:15
125:2 126:2
127:25
128:16,18
131:8,14
134:5 137:4
144:23 145:9,
11,20 149:18
150:16,23
151:5 157:7
158:24 165:6,
25 169:5,9
175:9 179:10
186:13 187:25
188:13 192:3
200:3,9
207:18 209:7
213:3 215:3,
23 216:6,9
220:9,25
223:19 224:6
228:2 229:8
235:22
239:14,18
242:6,20,23
244:18,21
248:23 250:25
251:5 255:18,
23 258:2
259:20 262:14
263:12 265:3
266:15

**terrible**
241:18

**testified**
6:4

**testify**
13:9

**testifying**
12:9 32:10,12

**testimony**
5:22 99:3,25
217:6

**text**
47:25 48:1,2,
5 49:1,3,4,6,
14,18,25
50:3,15,21
51:2,7

**texted**
51:12

**Thankfully**
102:4

**Thanksgiving**
257:2,5

**that'll**
242:13

**theft**
34:2 36:8
47:4

**thing**
12:25 66:15
151:6 255:22

**things**
9:5 14:1
26:10 28:9
62:10 64:3
73:17 82:14
86:2,23 113:5
133:4 143:13
159:8 160:12
188:5 198:11
201:20 202:1

Maritza Reyes
May 24, 2024

54

203:18 204:1,
4,11 205:1,14
211:17,20
219:18 222:18
223:19 226:3
233:11
244:12,13
245:5,7,10,
17,22,23
247:20 249:22
251:25 252:15
253:20 254:17
256:5 257:19
260:11 266:12

**thinking**
87:18 156:7

**thinks**
165:5

**third-class**
224:20,23

**Thomas**
258:15,16,23
259:10,23
263:11 266:12

**thought**
94:25 137:7
226:18 228:6
233:23
244:17,19

**throwing**
184:20

**tied**
98:19 146:2
204:13 235:21

**time**
5:3 8:4 9:3
10:5,17,21
12:3,15 14:16
29:5,20 31:5
34:7 36:17

38:19,22
51:21,23
57:17 58:19
59:23 64:7
65:16 67:23,
25 69:9 71:7,
8 72:3,5
74:18 76:6
79:6 82:2
85:22 90:10
91:6 92:15,16
93:17 103:22
109:16,19
112:15 114:20
119:13 123:10
126:1,14
127:1 128:3,
12 129:19
131:3 134:21
136:17 141:5,
6 152:14
153:1,5,11
155:13,15
157:17 158:1
166:15,19
168:20 172:10
174:5,7
175:24 176:24
179:21 183:11
184:6 189:21
191:3,16
192:11 195:3,
16 196:23
199:22 201:4
208:3 210:4
211:2 212:14
214:4 218:5,6
219:11 220:24
222:11 223:2
226:10 229:1,
7 231:21,22
232:17,20

233:13 237:1
240:9,12
242:21 243:3,
6 245:8
247:20 248:20
249:3 250:11
251:7,16
253:9 254:13,
16 256:10
258:4 261:23
262:2 263:3,
7,13 267:12
269:1

**timely**
82:15 177:13

**times**
9:7 70:13
140:4,8
230:12,25
231:20 246:19
251:5

**timing**
116:23 153:4

**tired**
13:8 14:22,23
243:11

**title**
20:11,15,17
46:9 144:19,
22 145:7

**titled**
17:25 43:17
81:22 84:2
118:25

**today**
6:5,10,18
10:3 12:9
13:13 14:10,
13 15:8,20
16:8,20 17:8

31:22 33:22
35:10 44:22
61:21 99:3,25
125:16 133:21
197:15 200:19
223:24 224:3
241:12 268:16
269:9

**told**
21:13 31:3,6
44:13 51:14
94:21 129:12
136:19 154:5
156:19 157:11
158:8,15
177:3 182:25
184:3 200:1,
10 208:9,13,
17,21 209:4
210:23 211:5,
20 212:1,5
213:3 245:20
254:2 256:4
266:13 268:2

**top**
102:1,3
122:16 164:13

**topic**
69:5

**topics**
87:11

**track**
21:7 218:16
222:4,12,13

**traditional**
62:11,16 63:3
152:22

**transcript**
22:1 175:25
269:9

**transfer**
  106:4,9,25

**transferred**
  105:25

**transferring**
  266:15

**transition**
  57:18 60:13
  62:4

**travel**
  252:12,13,17,
  20,22,25
  253:2,10,22
  254:15,23
  256:19,22

**traveled**
  256:24

**traveling**
  254:18 255:5

**travelled**
  252:12

**treated**
  14:4 21:3
  99:9 170:21
  201:11 209:7
  217:10,18
  218:22 221:10
  228:5

**treating**
  175:5

**treatment**
  175:8 202:4,7
  203:22 204:2,
  20 224:8,20,
  23 228:17
  235:24 239:18
  266:24

**trial**
  18:1 32:13

**triggering**
  253:19

**trips**
  252:24

**true**
  18:17 43:22,
  25 74:3
  198:12 200:21
  241:6,14

**trustees**
  5:19 24:25
  46:1 49:15
  82:24 83:2
  89:16,17
  93:14,17,20
  104:6 115:21
  162:10,17,19,
  20

**truth**
  5:23,24 12:7
  247:13

**truthful**
  14:13,14
  25:16 31:13

**turn**
  67:5 76:20

**turning**
  71:13

**Turnoff**
  61:5,8 62:2

**type**
  19:25 35:23
  68:6 69:25
  144:25 164:16
  235:4,17
  246:18

**types**
  47:3,13 86:5
  87:14 175:13

**typical**
  229:20

---

**U**

**U.S.**
  22:7,10

**ultimate**
  155:6,19,20,
  21,23 156:2,
  9,11,15,19,
  21,23 157:1,
  11,12,20,23
  158:14,16,18,
  21,24 159:21
  163:18,21
  236:21,22

**ultimately**
  102:17,23
  162:4,8,9,12,
  13,15,18,20

**un-**
  213:8

**undergone**
  127:9

**undergraduate**
  264:19

**underlying**
  213:11

**understand**
  6:6 8:25 9:12
  12:3,6,23
  15:11,13,23
  16:17 22:2
  24:4 41:18
  42:6 97:21
  113:18 115:23
  133:3 134:14
  140:15,18
  142:4 150:10

  155:24 158:12
  161:19 164:3,
  5,14 176:11
  178:17 210:22

**understanding**
  80:2,3 82:23
  85:2 89:25
  135:11 145:2,
  13 155:16,18
  158:9 185:10
  196:21

**understood**
  15:1 16:3

**United**
  18:4 22:7,11,
  22,24 57:5
  59:3,12,22
  60:5,17

**universities**
  112:23

**university**
  5:6,14 6:22
  8:3,8,21 10:2
  16:6 18:4
  24:17,24
  55:24 56:5,6,
  11,16,17 62:7
  76:23 86:6
  89:10,11,12
  91:11,13
  92:4,7 94:9
  95:7 98:8
  99:1 100:1,3,
  13 101:6
  102:6 113:24
  115:12 116:3,
  5,15 118:1,6
  119:2 139:20
  140:20,23
  145:18,24
  146:12 160:8,

17 161:6,9,
19,23,24,25
162:1,24
193:5,6,12,
15,19 209:25
221:3 222:7
231:12
236:17,24
237:23 242:22
246:13,16
264:14 265:8
267:25 268:5,
14

**university's**
268:3

**unlawful**
199:3

**unmarried**
64:8

**update**
46:13

**upper**
254:9

---

**V**

---

**vacations**
252:25

**valid**
18:22

**versus**
21:16 23:1
42:8 54:7
86:10,18
135:19 188:14
239:20,22
252:17

**vice**
8:2 76:4
103:19 216:19

**vicious**
214:19 246:11

**video**
33:8,25 35:6
269:9

**video-recorded**
5:3

**view**
21:15 97:10,
14,18 98:6,8,
10 105:17
212:16

**VII**
20:11,15,17
144:19,22
145:7

**VIII**
84:2,10

**vile**
165:17 246:11

**violation**
20:11,15,17

**visit**
63:12 255:10
257:8

**visiting**
153:2 209:17,
18 222:11

**visitor**
214:3 222:3

**visits**
231:2

**vote**
111:19
120:12,24,25
137:4 167:13,
21 168:5,10
169:22
170:14,17

187:10,11,14,
17

**voted**
137:11,25
138:25 165:13
167:2 192:4
226:23

**votes**
137:8,10,22

**voting**
187:9,21

---

**W**

---

**wages**
204:1

**wait**
8:24 58:2
64:12 74:10

**walked**
114:4

**walking**
29:11

**Wallace**
6:21 7:10,15,
16 8:9 9:8
10:4 11:1,19
183:5

**Wanamaker**
54:24

**wanted**
6:23 21:10
25:15 45:6
74:11,13
101:5 112:17
129:15 148:22
150:2 169:2
174:18 175:1
178:11 183:22
214:2

**warranted**
259:7

**Washington**
63:9 67:17
68:2,4

**waste**
175:24

**ways**
70:12 182:20

**wearing**
12:13

**week**
41:10 201:17
229:7,19
230:15 231:4,
18 232:21

**weekend**
254:24

**weekly**
42:22

**white**
22:17 148:19,
23 149:3
167:20 210:10
212:22 215:8,
10 225:17,18
267:18,19

**white-appearing**
215:8,10
216:17

**Wilkie**
59:14,16

**William**
61:5,7 62:2
120:6 147:19

**win**
265:18

**window**
186:18 195:24

201:14,25
202:6 203:9
204:21 239:17

**Winter**
34:22 39:15,
16,19,22,25
40:2 76:6

**witnessed**
44:11,15
46:5,23 52:24
54:7,10

**witnesses**
53:8 66:16
227:3

**woman**
21:23,24
34:18 149:21,
25 205:3,14
209:8 212:24
214:2 215:19,
25 216:7,9,10
217:16

**women**
149:21,22
150:2,3,5
167:17 169:8,
11 205:6
211:8 215:24
246:10

**Wonderful**
177:17,20

**word**
85:9,14
155:18 162:12

**wording**
85:14

**words**
23:25 78:20
116:2

**work**
16:15 23:9,
13,16,18,25
24:7,18 31:14
46:5 48:1
58:17 59:5,8,
10,12,16,21,
24 60:4 79:1
83:3 88:21
114:3,6
115:5,8 135:9
146:1,3 183:3
185:16 197:20
199:21 200:5,
17 201:7
207:22,23
213:23 220:13
222:20,23,25
223:3,8,13,24
224:7,18
226:12,15
227:8,14
229:24 230:21
231:1,25
233:3,6
234:2,7
235:1,5
238:15,19,21
239:10,14
242:1 247:12,
15,21 253:12
257:16
259:16,17,25
263:12

**worked**
25:20 54:5
63:19 65:16
115:5 169:5,
18 229:15

**worker**
249:15

**working**
64:19 88:2
229:18 232:16
246:17 251:12
259:22

**workplace**
167:9 168:7
223:11,18
244:25 251:14

**works**
115:10 116:9
125:22 206:10
223:11

**worse**
255:15

**wrap**
177:13

**write**
142:2 159:17,
22

**writing**
135:15,17
158:11 225:25
232:11 267:14

**written**
88:7

**wrong**
25:3 27:23
61:15 77:21
136:5 150:22
170:10 257:7,
9 261:15

**wrongfully**
246:10

**wrote**
101:15 128:12
144:3 167:25

**Y**

**year**
32:17,18,21
33:1,20 34:12
50:11 61:15
62:6,18 68:16
72:3,4,11,12,
15 75:11
76:18 104:21,
22 105:10
107:10 108:5,
8 111:1,4,6,
10 112:13,16
169:21
196:11,17
222:14 230:20
231:13
232:18,19
237:11

**year-long**
63:16

**years**
37:21 39:20,
22 49:20
50:13 54:4,5
61:9 64:15,18
68:14 78:1
79:1,7 88:1
148:13 169:25
170:1 196:8
201:15 219:10
223:16,17
229:18 232:8
242:25 255:15
256:9 260:7

**Yolanda**
105:21 106:1
107:12 108:11
111:7,10,19

Maritza Reyes
May 24, 2024

217:8,9
221:12,13

---

**Z**

---

**Zolty**
5:18 11:5,9,
13 43:7
189:1,7,10
237:17



# Florida Agricultural and Mechanical University

### TALLAHASSEE, FLORIDA 32307-3200

*Excellence With Caring*

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

OFFICE OF THE PROVOST AND
VICE PRESIDENT FOR ACADEMIC AFFAIRS

March 30, 2009

Professor Maritza I. Reyes
Post Office Box 630742
Miami, Florida 33163-0742

Dear Professor Reyes:

I am pleased to offer you a nine-month, full-time tenure earning position as Assistant Professor in the College of Law. The annual salary of $95,000.00 will be paid on a bi-weekly rate of $4,702.97. The appointment period is for the academic or fiscal year, which will begin on August 10, 2009 and end on May 18, 2010.

This offer is contingent upon results of a background check and approval of the documents listed below. Please provide the following documents immediately, if you have not already done so:

- Application for employment;
- I-9 form, with verification documents;
- Copy of current driver's license;
- Copy of Social Security card;
- Three letters of recommendation; and
- Official transcript of highest degree from a post-secondary institution.

You will hold an academic appointment within the College of Law. You will report to Dean LeRoy Pernell, who will provide your assignment of responsibility and evaluate your work performance annually. Performance evaluations are based on teaching effectiveness, evidence of research and creative activity, public service, University service, and other assigned University duties.

Reappointment, advancement in rank and the granting of tenure in the academic unit are dependent upon demonstrated excellence in teaching, research and meritorious service. University and college/school criteria for tenure emphasize possession of appropriate academic competencies, scholarly and creative achievements, and contributions to the University and community. For your information, I have enclosed a copy of the tenure guidelines. You should be eligible to be considered for tenure during the 2014-2015 academic year. Therefore, you will be required to apply for tenure no later than the beginning of that academic year.

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

Exhibit
4
Reyes
5/24/24
LSC

Offer letter to: Professor Maritza I. Reyes
March 30, 2009
Page 2

Please provide formal acceptance of this offer by signing the letter and returning it to my office by April 10, 2009. My facsimile number is (850) 561-2551.

We look forward to welcoming you to Florida A&M University. If further information is desired or clarification of any issues stated herein is needed, please contact Dean LeRoy Pernell at 407-254-3200.

Sincerely,

*Cynthia Hughes Harris*

Cynthia Hughes Harris, Ph.D.
Provost and Vice President for Academic Affairs

Enclosures

Cc: LeRoy Pernell, Dean

---

I, __Maritza Reyes__, the above referenced offer of employment (Accept / Decline)

with the terms and conditions described herein.

Signed: _____  Dated: _4/7/09_



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

JAMES H. AMMONS, Ph.D., PRESIDENT

Excellence With Caring

OFFICE OF THE PRESIDENT

TELEPHONE: (850) 599-3225
FAX: (850) 561-2152
TDD: (850) 561-2784

June 18, 2012

Ms. Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793

Dear Ms. Reyes:

I am happy to inform you that your application for promotion to the rank of **Associate Professor** is approved. The effective date of your promotion is August 6, 2012. I congratulate you for this milestone accomplishment with the hope that you continue to render to the University the kind of excellent service you have given in the past.

Sincerely,

James H. Ammons

James H. Ammons
President

cc: Dr. Larry Robinson, Provost and Vice President
Mr. Leroy Pernell, Dean

Exhibit
5
Reyes
5/24/24
LSC

## 2014/2015 Tenure and Promotion Schedule

| ACTION | DEADLINE |
|---|---|
| Applicant submits 25 copies of the "Application for Tenure and Promotion" and one (1) portfolio | September 12, 2014 |
| College/School committees submit recommendations to Deans | October 10, 2014 |
| Deans submit recommendations, applications and portfolios to University Promotion and Tenure Committee | November 14, 2014 |
| University Tenure and Promotion Committee holds organizational meeting and starts review of applications | December 2014 |
| University Committee submits tenure recommendations to Provost | February 6 , 2015 |
| Provost submits tenure recommendations to President | March 13, 2015 |
| University Committee submits promotion recommendations to Provost | March 20, 2015 |
| President notifies tenure applicants of recommendations to BOT | April/May 2015 |
| Provost submits promotion recommendations to President | April/May 2015 |
| Progress toward tenure appraisals should be completed for tenure-earning faculty | April 17, 2015 |
| BOT considers tenure recommendations | May/June 2015 |
| President notifies promotion applicants of decision | May/June 2015 |
| President notifies tenure applicants of BOT action (Tenure effective upon BOT approval) | May/June 2015 |
| Effective date of promotions | August 2015 |

*Note: If applying for promotion and tenure, only submit 25 applications and one (1) portfolio. The applicant will designate on the form whether they are applying for tenure and/or promotion.*

Exhibit
7
Reyes
5/24/24
LSC

## VIII.   STANDARDS FOR FACULTY

**A.  Professor.**  The rank of professor is to be accorded to persons who have achieved excellence in teaching, scholarship and research, and service.  Scholarship sufficient to evidence such excellence should include substantial publication, such as publication of articles of high quality in recognized professional journals, or the substantial equivalent, as in publishing books.  The rank should normally be reserved for persons with at least seven years of full-time teaching experience.

**B.  Associate Professor.**  The rank of Associate Professor is to be accorded to persons who have substantially demonstrated high quality in teaching, scholarship and research, and service. Scholarship sufficient to evidence such excellence should include publication, such as articles of high quality in recognized professional journals or the substantial equivalent.  The rank should normally be reserved for persons having at least three years of full time teaching experience.

**C.  Assistant Professor.**   The rank of Assistant Professor is the entry level rank for members of the faculty of the College of Law.  It is to be accorded to persons holding the LL.B. or J.D. degree with an excellent academic record and offering evidence of potential for accomplishment and promise of achievement in teaching, scholarship and research, and service.

Exhibit
8
Reyes
5/24/24
LSC

**D. Distinguished Professor.** *The rank of Distinguished Professor of Law is to be accorded persons of substantial and acknowledged accomplishments and excellence such as Judges, Legislators, Practitioners, Scholars, Diplomats, Government Officers of legal callings, and former full professors of law at Florida A & M or full professors at other A.B.A. accredited law schools, who teach on a full-time basis. This rank is not one subject to consideration for promotion or tenure*

**E. Contract Professor:** *Comprised of Clinical and Legal Writing Faculty*

**F. Adjunct Faculty:**

*1. Adjunct Professor of Law. The rank of Adjunct Professor of Law is to be accorded persons of substantial and acknowledged accomplishments and excellence such as Judges, Legislators, Practitioners, Scholars, Diplomats, Government Officers of legal callings, and former full professors of law at Florida A & M or full professors at other A.B.A. accredited law schools, who are invited to teach on a part-time basis as adjunct faculty. This rank is not one subject to consideration for promotion or tenure.*

*2. Adjunct faculty may not teach required courses, with the exception of assisting with the Legal Writing Program, unless an extreme emergency exists as determined by the Dean.*

*3. Adjunct professors may not supervise the senior writing requirement.*

*4. Supervision of adjunct faculty is the responsibility of the Dean. The Dean may assign supervision to the Associate Dean of Academic Affairs, or where appropriate to a faculty committee.*

## IX. STANDARDS OF TEACHING, SCHOLARSHIP & RESEARCH, AND SERVICE

**Teaching.** *Appraisal of teaching performance shall be based upon classroom visitations by other faculty members, a review of the course syllabi, and teaching materials prepared by the candidate. Effective teaching includes classroom instruction and a broad range of faculty-student relationships including ready availability to students in the faculty member's office both after class and in advising and encouraging co-curricular and extra-curricular student activities. Furthermore, the faculty member should demonstrate the following traits: command of the subject matter, familiarity with advances and developments in the areas taught, ability to organize materials and present them with force and logic capturing the students' attention, ability to arouse curiosity in the students towards further and more independent learning, ability to stimulate students in creative work, ability to prepare a sound and effective examination or other analysis of student comprehension, sound judgment in grading, and maintaining a high standard of achievement and fairness.*

**Research & Scholarship.** *Appraisal of accomplishment in research and scholarship shall be based on a close reading of published articles or works and obtaining the professional opinions and independent review of recognized authorities in the field of the published articles or works. A commitment must be demonstrated to original research and legal scholarship and a demonstrated*

ability to produce and publish scholarly work of high quality. The ability to critically analyze, synthesize, and expound sophisticated factual and legal subjects shall be shown. Participation on panels, in conferences, lectureships, preparation of statutes and codes, book reviews and other evidence of scholastic commitment and recognized ability shall be considered and weighed as such works may merit.

*Service.* Each faculty member is expected to render substantial service, apart from teaching (as herein defined) to the Law School, University, profession, community and/or state, without remuneration. Service may encompass any manner of contribution of one's professional knowledge and skills to the improvement of the School of Law, the University, the law, government, the administration of justice, or the legal profession. Among the kinds of service that may be considered are the following:

- a) advising student organizations;
- b) serving on special law school committees (in addition to the general service on standing committees upon which all faculty members are expected to serve as a part of general governance);
- c) serving on University committees;
- d) serving on committees or projects of the Bar and other professional groups;
- e) participating in continuing legal education programs; and
- f) assisting governmental units and public officials.

The College of Law faculty consists of the following groups: tenured faculty members; tenure-track faculty members; contract faculty members; distinguished professors. Tenure-track faculty members are considered for retention, promotion, and tenure according to the applicable rules set forth below. Contract and clinical faculty members are considered for retention according the applicable rules set forth below.



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3200

*Excellence With Caring*

April 28, 2015

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

OFFICE OF THE PROVOST AND
VICE PRESIDENT FOR ACADEMIC AFFAIRS

Ms. Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793

**RE: NOTIFICATION OF THE FLORIDA A&M UNIVERSITY TENURE AND PROMOTION COMMITTEE RECOMMENDATION**

Dear Ms. Reyes:

The University-Wide Tenure and Promotion Committee has reviewed your application for (x) Tenure and/or ( ) Promotion. You were ( ) recommended ( x ) not recommended ( x ) for Tenure and/or ( ) Promotion.

*The reason for disapproval is inadequate evidence of scholarly publications as indicated by the internal and external reviewers.*

The Committee's decision has been forwarded to the Provost and Vice President for Academic Affairs.

If you have any questions, please contact me by email (michael.abazinge@famu.edu) or by telephone at (850-599-3550).

Sincerely,

Michael Abazinge, Ph.D.
Chair, University-Wide Tenure and Promotion Committee

Copy:  Marcella David, Provost and Vice President for Academic
Dr. Leroy Pernell, Dean, College of Law

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

Exhibit
9
Reyes
5/24/24
LSC



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

ELMIRA MANGUM, Ph.D., PRESIDENT

TELEPHONE (850) 599-3225
FAX: (850) 561-2152
TDD: (850) 561-2784

OFFICE OF THE PRESIDENT

June 15, 2015

Ms. Maritza Reyes
P. O. Box 5102
Winter Park, FL  32793

Dear Ms. Reyes:

This letter comes to inform you that your nomination for tenure was approved by the Florida A&M University Board of Trustees at its June 10, 2015 meeting.  It is a pleasure to congratulate you on this significant accomplishment and I wish you continued success in your future endeavors.

Sincerely,

Elmira Mangum, Ph.D.
President

Copy:   Marcella David, Provost and Vice President for Academic Affairs
        Leroy Pernell, Dean

Exhibit
**10**
Reyes
5/24/24
LSC

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY



# REPORT AND RECOMMENDATION
# ON PROMOTION OF
# ASSOCIATE PROFESSOR MARITZA REYES

## FLORIDA A&M UNIVERSITY COLLEGE OF LAW
## RETENTION, PROMOTION AND TENURE COMMITTEE
## November 5, 2018

Interim Dean Leroy Pernell established a Florida A&M College of Law Retention, Promotion, and Tenure Committee (CoL RPT Committee) for 2018-19. Consistent with the provisions of the College of Law Faculty Handbook, for considering promotion candidates seeking the rank of full professor, Interim Dean Pernell appointed all of the College of Law tenured full professors to serve on that committee. The Chair of the committee is Professor Robert Abrams. The committee produced this report in relation to its deliberations in relation to Associate Professor Reyes' candidacy for promotion to the rank of Professor.

## <u>Summary of Findings</u>

For reasons set forth below the Retention, Promotion and Tenure Committee, Florida A&M College of Law, recommends that Florida A&M University decline to grant Associate Professor Reyes' application for promotion to the rank of Professor.

## <u>Applicable Policies and Procedures</u>

The criteria for review, that is, guidelines and rules appear in Section VIII and Section X (B) (4) (2) (B) of the Florida A & M College of Law Faculty Handbook. It outlines the procedure for review, tenure, and promotion applications filed by associate professors. The CoL RPT Committee must read timely applications, scholarly articles, books, monographs, and review teaching materials, student evaluations, community service declarations, outside letters of commendation, and other evidence for excellence pertinent to the application for promotion.

Associate Professor Reyes' application was timely filed using the University's Interfolio system and all documents submitted by her in support of her application are available there. In addition, in the Committee uploaded materials there are materials used by the CoL RPT Committee in addition to the materials submitted by the candidate. These include classroom observations conducted by CoL RPT Committee members during the Fall 2018 semester and this report. There are no internal or external reviews of scholarship. As detailed in the Scholarship section of this report, the CoL RPT Committee concluded that all of the writings that qualify as major scholarly works requiring both internal and external review had been reviewed in support of previous advancements for promotion to Associate Professor and for the grant of tenure. In similar fashion, the sections of this report on Teaching and Service focus on Reyes' teaching and service since the grant of tenure.

Exhibit
11
Reyes
5/24/24
LSC

1

## <u>Criteria and Evaluation Standard for Promotion to the Rank of Professor</u>

An associate professor is expected to meet the University standards for promotion to full professor. The directive appears in the Initial Contract, Retention, Promotion, and Tenure standard in the College of Law Faculty Handbook, Sections VIII and X.

### *STANDARDS FOR FACULTY:*

1. ***Professor:*** *The rank of Professor is to be accorded to persons who have achieved excellence in teaching, scholarship and research, and service. Scholarship sufficient to evidence such excellence should include substantial publication, such as publication of articles of high quality in recognized professional journals, or the substantial equivalent, as in publishing books. The rank should normally be reserved for persons with at least seven years of full-time teaching experience. ...*

4. ***Teaching:*** *Appraisal of teaching performance shall be based upon classroom visitations by other faculty members, a review of the course syllabi, and teaching materials prepared by the candidate. Effective teaching includes classroom instruction and a broad range of faculty-student relationships including ready availability to students in the faculty member's office both after class and in advising and encouraging co-curricular and extra-curricular student activities. Furthermore, the faculty member should demonstrate the following traits: command of the subject matter, familiarity with advances and developments in the areas taught, ability to organize materials and present them with force and logic capturing the students' attention, ability to arouse curiosity in the students towards further and more independent learning, ability to stimulate students in creative work, ability to prepare a sound and effective examination or other analysis of student comprehension, a sound judgment in grading, and maintaining a high standard of achievement and fairness.*

5. ***Research & Scholarship:*** *Appraisal of accomplishment in research and scholarship shall be based on a close reading of published articles or works and obtaining the professional opinions and independent review of recognized authorities in the field of published articles or works. A commitment must be demonstrated to original research and legal scholarship and a demonstrated ability to produce and publish scholarly work of high quality. The ability to critically analyze, synthesize, and expound sophisticated factual and legal subjects shall be shown. Participation on panels, in conferences, lectureships, preparation of statutes and codes, book review and other evidence of scholastic commitment and recognized ability shall be considered and weighed as such works may merit.*

6. ***Service:*** *Each faculty member is expected to render substantial service, apart from teaching (as herein defined) to the Law School, University, profession, community and/or state, without remuneration. Service may encompass any manner of contribution of one's professional knowledge and skills to the improvement of the School of Law, the University, the law, government, the administration of justice, or the legal profession. Among the kinds of service that may be considered are the following:*

   a) *advising student organizations;*
   b) *serving on special law school committees (in addition to the general service on standing committees upon which all faculty*

2

*members are expected to serve as a part of general
governance);*

    c) *serving on University committees;*
    d) *serving on committees or projects of the Bar and other professional groups;*
    e) *participating in continuing legal education programs; and*
    f) *assisting governmental units and public officials.*

## Background

Associate Professor Reyes began teaching at the College of Law in Fall 2009 and held the rank of Assistant Professor until 2012 when her promotion to Associate Professor became effective. She achieved tenure in 2014.

## Scholarship

In her period of service at the College of Law, Professor Reyes has had five works published in law reviews and other lesser publications that are listed on her C.V.

### Post-Tenure Publications

In the period since tenure, Associate Professor Reyes has had two items published in law reviews and has produced three blog posts in the immigration field (citations available on her CV). The law review publications (reproductions are included in her scholarship materials on Interfolio) are:

- Maritza I. Reyes, *In Memory of Julie Chek*, 10 FLA. A&M UNIV. L. REV. ix (2015).

- Maritza I. Reyes, Angela Mae Kupenda, Angela Onwuachi-Willig, Stephanie M. Wildman & Adrien Katherine Wing, *Reflections on Presumed Incompetent: The Intersections of Race and Class for Women in Academia Symposium—The Plenary Pane*l, 29 BERKELEY J. GENDER L. & JUST. 195 (2014) (lead article).

### Publications Evaluated in Relation to the Award of Tenure in 2014

Law Review Publications Reviewed in Relation to Application for the Award of Tenure:

- Maritza I. Reyes, *Professional Women: Silenced by Men-Made Norms*, 47 AKRON L. REV. 896 (2015) (lead article). [The manuscript of this article that had been accepted for publication at the time of application for tenure was evaluated]

- Maritza I. Reyes, *Opening Borders: African Americans and Latinos Through the Lens of Immigration,* 17 HARV. LATINO L. REV. 1 (2014) (lead article).

These articles are reproduced in the publication section of Associate Professor Reyes' materials on Interfolio. The 2014 Report of the College of Law RPT Committee that includes evaluation of these publications is included in the Appendix to this Report.

### Publications Evaluated in Relation to the Promotion to Associate Professor in 2012

Law Review Publication Reviewed in Relation to Application for Promotion to Associate Professor:

3

- Maritza I. Reyes, *Constitutionalizing Immigration Law: The Vital Role of Judicial Discretion in the Removal of Lawful Permanent Residents*, 84 TEMPLE L. REV. 637 (2012).

This article is reproduced in the publication section of Associate Professor Reyes' materials on Interfolio. The 2012 Report of the College of Law RPT Committee that includes evaluation of this publication is included in the Appendix to this Report.

### Evaluation of Post-Tenure Law Review Publications

As the title of the first post-tenure item indicates, it is a memorial to a FAMU College of Law student who died suddenly and is not a scholarly work. The other publication is a panel discussion that Associate Professor Reyes organized, moderated, and edited. While the topic is scholarly, it is not appropriate to consider it as scholarship by the candidate even accepting her involvement in planning the event and editing the presentations. There are no new scholarly writings since tenure. Accordingly, the College of Law RPT Committee declined to send the two new writings out for external review.

The College of Law RPT Committee communicated its decision on that point to Associate Professor Reyes. She responded with a memorandum indicating why she felt the entire body of work should be sent out for review, including articles previously reviewed in relation to promotion to Associate Professor and tenure. The College of Law has not previously sought additional external reviews of scholarship that had previously been reviewed as part of the RPT process. The Committee considered Associate Professor Reyes' memorandum and reaffirmed its decision to decline to send out either the new writings or the previously reviewed writings. A separate Appendix includes a copy of the Committee memorandum declining to send the new materials for review and the response memorandum of Associate Professor Reyes.

As noted above, the narrative standard for research and scholarship requires that:

> A commitment must be demonstrated to original research and legal scholarship and a demonstrated ability to produce and publish scholarly work of high quality. The ability to critically analyze, synthesize, and expound sophisticated factual and legal subjects shall be shown.

The external reviews of those earlier writings were mixed, and the College of Law RPT Committee concluded at that time that the writings did not meet the standard. The two law review publications submitted post-tenure and the blog posts do not "critically analyze, synthesize, and expound sophisticated factual and legal subjects." As noted above, the first new work is a tribute to a deceased former student; the second is a transcript of a panel discussion. When coupled with a previous record that had produced only the minimum number of law review articles required for those advancements, coming forward with no post-tenure scholarly articles does not satisfy the standard, that shows a "demonstrated ability to produce and publish scholarly work of high quality."

### *Committee Conclusion on Scholarship*

4

*Overall, the committee concludes that Associate Professor Reyes does not meet the standard for excellence in scholarship required for promotion to the rank of Professor of Law.*

## Evaluation of Teaching

Prior to this Fall semester, Associate Professor Reyes has completed nine years of teaching at the College of Law, less a one-semester (Fall 2015) visit to the University of Florida Levin College of Law. In recent years, her most frequent course offerings at the College of Law have been Evidence, Civil Procedure, Immigration and a seminar in Asylum Law.

### Teaching Materials

The teaching materials, syllabi, handouts, and other materials used for instruction are carefully thought out and well-suited to the curricular goals set forth by Associate Professor Reyes for the respective classes. They also were similar in breadth and depth to materials used by other professors teaching the same subjects at the College of Law and at other law schools. Associate Professor Reyes sets a high bar for her students and classroom observations bear that out and confirm that she pushes students to be rigorous in their thinking and argumentation.

### Student Evaluations

The student evaluations of Associate Professor Reyes are set out in her candidate materials. A review of those from the period subsequent to tenure demonstrate a pattern of high-quality teaching. Past student evaluations were not uniformly favorable and had raised a concern about classroom atmosphere. The College of Law RPT Committee reviewed the post-tenure student evaluation forms, including the narrative comments, and found the students no longer express that concern and rate Associate Professor Reyes' teaching quite favorably.

### College of Law Classroom Observation Reports

The College of Law RPT Committee attempts to assign at least one member of the committee to visit each class taught by untenured colleagues and at least two members to visit a class of a tenured colleague who is seeking promotion. These peer evaluations of Associate Professor Reyes included observations during Fall 2018. The observation report forms are included in the Committee provided materials and reflect strong classroom performance.

#### *Committee Conclusion on Teaching*

*The committee concludes that Associate Professor Reyes meets the standard for excellence in teaching required for promotion to the rank of Professor of Law.*

## Evaluation of Service

The law school expects faculty members to contribute to the academic, professional, and non-professional communities of which they are a part. As set out in a summary fashion in the Service materials uploaded to Interfolio, Associate Professor Reyes is exceedingly active in all levels of service—especially in the College of Law and the community.

*Committee Conclusion on Service*

*The committee concludes that Associate Professor Reyes meets the standard for service set forth in the Faculty Handbook for promotion to the rank of Professor of Law.*

## Recommendation on Promotion and Tally

There are three standards for promotion, one each relating to scholarship, teaching, and service. Candidates must proffer evidence that they have met or exceeded each of them. The candidate has failed to receive a two-thirds majority of the members of the College of Law RPT Committee present and voting in favor of promotion. Accordingly, the College of Law RPT Committee recommends that Florida A&M deny Associate Professor Reyes promotion to the rank of Professor of Law.

The vote of the committee was as follows:

For Full Professor

| | |
|---|---|
| 0 | In favor |
| 8 | Opposed |
| 2 | Abstentions |

This report is submitted on November 7, 2018, by members of the College of Law Retention, Promotion, and Tenure committee. The signatures of the members of the committee indicating this is the report of the Committee are attached.

I certify the accuracy of this tally.

Professor Robert Abrams
Chair, College of Law Retention, Promotion and Tenure Committee

6

Attendance at the Meeting of November 5, 2018 at which the vote of Associate Professor Reyes' application for promotion was considered:

Present:

Abrams, Boothe-Perry, Broussard, Cavazos, Griffin, Henslee, Jones, Reaves, Smith, Taite

Tellers: Cavazos, Henslee

Signature of College of Law RPT Committee Professors of Law indicating that the attached report, dated November 7, 2018, is the one in relation to the candidacy of Associate Professor Maritza Reyes for promotion to the rank of Professor.

_____
Robert Abrams

_____
Nicola Boothe-Perry

_____
Patricia Broussard

_____
Ann Marie Cavazos

_____
Markita Cooper

_____
John Duncan

_____
Joseph Grant

_____
Ronald Griffin

_____
William Henslee

_____
Darryll Jones

_____
Lundy Langston

_____
Jeremy Levitt

_____
Rhonda Reaves

_____
Omar Saleem

_____
Jennifer Smith

_____
Phyllis Taite



# Florida Agricultural and Mechanical University
### TALLAHASSEE, FLORIDA 32307-3200

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

*Excellence With Caring*

OFFICE OF THE PROVOST AND
VICE PRESIDENT FOR ACADEMIC AFFAIRS

July 24, 2019

Ms. Maritza Reyes
201 Beggs Avenue
Orlando, FL 32801

Dear Ms. Reyes:

After careful consideration of your application and supporting documentation, I regret to inform you that your application for promotion has been denied.

I encourage you to continue your efforts and development in the areas of teaching, scholarship and service. We value your contributions to Florida A&M University and hope that you continue to render to the University the kind of excellent service you have given in the past.

Sincerely,

Maurice Edington, Ph.D.
Provost and Vice President for Academic Affairs

Copy:  Larry Robinson, President
       Nicky Boothe-Perry, Interim Dean

Exhibit
**12**
Reyes
5/24/24
LSC

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3200

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

OFFICE OF THE PROVOST AND
VICE PRESIDENT FOR ACADEMIC AFFAIRS

August 7, 2019

Professor Maritza Reyes
College of Law
Orlando, FL 32801

RE:  Promotion Denial Explanation

Dear Professor Reyes:

Thank you for your inquiry submitted to the Office of Academic Affairs on August 5, 2019. This letter comes as a follow up to your recent application for promotion in the College of Law at Florida A&M University.  Upon review of your promotion application and supportive documentation, it was determined that your request for promotion to full professor be denied based on failure to satisfy the criteria specific to scholarship.

According to the criteria, faculty may be awarded promotion by satisfying the following requirement:  "Promotion to full-professor. Accorded by 2/3rd vote of the faculty upon a showing that an individual has achieved excellence in teaching, scholarship, research and service." To date, since being tenured in 2015, you introduce three documents to satisfy this requirement—1) In Memory of Julie Chek (a memorial); 2) *Reflections on Presumed Incompetent:  The Intersections of Race and Class for Women in Academia Symposium* (a panel discussion); and 3) "Congress Did Not Give the President Unfettered Discretion to Exclude Immigration" (a blog post).  According to the standards outlined in the College of Law Faculty Handbook, Sections VIII and X, research and scholarship should evidence, "A commitment . . . to original research and legal scholarship and a demonstrated ability to produce and publish scholarly work of high quality."  The documents you provide lack the qualities outlined in the research and scholarship standards for faculty.

Pursuant to FAMU Regulation 10.206, you are afforded the right to grieve the promotion process.  Please contact the Office of Academic Affairs if you have additional questions.

Sincerely,

Maurice Edington, Ph.D.
Provost and Vice President for Academic Affairs

c:     Nicky Boothe-Perry, Interim Dean

Enclosures:  Referenced FAMU Regulation

Exhibit
13
Reyes
5/24/24
LSC



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

LARRY ROBINSON, Ph.D., PRESIDENT

TELEPHONE: (850) 599-3225
FAX: (850) 561-2152
TDD: (850) 561-2784

OFFICE OF THE PRESIDENT

July 21, 2021

Ms. Maritza Reyes
P.O. Box 5102
Winter Park, FL 32793

Dear Ms. Reyes:

I am happy to inform you that your application for promotion to the rank of **Professor** in the College of Law is approved.  The effective date of your promotion is August 9, 2021.

It is a pleasure to congratulate you for this milestone accomplishment, and hope that you continue to render excellent service and commitment to the University in years to come.

Sincerely,

Larry Robinson, Ph.D.
President

c:    Maurice Edington, Provost and Vice President for Academic Affairs
      Herbert Bailey, Asst. Vice-President for Fiscal Management
      Dr. Deidre' Keller, Dean

FAMU IS AN EQUAL OPPORTUNITY/EQUAL  ACCESS UNIVERSITY

Exhibit
**14**
Reyes
5/24/24
LSC

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 511-2020-03277 |

**FLORIDA COMMISSION ON HUMAN RELATIONS** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **MS. MARITZA REYES** | **(305) 308-8200** | ▮ |

| Street Address | City, State and ZIP Code |
|---|---|
| **P.O. BOX 5102, WINTER PARK, FL 32793** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **FLORIDA A&M UNIVERSITY** | **501+** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **201 BEGGS AVENUE, ORLANDO, FL 32801** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☒ RACE  ☒ COLOR  ☒ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **08-03-2009** | **05-13-2020** |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began employment with Florida A&M University (an HBCU), in the College of Law, in Orlando, Florida on 8/3/09. I am currently an Associate Professor of Law. I planned to apply for promotion to full professor as soon as I qualified under the University rule, which was in Fall 2017. However, I did not receive access to the Interfolio system. I applied a year later, on 9/21/18. College of Law RPT Committee members who voted on my application for promotion totaled 10 full professors: 6 Black women (N. Boothe-Perry, P. Broussard, A. Cavazos, R. Reaves, J. Smith, and P. Taite), 2 Black men (D. Jones & R. Griffin), and 2 White men (R. Abrams & B. Henslee). Previously, they were all involved in the discriminatory, harassing, and retaliatory tenure process during the 2014-2015 academic year. The RPT Committee carried the discrimination from the tenure process into the promotion process; they built on some of the same violations of the standards and process and turned my promotion review into a continuation of the same discriminatory review as my tenure process. Interim Dean L. Pernell, Provost M. Edington, President L. Robinson (Black men) & T&P Comm. followed the lead of the RPT Committee. I received notice of the denial of my promotion on 8/5/19. Therefore, I do not get a raise and other benefits. On my first days at work, Prof. R. Cato (a Black woman) told me, 'so you are the wise Latina diva they hired'; Prof. J. Levitt

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Maritza Reyes on 05-29-2020 09:43 AM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

Exhibit
15
Reyes
5/24/24
LSC

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 511-2020-03277 |

| FLORIDA COMMISSION ON HUMAN RELATIONS | and EEOC |
|---|---|

*State or local Agency, if any*

(a Black man) told me that he knew all about Latinos because he watched George Lopez; Broussard (a Black woman) kept referring to my Latina/o identity as the reason for my hiring. Nine months later, then Associate Dean D. Jones told me that the junior faculty (Black women) did not like me because I am 'high maintenance'. He also said I 'oink'. When I asked Langston (a Black woman) why the women were so hostile to me, she responded that I look white because of my light skin complexion and my hair. She said that in the South, Black people view me as White and told me she identifies with her Dominican hair dresser because they have the same hair texture and, as such, share a racial connection. This goes to the 'Black Latina' vs. 'White Latina' difference some Black faculty and staff make and their preference for national origin they perceive as related to Black ancestry. On 10/24/14, Langston submitted an EOP complaint against Griffin (a Black man) for defending me during my tenure process and, according to Langston, calling the 'African-American women committee members' 'malicious, evil, racist, and vile'. On 5/13/19, Levitt (a Black man) called me a 'White privileged' 'White Latin or Hispanic' and, on 10/23/19, he said I am a descendant of 'enslavers' of his people. On 4/8/20, Smith (a Black woman) called me a 'White Latina'. I have seen how Black professors who were hired after me, including visitors, are treated more favorably than I am treated, including Prof. Y. Jones (a Black woman) during her tenure process. The people who have subjected me to ongoing harassment, discrimination, hostility and retaliation are the majority of the professors who voted to deny me tenure and promotion and their allies. On 4/27/15, I submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to FAMU's Office of Equal Opportunity Programs. The EOP Charge was investigated by Director C. Gavin (a black woman). She did a sham investigation and dismissed my complaint. After that, members of the RPT Committee retaliated against me, including Broussard filing a false, frivolous Title IX stalking complaint against me, which was eventually dismissed. When I complained to then Dean F. Epps (a Black woman), she also retaliated against me by placing a Letter of Counseling in my personnel file without due process. Interim Dean Boothe-Perry and Interim Associate Dean Taite have been discriminating against me and harassing me, including with false allegations, accusing me of not doing my job during a 1/29/20 public faculty meeting, refusing to process the certification of two students I supervised, and falsely accusing me of not complying with the ABA distant learning standard during the switch to on-line teaching due to Covid-19. On 5/13/20, Taite falsely accused me of withholding grades and threatened to put a memo in my evaluation file. I complained to Provost Edington on 5/15/20; he has not responded. They also sabotaged the appeal process. Similarly situated non-Latino assoc. profs.have been granted promotions.

I believe I have been subjected to unlawful discrimination because of my race (Latina), sex (female), color (light-skin), national origin (Nicaraguan) and retaliated against for complaining of discrimination, all in violation of Title VII of the Civil Rights Act of 1964, as amended, the Federal Civil Rights Act of 1992, Florida Statutes, 760.01, et seq. (FCRA), and any other applicable laws.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Maritza Reyes on 05-29-2020 09:43 AM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**Privacy Act Statement:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   **Form Number/Title/Date.**  EEOC Form 5, Charge of Discrimination (11/09).

2.   **Authority.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   **Principal Purposes.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **Routine Uses.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **Whether Disclosure is Mandatory; Effect of Not Giving Information.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.